Robert C. Huntley, ISB # 894
815 Washington Street, P.O. Box 2188
Boise, ID 83701
Phone: (208) 388-1230
(Fax): (208) 388-0234
rhuntley@huntleylaw.com

Michael J. Flynn,  MA Bar # 172780 *
P.O. Box 690
Rancho Santa Fe, CA 92067
Tel. (858) 775-7624
Fax:  (858) 759 0711
mike@mjfesq.com

James C. Sabalos, Tex. Bar No. 17499100 *
3900 Essex Lane, Suite 730
Houston, Texas 77027
Tel:   (949) 355-6084
jimsabalos@hotmail.com

John Flood, Texas Bar No.07155910 *
802 N. Carancahua, Ste 900
Corpus Christi, TX 78470
Tel: (361) 654-8877
Fax: (361) 654-8879
John@floodandflood.com

Philip H. Stillman, CA #152861 *
508 Meadowmist Court, Ste B
Olivenhain, CA 92024
Tel. (888) 235-4279
Fax. (888) 235-4279
pstillman@stillmanassociates.com

Peter Chase Neumann, NV Bar # 636 *
136 Ridge Street
Reno, NV 89501
Tel: (775) 786-3750
Fax: (775) 786-8791
peterneumann@sbcglobal.net

Chris Flood Tex. BN 07155700*
914 Preston, Suite 800
Houston, Texas 77002
Tel: (713) 223-8877
Fax: (713) 223-8879
chris@floodandflood.com

*   *Application for Admission pro hac vice pending*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| L.J. GIBSON and BEAU BLIXSETH, individually and on behalf of PROPOSED PLAINTIFF CLASS Members of Tamarack Resort, Yellowstone Club, Lake Las Vegas and Ginn Sur Mer, | Case No. _____ |
| | COMPLAINT FOR: |
| Plaintiffs, | 1. Racketeer Influenced and Corrupt Organizations Act; |
| vs. | 2. Fraud |
| | 3. Negligent Misrepresentation; |
| | 4. Breach of Fiduciary Duty; |
| CREDIT SUISSE AG, a Swiss corporation; | 5. Tortious Interference with Contractual Relations; |
| CREDIT SUISSE SECURITIES (USA), LLC, a Delaware limited liability company, | 6. Conspiracy; |
| CREDIT SUISSE FIRST BOSTON, a Delaware | 7. Unjust Enrichment; |
| limited liability corporation; CREDIT SUISSE | 8. Negligence; |
| CAYMAN ISLAND BRANCH, an entity of | 9. Breach of Covenant of Good Faith and Fair Dealing; |
| unknown type; CUSHMAN & WAKEFIELD, INC., a Delaware corporation and DOES 1 through 100 inclusive, | 10. Exemplary Damages |
| Defendants. | **JURY TRIAL DEMANDED** |

## INTRODUCTION AND SUMMARY OF CASE

1.          This is a proposed Class action to redress the rights and losses of persons and entities who purchased real property and homes in resort land developments known as Lake Las Vegas, Tamarack, Ginn Sur Mer, and Yellowstone Club, which lie situate in Nevada, Idaho, Grand Bahamas, and Montana caused by a pattern of racketeering and money laundering by Credit Suisse AG, Credit Suisse Securities (USA), LLC, Credit Suisse First Boston and Credit Suisse, Cayman Islands Branch (hereinafter sometimes collectively referred to as "Credit Suisse" or "defendants") and assisted in the scheme by international real estate services firm, Cushman & Wakefield. By means of mail and wire fraud, and money laundering, the defendants violated and conspired to violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(a), (c) and (d) ("RICO"). In addition, the plaintiffs seek damages pursuant to applicable state law claims for breach of fiduciary duty, fraud, negligence, and breach of the covenant of good faith and fair dealing, among others.

2.          Given the clear cut RICO violations plead herein; and the compensatory, consequential and punitive damages recoverable under RICO; and the catastrophic damages caused not only to the plaintiff–class, but also to the state of Idaho and other states, by Credit Suisse, acting as an international banking predator, with utter contempt for U.S. laws, plaintiff-class seeks damages in the amount of $24 Billion Dollars. The recovery of said damages from the defendants herein will cause said Plaintiff–class, with the approval of the Court, to contribute up to $150 million dollars in a fund created by the plaintiff-class to each of the states that have been damaged by the defendants' RICO violations, including Idaho. Included in said fund will be amounts reserved for payment of all unsecured creditors who have not been paid in

connection with each Resort whose developers have assigned their claims against the defendants to the plaintiff–class. The impunity with which the defendants violated U.S. laws as plead herein is similar to their criminal violations in connection with which they recently plead guilty and paid hundreds of millions of dollars in penalties. The funds derived from each unlawful scheme fueled the greed of Credit Suisse; and reciprocally financed the respective schemes. Where there is a wrong, there is a remedy. In enacting RICO, Congress gave the plaintiff-class a remedy as plead herein, which should also serve as a deterrent to future unlawful schemes.

2.       In short, beginning in or about 2004, as the real estate market was on a steady rise, Credit Suisse AG created what at least one federal bankruptcy judge has called a "predatory" non-recourse loan scheme believed to have been funded in part by Credit Suisse AG's fraudulent scheme to assist Iranian agencies to circumvent international economic sanctions in return for millions in fees. Credit Suisse targeted and aggressively marketed its unlawful scheme to high-end real estate developments by means of mail and wire fraud, along with intentional, material misrepresentations. The cornerstone of this loan scheme, derisively referred to herein as the "Loan to Own" scheme, depended on artificially inflating the value of a resort project in violation of U.S law, by means of an appraisal methodology created by Credit Suisse in collusion with Cushman and Wakefield called "Total Net Value." Defendants' intended to violate U.S. law with this appraisal scheme; and intended to burden the resorts and the purchasers of property in these resorts with enormous debt; and thereby earn for Defendants enormous fees based directly on the amount of debt that Credit Suisse and its agents could impose on a resort project. The entire scheme was based upon their intentional and explicit misrepresentations and statutory violations directed at both the developers and the plaintiff -

class, with the expectation that Credit Suisse would foreclose on, or use the non-performing loan to obtain ownership of the Resort at a cost significantly below market value.   The U.S. Bankruptcy Court for the District of Montana stated in a May 19, 2009 Order in connection with the Yellowstone Mountain Club, Case No. 08-61570-11 that "Credit Suisse's actions in the case were so far overreaching and self-serving that they shocked the conscience of the Court." (Hereinafter the "Montana Court Order" attached as Exhibit 1.)

3.         Referring to Credit Suisse's Loan to Own scheme as "overreaching and predatory lending practices," the Montana Court further stated, "the only plausible explanation for Credit Suisse's actions is that it was simply driven by the fees it was extracting from the loans it was selling, and letting the chips fall where they may.  The naked greed in this case combined with Credit Suisse's complete disregard for the [developer] or any other person or entity who was subordinated to Credit Suisse's first lien position, shocks the conscience of this Court.  While Credit Suisse's new loan product resulted in enormous fees to Credit Suisse in 2005, it resulted in financial ruin for several residential resort communities. Credit Suisse lined its pockets on the backs of the unsecured creditors."

4.         The standing of plaintiff–class is stronger herein than that of the "unsecured creditors" referenced in the foregoing Montana Court order because plaintiffs' "privity" position, or legal nexus to the defendants, based upon the defendants "lending fiduciary status" to the developers; together with  the nexus between the defendants' false "total net value" appraisal methodology, and its public syndication of the loans to the Credit Suisse  "note-holders," imposes legally cognizable duties supporting plaintiffs' state law claims, with or without the application of equitable principles. As recited herein, Credit Suisse used its "fulcrum" status between its mostly

U.S. "note-holders," who purchased its syndicated loan products, and upon which it originally sloughed off its risk on the one hand, and the developers and plaintiff-class on the other, who ultimately have borne the entire loss.    Additionally, the damages proximately caused by defendants' outrageous misconduct are substantially more direct and catastrophic to plaintiff – class than to the "unsecured creditors" of the various resorts.

5.        For Credit Suisse and the other defendants, the Loan to Own scheme was a "win-win" scheme – either the borrower repaid the loan in full and Credit Suisse pocketed not only the enormous up-front fees but interest on the loan, or the risk of loss would originally fall upon U.S. syndicated "note-holders,"  or as actually resulted from the scheme, the amount of debt could crush the Resorts and their homeowners; and Credit Suisse could then take the valuable property and either develop it and keep the profits, or "flip" the project to a buyer.  Possessing enormous financial reserves derived from international banking scams and frauds like those exposed  in the Iranian criminal plea, Credit Suisse has been able, to date, to consummate its schemes.  Moreover, through bankruptcy, Credit Suisse has been able to use its first-secured position on the Resort to control the Resort through a debtor-in-possession process, while obtaining the Trustee's avoidance powers and turning the non-recourse loan into a recourse loan against the borrowers; and /or foreclose, or have a receiver appointed.

6.        The Credit Suisse scheme, often with the collusive and conspiratorial aid of a select number of its syndicated "insider note-holders", such as Cross Harbor Capital in the Yellowstone Club, and another insider in Lake Las Vegas Resorts, has resulted in total control by both a select number of the "note-holders" and the defendants, which, in turn, has exacerbated the catastrophic damages to plaintiff–class.  The scheme has caused a "Snowball effect" in interstate

commerce contributing to the devastation in U.S. real estate markets. In effect, the defendants, aided and abetted by a few of their note-holders,  as in the Yellowstone and Lake Las Vegas cases, have obtained ownership and/or control over the Resorts, but flown under  the bankruptcy courts' radar, which has *only* protected  some "unsecured creditors,"  but caused increased, catastrophic, and yet un-remedied damages to  plaintiff–class. This complaint will remedy this serious injustice

7.        One of the goals of Credit Suisse, at all times, was to avoid the legal and equitable obligations and duties owed to homeowners and landowners as a successor developer and/or a debtor in possession, while in truth and fact, Credit Suisse became one or the other.  By doing so, Credit Suisse, and others conspiring with it, particularly Cushman & Wakefield, undertook a campaign at each resort to intentionally undermine, eliminate and destroy the rights of the homeowners and landowners to ready each resort for sale or development by a third party not strapped with the obligations to the homeowners and landowners, this in order to inflate the resale value of each resort or obtain the assets of each resort for its own use or the use of others with which  it colluded.  In one instance, it helped create a sham owner of a resort only to cause it to file bankruptcy, shortly thereafter, and as debtor in possession, it stripped the resort of the homeowners' rights and amenities, to further its scheme.

8.        As ruled in the Montana Court Order, the Loan to Own scheme also depended upon Credit Suisse being able to circumvent the Financial Institutions Reform, Recovery and Enforcement Act of 1989, 12 U.S.C. § 3331 *et seq.* ("FIRREA"), which was passed after the wholesale failure of numerous financial institutions, including Savings & Loan banks in the late 1980's, and after the collapse of the real estate market. The major congressional purpose of

FIRREA to protect the United States economy and banking institutions was and is to "provide that Federal financial and public policy interests in real estate related transactions will be protected by requiring that real estate appraisals utilized in connection with federally related transactions are performed in writing, in accordance with uniform standards, by individuals whose competency has been demonstrated and whose professional conduct will be subject to effective supervision." The Credit Suisse syndicated real estate loan scheme effectively operated to put the "fox in charge of the hen-house" as noted in the Montana Court Order by conspiring with the world's largest and most trusted real estate appraiser, Cushman & Wakefield, thereby destroying the "effective supervision" required by FIRREA. See Montana Court order at page 17. The developers, the syndicated note-holders, and the plaintiff-class, all trusted Cushman & Wakefield; and the defendants also relied upon and actively used *that* trust to defraud the plaintiff-class.

9.        For example, the developer of the Yellowstone Club, and his U.S. federally regulated banker, a Montana bank, had used Cushman & Wakefield in previous appraisals and loans. His trust was embedded in both that banking/appraisal relationship; as well as in generally acceptable banking and appraisal  industry standards which his lawyers believed to be embodied in state and federal laws. The defendants actively utilized *that* trust, then actively marketed their "syndicated loan product" to him acting as a "lending advisor" to convince him to accept the loan. Defendants then pulled a "bait and switch" without his knowledge using the "Total Net Value" appraisal method and a "Cayman Islands Branch to circumvent FIRREA, rather than the industry accepted "fair market value" standard.

10.       Because the Loan to Own scheme and the "Total Net Value" appraisal method on

- 7 -

which it depended did not comply with FIRREA and its related regulations and standards and guidelines with respect to, among other things, appraisals under FIRREA and state law, Credit Suisse created a "separate" banking entity in the Cayman Islands, Credit Suisse Cayman Islands Branch, through which the Loan to Own programs and appraisals were handled, specifically to evade the strict appraisal requirements and standards under state and federal law  required for lending and appraisals in connection with the enactment of FIRREA.  Plaintiffs are informed and believe that Credit Suisse Cayman Islands Branch was an entity established pursuant to a "Type B" license by the Cayman Island Monetary Authority.

11.      The "Cayman Island's Branch" was created , in part, to utilize  a post office box and letterhead  in which  the only "business" it apparently  conducted was to masquerade as a sham for its New York office where the handling and processing  of each of the loans to the Resorts was actually conducted.  With this international ploy, defendants used the "Cayman Islands Branch" name on its loan documents, syndicated offerings, and marketing materials to conduct and further the "Loan to Own" scheme by loaning significantly more money than would have been permitted pursuant to FIRREA, thereby earning significantly larger up-front fees (taken from the loan proceeds), with the expectation that Credit Suisse could foreclose on the project and/or take control or constructive control over the projects in order to further its scheme to defraud the Plaintiffs and proposed Class members.

12.      The scheme has been a financial heist for Credit Suisse with no risk. Its "note-holders" and its other fraudulent schemes are financing the pre-planned bankruptcy or receivership proceedings, while it reports billions every year in profits.   Regardless of the methods ultimately used to obtain ownership and control, Credit Suisse has received huge fees

up-front, and consummated ownership or control over all but one high-end Resort. The rest have failed as a direct and proximate result of its syndicated loan/FIRREA scheme, allowing Credit Suisse to take over each Resort or constructive control of each resort and turn the non-recourse loan into a "recourse" loan by going after the borrowers through the bankruptcy courts, as occurred in connection with the Yellowstone Club; or in the case of Tamarack, through a receiver; but in all cases causing catastrophic damages to the plaintiff-class, in the form of collapsed real estate values; and loss of amenities. The defendants' scheme has been catastrophic to the developers and to the plaintiff–class in Resorts which were promised high quality amenities that have now been shut down or amenities never provided, such as pools, golf courses, ski runs, clubs, restaurants, shops, hotels, a casino and numerous other amenities described below at each resort, also adding to the collapse of value.

13. Credit Suisse's marketing misrepresentations regarding its compliance with FIRREA, together with its violation of lending and appraisal standards, coupled with its employment of Cushman & Wakefield, and the industry-wide trust placed by the developers and plaintiff–class, and the non-insider "noteholders" in Cushman & Wakefield, effectively operated as a joint "bait and switch" scheme to defraud plaintiff–class. Plaintiffs, developers, and non-insider note-holders all believed that defendants' loans were safe and sound; and that with respect to each resort, the Cushman & Wakefield appraisal methodology could be relied upon and trusted as a basis for lending which would protect the homeowners and landowners. Numerous other intentional misrepresentations concerning the nature, safety and legality of the loan scheme to the developers and the Plaintiff Class, are the proximate cause of the plaintiffs' and Plaintiff Class' damages.

