Robert C. Huntley, ISB # 894
815 Washington Street, P.O. Box 2188
Boise, ID 83701
Phone: (208) 388-1230
(Fax):  (208) 388-0234
rhuntley@huntleylaw.com

Michael J. Flynn,  MA Bar # 172780
P.O. Box 690
Rancho Santa Fe, CA 92067
Tel. (858) 775-7624
Fax:  (858) 759 0711
 mike@mjfesq.com

James C.  Sabalos, Tex. Bar No. 17499100
3900Essex Lane, Suite 730
Houston, Texas 77027
Tel:  (949) 355-6084
jimsabalos@hotmail.com

John Flood, Texas Bar No.07155910
802 N. Carancahua, Ste 900
Corpus Christi, TX 78470
Tel: (361) 654-8877
Fax: (361) 654-8879
John@floodandflood.com

Philip H. Stillman, CA #152861
508 Meadowmist Court, Ste B
Olivenhain,  CA 92024
Tel.  (888) 235-4279
Fax. (888) 235-4279
pstillman@stillmanassociates.com

Peter Chase Neumann, NV Bar # 636
136 Ridge Street
Reno, NV 89501
Tel: (775) 786-3750
Fax: (775) 786-8791
petercneumann@sbcglobal.net

Chris Flood, Tex. BN 07155700
914 Preston, Suite 800
Houston, Texas 77002
Tel: (713) 223-8877
Fax: (713) 223-8879
chris@floodandflood.com

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| L.J. GIBSON, BEAU BLIXSETH; AMY KOENIG, DEAN FRESONKE, VERN JENNINGS, TERRI FROEHLICH, MONIQUE LEFLEUR, and GRIFFEN DEVELOPMENT, LLC, each individually, and on behalf of PROPOSED Plaintiff CLASS Members of Tamarack Resort, Yellowstone Club, Lake Las Vegas and Ginn Sur Mer, <br><br> Plaintiffs, <br><br> v. <br><br> CREDIT SUISSE AG, a Swiss corporation; CREDIT SUISSE SECURITIES (USA), LLC,  a Delaware limited liability company, CREDIT SUISSE FIRST BOSTON, a Delaware limited liability corporation; CREDIT SUISSE CAYMAN ISLAND BRANCH, an entity of unknown type; CUSHMAN & WAKEFIELD, INC., a Delaware corporation and DOES 1 through 100 inclusive, <br><br> Defendants. | Case No.  1:10-cv-00001-EJL <br><br> ***Correcting Paragraph Numbering in Document Nos. 12 (page 85 to end)*** <br><br> **SECOND AMENDED COMPLAINT** <br><br> 1.  Racketeer Influenced and Corrupt Organizations Act; <br> 2.  Fraud; <br> 3.  Negligent Misrepresentation; <br> 4.  Breach of Fiduciary Duty**;** <br> 5.  Tortious Interference with Contractual Relations; <br> 6.  Unjust Enrichment; and <br> 7.  Negligence. <br> 8.  Common Law Conspiracy <br><br> **JURY TRIAL DEMANDED** |

## I. <u>INTRODUCTION AND SUMMARY OF CASE</u>

1.     This is a proposed Class action to redress the rights and losses of persons and entities who purchased real property and homes in resort land developments known as Lake Las Vegas,  Tamarack, Ginn Sur Mer, and Yellowstone Club, which lie situate in Nevada, Idaho, Grand Bahamas, and Montana  caused by a pattern of racketeering and money laundering by Credit Suisse AG, Credit Suisse Securities (USA), LLC, Credit Suisse First Boston and Credit Suisse, Cayman Islands Branch (hereinafter sometimes collectively referred to as "Credit Suisse" or "Defendants") and assisted in the scheme by international real estate services firm, Cushman & Wakefield.  By means of mail and wire fraud, and money laundering, the Defendants violated and conspired to violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(a), (c) and (d) ("RICO").  In addition, the Plaintiffs seek damages pursuant to applicable state law claims for breach of fiduciary duty, fraud, negligence, and breach of the covenant of good faith and fair dealing, among others.  The Class of injured persons or entities additionally includes secured and unsecured creditors, shareholders, and others directly or indirectly injured by the acts and omissions of the Defendants.

2.     Given the clear cut RICO violations plead herein; and the compensatory, consequential and punitive damages recoverable under RICO; and the catastrophic damages caused not only to the Plaintiff Class, but also to the state of Idaho and other states, by Credit Suisse, acting as an international banking predator, with utter contempt for U.S. laws, Plaintiff Class seeks damages in the amount of $24 Billion Dollars.  The recovery of damages from the Defendants herein will cause the Plaintiff Class, with the approval of the Court, to contribute up to $150 million dollars into a fund created by the Plaintiff Class to each of the states which have been damaged by the Defendants' RICO violations, including Idaho.  Included in the fund will

be amounts reserved for payment of all secured and unsecured creditors who have not been paid in connection with each Resort whose developers have assigned their claims against the Defendants to the Plaintiff Class. The impunity with which the Defendants violated U.S. laws as plead herein is similar to their criminal violations in connection with which they recently plead guilty and paid hundreds of millions of dollars in penalties to the United States Treasury. The funds derived from each unlawful scheme reciprocally financed the respective schemes. In enacting RICO, Congress gave the Plaintiff Class a remedy which benefits not only the directly injured persons and entities, but also serves the public interest as pled herein, which also serves as a deterrent to future unlawful schemes.

## II.  PARTIES

**The Plaintiffs:**

3.      Plaintiff L. J. Gibson is an adult U. S. Citizen who resides in Henderson, Nevada at Lake Las Vegas, and owns her home there.  Gibson is also a property owner at Tamarack Resort in Idaho and at Ginn sur Mer in Grand Bahama Island, Bahamas.  Gibson is a victim of the illegal acts alleged herein and was injured as a result, suffering substantial losses to her money and property from the scheme as well as loss of the use of her property and rights in each of the resorts she invested in, namely: Tamarack, Lake Las Vegas and Ginn Sur Mer.

4.      Plaintiff Beau Blixseth, is an adult U.S. Citizen who resides in Oregon, and owns property in Yellowstone Club. Plaintiff Beau Blixseth is a victim of the illegal acts alleged herein and was injured as a result, suffering substantial losses to his money and property from the scheme as well as loss of the use of his property rights in Yellowstone Club.

5.      Plaintiff Amy L. Koenig, now resides in Park City, Utah, and is a former Vice President of real estate and resort Marketing at Tamarack, a former shareholder in Tamarack,

LLC, and a former owner of real estate at the resort, who suffered financial losses due to the illegal acts of the Defendants.

6.      Plaintiff Dean Fresonke is an adult U.S. Citizen who resides in Windermere, Florida.  Fresonke is also a property owner at Ginn sur Mer, and had planned to build a home there.  Fresonke is a victim of the illegal acts alleged herein and was injured as a result, suffering substantial losses to his money and property from the scheme as well as loss of the use of his property, and rights and reasonable expectations of development owed by the developer.

7.      Plaintiff Vern Jennings is an adult U.S. Citizen who resides in Henderson, Nevada at the gated SouthShore community.  He purchased his property and home in 2003 and invested substantially to belong to and enjoy the exclusive private SouthShore Golf Club and its privacy. Jennings is a victim of the illegal acts alleged herein and was injured as a result, suffering substantial losses to his money and property rights and club membership from the scheme as well as loss of the use of his privacy.

8.      Plaintiff Terri Froehlich is an adult U.S. Citizen who owns her home at Lake Las Vegas and resides at the same.  Froehlich is a victim of the illegal acts alleged herein and was injured as a result, suffering substantial losses to her money and property from the continuing and ongoing scheme as well as loss of the use of her property and rights at Lake Las Vegas that were promised to her and ran with the property.

9.      Plaintiff Monique LeFleur, as Trustee of the Monique LeFleur Trust is a resident of San Diego County, California and an owner of real estate at the Tamarack resort, who suffered financial losses due to the  illegal acts of the defendants.  The Trust owns one lot at the Tamarack resort.

10.    Plaintiff Griffen Development, LLC is a limited liability company and an owner of real estate at the Tamarack resort, who suffered financial losses due to the  illegal acts of the defendants.  Monique LeFleur is a member of Griffen Development, which owns six properties at Tamarack.

**The Defendants**:

11.    Defendant Credit Suisse Securities (USA) LLC is a Delaware limited liability company with its principal United States office at 11 Madison Avenue, New York, New York.

12.    Defendant Credit Suisse Cayman Islands Branch is a separate entity referred to as a "branch" and upon information and belief may be either wholly or partially owned by Credit Suisse A.G. or another subsidiary thereof.  Upon information and belief, Credit Suisse Cayman Islands Branch operates in the Cayman Islands and elsewhere and utilizes a postal drop box in the Cayman Islands but also has a United States office at 11 Madison Avenue, New York, New York.

13.    Credit Suisse First Boston is, upon information and belief, a Delaware limited liability company with its principal United States office at 11 Madison Avenue, New York, New York.

14.    Credit Suisse AG is, upon information and belief, a Swiss corporation with a usual place of business in Zurich, Switzerland.

15.    Defendant Cushman & Wakefield is, upon information and belief, a Delaware corporation with a usual place of business in New York, NY.

16.    Plaintiffs are uninformed as to the true names and capacities of those Defendants sued herein as DOES 1 through 100, inclusive, and therefore sue said Defendants under such fictitious names. Plaintiffs are informed and believe that such fictitiously named Defendants are

responsible in some manner for the events and happenings herein referred to, and proximately caused the damage to Plaintiffs as herein alleged.  Plaintiffs will seek leave to amend this Complaint to allege their true names and capacities when the same have been ascertained.

### III.  <u>JURISDICTION</u>

17.     This Court has federal question jurisdiction over the subject matter of this action pursuant to 18  U.S.C. §§ 1961, 1962, and 1964;  28 U.S.C. §§ 1331, 1332  and 1367.

18.     Diversity jurisdiction is also conferred over this Class action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), providing for jurisdiction where, as here, the aggregated amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs and: (a) any member of a class of Plaintiffs is a citizen of a State of different from any Defendant; and/or any member of a class of Plaintiffs is a citizen or subject of a foreign state.  28 U.S.C. §§ 1332(d)(2) and (6).

19.     This Court has supplemental jurisdiction over the state law claims and causes of action asserted herein for each jurisdiction, pursuant to 28 U.S.C. §1367(a).

20.     This Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. § 1965 (b) and (d).

21.     The activities of the Defendants and their co-conspirators as described herein have been, and are, within the flow of interstate commerce on a continuous and uninterrupted basis and have had a substantial and continuing effect on interstate commerce.

### IV.  <u>VENUE</u>

22.     The causes of action arose in the State of Idaho in that many of the acts and transactions in the violations alleged, including the funding of loans, instances of mail and wire fraud serving as predicate acts under RICO, as well as numerous misrepresentations and

omissions, took place in the State of Idaho. The Defendants transacted business in the state of Idaho and continue to conduct business and perpetrate their scheme on a continuous and on-going basis in the State of Idaho, which acts and omissions give rise to the causes of action hereinafter alleged, making this Court a proper venue for this case.

## V.   THE PLAINTIFF CLASS ALLEGATIONS

23.     This action is brought as a Plaintiff class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

24.     Plaintiffs and Class Representatives, L.J. GIBSON and BEAU BLIXSETH, AMY KOENIG, DEAN FRESONKE, VERN JENNINGS, TERRI FROEHLICH, MONIQUE LEFLEUR, and GRIFFEN DEVELOPMENT, LLC are members of the Plaintiff Class as defined herein and bring this action on their own behalf and on behalf of those similarly situated. Plaintiffs seek to recover damages which they, and the Class Members, suffered, as a result of the illegal, fraudulent, and predatory lending practices of Credit Suisse and Cushman & Wakefield.  Collectively, the Plaintiffs and Class Members on the one hand, the developers of the resorts on the second hand, and the Defendants on the third hand, were in a tri-partite "special relationship" in which the special relationship between the developers and the Defendants was extended to the individual Plaintiffs and proposed Class Members by virtue of the Defendants' knowledge of and active participation and control in  the developers' duties and promises to the Plaintiffs and Class Members.

25.     The class represented by the Plaintiffs (the "Plaintiff Class") includes all persons and entities, other than the Defendants named herein, who purchased, held or otherwise acquired both directly and indirectly, participation interests, homes or land in the Lake Las Vegas, Tamarack, Yellowstone Club and Ginn sur Mer real estate development projects to which Credit

Suisse Securities (USA) LLC or Credit Suisse made loans from and through its Cayman Islands "Branch" from 2004 through 2008 and  through the present day inclusive (the "Class Period"). The Class also includes secured creditors, unsecured creditors and other persons and entities who suffered economic losses by virtue of the acts and omissions of the Defendants, including the State of Idaho.

26.     The Plaintiff Class includes, but is not limited to, all persons who purchased their interests directly from the resorts' developers, and/or indirectly through agents, salesmen, employees, or representatives or from independent sellers or owners acting with authority from and by each developer to communicate promises, amenities, rights and enforceable expectations owners could and did rely upon at each resort, once the property was purchased.  The named Plaintiffs are members of the Plaintiff Class.

27.     Because hundreds of millions of dollars of interests were purchased by over 3,000 investor/owners during the Class Period, and because other persons and entities such as contractors and subcontractors have suffered economic losses, the members of the Plaintiff Class are so numerous that joinder of all members is impracticable.  While the exact number of Plaintiff Class Members can only be determined by appropriate discovery, the named Plaintiffs are informed and believe that Class Members number in the thousands and the damages sustained by the Class Members exceeds $8 billion dollars.

28.     The claims of the named Plaintiffs, L.J. Gibson, Amy Koenig, Dean Fresonke, Vern Jennings, Terri Froehlich, and Beau Blixseth are typical of the claims of the members of the Plaintiff Class.  Plaintiffs and all members of the Plaintiff Class sustained economic and property damage as a result of the Defendants' wrongful, intentional, and illegal misconduct complained of herein.

29.     Plaintiffs will fairly and adequately protect the interests of the members of the Plaintiff Class at each resort and have retained counsel competent and experienced in class action litigation as well as commercial, banking and criminal litigation.

30.     A class action is superior to other available methods for a fair and efficient adjudication of this controversy.  Since the damages suffered by the individual Plaintiff Class Members may be relatively small and geographically diverse, the expense and burden of individual litigation makes it impossible for the Plaintiff Class Members individually to seek redress for the wrongful conduct alleged.

31.     Common questions of law and fact exist as to all members of the Plaintiff Class in each of the aforementioned resort land developments, which predominate over questions affecting solely individual members of the class.

32.     Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a Plaintiff Class action.  Among the questions of law and fact common to the Plaintiff Class are:

(a)     Whether the Defendants have violated and conspired to violate the RICO Act, 18 U.S.C.  § 1961 et seq., by their acts alleged herein and the crimes so identified in this Complaint;

(b)     Whether the Defendants planned, implemented and perpetrated a scheme and artifice to defraud developers at Lake Las Vegas, Tamarack Resort, Ginn Sur Mer and Yellowstone Club (the "Resorts") which scheme to defraud included the Plaintiffs and Class Members as set forth herein;

(c)     Whether Defendant Credit Suisse acted as a lending advisor with a special relationship to developers, Plaintiffs and Class Members thereby owing contractual and fiduciary duties to the developers, Plaintiffs and Class Members;

(d)     Whether the Defendants owed a fiduciary duty to the Plaintiffs and the Class, and whether that duty was breached;

(e)     Whether Credit Suisse, aided and abetted by Cushman Wakefield and its agents and representatives as described herein, knowingly, intentionally and willfully undertook a "Loan to Own scheme" to defraud developers, Plaintiffs and Class Members of their economic

and property rights at each of the resorts with respect to the rights, promises, agreements, guarantees, amenities and privileges they held and were owed to them by the developer at each resort;

(f)      Whether Credit Suisse and Cushman Wakefield through their agents and representatives knowingly, willfully and intentionally, as part of their scheme to defraud developers, Plaintiffs and Class Members, utilized and controlled sham debtors in possession, receivers or by  other means to effectuate constructive control over each of the resorts for themselves and/or others to evade and avoid their duties and obligations as a fiduciary and successor developer in order to abrogate and destroy Plaintiffs' and Class Members' economic and property rights, promises, agreements, guarantees, amenities, reasonable expectations and privileges that each held and were owed by the developer and/or a successor developer to each of them at each resort and/or club;

(g)      Whether Credit Suisse and Cushman Wakefield  and their  agents and representatives, as part of and in furtherance of their scheme, sought to cleanse each resort of the obligations and duties owed by each developer and themselves as  successor and/or constructive developer  in order to maximize their economic interests and profits for themselves, other Defendants, joint-venturers, agents, representatives and third-party co-conspirators not yet known and not yet named, at this stage of the proceedings;

(h)      Whether Credit Suisse and Defendants breached their contract with developers, Plaintiffs and Class Members, the intended third-party beneficiaries, and whether Credit Suisse Defendants have become the developer-in-fact, and is in breach of its contract at the named resorts;

(i)      Whether Credit Suisse and Defendants breached their duty of care, the duty of good faith and fair dealing, the duty to make known material facts and full disclosure of the same, the duty of loyalty, the duty to avoid self-dealing and the duty to protect the intended beneficiaries, that is: Plaintiffs and Plaintiff Class;

(j)      Whether Credit Suisse and Defendants intentionally and tortiously interfered with the existing  rights, contracts, promises, agreements, guarantees, amenities and privileges held by the Plaintiffs and each Class Member at each of the resorts and owed to them by the developer and Credit Suisse;

(k)      Whether the members of the Plaintiff Class have sustained damages, and, if so, what is the proper measure of damages;

(l)      Whether Credit Suisse and the other Defendants used funds derived from their aiding and abetting the Iranian government and agencies thereof to circumvent U.S. and international sanctions, in order to help fund its fraudulent "Loan to Own" scheme perpetrated on the Plaintiff Class;

(m)      Whether  federal and state  banking and appraisal  standards, regulations and guidelines enacted under FIRREA  designed to protect the Plaintiff Class from such Loan to

Own schemes were violated by the Defendants' acts in order to further their scheme to defraud, as alleged herein;

(n)     Whether the "Loan to Own" scheme and the "Total Net Value" appraisal method used by Credit Suisse and Cushman Wakefield was inconsistent with the lending and appraisal standards enacted under federal and state law pursuant to FIRREA which was promised by Defendants;

(o)     Whether documents, releases, prospectuses and statements disseminated to the investing public omitted and/or misrepresented material facts about the business affairs of the Defendants, and particularly, the "Loan to Own" scheme;

(p)     Whether the Defendants held a "special relationship" to each developer, Plaintiff and Class Member as "lending advisors" and administrators of loans owing contractual and fiduciary duties to the developers,  borrowers and Class Members  and whether those duties were breached as part of the alleged  scheme to defraud;

(q)     Whether Defendants have engaged in mail and wire fraud, a pattern of racketeering and whether the three separate Credit Suisse entities at issue constitute an enterprise within the meaning of applicable federal law;

(r)     Whether Defendants conspired in a civil conspiracy to violate federal and state law;

(s)     Whether the Plaintiff Class has a remedy under substantive state law for the wrongs complained of.

(t)     Whether exemplary damages should be awarded Plaintiffs and Class Members and the amount that is appropriate under law.

(u)      Whether, and in what amount, attorney fees and costs should be awarded to the Plaintiffs and Class Members.

33.     Plaintiffs believe that there are approximately 14 resorts which have been devastated by Defendants' violations of state and federal law in addition to the resorts and states identified herein; and anticipate that additional resorts which have been damaged by Defendants will be added to the Plaintiff class.  Such addition of additional resorts and class members will assist in the fair adjudication of all claims of all parties who have been damaged by Defendants in one class action.

## VI.  FACTUAL ALLEGATIONS

34.    The four (4) resort land development entities currently at issue in this Complaint that have been caused harm by Credit Suisse's predatory loan practices through its  Loan to Own scheme, *to wit*: (1) Lake Las Vegas, (2) Tamarack, (3) Ginn sur Mer and (4) Yellowstone Club. Although  each  development  was  created  by  different  developers  and  in  different  states,  all shared  substantially  similar  or  identical  amenities,  were  sold  by  means  of  similar  or  identical promises  of  exclusive  amenities,  membership,  and  privacy,  and  were  targeted  by  Defendant Credit  Suisse  to  implement  its  predatory  loan  practices,  and  were  induced  to  borrow unreasonably excessive loans through Credit Suisse's use of a new  "Total Net Value" appraisal methodology  represented to comply with state and federal lending and appraisal practices under FIRREA.  In each instance, Credit Suisse, through its "Loan to Own" scheme, charged tens of millions of dollars of exorbitant loan fees. As set forth below, the predatory loan practices of Credit Suisse caused each development to become financially insolvent and fail.

35.    Credit Suisse's methodology, artifice and *modus operandi* in effectuating its Loan to Own scheme with the Lake Las Vegas resort land development was repeated by Credit Suisse in connection with the resort land developments at Tamarack, Ginn sur Mer, and Yellowstone Club.

36.    Plaintiffs are informed and believe that there are several other similarly situated high-end resort land developments that Credit Suisse and the other Defendants targeted for exploitation,  takeover  and  control  through  its  "Loan  to  Own"  scheme  identical  to  that  of  the named resorts, herein, and when identified, Plaintiffs may move the Court for leave to amend their Complaint appropriately so as to include the owners, developers and other Class members connected with those additional resort land developments  in the Plaintiff Class herein.

A.      **Credit Suisse's "Loan to Own" Scheme.**

37.     Credit Suisse AG is one of the largest banks in the world, with its home office based in Zurich, Switzerland.  Shortly before the filing of this Complaint, Defendant Credit Suisse pleaded guilty to a Criminal Information in which the Defendants admitted having engaged in a scheme with the Government of Iran to strip identifying information from wire transfers of amounts in excess of $1 Billion from Iranian banks needing to purchase technology in US dollars, in order to circumvent United States and United Nations economic sanctions. According to reports from the Department of Justice, clients involved in this scheme included Iran's Atomic Energy Commission, which purportedly oversees Iran's attempt to build a nuclear weapon.  Through this scheme and others, Credit Suisse illegally acquired huge fees, cash and profits from Iran and other prohibited nations from at least 2003 through 2008 and undertook a deliberate scheme with these nations to conceal their illegal conduct through sophisticated planning and preparation to avoid detection by the Treasury Department, the Internal Revenue Service, national security agencies and other law enforcement agencies of the United States and other nations.  This scheme enabled Credit Suisse to increase its capital and lending capability by illegal means and invest a portion of its illegal proceeds and profits to make loans to others, including the named resorts herein.

38.     Concurrently with Defendant Credit Suisse' scheme to evade US economic sanctions, and with the intent of expanding its presence in the "hot" US real estate market as a means of generating hundreds of millions of dollars in excessive loan fees for its operations, Credit Suisse, in or about 2004, devised and planned what is herein referred to as the Defendants' "Loan to Own" scheme.

