Richard C. Boardman, Bar No. 2922
RBoardman@perkinscoie.com
Rebecca H. Benavides, Bar No. 8147
RBenavides@perkinscoie.com
PERKINS COIE LLP
1111 West Jefferson Street, Suite 500
Boise, ID 83702-5391
Tele: 208.343.3434/Fax: 208.343.3232

Donald L. Morrow, admitted *Pro Hac Vice*
donaldmorrow@paulhastings.com
Panteha Abdollahi, admitted *Pro Hac Vice*
pantehaabdollahi@paulhastings.com
PAUL, HASTINGS, JANOFSKY & WALKER LLP
695 Town Center Drive, 17th Floor
Costa Mesa, CA 92626
Tele: 714.668.6200/Fax: 714.979.1921

Barry G. Sher, admitted *Pro Hac Vice*
barrysher@paulhastings.com
PAUL, HASTINGS, JANOFSKY & WALKER LLP
75 East 55th Street
New York, NY 10022
Tele: 212.318.6085/Fax: 212.230.5185

Attorneys for Defendant Cushman & Wakefield, Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| L.J. GIBSON, BEAU BLIXSETH, AMY KOENIG, DEAN FRESONKE, VERN JENNINGS, TERRI FROEHLICH, MONIQUE LEFLEUR, and GRIFFEN DEVELOPMENT, LLC, each individually, and on behalf of PROPOSED Plaintiff CLASS Members of Tamarack Resort, Yellowstone Club, Lake Las Vegas and Ginn Sur Mer, <br><br> Plaintiffs, <br><br> v. <br><br> CREDIT SUISSE AG, a Swiss corporation; CREDIT SUISSE SECURITIES (USA), LLC, a Delaware limited liability company, CREDIT SUISSE FIRST BOSTON, a Delaware limited liability corporation; CREDIT SUISSE CAYMAN ISLAND BRANCH, an entity of unknown type; CUSHMAN & WAKEFIELD, INC., a Delaware corporation and DOES 1 through 100 inclusive, <br><br> Defendants. | Case No. CV 10-001-S-EJL (REB) <br><br><br> **CUSHMAN & WAKEFIELD, INC.'S BRIEF IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT** |

## TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ............................................................................ 1

II.  BACKGROUND AND SUMMARY OF COMPLAINT ................................... 3

  A.   The Parties and the Resorts .................................................................... 3

  B.   Credit Suisse's So-Called "Loan to Own" Plan ..................................... 4

  C.   Plaintiffs Do Not Plead Any Relationship with C&W .......................... 6

III. THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS LACK
     ARTICLE III CONSTITUTIONAL STANDING ........................................... 6

  A.   Plaintiffs Must Plead Facts Establishing Standing ................................ 7

  B.   Plaintiffs Have Not Suffered a Concrete and Particularized Injury in Fact ......... 8

  C.   Plaintiffs Cannot Establish the Requisite Causal Connection ............... 9

IV.  THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL
     TO STATE A CLAIM ...................................................................................... 13

  A.   Plaintiffs Fail to Plead Their Claims with the Requisite Particularity .............. 14

       1.   All Claims "Sounding in Fraud" Must Be Alleged with
            "Particularity" ............................................................................. 14

       2.   Each of Plaintiffs' Claims Sounds in Fraud ................................ 16

       3.   The Complaint Does Not Satisfy the Heightened Pleading
            Standards As to C&W .................................................................. 17

  B.   As a Matter of Law, the Alleged Deception that Underlies Each of
       Plaintiffs' Claims Does Not Exist ....................................................... 21

       1.   The Appraisals Did Not Misrepresent What was Calculated ................. 21

       2.   FIRREA Is Not Relevant ............................................................. 23

  C.   Additional Failures to Plead Essential Elements of Each Cause of Action ......... 24

       1.   Plaintiffs Fail to State a RICO Claim ........................................ 24

       2.   Plaintiffs Fail to State a Claim for Fraud or Negligent
            Misrepresentation ........................................................................ 30

       3.   Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty ................ 33

       4.   Plaintiffs Fail to State a Claim for Tortious Interference with
            Contractual Relations .................................................................. 34

       5.   Plaintiffs Fail to State a Claim for Unjust Enrichment ..................... 35

       6.   Plaintiffs Fail to State a Claim for Negligence ........................... 36

       7.   Plaintiffs Fail to State a Claim for Conspiracy .......................... 37

V.   CONCLUSION ................................................................................................ 38

# TABLE OF AUTHORITIES

<u>**Page(s)**</u>

**CASES**

*Aardema Group v. Northwest Dairy Ass'n.,*
  2009 WL 1748082 (D. Idaho Jun. 17, 2009) ................................................... 34

*Alfus v. Pyramid Tech. Corp.,*
  745 F. Supp. 1511 (N.D. Cal. 1990) ............................................................... 15

*Allen v. Wright,*
  468 U.S. 737 (1984) .......................................................................... 10, 13

*Amaro v. Option One Mortgage Corp.,*
  2009 WL 103302 (C.D. Cal. Jan. 14, 2009) .................................................. 14

*Anza v. Ideal Steel Supply Corp.,*
  547 U.S. 451 (2006) ................................................................................. 25

*Arboireau v. Adidas-Saloman AG,*
  347 F.3d 1158 (9th Cir. 2003) .................................................................... 22

*Ashcroft v. Iqbal,*
  129 S. Ct. 1937 (2009) ............................................................................. 14

*Ass'n. of Wash. Pub. Hosp. Dists v. Philip Morris, Inc.,*
  241 F.3d 696 (9th Cir. 2001) ..................................................................... 26

*Baccus v. Ameripride Servs., Inc.,*
  179 P.3d 309, 145 Idaho 346 (2008) ......................................................... 36

*Barmettler v. Reno Air, Inc.,*
  956 P.2d 1382, 114 Nev. 441 (1998) ......................................................... 31

*Baumer v. Pachl,*
  8 F.3d 1341 (9th Cir. 1993) ...................................................................... 29

*Beck v. Prupis,*
  529 U.S. 494 (2000) ................................................................................. 30

*BECO Const. Co., Inc. v. J-U-B-Eng'rs, Inc.,*
  184 P.3d 844, 145 Idaho 719 (2008) ..................................................... 34, 35

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................................. 14

*Borsellino v. Goldman Sachs Group, Inc.,*
  477 F.3d 502 (7th Cir. 2007) ..................................................................... 15

# TABLE OF AUTHORITIES
### (continued)

<u>Page(s)</u>

*Bulgo v. Munoz,*
   853 F.2d 710 (9th Cir. 1988)................................................................. 31

*Bushi v. Sage Health Care, PLLC,*
   203 P.3d 694, 146 Idaho 764 (2009) .................................................... 33

*Canyon County v. Syngenta Seeds, Inc.,*
   519 F.3d 969 (9th Cir. 2008)...........................................................25, 26

*Cattie v. Wal-Mart Stores, Inc.,*
   504 F. Supp. 2d 939 (S.D. Cal. 2007)..............................................20, 21

*Cechovic v. Hardin & Assocs., Inc.,*
   902 P.2d 520, 273 Mont. 104 (1995).................................................... 31

*City of Cleveland v. Ameriquest Mortg. Sec., Inc.,*
   621 F. Supp. 2d 513 (N.D. Ohio 2009)............................................11, 12

*Common Cause v. Dept. of Energy,*
   702 F.2d 245 (D.C. Cir. 1983) ............................................................. 13

*Cooper v. Brakora & Assoc.,*
   838 So. 2d 679 (Fla. Dist. Ct. App. 2003) ........................................... 33

*Country Cove Dev., Inc. v. May,*
   150 P.3d 288, 143 Idaho 595 (2006) ................................................31, 34

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332 (2006)............................................................................... 7

*Doe v. Evans,*
   814 So. 2d 370 (Fla. 2002).................................................................... 34

*Duffy v. Butte Teachers' Union, No. 332, AFL-CIO,*
   541 P. 2d 1199, 168 Mont. 246 (1975).................................................. 37

*Eclectic Props. E., LLC v. The Marcus & Millichap Co.,*
   2010 WL 384736 (N.D. Cal. Jan. 29, 2010) ......................................19, 20

*Ecological Rights Found. v. Pac Lumber Co.,*
   230 F.3d 1141 (9th Cir. 2000) .............................................................. 10

*Edwards v. Edwards,*
   842 P.2d 299, 122 Idaho 963 (1992) ..................................................... 34

*First Nationwide Bank v. Gelt Funding Corp.,*
   27 F.3d 763 (2d Cir. 1994).................................................................... 10

## TABLE OF AUTHORITIES
(continued)

<u>Page(s)</u>

*Flast v. Cohen,*
   392 U.S. 83 (1968) ............................................................................................ 7

*Florida Power Corp. v. City of Winter Park,*
   887 So. 2d 1237 (Fla. 2004)........................................................................... 35

*Frank Krasner Enters., Ltd. v. Montgomery County,*
   401 F.3d 230 (4th Cir. 2005)......................................................................... 13

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,*
   528 U.S. 167 (2000)........................................................................................ 7

*Glen Holly Entm't, Inc. v. Tektronix, Inc.,*
   100 F. Supp. 2d 1086 (C.D. Cal. 1999) ..................................................... 15

*Gowen v. Tiltware LLC,*
   2009 WL 1441653 (D. Nev. May 19, 2009) ............................................... 33

*Gracey v. Eaker,*
   837 So. 2d 348 (Fla. 2002)........................................................................... 33

*Gray v. Tri-Way Constr. Servs., Inc.,*
   210 P.3d 63, 147 Idaho 378 (2009) ............................................................ 34

*Green v. Beazer Homes Corp.,*
   2007 WL 2688612 (D.S.C. Sept 10, 2007).................................... 8, 11, 12

*Headwaters Constr. Co. v. Nat'l City Mortg. Co.,*
   2010 WL 744287 (D. Idaho Feb. 26, 2010)......................................... 6, 36

*Hemi Group, LLC v. City of New York,*
   130 S. Ct. 983 (2010)................................................................................... 25

*Holmes v. Securities Investor Prot. Corp.,*
   503 U.S. 258 (1992)................................................................................24, 25

*Howard v. America Online, Inc.,*
   208 F.3d 741 (9th Cir. 2000)........................................................................ 29

*Hutson v. Am. Home Mortg. Servicing, Inc.,*
   2009 WL 3353312 (N.D. Cal. Oct. 16, 2009) ........................................... 19

*Impress Comm. v. Unumprovident Corp.,*
   335 F. Supp. 2d 1053 (C.D. Cal. 2003) ....................................................... 9

*In re Actimmune Mktg. Litig.,*
   2009 WL 3740648 (N.D. Cal. Nov. 6, 2009)............................................. 15

# TABLE OF AUTHORITIES
(continued)

Page(s)

*In re Autodesk Inc. Sec. Litig.,*
   132 F. Supp. 2d 833 (N.D. Cal. 2000) ................................................................ 4

*In re Blockbuster Sec. Litig.,*
   2004 WL 884308 (N.D. Tex. Apr. 26, 2004) ....................................................... 4

*In re MDC Holdings Sec. Litig.,*
   1991 WL 537515 (S.D. Cal. Jul. 2, 1991) ......................................................... 27

*Intermountain Const., Inc. v. City of Ammon,*
   841 P.2d 1082, 122 Idaho 931 (1992) .............................................................. 31

*Jones v. Kootenai County Title Ins. Co.,*
   873 P.2d 861, 125 Idaho 607 (1994) ................................................................ 33

*Kaing v. Pulte Homes, Inc.,*
   2010 WL 625365 (N.D. Cal. Feb. 18, 2010) ............................................. 9, 11, 12

*Knievel v. ESPN,*
   393 F.3d 1068 (9th Cir. 2005) ........................................................................... 5

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
   511 U.S. 375 (1994) .......................................................................................... 7

*Lancaster Community Hosp. v. Antelope Valley Hosp. Dist.,*
   940 F.2d 397 (9th Cir. 1991) ........................................................................... 19

*Leduc v. Micron Tech., Inc.*
   2005 WL 2847427 (D. Idaho Oct. 17, 2005) ...................................................... 6

*Lettunich v. Key Bank Nat'l Assn.,*
   109 P.3d 1104, 141 Idaho 362 (2005) .............................................................. 30

*Lierboe v. State Farm Mut. Auto. Ins. Co.,*
   350 F.3d 1018 (9th Cir. 2003) ........................................................................... 8

*Lubbe v. Barba,*
   540 P. 2d 115, 91 Nev. 596 (1975) ................................................................... 30

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) .................................................................................... 7, 10

*Lum v. Bank of America,*
   2001 WL 34059378 (D.N.J. Nov. 29, 2001) ...................................................... 19

*Maganallez v. Hilltop Lending Corp.,*
   505 F. Supp. 2d 594 (N.D. Cal. 2007) .............................................................. 15

