# Exhibit 1
# (Part 1 of 2)

# CREDIT AGREEMENT

## DATED AS OF NOVEMBER 1, 2004

Among

**LAKE AT LAS VEGAS JOINT VENTURE and LLV-1, L.L.C.,**
as the Borrowers,

**THE LENDERS LISTED HEREIN,**
as the Lenders,

**AND**

**CREDIT SUISSE FIRST BOSTON,**
as Administrative Agent, Collateral Agent and Syndication Agent

## $435,000,000 TERM LOAN SECURED CREDIT FACILITY

**FIRST LIEN CREDIT AGREEMENT**

## TABLE OF CONTENTS

**Page**

SECTION 1. DEFINITIONS ............................................................................................ 1

    1.1    Certain Defined Terms. ..................................................................................... 1
    1.2    Defined Terms; Accounting Terms; Utilization of GAAP for Purposes of
            Calculations Under Agreement. ..................................................................... 25

SECTION 2. AMOUNTS AND TERMS OF COMMITMENTS AND LOANS ................... 26

    2.1    Commitments; Loans. ...................................................................................... 26
    2.2    Interest on the Loans. ...................................................................................... 28
    2.3    Fees. ................................................................................................................. 30
    2.4    Repayments and Prepayments; General Provisions Regarding Payments. ...... 30
    2.5    Use of Proceeds. .............................................................................................. 34
    2.6    Special Provisions Governing Eurodollar Rate Loans. .................................... 34
    2.7    Increased Costs; Taxes. ................................................................................... 36
    2.8    Mitigation Obligations; Replacement of Lenders. .......................................... 39
    2.9    Calculation and Amount of Borrowing Base Availability. .............................. 39
    2.10   Limitations on Aggregate Outstanding Loans. ............................................... 40
    2.11   Release Upon Qualified Sale or Permitted Joint Venture Transaction. .......... 41

SECTION 3. CONDITIONS TO EFFECTIVENESS ........................................................ 41

    3.1    Conditions to Effectiveness. ............................................................................ 41
    3.2    Conditions to All Loans. .................................................................................. 47

SECTION 4. REPRESENTATIONS AND WARRANTIES ............................................... 48

    4.1    Organization and Qualification. ...................................................................... 48
    4.2    Power and Authority. ...................................................................................... 48
    4.3    Legally Enforceable Agreement. ..................................................................... 49
    4.4    No Conflict. ...................................................................................................... 49
    4.5    Capital Structure. ............................................................................................ 49
    4.6    Special Purpose Entity. ................................................................................... 50
    4.7    Corporate Names. ............................................................................................ 50
    4.8    Business Locations; Agent for Process. .......................................................... 50
    4.9    Title to Properties. ........................................................................................... 50
    4.10   Priority of Liens; UCC-1 Financing Statements. ............................................ 51
    4.11   No Subordination. ........................................................................................... 51
    4.12   Permits; Franchises. ....................................................................................... 51
    4.13   Indebtedness. .................................................................................................. 51
    4.14   Financial Condition; Pro Forma Balance Sheet; Projections. ......................... 51
    4.15   Disclosure. ...................................................................................................... 52
    4.16   Solvent Financial Condition. .......................................................................... 52
    4.17   Surety Obligations. ......................................................................................... 52
    4.18   Taxes. ............................................................................................................. 53

i

4.19 Brokers. ........................................................................................................ 53
4.20 Intellectual Property. ...................................................................................... 53
4.21 Governmental Authorization. .......................................................................... 53
4.22 Compliance with Laws. .................................................................................... 53
4.23 Burdensome Contracts. .................................................................................... 54
4.24 Litigation. ........................................................................................................ 54
4.25 No Defaults. ..................................................................................................... 54
4.26 Leases. ............................................................................................................. 54
4.27 Employee Benefit Plans. .................................................................................. 54
4.28 Trade Relations. .............................................................................................. 55
4.29 Labor Relations. .............................................................................................. 55
4.30 Not a Regulated Entity. ................................................................................... 55
4.31 Margin Stock. .................................................................................................. 56
4.32 No Material Adverse Change. .......................................................................... 56
4.33 Environmental Matters. ................................................................................... 56
4.34 Material Contracts. .......................................................................................... 57
4.35 Utilities. ........................................................................................................... 57
4.36 Licenses. .......................................................................................................... 58
4.37 Entitlements. ................................................................................................... 58
4.38 Transaction Documents. .................................................................................. 58
4.39 Credit Rating. .................................................................................................. 59

SECTION 5. AFFIRMATIVE COVENANTS ................................................................... 59

5.1 Visits and Inspections. ..................................................................................... 59
5.2 Notices. ............................................................................................................ 59
5.3 Financial Statements and Other Reports. ....................................................... 61
5.4 Corporate Existence. ........................................................................................ 65
5.5 Payment of Taxes and Claims; Tax Consolidation. ......................................... 65
5.6 Maintenance of Properties; Insurance. ............................................................ 66
5.7 Lender Meeting. ............................................................................................... 66
5.8 Compliance with Laws, etc. ............................................................................. 66
5.9 Environmental Disclosure and Inspection. ...................................................... 66
5.10 The Borrowers' Remedial Action Regarding Hazardous Materials. ................ 68
5.11 Execution of Guaranty and Collateral Documents by Future Subsidiaries. .... 68
5.12 Interest Rate Protection. ................................................................................. 69
5.13 Further Assurances. ......................................................................................... 69
5.14 Title. ................................................................................................................ 69
5.15 Estoppels. ........................................................................................................ 70
5.16 SPE Covenants. ............................................................................................... 70
5.17 Maintenance of Entitlements. ......................................................................... 71
5.18 Asset Sales. ...................................................................................................... 72
5.19 Control. ............................................................................................................ 72

SECTION 6. NEGATIVE COVENANTS ........................................................................ 72

6.1 Indebtedness. ................................................................................................... 72
6.2 Liens and Related Matters. .............................................................................. 73
6.3 Investments. ..................................................................................................... 74
6.4 Contingent Obligations. ................................................................................... 75
6.5 Restricted Payments. ....................................................................................... 75

FIRST LIEN CREDIT AGREEMENT

LA\1323477.16

6.6      Financial Covenants. ........................................................................................... 76
6.7      Restriction on Fundamental Changes. .................................................................. 77
6.8      Sale or Discount of Receivables. ......................................................................... 77
6.9      Assets Sales. ........................................................................................................ 77
6.10     Transactions with Shareholders and Affiliates. ................................................... 80
6.11     Conduct of Business. ........................................................................................... 80
6.12     Competing Business. ............................................................................................ 80
6.13     Amendments or Waivers of Certain Agreements. ................................................ 80
6.14     Fiscal Year. .......................................................................................................... 80

SECTION 7. EVENTS OF DEFAULT ............................................................................... 80

7.1      Payment of Obligations. ...................................................................................... 80
7.2      Misrepresentations. .............................................................................................. 81
7.3      Breach of Certain Covenants. .............................................................................. 81
7.4      Breach of Other Covenants. ................................................................................. 81
7.5      Default Under Loan Documents. .......................................................................... 81
7.6      Second Lien Credit Agreement; Other Defaults. ................................................. 81
7.7      Uninsured Losses. ................................................................................................ 82
7.8      Material Adverse Effect. ...................................................................................... 82
7.9      Solvency. .............................................................................................................. 82
7.10     Insolvency Proceedings. ...................................................................................... 82
7.11     Business Disruption; Condemnation. ................................................................... 82
7.12     ERISA. ................................................................................................................. 82
7.13     Challenge to Loan Documents. ............................................................................ 83
7.14     Judgment. ............................................................................................................. 83
7.15     Repudiation of or Default Under Guaranty. ......................................................... 83
7.16     Criminal Forfeiture. ............................................................................................. 83

SECTION 8. AGENTS ........................................................................................................ 84

8.1      Appointment. ....................................................................................................... 84
8.2      Rights as a Lender. ............................................................................................... 85
8.3      Exculpatory Provisions. ....................................................................................... 85
8.4      Reliance by the Agents. ....................................................................................... 85
8.5      Delegation of Duties. ........................................................................................... 86
8.6      Resignation of Administrative Agent and/or Collateral Agent. ........................... 86
8.7      Collateral Documents; Successor Collateral Agent. ............................................ 87
8.8      Non-Reliance on Agents and Other Lenders. ....................................................... 87

SECTION 9. MISCELLANEOUS ...................................................................................... 87

9.1      Assignments and Participations in Loans. ........................................................... 87
9.2      Expenses; Indemnity; Damage Waiver. ............................................................... 90
9.3      Right of Set-Off. .................................................................................................. 92
9.4      Sharing of Payments by Lenders. ........................................................................ 92
9.5      Amendments and Waivers. ................................................................................... 92
9.6      Independence of Covenants. ................................................................................. 94
9.7      Notices. ................................................................................................................. 94
9.8      Survival of Representations, Warranties and Agreements. ................................... 95
9.9      Failure or Indulgence Not Waiver; Remedies Cumulative. .................................. 95

iii

9.10    Marshalling; Payments Set Aside. ........................................................................ 96
9.11    Severability. ........................................................................................................ 96
9.12    Obligations Several; Independent Nature of the Lenders' Rights. ............................. 96
9.13    Maximum Amount. ............................................................................................... 96
9.14    Headings. ............................................................................................................. 97
9.15    Applicable Law. ................................................................................................... 97
9.16    Successors and Assigns. ........................................................................................ 97
9.17    Consent to Jurisdiction and Service of Process. ..................................................... 97
9.18    Waiver of Jury Trial. ............................................................................................. 98
9.19    Confidentiality. .................................................................................................... 98
9.20    Joint and Several Liability. .................................................................................... 99
9.21    Counterparts; Integration; Effectiveness; Electronic Execution. ............................. 100
9.22    USA Patriot Act Notification ................................................................................ 100

iv

**FIRST LIEN CREDIT AGREEMENT**

## EXHIBITS

Exhibit I........... Approved Budget
Exhibit II ......... Form of Assignment Agreement
Exhibit III........ Form of Assignment of Declarant's Rights
Exhibit IV........ Form of Compliance Certificate
Exhibit V ......... Form of Consent and Subordination of Affiliate Agreements
Exhibit VI........ Form of Intercreditor Agreement
Exhibit VII ...... Form of Notes
Exhibit VIII ..... Form of Disbursement Authorization
Exhibit IX........ Form of Notice of Conversion/Continuation
Exhibit X ......... Form of Pledge and Security Agreement
Exhibit XI........ Description of Project
Exhibit XII ...... Form of Subsidiary Guaranty
Exhibit XIII ..... Form of Trademark Security Agreement
Exhibit XIV ..... Form of Solvency Certificate
Exhibit XV ...... Form of Borrowing Base Certificate
Exhibit XVI..... Acknowledge for Qualified Sales Agreements
Exhibit XVII....Form of Consolidated Statement of Cash Flows

**FIRST LIEN CREDIT AGREEMENT**

**LAKE AT LAS VEGAS JOINT VENTURE and LLV-1, L.L.C.**

**FIRST LIEN CREDIT AGREEMENT**

This **CREDIT AGREEMENT** (this "**Agreement**") is dated as of November ___, 2004 and entered into by and among **LAKE AT LAS VEGAS JOINT VENTURE**, a Nevada general partnership, and **LLV-1, L.L.C.**, a Nevada limited liability company (collectively, the "**Borrowers**" and individually, a "**Borrower**"), **THE BANKS, FINANCIAL INSTITUTIONS AND OTHER ENTITIES LISTED ON THE SIGNATURE PAGES HEREOF** (each individually referred to herein as a "**Lender**" and collectively as the "**Lenders**"), and **CREDIT SUISSE FIRST BOSTON** ("**CSFB**"), as administrative agent for the Lenders (in such capacity, the "**Administrative Agent**"), as collateral agent for the Lenders (in such capacity, the "**Collateral Agent**") and as syndication agent (in such capacity, the "**Syndication Agent**"; together with the Administrative Agent and the Collateral Agent, the "**Agents**") for the Lenders.

R E C I T A L S

A. **WHEREAS**, the Borrowers desire that the Lenders extend certain term loans to the Borrowers hereunder, the proceeds of which, together with the proceeds of the loans under the Second Lien Credit Agreement will be used: (i) to make a one-time distribution to the holders of the Capital Stock of the Borrowers, (ii) to refinance the Bank of Scotland Loan, and (iii) to pay the Transaction Costs; and

B. **WHEREAS**, the Agents and the Lenders party hereto desire to enter into this Agreement to provide for such loans to the Borrowers subject to the terms and conditions contained herein.

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree to enter into this Credit Agreement as follows:

**SECTION 1.**
**DEFINITIONS**

1.1 **Certain Defined Terms.**

The following terms used in this Agreement shall have the following meanings:

"**Administrative Agent**" has the meaning assigned to that term in the preamble to this Agreement.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"**Affected Lender**" has the meaning assigned to that term in subsection 2.6C.

"**Affected Loans**" has the meaning assigned to that term in subsection 2.6C.

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Agents**" means, collectively, the Administrative Agent, the Collateral Agent and the Syndication Agent.

"**Agreement**" means this Credit Agreement dated as of November ___, 2004 as it may be amended, restated, amended and restated, supplemented or otherwise Modified from time to time.

"**Applicable Base Rate Margin**" means with respect to Loans that are Base Rate Loans, the applicable rate set forth on Appendix A attached hereto.

"**Applicable Eurodollar Rate Margin**" means with respect to Loans that are Eurodollar Rate Loans, the applicable rate set forth on Appendix A attached hereto:

"**Applicable Laws**" means, collectively, all statutes, laws, rules, regulations, ordinances, decisions, writs, judgments, decrees, and injunctions of any Governmental Authority affecting the Borrowers, any of their Subsidiaries, the Project or any Collateral, or any of the other assets of the Borrowers and their Subsidiaries, whether now or hereafter enacted and in force, and all Governmental Authorizations relating thereto, and all covenants, conditions, and restrictions contained in any instruments, either of record or known to the Borrowers or any of their Subsidiaries, at any time in force affecting any Real Property Asset or any part thereof, including any such covenants, conditions and restrictions which may (a) require improvements, repairs or alterations in or to such Real Property Asset or any part thereof or (b) limit the use and enjoyment of such Real Property Asset as used or intended to be used by the Borrowers and their Subsidiaries.

"**Appraised Value**" means the "Total Net Value" (as defined in the Initial Appraisal) of the Real Property Collateral as determined by the Appraiser in a Qualified Appraisal Update. As of the Effective Date, the Appraised Value of the Real Property Collateral is $1,093,000,000.

"**Appraiser**" means Cushman & Wakefield of California, Inc., or such other independent appraisal firm selected by the Administrative Agent.

"**Approved Budget**" means that certain capital expenditure budget and operating plan for the Project attached as Exhibit I attached hereto.

"**Approved Fund**" means any Fund or similar investment vehicle that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Asset Sale**" means the sale, lease, sale and leaseback, assignment, conveyance, transfer or other voluntary disposition (other than operating leases entered into in the Ordinary Course of Business) by the Borrowers or any of their Subsidiaries to any Person (other than the Loan Parties) of any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including, without limitation, Capital Stock (including, without limitation, of any of the Capital Stock of the Borrowers' Subsidiaries), but excluding with respect to sales of Excluded Assets (a) sales of inventory in the Ordinary Course of Business, which in the case of such asset sales in excess of $250,000 in a single transaction or series of related transactions, shall be certified in an Officer's Certificate as being in the Ordinary Course of Business, (b) sales of obsolete, worn out or excess equipment in the Ordinary Course of Business, which in the case of such asset sales in excess of $250,000 in a single transaction or series of related transactions, shall be certified in an Officer's Certificate as being a sale of obsolete, worn out or excess equipment in the Ordinary Course of Business, and (c) licenses of Intellectual Property entered into in the Ordinary Course of Business.

2

"**Assignment Agreement**" means an assignment and assumption agreement in substantially the form of Exhibit II annexed hereto or in such other form as may be approved by the Administrative Agent.

"**Assignment of Declarant's Rights**" means the Assignment of Declarant's Rights in CC&Rs dated as of the date hereof by Lake at Las Vegas Joint Venture in favor of the Collateral Agent, substantially in the form of Exhibit III annexed hereto, as such Assignment of Declarant's Rights may hereafter be amended, restated, amended and restated, supplemented or otherwise Modified from time to time.

"**Bank of Scotland Loan**" means that certain loan in the original principal amount of $80,000,000 made pursuant to the Bank of Scotland Loan Agreement.

"**Bank of Scotland Loan Agreement**" means that certain Loan Agreement dated as of October 31, 2002, by and among Lake at Las Vegas Joint Venture, LLV VHI, L.L.C., Marina Investors, L.L.C., Southshore Golf Club, L.L.C., BRJBO, L.L.C., Lake Las Vegas Properties, L.L.C., and Northshore Golf Club, L.L.C., as borrowers, and The Governor and Company of the Bank of Scotland and TriLyn LLV I, LLC, as lenders..

