# Exhibit 1
# (Part 2 of 2)

**4.6**     **Special Purpose Entity.**

The Borrowers and each of the other Loan Parties are in compliance with the special purpose entity requirements of Section 5.16.

**4.7**     **Corporate Names.**

During the 5-year period preceding the date of this Agreement and as of the Effective Date, no Borrower nor any Subsidiary has been known as or used any corporate, fictitious or trade names except those listed on Schedule 4.7 hereto. Except as set forth on Schedule 4.7, neither the Borrowers nor any Subsidiary has been the surviving corporation of a merger or consolidation or acquired all or substantially all of the assets of any Person.

**4.8**     **Business Locations; Agent for Process.**

As of the date hereof, the chief executive office and other places of business of each Borrower and each Subsidiary are as listed on Schedule 4.8 hereto. During the 5-year period preceding the date of this Agreement, neither of Borrowers nor any Subsidiary has had an office, place of business or agent for service of process other than as listed on Schedule 4.8. Except as shown on Schedule 4.8 on the date hereof, no inventory of a Borrower or any Subsidiary is stored with a bailee, warehouseman or similar Person, nor is any inventory consigned to any Person.

**4.9**     **Title to Properties.**

**A.** Each Borrower and each of its Subsidiaries has good and marketable title to and fee simple ownership of, or valid and subsisting leasehold interests in (if any), all of its Real Property Assets (including, without limitation, the Real Property Collateral), and good title to all of its personal property, including all property reflected in the financial statements referred to in Section 4.14 or delivered pursuant to Section 5.3, in each case free and clear of all Liens except for Liens permitted by this Agreement. Each Borrower has paid or discharged, and has caused each Subsidiary to pay and discharge, all lawful claims which, if unpaid, could reasonably be expected to become a Lien against any properties of such Borrower or such Subsidiary that is not permitted by this Agreement, except to the extent such claim is being Properly Contested. The Liens granted to the Collateral Agent pursuant to the Collateral Documents are First Priority Liens, subject only to those Liens which are expressly permitted by the terms of this Agreement.

**B.** There are no exceptions or adverse matters affecting the Real Property Collateral that would be disclosed by a survey of the Real Property Collateral except for those matters that would not, individually or in the aggregate, have an Material Adverse Effect. A true, accurate and complete depiction of the Project is set forth on the map attached hereto as Exhibit XI, which Project comprises approximately 3,500 acres, and which map identifies the portions of the Project comprising the Real Property Collateral as of the Effective Date. A true, accurate and complete depiction of the Real Property Collateral is set forth on the map attached to Exhibit XI, which Property comprises approximately 1073 acres.

**C.** No Borrower Entity has received any notice of any special assessment or proceeding affecting the Project, change in the tax rate or the assessed valuation of Project or any other changes affecting the taxes, assessments or other charges with respect to the Project. There are no special assessment districts, or plans for the same, or for any other scheme that would involve the imposition of taxes other than those disclosed on Schedule 4.9.C relating to the Project. There are no zoning or other land-use regulation proceedings or change or proposed change in any applicable laws, regulations or the

**FIRST LIEN CREDIT AGREEMENT**

Entitlements which could detrimentally affect the use, value, development or operation of the Project, including the Real Property Collateral.

**4.10     Priority of Liens; UCC-1 Financing Statements.**

**A.** As of the Effective Date, the security interests and Liens granted to Lender pursuant to the Collateral Documents in the Collateral (i) will constitute perfected security interests under the UCC, and (ii) will be superior and prior to the rights of all Persons now existing or hereafter arising, except for Permitted Encumbrances.

**B.** UCC-1 Financing Statements containing a correct, complete and adequate description of the Collateral have been delivered to the Administrative Agent for filing in the office of the Secretary of State of the State in which the Borrowers' chief executive office and principal place of business is located and the State in which the Project is located and for recording in the official records of the county in which the Project is located, to the extent necessary to establish a valid and perfected lien in favor of Lender in all Collateral in which a lien may be perfected by filing, and no further or subsequent filing, recording or registration is necessary in any such jurisdiction or elsewhere, except as provided under the UCC with respect to the filing of continuation statements.

**4.11     No Subordination.**

There is no agreement, indenture, contract or instrument to which the Borrowers or any of their Subsidiaries is subject or by which the Borrowers or their Subsidiaries may be bound that requires the subordination in right of payment of any of Borrowers' obligations under this Agreement to any other obligations of Borrowers.

**4.12     Permits; Franchises.**

The Borrowers and each of their Subsidiaries possesses all permits, memberships, franchises, contracts and licenses required and all trademark rights, trade names, trade name rights, patents, patent rights and fictitious name rights necessary to enable them to conduct the business in which they are now engaged without conflict with the rights of others.

**4.13     Indebtedness.**

The Borrowers and their Subsidiaries have no Indebtedness outstanding except for the Permitted Existing Indebtedness.

**4.14     Financial Condition; Pro Forma Balance Sheet; Projections.**

**A.   Financial Statements.**   The Borrowers have heretofore delivered to the Lenders, at the Lenders' request, (i) audited annual consolidated balance sheets and related statements of income, stockholders' equity and cash flows of Lake Las Vegas JV and its Subsidiaries for Fiscal Years 2001, 2002, and 2003, and (ii) unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of the Borrowers and their Subsidiaries for (a) the six months ending June 30, 2004, and (b) management reports only for each fiscal month after the most recent Fiscal Quarter for which financial statements were received by the Administrative Agent as described above and ended thirty (30) days before the Effective Date, together with all supporting documentation for any of the foregoing reasonably requested by the Administrative Agent, which financial statements shall not be materially inconsistent with the financial statements or forecasts previously provided to the Administrative Agent. All such statements were prepared in conformity with GAAP and fairly present, in all material respects, the financial position (on a consolidated basis) of the entities described in such

LA\1323477.16

financial statements as at the respective dates thereof and the results of operations and cash flows (on a consolidated basis) of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year-end adjustments and the absence of footnote disclosure required in accordance with GAAP. Neither the Borrowers nor any of their Subsidiaries have any Contingent Obligation, contingent liability or liability for Taxes, long-term lease or unusual forward or long-term commitment that is not reflected in the financial statements referred to in the preceding clauses of this subsection, the most recent financial statements delivered pursuant to Section 5.3 or the notes thereto and which in any such case is material in relation to the business, operations, properties, assets, condition (financial or otherwise) or prospects of the Borrowers and their Subsidiaries taken as a whole.

      **B.   Effective Date Projections.**   On and as of the Effective Date, the projections of the Borrowers and their Subsidiaries for the period from the Effective Date through the Fiscal Year ending December 31, 2010 previously delivered to the Lenders (the "**Effective Date Projections**") are based on good faith estimates and assumptions made by the management of the Borrowers at the time the Effective Date Projections were prepared, it being recognized, however, that projections as to future events are not to be viewed as facts and that the actual results during the period or periods covered by the Effective Date Projections may differ from the projected results and that the differences may be material. Notwithstanding the foregoing, as of the Effective Date, the management of the Borrowers believed that the Effective Date Projections were reasonable and attainable.

**4.15   Disclosure.**

      The representations and warranties of each of the Borrowers and their Subsidiaries contained in the Transaction Documents and the information contained in the other documents, certificates and written statements furnished to any of the Agents or the Lenders by or on behalf of any Borrower or any of its Subsidiaries for use in connection with the transactions contemplated by this Agreement or any other Transaction Document, when taken together, do not contain any untrue statement of a material fact or omit to state a material fact (known to a Borrower or the applicable Subsidiary, in the case of any document not furnished by it) necessary in order to make the statements contained herein or therein not misleading in light of the circumstances in which the same were made. Any projections and financial information prepared on a Pro Forma Basis and contained in such materials are based upon good faith estimates and assumptions believed by the Borrowers to be reasonable at the time made, it being recognized by the Agents and the Lenders that such projections as to future events are not be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results and that the differences may be material. There is no fact known to any Borrower that has had, or could reasonably be expected to result in, a Material Adverse Effect and that has not been disclosed herein or in such other documents, certificates and statements furnished to the Lenders for use in connection with the transactions contemplated hereby.

**4.16   Solvent Financial Condition.**

      Each Borrower and each of its Subsidiaries is now Solvent and, after giving effect to the Loans to be made hereunder and the consummation of the Transactions, each Borrower and each of its Subsidiaries will be Solvent.

**4.17   Surety Obligations.**

      Except as set forth on Schedule 4.17 hereto on the date hereof, the Borrowers and their Subsidiaries are not obligated as surety or indemnitor under any surety or similar bond or other contract

issued or entered into any agreement to assure payment, performance or completion of performance of any undertaking or obligation of any Person.

**4.18    Taxes.**

The FEIN of each Borrower and each of its Subsidiaries is as shown on Schedule 4.18 hereto. Each Borrower and each of its Subsidiaries has filed all federal, state and other material Tax returns and other reports it is required by law to file and has paid, or made provision for the payment of, all Taxes upon it, its income and properties as and when such Taxes are due and payable, except to the extent being Properly Contested. The provision for Taxes on the books of each Borrower and each of its Subsidiaries are adequate for all years not closed by applicable statutes, and for its current Fiscal Year. The Borrowers are not aware of any proposed material Tax assessment against any Loan Party.

**4.19    Brokers.**

Except as otherwise disclosed in writing to the Agents, there are no claims against any Borrower or amounts owing or to be owed by any Borrower for brokerage commissions, finder's fees or investment banking fees in connection with the Transactions, and each of the Borrowers hereby indemnifies the Agents and the Lenders against, and agrees that it will hold the Agents and the Lenders harmless from, any claim, demand or liability for any such commission or broker's or finder's fees alleged to have been incurred in connection herewith or therewith and any expenses (including reasonable fees, expenses and disbursements of counsel) arising in connection with any such claim, demand or liability.

**4.20    Intellectual Property.**

Each Borrower and each of its Subsidiaries owns or has the lawful right to use all Intellectual Property necessary for the present and planned future conduct of its business without, to Borrowers' Knowledge, any conflict with the rights of others; there is no objection to, or pending (or, to a Borrowers' Knowledge, threatened) claim with respect to, such Borrower's or any of its Subsidiaries' right to use any such Intellectual Property and such Borrower is not aware of any grounds for challenge or objection thereto; and, except as may be disclosed on Schedule 4.20 hereto, none of the Borrowers nor any of their Subsidiaries pay any royalty or other compensation to any Person for the right to use any Intellectual Property (other than with respect to off-the-shelf or prepackaged software). All such patents, trademarks, service marks, tradenames, copyrights, licenses and other similar rights are listed on Schedule 4.20 hereto, to the extent they are registered under any Applicable Law, application for registration have been made under any Applicable Law or are otherwise material to a Borrowers' business.

**4.21    Governmental Authorization.**

Each Borrower and each of its Subsidiaries has, and is in good standing with respect to, all Governmental Authorization necessary to continue to conduct its business as heretofore or proposed to be conducted by it and to own or lease and operate its properties as now owned or leased by it, except where the failure to have such Governmental Authorization could not reasonably be expected to have a Material Adverse Effect.

**4.22    Compliance with Laws.**

Each Borrower, each of its Subsidiaries, the Project and the use and operations of the Project are in compliance in all material respects with, the provisions of all Applicable Laws and there have been no citations, notices or orders of noncompliance issued to such Borrower or any of the Subsidiaries under

**FIRST LIEN CREDIT AGREEMENT**

any such law, rule or regulation. Each Borrower and its Subsidiaries is in material compliance with all Environmental Laws applicable to it and properties owned by it.

**4.23    Burdensome Contracts.**

Neither Borrower nor any of its Subsidiaries is a party or subject to any contract, agreement, or charter or other corporate restriction, which has or (after giving effect to the transactions contemplated by this Agreement) could be reasonably expected to have a Material Adverse Effect.

**4.24    Litigation.**

Except as set forth on Schedule 4.24 hereto, there are no actions, suits, proceedings or investigations pending or, to the Borrowers' Knowledge, threatened on the date hereof against or affecting the Borrowers or any of their Subsidiaries, or the business, operations, properties, prospects, profits or condition of the Borrowers or any of their Subsidiaries, (i) which relate to any of the Loan Documents or any of the transactions contemplated thereby or (ii) which could reasonably be expected to have a Material Adverse Effect. To the Borrowers' Knowledge, neither the Borrowers nor any of their Subsidiaries is in default on the date hereof with respect to any order, writ, injunction, judgment, decree or rule of any court, Governmental Authority or arbitration board or tribunal.

**4.25    No Defaults.**

No event has occurred and no condition exists which would, upon or after the execution and delivery of this Agreement or such Borrower's performance hereunder, constitute a Default or an Event of Default. Neither Borrower nor any of its Subsidiaries is in default, and no event has occurred and no condition exists which constitutes or which with the passage of time or the giving of notice or both would constitute a default, under any Material Contract or in the payment of any Indebtedness of such Borrower or a Subsidiary to any Person.

**4.26    Leases.**

Schedule 4.26 hereto is a complete listing of each Capitalized Lease and Operating Lease of each Borrower and its Subsidiaries on the date hereof that constitutes a Material Contract. Each Borrower and each of its Subsidiaries is in substantial compliance with all of the terms of each of its respective Capitalized Lease and Operating Leases and there is no basis upon which the lessors under any such leases could terminate same prior to the scheduled maturity or stated termination date thereof or declare such Borrower or any of its Subsidiaries in default thereunder.

**4.27    Employee Benefit Plans.**

**A.** Except as disclosed on Schedule 4.27 hereto, neither Borrower nor any of its ERISA Affiliates maintains, contributes or participates in or may incur any liability under any Pension Plan as of the date hereof. Each of the Borrowers and each ERISA Affiliate are in compliance in all material respects with all applicable provisions and requirements of ERISA and the Internal Revenue Code with respect to each Pension Plan and Borrower Pension Plan, and have performed all their obligations under each Pension Plan and Borrower Pension Plan, except those where failure to perform such obligations could not reasonably be expected to result in material liability to any Borrower. With respect to each Pension Plan and Borrower Pension Plan, no material liability to the PBGC (other than required premium payments), the Internal Revenue Service, any such Pension Plan or Borrower Pension Plan or any trust established under Title IV of ERISA has been, or is expected by any Borrower or any ERISA Affiliate to be, incurred by any Borrower or any ERISA Affiliate.

54

**B.** No ERISA Event has occurred or could reasonably be expected to occur which has resulted or is reasonably likely to result in any material liability to any Borrower. No fact or situation that could reasonably be expected to have a Material Adverse Effect exists with respect to any Pension Plan or Borrower Pension Plan.

**C.** Except as could not reasonably be expected to result in material liability to any Borrower, no Borrower nor any of their Subsidiaries maintains or contributes to any employee welfare benefit plan (as defined in Section 3(1) of ERISA) that provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employees of such Borrower or any of its Subsidiaries other than as required under Section 4980B of the Internal Revenue Code or Part 6 of Subtitle B of Title I of ERISA.

**D.** Except as could not reasonably be expected to result in material liability to any Borrower, no Pension Plan has any "unfunded benefit liability" as defined in Section 4001(a)(18) of ERISA (but excluding from the definition of "current value" of "assets" of such Pension Plan, accrued but unpaid contributions).

**E.** Except as could not reasonably be expected to result in material liability to any Borrower, each Borrower and each ERISA Affiliate has complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and is not in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan. Neither Borrower nor any of its ERISA Affiliates has incurred or could reasonably be expected to incur any withdrawal liability in connection with a Multiemployer Plan.

**4.28   Trade Relations.**

There exists no actual or, to the Borrowers' Knowledge, threatened termination, cancellation or material limitation of, or any materially adverse Modification or change in, the business relationship between a Borrower and any customer or any group of customers whose purchases individually or in the aggregate are material to the business of such Borrower, or with any material supplier or group of suppliers, and there exists no condition or state of facts or circumstances which could reasonably be expected to have a Material Adverse Effect or prevent such Borrower from conducting such business after the consummation of the transactions contemplated by this Agreement in substantially the same manner as it has heretofore been conducted.

