# Exhibit 2
# (Part 1 of 3)

# CREDIT AGREEMENT

## DATED AS OF SEPTEMBER 30, 2005

**Among**

**YELLOWSTONE MOUNTAIN CLUB, LLC**

**YELLOWSTONE DEVELOPMENT, LLC**
**AND**
**BIG SKY RIDGE, LLC,**
as the Borrower,

**THE LENDERS LISTED HEREIN,**
as the Lenders,

**AND**

**CREDIT SUISSE,**
as Administrative Agent, Collateral Agent, Paying Agent, Sole Lead Arranger
and Sole Bookrunner

### $375,000,000 SENIOR FIRST LIEN CREDIT FACILITY

**FIRST LIEN CREDIT AGREEMENT**

# TABLE OF CONTENTS

**Page**

SECTION 1. DEFINITIONS ................................................................................1

    1.1    Certain Defined Terms. .......................................................................1
    1.2    Defined Terms; Accounting Terms; Utilization of GAAP for Purposes of
           Calculations Under Agreement. ..........................................................24

SECTION 2. AMOUNTS AND TERMS OF COMMITMENTS AND LOANS .....................24

    2.1    Commitment for Loans. ......................................................................24
    2.2    Disbursement Procedures for Loans. ...................................................25
    2.3    Interest on the Loan. ..........................................................................26
    2.4    Fees. ..................................................................................................29
    2.5    Repayments and Prepayments; General Provisions Regarding Payments. .........29
    2.6    Use of Proceeds. ...............................................................................33
    2.7    Special Provisions Governing Eurodollar Rate Loans. ..........................34
    2.8    Increased Costs; Taxes. .....................................................................36
    2.9    Mitigation Obligations; Replacement of Lenders. ...............................38
    2.10   Releases of Collateral. .......................................................................39

SECTION 3. CONDITIONS TO EFFECTIVENESS.............................................................39

    3.1    Conditions to Effectiveness on the Effective Date. .............................39

SECTION 4. REPRESENTATIONS AND WARRANTIES ...................................................45

    4.1    Organization and Qualification. ........................................................45
    4.2    Power and Authority. ........................................................................45
    4.3    Legally Enforceable Agreement. ......................................................45
    4.4    No Conflict. ......................................................................................45
    4.5    Company Structure. ...........................................................................46
    4.6    Special Purpose Entity. .....................................................................46
    4.7    Company Names. ...............................................................................46
    4.8    Business Locations; Agent for Process. .............................................46
    4.9    Title to Properties. ............................................................................46
    4.10   Priority of Liens; UCC-1 Financing Statements. ...............................47
    4.11   No Subordination. .............................................................................47
    4.12   Permits; Franchises. ..........................................................................47
    4.13   Indebtedness. ....................................................................................47
    4.14   Financial Condition; Pro Forma Balance Sheet; Projections. ..............47
    4.15   Disclosure. ........................................................................................48
    4.16   Solvent Financial Condition. .............................................................48
    4.17   Surety Obligations. ...........................................................................48
    4.18   Taxes. ...............................................................................................49
    4.19   Brokers. ............................................................................................49
    4.20   Intellectual Property. ........................................................................49

i

| | | |
|---|---|---|
| 4.21 | Governmental Authorization. | 49 |
| 4.22 | Compliance with Laws. | 49 |
| 4.23 | [Intentionally Deleted.] | 50 |
| 4.24 | Litigation. | 50 |
| 4.25 | No Defaults. | 50 |
| 4.26 | Leases. | 50 |
| 4.27 | Employee Benefit Plans. | 50 |
| 4.28 | Labor Relations. | 51 |
| 4.29 | Not a Regulated Entity. | 51 |
| 4.30 | Margin Stock. | 51 |
| 4.31 | No Material Adverse Change. | 51 |
| 4.32 | Environmental Matters. | 51 |
| 4.33 | Material Contracts. | 53 |
| 4.34 | Utilities. | 53 |
| 4.35 | Licenses. | 53 |
| 4.36 | Entitlements. | 53 |
| 4.37 | Loan Documents. | 54 |

SECTION 5. AFFIRMATIVE COVENANTS .................................................... 54

| | | |
|---|---|---|
| 5.1 | Visits and Inspections. | 54 |
| 5.2 | Notices. | 55 |
| 5.3 | Financial Statements and Other Reports. | 56 |
| 5.4 | Company Existence. | 60 |
| 5.5 | Payment of Taxes and Claims; Tax Consolidation. | 60 |
| 5.6 | Maintenance of Properties; Insurance. | 60 |
| 5.7 | Lender Meeting. | 61 |
| 5.8 | Compliance with Laws, etc. | 61 |
| 5.9 | Environmental Disclosure and Inspection. | 61 |
| 5.10 | The Borrower's Remedial Action Regarding Hazardous Materials | 62 |
| 5.11 | Unrestricted Subsidiaries; Additional Collateral; Future Subsidiaries | 62 |
| 5.12 | [Intentionally Deleted]. | 64 |
| 5.13 | Further Assurances. | 64 |
| 5.14 | Title. | 65 |
| 5.15 | Estoppels. | 65 |
| 5.16 | Scope of Operations. | 65 |
| 5.17 | Maintenance of Entitlements. | 66 |
| 5.18 | Asset Sales. | 66 |
| 5.19 | Control. | 67 |
| 5.20 | Credit Rating. | 67 |
| 5.21 | Operating Account. | 67 |

SECTION 6. NEGATIVE COVENANTS ....................................................... 67

| | | |
|---|---|---|
| 6.1 | Indebtedness. | 67 |
| 6.2 | Liens and Related Matters. | 68 |
| 6.3 | Investments. | 69 |
| 6.4 | Contingent Obligations. | 69 |
| 6.5 | Restricted Payments. | 70 |
| 6.6 | Financial Covenants. | 70 |
| 6.7 | Restriction on Fundamental Changes. | 70 |

**FIRST LIEN CREDIT AGREEMENT**

| | | |
|---|---|---|
| 6.8 | Asset Sales. | 70 |
| 6.9 | Transactions with Shareholders and Affiliates. | 73 |
| 6.10 | Conduct of Business. | 73 |
| 6.11 | Amendments or Waivers of Certain Agreements. | 73 |
| 6.12 | Fiscal Year. | 73 |

**SECTION 7. EVENTS OF DEFAULT** ....... 74

| | | |
|---|---|---|
| 7.1 | Payment of Obligations. | 74 |
| 7.2 | Misrepresentations. | 74 |
| 7.3 | Breach of Certain Covenants. | 74 |
| 7.4 | Breach of Other Covenants. | 74 |
| 7.5 | Default Under Loan Documents. | 74 |
| 7.6 | Material Adverse Effect. | 75 |
| 7.7 | Solvency. | 75 |
| 7.8 | Insolvency Proceedings. | 75 |
| 7.9 | Business Disruption; Condemnation. | 75 |
| 7.10 | ERISA. | 75 |
| 7.11 | Challenge to Loan Documents. | 75 |
| 7.12 | Judgment. | 76 |
| 7.13 | Change in Control. | 76 |
| 7.14 | Criminal Forfeiture. | 76 |

**SECTION 8. AGENTS** ....... 76

| | | |
|---|---|---|
| 8.1 | Appointment. | 76 |
| 8.2 | Rights as a Lender. | 77 |
| 8.3 | Exculpatory Provisions. | 78 |
| 8.4 | Reliance by the Agents. | 78 |
| 8.5 | Delegation of Duties. | 79 |
| 8.6 | Resignation of Administrative Agent and/or Collateral Agent. | 79 |
| 8.7 | Collateral Documents; Successor Collateral Agent. | 79 |
| 8.8 | Non-Reliance on Agents and Other Lenders. | 80 |

**SECTION 9. MISCELLANEOUS** ....... 80

| | | |
|---|---|---|
| 9.1 | Assignments and Participations in Loans. | 80 |
| 9.2 | Expenses; Indemnity; Damage Waiver. | 83 |
| 9.3 | Right of Set-Off. | 84 |
| 9.4 | Sharing of Payments by Lenders. | 84 |
| 9.5 | Amendments and Waivers. | 85 |
| 9.6 | Independence of Covenants. | 86 |
| 9.7 | Notices. | 86 |
| 9.8 | Survival of Representations, Warranties and Agreements. | 88 |
| 9.9 | Failure or Indulgence Not Waiver; Remedies Cumulative. | 88 |
| 9.10 | Marshalling; Payments Set Aside. | 88 |
| 9.11 | Severability. | 88 |
| 9.12 | Obligations Several; Independent Nature of the Lenders' Rights. | 88 |
| 9.13 | Maximum Amount. | 89 |
| 9.14 | Headings. | 89 |
| 9.15 | Applicable Law. | 89 |

iii

**FIRST LIEN CREDIT AGREEMENT**

9.16   Successors and Assigns..................................................................................89
9.17   Consent to Jurisdiction and Service of Process............................................90
9.18   Waiver of Jury Trial......................................................................................90
9.19   Confidentiality..............................................................................................91
9.20   No Recourse to Partners................................................................................91
9.21   Counterparts; Integration; Effectiveness; Electronic Execution. ..................91
9.22   USA Patriot Act Notification ........................................................................92

iv

**FIRST LIEN CREDIT AGREEMENT**

# SCHEDULES

Schedule A................Existing Indebtedness
Schedule B................Intentionally Omitted
Schedule 3.1F.............. Mortgaged Property
Schedule 3.1O .............. Company Structure and Ownership of Borrower
Schedule 4.1 ................ Organization and Qualification
Schedule 4.7 ................ Company Names
Schedule 4.8 ................ Business Locations
Schedule 4.9.C ............ Taxes Related to Project
Schedule 4.17 .............. Surety Obligations
Schedule 4.18............ Borrower's EIN
Schedule 4.20 .............. Intellectual Property
Schedule 4.24 .............. Litigation
Schedule 4.26 .............. Leases
Schedule 4.27 .............. Employee Benefit Plan
Schedule 4.28 .............. Labor Relations
Schedule 4.32 .............. Environmental Matters
Schedule 4.33 .............. Material Contracts
Schedule 4.36 .............. List of Entitlements
Schedule 6.1A............ Schedule of Existing Equipment Financing
Schedule 6.1B........... Schedule of Other Permitted Existing Indebtedness
Schedule 6.1C ............. Schedule of Existing Membership Deposits