14.         In sum, with its "Loan to Own" scheme, Credit Suisse, a foreign banking leviathan, intentionally and willfully violated the congressional safeguards imposed by FIRREA, in order to extract billions of dollars out of the United States and Idaho, and Montana, and Nevada economies.  Their overt, admittedly criminal violations of U.S. laws in their Iranian clearing house scheme is intertwined with their explicit evasion of U.S. laws herein; and has served to finance the schemes plead herein; only here the damages are more catastrophic to thousands of U.S. citizens; and may be even more wide-spread, catastrophic, and damaging to interstate commerce; and to the U.S. real estate industry.

## II.  PARTIES

**The Plaintiffs:**

15.         Plaintiff L. J. Gibson is an adult U. S. Citizen who resides in Henderson, Nevada at Lake Las Vegas, and owns her home there.   Gibson is also a property owner at Tamarack Resort in Idaho and at Ginn sur Mer in Grand Bahama Island, Bahamas.   Gibson is a victim of the illegal acts alleged herein and was injured as a result, suffering substantial losses to her money and property from the scheme as well as loss of the use of her property and rights in each of the resorts she invested in, namely: Tamarack, Lake Las Vegas and Ginn Sur Mer.

16.         Plaintiff, BEAU BLIXSETH, is an adult U.S. Citizen who resides in Oregon, and owns property in Yellowstone Club.   Plaintiff Beau Blixseth is a victim of the illegal acts alleged herein and was injured as a result, suffering substantial losses to his money and property from the scheme as well as loss of the use of his property rights in Yellowstone Club.

**The Defendants:**

17.          Defendant Credit Suisse Securities (USA) LLC is a Delaware limited liability company with its principal United States office at 11 Madison Avenue, New York, New York.

18.          Defendant Credit Suisse Cayman Islands Branch is a separate entity referred to as a "branch" and upon information and belief may be either wholly or partially owned by Credit Suisse A.G. or another subsidiary thereof.  Upon information and belief, Credit Suisse Cayman Islands Branch operates in the Cayman Islands and elsewhere and utilizes a postal drop box in the Cayman Islands but also has a United States office at 11 Madison Avenue, New York, New York.

19.          Credit Suisse First Boston is, upon information and belief, a Delaware limited liability company with its principal United States office at 11 Madison Avenue, New York, New York.

20.          Credit Suisse AG is, upon information and belief, a Swiss corporation with a usual place of business in Zurich, Switzerland.

21.          Defendant Cushman & Wakefield is, upon information and belief, a Delaware corporation with a usual place of business in New York, NY.

22.          Plaintiffs are ignorant of the true names and capacities of those defendants sued herein as DOES 1 through 100, inclusive, and therefore sue said defendants under such fictitious names. Plaintiffs are informed and believe that such fictitiously named defendants are responsible in some manner for the events and happenings herein referred to, and proximately caused the damage to plaintiffs as herein alleged.  Plaintiffs will seek leave to amend this Complaint to allege their true names and capacities when the same have been ascertained.

### III.   JURISDICTION

23.       This Court has federal question jurisdiction over the subject matter of this action

pursuant to 18  U.S.C. §§ 1961, 1962, and 1964;  28 U.S.C. §§ 1331, 1332  and 1367.

24.       Diversity jurisdiction is also conferred over this Class action pursuant to the Class

Action Fairness Act of 2005, 28 U.S.C. § 1332(d), providing for jurisdiction where, as here, the

aggregated amount in controversy exceeds five million ($5,000,000), exclusive of interest and

costs and: (a) any member of a class of plaintiffs is a citizen of a State of different from any

defendant; and/or any member of a class of plaintiffs is a citizen or subject of a foreign state.  28

U.S.C. §§ 1332(d)(2) and (6).

25.       This Court has supplemental jurisdiction over the state law claims and causes of

action asserted herein for each jurisdiction, pursuant to 28 U.S.C. §1367(a).

26.       This Court has personal jurisdiction over the defendants pursuant to 18 U.S.C. §

1965 (b) and (d).

27.       The activities of the defendants and their co-conspirators as described herein have

been, and are, within the flow of interstate commerce on a continuous and uninterrupted basis and

have had a substantial and continuing effect on interstate commerce.

### IV.  VENUE

28.       The causes of action arose in the State of Idaho in that many of the acts and

transactions in the violations alleged, including the funding of loans, instances of mail and wire

fraud serving as predicate acts under RICO, as well as numerous misrepresentations and

omissions, took place in the State of Idaho.    The defendants transacted business in the state of

Idaho and continue to conduct business and perpetrate their scheme on a continuous and on-going

basis in the State of Idaho, which acts and omissions give rise to the causes of action hereinafter alleged, making this Court a proper venue for this case.

## V.  THE PLAINTIFF CLASS ALLEGATIONS

29.　　　　This action is brought as a plaintiff class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

30.　　　　Plaintiffs and Class Representatives, L.J. GIBSON and BEAU BLIXSETH, are members of the Plaintiff Class as defined herein and bring this action on their own behalf and on behalf of those similarly situated.  Plaintiffs seek to recover damages which they, and the Class Members, suffered, as a result of the illegal, fraudulent, and predatory lending practices of Credit Suisse and Cushman Wakefield.  Collectively, the plaintiffs and Class Members on the one hand, the developers of three resorts on the second hand, and the defendants on the third hand, were in a tri-partite "special relationship" in which the special relationship between the developers and the defendants was extended to the individual plaintiffs and proposed Class Members by virtue of the defendants knowledge of and active participation and control in  the developers' duties and promises to the plaintiffs and Class Members.

31.　　　　The class represented by the plaintiffs (the "Plaintiff Class") includes all persons and entities, other than the defendants named herein, who purchased, held or otherwise acquired both directly and indirectly, participation interests, homes or land in the Lake Las Vegas, Tamarack, Yellowstone Club and Ginn sur Mer real estate development projects to which Credit Suisse Securities (USA) LLC or Credit Suisse made loans from and through its Cayman Islands entity and  Branch from 2004 through 2008 and  through the present day inclusive (the "Class Period").

32.     The Plaintiff Class includes, but is not limited to, all persons who purchased their interests directly from the resorts' developers, and/or indirectly through agents, salesmen, employees, or representatives or from independent sellers or owners acting with authority from and by each developer to communicate promises, amenities, rights and enforceable expectations owners could and did rely upon at each resort, once the property was purchased.  The named plaintiffs are members of the Plaintiff Class.

33.     Because hundreds of millions of dollars of interests were purchased by over 3,000 investor/owners during the Class Period, the members of the Plaintiff Class are so numerous that joinder of all members is impracticable.  While the exact number of Plaintiff Class Members can only be determined by appropriate discovery, the named plaintiffs are informed and believe that Class Members number in the thousands and the damages sustained by the Class Members exceeds $8 Billion dollars.

34.     The claims of the named plaintiffs, L.J. Gibson and Beau Blixseth are typical of the claims of the members of the Plaintiff Class.  Plaintiffs and all members of the Plaintiff Class sustained economic and property damage as a result of the Defendants' wrongful, intentional, and illegal misconduct complained of herein.

35.     Plaintiffs will fairly and adequately protect the interests of the members of the Plaintiff Class at each resort and have retained counsel competent and experienced in class action litigation as well as commercial, banking and criminal litigation.

36.     A class action is superior to other available methods for a fair and efficient adjudication of this controversy.  Since the damages suffered by the individual Plaintiff Class Members may be relatively small and geographically diverse, the expense and burden of

individual litigation makes it impossible for the Plaintiff Class Members individually to seek redress for the wrongful conduct alleged.

37.        Common questions of law and fact exist as to all members of the Plaintiff Class in each of the aforementioned resort land developments, which predominate over questions affecting solely individual members of the class.

38.        Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a Plaintiff Class action.   Among the questions of law and fact common to the Plaintiff Class are:

(a)        Whether the defendants have violated and conspired to violate the RICO Act, 18 U.S.C. § 1961 et seq., by their acts alleged herein and the crimes so identified in this Complaint;

(b)        Whether the defendants planned, implemented and perpetrated a scheme and artifice to defraud developers at Lake Las Vegas, Tamarack Resort, Ginn Sur Mer and Yellowstone Club (the "Resorts") which scheme to defraud included the plaintiffs and Class Members as set forth herein;

(c)        Whether defendant Credit Suisse acted as a lending advisor with a special relationship to developers, plaintiffs and Class Members thereby owing contractual and fiduciary duties to the developers, plaintiffs and Class Members;

(d )        Whether the defendants owed a fiduciary duty to the plaintiffs and the Class, and whether that duty was breached;

(e)        Whether Credit Suisse, aided and abetted by Cushman Wakefield and its agents and representatives as described herein knowingly, intentionally and willfully undertook a "loan to own scheme" to defraud developers, plaintiffs and Class Members of their economic and property rights at each of the resorts with respect to the rights, promises, agreements, guarantees, amenities and privileges they held and were owed to them by the developer at each resort;

(f)        Whether Credit Suisse and Cushman Wakefield through their agents and representatives knowingly, willfully and intentionally, as part of their scheme to defraud developers, plaintiffs and Class Members, utilized and controlled sham debtors in possession, receivers or by  other means to effectuate constructive control over each of the resorts for themselves and/or others to evade and avoid their duties and obligations as a fiduciary and successor developer in order to abrogate and destroy plaintiffs' and Class Members' economic and property rights, promises, agreements, guarantees, amenities, reasonable expectations and

- 15 -

privileges that each held and were owed by the developer and/or a successor developer to each of them at each resort and/or club;

(g)   Whether Credit Suisse and Cushman Wakefield   and their   agents and representatives, as part of and in furtherance of their scheme, sought to cleanse each resort of the obligations and duties owed by each developer and them as   successor and/or constructive developer   in order to maximize their economic interests and profits for themselves, other defendants, joint venturers, agents, representatives and third-party co-conspirators not yet known and not yet named, at this stage of the proceedings;

(h)   Whether Credit Suisse and defendants breached their contract with developers, plaintiffs and Class Members, the intended third-party beneficiaries;

(i)   Whether Credit Suisse and defendants breached its duty of care, the duty of good faith and fair dealing, the duty to make known material facts and full disclosure of the same, the duty of loyalty, the duty to avoid self-dealing and the duty to protect the intended beneficiaries, that is: plaintiffs and Plaintiff Class;

(j)   Whether Credit Suisse and defendants intentionally and tortiously interfered with the existing  rights, contracts, promises, agreements, guarantees, amenities and privileges held by the plaintiffs and each Class Member at each of the resorts and owed to them by the developer and Credit Suisse;

(k)   Whether the members of the Plaintiff Class have sustained damages, and, if so, what is the proper measure of damages;

(l)   Whether Credit Suisse and the other defendants used funds derived from their aiding and abetting the Iranian government and agencies thereof to circumvent U.S. and international sanctions, in order to help fund its fraudulent "Loan to Own" scheme perpetrated on the Plaintiff Class;

(m)   Whether  federal and state  banking and appraisal  standards, regulations and guidelines enacted under FIRREA  designed to protect the Plaintiff Class from such Loan to Own schemes were violated by the defendants' acts in order to further their scheme to defraud, as alleged herein;

(n)   Whether the Loan to Own scheme and the "Total Net Value" appraisal method used by Credit Suisse and Cushman Wakefield was inconsistent with the lending and appraisal standards enacted under federal and state law pursuant to FIRREA which was promised by defendants;

(o)   Whether documents, releases, prospectuses and statements disseminated to the investing public omitted and/or misrepresented material facts about the business affairs of the Defendants, and particularly, the "Loan to Own" scheme;

(p)     Whether the defendants held a "special relationship" to each developer, plaintiff and Class Member as "lending advisors" and administrators of loans owing contractual and fiduciary duties to the developers, borrowers and Class Members and whether those duties were breached as part of the alleged scheme to defraud;

(q)     Whether defendants have engaged in mail and wire fraud, a pattern of racketeering and whether the three separate Credit Suisse entities at issue constitute an enterprise within the meaning of applicable federal law;

(r)     Whether defendants conspired in a civil conspiracy to violate federal and state law;

(s)     Whether the Plaintiff Class has a remedy under substantive state law for the wrongs complained of.

(t)     Whether exemplary damages should be awarded plaintiffs and Class Members and the amount that is appropriate under law.

(u)     Whether, and in what amount, attorney fees and costs should be awarded to the Plaintiffs and Class Members.

39.     Plaintiffs believe that there are approximately 14 resorts which have been devastated by defendants' violations of state and federal law in addition to the resorts and states identified herein; and anticipate that additional resorts which have been damaged by defendants will be added to the plaintiff–class. Such addition of additional resorts and class members will assist in the fair adjudication of all claims of all parties who have been damaged by defendants in one class action.

## VI.  FACTUAL ALLEGATIONS

40.     There are four (4) resort land development entities currently at issue in this Complaint that have been caused harm by Credit Suisse's predatory loan practices through its Loan to Own scheme, *to wit*: (1) Lake Las Vegas, (2) Tamarack, (3) Ginn sur Mer and (4) Yellowstone Club. Although each development was created by different developers and in

different states, all shared substantially similar or identical amenities, were sold by means of similar or identical promises of exclusive amenities, membership, and privacy, and were targeted by defendant  Credit Suisse to implement its  predatory loan practices, and were induced to borrow unreasonably excessive loans through Credit Suisse's use of a new  "total net value" appraisal methodology  represented to be compliant with state and federal lending and appraisal practices under FIRREA.  In each instance, Credit Suisse, through its "Loan to Own" scheme, charged tens of  millions of dollars of exorbitant loan fees. As set forth below, the predatory loan practices of Credit Suisse caused each development to become financially insolvent and fail.

41.        Credit Suisse's methodology, artifice and *modus operandi*  in effectuating its Loan to Own scheme with the Lake Las Vegas resort land development was repeated by Credit Suisse in connection with the resort land developments at Tamarack, Ginn sur Mer, and Yellowstone Club.

42.        Plaintiffs are informed and believe that there are several other high-end  resort land developments that Credit Suisse and the other defendants targeted for exploitation, takeover and control through its "Loan to Own" scheme identical to that of the named resorts, herein, and when identified, plaintiffs may move the Court for leave to amend their Complaint appropriately so as to include the owners and developers of those additional resort land developments  in the Plaintiff Class herein.

A.    **Credit Suisse's "Loan to Own" Scheme.**

43.        Credit Suisse AG is one of the largest banks in the world, with its home office based in Zurich, Switzerland.  Shortly before the filing of this Complaint, defendant Credit Suisse pleaded guilty to a Criminal Information in which the defendants admitted having engaged in a

scheme with the Government of Iran to strip identifying information from wire transfers of amounts in excess of $1 billion from Iranian banks needing to purchase technology in US dollars, in order to circumvent United States and United Nations economic sanctions.   According to reports from the Department of Justice, clients involved in this scheme included Iran's Atomic Energy Commission, which purportedly oversees Iran's attempt to build a nuclear weapon. Through this scheme and others, Credit Suisse illegally acquired huge fees, cash and profits from Iran and other prohibited nations from at least 2003 through 2008 and undertook a deliberate scheme with these nations  to conceal their illegal conduct through sophisticated planning and preparation to avoid detection by the Treasury Department, the Internal Revenue Service, National Security agencies and other law enforcement agencies of the United States and other nations in a  deliberate scheme to avoid detection in making profits at the expense of the safety and national security of the citizens of the United States.  This scheme enabled Credit Suisse to increase its capital and lending capability by illegal means and invest a portion of its illegal proceeds and profits to make loans to others, including the named resorts herein.