39.     Credit Suisse decided to "break new ground with a product by doing real estate loans in the corporate bank loan market."  *See* Montana U.S. Bankruptcy Court for District of Montana, Court Order May 12, 2009, in *Yellowstone Mountain Club, LLC* Case No. 08-61570-11, at page 6. Credit Suisse targeted certain master-planned residential and recreational communities such as Tamarack Resort, Promontory, Ginn sur Mer, Turtle Bay, Yellowstone Club, and Lake Las Vegas. Each of the above entities received a syndicated loan from Credit Suisse's Cayman Islands Branch. In each instance, the developers relied upon and believed that Credit Suisse employed acceptable and lawful appraisal methods in compliance with state and federal law.

40.     The Defendants' Loan to Own scheme was a device to target and persuade developers of first class or exclusive master-planned developments  to take out their equity and capitalize on the projection of future growth by means of non-recourse loans from Credit Suisse, which non-recourse loans would burden each land development with debt in excess of that required by FIRREA compliance, and acceptable by the federal and state standards of commercially reasonable lending practices. The Defendants' syndicated loan scheme in each instance violated federal and state standards proximately causing the damages to the Plaintiff Class.

41.     In the process, Credit Suisse was able to charge excessive and exorbitant "loan fees" which were extracted "off the top" of the proceeds of each loan and re-deposited to the accounts of the lender, Credit Suisse.

42.     In addition and as part of its scheme, Credit Suisse no longer became a mere lender but controlled each resort because it requested, solicited and required each resort to allow it to become its "Loan Administrator" and "Lending Advisor" and in said roles, encouraged each

developer to rely exclusively on Credit Suisse and Cushman & Wakefield  for financial advice, property development advice, marketing  advice, and other matters related to each land development, while simultaneously persuading the developer to increase the loan amount and become ever more indebted to Credit Suisse and entrapped by its control.

43.     Upon information and belief, in no instance, did Credit Suisse or Cushman & Wakefield disclose to its borrowers, the developers, the Plaintiff Class, or to many of its note-holders that the "Total Net Value" appraisal method violated FIRREA; and that the Cayman Islands "Branch" was being used to circumvent FIRREA.

44.     In this manner, Defendant Credit Suisse' Loan to Own scheme persuaded many owners and developers of land and structures in the aforesaid resort land developments to take equity out of their  investments  "up front, " by mortgaging their development projects to the hilt. Credit Suisse' plan was to loan the money to the owners and developers on a non-recourse basis, allowing Credit Suisse to charge excessive loan fees, and sell off most of the credit to loan participants.  The development owners were advised, encouraged, requested and instructed by Credit Suisse to personally take out very significant sums of money from their development accounts either as a "profit dividend," or as a loan, leaving their developments burdened with excessive and unsustainable debt. Credit Suisse represented that this would allow the development owners to benefit, and the owners of land and homeowners to prosper with increased expansion of the Resorts.

45.     In fact, Defendants knew that in making such representations, they had increased the debt load on the Resorts beyond FIRREA margins; and placed it squarely on the Resort's landowners and homeowners, the Plaintiff Class.

46.     Defendants knew in fact that its scheme would have a "snowball" effect on the Resorts. In violation of duties owed to all those who would be foreseeably damaged by their violations of state and federal commercially reasonable lending standards, Defendants violated said lending standards with actual knowledge that they imposed the increased loan risk on Plaintiff class;  and that the foreseeable damages to each Resort in both the loss of value and the loss of amenities would directly result from their scheme, all of which has now occurred.

47.     This newly developed syndicated loan scheme was deliberately designed by Credit Suisse with the knowing assistance of Cushman & Wakefield in order to enrich Credit Suisse and its employees, while placing the Resorts in a perfect position to be taken over by Credit Suisse and/or in collusion with its note-holders by leaving the developments too thinly capitalized to survive, precisely as Credit Suisse intended, planned and schemed from the beginning at each Resort.

48.     Having taken control of each of the Resorts while acting as a financial advisor to each with a special relationship to each resort and its developers, landowners and homeowners, the scheme has been consummated as anticipated by Defendants. Defendants own or control each Resort for a fraction of their values, with all of the catastrophic losses imposed on Plaintiff Class.

49.     Numerous entities that received Credit Suisse's syndicated loan product have failed financially, including Yellowstone Club, Tamarack Resort, Promontory, Lake Las Vegas, Turtle Bay and Ginn sur Mer.  As the Montana Bankruptcy Court stated at page 16, **"they were doomed to failure once they received their loans from Credit Suisse."**  The finding by the Montana Court highlights and demonstrates that the scheme did in fact target and take over the Resorts by deliberately gaining the trust of the each of the resort developers through false and

misleading lending advice, soliciting a special relationship with the developers on their behalf and the behalf of the Plaintiffs and proposed Class members, and through such artifice take sufficient control over the Resorts and lending practices to achieve their illegal and predatory scheme and ends, all at the expense of the Plaintiff Class.

50.     Like the sophisticated scheme to evade federal law in connection with transactional and lending practices with governmental agencies of Iran and others, requiring the United States of America and its law enforcement agencies and a grand jury years to figure out and uncover, Credit Suisse's "Loan to Own" scheme employed its same culture of greed and skill at deceit against the Plaintiff Class.  Upon information and belief, both schemes fed huge profits and deposits into Defendants' accounts for the purposes of maintaining the financing of the reciprocally unlawful schemes.

51.     As set forth above in the Montana Court Order at page 17, Credit Suisse, representatives of Credit Suisse, and others on the Credit Suisse team were paid on a contingent fee basis: they only earned loan fees if they sold loans.  Thus, as part of its scheme, Credit Suisse advised and  encouraged developers of the named residential resorts to take unnecessarily risky and excessive  loans which required them to burden their developments with excessive debt because, the  higher the loan amount, the larger and more excessive  the loan fee which could be exacted by  Credit Suisse.   As the Montana Court found at page 16, "**this program essentially puts the fox in charge of the hen house and was clearly self-serving for Credit Suisse**.*"*

52.     The loan fee structure led to one of the most egregious aspects of Credit Suisse's FIRREA violating loan product scheme.  In its role as lending advisor, Credit Suisse induced, encouraged, advised and recommended that the developers remove and take the proceeds of the loan out of the project development accounts, without placing commercially reasonable lending

controls on the loans.  In violation of the standards of normal and usual commercial lending and appraisal practices, Defendant Credit Suisse failed to specify how developers used the proceeds of the loan; and instead recommended, advised, encouraged and authorized developers to use the proceed for any purpose, including purposes totally unrelated to the subject development because, as Credit Suisse advised,  its appraisal methodology supported the same and such practices would not interfere with or place at risk  the rights and expectations of the homeowners and landowners which Defendants were obligated to and promised to protect. See Montana Court Order at 17.

53.     Credit Suisse "marketed" its new loan product to developers by characterizing a substantial portion of each amount of loan proceeds as a "distribution," which would cause the owner's equity account to be reflected as a negative balance. This caused the owner's equity to be reflected on the developers' audited financial statements as a "qualification."  Credit Suisse knew that this practice was highly likely, if not certain, to substantially diminish the value and credit worthiness of such developers' financial statements, balance sheets, and credit reputation and status in the financial community. Notwithstanding this knowledge, Credit Suisse as lender and lending advisor solicited, encouraged and persuaded the developers to engage in this practice which it represented would not harm the Resorts or Plaintiffs and proposed Class members. By soliciting, encouraging, advising and authorizing the developers to do so,  Credit Suisse was then able to charge excessive and exorbitant loan fees. Credit Suisse represented to developers that the loan was akin to a "home equity loan" in which the developers were entitled to receive the increased equity in the Resorts which they had built. These representations were particularly deceptive because "home equity loans" are not based on "Total Net Value" appraisals violating FIRREA.  The catastrophic damages suffered by Plaintiff Class directly

result from these "home equity loan" fraudulent representations participated in by Cushman & Wakefield. See Montana Court Order at 5-7, and 16-18.

54.     Credit Suisse knew at the time that the lending advice and authorizations were given that its scheme and tactics would cause the developers and the Resorts financial ruin, resulting in the ultimate take-over by Credit Suisse, directly, or indirectly through constructive control and/or collusion with third parties.   In the case of the Yellowstone Club, that third party became one of its "insider note-holders," Cross Harbor Capital Partners, ("CHC").  The details of the collusion between CHC and Credit Suisse are particularly shocking in the case of the Yellowstone Club because CHC obtained complete control over the Yellowstone Club by means of its own "predatory loan" and fiduciary lending advisor role with the ex-wife of the developer during her divorce proceedings.   Once CHC obtained control of the Yellowstone Club through the ex-wife of a principal of the developer, CHC, as an "insider note-holder," put up Debtor In Possession financing in the bankruptcy proceedings, then made a deal with Credit Suisse to carve up the Yellowstone Club carcass between them and vacate the Montana Court Order! The predicate acts and pattern of racketeering by CHC and the ex-wife, acting as *de facto* agents of Credit Suisse will be developed in discovery and proved at trial in this matter even including the fabrication of fake "Grand Jury Target Letters" against the developer to assist CHC and the ex-wife in the Yellowstone Club takeover in aid of the Credit Suisse scheme.

55.     Credit Suisse owed duties to both the developers and the Plaintiff Class not only to avoid misrepresentations to all those who could be foreseeably harmed by them, as a lending advisor it owed affirmative duties to provide truthful advice, knowing that the Plaintiff Class would be directly impacted by such advice.  As a component of said affirmative duties, pursuant to state and federal commercially reasonable lending standards, and heightened by its lending

advisory capacity, Credit Suisse owed both the developers and the Plaintiff Class the duty to exercise due diligence with respect to hundreds of millions of dollars of its loan transactions to the developers and home owners and landowners. In the case of each Resort, driven by "naked greed", Credit Suisse violated commercially reasonable state and federal loan "due diligence" standards; and it breached its heightened duties to insure that its "due diligence" on behalf of both the developers and  Plaintiff Class was of the highest and most accurate quality.   It intentionally and willfully breached both levels of duties owed.

56.     For example, regarding the Yellowstone Club, Credit Suisse and Cushman & Wakefield were aware that Cushman & Wakefield had appraised its assets in 2004 and knew that the collateral for the Credit Suisse loan had a fair market value of $420 million in 2004.  As the Montana Court pointed out at page 18-19, it was highly doubtful that Credit Suisse could have successfully syndicated a $375 million loan if the loan-to-value ratio were 90 percent. As that Court pointed out in its written decision ruling that Credit Suisse engaged in "predatory lending practices" and violated FIRREA with respect to the Yellowstone Club loan, the Montana Court referenced the four developments described in this Complaint, and ruled that Credit Suisse knew that those Resorts could never survive the debt burden which Credit Suisse had created by violating FIRREA and using the Total Net Value appraisal scheme.  Montana Court Order at 16.

57.     As hereinafter alleged, Credit Suisse in its conspiracy with Cushman &Wakefield, engaged in a "pattern of racketeering activity" involving two specific, unlawful, and coordinated schemes with multiple "predicate acts" in violation of 18 U.S.C. §1962.  The objective of the conspiracy with Cushman & Wakefield was to obtain appraisals of the targeted developments in amounts high enough to generate excessive loan fees that could be charged by Credit Suisse,

which in turn increased Credit Suisse's likelihood of acquiring the lands and improvements of each project, through foreclosure or bankruptcy.

58.     In order to carry out its Loan to Own scheme, Credit Suisse conspired with Cushman & Wakefield to circumvent the United States Financial Institutions Reform, Recovery and Enforcement Act of 1989, 12 U.S.C. § 3331 *et seq.* (herein, "FIRREA") and the standards and requirements adopted under federal and state laws in each Resort's jurisdiction, as set forth under the Uniform Professional Appraisal Practices guidelines and regulations, and elsewhere. These laws implement FIRREA, such as 12 C.F.R. § 34.44 (Office of Comptroller of Currency); 12 C.F.R. § 225.64 (Federal Reserve Board); 12 C.F.R. § 323.4 (FDIC); 12 C.F.R. § 564.4 (Office of Thrift Supervision), as well as other applicable federal banking statutes, regulations and guidelines.

59.     FIRREA   was enacted by Congress after the financial failure of numerous financial institutions in the late 1980's for the purpose, among others, to  "provide that Federal financial and public policy interests in real estate related transactions will be protected by requiring that real estate appraisals utilized in connection with federally related transactions are performed in writing, in accordance with uniform standards, by individuals whose competency has been demonstrated and whose professional conduct will be subject to effective supervision."

60.     Because Credit Suisse' "Loan to Own" scheme was predicated upon the "Total Net Value" appraisal method, it violated the lending and appraisal  standards and guidelines under state and federal law enacted pursuant to FIRREA.  Thus, in order to circumvent FIRREA, Credit Suisse created a "separate" banking entity in the Cayman Islands, known as the "Credit Suisse Cayman Islands Branch," through which its Loan to Own programs and appraisals were funneled.  Defendant created this corporate banking and lending shell for the express purpose of

evading the strict state and federal appraisal and other requirements implemented pursuant to FIRREA. Credit Suisse did not maintain a physical presence in the Cayman Islands, merely a post office box. But, by doing so, Credit Suisse, like most entities who set out to engage in unlawful conduct, effectively admitted the unlawfulness of its schemes by using its Cayman Islands Branch to then market, represent, sell and place its loan products in interstate commerce, while representing that its "syndicated" loan product was not available to U.S. banks.

61.     This forms the second major component of the unlawful scheme and objective of the conspiracy.  Defendant created its Credit Suisse Cayman Islands "Branch" in 2005 as a superficial but ultimately futile cover to implement the "syndication" of its Loan to Own scheme ostensibly without it being sold to U.S. federally regulated banks.  But, that is an obvious ploy. If Credit Suisse believed and intended *that* marketing scheme to be true, then there would have been no need for a "Cayman Islands Branch." It could have been marketed through its New York office, which it actually used to syndicate the loan under the cover of the Cayman Islands.

62.     Plainly, Credit Suisse knew its "syndicated loan product" would immediately penetrate interstate commerce with federally regulated U.S. banks when either the hedge funds or individual "note-holders" purchased it. Many of its "note-holders" actually visited the Resorts in various marketing promotions financed by Credit Suisse.  Defendants therefore knew that U.S. banks would become involved in financing the purchasers and "note-holders" of its syndicated notes. Even more significantly, Defendants knew that its "Total Net Value" appraisal values in violation of FIRREA would filter through to the developers' personal and/or corporate financial statements and loan applications to U.S. banks, as well as on to the financial statements and loan applications of Plaintiff Class.   Once the unlawful scheme was placed in interstate commerce, the "Snowball effect" of the scheme devastated the economics of all those involved.

63.     The Yellowstone Club is an example of this "Snowball effect;" and its use by Credit Suisse insiders.  There, in order to obtain control of the Yellowstone Club with CHC - the Credit Suisse "note-holder", the ex-wife borrowed about $30 million dollars from federally regulated banks and over $14 million from private lenders, all based on her financial statements reflecting the $1.2 Billion "Total Net Value" appraised value of the Yellowstone Club.  CHC knew the values were false, but loaned her *another* $35 million when she was in default on the other loans in order to take over the Yellowstone Club.

64.     In sum, one scheme led to another, one fraud led to another, and end result was the ownership and control by the wrong-doer perpetrators.  These are classic RICO "predicate acts" perpetrated as part of a "pattern of racketeering activity" to further the objectives of an "enterprise." Plaintiff Class is informed and believes that at each Resort, similar transactions occurred proximately caused by the Defendants' unlawful schemes, which served to fuel additional "predicate acts".

65.     Plaintiffs are informed and believe that the creation of a post office box and letterhead constitute the only "business" Credit Suisse Cayman Islands Branch conducted.  The Loan to Own scheme transactions  allowed Credit Suisse to loan sums significantly in excess of that which would have been permitted had it complied with the standards and requirements for appraisals and lending under state and federal law enacted pursuant to FIRREA; and enabled them to exact  commercially unreasonable and exorbitant "loan fees;" and thereby place Credit Suisse into the position to eventually acquire the subject resort land developments and/or control of the resorts through foreclosure, receivership, and/or the creation of sham debtor's in possession in bankruptcy. The Yellowstone Club is an insidious example of how collusive and conspiratorial fraud and bad faith between a debtor-in-possession on the one hand with a pre-

planned bankruptcy scheme, and Defendants and their insider note-holder, CHC, on the other, devastated the Plaintiff Class.

66.     Credit Suisse knew *before* marketing and selling its "syndicated loan product" that its Loan to Own scheme could *only* be successfully syndicated, and allow it to earn excessive loan fees, if it devised an unlawful method of securing *the appearance of* credible valuation appraisals with Cushman & Wakefield, thereby using their international stature in the real estate appraisal industry to deceive developers and the Plaintiff Class.  Defendants knew that each of the subject Resort land development projects that they pursued could only justify borrowing excessive loan amounts far beyond what would be deemed commercially reasonable and in compliance with state and federal standards if they deceived the developers by using the "Total Net Value" appraisal method endorsed by Cushman & Wakefield; and specifically concealing the FIRREA violations and the violations of state and federal standards, while credibly advising, authorizing and  assuring developers and home and land owners of such projects that such loans were lawful, safe, and in the best interests of the developers, homeowners and landowners.

67.     In or about 2005, Credit Suisse selected as its co-conspirator in the scheme, the nationally and internationally prominent real estate firm of Cushman & Wakefield, which advertised as among its services, a national appraisal service capable of appraising master-planned communities, and supervised by Brian J. Curry, a residential appraiser, who Cushman & Wakefield represented to have "extensive expertise in subdivision development appraisals and planned unit developments."

68.     Cushman & Wakefield represented itself to be:

> "The world's largest privately held real estate services firm. Founded in 1917, the firm has 189 offices in 57 countries around the globe, and

11,000+ talented professionals. Cushman & Wakefield delivers integrated solutions by actively advising, implementing and managing on behalf of landlords, tenants, and investors through every stage of the real estate process. These solutions include helping clients to buy, sell, finance, lease, and manage assets. C&W also provides valuation advice, strategic planning and research, portfolio analysis, and site selection and space location assistance, among many other advisory services."

69.     Defendants Credit Suisse and Cushman & Wakefield devised the new appraisal method which they termed as the "Total Net Value" method, which they represented could be applied to the appraisal of master-planned community developments.

70.     The "Total Net Value" methodology was first developed by Defendants in order to persuade the owners and developers of the resort land development known as Lake Las Vegas to do business with Defendants.  The  "Total Net Value" appraisal method failed to comply with state and federal standards and regulations implemented pursuant to FIRREA , but Defendants utilized it to persuade the developers of the Lake Las Vegas land development in southern Nevada to borrow unreasonable and commercially excessive amounts of money in connection with the development, which Defendants knew, and intended, would result in said development assuming a debt burden which was fiscally and economically unsustainable, in order that Credit Suisse could extract exorbitant and commercially unreasonable "loan fees"  from the loan proceeds, to syndicate the loans and take control or constructive control over the resort.  But the Lake Las Vegas developers, like those at Tamarack and the Yellowstone Club, were in the dark, and completely deceived by the Defendants' schemes.

71.     After making the loans to the developers of Lake Las Vegas, Credit Suisse nominated itself as the "loan administrator," and thereby became, in effect, the de facto developer in control of the project.  In so doing, Credit Suisse charged exorbitant and excessive "up-front" loan fees,  gathered unto itself  all of the profits from the Lake Las Vegas

development while the loans continued to perform, and positioned itself to eventually acquire and take control of the land and improvements of the Lake Las Vegas development by foreclosure or bankruptcy through a sham entity, at a fraction of its fair value,  when  the developer was unable to make the loan payments on schedule.

72.    Credit Suisse knew, when targeting Lake Las Vegas, that its scheme would eventually  burden  Lake Las Vegas development with debt thereby enabling it to ultimately cause it to be in  default, perfectly situated for take over and control by itself for a third party sham debtor in possession.   At no time did Credit Suisse disclose its true intentions with the resort or truthfully warn or advise it, as its lending advisor, of the economic ruin it had created and implemented against the resort.   Had Credit Suisse been truthful, it could never have implemented its scheme directly and/or through proxies to acquire near complete direct or indirect control of the development or its assets as its "secured creditor."   In fact, the Defendants collectively used their expertise, position, stature, and international reputations in the banking and appraisal industries, to deceive the Lake Las Vegas developers.

73.    Credit Suisse also knew that when its planned failure occurred, the homeowners who had purchased land within said development for building sites would ultimately be burdened with the development's debt, by Credit Suisse' scheme to convert the "non-recourse loans" into "recourse loans" against the interests of the developers which Credit Suisse had sought out, advised, authorized and persuaded to take the aforesaid unreasonably excessive loans.

**B.    The Defendants' Scheme To Defraud**.

74.    The Defendants' scheme to defraud the developers and homeowners consisted of aggressively soliciting developers using their superior expertise, experience and knowledge in

the banking industry to gain the developers' trust and confidence with offers of non-recourse financing to be used for any purpose including purposes not connected to the development, well knowing that such financing was highly likely to cause the development to fail, while enabling Defendants to charge excessive fees, syndicate the loans to other lenders and thereby charge yet more fees, and ultimately, acquire control and possession of the actual land and improvements of the real estate resort development, at prices substantially below that of the fair value thereof. The most critical component of their aggressive solicitation scheme involved a uniform pattern of representations and conduct designed to have the developers as their "clients" **"ENGAGE"** Credit Suisse as lending fiduciaries; and then induce the resort developer/clients to trust the Credit Suisse executives as lending advisors/fiduciaries, so that *Credit Suisse could obtain the developers' private, confidential and proprietary financial information in order to sell the syndication which produced the loan proceeds.* **Without such trust and confidence, the syndication process could NOT proceed; and the Credit Suisse executives driving the "GRAVY TRAIN" scheme knew it; so they devised their scheme to secure developer trust and confidence, with full knowledge of the contractual commitments to the Plaintiff Class, to enable Credit Suisse to obtain the required financial information; and then to sell the syndicated notes and obtain subscriptions BEFORE it loaned the money to the developers.**

That pattern of racketeering activity is one of the cornerstones of the fraudulent scheme. Unlike a normal banking arms-length relationship, where the customer approaches the bank to borrow money, in the Credit Suisse syndication scheme based upon FIRREA violations, it approached and sold the client on its expertise and special knowledge and experience, then required the client to place sufficient *trust and confidence* in Credit Suisse to surrender their financial records in reliance upon the expertise of the Credit Suisse executives. Without such reliance and

trust gained by fraud, Credit Suisse could not "pull off" the syndication process. The "client" remained ignorant of the FIRREA violations; and that the confidential and proprietary information that he had surrendered constituted the foundation for the entire fraudulent scheme. Without inducing such trust and confidence, and thereby obtaining past cash and sales volumes and flows from each "client" who had "ENGAGED" Credit Suisse, and then inflating them in violation of FIRREA, the scheme could not have worked - as the Montana Court said - they could not have sold the syndication and raised the money for the loans.