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Marlys Bear Medicine v. U.S. ex. rel. Secretary of Dept. of Interior*,
  241 F.3d 1208 (9th Cir. 2001) .................................................................................. 33

*Mayor and City Council of Baltimore v. Wells Fargo Bank, N.A.*,
  2010 WL 46401 (D. Md. Jan. 6, 2010) ...................................................................... 11

*McCormick v. Fund Am. Cos., Inc.*,
  26 F.3d 869 (9th Cir. 1994) ....................................................................................... 22

*McPheters v. Maile*,
  64 P.3d 317, 138 Idaho 391 (2003) ........................................................................... 37

*Mertens v. Shensky*,
  2006 WL 173651 (D. Idaho, Jan. 23, 2006) .............................................................. 37

*Moose Lodge No. 107 v. Irvis*,
  407 U.S. 163 (1972) ..................................................................................................... 9

*Morris v. Bank of America Nevada*,
  886 P.2d 454, 110 Nev. 1274 (Nev. 1994) ............................................................... 37

*Neilson v. Union Bank of Cal.*,
  290 F. Supp. 2d 1101 (C.D. Cal. 2003) .................................................................... 15

*Neubronner v. Milken*,
  6 F.3d 666 (9th Cir. 1993) ......................................................................................... 15

*Northwestern Nat'l Bank of Great Falls v. Weaver-Maxwell, Inc.*,
  729 P.2d 1258, 224 Mont. 33 (1986) ......................................................................... 35

*Nugget Hydroelectric, L.P. v. Pacific Gas & Electric Co.*,
  981 F.2d 429 (9th Cir. 1992) ...................................................................................... 27

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) ..................................................................................................... 8

*Occupational-Urgent Care Health Systems, Inc. v. Sutro & Co. Inc.*,
  711 F. Supp. 1016 (E.D. Cal. 1989) .................................................................... 15, 19

*Oland v. Forever Living Products Int'l., Inc.*,
  2009 WL 5128658 (D. Ariz. Dec. 17, 2009) ............................................................ 21

*Peterson v. Eichhorn*,
  189 P.3d 615, 344 Mont. 540 (2008) ......................................................................... 36

*PNGTS Shippers' Group v. FERC*,
  592 F.3d 132 (D.C. Cir. 2010) .................................................................................... 9

# TABLE OF AUTHORITIES
### (continued)

<u>Page(s)</u>

*Podolan v. Idaho Legal Aid Servs.,*
854 P.2d 280, 123 Idaho 937 (1993) ............................................................... 34

*Prezzi v. Schelter,*
469 F.2d 691 (2d Cir. 1972) ............................................................................. 4

*Pritkin v. Dept. of Energy,*
254 F.3d 791 (9th Cir. 2001) ........................................................................... 13

*Ragland v. Sheehan,*
846 P.2d 1000, 256 Mont. 322 (1993) ............................................................. 35

*Raimi v. Furlong,*
702 So. 2d 1273 (Fla. Dist. Ct. App. 1997) .................................................... 37

*Religious Technology Center v. Wollersheim,*
971 F.2d 364 (9th Cir. 1992) ........................................................................... 29

*Resolution Trust Corp. v. Rowe,*
1993 WL 165303 (N.D. Cal. May 7, 1993) ..................................................... 33

*Reves v. Ernst & Young,*
507 U.S. 170 (1993) ......................................................................................... 28

*Robert & Co. Assocs. v. Rhodes-Haverty Partnership,*
300 S.E.2d 503, 250 Ga. 680 (1983) .............................................................. 33

*Rosales v. Downey S&L Ass'n.,*
2009 WL 514229 (S.D. Cal. Mar. 2, 2009) .................................................... 19

*Rynearson v. Wells Fargo Home Mortg.,*
2005 WL 1364561 (D. Idaho June 8, 2005) ..................................................... 6

*San Diego County Gun Rights Comm. v. Reno,*
98 F.3d 1121 (9th Cir. 1996) ........................................................................... 12

*Schmechel v. Dille,*
219 P.3d 1192 (Idaho 2009) ............................................................................ 36

*Schreiber Distrib. Co. v. Serv-Well Furniture Co. Inc.,*
806 F.2d 1393 (9th Cir. 1986) ......................................................................... 15

*Schumacker v. Meridian Oil Co.,*
956 P.2d 1370, 288 Mont. 217 (1998) ............................................................. 37

*Seminole Tribe of Florida v. Times Publishing Co., Inc.,*
780 So. 2d 310 (Fla. Dist. Ct. App. 2001) ...................................................... 34

## TABLE OF AUTHORITIES
(continued)

<u>Page(s)</u>

*Sharp v. Idaho Inv. Corp.,*
504 P.2d 386, 95 Idaho 113 (1972) ................................................................ 31

*Silver Valley Partners, LLC v. Motte,*
2007 WL 2802315 (D. Idaho Sept. 24, 2007) ................................................ 19

*Simon v. Eastern Kentucky Welfare Rights Org.,*
426 U.S. 26 (1976) .............................................................................. 7, 8, 10

*Sorensen v. St. Alphonsus Reg'l. Med. Ctr., Inc.,*
118 P.3d 86, 141 Idaho 754 (2005) .............................................................. 33

*Stalk v. Mushkin,*
199 P.3d 838 (Nev. 2009) ............................................................................. 34

*Sutherland v. Gross,*
772 P.2d 1287, 105 Nev. 192 (1989) ............................................................ 35

*Swartz v. KPMG, LLP,*
476 F.3d 756 (9th Cir. 2007) ....................................................................... 19

*Sybersound Records, Inc. v. UAV Corp.,*
517 F.3d 1137 (9th Cir. 2008) ..................................................................... 27

*Taylor v. Weingart,*
693 P.2d 1231, 214 Mont. 282 (1984) .......................................................... 33

*Teton Peaks Inv. Co. v. Ohme,*
195 P.3d 1207, 146 Idaho 394 (2008) ........................................................... 35

*Tindall v. Konitz Contracting, Inc.,*
783 P. 2d 1376, 240 Mont. 345 (1989) .......................................................... 35

*Tingley v. Beazer Homes Corp.,*
2008 WL 1902108 (W.D.N.C. Apr. 25, 2008) ....................................... passim

*Topas Mut. Co., Inc. v. Marsh,*
839 P.2d 606, 108 Nev. 845 (1992) .............................................................. 36

*Town of Geraldine v. Mont. Mun. Ins. Auth.,*
198 P. 3d 796, 347 Mont. 267 (2008) ........................................................... 30

*Turner v. Mandalay Sports Entm't LLC,*
180 P.3d 1172 (Nev. 2008) .......................................................................... 36

*United Guar. Mortg. Indem. Co. v. Countrywide Fin. Corp.,*
660 F. Supp. 2d 1163 (C.D. Cal. 2009) ........................................................ 15

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*United States v. Bestfoods,*
    524 U.S. 51 (1998) ............................................................................. 21

*United States v. Oreto,*
    37 F.3d 739 (1st Cir. 1994) ............................................................. 28

*University of Md. v. Peat, Marwick, Main & Co,*
    996 F.2d 1534 (3rd Cir. 1993) ......................................................... 28

*Valley Forge Christian College v. Americans United For Separation of Church and State, Inc.,*
    454 U.S. 464 (1982) ........................................................................... 8

*Vess v. Ciba-Geigy Corp. USA,*
    317 F.3d 1097 (9th Cir. 2003) ....................................................14, 18

*Vieux v. East Bay Reg'l Park Dist.,*
    906 F.2d 1330 (9th Cir. 1990) ......................................................... 37

*Walter v. Drayson,*
    538 F.3d 1244 (9th Cir. 2008) ......................................................... 28

*Warth v. Seldin,*
    422 U.S. 490 (1975) ...................................................................... 8, 10

*Wasco Prods., Inc. v. Southwall Techs, Inc.,*
    435 F.3d 989 (9th Cir. 2006) ........................................................... 15

*Wordtech Systems, Inc. v. Programmer's Paradise, Inc.,*
    1997 WL 638444 (N.D. Cal. Oct. 8, 1997) ...................................... 15

*Zanaty Realty, Inc. v. Williams,*
    935 So. 2d 1163 (Ala. 2005) ........................................................... 33

**STATUTES**

12 U.S.C. § 3331 ..................................................................................... 23

12 U.S.C. § 3350 ..................................................................................... 23

12 U.S.C. § 3350(6)................................................................................. 23

18 U.S.C. § 1961(4)................................................................................. 28

18 U.S.C. § 1962(a)............................................................................26, 27

## TABLE OF AUTHORITIES
(continued)

Page(s)

18 U.S.C. § 1962(b)............................................................................................26, 27

18 U.S.C. § 1962(c).............................................................................................. 28

18 U.S.C. § 1962(d)............................................................................................. 29

18 U.S.C. § 1964(c).............................................................................................. 24


RULES

Fed. R. Civ. P. 8(a)(2) ......................................................................................... 14

Fed. R. Civ. P. 9(b)........................................................................................passim

Fed. R. Civ. P. 12(b)(6) ....................................................................................... 13

## I.   **PRELIMINARY STATEMENT**

Plaintiffs' claims against Cushman & Wakefield, Inc. ("C&W") are baseless and fail every applicable pleading standard.  They should be dismissed.

The essence of the rambling, 115-page Second Amended Complaint ("Complaint") is that plaintiffs bought property in the high-end resorts of Lake Las Vegas, Yellowstone Club, Tamarack, and Ginn sur Mer, and that the value of those resort properties has declined. Plaintiffs seek to blame this decline not on the nationwide collapse in real estate prices and credit markets over the last two years, but on what they call the Credit Suisse "Loan to Own" scheme. This scheme purportedly induced the developers of the resorts to borrow more money than they should have, leading to eventual loan defaults and the developers' loss of their projects to Credit Suisse in foreclosure.  Regardless of what the Court thinks of any such purported "scheme," the point of this motion is that C&W does not belong in this case under any circumstances.

Simply put, there is no connection between plaintiffs and C&W, and plaintiffs do not allege that there is.  Rather, C&W subsidiaries performed the service that their client, Credit Suisse, retained them to perform:  to appraise each of the resort projects using a "Total Net Value" calculation that estimated the net cash flow each project would generate over its development life.  Plaintiffs claim the Total Net Value appraisals were somehow misleading or deceptive.  The threshold problem with this, however, is that plaintiffs never allege that they even *read* a C&W appraisal – let alone relied on one in any way – or that they ever spoke to a C&W person, entered into any contract or other arrangement with C&W, or had any dealings with C&W whatsoever.  As a matter of law, the lack of any connection between plaintiffs and C&W means that plaintiffs have no standing to sue C&W.  This alone requires dismissal.

If plaintiffs *had* read the appraisals, their claims still would be deficient because the fundamental deception at the heart of plaintiffs' claims does not exist.  Every appraisal makes it perfectly clear that the appraisals used a specifically identified and defined approach (Total Net Value) that concluded to something different from market value.  This approach did not discount to present value to reflect the time value of money.  For example, the Yellowstone Club appraisal

stated:

> Because we are estimating Total Net Value, we eliminate the final step, which involves a discounted cash flow analysis. Instead, the series of cash flows over the absorption period are summed to determine the Total Net Value.
>
> Typically, for market value, these cash flows would be discounted at an appropriate discount rate to arrive at a present value. However, the annual cash flows are summed to determine the Total Net Value. No discounting is applied nor is any developer's profit deducted.
>
> *This is not the Market Value of the property as the standard valuation deductions for the time value of money and profit are not reflected. The As Is market value would be lower than the Total Net Value.*

(Emphasis added.) Similar language appears in each of the Total Net Value appraisals. There is no way anyone reading these appraisals could have been deceived into believing this was the same as market value. The linchpin of plaintiffs' fraud allegations, upon which each cause of action against C&W rests, is thus a fraud itself.

Nor can plaintiffs avoid dismissal by the invocation of FIRREA, the Financial Institutions Reform, Recovery and Enforcement Act. FIRREA applies only to appraisals performed for federally regulated financial institutions in connection with certain "federally regulated transactions." Plaintiffs themselves acknowledge that none of the loan transactions in Credit Suisse's supposed "Loan to Own" plan was a federally regulated transaction. As such, FIRREA is irrelevant to any of the loan transactions and appraisals alleged in the Complaint.

The claims against C&W fail for additional reasons as well. All of the claims sound in fraud, so they all must satisfy the heightened pleading standard of Rule 9 of the Federal Rules of Civil Procedure. This requires particularized facts demonstrating wrongdoing. The Complaint does not even begin to do this as to C&W. Instead, the Complaint focuses almost entirely on Credit Suisse. There are virtually no specific facts pled against C&W. Rule 9 exists for just this reason – to protect against false fraud claims that damage a defendant's reputation without any facts to support the accusations. Additional grounds for dismissal include the lack of any allegations that would establish a fiduciary relationship between plaintiffs and C&W; the failure to plead any benefit conferred on C&W by plaintiffs, precluding any claim for unjust

enrichment; the failure to plead any duty owed by C&W to plaintiffs; and the failure to plead reliance by plaintiffs on anything C&W said or did.