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"**Base Rate**" means, at any time, the higher of (a) the Prime Rate or (b) the rate which is 0.5% in excess of the Federal Funds Effective Rate.

"**Base Rate Loans**" means Loans bearing interest at rates determined by reference to the Base Rate as provided in subsection 2.2A.

"**BLM Property**" means the portion of the Real Property Collateral owned in fee simple by LLV-1.

"**Borrower Entity**" means any one of the Borrowers, their respective Subsidiaries or Joint Ventures.

"**Borrower Pension Plan**" means any pension plan, as defined in Section 3(2) of ERISA, other than a Pension Plan or Multiemployer Plan, which is intended to be qualified under Section 401(a) of the Internal Revenue Code and which is, or was within the past six years, maintained or contributed to by any Borrower Entity.

"**Borrowers**" means, collectively, LLV-1 and Lake Las Vegas JV.

"**Borrowers' Knowledge**" shall mean the actual knowledge, after due inquiry, of any Responsible Officer of the Borrowers.

"**Borrowing Base Availability**" has the meaning assigned to that term in subsection 2.9B.

"**Borrowing Base Certificate**" has the meaning assigned to that term in subsection 3.1U.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close; provided that, with respect to matters relating to Eurodollar Rate Loans, the term "**Business Day**" shall mean a day other than a Saturday,

3

**FIRST LIEN CREDIT AGREEMENT**

Sunday or other day on which commercial banks in New York City or London, England, are authorized or required by law to close.

"**Calculation Date**" has the meaning assigned to that term in subsection 6.6A.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, common stock, preferred stock, partnership interests (general and limited) and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**Cash**" means money, currency or a credit balance in a Deposit Account.

"**Cash Collateral**" means Cash held in a Deposit Account subject to a Control Agreement in favor of the Collateral Agent.

"**Cash EBITDA**" means the sum, without duplication, of Net Cash from Land Sales, Net Cash from Operations and Net Cash from Investments.

"**Cash Equivalents**" means (a) marketable securities issued or directly and unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof; (b) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having the highest rating obtainable from either S&P or Moody's; (c) commercial paper maturing no more than one year from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's; (d) certificates of deposit or bankers' acceptances maturing within one year from the date of acquisition thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, issued by any Lender or any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia having unimpaired capital and surplus of not less than $500,000,000 (each Lender and each such commercial bank being herein called a "**Cash Equivalent Bank**"); and (e) Eurodollar time deposits having a maturity of less than one year purchased directly from any Cash Equivalent Bank (provided such deposit is with such bank or any other Cash Equivalent Bank).

"**Cash from Land Sales**" means, with respect to Borrowers and their Subsidiaries, for any period and without duplication, (a) cash received during such period attributable to real estate transactions recognized for GAAP purposes which occurred during or prior to such period as either (i) a sale of real property, (ii) an option for the purchase of real property, or (iii) a transfer of real property (i.e., title has been transferred) that would be recognized as a sale for GAAP purposes if a sufficient cash payment had been received on account of such transfer (all amounts described in (i) through (iii) above included only if the cash received with respect such transaction is nonrefundable); (b) cash proceeds of any Permitted Receivables Financing or Permitted Receivables Sale; (c) principal collected in cash on receivables arising from real estate transactions to the extent such cash collected is not otherwise applied to the debt service of any Permitted Receivables Financing; (d) cash previously received in connection with a transaction described in (a)(i) through (iii) above which was previously refundable, but became

4

nonrefundable during the current period; and (e) reduced by commissions and closing costs properly allocable to such transactions.

"**Cash Proceeds**" means, with respect to any Asset Sale, Cash payments (including any Cash received by way of deferred payment pursuant to, or monetization of, a note receivable or otherwise, but only as and when so received) received from such Asset Sale.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"**Change of Control**" means any breach of the covenant contained in Section 5.19.

"**Cleanup**" means all actions required to:  (a) cleanup, remove, treat or remediate Hazardous Materials in the indoor or outdoor environment; (b) prevent the Release of Hazardous Materials so that they do not migrate, endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; or (c) perform pre-remedial studies and investigations and post-remedial monitoring and care.

"**Collateral**" means all of the properties and assets in which Liens are purported to be granted by the Collateral Documents.

"**Collateral Agent**" means CSFB, in its capacity as collateral agent hereunder and under the Collateral Documents, and any successor in such capacity.

"**Collateral Documents**" means the Pledge and Security Agreement, the Trademark Security Agreement, the Security Agreement and Assignment of Contractual Agreements, the Mortgages, the Intercreditor Agreement, the Consent and Subordination of Affiliate Agreements, Assignment of Declarant's Rights, and any other documents, instruments or agreements delivered by any Loan Party pursuant to this Agreement or any of the other Loan Documents in order to grant, protect or perfect liens on any assets of such Loan Party as security for all or any of the Obligations.

"**Commitments**" means the commitments of the Lenders to make Loans as set forth in subsection 2.1A of this Agreement.

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit IV annexed hereto delivered to the Administrative Agent by the Borrowers pursuant to subsection 5.3(iv).

"**Comprehensive Plan**" means the land use zoning and master development plan for Lake Las Vegas Resort, NorthShore Phase II and III dated December 9, 2002 and the land use zoning and master development plan for Lake Las Vegas Resort, The Falls Community dated February 24, 2004, revised March 10, 2004.

"**Condemnation Proceeds**" has the meaning assigned to that term in subsection 2.4B(ii)(c).

"**Consent and Subordination of Affiliate Agreements**" means the Consent and Subordination of Affiliate Agreements dated as of the date hereof among the Borrower Entities who are a party thereto and the Collateral Agent, substantially in the form of Exhibit V annexed hereto, as such Consent and

5

Subordination of Affiliate Agreements may hereafter be amended, restated, amended and restated, supplemented or otherwise Modified from time to time.

"**Consolidated Capital Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in cash or other consideration or accrued as a liability), by the Borrowers and their Subsidiaries during that period for land development costs and purchases of property, plant or equipment, and any comparable items reflected in the consolidated statement of cash flows of the Borrowers and their Subsidiaries (including, without limitation, all land development expenditures irrespective of any LID reimbursements).

"**Consolidated Interest Expense**" means, for any period (as determined for the Borrowers and their Subsidiaries on a consolidated basis), total interest expense (including that portion attributable to capital leases in accordance with GAAP) payable in cash in such period with respect to Recourse Debt, including, without limitation, all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Hedge Agreements, but excluding, however, (a) any amounts referred to in Section 2.3 payable to Agents or the Lenders on or before the Effective Date and (b) any amortized Transaction Costs.

"**Contingent Obligation**" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person (a) with respect to any Indebtedness, lease, dividend or other obligation of another if the primary purpose or intent thereof by the Person incurring the Contingent Obligation is to provide assurance to the obligee of such obligation of another that such obligation of another will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such obligation will be protected (in whole or in part) against loss in respect thereof, (b) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings, or (c) under Hedge Agreements. Contingent Obligations shall include, without limitation, (i) the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the Ordinary Course of Business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another, (ii) the obligation to make take-or-pay or similar payments if required regardless of non-performance by any other party or parties to an agreement, and (iii) any liability of such Person for the obligation of another through any agreement (contingent or otherwise) (A) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (B) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (A) or (B) of this sentence, the primary purpose or intent thereof is as described in the preceding sentence. The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if less, the amount to which such Contingent Obligation is specifically limited.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Control Agreement**" means a cash collateral control agreement in form and substance acceptable to the Administrative Agent.

"**CSFB**" means Credit Suisse First Boston.

"**Default**" means a condition or event that, after notice or after any applicable grace period has lapsed, or both, would constitute an Event of Default.

6

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Disbursement Authorization**" means a notice in the form of <u>Exhibit VIII</u> annexed hereto delivered by the Borrowers to the Administrative Agent pursuant to subsection 2.1B with respect to a proposed borrowing.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Effective Date**" means such date on or prior to November 1, 2004, on which the conditions to effectiveness set forth in Section 3.1 are satisfied.

"**Effective Date Projections**" has the meaning assigned to that term in subsection 4.14B.

"**Eligible Assignee**" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, (d) a commercial bank organized under the laws of the United States, or any State thereof, and having a combined capital and surplus of at least $250,000,000; (e) a savings and loan association or savings bank organized under the laws of the United States, or any State thereof, and having a combined capital and surplus of at least $250,000,000; (f) a commercial bank organized under the laws of any other country that is a member of the OECD or has concluded special lending arrangements with the International Monetary Fund associated with its General Arrangements to Borrow or a political subdivision of any such country, and having a combined capital and surplus of at least $250,000,000, so long as such bank is acting through a branch or agency located in the United States; (g) a finance company, insurance company or other financial institution or fund (whether a corporation, partnership, trust or other entity) that is engaged in making, purchasing or otherwise holding commercial loans in the ordinary course of its business and having a combined capital and surplus of at least $250,000,000 or an Approved Fund thereof and (h) any other Person (other than a natural person) approved by the Administrative Agent (such approval not to be unreasonably withheld or delayed) and so long as no Default or Event of Default has occurred and is continuing, approved by the Borrowers (such approval not to be unreasonably withheld or delayed); <u>provided</u> that notwithstanding the foregoing, "**Eligible Assignee**" shall not include the Borrowers or any Borrower Entity, other than any such Person that is a Lender as of the Effective Date.

"**Entitlement Documents**" has the meaning assigned to that term in Section 4.37.

"**Entitlements**" shall mean those certain Governmental Authorizations which are required to be obtained and maintained or appropriate in order to allow the expeditious and efficient completion of the development work for the Project and the sale of the Project (including, without limitation, the Real Property Collateral), and portions thereof as legal lots, all as contemplated by the Comprehensive Plan, and including, without limitation, all applicable earthwork, infrastructure, improvements, equipment, drainage, storm water and sewer systems, roadways and other work, labor or materials required to be furnished or actions to be taken by or in connection with amending, modifying, maintaining and perpetuating all of the foregoing, and the documents, agreements and instruments relating thereto. As of the Effective Date, the Entitlements consist of the Existing Entitlements.

"**Environmental Claim**" means any claim, action, investigation or written notice by any Person alleging potential liability (including, without limitation, potential liability for investigatory costs, Cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, or penalties) arising out of, based on or resulting from (a) the presence, or Release of any Hazardous Materials at any location, whether or not owned, leased or operated by the Borrowers any of

7

their Subsidiaries, or (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

"**Environmental Laws**" means all federal, state, local and foreign laws and regulations relating to pollution or protection of human health or the environment, including, without limitation, laws relating to Releases or threatened Releases of Hazardous Materials or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, Release, disposal, transport or handling of Hazardous Materials, laws and regulations with regard to record keeping, notification, disclosure and reporting requirements respecting Hazardous Materials and laws relating to the management or use of natural resources.

"**Environmental Liabilities**" means all liabilities, obligations, responsibilities, obligations to conduct Cleanup, and all Environmental Claims pending or threatened against any Loan Party or their Subsidiaries or against any Person whose liability for any Environmental Claim any Loan Party or their Subsidiaries may have retained or assumed either contractually or by operation of law, arising from (a) environmental, health or safety conditions, (b) the presence, Release or threatened Release of Hazardous Materials at any location, whether or not owned, leased or operated by the Borrowers or their Subsidiaries, or (c) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

"**Equity Proceeds**" means the sum of (i) cash proceeds from the issuance of any Capital Stock or other equity Securities of; less (ii) underwriting discounts and commissions and other Permitted Transaction Costs.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute.

"**ERISA Affiliate**" means (a) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which the Borrowers are a member; (b) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which the Borrowers are a member; and (c) solely for purposes of obligations under Section 412 of the Internal Revenue Code or under the applicable sections set forth in Section 414(t)(2) of the Internal Revenue Code, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which the Borrowers, any corporation described in clause (a) above or any trade or business described in clause (b) above is a member.

"**ERISA Event**" means (a) a "reportable event" within the meaning of Section 4043(c) of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (b) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(d) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 412(m) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (c) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (d) the withdrawal by the Borrowers or any ERISA Affiliate from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting, in either case, in liability pursuant to Section 4063 or 4064 of ERISA, respectively; (e) the institution by the PBGC of proceedings to terminate any Pension Plan pursuant to Section 4042 of ERISA; (f) the imposition of liability on the Borrowers or any ERISA Affiliate pursuant to Section 4062(e) or 4069 of ERISA or by reason of the

8

application of Section 4212(c) of ERISA; (g) the withdrawal by the Borrowers or any ERISA Affiliate in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan resulting in withdrawal liability pursuant to Section 4201 of ERISA, or the receipt by the Borrowers or any ERISA Affiliate of written notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4042 of ERISA or under Section 4041A of ERISA if such termination would result in liability to the Borrowers or any ERISA Affiliate; (h) the disqualification by the Internal Revenue Service of any Pension Plan or Borrower Pension Plan under Section 401(a) of the Internal Revenue Code, or the determination by the Internal Revenue Service that any trust forming part of any Pension Plan or Borrower Plan fails to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (i) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

"**Eurocurrency Reserve Requirements**" means, for each Interest Period for each Eurodollar Rate Loan, the highest reserve percentage applicable to any Lender during such Interest Period under regulations issued from time to time by the Board of Governors of the Federal Reserve System or any successor for determining the maximum reserve requirement (including, without limitation, any emergency, supplemental or other marginal reserve requirement), with respect to liabilities or assets consisting of or including Eurocurrency liabilities having a term equal to such Interest Period.

"**Eurodollar Base Rate**" means the rate per annum determined by the Administrative Agent at approximately 11:00 A.M. (London time) on the date which is two (2) Business Days prior to the beginning of the relevant Interest Period (as specified in the applicable Disbursement Authorization or Notice of Conversion/Continuation) by reference to the British Bankers' Association Interest Settlement Rates for deposits in Dollars (as set forth by any service selected by the Administrative Agent which has been nominated by the British Bankers' Association as an authorized information vendor for the purpose of displaying such rates) for a period equal to such Interest Period; provided that, to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "Eurodollar Base Rate" shall be the interest rate per annum determined by the Administrative Agent to be the average of the rates per annum at which deposits in Dollars are offered for such relevant Interest Period to major banks in the London interbank market in London, England by the Reference Lenders at approximately 11:00 A.M. (London time) on the date which is two (2) Business Days prior to the beginning of such Interest Period. If any of the Reference Lenders shall be unable or shall otherwise fail to supply such rates to the Administrative Agent upon its request, the rate of interest shall be determined on the basis of the quotations of the remaining Reference Lenders.

"**Eurodollar Rate Loans**" means Loans bearing interest at rates determined by reference to the Reserve Adjusted Eurodollar Rate as provided in subsection 2.2A.

"**Event of Default**" means each of the events set forth in Section 7.

"**Excess Cash Flow**" means, for any period, (a) Cash EBITDA, less (b) the sum for such period of the debt service for the Indebtedness defined herein as Total Recourse Debt (including, without limitation, the Indebtedness evidenced by the Loan Documents and the Second Lien Loan Documents).

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Asset Operating Deficit**" means, for any period, any negative cash flow resulting from the operations of any Excluded Assets.

"**Excluded Assets**" means the assets and other property owned by a Borrower or any Subsidiary of a Borrower that is not included as part of the Collateral.

"**Excluded Subsidiary**" means LHW MonteLago Investors, L.L.C., a Nevada limited liability company.

"**Excluded Taxes**" means, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of the Borrowers hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lender Office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Borrowers are located and (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrowers under subsection 2.8B), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new Lender Office) or is attributable to such Foreign Lender's failure (other than as a result of a Change in Law) to comply with subsection 2.7E(v), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Lender Office (or assignment), to receive additional amounts from the Borrowers with respect to such withholding tax pursuant to subsection 2.7E(i).

"**Existing Entitlements**" means the Entitlements listed on Schedule 4.37 attached hereto.

"**Existing Purchase Agreements**" means those agreements between a Borrower and a third party purchaser relating to the Real Property Collateral which are identified on Schedule 1.1(a) attached hereto as Material Contracts.

"**Existing Subsidiaries**" means the Subsidiaries listed on Schedule 1.1(b) attached hereto.

"**Federal Funds Effective Rate**" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by the Administrative Agent.

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the most senior Lien (other than Permitted Title Exceptions) to which such Collateral is subject.

"**Fiscal Quarter**" means a fiscal quarter of a Fiscal Year.

"**Fiscal Year**" means the fiscal year of the Borrowers and their Subsidiaries ending on December 31 of each calendar year.

"**Flood Hazard Property**" means a Mortgaged Property located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"**FLSA**" means the Fair Labor Standards Act of 1938.

10

"**Foreign Lender**" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrowers are residents for tax purposes.  For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans or similar extensions of credit in the ordinary course of its business.