**4.29   Labor Relations.**

Except as described on Schedule 4.29 hereto, neither the Borrowers nor any of their Subsidiaries is a party to any collective bargaining agreement on the date hereof. On the date hereof, there are no material grievances, disputes or controversies with any union or any other organization of the Borrowers and its Subsidiaries.

**4.30   Not a Regulated Entity.**

No Loan Party is (i) an "investment company" or a "person directly or indirectly controlled by or acting on behalf of an investment company" within the meaning of the Investment Company Act of 1940; (ii) a "holding company," or a "subsidiary company" of a "holding company," or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company," within the meaning of the Public Utility Holding Company Act of 1935; or (iii) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any public utilities code or any other Applicable Law regarding its authority to incur Indebtedness.

55

**FIRST LIEN CREDIT AGREEMENT**

**4.31**    **Margin Stock.**

Neither Borrower nor any of its Subsidiaries is engaged, principally or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.

**4.32**    **No Material Adverse Change.**

Since June 30, 2004, no event or change has occurred that has caused or evidences or could reasonably be expected to cause, either individually or in the aggregate, a Material Adverse Effect.

**4.33**    **Environmental Matters.**

Except as disclosed on Schedule 4.33 hereto:

      (i)      Each Borrower, each of its Subsidiaries (including, without limitation, all operations and conditions at or in the Real Property Assets), and, to the Borrowers' Knowledge, each of the tenants under any leases or occupancy agreements affecting any portion of any Real Property Assets, are in compliance with all applicable Environmental Laws (which compliance includes, but is not limited to, the possession by any Borrower, each of its Subsidiaries and each of such tenants of all permits and other Governmental Authorizations required under applicable Environmental Laws, and compliance with the terms and conditions thereof), except where failure to be in compliance could not reasonably be expected to have a Material Adverse Effect. Neither the Borrowers nor any of its Subsidiaries, nor, to the Borrowers' Knowledge, any tenants under any leases or occupancy agreements affecting any portion of the Real Property Assets has received any written communication, whether from a Governmental Authority, citizens group, employee or otherwise, alleging that a Borrower, any of its Subsidiaries, or any such tenant is not in such compliance, and to the Borrowers' Knowledge there are no past or present actions, activities, circumstances, conditions, events or incidents that could reasonably be expected to prevent or interfere with such compliance in the future.

      (ii)      There is no Environmental Claim pending or, to the Borrowers' Knowledge, threatened against a Borrower or any of its Subsidiaries or, to the Borrowers' Knowledge, against any Person whose liability for any Environmental Claim a Borrower or any of its Subsidiaries has retained or assumed either contractually or by operation of law, in each such case which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

      (iii)      There are no past or present actions, activities, circumstances, conditions, events or incidents, including, without limitation, the Release or presence of any Hazardous Material, which could reasonably be expected to form the basis of any Environmental Claim against a Borrower or any of its Subsidiaries, or to the Borrowers' Knowledge, against any Person whose liability for any Environmental Claim a Borrower or any of its Subsidiaries has retained or assumed either contractually or by operation of law, in each such case which could reasonably be expected to have a Material Adverse Effect.

      (iv)      Each Borrower and its Subsidiaries have not, and to the Borrowers' Knowledge, no other Person has placed, stored, deposited, discharged, buried, dumped or disposed of Hazardous Materials on, beneath or adjacent to any property currently or formerly owned, operated or leased by a Borrower or any of its Subsidiaries, in each case, which, individually or in the aggregate, which could reasonably be expected to have a Material Adverse Effect.

**FIRST LIEN CREDIT AGREEMENT**

(v)        No Lien in favor of any Person relating to or in connection with any Environmental Claim has been filed or has been attached to any Real Property Asset.

(vi)        Without in any way limiting the generality of the foregoing, except as would not have a Material Adverse Effect, none of the Real Property Assets contain any: underground storage tanks; asbestos; polychlorinated biphenyls ("**PCBs**"); underground injection wells; radioactive materials; or septic tanks or waste disposal pits in which process wastewater or any Hazardous Materials have been discharged or disposed.

**4.34**   **Material Contracts.**

**A.** There are no material contracts, agreements, commitments or documents affecting any portion of the Collateral, including any purchase agreements for any portion of the Real Property Collateral, except as set forth on Schedule 4.34 (collectively, the "**Material Contracts**").

**B.** All of the Existing Purchase Agreements are Material Contracts and are identified on Schedule 4.34.  None of the Existing Purchase Agreements qualify as Qualified Homebuilder Purchase Agreements or Qualified Homebuilder Option Agreements.

**C.** The Borrowers have heretofore furnished to the Administrative Agent a true, correct and complete copy of each document described on Schedule 4.34 annexed hereto and made a part hereof, and all Modifications thereto.  The Material Contracts have not been amended, Modified or clarified except as set forth on Schedule 4.34.

**D.** Each Material Contract is in full force and effect and constitutes a legal, valid and binding obligation of the applicable Borrower Entity, and, to the Borrowers' Knowledge, each other party thereto.

**E.** No Borrower Entity is in default or breach (with or without the giving notice or the passage of time) any such Material Contract.  Except as set forth on Schedule 4.34, Borrowers have no knowledge that any other party is in default or breach of any such Material Contract, or the existence of any conditions which, with the giving of notice or the passage of time, or both, could constitute a default. None of rights and privileges under the Material Contracts inuring to any Borrower Entity has lapsed, and neither the City of Henderson, Nevada nor any other party has any right as of the Effective Date to terminate any of the Material Contracts.

**F.** As of the Effective Date, the applicable Borrower Entity has paid all fees, made all dedications, posted all bonds and other security, completed all improvements and otherwise performed all obligations required to be performed by the applicable Borrower Entity under the Material Contracts in accordance therewith.

**G.** All of the Material Contracts to which a Loan Party is a party are assignable to the Lenders (or any successor-in-interest to the applicable Loan Party) as contemplated by the Security Agreement and Assignment of Contractual Agreements.

**4.35**   **Utilities.**

Except as set forth on Schedule 4.35 annexed hereto and made a part hereof, all water, sewer, gas, electric, telephone and drainage facilities and all other utilities required by law or for the intended full use, development and operation of the Project are installed to the property lines of the Project, are all connected and operating pursuant to valid permits, are adequate to service the Project (including the full contemplated development of the Real Property Collateral) and to permit full compliance with all

FIRST LIEN CREDIT AGREEMENT

applicable laws and regulations and the intended full development and usage of the Project, and are connected to the Project by means of one or more public or private easements extending from the Project to one or more public streets, public rights-of-way or utility facilities.

**4.36    Licenses.**

The Borrowers have obtained (or caused to be obtained) all material licenses, permits, approvals, easements and rights of way (and all such items are currently in full force and effect) required from any governmental or regulatory authority having jurisdiction over the Project, or from private parties, for the full intended use and operation of the Project and to ensure free and unimpeded vehicular and pedestrian ingress to and egress from the Project as required to permit the full development and usage of the Project.

**4.37    Entitlements.**

**A.**  All of the Existing Entitlements have been obtained and are in full force and effect. All such Existing Entitlements are vested in one or more of the Persons comprising the Borrowers, and the consummation of this transaction shall not affect the same. There are no unperformed obligations or conditions with respect to the effectiveness of any of such Existing Entitlements and there are no uncured defaults under any of the same. No Borrower Entity has received notice of any changes to any of the Existing Entitlements; all of the material documents relating to the Existing Entitlements are identified on Schedule 4.37 annexed hereto and made a part hereof (collectively, the **"Entitlement Documents"**), and there are no other material documents relating to the Existing Entitlements other than those set forth on Schedule 4.37.

**B.**  With respect to the Real Property Collateral, other than the Existing Entitlements listed on Schedule 4.37, there are no other Entitlements necessary to permit the development of the Real Property Collateral as contemplated by the Comprehensive Plan.

**C.**  The Borrowers have obtained a commitment from the City of Henderson to provide the necessary potable and raw water for construction and occupancy of the maximum development on the BLM Property, as contemplated in the Lake Las Vegas Master Plan Update - 2004, Water Analysis prepared by Kimley-Horn and Associates Inc dated September 23, 2004.

**4.38    Transaction Documents.**

**A.  Delivery of Transaction Documents.**  The Borrowers have delivered to the Agents complete and correct copies of each Transaction Document and of all exhibits and schedules thereto.

**B.  Representations and Warranties.**  Except to the extent otherwise set forth herein or in the schedules hereto, each of the representations and warranties of any Loan Party made in any other Transaction Document, except to the extent qualified in the schedules to such Transaction Documents, was true and correct in all material respects as of the Effective Date (or as of any earlier date to which such representation and warranty specifically relates).

**C.  Governmental Authorizations.**    All Governmental Authorizations and all other authorizations, approvals and consents of any other Person required by the Transaction Documents or to consummate the Transactions have been obtained and are in full force and effect.

**D.  Conditions and Consummation.**  On the Effective Date, (i) all of the conditions to the effectiveness of the Transactions set forth in the Transaction Documents have been duly satisfied or, with the consent of the Requisite Lenders, waived, and (ii) each of the Transactions has been consummated in all material respects in accordance with the Transaction Documents and all Applicable Laws.

58

**FIRST LIEN CREDIT AGREEMENT**

**4.39**    **Credit Rating.**

Each of the Borrowers shall use its commercially reasonable efforts to cause an updated credit rating by S&P and by Moody's to be received with respect to the Loans at least once during each Fiscal Year.

**SECTION 5.**
**AFFIRMATIVE COVENANTS**

Each of the Borrowers covenants and agrees that, until payment in full of all of the Loans and other Obligations, each of the Borrowers shall and shall cause each of its Subsidiaries to:

**5.1**    **Visits and Inspections.**

Permit representatives of the Administrative Agent, from time to time, as often as may be reasonably requested, but only during normal business hours and (except when a Default or Event of Default exists) upon reasonable prior notice to such Borrower, to visit and inspect the properties of such Borrower and each of its Subsidiaries, conduct appraisals of a Borrower's properties, inspect, audit and make extracts from each Borrower's and each of its respective Subsidiary's books and records, and discuss with its officers, its employees and its independent accountants, such Borrower's and each of its Subsidiary's business, financial condition, business prospects and results of operations. Representatives of the Borrowers (including the Borrowers' accountants) shall be authorized to accompany the Administrative Agent (or representative thereof) on any such visit or inspection, but such authorization shall in no manner be deemed to be a requirement or condition of the Administrative Agent's visits or inspections, and to the extent any of the Borrowers' representatives accompany the Administrative Agent on any visit or audit, such Persons shall in no manner hinder or delay the audits or inspections of the Administrative Agent.   Representatives of each Lender shall be authorized to accompany the Administrative Agent on each such visit and inspection and to participate with the Administrative Agent therein, but at their own expense, unless a Default or Event of Default exists. Neither the Administrative Agent nor any Lender shall have any duty to make any such inspection and shall not incur any liability by reason of its failure to conduct or delay in conducting any such inspection.

**5.2**    **Notices.**

Notify the Administrative Agent and Lenders in writing, promptly after any Borrower's obtaining knowledge of the following:

(i)        the institution of, or written threat of, any action, suit, proceeding, governmental investigation or arbitration against or affecting the Borrowers or their Subsidiaries and not previously disclosed, which action, suit, proceeding, governmental investigation or arbitration (a) exposes, or in the case of multiple actions, suits, proceedings, governmental investigations or arbitrations arising out of the same general allegations or circumstances expose, such Persons, in the Borrowers' reasonable judgment, to liability in an amount aggregating $2,500,000 or more and is or are not covered by insurance, or (b) seeks injunctive or other relief which, if obtained, could reasonably be expected to have a Material Adverse Effect, providing such other information as may be reasonably available to enable Administrative Agent and its counsel to evaluate such matters. The Borrowers, upon request of the Administrative Agent, shall promptly give written notice of the status of any action, suit, proceeding, governmental investigation or arbitration.

59

LA\1323477.16

(ii)      any labor dispute to which any of the Borrowers or their Subsidiaries may become a party, any strikes or walkouts relating to any of its property or facilities, and the expiration of any labor contract to which it is a party or by which it is bound, which could reasonably be expected to have a Material Adverse Effect;

(iii)     any default by any of the Borrowers or their Subsidiaries under, or termination of, any Material Contract or any note, indenture, loan agreement, mortgage, lease, deed, guaranty or other similar agreement relating to any Indebtedness of such Person exceeding $2,500,000;

(iv)     termination, suspension or revocation of any Entitlements which could reasonably be expected to have a Material Adverse Effect;

(v)      the existence of any (a) Default, (b) Event of Default or (c) event or change that has caused or could be reasonably expected to cause, either in any case or in the aggregate, a Material Adverse Effect;

(vi)     the occurrence of or forthcoming occurrence of any ERISA Event or the receipt by any Borrower or any ERISA Affiliate of notice from a Multiemployer Plan sponsor concerning an ERISA Event;

(vii)    any judgment against any of the Borrowers or their Subsidiaries in an amount exceeding $2,500,000;

(viii)   any violation or asserted violation by any of the Borrowers or their Subsidiaries of any Applicable Law (including ERISA, OSHA, FLSA, or any Environmental Laws), the adverse resolution of which could reasonably be expected to have a Material Adverse Effect or result in liability of such Borrower or Subsidiary in an amount in excess of $2,500,000;

(ix)     any Release on any property owned or occupied by any of the Borrowers or their Subsidiaries if such Release could reasonably be expected to require remedial action to correct the presence of Hazardous Materials in, around, or under the Mortgaged Property

(x)      the discharge of such Borrower's independent accountants or any withdrawal or resignation by such independent accountants from their acting in such capacity. In addition, each Borrower shall give the Administrative Agent at least ten (10) Business Days' prior written notice of any Borrower's or Guarantor's opening of any new office or place of business;

(xi)     copies of all environmental audits and reports, whether prepared by personnel of such Borrower or any of its Subsidiaries or by independent consultants, with respect to environmental matters affecting any property owned or operated by such Borrower or its Subsidiaries or which relate to any Environmental Liabilities of such Borrower or its Subsidiaries, to the extent reflecting any matters which, in any such case, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(xii)    copies of any Tax assessments; and

(xiii)   such other information and data with respect to such Borrower or any of its Subsidiaries as from time to time may be reasonably requested by the Administrative Agent or any Lender.