**FIRST LIEN CREDIT AGREEMENT**

LA\1454875.12

## EXHIBITS

Exhibit I........................ Financial Plan (as of the Effective Date)
Exhibit II ...................... Form of Assignment Agreement
Exhibit III ..................... Form of Compliance Certificate
Exhibit IV ..................... Form of Consent and Subordination of Affiliate Agreements
Exhibit V ...................... Form of Notes
Exhibit VI..................... Form of Disbursement Authorization
Exhibit VII ................... Form of Notice of Conversion/Continuation
Exhibit VIII ................. Description of Project
Exhibit IX..................... Form of Security Agreement
Exhibit X ...................... Form of Mortgage
Exhibit XI..................... Form of Solvency Certificate
Exhibit XII  ................. Form of Request for Release
Exhibit XIII ................. Form of Guaranty (for Restricted Subsidiaries)
Exhibit XIV ................. Form of Pledge Agreement (for future Subsidiaries)
Exhibit XV .............. Remaining Units Schedule
Exhibit XVI.............. Form of Control Agreement

**FIRST LIEN CREDIT AGREEMENT**

LA\1454875.12

## YELLOWSTONE MOUNTAIN CLUB, LLC AND YELLOWSTONE DEVELOPMENT, LLC

## CREDIT AGREEMENT

This **CREDIT AGREEMENT** (this "**Agreement**") is dated as of September 30, 2005 and entered into by and among YELLOWSTONE MOUNTAIN CLUB, LLC, a Montana limited liability company, YELLOWSTONE DEVELOPMENT, LLC, a Montana limited liability company, and BIG SKY RIDGE, LLC, a Montana limited liability company (collectively, the "**Borrower**"), THE BANKS, FINANCIAL INSTITUTIONS AND OTHER ENTITIES LISTED ON THE SIGNATURE PAGES HEREOF (each individually referred to herein as a "**Lender**" and collectively as the "**Lenders**"), and **CREDIT SUISSE** ("**Credit Suisse**"), as administrative agent for the Lenders (in such capacity, the "**Administrative Agent**"), as collateral agent (in such capacity, the "**Collateral Agent**"), as lead arranger for the Lenders (in such capacity, the "**Arranger**") as paying agent (in such capacity, the "**Paying Agent**"), and as sole bookrunner (in such capacity, the "**Bookrunner**"; together with the Administrative Agent, the Arranger, the Collateral Agent and the Paying Agent, the "**Agents**") for the Lenders.

## R E C I T A L S

**A. WHEREAS,** the Borrower desires that the Lenders extend certain senior term loans to the Borrower hereunder, the proceeds of which, will be used: (i) for distribution or loans up to $209,000,000 to members of the Borrower for purposes unrelated to the Yellowstone Development, (ii) for investments up to $142,000,000 into Unrestricted Subsidiaries for purposes unrelated to the Yellowstone Development, (iii) to pay the Transaction Costs, (iv) to refinance the Existing Indebtedness, (v) to finance a portion of the development and construction costs associated with the Yellowstone Development in accordance with the Financial Plan; and

**B. WHEREAS,** the Agents and the Lenders party hereto desire to enter into this Agreement to provide for such loans to the Borrower subject to the terms and conditions contained herein.

**NOW, THEREFORE,** in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree to enter into this Agreement as follows:

## SECTION 1.
## DEFINITIONS

**1.1**     **Certain Defined Terms**.

The following terms used in this Agreement shall have the following meanings:

"**Administrative Agent**" has the meaning assigned to that term in the preamble to this Agreement.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"**Affected Lender**" has the meaning assigned to that term in subsection 2.7C.

"**Affected Loans**" has the meaning assigned to that term in subsection 2.7C.

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Agents**" means, collectively, the Administrative Agent, Collateral Agent, the Arranger and the Bookrunner.

"**Agreement**" means this Credit Agreement dated as of the Effective Date as it may be amended, restated, amended and restated, supplemented or otherwise Modified from time to time.

"**Applicable Base Rate Margin**" means with respect to Loans that are Base Rate Loans, the applicable rate set forth on Appendix A attached hereto.

"**Applicable Eurodollar Rate Margin**" means with respect to Loans that are Eurodollar Rate Loans, the applicable rate set forth on Appendix A attached hereto.

"**Applicable Laws**" means, collectively, all statutes, laws, rules, regulations, ordinances, decisions, writs, judgments, decrees, and injunctions of any Governmental Authority affecting the Borrower, any of its Subsidiaries, the Project or any Collateral, or any of the other assets of the Borrower and its Subsidiaries, whether now or hereafter enacted and in force, and all Governmental Authorizations relating thereto, and all covenants, conditions, and restrictions contained in any instruments, either of record or known to the Borrower or any of its Subsidiaries, at any time in force affecting any Real Property Asset or any part thereof, including any such covenants, conditions and restrictions which may (a) require improvements, repairs or alterations in or to such Real Property Asset or any part thereof or (b) limit the use and enjoyment of such Real Property Asset as used or intended to be used by the Borrower and its Subsidiaries.

"**Applicable Percentage**" means, with respect to any Lender in respect of any indemnity claim arising out of an action or omission of the Paying Agent under this Agreement, the Loan Commitments (or, if the Loan has been made, the aggregate principal amount of the Loan) represented by the respective aggregate amounts thereof held by such Lender. If the Loan has been paid in full and the Loan Commitments have terminated, the Applicable Percentages shall be determined based upon the principal amount of the Loans outstanding immediately before their payment in full, giving effect to any assignments.

"**Appraised Value**" means the "Total Net Value" (as defined in the Initial Appraisal) of the Real Property Collateral as determined by the Appraiser in the most recent and available Qualified Appraisal Update. As of the Effective Date, the Appraised Value of the Real Property Collateral is $1,165,000,000.

"**Appraiser**" means Cushman & Wakefield of Colorado, Inc., or such other independent appraisal firm selected by the Administrative Agent.

"**Approved Fund**" means any Fund or similar investment vehicle that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Approved Escrow Company**" shall mean Security Title Company of Montana or such other escrow company reasonably acceptable to the Administrative Agent.

2

**FIRST LIEN CREDIT AGREEMENT**

"**Asset Sale**" means the sale, lease, sale and leaseback, assignment, conveyance, transfer or other voluntary disposition to any Person (other than a Borrower or any Restricted Subsidiary) of any right or interest in or to any asset of Borrower serving as Collateral under the Loan Documents.

"**Assignment Agreement**" means an assignment and assumption agreement in substantially in the form of Exhibit II annexed hereto or in such other form as may be approved by the Administrative Agent.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"**Base Rate**" means, at any time, the higher of (a) the Prime Rate or (b) the rate which is 0.5% in excess of the Federal Funds Effective Rate.

"**Base Rate Borrowing**" means a Borrowing of Base Rate Loans.

"**Base Rate Loans**" means Loans bearing interest at rates determined by reference to the Base Rate as provided in subsection 2.3A.

"**Borrower**" means Yellowstone Development, LLC, Yellowstone Mountain Club, LLC and Big Sky Ridge, LLC, collectively.

"**Borrower Entity**" means the Borrower and any of its Subsidiaries.

"**Borrower Pension Plan**" means any pension plan, as defined in Section 3(2) of ERISA, other than a Pension Plan or Multiemployer Plan, which is intended to be qualified under Section 401(a) of the Internal Revenue Code and which is, or was within the past six years, maintained or contributed to by any Borrower Entity.

"**Borrower's Knowledge**" shall mean the actual knowledge, after reasonable inquiry, of the Responsible Officers of the Borrower.

"**Borrowing**" means (a) all Base Rate Loans of the same Class made, converted or continued on the same date or (b) all Eurodollar Rate Loans of the same Class that have the same Interest Period.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close; provided that, with respect to matters relating to Eurodollar Rate Loans, the term "**Business Day**" shall mean a day other than a Saturday, Sunday or other day on which commercial banks in New York City or London, England, are authorized or required by law to close.