44.        Concurrently with defendant Credit Suisse' scheme to evade US economic sanctions, and with the intent of expanding its presence in the "hot" US real estate market as a means of generating hundreds of millions of dollars in excessive loan fees for its operations, Credit Suisse, in or about 2004, devised and planned what is herein referred to as the defendants' "Loan to Own" scheme.

45.        Credit Suisse decided to "break new ground with a product by doing real estate loans in the corporate bank loan market." See Montana Court Order at page 6. Credit Suisse targeted certain master-planned residential and recreational communities such as Tamarack

Resort, Promontory, Ginn sur Mer, Turtle Bay, Yellowstone Club, and Lake Las Vegas. Each of the above entities received a syndicated loan from Credit Suisse's Cayman Islands Branch. In each instance, the developers relied upon and believed that Credit Suisse employed acceptable and lawful appraisal methods in compliance with state and federal law.

46.      The defendants' Loan to Own scheme was a device to use the United States' real estate boom to target and persuade developers of first class or exclusive master-planned developments to take out their equity and capitalize on the projection of future growth by means of non-recourse loans from Credit Suisse, which non-recourse loans would burden each land development with debt in excess of that required by FIRREA compliance, and acceptable by the federal and state standards of commercially reasonable lending practices. The defendants' syndicated loan scheme in each instance violated federal and state standards proximately causing the damages to the plaintiff-class. In the process, Credit Suisse was able to charge excessive and exorbitant "loan fees" which were extracted "off the top" of the proceeds of each loan and re-deposited to the accounts of the lender, Credit Suisse. In addition and as part of its scheme, Credit Suisse no longer became a mere lender but controlled each resort because it requested, solicited and required each resort to allow it to become its "Loan Administrator" and "Lending Advisor" and in said roles, encouraged each developer to rely exclusively on Credit Suisse and Cushman & Wakefield for financial advice, property development advice, marketing advice, and other matters related to each land development, while simultaneously persuading the developer to increase the loan amount and become ever more indebted to Credit Suisse and entrapped by its control. Upon information and belief, in no instance, did Credit Suisse or Cushman & Wakefield disclose to its borrowers, the developers, the plaintiff-class, or to many of its note-holders that the

"total net value" appraisal method violated FIRREA; and that the Cayman Islands Branch was being used to circumvent FIRREA.

47.        In this manner, defendant Credit Suisse' Loan to Own scheme persuaded many owners and developers of land and structures in the aforesaid resort land developments to take equity out of their investments "up front, " by mortgaging their development projects to the hilt. Credit Suisse' plan was to loan the money to the aforesaid owners and developers on a non-recourse basis, allowing Credit Suisse to charge excessive loan fees, and sell off most of the credit to loan participants. The development owners were advised, encouraged, requested and instructed by Credit Suisse to take out personally very significant sums of money from their development accounts either as a "profit dividend," or as a loan, leaving their developments burdened with excessive and unsustainable debt. Credit Suisse represented that this would allow the development owners to benefit, and the owners of land and homeowners to prosper with increased expansion of the Resorts. In fact, defendants knew that in making said representations, they had increased the debt load on the Resorts beyond FIRREA margins; and placed it squarely on the Resort's landowners and homeowners, the plaintiff –class.

48.        Defendants knew in fact that its scheme would have a "snowball" effect on the Resorts. In violation of duties owed to all those who would be foreseeably damaged by their violations of state and federal commercially reasonable lending standards, defendants violated said lending standards with actual knowledge that they imposed the increased loan risk on plaintiff–class; and that the foreseeable damages to each Resort in both the loss of values and the loss of amenities would directly result from their scheme, all of which has now occurred. This newly developed syndicated loan scheme was deliberately designed by Credit Suisse with the

knowing assistance of Cushman & Wakefield in order to enrich Credit Suisse and its employees, while placing the Resorts in a perfect position to be taken over by Credit Suisse and/or in collusion with its note-holders by leaving the developments too thinly capitalized to survive, precisely as Credit Suisse intended, planned and schemed from the beginning at each Resort.

49.        Having now taken control of each of the Resorts while acting as a financial advisor to each with a special relationship to each resort and its developers, landowners and homeowners, the scheme has been consummated as anticipated by defendants. Defendants own or control each Resort for a fraction of their values, with all of the catastrophic losses imposed on plaintiff-class.

50.        Numerous entities that received Credit Suisse's syndicated loan product have failed financially, including Yellowstone Club, Tamarack Resort, Promontory, Lake Las Vegas, Turtle Bay and Ginn sur Mer. As the Montana Bankruptcy Court stated at page 16, *"they were doomed to failure once they received their loans from Credit Suisse."* The finding by the Montana Court highlights and demonstrates that the scheme did in fact target and take over the Resorts by deliberately gaining the trust of the each of the resort developers through false and misleading lending advice, soliciting a special relationship with the developers on their behalf and the behalf of the Plaintiffs and proposed Class members, and through such artifice take sufficient control over the Resorts and lending practices to achieve their illegal and predatory scheme and ends, all at the expense of the Plaintiff-class. Like the sophisticated scheme to evade federal law in connection with transactional and lending practices with the Government of Iran, and others, requiring the United States of America and its law enforcement agencies and a grand jury years to figure out and uncover, Credit Suisse employed its same culture of greed and skill at deceit

against the Plaintiffs, proposed Class members and their developers.   Upon information and

belief, both schemes fed huge profits and deposits into defendants' accounts for the purposes of

maintaining the financing of the reciprocally unlawful schemes – classic RICO violations.

51.        As set forth above in the Montana Court Order at page 17, Credit Suisse,

representatives of Credit Suisse, and others on the Credit Suisse team were paid on a contingent

fee basis: they only earned loan fees if they sold loans. Credit Suisse thus, as part of its scheme,

advised and  encouraged developers of the named residential resorts to take unnecessarily risky

and excessive  loans which required them to burden their developments with excessive debt

because, the  higher the loan amount, the larger and more excessive  the loan fee which could be

exacted by  Credit Suisse.   As the aforementioned Montana Court found at page 16,  *"this*

*program essentially puts the fox in charge of the hen ho*use *and was clearly self-serving for*

*Credit Suisse."*

52.        The loan fee structure led to one of the most egregious aspects of Credit Suisse's

FIRREA violating loan product scheme.  In its role as lending advisor, Credit Suisse induced,

encouraged, advised and recommended that the developers remove and take the proceeds of the

loan out of the project development accounts, without placing commercially reasonable lending

controls on the loans.  In violation of the standards of normal and usual commercial lending and

appraisal practices, defendant Credit Suisse failed to specify how developers used the proceeds of

the loan; and instead recommended, advised, encouraged and authorized developers to use the

proceed for any purpose, including purposes totally unrelated to the subject development because,

as Credit Suisse advised,  its appraisal methodology supported the same and such practices would

not interfere with or place at risk  the rights and expectations of the homeowners and landowners

which defendants were obligated to and promised to protect. See Montana Court Order at 17.

53.        Credit Suisse "marketed" its new loan product to developers by characterizing a substantial portion of each amount of loan proceeds as a "distribution," which would cause the owner's equity account to be reflected as a negative balance. This caused the owner's equity to be reflected on the developers' audited financial statements as a "qualification." Credit Suisse knew that this practice was highly likely, if not certain, to substantially diminish the value and credit worthiness of such developers' financial statements, balance sheets, and credit reputation and status in the financial community. Notwithstanding this knowledge, Credit Suisse as lender and lending advisor solicited, encouraged and persuaded the developers to engage in this practice which it represented would not harm the Resorts or Plaintiffs and proposed Class members. By soliciting, encouraging, advising and authorizing the developers to do so, Credit Suisse was then able to charge excessive and exorbitant loan fees. Credit Suisse represented to developers that the loan was akin to a "home equity loan" in which the developers were entitled to receive the increased equity in the Resorts which they had built. These representations were particularly deceptive because "home equity loans" are not based on "total net value" appraisals violating FIRREA. The catastrophic damages suffered by plaintiff-class directly result from these "home equity loan" fraudulent representations participated in by Cushman & Wakefield. See Montana Court Order at 5-7, and 16-18.

54.        Credit Suisse knew at the time the lending advice and authorizations were given that its scheme and tactics would cause the developers and the Resorts financial ruin, resulting in the ultimate take-over by Credit Suisse directly, or indirectly through constructive control and/or collusion with third parties.   In the case of the Yellowstone Club, that third party became one of

its "insider note-holders," Cross Harbor Capital Partners, ("CHC").  The details of the collusion

between CHC and Credit Suisse is particularly shocking in the case of the Yellowstone Club

because CHC obtained complete control over the Yellowstone Club by means of its own

"predatory loan" and fiduciary lending advisor role with the ex-wife of the developer during her

divorce proceedings.   Once CHC obtained control of the Yellowstone Club through the ex-wife,

as an "insider note-holder" CHC put up the DIP financing in the bankruptcy proceedings, then

made a deal with Credit Suisse to carve up the Yellowstone Club carcass between them and

vacate the Montana Court Order! The predicate acts and pattern of racketeering by CHC and the

ex-wife, acting as de facto agents of Credit Suisse will be developed in discovery and proved at

trial in this matter even including the fabrication of fake "Grand Jury Target Letters" against the

developer to assist CHC and the ex-wife in the Yellowstone Club takeover in aid of the Credit

Suisse scheme.

55.            Credit Suisse owed duties to both the developers and the plaintiff-class not only to

avoid misrepresentations to all those who could be foreseeably harmed by them, as a lending

advisor it owed affirmative duties to provide truthful advice, knowing that the plaintiff-class

would be directly impacted by such advice.  As a component of said affirmative duties, pursuant

to state and federal commercially reasonable lending standards, and heightened by its lending

advisory capacity, Credit Suisse owed both the developers and the plaintiff-class the duty to

exercise due diligence with respect to hundreds of millions of dollars of its loan transactions to

the developers and home owners and landowners. In the case of each Resort, driven by "naked

greed", Credit Suisse violated commercially reasonable state and federal loan "due diligence"

standards; and it breached its heightened duties to insure that its "due diligence" on behalf of both

the developers and  plaintiff-class was of the highest and most accurate quality.  It intentionally and willfully breached both levels of duties owed.

56.        For example, regarding the Yellowstone Club, Credit Suisse and Cushman & Wakefield were aware that Cushman & Wakefield had appraised its assets in 2004 and knew that the collateral for the Credit Suisse loan had a fair market value of $420 million in 2004.  As the Montana Court pointed out at page 18-19, it was highly doubtful that Credit Suisse could have successfully syndicated a $375 million loan if the loan-to-value ratio were 90 percent. As that Court pointed out in its written decision ruling that Credit Suisse engaged in "predatory lending practices" and violated FIRREA with respect to the Yellowstone Club loan, the Montana Court referenced the four developments described in this Complaint, and ruled that Credit Suisse knew that those Resorts could never survive the debt burden which Credit Suisse had created by violating FIRREA and using the total net value appraisal scheme.  Montana Court Order at 16.

57.        As hereinafter alleged, Credit Suisse in its conspiracy with Cushman &Wakefield, engaged in a "pattern of racketeering activity" involving two specific, unlawful, and coordinated schemes with multiple "predicate acts" in violation of 18 U.S.C. 1962.  The objective of the conspiracy with Cushman & Wakefield was to obtain appraisals of the targeted developments in amounts high enough to generate excessive loan fees that could be charged by Credit Suisse, which in turn increased Credit Suisse's likelihood of acquiring the lands and improvements of each project, through foreclosure or bankruptcy.

58.        First, in order to carry out its Loan to Own scheme, Credit Suisse conspired with Cushman & Wakefield to circumvent the United States Financial Institutions Reform, Recovery and Enforcement Act of 1989, 12 U.S.C. § 3331 *et seq.* (herein, "FIRREA") and the standards and

requirements adopted under federal and state laws in each Resort's jurisdiction, as set forth under the Uniform Professional Appraisal Practices guidelines and regulations, and elsewhere. These laws implement FIRREA, such as 12 C.F.R. § 34.44 (Office of Comptroller of Currency); 12 C.F.R. § 225.64 (Federal Reserve Board); 12 C.F.R. § 323.4 (FDIC); 12 C.F.R. § 564.4 (Office of Thrift Supervision), as well as other applicable federal banking statutes, regulations and guidelines.

59.        FIRREA was enacted by Congress after the financial failure of numerous financial institutions in the late 1980's for the purpose, among others, to  "provide that Federal financial and public policy interests in real estate related transactions will be protected by requiring that real estate appraisals utilized in connection with federally related transactions are performed in writing, in accordance with uniform standards, by individuals whose competency has been demonstrated and whose professional conduct will be subject to effective supervision."

60.        Because Credit Suisse' "Loan to Own" scheme was predicated upon the "total net value" appraisal method, it violated the lending and appraisal  standards and guidelines under state and federal law enacted pursuant to FIRREA.  Thus, in order to circumvent FIRREA, Credit Suisse created a "separate" banking entity in the Cayman Islands, known as the "Credit Suisse Cayman Islands Branch," through which its Loan to Own programs and appraisals were funneled. Defendant created this corporate banking and lending shell for the express purpose of evading the strict state and federal appraisal and other requirements implemented pursuant to FIRREA. Credit Suisse did not maintain a physical presence in the Cayman Islands, merely a post office box. But, by doing so, Credit Suisse, like most entities who set out to engage in unlawful conduct, effectively admitted the unlawfulness of its schemes by using its Cayman Islands Branch to then

market, represent, sell and place its loan products in interstate commerce,  while representing that
its "syndicated" loan product was not available to U.S. banks.

61.          This forms the second major component of the unlawful scheme and objective of

the conspiracy.   Defendant created its Credit Suisse Cayman Islands Branch in 2005 as a

superficial but ultimately futile cover to implement the "syndication" of its Loan to Own scheme

ostensibly without it being sold to U.S. federally regulated banks. But, that is an obvious ploy. If

Credit Suisse believed and intended *that* marketing scheme to be true, then there would have been

no need for a "Cayman Islands Branch." It could have been marketed through its New York

office, which it actually used to syndicate the loan under the cover of the Cayman Islands.

Plainly, Credit Suisse knew its "syndicated loan product" would immediately penetrate interstate

commerce with federally regulated U.S. banks when either the hedge funds or individual "note-

holders" purchased it. Many of its "note-holders" actually visited the Resorts in various marketing

promotions financed by Credit Suisse. Defendants knew that U.S banks would become involved

in financing the purchasers and "note-holders" of its syndicated notes. Even more significantly,

defendants knew that its "total net value" appraisal values in violation of FIRREA would filter

through to the developers' personal and/or corporate financial statements and loan applications to

U.S. banks, as well as on to the financial statements and loan applications of plaintiff-class. As

legions of case precedents establish, once the unlawful scheme was placed in interstate

commerce, the "Snowball effect" of the scheme devastated the economics of all those involved.

62.          Again, the Yellowstone Club is an example of this "Snowball effect;" and its

use by Credit Suisse insiders.  There, in order to obtain control of the Yellowstone Club with

CHC - the Credit Suisse "note-holder", the ex-wife borrowed about $30 Million dollars from

federally regulated banks and another $14 plus Million from private lenders, all based on her financial statements reflecting the $1.2 Billion "total net value" appraised value of the Yellowstone Club. CHC knew the values were false, but loaned her *another* $35 Million when she was in default on the other loans in order to take over the Yellowstone Club. In sum, one scheme led to another, one fraud led to another, and end result was the ownership and control by the wrong-doer perpetrators. These are classic RICO "predicate acts" perpetrated as part of a "pattern of racketeering activity" to further the objectives of an "enterprise." Plaintiff-class is informed and believes that at each Resort, similar transactions occurred proximately caused by the defendants' unlawful schemes, which served to fuel additional "predicate acts".