75.     In furtherance of this scheme, Credit Suisse issued billions of dollars of loans to equity holders, developers, land and/or home buyers while fraudulently misrepresenting to them that such loans were (1) made after exhaustive "due diligence," (2) in full compliance with all applicable state and federal laws; and (3) based on reliable, safe, sound and lawful appraisals, standards and guidelines.  As part of Defendants' scheme, prior to and applicable to real estate developments under state and federal law  after the loans were placed, Credit Suisse agreed  and promised to work cooperatively with the developers (for the benefit of the landowners and homeowners  such as Plaintiff and the members of Plaintiff Class who were to equally benefit as third-party beneficiaries)  during the life of the loans, and to assist them in implementing the requirements of the loan agreements such as the construction of the various amenities that were promised to run with the land for the benefit of the homeowners and purchasers of lots of land within the development.  Credit Suisse served as "Administrator" for the loans, thereby acquiring for itself all of the  powers and controls over the lending facilities and decision making for the developers and resorts, Plaintiffs and members of the Plaintiff Class. This specific "control mechanism" of serving as "lending advisors" to the Resorts, and "administrative agent" to the "note-holders" placed it in the fulcrum position of controlling the information flow between the

borrower-developers and the real "lenders" while obtaining all of the confidential and proprietary information of the developers and the resorts having induced the developers to place the confidence and trust in Credit Suisse that characterizes a fiduciary relationship.  Thus, Credit Suisse deflected all risk of loss, while skimming the cream off of the profits.

76.     The aforesaid false promises and representations made by Defendants to the developers of the subject resort land developments and to Plaintiff and members of the Plaintiff Class were made for the purpose of "ENGAGING" the  developers, and persuading Plaintiffs and members of the Plaintiff Class that their investments in the project would be safe and protected by Credit Suisse.  Defendants and their agents and representatives served as lending fiduciaries upon whom the developer - "clients", Plaintiffs and Class Members reasonably relied and trusted.  At all times relevant hereto, Credit Suisse knew that absent such inducements, promises and representations, the subject real estate developers would not "ENGAGE" them; and agree to surrender their confidential and proprietary information and records, to participate in the syndication process, and to borrow excessive sums from Credit Suisse, *directly derived from the syndication*. Credit Suisse knew and expressly relied upon the promises and representations that  each developer had made to the Plaintiff Class as a critical component of its lending fiduciary inducements to secure the trust and confidence of the developers; and it expressly relied upon the developers'  contractual commitments to the Plaintiff Class, knowing that each developer was obligated to protect the respective interests, rights and reasonable expectations of the homeowners who purchased land therefrom, including Plaintiffs and members of the Plaintiff Class, as the advisory mechanism upon which it structured the entire syndication process. In sum, because the Total Net Value appraisal method was based upon historical and projected sales and revenue streams, which, in turn, drove the syndication process,

which in turn, was based upon the developers' contractual commitments to the Plaintiff Class, the developers had to surrender their confidential and proprietary information; and then rely upon Credit Suisse's expertise in implementing the entire scheme. Credit Suisse promised each such "client" who had "ENGAGED" them that if the client agreed to participate in the Defendants' proposed lending program, and surrendered its confidential and proprietary information, including all information relating to the clients" contractual commitments to the Plaintiff class,  and allowed Credit Suisse to evaluate all such information for the purpose of preparing "Confidential Information Memoranda" to be presented to purchasers of the syndication, Credit Suisse would require specific controls over  the resorts, including audited financial statements, and certain ratios,  to be maintained, submitted and reviewed every quarter during the life of the loan.  By thrusting itself into the financial underpinnings of each resort with its fraudulent scheme, and implementing said controls, Credit Suisse effectively entered into a co-developer and successor developer relationship with the Plaintiff Class,  thereby promising to protect the interests, rights and reasonable expectations of each land owner, home buyer and homeowner at each resort.  By means of a pattern of fraudulent inducements, Credit Suisse thus became  the co-developer, and then the successor developer at each resort.  As each resort failed, Credit Suisse became the successor developer. It then breached and continues to breach all of its obligations and duties as the  successor developer. In sum, by means of fraud and a "pattern of racketeering activity," Credit Suisse gained the trust and confidence of the developers to secure a financial stranglehold over each resort, now it must satisfy all of the resorts' contractual commitments.

77.     To further its scheme to defraud, Credit Suisse promised and represented to each developer, Plaintiffs and members of the Plaintiff Class that Credit Suisse and its representatives

and agents, including Cushman & Wakefield, had extensive expertise in appraisal methodology as required by state and federal law and that the developers, Plaintiffs and the Class Members were justified in placing peculiar, unique and specific confidence and trust in Defendants to act in their respective best interests. The result of these promises was that Credit Suisse gained the total trust, confidence and reliance of the developers, Plaintiffs and Class Members which it had actively solicited.

78.    At all times relevant to this Complaint, Defendants knew, understood and agreed that the land owners, homeowners, as well as the developers, were to benefit from Defendants' appraisal methodology and unique management, implementation and control of each of the loans for each resort; and Defendants agreed and understood and accepted the same not merely as lenders but as lending advisors to Plaintiffs and the Class Members, having unique and special expertise in creating, marketing and selling syndicated real estate loans, outside normal banking channels. Defendants knew at all times that at each resort developer and homeowner, including Plaintiff and the members of Plaintiff Class, owned certain rights, expectations and benefits in connection with such development, that were required to be protected. Credit Suisse promised said developers and homeowners that they would benefit from its advice, lending and appraisal expertise and practices. Defendants knew and understood that Plaintiffs and Class Members required assurances from Defendants that the promised and bargained for infrastructure, amenities, golf courses, ski runs and ski lifts, restaurants, shops, clubs, hotels, swimming pools and theme parks, trails and other amenities running with the land would be protected and prosper but would result in expanded use and development for each resort; and, that the rights, privileges and amenities promised and provided by the developers would always exist, without

interference by Credit Suisse or its representatives, agents, contractors, partners, joint venture partners or assignees, affiliated entities or others.

79.     Credit Suisse explicitly represented and promised the developers and homeowners, including Plaintiffs and members of Plaintiff Class, that the initial appraisals of the resorts obtained by Credit Suisse with Cushman & Wakefield  in furtherance of its "Loan to Own" scheme, were based upon state and federal  standards in the field, in conformity with banking regulations and required state and federal appraisal standards and designed to achieve maximum development of the respective resorts in the marketplace.  Defendants' representations were untrue and fraudulent, and in furtherance of their plan to charge excessive and exorbitant loan fees, commissions, loan penalties, and to allow them to eventually acquire ownership of the subject real properties and resorts at substantially less than their reasonable value, by foreclosing upon them or forcing them into bankruptcy when the borrowers were unable to make the loan payments.

80.     In carrying out its unique lending facility scheme based upon an unlawful appraisal methodology at each resort (which illegality and scheme were concealed from the developers and homeowners including the Plaintiffs and members of Plaintiff Class), Credit Suisse and its representatives continued to represent  that they would protect the interests,  rights and reasonable expectations of the developers and homeowners, including Plaintiffs and members of Plaintiff Class, in order to solicit and gain the confidence and reliance thereof, even as Defendants were surreptitiously planning to eventually acquire control and ownership of the developments.

81.     The developers, Plaintiffs and Class Members at each resort were led by Credit Suisse to believe that they could look exclusively to Credit Suisse, its agents and representatives

for technical expertise and advice in connection with its appraisal methodology and loans to protect and further the rights and interests of the developers, Plaintiffs and home and land owners.  Developers and Plaintiffs at each of the resorts reasonably relied upon Defendants' promises, and placed their trust and confidence in Credit Suisse.

82.     Upon soliciting and gaining the trust and control of the developers, Plaintiffs and Class Members, the Defendants, knowing that their representations, promises, assurances and agreements,  were materially false and misleading, intentionally and systematically set about to destroy  the rights, agreements, amenities, guarantees, expectations and economic opportunities of the Plaintiffs and Class Members with respect to their properties..

83.     Each of the representations, promises, assurances and agreements by Credit Suisse and its agents and representatives, was made in furtherance of Defendants' secret plan to generate unreasonably large and excessive commissions, to eventually foreclose and take over the developments directly and/or indirectly, to constructively  interfere with and destroy valuable rights and amenities owed by the developers to the homeowners including Plaintiffs and members of Plaintiff Class in order to generate upstream to Defendants and/or their affiliates, agents and/or partners, joint venturers and co-conspirators,  and eventually, acquire ownership and control of the projects.  Defendants acted at all times alleged herein, intentionally or with reckless disregard of the possible or probably consequences to the economic interests of the developers, Plaintiffs and Class Members, and the destruction of their right to enjoy their properties.

84.     As a direct and proximate result of the Defendants' aforesaid plan and scheme, the developers, Plaintiffs and Class Members, and each of them, were caused economic damages of hundreds of thousands of dollars or more,  by the destruction or elimination of their  rights,

benefits, privileges,  amenities and reasonable use of their respective lands and properties, the extreme diminution of the value of their lands, and the destruction of other economic interests of thousands of people who relied upon existing promises, understandings  and contracts in each development with their developer.   Defendants' plan and scheme is continuing to the present time.

85.     Defendant Credit Suisse, assisted by co-conspirator Cushman & Wakefield, carried out the aforesaid plan and scheme by means of intentional misrepresentations and omissions both in writing and publication of sales brochures, and orally. Credit Suisse represented, among other things, that:

(A)     The "Loan to Own" scheme complied with all State and Federal laws and regulations;

(B)     The "Loan to Own" scheme was safe for the developers and homeowners;

(C)     Credit Suisse would, as Loan Administrator, protect the development and the homeowners, since it had a security interest in the development.

(D)     The borrowers could trust Credit Suisse as an experienced and sophisticated lender to assist the developers in financing and developing the development.

86.     Each of the aforesaid representations was false and Defendants Credit Suisse and Cushman & Wakefield knew they were false when made.  In fact,  the Loan to Own scheme *violated* federal, state and local standards, laws and regulations designed to prevent predatory lending, was *un*safe and likely or certain to cause the developments to fail, and likely or certain to cause homeowners to be burdened with substantial debt far in excess of the diminished value of the underlying properties.  The acts and conduct of Credit Suisse in furtherance of said plan and scheme, amounted to the operation of a racketeering enterprise within the contemplation of

the federal RICO Act, and made in total disregard of the rights and expectations of the developers or the property owners, and in furtherance of the intention of Credit Suisse to use its predatory loans to generate excessive loan fees and to acquire the respective properties by foreclosure.

87.    Knowing that its loan clients who had "ENGAGED" them to act as lending fiduciaries, would not likely understand the true nature of the aforesaid loan transactions, Credit Suisse persuaded them to trust in, and rely upon, its representations and those of its collaborating partner, Cushman & Wakefield that the loan transactions complied with all applicable governmental regulations and business practices.

88.    Defendant Cushman & Wakefield collaborated with and assisted Defendant Credit Suisse in its plan and scheme, by representing to developers and property owners that the inflated valuations of the various properties underlying the loans were safe, lawful, appropriate, credible, and justified, using Credit Suisse's "Total Net Value" appraisal method in support of the Defendants' Loan to Own scheme, notwithstanding that Defendant Cushman & Wakefield knew or in the exercise of reasonable care should have known that said representations were false and that the loans failed to comply with various provisions of the federal FIRREA statute. By "ENGAGING" each developer as a client in a fiduciary lending relationship in order to syndicate the loans, Credit Suisse owed an absolute duty of full disclosure to each resort and to each member of the Plaintiff class to disclose that the loans violated FIRREA.. Credit Suisse breached said fiduciary duties.

89.    Defendants Credit Suisse and Cushman & Wakefield made said false representations as part of their scheme to defraud the developers and property owners, knowing they would rely on them.

90.     As a result of the Defendants' aforesaid scheme to defraud, including their misrepresentations and the reasonable reliance thereon by the developers, Plaintiffs and Class Members, the respective resort developments of said developers, Plaintiffs and Class Members were caused to financially fail, and the developers, Plaintiffs and Class Members were caused substantial economic loss.

## C.     The Resorts.

### 1.     Lake Las Vegas.

91.     Lake Las Vegas is a real estate development 17 miles from the Las Vegas Strip, in Clark County, Nevada.  At the time of the Credit Suisse transaction at Lake Las Vegas, the Resort was a 3,592 acre master-planned residential and destination resort, which included a 320-acre private lake, the largest private lake in the State of Nevada, and the last such lake that could be built and developed in Nevada under present laws and regulations.  The Lake Las Vegas resort included residential offerings such as custom home sites, waterfront and golf villas, resort condominiums and luxury executive homes.  It offered attractive amenities including the 349-room Ritz-Carlton, Lake Las Vegas hotel, the 493-room Hyatt Regency Lake Las Vegas Resort, Spa and Casino (currently Loews), three award-winning golf courses and a full-service marina with water craft rentals and yacht cruises. Additionally, the Monte Lago Village Resort enclave at the center of the Lake Las Vegas Resort offered water's edge restaurants and cafes, boutiques and the 40,000 square-foot Casino Monte Lago.

92.     Defendants at all times knew that the Lake Las Vegas Resort was designed as a "high-end" luxury real estate development and life-style located in southern Nevada, and that the developer would represent to each owner/purchaser, both in writing and orally, at the time of purchase, that certain rights, privileges and amenities running with the land were included with

each purchase, including, among others, two  year-round golf courses  ("Falls" and "Reflection Bay"); various fresh water, man-made lakes to complement the luxurious  atmosphere of the development;  first class restaurants,  bar and pro-golf shop at each of the golf courses; owner discounts at all of the numerous stores at the golf courses and shops at the "Monte Lago Village" within  Lake Las Vegas;  and a shuttle service for residents and guests at the Lake Las Vegas community.

93.    Defendants also knew at all times that it was critical to the success of the Lake Las Vegas Resort that prospective purchasers of property and homes therein would have the right to join the "Yacht and Beach Club," and (for those purchasing properties on the "South Shore" of Lake Las Vegas), the right of privacy in connection with their gated area, a private club and membership in a private golf course with a value of $150,000 per member.

94.    Plaintiff Gibson, Froehlich and Jennings in reliance upon the developer's promises of the aforesaid rights, privileges and amenities running with the land, purchased property at Lake Las Vegas during the relevant period of time and remains an owner thereof.

95.    The valuable rights, privileges and amenities running with the land that were promised by the developer at Lake Las Vegas as described above were critical to the decision of Plaintiffs Gibson, Froehlich and Jennings and the Class Plaintiffs and  home owners, who based their decision to purchase their properties on the value said amenities would add to their land.

96.    Defendant Credit Suisse, while planning its scheme to defraud, knew that the aforesaid rights, privileges and amenities running with the land were promised to the Class Plaintiffs, and knew that the home owners' decisions to purchase said lands and properties were conditional upon the existence of said rights, privileges and amenities.

97.     Through the Transcontinental Corporation entities, Lake Las Vegas Resort was owned by Ronald F. Boeddeker (with additional non-operational ownership held by certain Bass family interests, sometimes collectively known as the "LLV Equity Owners".).

98.     Defendants aggressively solicited the owners of Lake Las Vegas Resorts, including the LLV Equity Owners, while promising them that the developers and others could "cash out" of their current equity tied up in the property for large up-front fees, with a non-recourse loan that would burden only the homeowners of Lake Las Vegas, but not the developers.

99.     From 1987, when the original development of the Lake Las Vegas Resort initially commenced, the LLV Equity Owners personally invested nearly six hundred million dollars ($600,000,000) in development costs therein.  Credit Suisse capitalized on this investment by comparing its syndicated loan product to a "home equity loan."

100.    In 2004, when Defendant Credit Suisse embarked upon its plan and scheme, the Lake Las Vegas Resort was burdened with only approximately $50 million in operating debt, which was reasonable and modest, when compared with the nearly $600 million personally invested in it by the LLV Equity Owners, a fact which was known by Defendant Credit Suisse.

101.    Plaintiffs are informed and believe and herein aver that Credit Suisse used the Lake Las Vegas Resort development as a testing ground to refine its Loan to Own scheme, and targeted the development as its first test of its scheme to defraud.

102.    Before the commencement of Credit Suisse's scheme to defraud, Transcontinental Corporation, the developer of Lake Las Vegas, maintained all rights, privileges and amenities promised by that developer to the property owners and prospective purchasers.

103.    Defendants Credit Suisse and Cushman & Wakefield, with knowledge of the developers' aforesaid promises to the Plaintiffs and members of the Plaintiff Class at Lake Las Vegas to perpetually maintain said amenities, devised a plan to unreasonably inflate the stated value of Lake Las Vegas Resort, by means of the "Total Net Value" appraisal method, in order to obtain exorbitant financing fees for themselves, at the expense of the Plaintiffs and Plaintiff Class at Lake Las Vegas, who were thereby burdened with added debt which Defendants knew would be so large as to be unsustainable, which would cause the operators of said property to be unable to maintain the amenities, and which plan was a violation of the provisions of the afore mentioned state and federal laws, standards and guidelines for appraisals and lending enacted pursuant to FIRREA.

104.    With this knowledge, Defendants and  Credit Suisse proposed to Ron Boeddekker and others at Lake Las Vegas and Transcontinental Corporation in 2004,  that it could provide a major lending and  credit facility or loan that Defendants represented would be used to pay off the modest existing debt owed by the equity owners of the various Lake Las Vegas entities, and that the home owners and property owners would also benefit as the Defendants' loan and lending facility  would also serve to provide capital to enhance the resort and allow for further growth.   Defendants Credit Suisse and Cushman & Wakefield  also advised Ron Boeddekker and others in 2004 that it was their opinion and that the value of the assets of Lake Las Vegas would justify a lending facility large enough to allow the equity owners to earn a return of a significant portion of their $600 million dollar investment and that doing so would not place at economic risk the developer or the home and land owners at the resort.   These representations were false and untrue when made by Credit Suisse and Cushman & Wakefield and both Credit Suisse and Cushman & Wakefield knew they were false when made in 2004.

105.    Credit Suisse and Cushman & Wakefield knew in 2004 that they had dishonestly and deliberately overvalued Lake Las Vegas Resort by significant amounts in order to obtain huge multi-million dollar fees that  would be run through their Cayman Islands Branch  owned, controlled and operated by Credit Suisse AG.   Additionally, defendants did so  to ensure that the resort  would  be  so  substantially  leveraged  that  defendants'  could,  under  their  complex, confusing and deceitful lending scheme, gain control and subsequent constructive ownership over the resort not long thereafter.   Defendants scheme ensured the demise of the resort, the rights of Plaintiffs and class members through their knowing and intentional misrepresentation to Ron Boddekker and others in 2004 as described above and herein.  The "gravy train, however, could only continue if defendants could somehow avoid becoming the successor developer but retain all the rights, influence and control of the resort through a "puppet" to fictitiously serve as the "developer" and carry out defendants' scheme and artifice to defraud as described herein.

106.    As part of Defendants' scheme to defraud the developers, home and land owners, it was essential that a plan be in place for Lake Las Vegas and other ski and golf resorts to take control without becoming the actual named successor developer, once the property at Lake Las Vegas and other resorts were foreclosed upon or taken over by consent or through receiverships. The plan at Lake Las Vegas included creation of another entity that would become the developer and later debtor-in-possession in bankruptcy, but remain loyal and under the direct control of Credit Suisse defendants and/or their lawyers.  By creating another successor developer or using other means, such as receiverships, Credit Suisse could avoid all the obligations owed by it as the  successor developer and the obligation to pay vendors to keep open and operate the clubs, golf-courses, ski runs, restaurants and all other rights and amenities promised each home owner and land owner at each of the resorts, including Lake Las Vegas.

107.   In connection with their scheme to defraud, Defendants further advised and recommended in 2004 to Ronald F. Boddekker and others at Transcontinental Corporation that the proposed major credit facility or loan by Credit Suisse would be used, first, to repay the previously existing modest bank debt; and second,  to provide repayment to the LLV Equity Owners of a percentage of the nearly $600 million they had invested in the Resort.   Defendant Credit Suisse served both as a proposed lender, and in addition, a lending advisor to Transcontinental Corporation and Ronald F. Boeddeker who held a special relationship along with Plaintiff and Class Members.

108.   By so advising, the Credit Suisse Defendants assumed the role of a fiduciary to Transcontinental Corporation  and Boeddeker, and by virtue thereof,  Defendants also owed to the developers and owners of  the Lake Las Vegas Resort properties,  and members of the Class, a fiduciary duty of good faith and fair dealing, full disclosure, and the duty to refrain from self-dealing and the withholding of relevant facts.

109.   At all times relevant hereto, Transcontinental Corporation, Boeddeker and others at Lake Las Vegas informed Defendants of the obligations owed to the owners of land, home owners and Plaintiff class members, and obtained the acknowledgment from Defendants of said obligations, and Defendants' promise to honor them, fully implement them, and to utilize the proposed loan to equally benefit them.   In making these promise and assurances to Boeddeker and others at Lake Las Vegas, Defendants' knowingly and intentionally deceived the developers doing so knowing at the time and thereafter when these promises were made that they had no intention of doing so, but rather, intended to keep the "gravy train" going until their ultimate takeover occurred through a sham proxy to deceive the home owners, property owners, vendors

and unsecured creditors of Lake Las Vegas and the entities to which Transcontinental were obligated.

110.    Based upon the specific contractual recitation that loan proceeds were to be used to repay the LLV Equity Owners a portion of the nearly $600 million they had personally invested in said resort development, and based upon the status of Transcontinental and Ronald F. Boeddeker as LLV Equity Owners, they were also intended beneficiaries under the loan agreements and entitled to the benefits thereof.   Residents and property owners of Lake Las Vegas were intended third-party beneficiaries of the proposed lending facilities proposed by Defendants in order that Lake Las Vegas Resort could expand and develop a promised a new golf course, convention facilities and other amenities for its homeowners. Such additional developments would have improved property values for all owners at Lake Las Vegas and improved their enjoyment of the land.   Defendant Credit Suisse knew the importance of the additional developments, when it made the aforesaid representations to Transcontinental Corporation and Ronald F. Boeddeker, which representations inured to the homeowners and Plaintiffs herein as third-party beneficiaries, to the effect that the amenities, benefits and privileges running with the land would remain secure and inviolate.

111.    At all times relevant hereto, while Transcontinental Corporation and Boeddeker continued to warn Defendants of the importance of maintaining the rights, amenities and privileges that were promised to the property owners  and homeowners of Lake Las Vegas Resort, and the fact that their maintenance was essential to the long term success and viability of the resort, Defendant Credit Suisse exploited its special fiduciary relationship with Transcontinental and Boeddeker by concealing material facts from them.

112.    Relying on the misrepresentations and fraudulent appraisal methodologies described in this Complaint, developer LLV Equity Owners agreed to an initial Credit Agreement dated November 1, 2004 as a $435,000,000  term loan secured credit facility, (hereinafter the "2004  LLV  Loan").   At all times, Defendants Credit Suisse assured the developer and Mr. Boeddeker that their methodology for lending was "safe and sound", in compliance with all relevant laws, and would benefit the residents and owners of property at Lake Las Vegas.   While making said assurances, Defendants commenced their lending scheme.

113.    Representatives and agents of the Credit Suisse Defendants who participated in or ratified and concealed the acts and conduct of the Defendants include David Miller, Grant Little, Jeff Cohen, Naeem Arastu, William O'Daly, Jeff Barcy, Jeremy Rogers, Jonathan Moneypenny, Julia Kingsbury, Grant Pothast, Andy Mahder, Michale Safko, Nancy Unrath, Matthew Tuck, Joe Friedman, Alan Berenbaum, Jed Kelly, Jodi Joskowitz, Don Berger, Paul Fuhrman,  Andy Stock and others.