In sum, while the Complaint is long on over the top, inflammatory charges against Credit Suisse – charges which themselves appear to be spurious and concocted – it is exceedingly short on factual allegations about C&W. And what is pleaded contradicts the actual appraisals, which C&W submits with this motion. The Complaint fails to plead any viable claims against C&W and should be dismissed.

## II.    BACKGROUND AND SUMMARY OF COMPLAINT

### A.    The Parties and the Resorts

On January 3, 2010, plaintiffs L.J. Gibson and Beau Blixseth sued Credit Suisse AG, Credit Suisse Securities (USA), LLC, Credit Suisse First Boston, Credit Suisse Cayman Island Branch (collectively, "Credit Suisse"), and Cushman & Wakefield, Inc. ("C&W"). (Docket # 1.) A First Amended Complaint, filed on January 25, 2010 (Docket # 12), added six additional named plaintiffs. (FAC ¶¶ 5-10.) Plaintiffs filed a Second Amended Complaint (the "Complaint") on January 28, 2010. (Docket # 18.)

According to the Complaint, plaintiffs are individuals and entities that purchased homes or lots at exclusive, resort-style development projects: Lake Las Vegas, Yellowstone Club, Tamarack, and Ginn sur Mer (collectively, the "Resorts"). (SAC ¶ 1.) The Resorts are located in Nevada, Montana, Idaho, and the Grand Bahamas, respectively. (SAC ¶ 1.)

Plaintiffs allege, on behalf of themselves and a putative class of property owners at the four Resorts,[1] eight causes of action: (1) violations of the Racketeer Influenced and Corrupt

---

[1] The "class" is defined as:

> all persons and entities, other than the Defendants named herein, who purchased, held, or otherwise acquired both directly and indirectly, participation interests, homes or land in the Lake Las Vegas, Tamarack, Yellowstone Club and Ginn sur Mer real estate development projects to which Credit Suisse Securities (USA) or Credit Suisse made loans from and through its Cayman Islands "Branch" from 2004 through 2008 and through the present day inclusive (the "Class Period.") *The Class also includes secured creditors, unsecured creditors and other persons and entities who*

Organizations Act ("RICO"), 18 U.S.C. § 1962; (2) fraud; (3) negligent misrepresentation; (4) breach of fiduciary duty; (5) tortious interference with contractual relations (also titled "tortious interference with plaintiffs' existing rights, amenities, and privileges at each resort"); (6) unjust enrichment; (7) negligence; and (8) common law conspiracy.  Plaintiffs say they may seek to add to their action homebuyers from 14 additional resorts.  (SAC ¶ 33.)

### B.   Credit Suisse's So-Called "Loan to Own" Plan

Although plaintiffs' Complaint includes much rhetoric that is often difficult to follow,[2] the basic thrust is that Credit Suisse induced the developers – who are not parties here – to borrow excessive amounts of money, with the twin goals of receiving millions of dollars in loan fees and later gaining control of the Resorts via foreclosure or bankruptcy.  (SAC ¶¶ 34, 38, 57, 192.)  Plaintiffs allege Credit Suisse devised this "Loan to Own" scheme in 2004.  (SAC ¶ 38.) Thereafter, Credit Suisse identified master-planned communities, such as the Resorts, and issued them syndicated loans.  (SAC ¶ 39.)  According to plaintiffs, the loans left the developers with unsustainable debt.  (SAC ¶ 44.)  Plaintiffs make the same allegation about each Resort.  (SAC ¶¶ 103, 104 (Lake Las Vegas); 183, 185 (Yellowstone Club); 153, 159 (Tamarack); 164, 165 (Ginn sur Mer).)  Plaintiffs claim that Credit Suisse hired C&W to appraise each of the Resorts. (SAC ¶¶ 67-68; 203.)  While plaintiffs vaguely assert C&W assisted in the purported "Loan to Own" scheme, no C&W representative is identified as having been involved in any way, and all

---

*suffered economic losses by virtue of the acts and omissions of the Defendants, including the State of Idaho.*

(SAC ¶ 25; emphasis added).  The purported class includes all persons who purchased either directly from the Resorts' developers or through agents, salespeople, or independent sellers. (SAC ¶ 26.)  This class definition is amorphous, inadequate, and hopelessly unlimited.  C&W reserves its rights to dispute the propriety of plaintiffs' purported class definition if this motion to dismiss is not granted in its entirety.
[2] District courts repeatedly have chastised plaintiffs for the use of needlessly defamatory-fueled complaints that scatter factual allegations in an unorganized manner.  *See, e.g., Prezzi v. Schelter*, 469 F.2d 691, 692 (2d Cir. 1972) (per curium) (affirming dismissal where complaint was "a labyrinthine prolixity of unrelated and vituperative charges that defied comprehension"); *In re Blockbuster Sec. Litig.*, 3:03-CV-0398-M, 2004 WL 884308, at *22 (N.D. Tex. Apr. 26, 2004) (granting a motion to dismiss where the complaint represented "a labyrinth, requiring the court to piece together the elements of the claims from allegations made all over the complaint"); *In re Autodesk Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 842 (N.D. Cal. 2000) (criticizing the use of puzzle-style pleading).

of the purported benefits were alleged to flow to Credit Suisse: the scheme would "enrich Credit Suisse and its employees, while placing the Resorts in a perfect position to be taken over by Credit Suisse and/or in collusion with its note-holders by leaving the developments too thinly capitalized to survive." (SAC ¶ 47.) C&W is not alleged to have received a single benefit from the supposed scheme.

Plaintiffs allege Credit Suisse used a new and improper Total Net Value ("TNV") appraisal calculation as the basis for the loans it made to the developers. (SAC ¶¶ 34, 43, 60, 69, 192, 203.) According to the Complaint, the TNV calculation generated inflated appraised values to justify the loans, which generated loan fees to Credit Suisse and increased Credit Suisse's likelihood of acquiring the lands and improvements of each project through foreclosure or bankruptcy. (SAC ¶¶ 57, 65, 103.)

C&W's name is sprinkled 70 times throughout the Complaint, but the substance of the charge against it is summarized in just one paragraph:

> Defendant Cushman & Wakefield collaborated with and assisted Defendant Credit Suisse in its plan and scheme, by representing to developers and property owners that the inflated valuations of the various properties underlying the loans were safe, lawful, appropriate, credible, and justified, using Credit Suisse's 'Total Net Value' appraisal method in support of the Defendants' Loan to Own scheme, notwithstanding that Defendant Cushman & Wakefield knew or in the exercise of reasonable care should have known that said representations were false and that the loans failed to comply with various provisions of the federal FIRREA statute.

(SAC ¶ 88.) No *facts* to support this conclusory allegation are pleaded anywhere in the Complaint.

While the Complaint is suspiciously vague as to the particular appraisals it alleges were fraudulently inflated, the four appraisals issued at the time of the Credit Suisse loans are dated October 26, 2004 (Lake Las Vegas), August 11, 2005 (Yellowstone), April 17, 2006 (Tamarack), and April 28, 2006 (Ginn sur Mer).[3]

---

[3] Plaintiffs do not attach to the Complaint any of the appraisals. Concurrently with this motion, C&W is filing the Declaration of James J. Moran that attaches the TNV appraisals noted above. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (the incorporation by reference doctrine permits courts to "take into account documents 'whose contents are alleged in a

C.    **Plaintiffs Do Not Plead Any Relationship with C&W**

Plaintiffs do not claim that C&W prepared any appraisal for *plaintiffs'* use or that plaintiffs relied upon, *or even read*, any C&W appraisal.  Plaintiffs do not contend they were the intended recipients of the C&W appraisals, were authorized to rely on the appraisals, or entered into any contracts with C&W.  Indeed, plaintiffs do not allege any direct interactions, communications or encounters with C&W of any kind.  Plaintiffs instead plead that:

> Plaintiffs and Class Members on the one hand, the developers of the resorts on the second hand, and the Defendants [defined to be the four Credit Suisse entities] on the third hand, were in a tri-partite 'special relationship' in which the special relationship between the developers and the Defendants was extended to the individual Plaintiffs and proposed Class Members by virtue of the Defendants' knowledge of and active participation and control in the developers' duties and promises to the Plaintiffs and Class Members.

(SAC ¶ 24.)  Missing from this purported "tri-partite 'special relationship'" is C&W.  Even plaintiffs' own Complaint never alleges that C&W was part of any such "relationship."

Plaintiffs theorize that had the "developers ... known the truth" about the "Loan to Own" program, the developers would not have accepted the loans at all, or would have done so on different terms.  (SAC ¶ 271.)  The Complaint says nothing, however, as to how that relates to C&W.

III.   **THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS LACK ARTICLE III CONSTITUTIONAL STANDING**

Plaintiffs lack Article III standing to sue C&W.  Plaintiffs allege neither an injury in fact nor an injury that is fairly traced to the alleged wrongdoing.  Plaintiffs cannot disguise the inherently speculative nature of the causal connection between their purported injury and the

---

complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading'"); *Leduc v. Micron Tech., Inc.* CV-04-531-S-BLW, 2005 WL 2847427, at *3 (D. Idaho Oct. 17, 2005); *Rynearson v. Wells Fargo Home Mortg.*, CV04-654-S-EJL, 2005 WL 1364561, at *2 (D. Idaho June 8, 2005) (Lodge, J.) (considering, as part of motion to dismiss fraud and breach of contract claims, the contract alleged to have been breached, which was not attached to the complaint); *Headwaters Constr. Co. v. Nat'l City Mortg. Co.*, CV09-119-E-EJL-REB, 2010 WL 744287, at *3 (D. Idaho Feb. 26, 2010) (Bush, M.J.).  All exhibits referenced herein are attached to the Moran Declaration.

alleged wrongdoing of C&W behind the Complaint's 313 paragraphs and 115 pages.  It is this Court's role, as the gatekeeper, to assess fair traceability to C&W's allegedly wrongful conduct in the first instance.  And here, the multitude of macro- and micro-economic forces – including the worst recession in the United States since the Great Depression – leading to the loss of property value at the Resorts makes any attempt to allege such a causal connection simply speculative and conjectural.

### A.    Plaintiffs Must Plead Facts Establishing Standing

The party invoking federal jurisdiction bears the burden of establishing standing.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000); *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("It is to be presumed that a cause lies outside [federal] jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction.").  Moreover, "a plaintiff must demonstrate standing for each claim he seeks to press" (*DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)), and the standing inquiry "'focuses on the *party* seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated.'"  *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38 (1976) (*quoting Flast v. Cohen*, 392 U.S. 83, 99 (1968)) (emphasis added).  When the plaintiff is not directly the object of the allegedly wrongful action, standing "is ordinarily substantially more difficult to establish."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992) (internal quotations and citations omitted).

"The irreducible constitutional minimum of standing" has three elements:  (1) plaintiffs must have suffered an *injury in fact* – an invasion of a legally protected interest that is concrete and particularized, and actual or imminent rather than conjectural or hypothetical; (2) there must be a *causal connection* between the injury and the conduct complained of; and (3) it is likely rather than merely speculative that the injury will be *redressed* by a favorable decision.  *Lujan*, 504 U.S. at 560.  Standing is "not [a] mere pleading requirement[,] but rather an indispensable part of the plaintiff's case, [and] each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof."  *Id.* at 561.  "Those who do not possess

Art. III standing may not litigate as suitors in the courts of the United States." *Valley Forge Christian College v. Americans United For Separation of Church and State, Inc.*, 454 U.S. 464, 475-476 (1982).[4]

### B.      Plaintiffs Have Not Suffered a Concrete and Particularized Injury in Fact

Each named plaintiff uses slightly different language, but all assert they have "suffer[ed] substantial losses to [their] money and property from the scheme as well as the loss of the use of [their] property and rights" in the Resorts or have suffered some vague and generic "financial losses." (SAC ¶¶ 3-10, 46.)  Plaintiffs do not, however, allege that they sold their homes or properties, that they attempted to sell their homes or properties and were unable to do so, or that they suffered any losses that have actually materialized.