"**Funding and Payment Office**" means the office of the Administrative Agent located at 11 Madison Avenue, New York, NY 11010 (or such office of the Administrative Agent or any successor Administrative Agent specified by the Administrative Agent or such successor Administrative Agent in a written notice to the Loan Parties and the Lenders).

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.2, generally accepted accounting principles, as in effect in the United States of America and on the date of determination.

"**Governmental Authority**" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Governmental Authorization**" means any permit, approval, license, zoning and other resolution, certificate of occupancy, authorization, plan, directive, consent order, consent decree or similar authorizations of or from any Governmental Authority.

"**Granting Lender**" has the meaning assigned to that term in subsection 9.1G.

"**Guarantor**" means, individually, the Subsidiary Guarantors, or any other guarantor of the Obligations, and "**Guarantors**" means, collectively, the Subsidiary Guarantors and each other guarantor of the Obligations.

"**Guaranty**" means the Subsidiary Guaranty.

"**Hazardous Materials**" means any chemical, material or substance, the generation, use, storage, transportation or disposal of which, or the exposure to which, is prohibited, limited or regulated by any Governmental Authority or which may or could pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any Real Property Asset or to the indoor or outdoor environment.

"**Hedge Agreements**" means all interest rate swaps, caps or collar agreements or similar arrangements entered into by the Borrowers or any of their Subsidiaries providing for protection against fluctuations in interest rates or currency exchange rates or the exchange of nominal interest obligations, either generally or under specific contingencies.

"**Homebuilder**" means any third party nationally recognized home builder including, without limitation, any of the following:  Centex Homes, Intrawest California Holdings, Inc., Pardee Homes of Nevada, Coleman-Toll Limited Partnership, Twin Development, LLC, Danville Land Investments, Lennar Homes, Beazer Homes, Shea Homes, William Lyon Homes, Capital Pacific Homes, D.R. Horton,

**FIRST LIEN CREDIT AGREEMENT**

Lewis Homes, Pulte Homes, Ryland Homes, Wexford Homes, Urban West Communities, Innovative Resort Communities, Tousa Homes, Inc. (dba Engle Homes) and Amstar Homes.

"**Indebtedness**" means, as applied to any Person, without duplication, (a) all indebtedness for borrowed money, (b) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP, (c) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money (other than current accounts payable incurred in the Ordinary Course of Business and accrued expenses incurred in the Ordinary Course of Business), (d) any obligation owed for all or any part of the deferred purchase price of property or services (excluding any such obligations incurred under ERISA and current trade payables incurred in the Ordinary Course of Business, but including earn-outs with respect to any acquisition), (e) all obligations evidenced by notes, bonds (other than performance bonds), debentures or other similar instruments, (f) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property or assets acquired by such Person (even though the rights and remedies of the seller or the lender under such agreement in the event of default are limited to repossession or sale of such property or assets), (g) all obligations, contingent or otherwise, as an account party under any letter of credit or under acceptance, letter of credit or similar facilities to the extent not reflected as trade liabilities on the balance sheet of such Person in accordance with GAAP, (h) all obligations, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock, (i) all obligations under Hedge Agreements with a Lender or an Affiliate of a Lender, including, as of any date of determination, the net amounts, if any, that would be required to be paid by such Person if such Hedge Agreements were terminated on such date, (j) all Contingent Obligations in respect of obligations of the kind referred to in clauses (a) through (i) above or in respect of the payment of dividends on the Capital Stock of any other Person, and (k) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; provided, that if such Person has not assumed such secured indebtedness that is nonrecourse to its credit, then the amount of indebtedness of such Person pursuant to this clause (k) shall be equal to the lesser of the amount of the secured indebtedness or the fair market value of the assets of such Person which secure such indebtedness.

"**Indemnified Taxes**" means Taxes other than Excluded Taxes.

"**Indemnitee**" has the meaning assigned to that term in subsection 9.2B.

"**Initial Appraisal**" means that certain "Appraisal of Real Property" (The Remaining Portions of the Lake Las Vegas Residential Community) dated as of August 10, 2004, and prepared by the Appraiser for the Administrative Agent.

"**Insolvency Proceeding**" means (A) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors, or (B) any general assignment for the benefit of creditors, composition, marshalling of assets for creditors or other, similar arrangement in respect of its creditors generally or any substantial portion of its creditors; in each case (A) and (B) undertaken under U.S. Federal, State or foreign law, including the Bankruptcy Code.

"**Insurance Proceeds**" has the meaning assigned to that term in subsection 2.4B(ii)(c).

"**Intellectual Property**" has the meaning assigned to that term in the Pledge and Security Agreement.

"**Intercreditor Agreement**" means that certain Intercreditor Agreement dated as of the date hereof, substantially the form of Exhibit VI attached hereto, entered into by and between the Collateral Agent and Administrative Agent and CSFB, as collateral agent and administrative agent under and as defined in the Second Lien Credit Agreement.

"**Interest Coverage Ratio**" has the meaning assigned to that term in subsection 6.6D.

"**Interest Payment Date**" means:

> (a)     with respect to any Base Rate Loan, the last Business Day in each of March, June, September and December of each year, commencing on December 30, 2004; and

> (b)     with respect to any Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan; provided that in the case of each Interest Period of longer than three months, "Interest Payment Date" shall also include the date that is three months after the commencement of such Interest Period.

"**Interest Period**" has the meaning assigned to that term in subsection 2.2B.

"**Interest Rate Determination Date**" means each date for calculating the Reserve Adjusted Eurodollar Rate, for purposes of determining the interest rate in respect of an Interest Period. The Interest Rate Determination Date for purposes of calculating the Reserve Adjusted Eurodollar Rate shall be the second Business Day prior to the first day of the related Interest Period.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter and any successor statute.

"**Investment**" means (a) any direct or indirect purchase or other acquisition by the Borrowers or any of their Subsidiaries of, or of a beneficial interest in, Capital Stock or other Securities of any other Person, or (b) any direct or indirect loan, advance (other than advances to employees for moving, education, computer, entertainment and travel expenses, drawing accounts and similar expenditures in the Ordinary Course of Business) or capital contribution by the Borrowers or any of their Subsidiaries to any other Person or in respect of any Excluded Asset Operating Deficit, including all indebtedness and accounts receivable acquired from that other Person that are not current assets or did not arise from sales to that other Person in the Ordinary Course of Business; provided, however, so long as no Excluded Asset Operating Deficit has occurred, the term "Investment" shall not include (i) current trade and customer accounts receivable for goods furnished or services rendered in the Ordinary Course of Business and payable in accordance with customary trade terms, and (ii) advances and prepayments to suppliers for goods and services in the Ordinary Course of Business. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"**IP Collateral**" has the meaning assigned to the term "Intellectual Property" in the Trademark Security Agreement.

"**Joint Venture**" means any Person in which the Borrowers or any of their Subsidiaries has an ownership interest, but not more than a 50% ownership interest (or if more than a 50% ownership interest in such Person is held by the Borrowers or any of their Subsidiaries, the results of such Person's operations are not consolidated, in accordance with GAAP, with the results of the Borrowers' operations for financial reporting purposes).

**FIRST LIEN CREDIT AGREEMENT**

"**Joint Venture Appraisal**" has the meaning assigned to such term in subsection 6.9(iii).

"**Lake Las Vegas JV**" means Lake at Las Vegas Joint Venture, a Nevada general partnership.

"**Land Entitled**" means the portion of the Real Property Collateral, which is neither Land Under Contract to Homebuilders nor Land Under Option Contract to Homebuilders, and which has all of the Existing Entitlements.

"**Land Expenses**" means, in respect of any portion of the Real Property Collateral, the general and administrative expenses, marketing expenses, land development costs (consisting of land development costs minus all LID reimbursements), and carry costs (consisting of management and other fees, LID assessments, taxes, insurance costs, capital expenditures, and property owners association subsidies and reserve funding) relating to such portion of the Real Property Collateral, excluding, however, the aggregate amount of the foregoing costs and expenses incurred prior to the Effective Date in connection with the purchase by LLV-1 of approximately 982 acres in 2004 from the Bureau of Land Management (the remainder of which is referred to herein as the BLM Property).

"**Land Under Contract to Homebuilders**" means any portion of the Real Property Collateral, which has all of the Existing Entitlements, subject to an Qualified Homebuilder Purchase Agreement which (i) is in full force and effect, and (ii) is not subject to any default by any party thereto.

"**Land Under Option Contract to Homebuilders**" means any portion of the Real Property Collateral, which has all of the Existing Entitlements, subject to an Qualified Homebuilder Option Agreement which (i) is in full force and effect, and (ii) is not subject to any default by any party thereto.

"**Land Unentitled**" means any Real Property Collateral that does not constitute Land Entitled, Land Under Contract to Homebuilders or Land Under Option Contract to Homebuilders.

"**Lender**" and "**Lenders**" means the Persons identified as "Lenders" and listed on the signature pages of this Agreement, together with their successors and permitted assigns pursuant to Section 9.1; provided that the term "Lenders", when used in the context of a particular Loan Commitment shall mean the Lenders having that Loan Commitment.

"**Lender Office**" means, as to any Lender, the office or offices of such Lender specified in the Administrative Questionnaire completed by such Lender and delivered to the Administrative Agent, and the office or offices of such Lender that the Administrative Agent notifies the Borrowers promptly but no later than two days after the Effective Date, or such other office or offices as such Lender may from time to time designate to the Borrowers and the Administrative Agent.

"**Leverage Ratio**" has the meaning assigned to that term in subsection 6.6A.

"**LID**" means the T-1 Local Improvement District, the T-12 Local Improvement District and, to the extent approved by the City of Henderson, Nevada, the T-16 Improvement District.

"**LID Agreements**" means any and all documents relating to the local improvement districts formed or to be formed by the City of Henderson, Nevada for the Project, including, without limitation: (i) City of Henderson, Nevada Local Improvement District No. T-1 (Lake Las Vegas) Limited Obligation Improvement Bonds, 1994 Series A in the original principal amount of $46,000,000 (as of June 30, 2004, the balance is $15,941,851); (ii) City of Henderson, Nevada Local Improvement District T-12 (Lake Las Vegas NorthShore), Limited Obligation Improvement Bonds, 1998 Series A in the original principal amount of $50,000,000 (as of June 30, 2004, the balance is $42,060,195) ; and (iii) the Local

14

Improvement District No. T-16 (Lake Las Vegas BLM Property) Limited Obligation Improvement Bonds, projected to be approved by the City of Henderson, Nevada, in December, 2004, in the amount of $45,000,000.

"**Lien**" means any lien, mortgage, pledge, assignment, security interest, fixed or floating charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give any security interest) and any option, trust or deposit or other preferential arrangement having the practical effect of any of the foregoing.

"**LLV-1**" means LLV-1, L.L.C., a Nevada limited liability company.

"**Loan Commitment**" means the commitment of a Lender to make a Loan to the Borrowers pursuant to subsection 2.1A in the amount set forth in the Register.

"**Loan Documents**" means this Agreement, the Notes, the Guaranties and the Collateral Documents or other documents evidencing or securing Obligations.

"**Loan Exposure**" means, with respect to any Lender, as of any date of determination the outstanding principal amount of the Loan of that Lender.

"**Loan Parties**" means the Borrowers and any of the Borrowers' Affiliates and/or direct or indirect Subsidiaries who execute any of the Loan Documents.

"**Loans**" mean the loans outstanding or made by the Lenders pursuant to subsection 2.1A.

"**Major Collateral Sale**" means a Permitted Collateral Asset Sale with a gross sales price in excess of $50,000,000.

"**Major Joint Venture Transaction**" means a Permitted Joint Venture Transaction which contemplates the contribution of a portion of the Real Property Collateral to a Joint Venture which portion of the Real Property Collateral has an Appraised Value of more than $15,000,000.

"**Margin Stock**" has the meaning assigned to that term in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**Material Adverse Effect**" means (a) a material adverse effect upon the business, operations, properties, assets, condition (financial or otherwise) or prospects of the Borrowers and their Subsidiaries, taken as a whole, (b) the material impairment of the ability of the Loan Parties to perform the Obligations, (c) a material adverse effect upon the legality, validity, binding effect or enforceability against a Loan Party of a Loan Document to which it is a party, (d) a material adverse effect upon the rights, remedies and benefits, available to, or conferred upon, the Agents or any Lender under any Loan Document, (e) a material adverse effect upon the value of the Real Property Collateral, and (f) a material adverse effect upon the Entitlements and the intended development of the Real Property Collateral.

"**Material Contracts**" has the meaning assigned to that term in subsection 4.34A.

"**Material Environmental Liability**" means an Environmental Liability which may result in (i) a discontinuation of a substantial portion of the business, operations or development of any of the Borrowers or their Subsidiaries, (ii) potential Cleanup costs in excess of $500,000, or (iii) any designation of any portion of the Real Property Assets on a list maintained by any Governmental Authority of sites at which a Release of Hazardous Materials has occurred.

15

"**Maturity Date**" means November 1, 2009.

"**Maximum Amount**" has the meaning assigned to that term in subsection 9.13A.

"**Modifications**" shall mean any amendments, supplements, modifications, renewals, replacements, consolidations, severances, substitutions and extensions of any document or instrument from time to time; "Modify", "Modified," or related words shall have meanings correlative thereto.

"**Moody's**" means Moody's Investors Service, Inc.

"**Mortgage**" means a deed of trust, assignment of leases and rents, security agreement and fixture filing executed and delivered by any Loan Party after the Effective Date in such form as may be approved by the Collateral Agent, with such changes thereto as may be recommended by the Collateral Agent's local counsel based on local laws or customary local mortgage or deed of trust practices, as such security instrument may be amended, restated, amended and restated, supplemented, or otherwise Modified from time to time. "**Mortgages**" means all such instruments collectively.

"**Mortgagee Policy**" has the meaning assigned to that term in subsection 3.1G.

"**Multiemployer Plan**" means a "multiemployer plan", as defined in Section 4001(a)(3) of ERISA, to which the Borrowers or any ERISA Affiliate is contributing or to which the Borrowers or any ERISA Affiliate had an obligation to contribute within the last six years.

"**Net Cash from Investments**" means, for any period, cash from Investments received by the Borrowers or their Subsidiaries (including cash from Investments in the hotel and marina related assets and cash from Investments in Joint Ventures pursuant to one or more Permitted Joint Venture Transactions), less interest and principal repayments on all Indebtedness associated with such Investments that is non-recourse to the Borrowers.

"**Net Cash from Operations**" means, for any period, cash from operations of the Project (including cash from operations related to the golf courses (including sales of memberships), yacht club, Como's restaurant and other recreational operations relating to the operation of the Project), less interest and principal repayments on all Indebtedness associated with such operations that is non-recourse to the Borrowers.

"**Net Cash from Land Sales**" means, for any period, Cash From Land Sales less Land Expenses.

"**Non-Consenting Lender**" has the meaning assigned to that term in subsection 9.5B.

"**Notes**" means (a) the promissory notes of the Borrowers issued pursuant to subsection 2.1D on the Effective Date and (b) any promissory notes issued by the Borrowers in connection with assignments of the Loans of any Lender, in each case substantially in the form of Exhibit VII annexed hereto, as they may be amended, restated, amended and restated, supplemented or otherwise Modified from time to time.

"**Notice of Conversion/Continuation**" means a notice substantially in the form of Exhibit IX annexed hereto delivered by the Borrowers to the Administrative Agent pursuant to subsection 2.2D with respect to a proposed conversion or continuation of the applicable basis for determining the interest rate with respect to the Loans specified therein.

"**Obligations**" means all obligations of every nature of each Loan Party from time to time owed to the Agents, the Lenders or any of them or their respective Affiliates under the Loan Documents, or, if

approved by the Administrative Agent, Hedge Agreements, whether for principal, interest or payments for early termination of Hedge Agreements, fees, expenses, indemnification or otherwise.

"**OECD**" means the Organisation for Economic Co-Operation and Development.

"**Officer's Certificate**" means, with respect to any Person, a certificate executed on behalf of such Person (a) if such Person is a partnership or limited liability company, by its chairman of the Board (if an officer) or chief executive officer or by the chief financial officer of its general partner or managing member or other Person authorized to do so by its Organizational Documents, (b) if such Person is a corporation, on behalf of such corporation by its chairman of the board (if an officer) or chief executive officer or its chief financial officer or vice president, and (c) if such person is one of the Borrowers or a Subsidiary of the Borrowers, a Responsible Officer.

"**Operating Lease**" means, as applied to any Person, any lease (including, without limitation, leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) that is not a Capital Lease other than any such lease under which that Person is the lessor.

"**Ordinary Course of Business**" means, with respect to a specific Person, the ordinary course of such Person's business, substantially as conducted by any such Person prior to and as of the Effective Date, and (A) undertaken by such Person in good faith and not for purposes of evading any covenant or restriction in any Loan Document, and (B) which shall not in any event interfere with the ongoing operation of the assets of such Person in a manner consistent with similar properties and shall not interfere with the day-to-day operations of such assets as contemplated in the Loan Documents.