**FIRST LIEN CREDIT AGREEMENT**

## 5.3    Financial Statements and Other Reports.

The Borrowers will maintain, and cause each of their Subsidiaries to maintain, proper books and records including a system of accounting established and administered in accordance with sound business practices to permit preparation of financial statements in conformity with GAAP.  The Borrowers will deliver to the Administrative Agent for distribution to each Lender:

(i)      Monthly Financials: as soon as available and in any event within thirty (30) days after each calendar month-end (other than the third month of any Fiscal Quarter) commencing with the calendar month ending November 30, 2004, (a) the respective consolidated balance sheets as at the end of each fiscal month of the Borrowers and their Subsidiaries, together with the related consolidated statements of income, and consolidated statement of cash flows of each for such month and for the period from the beginning of the then current Fiscal Year to the end of such month, setting forth, in the case of statements of income only, in comparative form the corresponding figures for the corresponding periods of the previous fiscal year and the corresponding figures from the consolidated plan and financial forecast for the current Fiscal Year delivered pursuant to subsection 5.1(xvi), all prepared in accordance with GAAP and in reasonable detail and certified by the chief financial officer of the Borrowers that they fairly present, in all material respects, the financial condition of each as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments; and (b) a narrative report describing the operations of each of the Borrowers and their Subsidiaries, in each case, taken as a whole, in the form prepared for presentation to senior management for such month and for the period from the beginning of the then current Fiscal Year to the end of such month;

(ii)      Quarterly Financials: as soon as available and in any event within forty-five (45) days after the end of each Fiscal Quarter (other than the fourth Fiscal Quarter of any Fiscal Year) commencing with the Fiscal Quarter ending December 31, 2004, (a) the respective consolidated balance sheets of the Borrowers and their Subsidiaries, as at the end of such Fiscal Quarter and the related consolidated statements of income and consolidated statement of cash flows of each for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth, in the case of statements of income only, in comparative form the corresponding figures for the corresponding periods of the previous fiscal year and the corresponding figures from the consolidated plan and financial forecast for the current Fiscal Year delivered pursuant to subsection 5.1(xvi), all prepared in accordance with GAAP and in reasonable detail and certified by the chief financial officer of the Borrowers that they fairly present, in all material respects, the financial condition of each as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments; and (b) a narrative report describing the operations of the Borrowers and their Subsidiaries, if any, in each case, taken as a whole, in the form prepared for presentation to senior management for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter;

(iii)      Year-End Financials: as soon as available and in any event within ninety (90) days after the end of each Fiscal Year, (a) the respective consolidated balance sheets of the Borrowers and their Subsidiaries, as at the end of such Fiscal Year and the related consolidated statements of income and consolidated statement of cash flows of each for such Fiscal Year, setting forth, in the case of statements of income only, in comparative form the corresponding figures for the previous fiscal year and the corresponding figures from the consolidated plan and financial forecast delivered pursuant to subsection 5.1(xvi) for the Fiscal Year covered by such

61

financial statements, all prepared in accordance with GAAP and in reasonable detail and certified by the chief financial officer of the Borrowers that they fairly present, in all material respects, the financial condition of the entities covered thereby as at the dates indicated and the results of their operations and their cash flows for the periods indicated; (b) a narrative report describing the operations of the Borrowers and their Subsidiaries, in each case, taken as a whole, in the form prepared for presentation to senior management for such Fiscal Year; and (c) in the case of such consolidated financial statements of the Borrowers and their Subsidiaries, a report thereon of independent certified public accountants of recognized national standing selected by the Borrowers and reasonably satisfactory to the Administrative Agent, which report shall be unqualified as to going concern and scope of audit and contains no other material qualification or exception, and shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of the Borrowers and their Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except as otherwise disclosed in such financial statements) and that the audit by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards;

(iv)    Officer's Certificates; Compliance Certificates:  together with each delivery of financial statements of the Borrowers and their Subsidiaries pursuant to subdivisions (ii) and (iii) above, (a) an Officer's Certificate of the Borrowers stating that the signer has reviewed the terms of this Agreement and has made, or caused to be made under his or her supervision, a review in reasonable detail of the transactions and condition of the Borrowers and their Subsidiaries during the accounting period covered by such financial statements and that such review has not disclosed the existence during or at the end of such accounting period, and that the signer did not have knowledge of the existence as at the date of such Officer's Certificate, of any condition or event that constitutes a Default or Event of Default, or, if any such condition or event existed or exists, specifying the nature and period of existence thereof and what action the Borrowers have taken, is taking and proposes to take with respect thereto; and (b) a Compliance Certificate demonstrating in reasonable detail compliance during and at the end of the applicable accounting periods with the restrictions contained in Section 6.6.

(v)    Reconciliation Statements:  if, as a result of any change in accounting principles and policies from those used in the preparation of the audited financial statements referred to in Section 4.14, the consolidated financial statements delivered pursuant to subdivisions (i), (ii), (iii) or (xvi) of this Section 5.3 will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then (a) together with the first delivery of financial statements pursuant to subdivision (i), (ii), (iii) or (xvi) of this Section 5.1 following such change, consolidated financial statements for (y) the current Fiscal Year to the effective date of such change and (z) the two (2) full fiscal years immediately preceding the Fiscal Year in which such change is made, in each case prepared on a Pro Forma Basis as if such change had been in effect during such periods, and (b) together with each delivery of financial statements pursuant to subdivision (i), (ii), (iii) or (xvi) of this Section 5.3 following such change, a written statement of the chief accounting officer or chief financial officer of the Borrowers setting forth the differences which would have resulted if such financial statements had been prepared without giving effect to such change, if reasonably requested by the Administrative Agent;

(vi)    Accountants' Certification:  together with each delivery of consolidated financial statements of the Borrowers and their Subsidiaries pursuant to subdivision (iii) above, a

**FIRST LIEN CREDIT AGREEMENT**

written statement by the independent certified public accountants giving the report thereon (a) stating that their audit has included a reading of the terms of this Agreement and the other Loan Documents as they relate to the covenants set forth in Section 6.6 and accounting matters, and (b) stating whether, in connection with their audit examination, any condition or event, insofar as such condition or event relates to the covenants set forth in Section 6.6 or accounting matters, that constitutes an Default or Event of Default has come to their attention and, if such a condition or event has come to their attention, specifying the nature and period of existence thereof; provided that such accountants shall not be liable by reason of any failure to obtain knowledge of any such Default or Event of Default that would not be disclosed in the course of their audit examination;

(vii)     Accountants' Reports:  promptly upon receipt thereof (unless restricted by applicable professional standards), copies of all reports submitted to the Borrowers by a national independent certified public accountants in connection with each annual, interim or special audit of the financial statements of the Borrowers and their Subsidiaries made by such accountants, including, without limitation, any comment letter submitted by such accountants to management in connection with their annual audit;

(viii)     Press Releases:  promptly upon their becoming available, copies of all press releases and other statements made available generally by the Borrowers or any of their Subsidiaries to the public concerning material developments in the business of the Borrowers or any of their Subsidiaries;

(ix)     Casualty:  promptly upon the occurrence of any casualty involving any Real Property Asset of the Borrowers or any of their Subsidiaries involving a loss that could reasonably be expected to exceed $5,000,000, written notice with sufficient detail describing the casualty and the extent to which any losses resulting from such casualty will be covered by insurance.

(x)     Appraisal Updates:  together with each delivery of financial statements of the Borrowers and their Subsidiaries pursuant to subdivisions (ii) and (iii) above, a Qualified Appraisal that provides an Appraised Value of the remaining portion of the Real Property Collateral effective as of the last day of the preceding Fiscal Quarter.

(xi)     Budget Updates:  together with each delivery of financial statements of the Borrowers and their Subsidiaries pursuant to subdivisions (ii) and (iii) above, an update to the Approved Budget providing a detailed line-item accounting of what amounts on the Approved Budget have been incurred and paid effective as of the last day of the preceding Fiscal Quarter.

(xii)     Events of Default, etc.:  promptly upon any Responsible Officer of the Borrowers obtaining knowledge (a) of any condition or event that constitutes a Default or an Event of Default, (b) that any Person has given any written notice to the Borrowers or any of their Subsidiaries or taken any other action that could reasonably be expected to have an adverse effect on the Borrowers or any of their Subsidiaries with respect to a claimed default or event or condition of the type referred to in Section 7.6, or (c) of the occurrence of any event or change that has caused or evidences or could be reasonably expected to cause, either in any case or in the aggregate, a Material Adverse Effect, an Officer's Certificate specifying the nature and period of existence of such condition, event or change, or specifying the written notice given or action taken by any Person and the nature of such claimed Default, Event of Default, default, event or condition, and what action the Borrowers (or applicable Subsidiaries) have taken, is taking and proposes to take with respect thereto;

FIRST LIEN CREDIT AGREEMENT

   (xiii) <u>Litigation or Other Proceedings</u>:  (a) promptly upon any Responsible Officer of the Borrowers obtaining knowledge of (X) the institution of, or written threat of, any action, suit, proceeding (whether administrative, judicial or otherwise), Environmental Claim, governmental investigation or arbitration against or affecting the Borrowers or any of their Subsidiaries or any property of the Borrowers or any of their Subsidiaries (collectively, "**Proceedings**") not previously disclosed in writing by the Borrowers to the Lenders or (Y) any material development in any Proceeding that, in any case:

    (a) could reasonably be expected to have a Material Adverse Effect; or

    (b) seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby;

written notice thereof together with such other information as may be reasonably available to the Borrowers and as the Borrowers and their counsel shall reasonably determine would not jeopardize the attorney-client privilege with respect to such Proceeding, to enable the Lenders and their counsel to evaluate such matters; and (b) within forty-five (45) days after the end of each Fiscal Quarter of the Borrowers, a schedule of all Proceedings involving an alleged liability of, or claims against or affecting, the Borrowers or any of their Subsidiaries equal to or greater than $5,000,000 and promptly after request by the Administrative Agent such other information as may be reasonably requested by the Administrative Agent to enable the Administrative Agent and its counsel to evaluate any of such Proceedings; provided, however, that the Borrowers and their counsel may withhold information if in their reasonable determination, disclosure of such information would jeopardize the attorney-client privilege with respect to such Proceeding;

   (xiv) <u>ERISA Events</u>:  promptly upon the Borrowers becoming aware of the occurrence of any ERISA Event that could reasonably be expected to have a Material Adverse Effect, a written notice specifying the nature thereof, what action the Borrowers or any ERISA Affiliate has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto;

   (xv) <u>ERISA Notices</u>: with reasonable promptness, copies of (a) all written notices received by the Borrowers or any ERISA Affiliate from a Multiemployer Plan sponsor concerning an ERISA Event; and (b) such other documents or governmental reports or filings relating to any Pension Plan or Borrower Pension Plan as the Administrative Agent shall reasonably request;

   (xvi) <u>Financial Plans</u>: as soon as practicable and in any event no later than ninety (90) days after the end of each Fiscal Year, a monthly consolidated plan and financial forecast for the next succeeding Fiscal Year, including without limitation (a) forecasted consolidated statement of cash flows of the Borrowers and their Subsidiaries for such Fiscal Year in form of <u>Exhibit XVII</u> attached hereto, together with a Compliance Certificate prepared on a Pro Forma Basis for such Fiscal Year and an explanation of the assumptions on which such forecasts are based and (b) such other information and projections as the Administrative Agent may reasonably request;

   (xvii) <u>Insurance</u>: as soon as practicable and in any event by the last day of each Fiscal Year, a report in form and substance satisfactory to the Administrative Agent outlining all material insurance coverage maintained as of the date of such report by the Borrowers and their

LA\1323477.16

Subsidiaries and all material insurance coverage planned to be maintained by the Borrowers and their Subsidiaries in the immediately succeeding Fiscal Year;

(xviii)   Environmental Audits and Reports:  promptly following receipt thereof, copies of all environmental audits and reports, whether prepared by personnel of the Borrowers or any of their Subsidiaries or by independent consultants, with respect to environmental matters at any Real Property Asset presently owned or operated by the Borrowers or their Subsidiaries or which relate to any Environmental Liabilities of the Borrowers or its Subsidiaries, to the extent reflecting any matters which, in any such case, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(xix)   Regulatory Notices:  as soon as practicable, notification of any change in any law, rule or regulation relating to the business of the Borrowers and their Subsidiaries which could reasonably be expected to have a Material Adverse Effect;

(xx)   Material Contracts:  promptly after (a) any Material Contract is terminated or expires or is renewed or is, amended or otherwise Modified in any manner which is materially adverse to the Borrowers or their Subsidiaries by reason of a default thereunder, or (b) any notice or other communication is delivered by any party to any Material Contract pursuant thereto or in respect thereof relating to (x) any financial matter or other matter having adverse financial consequences to the Borrower or their Subsidiaries in excess of $2,500,000 or (y) any other non-financial matter which could reasonably be expected to have material adverse consequence to the business of the Borrower or any of their Subsidiaries (whether or not constituting a Material Adverse Effect), notice and a copy thereof and, in the case of any such renewal, amendment, other Modification or new Material Contract, a description in reasonable detail of the material terms thereof; and

(xxi)   Other Information:  with reasonable promptness, such other information and data with respect to the Borrowers or any of the Borrowers' Subsidiaries as from time to time may be reasonably requested by the Administrative Agent or any Lenders, and such other documentation, information and certifications described in subsection 3.1S as from time to time requested by the Administrative Agent or any Lender.

**5.4    Corporate Existence.**

The Borrowers will, and will cause each of their Subsidiaries to, at all times preserve and keep in full force and effect its organizational existence and all rights and franchises material to the business of the Borrowers and their Subsidiaries (on a consolidated basis) or the Loan Parties, taken as a whole.

**5.5    Payment of Taxes and Claims; Tax Consolidation.**

**A.** The Borrowers will, and will cause each of their Subsidiaries to, pay all taxes, assessments and other governmental charges imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any penalty accrues thereon, and all claims (including, without limitation, claims for labor, services, materials and supplies) for sums that have become due and payable which, if unpaid, might become a Lien (other than a Permitted Encumbrance) upon any of its properties or assets; provided that no such tax, charge or claim need be paid if being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and if such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made therefore.

LA\1323477.16

**B.**  The Borrowers will not, nor will it permit any of their Subsidiaries to, file or consent to the filing of any consolidated, combined or other similar income tax return with any Person (other than the Borrowers and Subsidiaries of the Borrowers).

**5.6  Maintenance of Properties; Insurance.**

The Borrowers will, and will cause each of their Subsidiaries to, maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all material properties used in the business of the Borrowers and their Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof.  The Borrowers will maintain or cause to be maintained, with financially sound and reputable insurers, insurance with respect to its properties and business and the properties and businesses of its Subsidiaries against loss or damage of the kinds and with respect to liability customarily carried or maintained under similar circumstances by corporations of established reputation engaged in similar businesses.  Each such policy of casualty insurance covering damage to or loss of property shall name the Collateral Agent for the benefit of the Lenders as additional insured and as the loss payee thereunder for all losses, subject to application of proceeds as required by subsection 2.4B(ii)(c), each such policy of liability insurance coverage shall name the Collateral Agent, for the benefit of themselves and the Lenders, as additional insureds, and all such policies of insurance shall provide for at least thirty (30) days' prior written notice to the Collateral Agent of any Modification or cancellation of such policy.

**5.7  Lender Meeting.**

The Borrowers will, upon the request of the Administrative Agent, participate in a meeting of the Administrative Agent and the Lenders at least once during each Fiscal Year (and will participate in such other meetings at such other times as the Borrowers and the Administrative Agent may agree) to be held at the Borrowers' corporate offices (or such other location as may be agreed to by the Borrowers and the Administrative Agent) at such time as may be agreed to by the Borrowers and the Administrative Agent.

**5.8  Compliance with Laws, etc.**

The Borrowers shall, and shall cause each of their Subsidiaries to, comply with the requirements of all Applicable Laws, noncompliance with which, individually or in the aggregate with other non-compliances, could reasonably be expected to cause a Material Adverse Effect.

**5.9  Environmental Disclosure and Inspection.**

**A.**  The Borrowers shall, and shall cause each of their Subsidiaries to, exercise all due diligence in order to comply and cause (i) all tenants or subtenants under any leases or occupancy agreements affecting the Real Property Assets, (ii) all contractors, engineers, architects and similar vendors and contractors, and (iii) all other Persons on or occupying the Real Property Assets, to comply with all Environmental Laws, except for any such noncompliance which could not reasonably be expected to cause a Material Adverse Effect.