"**Calculation Date**" means the last day of the relevant Fiscal Quarter.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, common stock, preferred stock, partnership interests

3

(general and limited) and membership or ownership interests in limited liability companies, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**Cash**" means all monetary items treated as cash in accordance with GAAP, consistently applied.

"**Cash Equivalents**" means (a) marketable securities issued or directly and unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof; (b) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having the highest rating obtainable from either S&P or Moody's; (c) commercial paper maturing no more than one year from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's; (d) certificates of deposit or bankers' acceptances maturing within one year from the date of acquisition thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, issued by any Lender or any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia having unimpaired capital and surplus of not less than $250,000,000 (each Lender and each such commercial bank being herein called a "**Cash Equivalent Bank**"); (e) money market funds administered by the Account Holder with a rating of at least AAAm from S&P, and (f) Eurodollar time deposits having a maturity of less than one year purchased directly from any Cash Equivalent Bank (provided such deposit is with such bank or any other Cash Equivalent Bank).

"**Cash From Land Sales**" means, with respect to Borrower and its Subsidiaries, for any period and without duplication, (a) Cash Proceeds received during such period attributable to real estate transactions recognized for GAAP purposes which occurred during or prior to such period as either (i) a sale of real property, (ii) an option for the purchase of real property, or (iii) a transfer of real property (i.e., title has been transferred) that would be recognized as a sale of real property for GAAP purposes if a sufficient Cash payment had been received on account of such transfer (all amounts described in (i) through (iii) above included only if the Cash received with respect such transaction is nonrefundable); (b) principal collected in Cash on receivables arising from real estate transactions; (c) Cash previously received in connection with a transaction described in (a)(i) through (iii) above which was previously refundable, but became nonrefundable during the current period; and (d) reduced by commissions and closing costs properly allocable to such transactions.

"**Cash Proceeds**" means, with respect to any Asset Sale, Cash payments (including any Cash received by way of deferred payment pursuant to, or monetization of, a note receivable or otherwise, but only as and when so received) received from such Asset Sale.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"**Change of Control**" means any breach of the covenant contained in Section 5.18.

"**Cleanup**" means all actions required to: (a) cleanup, remove, treat or remediate Hazardous Materials in the indoor or outdoor environment; (b) prevent the Release of Hazardous Materials so that they do not migrate, endanger or threaten to endanger public health or welfare or the indoor or outdoor

4

environment; or (c) perform pre-remedial studies and investigations and post-remedial monitoring and care.

"**Collateral**" means all of the properties and assets in which Liens are purported to be granted by the Collateral Documents other than the Excluded Collateral.

"**Collateral Agent**" means Credit Suisse, in its capacity as collateral agent hereunder and under the Collateral Documents, and any successor in such capacity.

"**Collateral Documents**" means: (i) the Mortgage(s); (ii) the Security Agreement; (iii) the Control Agreement; (iv) the Consent and Subordination of Affiliate Agreements; (v) any Pledge Agreement, Guaranty Agreement and security agreement supplement executed by a Subsidiary after the Effective Date pursuant to Section 5.11; and (vi) any other documents, instruments or agreements delivered by any Loan Party pursuant to this Agreement or any of the other Loan Documents in order to grant, protect or perfect liens on any assets of such Loan Party as security for all or any of the Obligations.

"**Combined Net Income**" means, for any period, the consolidated net income (or loss) of the Borrower and their Restricted Subsidiaries, less the amount of Permitted Tax Distributions paid or to be paid by the Borrower and their Restricted Subsidiaries with respect to such period, *provided* that there shall not be included in such Combined Net Income: (a) any net income (or loss) of any Person (other than Borrower) if such Person is not a Restricted Subsidiary at the date of determination; (b) any net income (or loss) of any Person acquired by the Borrower or any of their Subsidiaries for any period prior the date of such acquisition; and (c) any net income (but not loss) of any Restricted Subsidiary if such Restricted Subsidiary is subject to restrictions, directly or indirectly, on the payment of dividends or the making of distributions, restrictions, directly or indirectly, to the Borrower, except that the Borrower's equity in the net income of any such Restricted Subsidiary for such period shall be included in such Combined Net Income up to the aggregate amount of cash distributed by such Restricted Subsidiary during such period to the Borrower or another Restricted Subsidiary as a dividend or other distribution (subject, in the case of a dividend or other distribution to another Restricted Subsidiary, to the limitation contained in this clause) and (d) any extraordinary gains or losses. In addition to the foregoing, there shall be added to Combined Net Income the amount of any cash distribution actually received by either Borrower or any Restricted Subsidiary from any Unrestricted Subsidiary during such period.

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit III annexed hereto delivered to the Administrative Agent by the Borrower pursuant to subsection 5.3(iv).

"**Condemnation Proceeds**" has the meaning assigned to that term in subsection 2.5B(ii)(c).

"**Consent and Subordination of Affiliate Agreements**" means the Consent and Subordination of Affiliate Agreements dated as of the date hereof among the Borrower Entities who are a party thereto and the Collateral Agent, substantially in the form of Exhibit IV annexed hereto, as such Consent and Subordination of Affiliate Agreements may hereafter be amended, restated, amended and restated, supplemented or otherwise Modified from time to time.

"**Consolidated Interest Expense**" means, for any period (as determined for the Borrower and its Subsidiaries on a consolidated basis) (1) total interest expense net of interest earned by Borrower (including that portion attributable to capital leases in accordance with GAAP) payable in Cash in such period with respect to Indebtedness, including, without limitation, all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs

5

**FIRST LIEN CREDIT AGREEMENT**

under Hedge Agreements (<u>excluding</u>, however, (a) any amounts referred to in Section 2.4 payable to Agents or the Lenders on or before the Effective Date, and (b) any amortized Transaction Costs).

"**Contingent Obligation**" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person (a) with respect to any Indebtedness, lease, dividend or other obligation of another if the primary purpose or intent thereof by the Person incurring the Contingent Obligation is to provide assurance to the obligee of such obligation of another that such obligation of another will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such obligation will be protected (in whole or in part) against loss in respect thereof, (b) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings, or (c) under Hedge Agreements. Contingent Obligations shall include, without limitation, (i) the direct or indirect guaranty, endorsement (other than for collection or deposit in the Ordinary Course of Business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another, (ii) the obligation to make take-or-pay or similar payments if required regardless of non-performance by any other party or parties to an agreement, and (iii) any liability of such Person for the obligation of another through any agreement (contingent or otherwise) (A) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (B) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (A) or (B) of this sentence, the primary purpose or intent thereof is as described in the preceding sentence. The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if less, the amount to which such Contingent Obligation is specifically limited.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Control Agreement**" means an authenticated record, as that term is used under UCC §9.104(1)(B), in form and substance substantially similar to <u>Exhibit XVI</u> attached hereto or as otherwise reasonably acceptable to the Administrative Agent.

"**Credit Suisse**" means Credit Suisse, Cayman Islands Branch, or one or more of its other branches and any Affiliate thereof.

"**Debt Service**" means, for any period, all payments of interest and all scheduled and voluntary prepayments of principal made during such period for all Indebtedness of the Borrower and its Subsidiaries.

"**Default**" means a condition or event that, after notice or after any applicable grace period has lapsed, or both, would constitute an Event of Default.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Disbursement Authorization**" means a notice in the form of <u>Exhibit VI</u> annexed hereto delivered by the Borrower to the Administrative Agent pursuant to Section 2.2 with respect to a proposed borrowing.

6

LA\1454875.12

"**Disbursement Date**" means any Business Day specified by the Borrower as a date on which the Borrower delivers a Disbursement Authorization.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**EBITDA**" means, for any period, Combined Net Income for any such period *plus*, to the extent deducted in calculating Combined Net Income for such period, (a) Interest Expense, (b) income taxes and Permitted Tax Distributions, (c) depreciation, (d) amortization and (e) equity in losses related to any investment in any Unrestricted Subsidiary *minus*, to the extent included in calculating the Combined Net Income for such period, equity in gains related to any investment in any Unrestricted Subsidiary. If, during the period for which EBITDA is being calculated, either Borrower or a Restricted Subsidiary has (a) acquired one or more Persons (or the assets thereof), EBITDA shall be calculated on a pro forma basis as if all of such acquisitions (other than acquisitions resulting in Unrestricted Subsidiaries) and all such dispositions had occurred on the first day of such period.

"**Effective Date**" means such date on or prior to September 30, 2005, on which the conditions to effectiveness set forth in Section 3.1 are satisfied.

"**Effective Date Projections**" has the meaning assigned to that term in subsection 4.14B.

"**Eligible Assignee**" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, (d) a commercial bank organized under the laws of the United States, or any State thereof, and having a combined capital and surplus of at least $250,000,000; (e) a savings and loan association or savings bank organized under the laws of the United States, or any State thereof, and having a combined capital and surplus of at least $250,000,000; (f) a commercial bank organized under the laws of any other country that is a member of the OECD or has concluded special lending arrangements with the International Monetary Fund associated with its General Arrangements to Borrow or a political subdivision of any such country, and having a combined capital and surplus of at least $250,000,000, so long as such bank is acting through a branch or agency located in the United States; (g) a finance company, insurance company or other financial institution or fund (whether a corporation, partnership, trust or other entity) that is engaged in making, purchasing or otherwise holding commercial loans in the ordinary course of its business and having a combined capital and surplus of at least $250,000,000 or an Approved Fund thereof and (h) any other Person (other than a natural person) approved by the Administrative Agent (such approval not to be unreasonably withheld or delayed) and so long as no Default or Event of Default has occurred and is continuing, approved by the Borrower (such approval not to be unreasonably withheld or delayed); provided that notwithstanding the foregoing, "**Eligible Assignee**" shall not include the Borrower or any Borrower Entity, other than any such Person that is a Lender as of the Effective Date.