63.         Plaintiffs are informed and believe that the creation of a post office box and letterhead constitute the only "business" Credit Suisse Cayman Islands Branch conducted. The Loan to Own scheme transactions  allowed Credit Suisse to loan sums significantly in excess of that which would have been permitted had it complied with the standards and requirements for appraisals and lending under state and federal law enacted pursuant to FIRREA; and enabled them to exact  commercially unreasonable and exorbitant "loan fees;" and thereby place Credit Suisse into the position to eventually acquire the subject resort land developments and/or control of the resorts through foreclosure, receivership, and/or the creation of sham debtor's in possession in bankruptcy. The Yellowstone Club is an insidious  example of how collusive and conspiratorial fraud  and  bad  faith  between  a  debtor-in-possession  on  the  one  hand  with  a  pre-planned bankruptcy scheme, and defendants and their insider note-holder, CHC, on the other,   devastated the plaintiff–class.

64.         Credit Suisse knew *before* marketing and selling its "syndicated loan product" that

- 29 -

its Loan to Own scheme could *only* be successfully syndicated, and allow it to earn excessive loan fees, if it devised an unlawful method of securing *the appearance of* credible valuation appraisals with Cushman & Wakefield, thereby using their international stature in the real estate appraisal industry to deceive developers and the plaintiff - class.  Both defendants knew that each of the subject Resort land development projects that they pursued, could only justify borrowing excessive loan amounts far beyond what would be deemed commercially reasonable and in compliance with state and federal standards, if they deceived the developers by using the "total net value" appraisal method endorsed by Cushman & Wakefield; and specifically concealing the FIRREA violations and the violations of state and federal standards,  while  credibly advising, authorizing and  assuring developers and home and land owners of such projects that such loans were lawful, safe, and in the best interests of the developers,  homeowners and landowners.

65.        In or about 2005, Credit Suisse selected as its co-conspirator in the scheme, the nationally and internationally prominent real estate firm of Cushman & Wakefield, which advertised as among its services, a national appraisal service capable of appraising master-planned communities, and supervised by Brian J. Curry, a residential appraiser, who Cushman & Wakefield represented to have "extensive expertise in subdivision development appraisals and planned unit developments."

66.        Cushman & Wakefield represented itself to be:

> "The world's largest privately held real estate services firm. Founded in 1917, the firm has 189 offices in 57 countries around the globe, and 11,000+ talented professionals. Cushman & Wakefield delivers integrated solutions by actively advising, implementing and managing on behalf of landlords, tenants, and investors through every stage of the real estate process. These solutions include helping clients to buy, sell, finance, lease, and manage assets. C&W also provides valuation advice, strategic planning and research, portfolio analysis, and site selection and space location assistance, among many other advisory services."

- 30 -

67.        Defendants Credit Suisse and Cushman & Wakefield devised the new appraisal method which they termed as the "Total Net Value" method, which they represented could be applied to the appraisal of master-planned community developments.

68.        The "Total Net Value" methodology was first developed by defendants in order to persuade the owners and developers of the Resort land development known as Lake Las Vegas to do business with defendants.  The  "total net value" appraisal method failed to comply with state and federal standards and regulations implemented pursuant to FIRREA , but defendants utilized it to persuade the developers of the Lake Las Vegas land development in southern Nevada to borrow unreasonable and commercially excessive amounts of money in connection with the development, which defendants knew, and intended, would result in said development assuming a debt burden which was fiscally and economically unsustainable, in order that Credit Suisse could extract exorbitant and commercially unreasonable "loan fees"  from the loan proceeds, to syndicate the loans and take control or constructive control over the resort.  But the Lake Las Vegas developers, like those at Tamarack and the Yellowstone Club, were in the dark, and completely deceived by the defendants' schemes.

69.        After making the loans to the developers of Lake Las Vegas, Credit Suisse nominated itself as the "loan administrator," and thereby became, in effect, the de facto developer in control of the project.  In so doing, Credit Suisse charged exorbitant and excessive "up-front" loan fees,  gathered unto itself  all of the profits from the Lake Las Vegas development while the loans continued to perform, and positioned itself to eventually acquire and take control the land and improvements of the Lake Las Vegas development by foreclosure or bankruptcy through a

sham entity, at a fraction of its fair value, when the developer was unable to make the loan payments on schedule.

70.        Credit Suisse knew, when targeting Lake Las Vegas, that its scheme would eventually burden Lake Las Vegas development with debt thereby enabling it to ultimately cause it to be in default, perfectly situated for take over and control by itself for a third party sham debtor in possession. At no time did Credit Suisse disclose its true intentions with the resort or truthfully warn or advise it, as its lending advisor, of the economic ruin it had created and implemented against the resort. Had Credit Suisse been truthful, it could never have implemented its scheme directly and/or through proxies to acquire near complete direct or indirect control of the development or its assets as its "secured creditor." In fact, the defendants collectively used their expertise, position, stature, and international reputations in the banking and appraisal industries, to deceive the Lake Las Vegas developers.

71.        Credit Suisse also knew that when its planned failure occurred, the homeowners who had purchased land within said development for building sites would ultimately be burdened with the development's debt, by Credit Suisse' scheme to convert the "non-recourse loans" into "recourse loans" against the interests of the developers which Credit Suisse had sought out, advised, authorized and persuaded to take the aforesaid unreasonably excessive loans.

B.     **The Defendants' Scheme To Defraud**.

72.        The defendants' scheme to defraud the developers and homeowners consisted of aggressively soliciting developers with offers of non-recourse financing to be used for any purpose including purposes not connected to the development, well knowing that such financing was highly likely to cause the development to fail, while enabling defendants to charge excessive

fees,  syndicate the loans to other lenders and thereby charge  yet more fees, and ultimately, acquire control and possession of the actual land and improvements of the real estate resort development, at prices substantially below that of the fair value thereof.

73.         In furtherance of this scheme, Credit Suisse issued billions of dollars of loans to equity holders, developers, land and/or home buyers while fraudulently misrepresenting to them that such loans were (1) made after exhaustive "due diligence,"  (2) in full compliance with all applicable state and federal laws; and (3) based on reliable, safe, sound and lawful  appraisals, standards and guidelines.  As part of defendants' scheme, prior to and applicable  to real estate developments under state and federal law  after the loans were placed, Credit Suisse agreed  and promised to work cooperatively with the developers (for the benefit of the landowners and homeowners  such as plaintiff and the members of Plaintiff Class who were to equally benefit as third-party beneficiaries)  during the life of the loans, and to assist them in implementing the requirements of the loan agreements such as the construction of the various amenities that were promised to run with the land for the benefit of the homeowners and purchasers of lots of land within the development.   Defendant Credit Suisse also nominated itself to serve as "Administrator" for the loans, thereby acquiring for itself certain powers and control over the lending facilities and decision making for the developers and resorts, plaintiffs and members of the Plaintiff Class. This specific "control mechanism" of serving as "lending advisors" to the Resorts, and "administrative agent" to the "note-holders" placed it in the fulcrum position of controlling the information flow between the borrower-developers and the real "lenders." Thus, Credit Suisse deflected all risk of loss, while skimming the cream of the profits.  As noted by the Montana Court, however, it must now face its victims in a U.S. court of justice, administering

U.S. laws.

74.        The aforesaid false promises and representations made by defendants to the developers of the subject resort land developments and to plaintiff and members of the Plaintiff Class were made for the purpose of persuading developers, plaintiffs and members of the Plaintiff Class that their investments in the project would be safe and protected by Credit Suisse. Defendants and their agents and representatives served not merely as lenders but as lending advisors upon whom the developers, plaintiffs and Class Members reasonably relied and trusted. At all times relevant hereto, Credit Suisse knew that absent such promises and representations, the subject real estate developers would not agree to borrow the excessive sums from Credit Suisse, because each developer was obligated to protect the respective interests, rights and reasonable expectations of the homeowners who purchased land therefrom, including plaintiff and members of the Plaintiff Class.   Credit Suisse promised each such land developer that if it agreed to participate in the defendants' proposed lending program, plans and lending facilities and allowing Credit Suisse certain controls over lending and the resorts, Credit Suisse would see that the interests, rights and reasonable expectations of each land owner, home buyer and homeowner at each resort would be protected.

75.        To further its scheme to defraud, Credit Suisse promised and represented to each developer, plaintiffs and members of the Plaintiff Class that Credit Suisse and its representatives and agents, including Cushman Wakefield, had extensive expertise in appraisal methodology as required by state and federal law and that the developers, plaintiffs and the Class Members were justified in  placing  peculiar, unique  and specific confidence and trust in defendants to act in their respective best interests.  The result of these promises was that Credit Suisse gained the total

- 34 -

trust, confidence and reliance of the developers, plaintiffs and Class Members which it had actively solicited.

76.        At all times relevant to this Complaint, defendants knew, understood and agreed that the land owners, homeowners, as well as the developers, were to benefit from defendants' appraisal methodology and unique management,   implementation and control of each of the loans for each resort; and defendants agreed and understood and accepted the same not merely as lenders but as lending advisors to plaintiffs and the Class Members.  Defendants knew at all times that at each resort developer and homeowner, including plaintiff and the members of Plaintiff Class, owned certain  rights, expectations and benefits in connection with such development,  that were required to be protected.  Credit Suisse promised said developers and homeowners that they would benefit from its advice, lending and appraisal expertise and practices.  Defendants knew and understood that plaintiffs and Class Members required assurances from defendants that the promised  and bargained  for infrastructure, amenities, golf courses, ski runs and ski lifts, restaurants, shops, clubs, hotels, swimming pools and theme parks, trails and other amenities running with the land would  be protected and prosper  but would result in expanded use and development for each resort; and, that the rights, privileges and amenities promised and provided by the developers would always exist, without interference by Credit Suisse or its representatives, agents, contractors, partners, joint venture partners or assignees, affiliated entities or others. Credit Suisse explicitly represented and promised the developers and homeowners, including plaintiffs and members of Plaintiff Class, that the initial appraisals of the resorts obtained by Credit Suisse with Cushman & Wakefield  in furtherance of its "Loan to Own" scheme, were based upon state and federal  standards in the field, in conformity with banking regulations and

- 35 -

required state and federal appraisal standards and designed to achieve maximum development of the respective resorts in the marketplace. Defendants' representations were untrue and fraudulent, and in furtherance of their plan to charge excessive and exorbitant loan fees, commissions, loan penalties, and to allow them to eventually acquire ownership of the subject real properties and resorts at substantially less than their reasonable value, by foreclosing upon them or forcing them into bankruptcy when the borrowers were unable to make the loan payments.

77.          In carrying out its unique lending facility scheme based upon an unlawful appraisal methodology at each resort (which illegality and scheme were concealed from the developers and homeowners including the plaintiffs and members of Plaintiff Class ) Credit Suisse and its representatives continued to represent that they would protect the interests, rights and reasonable expectations of the developers and homeowners, including plaintiffs and members of Plaintiff Class, in order to solicit and gain the confidence and reliance thereof, even as defendants were surreptitiously planning to eventually acquire control and ownership of the developments.

78.          The developers, plaintiffs and Class Members at each resort were led by Credit Suisse to believe that they could look exclusively to Credit Suisse, its agents and representatives for technical expertise and advice in connection with its appraisal methodology and loans to protect and further the rights and interests of the developers, plaintiffs and home and land owners. Developers and plaintiffs at each of the resorts reasonably relied upon defendants' promises, and placed their trust and confidence in Credit Suisse.

79.          Upon soliciting and gaining the trust and control of the developers, plaintiffs and Class Members, the defendants, knowing that their representations, promises, assurances and agreements, were materially false and misleading, intentionally and systematically set about to

destroy the rights, agreements, amenities, guarantees, expectations and economic opportunities of the plaintiffs and Class Members with respect to their properties.

80.        Each of the representations, promises, assurances and agreements by Credit Suisse and its agents and representatives, was made in furtherance of defendants' secret plan to generate unreasonably large and excessive commissions, to eventually foreclose and take over the developments directly and/or indirectly, to constructively  interfere with and destroy valuable rights and amenities owed by the developers to the homeowners including plaintiffs and members of Plaintiff Class in order to generate upstream to defendants and/or their affiliates, agents and/or partners, joint venturers and co-conspirators,  and eventually, acquire ownership and control of the projects. Defendants acted at all times alleged herein, intentionally or with reckless disregard of the possible or probably consequences to the economic interests of the developers, plaintiffs and Class Members, and the destruction of their right to enjoy their properties.

81.        As a direct and proximate result of the defendants' aforesaid plan and scheme, the developers, plaintiffs and Class Members, and each of them, were caused economic damages of hundreds of thousands of dollars or more,  by the destruction or elimination of their  rights, benefits, privileges,  amenities and reasonable use of their respective lands and properties, the extreme diminution of the value of their lands, and the destruction of other economic interests of thousands of people who relied upon existing promises, understandings  and contracts in each development with their developer.   Defendants' plan and scheme is continuing to the present time.

82.        Defendant Credit Suisse, assisted by co-conspirator Cushman & Wakefield, carried out the aforesaid plan and scheme by means of intentional misrepresentations and omissions both

in writing and publication of sales brochures, and orally. Credit Suisse represented, among other things, that:

(A)     The "Loan to Own" scheme complied with all State and Federal laws and regulations;

(B)     The "Loan to Own" scheme was safe for the developers and homeowners;

(C)     Credit Suisse would, as Loan Administrator, protect the development and the homeowners, since it had a security interest in the development.

(D)     The borrowers could trust Credit Suisse as an experienced and sophisticated lender to assist the developers in financing and developing the development.

83.     Each of the aforesaid representations was false and defendants Credit Suisse and Cushman & Wakefield knew they were false when made. In fact, the Loan to Own scheme *violated* Federal, state and local standards, laws and regulations designed to prevent predatory lending, was *un*safe and likely or certain to cause the developments to fail, and likely or certain to cause homeowners to be burdened with substantial debt far in excess of the diminished value of the underlying properties. The acts and conduct of Credit Suisse in furtherance of said plan and scheme, amounted to the operation of a racketeering enterprise within the contemplation of the federal RICO Act, and made in total disregard of the rights and expectations of the developers or the property owners, and in furtherance of the intention of Credit Suisse to use its predatory loans to generate excessive loan fees and to acquire the respective properties by foreclosure.

84.     Knowing that its loan customers would not be likely to understand the true nature of the aforesaid loan transactions, Credit Suisse persuaded them to trust in, and rely upon, its representations and those of its collaborating partner, Cushman & Wakefield that the loan

- 38 -

transactions complied with all applicable governmental regulations and business practices.

85.      Defendant Cushman & Wakefield collaborated with and assisted defendant Credit Suisse in its plan and scheme, by representing to developers and property owners that the inflated valuations of the various properties underlying the loans were safe, lawful, appropriate, credible, and justified,   using Credit Suisse's "total net value" appraisal method in support of the defendants'  Loan to Own scheme, notwithstanding that defendant Cushman & Wakefield knew or in the exercise of reasonable care should have known that said  representations were false and that the loans failed to comply with various provisions of the federal FIRREA statute.

86.      Defendants Credit Suisse and Cushman & Wakefield made said false representations as part of their scheme to defraud the developers and property owners, knowing they would rely on them.

87.      As a result of the defendants' aforesaid scheme to defraud, including their misrepresentations and the reasonable reliance thereon by the developers, plaintiffs and Class Members, the respective resort developments of said developers, plaintiffs and Class Members were caused to financially fail, and the  developers, plaintiffs and Class Members were caused substantial economic loss.