114.  Because  numerous  communications  in  which  Defendants  Credit  Suisse representatives  uttered  the  misrepresentations  herein  alleged  were  conducted  via  interstate telephone communications, it is not in all instances possible for Plaintiffs to now identify which Credit Suisse agent or representative was speaking at any particular time.   The volume of interstate communications made by Defendants or their representatives in furtherance of their scheme to defraud and conceal the true facts known to them, of which the developers and Plaintiffs were not aware, cannot be completely reconstructed but are alleged to exceed a minimum of 300 or more instances between 2004 and 2007 of unlawful use of the wires, mails and interstate carriers and facilities in violations 18 U.S.C. §§ 1341 and 1343.

115.     Some of the specific representations that were later discovered to be false or materially misleading were presented by one of more of the previously referenced authorized representatives and agents of Credit Suisse at a meeting held in Henderson, Nevada on Tuesday October 12, 2004 and Wednesday October 13, 2004.  In addition to the in-person representations of Credit Suisse, domestic and international phone lines were established as dial-in numbers to facilitate participation by additional meeting participants who were not physically present.  Specifically, interstate wires were utilized to implement and perpetrate the scheme and artifice to defraud Plaintiffs and interfere with the rights and privileges of the land-owners and homeowners at Lake Las Vegas Resort.

116.     Having completed the 2004 LLV  Loan as described herein, (which was the first loan arranged with the "Total Net Value"  methodology) Defendant Credit Suisse then changed its organizational operation to create a new, off-shore entity which it named as "Credit Suisse, Cayman Islands Branch, " intending to continue with its plan and scheme to dominate the high-end resort lending market.  Plaintiffs believe, and aver herein, that the reason Defendant Credit Suisse established the off-shore entity or department was to permit it to evade United States federal banking and securities laws and regulations and to avoid compliance with the United States tax laws.

117.     When Defendants, as lending advisors and fiduciaries, advised the developer Transcontinental Corporation and Mr. Boeddekker that its lending proposal and methodology was safe and sound and in compliance with the law, the developers understood that to mean the laws of the United States and the agencies that regulate them.

118.     Upon information and belief, Plaintiffs further aver that the so called entity or "branch" of Credit Suisse (the Swiss bank) that was termed "Credit Suisse, Cayman Island

Branch," was an entity that had no meaningfully established business presence in the Cayman Island and was, in effect, merely a sham post office box "mail drop" established to avoid federal banking laws, regulations, guidelines and penalties for violations of the laws of the United States.

119.    Having made the initial 2004 LLV Loan, Credit Suisse First Boston -- without providing Plaintiffs full, complete, accurate and truthful information regarding the details of and reasons for the formation of Defendants' "Cayman Island Branch," Defendant then transferred all obligations and financial transactions of the developers and Plaintiffs to its new off-shore entity.

120.    Following the formation of its sham off-shore branch, and without disclosing the existence,  relevance and importance thereof  to Plaintiffs,  the Defendants opened negotiations with Plaintiffs to facilitate additional loans, substantially exceeding the  2004  LLV Loan which, based on the non-FIRREA standards,  Credit Suisse/Cushman  methodology, had been in the amount of  $435 million.

121.    Defendants facilitated subsequent amended and restated credit agreements in May 2005 and June 2007, until, by June 22, 2007, the total loan balance amount for which the newly formed off-shore Credit Suisse, Cayman Islands Branch was the "Fronting Bank and Paying Agent" had risen to $540 million ($570 million less principal payment of $30 million).

122.    Defendants also fraudulently induced developers and owners of other high-end real property resorts to borrow very large sums of money from Credit Suisse, in similar fashion as it had induced the developers and owners of the Las Vegas Lake Resort property described herein above.  By June 22, 2007 Defendants had arranged, or were in the process of arranging for similar loans to the developers and owners of the resort properties described herein below, in

order to charge exorbitant loan fees in the tens of millions of dollars using the model which Defendants perpetrated upon the developers and owners of Lake Las Vegas Resort.  All of these loans were designed to permit Defendants to both overcharge loan fees, but also to eventually foreclose on the underlying properties at a huge discount to fair market value, when the loans went into default status as Defendants contemplated they would do. If the developers and owners, including Plaintiffs and Class Plaintiffs, were unable to satisfy all the terms, conditions and covenants of the loan agreements, the Defendants as "secured creditors" would foreclose upon and/or take constructive control and take title and possession of the underlying lands for an amount significantly below fair market value.

123.    By means of foreclosing upon or taking control of these resort properties by similar means, the Credit Suisse Defendants gained the ability to terminate or substantially diminish the various rights, privileges and amenities promised to the third-party beneficiary owners, including Plaintiffs and Class Plaintiffs herein, knowing that by so doing, Defendants would cause Plaintiffs and Class Plaintiffs and others to suffer hundreds of millions of dollars of economic damages by deflating the value of their properties.

124.    In 2004, when it appeared that the developers of Lake Las Vegas Resort might be able to successfully service or repay the loan, the Credit Suisse Defendants and other lenders for which Credit Suisse was fronting, set out to fraudulently induce the developers to borrow even greater sums, always with the intention of eventually foreclosing upon the underlying properties and acquiring the lands at a price substantially below fair market value.

125.    In order to accelerate the anticipated failure of the respective real estate development projects described herein, and to accelerate the time when Defendants would acquire control over the projects, the Credit Suisse Defendants deliberately interfered with the

rights, benefits and expectations of homeowners and landowners in each of the resorts through the artifice of creating sham debtors-in-possession. Knowing that the sham debtors-in-possession had no practical experience or expertise in managing resorts or developing master planned communities, and with inadequate operating capital, Defendants instructed them to terminate and close golf courses, restaurants, and clubs, with the intended result that club members would quit when their rights were taken away, in further derogation of the land values of the owners, Plaintiffs and Class Plaintiffs herein.

126. Defendants' intentional interference with the contractual rights of Plaintiffs and Class Plaintiffs was committed in various ways. For example, Defendants interfered with the negotiations of the Lake Las Vegas Equity Owners with respect to the sale of a major parcel of land in proximity to a planned 4th golf course, to be known as Rainbow Canyon, by falsely and with intent to deceive, communicating to the prospective purchasers that the developers had no intention to ever build that golf course.

127. At the time Defendants published the aforesaid false statements relative to the Rainbow Canyon Golf Course at Lake Las Vegas Resorts, Defendants knew its statements were false, yet did so intending to cause the developers and owners of the Lake Las Vegas Resorts properties to lose a major land sale, to diminish the developers' ability to perform the covenants contained in the loan agreements, and to diminish and depreciate the value of Plaintiff's and Class Plaintiffs' interests in the Lake Las Vegas Resorts properties.

128. As part of and in furtherance of their scheme, and immediately after having fraudulently entrapped Ron Boeddeker and others at Lake Las Vegas into their lending and appraisal scheme described herein, Defendants immediately turned their attention to another resort located immediately adjacent to Lake Las Vegas over the western hillside called

"Tuscany."  Tuscany was a master-planned development operated by Rhodes Homes and owned by Jim Rhodes.  Rhodes homes developed Tuscany, similar to Lake Las Vegas, and developed property in several states.   Rhodes Homes hired Frederick Chin as its Chief Financial Officer in 2004. In early 2005, Jeff Barcy and others from Credit Suisse and Cushman & Wakefield approached Jim Rhodes and Frederick Chin to market their scheme to Lake Las Vegas' next door neighbor, Tuscany.   The continuation of the loan to own scheme became much easier after Lake Las Vegas.  Defendants told Chin and Rhodes, as well as others with their company, that they could provide the same kind of lending facility and program for it that it did for Lake Las Vegas.  At this time, Credit Suisse and Cushman & Wakefield had developed the Lake Las Vegas scheme to use as a basis to fraudulently induce Rhodes Homes into the same scheme to borrow money through an inflated appraisal scheme identical to that of Lake Las Vegas, enabling Defendants  to capture the entire resort developments in the Henderson, Nevada area and control each resorts "future" for its own economic purposes.  In 2005, Credit Suisse was able to secure another victim in Defendants'  loan to own scheme; that is, a nearly  $600 Million  loan to Rhodes Homes based upon a fraudulent appraisal of about $1.6 Billion for Tuscany, hundreds of millions of dollars more than it was actually and fairly valued by state and federal appraisal and lending standards which Defendants promised they were complying with and which Rhodes Homes relied upon.   Defendants employed the same scheme against Rhodes Homes as it did against Lake Las Vegas and other resorts.   It used Cushman & Wakefield to aid and abet it in its scheme with Tuscany.  To compound their deceit, Cushman & Wakefield shared the fraudulent appraisal Defendants performed for Lake Las Vegas with Rhodes Homes, Chin and others to buttress the justification for Rhodes Homes to agree to the lending program and appraisal scheme.   Not more than one year later, Rhodes Homes was in  default just as defendants planned

and orchestrated  Credit Suisse demanded  Jim Rhodes and Rhodes Homes appoint Frederick

Chin as its new Chief Executive Officer to take direct  control of the resort through Chin.  Chin

became a willing puppet for Credit Suisse to secure his economic future.

129.   In early 2007, the real estate market had generally begun to soften and the market

values of land no longer rising, and in some instances, beginning to decline, as anticipated by

Defendants in early 2003 and 2004 when Defendants began their scheme and conspiracy to

defraud the various ski and golf resorts.  As part of their scheme, Defendants approached Chin at

Rhodes Homes in late 2006 or early 2007, and advised him that in the near future,

Transcontinental Homes would be unable to meet its obligations just like Rhodes Homes.

Defendants told Chin that they were ultimately going to take over Lake Las Vegas either by

foreclosure or consent by Boeddeker.  Chin was told by Credit Suisse that it did not want to

become the new successor developer as that would require Credit Suisse, as the new successor

developer and owner,  to meet the obligations owed to the land owners and home owners as well

as the vendors and creditors at Lake Las Vegas; that is, keeping the golf courses open, the clubs

operating, and all the amenities and rights  running with the land promised to the residents in

effect as promised.  In addition, it would require Credit Suisse Defendants to make timely

payments to all vendors of Lake Las Vegas ensuring the resort would be maintained, as

promised.   Credit Suisse proposed, however,  that Chin become the new operator and successor

developer.  Defendants' promised to loan Chin $1 Million to use for his new company, the

Atalon Group.  They also promised Chin, that once Atalon took over, Defendants  would agree

to loan his new company, Atalon Group,  a substantial amount of money on a non-recourse basis

to operate the resort for a period of time to create the impression of legitimacy,  when in truth in

fact, the continuation of the scheme would require Atalon Group to take all of the  Lake Las

Vegas companies  into bankruptcy and undermine and destroy the rights and amenities owed to the residents.  Defendants' first, however, wanted Chin to operate and take control of Lake Las Vegas as its new Restructuring Officer, to report back to Defendants all material information it needed to effectuate its pre-planned takeover of the resort.  Chin agreed to the illegal scheme.

130.    In furtherance of the scheme, Defendants convinced the developers and owners of Lake Las Vegas Resort, R.F. Boeddeker and Transcontinental, to accept the appointment of Frederick Chin as the Chief Restructuring Officer, who Defendants falsely represented would act in the resorts best interests in managing and controlling the property and resort.  In effect, Defendants', through Chin and later the Atalon Group, not only created a special relationship to the developers and fiduciary obligations thereto and to the Plaintiffs and Plaintiff Class, they became the new developer at that moment.  In furtherance of the scheme,  Defendants' Chin and Atalon Group, deliberately failed to disclose to Transcontinental, Boddeker, the Plaintiffs and Class Plaintiffs, that each of the Defendants were in fact conspiring to foreclose upon, and take over, the resort, and subsequently, through Atalon Group and Chin, take the resort and resort companies into bankruptcy with the specific intent of destroying the Plaintiffs' and Class Plaintiffs' rights described herein.  Defendants also failed to disclose Chin's roles  with  Rhodes Homes and the fact that he was also assisting defendants Credit Suisse and Cushman & Wakefield in perpetrating the same scheme against Rhodes Homes.  Defendants' failure to disclose these material facts were intended to deceive and constituted a violation of Defendants' duty of full disclosure and loyalty to the developers, owners of land and homes and vendors of Lake Las Vegas.  Had Boeddeker, Transcontinental and/or  the Plaintiffs and Plaintiff Class of Lake Las Vegas participants, known of the Defendants' schemes described herein and above,

they would never have entered into any lending program   with Defendants and permit Defendants to take control of the resort .

131.    In early 2007, the real estate market had generally begun to soften and the market values of land no longer rising, and in some instances, beginning to decline, as anticipated by Defendants in early 2003 and 2004 when they began their scheme and conspiracy to defraud ski and golf resorts.   As part of their scheme, Defendants approached Chin at Rhodes Homes in late 2006 or early 2007, and advised him that in the near future, Transcontinental Homes would be unable to meet its obligations just like Rhodes Homes. Defendants told Chin that they were ultimately going to take over Lake Las Vegas either by foreclosure or consent by Boeddeker and the equity owners.  Chin was told by Credit Suisse that it did not want to become the new successor developer as that would require Credit Suisse, as the new successor developer and owner,  to meet the obligations owed to the land owners and home owners as well as the vendors and creditors; that is, keeping the golf courses open, the clubs operating, and all the amenities and rights  running with the land promised to the residents and vendors of Lake Las Vegas including Plaintiffs and Plaintiff class. Credit Suisse proposed that Chin become the new operator and successor developer.  Defendants' promised to loan Chin $1 million dollars to use for his new company, the Atalon Group.  They also promised Chin, that once Atalon took over, Defendants  would agree to loan his new company, Atalon an substantial amount of money on a non-recourse basis to operate the resort for a period of time to create the impression of legitimacy,  when in truth in fact, the continuation of the scheme would require Atalon to take Lake Las Vegas into bankruptcy and undermine and destroy the rights and amenities owed to the residents.   Defendants' first, however, wanted Chin to run and take control of Lake Las Vegas as its new restructuring Officer, to report back to Defendants' all material financial information

so it could help plan the take-over of the resort, by Chin's Atalon Group and they  agreed to the scheme.

132.     In furtherance of the scheme, Defendants thereafater  convinced the developers and owners of Lake Las Vegas Resort, R.F. Boeddeker and Transcontinental, to accept the appointment of Frederick Chin as the Chief Restructuring Officer, who Defendants falsely represented would act in their best interests in managing and controlling the property and resort. Defendants,' Chin and Atalon Group,  however, failed to disclose to Transcontinental, Boddeker and the equity owners, Lake Las Vegas or the Plaintiffs and Class Plaintiffs that each of the Defendants were in fact conspiring to foreclose upon, and take over, the resort, and subsequently, through Atalon Group and Chin, take the resort and resort companies into bankruptcy.   Defendants also failed to disclose their prior dealings with Chin at Rhodes Homes and the fact that he was helping to also take that property into bankruptcy for Credit Suisse, which he did.   Defendants' failure to disclose these material facts were intended to deceive and constituted a violation of Defendants' duty of full disclosure and loyalty to the developers, owners of land and homes, all third-party beneficiaries of the lending facilities made to Lake Las Vegas.   More than being involved in a direct conflict of interest with the developers, home and land owners and creditors, Defendants' carried out their scheme just as planned from the beginning in late 2003 and early 2004 when they began to target the resorts of America and the Bahamas in their loan to own scheme.   Had the developers and equity owners as well as the Plaintiffs and Plaintiff class  of Lake Las Vegas known, in advance, of the schemes described herein and above, they would never have entered into any lending facility with Defendants or allowed, after the fact, Mr. Chin and Atalon Group to become the puppet for Defendants to carry out the take-over scheme which has destroyed the rights of the owners of land and homes at

Lake Las Vegas and their land values, some at 80 percent below the value after Credit Suisse took over Lake Las Vegas and, through a sham debtor-in-possession, the Atalon Group and Chin, thereby bankrupting Lake Las Vegas for its own benefit and that of Defendants syndicated lenders.

133.    As a direct and proximate result of the aforesaid, unlawful and fraudulent and unfair conduct of the Defendants, the Lake Las Vegas Resort developers were unable or unwilling to continue paying down the loan to Credit Suisse, causing a failure of the project, and resulting in the Plaintiff and other homeowners of the various lands and properties within said resort, constituting the Class Plaintiffs, to be burdened with loans that far exceed the now-depreciated value of their respective properties, and in fact to be practically unable to resell them.

134.    Defendants and their sham agents and representatives now control the lands known as Lake Las Vegas, and have caused both golf courses to be shut down, have caused the termination of the rights, privileges and amenities running with the land to be terminated, the various shops to be closed, the shuttle service discontinued, the restaurants to be closed and boarded up, the rights, benefits and privileges at the Yacht and Beach Club severely limited, and the South Shore Club to be forced into foreclosure and sale in a Bankruptcy proceeding thereby destroying the rights and privileges of the owner-members, all of which has caused the property values to owners and residents of Lake Las Vegas Resort to suffer substantial economic damages.

135.    The damage resulting to the land itself, from the aforesaid fraudulent, oppressive, and malicious conduct of the Defendants, including closed golf courses, the dying grass, and the loss of streams and ponds once inhabited by song birds and other desirable wild life and flora,

has resulted in the overall value of the Las Vegas Lake Resort property values declining by hundreds of millions of dollars, and a substantial loss of visitors who are willing to stay at the hotels, rent properties or purchase homes therein.

136.    Similar to other homeowners and landowners at Lake Las Vegas, Plaintiff Gibson has suffered a loss in excess of one million dollars all attributable to Defendants scheme to defraud.   More specifically, Plaintiff Gibson's residence has lost nearly 80% percent of its value as a direct and proximate result of Defendants' scheme in an amount of approximately $500,000 due to the scheme as virtually nobody wants to purchase property in Lake Las Vegas, because of the destruction caused by Defendants.  Plaintiff Gibson has lost two properties as a result of the intentional scheme and damage proximately caused by Defendants in an amount of $550, 000 on two other properties at Lake Las Vegas that sit next to dead golf courses, with no clubs or eating establishments at the Clubs that made Lake Las Vegas a beautiful resort, a wonderful life style and a resort that previously hosted nationally televised golf tournaments and charities.  Just like Plaintiff Gibson, Plaintiff Terri Froehlich has lost over $350,000 in the value of her home as a proximate result of the scheme to defraud by Defendants, as alleged herein and throughout the Amended Complaint.   Plaintiff  Vern Jennings has suffered damages in excess of $1 Million in value of his real estate and loss of his rights in the membership purchased in SouthShore Golf Club as a direct and proximate result of the scheme to defraud by Defendants as alleged herein.

137.    On September 29, 2009, the Honorable Linda B. Riegle, United States Bankruptcy Judge for the District of Nevada, Las Vegas Division, in the matter of "Lake Las Vegas Joint Venture, et al, Case No: BK-S-08-17814-LBR, E-Filed 11/05/08, stated in the official transcript:

THE COURT:        I guess my problem in this is, you know, this debtor [Atalon Group] is really nothing more than Credit Suisse puppets now.

138.    The Court went on to address the conflicts of lawyers representing the debtor in possession and Credit Suisse.  This very court has on other occasions indicated its concern with the integrity of these proceedings in connection with who the real debtor in possession is.  At this time, Plaintiffs are unaware of whether the United States Bankruptcy Court has made a criminal referral to the Federal Bureau of Investigation which agency is charged with the investigation of bankruptcy crimes, mail and wire fraud and racketeering.  In this case, however, Plaintiffs will establish that these very bankruptcy proceedings were a sham and a continuation of the racketeering activity of Defendants.  Not one, but now two United States Bankruptcy Judges have addressed the conduct of Defendants.  These proceedings will get to the bottom of the intentional and egregious misconduct  of Defendants and their representatives at Lake Las Vegas and the other resorts.

139.    Currently, the real owners of Lake Las Vegas are the Credit Suisse Defendants, as the true successor developers, who have breached, abrogated and destroyed the contractual rights, expectations and privileges owed by them to Plaintiffs and Class members.  In so doing, Defendants' scheme has also destroyed the value of Plaintiffs' and Class members' real estate holdings   These same Defendants are also the true owners and successor developers at Tamarack, Ginn sur Mer and Yellowstone, as well as other resorts that they have deliberately destroyed, including the master-planned community next to Lake Las Vegas, Tuscany, which is now bankrupt and also ruined similarly to the circumstances of Lake Las Vegas.

140.    The *modus operandi* utilized by the Defendants relative to the Lake Las Vegas development, was and is the *modus operandi* similarly employed at the Tamarack, Yellowstone Club, and Ginn Sur Mer developments.

2.     **Tamarack Resort Development.**

141.     Plaintiff L.J. Gibson, Amy L. Koenig and other Plaintiff Class Members own or owned real property interests in the State of Idaho, located in the Tamarack Resort Development.

142.     The real property development known as Tamarack was similar in concept to the aforementioned Lake Las Vegas Resort in Nevada.  Situated in Tamarack/Donnelly, Idaho, the Tamarack Resort was advertised by its developer as having been designed to be an exclusive, private, first-class real estate development that was advertised to include such amenities as all-season recreational facilities, including ski slopes, chair lifts to numerous mountaintops, hotels, shops, pools, restaurants, a world class golf course, and Lake Cascade, for swimming, boating and fishing.  The Tamarack real property development was planned as a phased development project, once characterized by the Governor of the State of Idaho as one of Idaho's most valued treasures.

143.     Plaintiffs Gibson, Koenig and other Plaintiff Class members purchased real property in the Tamarack development, in reliance upon written and oral guarantees that their purchase of ownership to the land included the rights, privileges and amenities running with the land, described above, and including, specifically: the Osprey Meadows Golf Course; the skiing facility including 7 chair lifts; the 50,000 square foot Discovery Square base facility;  a 150-acre snow-making system; twenty kilometers of hiking and  bicycling trails;  ski shops, and restaurants. The developers and sales agents further represented to Plaintiffs that Tamarack Resort would be professionally managed by the world famous Fairmont Hotels Company. Many of these amenities were already in existence and operational, when Plaintiffs purchased their interests therein.

144.    In 2002, WestRock Associates, LLC was granted an initial lease of 1,200 acres by the State of Idaho.   That same year, WestRock changed its name to Tamarack Resort LLC. Within the next two years, Tamarack sold out its initial real estate offering of 104 vacation homes and homesites – making it the largest resort homesite launch in North American history. Later in 2004 a second real estate release – 64 homes and homesites – also sold out, ground was broken at Tamarack Village, and Tamarack ski mountain opened.   By the end of 2005, a third, fourth and fifth release were successfully completed and construction of the Osprey Meadows golf course was in its final stages.   By January 2006, the Lodge at Osprey Meadows was opened, two more lifts were added to the ski resort, and a sixth successful real estate release was completed.   Against this backdrop, Credit Suisse descended upon Tamarack Resort LLC with its loan-to-own scheme.