Plaintiffs' supposition of a "diminution in value" injury is insufficient to confer standing. Courts routinely have held that generalized allegations of property value decreases do not meet the "actual injury" requirement.  This is because (1) no harm is realized *unless* and *until* plaintiff sells or attempts to sell, and (2) future economic changes may negate any current fluctuations in value.  *See Tingley v. Beazer Homes Corp.*, 3:07 CV176, 2008 WL 1902108, at *5 (W.D.N.C. Apr. 25, 2008) (no "actual injury" for alleged property depreciation caused by a "high rate of foreclosure" in plaintiffs' neighborhood since plaintiffs never attempted to sell their property); *Green v. Beazer Homes Corp.*, 3:07-1098-CMC, 2007 WL 2688612, at *3 (D.S.C. Sept 10, 2007) (claim for depreciation of home values caused by purported scheme of selling to low-income homebuyers who would eventually default, was "conjectural and speculative" because plaintiffs had alleged nothing more than "a generalized loss in the potential market value of their

---

[4] Plaintiffs' invocation of the class action mechanism does not affect plaintiffs' need to show personalized standing.  *See, e.g., Simon*, 426 U.S. at 40 n.20 ("That a suit may be a class action, however, adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that the they personally have been injured, not that the injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.") (internal quotations and citations omitted); *Warth v. Seldin*, 422 U.S. 490, 502 (1975) (same); *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022 (9th Cir. 2003) (*quoting O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)) ("[I]f none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class.").

homes" and the loss was neither "realized" nor the type of injury that would have a "long term impact on home prices"); *Kaing v. Pulte Homes, Inc.*, 09-5057 SC, 2010 WL 625365, at *5 (N.D. Cal. Feb. 18, 2010) ("a decline in value that is tied to a purely economic change to a neighborhood is much more difficult to characterize as 'concrete and particularized', and 'actual or imminent'"; economic conditions "are likely to change with the broader economy, and any decline in housing value can potentially evaporate before Plaintiff has suffered a concrete injury... Given that Plaintiff has not sold, or even attempted to sell, her house under these new economic conditions, it is not clear that the diminished value of her house is cognizable as an 'injury in fact.'") (internal citations omitted); *cf. Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166-67 (1972) (plaintiff could not have been injured by discriminatory membership policies of private club "since he never sought to become a member").

  *Potential* future injury (if plaintiffs at some point do decide to sell their homes) is insufficient. *See Impress Comm. v. Unumprovident Corp.*, 335 F. Supp. 2d 1053, 1061 (C.D. Cal. 2003) (no injury under "diminished value theory" for alleged loss of insurance value based on potential denial of future benefits because such an injury is purely speculative); *PNGTS Shippers' Group v. FERC*, 592 F.3d 132, 137 (D.C. Cir. 2010) (court lacked jurisdiction to review shippers' challenge to agency's new rates, because "the potential for future economic injury, even assuming it is readily quantifiable into a possible rate increase in the future, is not enough to show the requisite injury for Article III standing"). Since "harm is only realized" if plaintiffs sell their home during an alleged glut, if plaintiffs "choose to remain in their home until more favorable economic conditions arrive, then they will have realized no loss at all." *Tingley*, 2008 WL 1902108, at *4 n.3. Here, plaintiffs seek to be compensated for alleged paper value decreases. If they recovered, they would receive a windfall by holding on to their property and riding the market value back up again. Accordingly, plaintiffs' alleged paper loss is not the kind of actual and concrete injury that Article III requires.

### C. Plaintiffs Cannot Establish the Requisite Causal Connection

  Nor can plaintiffs demonstrate "a causal connection between the injury and the conduct

complained of." In order to establish standing, "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the Court." *Lujan*, 504 U.S. at 560-561 (internal citations and quotations omitted); *see also Simon*, 426 U.S. at 45 (plaintiff must establish that "the asserted injury was the consequence of the defendants' actions"). This causal connection "cannot be too speculative, or rely on conjecture about the behavior of other parties[.]" *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1152 (9th Cir. 2000). Thus, where the injury could have been caused by a multitude of factors or outside forces, no causation is established. *See Warth*, 422 U.S. at 506 (no causation where plaintiff's injury – the inability to obtain housing in defendant's development – was likely "the consequences of the economics of the area housing market, rather than of respondent's assertedly illegal acts."); *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994) (no causation where "plaintiff's loss coincide[d] with a market-wide phenomenon causing comparable losses to other investors," *i.e.*, a "real estate market crash").

Stated simply, the critical inquiry is: "Is the line of causation between the illegal conduct and injury too attenuated?" *Allen v. Wright*, 468 U.S. 737, 752 (1984). The answer, here, is yes. The notion that the appraisals prepared by C&W's subsidiaries are the *cause* of plaintiffs' alleged economic harm cannot withstand scrutiny. There is no causal link between C&W's subsidiaries' preparation of appraisals of the Resorts and the alleged diminution in the value of plaintiffs' homes and lots.

Plaintiffs' theory is analogous to that previously rejected in *Tingley*. There, plaintiffs sued their home builder and its lending arm, contending that defendants, through a "complex conspiracy and scheme," helped unqualified borrowers purchase homes in plaintiffs' neighborhood, resulting in widespread foreclosures that exceeded the statewide average and devalued plaintiffs' home. 2008 WL 1902108, at *1. The court found that plaintiffs lacked standing, concluding that "Plaintiffs' allegations require a series of speculative inferences to be drawn in order to connect their claimed injury to the alleged conduct of the Defendants." *Id.* at

*4. Specifically, the court noted that the depreciation in the value of plaintiffs' homes could have been the "result of a myriad of other factors, such as rising unemployment in the region, changes in the housing market, or other economic conditions. It is just as plausible that any one of these other factors caused any reduction in the Plaintiffs' property values." *Id.* at *4. Accordingly, the connection was "too tenuous to provide standing" and "[t]he tenuousness of the connection between Defendants' alleged actions and the alleged diminished value in Plaintiffs' property [became] greater with each additional link in the chain where the choices of others [had] an impact." *Id.* The *Tingley* court thus dismissed plaintiffs' complaint. Likewise, in *Green*, another so-called predatory lending case, the court dismissed plaintiff's complaint after concluding that plaintiff could not prove a causal link between defendants' alleged fraudulent lending activities and decreases in plaintiff's home value: "the alleged wrongs relate to actions directed toward other homeowners or their lenders" and "at most, [plaintiff had] suffered collateral injury as a result of a generalized market impact of wrongs directed towards others." 2007 WL 2688612, at *3.

        At least three other courts recently have reached the same conclusion, finding insufficient causal connections between alleged "predatory lending practices" directed towards third parties and "decline[s] in value[s] of homes" unrelated to the original loans. *See Mayor and City Council of Baltimore v. Wells Fargo Bank, N.A.*, 1:08 CV-00062, 2010 WL 46401, at *2-3 (D. Md. Jan. 6, 2010) (finding no causation between defendant lenders' alleged "predatory and discriminatory lending practices" and city's allegations of property devaluation from foreclosures); *City of Cleveland v. Ameriquest Mortg. Sec., Inc.*, 621 F. Supp. 2d 513, 534 (N.D. Ohio 2009) (finding no causal connection between defendant lenders' predatory lending practices targeting subprime borrowers and the decreased value of neighborhood homes); *Kaing*, 2010 WL 625365, at *5 (finding no causal link between the decline in value of plaintiff's home and defendant's alleged practice of providing loans to unqualified high-foreclosure-risk neighbors). These courts have explained that any claimed injuries, "are ... contingent upon the insolvency (or inability or unwillingness to repay) of non-parties" and a host of third party

decisions so that "[d]efendants stand atop a lengthy chain of events, far removed from [plaintiff's] ultimate damages." *City of Cleveland*, 621 F. Supp. 2d at 534.  Significantly, the district court judges in the three cases (*Tingley, Green* and *Kaing*) filed by homeowners seeking damages for a decline in the value of their property against their lenders all granted defendants' motion to dismiss *with prejudice*, declining to allow plaintiffs leave to amend.

Here, plaintiffs' claim for standing is even more speculative and tenuous.  Plaintiffs allege that C&W prepared appraisals of the Resorts for its client, Credit Suisse; Credit Suisse made loans to each of the developers; the developers then used portions of the loan proceeds for matters unrelated to the Resorts; the developers sold homes or lots either directly or indirectly to Plaintiffs; the developers ultimately defaulted on the loans from Credit Suisse; attempts by Credit Suisse and the developers to restructure the loans proved unsuccessful; Credit Suisse foreclosed; the Resorts filed for restructuring/bankruptcy; the amenities at the Resorts did not get completed as plaintiffs expected; and as a result of all of this, the paper value of plaintiffs' properties diminished.  Even a simplified chart shows that C&W is multiple steps removed from plaintiffs and their properties:



All of this is against a backdrop of broader economic forces at play, including a nationwide crash in real estate values and a meltdown in credit markets.  Plaintiffs' claim that the TNV appraisals caused the decline in their property values (rather than all of these other actors and events) is nothing short of rank speculation that destroys standing.  *San Diego County Gun*

*Rights Comm. v. Reno*, 98 F.3d 1121, 1130 (9th Cir. 1996) ("'where injury is alleged to occur within a market context, the concepts of causation and redressability become particularly nebulous and subject to contradictory, and frequently unprovable, analyses'") (*quoting Common Cause v. Dept. of Energy*, 702 F.2d 245, 251 (D.C. Cir. 1983)).

Put simply, "[t]he links in the chain of causation" between the challenged conduct of C&W's subsidiaries and the asserted injury "are far too weak for the chain as a whole to sustain" plaintiffs' standing. *Allen*, 468 U.S. at 759. *See also Pritkin v. Dept. of Energy*, 254 F.3d 791, 797 (9th Cir. 2001) (plaintiff's "standing appears weak, as her theory omits a necessary step in the causation chain – the independent decision of … a third party not before the court"); *Frank Krasner Enters., Ltd. v. Montgomery County*, 401 F.3d 230, 236 (4th Cir. 2005) (plaintiffs lack standing because "the purported injury … is not directly linked to the challenged law because an intermediary … stands directly between the plaintiffs and the challenged conduct in a way that breaks the causal chain").

## IV.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO STATE A CLAIM

The Complaint also should be dismissed because it fails to state a claim against C&W upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). First, because all of plaintiffs' claims sound in fraud, Rule 9(b) requires plaintiffs to allege *with specificity* all facts supporting their claims. Plaintiffs utterly fail to do this with respect to C&W. Second, the alleged "deception" that serves as the foundation for each of plaintiffs' claims – that the TNV appraisals were not FIRREA-compliant and someone might have thought that the TNV conclusion was the same as market value – cannot stand as a matter of law. Each and every TNV appraisal specifically described the analysis being performed, and clearly stated that TNV was *not* the same as the market value of the property being appraised. Third, as shown below, plaintiffs fail to allege additional, critical elements of each of their claims.

A.    **Plaintiffs Fail to Plead Their Claims with the Requisite Particularity**

    1.    **All Claims "Sounding in Fraud" Must Be Alleged with "Particularity"**

Rule 8(a)(2) requires any plaintiff to "show[] that [he] is entitled to relief," and the failure to do so is grounds for dismissal. Fed. R. Civ. P. 8(a)(2). Although a plaintiff's stated claim may be "short and plain," "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Nor does a complaint suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" *Iqbal*, 129 S. Ct. at 1949. Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Bell Atlantic*, 550 U.S. at 555 (citations omitted). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal,* 129 S. Ct. at 1949 (internal quotations and citations omitted). The plausibility requirement requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.*

Fraud must be pleaded with even more specificity. Where a plaintiff "allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim," the claim is "'grounded in fraud' or ... 'sound[s] in fraud,' and the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003); *see also Amaro v. Option One Mortgage Corp.*, CV08-1498, 2009 WL 103302, at *4 (C.D. Cal. Jan. 14, 2009) ("*any* allegations of fraudulent conduct in a complaint must be plead with particularity") (emphasis in original). Rule 9(b) specifies that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." This means plaintiffs must identify "the who, what, when, where and how of the misconduct charged." *Vess*, 317 F.3d at 1106 (internal citations and quotations omitted). Such particulars include "the times, dates, places, benefits

received, and other details of the allegedly fraudulent activity." *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993). For misrepresentations, Rule 9(b) requires plaintiffs to state the time, place and specific content of the false representations as well as the identities of the parties to the misrepresentation. *Schreiber Distrib. Co. v. Serv-Well Furniture Co. Inc.*, 806 F.2d 1393, 1400-01 (9th Cir. 1986); *Occupational-Urgent Care Health Systems, Inc. v. Sutro & Co. Inc.*, 711 F. Supp. 1016, 1020 (E.D. Cal. 1989).