"**Organizational Authorizations**" means, with respect to any Person, resolutions of its Board of Directors, general partners or members of such Person, and such other Persons, groups or committees (including, without limitation, managers and managing committees), if any, required by the Organizational Certificate or Organizational Documents of such Person to authorize or approve the taking of any action or the entering into of any transaction.

"**Organizational Certificate**" means, with respect to any Person, the certificate or articles of incorporation, partnership or limited liability company or any other similar or equivalent organizational, charter or constitutional certificate or document filed with the applicable Governmental Authority in the jurisdiction of its incorporation, organization or formation, which, if such Person is a partnership or limited liability company, shall include such certificates, articles or other certificates or documents in respect of each partner or member of such Person.

"**Organizational Documents**" means, with respect to any Person, the by-laws, partnership agreement, limited liability company agreement, operating agreement, management agreement or other similar or equivalent organizational, charter or constitutional agreement or arrangement, which, if such Person is a partnership or limited liability company, shall include such by-laws, agreements or arrangements in respect of each partner or member of such Person.

"**OSHA**" means the Occupational Safety and Hazard Act of 1970.

"**Other Taxes**" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"**Participant**" has the meaning assigned to that term in subsection 9.1D.

17

"**Participant Register**" has the meaning assigned to that term in subsection 9.1.D(iv).

"**PBGC**" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA (or any successor thereto).

"**PCBs**" has the meaning assigned to that term in subsection 4.33(vi).

"**Pension Plan**" means any employee pension benefit plan, as defined in Section 3(2) of ERISA, other than a Multiemployer Plan, which is subject to Title IV of ERISA and is, or was within the past six years, maintained or contributed to by the Borrowers or any ERISA Affiliate.

"**Permitted Collateral Asset Sale**" means any transaction (or series of transactions) constituting an arms length sale of a portion of the Real Property Collateral to a third party in the Ordinary Course of Business pursuant to a Qualified Sales Agreement.

"**Permitted Encumbrances**" means the following types of Liens:

(a)     Liens for taxes, assessments or governmental charges or claims the payment of which is not, at the time, required by Section 5.5;

(b)     statutory Liens of landlords, statutory Liens of carriers, warehousemen, mechanics and materialmen and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or by ERISA) incurred in the Ordinary Course of Business for sums not yet delinquent or is being Properly Contested;

(c)     Liens incurred or deposits made in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive, in each case, of obligations for the payment of borrowed money or other Indebtedness);

(d)     any attachment or judgment Lien with respect to a money judgment, writ, warrant of attachment or similar process not constituting an Event of Default, so long as such Lien could not reasonably be expected to have a Material Adverse Effect;

(e)     leases, subleases, licenses and sublicenses granted to others (in the Ordinary Course of Business) not interfering with the ordinary conduct of the business or operations of the Borrowers or any of their Subsidiaries;

(f)     easements, covenants, conditions, rights-of-way, restrictions, minor defects, encroachments or irregularities in title and other similar charges or encumbrances entered into in the Ordinary Course of Business of the Borrowers or any of their Subsidiaries;

(g)     any (i) interest or title of a lessor or sublessor under any Capital Lease permitted by subsection 6.1(v) or any operating lease not prohibited by this Agreement, (ii) restriction or encumbrance that the interest or title of such lessor or

**FIRST LIEN CREDIT AGREEMENT**

sublessor may be subject to, or (iii) subordination of the interest of the lessee or sublessee under such lease to any restriction or encumbrance referred to in the preceding clause (ii);

(h)     deposits in the Ordinary Course of Business to secure liabilities to insurance carriers, lessors, utilities and other service providers;

(i)     zoning, building codes and other Governmental Authorizations regulating the use, development and/or occupancy of any Real Property Asset or activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such Real Property Asset which are not violated and would not be violated by the current and contemplated use, development and/or occupancy of such Real Property Asset or the operation of the business of the Borrowers or any of their Subsidiaries thereon;

(q)     bankers liens and rights of setoff with respect to customary depository arrangements entered into in the Ordinary Course of Business; and

(r)     with respect to the Real Property Collateral, the Permitted Title Exceptions.

"**Permitted Equipment Financing**" means financing obtained in the Ordinary Course of Business which is secured solely by furnishings, fixtures and equipment acquired using the proceeds of such financing in the aggregate amount not to exceed $1,000,000.

"**Permitted Excluded Asset Sale**" means with respect to any Excluded Asset, any bona fide Asset Sale to a Person which is not an Affiliate of Borrowers or their Subsidiaries in the Ordinary Course of Business for fair value.

"**Permitted Existing Indebtedness**" means the Indebtedness set forth on Schedule 1.1(c) attached hereto.

"**Permitted Investment/Restricted Payment Amount**" means an amount equal to 50% of Excess Cash Flow received by the Borrowers or their Subsidiaries from and after the Effective Date; provided that after giving effect to any applicable payment or Investment, (1) the Borrowing Base Availability shall exceed the aggregate amount of the Obligations and the Indebtedness under the Second Lien Credit Agreement on a Pro Forma Basis, and (2) the Leverage Ratio shall be less than 2.50 to 1.00 on a Pro Forma Basis. In the event that the conditions set forth in clauses (1) and (2) above are not satisfied, the Permitted Investment/Restricted Payment Amount shall equal zero.

"**Permitted Joint Venture Transaction**" means any Asset Sale permitted by subsection 6.9(iii).

"**Permitted Receivables Financing**" means financing obtained in the Ordinary Course of Business which is secured solely by an assignment of one or more note receivables held by the Borrowers which were obtained in connection with any Permitted Collateral Asset Sale, which financing in the aggregate amount shall not exceed $75,000,000, and which financing does not encumber or otherwise have a Lien on any portion of the Collateral.

"**Permitted Receivables Sale**" means any sale of a note receivable which is made in the Ordinary Course of Business, without recourse to the Borrowers or their Subsidiaries, and otherwise on an arms length basis for not less than substantially all of the fair market value of such note receivable.

FIRST LIEN CREDIT AGREEMENT

"**Permitted Title Exceptions**" means the title exceptions reflected in the Mortgagee Policies.

"**Permitted Transaction Costs**" means bona fide, reasonable, direct costs actually incurred by Borrowers or their Subsidiaries in connection with an Asset Sale, the issuance of debt Securities (or incurrence of borrowed Indebtedness), or the receipt of Equity Proceeds, including, without limitation, (a) transfer, sales, use and other taxes payable in connection with such Asset Sale, (b) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any permitted Indebtedness (other than the Loans) that is secured by a Lien on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such transaction, and (c) brokers' or advisors' commissions, and (d) fees and expenses of counsel and other advisors in connection with such Asset Sale.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"**Pledge and Security Agreement**" means the Pledge and Security Agreement dated as of the date hereof and entered into by and among the Borrowers, the Subsidiary Guarantors and the Collateral Agent, substantially in the form of  Exhibit X  annexed hereto, as such Pledge and Security Agreement may hereafter be amended, restated, amended and restated, supplemented or otherwise Modified from time to time.

"**Pledging Parent**" has the meaning assigned to that term in subsection 5.11.

"**Prime Rate**" means the rate of interest per annum announced from time to time by CSFB as its prime commercial lending rate in effect at its principal office in New York City.  The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. CSFB or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"**Proceedings**" has the meaning assigned to that term in subsection 5.3(xii).

"**Pro Forma Basis**" means, with respect to compliance with any test or covenant hereunder, compliance with such covenant or test after giving effect to any proposed acquisition, distribution or other action which requires compliance on a pro forma basis (including pro forma adjustments arising out of events which are directly attributable to a specific transaction, are factually supportable and are expected to have a continuing impact, in each case determined on a basis consistent with Article 11 of Regulation S-X of the Securities Act and as interpreted by the staff of the Securities and Exchange Commission, which pro forma adjustments shall be certified by the chief financial officer of the Borrowers), using, for purposes of determining such compliance, the historical financial statements of all entities or assets so acquired or to be acquired and the consolidated financial statements of the Borrowers and their Subsidiaries which shall be reformulated (a) as if such acquisition, distribution or other action, and any acquisitions which have been consummated during the period, and any Indebtedness or other liabilities incurred in connection with any such acquisition, distribution or other action had been consummated at the beginning of such period (and assuming that such Indebtedness bears interest during any portion of the applicable measurement period prior to the relevant acquisition at the weighted average of the interest rates applicable to outstanding Loans during such period), and (b) otherwise in conformity with such procedures as may be agreed upon between the Administrative Agent and the Borrowers, all such calculations to be in form and substance reasonably satisfactory to the Administrative Agent.

"**Project**" means that certain project located in Henderson, Nevada, commonly known as the Lake Las Vegas Resort and depicted on the map attached hereto as Exhibit XI.

**FIRST LIEN CREDIT AGREEMENT**

"**Properly Contested**" means, in the case of any Indebtedness of a Loan Party (including any Taxes) that is not paid as and when due or payable by reason of such Loan Party's bona fide dispute concerning its liability to pay same or concerning the amount thereof: (i) such Indebtedness is being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (ii) such Loan Party has established appropriate reserves as shall be required in conformity with GAAP; (iii) the non-payment of such Indebtedness could not reasonably be expected to have a Material Adverse Effect; (iv) no Lien is imposed upon any of such Loan Party's assets with respect to such Indebtedness unless such Lien is at all times junior and subordinate in priority to the Liens in favor of the Collateral Agent (except only with respect to property taxes that have priority as a matter of applicable state law and as set forth in the Intercreditor Agreement) and enforcement of such Lien is stayed during the period prior to the final resolution or disposition of such dispute; (v) if the Indebtedness results from, or is determined by the entry, rendition or issuance against a Loan Party or any of its assets of a judgment, writ, order or decree, enforcement of such judgment, writ, order or decree is stayed pending a timely appeal or other judicial review; and (vi) if such contest is abandoned, settled or determined adversely (in whole or in part) to such Loan Party, such Loan Party forthwith pays such Indebtedness and all penalties, interest and other amounts due in connection therewith.

"**Pro Rata Share**" means with respect to all payments, computations and other matters relating to the Loans of any Lender, the percentage obtained by dividing (i) the Loan Exposure of that Lender by (ii) the aggregate Loan Exposure of all the Lenders; in any such case as the applicable percentage may be adjusted by assignments permitted pursuant to subsection 9.1. The initial Pro Rata Share of each Lender is set forth in the Register.

"**PTO**" means the United States Patent and Trademark Office.

"**Qualified Appraisal**" means the Initial Appraisal and any other real estate appraisal conducted in accordance with the Uniform Standards of Professional Appraisal Practice (as promulgated by the Appraisal Standards Board of the Appraisal Foundation) and all requirements of Applicable Law applicable to Administrative Agent undertaken by an Appraiser, and providing an assessment of "Total Net Value" (as defined in the Initial Appraisal) of the remaining Real Property Collateral, the form and substance of such appraisal to be reviewed and approved by the Administrative Agent in its reasonable judgment.

"**Qualified Appraisal Update**" means a quarterly update of the Initial Appraisal or other Qualified Appraisal prepared by the same appraiser who prepared such appraisal, the form and substance of such update to be reviewed and approved by the Administrative Agent in its reasonable judgment.

"**Qualified Homebuilder Option Agreement**" means a definitive and binding option agreement between a Borrower and a Homebuilder pursuant to which the Borrower has received a non-refundable option payment equal to 15% (or more) of the aggregate base purchase price (subject only to a refund in the event of a material default by such Borrower) contemplated for the sale of the subject Real Property Collateral encumbered by such option agreement; provided, however, to the extent such option agreement contemplates a Major Collateral Sale, then as a condition to such option agreement qualifying as a Qualified Homebuilder Option Agreement, the applicable Borrower must provide the Administrative Agent with a Borrowing Base Certificate showing Pro Forma compliance as required by subsection 2.9A(i).

"**Qualified Homebuilder Purchase Agreement**" means a definitive and binding purchase agreement between a Borrower and a Homebuilder pursuant to which a non-refundable deposit of 15% (or more) of the aggregate base purchase price (subject only to a refund in the event of a material default by such Borrower) contemplated for the subject Real Property Collateral and which, by its terms, (i)

**FIRST LIEN CREDIT AGREEMENT**

obligates the Homebuilder to purchase the subject Real Property Collateral subject only to customary closing conditions; and (ii) does not permit the Homebuilder to terminate the Agreement except upon the material default of the Borrower; provided, however, to the extent such purchase agreement contemplates a Major Collateral Sale, then as a condition to such purchase agreement qualifying as a Qualified Homebuilder Purchase Agreement, the applicable Borrower must provide the Administrative Agent with a Borrowing Base Certificate showing Pro Forma compliance as required by subsection 2.9A(i).

"**Qualified Other Sales Agreement**" means a definitive and binding purchase agreement between a Borrower and a non-affiliate third party (other than a Qualified Homebuilder Option Agreement, a Qualified Homebuilder Purchase Agreement or a Qualified Retail Purchase Agreement) which complies with the requirements of Section 6.9 or has been approved by the Administrative Agent, which approval shall not be unreasonably withheld.

"**Qualified Retail Purchase Agreement**" means a definitive and binding purchase agreement between a Borrower and a non-affiliate third party relating to a portion of the Real Property Collateral being sold in the Ordinary Course of Business with a purchase price of less than $5,000,000 which complies with the requirements of Section 6.9.

"**Qualified Sales Agreement**" means any of a Qualified Homebuilder Option Agreement, Qualified Homebuilder Purchase Agreement, Qualified Other Sales Agreement or Qualified Retail Purchase Agreement.

"**Real Property Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by any Borrower Entity in any real property.

"**Real Property Collateral**" or "**Mortgaged Property**" means the portion of the Collateral comprising a Real Property Asset in which one or more of the Borrowers hold fee simple title, as determined from time to time, which is encumbered by a First Priority Lien of the Mortgages.

"**Recovery Event**" has the meaning assigned to that term in subsection 2.4B(ii)(c).

"**Reference Lenders**" means (a) CSFB and (b) another Lender determined by the Administrative Agent with the consent of the Borrowers, which consent shall not be unreasonably withheld or delayed.

"**Register**" has the meaning assigned to that term in subsection 9.1C.

"**Registered Loan**" has the meaning assigned to that term in subsection 9.1C.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the directors, officers, employees, agents, trustees and advisors of such Person and of such Person's Affiliates.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Materials into the indoor or outdoor environment (including, without limitation, the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Materials), or into or out of any property, including the movement of any Hazardous Material through the air, soil, surface water, groundwater or property.

"**Requisite Lenders**" means Lenders having or holding more than 50% of the sum of the aggregate Loan Exposure of all Lenders.

22

"**Reserve Adjusted Eurodollar Rate**" means, with respect to each day during each Interest Period pertaining to a Eurodollar Rate Loan, a rate per annum determined for such day in accordance with the following formula; provided, however, that at all times such rate shall be equal to or exceed 1%:

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

"**Responsible Officer**" means the chief executive officer, president/chief operating officer, any vice president, general counsel or chief financial officer of each of the Borrowers, but in any event, with respect to financial matters, the chief financial officer or treasurer of each of the Borrowers.

"**Restricted Payment**" means (a) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock (or of any other Capital Stock) of the Borrowers or any of their Subsidiaries now or hereafter outstanding, except a dividend payable solely in shares of that class of stock to the holders of that class, (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock (or of any other Capital Stock) of its, the Borrowers or any of their Subsidiaries now or hereafter outstanding, (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of stock (or of any other Capital Stock) of its, the Borrowers or any of their Subsidiaries now or hereafter outstanding, and (d) payment of principal and interest in respect of the Indebtedness incurred under the Second Lien Credit Agreement and any refinancing thereof.

"**S&P**" means Standard & Poor's, a division of the McGraw-Hill Companies, Inc.

"**Second Lien Credit Agreement**" means the Second Lien Credit Agreement dated as of the date hereof among the Borrowers, as the borrowers, CSFB as administrative agent and collateral agent and the lenders party thereto, as it may be amended, restated, amended and restated, supplemented or otherwise Modified from time to time.

"**Second Lien Loan Documents**" means, collectively, the Second Lien Credit Agreement and the other documents, instruments and agreements entered into or delivered by any Loan Party in connection therewith.

"**Securities**" means any Capital Stock, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, bonds, debentures, notes, or other evidences of Indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Security Agreement and Assignment of Contractual Agreements**" means each Security Agreement and Assignment of Contractual Agreements executed and delivered by any Loan Party in favor of the Collateral Agent for the benefit of the Agents and the Lenders in such form as shall be reasonably approved by the Collateral Agent, in each case with such changes thereto as may be reasonably recommended by the Collateral Agent's local counsel based on local laws or customary practice, as may be amended, restated, amended and restated, supplemented or otherwise Modified from time to time in accordance with the terms thereof and hereof.