**B.**  The Borrowers agree that the Administrative Agent may, from time to time, retain, at the Borrowers' expense, an independent professional consultant reasonably acceptable to the Borrowers to review any report relating to Hazardous Materials prepared by or for the Borrowers and to conduct their own investigation (the scope of which investigation shall be reasonable based upon the circumstances) of any Real Property Asset currently owned, leased, operated or used by the Borrowers or any of their Subsidiaries, if (x) a Default or an Event of Default shall have occurred and be continuing, or (y) the Administrative Agent reasonably believes (1) that an occurrence relating to such Real Property Asset is

66

likely to give rise to an Environmental Liability or (2) that a violation of an Environmental Law on or around such Real Property Asset has occurred or is likely to occur, which could, in either such case, reasonably be expected to result in a Material Adverse Effect.  The Borrowers shall use their reasonable efforts to obtain for the Administrative Agent and its agents, employees, consultants and contractors the right, upon reasonable notice to the Borrowers, to enter into or on to the Real Property Assets currently owned, leased, operated or used by the Borrowers or any of their Subsidiaries to perform such tests on such property as are reasonably necessary to conduct such a review and/or investigation.  Any such investigation of any Real Property Asset shall be conducted, unless otherwise agreed to by the Borrowers and the Administrative Agent, during normal business hours and, shall be conducted so as not to unreasonably interfere with the ongoing operations at any such Real Property Asset or to cause any damage or loss to any property at such Real Property Asset.  The Borrowers and the Administrative Agent hereby acknowledge and agree that any report of any investigation conducted at the request of the Administrative Agent pursuant to this subsection 5.9.B will be obtained and shall be used by the Administrative Agent and the Lenders for the purposes of the Lenders' internal credit decisions, to monitor and police the Loans and to protect the Lenders' security interests, if any, created by the Loan Documents, and the Administrative Agent and the Lenders hereby acknowledge and agree any such report will be kept confidential by them to the extent permitted by law except as provided in the following sentence.  The Administrative Agent agrees to deliver a copy of any such report to the Borrowers with the understanding that the Borrowers acknowledge and agree that (i) they will indemnify and hold harmless the Administrative Agent and each Lender from any costs, losses or liabilities relating to the Borrowers' use of or reliance on such report, (ii) neither Agent nor any Lender makes any representation or warranty with respect to such report, and (iii) by delivering such report to the Borrowers, neither the Administrative Agent nor any Lender is requiring or recommending the implementation of any suggestions or recommendations contained in such report.

C.  The Borrowers shall promptly advise the Administrative Agent in writing and in reasonable detail of (i) any Release or threatened Release of any Hazardous Materials, or to the Borrowers' Knowledge any tenants under any leases or occupancy agreements affecting any portion of any Real Property Asset, to any federal, state, local or foreign governmental or regulatory agency under any applicable Environmental Laws, (ii) any and all written communications with respect to any pending or threatened Environmental Claims and any and all material written communications with respect to any Release or threatened Release of Hazardous Materials the existence of which has a reasonable possibility of resulting in a Material Environmental Liability, (iii) any Cleanup performed by the Borrowers or any other Person in response to any Hazardous Materials on, under or about any Real Property Asset, the existence of which has a reasonable possibility of resulting in a Material Environmental Liability, (iv) the Borrowers' discovery of any occurrence or condition on any property that could cause any Real Property Asset to be subject to any restrictions on the ownership, occupancy, transferability or use thereof under any Environmental Laws, and (v) any written request for information from any governmental agency that fairly suggests such agency is investigating whether the Borrowers or any of their Subsidiaries may be potentially responsible for a Release or threatened Release of Hazardous Materials which has a reasonable possibility of giving rise to a Material Environmental Liability.

D.  The Borrowers shall promptly notify the Administrative Agent of (i) any proposed acquisition of stock, assets, or property by the Borrowers or any of their Subsidiaries that could reasonably be expected to expose the Borrowers or any of their Subsidiaries to, or result in, Environmental Liability that could reasonably be expected to have a Material Adverse Effect and (ii) any proposed action to be taken by the Borrowers or any of their Subsidiaries to commence manufacturing, industrial or other similar operations that could reasonably be expected to subject the Borrowers or any of their Subsidiaries to additional Environmental Laws, that are materially different from the Environmental Laws applicable to the operations of the Borrowers and their Subsidiaries as of the Effective Date.

67

LA\1323477.16

E.  The Borrowers shall, at their own expense, provide copies of such documents or information as the Administrative Agent may reasonably request in relation to any matters disclosed pursuant to this Section 5.9.

**5.10    The Borrowers' Remedial Action Regarding Hazardous Materials.**

The Borrowers shall promptly take, and shall cause each of their Subsidiaries promptly to take, any and all necessary remedial action in connection with the presence, handling, storage, use, disposal, transportation or Release or threatened Release of any Hazardous Materials on, under or affecting any Real Property Asset in order to comply in all material respects with all applicable Environmental Laws and Governmental Authorizations. In the event the Borrowers or any of their Subsidiaries undertakes any Cleanup action with respect to the presence, Release or threatened Release of any Hazardous Materials on or affecting any Real Property Asset, the Borrowers or such Subsidiary shall conduct and complete such Cleanup action in material compliance with all applicable Environmental Laws, and in accordance with the policies, orders and directives of all federal, state and local governmental authorities except when, and only to the extent that, the Borrowers' or such Subsidiary's liability for such presence, handling, storage, use, disposal, transportation or Release or threatened Release of any Hazardous Materials is being Properly Contested.

**5.11    Execution of Guaranty and Collateral Documents by Future Subsidiaries.**

In the event that any Person becomes a Subsidiary of the Borrowers, the Borrowers will promptly notify the Administrative Agent of that fact and, cause such Subsidiary on or prior to the time it becomes a Subsidiary to execute and deliver to the Administrative Agent and the Collateral Agent a counterpart of the Subsidiary Guaranty and the Pledge and Security Agreement and a foreign law governed security agreement, as the case may be, and to take all such further action and execute all such further documents and instruments as may be required to grant and perfect in favor of the Collateral Agent, for the benefit of the Lenders, a First Priority security interest in all of the: (a) personal property assets of such Subsidiary; (b) real property assets owned by such Subsidiary, the fair market value of which exceeds, individually or in the aggregate, $1,000,000; and (c) leasehold interests owned by such Subsidiary, the fair market value of which exceeds, individually or in the aggregate, $1,000,000, as reasonably determined by the Administrative Agent (such amount, the "**Leasehold Value**"). In addition, the Borrowers shall pledge (if they are the direct owner of Capital Stock of such Subsidiary) or shall cause each of their applicable Subsidiaries to pledge (if any of such other Subsidiaries is the direct owner of Capital Stock of such Subsidiary, each such owner, whether the Borrowers or any of their other Subsidiaries, the "**Pledging Parent**") all of the Capital Stock of such Pledging Parent's Subsidiary to the Collateral Agent pursuant to the applicable Collateral Documents and to take all such further action and execute all such further documents and instruments as may be required or advisable to grant and perfect in favor of the Collateral Agent, for the benefit of the Lenders, a First Priority security interest in such Capital Stock.  The Borrowers shall deliver to the Administrative Agent, together with such Loan Documents, in the case of each such Subsidiary that is required to be a party to any Loan Document: (i) (a) certified copies of such Subsidiary's Organizational Certificate together, if applicable, with a good standing certificate from the Secretary of State of the jurisdiction of its incorporation, formation or organization, as applicable, each to be dated a recent date prior to their delivery to the Administrative Agent, (b) a copy of such Subsidiary's Organizational Documents, certified by its secretary or an assistant corporate secretary (or Person holding an equivalent title or having equivalent duties and responsibilities) as of a recent date prior to their delivery to the Administrative Agent, (c) a certificate executed by the secretary or an assistant secretary of such Subsidiary as to (x) the incumbency and signatures of the officers of such Subsidiary executing such Guaranty, the Collateral Documents and the other Loan Documents to which such Subsidiary is a party and (y) the fact that the attached Organizational Authorizations of such Subsidiary authorizing the execution, delivery and performance of such Guaranty, such Collateral Documents and such other Loan

68

LA\1323477.16

Documents are in full force and effect and have not been Modified or rescinded, and (ii) a favorable opinion of counsel to such Subsidiary, that is reasonably satisfactory to the Collateral Agent and its counsel, as to (a) the due organization and good standing of such Subsidiary, (b) the due authorization, execution and delivery by such Subsidiary of such Guaranty, the Collateral Documents and any other Loan Documents to which it is a party and (c) the enforceability of such Guaranty and such Collateral Documents against such Subsidiary, (d) the validity and perfection of the security interests granted by such Subsidiary (and by the Pledging Parent of such Subsidiary in respect of the Capital Stock of such Subsidiary) in favor of the Collateral Agent pursuant to the Collateral Documents, and (e) such other matters as any Agent may reasonably request, all of the foregoing to be reasonably satisfactory in form and substance to the Administrative Agent, the Collateral Agent and their counsel. In addition, the Borrowers shall promptly deliver a supplement to Schedule 4.1 to the Administrative Agent if any Subsidiary is created or acquired.

**5.12    Interest Rate Protection.**

At all times, commencing one hundred-eighty (180) days after the Effective Date, the Borrowers shall maintain in effect one or more Hedge Agreements in form and substance satisfactory to the Administrative Agent with respect to an aggregate principal amount equal to at least 50% of the aggregate outstanding principal amount of the Loans and the loans under the Second Lien Credit Agreement. Such Hedge Agreements shall be maintained for two (2) years (or such longer period as required by the Administrative Agent in its good faith discretion) in a form and with a counterparty acceptable to the Administrative Agent in its good faith discretion.

**5.13    Further Assurances.**

At any time or from time to time upon the request of the Administrative Agent or the Collateral Agent, the Borrowers will, at their expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as the Administrative Agent or the Collateral Agent may reasonably request in order to effect fully the purposes of the Loan Documents and to provide for payment of the Obligations in accordance with the terms of this Agreement, the Notes and the other Loan Documents. In furtherance and not in limitation of the foregoing, the Borrowers shall take, and cause each of its Subsidiaries to take, such actions as the Administrative Agent or the Collateral Agent may reasonably request from time to time (including, without limitation, the execution and delivery of guaranties, security agreements, pledge agreements, mortgages, deeds of trust, landlord's consents and estoppels, stock powers, financing statements and other documents, the filing or recording of any of the foregoing, title insurance with respect to any of the foregoing that relates to an interest in real property, and the delivery of stock certificates and other collateral with respect to which perfection is obtained by possession) to ensure that the Obligations are guaranteed by the Guarantors and are secured by substantially all of the assets (other than those assets specifically excluded by the terms of this Agreement) of the Borrowers and their Subsidiaries.

**5.14    Title.**

Each of the Borrowers shall warrant and defend (a) its title to the Real Property Collateral and every part thereof, subject only to Liens permitted hereunder (including Permitted Encumbrances) and (b) the validity and priority of the Liens of the applicable Collateral Documents, subject only to Liens permitted hereunder (including Permitted Encumbrances), in each case against the claims of all Persons whomsoever. The Borrowers shall reimburse the Administrative Agent for any losses, costs, damages or expenses (including reasonable attorneys' fees and court costs) incurred by the Administrative Agent if an interest in the Mortgaged Property, other than as permitted hereunder, is claimed by another Person.

**5.15**   **Estoppels.**

Borrowers will at any time and from time to time, within ten (10) days after written demand by Administrative Agent, deliver to Administrative Agent a certificate duly executed, and in form satisfactory to Administrative Agent, stating and acknowledging the then outstanding principal balance of the Loans and the fact that, to Borrower's knowledge, there are no defenses, offsets or counterclaims (or, if such should not be the fact, then the facts and circumstances relating to such defenses, offsets or counterclaims) and such other information as may reasonably be requested by Administrative Agent.

**5.16**   **SPE Covenants.**

The Borrowers and each of the Borrowers' Subsidiaries:

(a)     does not own and will not own any asset or property other than their respective interests in the Project, and together with incidental personal property reasonably necessary for the ownership or operation of the Project;

(b)     will not engage in any business other than the ownership, management and operation of the Project, and incidental personal property reasonably necessary thereto and will conduct and operate its business in all material respects as presently conducted and operated;

(c)     except to the extent permitted by this Agreement, has not made and will not make loans to any Person or hold evidence of Indebtedness issued by any other Person or entity;

(d)     except to the extent permitted by this Agreement, shall not acquire obligations or securities of its Affiliates or any constituent party of any Borrower Entity;

(e)     with respect to the Borrowers, each Borrower is and will remain solvent and will pay its debts and liabilities from its assets as the same shall become due;

(f)     has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, and will not materially amend, Modify or otherwise change its partnership certificate, partnership agreement, articles of incorporation and bylaws, articles of organization or operating agreement, trust or other organizational documents, and in connection with any non-material amendment of any such partnership certificate, partnership agreement, articles of incorporation and bylaws, articles of organization or operating agreement, trust or other organizational documents, as the case may be, shall forward a copy of such amendment to the Administrative Agent promptly after the execution or filing thereof,

(g)     will maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliates and any constituent party and will file its own tax returns except to the extent that (A) a consolidated tax return is permitted by Applicable Law or (B) a tax return is not required by Applicable Law;

(h)     will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any other Borrower Entity and any Affiliate of any Borrower Entity), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, and shall not identify itself or any of its Affiliates as a division or part of the other;

LA\1323477.16

(i)      with respect to the Borrowers, each will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(j)      will not, and will not permit any constituent party to, seek the dissolution, winding up, liquidation, consolidation or merger in whole or in part, of such entity;

(k)      will not commingle its funds and other assets with those of any Affiliate or constituent party, Subsidiary Guarantor, or any Affiliate of any constituent party or Subsidiary Guarantor, or any other Person;

(l)      has and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or constituent party, Subsidiary Guarantor, or any Affiliate of any constituent party or Subsidiary Guarantor, or any other Person; and

(m)      does not and will not hold itself out to be responsible for the debts or obligations of any other Person (except for the Loans).

In addition to the foregoing, LLV-1 covenants and agrees to the following:

(n)      is organized solely for the purpose of developing, owning, holding, selling, leasing, transferring, managing and operating the BLM Property;

(o)      is not engaged and will not engage in any business unrelated to clause (n) above and will not own any assets other than the BLM Property and those related to the business activities permitted hereunder;

(p)      has two (2) independent directors or managers; and

(q)      has Organizational Documents that provide that such entity will not:  (1) dissolve, merge, liquidate, consolidate; (2) sell all or substantially all of its assets (except as permitted by this Agreement); (3) engage in any other business activity, or amend its Organizational Documents with respect to the matters set forth in this definition without the prior written consent of the Administrative Agent; or (4) without the affirmative vote of the independent directors and of all other directors of the corporation (or the general partner or managing or co-managing member of such entity), institute Insolvency Proceedings with respect to itself or to any other entity in which it has a direct or indirect legal or beneficial ownership interest.

## 5.17    **Maintenance of Entitlements.**

Each of the Borrowers shall warrant and defend, and otherwise maintain, all of the Existing Entitlements. To the extent the Existing Entitlements require any obligations or conditions to be fulfilled by the Borrowers or any of their Subsidiaries, the Borrower will perform (or caused to be performed) such obligations or conditions.

71

**FIRST LIEN CREDIT AGREEMENT**

## 5.18    Asset Sales.

The Borrowers covenant and agree that the Real Property Collateral shall only be sold pursuant to a Permitted Collateral Asset Sale, and that any Qualified Sales Agreement entered into after the date hereof must (i) provide that such agreement is deemed automatically assigned to the Collateral Agent pursuant to the "after acquired" clause contained in the Security Agreement and Assignment of Contractual Agreements, and (ii) contain such other acknowledgments in favor of the Collateral Agent as set forth on Exhibit XVI attached hereto.

## 5.19    Control.

Each Borrower shall, at all times, be Controlled by Ronald F. Boeddeker, and the majority of beneficial interests therein shall, at all times, be directly or indirectly owned by Ronald F. Boeddeker, Sid R. Bass and Lee M. Bass.

## SECTION 6.
## NEGATIVE COVENANTS

Each of the Borrowers covenants and agrees that, until payment in full of all of the Loans and other Obligations, each of the Borrowers shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 6.