"**Engagement Letter**" means that certain engagement letter dated May 6, 2005 by and between Credit Suisse and the Borrower.

"**Entitlement Documents**" has the meaning assigned to that term in Section 4.36.

"**Entitlements**" shall mean those certain Governmental Authorizations which were required to be obtained and maintained (as applicable) in order to allow the completion of the development work for the Project and the sale of the Project (including, without limitation, the Real Property Collateral) and portions thereof as legal lots, all as contemplated by the Master Plan and the Effective Date Projections, and including, without limitation, all Governmental Authorizations necessary to permit applicable earthwork, grading, infrastructure, improvements, equipment, drainage, storm water and sewer systems, roadways and other work, labor or materials required to be furnished or actions to be taken by or in connection with amending, modifying, maintaining and perpetuating all of the foregoing, and the

7

**FIRST LIEN CREDIT AGREEMENT**

documents, agreements and instruments relating thereto.   The Entitlements currently obtained by Borrower are listed on Schedule 4.36 attached hereto.

"**Environmental Claim**" means any claim, action, investigation or written notice by any Person alleging potential liability (including, without limitation, potential liability for investigatory costs, Cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, or penalties) arising out of, based on or resulting from (a) the presence, or Release of any Hazardous Materials at any location, whether or not owned, leased or operated by the Borrower or any of its Subsidiaries, or (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

"**Environmental Laws**" means all federal, state, local and foreign laws and regulations relating to pollution or protection of human health or the environment, including, without limitation, laws relating to Releases or threatened Releases of Hazardous Materials or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, Release, disposal, transport or handling of Hazardous Materials, laws and regulations with regard to record keeping, notification, disclosure and reporting requirements respecting Hazardous Materials and laws relating to the management or use of natural resources.

"**Environmental Liabilities**"  means all liabilities, obligations, responsibilities, obligations to conduct Cleanup, and all Environmental Claims pending or threatened against any Loan Party or its Subsidiaries or against any Person whose liability for any Environmental Claim any Loan Party or its Subsidiaries may have retained or assumed either contractually or by operation of law, arising from (a) environmental, health or safety conditions, (b) the presence, Release or threatened Release of Hazardous Materials at any location, whether or not owned, leased or operated by the Borrower or its Subsidiaries, or (c) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

"**Equity Proceeds**" means the sum of (i) Cash Proceeds from the issuance of any Capital Stock or other equity Securities of the Borrower or any Subsidiary of the Borrower; less (ii) underwriting discounts and commissions and other Permitted Transaction Costs.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute.

"**ERISA Affiliate**" means (a) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which the Borrower is a member; (b) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which the Borrower is a member; and (o) solely for purposes of obligations under Section 412 of the Internal Revenue Code or under the applicable sections set forth in Section 414(t)(2) of the Internal Revenue Code, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which the Borrower, any corporation described in clause (a) above or any trade or business described in clause (b) above is a member.

"**ERISA Event**" means (a) a "reportable event" within the meaning of Section 4043(c) of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (b) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(d) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 412(m) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (c)

8

**FIRST LIEN CREDIT AGREEMENT**

the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (d) the withdrawal by the Borrower or any ERISA Affiliate from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting, in either case, in liability pursuant to Section 4063 or 4064 of ERISA, respectively; (e) the institution by the PBGC of proceedings to terminate any Pension Plan pursuant to Section 4042 of ERISA; (f) the imposition of liability on the Borrower or any ERISA Affiliate pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (g) the withdrawal by the Borrower or any ERISA Affiliate in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan resulting in withdrawal liability pursuant to Section 4201 of ERISA, or the receipt by the Borrower or any ERISA Affiliate of written notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4042 of ERISA or under Section 4041A of ERISA if such termination would result in liability to the Borrower or any ERISA Affiliate; (h) the disqualification by the Internal Revenue Service of any Pension Plan or Borrower Pension Plan under Section 401(a) of the Internal Revenue Code, or the determination by the Internal Revenue Service that any trust forming part of any Pension Plan or Borrower Plan fails to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (i) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

"**Eurocurrency Reserve Requirements**" means, for each Interest Period for each Eurodollar Rate Loan, the highest reserve percentage applicable to any Lender during such Interest Period under regulations issued from time to time by the Board of Governors of the Federal Reserve System or any successor for determining the maximum reserve requirement (including, without limitation, any emergency, supplemental or other marginal reserve requirement), with respect to liabilities or assets consisting of or including Eurocurrency liabilities having a term equal to such Interest Period.

"**Eurodollar Base Rate**" means the rate per annum (determined by the Administrative Agent or the Paying Agent, as applicable) at approximately 11:00 A.M. (London time) on the date which is two (2) Business Days prior to the beginning of the relevant Interest Period (as specified in the applicable Disbursement Authorization or Notice of Conversion/Continuation) by reference to the British Bankers' Association Interest Settlement Rates for deposits in Dollars (as set forth by any service selected by the Administrative Agent or the Paying Agent which has been nominated by the British Bankers' Association as an authorized information vendor for the purpose of displaying such rates) for a period equal to such Interest Period; provided that, to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "Eurodollar Base Rate" shall be the interest rate per annum determined by the Administrative Agent or the Paying Agent, as applicable, to be the average of the rates per annum at which deposits in Dollars are offered for such relevant Interest Period to major banks in the London interbank market in London, England by the Reference Lenders at approximately 11:00 A.M. (London time) on the date which is two (2) Business Days prior to the beginning of such Interest Period. If any of the Reference Lenders shall be unable or shall otherwise fail to supply such rates to the Administrative Agent or Paying Agent upon its request, the rate of interest shall be determined on the basis of the quotations of the remaining Reference Lenders.

"**Eurodollar Borrowing**" means a Borrowing of Eurodollar Rate Loans.

"**Eurodollar Rate Loans**" means Loans bearing interest at rates determined by reference to the Reserve Adjusted Eurodollar Rate as provided in subsection 2.3A.

"**Event of Default**" means each of the events set forth in Section 7.

9

"**Excess Cash Flow**" means, for any period, (a) EBITDA for such period, less (b) Debt Service for such period, less (c) Permitted Tax Distributions made during such period.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Collateral**" means those assets listed on Schedule 6.1A hereto.

"**Excluded Taxes**" means, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any Obligation of the Borrower, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the United States, the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lender Office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Borrower is located and (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under subsection 2.9B), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new Lender Office) or is attributable to such Foreign Lender's failure (other than as a result of a Change in Law) to comply with subsection 2.8E(v), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Lender Office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to subsection 2.8E(i).

"**Existing Equipment Financing**" means the Indebtedness obligations of the Borrower constituting equipment financing and Capital Leases listed on Schedule 6.1A attached hereto.

"**Existing Indebtedness**" means the Indebtedness obligations of Borrower as of the Effective Date listed on Schedule A hereto, which Indebtedness will be paid in full and extinguished on or prior to the Effective Date.

"**Existing Membership Deposits**" means the membership deposits listed on Schedule 6.1C attached hereto.

"**Federal Funds Effective Rate**" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by the Administrative Agent.

"**Financial Plan**" means a capital expenditure budget and financial plan for the Project setting forth, in each case, for the Fiscal Years 2005 through 2012, consolidated balance sheets of the Borrower and its Restricted Subsidiaries and related consolidated statements of income and consolidated statements of cash flows of the Borrower and its Restricted Subsidiaries, together with separate summary schedules showing detailed projections of capital expenditures of the Borrower and its Restricted Subsidiaries, as updated from time to time in accordance with subsection 5.3(xv).

"**First Lien Debt LTV Ratio**" has the meaning assigned to that term in subsection 6.6A.

10

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the most senior Lien (other than Liens listed in subclauses (a), (b), (f), (g) and (h) of the definition of Permitted Encumbrances) to which such Collateral is subject.

"**Fiscal Quarter**" means a fiscal quarter of a Fiscal Year.

"**Fiscal Year**" means a calendar year ending on December 31.

"**Flood Hazard Property**" means a Mortgaged Property located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"**FLSA**" means the Fair Labor Standards Act of 1938.

"**Foreign Lender**" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is a resident for tax purposes.  For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans or similar extensions of credit in the ordinary course of its business.

"**Funding and Payment Office**" means the office of the Administrative Agent located at 11 Madison Avenue, New York, NY 10010 (or such office of the Administrative Agent or any successor Administrative Agent specified by the Administrative Agent or such successor Administrative Agent in a written notice to the Loan Parties and the Lenders).

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.2, generally accepted accounting principles, as in effect in the United States of America and on the date of determination.

"**Governmental Authority**" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Governmental Authorization**" means any permit, approval, license, zoning and other resolution, certificate of occupancy, authorization, plan, directive, consent order, consent decree or similar authorizations of or from any Governmental Authority.