C.    **The Resorts.**

   1.    **Lake Las Vegas.**

88.      Lake Las Vegas is a real estate development 17 miles from the Las Vegas Strip, in Clark County, Nevada.  At the time of the Credit Suisse transaction at Lake Las Vegas, the Resort was a 3,592 acre master-planned residential and destination resort, which included a 320-acre private lake, the largest private lake in the State of Nevada, and the last such lake that could be

built and developed in Nevada under present laws and regulations.  The Lake Las Vegas resort included residential offerings such as custom home sites, waterfront and golf villas, resort condominiums and luxury executive homes.  It offered attractive amenities including the 349-room Ritz-Carlton, Lake Las Vegas hotel, the 493-room Hyatt Regency Lake Las Vegas Resort, Spa and Casino (currently Loews), three award-winning golf courses and a full-service marina with water craft rentals and yacht cruises. Additionally, the Monte Lago Village Resort enclave at the center of the Lake Las Vegas Resort offered water's edge restaurants and cafes, boutiques and the 40,000 square-foot Casino Monte Lago.

89.      Defendants at all times knew that the Lake Las Vegas Resort was designed as a "high-end" luxury real estate development and life-style located in southern Nevada, and that the developer would represent to each owner/purchaser, both in writing and orally, at the time of purchase, that certain rights, privileges and amenities running with the land were included with each purchase, including, among others, two  year-round golf courses  ("Falls" and "Reflection Bay"); various fresh water, man-made lakes to complement the luxurious  atmosphere of the development;  first class restaurants, bar and pro-golf shop at each of the golf courses; owner discounts at all of the numerous stores at the golf courses and shops at the "Monte Lago Village" within  Lake Las Vegas;  and a shuttle service for residents and guests at the Lake Las Vegas community.

90.      Defendants also knew at all times that it was critical to the success of the Lake Las Vegas Resort that prospective purchasers of property and homes therein would have the right to join the "Yacht and Beach Club," and (for those purchasing properties on the "South Shore" of Lake Las Vegas), the right of privacy in connection with their gated area, a private club and

membership in a private golf course with a value of $150,000 per member.

91.        Plaintiff Gibson, in reliance upon the developer's promises of the aforesaid rights, privileges and amenities running with the land, purchased property at Lake Las Vegas during the relevant period of time and remains an owner thereof.

92.        The valuable rights, privileges and amenities running with the land that were promised by the developer at Lake Las Vegas as described above were critical to the decision of plaintiff Gibson, and the Class Plaintiffs and home owners, who based their decision to purchase their properties on the value said amenities would add to their land.

93.        Defendant Credit Suisse, while planning its scheme to defraud, knew that the aforesaid rights, privileges and amenities running with the land were promised to the Class Plaintiffs, and knew that the home owners' decisions to purchase said lands and properties were conditional upon the existence of said rights, privileges and amenities.

94.        Through the Transcontinental Corporation entities, Lake Las Vegas Resort was owned by Ronald F. Boeddeker (with additional non-operational ownership held by certain Bass family interests, sometimes collectively known as the "LLV Equity Owners".).

95.        Defendants aggressively solicited the owners of Lake Las Vegas Resorts, including the LLV Equity Owners, while promising them that the developers and others could "cash out" of their current equity tied up in the property for large up-front fees, with a non-recourse loan that would burden only the homeowners of Lake Las Vegas, but not the developers.

96.        From 1987, when the original development of the Lake Las Vegas Resort initially commenced, the LLV Equity Owners personally invested nearly six hundred million dollars ($600,000,000) in development costs therein.  Credit Suisse capitalized on this investment by

comparing its syndicated loan product to a "home equity loan."

97.    In 2004, when defendant Credit Suisse embarked upon its plan and scheme, the Lake Las Vegas Resort was burdened with only approximately $50 million in operating debt, which was reasonable and modest, when compared with the nearly $600 million personally invested in it by the LLV Equity Owners, a fact which was known by defendant Credit Suisse.

98.    Plaintiffs are informed and believe and herein aver that Credit Suisse used the Lake Las Vegas Resort development as a testing ground to refine its Loan to Own scheme, and targeted the development as its first test of its scheme to defraud.

99.    Before the commencement of Credit Suisse's scheme to defraud, Transcontinental Corporation, the developer of Lake Las Vegas, maintained all rights, privileges and amenities promised by that developer to the property owners and prospective purchasers.

100.    Defendants Credit Suisse and Cushman & Wakefield, with knowledge of the developers' aforesaid promises to the plaintiffs and members of the Plaintiff Class at Lake Las Vegas to perpetually maintain said amenities, devised a plan to unreasonably inflate the stated value of Lake Las Vegas Resort, by means of the "Total Net Value" appraisal method, in order to obtain exorbitant financing fees for themselves, at the expense of the plaintiffs and Plaintiff Class at Lake Las Vegas, who were thereby burdened with added debt which defendants knew would be so large as to be unsustainable, which would cause the operators of said property to be unable to maintain the amenities, and which plan was a violation of the provisions of the afore mentioned state and federal laws, standards and guidelines for appraisals and lending enacted pursuant to FIRREA.

101.    With this knowledge, defendant Credit Suisse proposed a major credit facility or

loan that defendant represented would be used to pay off the modest existing debt, protect the home owners and land owners by further enhancing the development of the resort and allowing the LLV equity owners to earn a return of a significant portion of their $600 million investment.

102.     Defendants further represented that the proposed major credit facility or loan by Credit Suisse would be used, first, to repay the previously existing modest bank debt; and second, to provide repayment to the LLV Equity Owners of a percentage of the nearly $600 million they had invested in the Resort.   Defendant Credit Suisse served both as a proposed lender, and in addition, a lending advisor to Transcontinental Corporation and Ronald F. Boeddeker who held a special relationship along with Plaintiff and Class Members.

103.     By so advising, the Credit Suisse defendants assumed the role of a fiduciary to Transcontinental Corporation and Boeddeker, and by virtue thereof, defendants also owed to the developers and owners of the Lake Las Vegas Resort properties, and members of the Class, a fiduciary duty of good faith and fair dealing, full disclosure, and the duty to refrain from self-dealing and the withholding of relevant facts.

104.     At all times relevant hereto, Transcontinental Corporation and Boedekker informed defendants of the obligations owed to the owners of land, homeowners and plaintiff Class Members, and obtained from defendants their acknowledgment of said obligations, and defendants' promise to honor them, fully implement them, and to utilize the proposed loan to benefit them.

105.     Based upon the specific contractual recitation that loan proceeds were to be used to repay the LLV Equity Owners a portion of the nearly $600 million they had personally invested in said resort development, and based upon the status of Transcontinental and Ronald F.

Boeddeker as LLV Equity Owners, they were also intended beneficiaries under the loan agreements and entitled to the benefits thereof. Residents and property owners of Lake Las Vegas were intended third-party beneficiaries of the proposed lending facilities proposed by defendants in order that Lake Las Vegas Resort could expand and develop a promised a new golf course, convention facilities and other amenities for its homeowners. Such additional developments would have improved property values for all owners at Lake Las Vegas and improved their enjoyment of the land. Defendant Credit Suisse knew the importance of the additional developments, when it made the aforesaid representations to Transcontinental Corporation and Ronald F. Boeddeker, which representations inured to the homeowners and plaintiffs herein as third-party beneficiaries, to the effect that the amenities, benefits and privileges running with the land would remain secure and inviolate.

106.        At all times relevant hereto, while Transcontinental Corporation and Boeddeker continued to warn defendants of the importance of maintaining the rights, amenities and privileges that were promised to the property owners and homeowners of Lake Las Vegas Resort, and the fact that their maintenance was essential to the long term success and viability of the resort, defendant Credit Suisse exploited its special fiduciary relationship with Transcontinental and Boeddeker by concealing material facts from them.

107.        Relying on the misrepresentations and fraudulent appraisal methodologies described in this Complaint, developer LLV Equity Owners agreed to an initial Credit Agreement dated November 1, 2004 as a $435,000,000 term loan secured credit facility, (hereinafter the "2004 LLV Loan"). At all times, defendants Credit Suisse assured the developer and Mr. Boeddeker that their methodology for lending was "safe and sound", in compliance with all

- 44 -

relevant laws, and would benefit the residents and owners of property at Lake Las Vegas.   While making said assurances, defendants commenced their lending scheme.

108.        Representatives and agents of the Credit Suisse defendants who participated in or ratified and concealed the acts and conduct of the defendants include David Miller, Grant Little, Jeff Cohen, Naeem Arastu, William O'Daly, Jeff Barcy, Jeremy Rogers, Jonathan Moneypenny, Julia Kingsbury, Grant Pothast, Andy Mahder, Michale Safko, Nancy Unrath, Matthew Tuck, Joe Friedman, Alan Berenbaum, Jed Kelly, Jodi Joskowitz, Don Berger, Paul Fuhrman,  Andy Stock and others.

109.        Because  numerous  communications  in  which  defendants  Credit  Suisse representatives uttered the misrepresentations herein alleged were conducted via interstate telephone communications, it is not in all instances possible for plaintiffs to now identify which Credit Suisse agent or representative was speaking at any particular time.  The volume of interstate communications made by defendants or their representatives in furtherance of their scheme to defraud and conceal the true facts known to them, of which the developers and plaintiffs were not aware, cannot be completely reconstructed but are alleged to exceed a minimum of 300 or more instances of unlawful use of the wires, mails and interstate carriers and facilities in violations 18 U.S.C. §§ 1341 and 1343.

110.        Some  of  the  specific  representations  that  were  later  discovered  to  be  false  or materially misleading were presented by one of more of the previously referenced authorized representatives and agents of Credit Suisse at a meeting held in Henderson, Nevada on Tuesday October 12, 2004 and Wednesday October 13, 2004.  In addition to the in-person representations of Credit Suisse, domestic and international phone lines were established as dial-in numbers to

facilitate participation by additional meeting participants who were not physically present. Specifically, interstate wires were utilized to implement and perpetrate the scheme and artifice to defraud Plaintiffs and interfere with the rights and privileges of the land-owners and homeowners at Lake Las Vegas Resort.

111.     Having completed the 2004 LLV Loan as described herein, (which was the first loan arranged with the "total net value" methodology) defendant Credit Suisse then changed its organizational operation to create a new, off-shore entity which it named as "Credit Suisse, Cayman Islands Branch, " intending to continue with its plan and scheme to dominate the high-end resort lending market.  Plaintiffs believe, and aver herein, that the reason defendant Credit Suisse established the off-shore entity or department was to permit it to evade United States federal banking and securities laws and regulations and to avoid compliance with the United States tax laws.

112.     Upon information and belief, plaintiffs aver that Credit Suisse may not be legally connected to Credit Suisse Securities, LLC but may instead be an entity associated with Credit Suisse, the Swiss Banking entity.   When Defendants, as lending advisors and fiduciaries, advised the developer Transcontinental Corporation and Mr. Boeddekker that its lending proposal and methodology was safe and sound and in compliance with the law, the developers understood that to mean the laws of the United States and the agencies that regulate them.

113.     Upon information and belief, plaintiffs further aver that the so called entity or "branch" of Credit Suisse (the Swiss bank) that was termed "Credit Suisse, Cayman Island Branch," was an entity that had no meaningfully  established business presence in the Cayman Island and was, in effect, merely a sham post office box "mail drop" established to avoid federal

banking laws, regulations, guidelines and penalties for violations of the laws of the United States.

114.     Having made the initial 2004 LLV Loan, Credit Suisse First Boston -- without providing plaintiffs full, complete, accurate and truthful information regarding the details of and reasons for the formation of defendant's "Cayman Island Branch," defendant then transferred all obligations and financial transactions of the developers and plaintiffs to its new off-shore entity.

115.     Following the formation of its sham off-shore branch, and without disclosing the existence, relevance and importance thereof to plaintiffs, the defendants opened negotiations with plaintiffs to facilitate additional loans, substantially exceeding the 2004 LLV Loan which, based on the non-FIRREA standards, Credit Suisse/Cushman methodology, had been in the amount of $435 million.

116.     Defendants facilitated subsequent amended and restated credit agreements in May 2005 and June 2007, until, by June 22, 2007, the total loan balance amount for which the newly formed off-shore Credit Suisse, Cayman Islands Branch was the "Fronting Bank and Paying Agent" had risen to $540 million ($570 million less principal payment of $30 million).

117.     Defendants also fraudulently induced developers and owners of other high-end real property resorts to borrow very large sums of money from Credit Suisse, in similar fashion as it had induced the developers and owners of the Las Vegas Lake Resort property described herein above. By June 22, 2007 defendants had arranged, or were in the process of arranging for similar loans to the developers and owners of the resort properties described herein below, in order to charge exorbitant loan fees in the tens of millions of dollars using the model which defendants perpetrated upon the developers and owners of Lake Las Vegas Resort. All of these loans were designed to permit defendants to both overcharge loan fees, but also to eventually foreclose on the

underlying properties at a huge discount to fair market value, when the loans went into default status as defendants contemplated they would do. If the developers and owners, including plaintiffs and Class Plaintiffs, were unable to satisfy all the terms, conditions and covenants of the loan agreements, the defendants as "secured creditors" would foreclose upon and/or take constructive control and take title and possession of the underlying lands for an amount significantly below fair market value.

118.     By means of foreclosing upon or taking control of these resort properties by similar means, the Credit Suisse defendants gained the ability to terminate or substantially diminish the various rights, privileges and amenities promised to the third-party beneficiary owners, including plaintiffs and Class Plaintiffs herein, knowing that by so doing, defendants would cause plaintiffs and Class Plaintiffs and others to suffer hundreds of millions of dollars of economic damages by deflating the value of their properties.

119.     In 2004, when it appeared that the developers of Lake Las Vegas Resort might be able to successfully service or repay the loan, the Credit Suisse defendants and other lenders for which Credit Suisse was fronting, set out to fraudulently induce the developers to borrow even greater sums, always with the intention of eventually foreclosing upon the underlying properties and acquiring the lands at a price substantially below fair market value.

120.     In order to accelerate the anticipated failure of the respective real estate development projects described herein, and to accelerate the time when defendants would acquire control over the projects, the Credit Suisse defendants deliberately interfered with the rights, benefits and expectations of homeowners and landowners in each of the resorts through the artifice of creating sham debtors-in-possession. Knowing that the sham debtors-in-possession

- 48 -

had no practical experience or expertise in managing resorts or developing master planned communities, and with inadequate operating capital, defendants instructed them to terminate and close golf courses, restaurants, and clubs, with the intended result that club members would quit when their rights were taken away, in further derogation of the land values of the owners, plaintiffs and Class Plaintiffs herein.

121.      Defendants' intentional interference with the contractual rights of plaintiffs and Class Plaintiffs was committed in various ways. For example, defendants interfered with the negotiations of the Lake Las Vegas Equity Owners with respect to the sale of a major parcel of land in proximity to a planned 4th golf course, to be known as Rainbow Canyon, by falsely and with intent to deceive, communicating to the prospective purchasers that the developers had no intention to ever build that golf course.

122.      At the time Defendants published the aforesaid false statements relative to the Rainbow Canyon Golf Course at Lake Las Vegas Resorts, defendants knew its statements were false, yet did so intending to cause the developers and owners of the Lake Las Vegas Resorts properties to lose a major land sale, to diminish the developers' ability to perform the covenants contained in the loan agreements, and to diminish and depreciate the value of plaintiff's and Class Plaintiffs' interests in the Lake Las Vegas Resorts properties.

123.      In 2007, the real estate market had generally begun to soften and the market values of land to decline.  Knowing this fact, defendants decided to further implement their fraudulent scheme to obtain complete control of the lands known as the Lake Las Vegas Resort, by the creation of an office for that purpose, called the office of Chief Restructuring Officer (CRO), or, Administrator.