145.    In January 2006, deal-makers from Credit Suisse's Los Angeles office, including Arik Prawer, Managing Director of Real Estate Investment Banking, approached Tamarack with a slick promotional presentation.   The overture was unusual because Credit Suisse had pursued Tamarack; not the other way around.   As Tamarack's Jean-Pierre Boespflug later stated, "usually bankers don't come to you; you go to them […] they came to us with a very fancy PowerPoint presentation."   In addition to Mr. Prawer, the Credit Suisse Tamarack Resort Team included:

♦    James Meehan, Jeremy Rogers, and Adam Ray from Real Estate Investment Banking;

♦    Kent Savagian and Steve Kantor from Senior Management;

♦    Frank Garibaldi and Peter Espy from High Yield Capital Markets;

♦    John Putrino and Dave Lewisch from Mergers & Acquisitions;

♦   David Miller and Jon Moneypenny from Syndicated Loan Capital Markets; and

♦   Don Kinsey and EJ Kavounas from "CMBS".

146.   Credit Suisse's team also included Michael Criscito, one of Credit Suisse First Boston's Managing Directors in its New York office.

147.   Noting its success as the "sole bookrunner and lead arranger" at Lake Las Vegas and Yellowstone Club, Credit Suisse characterized itself in the presentation as the market leader in resort lending such as that being offered to Tamarack.   Credit Suisse represented that the loans would be based upon an appraisal by a "nationally recognized independent appraiser" who would be required to perform an appraisal of the land holdings, and, perform quarterly updates to such appraisal.   As it turned out, such quarterly updates never took place.

148.   However, most importantly, prior to finalization of the loan documents, Tamarack received a "Total Net Value appraisal" performed by Cushman & Wakefield's Denver, Colorado office.   The appraisal report opined that Tamarack was worth $743,000,000, and represented that it "was performed in compliance … with the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA)."   Such statement was false and was relied upon by Tamarack to its and the Plaintiff Class' detriment.

149.   Credit Suisse marketed itself as a sole-lead/arranger for the $250 million facility and Tamarack's "partner" in the transaction.   As part of the sales process of the syndicated $250-million senior credit facility, Prawer held himself out as Managing Director of Credit Suisse First Boston, a United States based and regulated bank with its main offices in New York.   At that time, and thereafter, Prawer and his team from Credit Suisse made the representations cited herein as part of specific solicitations designed to create a trust and fiduciary relationship between Tamarack Resorts, LLC and Credit Suisse. At all times, Prawer and the other

representatives of Credit Suisse held themselves out to Tamarack as employees of Credit Suisse First Boston acting in the capacity of expert lending advisors in order to implement their syndicated loan facilities.

150.    Credit Suisse represented that the $250-million financing would allow for reinvestment of the proceeds from real estate sales against a business plan that was developed solely by Credit Suisse.  Based upon the net value appraisal methodology, the Credit Suisse credit facility miraculously tripled Tamarack's borrowing capacity with the stroke of a few pens on paper.

151.    Based upon the skill, experience and sophistication of the Defendants, and, the representations by Credit Suisse and its agents and representatives that the loan transaction conformed to all of the laws of the United States and Idaho, including all laws relating to fiduciary duty, U.S. banking regulations, and laws involving commercial loan transactions, Tamarack agreed to enter into the loan transaction in May 2006.  Without the explicit representations and approval of Credit Suisse, and the trust and confidence that Tamarack had reposed in it and its agents and such representations, Tamarack would not have entered into the $250-million loan facility.

152.    Besides being a Managing Director in its New York office, Michael Criscito was also a Managing Director of Credit Suisse's "Cayman Islands Branch".  Utilizing the confidential information that he and others at Credit Suisse received by virtue of the fiduciary relationship that was intentionally created by Credit Suisse between it and Tamarack, Criscito and his team developed a detailed financial/business plan that included mathematical models from which came the EBITDA, and other returns and indices that provided the justification for the loan.  These models and plan enticed Tamarack to purchase the loan facility.

153. Credit Suisse sold the loans to investors who then put them into mutual funds or packaged them into securities called collateralized loan obligations ("CLOs"). Credit Suisse had nearly cornered the market on such large dollar loan facilities to resort properties. The secret to its success was its ability to create a relationship of trust in its role as expert, confidant, lending advisor and fiduciary to the Resorts, including Tamarack. This relationship, intentionally created by Credit Suisse, enabled it to fashion a loan product that was designed solely to benefit Credit Suisse by creating huge fees. The $250 Million loan, based on the bogus and illegal net value methodology, was not in the best interest of Tamarack.

154. Credit Suisse's master planned marketing program to inject itself into a position of trust with resort developers played out precisely as planned at Tamarack. The Credit Suisse capital markets team acquired insider and confidential information from Tamarack, as part of its scheme. As proven in the evolution of the "lending relationship" between Credit Suisse and Tamarack, the entire scheme constituted a massive "bait and switch" pre-planned RICO enterprise. The Credit Suisse Capital Markets team first secured the confidence and insider positions needed to secure the private confidential information that was needed; then, having set the bait, the team switched the relationship to one of a traditional bank/customer relationship and created the loan documents to create that appearance. Later, the risk management team appeared in an effort to takeover the control of Tamarack and to sue the developers, while leaving the Plaintiff Class with devastated equities and ever-diminishing, or disappearing, amenities. However, the risk management team, again, utilized a receivership scheme in a fraudulent effort to avoid its duties as the successor developer to Tamarack.

155. Mr. Prawer and the Credit Suisse Tamarack team knew that the loans violated FIRREA; that the loan to value ratios based on the TNV method were over 100% because of the

bogus valuation; and, they knew when the loans were entered into that Tamarack would default and that the "risk management team" within Credit Suisse would then step in and utilize foreclosure, bankruptcy, receivership, and insider schemes to defraud the Plaintiff Class.

156.    The loan facility entered into in 2006 between Credit Suisse and Tamarack violated U. S. law.  Prior to entering into the loan agreements, Tamarack was told that the loan facility was in compliance with applicable U.S. and Idaho laws when, in fact, it was not.   Such material misrepresentations, and failures to disclose despite a duty to do so, were made by Mr. Prawer and others on the Credit Suisse team, and others within Credit Suisse and Cushman Wakefield, in 2006, via telephone calls, emails, U. S. Mail, and verbally.

157.    Defendants acted in furtherance of its predatory lending scheme with respect to the Tamarack Resort real property development, commencing with its first involvement in 2005 and continuing to the present, in the same or similar manner that it used to defraud the owners and developers of the Lake Las Vegas Resort, including such acts as, among others, willfully and intentionally interfering with Plaintiffs' contractual rights and "guaranteed amenities" and causing the ski and summer resort at Tamarack to be effectively terminated, or altered so significantly as to significantly diminish its value and deprive Plaintiffs of the effective use and enjoyment of their land. Defendant's fraudulent scheme with respect to Tamarack Resort has caused the ski runs to be closed, the chair lifts shut down, the ski trails and snow-making facilities to be closed or terminated, numerous summer shops and restaurants to be closed, and the "Club at Tamarack" (for which Plaintiffs and numerous members of the Plaintiff Class paid an additional $25,000 to join) to be closed, and vital trails closed or never constructed.

158.    Defendants' conduct with respect to the Tamarack Resort real property development was committed intentionally, with the intent of substantially diminishing the value

of the respective ownership interests in Tamarack Resort at the expense of Plaintiffs and the developers, so that Defendants could gain control and ownership over the lands within the Resort, at a price substantially below that of fair market value.

159.    Defendant Credit Suisse has, using its predatory lending scheme, effectively taken control of the Tamarack Resort operation.  Notwithstanding the requests of Plaintiff Gibson and other owners of lands and homes built within the Tamarack Resort to Defendant, it has failed and refused to reopen the resort and shops for the present winter skiing season, in order to accomplish its unlawful purpose of depreciating the values of the homes and parcels within the Resort, and to eventually foreclose on such interests at prices substantially below fair market value.

160.    As a result of the unlawful conduct of Defendants aforesaid, Plaintiffs Gibson and Koenig and other owners of land at Tamarack Resorts within the Plaintiffs' Class, have been caused substantial economic loss and damage, because of the diminution in market value of their lands, and because of their loss of the use and enjoyment of their lands.  Plaintiff Gibson's damages exceed one million dollars ($1 million) and the land she purchased to build a home is now virtually worthless.  Plaintiff Koenig's losses exceed $500,000.

**3.    The Ginn sur Mer Land Development Resort**

161.    Ginn sur Mer Resort at the West-End of Grand Bahama Island, Grand Bahamas was designed by its developers as a $4.9 billion "mega-mix" resort on the western tip of Grand Bahama Island. Ginn and the Bahamian Government signed an agreement for the development of its 2,000 acres of land, in December of 2005, including those required under FIRREA.

162.    Ginn sur Mer, located 48 miles south of Florida, was marketed to citizens of the United States as a first class luxury resort development similar to the Lake Las Vegas and

Tamarack Resorts described herein. Most of the purchasers of property at Ginn sur Mer were United States citizens who borrowed funds from Ginn Financial Corporation, located in the state of Florida, and subject to State of Florida Federal lending and appraisal guidelines and standards implemented pursuant to FIRREA. Most, if not all, of the closing transactions occurred in Palm Coast, Florida at Ginn's Hammock Beach Resort.

163.   Plaintiffs Gibson and Fresonke and members of Plaintiff Class purchased property at Ginn sur Mer from Ginn-LA West End Limited, between 2006 and early 2007 and financed their purchases through a U.S. lending institution out of Florida, Ginn Financial,  which institution was subject to state and federal appraisal and lending standards and laws.

164.   As part of their continuing scheme to defraud utilizing  the same *modus operandi* employed against Lake Las Vegas, Yellowstone Club Resort and Tamarack along with numerous other resorts such as Rhodes Homes, Defendants' targeted Ginn resort properties owned and operated by several Ginn companies along with several Lubert-Adler companies in properties along the Florida, the east coast and in particular, the crown-jewel, Ginn sur Mer Resort in the West end of Grand Bahama Island.   Defendants utilized the same TEAM approach with Ginn and Lubert-Adler  to promote its fee generated "loan to own" scheme and its  "Equity Recapitalization Loan Program" on Ginn and Lubert-Adler in 2006 in connection with various resort developments, including and in particular, Ginn sur Mer.    Like Lake Las Vegas and Yellowstone, some of the very same individuals came to Ginn and presented a PowerPoint presentation on their approach to a "total net value" appraisal of their resorts. Defendants' represented that Cushman & Wakefield could provide an "independent" appraisal like it had for other resorts that would be compliant with federal and state appraisal standards, including FIRREA.  Relying on the same, Ginn and Lubert-Adler agreed and the scheme of Defendants

was, again, underway.  Having misrepresented orally and through the United States mails and wires to Ginn and Lubert-Adler in 2006 false and fraudulently  inflated appraisals for the various resorts including and in particular Ginn sur Mer, Defendants began the implementation of their scheme just like did with Lake Las Vegas, Yellowstone, Tamarack and other resorts.   In furtherance of their scheme, various Ginn-Lubert Adler companies agreed to a $525,000,000 First Lien Credit Agreement dated June 8, 2006 with Ginn-LAConduit Lender, Inc,. and Ginn-LA CS Borrower, LLC which lending facility was utilized, in part, to finance continued development of Ginn sur Mer.  As part of the lending facility and in furtherance of the scheme to defraud and take over Ginn-sur Mer, Defendants demanded that Ginn and Lubert-Adler companies (hereinafter "Ginn") agree that Credit Suisse become its Administrator and collateral agent rendering it certain fiduciary control over borrowers and the development of Ginn sur Mer and other Ginn properties.  Like Lake Las Vegas, Yellowstone, and Tamarack, Credit Suisse demanded and Ginn agreed that Cayman Islands Branch of Credit Suisse serve as that collateral and administrative agent in control and to utilize it under its appointment authority and the power to exercise control over the developments which it exercised to the detriment of Plaintiff Gibson and Plaintiff class.

165.   Defendants knew Ginn enjoyed a great reputation in the real estate industry and had a great following of owner investors in his resorts.   Of particular interest to Defendants loan to own scheme was the prospect of not merely extracting massive up front fees from Ginn, but to gain control over the resort, at a time it determined most profitable to ultimately own it.  Defendants also knew that with the close relationship Ginn had with the Bahamian Government, Ginn sur Mer would be a great and immediate success for Ginn.   It also knew from the beginning,  that despite the success of Ginn with  investors like Plaintiff Gibson and Plaintiff

class, Ginn would soon fail to meet its obligations under the scheme employed by Defendants. As anticipated, less than two years after the initial $525,000,000 credit agreement Ginn, just as planned and anticipated by Defendants, was in default. The default was predicted and planned for but no action was taken by Defendants until investors in Ginn sur Mer, like Gibson and class Plaintiffs, had invested in over 190 beach front and canal front lots totaling over $160,000,000 which funds would be pledged and used to build the infrastructure of Ginn sur Mer.

166.    Credit Suisse also knew that the developer of Ginn sur Mer planned to build 870 single family residential home sites on the canal site, beach front and interior of the West-End of the development land, and that in addition thereto, two championship ocean-front golf courses and clubhouses; 4,400 condominium hotel units; two large marinas; a 130,000 square-foot casino; swimming pools and water park facilities; tennis court complexes; beach clubs and spas; a modern medical facility and private airport expansion to accommodate owners and their guests while visiting the resort.

167.    The sum of $160 million, derived from the private funds of Plaintiff and members of Plaintiff Class, as well as from the developers Ginn and Ginn-LA West End Limited, was deposited in an escrow account and dedicated for use in completion of the canals, infrastructure and site preparation, water, sewage, electrical systems, roads, club houses and entry gate house in connection with the Ginn sur Mer land development resort. This fact was known to Defendant Credit Suisse, before it designed its predatory lending scheme to perpetrate upon the owners, developers of Ginn sur Mer, including Plaintiff and the members of Plaintiff Class.

168.    During 2006 through 2008, and especially on or about January 26-27, 2007, Plaintiff Gibson and members of Plaintiff Class purchased approximately 195 ocean front and canal front lots at the West-End Resort. A "Founder's Weekend Celebration" was held at the

development site between January 26 and 27, 2007 at which Plaintiff Gibson, and other class members personally spoke to the Bahamian Prime Minister, and developer Bobby Ginn, about the development, and Plaintiff and members of Plaintiff Class were assured that Ginn would go forward with the Ginn sur Mer development, as promised and set forth above, with the total support and cooperation of the Bahamian Government.

169.    Plaintiff and the other Class Members who purchased ownership in the land known as Ginn sur Mer reasonably relied upon said promises and assurances that the aforesaid facilities and amenities, would be built as part of the Ginn sur Mer development, in making their decisions to purchase millions of dollars of previously undeveloped land therein.  Had Plaintiff and other members of Plaintiff Class been informed that the resort would be shut down, except for completion of the infrastructure that Plaintiff and Plaintiff Class paid for, Plaintiff and other members of Plaintiff Class would not have invested their hard earned money in the development.

170.    Plaintiff Gibson and the other members of Plaintiff Class are informed and believe, and therefore aver, that the developer Ginn intended and promised in good faith to construct the aforesaid facilities and amenities which he promised to Plaintiffs, as part of the Ginn Sur Mer Resort development, and that the developer in fact proceeded to affirmatively act on said promises and assurances before the scheme was effectuated, all to the detriment of the economic interests of the Class members.

171.    Just as planned and as part of the scheme to defraud as described herein, Defendants determined on June 30, 2008 that Ginn had defaulted on the loans and agreed to enter a restructuring agreement precisely as they did with Lake Las Vegas developers (Mr. Chin) to prepare the ultimate financial take over of Ginn sur Mer.  Once again and like Lake Las Vegas and other resorts, Credit Suisse did not want to become  the successor developer required to

carry out the promises and reasonable expectations of Plaintiff Gibson and the Plaintiff class of investors at Ginn sur Mer including the building of condominiums, a casino, swimming pools and water park facilities, tennis court complexes, beach clubs and spas, a modern medical facility and other amenities and obligations owed to the Plaintiff Gibson and Plaintiff class. Instead, like Lake Las Vegas and the other resorts, Credit Suisse agreed to continue having Ginn remain the developer in name, but in truth and fact, Credit Suisse was in control as it was from the beginning when it became the administrative agent to Ginn and thereafter.   In this manner, Defendants thought they could own and control Ginn sur Mer but avoid liability and the obligations of a successor developer and essentially shut down the development of the resort until it was ready to proceed further.  During the period from June 30, 2008 up through the end of 2009,  when the resort would complete the infrastructure development with Plaintiff Gibson's and Plaintiff class funds that were in escrow for the development of the  infrastructure, Credit Suisse  pre-textually held Ginn out as the developer.  It, like Lake Las Vegas and other resorts, was a sham.

172.    Just as the Montana Court stated in its Order, the loan to Ginn was part of the same predatory and illegal scheme undertaken against Lake Las Vegas, Tamarack Resort and Yellowstone. Credit Suisse intended from the beginning that Ginn sur Mer would fail so that Credit Suisse could acquire the said land at a substantial discount to its fair market value, at the expense of Plaintiff Gibson, Fresonke, and Plaintiff class, in violation of state and federal lending and appraisal  standards enacted pursuant to FIRREA and other applicable United States banking laws to protect them.

173.    On December 31, 2009, Credit Suisse Cayman Islands Branch, as Administrative and Collateral Agent foreclosed on Ginn sur Mer owning nearly all the balance of the Ginn sur

Mer property.  As part of the uncontested foreclosure and judgment before the Supreme Court of New York,  Credit Suisse agreed with Ginn that Ginn could reserve a limited interest in the development and remain the fictitious developer in order for Credit Suisse to avoid admitting it was the new successor developer.  Ginn has become a "puppet" just like the Atalon Group and Chin at Lake Las Vegas to give cover to Defendants' refusal to develop the resort as promised by the former developer Ginn.  In furtherance of the scheme, Credit Suisse  required Ginn to state:  "Credit Suisse did nothing wrong" which false statement constitutes a "false exculpatory statement and admission" that Credit Suisse, in fact, did many things wrong including violating the laws of the United States and creating a fiction that Ginn is the true developer of Ginn sur Mer when in truth and fact, the developer in control is Credit Suisse in continuing  its obligation to carry out the promises made by developer Ginn-Lubert-Adler and do so  in  good faith and fair dealing required by law.   Defendants continue to breach their contractual obligations owed to Plaintffs and Plaintiffs Class at Ginn sur Mer in violation of the covenant of food faith and fair dealing owed to the Plaintiff Class.

174.    Credit Suisse, having taken actual and constructive legal control of Ginn sur Mer, has no intention of developing the resort as promised to Plaintiff Gibson and the Plaintiff Class and is hoping and anticipating that the owners such as Gibson and Plaintiff class will give up and default on their interests so Credit Suisse or their syndicated agents or representative can acquire their property for pennies on the dollar.

175.    Had Credit Suisse and Defendants been truthful with Ginn and not utilized the United States mails and wires in 2006 in falsely representing to Ginn that their appraised land values were hundreds of millions of dollars more than they actually were and falsely representing to  Ginn and Lupert-Adler that they could  utilize the funds for their resorts and

expand without risk to the developers, the owners of land such as Plaintiff Gibson and Plaintiff Class, Ginn would never have accepted the Defendants' program and credit facility of $525,000,000.  Had defendants been truthful and not falsely  represented to Ginn that the lending facilities promoted by Defendants would protect the investors at Ginn sur Mer, like Plaintiffs Gibson and Fresonke and Plaintiff Class who followed and trusted Bobby Ginn as a developer, Ginn would never have agreed to any lending agreement with Credit Suisse or allow Defendants to appraise their land in the first place.  Instead, Ginn would have worked with other lenders. Defendants falsely represented in the United States mails and wires in 2006 and thereafter,  that they were employing lawful, safe and sound lending appraisals and a lending facility. These representations were false when made and mislead Ginn and Plaintiffs Gibson, Fresonke and Plaintiff Class.

176.    Credit Suisse employed the same scheme against Ginn as it did against Lake Las Vegas, Yellowstone and Tamarack. Similarly, and as determined by the United States Bankruptcy Court in Las Vegas, Credit Suisse again  employed a "*puppet*" developer, Ginn, to avoid its contractual obligations as the actual controlling developer, in fact.  Defendants' refusal to develop Ginn sur Mer and the promised  amenities described herein and to use Ginn as a *proxy* developer and shield itself against successor developer liability is a continuation of its scheme to defraud Plaintiff Gibson and Plaintiff class.  Credit Suisse is the actual owner, not merely the *de facto* owner.

177.    The aforesaid acts and conduct of Defendants have proximately caused Plaintiffs Gibson and Fresonke and Plaintiff Class to incur substantial economic damages, in the millions of dollars, by the resulting depreciation and diminution in value of their land at the Ginn sur Mer Resort land development, and the denial of Plaintiffs' lawful use and enjoyment of their land and

amenities promised by the developer.    Plaintiff Gibson has lost One Million Dollars ($1,000,000) in connection with her investment in land, which loss was directly and proximately caused by Defendants illegal and predatory practices described herein and throughout the Amended Complaint.  Similarly to Gibson and other Class Plaintiffs, Plaintiff Fresonke has also lost approximately One Million Dollars ($1,000,000) in connection with his investment in land at Ginn sur Mer, which loss was directly and proximately caused by Defendants illegal and predatory practices described herein and throughout the First Amended Complaint."

178.    The aforesaid acts and conduct of Defendants have proximately caused Plaintiffs to incur substantial economic damages, in the millions of dollars, by the resulting depreciation and diminution in value of their land at the Ginn sur Mer Resort land development, and the denial of Plaintiffs' lawful use and enjoyment of their land.    Plaintiff Gibson has lost approximately One Million Dollars ($1,000,000) in connection with her investment in land, which loss was directly and proximately caused by Defendants illegal and predatory practices described herein and throughout the Complaint.

**4.    The Yellowstone Club.**

179.    The Yellowstone Club land development was designed to develop 13,400 acres of privately held land located in Madison County, Montana near the northwest corner of the Yellowstone National Park, as a private ski and golf community consisting of seven (7) residential neighborhoods comprised of more than 850 residential dwellings on 2,700 acres of the land.  The development originated in late 1999 and was advertised as the world's first private skiing and golfing community, open to members and guests of The Yellowstone Club.

180.    Defendant Cushman & Wakefield appraised the project and issued its report on July 1, 2005 in which it described the Yellowstone Club land development as one which will:

"…[a]ppeal to ultra-wealthy families as a second-home (or third-home) location for its private recreational facilities (particularly the ski area), views, and proximity to winter and summer recreation. Prospective buyers are required to have a net worth of over $3 million, but based on the costs of membership and housing, we would expect nearly all buyers to have investable assets of at least $5 million, if not $10 million. The membership price for residents is $250,000 for a 30-year refundable deposit."

181.    Similarly to the aforementioned land developments known as Lake Las Vegas, Tamarack, and Ginn Sur Mer,  the Yellowstone Club land development was designed to appeal to buyers who desired to invest in a luxurious, first class real estate development, with golf courses, private ski area and other similar amenities.