Negligent misrepresentation claims also are subject to Rule 9(b)'s heightened pleading requirements. *Neilson v. Union Bank of Cal.*, 290 F. Supp. 2d 1101, 1141 (C.D. Cal. 2003) ("It is well-established in the Ninth Circuit that both claims for fraud and negligent misrepresentation must meet Rule 9(b)'s particularity requirement."); *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 100 F. Supp. 2d 1086, 1093 (C.D. Cal. 1999) (same). The title of a particular cause of action does not control. Rather, the critical inquiry is whether the claim "sounds in fraud." Thus, Rule 9(b) also applies to RICO claims, where the predicate acts are alleged to constitute fraudulent activity. *Wordtech Systems, Inc. v. Programmer's Paradise, Inc.*, C97-327 TEH, 1997 WL 638444, at *3 (N.D. Cal. Oct. 8, 1997) ("[W]hen a plaintiff alleges fraudulent acts as the predicate acts in his RICO claim, Federal Rule of Civil Procedure 9(b) 'requires that circumstances constituting fraud be stated with particularity.'"). The same is true for claims of conspiracy. *Wasco Prods., Inc. v. Southwall Techs, Inc.*, 435 F.3d 989, 991 (9th Cir. 2006) (based on "the plain language of Rule 9(b), we hold that under federal law a plaintiff must plead, at a minimum, the basic elements of a civil conspiracy if the object of the conspiracy is fraudulent"); *Alfus v. Pyramid Tech. Corp.*, 745 F. Supp. 1511, 1521 (N.D. Cal. 1990) (same). Simply put, courts apply Rule 9(b)'s heightened pleading requirements to otherwise "non-fraud" causes of action when they "sound in fraud," *i.e.* are premised on a course of alleged fraudulent conduct. *See, e.g., United Guar. Mortg. Indem. Co. v. Countrywide Fin. Corp.*, 660 F. Supp. 2d 1163, 1179 (C.D. Cal. 2009) (negligence); *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507-08 (7th Cir. 2007) (tortious interference); *In re Actimmune Mktg. Litig.*, C08-02376, 2009 WL 3740648, at *16 (N.D. Cal. Nov. 6, 2009) (unjust enrichment); *Maganallez v. Hilltop*

*Lending Corp.*, 505 F. Supp. 2d 594, 608 (N.D. Cal. 2007) (fiduciary duty).

### 2. Each of Plaintiffs' Claims Sounds in Fraud

Here, all of plaintiffs' causes of action "sound in fraud." Indeed, an alleged fraudulent scheme is the entire basis of the Complaint. The words "fraud," "defraud" and "fraudulent" are used over 130 times in the Complaint, and the word "scheme" (or a derivation) is used another 267 times. Each and every cause of action alleges fraudulent activity. For example:

1. <u>RICO</u>: "The purpose of this *racketeering* activity has been to *defraud* the Plaintiff Class and others similarly situated through the conduct described herein. In furtherance of this *scheme*, each Defendant ... has conspired to commit and has committed two or more violations of 18 U.S.C. § 1341 ["*frauds and swindles*"], 1343 ["*frauds* by wire, radio, or television"] and 1952 [interstate and foreign travel in aid of *racketeering* enterprise]. Further, as described herein, each has conspired to commit and has committed numerous acts of *fraud*." (SAC ¶ 214; emphasis added.)

2. <u>Common Law Fraud</u>: "Defendants ... committed common law *fraud* by intentionally supplying materially *false* information to developers and third party beneficiary Plaintiffs and Class Members and *concealing* material facts they had a duty to disclose ...." (SAC ¶ 267; emphasis added.)

3. <u>Negligent Misrepresentation</u>: "[E]ach of the Defendants is also liable to Plaintiffs ... for committing *negligent misrepresentations* by supplying *materially false* information to Plaintiffs in connection with the financial transactions it entered into with the Plaintiffs." (SAC ¶ 274; emphasis added.)

4. <u>Breach of Fiduciary Duty</u>: "By means of their *frauds* and conduct recited herein, Defendants became successor developers at each of the resorts; and liable to the Plaintiff class in said capacity." (SAC ¶ 288; emphasis added.)

5. <u>Tortious Interference</u>: "Despite Defendants' knowledge of the contractual rights of said Plaintiffs, Defendants intentionally and without justification or privilege, interfered with

Plaintiffs' contractual rights by committing the aforesaid unlawful, *fraudulent*, and illegal acts and omissions." (SAC ¶ 292; emphasis added.)

      6.    <u>Unjust Enrichment</u>: "Defendants and each of them wrongfully benefitted from and were enriched by their role in the aforesaid *fraudulent* loans and financial transactions ..., of which the Defendants acted with knowledge and *intent to defraud* and thereby to reap rich financial rewards." (SAC ¶ 299, emphasis added.)

      7.    <u>Negligence</u>: Plaintiffs' negligence claim also sounds in fraud, as it merely recites and incorporates by reference the previously alleged paragraphs. (SAC ¶ 302.)

      8.    <u>Conspiracy</u>: "Defendants, and each of them, combined and conspired with each other in furtherance of a *conspiracy to defraud* plaintiffs ... by means of *racketeering*, breach of fiduciary duty, and *fraud*." (SAC ¶ 309, emphasis added.)

### 3.    <u>The Complaint Does Not Satisfy the Heightened Pleading Standards As to C&W</u>

Plaintiffs thus must plead all of their causes of action with particularity or have them dismissed. They fail to do so as to C&W. Plaintiffs toss about the label "fraud" liberally, but they are miserly in pleading *actual facts* as to C&W. Plaintiffs identify numerous Credit Suisse personnel, restructuring officers appointed by the bankruptcy courts, developers, third parties, and meetings attended by those persons, but they do nothing with respect to C&W. Indeed, not a single allegation of wrongdoing is made against a C&W employee. None is alleged to have been at any meeting, made any particular statement, or interacted with plaintiffs at all.

Where the Complaint does mention C&W, it is to lump it with generalized allegations about conduct by Credit Suisse. For example, the Complaint alleges that the "newly developed syndicated loan scheme was deliberately designed by Credit Suisse with the knowing assistance of Cushman & Wakefield." (SAC ¶ 47.) No specifics regarding C&W's alleged knowing assistance are pleaded other than the fact that C&W prepared appraisals. Plaintiffs' *modus operandi* throughout the Complaint is to plead action on the part of Credit Suisse, and then lump C&W in as an afterthought. *See, e.g.,* SAC ¶¶ 53, 79, 197.

This is particularly apparent from the allegations for each Resort, where plaintiffs include C&W only in broad-brush fashion. As a case in point, plaintiffs describe the alleged "Loan to Own" program at the Tamarack Resort in Paragraphs 141-160. C&W is identified in only two of these paragraphs:

- Paragraph 148: Tamarack's developer received a TNV appraisal "performed by Cushman & Wakefield's Denver, Colorado office," which "opined that Tamarack was worth $743,000,000, and represented that it 'was performed in compliance' with [FIRREA]."

- Paragraph 156: "material misrepresentations" about the loan facility being in compliance with federal and state law were made to the Tamarack developers by "Mr. Prawer and others on the Credit Suisse team, and others within Credit Suisse and Cushman and Wakefield, in 2006, via telephone calls, emails, U.S. Mail, and verbally."

This is the entirety of the allegations against C&W in the Tamarack portion of the Complaint. There is nothing identifying the C&W appraisal at issue with specificity, no allegation that any plaintiff (as opposed to the developers) ever received the Tamarack appraisal (and if they did, who provided it to them), and no allegation that plaintiffs ever read or relied on the appraisal. Plaintiffs do not provide the required dates, times, or methods of any purported misrepresentations.

The same types of deficiencies are apparent with respect to Ginn sur Mer, which is described in paragraphs 161-178 of the Complaint. In those 18 paragraphs, C&W is named once, and even then, no conduct on the part of C&W is alleged: "Defendants' [*i.e.* Credit Suisse (see below)] represented that Cushman & Wakefield could provide an 'independent' appraisal like it had for other resorts that would be compliant with federal and state appraisal standards, including FIRREA." (SAC ¶ 164.) That is the totality of the Complaint's allegations about C&W in connection with Ginn sur Mer. The circumstances of C&W's involvement with Yellowstone Club and Lake Las Vegas are similarly non-specific. *See* SAC ¶¶ 91-140 (Lake Las Vegas); 179-189 (Yellowstone Club).

These meager allegations against C&W do not suffice. *Vess*, 317 F.3d at 1106. In a

complaint that has multiple defendants, Rule 9(b) "'require[s] plaintiffs to differentiate their allegations ... and inform each defendant separately of the allegations surrounding his participation in the fraud.'" *Hutson v. Am. Home Mortg. Servicing, Inc.*, C-09-1951, 2009 WL 3353312, at *9 (N.D. Cal. Oct. 16, 2009) (*quoting Swartz v. KPMG, LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007)). *See also Silver Valley Partners, LLC v. Motte*, 06-429-N-ELJ, 2007 WL 2802315, at *5 (D. Idaho Sept. 24, 2007) (Lodge, J.) (granting motion to dismiss fraud claim because the complaint was "extremely lacking in particularity as to the identity of who was involved and to what extent they were involved in the various misstatements alleged to have been made"); *Lum v. Bank of America*, CIV.A. 00-223 (FSG), 2001 WL 34059378, at *4 (D.N.J. Nov. 29, 2001) ("allegations that generally allege fraud as against multiple defendants, without informing each defendant as to the specific fraudulent acts he or she is alleged to have committed, do not satisfy Rule 9(b)"). Here, the mandatory "who, what, when, where, and how" is completely absent as to C&W.

The failure to satisfy Rule 9(b)'s pleading requirements is particularly glaring with respect to RICO. A "RICO plaintiff must allege the time, place and manner of each act of fraud, and the role of each defendant in the fraud." *Rosales v. Downey S&L Ass'n.*, 09CV39WQH, 2009 WL 514229, at *6 (S.D. Cal. Mar. 2, 2009) (*citing Lancaster Community Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991)); *Occupational-Urgent Care*, 711 F. Supp. at 1020. In *Rosales*, the court granted defendant's motion to dismiss because, among other things, the complaint failed to allege the role of each defendant in the allegedly unlawful acts, the identities of the actors, the precise actions taken or statements made, the time, place and methods of communication, including dates of telephone calls or mailings, and the precise effects of the fraudulent activity. *Id.* at *6-7. Similarly, in *Eclectic Props. E., LLC v. The Marcus & Millichap Co.*, a federal court recently dismissed a RICO claim alleging a fraudulent conspiracy to sell real estate at inflated prices using "sham appraisals." C-09-0511 RMW, 2010 WL 384736, at *2 (N.D. Cal. Jan. 29, 2010). The court rejected plaintiffs' attempt to lump all the defendants together: "While long and colorful, the complaint nevertheless fails to adequately plead *facts*

sufficient to inform each defendant of the specific allegations against it under each asserted cause of action, and many of the allegations simply lump all of the defendants together in a group ... The complaint does not adequately allege facts showing that each defendant conducted the enterprise through a pattern of racketeering activity." *Id.* at *2-3 (emphasis in original). Plaintiffs' Complaint here is similarly deficient and should be dismissed.

The wholesale failure to plead particularized facts against C&W is highlighted by the fact that plaintiffs do not even include C&W in the definition of "Defendants." Plaintiffs twice define the term "Defendants" as "Credit Suisse AG, Credit Suisse Securities (USA), LLC, Credit Suisse First Boston, and Credit Suisse, Cayman Islands Branch." (SAC ¶¶ 1, 206.) C&W is excluded from these definitions. While in a different case this might be viewed as a mere oversight, here it was clearly intentional. Plaintiffs have already amended their complaint twice and have not changed the definition of the term "Defendants." The definition is repeated in separate paragraphs of the Complaint, and in each instance C&W is referenced immediately *after* the term "Defendants." *Id.* In fact, the pattern of using the term "Defendants" and then separately referencing C&W is repeated another 11 times in the Complaint (SAC ¶¶ 69, 85, 86, 89, 103, 104, 128, 164, 198, 205, 217(f)). This reinforces the failure to allege any wrongdoing on the part of C&W, let alone with particularity as required by Rule 9(b).

Indeed, Plaintiffs have not even sued the right party. The appraisals themselves make clear they were prepared not by C&W, but by legally distinct C&W subsidiaries: Cushman & Wakefield of California, Inc. (Lake Las Vegas); Cushman & Wakefield of Colorado, Inc., (Yellowstone Club and Tamarack); and Cushman & Wakefield of Georgia, Inc. (Ginn sur Mer).[5] No appraisal was prepared by the named defendant, C&W, which is described as a "Delaware corporation with a usual place of business in New York, NY." (SAC ¶ 15.) C&W cannot be held liable for appraisals that it did not prepare. *See, e.g., Cattie v. Wal-Mart Stores, Inc.*, 504 F. Supp. 2d 939, 944-46 (S.D. Cal. 2007) (granting retailer's motion to dismiss because

---

[5] Exh. A, Transmittal Letter, p. 3; Exh. B, Transmittal Letter, p. 3; Exh. C, Transmittal Letter, p. 4; and Exh. D, Transmittal Letter, p. 4, respectively.

allegations were insufficient to show the retailer itself, rather than its related online company, was involved in the alleged wrongdoing against plaintiff); *Oland v. Forever Living Products Int'l., Inc.*, CV 09-8039, 2009 WL 5128658, at *2-3 (D. Ariz. Dec. 17, 2009) (granting summary judgment to defendant in employment discrimination suit because the defendant was not plaintiff's employer and therefore it was "undisputed that Plaintiff sued the wrong party"). The existence of a parent-subsidiary relationship does not alter this conclusion. *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation ... is not liable for the acts of its subsidiaries."); *Cattie*, 504 F. Supp. at 944 ("It is well-established that a parent-subsidiary relationship alone is an insufficient basis on which to hold a parent liable for a subsidiary's actions."). This simply underscores that C&W has no business in this case.