**FIRST LIEN CREDIT AGREEMENT**

"**Senior Debt LTV Ratio**" has the meaning assigned to that term in subsection 6.6C.

"**Solvency Certificate**" has the meaning assigned to that term in subsection 3.1H.

"**Solvent**" means, with respect to any Person, that as of the date of determination both (a) (i) the then fair saleable value of the property of such Person, sold as a going concern, is (A) greater than the total amount of liabilities (including contingent liabilities but excluding amounts payable under intercompany promissory notes) of such Person and (B) not less than the amount that will be required to pay the probable liabilities on such Person's then existing debts as they become absolute and matured considering all financing alternatives and potential asset sales reasonably available to such Person; (ii) such Person's capital is not unreasonably small in relation to its business or any contemplated or undertaken transaction; and (iii) such Person does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due; and (b) such Person is "solvent" within the meaning given that term and similar terms under applicable laws relating to fraudulent transfers and conveyances.  For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"**SPV**" has the meaning assigned to that term in subsection 9.1G.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"**Subsidiary Guarantor**" means any Subsidiary of the Borrowers that is a party to the Subsidiary Guaranty or any other Guaranty on the Effective Date (which shall be each of the Existing Subsidiaries) or at any time after the Effective Date pursuant to subsection 5.11.

"**Subsidiary Guaranty**" means the Subsidiary Guaranty, substantially in the form of Exhibit XII annexed hereto, executed and delivered by the Subsidiary Guarantors on the Effective Date, or executed and delivered by any additional Subsidiary Guarantor from time to time thereafter pursuant to subsection 5.11, as such Subsidiary Guaranty may hereafter be amended, restated, supplemented or otherwise Modified from time to time.

"**Supplemental Collateral Agent**" and "**Supplemental Collateral Agents**" shall have the meaning assigned to these terms in subsection 8.1B.

"**Syndication Agent**" has the meaning assigned to that term in the preamble to this Agreement.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Title Company**" means, collectively, one or more title insurance companies reasonably satisfactory to the Administrative Agent.

24

"**Total Debt LTV Ratio**" has the meaning assigned to that term in subsection 6.6B.

"**Total Recourse Debt**" or "**Recourse Debt**" means, as at any date of determination, the aggregate principal balance of Indebtedness under the Loan Documents and the Second Lien Loan Documents plus the aggregate amount of other Indebtedness that is recourse to one or both of the Borrowers.

"**Trademark Security Agreement**" means the Trademark Security Agreement, dated as of the date hereof, by the Borrowers in favor of the Collateral Agent, in the form of Exhibit XIII annexed hereto, as such Trademark Security Agreement may be amended, restated, amended and restated, supplemented or otherwise Modified from time to time.

"**Transaction Costs**" means the fees, costs and expenses payable by the Borrowers and their Subsidiaries in connection with the Transactions and set forth in the schedule delivered by the Borrowers pursuant to subsection 3.1I, including, without limitation, amounts payable to the Agents and the Lenders.

"**Transaction Documents**" means, collectively, (a) the Loan Documents, and (b) the Second Lien Credit Agreement and the other Second Lien Loan Documents, and (c) all other documents, instruments and agreements entered into or delivered by the Borrowers and/or any of their Subsidiaries in connection with the Transactions.

"**Transactions**" means, collectively, (a) the consummation of the transactions contemplated under this Agreement and the Second Lien Credit Agreement, (b) the repayment in full of the obligations owing to the lenders under the Bank of Scotland Loan, (c) the termination of the Bank of Scotland Loan Agreement, and (e) the making of the one-time distribution to the holders of the Capital Stock of Borrowers.

"**UCC**" means the Uniform Commercial Code (or any successor statute) as adopted and in force in the State of New York or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code (or any successor statute) of such state.

"**Unfunded Current Liability**" means, with respect to any Pension Plan, the amount, if any, by which the actuarial present value of the accumulated plan benefits under such Pension Plan as of the close of its most recent plan year exceeds the fair market value of the assets allocable thereto, each determined in accordance with Statement of Financial Accounting Standards No. 87, based upon the actuarial assumptions used by such Pension Plan's actuary in the most recent annual valuation of such Pension Plan.

**1.2**     **Defined Terms; Accounting Terms; Utilization of GAAP for Purposes of Calculations Under Agreement.**

A.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented or otherwise Modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such

LA\1323477.16

Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to, this Agreement (unless expressly referring to another agreement) and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all Documents, General Intangibles, Goods, Intellectual Property, Investment Related Property, Letter of Credit Rights, Money, Receivables, Receivable Records, Commercial Tort Claims, Material Contracts, and Proceeds therefrom (for purposes of this Section, as each such term is defined in the Pledge and Security Agreement).

**B.**   Except as otherwise expressly provided in this Agreement, (a) all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP; and (b) financial statements and other information required to be delivered by the Borrowers to the Lenders pursuant to clauses (i), (ii), (iii) and (xvi) of subsection 5.3 shall be prepared in accordance with GAAP (except, with respect to interim financial statements, for the absence of normal year-end audit adjustments and explanatory footnotes) as in effect at the time of such preparation (and delivered together with the reconciliation statements provided for in subsection 5.3(v)).   Calculations in connection with the definitions, covenants and other provisions of this Agreement shall utilize accounting principles and policies in conformity with those used to prepare the financial statements of the Subsidiaries of the Borrowers referred to in subsection 4.14A; provided, that should such accounting principles and policies change, the Borrowers, the Administrative Agent, and the Lenders shall negotiate in good faith to amend the financial definitions and related covenants in conformity therewith.

## SECTION 2.
## AMOUNTS AND TERMS OF COMMITMENTS AND LOANS

**2.1**   **Commitments; Loans.**

**A.   Loans.**   Subject to the terms and conditions of this Agreement, each of the Lenders agrees to make on the Effective Date a Loan (a "**Loan**") in the amount equal to its Loan Commitment.   The Borrowers may only make one borrowing under the Loan Commitments which shall be made on the Effective Date.   Each Loan Commitment shall terminate immediately and without further action after giving effect to the making of the Loans.   The proceeds of the Loans shall be used for the purposes identified in subsection 2.5A.   Loans, once repaid or prepaid, may not be reborrowed.

**B.   Disbursement Authorization.**   The Borrowers shall deliver to the Administrative Agent a Disbursement Authorization no later than 11:00 a.m. (New York time), at least one (1) Business Day in advance of the Effective Date.   In lieu of delivering the above-described Disbursement Authorization, the Borrowers may give the Administrative Agent telephonic notice by the required time of any proposed borrowing under this subsection 2.1B; provided that such notice shall be promptly confirmed in writing by delivery of a Disbursement Authorization to the Administrative Agent on or before the Effective Date.

Neither the Administrative Agent nor any Lender shall incur any liability to the Borrowers in acting upon any telephonic notice referred to above that the Administrative Agent believes in good faith to have been given by a duly authorized officer or other Person authorized to borrow on behalf of the Borrowers or for otherwise acting in good faith under this subsection 2.1B, and upon funding of Loans by the Lenders in accordance with this Agreement pursuant to any such telephonic notice, the Borrowers shall have effected Loans hereunder.

The Borrowers shall notify the Administrative Agent prior to the funding of any Loans in the event that any of the matters to which the Borrowers are required to certify in the applicable

LA\1323477.16

Disbursement Authorization are no longer true and correct as of the Effective Date, and the acceptance by the Borrowers of the proceeds of any Loans shall constitute a re-certification by the Borrowers, as of the Effective Date, as to the matters to which the Borrowers are required to certify in the applicable Disbursement Authorization.

**C. Disbursement of Funds.** The Loans shall be made by the Lenders in the amounts of their respective Loan Commitments, it being understood that no Lender shall be responsible for any default by any other Lender in that other Lender's obligation to make a Loan requested hereunder nor shall the Commitment of any Lender to make the particular type of Loan requested be increased or decreased as a result of a default by any other Lender in that other Lender's obligation to make a Loan requested hereunder.

Each Lender shall make the amount of its Loan available to the Administrative Agent not later than 2:00 pm (New York time) on the Effective Date in same day funds at the Funding and Payment Office. Unless the Administrative Agent shall have received written notice to the contrary prior to the Effective Date, the Administrative Agent may assume that each Lender will fund its respective Loan Commitment and may, in reliance upon such assumption, distribute to the Borrowers the amount of each such Lender's Loan Commitment. In such event, if any Lender does not in fact fund its respective Loan Commitment, then each of the Borrowers severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to the Borrowers, with interest thereon as computed in accordance with this Agreement, for each day from and including the date such amount is distributed to the Borrowers to the date of payment to the Administrative Agent.

Upon satisfaction or waiver of the conditions precedent specified in subsection 3.1, the Administrative Agent shall make the proceeds of such Loans available to the Borrowers on the Effective Date by causing an amount of same day funds equal to the proceeds of all such Loans received by the Administrative Agent from the Lenders to be credited to the account of the Borrowers as specified in the Disbursement Authorization.

Unless the Administrative Agent shall have received notice from the Borrowers prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Base Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

**D. Notes.** The Borrowers shall execute and deliver on the Effective Date to each Lender requesting the same (or to the Administrative Agent for that Lender) a Note substantially in the form of Exhibit VII annexed hereto to evidence that Lender's Loan. Any Lender not receiving a Note may request at any time that the Borrowers issue it such Note on the terms set forth herein, and the Borrowers agree to issue such Note promptly upon the request of a Lender. The Notes and the Obligations evidenced thereby shall be governed by, subject to and benefit from all of the terms and conditions of this Agreement and the other Loan Documents and shall be secured by the Collateral.

27

**2.2**    **Interest on the Loans.**

   **A.    Rate of Interest.**  Subject to the provisions of subsections 2.2E, 2.6 and 2.7, each Loan shall bear interest on the unpaid principal amount thereof from the date made to maturity (whether by acceleration or otherwise) at a rate determined by reference to the Base Rate or the Reserve Adjusted Eurodollar Rate, as the case may be.  The Loans shall be made as Base Rate Loans as of the Effective Date (it being understood that Loans may be converted into Eurodollar Rate Loans after the Effective Date in accordance with the provisions of subsection 2.2D).  If on any day any Loan is outstanding with respect to which notice has not been delivered to the Administrative Agent in accordance with the terms of this Agreement specifying the applicable basis for determining the rate of interest, then for that day that Loan shall bear interest determined by reference to the Base Rate.  Subject to the provisions of subsections 2.2E, 2.6 and 2.7, the Loans shall bear interest through maturity as follows:

   (i)    if a Base Rate Loan, then at the sum of the Base Rate plus the Applicable Base Rate Margin; or

   (ii)    if a Eurodollar Rate Loan, then at the sum of the Reserve Adjusted Eurodollar Rate for the relevant Interest Period plus the Applicable Eurodollar Rate Margin.

   **B.    Interest Periods.**  In connection with each Eurodollar Rate Loan, the Borrowers may, pursuant to the applicable Notice of Conversion/Continuation select an interest period (each an "**Interest Period**") to be applicable to such Loan, which Interest Period shall be, at the Borrowers' option, either a one (1), two (2), three (3) or six (6) month period; provided that:

   (i)    the initial Interest Period for any Eurodollar Rate Loan shall commence on the date specified in the applicable Notice of Conversion/Continuation, in the case of a Loan converted to a Eurodollar Rate Loan;

   (ii)    in the case of immediately successive Interest Periods applicable to a Eurodollar Rate Loan continued as such pursuant to a Notice of Conversion/Continuation, each successive Interest Period shall commence on the day on which the next preceding Interest Period expires;

   (iii)    if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; provided that, if any Interest Period would otherwise expire on a day that is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day;

   (iv)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (v) of this subsection 2.2B, end on the last Business Day of a calendar month;

   (v)    no Interest Period with respect to any portion of the Loans shall extend beyond the Maturity Date;

   (vi)    the Borrowers may not select an Interest Period of longer than one (1) month prior to the end of the period commencing on and including the Effective Date and ending on the earlier of (a) the date on which the Syndication Agent notifies the Borrowers that it has concluded

28

its primary syndication of the Loans and the Commitments, and (b) the date which is six (6) months following the Effective Date;

      (vii)     there shall be no more than eight (8) Interest Periods outstanding at any time; and

      (viii)    in the event the Borrowers fail to specify an Interest Period for any Eurodollar Rate Loan in the applicable Notice of Conversion/Continuation, the Borrowers shall be deemed to have selected an Interest Period of one (1) month.

    **C. Interest Payments.** Subject to the provisions of subsection 2.2E below, interest on each Loan shall be payable in arrears on each Interest Payment Date applicable to that Loan, upon any prepayment of that Loan (to the extent accrued on the amount being prepaid) and at maturity (including final maturity, by acceleration or otherwise); provided that in the event that any Loans that are Base Rate Loans are prepaid pursuant to subsection 2.4B(i), interest accrued on such Loans through the date of such prepayment shall be payable on the next succeeding Interest Payment Date applicable to Base Rate Loans (or, if earlier, at final maturity).

    **D. Conversion or Continuation.** Subject to the provisions of subsection 2.6, the Borrowers shall have the option: (i) to convert at any time all or any part of its outstanding Loans equal to $1,000,000 and integral multiples of $500,000 in excess of that amount from Loans bearing interest at a rate determined by reference to one basis to Loans bearing interest at a rate determined by reference to an alternative basis; provided, however, that a Eurodollar Rate Loan may only be converted into a Base Rate Loan on the expiration date of an Interest Period applicable thereto; or (ii) upon the expiration of any Interest Period applicable to a Eurodollar Rate Loan, to continue all or any portion of such Loan equal to $1,000,000 and integral multiples of $500,000 in excess of that amount as a Eurodollar Rate Loan.

    The Borrowers shall deliver a Notice of Conversion/Continuation to the Administrative Agent no later than 11:00 a.m. (New York time) at least one (1) Business Day in advance of the proposed conversion date (in the case of a conversion to a Base Rate Loan), and at least three (3) Business Days in advance of the proposed conversion/continuation date (in the case of a conversion to, or a continuation of, a Eurodollar Rate Loan). A Notice of Conversion/Continuation shall specify (i) the proposed conversion/continuation date (which shall be a Business Day), (ii) the amount and type of the Loan to be converted/continued, (iii) the nature of the proposed conversion/continuation, (iv) in the case of a conversion to, or a continuation of, a Eurodollar Rate Loan, the requested Interest Period, and (v) in the case of a conversion to, or a continuation of, a Eurodollar Rate Loan, that no Default or Event of Default has occurred and is continuing. In lieu of delivering the above-described Notice of Conversion/Continuation, the Borrowers may give the Administrative Agent telephonic notice by the required time of any proposed conversion/continuation under this subsection 2.2D; provided that such notice shall be promptly confirmed in writing by delivery of a Notice of Conversion/Continuation to the Administrative Agent on or before the proposed conversion/continuation date.

    Neither the Administrative Agent nor any Lender shall incur any liability to the Borrowers in acting upon any telephonic notice referred to above that the Administrative Agent believes in good faith to have been given by a duly authorized officer or other Person authorized to act on behalf of the Borrowers or for otherwise acting in good faith under this subsection 2.2D, and upon conversion or continuation of the applicable basis for determining the interest rate with respect to any Loans in accordance with this Agreement pursuant to any such telephonic notice, the Borrowers shall have effected a conversion or continuation, as the case may be, hereunder.

**FIRST LIEN CREDIT AGREEMENT**

Except as otherwise provided in subsections 2.6B, 2.6C and 2.6G, a Notice of Conversion/Continuation for conversion to, or continuation of, any Eurodollar Rate Loan (or telephonic notice in lieu thereof) shall be irrevocable, and the Borrowers shall be bound to effect a conversion or continuation in accordance therewith.

**E. Post-Default Interest.** Upon the occurrence and during the continuation of any Event of Default, if requested by the Requisite Lenders, the outstanding principal amount of all Loans and, to the extent permitted by applicable law, any interest payments thereon not paid when due and any fees and other amounts then due and payable hereunder, shall thereafter bear interest (including post-petition interest in any proceeding under the Bankruptcy Code, or other applicable bankruptcy or insolvency laws) payable upon demand at a rate that is 2% per annum in excess of the interest rate otherwise payable under this Agreement with respect to the applicable Loans (or, in the case of any such fees and other amounts, at a rate which is 2% per annum in excess of the interest rate otherwise payable under this Agreement for Loans bearing interest at a rate determined by reference to the Base Rate); provided that, in the case of Eurodollar Rate Loans, upon the expiration of the Interest Period in effect at the time any such increase in interest rate is effective such Eurodollar Rate Loans shall thereupon become Base Rate Loans and shall thereafter bear interest payable upon demand at a rate equal to 2% per annum in excess of the interest rates otherwise payable under this Agreement for Base Rate Loans. Payment or acceptance of the increased rates of interest provided for in this subsection 2.2E is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Lender.