## 6.1    Indebtedness.

The Borrowers shall not, and shall not permit any of their Subsidiaries (other than the Excluded Subsidiary and its Subsidiaries) to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness or preferred stock, except that each of the Borrowers and their Subsidiaries may create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to Indebtedness or preferred stock, as follows:

(i)    Each of the Loan Parties may become and remain liable with respect to its respective Obligations in accordance with the terms of this Agreement and the Loan Documents;

(ii)    Each of the applicable Loan Parties may remain liable for the Permitted Existing Indebtedness or the refinancing of any such Permitted Existing Indebtedness; provided, however, that any such refinancing must not do any of the following, as determined in good faith by Administrative Agent: (i) change the obligor on such Indebtedness; (ii) increase the principal amount such Indebtedness beyond the then existing balance, (iii) result in a ratio of such Indebtedness after such refinancing to the collateral value securing the repayment of such Indebtedness which exceeds the lesser of (A) 95% and (B) the ratio as of the Effective Date, (iv) establish additional material events of default, (v) increases the amount or type of recourse liability to Borrowers or any of its Subsidiaries; (vi) changes in any material adverse manner any material terms and conditions of such Indebtedness; or (vii) otherwise contain terms not reflective of an arm's length, market transaction;

(iii)    The Borrowers and their Subsidiaries may become and remain liable with respect to trade payables incurred in the Ordinary Course of Business of the Borrowers or their Subsidiaries;

(iv)    The Borrowers and their Subsidiaries may become and remain liable with respect to Permitted Receivables Financing and Permitted Equipment Financing;

FIRST LIEN CREDIT AGREEMENT

(v)      The Borrowers and their Subsidiaries may become and remain liable with respect to Indebtedness under Capital Leases capitalized on the consolidated balance sheet of the Borrowers and other Indebtedness secured by Permitted Encumbrances; provided that the aggregate amount of all Indebtedness outstanding under this clause (v) at any time shall not exceed $2,000,000;

(vi)      Each of the Loan Parties may become and remain liable with respect to Indebtedness to any other Loan Party; provided that, in each case, (a) no Default or Event of Default has occurred and is continuing or would result therefrom, (b) all such intercompany Indebtedness shall be evidenced by promissory notes which shall have been pledged to the Collateral Agent pursuant to the Collateral Documents, (c) all such intercompany Indebtedness owed by a Borrower to any of its respective Subsidiaries shall be unsecured and subordinated in right of payment to the payment in full of the Obligations pursuant to the terms of the applicable promissory notes or an intercompany subordination agreement that in any such case, are reasonably satisfactory to the Administrative Agent, and (d) any payment by any Subsidiary of a Borrower under any Guaranty or any payment by a Borrower of the Obligations shall result in a pro tanto reduction of the amount of any intercompany Indebtedness owed by such Borrower or by such Subsidiary to such Borrower or to any of its Subsidiaries for whose benefit such payment is made;

(vii)      The Borrowers and their Subsidiaries may become and remain liable with respect to obligations owed under the Second Lien Credit Agreement in an aggregate principal amount not to exceed $125,000,000 less the amount of any permanent repayments or prepayments thereof (other than repayments or prepayments in connection with a refinancing thereof permitted hereunder);

(viii)      The Borrowers and their Subsidiaries may become and remain liable with respect to Indebtedness under performance, surety, appeal or indemnity bonds required by Governmental Authorities in connections with the development of the Project, in each case incurred in the Ordinary Course Of Business; and

(ix)      The Borrowers and their Subsidiaries may become and remain liable with respect to Indebtedness under the Hedge Agreements required under Section 5.12.

## 6.2   Liens and Related Matters.

**A. Prohibition on Liens.** The Borrowers shall not, and shall not permit any of their Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of any Borrower or any of its Subsidiaries (or a Lien on the Capital Stock of Borrower or its Subsidiaries), whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement, or other similar notice of any Lien with respect to any such property, asset, income or profits under the Uniform Commercial Code of any state or under any similar recording or notice statute, except (solely with respect to the Borrowers and their Subsidiaries),

(i)      any Permitted Encumbrances; provided, however, that (i) with respect to the Real Property Collateral no Permitted Encumbrances except the Permitted Title Exceptions and the LID Agreements shall be senior or prior to the First Priority liens under the Mortgages; and (ii) no such Permitted Encumbrances or LID Agreements shall result in a Lien on the Capital Stock of Borrower or its Subsidiaries;

**FIRST LIEN CREDIT AGREEMENT**

(ii)        any Liens on Excluded Assets securing obligations under Permitted Existing Indebtedness;

(iii)        Liens in favor of the Collateral Agent granted pursuant to the Collateral Documents or granted in favor of any Agent or Lender pursuant to the terms of this Agreement;

(iv)        any Liens securing Permitted Receivables Financing or Permitted Equipment Financing (provided such Liens to not encumber the Real Property Collateral); and

(v)        Liens on the Collateral securing obligations under the Second Lien Credit Agreement and the other Second Lien Loan Documents.

**B.    No Further Negative Pledges.**   Except with respect to specific property encumbered to secure payment of particular Indebtedness permitted by this Agreement or to be sold pursuant to an Asset Sale otherwise permitted by this Agreement, neither the Borrowers nor any of their Subsidiaries shall enter into any agreement (other than the Loan Documents and the Second Lien Loan Documents) prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired.

**C.    No Restrictions on Distributions, etc.**   Except as otherwise provided in the Loan Documents or the Second Lien Loan Documents, the Borrowers will not, and will not permit any of their Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance, limitation or restriction of any kind on the ability of any Subsidiary of a Borrower to (i) pay dividends or make any other distributions on any of such Subsidiary's Capital Stock owned by a Borrower or any other Subsidiary of a Borrower, (ii) repay or prepay any Indebtedness owed by such Subsidiary to a Borrower or any other Subsidiary of a Borrower, (iii) make loans or advances to a Borrower or any other Subsidiary of a Borrower, or (iv) transfer any of its property or assets to a Borrower or any other Subsidiary of a Borrower.

**6.3    Investments.**

The Borrowers shall not, and shall not permit any of their Subsidiaries to, directly or indirectly, make or own any Investments except:

(i)        The Borrowers and their Subsidiaries may continue to own the Investments owned by them as of the Effective Date in any Borrower Entities as listed on Schedule 6.3(i);

(ii)        The Borrowers and their Subsidiaries may make and own intercompany loans to the extent permitted by subsection 6.1(vi);

(iii)        The Borrowers and their Subsidiaries may make and own Investments in Cash Equivalents;

(iv)        The Borrowers and their Subsidiaries may make and own Investments in stock or other securities acquired in connection with the satisfaction or enforcement of Indebtedness permitted by this Agreement;

(v)        The Borrowers and their Subsidiaries may make and own Permitted Joint Venture Transactions; provided that (i) each Joint Venture shall be engaged exclusively in the ownership, operation, or development of a portion of the Project, (ii) no Default or Event of

74

Default has occurred and is continuing or would result therefrom, and (iii) the Borrowers and their Subsidiaries have otherwise complied with the provisions of Section 6.9(iii);

(vi)        The Borrowers and their Subsidiaries may have other Investments (including, without limitation, Investments to pay for Excluded Asset Operating Deficits) not otherwise permitted above so long as the total amount of all of such Investments does not exceed $10,000,000 in the aggregate at any given time from and after the Effective Date; provided that no Default or Event of Default has occurred and is continuing or would result therefrom; and

(vii)       Any other Investments so long as the aggregate amount of such Investments do not exceed the Permitted Investment/Restricted Payment Amount.

**6.4**    **Contingent Obligations.**

The Borrowers shall not, and shall not permit any of their Subsidiaries to, directly or indirectly, create or become or remain liable with respect to any Contingent Obligation, except:

(i)         The Subsidiary Guarantors may become and remain liable with respect to Contingent Obligations arising under the Subsidiary Guaranty;

(ii)        The Borrowers and their Subsidiaries may become and remain liable with respect to Contingent Obligations in respect of customary indemnification and purchase price adjustment obligations of any such Person incurred in connection with Asset Sales permitted by this Agreement;

(iii)       The Borrowers and their Subsidiaries may become and remain liable with respect to Contingent Obligations in respect of any of the Indebtedness, that if outstanding, would be permitted under Section 6.1; and

(iv)        The Subsidiary Guarantors may become and remain liable with respect to Contingent Obligations arising under the Second Lien Loan Documents.

**6.5**    **Restricted Payments.**

The Borrowers shall not, and shall not permit any of their Subsidiaries to, directly or indirectly, declare, order, pay, make or set apart any sum for any Restricted Payment; provided that so long as no Default or Event of Default has occurred and is continuing or would result therefrom, the Borrowers and their Subsidiaries may:

(i)         Make prepayments of principal in respect of secured Indebtedness from the proceeds of Asset Sales of Excluded Assets to the extent that (a) such Asset Sale is otherwise permitted under this Agreement; (b) the agreements relating to such Indebtedness require such repayment in connection with such Asset Sale, and (c) the repaid Indebtedness and the Liens in respect thereof are permitted hereunder;

(ii)        Subject to the terms of the Intercreditor Agreement, make required payments of principal and interest in respect of the Indebtedness incurred under the Second Lien Credit Agreement;

**FIRST LIEN CREDIT AGREEMENT**

(iii)   Make other Restricted Payments to the holders of the Capital Stock of the Borrowers in the aggregate amount not to exceed the Permitted Investment/Restricted Payment Amount; and

(iv)   Subject to the terms of the Intercreditor Agreement, make other Restricted Payments permitted under the terms of the Second Lien Credit Agreement as in effect on the Effective Date and not otherwise included above.

**6.6    Financial Covenants.**

**A.  Leverage Ratio.**  The ratio (the "**Leverage Ratio**") of (i) Total Recourse Debt as of the last day of each Fiscal Quarter (any such day being a "**Calculation Date**"), to (ii) Cash EBITDA for the four-Fiscal Quarter period ending on such Calculation Date <u>shall not exceed</u> the following ratios:

| Fiscal Quarter Ending | Leverage Ratio |
|---|---|
| After the Effective Date and on or prior to December 31, 2005 | 4.25 |
| After December 31, 2005 and on or prior to December 31, 2007 | 3.50 |
| Thereafter | 3.00 |

**B.  Total Debt LTV Ratio.**  The ratio (the "**Total Debt LTV Ratio**") of (i) Total Recourse Debt as of the Calculation Date, to (ii) the Appraised Value of the then remaining Real Property Collateral as of the Calculation Date <u>shall not exceed</u> the following ratios:

| Fiscal Quarter Ending | Total Debt LTV Ratio |
|---|---|
| After the Effective Date and on or prior to December 31, 2005 | 65% |
| After December 31, 2005 and on or prior to December 31, 2006 | 60% |
| Thereafter | 55% |

**C.  Senior Debt LTV Ratio.**  The ratio (the "**Senior Debt LTV Ratio**") of (i) the principal amount of the Obligations as of the Calculation Date, to (ii) the Appraised Value of the then remaining Real Property Collateral as of the Calculation Date <u>shall not exceed</u> the following ratios:

| Fiscal Quarter Ending | Senior Debt LTV Ratio |
|---|---|
| After the Effective Date and on or prior to December 31, 2005 | 47.5% |
| After December 31, 2005 and on or prior to December 31, 2006 | 42.5% |
| Thereafter | 40% |

**D.  Interest Coverage Ratio.**  The ratio (the "**Interest Coverage Ratio**") of (i) Cash EBITDA for the four–Fiscal Quarter period ending on the Calculation Date, to (b) Consolidated Interest Expense for such four–Fiscal Quarter period <u>shall not be less than</u> 3.00 to 1.00.

**E.  Borrowing Base Availability.**  The Borrowing Base Availability shall at all times be greater than the sum of (i) the principal amount of the Obligations, and (ii) the aggregate principal Indebtedness outstanding under the Second Lien Loan Documents.

76

**FIRST LIEN CREDIT AGREEMENT**

**F. Consolidated Capital Expenditures.**  The Consolidated Capital Expenditures of the Borrowers and their Subsidiaries shall be consistent with and in accordance with the Approved Budget and in no event exceed the respective amount for the respective periods set forth below (provided, however, that (i) to the extent any amount allocated for a period is not fully utilized in such period the unused portion may be carried over and shall be available for use in the subsequent period, and (ii) in any given period the Borrower and their Subsidiaries may use the amount available in such period and the immediately subsequent period):

| Period | Maximum Capital Expenditures Amount |
|---|---|
| After the Effective Date through December 31, 2004 | $15,000,000 |
| Fiscal Year 2005 | $50,000,000 |
| Fiscal Year 2006 | $65,000,000 |
| Fiscal Year 2007 | $25,000,000 |
| Fiscal Year 2008 | $10,000,000 |
| Fiscal Year 2009 | $5,000,000 |

**6.7    Restriction on Fundamental Changes.**

Neither the Borrowers nor any of its Subsidiaries shall, without the prior written consent of the Requisite Lenders in their sole and absolute discretion, directly or indirectly, enter into any merger, consolidation, reorganization or recapitalization, liquidate, wind up or dissolve, or cause or consent to any other Borrower or Subsidiary to enter into any merger, consolidation, reorganization or recapitalization, liquidate, wind up or dissolve.

**6.8    Sale or Discount of Receivables.**

The Borrowers shall not, and shall not permit any of their Subsidiaries to, directly or indirectly, sell any of its notes or accounts receivable other than in connection with Permitted Receivables Sales.

**6.9    Assets Sales.**

Without the prior written consent of Requisite Lenders, Borrowers shall not, and shall not permit any of their Subsidiaries to, (1) engage in any Asset Sales; (2) sell, assign, exchange, transfer, or otherwise dispose of any direct ownership interest in Borrowers, or (3) sell, assign, exchange, transfer, or otherwise dispose of any indirect ownership or beneficial interest in Borrowers, irrespective of the number of tiers of ownership, to the extent affecting fifteen percent (15%) or more (either individually or after taking into account all such prior sales, assignments, exchanges, transfers, or dispositions, whether or not related, in the aggregate) of the indirect ownership or beneficial interests in Borrowers, except as follows:

(i)    With respect to the Excluded Assets, a Permitted Excluded Asset Sale, provided that each of the following conditions have been satisfied:

(a)    no Default or Event of Default shall have occurred and be continuing (other than a Default or Event of Default that will be cured through the consummation of the proposed Asset Sale); and

77

(b)    not less than ten (10) Business Days prior written notice of such sale has been provided to the Collateral Agent with a true, correct and complete copy of the relevant sales agreement.

(ii)    With respect to Real Property Collateral, a Permitted Collateral Asset Sale, provided that each of the following conditions has been satisfied:

(a)    no Default or Event of Default shall have occurred and be continuing (other than a Default or Event of Default that will be cured through the consummation of the proposed Asset Sale);

(b)    not less than ten (10) Business Days prior written notice of such sale has been provided to the Collateral Agent with a true, correct and complete copy of the relevant Qualified Sales Agreement;

(c)    the Asset Sale is consummated in accordance with the terms of a Qualified Sales Agreement;

(d)    except with respect to an Asset Sale pursuant to a Qualified Retail Purchase Agreement, Collateral Agent shall have received a Compliance Certificate and a Borrowing Base Certificate, each on a Proforma Basis giving effect to the proposed Asset Sale;

(e)    any and all mandatory prepayments of the Loan required to be made through the date of the proposed Asset Sale have been made, and all mandatory prepayments of Excess Cash Flow resulting from such Asset Sale will be made in accordance with subsection 2.4.B(ii)(d);

(f)    the Real Property Collateral subject to such Asset Sale, and the remaining Real Property Collateral after giving effect to such Asset Sale shall constitute a legal subdivision in accordance with all Applicable Laws and Governmental Authorizations;

(g)    Collateral Agent shall have received such title endorsements, date downs or other evidence reasonably satisfactory to Collateral Agent that (i) the priority of the liens evidenced by the Mortgages with respect to the remaining Real Property Collateral after giving effect to such Asset Sale shall be maintained following the subject Asset Sale, and (ii) the remaining Real Property Collateral is not subject to any Liens other than Permitted Encumbrances and Liens permitted by Section 6.2;

(h)    with respect to any Major Collateral Sale, Borrowers shall not execute any Qualified Sales Agreement relating thereto or consummate any such Major Collateral Asset Sale without having first complied with the terms of Section 2.9;

(i)    with respect to any Major Collateral Sale, if requested by the Collateral Agent, a Qualified Appraisal Update demonstrating the Appraised Value of the remaining Real Property Collateral assuming such Major Collateral Sale is consummated; and

(j)    the Borrowers shall have paid all reasonable out-of-pocket costs and expenses incurred by the Collateral Agent and all reasonable fees and expenses paid to

third party consultants (including reasonable attorneys' fees and expenses) by the Collateral Agent in connection with such release.