"**Guaranty**" means a guaranty agreement substantially in the form of Exhibit XIII attached hereto, executed and delivered after the Effective Date by a Subsidiary pursuant to subsection 5.11.

"**Hazardous Materials**" means any chemical, material or substance, the generation, use, storage, transportation or disposal of which, or the exposure to which, is prohibited, limited or regulated by any Governmental Authority or which may or could pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any Real Property Asset or to the indoor or outdoor environment.

11

**FIRST LIEN CREDIT AGREEMENT**

"**Hedge Agreements**" means all interest rate swaps, caps or collar agreements or similar arrangements entered into by the Borrower or any of its Subsidiaries providing for protection against fluctuations in interest rates or currency exchange rates or the exchange of nominal interest obligations, either generally or under specific contingencies.

"**Indebtedness**" means, as applied to any Person, without duplication, (a) all indebtedness for borrowed money, (b) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP, (c) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money (other than current accounts payable incurred in the Ordinary Course of Business and accrued expenses incurred in the Ordinary Course of Business), (d) any obligation owed for all or any part of the deferred purchase price of property or services (excluding any current trade payables incurred in the Ordinary Course of Business, but including earn-outs with respect to any acquisition), (e) all obligations evidenced by notes, bonds (other than performance bonds), debentures or other similar instruments, (f) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property or assets acquired by such Person (even though the rights and remedies of the seller or the lender under such agreement in the event of default are limited to repossession or sale of such property or assets), (g) all obligations, contingent or otherwise, as an account party under any letter of credit or under acceptance, letter of credit or similar facilities to the extent not reflected as trade liabilities on the balance sheet of such Person in accordance with GAAP, (h) all obligations, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock, (i) all obligations under Hedge Agreements, including, as of any date of determination, the net amounts, if any, that would be required to be paid by such Person if such Hedge Agreements were terminated on such date, (j) all Contingent Obligations in respect of obligations of the kind referred to in clauses (a) through (i) above or in respect of the payment of dividends on the Capital Stock of any other Person, and (k) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; provided, that if such Person has not assumed such secured indebtedness that is nonrecourse to its credit, then the amount of indebtedness of such Person pursuant to this clause (k) shall be equal to the lesser of the amount of the secured indebtedness or the fair market value of the assets of such Person which secure such indebtedness.

"**Indemnified Taxes**" means Taxes other than Excluded Taxes.

"**Indemnitee**" has the meaning assigned to that term in subsection 9.2B.

"**Independent Accountants**" means Mack, Roberts & Co., LLC, CPAs, of Portland, Oregon, or other accounting firm chosen by Borrower and reasonably acceptable to Administrative Agent.

"**Initial Appraisal**" means that certain "Complete Appraisal of Real Property" dated as of July 1, 2005, and prepared by the Appraiser for the Administrative Agent.

"**Insolvency Proceeding**" means (A) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors, or (B) any general assignment for the benefit of creditors, composition, marshalling of assets for creditors or other, similar arrangement in respect of its creditors generally or any substantial portion of its creditors; in each case (A) and (B) undertaken under U.S. Federal, State or foreign law, including the Bankruptcy Code.

"**Insurance Proceeds**" has the meaning assigned to that term in subsection 2.8B(ii)(e).

12

"**Intellectual Property**" has the meaning set forth in the Security Agreement.

"**Interest Coverage Ratio**" has the meaning assigned to that term in subsection 6.6B.

"**Interest Payment Date**" means:

>> (a)    with respect to any Base Rate Loan, the last Business Day in each of March, June, September and December of each year, commencing on December 31 and upon each prepayment or conversion; and

>> (b)    with respect to any Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan; underlined provided that in the case of each Interest Period of longer than three months, "Interest Payment Date" shall also include the date that is three months after the commencement of such Interest Period.

"**Interest Period**" has the meaning assigned to that term in subsection 2.3B.

"**Interest Rate Determination Date**" means each date for calculating the Reserve Adjusted Eurodollar Rate, for purposes of determining the interest rate in respect of an Interest Period.  The Interest Rate Determination Date for purposes of calculating the Reserve Adjusted Eurodollar Rate shall be the second Business Day prior to the first day of the related Interest Period.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter and any successor statute.

"**Investment**" means (a) any direct or indirect purchase or other acquisition by the Borrower or any of its Subsidiaries of, or of a beneficial interest in, Capital Stock or other Securities of any other Person, or (b) any direct or indirect loan, advance (other than advances to employees for moving, education, computer, entertainment and travel expenses, drawing accounts and similar expenditures in the Ordinary Course of Business) or capital contribution by the Borrower or any of its Subsidiaries to any other Person, including all indebtedness and accounts receivable acquired from that other Person that are not current assets or did not arise from sales to that other Person in the Ordinary Course of Business.  The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"**Land Expenses**" means, with respect to Borrower and its Subsidiaries, for any period and without duplication, the costs and expenses incurred by the Borrower and its Subsidiaries in connection with the development of the Project as contemplated in the Financial Plan including, without limitation, general and administrative expenses, marketing expenses, land development costs, and carry costs (consisting of taxes, insurance costs, capital expenditures, and property owners association subsidies and reserve funding).

"**Land Under Contract**" means any portion of the Real Property Collateral subject to a Qualified Sales Agreement with a third party unaffiliated buyer.

"**Lender**" and "**Lenders**" means the Persons identified as "Lenders" and listed on the signature pages of this Agreement, together with their successors and permitted assigns pursuant to Section 9.1; underlined provided that the term "Lenders", when used in the context of a particular Loan Commitment shall mean the Lenders having that Loan Commitment.

13

**FIRST LIEN CREDIT AGREEMENT**

"**Lender Office**" means, as to any Lender, the office or offices of such Lender specified in the Administrative Questionnaire completed by such Lender and delivered to the Administrative Agent, or such other office or offices as such Lender may from time to time designate to the Administrative Agent.

"**Lien**" means any lien, mortgage, pledge, assignment, security interest, fixed or floating charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give any security interest) and any option, trust or deposit or other preferential arrangement having the practical effect of any of the foregoing.

"**Loan Commitment**" means the commitment of a Lender to make a Loan to the Borrower pursuant to subsection 2.1 as to any Lender, in an aggregate principal amount not to exceed the amount set forth in the Assignment Agreement pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof.  The original aggregate amount of the Loan Commitments is $375,000,000 (including the commitment of any Eligible Assignee to participate with respect to a Loan as part of the primary syndication).

"**Loan Documents**" means this Agreement, the Notes and the Collateral Documents or other documents evidencing or securing Obligations.

"**Loan Exposure**" means, with respect to any Lender, as of any date of determination the outstanding principal amount of the Loan of that Lender.

"**Loan Party**" or "**Loan Parties**" means the Borrower and any direct or indirect Subsidiaries who executes any of the Loan Documents.

"**Loans**" mean the loans outstanding or made by the Lenders pursuant to subsection 2.1.

"**Margin Stock**" has the meaning assigned to that term in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**Master Plan**" means that certain Yellowstone Club Master Plan as approved by the Board of Commissioners, Madison County, Montana on February 8, 1999, as amended, restated, supplemented, or otherwise Modified from time to time.

"**Material Adverse Effect**" means (a) a material adverse effect upon the business, operations, properties, assets or condition (financial or otherwise) of the Borrower and its Subsidiaries, taken as a whole, (b) the material impairment of the ability of the Loan Parties to perform the Obligations (regardless of whether or not such Material Adverse Effect can be or has been cured at any time or whether Borrower has knowledge of such Material Adverse Effect), (c) a material adverse effect upon the legality, validity, binding effect or enforceability against a Loan Party of a Loan Document to which it is a party, (d) a material adverse effect upon the rights, remedies and benefits, available to, or conferred upon, the Agents or any Lender under any Loan Document, (e) a material adverse effect upon the value of the Real Property Collateral, and (f) a material adverse effect upon the Entitlements and the intended development of the Real Property Collateral as contemplated by the Master Plan.

"**Material Contracts**" has the meaning assigned to that term in subsection 4.33A.

"**Maturity Date**" means September 30, 2010 for the Loan.

"**Maximum Amount**" has the meaning assigned to that term in subsection 9.13A.

14

**FIRST LIEN CREDIT AGREEMENT**

"**Measurement Period**" means, with respect to any Fiscal Quarter, the period (a) commencing (i) with respect to the first Measurement Period, the Effective Date, and (ii) with respect to each subsequent Measurement Period, the first day of the Fiscal Quarter following the most recent Fiscal Quarter for which a mandatory prepayment was required under subsection 2.5B(ii)(d), and (b) ending on the last day of such Fiscal Quarter.

"**Modifications**" shall mean any amendments, supplements, modifications, renewals, replacements, consolidations, severances, substitutions and extensions of any document or instrument from time to time; "**Modify**", "**Modified**," or related words shall have meanings correlative thereto.

"**Moody's**" means Moody's Investors Service, Inc.

"**Mortgage**" means a first lien mortgage, security agreement, assignment of leases and rents, and fixture filing, substantially in the form of Exhibit X annexed hereto, executed and delivered by any Loan Party on or after the Effective Date, with such changes thereto as may be recommended by the Collateral Agent's local counsel based on local laws or customary local mortgage or deed of trust practices, as such security instrument may be amended, restated, amended and restated, supplemented, or otherwise Modified from time to time. "**Mortgages**" means all such instruments collectively.