- 49 -

124.        In furtherance of their scheme, defendants convinced the developers and owners of Lake Las Vegas Resorts, R.F. Boeddeker and Transcontinental, to accept the appointment of one Frederick Chin as the Chief Restructuring Officer, who defendants falsely represented would act in their best interests in managing the property during a difficult downturn in the real estate market.   While so representing, defendants failed to disclose to the developers and owners including plaintiffs and Class Plaintiffs that defendants were in fact conspiring to foreclose upon, and take over, the resort project. Defendants also failed to disclose their prior dealings with the CRO in which Mr. Chin, prior to his appointment as CRO, had been responsible for approximately $500 million placed with the defendants for a similar resort project that was adjacent to and in direct competition with the Lake Las Vegas Resort project.   Defendants' failures to disclose these material facts were intended to deceive, and constituted a violation of defendants' duty of full disclosure and loyalty to the developers and owners, and their third-party beneficiaries, the plaintiff and Class Plaintiffs herein, and created a direct conflict-of-interest between defendants and the owners and developers, as well as plaintiffs and Class Plaintiffs, who would not have consented to the appointment of the Chief Restructuring Officer had the true facts been disclosed by defendants.

125.        With the knowledge and consent of the defendants, the Chief Restructuring Officer (CRO) set out upon a course of deception and self-dealing calculated to benefit his own interests and those of the Credit Suisse defendants, to the detriment of the land values of the Lake Las Vegas Resort and those of plaintiff and Class Plaintiffs. Said course of deception and self-dealing included the attempted removal of key management personnel and replacement thereof with personnel whose loyalties were to defendants, in furtherance of defendants' plan to cause the

project to fail, the debtors to be unable to repay the loan to Credit Suisse, and eventually to foreclose on the properties and acquire complete ownership thereof.

126.     As a direct and proximate result of the aforesaid, unlawful and fraudulent and unfair conduct of the defendants, the Lake Las Vegas Resort developers were unable or unwilling to continue paying down the loan to Credit Suisse, causing a failure of the project, and resulting in the plaintiff and other homeowners of the various lands and properties within said resort, constituting the Class Plaintiffs, to be burdened with loans that far exceed the now-depreciated value of their respective properties, and in fact to be practically unable to resell them.

127.     Defendants and their sham agents and representatives now control the lands known as Lake Las Vegas, and have caused both golf courses to be shut down, have caused the termination of the rights, privileges and amenities running with the land to be terminated, the various shops to be closed, the shuttle service discontinued, the restaurants to be closed and boarded up, the rights, benefits and privileges at the Yacht and Beach Club severely limited, and the South Shore Club to be forced into foreclosure and sale  in a Bankruptcy proceeding thereby destroying the rights and privileges of the owner-members, all of which has caused the property values to owners and residents of Lake Las Vegas Resort to suffer substantial economic damages.

128.     The damage resulting to the land itself, from the aforesaid fraudulent, oppressive, and malicious conduct of the defendants, including closed golf courses, the dying grass, and the loss of streams and ponds once inhabited by song birds and other desirable wild life and flora, has resulted in the overall value of the Las Vegas Lake Resort property values declining by hundreds of millions of dollars, and a substantial loss of visitors who are willing to stay at the hotels, rent properties or purchase homes therein.

129.        Similar to other homeowners and landowners at Lake Las Vegas, Plaintiff Gibson

has suffered a loss in excess of one million dollars all attributable to defendants scheme to

defraud.   More specifically, Plaintiff Gibson's residence has lost nearly 80% percent of its value

as a direct and proximate result of defendants' scheme in an amount of approximately $500,000

due to the scheme as virtually nobody wants to purchase property in Lake Las Vegas, because of

the destruction caused by defendants.   Plaintiff Gibson has lost two properties as a result of the

intentional scheme and damage proximately caused by defendants in an amount of $550, 000 on

two other properties at Lake Las Vegas that sit next to dead golf courses, with no clubs or eating

establishments at the Clubs that made Lake Las Vegas a beautiful resort, a wonderful life style

and a resort that previously hosted nationally televised golf tournaments and charities.

**2.      Tamarack Resort Development.**

130.        Plaintiff L.J. Gibson and other Plaintiff Class Members own real property interests

in the State of Idaho, located in the Tamarack Resort Development.

131.        The real property development known as Tamarack was similar in concept to the

aforementioned Lake Las Vegas Resort in Nevada.   Situated in Tamarack/Donnelly, Idaho, the

Tamarack Resort was advertised by its developer as having been designed to be an exclusive,

private, first-class real estate development that was advertised to include such amenities as all-

season recreational facilities, including ski slopes, chair lifts to numerous mountaintops, hotels,

shops, pools, restaurants, a world class golf course, and Lake Cascade, for swimming, boating and

fishing.   The Tamarack real property development was planned as a phased development project,

once characterized by the Governor of the State of Idaho as one of Idaho's most valued treasures.

132.        Plaintiff Gibson and other Plaintiff Class members purchased real property in the

Tamarack development, in reliance upon written and oral guarantees that their purchase of ownership to the land included the rights, privileges and amenities running with the land, described above, and including, specifically: the Osprey Meadows Golf Course; the skiing facility including 7 chair lifts; the 50,000 square foot Discovery Square base facility;  a 150-acre snow-making system; twenty kilometers of hiking and  bicycling trails;  ski shops, and  restaurants. The developers and sales agents further represented to Plaintiffs that Tamarack Resort would be professionally managed by the world famous Fairmont Hotels Company. Many of these amenities were already in existence and operational, when plaintiffs purchased their interests therein.

133.        At a time when Tamarack Resort was open and operating, and after plaintiff and Plaintiff Class members purchased their real property interests at Tamarack Resorts, defendant Credit Suisse formed a plan or scheme to defraud the owners and developers of Tamarack Resorts, utilizing defendant's unlawful "Loan to Own," predatory lending scheme which it used to defraud the owners and developers of the Lake Las Vegas Resort.

134.        Defendants acted in furtherance of its predatory lending scheme, with respect to the Tamarack Resort real property development, commencing with its first involvement in 2005 and continuing to the present, in the same or similar manner that it used to defraud the owners and developers of the Lake Las Vegas Resort, including such acts as, among others,  willfully and intentionally interfering with Plaintiff's contractual rights and "guaranteed amenities" and causing the ski and summer resort at Tamarack  to be effectively terminated, or altered so significantly as to significantly diminish its value and deprive plaintiffs of the effective use and enjoyment of their land.   Defendant's fraudulent scheme with respect to Tamarack Resort has caused the ski runs to be closed,   the chair lifts shut down, the ski trails and snow-making facilities to be closed

or terminated, numerous summer shops and restaurants to be closed, and the "Club at Tamarack" (for which plaintiff and numerous members of the Plaintiff Class paid an additional $25,000 to join) to be closed, and vital trails closed or never constructed.

135.        Defendants' conduct with respect to the Tamarack Resort real property development was committed intentionally, with the intent of substantially diminishing the value of the respective ownership interests in Tamarack Resort at the expense of plaintiffs and the developers, so that defendants could gain control and ownership over the lands within the Resort, at a price substantially below that of fair market value.

136.        Defendant Credit Suisse has, using its predatory lending scheme, effectively taken control of the Tamarack Resort operation.  Notwithstanding the requests of plaintiff Gibson and other owners of lands and homes built within the Tamarack Resort to defendant, it has failed and refused to reopen the resort and shops for the present winter skiing season, in order to accomplish its unlawful purpose of depreciating the values of the homes and parcels within the Resort, and to eventually foreclose on such interests at prices substantially below fair market value.

137.        As a result of the unlawful conduct of defendants aforesaid, plaintiff Gibson and other owners of land at Tamarack Resorts, within the Plaintiffs' Class, have been caused substantial economic loss and damage, because of the diminution in market value of their lands, and because of their loss of the use and enjoyment of their lands.  Plaintiff Gibson's damages exceed one million dollars ($1 million) and the land she purchased to build a home is now virtually worthless.

**3.      The Ginn sur Mer Land Development Resort**

138.        Ginn sur Mer Resort at the West-End of Grand Bahama Island, Grand Bahamas

was designed by its developers as a $4.9 billion "mega-mix" resort on the western tip of Grand Bahama Island. Ginn and the Bahamian Government signed an agreement for the development of its 2,000 acres of land, in December of 2005.

139.     Ginn sur Mer, located 48 miles south of Florida, was marketed to citizens of the United States as a first class luxury resort development similar to the Lake Las Vegas and Tamarack Resorts described herein. Most of the purchasers of property at Ginn sur Mer were United States citizens who borrowed funds from Ginn Financial Corporation, located in the state of Florida, and subject to State of Florida Federal lending and appraisal guidelines and standards implemented pursuant to FIRREA.  Most, if not all, of the closing transactions occurred in Palm Coast, Florida at Ginn's Hammock Beach Resort.

140.     Plaintiff Gibson and members of the Plaintiff Class purchased property at Ginn sur Mer from Ginn-LA, West End Limited, between 2006 and 2007.

141.     As defendant Credit Suisse knew, the developer, Ginn and his company, enjoyed a good reputation in the financial and real estate industries as honorable and competent developers of land, and especially resort properties, before the advent of the development of Gin Sur Mer, and an excellent relationship with the Bahamian Government, which favored the development that was expected to bring business and to generally improve the standard of living for Bahamian citizens. The announcement of the development of Ginn sur Mer also won a favorable reception and acclaim in the United States..

142.     Credit Suisse also knew that the developer of Ginn sur Mer planned to build 870 single family residential home sites on the canal site, beach front and interior of the West-End of the development land, and that in addition thereto, two championship ocean-front golf courses

and clubhouses; 4,400 condominium hotel units;  two large marinas;  a 130,000 square-foot casino; swimming pools and water park facilities; tennis court complexes;  beach clubs and spas; a modern medical facility and private airport expansion to accommodate owners and their guests while visiting the resort.

143.      The sum of $160 million, derived from the private funds of plaintiff and members of Plaintiff Class, as well as from the developers Ginn and Ginn-LA West End Limited, was deposited in an escrow account and dedicated for use in completion of the canals, infrastructure and site preparation, water, sewage, electrical systems, roads, club houses and entry gate house in connection with the Ginn sur Mer land development resort. This fact was known to defendant Credit Suisse, before it designed its predatory lending scheme to perpetrate upon the owners, developers of Ginn sur Mer, including plaintiff and the members of Plaintiff Class.

144.      During 2006 through 2008, and especially on or about January 26-27, 2007, plaintiff Gibson and members of Plaintiff Class purchased approximately 195 ocean front and canal front lots at the West-End Resort. A "Founder's Weekend Celebration" was held at the development site between January 26 and 27, 2007 at which plaintiff Gibson, and other class members personally spoke to the Bahamian Prime Minister, and developer Bobby Ginn, about the development, and plaintiff and members of Plaintiff Class were assured that Ginn would go forward with the Ginn sur Mer development, as promised and set forth above, with the total support and cooperation of the Bahamian Government.  Plaintiff and the other Class Members who purchased ownership in the land known as Ginn sur Mer reasonably relied upon said promises and assurances that the aforesaid facilities and amenities, would be built as part of the Ginn sur Mer development, in making their decisions to purchase millions of dollars of previously

undeveloped land therein.   Had Plaintiff and other members of Plaintiff Class been informed that the resort would be shut down, except for completion of the infrastructure that Plaintiff and Plaintiff Class paid for, Plaintiff and other members of Plaintiff Class would not have invested their hard earned money in the development.

145.        Plaintiff Gibson and the other members of Plaintiff Class are informed and believe, and therefore aver, that the developer Ginn intended and promised in good faith to construct the aforesaid facilities and amenities which he promised to plaintiffs, as part of the Ginn Sur Mer Resort development, and that the developer in fact proceeded to affirmatively act on said promises and assurances before the scheme was effectuated and Credit Suisse took Ginn and Plaintiff Gibson and Plaintiff Class by the throat to destroy their respective rights and interests.

146.        After defendant Credit Suisse learned that the developer Ginn and Ginn-LA West End Limited was proceeding in good faith with the Ginn Sur Mer land development, Credit Suisse conspired to perpetrate the same or similar predatory lending practices upon the owners and developers of Ginn sur Mer  as it did with respect to the owners and developers of Lake Las Vegas, Tamarack Resort and other resorts, with the intention of causing the development to fail, so that Credit Suisse could acquire said land at a substantial discount to its fair market value, at the expense of plaintiffs, in violation of the state and federal appraisal and lending standards enacted pursuant to FIRREA, and other applicable United States banking laws, including conspiracy to violate federal mail and wire fraud statutes, described herein, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(a), (c) and (d) ("RICO"), cited herein above.

147.        In June, 2008, as a result of defendant Credit Suisse' predatory loan practices, the

Ginn sur Mer land development project was forced into default status. The Montana Court later found that the loan to Ginn was part of the same predatory scheme undertaken against Lake Las Vegas and Tamarack Resort as described herein. Credit Suisse forced the developer, Ginn-LA, to enter into an agreement in which only the infrastructure and golf course at Ginn Sur Mer would be completed from the money paid into an escrow account and trust by the developer, plaintiff Gibson, and members of Plaintiff Class.

148.     Defendant Credit Suisse wrongfully acquired ownership control of the Ginn Sur Mer land development, and became the *defacto* successor developer at Ginn Sur Mer. Notwithstanding its status as the *defacto* controlling owner and now developer of Ginn sur Mer, Credit Suisse has continuously failed and refused to honor the aforesaid promises and covenants made by Ginn and the Prime Minister of Bahamas to plaintiff Gibson, members of the Plaintiff Class, refused to complete the construction of the aforesaid amenities and improvements to the land, apart from the infrastructure, in violation of its duty to plaintiffs to do so. Defendant's failure and refusal is intentional, malicious and oppressive, and done for the purpose of causing injury and economic damage to the plaintiffs and the development project at Ginn sur Mer in order to achieve financial gain for Credit Suisse.

149.     The aforesaid acts and conduct of defendants have proximately caused plaintiffs to incur substantial economic damages, in the millions of dollars, by the resulting depreciation and diminution in value of their land at the Ginn sur Mer Resort land development, and the denial of plaintiffs' lawful use and enjoyment of their land. Plaintiff Gibson has lost approximately one million dollars ($1,000,000) in connection with her investment in land, which loss was directly and proximately caused by defendants illegal and predatory practices described herein and

throughout the Complaint.

**4.    The Yellowstone Club.**

150.        The Yellowstone Club land development was designed to develop 13,400 acres of privately held land located in Madison County, Montana near the northwest corner of the Yellowstone National Park, as a private ski and golf community consisting of seven (7) residential neighborhoods comprised of more than 850 residential dwellings on 2,700 acres of the land.  The development originated in late 1999 and was advertised as the world's first private skiing and golfing community, open to members and guests of The Yellowstone Club.

151.        Defendant Cushman & Wakefield appraised the project and issued its report on July 1, 2005 in which it described the Yellowstone Club land development as one which will:

> "…[a]ppeal to ultra-wealthy families as a second-home (or third-home) location
>
> for its private recreational facilities (particularly the ski area), views, and proximity
>
> to winter and summer recreation. Prospective buyers are required to have a net
>
> worth of over $3 million, but based on the costs of membership and housing, we
>
> would expect nearly all buyers to have investable assets of at least $5 million, if
>
> not $10 million. The membership price for residents is $250,000 for a 30-year
>
> refundable deposit. "

152.        Similarly to the aforementioned land developments known as Lake Las Vegas, Tamarack, and Ginn Sur Mer, the Yellowstone Club land development was designed to appeal to buyers who desired to invest in a luxurious, first class real estate development, with golf courses, private ski area and other similar amenities.