182.    Plaintiff, Beau Blixseth, in reliance upon the developer's promises of the aforesaid  rights, privileges and amenities running with the land, purchased property at Yellowstone Club, during the relevant period of time and remains an owner thereof

183.    In late 2004, Defendant Credit Suisse began actively and aggressively soliciting the developer of Yellowstone Club to participate in Defendants' Loan to Own scheme. Defendant Credit Suisse's solicitations included telephone calls and emails, directed to the Yellowstone Mountain Club, LLC, the developer, designed to persuade it to borrow $150 million from Credit Suisse.   The developer of Yellowstone Club initially rejected Credit Suisse's solicitation offer. Credit Suisse persisted in its solicitation of the developer, which eventually agreed to the proposed loan to it by Credit Suisse of $150 million. In the months that followed, Credit Suisse continued to solicit the developer of Yellowstone Club to persuade it to borrow even more money for the land development project, until the developer agreed to increase the amount of the loan to $375 Million.

184.    Credit Suisse acted at all times relevant hereto, fraudulently and deceitfully, in its dealings with the developer of Yellowstone Club, and with the intention of eventually forcing the developer into bankruptcy, so that Credit Suisse could then take control of, and ownership to, the land and improvements thereto, known as Yellowstone Club, to the detriment of the developer and the owners who had invested in it, as well as the hundreds of suppliers and material men and women with whom the developer had contracted to construct the improvements on the large land development project.

185.    The acts and conduct of Defendant Credit Suisse and the other Defendants associated with it toward the developer of Yellowstone Club, were part of Defendants' Loan to Own scheme or plan which they perpetrated on the aforesaid owners and developers of the land developments described herein as Lake Las Vegas, Tamarack, and Ginn Sur Mer, which scheme or plan was designed by Credit Suisse to charge exorbitant loan fees while planning the failure of the project so that it could eventually foreclose on or otherwise acquire control and ownership of the lands and improvements through the bankruptcy of the developer, which Credit Suisse intended would occur.

186.    Defendants' conduct was done with the intention of causing the development to fail, so that Credit Suisse could acquire said land at a substantial discount to its fair market value, at the expense of Plaintiffs, in violation of the FIRREA act and its standards, and other applicable United States banking laws, including conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(a), (c) and (d).

187.    Credit Suisse's and the other Defendants' conduct in perpetrating the Loan to Own scheme caused the Yellowstone Club land development project to fail, and caused the developer to be forced into the United States Bankruptcy Court, where Credit Suisse took

effective control of the assets of Yellowstone Club, through its "note-holder", Cross Harbor Capital Partners ("CHC") and the "predatory lending practices" of CHC.

188.    The underlying facts involving the takeover of the Yellowstone Club are even more insidious and involve overt criminality.  There, CHC, had previously executed a purchase and sales contract on January 15, 2008 to purchase the assets of the Yellowstone Club for $455 Million dollars and repay the Credit Suisse loan, which would have protected the Yellowstone homeowners.  Instead, it conspired with Credit Suisse, and became a "note-holder."  It then conspired with the ex-wife of the developer to kill the sale, using in part the fake "Grand Jury Target Letters" against the developers, which letters had been created by the ex-wife's partner. In order to finance their scheme, the ex-wife had borrowed over $43 million dollar in overtly fraudulent loans, based mostly on the fraudulent values of the Credit Suisse "Total Net Value" appraisal scheme. She then used those funds, in part, to finance her scheme to conspire with CHC to put the Yellowstone Club into bankruptcy. As part of their scheme, CHC loaned the ex-wife another $35 Million dollars to obtain full ownership of the Yellowstone Club knowing that the previous loans were procured by both the fraudulent Credit Suisse appraisal method, and by fraudulent loan applications containing additional fraudulent statements submitted to multiple lenders by the ex-wife.  When CHC loaned her the $35 Million dollars to obtain control of the Yellowstone Club, it did so with full knowledge of the fraudulent and then defaulted federally regulated bank loans; and with full knowledge of the  fraudulent Credit Suisse appraisal methods and FIRREA violations, while operating as its insider "note-holder" to take control of the Yellowstone Club.

189.    Credit Suisse and CHC in collusion with the ex-wife then attacked the former developer of Yellowstone Club by forcibly converting the $375 million loan from a non-recourse

loan against the property into a recourse loan against the former developer, which caused the developer and the owner-investors in the land, including Plaintiff, Beau Blixseth, and those members of Plaintiff Class similarly situated, to sustain hundreds of millions of dollars of economic loss and damages.  The aforesaid conduct of Credit Suisse was wrongful, malicious and shocking to the conscience of the United States Bankruptcy Court as hereinabove recounted.

## VII.  CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
(Violation of RICO Act against all Defendants)

190.    Plaintiffs and similarly situated members of Plaintiff Class incorporate as if fully set forth here the facts and allegations both previously and hereafter set forth in this Complaint.

### Overview of the RICO Act Violations

191.    Beginning in or about 2004, as the real estate market was on a steady rise, Credit Suisse AG created what at least one federal bankruptcy judge has called a "predatory" non-recourse loan scheme believed to have been funded in part by Credit Suisse AG's fraudulent scheme to assist Iranian agencies to circumvent international economic sanctions in return for millions in fees.  Credit Suisse targeted and aggressively marketed its unlawful scheme to high-end real estate developments by means of mail and wire fraud, along with intentional, material misrepresentations and/or omissions.

192.    The cornerstone of this loan scheme, derisively referred to herein as the "Loan to Own" scheme, depended on artificially inflating the value of a resort project in violation of U.S law, by means of an appraisal methodology created  by Credit Suisse in collusion with Cushman and Wakefield called "Total Net Value.,"("TNV"). In order to "sell" each resort developer on the lawfulness and acceptance of TNV as an acceptable banking industry practice, and obtain the

confidential information needed for the scheme, the Defendants had to "ENGAGE" the developer as a "client" and  secure their trust and confidence in  a fiduciary/lending relationship. They established a specific and unlawful scheme to do so. The Defendants' intended to violate U.S. law with this appraisal scheme; and intended to burden the resorts and the purchasers of property in these resorts with enormous debt; and thereby earn for Defendants enormous fees based directly on the amount of debt that Credit Suisse and its agents could impose on a resort project.  The entire scheme was based upon their intentional and explicit misrepresentations or omissions and statutory violations directed at both the developers and the Plaintiff Class, with the expectation that Credit Suisse would foreclose on, or use the non-performing loan to obtain ownership of the Resort at a cost significantly below market value.  The U.S. Bankruptcy Court for the District of Montana stated in a May 19, 2009 Order in connection with the Yellowstone Mountain Club, Case No. 08-61570-11 that "Credit Suisse's actions in the case were so far overreaching and self-serving that they shocked the conscience of the Court."  (Hereinafter the "Montana Court Order")

193.    Referring to Credit Suisse's Loan to Own scheme as "overreaching and predatory lending practices," the Montana Court further stated, "the only plausible explanation for Credit Suisse's actions is that it was simply driven by the fees it was extracting from the loans it was selling, and letting the chips fall where they may.  The naked greed in this case combined with Credit Suisse's complete disregard for the [developer] or any other person or entity who was subordinated to Credit Suisse's first lien position, shocks the conscience of this Court.  While Credit Suisse's new loan product resulted in enormous fees to Credit Suisse in 2005, it resulted in financial ruin for several residential resort communities. Credit Suisse lined its pockets on the backs of the unsecured creditors."

194.    The standing of Plaintiff Class is stronger herein than that of the "unsecured creditors" referenced in the foregoing Montana Court order because Plaintiffs' "privity" position, or legal nexus to the Defendants, based upon the Defendants "lending fiduciary status" to the developers who "ENGAGED" Credit Suisse to act a their lending fiduciaries, together with  the nexus between the Defendants' false "Total Net Value" appraisal methodology, and its public syndication of the loans to the Credit Suisse  "note-holders," imposes legally cognizable duties supporting Plaintiffs' state law claims, with or without the application of equitable principles. As recited herein, Credit Suisse used its "fulcrum" status between its mostly U.S. "note-holders," who purchased its syndicated loan products, and upon which it originally sloughed off its risk on the one hand, and the developers and Plaintiff Class on the other, who ultimately have borne the entire loss. Additionally, the damages proximately caused by Defendants' outrageous misconduct are substantially more direct and catastrophic to Plaintiff – class than to the "unsecured creditors" of the various resorts.

195.    For Credit Suisse and the other Defendants, the Loan to Own scheme was a "win-win" scheme – either the borrower repaid the loan in full and Credit Suisse pocketed not only the enormous up-front fees but interest on the loan [if CS had no ongoing interest in the principal, how would it have an ongoing entitlement to interest?], or the risk of loss would originally fall upon U.S. syndicated "note-holders,"  or as actually resulted from the scheme, the amount of debt could crush the Resorts and their homeowners; and Credit Suisse could then take the valuable property and either develop it and keep the profits, or "flip" the project to a buyer. Possessing enormous financial reserves derived from international banking scams and frauds like those exposed  in the Iranian criminal plea, Credit Suisse has been able, to date, to consummate its schemes.  Moreover, through bankruptcy, Credit Suisse has been able to use its first-secured

position on the Resort to control the Resort through a debtor-in-possession process, while obtaining the Trustee's avoidance powers and turning the non-recourse loan into a recourse loan against the borrowers; and /or foreclose, or have a receiver appointed.

196.    The Credit Suisse scheme, often with the collusive and conspiratorial aid of a select number of its syndicated "insider note-holders", such as Cross Harbor Capital in the Yellowstone Club, and another insider in Lake Las Vegas Resorts, has resulted in total control by both a select number of the "note-holders" and the Defendants, which, in turn, has exacerbated the catastrophic damages to Plaintiff Class.  The scheme has caused a "Snowball effect" in interstate commerce contributing to the devastation in U.S. real estate markets. In effect, the Defendants, aided and abetted by a few of their note-holders,  as in the Yellowstone and Lake Las Vegas cases, have obtained ownership and/or control over the Resorts, but flown under  the bankruptcy courts' radar, which has *only* protected  some "unsecured creditors,"  but caused increased, catastrophic, and yet un-remedied damages to  Plaintiff Class. This complaint seeks to remedy this serious injustice.

197.    One of the goals of Credit Suisse, at all times, was to avoid the legal and equitable obligations and duties owed to homeowners and landowners as a successor developer and/or a debtor in possession, while in truth and fact, Credit Suisse became one or the other.  By doing so, Credit Suisse, and others conspiring with it, particularly Cushman & Wakefield, undertook a campaign at each resort to intentionally undermine, eliminate and destroy the rights of the homeowners and landowners to ready each resort for sale or development by a third party not strapped with the obligations to the homeowners and landowners, this in order to inflate the resale value of each resort or obtain the assets of each resort for its own use or the use of others with which  it colluded.  In one instance, it helped create a sham owner of a resort only to cause

it to file bankruptcy, shortly thereafter, and as debtor in possession, it stripped the resort of the homeowners' rights and amenities, to further its scheme.

198.     As ruled in the Montana Court Order, the Loan to Own scheme also depended upon Credit Suisse being able to circumvent the Financial Institutions Reform, Recovery and Enforcement Act of 1989, 12 U.S.C. § 3331 *et seq.* ("FIRREA"), which was passed after the wholesale failure of numerous financial institutions, including Savings & Loan banks in the late 1980's, and after the collapse of the real estate market. The major congressional purpose of FIRREA to protect the United States economy and banking institutions was and is to "provide that Federal financial and public policy interests in real estate related transactions will be protected by requiring that real estate appraisals utilized in connection with federally related transactions are performed in writing, in accordance with uniform standards, by individuals whose competency has been demonstrated and whose professional conduct will be subject to effective supervision."  The Credit Suisse syndicated real estate loan scheme effectively operated to put the "fox in charge of the hen-house" as noted in the Montana Court Order by conspiring with the world's largest and most trusted real estate appraiser, Cushman & Wakefield, thereby destroying the "effective supervision" required by FIRREA.  See Montana Court order at page 17.  The developers, the syndicated note-holders, and the Plaintiff Class, all trusted Cushman & Wakefield; and the Defendants also relied upon and actively used *that* trust to defraud the Plaintiff Class.

199.     For example, the developer of the Yellowstone Club, and his U.S. federally regulated banker, a Montana bank, had used Cushman & Wakefield in previous appraisals and loans.  His trust was embedded in both that banking/appraisal relationship; as well as in generally acceptable banking and appraisal  industry standards which his lawyers believed to be

embodied in state and federal laws. The Defendants actively utilized *that* trust, then actively marketed their "syndicated loan product" to him acting as a "lending advisor" to convince him to accept the loan. Defendants specifically "ENGAGED" the Yellowstone developer as their client, obtained all of his financial and proprietary information, then pulled a "bait and switch" without his knowledge using the "Total Net Value" appraisal method and a "Cayman Islands Branch" to circumvent FIRREA, rather than the industry accepted "fair market value" standard.

200.    Because the Loan to Own scheme, and the "Total Net Value" appraisal method on which it depended, did not comply with FIRREA, and was dependent upon the confidential information obtained from the client based upon fraud, and violations of related regulations and standards and guidelines with respect to, among other things, appraisals under FIRREA and state law, Credit Suisse created a "separate" banking entity in the Cayman Islands, Credit Suisse Cayman Islands Branch, through which the Loan to Own programs and appraisals were handled, specifically to evade the strict appraisal requirements and standards under state and federal law required for lending and appraisals in connection with the enactment of FIRREA. Plaintiffs are informed and believe that Credit Suisse Cayman Islands Branch was an entity established pursuant to a "Type B" license by the Cayman Island Monetary Authority.

201.    The "Cayman Island's Branch" was created, in part, to utilize a post office box and letterhead in which the only "business" it apparently conducted, was a sham masquerade for its New York office where the handling and processing of each of the loans to the Resorts was actually conducted. After presenting marketing materials, business cards, and subsequent "Confidential Information Memoranda" all as "bait" representing to their client / developers that they were executives employed by "Credit Suisse First Boston", at the time of execution of the loans, Defendants "switched" and used the "Cayman Islands Branch" name on its loan

documents. Defendants then implemented the "Loan to Own" scheme by loaning significantly more money than would have been permitted pursuant to FIRREA, thereby earning significantly larger up-front fees (taken from the loan proceeds), with the expectation that Credit Suisse could foreclose on the project and/or take control or constructive control over the projects in order to further its scheme to defraud the Plaintiffs and proposed Class members.

202.    The scheme has been a financial heist for Credit Suisse with no risk. Its "note-holders" and its other fraudulent schemes are financing the pre-planned bankruptcy or receivership proceedings, while it reports billions every year in profits.  Regardless of the methods ultimately used to obtain ownership and control, Credit Suisse has received huge fees up-front, and consummated ownership or control over all but one high-end Resort. The rest have failed as a direct and proximate result of its syndicated loan/FIRREA scheme,  allowing Credit Suisse to take over each Resort or constructive control of each resort and turn the non-recourse loan into a "recourse" loan by going after the borrowers through the bankruptcy courts, as occurred in connection with the Yellowstone Club; or in the case of Tamarack, through a receiver; but in all cases causing catastrophic damages to the Plaintiff Class, in the form of collapsed real estate values; and loss of amenities. The Defendants' scheme has been catastrophic to the developers and to the Plaintiff–class in Resorts which were promised high quality amenities that have now been shut down or amenities never provided, such as pools, golf courses, ski runs, clubs, restaurants, shops, hotels, a casino and numerous other amenities described below at each resort, also adding to the collapse of value.

203.    Credit Suisse's marketing misrepresentations regarding its compliance with FIRREA, together with its violation of lending and appraisal standards, coupled with its employment of Cushman & Wakefield, and the industry-wide trust placed by the developers and

Plaintiff–class, and the non-insider "noteholders" in Cushman & Wakefield, effectively operated as a joint "bait and switch" scheme to defraud Plaintiff–class.  Plaintiffs, developers, and non-insider note-holders all believed  that Defendants' loans were safe and sound; and that with respect to each resort, the Cushman & Wakefield appraisal methodology could be relied upon and trusted as a basis for lending which would protect the homeowners and landowners. Numerous other intentional  misrepresentations concerning the nature,  safety and legality of the loan scheme to the developers and the Plaintiff Class, are the proximate cause of the Plaintiffs' and Plaintiff Class' damages.

204.    In sum, with its "Loan to Own" scheme, Credit Suisse, a foreign banking leviathan, intentionally and willfully violated the congressional safeguards imposed by FIRREA, in order to extract billions of dollars out of the United States and Idaho, and Montana, and Nevada economies.  Their overt, admittedly criminal violations of U.S. laws in their Iranian clearing house scheme is intertwined with their explicit evasion of U.S. laws herein; and has served to finance the schemes plead herein; only here the damages are more catastrophic to thousands of U.S. citizens; and may be even more wide-spread, catastrophic, and damaging to interstate commerce; and to the U.S. real estate industry.

**More Specific RICO Allegations**

205.    At all material times, the Credit Suisse Defendants and Cushman & Wakefield formed an association-in-fact that was an enterprise which engaged in, and whose activities affected, interstate commerce.  The enterprise is an entity separate and apart from the pattern of racketeering alleged.  The enterprise, which is called the Credit Suisse Cayman Island Branch, among other things, engages in the sale and solicitation of investments for unregistered and fraudulent investments.

206.    Based upon the information and belief of Plaintiff, they allege that the following persons constitute a group of individuals and persons associated in fact who constitute a RICO enterprise referred to as the Credit Suisse Cayman Islands Branch Enterprise: Credit Suisse Securities (USA), LLC, Credit Suisse First Boston and Credit Suisse Cayman Islands Branch (collectively "Credit Suisse" or "Defendants") together with Cushman & Wakefield are an enterprise and are continuously engaged in ongoing activities  which affect interstate commerce and have been and are being operated in furtherance of a common purpose beginning in or around 2004.

207.    Credit Suisse, AG, Credit Suisse Securities, USA, Credit Suisse First Boston Credit Suisse, Cayman Islands Branch and Cushman & Wakefield are each a "person" as defined in the United States Code and constitute a RICO "Enterprise".

208.    Credit Suisse AG, Credit Suisse Securities, USA, Credit Suisse First Boston and Credit Suisse, Cayman Islands Branch and Cushman & Wakefield are members of and have participated in and have associated together for the common purpose of the enterprise; *e.g.*, promoting and selling loan agreements and credit facilities under the fraudulent circumstances described herein even though each has an existence separate and apart from the enterprise.  The Credit Suisse enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants have engaged.

209.    As more fully set forth herein, Defendants were engaged in a scheme and artifice utilizing offices and branches of Credit Suisse, Cushman & Wakefield and multiple syndicates and lenders to defraud the Plaintiffs and similarly situated members of Plaintiff Class, as well as others whom are not presently known to the Plaintiffs, but when ascertained Plaintiffs will seek leave of the Court to amend this Complaint appropriately.

210.    Defendants control and operate the Credit Suisse Cayman Islands Branch enterprise through a variety of means.  More particularly and as set forth in detail herein, Defendants and their agents, representatives and commission sales persons identified herein utilized misrepresentations, omissions or other dishonest means which were reasonably calculated to deceive persons of ordinary prudence and intelligence.

211.    The Defendants utilized misrepresentations, omissions, untrue promises and other dishonest means which were reasonably calculated to deceive the Plaintiffs and Class Members because they were knowingly false and/or these Defendants did not intend to fulfill the promises.

212.    The Defendants knowingly made and/or facilitated material misrepresentations of fact, which misrepresentations they knew to be false, and which were intended to deceive Plaintiffs.

213.    The Plaintiffs and Class Members believed the representations and promises to be true, acted in reliance upon them and were misled and deceived by these Defendants' willful misrepresentations, omissions, promises and dishonesty, all causing injury and economic damage to the Plaintiffs.

214..    Defendants have conspired to conduct and are conducting the affairs of the enterprise, either directly or indirectly, through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(5).  The purpose of this racketeering activity has been to defraud the Plaintiff Class and other similarly situated through the conduct described herein.  In furtherance of this scheme, each Defendant, since 2004 and continuing through the present, has conspired to commit and has committed two or more violations of 18 U.S.C. §§ 1341, 1343 and 1952.  Further, as described herein, each has conspired to commit and has committed numerous acts of fraud.

215.    The Plaintiff Class, and each of the members thereof, specifically allege that the Defendants have violated the following criminal statutes on two or more occasions, including but not limited to the following:

1.    The use of mail delivered by the United States Postal Service, in furtherance of a scheme to defraud, in violation of 18 U.S.C. § 1341;

2.    The use of writings, sounds or signals transmitted by means of wire communication in interstate or foreign commerce, in furtherance of a scheme to defraud, in violation of 18 U.S.C. § 1343;

3.    Transporting or transmitting a monetary instrument from a place outside the United States to a place inside the United States, in violation of 18 U.S.C. § 1956(a)(2)(A); and

4.    Engaging or attempting to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity, in violation of 18 U.S.C. § 1957(a).

216.    In addition to running the affairs of the enterprise through this pattern of racketeering activity, Defendants have conspired to and have used the same pattern of racketeering activity to receive income directly and indirectly from Plaintiffs and from similarly situated individuals.   Defendants have conspired to and have used income derived from this pattern of racketeering to invest in the establishment and continued operations of the enterprise and upon information and belief, other fraudulent schemes.

217.     Defendants agreed to commit and did commit multiple, but in any event at least two (2), unlawful acts that are predicate acts of racketeering in furtherance of the racketeering enterprise. The pattern of racketeering activity engaged in by Defendants, and each of them, includes use of the mails and telephone lines and aiding and abetting in the use of the mails and telephone lines to execute the relevant fraudulent schemes described herein, including:

a.      During 2004 and continuing to at least 2008, principals, employees or agents of the Credit Suisse Loan to Own scheme repeatedly used the mails and wires to solicit potential borrowers and "ENGAGE" them as clients for each of the four land development resorts listed herein; and after gaining their trust and confidence through misrepresentations and fraud, then transmitted loan forms by both wire and mail in furtherance of the scheme to defraud;

b.      Between 2004 through 2008, on dates presently unknown to Plaintiff Class, Credit Suisse, with the consent of the other Defendants, sent, through the mails, false and misleading marketing materials, and "Confidential Information Memoranda" for the Loan to Own scheme representing itself to be "Credit Suisse First Boston" in order to sell the loans, and then switching to "Credit Suisse Cayman Islands Branch" at the time of execution of the loan documents more particularly described herein;

c.      In December 2004, Credit Suisse used the wires to solicit Yellowstone Mountain Club, LLC for the Loan to Own scheme

d.      On September 30, 2005, Credit Suisse transmitted loan forms by wire in furtherance of the scheme to defraud;

e.      At various times between 2004 and 2008, Credit Suisse and its agents and employees transferred funds from Credit Suisse bank accounts both within and outside the United States to developers to fund the Loan to Own scheme and similarly used the wires to transmit fees to Credit Suisse-controlled accounts.

f.      At dates and times presently unknown to Plaintiffs, Credit Suisse Defendants, Cushman & Wakefield discussed with the Plaintiff Class and with each other, both in person and over the telephone, the status of the Loan to Own scheme and, on information and belief, approved various of the fraudulent acts herein described;

g.      At dates and times presently unknown to Plaintiffs, Defendants corresponded by mail with the various banks concerning the transfer of funds for the enterprise at issue here;

h.      At times presently unknown to the Plaintiffs, Cushman & Wakefield used both the mails and the wires to transmit fraudulent and unlawful "Total Net Value" appraisals to the developments and to the Credit Suisse Defendants.

i.      The Credit Suisse Defendants helped fund the Loan to Own Enterprise

with the proceeds of its illegal scheme to assist agencies of the Iranian government to circumvent USA economic sanctions in violation of 18 U.S.C. § 1957(a).

    j.    The racketeering activities also included using the Cayman Islands "connections" to aid and facilitate clients in evading U.S. income taxes.