In sum, plaintiffs completely fail to make any particularized factual allegations of wrongdoing against C&W, and even the general assertions plaintiffs do make are misdirected. This requires dismissal of all their claims.

**B.   As a Matter of Law, the Alleged Deception that Underlies Each of Plaintiffs' Claims Does Not Exist**

The complaint also should be dismissed because the alleged "deception" underlying all of plaintiffs' claims against C&W does not exist.

**1.   The Appraisals Did Not Misrepresent What was Calculated**

The Complaint alleges that C&W TNV appraisals misrepresented the "worth" of the Resorts. SAC ¶ 148; *see also* SAC ¶¶ 88; 103; 105. That allegation is belied by the plain language of the appraisals. Each of the appraisals stated expressly that its conclusion was *not* market value. Rather, all stated that they used a specifically identified and defined approach (TNV), which did not discount to present value and therefore did not reflect the time value of money, thereby producing a conclusion that was different from market value. For example, the TNV appraisal for Lake Las Vegas, after defining TNV, contained the following language:

> *This is not the market value of the property* as the standard
> valuation deductions for the time value of money and profit are not
> reflected.  The As Is market value is lower than the Total Net
> Value.

(Exh. A, Transmittal Letter, p. 2; emphasis added; *see also* p. 84.)

The same or similar language was used in the TNV appraisals for Yellowstone,

Tamarack, and Ginn sur Mer.  Yellowstone Club: "*This is not the Market Value of the property*

as the standard valuation deductions for the time value of money and profit are not reflected.

The As Is market value would be lower than the Total Net Value.  Because Total Net Value is an

undiscounted value, there is no 'exposure period' that is tied to this value." (Exh. B, p. 80; *see*

*also* pp. 63, 77.)  Tamarack: "*This is not the Market Value of the property* as the standard

valuation deductions for the time value of money are not reflected.  Because the Total Net Value

is an undiscounted value, there is no 'exposure period' that is tied into this value." (Exh. C,

Transmittal Letter, p. 2; p. 93; *see also* pp. 69, 90, 92.)  Ginn sur Mer: "*This is not the Market*

*Value of the property* as the standard valuation deductions for the time value of money and profit

are not reflected.  The As Is market value is lower than the Total Net Value." (Exh. D,

Transmittal Letter p. 3, p. 40.)  (Emphasis added in each case.)

This language as a matter of law is not misleading, even for a lay person, let alone for a

sophisticated, experienced high-end resort developer.  *See, e.g.*, *Arboireau v. Adidas-Saloman*

*AG*, 347 F.3d 1158, 1166 (9th Cir. 2003) (concluding as a matter of law that a claim for

misrepresentation as to tenure of employment was unsustainable because adequate disclosures

had been made: "defendant adequately disclosed the nature of the employment relationship,

primarily in written materials that a senior executive in a substantial business would be charged

with reading and understanding."); *McCormick v. Fund Am. Cos., Inc.*, 26 F.3d 869, 884

(9th Cir. 1994) (disclosures made to plaintiff, while general and succinct, found sufficient to

negate securities fraud claim, as plaintiff "was a sophisticated businessman, and he was the

former CEO of FFIC and a director of FAC at the time of the events ... [and] his reading of the

Acknowledgement must be seen against that background").  No one can credibly contend that

anyone was misled into thinking TNV was the same as market value (or the "worth") of the

Resorts as alleged in the Complaint.  The appraisals say the exact opposite.

## 2.   **FIRREA Is Not Relevant**

Plaintiffs complain at length that the TNV appraisals were not FIRREA-compliant.  (*See e.g.* SAC ¶¶ 43, 70, 200.)  But FIRREA does not apply here.

FIRREA regulates certain financial institutions.  The statute curtails investments and other activities that pose unacceptable risks to federal deposit insurance funds.  Title XI of FIRREA addresses the real estate appraisal process, and declares as its purpose that "real estate appraisals *"utilized in connection with federally regulated transactions"* be performed in a particular way.  12 U.S.C. § 3331 (emphasis added).  "Federally regulated transactions" are defined as real estate transactions that "a federal financial institutions regulatory agency ... engages in, contracts for, or regulates."  *Id.* at § 3350.  The financial institution regulatory agencies are the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporations, the Office of the Comptroller of the Currency, the Office of Thrift Supervision, and the National Credit Union Administration.  *Id.* at § 3350(6).  Therefore, FIRREA covers a transaction *only if* the transaction is regulated by one of these five federal agencies.

Here, the Complaint alleges that the loans were made by Credit Suisse Cayman Islands Branch.  (SAC ¶ 60.)  The Complaint accurately acknowledges that this Credit Suisse entity was not a federally regulated institution.  (SAC ¶ 61.)  As such, neither the entity that made the loans to the developers nor the developers themselves was a "federally regulated institution" as FIRREA defines the term.  Because the TNV appraisals were not subject to FIRREA, that statute is irrelevant, and plaintiffs cannot extend FIRREA by fiat in order to manufacture claims under RICO or common law.

Moreover, to the extent the relevance of FIRREA to the developers is mentioned at all, it is to note that it had no relevance, since the developer "had no knowledge whatsoever of FIRREA."  (SAC ¶ 241(e).)  And plaintiffs certainly never suggest that *they* were told or relied

on anything about FIRREA.  While the Complaint implies that FIRREA requires *any* appraisal to opine to market value (*see* SAC ¶¶ 32(n), 56, 198, 199, 241(d-e)), that simply misstates the law. Plaintiffs' FIRREA argument is illusory.

### C.   Additional Failures to Plead Essential Elements of Each Cause of Action

The foregoing flaws in the Complaint apply to all of plaintiffs' causes of action and are dispositive without more.  But there *is* more.  Each cause of action fails to plead additional essential elements, as shown below.

#### 1.   Plaintiffs Fail to State a RICO Claim

Plaintiffs assert in conclusory terms that "Defendants" violated RICO, 18 U.S.C. § 1962 (a), (b), (c) and (d).  (SAC ¶¶ 1, 186, 218, 259-61.)  But plaintiffs do not come close to alleging a valid RICO claim.  Besides failing to satisfy Rule 9(b) as discussed in Section IV(A) above, the RICO cause of action is defective on multiple additional grounds because it does not:

- Allege that losses were proximately caused by C&W, which failure eliminates any RICO claim;
- Allege that C&W utilized or invested any income from a supposed "enterprise," as required for a violation of Section 1962(a);
- Allege that C&W engaged in a pattern of racketeering activity or collected an unlawful debt, as required for a violation of Section 1962(b);
- Allege that C&W directed the affairs or participated in the operation or management of an enterprise, as required for a violation of Section 1962(c); or
- Allege that C&W was involved in a conspiracy, as required for a violation of Section 1962(d).

##### a.   Plaintiffs Do No Plead Proximate Causation

A plaintiff must be injured "by reason of a violation of Section 1962" in order to state a civil RICO claim.  18 U.S.C. § 1964(c).  The "by reason of" language means plaintiff must show that defendant proximately caused plaintiff's injury.  *Holmes v. Secs. Investor Prot. Corp.,* 503

U.S. 258, 265-66 (1992); *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006) (plaintiff had no claim under RICO because plaintiff was not the direct victim of, and its loss was too attenuated from, the alleged racketeering activity). In *Holmes*, the Supreme Court explained that in a RICO case, "but for" causation is insufficient. There must be "some direct relationship between the injury asserted and the injurious conduct alleged." 503 U.S. at 268. As the Supreme Court explained in *Anza*, a RICO plaintiff must allege and prove *direct* harm from the alleged RICO violation. "When a court evaluates a RICO claim for proximate causation, *the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries*." 547 U.S. at 461 (emphasis added). "A link that is too remote, purely contingent, or indirect is insufficient" to satisfy RICO's proximate causation requirement. *Hemi Group, LLC v. City of New York*, 130 S. Ct. 983, 989 (2010) (when plaintiff's "theory of causation requires [the court] to move well beyond the first step [in regards to damages], that theory cannot meet RICO's direct relationship requirement").

The Ninth Circuit recently applied the proximate causation test in dismissing a RICO claim on a motion to dismiss. In *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969 (9th Cir. 2008), Canyon County sued defendant-companies for violations of RICO, claiming that defendants knowingly employed and/or harbored large numbers of illegal immigrants in an "Illegal Immigrant Hiring Scheme." The County alleged this scheme resulted in additional expenditures for the County in the form of increased public health care and law enforcement services. The Ninth Circuit denied the County's claims as a matter of law. In addition to other defects, the court concluded plaintiff had no RICO claim because the "complaint was flawed in another critical aspect: most of the defendants' alleged RICO violations do not bear a direct connection to the County's asserted harms." *Id.* at 980. The court rejected the notion that simply pleading a RICO violation and "but for" causation would suffice; instead, "plaintiff must show the 'defendant's RICO violation proximately caused her injury.'" *Id.* at 981 (*quoting Holmes*, 503 U.S. at 268). The court held that the alleged injury (increased government expenditures) was "entirely distinct from" the alleged RICO violation (hiring of illegal immigrants), and the

asserted causal link between defendant's conduct and the injury was "quite attenuated, [as] there are numerous other factors that could lead to higher expenditures by the County." *Id.* at 982. *See also Ass'n. of Wash. Pub. Hosp. Dists v. Philip Morris, Inc.*, 241 F.3d 696, 701 (9th Cir. 2001) ("A direct relationship between the injury and the alleged wrongdoing has been one of the central elements of the proximate causation determination, and a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts generally has been said to stand too remote a distance to recover.") (internal citations and quotations omitted).

Similarly, the necessary direct causal relationship between C&W's appraisals and the diminution in value of plaintiffs' resort properties is entirely lacking. C&W's subsidiaries prepared appraisals for Credit Suisse; Credit Suisse lent money to developers; the developers built and expanded the Resorts; plaintiffs (without themselves relying on C&W's appraisals) bought property, either from the developers or other third parties; and a nationwide (indeed, worldwide) real estate implosion occurred. Plaintiffs now allege that C&W should indemnify (as a racketeer, no less) plaintiffs for their paper losses. But the alleged decline in property values is entirely distinct and far too attenuated from the C&W appraisals. The lack of proximate causation is fatal to all of plaintiffs' RICO claims.[6]

> **b.     Plaintiffs Fail to Plead the Requisite Elements of a Section 1962(a) or (b) Claim**

While the Section 1962(a) and (b) claims are subject to dismissal for the reason outlined above – lack of proximate causation – C&W also moves to dismiss these claims because plaintiffs do not and cannot allege the requisite elements for a RICO violation under either provision.

First, Section 1962(a) makes it unlawful "for any person who has received any income ...

---

[6] The RICO proximate cause requirement is even more rigorous than the Article III jurisdictional standing requirement. *See Canyon County, infra*, 519 F.3d at 975 (preliminarily concluding that Article III's jurisdictional requirements were met, but nonetheless finding that plaintiffs could not "show the proximate causation that is necessary for civil RICO standing").

from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal ... to use or invest ... any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise...." Based on this plain language, "a plaintiff seeking civil damages for a violation of section 1962(a) must allege facts tending to show that he or she was injured by the use or investment of racketeering income." *Nugget Hydroelectric, L.P. v. Pacific Gas & Electric Co.*, 981 F.2d 429, 437 (9th Cir. 1992). The investment injury must be separate and distinct from the injury flowing from the RICO predicate acts, and must proximately cause plaintiff's alleged injuries. *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1149 (9th Cir. 2008). The allegations regarding the receipt of the racketeering income and subsequent use to injure plaintiff cannot be general, conclusory or vague. *Nugget Hydroelectric*, 981 F.2d at 437. Here the Complaint is devoid of allegations that C&W used or invested any income in any enterprise (let alone income from a "pattern of racketeering activity or the collection of an unlawful debt"), or that plaintiffs were injured by the use or investment of racketeering income. Plaintiffs thus fail to state a Section 1962(a) claim as a matter of law. *See In re MDC Holdings Sec. Litig.*, 89-0090-E, 1991 WL 537515, at *4 (S.D. Cal. Jul. 2, 1991) (granting defendant's motion to dismiss Section 1962(a) claim because plaintiff's complaint "does not plead facts describing how, when, or where the racketeering income was used or invested" and "plaintiffs have not alleged any facts which demonstrate they were injured by [defendant's] alleged use or investment of racketeering income.").