**F. Computation of Interest.** Interest on Loans shall be computed on the basis of a 360-day year (a 365 or 366-day year, as applicable, in the case of Base Rate Loans based on the Prime Rate) and for the actual number of days elapsed in the period during which it accrues. In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted from a Eurodollar Rate Loan, the date of conversion of such Eurodollar Rate Loan to such Base Rate Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted to a Eurodollar Rate Loan, the date of conversion of such Base Rate Loan to such Eurodollar Rate Loan, as the case may be, shall be excluded; provided that if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

## 2.3   Fees.

The Borrowers agree to pay such fees to the Agents as may hereafter be (or heretofore been) agreed upon.

## 2.4   Repayments and Prepayments; General Provisions Regarding Payments.

### A. Scheduled Payments of Loans.

The Borrowers shall make principal payments on the Loans in installments in amounts equal to a percentage of the Loans funded on the Effective Date as set forth below and on the dates set forth below:

LA\1323477.16

| DATE | AMORTIZATION SCHEDULE |
|---|---|
| December 31, 2004<br>March 31, 2005<br>June 30, 2005<br>September 30, 2005 | .25%<br>.25%<br>.25%<br>.25% |
| December 31, 2005<br>March 31, 2006<br>June 30, 2006<br>September 30, 2006 | .25%<br>.25%<br>.25%<br>.25% |
| December 31, 2006<br>March 31, 2007<br>June 30, 2007<br>September 30, 2007 | .25%<br>.25%<br>.25%<br>.25% |
| December 31, 2007<br>March 31, 2008<br>June 30, 2008<br>September 30, 2008 | .25%<br>.25%<br>.25%<br>.25% |
| Maturity Date | Remaining Principal (after giving effect to any voluntary or mandatory prepayments in accordance with subsection 2.4C) |

The scheduled installments of principal of the Loans set forth above shall not be reduced in connection with any voluntary or mandatory prepayments of the Loans in accordance with subsection 2.4B. The final installment on the Maturity Date specified above for the repayment by the Borrowers of the Loans shall be in an amount sufficient to repay all amounts owing by the Borrowers under this Agreement with respect to the Loans.

**B. Prepayments**.

(i)         Voluntary Prepayments. The Borrowers may, upon not less than three (3) Business Days' prior written or telephonic notice, promptly confirmed in writing to the Administrative Agent (and the Administrative Agent will promptly notify each Lender upon receipt of such notice from the Borrowers), at any time and from time to time prepay, without premium or penalty (except in connection with a Change of Control as provided in subsection 2.4.B(ii)(e)), the Loans on any Business Day in whole or in part in an aggregate minimum amount of $1,000,000 and integral multiples of $500,000 in excess of that amount or such lesser amount as is then outstanding; provided, however, that in the event the Borrowers elect to prepay a Eurodollar Rate Loan other than on the expiration of the Interest Period applicable thereto, the Borrowers shall, at the time of such prepayment, also pay any amounts payable under subsection 2.6D hereof. Notice of prepayment having been given as aforesaid, the Loans shall become due and payable on the prepayment date specified in such notice and in the aggregate principal amount specified therein. Any voluntary prepayments pursuant to this subsection 2.4B(i) shall be applied as specified in subsection 2.4C.

(ii)         Mandatory Prepayments.

31

The Loans shall be prepaid in the manner provided in subsection 2.4C upon the occurrence of the following circumstances:

(a)      Prepayments Due to Issuance of Debt.  Concurrently with and as a condition to the closing any transaction pursuant to which Borrowers or any of their Subsidiaries issue debt Securities or incur additional borrowed Indebtedness (other than Permitted Receivables Financing and Permitted Equipment Financing), the Borrowers shall prepay the Loans in an amount equal to the sum of (i) the principal amount of such debt Securities or borrowed Indebtedness paid or payable to Borrowers or their Subsidiaries; less (ii) Permitted Transaction Costs.

(b)      Prepayments Due to Issuance of Equity Securities.  Concurrently with and as a condition to the closing any transaction pursuant to which Borrowers or any of their Subsidiaries receive any Equity Proceeds (other than Equity Proceeds received by the Borrowers' wholly-owned Subsidiaries from Investments made by the Borrowers or another of their Subsidiaries in such Subsidiary and permitted under Section 6.3), the Borrowers shall prepay the Loans in an aggregate amount equal to 50% of such Equity Proceeds.

(c)      Prepayments Due to Insurance and Condemnation Proceeds.  No later than the fifth (5th) Business Day following the date of receipt by the Borrowers or any of their Subsidiaries of any cash payments which exceed $250,000 under any insurance policy as a result of any damage to or loss of all or any portion of the Collateral net of actual and documented reasonable costs actually incurred by the Borrowers or any of their Subsidiaries in connection with adjustment and settlement thereof, "**Insurance Proceeds**") or any proceeds resulting from the taking of assets by the power of eminent domain, condemnation or otherwise (net of actual and documented reasonable costs incurred by the Borrowers or any of their Subsidiaries in connection with adjustment and settlement thereof, "**Condemnation Proceeds**") (any such event resulting in the recovery of Insurance Proceeds or Condemnation Proceeds, a "**Recovery Event**"), the Borrowers shall prepay the Loans in an amount equal to the Insurance Proceeds or Condemnation Proceeds, as the case may be, received.  Concurrently with any prepayment of Loans pursuant to this subsection 2.4B(iii)(c), the Borrowers shall deliver to the Administrative Agent an Officer's Certificate demonstrating in reasonable detail the derivation of the Insurance Proceeds or Condemnation Proceeds, as the case may be, of the correlative Recovery Event.

(d)      Prepayments from Excess Cash Flow.  In the event that there shall be Excess Cash Flow for any Fiscal Quarter (commencing with the Fiscal Quarter ending December 31, 2004), the Borrowers shall, no later than 45 days after the end of such Fiscal Quarter, prepay the Loans in an aggregate amount equal to 50% of such Excess Cash Flow.

(e)      Change of Control.  Upon the occurrence of a Change of Control, the Borrowers shall prepay the Loans in full, and shall pay the Lenders on such date a prepayment fee equal to one percent (1%) of the aggregate principal amount of the Loans then outstanding.

(iii)      No Waiver.  Nothing contained in subsection 2.4B(ii) shall be deemed to permit either Borrower to consummate any Asset Sale unless otherwise permitted under this Agreement.

FIRST LIEN CREDIT AGREEMENT

**C. Application of Prepayments**.

Each payment received by Collateral Agent from Borrowers with respect to the Loans shall be applied in the following order: First, any prepayment premiums due and payable hereunder; second, to the payment of any late charges due and payable hereunder; third, to the repayment of any amounts advanced by Collateral Agent in accordance with the Mortgages or any of the Collateral Documents for insurance premiums, taxes, assessments or for preservation or protection of the Collateral and to the payment of all costs and expenses incurred by Collateral Agent in connection with the collection of the Loans (including all attorneys' fees payable hereunder); fourth, to the payment of accrued and unpaid interest; fifth, to fund any reserves or escrows required by Collateral Agent in accordance with the terms of the Mortgages or any of the Collateral Documents; sixth, to payment of any LIBOR breakage costs incurred by Lenders on account of such payment; seventh, to reduction of the outstanding principal balance of the Loans.  Notwithstanding the foregoing, (A) if an Event of Default has occurred and is continuing, Collateral Agent may apply any payments received in such order or proportion as Collateral Agent, in Collateral Agent's sole discretion, may determine, and (B) as among the Lenders, such payments shall be applied in accordance with subsection 2.4D(iii) below.

**D. General Provisions Regarding Payments**.

(i)      Manner and Time of Payment.  All payments by the Borrowers of principal, interest, fees and other Obligations hereunder and under the Notes shall be made in same day funds and without defense, setoff or counterclaim, free of any restriction or condition, and delivered to the Administrative Agent not later than 12:00 Noon (New York time) on the date due at the Funding and Payment Office for the account of the Lenders; funds received by the Administrative Agent after that time on such due date shall, at the Administrative Agent's sole discretion, be deemed to have been paid by the Borrowers on the next succeeding Business Day. The Borrowers hereby authorize the Administrative Agent to charge its accounts with the Administrative Agent in order to cause timely payment to be made to the Administrative Agent of all principal, interest, fees and expenses due hereunder (subject to sufficient funds being available in its accounts for that purpose).

(ii)      Application of Payments to Principal, Interest and Prepayment Fees.  Except as provided in subsection 2.2C, all payments in respect of the principal amount of any Loan shall include payment of accrued interest and prepayment fees, if any, on the principal amount being repaid or prepaid, and all such payments (and in any event any payments made in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest and prepayment fees, if any, before application to principal.

(iii)      Apportionment of Payments.  The aggregate principal, prepayment fees and interest payments shall be apportioned among all outstanding Loans to which such payments relate, in each case proportionately to the Lenders' respective Pro Rata Shares.   The Administrative Agent shall promptly distribute to each Lender, at its applicable Lender Office, its Pro Rata Share of all such payments received by the Administrative Agent and the commitment fees of such Lender when received by the Administrative Agent pursuant to subsection 2.3. Notwithstanding the foregoing provisions of this subsection 2.4D(iii) if, pursuant to the provisions of subsection 2.6C, any Notice of Conversion/Continuation is withdrawn as to any Affected Lender or if any Affected Lender makes Base Rate Loans in lieu of its Pro Rata Share of any Eurodollar Rate Loans, the Administrative Agent shall give effect thereto in apportioning payments received thereafter.

33

**FIRST LIEN CREDIT AGREEMENT**

(iv)     Payments on Business Days.   Except if expressly provided otherwise, whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or of the commitment fees hereunder, as the case may be.

(v)     Notation of Payment.   Each Lender agrees that before disposing of any Note held by it, or any part thereof (other than by granting participations therein), that Lender will make a notation thereon of all Loans evidenced by that Note and all principal payments previously made thereon and of the date to which interest thereon has been paid; provided that the failure to make (or any error in the making of) a notation of any Loan made under such Note shall not limit or otherwise affect its disposition or the obligations of the Borrowers hereunder or under such Note with respect to any Loan or any payments of principal or interest on such Note.

## 2.5     Use of Proceeds.

**A.   Loans.**   The proceeds of the Loans made to the Borrowers shall be applied, together with the proceeds of the loans made pursuant to the Second Lien Credit Agreement (i) to make a one-time dividend distribution to the holders of the Capital Stock of the Borrowers, (ii) to repay all amounts owing under the Bank of Scotland Loan and related documents, and (iii) to pay the Transaction Costs.

**B.   Compliance With Laws.**   The Borrowers undertake that no portion of the proceeds of any Loans or other extensions of credit under this Agreement shall be used by any Loan Party in any manner which would be illegal under, or which would cause the invalidity or unenforceability (in each case in whole or in part) of any Loan Document under, any applicable law.

**C.   Margin Regulations.**   Without limiting the generality of subsection 2.5B, no portion of the proceeds of any borrowing under this Agreement shall be used by the Borrowers or any of their Subsidiaries in any manner that might cause the borrowing or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation of such Board or to violate the Exchange Act, in each case as in effect on the date or dates of such borrowing and such use of proceeds.

## 2.6     Special Provisions Governing Eurodollar Rate Loans.

Notwithstanding any other provision of this Agreement to the contrary, the following provisions shall govern with respect to Eurodollar Rate Loans as to the matters covered:

**A.   Determination of Applicable Interest Rate.**   As soon as practicable after 11:00 A.M. (New York time) on each Interest Rate Determination Date, the Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Eurodollar Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to the Borrowers and each Lender.

**B.   Inability to Determine Applicable Interest Rate.**   In the event that the Administrative Agent shall have reasonably determined (which determination shall be final and conclusive and binding upon all parties hereto), on any Interest Rate Determination Date with respect to any Eurodollar Rate Loans, that by reason of circumstances arising after the date of this Agreement affecting the London interbank market, adequate and fair means do not exist for ascertaining the interest rate applicable to such Loans on the basis provided for in the definition of Reserve Adjusted Eurodollar Rate the Administrative

**FIRST LIEN CREDIT AGREEMENT**

Agent shall on such date give notice (by telecopy or by telephone confirmed in writing) to the Borrowers and each Lender of such determination, whereupon (i) no Loans may be made or continued as, or converted to, Eurodollar Rate Loans, until such time as the Administrative Agent notifies the Borrowers and the Lenders that the circumstances giving rise to such notice no longer exist (such notification not to be unreasonably withheld or delayed) and (ii) any Disbursement Authorization or Notice of Conversion/Continuation given by the Borrowers with respect to the Loans in respect of which such determination was made shall be deemed to be rescinded by the Borrowers; provided, however that, at the option of the Borrowers, any such Disbursement Authorization may be re-submitted to the Administrative Agent indicating that the Borrowers are electing a Base Rate Loan, which Loan shall be funded no later than one (1) Business Day after the date of such Base Rate Loan Disbursement Authorization in accordance with subsection 2.1B.

**C.   Illegality or Impracticability of Eurodollar Rate Loans.**   In the event that on any date any Lender shall have reasonably determined (which determination shall be final and conclusive and binding upon all parties hereto but shall be made only after consultation with the Borrowers and the Administrative Agent) that the making, maintaining or continuation of its Eurodollar Rate Loans (i) has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful) or (ii) has become impracticable, or would cause such Lender material hardship, as a result of contingencies occurring after the date of this Agreement which materially and adversely affect the London interbank market, then, and in any such event, such Lender shall be an "**Affected Lender**" and it shall on that day give notice (by telecopy or by telephone confirmed in writing) to the Borrowers and the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each other Lender).  Thereafter (a) the obligation of the Affected Lender to make Loans as, or to convert Loans to, Eurodollar Rate Loans, shall be suspended until such notice shall be withdrawn by the Affected Lender, (b) to the extent such determination by the Affected Lender relates to a Eurodollar Rate Loan then being requested by the Borrowers pursuant to the Disbursement Authorization or a Notice of Conversion/Continuation, the Affected Lender shall make such Loan as (or convert such Loan to, as the case may be) a Base Rate Loan, (c) the Affected Lender's obligation to maintain its outstanding Eurodollar Rate Loans, as the case may be (the "**Affected Loans**"), shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (d) the Affected Loans shall automatically convert into Base Rate Loans on the date of such termination.  Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to a Eurodollar Rate Loan then being requested by the Borrowers pursuant to a Notice of Conversion/Continuation, the Borrowers shall have the option, subject to the provisions of subsection 2.6D, to rescind such Disbursement Authorization or Notice of Conversion/Continuation as to all Lenders by giving notice (by telecopy or by telephone confirmed in writing) to the Administrative Agent of such rescission on the date on which the Affected Lender gives notice of its determination as described above (which notice of rescission the Administrative Agent shall promptly transmit to each other Lender).  Except as provided in the immediately preceding sentence, nothing in this subsection 2.6C shall affect the obligation of any Lender other than an Affected Lender to make or maintain Loans as, or to convert Loans to, Eurodollar Rate Loans in accordance with the terms of this Agreement.

**D.   Compensation For Breakage or Non-Commencement of Interest Periods.**   The Borrowers shall compensate the Administrative Agent, upon written request by that Lender (which request shall set forth the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including, without limitation, any interest paid by that Lender to the lenders of funds borrowed by it to make or carry its Eurodollar Rate Loans and any actual loss, expense or liability sustained by that Lender in connection with the liquidation or re-employment of such funds) which that Lender may

35

sustain: (i) if for any reason (other than a default by that Lender) a borrowing of any Eurodollar Rate Loan does not occur on a date specified therefor in a Disbursement Authorization or a telephonic request for borrowing, or a conversion to or continuation of any Eurodollar Rate Loan does not occur on a date specified therefor in a Notice of Conversion/Continuation or a telephonic request for conversion or continuation, (ii) if any prepayment (including any prepayment pursuant to subsection 2.4B or assignment pursuant to Section 2.8) or conversion of any of its Eurodollar Rate Loans occurs on a date that is not the last day of an Interest Period applicable to that Loan (including, without limitation, as a result of the Transactions), (iii) if any prepayment of any of its Eurodollar Rate Loans is not made on any date specified in a notice of prepayment given by the Borrowers, or (iv) as a consequence of any other default by the Borrowers in the repayment of its Eurodollar Rate Loans when required by the terms of this Agreement.

**E. Booking of Eurodollar Rate Loans.** Any Lender may make, carry or transfer Eurodollar Rate Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of that Lender.