(iii)     With respect to Real Property Collateral, an Asset Sale which contemplates a transfer of a portion of the Real Property Collateral to a Joint Venture provided that each of the following conditions has been satisfied:

(a)     no Default or Event of Default shall have occurred and be continuing (other than a Default or Event of Default that will be cured through the consummation of the proposed Asset Sale);

(b)     such Asset Sale is permitted by subsection 6.3(v);

(c)     not less than ten (10) Business Days prior written notice of such sale has been provided to the Collateral Agent with a true, correct and complete copy of the relevant Organizational Documents of the Joint Venture and, with respect to a Major Joint Venture Transaction, a Qualified Appraisal Update which includes an Appraised Value of the relevant portion of the Real Property Collateral proposed to be contributed to the Joint Venture (the "**Joint Venture Appraisal**");

(d)     Collateral Agent shall have received a Compliance Certificate and a Borrowing Base Certificate, each on a Proforma Basis giving effect to the proposed Asset Sale;

(e)     any and all mandatory prepayments of the Loan required to be made through the date of the proposed Asset Sale have been made, and all mandatory prepayments of Excess Cash Flow resulting from such Asset Sale will be made in accordance with subsection 2.4.B(ii)(d);

(f)     the Real Property Collateral subject to such Asset Sale, and the remaining Real Property Collateral after giving effect to such Asset Sale shall constitute a legal subdivision in accordance with all Applicable Laws and Governmental Authorizations;

(g)     Collateral Agent shall have received such title endorsements, date downs or other evidence reasonably satisfactory to Collateral Agent that (i) the priority of the liens evidenced by the Mortgages with respect to the remaining Real Property Collateral after giving effect to such Asset Sale shall be maintained following the subject Asset Sale, and (ii) the remaining Real Property Collateral is not subject to any Liens other than Permitted Encumbrances and Liens permitted by Section 6.2;

(h)     prior to the release of its Lien, the Collateral Agent shall have received an opinion of counsel that the Collateral Agent holds a duly perfected First Priority Lien on the Borrower Entities' equity interests in the Joint Venture, such opinion subject to the Collateral Agent's reasonable satisfaction;

(i)     concurrently with the release of its Lien in accordance with Section 2.11, Collateral Agent shall have received a duly perfected pledge and First Priority Lien on the Borrower Entities' equity interests in the Joint Venture, the documentation of which (including UCC Financing Statements) shall be subject to the Collateral Agent's reasonable approval; and

79

(j)      the Borrowers shall have paid all reasonable out-of-pocket costs and expenses incurred by the Collateral Agent and all reasonable fees and expenses paid to third party consultants (including reasonable attorneys' fees and expenses) by the Collateral Agent in connection with such release.

**6.10    Transactions with Shareholders and Affiliates.**

The Borrowers shall not, and shall not permit any of their Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service or the payment of any management fees, consulting fees or the making of other disbursements) with any holder of 5% or more of any class of equity Securities of one of the Borrowers or a Subsidiary or with any Affiliate of the Borrowers or of any such Subsidiary or holder, on terms that are less favorable to the Borrowers or that Subsidiary, as the case may be, than those that might be obtained at the time from Persons who are not such a holder or Affiliate; provided that the foregoing restriction shall not apply to (i) transactions between the Borrowers and any wholly-owned Subsidiary Guarantor, (ii) reasonable and customary fees paid to members of the boards of directors of the Borrowers and their Subsidiaries, and (iii) the Transactions.

**6.11    Conduct of Business.**

The Borrowers shall not, and shall not permit any of their Subsidiaries to, engage in any business other than (i) the businesses engaged in by the Borrowers and their Subsidiaries on the Effective Date and (ii) such other lines of business as may be reasonably related thereto.

**6.12    Competing Business.**

Ronald F. Boeddeker shall not directly or indirectly engage in any golf, hotel, commercial or residential development other than the Project in the greater Las Vegas area without the consent of the Requisite Lenders, which may be withheld in their sole and absolute discretion.

**6.13    Amendments or Waivers of Certain Agreements.**

None of the Borrowers nor their Subsidiaries shall terminate or agree to any amendment, restatement, supplement or other Modification to, or waive any of its rights under, any (i) Transaction Document, or (iii) Organizational Certificates or Organizational Documents of the Borrowers and their Subsidiaries, if such termination, amendment, restatement, supplement, Modification or waiver would be materially adverse to a Borrower, any Subsidiaries of a Borrower or the Lenders.

**6.14    Fiscal Year.**

Neither the Borrowers nor any of its Subsidiaries shall change its Fiscal Year-end from December 31.

**SECTION 7.**
**EVENTS OF DEFAULT**

IF any of the following conditions or events ("**Events of Default**") shall occur:

**7.1    Payment of Obligations.**

The Borrowers shall fail to pay any of the Obligations on the due date thereof (whether due at stated maturity, on demand, upon acceleration or otherwise); or

80

**7.2**   <u>Misrepresentations.</u>

Any representation, warranty or other written statement to any Agent or any Lender by or on behalf of any Loan Party, whether made in or furnished in compliance with or in reference to any of the Loan Documents, proves to have been false or misleading in any material respect when made or furnished; or

**7.3**   <u>Breach of Certain Covenants.</u>

The Borrowers shall fail or neglect to perform, keep or observe (i) any covenant contained in Sections 5.1, 5.3(xii), 5.4, 5.16, 5.18, 5.19 and Section 6 hereof on the date that Borrowers are required to perform, keep or observe such covenant, (ii) any covenant contained in subsection 5.3(ii) within 5 Business Days after the date on which Borrowers were required to perform, keep or observe such covenant (provided, that Borrowers may not avail itself of such 5-Business Day cure period more than 1 time during any Fiscal Year), (iii) any covenant contained in subsection 5.3(iii) within three (3) Business Days after the date on which Borrowers were required to perform, keep or observe such covenant (provided, that Borrowers may not avail itself of such 3-Business Day cure period more than three (3) times during any Fiscal Year), or (iv) any covenant contained in subsection 5.3(iv) within seven (7) Business Days after the date on which Borrowers were required to perform, keep or observe such covenant; or

**7.4**   <u>Breach of Other Covenants.</u>

A Borrower shall fail or neglect to perform, keep or observe any covenant contained in this Agreement (and the breach of such other covenant is not cured to the Administrative Agent's and the Requisite Lenders' satisfaction within thirty (30) days after the sooner to occur of any Responsible Officer's receipt of notice of such breach from the Administrative Agent or the date on which such failure or neglect first becomes actually known to any Responsible Officer; provided, however, that such notice and opportunity to cure shall not apply in the case of any failure to perform, keep or observe any covenant which is not capable of being cured at all or within such 30-day period or which is a willful and knowing breach by such Borrower; or

**7.5**   <u>Default Under Loan Documents.</u>

A Borrower or any other Loan Party shall default in the due and punctual observance or performance (taking into account any applicable grace periods) of any liability or obligation to be observed or performed by it under any of the Loan Documents; or

**7.6**   <u>Second Lien Credit Agreement; Other Defaults.</u>

There shall occur an Event of Default under the Second Lien Credit Agreement or any of the Second Lien Loan Documents, or there shall occur any default or event of default on the part of a Borrower or any Subsidiary beyond any applicable cure or grace period under any agreement, document or instrument to which a Borrower or any Subsidiary is a party or by which a Borrower or any Subsidiary or any of their respective properties is bound, creating or relating to any Indebtedness (other than the Obligations) in excess of $2,000,000 if the payment or maturity of such Indebtedness may be accelerated in consequence of such event of default or demand for payment of such Indebtedness may be made; or

LA\1323477.16

**7.7    Uninsured Losses.**

Any loss (other than a loss relating to an account), theft, damage or destruction of any of the Collateral not fully covered (subject to such deductibles as the Administrative Agent shall have permitted) by insurance if the aggregate amount not covered by insurance exceeds $2,000,000 in any Fiscal Year; or

**7.8    Material Adverse Effect.**

There shall occur any event or condition that has a Material Adverse Effect; or

**7.9    Solvency.**

Any Loan Party shall cease to be Solvent; or

**7.10    Insolvency Proceedings.**

Any Insolvency Proceeding shall be commenced by any Loan Party; an Insolvency Proceeding is commenced against any Loan Party and any of the following events occur: such Loan Party consents to the institution of the Insolvency Proceeding against it, the petition commencing the Insolvency Proceeding is not timely controverted by such Loan Party, the petition commencing the Insolvency Proceeding is not dismissed within sixty (60) days after the date of the filing thereof (provided that, in any event, during the pendency of any such period, Lenders shall be relieved from their obligation to make Loans or otherwise extend credit to or for the benefit of the Borrowers hereunder), an interim trustee is appointed to take possession all or a substantial portion of the properties of such Loan Party or to operate all or any substantial portion of the business of such Loan Party or an order for relief shall have been issued or entered in connection with such Insolvency Proceeding; or any Loan Party shall make an offer of settlement extension or composition to its unsecured creditors generally; or

**7.11    Business Disruption; Condemnation.**

There shall occur a cessation of a substantial part of the business of any Loan Party for a period which may be reasonably expected to have a Material Adverse Effect; or any Loan Party shall suffer the loss or revocation of any license or permit now held or hereafter acquired by such Loan Party which is material to the operations of such Loan Party or necessary to the continued or lawful operation of its business; or any Loan Party shall be enjoined, restrained or in any way prevented by court, governmental or administrative order from conducting all or any material part of its business affairs; or any material lease or agreement pursuant to which any Loan Party leases or occupies any premises on which any Collateral is located shall be canceled or terminated prior to the expiration of its stated term and such cancellation or termination has a Material Adverse Effect; or any material part of the Collateral shall be taken through condemnation or the Appraised Value of such property shall be materially impaired through condemnation; or

**7.12    ERISA.**

An ERISA Event shall occur which could reasonably be expected to result in a Material Adverse Effect or which the Administrative Agent, in its reasonable discretion, shall determine constitutes grounds for the termination by the PBGC of any Pension Plan or for the appointment by the appropriate United States district court of a trustee for any Pension Plan; or if any Pension Plan shall be terminated or any such trustee shall be requested or appointed; or if a Borrower or any Subsidiary is in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan resulting from a Borrower's or such Subsidiary's complete or partial withdrawal from such Pension Plan; or

LA\1323477.16

**7.13**     <u>Challenge to Loan Documents.</u>

Any Loan Party or any of its Affiliates shall challenge or contest in any action, suit or proceeding the validity or enforceability of any of the Loan Documents, the legality or enforceability of any of the Obligations or the perfection or priority of any Lien granted to the Collateral Agent, or any of the Loan Documents ceases to be in full force or effect for any reason other than a full or partial waiver or release by the applicable Agent and Lenders in accordance with the terms thereof; or

**7.14**     <u>Judgment.</u>

One or more judgments or orders for the payment of money in an amount that exceeds, individually or in the aggregate, $2,500,000 shall be entered against a Borrower or any other Loan Party and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

**7.15**     <u>Repudiation of or Default Under Guaranty</u>.

Any Guarantor shall revoke or attempt to revoke the Guaranty signed by such Guarantor, shall repudiate such Guarantor's liability thereunder, or shall be in default under the terms thereof, or shall fail to confirm in writing, promptly after receipt of the Administrative Agent's written request therefor, such Guarantor's ongoing liability under the Guaranty in accordance with the terms thereof; or

**7.16**     <u>Criminal Forfeiture</u>.

Any Loan Party shall be convicted under any criminal law that could lead to a forfeiture of any property of such Loan Party.

**THEN** (i) upon the occurrence of any Event of Default described in subsection 7.10, each of (a) the unpaid principal amount of and accrued interest on the Loans, and (b) all other Obligations shall automatically become immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by the Company, and the obligation of each Lender to make any Loan shall thereupon terminate, and (ii) upon the occurrence and during the continuation of any other Event of Default, the Administrative Agent shall, upon the written request of the Requisite Lenders, by written notice to the Company, declare all or any portion of the amounts described in clauses (a) and (b) above to be, and the same shall forthwith become, immediately due and payable, and the obligation of each Lender to make any Loan shall thereupon terminate. Upon the occurrence of any Event of Default, Administrative Agent may (and shall as directed by the Requisite Lenders) (A) exercise, on behalf of the Lenders, any and all rights and remedies under the Guaranties, the Collateral Documents, and any other collateral documents entered into with respect to the Loans; and/or (B) exercise any and all rights, powers and remedies available to Administrative Agent or Lenders at law, in equity or otherwise, including, without limitation, under the other Loan Documents, all of which rights, powers and remedies are cumulative and not exclusive.

# SECTION 8.
## AGENTS

**8.1** <u>**Appointment.**</u>

    **A. Appointment Authority.** Each of the Lenders hereby irrevocably appoints CSFB as the Administrative Agent and the Collateral Agent hereunder and under the other Loan Documents and authorizes CSFB, in such capacities, to take such actions on its behalf and to exercise such powers as are delegated to CSFB, in such capacities by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. Each Agent agrees to act upon the express conditions contained in this Agreement and the other Loan Documents, as applicable. In performing its functions and duties under this Agreement, each Agent shall act solely as an agent of the Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for the Borrowers or any of their Subsidiaries. The provisions of this Section 8 are solely for the benefit of the Agents, the Lenders and the Borrowers shall not have rights as third party beneficiaries of any of such provisions.

    **B. Appointment of Supplemental Collateral Agents.** It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction. It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent or the Collateral Agent deems that by reason of any present or future law of any jurisdiction the Administrative Agent or the Collateral Agent may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, it may be necessary that the Administrative Agent or the Collateral Agent appoint an additional individual or institution as a separate trustee, co-trustee, collateral agent or collateral co-agent (any such additional individual or institution being referred to herein individually as a "<u>**Supplemental Collateral Agent**</u>" and collectively as "<u>**Supplemental Collateral Agents**</u>").

    In the event that the Administrative Agent or the Collateral Agent appoints a Supplemental Collateral Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent or the Collateral Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Collateral Agent to the extent, and only to the extent, necessary to enable such Supplemental Collateral Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Collateral Agent shall run to and be enforceable by either the Administrative Agent or the Collateral Agent or such Supplemental Collateral Agent, and (ii) the provisions of this Section 8 and of subsection 9.2 that refer to the Administrative Agent or the Collateral Agent shall inure to the benefit of such Supplemental Collateral Agent and all references therein to the Administrative Agent or the Collateral Agent shall be deemed to be references to the Administrative Agent or the Collateral Agent and/or such Supplemental Collateral Agent, as the context may require.

    Should any instrument in writing from the Borrowers or any other Loan Party be required by any Supplemental Collateral Agent so appointed by the Administrative Agent or the Collateral Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrowers shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Administrative Agent or the Collateral Agent. In case any

84

Supplemental Collateral Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Collateral Agent, to the extent permitted by law, shall vest in and be exercised by the Administrative Agent or the Collateral Agent until the appointment of a new Supplemental Collateral Agent.