"**Mortgagee Policies**" has the meaning assigned to that term in subsection 3.1F(ii).

"**Multiemployer Plan**" means a "multiemployer plan", as defined in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate is contributing or to which the Borrower or any ERISA Affiliate had an obligation to contribute within the last six years.

"**Non-Consenting Lender**" has the meaning assigned to that term in subsection 9.5B.

"**Notes**" means (a) the promissory notes of the Borrower issued pursuant to subsection 2.2C on the Effective Date and (b) any promissory notes issued by the Borrower in connection with assignments of the Loans of any Lender, in each case substantially in the form of Exhibit V annexed hereto, as they may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"**Notice of Conversion/Continuation**" means a notice substantially in the form of Exhibit VII annexed hereto delivered by the Borrower to the Administrative Agent pursuant to subsection 2.3D with respect to a proposed conversion or continuation of the applicable basis for determining the interest rate with respect to the Loans specified therein.

"**Obligations**" means all obligations of every nature of each Loan Party from time to time owed to the Agents, the Lenders or any of them or their respective Affiliates under the Loan Documents, or, if approved by the Administrative Agent or otherwise required hereunder, Hedge Agreements (with a Lender or an Affiliate of a Lender), whether for principal, interest or payments for early termination of Hedge Agreements, fees, expenses, indemnification or otherwise.

"**OECD**" means the Organization for Economic Co-Operation and Development.

"**Officer's Certificate**" means, with respect to any Person, a certificate executed on behalf of such Person (a) if such Person is a partnership or limited liability company, by its chairman of the Board (if an officer) or chief executive officer or by the chief financial officer of its general partner or managing member or other Person authorized to do so by its Organizational Documents, (b) if such Person is a corporation, on behalf of such corporation by its chairman of the board (if an officer) or chief executive

15

officer or its chief financial officer or vice president, and (c) if such person is one of the Borrower or a Subsidiary of the Borrower, a Responsible Officer.

"**Operating Account**" means a Deposit Account to be established by the Borrower pursuant to Section 5.21 at the Operating Account Bank, which shall at all times be subject to a Control Agreement in favor of the Administrative Agent.

"**Operating Account Bank**" means American Bank, a Montana banking corporation.

"**Operating Lease**" means, as applied to any Person, any lease (including, without limitation, leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) that is not a Capital Lease other than any such lease under which that Person is the lessor.

"**Ordinary Course of Business**" means, with respect to a specific Person, the ordinary course of such Person's business, substantially as conducted by any such Person prior to and as of the Effective Date or as otherwise contemplated in connection with the development of the Project, and undertaken by such Person in good faith and not for purposes of evading any covenant or restriction in any Loan Document.

"**Organizational Authorizations**" means, with respect to any Person, resolutions of its Board of Directors, general partners or members of such Person, and such other Persons, groups or committees (including, without limitation, managers and managing committees), if any, required by the Organizational Certificate or Organizational Documents of such Person to authorize or approve the taking of any action or the entering into of any transaction.

"**Organizational Certificate**" means, with respect to any Person, the certificate or articles of incorporation, partnership or limited liability company or any other similar or equivalent organizational, charter or constitutional certificate or document filed with the applicable Governmental Authority in the jurisdiction of its incorporation, organization or formation, which, if such Person is a partnership or limited liability company, shall include such certificates, articles or other certificates or documents in respect of each partner or member of such Person.

"**Organizational Documents**" means, with respect to any Person, the by-laws, partnership agreement, limited liability company agreement, operating agreement, management agreement or other similar or equivalent organizational, charter or constitutional agreement or arrangement, which, if such Person is a partnership or limited liability company, shall include such by-laws, agreements or arrangements in respect of each partner or member of such Person.

"**OSHA**" means the Occupational Safety and Hazard Act of 1970.

"**Other Permitted Existing Indebtedness**" means the Indebtedness of the Borrower existing as of the Effective Date as further described on Schedule 6.1B attached hereto and not Existing Equipment Financing.

"**Other Taxes**" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"**Paying Agent**" means Credit Suisse, in its capacity as paying agent for the Lenders hereto.

16

"**Participant**" has the meaning assigned to that term in subsection 9.1D.

"**PBGC**" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA (or any successor thereto).

"**PCBs**" has the meaning assigned to that term in subsection 4.32(vi).

"**Pension Plan**" means any employee pension benefit plan, as defined in Section 3(2) of ERISA, other than a Multiemployer Plan, which is subject to Title IV of ERISA and is, or was within the past six years, maintained or contributed to by the Borrower or any ERISA Affiliate.

"**Permitted Collateral Asset Sale**" means any transaction (or series of transactions) constituting an arms length sale for fair market value of one or more platted and legally subdivided Residential Units to a third party in the Ordinary Course of Business pursuant to a Qualified Sales Agreement.

"**Permitted Collateral Release**" means the release of the Lien of the Mortgage as to a portion of the Real Property Collateral representing any one or more legally subdivided and platted Residential Units in connection with the Borrower or one of its Restricted Subsidiaries obtaining Permitted Construction Financing to finance the development of such Residential Units.

"**Permitted Construction Financing**" means construction financing obtained in the Ordinary Course of Business of the Borrower in connection with Residential Units released pursuant to Section 6.8 (upon payment of the Release Amount) which (i) is not secured by any portion of the Collateral, (ii) is used to construct or develop a portion of the Project, and (iii) is non-recourse to the Borrower and its Restricted Subsidiaries.

"**Permitted Encumbrances**" means the following types of Liens:

> (a)    Liens for taxes, assessments or governmental charges or claims the payment of which is not, at the time, required by Section 5.5;

> (b)    statutory Liens of landlords, statutory Liens of carriers, warehousemen, mechanics and materialmen and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or by ERISA) incurred in the Ordinary Course of Business for sums not yet delinquent or being Properly Contested;

> (c)    Liens incurred or deposits made in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive, in each case, of obligations for the payment of borrowed money or other Indebtedness);

> (d)    any attachment or judgment Lien with respect to a money judgment, writ, warrant of attachment or similar process not constituting an Event of Default, so long as such Lien could not reasonably be expected to have a Material Adverse Effect;

17

(e)      leases, subleases, licenses and sublicenses granted to others (in the Ordinary Course of Business) not interfering with the ordinary conduct of the business or operations of the Borrower or any of its Subsidiaries;

(f)      easements, covenants, conditions, rights-of-way, restrictions, minor defects, encroachments or irregularities in title and other similar charges or encumbrances entered into in the Ordinary Course of Business of the Borrower or any of its Subsidiaries;

(g)      any (i) Lien arising from any Permitted Equipment Financing or Existing Equipment Financing, (ii) interest or title of a lessor or sublessor under any Capital Lease permitted by subsection 6.1 or any operating lease not prohibited by this Agreement, (iii) restriction or encumbrance that the interest or title of such lessor or sublessor may be subject to, or (iv) subordination of the interest of the lessee or sublessee under such lease to any restriction or encumbrance referred to in the preceding clause (iii);

(h)      deposits in the Ordinary Course of Business to secure liabilities to insurance carriers, lessors, utilities and other service providers;

(i)      zoning, building codes and other Governmental Authorizations regulating the use, development and/or occupancy of any Real Property Asset or activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such Real Property Asset;

(j)      bankers liens and rights of setoff with respect to customary depository arrangements entered into in the Ordinary Course of Business;

(k)      with respect to the Real Property Collateral only, the Permitted Title Exceptions.

"**Permitted Equipment Financing**" means financing obtained in the Ordinary Course of Business which is secured solely by furnishings, fixtures and equipment, provided that such Permitted Equipment Financing shall not exceed 100% of the value of the asset being financed.

"**Permitted Holder**" means Blixseth Group, Inc. or Timothy L. Blixseth.

"**Permitted Investment Amount**" means the sum of (i) $142,000,000, plus (ii) an amount equal to the Restricted Payment Amount available to be paid to the holders of the Capital Stock of the Borrower pursuant to Section 6.5(i) but reallocated by the Borrower for Investments into Unrestricted Subsidiaries. The Permitted Investment Amount shall be reduced to the extent of any Investments made pursuant to Section 6.3(ii).

"**Permitted Tax Distributions**" means Restricted Payments made pursuant to Section 6.5(ii).

"**Permitted Title Exceptions**" means the title exceptions reflected in the Mortgagee Policies.

"**Permitted Transaction Costs**" means bona fide, reasonable, direct costs actually incurred by Borrower or its Subsidiaries in connection with an Asset Sale, the issuance of debt Securities (or incurrence of borrowed Indebtedness), or the issuance of equity, including, without limitation, (a) transfer, sales, use and other taxes payable in connection with such Asset Sale, (b) payment of the

18

outstanding principal amount of, premium or penalty, if any, and interest on any permitted Indebtedness (other than the Loans) that is secured by a Lien on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such transaction, (c) brokers' or advisors' commissions, (d) fees and expenses of counsel and other advisors and other customary and reasonable closing costs in connection with such transaction, and (e) any underwriting discounts, commitments, arrangements or similar fees.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"**Pledge Agreement**" means a pledge agreement to be executed and delivered after the Effective Date by the Borrower (or, if applicable, a Subsidiary) with respect to the pledge of the Capital Stock of any Subsidiary formed after the Effective Date, which pledge shall be in favor of the Collateral Agent for the benefit of the Lenders and substantially in the form of Exhibit XIV annexed hereto with such changes thereto as may be reasonably recommended by the Collateral Agent's local counsel based on local laws or customary practice, as may be amended, restated, amended and restated, supplemented or otherwise Modified from time to time in accordance with the terms hereof and thereof.