153.        Plaintiff, BEAU BLIXSETH,  in reliance upon the developer's promises of the

aforesaid   rights, privileges and amenities running with the land,   purchased property at Yellowstone Club, during the relevant period of time and remains an owner thereof

154.        In late 2004, defendant Credit Suisse began actively and aggressively soliciting the developer of Yellowstone Club to participate in defendants' Loan to Own scheme. Defendant Credit Suisse's solicitations included telephone calls and emails, directed to the Yellowstone Mountain Club, LLC, the developer, designed to persuade it to borrow $150 million from Credit Suisse.  The developer of Yellowstone Club initially rejected Credit Suisse's solicitation offer. Credit Suisse persisted in its solicitation of the developer, which eventually agreed to the proposed loan to it by Credit Suisse of $150 million. In the months that followed, Credit Suisse continued to solicit the developer of Yellowstone Club to persuade it to borrow even more money for the land development project, until the developer agreed to increase the amount of the loan to $375 million.

155.        Credit Suisse acted at all times relevant hereto, fraudulently and deceitfully, in its dealings with the developer of Yellowstone Club, and with the intention of eventually forcing the developer into bankruptcy, so that Credit Suisse could then take control of, and ownership to, the land and improvements thereto, known as Yellowstone Club, to the detriment of the developer and the owners who had invested in it, as well as the hundreds of suppliers and material men and women with whom the developer had contracted to construct the improvements on the large land development project.

156.        The acts and conduct of defendant Credit Suisse and the other defendants associated with it toward the developer of Yellowstone Club, were part of defendants' Loan to Own scheme or plan which they perpetrated on the aforesaid owners and developers of the land

developments described herein as Lake Las Vegas, Tamarack, and Ginn Sur Mer, which scheme or plan was designed by Credit Suisse to charge exorbitant loan fees while planning the failure of the project so that it could eventually foreclose on or otherwise acquire control and ownership of the lands and improvements through the bankruptcy of the developer, which Credit Suisse intended would occur.

157.        Defendants' aforesaid conduct was intentional, malicious and oppressive and done with the intention of causing the development to fail, so that Credit Suisse could acquire said land at a substantial discount to its fair market value, at the expense of plaintiffs, in violation of the FIRREA act and its standards, and other applicable United States banking laws, including conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(a), (c) and (d) ("RICO"), cited herein above.

158.        The aforesaid conduct of Credit Suisse and the other defendants in perpetrating the Loan to Own scheme caused the Yellowstone Club land development project to fail, and the developer to be forced into the United States Bankruptcy Court, where Credit Suisse took effective control of the assets of Yellowstone Club, through its "note-holder", Cross Harbor Capital partners ("CHC"); and the "predatory lending practices" of CHC.

159.        The underlying facts involving the takeover of the Yellowstone Club are even more insidious and involve even more RICO "patterns of racketeering activity" and "predicate acts" extending beyond civil fraud into the arena of overt criminality.   There, CHC, had previously executed a purchase and sales contract on January 15, 2008 to purchase the assets of the Yellowstone Club for $455 Million dollars and repay the Credit Suisse loan, which would have protected the Yellowstone homeowners.   Instead, it conspired with Credit Suisse, and

became a "note-holder." It then conspired with the ex-wife of the developer to kill the sale, using in part the fake "Grand Jury Target Letters" against the developers, which letters had been created by the ex-wife's partner. In order to finance their scheme, the ex-wife had borrowed over $43 Million dollars of overtly fraudulent loans, based mostly on the fraudulent values of the Credit Suisse "total net value" appraisal scheme. She then used those funds, in part, to finance her scheme to conspire with CHC to put the Yellowstone Club into bankruptcy. As part of their scheme, CHC loaned the ex-wife another $35 Million dollars to obtain full ownership of the Yellowstone Club knowing that the previous loans were procured by both the fraudulent Credit Suisse appraisal method, and by fraudulent loan applications containing additional fraudulent statements submitted to multiple lenders by the ex-wife. When CHC loaned her the $35 Million dollars to obtain control of the Yellowstone Club, it did so with full knowledge of the fraudulent and then defaulted federally regulated bank loans; and with full knowledge of the  fraudulent Credit Suisse appraisal methods and FIRREA violations, *while operating as its insider "note-holder" to take control of the Yellowstone Club.*

160.        Credit Suisse and CHC in collusion with the ex-wife then attacked the former developer of Yellowstone Club by forcibly converting the $375 million loan from a non-recourse loan against the property into a recourse loan against the former developer, which caused the developer and the owner-investors in the land, including plaintiff, BEAU BLIXSETH, and those members of Plaintiff Class similarly situated, to sustain hundreds of millions of dollars of economic loss and damages.  The aforesaid conduct of Credit Suisse was wrongful, malicious and shocking to the conscience of the United States Bankruptcy Court as hereinabove recounted.

## VII.   CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Violation of RICO Act against all defendants)

161.          Plaintiffs incorporate by reference each of the prior paragraphs in full as though set forth herein in full.

162.          At all material times, the Credit Suisse defendants and Cushman & Wakefield formed an association-in-fact that was an enterprise which engaged in, and whose activities affected, interstate commerce.  The enterprise is an entity separate and apart from the pattern of racketeering alleged.  The enterprise, which is called the Credit Suisse Cayman Island Branch, among other things, engages in the sale and solicitation of investments for unregistered and fraudulent investments.

163.          Based upon the information and belief of plaintiff, they allege that the following persons constitute a group of individuals and persons associated in fact who constitute a RICO enterprise referred to as the Credit Suisse Cayman Islands Branch Enterprise: Credit Suisse Securities (USA), LLC, Credit Suisse First Boston and Credit Suisse Cayman Islands Branch (collectively "Credit Suisse" or "Defendants") together with Cushman & Wakefield are an enterprise and are continuously engaged in ongoing activities  which affect interstate commerce and have been and are being operated in furtherance of a common purpose beginning in or around 2004.

164.          Credit Suisse, AG, Credit Suisse Securities, USA, Credit Suisse First Boston Credit Suisse, Cayman Islands Branch and Cushman & Wakefield are each a "person" as defined in the United States Code and constitute a RICO "Enterprise".

- 63 -

165.        Credit Suisse AG, Credit Suisse Securities, USA, Credit Suisse First Boston and

Credit Suisse, Cayman Islands Branch and Cushman & Wakefield are members of and have

participated in and have associated together for the common purpose of the enterprise; *e.g.*,

promoting and selling loan agreements and credit facilities under the fraudulent circumstances

described herein even though each has an existence separate and apart from the enterprise.  The

Credit Suisse enterprise has an ascertainable structure separate and apart from the pattern of

racketeering activity in which the Defendants have engaged.

166.        As more fully set forth herein, Defendants were engaged in a scheme and artifice

utilizing offices and branches of Credit Suisse, Cushman & Wakefield and multiple syndicates

and lenders to defraud the plaintiffs and similarly situated members of Plaintiff Class, as well as

others whom are not presently known to the plaintiffs, but when ascertained plaintiffs will seek

leave of the Court to amend this Complaint appropriately.

167.        Defendants control and operate the Credit Suisse Cayman Islands Branch

enterprise through a variety of means.  More particularly and as set forth in detail herein,

Defendants and their agents, representatives and commission sales persons identified herein

utilized misrepresentations, omissions or other dishonest means which were reasonably calculated

to deceive persons of ordinary prudence and intelligence.

168.        The Defendants utilized misrepresentations, omissions, untrue promises and other

dishonest means which were reasonably calculated to deceive the Plaintiffs and Class Members

because they were knowingly false and/or these Defendants did not intend to fulfill the promises.

169.        The Defendants knowingly made and/or facilitated material misrepresentations of

fact, which misrepresentations they knew to be false, and which were intended to deceive

Plaintiffs.

170.        The Plaintiffs and Class Members believed the representations and promises to be true, acted in reliance upon them and were misled and deceived by these Defendants' willful misrepresentations, omissions, promises and dishonesty, all causing injury and economic damage to the Plaintiffs.

171.        Defendants have conspired to conduct and are conducting the affairs of the enterprise, either directly or indirectly, through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(5).  The purpose of this racketeering activity has been to defraud the Plaintiff Class and other similarly situated through the conduct described herein.  In furtherance of this scheme, each defendant, since 2004 and continuing through the present, has conspired to commit and has committed two or more violations of 18 U.S.C. §§ 1341, 1343 and 1952.  Further, as described herein, each has conspired to commit and has committed numerous acts of fraud.

172.        The Plaintiff Class, and each of the members thereof, specifically allege that the defendants have violated the following criminal statutes on two or more occasions, including but not limited to the following:

1.     The use of mail delivered by the United States Postal Service, in furtherance of a scheme to defraud, in violation of 18 U.S.C. § 1341;

2.     The use of writings, sounds or signals transmitted by means of wire communication in interstate or foreign commerce, in furtherance of a scheme to defraud, in violation of 18 U.S.C. § 1343;

3.     Transporting or transmitting a monetary instrument from a place outside the United States to a place inside the United States, in violation of 18 U.S.C. § 1956(a)(2)(A); and

4.     Engaging or attempting to engage in a monetary transaction in criminally derived

- 65 -

property that is of a value greater than $10,000 and is derived from specified unlawful activity, in violation of 18 U.S.C. § 1957(a).

173.      In addition to running the affairs of the enterprise through this pattern of racketeering activity, defendants have conspired to and have used the same pattern of racketeering activity to receive income directly and indirectly from plaintiffs and from similarly situated individuals. Defendants have conspired to and have used income derived from this pattern of racketeering to invest in the establishment and continued operations of the enterprise and upon information and belief, other fraudulent schemes.

174.      Defendants agreed to commit and did commit multiple, but in any event at least two (2), unlawful acts that are predicate acts of racketeering in furtherance of the racketeering enterprise. The pattern of racketeering activity engaged in by defendants, and each of them, includes use of the mails and telephone lines and aiding and abetting in the use of the mails and telephone lines to execute the relevant fraudulent schemes described herein, including:

        a.    During 2004 and continuing to at least 2008, principals, employees or agents of the Credit Suisse Loan to Own scheme repeatedly used the mails and wires to solicit potential borrowers and for each of the four land development resorts listed herein, transmitted loan forms by both wire and mail in furtherance of the scheme to defraud;

        b.    Between 2004 through 2008, on dates presently unknown to Plaintiff Class, Credit Suisse, with the consent of the other defendants, sent, through the mails, false and misleading Offering Circulars for the Loan to Own scheme more particularly described above;

        c.    In December 2004, Credit Suisse used the wires to solicit Yellowstone Mountain Club, LLC for the Loan to Own scheme

        d.    On September 30, 2005, Credit Suisse transmitted loan forms by wire in furtherance of the scheme to defraud;

        e.    At various times between 2004 and 2008, Credit Suisse and its agents and

employees transferred funds from Credit Suisse bank accounts both within and outside the United States to developers to fund the Loan to Own scheme and similarly used the wires to transmit fees to Credit Suisse-controlled accounts.

f.   At dates and times presently unknown to plaintiffs, Credit Suisse defendants, Cushman & Wakefield discussed with the Plaintiff Class and with each other, both in person and over the telephone, the status of the Loan to Own scheme and, on information and belief, approved various of the fraudulent acts herein described;

g.   At dates and times presently unknown to plaintiffs, defendants corresponded by mail with the various banks concerning the transfer of funds for the enterprise at issue here;

h.   At times presently unknown to the Plaintiffs, Cushman & Wakefield used both the mails and the wires to transmit fraudulent and unlawful "Total Net Value" appraisals to the developments and to the Credit Suisse Defendants.

i.   The Credit Suisse Defendants helped fund the Loan to Own Enterprise with the proceeds of its illegal scheme to assist agencies of the Iranian government to circumvent USA economic sanctions in violation of 18 U.S.C. § 1957(a).

175.   As a result of the conduct alleged herein, defendants, and each of them, have violated the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(a), (c) and (d).

176.   As a result of said violations, the defendants, and each of them, have caused substantial and irreparable economic loss and damage, both directly and indirectly, to plaintiffs' business and property as described in more detail herein.

177.   Defendants knowingly, willfully and unlawfully engaged in a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), by committing multiple, but in any event at least two (2), related acts of racketeering activity within four (4) years.  Each act of racketeering was related, had a similar purpose, involved the same or similar participants and

means of commission, had similar results and impacted similar victims, including Plaintiffs and Class Members, to wit: the named Plaintiffs and the Plaintiff class of land owners and homeowners at Lake Las Vegas, Tamarack Resort, Ginn sur Mer and Yellowstone Club.

178.      Defendants' wrongful conduct as complained of and/or that which it conspired to or aided and abetted in the commission of, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1965(5).

179.      Defendants knew that the alleged unlawful acts were part of a pattern of racketeering activity.

180.      Defendants, in devising, facilitating, participating in and/or in conspiring to and in perpetrating the wrongful acts complained of herein, knowingly and willfully engaged in a pattern of racketeering activity as hereinafter described for the purpose of defrauding plaintiffs, the similarly situated members of Plaintiff Class, and the developers and builders of the land developments known as Lake Las Vegas, Tamarack Resort, Ginn sur Mer and Yellowstone Club

181.      Defendants as persons within the meaning of 18 U.S.C. § 1961(3), received income in the hundreds of millions of dollars derived, directly or indirectly, from a pattern of racketeering activity which was used to acquire an interest in said enterprise in violation of 18 U.S.C. § 1962(a).

182.      Defendants, as persons within the meaning of 18 U.S.C. § 1961(3), through a pattern of racketeering activity, acquired and/or maintained directly or indirectly, control of said enterprise in violation of 18 U.S.C. § 1962(b).

183.      Defendants, as persons within the meaning of 18 U.S.C. § 1961(3) and as persons

employed by/associated with said enterprise, conducted and participated, directly and indirectly, in the conduct of the affairs of said enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

184.     The multiple predicate acts including, upon information and belief, in excess of 15 separate resort loans made under the same fraudulent circumstances described herein constitute a pattern of racketeering activity.

185.     These 15 or more acts of racketeering, occurring within ten years or less of one another, constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

186.     Plaintiffs and Class Members were caused economic loss, damage and injury to their business or property by reason of this violation of 18 U.S.C. § 1962, in that, as a direct and proximate result of defendants' aforesaid acts and conduct, plaintiffs suffered economic and property damages, loss of property values or property itself, including financial losses, loss of existing and prospective business interests and advantages and loss of reputation in the excess of Eight Billion Dollars. ($8,000,000,000)

187.     By reason of the Defendants' violation of 18 U.S.C. § 1962, Plaintiffs are entitled, pursuant to 18 U.S.C. § 1964(c), to threefold the damages sustained or Twenty Four ($24) Billion Dollars, with interest thereon, and a reasonable attorney's fee in connection herewith.

## SECOND CAUSE OF ACTION

### (Common Law Fraud Against All Defendants)

188.     Plaintiffs and similarly situated members of Plaintiff Class incorporate as if fully set forth here the facts and allegations previously set forth in this Complaint.

189.     As described herein, defendants are liable to plaintiffs and Class Members for

damages because they committed common law fraud by intentionally supplying materially false information to developers and third party beneficiary plaintiffs and Class Members  and concealing material facts they had a duty to disclose, in connection with the described financial transactions with developers, plaintiffs and Class Members.