218.    As a result of the conduct alleged herein, Defendants, and each of them, have violated the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(a), (c) and (d).

219.    As a result of said violations, the Defendants, and each of them, have caused substantial and irreparable economic loss and damage, both directly and indirectly, to Plaintiffs' business and property as described in more detail herein.

220.    Defendants knowingly, willfully and unlawfully engaged in a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), by committing multiple, but in any event at least two (2), related acts of racketeering activity within four (4) years. Each act of racketeering was related, had a similar purpose, involved the same or similar participants and means of commission, had similar results and impacted similar victims, including Plaintiffs and Class Members, to wit: the named Plaintiffs and the Plaintiff Class of land owners and homeowners and other injured entities or persons at Lake Las Vegas, Tamarack Resort, Ginn sur Mer and Yellowstone Club.

221.    Defendants' wrongful conduct as complained of and/or that which it conspired to or aided and abetted in the commission of, were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1965(5).

222.    Defendants knew that the alleged unlawful acts were part of a pattern of

racketeering activity.

223.    Defendants, in devising, facilitating, participating in and/or in conspiring to and in perpetrating the wrongful acts complained of herein, knowingly and willfully engaged in a pattern of racketeering activity as hereinafter described for the purpose of defrauding Plaintiffs, the similarly situated members of Plaintiff Class.

224.    The scheme to defraud perpetrated by Defendants on Yellowstone Club as enumerated in paragraphs 185 through 207 are typical of the acts, misrepresentations, and unlawful conduct by the Defendants at each of the four resorts.

225.    On or about December 16, 2004, a senior Credit Suisse executive, Jeff Barcy, in charge of the field marketing of its "Equity Recapitalization Loan Program" from its "Investment Banking Team" in Los Angeles made a "cold call" on the Yellowstone Club Resort ("YC") and Tim Blixseth pursuant to its highly refined "pre-planned" solicitation protocols to have the Resorts, including the YC, <u>"ENGAGE</u>" Credit Suisse as *the* "<u>SOLE-LEAD/ ARRANGER</u>" -  the Credit Suisse term for " Lending Advisor/Fiduciary" -  for each Resort.  At all times, herein, Barcy and other representatives of Credit Suisse held themselves out to the YC as employees of Credit Suisse First Boston  acting in the capacity of expert  lending advisors in order to implement their syndicated "Equity Recapitalization Loan Program." Without the express representations made by Barcy and other Credit Suisse executives that they possessed the expertise, knowledge and experience to implement their "Equity Recapitalization Loan Program," the developer would not have relied upon and "ENGAGED" them as lending advisors owing fiduciary duties to the developer.

226.    As part of the sales and "Engagement Process"  on that date, and thereafter, Barcy presented himself as a Senior Executive of "Credit Suisse First Boston" a United States based

and regulated  BANK with its main offices in New York. Thereafter Barcy and his "TEAM" made the representations recited herein as part of specific solicitation protocols specifically designed to create a trust and fiduciary relationship between the Resorts, including the YC, and Credit Suisse.  In order to implement its scheme, Credit Suisse used a "Dedicated Management TEAM" specifically assigned to "ENGAGE" Credit Suisse as the "SOLE-LEAD/ ARRANGE[R]" for each Resort in the Credit Suisse "Equity Recapitalization Loan Program."

227.   As recited herein, without the confidence,  trust, lending advisory expertise, and fiduciary "factors" relied upon by the YC from which Credit Suisse *created* its loan program; and which factors  were designed, engineered and implemented by Credit Suisse beginning with their  pre-planned marketing  "cold call," NONE of the sophisticated schemes, frauds, evolving conspiracies, "pattern of racketeering activity" and "predicate acts" as recited herein could have occurred; nor could the subsequent participants, who knowingly participated in this massive RICO scheme, and who are directly and financially linked to Credit Suisse as recited herein, have engaged in the "pattern of racketeering activity" alleged herein.

228.   With some minor variables, all of the Resorts targeted by the Credit Suisse "Loan to Own" scheme, as recited specifically in the YC allegations,  were the victims of the original schemes and frauds implemented by the "Capital Markets TEAM" of Credit Suisse; and then subsequently  taken over by the "Risk Management TEAM" of Credit Suisse when the Resorts failed. Collectively, the "TEAMS" from the respective departments within Credit Suisse had planned - based on profit  incentives for each TEAM , had designed the "loan to own" scheme to do just that.  As long as the Capital Markets "gravy train" existed, they made gargantuan fees. When that "gravy train" ended, the Risk management TEAM made gargantuan profits.  Indeed, the "Risk Management TEAM"  designed their involvement and profit-making schemes *before*

*the loans were ever made.*   The myth propagated by Credit Suisse and others in the international banking markets that "banks lose money on bad loans" is proven in spades to be a fraud in itself, as proven herein in  the "Loan to Own" schemes implemented by Credit Suisse. The essence of the RICO frauds perpetrated herein required the Credit Suisse executives to secure the trust and confidence of the developers in order to obtain confidential and proprietary information from them, including their contractual commitments to the Plaintiff Class, in order to sell the syndication. The syndications were sold and the money was raised BEFORE the loans were made - all based on the FIRREA violating frauds.  In sum, Credit Suisse concealed the FIRREA frauds from  the developers to convince the developer/clients  to  "ENGAGE" them, then sold their lies to obtain the funds to loan to their "clients."

229.   The Credit Suisse "Capital markets TEAM" designed their  solicitation protocols to the targeted Resorts as part of a master planned marketing program specifically and explicitly designed to *inject* Credit Suisse into a position of trust with  the developer of each resort,  which Credit Suisse knew would cause each developer to rely upon Credit Suisse as a trusted  lending advisor who  had been "ENGAGED" by the developer.   The TEAM's  function and goal was to create  a trust relationship. Without it, the  TEAM  could  not  have  acquired  insider  and confidential information, typical of that gained by a fiduciary, which information was mandatory for the scheme.   The  individual members of the TEAM  were chosen to enlist *trust* with  the developer/Resort in order to acquire the information and facts needed to implement the scheme. Credit Suisse specifically implemented this "Trust/Lending Advisory/Fiduciary  scheme with the solicitation protocols and the financial incentives for its executives,  and for itself,  at the YC as herein recited.  These facts apply to all of the Resorts.

230.    As proven in the evolution of the "lending relationship" between Credit Suisse and the YC and the actual executed  loan documents,  the entire scheme constituted a massive "bait and switch" pre-planned RICO enterprise.  The Credit Suisse Capital Markets TEAM first secured the confidence and insider positions needed to secure the private and confidential information and cooperation they  needed, including representations that the program was like a "home equity loan" without disclosing that it was based on FIRREA violations; then having set the bait,  the legal TEAM switched the relationship into a traditional bank/customer relationship and drafted the loan documents to create that appearance;  then the Risk Management TEAM came in, switched even the promises and covenants in the loan documents from a **"non-recourse loan"** to strategies designed  and usurp ownership and control over the YC by creating a "Liquidating Trust" to sue the developers, while leaving the Plaintiff Class with devastated equities and amenities. The proof is in their own documents loaded with confidential, proprietary, and  insider information secured directly from the developers and the Resorts. It is akin to a lawyer making material misrepresentations to obtain confidential client information from one client - here the developer; and then using the confidential information secured by fraud to obtain funds from another  client -- here  the note-holders; and then taking the funds and loaning them to  the first client knowing that the first client had no means to pay the loans but from which scheme the lawyer derived huge fees.

231.    Like the loans themselves, and the TEAM designed to *sell* the loans,  this was NOT a normal banking relationship. It was based upon a designed "bait and switch"  relationship of trust and confidence between Credit Suisse and each Resort, not just the developer, in which the *amount* of the  compensation of the Credit Suisse executives, and the huge financial fees to the BANK  itself,  were dependent upon  the degree of trust and confidence its Executives could

engender and implement at each Resort in order to acquire the required information and confidence to sell the syndication that Credit Suisse was "arranging."  The greater the trust and reliance,  then the bigger the loan, the fatter the executive compensation package, and the greater the  fees for Credit Suisse -- all based on trust on the part of the developer  and the Resort; and their reliance on the Banking skills and experience of Credit Suisse, and its money and resources, all backed up by the fraudulent Cushman & Wakefield  total net value appraisal methodology in violation of FIRREA.

232.    This bait and switch trust/lending advisory relationship was a direct and proximate result of the amount of resources,  the amount of time,  the degree of knowledge and experience, the sophistication of the "loan package" -- in the case of each resort the unprecedented syndicated total net value land development loan -- all brought into its "cold call" marketing program  by Credit Suisse and Cushman & Wakefield.  This was set up as a classic fiduciary/advisory and trust relationship which Credit Suisse knew and needed it to implement their schemes.  Credit Suisse possessed all of the foregoing skills, experience, resources,  money, executive level involvement, and lending sophistication  relied upon by the developers and Resorts, particularly the YC. The Resorts were targeted by Credit Suisse like stuffed fake animals at a Coney Island shooting gallery, not far from its New York offices -- only it held a huge shotgun to knock down all the targets at once.

233.    The huge fees to Credit Suisse and its executives  referenced in the "Montana Order" constituted a commission based executive  compensation package, and percentage based loan fees to Credit Suisse,  which, in turn,  were based upon  the size of the loan. The size of the loan was based upon the total net value Cushman & Wakefield appraisal methods in violation of FIRREA.   The FIRREA violating appraisals were based on projected cash flows from land sales

*directly sold to the Plaintiff Class based on confidential, insider information extracted by fraud from the developers based on the contractual commitments of the developers to the Plaintiff class.* Credit Suisse money, resources and knowledge were used as the original "bait" to create the fiduciary relationship.

234.   In connection with banking resources, banking executive consultation time actually spent with the developers, banking experience, sophistication and skill, particularly involving an unprecedented syndicated land development loan in which the developer and Resort could *only* rely upon Credit Suisse and Cushman & Wakefield, as evidentiary proof of the trust/advisory/fiduciary/lending relationship, the foregoing factors are all conclusively established by the internal, marketing and banking solicitation protocols of Credit Suisse, as recited herein. The sheer size and power of Credit Suisse also served as "bait" to thrust themselves into a "lending advisory" relationship.

235.   The banking solicitation protocols of Credit Suisse establish the foundation for its RICO scheme; and they start at the highest levels of the Bank. These solicitation protocols were designed at the Director and Management level to solicit each resort to "ENGAGE" Credit Suisse to "SOLE-LEAD ARRANGE A RECAPITALIZATION" of each Resort.

236.   The "ENGAGEMENT" agreement was based on the exorbitant commission based fees paid by each Resort -- just like a lawyer contingent fee fiduciary relationship based upon the amount the lawyer recovers. The Credit Suisse "Capital Markets TEAM," which was "ENGAGED" by each resort to advise, inform, educate, and "SOLE-LEAD" each developer and each resort, prepared and planned its Loan to Own scheme with both explicit fraudulent representations, and specific failures to disclose material facts, including but not limited to the failure to disclose FIRREA violations, as recited herein. Without said expertise in putting the

whole scheme together and securing confidential information from each developer, the scheme could not work.

237.    This scheme was approved and directed at the "Director level" of the BANK. The " Team" was assembled from five departments within the Credit Suisse New York office including the following:

Investment Banking: Jeff Barcy; Jeff Tuckel; Jeremy Rogers; Andrew Park.

Syndicated Financing: David Miller, Senior Manger / Director; Jon Moneypenny;

Corporate Banking: William O'Daly, Director;

Transaction Advisory: Douglas Buffone.

Risk Management: Steven Yankauer, Director.

238.    The foregoing individuals analyzed the "Equity Recapitalization Loan" scheme in an internal "Memo to the Credit Committee" dated August, 2005, regarding the YC. In the very first sentence of the very first paragraph of this 70 page analysis *prepared in its entirety by these executives from information directly obtained by fraud and deception from the YC. Based on the relationship of trust*, the foregoing individuals wrote:

> **"CSFB [Credit Suisse First Boston] has been ENGAGED by the owners of Yellowstone Club ("Yellowstone" or the "Comapny") an approximately 14,000 acre master-planned community in Big Sky Montana**, **to SOLE-LEAD/ARRANGE a recapitalization of the Company."** (Caps Supplied)

239.    Said "ENGAGEMENT" constitutes the YC hiring of Credit Suisse as YC's "Lending Advisor." That relationship is cemented in the actual facts involved in the fiduciary relationship, which are contained within a detailed analysis by Credit Suisse executives derived

from confidential information conveyed by the YC to the Credit Suisse executives over a period of NINE months; and contained within multiple documents, including the foregoing "Internal MEMO." That memo itself, contains a detailed analysis *completely prepared* by the foregoing Credit Suisse executives acting in their capacity as lending advisors to the YC, and based on confidential YC information. These executives worked hand-in-glove for over NINE MONTHS with YC employees and representatives to prepare this comprehensive analysis which was then used as the "CONFIDENTIAL INFORMATION MEMORANDUM" ("CIF") submitted to "investors"/note-holders by Credit Suisse and Cushman & Wakefield to sell their syndicated "loan product." From that intended fraud, Credit Suisse then secured the money to make the loans -- akin to a giant ponzi scheme.

240.    The "CIF" distributed by Credit Suisse for the YC is dated "September, 2005. It was first used by Credit Suisse at the YC on or about September 7-8, 2005, when Credit Suisse put on a massive "dog and pony" show for its potential " investors" at the YC in Montana with fly-fishing excursions and a "get-acquainted" promotional campaign to sell the syndication. Incredibly, the CIF details the reliance and confidential information transfers between YC and Credit Suisse cementing their "lending advisory" relationship, but then attempts to masquerade the actual fiduciary relationship with disclaimers and representations, all as part of the "bait and switch" enterprise.

241.    The CIF prepared by Credit Suisse contains multiple false and fraudulent statements, and/or concealments without required disclosures including but not limited to:

(a) That the loan program was operated by a U.S. federally regulated bank, "Credit Suisse First Boston" when it was operated in fact by "Credit Suisse Cayman Islands Branch" in order to circumvent FIRREA. Each and every page of the 50 page CIF, states

prominently: **"CREDIT SUISSE    FIRST BOSTON**."  There is no reference whatsoever  to Credit Suisse Cayman Islands Branch or FIRREA. But when the loan documents were presented several weeks later on September 30, 2005, they state: "Credit Suisse Cayman Island's Branch"-- another "bait and switch."

      (b) That the loan program was based on a Cushman & Wakefield appraisal attached as an  "Appendix"  to the CIF without disclosing on its face that the appraisal was not FIRREA compliant. To cover themselves, they referred in the Appendix to a "SyndTrak"  site. It appears like a another marketing fraud -- while concentrating the attention of  their "investors" on "fly-fishing," they slip in their undisclosed appraisal scheme without disclosure.

      (c) That they had falsified information given to Moody's to secure a rating by representing that $142 Million of the $375 M dollar loan was for "Development Reserve" when it was not.

      (d) That they had sold the loan program to developers as being similar to a "home equity loan" when it was not FIRREA compliant; and it was not based on "fair market value" as such loans are based.

      (e) That Cushman & Wakefield had "UPDATED" a prior  2004 appraisal with its recent appraisal supporting a value of $1.2 Billion Dollars. In fact the 2004  appraisal was based on "Fair Market Value" supporting a value of approximately $420 Million Dollars; and the new FIRREA violation appraisal was not only not an "UPDATE," Credit Suisse and Cushman & Wakefield intentionally used the word "UPDATE" to conceal the shocking discrepance between the $420 Million appraisal and their bloated 1.2 Billion appraisal to sell the syndication to the "fly fishers."  This overt fraud was further represented to their  developer/client, who didn't have a clue as to how this international banking giant was pulling this whole scheme off, as being

"another method of appraising the project" or words to that effect.  The YC developer had no knowledge whatsoever of FIRREA; or that to use the appraisal for any purposes under U.S. banking regulations, the appraisal had to be FIRREA compliant.  This fraud was in turn passed on to the Plaintiff Class based on the confidential information involving the Plaintiff class that the developer had given to his fiduciary -- Credit Suisse .

242.    The "Managing Director" and brain-child behind the "Loan to Own" scheme was David Miller, who was  the "Senior Member of the  Capital Markets TEAM within Leveraged Finance within Credit Suisse in its New York office. Before implementing the Loan to Own scheme,  Mr. Miller interfaced with other departments within Credit Suisse including those in the foregoing paragraph, to assess risk. Risk assessment included the "Risk Management TEAM," headed by Steven Yankauer.

243.    Mr. Yankauer assisted in implementing the scheme by assessing the loans as a credit risk officer in order to assure  that "risk management" protocols were in place; and to prepare and implement  strategies to maximize corporate profit on the loans *when* they failed. These protocols including the spreading of the risk through syndication of the loans through the Cayman Islands Branch in order to circumvent FIRREA;  and to have Credit Suisse serve as the "SOLE-LEAD  ARRANGER"  for  the  ever-trusting  and  deceived  developers;  and  while representing the loan to be  "non- recourse" to their own "clients."  It is  akin to a contingent fee lawyer representing to a client that "the case  won't cost you anything," then obtaining money from another client to finance the case based on the client confidences, then suing the client for more money when the lawyer loses.  Like the dishonest lawyer, Credit Suisse and Mr. Yankauer, had  pre-planned strategies to sue the developers through bankruptcy proceedings when their scheme cratered.  Mr. Yankauer is  a Director of the Cayman Islands Branch.   The strategies to

defraud the developers and the Plaintiff Class include those hereinafter recited in connection with the YC loan.

244. Mr. Miller and the other Credit Suisse executives knew that by syndicating the loan to the "noteholders", while acting as the "SOLE-LEAD ARRANGER with the Developer/ Resorts, he maximized profit and minimized risk to the BANK, while maximizing huge fees for his TEAM within the bank. Mr. Miller knew in August, 2005, *before its implementation* at YC, based on the frauds already perpetrated on LLV, that the "Loan to Own" scheme was fraudulent, that it violated FIRREA, that the loan to value ratios based on the TNV method, were 100 per cent plus inflated by the FIRREA violations; and most importantly, that the fraudulent scheme they were implementing, which he called a "gravy train" for *his* TEAM within Credit Suisse would then be taken over by the "Risk Management TEAM within Credit Suisse in order to implement their own profit making schemes. That TEAM used the foreclosure, bankruptcy, receivership, and insider schemes recited herein, to defraud the Plaintiff Class. Mr. Miller's biggest fear was that he would lose this fraudulently contrived resort market-place.

245. One of Mr. Miller's emails to Mr. Rogers, a field marketing executive who worked for Mr. Barcy, dated August 5, 2005, and relating to the risk by investors in the scheme using the "100% of value FIRREA avoidance appraisals, before the YC loan, is particularly revealing:

> **"these are aggressive deals and it is all of our best interests, that the investors are protected, because if one of them blow up, you will see these investors pull out of this land development mkt [market] and our gravy train will stop."**

246. Mr. Miller meant that the "gravy train" to his Capital Markets TEAM, " including

Rogers,  with no risk to them or Credit Suisse would "stop"  because  the "investors" sucked in

by the scheme would "blow up" and thus the market place for the entire fraudulent scheme

would then "stop." In other words, their house of cards, ponzi-type scheme would collapse

because they would lose their "investors. But since they were merely the "Administrator,"

although their "gravy train" would end, the investors would also be blown up.  But not so, for the

Risk Management Team.  As recited below, they had their own schemes in place, or adjusted

them,  as they proceeded to take over each Resort.

247.    On or about September 30, 2005,  less than a month after the Credit Suisse "dog

and pony show" at the YC, Tim Blixseth ("TB") agreed to enter into the $375 million loan

transaction based upon the fraudulent and trust induced  promotional and marketing tactics of all

Defendants.  Defendants called the loan  an "Equity Recapitalization Loan."  As explained to TB

by the Credit Suisse  marketing agents, including Jeff Barcy and others, the loan was "similar to

a home equity loan" intended to reimburse them and  BGI for the increased equity resulting from

their creation and development of YC, and millions of dollars of investment in time and money.

Credit Suisse and their lawyers approved, endorsed, and even recommended that BGI receive

$209 Million of the loan proceeds directly in exchange for a promissory note from BGI to the

YC, which "increased the value of the loan product."  Although Credit Suisse approved the $209

Million as a "dividend" or "distribution" based on its "home equity" representations, TB decided

that to insure the financial strength of the YC,  he would take the $209 Million loan proceeds as

a "loan" backed up by hundreds of millions of dollars of assets owned by "BGI", the owner of

the YC.  As part of their RICO, conspiracy, and following the Credit Suisse "SOLE-LEAD", as

hereinafter recited, one of their own "insider note holders", Cross Harbor Capital, operated by

Samuel Byrne, made his own $35 Million  "Predatory Loan," and thereby gained control of the

$200 Million asset that backed up the $209 Million note, thereby defrauding the YC and the Plaintiff Class. The Byrne predatory loan also involved numerous "predicate acts" of mail and wire fraud.

248.    Additionally, based upon the knowledge, skill, experience and sophistication of each of the Defendants, and the representations made to TB and his employees over a period of NINE months, and his previous experience with Cushman & Wakefield,  and the approval and endorsement of Defendants and its two law firms,  that the loan transaction conformed to all of the laws of the United States and Montana, including all laws relating to fiduciary duty, U.S. banking regulations, and laws involving commercial loan transactions, TB and the YC,  and BGI agreed to enter into the loan. Without the explicit representations and approval of Credit Suisse, and the trust and confidence that he had reposed in them and the material representations of Defendants, and but for the concealment of the FIRREA fraud, TB would NOT have entered into the loan.

249.    In March - April, 2007 in the middle of divorce proceedings, TB  informed his ex-wife, Edra Blixseth ("EB")  that he intended to sell the $200 Million asset, "Porcupine Creek" ("PC")  to pay the notes owed by BGI to YC in order to pay down the Credit Suisse loan.  She refused and thereafter, entered into the conspiracy described below with the agents and co-conspirators of Credit Suisse. The sale of PC would have paid off the $209 Million of the Credit Suisse loan. Instead, EB took $35 Million from Mr. Byrne and transferred control of both assets – a total of about $700 Million in then 2008 dollars.

250.    Unknown to TB at all times material to the claims herein, the appraised value of YC was based on the Total Net Value appraisal method created, implemented, approved and concocted by Defendants in violation of U.S. banking regulations.   NO-ONE advised him of any

potential issues involving the appraisal method or any other problems associated with the loan as not being FIRREA compliant, or in violation of federal and state standards.