    As for Section 1962(b), it prohibits "any person through a pattern of racketeering activity or through collection of an unlawful debt" from acquiring or maintaining "any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(b). Here, the Complaint does not allege that C&W acquired or maintained any interest in or controlled any alleged enterprise, much less that it did so through a pattern of racketeering activity. C&W is "accused" merely of doing what it was retained to do by its client: providing appraisals. This does not a RICO claim make.

        **c.**      **The Section 1962(c) Claim Fails Because Plaintiffs Fail to Plead that C&W "Participated" in a RICO Enterprise**

Section 1962(c) makes it unlawful "for any person employed by or associated with any enterprise ... to conduct or participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).  A RICO enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  Plaintiffs allege that the RICO enterprise in this case was an "association in fact" called the "Credit Suisse Cayman Island Branch Enterprise."  (SAC ¶¶ 205-206.) Regardless of whether this constitutes any kind of RICO "enterprise" at all (which C&W disputes), the Supreme Court has held that "one is not liable under [§ 1962(c)] unless one has *participated in the operation or management* of the enterprise itself." *Reves v. Ernst & Young,* 507 U.S. 170, 183 (1993) (emphasis added).  Liability under this provision extends only to those who "have some part in directing [the enterprise's] affairs." *Id.* at 179 (an auditor who provided valuation reports in advance of a purchase of a gasohol plant did not participate in the operation or management of the enterprise).  Stated differently, to be liable, one must "occupy a position in the 'chain of command' ... through which the affairs of the enterprise are conducted." *Walter v. Drayson,* 538 F.3d 1244, 1249 (9th Cir. 2008) (*quoting United States v. Oreto,* 37 F.3d 739, 750 (1st Cir. 1994)).

Nothing like that is alleged against C&W.  In *University of Md. v. Peat, Marwick, Main & Co.,* 996 F.2d 1534, 1539-40 (3rd Cir. 1993), the court, at the motion to dismiss stage, rejected allegations that an auditing company had participated in a RICO enterprise by providing deficient audit reports and issuing unqualified auditor's opinions.  The court noted that "merely performing financial services and attending board meetings do not show that [defendant] was participating in the affairs of the enterprise." *Id.* at 1539. *See also Walter,* 538 F.3d at 1248-49 (applying *Reves* and its requirement of "some degree of direction" to conclude that defendant, by rendering legal services, writing emails, and giving advice, did not satisfy the "conduct" requirement of § 1962(c); "[s]imply performing services for the enterprise does not rise to the

level of direction" required); *Baumer v. Pachl*, 8 F.3d 1341, 1344-45 (9th Cir. 1993) (defendant did not conduct or participate in enterprise's affairs, even though he allegedly provided bogus letters, financial reports and partnership agreements in furtherance of the alleged enterprise).

Here, there is no allegation that C&W managed or directed the affairs of the purported "Credit Suisse Cayman Island Branch Enterprise" (or any Credit Suisse entity) in any way. (*See, e.g.*, SAC ¶¶ 34, 35, 38, 39, 44.) This is fatal to the claim. Plaintiffs allege that C&W provided appraisals to Credit Suisse, but that is all. The Section 1962(c) claim against C&W must be dismissed for this reason as well.

> ### d.    Plaintiffs Do Not Adequately Allege a RICO Conspiracy Involving C&W under § 1962(d)

Section 1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [Section 1962]." 18 U.S.C. § 1962(d). As demonstrated above, plaintiffs fail to state an underlying substantive RICO violation. Without that, there can be no claim for RICO conspiracy. *See Religious Technology Center v. Wollersheim*, 971 F.2d 364, 367 n.8 (9th Cir. 1992) ("[B]ecause we find that RTC has failed to allege the requisite substantive elements of RICO, the conspiracy cause of action cannot stand.").

Moreover, to establish a violation of Section 1962(d), plaintiffs must allege either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, two predicate offenses. *See Howard v. America Online, Inc.*, 208 F.3d 741, 751 (9th Cir. 2000) (affirming dismissal of RICO conspiracy claim) (a "defendant must also have been aware of the essential nature and scope of the enterprise and intended to participate in it" to be liable under Section 1962(d)) (internal quotations omitted). In other words, one cannot be liable for a RICO conspiracy simply for providing services to a RICO enterprise: "mere association" with an enterprise, without an agreement to commit predicate acts and consent to the objective of the enterprise, does not "constitute an actionable § 1962(d) violation." *Baumer*, 8 F.3d at 1345-46.

Plaintiffs' Complaint does not allege facts to show there was any agreement between co-

conspirators to commit predicate acts such as mail fraud, wire fraud or racketeering. No facts alleged suggest that C&W had any knowledge of an allegedly fraudulent scheme. The Supreme Court has held that an "injury caused by an overt act that is not an act of racketeering or otherwise wrongful under RICO is not sufficient to give rise to a cause of action under § 1964(c) for a violation of § 1962(d)." *Beck v. Prupis*, 529 U.S. 494, 505 (2000). Here, there is nothing to suggest anything more than that C&W undertook to provide a lawful service: property appraisals. That is insufficient to establish liability for conspiracy because preparing appraisals is not independently wrongful. *Id.* at 505-506 ("a civil conspiracy plaintiff cannot bring suit under RICO based on injury caused by *any* act in furtherance of a conspiracy that might have caused the plaintiff injury. Rather ... a RICO conspiracy plaintiff [must] allege injury from ... an act that is independently wrongful under RICO.") (emphasis in original).

### 2.    Plaintiffs Fail to State a Claim for Fraud or Negligent Misrepresentation

Under Idaho law[7] a claim for common law fraud has nine essential elements: (a) statement of fact; (b) falsity; (c) materiality; (d) the speaker's knowledge of falsity; (e) the speaker's intent to induce reliance; (f) the hearer's ignorance of the falsity of the statement; (g) reliance; (h) justifiable reliance; and (i) consequent and proximate injury. *Lettunich v. Key Bank Nat'l Assn.*, 109 P.3d 1104, 1110, 141 Idaho 362, 368 (2005). The same elements apply under Florida, Montana, and Nevada law. *See* Fla. Std. Jury Instr. (Civ.) § 8.1(a); *Town of Geraldine v. Mont. Mun. Ins. Auth.*, 198 P. 3d 796, 801, 347 Mont. 267, 275 (2008); *Lubbe v. Barba*, 540 P. 2d 115, 117, 91 Nev. 596, 598 (1975).

In states that recognize negligent misrepresentation as a claim,[8] the elements are:

---

[7] The Resorts at issue are located in four different jurisdictions, but this case can be disposed of without a protracted choice of law analysis. C&W describes the required elements for each of the common law tort claims using Idaho, Nevada, Montana and Florida law. Idaho, Nevada, and Montana are the locations of three of the Resorts. The fourth resort, Gin sur Mer, is located in the Grand Bahamas. Plaintiffs imply that Florida law should apply to claims arising from Ginn sur Mer because the majority of Ginn sur Mer homeowners allegedly borrowed funds in Florida and most closing transactions occurred in Florida. (SAC ¶ 162.) C&W reserves all rights with respect to the choice-of-law inquiry should this case proceed past the motion to dismiss stage.

[8] Idaho does not recognize a claim for negligent misrepresentation, except in the narrow confines

(a) defendant made a representation as to a past or existing material fact; (b) the representation

was untrue; (c) defendant made the representation without any reasonable ground for believing it

to be true; (d) the representation was made with the intent to induce plaintiff to rely on it;

(e) plaintiff was unaware of the falsity of the representation and justifiably relied upon it; and

(f) plaintiff, as a result of the reliance, has sustained damage. *Cechovic v. Hardin & Assocs.,*

*Inc.*, 902 P.2d 520, 525, 273 Mont. 104, 112 (1995); *see also* Fla. Std. Jury Instr. (Civ.) §8.1(b);

*Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1387, 114 Nev. 441, 449 (1998).

Plaintiffs fail to allege key elements of both causes of action, no matter what law is

applied, and particularly fail to allege that there was any misrepresentation or reliance.

### a.      Plaintiffs Do Not Allege Any Actionable Misrepresentation

The TNV appraisals explicitly and unambiguously stated that they were *not* estimating

market value.  There can be no "misrepresentation" when no false statement has been made.

*Sharp v. Idaho Inv. Corp.*, 504 P.2d 386, 395, 95 Idaho 113, 122 (1972) ("A false representation

is the cornerstone to an action in fraud.").  Further, TNV by its terms was an estimate of net cash

flow to be derived *in the future.*  In an action for fraud or negligent misrepresentation, plaintiff

must show that a defendant made false statements of fact, rather than a mere "expression of

opinion or prediction." *Bulgo v. Munoz*, 853 F.2d 710, 716 (9th Cir. 1988).  The TNV estimation

of cash flow is by its nature a prediction, an opinion, not a statement of fact.  "An opinion or

prediction about a future event" is not actionable. *Country Cove Dev., Inc. v. May*, 150 P.3d

288, 293, 143 Idaho 595, 600-01 (2006) (plaintiff failed to state a claim for fraud because

defendant's statement was merely an opinion or prediction about a future event and parties are

presumed to have formed their own conclusions as to such future events).  The Complaint thus

fails to allege the misrepresentation element of a fraud or negligent misrepresentation cause of

action.

---

of an accountant/client relationship. *Intermountain Const., Inc. v. City of Ammon*, 841 P.2d
1082, 1084, 122 Idaho 931, 933 (1992).  On this basis alone, plaintiffs' claim for negligent
misrepresentation should be dismissed, as C&W did not act as an accountant for (and indeed did
not have a contractual relationship with) plaintiffs.

### b.    Plaintiffs Do Not Allege that C&W Intended Plaintiffs Rely on Any Alleged Misrepresentation or that Any Such Reliance Was Justifiable

The Complaint also fails adequately to allege reliance.  The Complaint alleges that C&W prepared the TNV appraisals for Credit Suisse and/or the developers.  (*See* SAC ¶¶ 70, 148, 217(h).)  Credit Suisse then used those appraisals for purposes of its initial loans to the *developers.*  (SAC ¶ 79.)  That the developers did what developers do – sell property – does not mean that ultimate purchasers actually, let alone reasonably, relied on documents prepared for the developers' lender.  Moreover, plaintiffs' suggestion that C&W knew the TNV appraisals would make their way into "the stream of commerce" (SAC ¶ 62) adds nothing.  Regardless of any entry into commerce, the Complaint does not allege that any homeowners relied upon – or even read – any of the appraisals.[9]  There is no basis for concluding that C&W could have intended that plaintiffs rely on an appraisal not prepared for them.

Moreover, any purported reliance by plaintiffs would not have been justifiable.  The TNV appraisals contain explicit language limiting who may rely on them:

> This appraisal is intended for use only by the client indentified as the addressee of this report.  This report is intended to assist in internal decision making purposes regarding potential financing.  The use of this report by others is not intended by the appraisers.

*See* Exh. A, Transmittal Letter, p. 2 (Lake Las Vegas).  Each of the appraisals contains similar language.  *See* Exh. B, Transmittal Letter, p. 2 (Yellowstone Club); Exh. C, Transmittal Letter, p. 1, p. 3 (Tamarack); Exh. D, Transmittal Letter p. 2, p. 2 (Ginn sur Mer).[10]  These limitations on use are enforceable, and further serve to defeat any reliance claim by plaintiffs, as a matter of law.  *See Zanaty Realty, Inc. v. Williams*, 935 So. 2d 1163, 1169 (Ala. 2005) (appraiser's disclaimer of liability to all unintended users was sufficient to shield the appraiser from liability

---

[9] Not until paragraph 276 in the Third Cause of Action does the Complaint first allege, albeit in conclusory fashion, that plaintiffs even "received" the appraisals.

[10] Certain of the appraisals also include limitations on *distribution*.  *See* Exh. B, Transmittal Letter, p. 1 (Yellowstone) (this appraisal "may not be distributed to or relied upon by other persons or entities without written permission of Cushman & Wakefield of Colorado, Inc."); Exh. D, Transmittal Letter, p. 2 (Ginn sur Mer) (the appraisal "may not be distributed or relied upon by any other persons or entities without the written permission of Cushman & Wakefield of Georgia, Inc.").

to unintended third party users); *Robert & Co. Assocs. v. Rhodes-Haverty Partnership*,

300 S.E.2d 503, 504, 250 Ga. 680, 681 (1983) (concluding that liability to non-client third

parties may be "limited by appropriate disclaimers which would alert those not in privity with

the supplier of information that they may rely upon it only at their peril."); *Resolution Trust

Corp. v. Rowe*, C 91-3968 BAC, 1993 WL 165303, at *4 (N.D. Cal. May 7, 1993) (finding no

liability for auditor to third party for financial report when the financial report contained

disclaimers regarding its scope and intended users); *c.f. Cooper v. Brakora & Assoc.*, 838 So. 2d

679, 682 (Fla. Dist. Ct. App. 2003) (no claim for negligent misrepresentation by homebuyer

against appraiser because the appraisal was intended to assist in bank's loan transaction, and not

in the purchase/sale transaction of the homebuyer).  As a matter of law, the Complaint fails to

plead the reliance element of a fraud or negligent misrepresentation claim.