**F. Assumptions Concerning Funding of Eurodollar Rate Loans.** Calculation of all amounts payable to a Lender under this Section 2.6 and under subsection 2.7A shall be made as though that Lender had actually funded each of its relevant Eurodollar Rate Loans through the purchase of a Eurodollar deposit bearing interest at the rate obtained pursuant to the definition of Reserve Adjusted Eurodollar Rate in an amount equal to the amount of such Eurodollar Rate Loan and having a maturity comparable to the relevant Interest Period and, through the transfer of such Eurodollar deposit from an offshore office of that Lender to a domestic office of that Lender in the United States of America; provided, however, that each Lender may fund each of its Eurodollar Rate Loans in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable under this Section 2.6 and under subsection 2.7A.

**G. Eurodollar Rate Loans After Default.** After the occurrence of and during the continuation of a Default or Event of Default, (i) the Borrowers may not elect to have a Loan be made or maintained as, or converted to, a Eurodollar Rate Loan after the expiration of any Interest Period then in effect for that Loan and (ii) subject to the provisions of subsection 2.6D, any Disbursement Authorization or Notice of Conversion/Continuation given by the Borrowers with respect to a requested borrowing or conversion/continuation that has not yet occurred shall be deemed to be rescinded by the Borrowers.

**2.7    Increased Costs; Taxes.**

**A. Increased Costs Generally.** If any Change in Law shall: (i) impose, Modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any reserve requirement reflected in the Reserve Adjusted Eurodollar Rate); or (ii) impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Loans hereunder made by such Lender; and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Rate Loan (or of maintaining its obligations to make any such Loan) or to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount), then upon request of such Lender, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender on an after-tax basis for such additional costs incurred or reduction suffered.

**B. Capital Requirements.** If any Lender determines that any Change in Law affecting such Lender or the applicable Lender Office of such Lender or such Lender's holding company, if any,

regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company on an after-tax basis for any such reduction suffered.

   **C.   Certificates for Reimbursement.**   A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection 2.7A or 2.7B and delivered to the Borrowers shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

   **D.   Delay in Requests.**   Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation, <u>provided</u> that the Borrowers shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender  notifies the Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

   **E.   Taxes.**

      (i)        <u>Payments Free of Taxes.</u>   Subject to subsection 2.7(E)(v) below, any and all payments by or on account of any obligation of the Borrowers hereunder or any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, provided that if the Borrowers shall be required by applicable law to deduct any Indemnified Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this subsection) the Agent or Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrowers shall make such deductions and (iii) the Borrowers shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

      (ii)        <u>Payment of Other Taxes by the Borrowers.</u>   Without limiting the provisions of paragraph (i) above, the Borrowers shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

      (iii)        <u>Indemnification by the Borrowers.</u>   The Borrowers shall indemnify the Agents and each Lender within 20 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this subsection 2.7E) paid by such Agent or such Lender and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate stating the amount of such payment or liability and setting forth in reasonable detail the calculation thereof delivered to the Borrowers by an Agent or a Lender (with a copy to the Administrative Agent), or by the

37

Administrative Agent on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(iv)   Evidence of Payments.   As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrowers to a Governmental Authority, the Borrowers shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(v)   Status of Lenders.   Any Lender, if requested by the Borrowers or the Administrative Agent, shall deliver documentation prescribed by applicable law or reasonably requested by the Borrowers or the Administrative Agent as will enable the Borrowers or the Administrative Agent to determine whether or not such Lender is subject to withholding, backup withholding or information reporting requirements.   Without limiting the generality of the foregoing, in the event that the Borrowers is a resident for tax purposes in the United States of America, each Foreign Lender shall deliver to the Borrowers and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrowers or the Administrative Agent), whichever of the following is applicable: (i) duly completed copies of Internal Revenue Service Form W-8BEN, claiming eligibility for benefits of an income tax treaty to which the United States of America is a party, (ii) duly completed copies of Internal Revenue Service Form W-8ECI, (iii) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Internal Revenue Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Internal Revenue Code, (B) a "10 percent shareholder" of the Borrowers within the meaning of section 881(c)(3)(B) of the Internal Revenue Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Internal Revenue Code and (y) duly completed copies of  Internal Revenue Service Form W-8BEN or (iv) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax and reasonably requested by the Borrowers or the Administrative Agent duly completed together with such supplementary documentation as may be prescribed by applicable law and reasonably requested by the Borrowers or the Administrative Agent to permit the Borrowers to determine the withholding or deduction required to be made.   A Foreign Lender shall not be required to deliver any form or statement pursuant to this Section 2.7E(v) that such Foreign Lender is not legally able to deliver.

(vi)   Treatment of Certain Refunds.   If the Administrative Agent or a Lender determines, in its reasonable discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrowers or with respect to which the Borrowers have paid additional amounts pursuant to such subsection 2.7, it shall pay to the Borrowers an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrowers under such subsection 2.7 with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrowers, upon the request of such Agent or such Lender, agrees to repay the amount paid over to the Borrowers (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Agent or such Lender in the event such Agent or such Lender is required to repay such refund to such Governmental Authority.   This paragraph shall not be construed to require any Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrowers or any other Person.

38

**FIRST LIEN CREDIT AGREEMENT**

**2.8**   **Mitigation Obligations; Replacement of Lenders.**

**A.  Designation of a Different Lender Office.**  If any Lender requests compensation under subsection 2.7A or 2.7B, or requires the Borrowers to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to subsection 2.7E, then such Lender shall use reasonable efforts to designate a different Lender Office for making, issuing, funding or maintaining its Commitments or Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.7 in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be materially disadvantageous to such Lender.  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

**B.  Replacement of Lenders.**  If any Lender requests compensation under subsection 2.7A or 2.7B, or if the Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to subsection 2.7E, or if any Lender defaults in its obligation to fund Loans hereunder, or if any Lender has determined that it is unable to make, maintain or continue its Eurodollar Rate Loans in accordance with subsection 2.6.C hereof, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 9.1), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment), provided that (i) the Borrowers shall have paid to the Administrative Agent the assignment fee specified in subsection 9.1B(i)(c), (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under subsection 2.6D) from such Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts), (iii) such Eligible Assignee is able to make, maintain or continue, as applicable, Eurodollar Rate Loans, (iv) in the case of any such assignment resulting from a claim for compensation under subsection 2.7A or 2.7B or payments required to be made pursuant to subsection 2.7E, such assignment will result in a reduction in such compensation or payments thereafter, and (v) such assignment does not conflict with applicable law.  A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

**2.9**   **Calculation and Amount of Borrowing Base Availability.**

**A.  Calculation.**  The Borrowing Base Availability shall be calculated at the times and in the manner set forth in this subsection 2.9(A):

(i)        The Borrowers shall (A) concurrently with the delivery of financial statements of the Borrowers and their Subsidiaries as required under subsection 5.3(ii), (B) at least ten (10) Business Days prior to entering into any Qualified Sales Agreement which contemplates a Major Collateral Sale, and (C) at least fifteen (15) Business Days prior to consummating a Major Collateral Sale, and (D) at such other times as the Administrative Agent may reasonably request, provide the Administrative Agent with a Borrowing Base Certificate showing the Borrowers' calculations of the components of the Borrowing Base Availability as of the end of each Fiscal Quarter, in the case of (A) above, and on a Pro Forma Basis, taking into account the effect of the proposed Major Collateral Sale and any prepayments that may be required in accordance with subsection 2.4B above, in the case of (B) and (C) above, and such

39

data supporting such calculations as the Agent reasonably may require. The Administrative Agent shall have a period of thirty (30) days following receipt of a Borrowing Base Certificate to notify the Borrowers of the Administrative Agent's approval or disapproval thereof (provided, however, in the case of clause (B) above the Administrative Agent shall have five (5) Business Days following such receipt, and in the case of clause (C) above the Administrative Agent shall have ten (10) Business Days following such receipt).

(ii)     In the event and at the time that the Administrative Agent timely notifies the Borrowers of disapproval of a Borrowing Base Certificate (or should the Borrowers fail to provide a Borrowing Base Certificate to Administrative Agent as and when required under subsection 2.9A(i) above), the Administrative Agent shall notify the Borrowers in writing of the amount of the Borrowing Base Availability as determined in good faith by the Administrative Agent and the basis of such determination, and the effective date thereof (which shall be the date of the giving of such notice respecting the amount of the Borrowing Base Availability by the Administrative Agent), and such amount shall thereupon and thereafter constitute the Borrowing Base Availability which shall remain in effect until such time as a new Borrowing Base Certificate is delivered in accordance with this subsection 2.9A. The Agent and the Borrowers shall each cooperate in good faith with the other in the calculation of the Borrowing Base Availability in circumstances where the Agent disapproves a Borrowing Base Certificate prepared by the Borrowers.

(iii)     Each determination of the Borrowing Base Availability in accordance with this subsection 2.9A shall be binding and conclusive upon the parties hereto, absent manifest error; _provided_ that the Administrative Agent is not bound to rely on information and figures provided by the Borrowers if the Administrative Agent determines in good faith that it would be inappropriate to do so.

**B. Amount of Borrowing Base**. As used in this Agreement, the term "**Borrowing Base Availability**" shall at any time mean the sum of the Appraised Value of the then remaining Real Property Collateral which is subject to the First Priority Lien of the Mortgages subject to the following discounting based on the category of such Real Property Collateral.

| LAND CATEGORY | ADVANCE FORMULA |
|---|---|
| Cash Collateral | 100% |
| Land Under Contracts to Homebuilders | 80% of Appraised Value |
| Land Under Option Contracts to Homebuilders | 65% of Appraised Value |
| Land Entitled | 60% of Appraised Value |
| Land Unentitled | 0% of Appraised Value |

**2.10     Limitations on Aggregate Outstanding Loans.**

The Borrower shall at all times be in compliance with Section 6.6.E.

**2.11**    **Release Upon Qualified Sale or Permitted Joint Venture Transaction.**

In connection with any Permitted Collateral Asset Sale or Permitted Joint Venture Transaction, the Collateral Agent or its duly authorized attorney-in-fact shall release the applicable portion of the Real Property Collateral from the lien of the Mortgages (such portion of the Mortgaged Property, a "**Released Parcel**"); provided that all of the conditions set forth in Section 6.9 have been satisfied and the applicable Borrower shall have submitted to Agent not less than fifteen (15) days prior to the date of such proposed release (which must be on a Business Day), a reconveyance or release of Liens (and related Loan Documents) for each Released Parcel (for execution by the Collateral Agent) in a form appropriate for recordation in Clark County, State of Nevada and otherwise satisfactory to the Collateral Agent in its good faith discretion and all other documentation as the Collateral Agent reasonably requires to be delivered by such Borrower in connection with such release (collectively, the "**Release Instruments**") for each Released Parcel (for execution by Collateral Agent) together with an Officer's Certificate certifying that (i) the Release Instruments are in compliance with all Applicable Laws and Governmental Authorizations, (ii) the release to be effected will not violate the terms of this Agreement on a Pro Forma Basis, and (iii) the release to be effected will not impair or otherwise adversely affect the Liens and other rights of the Collateral Agent under the Loan Documents not being released.

# SECTION 3.
## CONDITIONS TO EFFECTIVENESS

**3.1**    **Conditions to Effectiveness.**

The effectiveness of this Agreement, and the obligation of each Lender to make the initial extension of credit requested to be made by it is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Effective Date, of the following conditions precedent:

**A. Borrowers' Documents.** On or before the Effective Date, the Borrowers shall deliver or cause to be delivered to the Administrative Agent for the Lenders the following, each, unless otherwise noted, dated the Effective Date:

(i)        a certified copy of the organizational documents of each of the Borrowers, together with good standing certificates from the Secretary of State of the State of Nevada, each dated a recent date prior to the Effective Date;

(ii)        incumbency certificates of the officers of the Borrowers executing this Agreement and the other Transaction Documents to which it is a party as of the Effective Date;

(iii)        executed originals of this Agreement and the other Loan Documents to which the Borrowers are a party that are to be delivered on the Effective Date;

(iv)        certified copies of each of the other Transaction Documents to which the Borrowers are a party that are to be delivered on the Effective Date; and

(v)        such other documents as the Administrative Agent may reasonably request.

**B. Subsidiary Documents.** On or before the Effective Date, the Borrowers shall deliver or cause to be delivered to the Administrative Agent for the Lenders the following for each Subsidiary of the Borrowers that is a Loan Party (which may be waived by the Administrative Agent for any Subsidiary

41

with respect to the items described in clause (i) below), each, unless otherwise noted, dated the Effective Date:

(i)       certified copies of its Organizational Certificate, together with a good standing certificate from the applicable Governmental Authority of its jurisdiction of incorporation, organization or formation, each state in which any of its Real Property Assets are located, and each other state in which it is qualified as a foreign corporation or other entity to do business, each dated a recent date prior to the Effective Date;

(ii)      copies of its Organizational Documents, certified as of the Effective Date by its corporate secretary or an assistant secretary;

(iii)     copies of its Organizational Authorizations approving and authorizing the execution, delivery and performance of the Subsidiary Guaranty, as the case may be, and the other Transaction Documents to which it is party or by which it or its assets may be bound that are to be delivered on the Effective Date, certified as of the Effective Date by its corporate secretary or an assistant secretary as being in full force and effect without Modification;

(iv)      incumbency certificates of its officers executing the Subsidiary Guaranty and the other Transaction Documents to which it is a party as of the Effective Date;

(v)       executed originals of the Subsidiary Guaranty and the other Loan Documents to which it is a party that are to be delivered on the Effective Date;

(vi)      certified copies of each of the other Transaction Documents to which it is a party that are to be delivered on the Effective Date; and

(vii)     such other documents as the Administrative Agent may reasonably request.

**C.  Consummation of Transactions.**

(i)       (a) Each of the Transaction Documents shall be in form and substance reasonably satisfactory to the Administrative Agent and each such Transaction Document shall have been duly executed and delivered by each party thereto and shall be in full force and effect; and (b) all other conditions set forth in the Transaction Documents shall have been satisfied or the fulfillment of any such conditions shall have been waived with the written consent of the Administrative Agent;

(ii)      $125,000,000 shall have been borrowed by the Borrowers pursuant to the Second Lien Credit Agreement;

(iii)     simultaneously with funding of the Loans, the obligations of the lenders under the Bank of Scotland Loan Agreement shall have been repaid in full, all commitments thereunder shall have been permanently terminated and all Liens granted thereunder shall have been permanently terminated and released, and the Administrative Agent shall have received evidence thereof to its reasonable satisfaction;

(iv)      simultaneously with funding of the Loans, each of the other Transactions shall have been effected and consummated to the reasonable satisfaction of the Administrative Agent; and

(v)        after giving effect to the Transactions and the other transactions contemplated hereby, the Borrowers and their Subsidiaries shall have no outstanding Indebtedness or preferred stock other than (a) the Loans under this Agreement and the Second Lien Credit Agreement, and (b) existing Indebtedness listed on <u>Schedule 3.1C</u>.

**D. Lender Signatures.**   The following Persons shall have executed and delivered this Agreement:

(i)        the Lenders; and

(ii)       the Agents.

**E. Necessary Consents.**   The Borrowers shall have obtained all approvals and consents of Governmental Authorities and other Persons necessary or advisable in connection with the Transactions and the continued operation of the business conducted by the Borrowers and their Subsidiaries, all applicable appeal periods shall have expired and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to the Administrative Agent.  Such approvals and consents shall be satisfactory to Administrative Agent in its sole and absolute discretion and shall include, without limitation:

(i)        executed estoppel certificates from all homeowners' associations and property owners' associations related to the Project;

(ii)       executed consents from any other lenders of Borrowers or any of their Subsidiaries, as required by the terms of any other loan documents to which the Borrowers or such Subsidiaries, as applicable, are a party;

(iii)      executed consents from any Person required in connection with the Pledge and Security Agreement;

(iv)      executed consents from any Person required in connection with the Security Agreement and Assignment of Contractual Agreements; and

(v)       executed estoppel certificate from the LID regarding the LID Agreements.

**F. Perfection of Security Interests.**   The Borrowers shall have taken or caused to be taken such actions in such a manner directed by the Collateral Agent to create a valid and perfected First Priority security interest in the Collateral of each Loan Party in which a security interest can be granted and perfected under the UCC or other Applicable Law to the extent required by the Pledge and Security Agreement or other applicable Collateral Documents.  Such actions shall include:  (i) the delivery pursuant to the applicable Collateral Documents of (a) such certificates or other instruments (each of which shall be registered in the name of the Collateral Agent or properly endorsed in blank for transfer or accompanied by irrevocable undated stock or equivalent powers duly endorsed in blank, all in form and substance satisfactory to the Collateral Agent) representing all of the shares or other interests of Capital Stock required to be pledged pursuant to the Collateral Documents identified on <u>Schedule 3.1F</u>, and (b) all promissory notes or other instruments (duly endorsed, where appropriate, in a manner satisfactory to the Collateral Agent) evidencing any Collateral; (ii) the delivery to the Collateral Agent of (a) the results of a recent search, by a Person satisfactory to the Collateral Agent, of all effective UCC financing statements and fixture filings and all judgment and tax lien filings which may have been made with respect to any personal or mixed property of any Loan Party, together with copies of all such filings disclosed by such search and (b) UCC financing statements the recordation of which has been authorized

43

by the applicable Loan Parties as to all such Collateral granted by such Loan Parties for all jurisdictions as may be necessary or desirable to perfect Collateral Agent's security interest in such Collateral; and (iii) the delivery to the Collateral Agent of evidence reasonably satisfactory to the Collateral Agent that all other filings (including UCC termination statements and releases and filings with the PTO and the United States Copyright Office with respect to Intellectual Property of the Loan Parties), recordings and other actions the Collateral Agent deems necessary or advisable to establish, preserve and perfect the First Priority liens granted to the Collateral Agent in Collateral constituting personal (both tangible and intangible) and mixed property shall have been made.