**8.2**     **Rights as a Lender.**

The Persons serving as the Agents hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Persons serving as the Agents hereunder in their individual capacity. Such Persons and their Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrowers or any Subsidiary or other Affiliate thereof as if such Persons were not Agents hereunder and without any duty to account therefor to the Lenders.

**8.3**     **Exculpatory Provisions.**

The Agents shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Agents (i) shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred and is continuing, (ii) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agents are required to exercise as directed in writing by the Requisite Lenders (or such other number or percentage of the relevant Lenders as shall be necessary under the circumstances as provided in subsection 9.5), underlined provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law, and (iii) shall not, except as expressly set forth herein and in the other Loan Documents have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrowers or any of their Affiliates that is communicated to or obtained by the Person serving as an Agent or any of its Affiliates in any capacity. No Agent shall be liable to the Lenders for any action taken or not taken by it with the consent or at the request of the Requisite Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in subsection 9.5) or in the absence of its own gross negligence or willful misconduct. No Agent shall be deemed to have knowledge of any Default or Event of Default unless and until notice thereof is given to such Agent by the Borrowers or a Lender. The Agents shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement or any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Section 3 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agents.

**8.4**     **Reliance by the Agents.**

The Agents shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, posting or other distribution) believed by it in good faith to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Agents also may rely upon any

statement made to it orally or by telephone and believed by it in good faith to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of such Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Agents may presume that such condition is satisfactory to such Lender unless the Agents shall have received notice to the contrary from such Lender prior to the making of such Loan. The Agents may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**8.5    Delegation of Duties.**

Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by such Agent. The Agents and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of subsection 8.3 shall apply to any such sub-agent and to the Related Parties of such Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as such Agent.

**8.6    Resignation of Administrative Agent and/or Collateral Agent.**

The Administrative Agent and/or Collateral Agent may at any time give notice of its resignation to the Lenders and the Borrowers. Upon receipt of any such notice of resignation, the Requisite Lenders shall have the right, with the written consent of the Borrowers if no Default or Event of Default shall have occurred and be continuing (such consent not to be unreasonably withheld or delayed), to appoint a successor Administrative Agent and/or Collateral Agent, as applicable, which shall be a bank with an office in New York, or an Affiliate of any such bank with an office in New York. If no such successor shall have been so appointed by the Requisite Lenders and shall have accepted such appointment within 10 days after the retiring Administrative Agent and/or Collateral Agent as the case may be, gives notice of its resignation, then the retiring Administrative Agent may, with the written consent of the Borrowers if no Default or Event of Default shall have occurred and be continuing (such consent not to be unreasonably withheld or delayed), on behalf of the Lenders, appoint a successor Administrative Agent and/or Collateral Agent, as applicable, meeting the qualifications set forth above, provided that if the Administrative Agent and/or Collateral Agent, as applicable, shall notify the Borrowers and the Lenders that no such successor is willing to accept such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent and/or Collateral Agent, as applicable, shall be discharged from its duties and obligations hereunder and under the other Loan Documents and (2) all payments, communications and determinations provided to be made by, to or through the Administrative Agent and/or Collateral Agent, as applicable, shall instead be made by or to each Lender directly, until such time as the Requisite Lenders appoint a successor Administrative Agent and/or Collateral Agent, as applicable, as provided for above in this paragraph. Upon the acceptance of a successor's appointment as Administrative Agent and/or Collateral Agent, as applicable hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent and/or Collateral Agent, as applicable, and the retiring Administrative Agent and/or Collateral Agent, as applicable shall be discharged from all of its duties and obligations hereunder or under the Loan Documents. The fees payable by the Borrowers to a successor Administrative Agent and/or Collateral Agent, as applicable, shall be the same as those payable to its predecessor unless otherwise agreed between the Borrowers and such successor. After the retiring Administrative Agent's and/or Collateral Agent's resignation hereunder and under the other Loan Documents, the provisions of this Section 8 and subsection 9.2 shall continue in effect for the benefit of such retiring Administrative Agent and/or Collateral Agent, as applicable, its sub-agents and their

86

**FIRST LIEN CREDIT AGREEMENT**

respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent and/or Collateral Agent, as applicable was acting in such capacity.

**8.7**   **Collateral Documents; Successor Collateral Agent.**

Each Lender hereby further authorizes the Collateral Agent to enter into each Collateral Document, including without limitation the Intercreditor Agreement, as secured party on behalf of and for the benefit of the Lenders and the other beneficiaries named therein and agrees to be bound by the terms of each Collateral Document; provided that the Collateral Agent shall not enter into or consent to any amendment, Modification, termination or waiver of any provision contained in any Collateral Document without the prior consent of the Requisite Lenders (or, if required pursuant to subsection 9.5, all the Lenders); provided further, however, that, without further written consent or authorization from any Lender, the Collateral Agent may execute any documents or instruments necessary to effect the release of any asset constituting Collateral from the Lien of the applicable Collateral Document in the event that such asset is sold or otherwise disposed of in a transaction effected in accordance with Section 6.9 or to the extent otherwise required by any Collateral Document.  Anything contained in any of the Loan Documents to the contrary notwithstanding, each Lender agrees that no Lender shall have any right individually to realize upon any of the Collateral under any Collateral Document, it being understood and agreed that all rights and remedies under the Collateral Documents may be exercised solely by the Collateral Agent for the benefit of the Lenders and the other beneficiaries named therein in accordance with the terms thereof.

**8.8**   **Non-Reliance on Agents and Other Lenders.**

Each Lender acknowledges that it has, independently and without reliance upon any Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the any Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

**SECTION 9.**
**MISCELLANEOUS**

**9.1**   **Assignments and Participations in Loans.**

**A. Successors and Assigns Generally.**  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrowers may not assign or otherwise transfer any of their rights or obligations hereunder without the prior written consent of each Lender and the Administrative Agent and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of subsection 9.1B, (ii) by way of participation in accordance with the provisions of subsection 9.1D or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection 9.1F (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection 9.1D and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

87

**B. Assignments by Lenders.**

(i)        Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it); provided that

(a)        except in the case of an assignment of entire remaining amount of the assigning Lender's Loans or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, the aggregate amount of the Loans subject to each such assignment (determined as of the date of the Assignment Agreement with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 or an integral multiple of $500,000 in excess thereof, unless the Administrative Agent otherwise consents;

(b)        each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans assigned; and

(c)        subject to subsection 9.1B(iii), the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment Agreement, together with a processing and recordation fee of $3,500 in the case of assignments not made using an electronic settlement system (*e.g.,* ClearPar) (which fee may be waived in the sole discretion of the Administrative Agent), and the Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and if required, applicable tax forms.

(ii)        Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection 9.1C, from and after the effective date specified in each Assignment Agreement, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment Agreement, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment Agreement, be released from its obligations under this Agreement (and, in the case of an Assignment Agreement covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of subsection 2.7 with respect to facts and circumstances occurring prior to the effective date of such assignment. An Eligible Assignee shall not be entitled to receive any greater payment under subsection 2.7 that the assigning Lender would have been entitled to receive with respect to the Loan or portion of the Loan assigned to such Eligible Assignee, unless the grant to such Eligible Assignee is made with the Borrowers' prior written consent. Except in the case of an assignment to a Lender, an Affiliate of a Lender, or an Approved Fund with respect to a Lender, any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection 9.1D.

**C. The Register.** The Administrative Agent, acting solely for this purpose as an agent of the Borrowers, shall maintain at one of its offices in New York a copy of each Assignment Agreement delivered to it and a register for the recordation of the names and addresses of the Lenders and principal amounts of the Loans (each, a "**Registered Loan**") owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive, and the Borrowers, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register

LA\1323477.16

pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrowers at any reasonable time and from time to time upon reasonable prior notice.

D. **Participations.**  Any Lender may at any time, without the consent of, or notice to, the Borrowers or the Administrative Agent, sell participations to any Person (other than a natural person or a Borrower or any of the Affiliates or Subsidiaries of a Borrower) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of the Loans owing to it); provided that

(i)        such Lender's obligations under this Agreement shall remain unchanged,

(ii)        such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations,

(iii)        the Borrowers, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and

(iv)        in the event that any Lender sells participations in a Registered Loan, such Lender shall maintain a register on which it enters the name of all participants in the Registered Loans held by it (the "**Participant Register**").  A Registered Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide).  Any participation of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, Modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, Modification or waiver with respect to any action (i) effecting the extension of the final maturity of the Loan allocated to such participation, (ii) effecting a reduction of the principal amount of or affecting the rate of interest payable on any Loan or any fee allocated to such participation, (iii) releasing all or substantially all of the Collateral, or (iv) releasing all or substantially all of the Guarantors from their obligations under the Guaranties.  Subject to subsection 9.1E, the Borrowers agree that each Participant shall be entitled to the benefits of subsection 2.7 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection 9.1B; provided that such Participant agrees to be subject to subsection 2.8 as though it were a Lender.  To the extent permitted by law, each Participant also shall be entitled to the benefits of subsection 9.3 as though it were a Lender, provided such Participant agrees to be subject to subsection 9.4 as though it were a Lender.

E. **Limitations Upon Participant Rights**.  A Participant shall not be entitled to receive any greater payment under subsection 2.7 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrowers' prior written consent.  Without limiting the generality of the foregoing, a Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of subsection 2.7E unless the Borrowers are notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrowers, to comply with subsection 2.7E(v) as though it were a Lender.

**FIRST LIEN CREDIT AGREEMENT**

F. **Certain Pledges.** Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto. Notwithstanding anything to the contrary contained herein, any Lender that is a Fund may create a security interest in all or any portion of the Loans owing to it and the Notes, if any, held by it to the trustee for holders of obligations owed, or Securities issued, by such Fund as security for such obligations or Securities; provided that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this subsection 9.1, (i) no such pledge shall release the pledging Lender from any of its obligations under this Agreement and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under this Agreement and the Notes even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

G. **SPV Lender.** Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle (a "**SPV**"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrowers, the option to provide to the Borrowers all or any part of any Loan that such Granting Lender would otherwise be obligated to make the Borrowers pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPV to make any Loan, (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). An SPV shall not be entitled to receive any greater payment under subsection 2.7 that the Granting Lender would have been entitled to receive with respect to the Loan or portion of the Loan granted to such SPV, unless the grant to such SPV is made with the Borrowers' prior written consent. In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it will not institute against, or join any other Person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof. In addition, notwithstanding anything to the contrary contained in this subsection 9.1, any SPV may (i) with notice to, but without the prior written consent of, the Borrowers and the Administrative Agent and without paying any processing fee therefore, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrowers and Administrative Agent) providing liquidity and/or credit support to or for the account of such SPV to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV. This subsection 9.1 may not be amended without the written consent of the SPV.

**9.2    Expenses; Indemnity; Damage Waiver.**

A. **Costs and Expenses.**   Each of the Borrowers shall pay:   (i) all reasonable, actual out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable fees, charges and disbursements of counsel for the Administrative Agent and Collateral Agent (and fees and time charges for attorneys who may be employees of the Administrative Agent and Collateral Agent), in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, Modifications or waivers of the provisions hereof or thereof (whether or not the transactions

90

contemplated hereby or thereby shall be consummated); and (ii) all out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent or any Lender, including the fees, charges and disbursements of any counsel for the Administrative Agent or any Lender (and fees and time charges for attorneys who may be employees of the Administrative Agent, the Collateral Agent or any Lender), in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents, including its rights under this subsection 9.2.A, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

    **B.  Indemnification by the Borrowers.**  Each of the Borrowers shall indemnify each Agent (and any sub-Agent thereof), each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee (and fees and time charges for attorneys who may be employees of any Agent or any Lender), incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property, or any Environmental Claim related in any way to any Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted solely from the gross negligence or willful misconduct of any Indemnitee.

    **C.  Reimbursement by the Lenders.**  To the extent that a Borrower fails to pay any amount required under subsection 9.2A or 9.2B to be paid by it to any Agent (or any sub-Agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Agent (or any such sub-Agent) or such Related Party, as the case may be, such Lender's Pro Rata Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, <u>provided</u> that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Agent (or any such sub-Agent) in its capacity as such, or against any Related Party of any of the foregoing acting for such Agent (or any such sub-Agent) in connection with such capacity.  The obligations of the Lenders under this subsection 9.2C are subject to the provisions of subsection 9.12.

    **D.  Waiver of Consequential Damages, Etc.**  To the fullest extent permitted by Applicable Law, each of the Borrowers shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in subsection 9.2B above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, unless such damages are directly caused solely by the gross negligence or willful misconduct of such Indemnitee as determined by a court of competent jurisdiction by final and nonappealable judgment.

**FIRST LIEN CREDIT AGREEMENT**

**E. Payments.** All amounts due under this subsection 9.2 shall be payable promptly after demand therefor.

## 9.3    Right of Set-Off.

Without limitation of any other rights of the Agents or Lenders and subject to the terms of the Intercreditor Agreement, if an Event of Default shall have occurred and be continuing, each Agent, Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Agent, Lender, or any such Affiliate to or for the credit or the account of a Borrower against any and all of the Obligations of the Borrowers now or hereafter existing under this Agreement or any other Loan Document to such Agent or Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such Obligations of the Borrowers may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Agent, Lender and their respective Affiliates under this subsection 9.3 are in addition to other rights and remedies (including other rights of setoff) which such Agent, Lender or their respective Affiliates may have and are subject to the terms of the Intercreditor Agreement.  Each Agent and Lender agrees promptly to notify the Borrowers and the Administrative Agent after any such setoff and application; <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

## 9.4    Sharing of Payments by Lenders.

If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other obligations hereunder resulting in such Lender's receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other such obligations greater than its Pro Rata Share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for Cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, to the end that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; <u>provided</u> that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to (x) any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to a Borrower or any Subsidiary thereof (as to which the provisions of this paragraph shall apply).  Each of the Borrowers consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against any Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation.

## 9.5    Amendments and Waivers.

**A. Amendment and Waivers.** No amendment, Modification, termination or waiver of any provision of this Agreement or of the Notes, or consent to any departure by any Borrower or any other Loan Party therefrom, shall in any event be effective without the written concurrence of the Requisite

Lenders; <u>provided</u> that any such amendment, Modification, termination, waiver or consent which: (a) reduces or forgives the principal amount of any of the Loans; (b) reduces the percentage specified in the definition of the "Requisite Lenders" (it being understood that, with the consent of the Requisite Lenders, additional extensions of credit pursuant to this Agreement may be included in the definition of the "Requisite Lenders" on substantially the same basis as the Loans are included on the Effective Date); (c) changes in any manner any provision of this Agreement which, by its terms, expressly requires the approval or concurrence of all the Lenders; (d) postpones the scheduled final maturity date of any of the Loans; (e) postpones the date or reduces the amount of any scheduled payment (but not prepayment) of principal of any of the Loans; (f) postpones the date on which any interest, any fees or any amounts due under subsection 2.4B(ii) are payable; (g) decreases the interest rate borne by any of the Loans (other than any waiver of any increase in the interest rate applicable to any of the Loans pursuant to subsection 2.2E) or the amount of any fees payable hereunder or any amounts payable under subsection 2.4B(ii); (h) increases the Commitment of any Lender or the maximum duration of Interest Periods permitted hereunder; (i) releases all or substantially all of the Collateral (except to the extent otherwise required to be released under the terms of the Loan Documents); (j) except as required by any Guaranty, releases any of the Guarantors from their obligations under the Guaranties; and (k) changes in any manner the provisions contained in subsection 7.1 or this subsection 9.5; shall be effective only if evidenced by a writing signed by or on behalf of all the Lenders to whom Obligations are owed being directly affected by such amendment, Modification, termination, waiver or consent (the consent of the Requisite Lenders not being required for any such change); <u>provided</u>, <u>further</u> that any amendment, Modification, termination, waiver or consent which amends or modifies the definition of "Approved Fund," "Eligible Assignee," or "Fund," shall be effective only if evidenced by a written concurrence of the Requisite Lenders and the Administrative Agent. In addition, (i) any amendment, Modification, termination or waiver of any of the provisions contained in subsection 3.2 for periods following the Effective Date shall be effective only if evidenced by a writing signed by or on behalf of the Administrative Agent and the Requisite Lenders, (ii) no amendment, Modification, termination or waiver of any provision of any Note shall be effective without the written concurrence of the Lender which is the holder of that Note, and (iii) no amendment, Modification, termination or waiver of any provision of Section 8 or of any other provision of this Agreement which, by its terms, expressly requires the approval or concurrence of the Administrative Agent shall be effective without the written concurrence of the Administrative Agent. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on any Borrower in any case shall entitle the Borrowers to any other or further notice or demand in similar or other circumstances. Any amendment, Modification, termination, waiver or consent effected in accordance with this subsection 9.5 shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by the Borrowers, on the Borrowers.