"**Pledging Parent**" has the meaning assigned to that term in subsection 5.11(C).

"**Prime Rate**" means the rate of interest per annum announced from time to time by Credit Suisse as its prime commercial lending rate in effect at its principal office in New York City. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer. Credit Suisse or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"**Proceedings**" has the meaning assigned to that term in subsection 5.3(xi).

"**Pro Forma Basis**" means, with respect to compliance with any test or covenant hereunder, compliance with such covenant or test after giving effect to any proposed acquisition, distribution or other action which requires compliance on a pro forma basis (including pro forma adjustments arising out of events which are directly attributable to a specific transaction, are factually supportable and are expected to have a continuing impact, in each case determined on a basis consistent with Article 11 of Regulation S-X of the Securities Act and as interpreted by the staff of the Securities and Exchange Commission, which pro forma adjustments shall be certified by the chief financial officer of the Borrower), using, for purposes of determining such compliance, the historical financial statements of all entities or assets so acquired or to be acquired and the consolidated financial statements of the Borrower and its Subsidiaries which shall be reformulated (a) as if such acquisition, distribution or other action, and any acquisitions which have been consummated during the period, and any Indebtedness or other liabilities incurred in connection with any such acquisition, distribution or other action had been consummated at the beginning of such period (and assuming that such Indebtedness bears interest during any portion of the applicable measurement period prior to the relevant acquisition at the weighted average of the interest rates applicable to outstanding Loans during such period), and (b) otherwise in conformity with such procedures as may be agreed upon between the Administrative Agent and the Borrower, all such calculations to be in form and substance reasonably satisfactory to the Administrative Agent.

"**Project**" means that certain Yellowstone Development located in Montana as depicted on the map attached hereto as Exhibit VIII.

"**Properly Contested**" means, any claim against a Loan Party or any Indebtedness of a Loan Party (including any Taxes) that is not paid or settled as and when such claim or Indebtedness is due or

19

**FIRST LIEN CREDIT AGREEMENT**

undertaken transaction; and (iii) such Person does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due; and (b) such Person is "solvent" within the meaning given that term and similar terms under applicable laws relating to fraudulent transfers and conveyances.  For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"**Special Permitted Release**" means up to (but no more than) nine (9) Residential Units which may be transferred to certain members of the Borrower's senior management team, honorary board members or otherwise for legitimate business reasons during the term of the Loan pursuant to Section 2.5B(ii)(d) without the payment of the Release Amount.

"**Subsidiary**" means, with respect to any Person, any limited liability company, corporation, partnership, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"**Supplemental Collateral Agent**" and "**Supplemental Collateral Agents**" shall have the meaning assigned to these terms in subsection 8.1B.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Title Company**" means, collectively, one or more title insurance companies reasonably satisfactory to the Administrative Agent.

"**Transaction Costs**" means the fees, costs and expenses payable by the Borrower and its Subsidiaries in connection with the Transactions and set forth in the schedule delivered by the Borrower pursuant to subsection 3.1I, including, without limitation, amounts payable to the Agents and the Lenders.

"**Transactions**" means, collectively, (a) the consummation of the transactions contemplated under this Agreement, (b) the repayment in full of the obligations owing to the lenders under the Existing Indebtedness, and (c) the termination of the Existing Indebtedness and all Liens associated therewith.

"**UCC**" means the Uniform Commercial Code (or any successor statute) as adopted and in force in the State of New York or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code (or any successor statute) of such state.

"**Unrestricted Subsidiary**" shall mean a Subsidiary designated at any time as an Unrestricted Subsidiary by the Borrower to the Administrative Agent in writing for the purpose of engaging in a bona fide investment or business (and not with a view to circumventing the terms and provisions of this Agreement), into which Borrower may (i) make certain Investments to the extent permitted under Section 6.3(ii) hereof, and/or (ii) transfer Residential Units after payment to the Administrative Agent of the Release Amount for each such Residential Unit; provided, however, that (a) no Subsidiary may be designated as an Unrestricted Subsidiary at any time when a Default or Event of Default has occurred and

23

remains continuing, or would result from such designation, (b) no Unrestricted Subsidiary shall own, directly or indirectly, any portion of the Collateral. Unrestricted Subsidiaries shall not become guarantors of the Loans, and (c) the Borrower has complied with the provisions of Section 5.11A.

"**Yellowstone Development**" means the approximately 13,500 acre master planned community entitled to permit the development of approximately 864 Residential Units as contemplated by the Master Plan.

**1.2**    **Defined Terms; Accounting Terms; Utilization of GAAP for Purposes of Calculations Under Agreement**.

**A.**  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.   Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented or otherwise Modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to, this Agreement (unless expressly referring to another agreement) and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all Documents, General Intangibles, Goods, Intellectual Property, Investment Related Property, Letter of Credit Rights, Money, Receivables, Receivable Records, Commercial Tort Claims, Material Contracts, and Proceeds therefrom (for purposes of this Section, as each term is defined in the Security Agreement.)

**B.**  Except as otherwise expressly provided in this Agreement, (a) all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP; and (b) financial statements and other information required to be delivered by the Borrower to the Lenders pursuant to clauses (ii), (iii) and (xvi) of subsection 5.3 shall be prepared in accordance with GAAP (except, with respect to interim financial statements, for the absence of normal year-end audit adjustments and explanatory footnotes) as in effect at the time of such preparation (and delivered together with the reconciliation statements provided for in subsection 5.3(v)).   Calculations in connection with the definitions, covenants and other provisions of this Agreement shall utilize accounting principles and policies in conformity with those used to prepare the financial statements of the Subsidiaries of the Borrower referred to in subsection 4.14A; provided, that should such accounting principles and policies change, the Borrower, the Administrative Agent, and the Lenders shall negotiate in good faith to amend the financial definitions and related covenants in conformity therewith.

**SECTION 2.**
**AMOUNTS AND TERMS OF COMMITMENTS AND LOANS**

**2.1**    **Commitment for Loans**.

Subject to the terms and conditions of this Agreement, each of the Lenders agrees to make on the Effective Date a Loan in the amount equal to its Loan Commitment.  The Borrower may only make one borrowing under the Loan Commitment.  As described below, the Loan will be distributed to the

24

Borrower on the Effective Date for the purposes contemplated herein.  Each Loan Commitment shall terminate immediately and without further action after giving effect to the making of the Loan.  The proceeds of the Loan shall be used for the purposes identified in subsection 2.6. The Loan, once repaid or prepaid, may not be reborrowed.

**2.2     Disbursement Procedures for Loans**.

      **A. Disbursement Authorization**.  The Borrower shall deliver to the Administrative Agent a Disbursement Authorization no later than 11:00 a.m. (New York time), at least one (1) Business Day in advance of the Effective Date.  In lieu of delivering the above-described Disbursement Authorization, the Borrower may give the Administrative Agent telephonic notice by the required time of any proposed borrowing under this subsection 2.2A; provided that such notice shall be promptly confirmed in writing by delivery of a Disbursement Authorization to the Administrative Agent on or before the Effective Date.

      Neither the Administrative Agent nor any Lender shall incur any liability to the Borrower in acting upon any telephonic notice referred to above that the Administrative Agent believes in good faith to have been given by a duly authorized officer or other Person authorized to borrow on behalf of the Borrower or for otherwise acting in good faith under this subsection 2.2A, and upon funding of Loans by the Lenders in accordance with this Agreement pursuant to any such telephonic notice, the Borrower shall have effected Loans hereunder.

      The Borrower shall notify the Administrative Agent prior to the funding of any Loans in the event that any of the matters to which the Borrower is required to certify in the applicable Disbursement Authorization are no longer true and correct as of the Effective Date or the requested Disbursement Date, and the acceptance by the Borrower of the proceeds of any Loans shall constitute a re-certification by the Borrower, as of the Effective Date or the requested Disbursement Date, as to the matters to which the Borrower is required to certify in the applicable Disbursement Authorization.

      **B. Disbursement Procedures for the Loans**.  The Loans shall be made by the Lenders in the amounts of their respective Loan Commitments, it being understood that no Lender shall be responsible for any default by any other Lender in that other Lender's obligation to make a Loan requested hereunder nor shall the Loan Commitment of any Lender to make the particular type of Loan requested be increased or decreased as a result of a default by any other Lender in that other Lender's obligation to make a Loan requested hereunder.