190.       The defendants' aforesaid false, misleading and untrue statements and omissions presentations were material in that they related to matters that would have been of importance or significance in the developers' decision whether to participate in the aforesaid financial transactions. Developers, plaintiffs and similarly situated members of Plaintiff Class would have viewed the disclosure of the true facts as significantly altering the overall character and nature of the information available such that knowledge of the true facts would have materially affected their financial and economic decisions relative to the aforesaid financial transactions.

191.       At the time they entered into the aforesaid financial transactions developers, plaintiffs and similarly situated members of Plaintiff Class were not aware of the above-detailed untruths or omissions.

192.       Defendants made the aforementioned false representations, statements and omissions with knowledge of their falsity at the time they were made, or with reckless disregard for the truth and the rights of plaintiffs, and knowing that developers, plaintiffs and members of Plaintiff Class would rely thereon to their detriment.

193.       Developers, Plaintiffs and Class Members actually, reasonably and justifiably relied to their detriment on the material misrepresentations and omissions of the Defendants in entering into the financial transactions with defendants, and that reliance caused the damages and harm for which plaintiffs and members of Plaintiff Class  seek redress in this civil action.  Had

developers, plaintiffs and members of Plaintiff Class   known the truth, developers would not have consummated the financial transactions or would have done so only on significantly different terms; accordingly, the developers, would have remained the developers, the rights, amenities and privileges promised by the developers would have been honored and the rights and property interests and values of plaintiffs and members of Plaintiff Class would not have been injured and damaged.

194.        As a direct and proximate result of the aforesaid fraudulent, malicious and oppressive conduct of the defendants, and each of them, plaintiffs and members of Plaintiff Class were caused severe economic damages in an amount to be determined at trial but which damages are substantially in excess of the $5,000,000 jurisdictional minimum of this court.

## THIRD CAUSE OF ACTION

### (Common Law Negligent Misrepresentation Against All Defendants)

195.        Plaintiffs and Class Members incorporate as if fully set forth herein the facts and allegations contained in this Complaint. Plaintiffs and the members of Plaintiff Class represented by plaintiffs, bring this civil action against all defendants.

196.        As described herein, each of the defendants is also liable to plaintiffs and members of Plaintiff Class in damages for committing negligent misrepresentations by supplying materially false information to Plaintiffs in connection with the financial transactions it entered into with the Plaintiffs.

197.        Defendants furnished written and oral information to developers.   Defendants prepared these documents and made these representations (including but not limited to the "total net value" appraisals) with specific knowledge and intent that said documents would be

distributed to developers and their foreseeable home buyers, in order to induce them to enter into the aforesaid financial and real estate transactions.  Developers, plaintiffs and Class Members were foreseeable recipients of said representations, and defendants knew and intended that they would rely on the defendants' representations, which defendants knew were false and misleading.

198.        In connection with their respective proper business purposes in which they were lawfully engaged, developers, plaintiffs and Class Members  received the appraisals and other written and oral presentations from defendants before entering into the financial transactions with defendants.  Developers, plaintiffs and Class Members also received the oral misstatements from the Defendants, and were subject to the aforementioned materially misleading omissions of the defendants, in connection with said business purposes.

199.        Defendants each had a duty to provide developers, plaintiffs and Class Members with materially accurate information and disclosures, and each defendant had a duty to refrain from misrepresenting the terms of or the basis for the said loans and Credit Agreements.   In violation of that duty, each defendant failed to exercise reasonable care in connection with the aforesaid transactions, and the preparation, presentation, publication and communication thereof to foreseeable users of said information.

200.        Defendants and each of them failed to exercise reasonable care in making the oral and written presentations to the developers, plaintiffs, and members of the Plaintiff Class.

201.        Defendants and each of them had a substantial pecuniary interest in the completion of the aforesaid loans, and stood to receive substantial personal gain if the loan transactions were executed.

202.        Defendants and each of them negligently published and uttered untrue statements

of material facts and negligently failed to affirmatively disclose facts that were necessary for the persons and entities to which they were published and uttered, in order to prevent said statements from being misleading and detrimental to the interests of the aforesaid developers, plaintiffs, and members of Plaintiff Class.

203.      Defendants' aforesaid untrue statements and failures to disclose material facts related to matters of importance or significance to the decisions of the developers as to whether to enter into the said loan transactions with defendants, and caused them to accept defendants' proffered loan agreements, which caused harm and substantial economic damages to the developers, owners, plaintiffs and members of Plaintiff Class.

204.      The acts, omissions and conduct aforesaid of defendants and each them amounted to the commission of gross negligence.

205.      The developers, owners, plaintiffs and members of Plaintiff Class herein did not know that the aforementioned representations and promises of defendants were false, and they justifiably relied to their detriment on said representations, believing them to be true.

206.      As a direct and proximate result of the defendants' misrepresentations, plaintiffs and the members of Plaintiff Class were caused, and continue to suffer, economic damages in excess of $8 Billion.

207.      Plaintiffs and the members of Plaintiff Class are lawfully entitled to recover from the defendants all of the economic damages that were caused them by the defendants' negligent misrepresentations and omissions of the facts pertinent to the aforesaid loan transactions and Credit Agreements with the developers.

## FOURTH CAUSE OF ACTION

### (Breach of Fiduciary Duty Against All Defendants)

208.     Plaintiffs and the members of Plaintiff-class incorporate as if fully set forth herein the facts and allegations contained in this Complaint.

209.     Defendants, their agents and employees, acting in the course and scope of their employment, instituted a relationship of trust and confidence with plaintiffs.  Defendants had superior knowledge of the "Loan to Own" transactions and expected and intended that the developers and plaintiffs would rely upon them.  Defendants had a duty to investigate and to disclose all material facts related to said transactions.  Defendants failed to investigate, failed to disclose and actively misled plaintiffs and the members of Plaintiff-class to their detriment.  Defendants owed fiduciary duties of care, undivided loyalty and full disclosure to said plaintiffs, which defendants violated.

210.     The defendants, the developers and the plaintiffs including the members of Plaintiff Class were parties to a tri-partite special relationship of confidence and trust.  Such special relationship burdened the participants in the relationship with the fiduciary duties of candor, loyalty and good faith and fair dealing.

211.     Defendants breached their fiduciary duties with respect to each resort by making oral and written statements which were known by Credit Suisse to be false at the time they were made, and while knowing that each resort's developer would never have undertaken any lending relationship with the defendants had they truthfully represented the aforementioned facts and intentions of defendants.  Defendants' breach of said fiduciary obligations caused the developers and owners of the lands known as Lake Las Vegas, Tamarack, Yellowstone and Ginn Sur Mer to

lose control of their properties, to become burdened with unsustainable debt, and to incur economic losses estimated to exceed $8 billion dollars.

212.        Defendants' acts and conduct alleged herein, was committed by the defendants while acting with fraud, malice, or oppression and done with intention to harm, or in reckless disregard of the consequential harm to plaintiffs and members of the Plaintiff Class, and the defendants ought therefore to be punished, and an example made to defendants and others, by the assessment of punitive damages in a just and reasonable amount, in excess of $24 billion dollars.

## FIFTH CAUSE OF ACTION

### (Tortious Interference with Plaintiffs Existing Rights, Amenities, and Privileges With Developers at Each Resort)

213.        Plaintiffs incorporate as if fully set forth herein the facts and allegations contained in this Complaint.

214.        Plaintiffs and members of Plaintiff Class had contracts with the developers of each of the aforesaid land-development resorts, which contracts provided for the construction and maintenance of the aforementioned rights, amenities and privileges running with the lands, and which were known to defendants at all times relevant hereto.

215.        Despite defendants' knowledge of the contractual rights of said plaintiffs, defendants intentionally and without justification or privilege, interfered with plaintiffs' contractual rights by committing the aforesaid unlawful, fraudulent and illegal acts and omissions.

216.        As a direct and proximate result of defendants' unlawful, intentional and unprivileged interference with the contractual rights of plaintiffs and members of Plaintiff Class, they were caused economic damages in an amount to be determined at trial but well in excess of

the jurisdictional minimum requirements of this Court.

## SIXTH CAUSE OF ACTION

### (Common Law Conspiracy Against All Defendants)

217.        Plaintiffs and members of Plaintiff Class   incorporate as if fully set forth herein the facts and allegations contained in this Complaint.

218.        Defendants, and each of them, combined and conspired with each other in furtherance of the aforesaid conspiracy to defraud plaintiffs and members of the Plaintiff Class by means of racketeering, breach of fiduciary duty and fraud.

219.        Defendants and each of them agreed to participate in combination one with another and with third parties or persons not herein named in a scheme and civil conspiracy to effect the fraudulent consummation of the aforesaid loans and Credit Agreements, or to do so by fraudulent means. In addition, all the defendants agreed to participate in a conspiracy to keep the true and accurate nature and significance of the unproven, artificial "total net value" appraisal methodology hidden from plaintiffs in order to perpetuate the ability of defendants   to make repeated fraudulent loans to plaintiffs.

220.        Defendants' aforesaid wrongful acts and conduct was committed by them with wrongful intent pursuant to defendants' plan and  scheme and in furtherance of their unlawful and tortious intent to earn excessive and exorbitant loan fees, and to gain ownership or control over the lands described herein above, at the expense and harm to the developers, homeowners, plaintiffs and members of Plaintiff Class, by means of the aforesaid fraudulent loan transactions and fraudulent misrepresentations.

221.        Defendants' wrongful acts and conduct in furtherance of the Loan to Own scheme

- 76 -

caused substantial economic harm and damage to each developer, homeowner, plaintiff and member of Plaintiff Class, in a cumulative amount in excess of $8 billion dollars, and each defendant is jointly and severally liable to plaintiffs and the members of Plaintiff Class for said damages.

## SEVENTH CAUSE OF ACTION

### (Common Law Unjust Enrichment Against All Defendants)

222.        Plaintiffs and the members of Plaintiff Class incorporate as if fully set forth here the facts and allegations contained in this Complaint.

223.        Defendants and each of them wrongfully benefited from and were enriched by their role in the aforesaid fraudulent loans and financial transactions by receiving compensation, payment or fees for their services in connection therewith, of which the defendants acted with knowledge and intent to defraud, and thereby to reap rich financial rewards.

224.        The wrongful benefit and enrichment of each defendant was at the expense of the plaintiffs including the members of Plaintiff Class.

225.        Because the retention by defendants of these benefits would be grossly unjust, plaintiffs and the members of Plaintiff Class are entitled to recover from defendants, and each of them, the benefits and enrichment each received as a result of their aforesaid conduct in connection with the aforementioned loans and credit agreements.

## EIGHTH CAUSE OF ACTION

### (Negligence and Gross Negligence Against All Defendants)

226.        Plaintiffs and Class Members incorporate as if fully set forth herein the facts and allegations contained in this Complaint.

227.        Defendants owed a duty to developers, Plaintiffs and Class Members to use ordinary and reasonable care in carrying out their obligations.

228.        Defendants breached this duty through the conduct described above.

229.        As described herein, each Defendant is also liable to Plaintiffs and Class Members in damages for its negligent and grossly negligent behavior.

230.        Plaintiff and Class Members were directly and foreseeable injured as a result of Defendants' negligence and gross negligence. As a direct and proximate result of this breach of ordinary or reasonable care, Plaintiff and Class Members were damaged.

231.        By reason of the foregoing, Plaintiff and Class Members are therefore entitled to recover all of the damages Plaintiffs sustained as a result of Defendants' negligence and gross negligence.

## NINTH CAUSE OF ACTION

### (Breach of Covenant of Good Faith and Fair Dealing Against All Defendants)

232.        Plaintiff and Class Members incorporate as if fully set forth herein the facts and allegations contained in this Complaint.

233.        The developers' loan agreements and contracts with defendants included an implied covenant of good faith and fair dealing that inured to the benefit of and was therefore owed to the plaintiffs and the members of Plaintiff Class, who were and continue to be third-party beneficiaries thereof.

234.        Consistent with the covenant of good faith and fair dealing inherent in said loan agreements and contracts, the defendants owed, at all times, the duty and an obligation to deal fairly, honestly and in good faith with the aforesaid developers, homeowners, plaintiffs and

- 78 -

members of Plaintiff Class in a manner consistent with accepted commercial practices and to do nothing to deprive them of the benefits to which they were entitled by virtue of their contractual rights in connection with the resort land developments at Lake Las Vegas, Tamarack, Ginn Sur Mer, and Yellowstone Club.

235.        By their wrongful acts and omissions aforesaid, defendants and each of them breached the covenant of good faith and fair dealing owed to plaintiffs and members of Plaintiff Class.

236.        As a direct and proximate result of the defendants' breach of the covenant of good faith and fair dealing, plaintiffs and the members of Plaintiff Class were caused and continue to suffer severe and substantial economic harm, loss and damages in an amount of $4 billion or such sum as determined at trial, and significantly in excess of the jurisdictional minimum of this court.

237.        Defendants' aforesaid conduct and bad faith was done willfully, maliciously, intentionally or in reckless disregard of the foreseeable harm to the developers, plaintiffs and members of Plaintiff Class, and ought to be punished and an example made to defendants and other, by the assessment of punitive damages in a just and reasonable amount in excess of $1 billion dollars against defendants.

## TENTH CAUSE OF ACTION

### (Exemplary Damages Against All Defendants)

238.        Plaintiff and Class Members incorporate as if fully set forth here the facts and allegations contained in this Complaint.

239.       Defendants' actions as described in detail above were done with specific intent to defraud developers and the Plaintiffs and Class Members and with a conscious and deliberate disregard of the substantial risk of tremendous harm to Plaintiffs and the Class Members. Defendants acted in a manner that was an extreme deviation from reasonable standards of conduct. The conduct set forth in this complaint was performed by defendants with understanding of or disregard for its likely consequences. The conduct was outrageous, wanton, deliberate and willful. Due to the fraudulent and/or grossly negligent nature of their acts, Defendants are liable to Plaintiffs and Class Members for exemplary and punitive damages.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a jury trial on all issues in the Complaint and Counterclaim so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that, after trial by jury, the Court enter a judgment on behalf of plaintiffs and the members of Plaintiff Class and against defendants and each of them as follows:

A.       Economic damages in a just and reasonable amount as determined by proof at trial, in approximately the sum of $8 Billion dollars;

B.       Plaintiffs' costs and expenses incurred in this action, including reasonable attorneys' and experts' fees;

C.       Exemplary or punitive damages in a just and reasonable amount, in approximately the sum of $16 Billion dollars pursuant to RICO, including a reasonable attorney's fee, pursuant to

18 U.S.C. § 1964(c); and/or pursuant to Idaho law;

      D.      Alternatively, for treble damages under state law claims actually sustained and the costs of suit, in a sum not less than $16 Billion dollars ($16,000,000,000);

      E.      For an order that Defendants are estopped from asserting or attempting to enforce the contractual jury waiver clause, and /or other clauses in its loan agreements, or in the alternative for an Order that said clause, or clauses is/are not applicable and void in its/their entirety due to illegality or in the alternative that said clause, or clauses is/are not applicable with regard to Defendants' international torts; and

      F.      For such other and further relief as the Court may deem appropriate pursuant to 18 U.S.C. § 1964.

Dated this 3rd day of January, 2010.

/s/  Michael J. Flynn                         /s/  Philip H. Stillman
Michael J. Flynn                              Philip H. Stillman

/s/  James C. Sabalos                         /s/  John Flood
James C. Sabalos                              John Flood

/s/ Chris Flood                              /s/ Peter C. Neumann
Chris Flood                                 Peter C. Neumann

/s/  Robert C. Huntley
Robert C. Huntley

Attorneys for Plaintiffs and members of proposed Plaintiff Class