251.    At the trial of adversary proceeding No. 09-00014 in the Montana Bankruptcy Court, TB learned  that CS had made material misrepresentations relating to the loan not only to him but also to syndicated owners of the loan; and to other Resorts; and that CS acted merely as an Administrator in breach of representations that it had made in the CIF ; and that the loan and appraisal methods of Defendants violated FIRREA; and that Defendants  used the Cayman Islands Branch as a cover for the loan in order to circumvent FERREA. On that basis the Montana Court entered its "predatory loan" order.

252.    Although the Montana Court  Predatory Loan Order was ostensibly vacated as a condition of the settlement and plan confirmation between Credit Suisse, Cross Harbor Capital, the YC  and the Unsecured Creditor's Committee, subsequent appeals of the reorganization plan may  have stayed the effect of the order which vacated the predatory loan order.  Moreover, the underlying facts cited in and giving rise to the Predatory Loan Order remain in evidence in the continuation of said adversary proceeding, and as to TB, a non-settling party,  and the  Plaintiffs herein, said Order has the practical effect of having adjudicated the *underlying facts* supporting the conclusions of the Montana Court.  The  conclusions of law and fact in the vacated Predatory Loan Order, based on  the pendency of the appeals, may remain in effect under the doctrines of collateral estoppel and judicial estoppel, and effectively remain the law of the case in the continued adversary proceedings.

253.    Based on said settlement and reorganization plan designed by Credit Suisse to dodge the legal effect of the Predatory Loan Order, and circumvent  said conclusions of law and fact therein, Credit Suisse and its agent CHC have obtained complete ownership and control over

virtually all aspects of the bankruptcy proceedings, including claims and assets of the YC through the  Liquidating Trust, ("LT") of which CS has four of the seven votes on the LT thereby essentially controlling the future disposition of the YC.

254.    Between January  and August, 30, 2008, aided and abetted by Samuel T. Byrne, and his company Cross Harbor Capital, ("CHC") one of the "insider note-holders" of Credit Suisse, EB and Byrne acting in collusion and  in utter bad faith, participated in the following specific "predicate acts" as a co-conspirator of the Defendants:

(a)     Together, they  terminated a $455 Million contract to sell the YC which would have paid off the Credit Suisse loan, but removed EB  from control of the YC and left her with "only" about $10 Million from the sales proceeds for her 50% community share -- which she rejected;

(b)     EB borrowed approximately $30 Million from federally regulated banks based on the Total Net Value appraisal method, in addition to $13 Million she had previously borrowed, and based on numerous frauds in her loan applications, all to carry-on her scheme to obtain control of the YC, while already in default on multiple loans. The multiple frauds involving these loans all constitute a "pattern of racketeering activity" and multiple "predicate acts" of bank fraud as will be proven at trial.

(c)     On August 13, 2008, Byrne and CHC loaned EB an additional $35 million on a 48-day demand note to acquire the YC in her divorce proceedings while knowing that she was then in default on over $43 Million of fraudulently procured bank and private loans. This scheme was implemented through the Byrne "predatory $35 Million loan"  in order to obtain ownership and control over the YC and Porcupine Creek, while Byrne was then negotiating with Credit Suisse as one of its "insider note-holders."

(d)     In July - August,  2008, upon EB's making the foregoing "deal" with Mr. Byrne, he and his agents acquired immediate and complete control over the YC and implemented a plan to put it into bankruptcy for the purpose of negotiating another deal with Credit Suisse.

(e)     The transfer of control from Tim Blixseth to Edra Blixseth and Mr. Byrne constituted an event of default under the Credit Suisse loan which Credit Suisse ignored.

(f)     Mr. Byrne then put the YC into bankruptcy and acted as the DIP financier through which he then  acquired ownership and control over  the YC with Credit Suisse.

255.    Together, based on all of the foregoing "pattern of racketeering activity" Credit Suisse, EB, the YC and Byrne obtained ownership and/or control over the YC. They then created a Liquidating Trust" ("LT") to sue the developer, Tim Blixseth notwithstanding the "non-recourse" provision in the original loan. Without the original FIRREA violations and frauds recited above, and without the  bank and lending fraud recited above by Edra Blixseth acting in collusion with a Credit Suisse note-holder, Byrne, to take control of the YC, Defendants would not have been able to carry out their fraudulent enterprise to defraud the Plaintiff Class.  As each individual joined the RICO enterprise as described herein, they each  became liable for the acts and unlawful conduct previously perpetrated by Credit Suisse and Cushman & Wakefield.

256.    As of August 13, 2008 when Mr. Byrne loaned EB $35 Million on the 48-day note secured by PC, in order to obtain control over the YC and PC and put YC in bankruptcy, which devastated the equities owned by the Plaintiff Class in the YC, and wiped out the security for the $209 Million note,  while acting as a note-holder of Credit Suisse, he and his lawyers  all had full and complete knowledge that EB had no means to pay the loan; that she was completely insolvent under any standard; and  that rampant bank and lending  fraud had been committed

against at least five lending institutions.

257.    The net effect of these frauds, collusive bad faith, and aiding and abetting breach of fiduciary duties owed by EB to the YC and to the marital Community, as perpetrated by Mr. Byrne acting as a note-holder for Credit Suisse, was for Mr. Byrne to acquire over $500 Million in YC assets for a $35 Million loan and a primed $20 Million DIP loan, which he and Credit Suisse then used to transform its $375 Million non-recourse "Predatory Loan, as ruled by the Montana Court into a reorganization plan in which it created the LT to sue the developer, while leaving the Plaintiff Class devastated.

258.    In addition to the predicate acts recited herein, as part of their scheme to take control of the YC and put it in bankruptcy, EB and her accomplices, including her "business partner" resorted to even more blatant criminal conduct. They fabricated two fake "Grand Jury Target" letters and gave them to Mr. Byrne and CHC for purposes of giving them to his "investors" and to Credit Suisse for the purpose of killing the sale of YC, so that they could acquire control and put the YC into bankruptcy.

259.    Defendants as persons within the meaning of 18 U.S.C. §1961(3), received income in the hundreds of millions of dollars derived, directly or indirectly, from a pattern of racketeering activity which was used to acquire an interest in said enterprise in violation of 18 U.S.C. §1962(a).

260.    Defendants, as persons within the meaning of 18 U.S.C. §1961(3), through a pattern of racketeering activity, acquired and/or maintained directly or indirectly, control of said enterprise in violation of 18 U.S.C. §1962(b).

261.    Defendants, as persons within the meaning of 18 U.S.C. §1961(3) and as persons employed by/associated with said enterprise, conducted and participated, directly and indirectly,

in the conduct of the affairs of said enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

262.    The multiple predicate acts including, upon information and belief, in excess of 15 separate resort loans made under the same fraudulent circumstances described herein constitute a pattern of racketeering activity.

263.    These 15 or more acts of racketeering, occurring within ten years or less of one another, constitute a pattern of racketeering activity within the meaning of 18 U.S.C. §1961(5).

264.    Plaintiffs and Class Members were caused economic loss, damage and injury to their business or property by reason of this violation of 18 U.S.C. §1962, in that, as a direct and proximate result of Defendants' aforesaid acts and conduct, Plaintiffs suffered economic and property damages, loss of property values or property itself, including financial losses, loss of existing and prospective business interests and advantages and loss of reputation in the excess of Eight Billion Dollars. ($8,000,000,000).

265.    By reason of the Defendants' violation of 18 U.S.C. §1962, Plaintiffs are entitled, pursuant to 18 U.S.C. §1964(c), to threefold the damages sustained or Twenty Four ($24) Billion,  with interest thereon, and a reasonable attorney's fee in connection herewith.

## SECOND CAUSE OF ACTION
### (Common Law Fraud Against All Defendants)

266.    Plaintiffs and similarly situated members of Plaintiff Class incorporate as if fully set forth here the facts and allegations previously and hereafter set forth in this Complaint.

267.    As described herein, Defendants are liable to Plaintiffs and Class Members for damages because they committed common law fraud by intentionally supplying materially false information to developers and third party beneficiary Plaintiffs and Class Members and

concealing material facts they had a duty to disclose, in connection with the described financial transactions with developers, Plaintiffs and Class Members.

268.    The Defendants' aforesaid false, misleading and untrue statements and omissions presentations were material in that they related to matters that would have been of importance or significance in the developers' decision whether to participate in the aforesaid financial transactions. Developers, Plaintiffs and similarly situated members of Plaintiff Class would have viewed the disclosure of the true facts as significantly altering the overall character and nature of the information available such that knowledge of the true facts would have materially affected their financial and economic decisions relative to the aforesaid financial transactions.

269.    At the time they entered into the aforesaid financial transactions developers, Plaintiffs and similarly situated members of Plaintiff Class were not aware of the above-detailed untruths or omissions.

270.    Defendants made the aforementioned false representations, statements and omissions with knowledge of their falsity at the time they were made, or with reckless disregard for the truth and the rights of Plaintiffs, and knowing that developers, Plaintiffs and members of Plaintiff Class would rely thereon to their detriment.

271.    Developers, Plaintiffs and Class Members actually, reasonably and justifiably relied to their detriment on the material misrepresentations and omissions of the Defendants in entering into the financial transactions with Defendants, and that reliance caused the damages and harm for which Plaintiffs and members of Plaintiff Class  seek redress in this civil action. Had developers, Plaintiffs and members of Plaintiff Class   known the truth, developers would not have consummated the financial transactions or would have done so only on significantly different terms; accordingly, the developers, would have remained the developers, the rights,

amenities and privileges promised by the developers would have been honored and the rights and property interests and values of Plaintiffs and members of Plaintiff Class would not have been injured and damaged.

272.   As a direct and proximate result of the aforesaid fraudulent, malicious and oppressive conduct of the Defendants, and each of them, Plaintiffs and members of Plaintiff Class were caused severe economic damages in an amount to be determined at trial but which damages are substantially in excess of the $5,000,000 jurisdictional minimum of this Court.

**THIRD CAUSE OF ACTION**
**(Common Law Negligent Misrepresentation Against All Defendants)**

273.    Plaintiffs and similarly situated members of Plaintiff Class incorporate as if fully set forth here the facts and allegations previously and hereafter set forth in this Complaint.

274.   As described herein, each of the Defendants is also liable to Plaintiffs and members of Plaintiff Class in damages for committing negligent misrepresentations by supplying materially false information to Plaintiffs in connection with the financial transactions it entered into with the Plaintiffs.

275.   Defendants furnished written and oral information to developers. Defendants prepared these documents and made these representations (including but not limited to the "Total Net Value" appraisals) with specific knowledge and intent that said documents would be distributed to developers and their foreseeable home buyers, in order to induce them to enter into the aforesaid financial and real estate transactions.  Developers, Plaintiffs and Class Members were foreseeable recipients of said representations, and Defendants knew and intended that they would rely on the Defendants' representations, which Defendants knew were false and misleading.

276.     In connection with their respective proper business purposes in which they were lawfully engaged, developers, Plaintiffs and Class Members received the appraisals and other written and oral presentations from Defendants before entering into the financial transactions with Defendants.  Developers, Plaintiffs and Class Members also received the oral misstatements from the Defendants, and were subject to the aforementioned materially misleading omissions of the Defendants, in connection with said business purposes.

277.     Defendants each had a duty to provide developers, Plaintiffs and Class Members with materially accurate information and disclosures, and each Defendant had a duty to refrain from misrepresenting the terms of or the basis for the said loans and Credit Agreements.  In violation of that duty, each Defendant failed to exercise reasonable care in connection with the aforesaid transactions, and the preparation, presentation, publication and communication thereof to foreseeable users of said information.

278.     Defendants and each of them failed to exercise reasonable care in making the oral and written presentations to the developers, Plaintiffs, and members of the Plaintiff Class.

279.     Defendants and each of them had a substantial pecuniary interest in the completion of the aforesaid loans, and stood to receive substantial personal gain if the loan transactions were executed.

280.     Defendants and each of them negligently published and uttered untrue statements of material facts and negligently failed to affirmatively disclose facts that were necessary for the persons and entities to which they were published and uttered, in order to prevent said statements from being misleading and detrimental to the interests of the aforesaid developers, Plaintiffs, and members of Plaintiff Class.

281.     Defendants' aforesaid untrue statements and failures to disclose material facts

related to matters of importance or significance to the decisions of the developers as to whether to enter into the said loan transactions with Defendants, and caused them to accept Defendants' proffered loan agreements, which caused harm and substantial economic damages to the developers, owners, Plaintiffs and members of Plaintiff Class.

282.    The acts, omissions and conduct aforesaid of Defendants and each them amounted to the commission of gross negligence.

283.    The developers, owners, Plaintiffs and members of Plaintiff Class herein did not know that the aforementioned representations and promises of Defendants were false, and they justifiably relied to their detriment on said representations, believing them to be true.

284.    As a direct and proximate result of the Defendants' misrepresentations, Plaintiffs and the members of Plaintiff Class were caused, and continue to suffer, economic damages in excess of $8 Billion.

285.    Plaintiffs and the members of  Plaintiff Class are lawfully entitled to recover from the Defendants all of the economic damages that were caused them by the Defendants' negligent  misrepresentations and omissions of the facts pertinent to the aforesaid loan transactions  and Credit Agreements with the developers, the amount of which damages will be proven at trial and which damages exceed $8,000,000,000.

**FOURTH CAUSE OF ACTION**
**(Breach of Fiduciary Duty Against All Defendants)**

286.     Plaintiffs and similarly situated members of Plaintiff Class incorporate as if fully set forth here the facts and allegations previously and hereafter set forth in this Complaint.

287.    Defendants, their agents and employees, acting in the course and scope of their employment, instituted a relationship of trust and confidence with Plaintiffs. Defendants knew or

had reason to know that the borrowers and Plaintiff Class had placed a special trust in them to counsel or inform them of material matters affecting the developments.  Defendants had superior knowledge of the "Loan to Own" transactions and expected and intended that the developers and Plaintiffs would rely upon them.  Defendants had a duty to investigate and to disclose all material facts related to said transactions.  Defendants failed to investigate, failed to disclose and actively misled Plaintiffs and the members of Plaintiff Class to their detriment.  Defendants owed fiduciary duties of care, undivided loyalty and full disclosure to said Plaintiffs, which Defendants violated.

288.    The Defendants, the developers and the Plaintiffs including the members of Plaintiff Class were parties to a tri-partite special relationship of confidence and trust. Such special relationship burdened the participants in the relationship with the fiduciary duties of candor, loyalty and good faith and fair dealing. By means of their frauds and conduct recited herein, Defendants became successor developers at each of the resorts; and liable to the Plaintiff class in said capacity.

289.    Defendants breached their fiduciary duties with respect to each resort by making oral and written statements which were known by Credit Suisse to be false at the time they were made, and while knowing that each resort's developer would never have undertaken any lending relationship with the Defendants had they truthfully represented the aforementioned facts and intentions of Defendants.  Defendants' breach of said fiduciary obligations caused the developers and owners of the lands known as Lake Las Vegas, Tamarack, Yellowstone and Ginn Sur Mer to lose control of their properties, to become burdened with unsustainable debt, and to incur economic losses in an amount which will be proven at trial, but which exceed $8,000,000,000.

**FIFTH CAUSE OF ACTION**
**(Tortious Interference with Plaintiffs Existing Rights,**
**Amenities, and Privileges at Each Resort)**

290.    Plaintiffs and similarly situated members of Plaintiff Class incorporate as if fully set forth here the facts and allegations previously and hereafter set forth in this Complaint.

291.    Plaintiffs and members of Plaintiff Class had contracts with the developers of each of the aforesaid land-development resorts, which contracts provided for the construction and maintenance of the aforementioned rights, amenities and privileges running with the lands, and which were known to Defendants at all times relevant hereto.

292.    Despite Defendants' knowledge of the contractual rights of said Plaintiffs, Defendants intentionally and without justification or privilege, interfered with Plaintiffs' contractual rights by committing the aforesaid unlawful, fraudulent and illegal acts and omissions.

293.    As a direct and proximate result of Defendants' unlawful, intentional and unprivileged interference with the contractual rights of Plaintiffs and members of Plaintiff Class, they were caused economic damages in an amount to be determined at trial but well in excess of the jurisdictional minimum requirements of this Court.

294.    The developers' loan agreements and contracts with Defendants included an implied covenant of good faith and fair dealing that inured to the benefit of and was therefore owed to the Plaintiffs and the members of Plaintiff Class, who were and continue to be third-party beneficiaries thereof.

295.    Consistent with the covenant of good faith and fair dealing inherent in said loan agreements and contracts, the Defendants owed, at all times, the duty and an obligation to deal fairly, honestly and in good faith with the aforesaid developers, homeowners, Plaintiffs and

members of Plaintiff Class in a manner consistent with accepted commercial practices and to do nothing to deprive them of the benefits to which they were entitled by virtue of their contractual rights in connection with the resort land developments at Lake Las Vegas, Tamarack, Ginn Sur Mer, and Yellowstone Club.

296.    By their wrongful acts and omissions aforesaid, Defendants and each of them breached the covenant of good faith and fair dealing owed to Plaintiffs and members of Plaintiff Class.

297.    As a direct and proximate result of the Defendants' breach of the covenant of good faith and fair dealing, Plaintiffs and the members of Plaintiff Class were caused and continue to suffer severe and substantial economic harm, loss and damages in an amount which will be determined at trial, and significantly in excess of the jurisdictional minimum of this Court.

### SIXTH CAUSE OF ACTION
**(Common Law Unjust Enrichment Against All Defendants**)

298.     Plaintiffs and similarly situated members of Plaintiff Class incorporate as if fully set forth here the facts and allegations previously and hereafter set forth in this Complaint.

299.    Defendants and each of them wrongfully benefitted from and were enriched by their role in the aforesaid fraudulent loans and financial transactions by receiving  compensation, payment or fees for their services in connection therewith, of which the Defendants acted with knowledge and intent to defraud, and thereby to reap rich financial rewards.

300.    The wrongful benefit and enrichment of each Defendant was at the expense of the Plaintiffs including the members of Plaintiff Class. By means of their frauds recited herein, Defendants are the co-developers and the successor developers at each of the resorts and liable

as said successor developers for unjust enrichment.

301.    Because the retention by Defendants of these benefits would be grossly unjust, Plaintiffs and the members of Plaintiff Class are entitled to recover from Defendants, and each of them, the benefits and enrichment each received as a result of their aforesaid conduct in connection with the aforementioned loans and credit agreements.

**SEVENTH CAUSE OF ACTION**
**(Negligence and Gross Negligence Against All Defendants)**

302.    Plaintiffs and similarly situated members of Plaintiff Class incorporate as if fully set forth here the facts and allegations previously and hereafter set forth in this Complaint.

303.    Defendants owed a duty to developers, Plaintiffs and Class Members to use ordinary and reasonable care in carrying out their obligations.

304.    Defendants breached this duty through the conduct described above.

305.    As described herein, each Defendant is also liable to Plaintiffs and Class Members in damages for its negligent and grossly negligent behavior.

306.    Plaintiff and Class Members were directly and foreseeable injured as a result of Defendants' negligence and gross negligence. As a direct and proximate result of this breach of ordinary or reasonable care, Plaintiff and Class Members were damaged.

307.    By reason of the foregoing, Plaintiff and Class Members are therefore entitled to recover all of the damages Plaintiffs sustained as a result of Defendants' negligence and gross negligence.

**EIGHTH CAUSE OF ACTION**
**(Common Law Conspiracy Against All Defendants)**

308.    Plaintiffs and members of Plaintiff Class incorporate as if fully set forth herein the facts and allegations contained in this Complaint.

309.    Defendants, and each of them, combined and conspired with each other in furtherance of a conspiracy to defraud plaintiffs and members of the Plaintiff Class by means of racketeering, breach of fiduciary duty and fraud.

310.    Defendants and each of them agreed to participate in combination one with another and with third parties or persons not herein named in a scheme and civil conspiracy to effect the fraudulent consummation of the aforesaid loans and Credit Agreements, or to do so by fraudulent means. In addition, all the defendants agreed to participate in a conspiracy to keep the true and accurate nature and significance of the unproven, artificial "Total Net Value" appraisal methodology hidden from plaintiffs in order to perpetuate the ability of defendants  to make repeated fraudulent loans to plaintiffs.

311.    Defendants' aforesaid wrongful acts and conduct was committed by them with wrongful intent pursuant to defendants' plan and  scheme and in furtherance of their unlawful and tortious intent to earn excessive and exorbitant loan fees, and to gain ownership or control over the lands described herein above, at the expense and harm to the developers, homeowners, plaintiffs and members of Plaintiff Class, by means of the aforesaid fraudulent loan transactions and fraudulent misrepresentations.

312.    Defendants' wrongful acts and conduct in furtherance of the Loan to Own scheme caused substantial economic harm and damage to each developer, homeowner, plaintiff and member of Plaintiff Class, in a cumulative amount in excess of $8 billion dollars, and each defendant is jointly and severally liable to plaintiffs and the members of Plaintiff Class for said damages.

### Notice of Contemplated Amendment of Claim for Relief

313.    Defendants' actions as described in detail above were done with specific intent to

defraud developers and the Plaintiffs and Class Members and with a conscious and deliberate disregard of the substantial risk of tremendous harm to Plaintiffs and the Class Members. Defendants acted in a manner that was an extreme deviation from reasonable standards of conduct. The conduct set forth in this complaint was performed by Defendants with understanding of or disregard for its likely consequences. The conduct was outrageous, wanton, deliberate and willful.  Due to the fraudulent and/or grossly negligent nature of their acts, Defendants are liable to Plaintiffs and Class Members for exemplary and punitive damages, and at the appropriate juncture in this action, the Plaintiffs intend to seek leave to add a claim for exemplary/punitive damages to their prayer for relief.

DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a jury trial on all issues in the Complaint and Counterclaim so triable.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that, after trial by jury, the Court enter a judgment on behalf of Plaintiffs and the members of Plaintiff Class and against Defendants and each of them as follows:

A.     Economic damages in a just and reasonable amount as determined by proof at trial;

B.     Plaintiffs' costs and expenses incurred in this action, including reasonable attorneys' and experts' fees;

C.      Trebled damages in a just and reasonable amount pursuant to RICO, including a reasonable attorney's fee, pursuant to 18 U.S.C. § 1964(c); and/or pursuant to Idaho law;

D.     For an order that Defendants are estopped from asserting or attempting to enforce

the contractual jury waiver clause, and/or other clauses in its loan agreements, or in the alternative for an Order that said clause, or clauses is/are not applicable and void in its/their entirety due to illegality or in the alternative that said clause, or clauses is/are not applicable with regard to Defendants' international torts; and

      E.      For such other and further relief as the Court may deem appropriate pursuant to 18 U.S.C. § 1964 and/or other statutes and case authorities.

      Dated this 25th day of January, 2010.

/s/  Michael J. Flynn            /s/  Philip H. Stillman
Michael J. Flynn                 Philip H. Stillman

/s/  James C. Sabalos            /s/  John Flood
James C. Sabalos                John Flood

/s/ Chris Flood                 /s/ Peter C. Neumann
Chris Flood                    Peter C. Neumann

/s/  Robert C. Huntley
Robert C. Huntley

*Attorneys for Plaintiffs and members of proposed Plaintiff Class*