### 3.    Plaintiffs Fail to State a Claim for Breach of Fiduciary Duty

To state a claim for breach of fiduciary duty, plaintiffs must allege: (a) C&W had a

fiduciary obligation to them; (b) C&W breached that fiduciary duty; and (c) the breach of

fiduciary duty by C&W caused damage to plaintiffs. *Bushi v. Sage Health Care, PLLC*,

203 P.3d 694, 699, 146 Idaho 764, 769 (2009); *Sorensen v. St. Alphonsus Reg'l. Med. Ctr., Inc.*,

118 P.3d 86, 92, 141 Idaho 754, 760 (2005); *Taylor v. Weingart*, 693 P.2d 1231, 1234,

214 Mont. 282, 288 (1984).  Florida and Nevada law mirrors these elements, and adds that the

breach of the fiduciary duty must proximately cause plaintiffs' damages.  *See Gracey v. Eaker*,

837 So. 2d 348, 353 (Fla. 2002); *Gowen v. Tiltware LLC*, 2:08-CV-01581-RCJ-RJJ, 2009 WL

1441653, at *7 (D. Nev. May 19, 2009).  A fiduciary obligation arises only in situations where a

relationship of special trust and confidence exists between the parties (*Jones v. Kootenai County

Title Ins. Co.*, 873 P.2d 861, 868, 125 Idaho 607, 614 (1994); *see also Marlys Bear Medicine v.

U.S. ex. rel. Secretary of Dept. of Interior*, 241 F.3d 1208, 1218-1219 (9th Cir. 2001) (Montana

law); *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002)), or where one is under a duty to act or give

advice to another (*Stalk v. Mushkin*, 199 P.3d 838, 843 (Nev. 2009)).

Some special duty must exist to create a fiduciary relationship between the defendant and

plaintiff. "[I]n Idaho, a fiduciary relation exists between two parties when one is under a duty to act or give advice for the benefit of the other upon a matter within the scope of the relation." *Aardema Group v. Northwest Dairy Ass'n.*, CV 09-0045-EJL-REB, 2009 WL 1748082, at * 6 (D. Idaho Jun. 17, 2009) (Bush, M.J.). "Fiduciary relationships are commonly characterized by one party placing property or authority in the hands of another, or being authorized to act on behalf of the other." *Country Cove Dev.*, 150 P.3d at 296. Thus, fiduciary relationships traditionally are found in such scenarios as a trustee to a beneficiary (*Edwards v. Edwards*, 842 P.2d 299, 305, 122 Idaho 963, 969 (1992)), or a lawyer to a client (*Podolan v. Idaho Legal Aid Servs.*, 854 P.2d 280, 289, 123 Idaho 937, 946 (1993)). *See also Gray v. Tri-Way Constr. Servs., Inc.*, 210 P.3d 63, 71, 147 Idaho 378, 386 (2009) ("Examples of relationships from which the law will impose fiduciary obligations on the parties include when the parties are: members of the same family, partners, attorney and client, executor and beneficiary of the estate, principal and agent, insurer and insured, or close friends."). Here, C&W did not have any relationship at all with plaintiffs, let alone a fiduciary one. The TNV appraisals were transmitted to Credit Suisse and the "developments" (SAC ¶ 217(h)), not plaintiffs. Plaintiffs do not allege any direct interactions, communications, or encounters with C&W of any kind. Plaintiffs cannot claim to have had a "special" relationship of "trust" with someone they never met and with whom they never even interacted.

### 4. Plaintiffs Fail to State a Claim for Tortious Interference with Contractual Relations

A claim for tortious interference with contractual relations requires: (a) the existence of a contract; (b) knowledge of the contract on the part of the defendant; (c) intentional interference causing breach of the contract; and (d) injury to the plaintiff. *BECO Const. Co., Inc. v. J-U-B-Eng'rs, Inc.*, 184 P.3d 844, 848, 145 Idaho 719, 723 (2008). *See also Seminole Tribe of Florida v. Times Publishing Co., Inc.*, 780 So. 2d 310, 315 (Fla. Dist. Ct. App. 2001); *Tindall v. Konitz Contracting, Inc.*, 783 P. 2d 1376, 1381, 240 Mont. 345, 353 (1989); *Northwestern Nat'l Bank of Great Falls v. Weaver-Maxwell, Inc.*, 729 P.2d 1258, 1262, 224 Mont. 33, 40 (1986); *Sutherland*

*v. Gross*, 772 P.2d 1287, 1290, 105 Nev. 192, 196 (1989). A plaintiff may show intentional interference if the actor desires to bring the interference about or "if he knows that the interference is certain or substantially certain to occur." *BECO Const. Co.*, 184 P.3d at 848. For liability to arise, the interference must be improper and non-privileged. *Id.*; *Northwest Nat'l*, 729 P.2d at 1262.

Plaintiffs recite interference with their "rights, amenities and privileges." The claim is riddled with flaws. First, plaintiffs do not identify what the "rights, amenities, and privileges" are, or describe any entitlement (contractual or otherwise) to them. Second, even if those rights and privileges were in some form of a contract, plaintiffs do not identify the contract or allege how C&W could know about it. Without such knowledge and an intent to interfere, no claim for tortious interference can succeed. Third, any claim that a breach *by the developers* was the result of conduct *on the part of C&W* is too attenuated to be sustainable. All C&W's subsidiaries did was to prepare appraisals for their client, Credit Suisse. Credit Suisse then made loans to the developers, who in turn decided how to use the loan proceeds. The developers ultimately defaulted on those loans, and the projects went into bankruptcy or did not develop as plaintiffs anticipated. There is no causal link between the C&W appraisals and any damage plaintiffs may have suffered.

## 5.    Plaintiffs Fail to State a Claim for Unjust Enrichment

To state a claim for unjust enrichment, a plaintiff must show: (a) benefit conferred on defendant by the plaintiff; (b) defendant appreciates the benefit; and (c) it would be inequitable for defendant to accept the benefit without the payment of value of the benefit. *Teton Peaks Inv. Co. v. Ohme*, 195 P.3d 1207, 1211, 146 Idaho 394, 398 (2008). These elements are substantially the same in Florida, Montana, and Nevada. *Florida Power Corp. v. City of Winter Park*, 887 So. 2d 1237, 1242 n.4 (Fla. 2004); *Ragland v. Sheehan*, 846 P.2d 1000, 1004, 256 Mont. 322, 327 (1993); *Topas Mut. Co., Inc. v. Marsh*, 839 P.2d 606, 613, 108 Nev. 845, 856 (1992).

Here, there is no allegation that plaintiffs conferred any benefit on C&W. Plaintiffs never paid C&W, never rendered any services to C&W, and never even dealt with C&W. With respect

to the alleged "Loan to Own" scheme, plaintiffs point to alleged benefits received only by Credit Suisse. (SAC ¶ 47.) With no allegation of benefit conveyed by plaintiffs to C&W, the claim for unjust enrichment must be dismissed. *See Headwaters Constr. Co.*, 2010 WL 744287, at *4-5 (dismissing claim for unjust enrichment because defendant did not own the properties at issue, and therefore plaintiff could not have conferred a benefit on defendant as to those properties).

### 6.      Plaintiffs Fail to State a Claim for Negligence

A claim of negligence requires proof of: "a duty the defendant owes to the plaintiff, a breach of that duty by the defendant, a causal connection between the breach and the plaintiff's injury, and actual injury. In the absence of any of these elements, no cause of action for negligence will lie." *Schmechel v. Dille*, 219 P.3d 1192, 1203 (Idaho 2009) (*quoting* 57A Am.Jur.2d Negligence § 71). These elements exist in each of the potentially applicable jurisdictions. *See* Fla. Forms Jury Instr. (Civ.) § 50.01; Fla. Std. Jury Instr. Civ. § 4.1; *Peterson v. Eichhorn*, 189 P.3d 615, 621, 344 Mont. 540, 546 (2008); *Turner v. Mandalay Sports Entm't LLC*, 180 P.3d 1172, 1175 (Nev. 2008).

This claim fails for the fundamental reason that C&W owed no duty to plaintiffs. *Baccus v. Ameripride Servs., Inc.*, 179 P.3d 309, 312, 145 Idaho 346, 349 (2008) ("No liability exists under the law of torts unless the person from whom relief is sought owed a duty to the allegedly injured party.") (internal quotations omitted). Courts evaluate whether or not a duty exists by considering several factors, including the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection of defendant's conduct to the claimed injury, and the moral blame attached to defendant's conduct, among other things. *Id.* at 312. Whether a duty was owed by defendant to plaintiff is a question of law. *Id.*

Plaintiffs do not even attempt to allege a basis for any such duty. Their negligence cause of action is a mere six paragraphs, in which plaintiffs assert that "[d]efendants owed a duty to developers, Plaintiffs and Class Members to use ordinary and reasonable care in carrying out their obligations." (SAC ¶ 303.) But such a generic recitation of a purported duty is insufficient, as plaintiffs nowhere allege that C&W had any relationship with plaintiffs. As no duty existed as

a matter of law, the negligence claim must be dismissed.

### 7.   Plaintiffs Fail to State a Claim for Conspiracy

Neither Idaho nor Montana recognizes a separate cause of action for conspiracy. *Mertens v. Shensky*, CV05-147-N-EJL, 2006 WL 173651, at *4 (D. Idaho, Jan. 23, 2006) (Lodge, J.) (stating "there is no tort of civil conspiracy in Idaho") (*citing McPheters v. Maile*, 64 P.3d 317, 321, 138 Idaho 391, 395 (2003)); *Schumacker v. Meridian Oil Co.*, 956 P.2d 1370, 1373, 288 Mont. 217, 221 (1998) ("it is not the conspiracy itself that gives rise to the cause of action") (*citing Duffy v. Butte Teachers' Union, No. 332, AFL-CIO*, 541 P. 2d 1199, 1201, 168 Mont. 246, 251 (1975) (for an action for civil conspiracy, "plaintiffs must allege a tort committed by one of the alleged conspirators")).   Moreover, even in states that recognize the claim, since plaintiffs have not pleaded any viable underlying cause of action, the conspiracy allegations add nothing to the Complaint. A "conspiracy" is not unlawful unless the object of the conspiracy is unlawful. *Vieux v. East Bay Reg'l Park Dist.*, 906 F.2d 1330, 1343 (9th Cir. 1990) ("A civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some *unlawful* objective for the purpose of harming another which results in damage.") (internal quotations omitted, emphasis added); *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. Dist. Ct. App. 1997) ("[A]n actionable conspiracy requires an actionable underlying tort or wrong."); *Morris v. Bank of America Nevada*, 886 P.2d 454, 456 n.1, 110 Nev. 1274, 1276 n.1 (Nev. 1994) (dismissing conspiracy counterclaim for failure to state the "unlawful objective" of the alleged conspiracy). Here, all C&W did was to prepare appraisals – which is not an unlawful objective. As a result, the conspiracy count cannot stand.

V.    **CONCLUSION**

C&W is an afterthought in this case. Plaintiffs do not allege any connection to C&W whatsoever. Plaintiffs' claim that appraisals prepared by subsidiaries of C&W were somehow deceptive is put to rest by the language of the appraisals themselves. And plaintiffs allege no particularized facts supporting any of their claims, all of which sound in fraud. For these and all the foregoing reasons, the Court should dismiss this case with prejudice as to C&W.


DATED: March 29, 2010              **PAUL, HASTINGS, JANOFSKY & WALKER LLP**


                                   By: */s/ Donald L. Morrow*
                                       Donald L. Morrow
                                       Barry G. Sher


                                   **PERKINS COIE** LLP


                                   By: */s/ Richard C. Boardman*
                                       Richard C. Boardman

                                   Attorneys for Defendant
                                   Cushman & Wakefield, Inc.

### CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

> Michael James Flynn (mike@mjfesq.com)
> Chris Flood (chris@floodandflood.com)
> James C. Sabalos (jimsabalos@hotmail.com)
> John Flood (john@floodandflood.com)
> Philip H. Stillman (pstillman@stillmanassociates.com)
> Robert C. Huntley (rhuntley@huntleylaw.com)
> Randall A. Peterman (rap@moffatt.com)
> David Wilson Dummer (david.dummer@weil.com)
> David Jason Lender (david.lender@weil.com)
> Jason Ira Lichter (Jason.lichter@weil.com)
> Thomas Ray Guy (ray.guy@weil.com)
> James L. Martin (jlm@moffatt.com)

And, I hereby certify that I have mailed by United States Postal Service the foregoing documents(s) to the following non-CM/ECF Registered Participant(s):

> [NONE]

> _/s/ Richard C. Boardman_
> Richard C. Boardman