G.  **Real Property.**  The Administrative Agent shall have received on or prior to the Effective Date from the Borrowers and each applicable Loan Party:

(i)  Mortgages.  Fully executed and notarized Mortgages, together with any Modifications thereto deemed necessary by the Collateral Agent in connection with the execution and delivery of this Agreement, the other Loan Documents and the transactions contemplated hereby and thereby, in proper form for recording in the real property records of Clark County, Nevada, encumbering the Mortgaged Property listed on Schedule 3.1G, in each case in form and substance satisfactory to the Collateral Agent;

(ii)  Opinions of Local Counsel.  An opinion of counsel (which counsel shall be satisfactory to the Collateral Agent) with respect to the enforceability of the Mortgages to be recorded in the real property records of Clark County, Nevada, and such other related matters as the Collateral Agent may reasonably request, in each case in form and substance reasonably satisfactory to the Collateral Agent;

(iii)  Title Insurance.  ALTA extended coverage mortgagee title insurance policies (the "**Mortgagee Policies**") issued by the Title Company with respect to the Mortgages listed on Schedule 3.1G, in amounts not less than the respective amounts designated on such Schedule with respect to any particular Mortgaged Property, insuring fee simple title to each such Mortgaged Property vested in such Loan Party and insuring the Collateral Agent that the applicable Mortgages create valid and enforceable First Priority mortgage Liens on the respective Mortgaged Properties encumbered thereby, subject only to the Permitted Encumbrances, which Mortgagee Policies (1) shall include all endorsements requested by Collateral Agent include an endorsement for mechanics' liens (or a deletion of the standard pre-printed mechanics' lien exception) and (2) shall provide for affirmative insurance and such reinsurance as the Collateral Agent may reasonably request, all of the foregoing in form and substance reasonably satisfactory to the Collateral Agent; and evidence satisfactory to the Collateral Agent that such Loan Party has (i) delivered to the Title Company all certificates and affidavits required by the Title Company in connection with the issuance of the  Mortgagee Policies and (ii) paid to the Title Company or to the appropriate Governmental Authorities all expenses and premiums of the Title Company and all other sums required in connection with the issuance of the Mortgagee Policies and all recording and stamp taxes (including mortgage recording and intangible taxes) payable in connection with recording the Mortgages in the Clark County real property records;

(iv)  Eagle-9 Insurance.  Eagle 9 insurance policies in form and substance satisfactory to the Collateral Agent, and in favor of the Collateral Agent, insuring that the Collateral Agent holds a First Priority Lien and security interest in the Pledged Interests (as defined in the Pledge and Security Agreement).

44

(v)     Title Reports.  With respect to each Mortgaged Property, a title report issued by the Title Company with respect thereto, dated a date, and in form and substance, satisfactory to the Collateral Agent and may include Permitted Encumbrances;

(vi)     Surveys.  An ALTA/ACSM survey with respect to the BLM Property dated a date, and prepared by a Person and in form and substance, reasonably satisfactory to the Collateral Agent;

(vii)     Appraisal.  One original of the Appraisal, in form and substance satisfactory to the Collateral Agent;

(viii)     Entitlement Documents.  Administrative Agent shall have been received true, correct and complete copies of all Entitlement Documents including, without limitation, evidence that the Project and the Collateral are in compliance with applicable zoning, subdivision and all other applicable federal state or local laws affecting the development of the Collateral and the use and operation of the Project.

(ix)     Engineering Reports.  Administrative Agent shall have received engineering and soils reports with respect to the Project in form and substance satisfactory to the Administrative Agent.

(x)     Copies of Documents Relating to Title Exceptions.  Copies of all recorded documents listed as exceptions to title or otherwise referred to in the Mortgagee Policies or in the title reports delivered pursuant to clauses (iii) or (v) above; and

(xi)     Matters Relating to Flood Hazard Properties.  (a) Evidence, which may be in the form of a letter from an insurance broker as to whether (1) any Mortgaged Property is a Flood Hazard Property and (2) the community in which any such Flood Hazard Property is located is participating in the National Flood Insurance Program, (b) if there are any such Flood Hazard Properties, such Loan Party's written acknowledgment of receipt of written notification from the Collateral Agent (1) as to the existence of each such Flood Hazard Property and (2) as to whether the community in which each such Flood Hazard Property is located is participating in the National Flood Insurance Program, and (c) in the event any such Flood Hazard Property is located in a community that participates in the National Flood Insurance Program, evidence that the Borrowers have obtained flood insurance in respect of such Flood Hazard Property to the extent required under the applicable regulations of the Board of Governors of the Federal Reserve System.

**H.  Financial Condition and Solvency Certificate.**  The Borrowers shall have delivered to the Administrative Agent a certificate from the chief financial officer of each of the Borrowers, substantially in the form of Exhibit XIV attached hereto (the **"Solvency Certificate"**).

**I.  Transaction Costs, Fees and Expenses.**  On or prior to the Effective Date, the Borrowers shall have paid (i) to the Administrative Agent any and all fees and reasonable expenses of the Agents that are then due and owing or accrued and not yet paid under or in connection with this Agreement or any of the documents, instrument or agreements executed in connection herewith and (ii) to the appropriate Persons any and all outstanding reasonable fees and expenses (including legal advisors) incurred by the Agents through the Effective Date in connection with the negotiation, drafting and execution of the Transaction Documents.  On or prior to the Effective Date, the Borrowers shall have delivered to the Administrative Agent a schedule, in a form satisfactory to the Administrative Agent,

setting forth the Borrowers' estimate of the Transaction Costs (other than fees payable to any of the Agents).

**J.   Opinions of Loan Parties' Counsel.**  The Administrative Agent and its counsel shall have received the written opinions of (i) Jennings, Strouss & Salmon, P.L.C., special Nevada counsel for the Loan Parties, (ii) Kelly, Hart & Hallman, special New York counsel for the Loan Parties, and (iii) each other special and local counsel for the Loan Parties as the Administration Agent may reasonably request, in each case, (a) in form and substance reasonably satisfactory to the Administrative Agent and its counsel, (b) dated as of the Effective Date, (c) addressed to each of the Agents and the Lenders, and (d) setting forth the matters reasonably requested by the Administrative Agent.

**K.   Financial Information.**  On or before the Effective Date, the Administrative Agent shall have received from the Borrowers (i) such budgets and other cash flow and financial information and projections described in Section 5.3 as the Administrative Agent may reasonably request, all in form and substance reasonably satisfactory to the Administrative Agent, and (ii) a detailed business plan of the Borrowers and their Subsidiaries for the period commencing October 1, 2004 through December 31, 2012 and for the quarter in which the Effective Date occurs, in form and substance satisfactory to the Administrative Agent.

**L.   Evidence of Insurance.**  The Administrative Agent shall have received copies of certificates of insurance with respect to each of the insurance policies required pursuant to Section 5.6, and the Administrative Agent shall be reasonably satisfied with the nature and scope of these insurance policies.

**M. Environmental.**  The Administrative Agent shall have received one or more environmental assessment reports which, in their totality, provide a detailed environmental assessment of the entire Project, in form and substance and from an independent environmental assessment firm satisfactory to the Administrative Agent, and the Administrative Agent shall be reasonably satisfied as to the amount and nature of any environmental and employee health and safety exposures to which the Borrowers and their Subsidiaries may be subject after giving effect to the Transactions, and with the plans of the Borrowers or such Subsidiaries with respect thereto.

**N.   No Material Adverse Effect.**  Since June 30, 2004, there shall not have occurred any event, change or condition that has had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

**O.   Corporate and Capital Structure, Ownership, Management, Etc.**

    (i)        <u>Corporate Structure</u>.  The corporate organizational structure of Borrowers and their Subsidiaries as of the Effective Date shall be as set forth on <u>Schedule 3.1.O</u>.

    (ii)       <u>Capital Structure and Ownership</u>.  The capital structure and ownership of the Borrowers and as of the Effective Date shall be as set forth on <u>Schedule 3.1.O</u>.

**P.   Representations and Warranties; Performance of Agreements.**  The Borrowers shall have delivered to the Administrative Agent an Officer's Certificate, in form and substance satisfactory to the Administrative Agent, to the effect that the representations and warranties in Section 5 are true and correct in all material respects on and as of the Effective Date and both before and after giving effect to the Transactions, to the same extent as though made on and as of that date and that the Borrowers have performed in all material respects all agreements and satisfied all conditions which this Agreement provides shall be performed or satisfied by it on or before the Effective Date.

**Q.  No Litigation.**  There shall be no litigation or governmental, administrative or judicial actions or proceedings, actual or threatened, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or that could reasonably be expected to restrain, prevent or impose burdensome conditions on any of the Transactions.

**R.  Intercreditor Agreement.**  The Intercreditor Agreement shall have been executed by the parties thereto.

**S.  Completion of Proceedings.**  All partnership, corporate, limited liability company and other proceedings taken or to be taken in connection with the Transactions and all documents incidental thereto not previously found acceptable by the Administrative Agent and its counsel shall be satisfactory in form and substance to the Administrative Agent and such counsel, and the Administrative Agent and such counsel shall have received all such counterpart originals or certified copies of such documents as the Administrative Agent may reasonably request.  Each Lender, by delivering its signature page to this Agreement, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by any Agent, Requisite Lenders or Lenders, as applicable, on or prior to the Effective Date.

**T.  Money Laundering.**  The Administrative Agent shall have received, sufficiently in advance of the Effective Date, all documentation and other information required by bank regulatory authorities from the Loan Parties under applicable "know your customer" and anti-money laundering rules and regulations, including the U.S.A. Patriot Act.

**U.  Borrowing Base Certificate.**  The Borrowers shall have delivered to the Administrative Agent a certificate from the chief financial officer of each of the Borrowers, substantially in the form of Exhibit XV attached hereto (the "**Borrowing Base Certificate**").

**V.  Rating Agencies.**  Each of the Borrowers shall have obtained a credit rating by S&P and by Moody's with respect to the Loans prior to the Effective Date.

**W.  Entitlements.**

(i)        LLV-1 shall have received a written confirmation or other written commitment by the City of Henderson (in form and substance satisfactory to the Administrative Agent) to provide the necessary potable and raw water for construction and occupancy of the maximum development on the BLM Property, as contemplated in the Lake Las Vegas Master Plan Update - 2004, Water Analysis prepared by Kimley-Horn and Associates Inc dated September 23, 2004.

(ii)       The parent final maps for all of the Real Property Collateral shall have been approved by the City of Henderson and released to the Borrowers, and shall be recordable subject only to ministerial, non-discretionary acts.

**3.2    Conditions to All Loans.**

The obligations of the Lenders to make Loans on the Effective Date are subject to the following further conditions precedent:

**A.**  The Administrative Agent shall have received before the Effective Date, in accordance with the provisions of subsection 2.1B, an originally executed Disbursement Authorization, signed by the chief executive officer or the chief financial officer of each Borrower or by any executive officer of each

LA\1323477.16

Borrower designated by any of the above-described officers on behalf of the Borrowers in a writing delivered to the Administrative Agent.

**B.** As of the Effective Date:

(i)       The representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects on and as of the Effective Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date;

(ii)       No event shall have occurred and be continuing or would result from the consummation of the borrowing contemplated by such Disbursement Authorization that would constitute a Default or Event of Default; and

No order, judgment or decree of any Governmental Authority shall purport to enjoin or restrain any Lender from making the Loans to be made by it on the Effective Date.

## SECTION 4.
## REPRESENTATIONS AND WARRANTIES

In order to induce the Lenders to enter into this Agreement and to make the Loans and to induce the other Lenders to purchase participations therein, each of the Borrowers represents and warrants to each Lender, on the date of this Agreement and on the Effective Date, that the following statements are true and correct.

**4.1**     <u>**Organization and Qualification.**</u>

Each Borrower and its Subsidiaries is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Each Borrower and its Subsidiaries is duly qualified and is authorized to do business and is in good standing as a foreign corporation in each state or jurisdiction listed on <u>Schedule 4.1</u> hereto and in all other states and jurisdictions in which the failure of such Borrower or any of such Subsidiaries to be so qualified could reasonably be expected to have a Material Adverse Effect.

**4.2**     <u>**Power and Authority.**</u>

Each of the Borrowers and the other Loan Parties are duly authorized and empowered to enter into, execute, deliver and perform this Agreement and each of the other Loan Documents to which each is a party.    The execution, delivery and performance of this Agreement and each of the other Loan Documents have been duly authorized by all necessary action and do not and will not: (i) require any consent or approval of any of the holders of the Capital Stock of such Borrower or any Subsidiary; (ii) contravene such Borrower's or any Borrower Entity's organization documents; (iii) violate, or cause such Borrower or any Borrower Entity to be in default under, any provision of any Applicable Law, order, writ, judgment, injunction, decree, determination or award in effect having applicability to such Borrower or any Borrower Entity; (iv) result in a breach of or constitute a default under any indenture or loan or credit agreement or any other agreement, lease or instrument to which such Borrower or any Borrower Entity is a party or by which it or its properties may be bound or affected; or (v) result in, or require, the creation or imposition of any Lien (except as permitted by this Agreement) upon or with respect to any of the properties now owned or hereafter acquired by such Borrower or any Borrower Entity.

48

### 4.3    Legally Enforceable Agreement.

This Agreement is, and each of the other Loan Documents when delivered under this Agreement will be, a legal, valid and binding obligation of each Borrower and its Subsidiaries signatories thereto, enforceable against each of them in accordance with the respective terms of such Loan Documents, except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws of general application affecting the enforcement of creditors' rights or general equitable principals, whether applied in law or equity.

### 4.4    No Conflict.

After giving effect to the Transactions and the execution, delivery and performance by each of the applicable Loan Parties of the Transaction Documents, the issuance, delivery and payment of the Notes and the consummation of the Transactions do not and will not (i) violate any provision of any law or any governmental rule or regulation applicable to any Loan Party, or violate the organizational certificate or any other organizational documents of any Loan Party or any order, judgment or decree of any court or other Governmental Authority binding on any Loan Party, (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any indenture, agreement, contract or instrument to which any Loan Party is a party or by which any of them or any of their property may be bound, except to the extent such conflict, breach or default could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (iii) result in or require the creation or imposition of any Lien upon any of the properties or assets of any Loan Party (other than any Liens created under any of the Loan Documents in favor of the Collateral Agent and the Liens securing obligations under the Second Lien Credit Agreement), (iv) require any approval of stockholders, partners or members or any approval or consent of any Person under any organizational certificate or other indenture, agreement, contract or instrument to which any Loan Party is a party or by which any of them or any of their property may be bound, except for such approvals or consents obtained on or before the Effective Date or (v) give rise to any preemptive rights, rights of first refusal or other similar rights on behalf of any Person under any Applicable Law or any provision of the organizational documents of any Loan Party or any Material Contract to which any Loan Party is a party or by which any Loan Party is bound.

### 4.5    Capital Structure.

As of the date hereof, <u>Schedule 4.5</u> hereto states (i) the correct name of each Subsidiary, its jurisdiction of incorporation and the percentage of its Capital Stock having voting powers owned by each Person, (ii) the name of each Borrower's corporate Affiliates and the nature of the affiliation (except where a director of a Borrower is a director or officer of another Person) and (iii) the number of authorized and issued Capital Stock (and treasury shares) of such Borrower and each Subsidiary. Each Borrower has good title to all of the shares it purports to own of the Capital Stock of each of its Subsidiaries, free and clear in each case of any Lien (except as permitted by this Agreement). All such Capital Stock have been duly issued and are fully paid and non-assessable. No Borrower has made or obligated itself to make, any Restricted Payment. No Borrower has issued any options to purchase, or any rights or warrants to subscribe for, or any commitments or agreements to issue or sell, or any Capital Stock or obligations convertible into, or any powers of attorney relating to, shares of the Capital Stock of such Borrower or any of its Subsidiaries. Except as set forth on <u>Schedule 4.5</u> hereto, to the Borrowers' Knowledge, there are no outstanding agreements or instruments binding upon the holders of a Borrower's Capital Stock relating to the ownership of its Capital Stock. No Lender is an Affiliate of a Borrower.

49