**B. Non-Consenting Lenders.** Each Lender grants (x) to the Administrative Agent the right to purchase all (but not less than all) of such Lender's Commitments and Loans owing to it and the Notes held by it and all of its rights and obligations hereunder and under the other Loan Documents, and (y) to the Borrowers the right to cause an assignment of all (but not less than all) of such Lender's Loans owing to it, its participations in the Notes held by it and all of its rights and obligations hereunder and under the other Loan Documents to Eligible Assignees, which right may be exercised by the Administrative Agent or the Borrowers, as the case may be, if such Lender (a "**Non-Consenting Lender**") refuses to execute any amendment, waiver or consent which requires the written consent of Lenders other than Requisite Lenders and to which the Requisite Lenders, the Administrative Agent and the Borrowers have otherwise agreed; <u>provided</u> that such Non-Consenting Lender shall receive, in connection with such assignments, payment equal to the aggregate amount of outstanding Loans owed to such Lender (together with all accrued and unpaid interest, fees and other amounts (other than indemnities) owed to such Lender). Each Lender agrees that if the Administrative Agent or the Borrowers, as the case may be, exercises their option hereunder, it shall promptly execute and deliver all agreements and documentation necessary to effectuate such assignment as set forth in subsection 9.1. The Borrowers shall be entitled (but not

93

**FIRST LIEN CREDIT AGREEMENT**

obligated) to execute and deliver such agreement and documentation on behalf of such Non-Consenting Lender and any such agreement and/or documentation so executed by the Borrowers shall be effective for purposes of documenting an assignment pursuant to subsection 9.1.

**9.6     Independence of Covenants.**

All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another such covenant shall not avoid the occurrence of a Default or Event of Default if such action is taken or condition exists.

**9.7     Notices.**

**A. Notices Generally.**   Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection 9.7B below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows:

<table>
<tr><td>If to Borrowers:</td><td>Lake at Las Vegas Joint Venture<br>1600 Lake Las Vegas Parkway<br>Henderson, NV 89011<br>Attention: Ronald F. Boeddeker<br>Telephone No.: (702) 565-4924<br>Telecopier No.: (702) 565-6963</td></tr>
<tr><td>with copies to:</td><td>Lake at Las Vegas Joint Venture<br>1600 Lake Las Vegas Parkway<br>Henderson, NV 89011<br>Attention: Stephen G. Shapiro, Esq.<br>Telephone No.: (702) 990-0254<br>Telecopier No.: (702) 565-8400</td></tr>
<tr><td></td><td>Kelly, Hart & Hallman, P.C.<br>201 Main Street , Suite 2500<br>Fort Worth, Texas 76102<br>Attention: Daniel L. Lowry, Esq.<br>Telephone No.: (817) 878-3583<br>Telecopier No.: (817) 878-9783</td></tr>
<tr><td>If to the Administrative Agent,<br>the Collateral Agent, or to CSFB:</td><td>Eleven Madison Avenue<br>New York, New York 10010<br>Attention: Deryck Hawker<br>Telephone No.: (212) 538-3314</td></tr>
</table>

94

**FIRST LIEN CREDIT AGREEMENT**

Telecopier No.:  (212) 325-8304

If to a Lender, to it at its address (or telecopier number) set forth in its Administrative Questionnaire.  Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).  Notices delivered through electronic communications to the extent provided in subsection 9.7B below, shall be effective as provided in said subsection 9.7B.

**B. Electronic Communications.**  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to subsection 2.1, if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such subsection by electronic communication.  The Administrative Agent or the Borrowers may, in their discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, _provided_ that approval of such procedures may be limited to particular notices or communications.   Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), _provided_ that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

**C. Change of Address, Etc.**  Any party hereto may change its address or telecopier number for notices and other communications hereunder by notice to the other parties hereto.

**9.8**   **Survival of Representations, Warranties and Agreements.**

All representations, warranties and agreements made herein shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.

Notwithstanding anything in this Agreement or implied by law to the contrary, the agreements of the Borrowers set forth in subsections 2.6D, 2.7, 9.2, 9.3 and 9.18 and the agreements of the Lenders set forth in subsections 8.2, 8.3, 8.4, 9.2C, 9.3, 9.4 and 9.19 shall survive the payment of the Loans and the reimbursement of any amounts drawn or paid thereunder, and the termination of this Agreement.

**9.9**   **Failure or Indulgence Not Waiver; Remedies Cumulative.**

No failure or delay on the part of any Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Loan Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.  All rights and remedies existing under this Agreement and the other Loan Documents are cumulative to, and not exclusive of, any rights or remedies otherwise available.

95

**FIRST LIEN CREDIT AGREEMENT**

**9.10    Marshalling; Payments Set Aside.**

Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of the Borrowers or any other party or against or in payment of any or all of the Obligations. To the extent that any Borrower makes a payment or payments to the Administrative Agent or the Lenders (or to the Administrative Agent or Collateral Agent for the benefit of the Lenders), or any Agent or the Lenders enforce any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**9.11    Severability.**

In case any provision in or obligation under this Agreement or the Notes shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**9.12    Obligations Several; Independent Nature of the Lenders' Rights.**

The obligations of the Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitments of any other Lender hereunder. Nothing contained herein or in any other Loan Document, and no action taken by the Lenders pursuant hereto or thereto, shall be deemed to constitute the Lenders as a partnership, an association, a joint venture or any other kind of entity. The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out of this Agreement and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

**9.13    Maximum Amount.**

**A.**  It is the intention of the Borrowers and the Lenders to conform strictly to the usury and similar laws relating to interest from time to time in force, and all agreements between the Loan Parties and their respective Subsidiaries and the Lenders, whether now existing or hereafter arising and whether oral or written, are hereby expressly limited so that in no contingency or event whatsoever, whether by acceleration of maturity hereof or otherwise, shall the amount paid or agreed to be paid in the aggregate to the Lenders as interest (whether or not designated as interest, and including any amount otherwise designated but deemed to constitute interest by a court of competent jurisdiction) hereunder or under the other Loan Documents or in any other agreement given to secure the Indebtedness or obligations of the Borrowers to the Lenders, or in any other document evidencing, securing or pertaining to the Indebtedness evidenced hereby, exceed the maximum amount permissible under applicable usury or such other laws (the "**Maximum Amount**"). If under any circumstances whatsoever fulfillment of any provision hereof, or any of the other Loan Documents, at the time performance of such provision shall be due, shall involve exceeding the Maximum Amount, then, ipso facto, the obligation to be fulfilled shall be reduced to the Maximum Amount. For the purposes of calculating the actual amount of interest paid and/or payable hereunder in respect of laws pertaining to usury or such other laws, all sums paid or agreed to be paid to the holder hereof for the use, forbearance or detention of the Indebtedness of the Borrowers evidenced hereby, outstanding from time to time shall, to the extent permitted by Applicable Law, be amortized, pro-rated, allocated and spread from the date of disbursement of the proceeds of the

LA\1323477.16

Notes until payment in full of all of such Indebtedness, so that the actual rate of interest on account of such Indebtedness is uniform through the term hereof. The terms and provisions of this subsection shall control and supersede every other provision of all agreements between the Borrowers or any endorser of the Notes and the Lenders.

**B.** If under any circumstances any Lender shall ever receive an amount which would exceed the Maximum Amount, such amount shall be deemed a payment in reduction of the principal amount of the Loans and shall be treated as a voluntary prepayment under subsection 2.4B(i) and shall be so applied in accordance with subsection 2.4 hereof or if such excessive interest exceeds the unpaid balance of the Loans and any other Indebtedness of the Borrowers in favor of such Lender, the excess shall be deemed to have been a payment made by mistake and shall be refunded to the Borrowers.

## 9.14   Headings.

Section and subsection headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

## 9.15   Applicable Law.

**THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

## 9.16   Successors and Assigns.

This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of the Lenders (it being understood that the Lenders' rights of assignment are subject to subsection 9.1). Neither the Borrowers' rights or obligations hereunder nor any interest therein may be assigned or delegated by any Borrower without the prior written consent of all Lenders.

## 9.17   Consent to Jurisdiction and Service of Process.

**A. SUBMISSION TO JURISDICTION.   EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY AND OF THE UNITED STATES DISTRICT COURT SITTING IN NEW YORK CITY, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.   EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN**

DOCUMENT AGAINST A BORROWER OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

B.  WAIVER OF VENUE.  EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN SUBSECTION 9.17A.    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

C.  Service of Process.  Each party hereto irrevocably consents to service of process in the manner provided for notices in subsection 9.7.  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

### 9.18    Waiver of Jury Trial.

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

### 9.19    Confidentiality.

Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to it, its Affiliates' and their respective partners, directors, officers, employees, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential as provided herein), (b) to the extent requested by any regulatory authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by Applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this subsection 9.19, to (i) any assignee or pledgee of or Participant in, or any prospective assignee or pledgee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrowers and their obligations, (g) with the consent of the Borrowers (such consent not to be unreasonably withheld or delayed) or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this

LA\1323477.16

subsection or (y) becomes available to the Administrative Agent or any Lender on a nonconfidential basis from a source other than a Borrower or any of its Subsidiaries or Affiliates.

For purposes of this subsection 9.19, "**Information**" means all written information received from a Borrower or any of its Subsidiaries or Affiliates relating to a Borrower or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by a Borrower, which to the extent received on or after the date hereof, is identified as confidential by the Borrowers. Any Person required to maintain the confidentiality of Information as provided in this subsection 9.19 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

## 9.20    Joint and Several Liability.

**A.** The Borrowers shall be liable for all amounts due to the Agents and Lenders under this Agreement and the other Loan Documents, regardless of which Borrower actually receives the proceeds of the Loans or the manner in which any Agent or Lender accounts for the Loans on its books and records. Each Borrower's Obligations, and each Borrower's Obligations arising as a result of the joint and several liability of the Borrowers hereunder, shall be separate and distinct obligations, but all such Obligations shall be primary obligations of each Borrower. Each Borrower's Obligations arising as a result of the joint and several liability of the Borrowers hereunder shall, to the fullest extent permitted by law, be unconditional irrespective of (a) the validity or enforceability, avoidance or subordination of the Obligations of the other Borrower or of any Loan Document evidencing all or any part of the Obligations of the other Borrower, (b) the absence of any attempt to collect the Obligations from the other Borrower or any other security therefor, or the absence of any other action to enforce the same, (c) the waiver, consent, extension, forbearance or granting of any indulgence by the Agents and the Requisite Lenders with respect to any provision of any instrument evidencing the Obligations of the other Borrower, or any part thereof, or any other agreement now or hereafter executed by the other Borrower and delivered to the Agents and the Lenders, (d) the failure by Collateral Agent to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or Collateral of the other Borrower, (e) any election in any proceeding instituted under the Bankruptcy Code of the application of Section-1111(b)(2) of the Bankruptcy Code, (f) any borrowing or grant of a security interest by the other Borrower, as debtors-in-possession under Section 364 of the Bankruptcy Code, (g) the disallowance of all or any portion of any claim by any Agent or Lender for the repayment of the Obligations of the other Borrower under Section 502 of the Bankruptcy Code, or (h) any other circumstances which might constitute a legal or equitable discharge or defense of the other Borrower. With respect to each Borrower's Obligations arising as a result of the joint and several liability of the Borrowers under this Agreement and the other Loan Documents, each Borrower waives, until the Obligations shall have been indefeasibly paid in full and the Agreement shall have been terminated, any right to enforce any right of subrogation or any remedy which any Agent or Lender now has or may hereafter have against such Borrower, any endorser or any guarantor of all or any part of the Obligations, and any benefit of, and any right to participate in, any security or collateral given to any Agent or Lender to secure payment of the Obligations or any other liability of the Borrowers to any Agent or Lender. Upon and during the continuance of any Event of Default, the Agents may proceed directly and at once, without notice, against any Borrower to collect and recover the full amount, or any portion of the Obligations, without first proceeding against any other Borrower or any other Person, or against any security or collateral for the Obligations. Each Borrower consents and agrees that the Agents shall be under no obligation to marshal any assets in favor of such Borrower or against or in payment of any or all of the Obligations.

LA\1323477.16

**B.**  Notwithstanding anything in any of the Loan Documents to the contrary, no partner in Lake at Las Vegas Joint Venture shall be personally liable for the payment of the Obligations; provided, however, nothing contained herein shall release, diminish or impair the obligations of the Borrowers to pay in full when due all Obligations in accordance with the provisions of the Loan Documents.

**9.21**    **Counterparts; Integration; Effectiveness; Electronic Execution.**

**A. Counterparts; Integration; Effectiveness.**    This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto required pursuant to Section 3, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

**B. Electronic Execution of Assignments.**  The words "execution," "signed," "signature," and words of like import in any Assignment Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**9.22**    **USA Patriot Act Notification**. The following notification is provided to the Borrowers pursuant to Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318:

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT.

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each Person or entity that opens an account, including any deposit account, treasury management account, loan, other extension of credit, or other financial services product.

What this means for each Borrower:  When a Borrower opens an account, if the Borrower is an individual, the Administrative Agent and the Lenders will ask for the Borrower's name, residential address, tax identification number, date of birth, and other information that will allow the Administrative Agent and the Lenders to identify the Borrower, and, if the Borrower is not an individual, the Administrative Agent and the Lenders will ask for the Borrower's name, tax identification number, business address, and other information that will allow the Administrative Agent and the Lenders to identify the Borrower.  The Administrative Agent and the Lenders may also ask, if the Borrower is an individual, to see the Borrower's driver's license or other identifying documents, and, if the Borrower is not an individual, to see the Borrower's legal organizational documents or other identifying documents.

**FIRST LIEN CREDIT AGREEMENT**

LA\1323477.16

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**FIRST LIEN CREDIT AGREEMENT**

LA\1323477.16

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**THE BORROWERS:**        **LAKE AT LAS VEGAS JOINT VENTURE,** a Nevada general partnership

By:   TransNeva Limited Partnership, a Nevada limited partnership, its managing partner

      By:   Transcontenental Properties, Inc., an Arizona corporation, its general partner

           By:   _____
                  David H. Cox, Senior Vice President

**LLV-1, L.L.C.,** a Nevada limited liability company

By:   Transcontinental Land Company, a Texas general partnership, its managing member

      By:   Transcontinental Corporation, a California corporation, its managing partner

           By:   _____
                  David H. Cox, Senior Vice President

**AGENTS AND LENDERS:**

**CREDIT SUISSE FIRST BOSTON,**
individually as a Lender and as the Administrative Agent,
the Collateral Agent and Syndication Agent, Acting
through its Cayman Islands Branch

By: _____

    Name:   **BILL O'DALY**
    Title:      **DIRECTOR**

By: _____

    Name:   **JULIA P. KINGSBURY**
    Title:      **DIRECTOR**

## APPENDIX A

### APPLICABLE MARGINS

| ADJUSTED LIBOR | ABR LOANS |
|---|---|
| 250 bps | 150 bps |

3