      Each Lender shall make the amount of its Loan available to the Administrative Agent not later than 2:00 pm (New York time) on the Effective Date in same day funds at the Funding and Payment Office.  Unless the Administrative Agent shall have received written notice to the contrary prior to the Effective Date, the Administrative Agent may assume that each Lender (and Eligible Assignee as part of the primary syndication) will fund its respective Loan Commitment and may, in reliance upon such assumption, distribute to the Borrower the amount of each such Loan Commitment.  In such event, if any Lender (or Eligible Assignee as part of the primary syndication) does not in fact fund its respective Loan Commitment, then the Borrower severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to the Borrower, with interest thereon as computed in accordance with this Agreement, for each day from and including the date such amount is distributed to the Borrower to the date of payment to the Administrative Agent.

      Upon satisfaction or waiver of the conditions precedent specified in subsection 3.1, the Administrative Agent shall make the proceeds of the Loans available to the Borrower on the Effective Date by causing an amount of same day funds equal to the proceeds of all such Loans received by the

25

**FIRST LIEN CREDIT AGREEMENT**

Administrative Agent from the Lenders to be credited pursuant to the terms of the Disbursement Authorization.

Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Base Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

**C. Note.**  The Borrower shall execute and deliver on the Effective Date to each Lender requesting the same (or to the Administrative Agent for that Lender) a Note substantially in the form of Exhibit V annexed hereto to evidence that Lender's Loan.  Any Lender not receiving a Note may request at any time that the Borrower issue it such Note on the terms set forth herein, and the Borrower agree to issue such Note promptly upon the request of a Lender.  The Notes and the Obligations evidenced thereby shall be governed by, subject to and benefit from all of the terms and conditions of this Agreement and the other Loan Documents and shall be secured by the Collateral.

**2.3**    **Interest on the Loan.**

**A. Rate of Interest.**  Subject to the provisions of subsections 2.7 and 2.8, each Loan shall bear interest on the unpaid principal amount thereof from the date made to maturity (whether by acceleration or otherwise) at a rate determined by reference to the Base Rate or the Reserve Adjusted Eurodollar Rate, as the case may be.  The Loans shall be made as Base Rate Loans or one (1) month Eurodollar Rate Loans as of the Effective Date (it being understood that Loans may be converted into other Eurodollar Rate Loans after the Effective Date in accordance with the provisions of subsection 2.3D).  If on any day any Loan is outstanding with respect to which notice has not been delivered to the Administrative Agent in accordance with the terms of this Agreement specifying the applicable basis for determining the rate of interest, then for that day that Loan shall bear interest determined by reference to the Base Rate. Subject to the provisions of subsections 2.7 and 2.8, the Loans shall bear interest through maturity as follows:

(i)    if a Base Rate Loan, then at the sum of the Base Rate plus the Applicable Base Rate Margin; or

(ii)    if a Eurodollar Rate Loan, then at the sum of the Reserve Adjusted Eurodollar Rate for the relevant Interest Period plus the Applicable Eurodollar Rate Margin.

**B. Interest Periods.**  In connection with each Eurodollar Rate Loan, the Borrower may, pursuant to the applicable Notice of Conversion/Continuation select an interest period (each an "**Interest Period**") to be applicable to such Loan, which Interest Period shall be, at the Borrower's option, either a one (1), two (2), three (3) or six (6) month period; provided that:

(i)    the initial Interest Period for any Eurodollar Rate Loan shall commence on the date specified in the applicable Notice of Conversion/Continuation, in the case of a Loan converted to a Eurodollar Rate Loan;

26

(ii)     in the case of immediately successive Interest Periods applicable to a Eurodollar Rate Loan continued as such pursuant to a Notice of Conversion/Continuation, each successive Interest Period shall commence on the day on which the next preceding Interest Period expires;

(iii)     if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; provided that, if any Interest Period would otherwise expire on a day that is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day;

(iv)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (v) of this subsection 2.3B, end on the last Business Day of a calendar month;

(v)     no Interest Period with respect to any portion of the Loans shall extend beyond the Maturity Date for such Loans;

(vi)     the Borrower may not select an Interest Period of longer than one (1) month prior to the end of the period commencing on and including the Effective Date and ending on the earlier of (a) the date on which the Administrative Agent notifies the Borrower that it has concluded its primary syndication of the Loans and the Loan Commitments, and (b) the date which is six (6) months following the Effective Date;

(vii)     there shall be no more than twelve (12) Interest Periods outstanding at any time; and

(viii)     with respect to a conversion, in the event the Borrower fails to specify an Interest Period for any Eurodollar Rate Loan in the applicable Notice of Conversion/Continuation, the Borrower shall be deemed to have selected an Interest Period of one (1) month; and

(ix)     with respect to a continuation, in the event the Borrower fails to specify an Interest Period for any Eurodollar Rate Loan in the applicable Notice of Conversion/Continuation, the Eurodollar Rate Loan shall automatically be converted to a Base Rate Loan.

**C. Interest Payments**.  Subject to the provisions of subsection 2.3E below, interest on each Loan shall be payable in arrears on each Interest Payment Date applicable to that Loan, upon any prepayment of that Loan (to the extent accrued on the amount being prepaid) and at maturity (including final maturity, by acceleration or otherwise).

**D. Conversion or Continuation**.  Subject to the provisions of subsection 2.7, the Borrower shall have the option:  (i) to convert at any time all or any part of its outstanding Loans equal to $1,000,000 and integral multiples of $500,000 in excess of that amount from Loans bearing interest at a rate determined by reference to one basis to Loans bearing interest at a rate determined by reference to an alternative basis; provided, however, that a Eurodollar Rate Loan may only be converted into a Base Rate Loan on the expiration date of an Interest Period applicable thereto; or (ii) upon the expiration of any Interest Period applicable to a Eurodollar Rate Loan, to continue all or any portion of such Loan equal to $1,000,000 and integral multiples of $500,000 in excess of that amount as a Eurodollar Rate Loan.

**FIRST LIEN CREDIT AGREEMENT**

The Borrower shall deliver a Notice of Conversion/Continuation to the Administrative Agent no later than 11:00 a.m. (New York time) at least one (1) Business Day in advance of the proposed conversion date (in the case of a conversion to a Base Rate Loan), and at least three (3) Business Days in advance of the proposed conversion/continuation date (in the case of a conversion to, or a continuation of, a Eurodollar Rate Loan). A Notice of Conversion/Continuation shall specify (i) the proposed conversion/continuation date (which shall be a Business Day), (ii) the amount and type of the Loans to be converted/continued, (iii) the nature of the proposed conversion/continuation, (iv) in the case of a conversion to, or a continuation of, a Eurodollar Rate Loan, the requested Interest Period, and (v) in the case of a conversion to, or a continuation of, a Eurodollar Rate Loan, that no Default or Event of Default has occurred and is continuing. In lieu of delivering the above-described Notice of Conversion/Continuation, the Borrower may give the Administrative Agent telephonic notice by the required time of any proposed conversion/continuation under this subsection 2.3D; provided that such notice shall be promptly confirmed in writing by delivery of a Notice of Conversion/Continuation to the Administrative Agent on or before the proposed conversion/continuation date. In the event the Borrower fails to deliver a Notice of Conversion/Continuation with respect to a Eurodollar Rate Loan, the Borrower shall be deemed to have selected an Interest Period of one (1) month.

Neither the Administrative Agent nor any Lender shall incur any liability to the Borrower in acting upon any telephonic notice referred to above that the Administrative Agent believes in good faith to have been given by a duly authorized officer or other Person authorized to act on behalf of the Borrower or for otherwise acting in good faith under this subsection 2.3D, and upon conversion or continuation of the applicable basis for determining the interest rate with respect to any Loans in accordance with this Agreement pursuant to any such telephonic notice, the Borrower shall have effected a conversion or continuation, as the case may be, hereunder.

Except as otherwise provided in subsections 2.7B, 2.7C and 2.7G, a Notice of Conversion/Continuation for conversion to, or continuation of, any Eurodollar Rate Loan (or telephonic notice in lieu thereof) shall be irrevocable, and the Borrower shall be bound to effect a conversion or continuation in accordance therewith.

**E. Post-Default Interest.** Upon the occurrence and during the continuation of any Event of Default, if requested by the Requisite Lenders, the outstanding principal amount of all Loans and, to the extent permitted by applicable law, any interest payments thereon not paid when due and any fees and other amounts then due and payable hereunder, shall thereafter bear interest (including post-petition interest in any proceeding under the Bankruptcy Code, or other applicable bankruptcy or insolvency laws) payable upon demand at a rate that is 2% per annum in excess of the interest rate otherwise payable under this Agreement with respect to the applicable Loans (or, in the case of any such fees and other amounts, at a rate which is 2% per annum in excess of the interest rate otherwise payable under this Agreement for Loans bearing interest at a rate determined by reference to the Base Rate); provided that, in the case of Eurodollar Rate Loans, upon the expiration of the Interest Period in effect at the time any such increase in interest rate is effective such Eurodollar Rate Loans shall thereupon become Base Rate Loans and shall thereafter bear interest payable upon demand at a rate equal to 2% per annum in excess of the interest rates otherwise payable under this Agreement for Base Rate Loans. Payment or acceptance of the increased rates of interest provided for in this subsection 2.3E is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Lender.

**F. Computation of Interest.** Interest on Loans shall be computed on the basis of a 360-day year (a 365 or 366-day year, as applicable, in the case of Base Rate Loans based on the Prime Rate) and for the actual number of days elapsed in the period during which it accrues. In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan

**FIRST LIEN CREDIT AGREEMENT**