# Exhibit 2
# (Part 2 of 3)

or, with respect to a Base Rate Loan being converted from a Eurodollar Rate Loan, the date of conversion of such Eurodollar Rate Loan to such Base Rate Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted to a Eurodollar Rate Loan, the date of conversion of such Base Rate Loan to such Eurodollar Rate Loan, as the case may be, shall be excluded; provided that if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

**2.4     Fees.**

    **A.   Other Fees.**  The Borrower agrees to pay to the Administrative Agent, the Collateral Agent and the Paying Agent, for their own respective accounts, fees payable in the amounts and at the times to the extent separately agreed upon in writing between the Borrower and each of the Administrative Agent, the Collateral Agent and the Paying Agent.

    **B.   General.**  All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Paying Agent for distribution, in the case of fees payable under Section 2.5A, to the Lenders entitled thereto.  Fees paid shall not be refundable under any circumstances.

**2.5     Repayments and Prepayments; General Provisions Regarding Payments.**

    **A.   Scheduled Payments of Loans.**

    The Borrower shall make principal payments on the Loans in installments in amounts equal to a percentage of the Loans funded on the Effective Date as set forth below and on the dates set forth below:

| DATE | AMORTIZATION SCHEDULE |
|---|---|
| December 31, 2005 | .25% |
| March 31, 2006<br>June 30, 2006<br>September 30, 2006<br>December 31, 2006 | .25%<br>.25%<br>.25%<br>.25% |
| March 31, 2007<br>June 30, 2007<br>September 30, 2007<br>December 31, 2007 | .25%<br>.25%<br>.25%<br>.25% |
| March 31, 2008<br>June 30, 2008<br>September 30, 2008<br>December 31, 2008 | .25%<br>.25%<br>.25%<br>.25% |
| March 31, 2009<br>June 30, 2009<br>September 30, 2009<br>December 31, 2009 | .25%<br>.25%<br>.25%<br>.25% |
| March 31, 2010<br>June 30, 2010 | .25%<br>.25% |

**FIRST LIEN CREDIT AGREEMENT**

| DATE | AMORTIZATION SCHEDULE |
|------|----------------------|
| Maturity Date | Remaining Principal (after giving effect to any voluntary or mandatory prepayments in accordance with subsection 2.5C) |

If any of the dates above are not a Business Day, then the applicable installment shall be made on the next succeeding Business Day. The scheduled installments of principal of the Loans set forth above shall be reduced in connection with any voluntary or mandatory prepayments of the Loans in accordance with subsection 2.5B, with such reduction starting with the following scheduled installment of principal and then to each installment of principal due thereafter through the installment due June 30, 2010. The final installment on the Maturity Date specified above for the repayment by the Borrower of the Loans shall be in an amount sufficient to repay all amounts owing by the Borrower under this Agreement with respect to the Loans.

**B. Prepayments**.

      (i)    <u>Voluntary Prepayments</u>.

           The Borrower may at any time and from time to time prepay, without premium or penalty, the Loans on any Business Day in whole or in part in an aggregate minimum amount of $1,000,000 and integral multiples of $500,000 in excess of that amount or such lesser amount as is then outstanding; <u>provided</u>, <u>however</u>, that in the event the Borrower elects to prepay a Eurodollar Rate Loan other than on the expiration of the Interest Period applicable thereto, the Borrower shall, at the time of such prepayment, also pay any amounts payable under subsection 2.7D hereof. The Borrower shall notify the Administrative Agent, in writing or by telephone, promptly confirmed in writing to the Administrative Agent, no later than 11:00 a.m. (New York time) at least two (2) Business Days' prior to such prepaying. The Administrative Agent will promptly notify each Lender upon receipt of such notice from the Borrower. Notice of prepayment having been given as aforesaid, the Loans shall become due and payable on the prepayment date specified in such notice and in the aggregate principal amount specified therein. Any voluntary prepayments pursuant to this subsection 2.5B(i) shall be applied as specified in subsection 2.5C.

      (ii)    <u>Mandatory Prepayments</u>.

The Loans shall be prepaid in the manner provided in subsection 2.5C upon the occurrence of the following circumstances:

      (a)    <u>Prepayments Due to Issuance of Debt</u>. Concurrently with and as a condition to the closing of any transaction pursuant to which Borrower or any of its Subsidiaries issue debt Securities or incur additional borrowed Indebtedness (other than Indebtedness permitted under Section 6.1), the Borrower shall prepay the Loans in an amount equal to the sum of (i) the principal amount of such debt Securities or borrowed Indebtedness paid or payable to the Borrower or its Subsidiaries; less (ii) Permitted Transaction Costs.

      (b)    <u>Prepayments Due to Issuance of Equity Securities</u>. Concurrently with and as a condition to the closing of any transaction pursuant to which the Borrower or

30

any of its Subsidiaries receive any Equity Proceeds (other than Equity Proceeds received by (i) the Borrower from Investments made by the holders of the Capital Stock in the Borrower or (ii) the Borrower's wholly-owned Subsidiaries from Investments made by the Borrower or another of its Subsidiaries in such Subsidiary and permitted under Section 5.11), the Borrower shall prepay the Loans in an aggregate amount equal to 50% of such Equity Proceeds.

(c)     Prepayments Due to Insurance and Condemnation Proceeds.   No later than the fifth (5th) Business Day following the date of receipt by the Borrower or any of its Subsidiaries of any cash payments which exceed $500,000 (i) under any insurance policy as a result of any damage to or loss of all or any portion of the Collateral net of actual and documented reasonable costs actually incurred by the Borrower or any of its Subsidiaries in connection with adjustment and settlement thereof, (the "**Insurance Proceeds**"), unless a Reinvestment Notice shall be delivered in respect thereof, or (ii) resulting from the taking of assets by the power of eminent domain, condemnation or otherwise (net of actual and documented reasonable costs incurred by the Borrower or any of its Subsidiaries in connection with adjustment and settlement thereof, "**Condemnation Proceeds**") (any such event resulting in the recovery of Insurance Proceeds or Condemnation Proceeds, a "**Recovery Event**"), the Borrower shall prepay the Loans in an amount equal to the Insurance Proceeds or Condemnation Proceeds, as the case may be, received.   Concurrently with any prepayment of Loans pursuant to this subsection 2.5B(ii)(c), the Borrower shall deliver to the Administrative Agent an Officer's Certificate demonstrating in reasonable detail the derivation of the Insurance Proceeds or Condemnation Proceeds, as the case may be, of the correlative Recovery Event.

(d)     Prepayments Due to Release of Residential Units.   Concurrently with and as a condition to the consummation of any sale or release of any Residential Unit (or other portion of Real Property Collateral) permitted under Section 6.8, the Borrower shall prepay the Loans in an amount equal to the Release Amount for each Residential Unit sold or otherwise released from the First Priority Lien of the Mortgage.   Such prepayments shall be made in accordance with the procedures set forth in Section 2.10B.  Notwithstanding the foregoing provisions of this subsection 2.5B(ii)(d), Borrower shall be permitted to make Special Permitted Releases permitted under Section 6.8(iii) without the payment of the Release Amount.

(e)     Release Amount Adjustment.   The Release Amount shall be recalculated each time Borrower makes one or more voluntary prepayments pursuant to Section 2.5B(i) aggregating at least $50,000,000, but in no event shall the Release Amount be recalculated more than one (1) time per Fiscal Year.   The recalculation of the Release Amount shall be pro rata based upon the percentage decrease in the Loans outstanding or made by the Lenders hereunder.

(iii)     No Waiver.   Nothing contained in subsection 2.5B(ii) shall be deemed to permit the Borrower to consummate any Asset Sale unless otherwise permitted under this Agreement.

## C.  Application of Prepayments.

Each payment received by Collateral Agent or Administrative Agent from the Borrower with respect to the Loans shall be applied in the following order: First, any prepayment premiums, if any, due and payable hereunder; second, to the payment of any late charges due and payable hereunder; third, to

**FIRST LIEN CREDIT AGREEMENT**

the repayment of any amounts advanced by Collateral Agent in accordance with the Mortgages or any of the Collateral Documents for insurance premiums, taxes, assessments or for preservation or protection of the Collateral and to the payment of all costs and expenses incurred by Collateral Agent in connection with the collection of the Loans (including all attorneys' fees payable hereunder); fourth, to the payment of accrued and unpaid interest; fifth, to fund any reserves or escrows required by Collateral Agent in accordance with the terms of the Mortgages or any of the Collateral Documents; sixth, to payment of any Eurodollar Borrowing breakage costs incurred by Lenders on account of such payment; seventh, to reduction of the outstanding principal balance of the Loans.  Notwithstanding the foregoing, (A) if an Event of Default has occurred and is continuing, Collateral Agent may apply any payments received in such order or proportion as Collateral Agent, in Collateral Agent's sole discretion, may determine, and (B) as among the Lenders, such payments shall be applied in accordance with subsection 2.5D(iii) below.

### D. General Provisions Regarding Payments.

(i)     Manner and Time of Payment.  All payments by the Borrower of principal, interest, fees and other Obligations hereunder and under the Notes shall be made in same day funds and without defense, setoff or counterclaim, free of any restriction or condition, and delivered to the Administrative Agent not later than 1:00 pm (New York time) on the date due at the Funding and Payment Office for the account of the Lenders; funds received by the Administrative Agent after that time on such due date shall, at the Administrative Agent's sole discretion, be deemed to have been paid by the Borrower on the next succeeding Business Day. The Borrower hereby authorizes the Administrative Agent to charge its accounts with the Administrative Agent in order to cause timely payment to be made to the Administrative Agent of all principal, interest, fees and expenses due hereunder (subject to sufficient funds being available in its accounts for that purpose).

(ii)     Application of Payments to Principal, Interest and Prepayment Fees.  Except as provided in subsection 2.3C, all payments in respect of the principal amount of any Loan shall include payment of accrued interest and prepayment fees, if any, on the principal amount being repaid or prepaid, and all such payments (and in any event any payments made in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest and prepayment fees, if any, before application to principal.

(iii)     Apportionment of Payments.  The aggregate principal, prepayment fees and interest payments shall be apportioned among all outstanding Loans to which such payments relate, in each case proportionately to the Lenders' respective Pro Rata Shares.     The Administrative Agent shall promptly distribute to each Lender, at its applicable Lender Office, its Pro Rata Share of all such payments received by the Administrative Agent and the commitment fees of such Lender when received by the Administrative Agent pursuant to Section 2.4. Notwithstanding the foregoing provisions of this subsection 2.5D(iii) if, pursuant to the provisions of subsection 2.7, any Notice of Conversion/Continuation is withdrawn as to any Affected Lender or if any Affected Lender makes Base Rate Loans in lieu of its Pro Rata Share of any Eurodollar Rate Loans, the Administrative Agent shall give effect thereto in apportioning payments received thereafter.

(iv)     Payments on Business Days.  Except if expressly provided otherwise, whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or of the commitment fees hereunder, as the case may be.

**FIRST LIEN CREDIT AGREEMENT**

(v)     Notation of Payment. Each Lender agrees that before disposing of any Note held by it, or any part thereof (other than by granting participations therein), that Lender will make a notation thereon of all Loans evidenced by that Note and all principal payments previously made thereon and of the date to which interest thereon has been paid; provided that the failure to make (or any error in the making of) a notation of any Loan made under such Note shall not limit or otherwise affect such disposition or the obligations of the Borrower hereunder or under such Note with respect to any Loan or any payments of principal or interest on such Note.

### E.  Application of Proceeds of Collateral.

(i)     Application of Proceeds of Collateral.  Except as provided in subsection 2.5B(ii) with respect to prepayments, all proceeds received by the Collateral Agent after an Event of Default or as a result of exercising remedies under the Loan Documents, in respect of any sale of, collection from, or other realization upon all or any part of the Collateral under any Collateral Document may, in the discretion of the Collateral Agent, be held by the Collateral Agent as Collateral for, and/or (then or at any time thereafter) applied in full or in part by the Administrative Agent against, the applicable Secured Obligations (as defined in such Collateral Document) in the following order of priority:

(a)     to the payment of all costs and expenses of such sale, collection or other realization, including, without limitation, reasonable compensation to the Agents and their agents and counsel, and all other reasonable expenses, liabilities and advances made or incurred by the Agents in connection therewith, and all amounts for which such Agents are entitled to indemnification under such Collateral Document and all advances made by the Collateral Agent thereunder for the account of the applicable Loan Party (excluding principal and interest in respect to any Loans of such Loan Party), and to the payment of all reasonable costs and expenses paid or incurred by the Collateral Agent in connection with the exercise of any right or remedy under such Collateral Document, all in accordance with the terms of this Agreement and such Collateral Document;

(b)     thereafter, to the extent of any excess proceeds, to the payment of all other Secured Obligations, including any Secured Obligations related to Hedge Agreements; and

(c)     thereafter, to the extent of any excess proceeds, to the payment to or upon the order of such Loan Party or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

## 2.6   Use of Proceeds.

**A. Loan.**  The proceeds of the Loans made to the Borrower shall be applied, (i) pursuant to Section 6.5(iii), for distributions or loans up to $209,000,000 to members of the Borrower for purposes unrelated to the Yellowstone Development, (ii) pursuant to Section 6.3(ii), for investments or loans up to $142,000,000 into any Unrestricted Subsidiaries, (iii) to pay the Transaction Costs, (iv) to refinance the Existing Indebtedness, (v) to finance a portion of the development and construction costs associated with the Yellowstone Development in accordance with the Financial Plan.

**B. Compliance With Laws.**  The Borrower undertakes that no portion of the proceeds of any Loans or other extensions of credit under this Agreement shall be used by any Loan Party in any manner which would be illegal under, or which would cause the invalidity or unenforceability (in each case in whole or in part) of any Loan Document under, any applicable law.

33

**FIRST LIEN CREDIT AGREEMENT**

**C. Margin Regulations.** Without limiting the generality of subsection 2.6A and 2.6B, no portion of the proceeds of any borrowing under this Agreement shall be used by the Borrower or any of its Subsidiaries in any manner that might cause the borrowing or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation of such Board or to violate the Exchange Act, in each case as in effect on the date or dates of such borrowing and such use of proceeds.

**2.7    Special Provisions Governing Eurodollar Rate Loans.**

Notwithstanding any other provision of this Agreement to the contrary, the following provisions shall govern with respect to Eurodollar Rate Loans as to the matters covered:

**A. Determination of Applicable Interest Rate.** As soon as practicable after 11:00 A.M. (New York time) on each Interest Rate Determination Date, the Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Eurodollar Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to the Borrower and each Lender.

**B. Inability to Determine Applicable Interest Rate.** In the event that the Administrative Agent shall have reasonably determined (which determination shall be final and conclusive and binding upon all parties hereto), on any Interest Rate Determination Date with respect to any Eurodollar Rate Loans, that by reason of circumstances arising after the date of this Agreement affecting the London interbank market, adequate and fair means do not exist for ascertaining the interest rate applicable to such Loans on the basis provided for in the definition of Reserve Adjusted Eurodollar Rate, the Administrative Agent shall, on such date, give notice (by telecopy or by telephone confirmed in writing) to the Borrower and each Lender of such determination, whereupon (i) no Loans may be made or continued as, or converted to, Eurodollar Rate Loans, until such time as the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist (such notification not to be unreasonably withheld or delayed) and (ii) any Disbursement Authorization or Notice of Conversion/Continuation given by the Borrower with respect to the Loans in respect of which such determination was made shall be deemed to be rescinded by the Borrower; provided, however that, at the option of the Borrower, any such Disbursement Authorization may be re-submitted to the Administrative Agent indicating that the Borrower is electing a Base Rate Loan, which Loan shall be funded no later than one (1) Business Day after the date of such Base Rate Loan Disbursement Authorization.

**C. Illegality or Impracticality of Eurodollar Rate Loans.** In the event that on any date any Lender shall have reasonably determined (which determination shall be final and conclusive and binding upon all parties hereto but shall be made only after consultation with the Borrower and the Administrative Agent) that the making, maintaining or continuation of its Eurodollar Rate Loans (i) has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful) or (ii) has become impracticable, or would cause such Lender material hardship, as a result of contingencies occurring after the date of this Agreement which materially and adversely affect the London interbank market, then, and in any such event, such Lender shall be an "**Affected Lender**" and it shall on that day give notice (by telecopy or by telephone confirmed in writing) to the Borrower and the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each other Lender). Thereafter (a) the obligation of the Affected Lender to make Loans as, or to convert Loans to, Eurodollar Rate Loans, shall be suspended until such notice shall be withdrawn by the Affected Lender, (b) to the extent such determination by the Affected Lender relates to a Eurodollar Rate Loan then being

34

requested by the Borrower pursuant to the Disbursement Authorization or a Notice of Conversion/Continuation, the Affected Lender shall make such Loan as (or convert such Loan to, as the case may be) a Base Rate Loan, (c) the Affected Lender's obligation to maintain its outstanding Eurodollar Rate Loans, as the case may be (the "**Affected Loans**"), shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (d) the Affected Loans shall automatically convert into Base Rate Loans on the date of such termination. Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to a Eurodollar Rate Loan then being requested by the Borrower pursuant to a Notice of Conversion/Continuation, the Borrower shall have the option, subject to the provisions of subsection 2.7D, to rescind such Disbursement Authorization or Notice of Conversion/Continuation as to all Lenders by giving notice (by telecopy or by telephone confirmed in writing) to the Administrative Agent of such rescission on the date on which the Affected Lender gives notice of its determination as described above (which notice of rescission the Administrative Agent shall promptly transmit to each other Lender). Except as provided in the immediately preceding sentence, nothing in this subsection 2.7C shall affect the obligation of any Lender other than an Affected Lender to make or maintain Loans as, or to convert Loans to, Eurodollar Rate Loans in accordance with the terms of this Agreement.

     **D. Compensation For Breakage or Non-Commencement of Interest Periods.** The Borrower shall compensate the Administrative Agent, upon written request by that Lender (which request shall set forth the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including, without limitation, any interest paid by that Lender to the lenders of funds borrowed by it to make or carry its Eurodollar Rate Loans and any actual loss, expense or liability sustained by that Lender in connection with the liquidation or re-employment of such funds) which that Lender may sustain: (i) if for any reason (other than a default by that Lender) a borrowing of any Eurodollar Rate Loan does not occur on a date specified therefor in a Disbursement Authorization or a telephonic request for borrowing, or a conversion to or continuation of any Eurodollar Rate Loan does not occur on a date specified therefor in a Notice of Conversion/Continuation or a telephonic request for conversion or continuation, (ii) if any prepayment (including any prepayment pursuant to subsection 2.5B or assignment pursuant to Section 2.7) or conversion of any of its Eurodollar Rate Loans occurs on a date that is not the last day of an Interest Period applicable to that Loan (including, without limitation, as a result of the Transactions), (iii) if any prepayment of any of its Eurodollar Rate Loans is not made on any date specified in a notice of prepayment given by the Borrower, or (iv) as a consequence of any other default by the Borrower in the repayment of its Eurodollar Rate Loans when required by the terms of this Agreement.

     **E. Booking of Eurodollar Rate Loans.** Any Lender may make, carry or transfer Eurodollar Rate Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of that Lender.

     **F. Assumptions Concerning Funding of Eurodollar Rate Loans.** Calculation of all amounts payable to a Lender under this Section 2.7 and under subsection 2.8A shall be made as though that Lender had actually funded each of its relevant Eurodollar Rate Loans through the purchase of a Eurodollar deposit bearing interest at the rate obtained pursuant to the definition of Reserve Adjusted Eurodollar Rate in an amount equal to the amount of such Eurodollar Rate Loan and having a maturity comparable to the relevant Interest Period and, through the transfer of such Eurodollar deposit from an offshore office of that Lender to a domestic office of that Lender in the United States of America; provided, however, that each Lender may fund each of its Eurodollar Rate Loans in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable under this Section 2.7 and under subsection 2.8A.

     **G. Eurodollar Rate Loans After Default.** After the occurrence of and during the continuation of a Default or Event of Default, (i) the Borrower may not elect to have a Loan be made or maintained as,

35

or converted to, a Eurodollar Rate Loan after the expiration of any Interest Period then in effect for that Loan and (ii) subject to the provisions of subsection 2.7D, any Disbursement Authorization or Notice of Conversion/Continuation given by the Borrower with respect to a requested borrowing or conversion/continuation that has not yet occurred shall be deemed to be rescinded by the Borrower.

**2.8    Increased Costs; Taxes**.

      **A.   Increased Costs Generally**.   If any Change in Law shall: (i) impose, Modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any reserve requirement reflected in the Reserve Adjusted Eurodollar Rate); or (ii) impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Loans hereunder made by such Lender; and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Rate Loan (or of maintaining its obligations to make any such Loan) or to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount), then upon request of such Lender, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender on an after-tax basis for such additional costs incurred or reduction suffered.

      **B.   Capital Requirements**.   If any Lender determines that any Change in Law affecting such Lender or the applicable Lender Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Loan Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company on an after-tax basis for any such reduction suffered.

      **C.   Certificates for Reimbursement**.   A certificate of a Lender setting forth in reasonable detail the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection 2.8A or 2.8B and delivered to the Borrower shall be conclusive absent manifest error.   The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

      **D.   Delay in Requests**.   Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than three (3) months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the three-month period referred to above shall be extended to include the period of retroactive effect thereof).

      **E.   Taxes**.

          (i)      Payments Free of Taxes.   Subject to subsection 2.8E(v) below, any and all payments by or on account of any obligation of the Borrower hereunder or any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, provided that if the Borrower shall be required by applicable

36

**FIRST LIEN CREDIT AGREEMENT**

law to deduct any Indemnified Taxes or Other Taxes from such payments, then (a) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this subsection) the Agent or Lender receives an amount equal to the sum it would have received had no such deductions been made, (b) the Borrower shall make such deductions and (c) the Borrower shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(ii)     <u>Payment of Other Taxes by the Borrower</u>.  Without limiting the provisions of paragraph (i) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(iii)    <u>Indemnification by the Borrower</u>.  The Borrower shall indemnify the Agents and each Lender within twenty (20) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this subsection 2.8E) paid by such Agent or such Lender and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate stating the amount of such payment or liability and setting forth in reasonable detail the calculation thereof delivered to the Borrower by an Agent or a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(iv)    <u>Evidence of Payments</u>.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(v)     <u>Status of Lenders</u>.   Any Lender, if requested by the Borrower or the Administrative Agent, shall deliver documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to withholding, backup withholding or information reporting requirements.   Without limiting the generality of the foregoing, in the event that the Borrower is a resident for tax purposes in the United States of America, each Foreign Lender shall deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent), whichever of the following is applicable:  (i) duly completed copies of Internal Revenue Service Form W-8BEN, claiming eligibility for benefits of an income tax treaty to which the United States of America is a party, (ii) duly completed copies of Internal Revenue Service Form W-8ECI, (iii) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Internal Revenue Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Internal Revenue Code, (B) a "10 percent shareholder" of the Borrower within the meaning of section 881(c)(3)(B) of the Internal Revenue Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Internal Revenue Code and (y) duly completed copies of  Internal Revenue Service Form W-8BEN or (iv) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax and reasonably requested by the Borrower or the Administrative Agent duly completed together with such supplementary

37

documentation as may be prescribed by applicable law and reasonably requested by the Borrower or the Administrative Agent to permit the Borrower to determine the withholding or deduction required to be made. A Foreign Lender shall not be required to deliver any form or statement pursuant to this subsection 2.8E(v) that such Foreign Lender is not legally able to deliver.

(vi)     <u>Treatment of Certain Refunds</u>.   If the Administrative Agent or a Lender determines, in its reasonable discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to such subsection 2.8, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under such subsection 2.8 with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), <u>provided</u> that the Borrower, upon the request of such Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Agent or such Lender in the event such Agent or such Lender is required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require any Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.

**2.9     <u>Mitigation Obligations; Replacement of Lenders</u>.**

**A. <u>Designation of a Different Lender Office</u>**.   If any Lender requests compensation under subsection 2.8A or 2.8B, or requires the Borrower to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to subsection 2.8E, or any Lender becomes an Affected Lender, then such Lender shall use reasonable efforts to designate a different Lender Office for making, issuing, funding or maintaining its Loan Commitments or Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.8 in the future and, if applicable, cause such Lender to no longer be an Affected Lender and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be materially disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment; provided, however, no assignment fee or similar fee shall be due in connection with any such designation or assignment.

**B. <u>Replacement of Lenders</u>**.   If any Lender requests compensation under subsection 2.8A or 2.8B, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to subsection 2.8E, or if any Lender defaults in its obligation to fund Loans hereunder, or if any Lender has determined that it is unable to make, maintain or continue its Eurodollar Rate Loans in accordance with subsection 2.7C hereof, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 9.1), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment), provided that (i) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under subsection 2.7D) from such Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts),

**FIRST LIEN CREDIT AGREEMENT**

(ii) such Eligible Assignee is able to make, maintain or continue, as applicable, Eurodollar Rate Loans, (iii) in the case of any such assignment resulting from a claim for compensation under subsection 2.8A or 2.8B or payments required to be made pursuant to subsection 2.8E, such assignment will result in a reduction in such compensation or payments thereafter, and (iv) such assignment does not conflict with applicable law.  A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

**2.10    Releases of Collateral.**

     **A. Request for Release.**  In connection with any Permitted Collateral Asset Sale, a Special Permitted Release, Permitted Collateral Release or a transfer of Residential Units to an Unrestricted Subsidiary, the Collateral Agent or its duly authorized attorney-in-fact shall release the applicable portion of the Real Property Collateral from the Lien of the Mortgages (such portion of the Mortgaged Property, a "**Released Parcel**"); provided that all of the applicable conditions set forth in Section 6.8 have been satisfied and the Borrower shall have submitted to Collateral Agent not less than five (5) Business Days (or such shorter period as is acceptable to the Collateral Agent) prior to the date of such proposed release (which must be on a Business Day) (i) a request for release in the form of Exhibit XII attached hereto (the "**Request for Release**"), and (ii) one or more reconveyances or releases for each Released Parcel for execution by the Collateral Agent (collectively, the "**Release Instruments**") in a form appropriate for recordation in the applicable county and otherwise reasonably satisfactory to the Collateral Agent in its good faith discretion and all other documentation as the Collateral Agent reasonably requires to be delivered by the Borrower in connection with such release for each Released Parcel together with an Officer's Certificate certifying that (i) the Release Instruments are in compliance with all Applicable Laws and Governmental Authorizations, (ii) the release to be effected will not violate the terms of this Agreement and (iii) the release to be effected will not impair or otherwise adversely affect the Liens (other than the Lien that is actually being released) and other rights of the Collateral Agent under the Loan Documents not being released.  The Collateral Agent is authorized by the Lenders to enter into release and/or escrow arrangements with the Approved Escrow Company or any other third-party designated by the Collateral Agent for purposes of delivery of Release Instruments.

     **B. Release Payment Account.**  Borrower shall arrange with the Approved Escrow Company to have the Release Amount deposited directly into the Release Payment Account concurrently with each sale of a Residential Unit.  The escrow agreement governing the Release Payment Account shall provide, among other things, that the aggregate amount in the Release Payment Account (other than the accrued interest on the Release Amount which shall be payable to Borrower provided there is no Default or Event of Default then existing) be automatically wire transferred to the Administrative Agent on the last day of current Interest Period (and in no event later than 30 days following the date upon which any Release Amount is deposited into the Release Payment Account).

**SECTION 3.**
**CONDITIONS TO EFFECTIVENESS**

**3.1    Conditions to Effectiveness on the Effective Date.**

     The effectiveness of this Agreement, and the obligation of each Lender to make the extension of credit requested to be made by it is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Effective Date, of the following conditions precedent:

     **A. Organizational Documents.**  On or before the Effective Date, the Borrower shall deliver or cause to be delivered to the Administrative Agent for the Lenders the following, each, unless otherwise noted, dated the Effective Date:

39

**FIRST LIEN CREDIT AGREEMENT**

(i)      a certified copy of the organizational documents of the Borrower, together with good standing certificates from the Secretary of State of the States of Delaware and Montana, each dated a recent date prior to the Effective Date;

(ii)      incumbency certificates of the officers of the Borrower executing this Agreement and the other Loan Documents to which it is a party as of the Effective Date;

(iii)      executed originals of this Agreement and the other Loan Documents to which the Borrower is a party that are to be delivered on the Effective Date;

(iv)      certified copies of each of the other Loan Documents to which the Borrower is a party that are to be delivered on the Effective Date; and

(v)      such other documents as the Administrative Agent may reasonably request.

**B.  Consummation of Transactions**.

(i)      (a) each of the Loan Documents shall be in form and substance reasonably satisfactory to the Administrative Agent and each such Loan Document shall have been duly executed and delivered by each party thereto and shall be in full force and effect; and (b) all other conditions set forth in the Loan Documents shall have been satisfied or the fulfillment of any such conditions shall have been waived with the written consent of the Administrative Agent;

(ii)      simultaneously with funding of the Loans, the obligations of the lenders under the Existing Indebtedness shall have been repaid in full, all commitments thereunder shall have been permanently terminated and all Liens granted thereunder shall have been permanently terminated and released, and the Administrative Agent shall have received evidence thereof to its reasonable satisfaction;

(iii)      simultaneously with funding of the Loans, each of the other Transactions shall have been effected and consummated to the reasonable satisfaction of the Administrative Agent; and

(iv)      after giving effect to the Transactions and the other transactions contemplated hereby, the Borrower and its Subsidiaries shall have no outstanding Indebtedness or preferred stock other than (a) the Loans under this Agreement, and (b) the Indebtedness permitted under Section 6.1.

**C. Lender Signatures**.    The following Persons shall have executed and delivered this Agreement:

(i)      the Lenders; and

(ii)      the Agents.

**D. Necessary Consents**.    The Borrower shall have obtained all approvals and consents of Governmental Authorities and other Persons necessary or advisable in connection with the Transactions and the continued operation of the business conducted by the Borrower and its Subsidiaries, all applicable appeal periods shall have expired and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to the Administrative Agent. Such approvals and consents, if any, shall be satisfactory to Administrative Agent in its reasonable discretion and shall include, without

limitation, executed consents from any Person required in connection with the Collateral Documents or as may be required to perfect Collateral Agent's security interest in the Collateral.

**E. Perfection of Security Interests**. The Borrower shall have taken or caused to be taken such actions in such a manner directed by the Collateral Agent to create a valid and perfected First Priority security interest in the Collateral of each Loan Party in which a security interest can be granted and perfected under the UCC or other Applicable Law to the extent required by the Collateral Documents. Such actions shall include: (i) the delivery to the Collateral Agent of (a) the results of a recent search, by a Person satisfactory to the Collateral Agent, of all effective UCC financing statements and fixture filings and all judgment and tax lien filings which may have been made with respect to any personal or mixed property of any Loan Party, together with copies of all such filings disclosed by such search and (b) UCC financing statements the recordation of which has been authorized by the applicable Loan Parties as to all such Collateral granted by such Loan Parties for all jurisdictions as may be necessary or desirable to perfect Collateral Agent's security interest in such Collateral; and (ii) the delivery to the Collateral Agent of evidence reasonably satisfactory to the Collateral Agent that all other filings (including UCC termination statements and releases and filings with the PTO and the United States Copyright Office with respect to Intellectual Property of the Loan Parties), recordings and other actions the Collateral Agent deems necessary or advisable to establish, preserve and perfect the First Priority liens granted to the Collateral Agent in Collateral constituting personal (both tangible and intangible) and mixed property shall have been made. All "securities accounts" and "deposit accounts" (as such terms are defined in the UCC) of the Borrower and its Restricted Subsidiaries shall be subject to effective Control Agreements in favor of the Collateral Agent in form and substance reasonably satisfactory to the Collateral Agent, all of which have been duly executed and delivered by each party thereto and are in full force and effect.

**F. Real Property**. The Administrative Agent shall have received on or prior to the Effective Date from the Borrower and each applicable Loan Party:

(i)  <u>Mortgages</u>.  Fully executed and notarized Mortgages, together with any Modifications thereto deemed necessary by the Collateral Agent in connection with the execution and delivery of this Agreement, the other Loan Documents and the transactions contemplated hereby and thereby, in proper form for recording in the real property records of Madison County, State of Montana, encumbering the Mortgaged Property listed on <u>Schedule 3.1.F</u>, in each case in form and substance satisfactory to the Collateral Agent;

(ii)  <u>Title Insurance</u>.  ALTA extended coverage mortgagee title insurance policies (the "**<u>Mortgagee Policies</u>**") issued by the Title Company with respect to the Mortgages listed on <u>Schedule 3.1F</u>, in amounts not less than the respective amounts designated on such Schedule with respect to any particular Mortgaged Property, insuring fee simple title to each such Mortgaged Property vested in such Loan Party and insuring the Collateral Agent that the applicable Mortgages create valid and enforceable First Priority mortgage Liens on the respective Mortgaged Properties encumbered thereby, subject only to the Permitted Encumbrances, which Mortgagee Policies (1) shall include all endorsements requested by Collateral Agent, including an endorsement for mechanics' liens (or a deletion of the standard pre-printed mechanics' lien exception) and (2) shall provide for affirmative insurance and such reinsurance as the Collateral Agent may reasonably request, all of the foregoing in form and substance reasonably satisfactory to the Collateral Agent; and evidence satisfactory to the Collateral Agent that such Loan Party has (i) delivered to the Title Company all certificates and affidavits required by the Title Company in connection with the issuance of the Mortgagee Policies and (ii) paid to the Title Company or to the appropriate Governmental Authorities all expenses and premiums of the Title Company and all other sums required in connection with the issuance of the Mortgagee Policies and all

LA\1454875.12

recording and stamp taxes (including mortgage recording and intangible taxes) payable in connection with recording the Mortgages in the Madison County, Montana real property records;

(iii)   <u>Title Reports</u>.  With respect to each Mortgaged Property, a title report issued by the Title Company with respect thereto, dated a date, and in form and substance, satisfactory to the Collateral Agent and may include Permitted Encumbrances;

(iv)   <u>Surveys</u>.  A survey or plat maps with respect to the Property dated a date, and prepared by a Person and in form and substance, reasonably satisfactory to the Collateral Agent;

(v)   <u>Appraisal</u>.  One original of the Appraisal, in form and substance satisfactory to the Collateral Agent;

(vi)   <u>Entitlement Documents</u>.  Administrative Agent shall have received true, correct and complete copies of all Entitlement Documents;

(vii)   <u>Engineering Reports</u>.  Administrative Agent shall have received engineering and soils reports with respect to the Project in form and substance satisfactory to the Administrative Agent;

(viii)   <u>Copies of Documents Relating to Title Exceptions</u>.  Copies of all recorded documents listed as exceptions to title or otherwise referred to in the Mortgagee Policies or in the title reports delivered pursuant to clause (iii) above; and

(ix)   <u>Matters Relating to Flood Hazard Properties</u>.  (a) Evidence, which may be in the form of a letter from an insurance broker as to whether (1) any Mortgaged Property is a Flood Hazard Property and (2) the community in which any such Flood Hazard Property is located is participating in the National Flood Insurance Program, (b) if there are any such Flood Hazard Properties, such Loan Party's written acknowledgment of receipt of written notification from the Collateral Agent (1) as to the existence of each such Flood Hazard Property and (2) as to whether the community in which each such Flood Hazard Property is located is participating in the National Flood Insurance Program, and (c) in the event any such Flood Hazard Property is located in a community that participates in the National Flood Insurance Program, evidence that the Borrower has obtained flood insurance in respect of such Flood Hazard Property to the extent required under the applicable regulations of the Board of Governors of the Federal Reserve System.

**G. Copies of Documents for Lenders**.  If requested by any Lender or any potential Eligible Assignee in writing (with such request addressed to the Administrative Agent) prior to the Effective Date, Administrative Agent shall provide a copy of the Survey or plat maps, the title report or any other due diligence document reasonably requested by such Lender or potential Eligible Assignee.

**H. Financial Condition and Solvency Certificate**.  The Borrower shall have delivered to the Administrative Agent a certificate from Timothy L. Blixseth, substantially in the form of <u>Exhibit XI</u> attached hereto (the "**Solvency Certificate**").

**I.   Transaction Costs, Fees and Expenses**.  On or prior to the Effective Date, the Borrower shall have paid (i) to the Administrative Agent any and all fees and reasonable expenses of the Agents that are then due and owing or accrued and not yet paid under or in connection with this Agreement or any of the documents, instruments or agreements executed in connection herewith and (ii) to the appropriate Persons any and all outstanding reasonable fees and expenses (including appraisal fees and

42

the Administrative Agent's legal fees, but specifically excluding, without limitation, all title company fees (including endorsement costs) which are the responsibility of Borrower) incurred by the Agents through the Effective Date in connection with the negotiation, drafting, execution and securing of the Loan Documents, provided that such cost, fees and expenses payable by Borrower pursuant to this clause (ii) shall not exceed the amount set forth in the Engagement Letter.  On or prior to the Effective Date, the Borrower shall have delivered to the Administrative Agent a schedule, in a form satisfactory to the Administrative Agent, setting forth the Borrower's estimate of the Transaction Costs (other than fees payable to any of the Agents).

**J. Opinions of Loan Parties' Counsel**.  The Administrative Agent and its counsel shall have received the written opinions of (i) Stephen R. Brown, of Garlington, Lohn & Robinson, PLLP and (ii) McDermott, Will & Emery, counsel for the Loan Parties (a) in form and substance reasonably satisfactory to the Administrative Agent and its counsel, (b) dated as of the Effective Date, (c) addressed to each of the Agents and the Lenders, and (d) setting forth the matters reasonably requested by the Administrative Agent.

**K. Financial Information**.  On or before the Effective Date, the Administrative Agent shall have received from the Borrower such budgets and other cash flow and financial information and projections described in Section 5.3 as the Administrative Agent may reasonably request, all in form and substance reasonably satisfactory to the Administrative Agent.

**L. Evidence of Insurance**.  The Administrative Agent shall have received copies of certificates of insurance with respect to each of the insurance policies required pursuant to Section 5.6, and the Administrative Agent shall be reasonably satisfied with the nature and scope of these insurance policies.

**M. Environmental**.  The Administrative Agent shall have received one or more environmental assessment reports which, in their totality, provide a detailed environmental assessment of the entire Project, in form and substance and from an independent environmental assessment firm satisfactory to the Administrative Agent, and the Administrative Agent shall be reasonably satisfied as to the amount and nature of any environmental and employee health and safety exposures to which the Borrower and its Subsidiaries may be subject after giving effect to the Transactions, and with the plans of the Borrower or such Subsidiaries with respect thereto.

**N. No Material Adverse Effect**.  Since December 31, 2004, there shall not have occurred any event, change or condition that has had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

**O. Company Structure, Ownership, Management, Etc**.

(i)    Company Structure.  The company organizational structure of Borrower and its Subsidiaries as of the Effective Date shall be as set forth on Schedule 3.1O.

(ii)    Ownership Structure.  The ownership structure of the Borrower and as of the Effective Date shall be as set forth on Schedule 3.1O.

**P. Representations and Warranties; Performance of Agreements**.  The Borrower shall have delivered to the Administrative Agent an Officer's Certificate, in form and substance satisfactory to the Administrative Agent, to the effect that the representations and warranties in Section 4 are true and correct in all material respects on and as of the Effective Date and both before and after giving effect to the Transactions, to the same extent as though made on and as of that date and that the Borrower has

43

performed in all material respects all agreements and satisfied all conditions which this Agreement provides shall be performed or satisfied by it on or before the Effective Date.

**Q. No Litigation**. There shall be no litigation or governmental, administrative or judicial actions or proceedings, actual or threatened, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or that could reasonably be expected to restrain, prevent or impose burdensome conditions on any of the Transactions.

**R. Completion of Proceedings**. All partnership, corporate, limited liability company and other proceedings taken or to be taken in connection with the Transactions and all documents incidental thereto not previously found acceptable by the Administrative Agent and its counsel shall be satisfactory in form and substance to the Administrative Agent and such counsel, and the Administrative Agent and such counsel shall have received all such counterpart originals or certified copies of such documents as the Administrative Agent may reasonably request. Each Lender, by delivering its signature page to this Agreement, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by any Agent, Requisite Lenders or Lenders, as applicable, on or prior to the Effective Date.

**S. Money Laundering**. The Administrative Agent shall have received, sufficiently in advance of the Effective Date, all documentation and other information required by bank regulatory authorities from the Loan Parties under applicable "know your customer" and anti-money laundering rules and regulations, including the U.S.A. Patriot Act.

**T. Rating Agencies**. The Borrower shall have obtained a credit rating by S&P and by Moody's with respect to the Loans prior to the Effective Date.

**U. Additional Conditions**. The Administrative Agent shall have received before the Effective Date, in accordance with the provisions of Section 2.1, an originally executed Disbursement Authorization, signed by the chief executive officer or the chief financial officer of the Borrower or by any executive officer of the Borrower designated by any of the above-described officers on behalf of the Borrower in a writing delivered to the Administrative Agent.

**V. As of the Effective Date**:

(i)     The representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects on and as of the Effective Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date;

(ii)    No event shall have occurred and be continuing or would result from the consummation of the borrowing contemplated by such Disbursement Authorization that would constitute a Default or Event of Default, or could reasonably be expected to have a Material Adverse Effect; and

(iii)   No order, judgment or decree of any Governmental Authority shall purport to enjoin or restrain any Lender from making the Loans to be made by it on the Effective Date.

44

**FIRST LIEN CREDIT AGREEMENT**

## SECTION 4.
## REPRESENTATIONS AND WARRANTIES

In order to induce the Lenders to enter into this Agreement and to make the Loans and to induce the other Lenders to purchase participations therein, the Borrower represents and warrants to each Lender, on the date of this Agreement and on the Effective Date, that the following statements are true and correct.

**4.1     Organization and Qualification.**

The Borrower is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.  The Borrower is duly qualified and is authorized to do business and is in good standing as a foreign corporation in each state or jurisdiction listed on Schedule 4.1 hereto and in all other states and jurisdictions in which the failure of the Borrower to be so qualified could reasonably be expected to have a Material Adverse Effect.  The Borrower has no Subsidiaries other than those created after the Effective Date in accordance with Section 5.11.

**4.2     Power and Authority.**

The Borrower and the other Loan Parties are duly authorized and empowered to enter into, execute, deliver and perform this Agreement and each of the other Loan Documents to which each is a party.  The execution, delivery and performance of this Agreement and each of the other Loan Documents have been duly authorized by all necessary action.

**4.3     Legally Enforceable Agreement.**

This Agreement is, and each of the other Loan Documents when delivered under this Agreement will be, a legal, valid and binding obligation of the Borrower and its Subsidiaries signatories thereto, enforceable against each of them in accordance with the respective terms of such Loan Documents, except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws of general application affecting the enforcement of creditors' rights or general equitable principals, whether applied in law or equity.

**4.4     No Conflict.**

After giving effect to the Transactions and the execution, delivery and performance by each of the applicable Loan Parties of the Transaction Documents, the issuance, delivery and payment of the Notes and the consummation of the Transactions do not and will not (i) violate any provision of any law or any governmental rule or regulation applicable to any Loan Party, or violate or contravene the organizational certificate or any other organizational documents of any Loan Party or any order, judgment or decree of any court or other Governmental Authority binding on any Loan Party, (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any indenture, agreement, contract or instrument to which any Loan Party is a party or by which any of them or any of their property may be bound, (iii) result in or require the creation or imposition of any Lien upon any of the properties or assets of any Loan Party (other than any Liens created under any of the Loan Documents in favor of the Collateral Agent), (iv) require any approval of stockholders, partners or members or any approval or consent of any Person under any organizational certificate or other indenture, agreement, contract or instrument to which any Loan Party is a party or by which any of them or any of their property may be bound, except for such approvals or consents obtained on or before the Effective Date, or (v) give rise to any preemptive rights, rights of first refusal or other similar rights on behalf of any Person under any

45

**FIRST LIEN CREDIT AGREEMENT**

Applicable Law or any provision of the organizational documents of any Loan Party or any Material Contract to which any Loan Party is a party or by which any Loan Party is bound.

**4.5**   **Company Structure**.

As of the Effective Date, the Borrower has no Subsidiaries. Borrower has not made, or obligated itself to make, any Restricted Payment except as expressly permitted by this Agreement. The Borrower has not issued any options to purchase, or any rights or warrants to subscribe for, or any commitments or agreements to issue or sell, or any of its Capital Stock or obligations convertible into, or any powers of attorney relating to, shares of the Capital Stock of the Borrower. There are no outstanding agreements or instruments binding upon the holders of the Borrower's Capital Stock relating to the ownership of its Capital Stock. No Lender is an Affiliate of the Borrower.

**4.6**   **Special Purpose Entity**.

The Borrower is in compliance with the special purpose entity requirements of Section 5.16.

**4.7**   **Company Names**.

During the 5-year period preceding the date of this Agreement and as of the Effective Date, neither the Borrower nor any Subsidiary has been known as or used any corporate, fictitious or trade names except those listed on Schedule 4.7 hereto. Except as set forth on Schedule 4.7, neither the Borrower nor any Subsidiary has been the surviving corporation of a merger or consolidation or acquired all or substantially all of the assets of any Person.

**4.8**   **Business Locations; Agent for Process**.

As of the date hereof, the chief executive office and other places of business of the Borrower and each Subsidiary are as listed on Schedule 4.8 hereto. During the 5-year period preceding the date of this Agreement, neither the Borrower nor any Subsidiary has had an office, place of business or agent for service of process other than as listed on Schedule 4.8. Except as shown on Schedule 4.8 on the date hereof, no inventory of the Borrower or any Subsidiary is stored with a bailee, warehouseman or similar Person, nor is any inventory consigned to any Person.

**4.9**   **Title to Properties**.

**A.** The Borrower and each of its Subsidiaries has good and marketable title to and fee simple ownership of, or valid and subsisting leasehold interests in (if any), all of its Real Property Assets (including, without limitation, the Real Property Collateral), and good title to all of its personal property (except to the extent disposed of in the Ordinary Course of Business in compliance with this Agreement), including all property reflected in the financial statements referred to in Section 4.14 or delivered pursuant to Section 5.3, in each case free and clear of all Liens except for Liens permitted by this Agreement. The Borrower has paid or discharged, and has caused each Subsidiary to pay and discharge, all lawful claims which, if unpaid, could reasonably be expected to become a Lien against any properties of the Borrower or such Subsidiary that is not permitted by this Agreement, except to the extent such claim is being Properly Contested. The Liens granted to the Collateral Agent pursuant to the Collateral Documents are First Priority Liens, subject only to those Liens which are expressly permitted by the terms of this Agreement.

**B.** To Borrower's Knowledge, there are no exceptions or adverse matters affecting the Real Property Collateral that would be disclosed by a survey of the Real Property Collateral except for those matters that would not, individually or in the aggregate, have a Material Adverse Effect. A true, accurate

46

and complete depiction of the Project is set forth on the map attached hereto as <u>Exhibit VIII</u>, which Project comprises approximately 13,500 acres, and which map identifies the portions of the Project comprising the Real Property Collateral as of the Effective Date.

**C.** No Borrower Entity has received any notice of any special assessment or proceeding affecting the Project, change in the tax rate or the assessed valuation of Project or any other changes affecting the taxes, assessments or other charges with respect to the Project which could reasonably be expected to have a Material Adverse Effect.  There are no special assessment districts, or, to Borrower's Knowledge, plans for the same, or, to Borrower's Knowledge, for any other scheme that would involve the imposition of taxes other than those disclosed on <u>Schedule 4.9.C</u> relating to the Project.   To Borrower's Knowledge, there are no zoning or other land-use regulation proceedings or change or proposed change in any applicable laws, regulations or the Entitlements which could reasonably be expected to have a Material Adverse Effect.

**4.10     <u>Priority of Liens; UCC-1 Financing Statements</u>.**

As of the Effective Date, the security interests and Liens granted to Collateral Agent pursuant to the Collateral Documents in the Collateral (i) will constitute perfected security interests under the UCC, and (ii) will be superior and prior to the rights of all Persons now existing or hereafter arising, except for Permitted Encumbrances.

**4.11     <u>No Subordination</u>.**

There is no agreement, indenture, contract or instrument to which the Borrower or any of its Subsidiaries is subject or by which the Borrower or its Subsidiaries may be bound that requires the subordination in right of payment of any of Borrower's obligations under this Agreement to any other obligations of Borrower.

**4.12     <u>Permits; Franchises</u>.**

The Borrower possesses all permits, memberships, franchises, contracts and licenses required and all trademark rights, trade names, trade name rights, patents, patent rights and fictitious name rights necessary to enable Borrower to continue with the development of the Project (i) as contemplated by the Master Plan, (ii) in compliance with Applicable Laws in all material respects, and (iii) as and when necessary to achieve the Effective Date Projections.   .

**4.13     <u>Indebtedness</u>.**

The Borrower and its Subsidiaries have no Indebtedness outstanding except for Indebtedness permitted pursuant to <u>Section 6.1</u>.

**4.14     <u>Financial Condition; Pro Forma Balance Sheet; Projections</u>.**

**A. Financial Statements.**   The Borrower has heretofore delivered to the Lenders, at the Lenders' request, unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of the Borrower and its Subsidiaries for the year ending December 31, 2004, together with all supporting documentation for the foregoing reasonably requested by the Administrative Agent, which financial statements shall not be materially inconsistent with the financial statements or forecasts previously provided to the Administrative Agent.   All such statements and all financial statements delivered pursuant to <u>Section 5.3</u> were prepared in conformity with GAAP and fairly present, in all material respects, the financial position (on a consolidated basis) of the entities described in such financial statements as at the respective dates thereof and the results of operations and cash flows (on a

**FIRST LIEN CREDIT AGREEMENT**

consolidated basis) of the entities described therein for each of the periods then ended, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year-end adjustments and the absence of footnote disclosure required in accordance with GAAP. Neither the Borrower nor any of its Subsidiaries have any Contingent Obligation, contingent liability or liability for Taxes, long-term lease or unusual forward or long-term commitment that is not reflected in the financial statements referred to in the preceding clauses of this subsection, the most recent financial statements delivered pursuant to Section 5.3 or the notes thereto and which in any such case is material in relation to the business, operations, properties, assets, condition (financial or otherwise) or prospects of the Borrower and its Subsidiaries taken as a whole.

      **B. Effective Date Projections**. On and as of the Effective Date, the projections of the Borrower and its Subsidiaries for the period from the Effective Date through the Fiscal Year ending December 31, 2012 previously delivered to the Lenders (the "**Effective Date Projections**") are based on good faith estimates and assumptions made by the management of the Borrower at the time the Effective Date Projections were prepared, it being recognized, however, that projections as to future events are not to be viewed as facts and that the actual results during the period or periods covered by the Effective Date Projections may differ from the projected results and that the differences may be material. Notwithstanding the foregoing, as of the Effective Date, the management of the Borrower believed that the Effective Date Projections were reasonable and attainable.

**4.15**    **Disclosure**.

      The representations and warranties of the Borrower and its Subsidiaries contained in the Transaction Documents and the information contained in the other documents, certificates and written statements furnished to any of the Agents or the Lenders by or on behalf of the Borrower or any of its Subsidiaries for use in connection with the transactions contemplated by this Agreement or any other Transaction Document, when taken together, do not contain any untrue statement of a material fact or omit to state a material fact (known to the Borrower or the applicable Subsidiary, in the case of any document not furnished by it) necessary in order to make the statements contained herein or therein taken as a whole not misleading in light of the circumstances in which the same were made. Any projections and financial information prepared on a Pro Forma Basis and contained in such materials are based upon good faith estimates and assumptions believed by the Borrower to be reasonable at the time made, it being recognized by the Agents and the Lenders that such projections as to future events are not be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results and that the differences may be material. There is no fact known to the Borrower that has had, or could reasonably be expected to result in, a Material Adverse Effect and that has not been disclosed herein or in such other documents, certificates and statements furnished to the Lenders for use in connection with the transactions contemplated hereby.

**4.16**    **Solvent Financial Condition**.

      The Borrower and each of its Subsidiaries is now Solvent and, after giving effect to the Loans to be made hereunder and the consummation of the Transactions, the Borrower and each of its Subsidiaries will be Solvent.

**4.17**    **Surety Obligations**.

      Except as set forth on Schedule 4.17 hereto, on the date hereof, the Borrower and its Subsidiaries are not obligated as surety or indemnitor under any surety or similar bond or other contract issued or entered into any agreement to assure payment, performance or completion of performance of any undertaking or obligation of any Person.

48

LA\1454875.12

**4.18    Taxes**.

The FEIN of the Borrower is as shown on Schedule 4.18 hereto.  The Borrower and each of its Subsidiaries has filed all federal, state and other material Tax returns and other reports it is required by law to file and has paid, or made provision for the payment of, all Taxes upon it, its income and properties as and when such Taxes are due and payable, except to the extent being Properly Contested.  The provision for Taxes on the books of the Borrower and each of its Subsidiaries are adequate for all years not closed by applicable statutes, and for its current Fiscal Year.  The Borrower is not aware of any proposed material Tax assessment against any Loan Party.

**4.19    Brokers**.

There are no claims against the Borrower or amounts owing or to be owed by the Borrower for brokerage commissions, finder's fees or investment banking fees in connection with the Transactions, and the Borrower hereby indemnifies the Agents and the Lenders against, and agrees that it will hold the Agents and the Lenders harmless from, any claim, demand or liability for any such commission or broker's or finder's fees alleged to have been incurred in connection herewith or therewith and any expenses (including reasonable fees, expenses and disbursements of counsel) arising in connection with any such claim, demand or liability.

**4.20    Intellectual Property**.

The Borrower and each of its Subsidiaries owns or has the lawful right to use all Intellectual Property necessary for the present and planned future conduct of its business without, to Borrower's Knowledge, any conflict with the rights of others in any material respect; there is no objection to, or pending (or, to the Borrower's Knowledge, threatened) claim with respect to, the Borrower's or any of its Subsidiaries' right to use any such Intellectual Property and the Borrower is not aware of any grounds for challenge or objection thereto; and, except as may be disclosed on Schedule 4.20 hereto, as of the Effective Date none of the Borrower nor any of its Subsidiaries pay any royalty or other compensation to any Person for the right to use any Intellectual Property (other than with respect to off-the-shelf or prepackaged software).  All such patents, trademarks, service marks, tradenames, copyrights, licenses and other similar rights are listed on Schedule 4.20 hereto, to the extent they are registered under any Applicable Law, application for registration have been made under any Applicable Law or are otherwise material to the Borrower' business.

**4.21    Governmental Authorization**.

The Borrower and each of its Subsidiaries has, and is in good standing with respect to, all Governmental Authorization necessary to continue to conduct its business as heretofore or proposed to be conducted by it and to own or lease and operate its properties as now owned or leased by it, except where the failure to have such Governmental Authorization could not reasonably be expected to have a Material Adverse Effect.

**4.22    Compliance with Laws**.

The Borrower, each of its Subsidiaries, the Project, and the Master Plan are in compliance in all material respects with, the provisions of all Applicable Laws, and there have been no citations, notices or orders of noncompliance issued to the Borrower or any of the Subsidiaries under any such law, rule or regulation which could reasonably be expected to have a Material Adverse Effect. The Borrower and its Subsidiaries are in material compliance with all Environmental Laws applicable to it and properties owned by it.

49

**4.23**    **[Intentionally Deleted.]**

**4.24**    **Litigation**.

Except as set forth on Schedule 4.24 hereto, there are no actions, suits, proceedings or investigations pending or, to the Borrower's Knowledge, threatened on the date hereof against or affecting the Borrower or any of its Subsidiaries, or the business, operations, properties, prospects, profits or condition of the Borrower or any of its Subsidiaries, (i) which relate to any of the Loan Documents or any of the transactions contemplated thereby or (ii) which could reasonably be expected to have a Material Adverse Effect. To the Borrower's Knowledge, neither the Borrower nor any of its Subsidiaries is in default on the date hereof with respect to any order, writ, injunction, judgment, decree or rule of any court, Governmental Authority or arbitration board or tribunal.

**4.25**    **No Defaults**.

No event has occurred and, to Borrower's Knowledge, no condition exists which would, upon or after the execution and delivery of this Agreement or the Borrower's performance hereunder, constitute a Default or an Event of Default. Neither the Borrower nor any of its Subsidiaries is in default, and no event has occurred and no condition exists which constitutes or which with the passage of time or the giving of notice or both would constitute a default, under any Material Contract or in the payment of any Indebtedness of the Borrower or a Subsidiary to any Person, except for any event (or series of events) which would not be reasonably expected to result in a Material Adverse Effect.

**4.26**    **Leases**.

Schedule 4.26 hereto is a complete listing of each Capitalized Lease and Operating Lease of the Borrower and its Subsidiaries on the date hereof that constitutes a Material Contract. The Borrower and each of its Subsidiaries is in compliance, in all material respects, with all of the terms of each of its respective Capitalized Lease and Operating Leases and there is no basis upon which the lessors under any such leases could terminate same prior to the scheduled maturity or stated termination date thereof or declare the Borrower or any of its Subsidiaries in default thereunder.

**4.27**    **Employee Benefit Plans**.

**A.** Except as disclosed on Schedule 4.27 hereto, neither the Borrower nor any of its ERISA Affiliates maintains, contributes or participates in or may incur any liability under any Pension Plan as of the date hereof. The Borrower and each ERISA Affiliate are in compliance in all material respects with all applicable provisions and requirements of ERISA and the Internal Revenue Code with respect to each Pension Plan and Borrower Pension Plan, and have performed all their obligations under each Pension Plan and Borrower Pension Plan, except those where failure to perform such obligations could not reasonably be expected to result in material liability to the Borrower. With respect to each Pension Plan and Borrower Pension Plan, no material liability to the PBGC (other than required premium payments), the Internal Revenue Service, any such Pension Plan or Borrower Pension Plan or any trust established under Title IV of ERISA has been, or is expected by the Borrower or any ERISA Affiliate to be, incurred by the Borrower or any ERISA Affiliate.

**B.** No ERISA Event has occurred or could reasonably be expected to occur which has resulted or is reasonably likely to result in any material liability to the Borrower. No fact or situation that could reasonably be expected to have a Material Adverse Effect exists with respect to any Pension Plan or Borrower Pension Plan.

50

**C.**   Except as could not reasonably be expected to result in material liability to the Borrower, no Borrower nor any of its Subsidiaries maintains or contributes to any employee welfare benefit plan (as defined in Section 3(1) of ERISA) that provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employees of the Borrower or any of its Subsidiaries other than as required under Section 4980B of the Internal Revenue Code or Part 6 of Subtitle B of Title I of ERISA.

**D.**   Except as could not reasonably be expected to result in material liability to the Borrower, no Pension Plan has any "unfunded benefit liability" as defined in Section 4001(a)(18) of ERISA (but excluding from the definition of "current value" of "assets" of such Pension Plan, accrued but unpaid contributions).

**E.**   Except as could not reasonably be expected to result in material liability to the Borrower, the Borrower and each ERISA Affiliate has complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and is not in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.  Neither the Borrower nor any of its ERISA Affiliates has incurred or could reasonably be expected to incur any withdrawal liability in connection with a Multiemployer Plan.

**4.28**   **Labor Relations**.

Except as described on Schedule 4.28 hereto, neither the Borrower nor any of its Subsidiaries is a party to any collective bargaining agreement on the date hereof.  On the date hereof, there are no material grievances, disputes or controversies with any union or any other organization of the Borrower and its Subsidiaries.

**4.29**   **Not a Regulated Entity**.

No Loan Party is (i) an "investment company" or a "person directly or indirectly controlled by or acting on behalf of an investment company" within the meaning of the Investment Company Act of 1940; (ii) a "holding company," or a "subsidiary company" of a "holding company," or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company," within the meaning of the Public Utility Holding Company Act of 1935; or (iii) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any public utilities code or any other Applicable Law regarding its authority to incur Indebtedness.

**4.30**   **Margin Stock**.

Neither the Borrower nor any of its Subsidiaries is engaged, principally or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.

**4.31**   **No Material Adverse Change**.

Since December 31, 2004, no event or change has occurred that has caused or evidences or could reasonably be expected to cause, either individually or in the aggregate, a Material Adverse Effect.

**4.32**   **Environmental Matters**.

Except as disclosed on Schedule 4.32 hereto:

(i)     The Borrower, each of its Subsidiaries (including, without limitation, all operations and conditions at or in the Real Property Assets), and, to the Borrower's Knowledge, each of the tenants under any leases or occupancy agreements affecting any portion of any Real Property Assets, are in compliance with all applicable Environmental Laws (which compliance includes, but is not limited to, the possession by the Borrower, each of its Subsidiaries and each of such tenants of all permits and other Governmental Authorizations required under applicable Environmental Laws, and compliance with the terms and conditions thereof), except where failure to be in compliance could not reasonably be expected to have a Material Adverse Effect. Neither the Borrower nor any of its Subsidiaries, nor, to the Borrower's Knowledge, any tenants under any leases or occupancy agreements affecting any portion of the Real Property Assets has received any written communication, whether from a Governmental Authority, citizens group, employee or otherwise, alleging that the Borrower, any of its Subsidiaries, or any such tenant is not in such compliance, and to the Borrower's Knowledge there are no past or present actions, activities, circumstances, conditions, events or incidents that could reasonably be expected to prevent or interfere with such compliance in the future, except where failure to be in compliance in the future could not reasonably be expected to have a Material Adverse Effect.

(ii)    There is no Environmental Claim pending or, to the Borrower's Knowledge, threatened against the Borrower or any of its Subsidiaries or, to the Borrower's Knowledge, against any Person whose liability for any Environmental Claim the Borrower or any of its Subsidiaries has retained or assumed either contractually or by operation of law, in each such case which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(iii)   There are no past or present actions, activities, circumstances, conditions, events or incidents, including, without limitation, the Release or presence of any Hazardous Material, which could reasonably be expected to form the basis of any Environmental Claim against the Borrower or any of its Subsidiaries, or to the Borrower's Knowledge, against any Person whose liability for any Environmental Claim the Borrower or any of its Subsidiaries has retained or assumed either contractually or by operation of law, in each such case which could reasonably be expected to have a Material Adverse Effect.

(iv)    The Borrower and its Subsidiaries have not, and to the Borrower's Knowledge, no other Person has placed, stored, deposited, discharged, buried, dumped or disposed of Hazardous Materials on, beneath or adjacent to any property currently or formerly owned, operated or leased by the Borrower or any of its Subsidiaries, in each case, which, individually or in the aggregate, which could reasonably be expected to have a Material Adverse Effect.

(v)     No Lien in favor of any Person relating to or in connection with any Environmental Claim has been filed or has been attached to any Real Property Asset.

(vi)    Without in any way limiting the generality of the foregoing, except as would not have a Material Adverse Effect, none of the Real Property Assets contain any: underground storage tanks; asbestos; polychlorinated biphenyls ("**PCBs**"); underground injection wells; radioactive materials; or septic tanks or waste disposal pits in which process wastewater or any Hazardous Materials have been discharged or disposed.

(vii)   As disclosed on Schedule 4.32, the Phase I Environmental Site Assessment dated September 2005 (the "**Phase I**") for the Yellowstone Club identified twelve (12) sites within the Real Property Collateral where releases of petroleum products may have occurred. None of the releases are a Recognized Environmental Condition (as that term is defined in the Phase I) and

52

**FIRST LIEN CREDIT AGREEMENT**

none of the releases could reasonably be expected to have a Material Adverse Effect.  The remediation expenses, if any, related to these sites will be negligible.  None of the Entitlements, nor the development and sale of the Residential Units identified on the Remaining Units Schedule is or will be adversely effected by such releases identified in the Phase I.

**4.33**    **Material Contracts**.

There are no contracts, agreements, commitments or documents affecting any portion of the Collateral which have an aggregate value greater than (or contemplate the payment of sums which exceed) $5,000,000, excluding any Qualified Sales Agreements for the purchase of any Residential Units, except as set forth on Schedule 4.33 (as may be updated from time to time, the "**Material Contracts**"). Each Material Contract is in full force and effect and constitutes a legal, valid and binding obligation of the Borrower or its applicable Subsidiary, and, to the Borrower's Knowledge, each other party thereto. Except as set forth on Schedule 4.33, all of the Material Contracts to which a Loan Party is a party are assignable to the Lenders as contemplated by the Security Agreement.

**4.34**    **Utilities**.

Borrower is not aware of any facts or circumstances which could reasonably be expected to materially adversely effect Borrower's ability to obtain all water, sewer, gas, electric, telephone and drainage facilities and all other utilities required by law or for the use, development and operation of the Project as and when necessary to permit Borrower to achieve the Effective Date Projections.

**4.35**    **Licenses**.

The Borrower has obtained (or caused to be obtained) all material licenses, permits, approvals, easements and rights of way (and all such items are currently in full force and effect) required from any governmental or regulatory authority having jurisdiction over the Project, or from private parties, necessary for the intended use, development and operation of the Project (i) as contemplated by the Master Plan, (ii) in compliance with Applicable Laws in all material respects, (iii) as and when necessary to achieve the Effective Date Projections by their respective deadlines, and (iv) to ensure free and unimpeded vehicular and pedestrian ingress to and egress from the Project as necessary for the then current stage of the development of the Project.

**4.36**    **Entitlements**.

All of the Entitlements have been obtained and are in full force and effect.  The Entitlements permit the development and sale of no less than 864 Residential Units. The aggregate number of Residential Units permitted to be developed on the Real Property Collateral as of the Effective Date is no less than 522 as set forth on Exhibit XV attached hereto. No more than one Residential Unit is permitted to be constructed on each of the real property areas commonly referred to on the date hereof as (i) Rainbow Minor Subdivision (tract 1); (ii) Club Cabin Subdivision (tract 2); (iii) Certificate of Survey 1554 (tract 1); and (iv) Warren Miller Minor (tract 1).  All the Entitlements are vested in the Real Property Collateral, and the consummation of this transaction shall not affect the same.  There is no uncured material default or breach of any Entitlement.  No Borrower Entity is aware of any defects or potential actions, challenges, proceedings by any third party or Governmental Authority which could reasonably be expected to have a material adverse effect on any Entitlement.  No Borrower Entity has received notice of any changes to any of the Entitlements which could reasonably be expected to have a Material Adverse Effect or jeopardize the Borrower's ability to develop the Project and/or sell the Residential Units comprising the Real Property Collateral.  All of the material documents relating to the Entitlements are identified on Schedule 4.36 annexed hereto and made a part hereof (collectively, the

**FIRST LIEN CREDIT AGREEMENT**

"**Entitlement Documents**"), and there are no other material documents relating to the Entitlements other than those set forth on <u>Schedule 4.36</u>.  With respect to the Real Property Collateral, other than the Entitlements listed on <u>Schedule 4.36</u>, there are no other Entitlements necessary to permit the development and sale of the Real Property Collateral as contemplated by the Master Plan, the Financial Plan and the Effective Date Projections other than the legal subdivision and final platting of approximately 507 Residential Units.

**4.37    Loan Documents**.

    **A. Delivery of Loan Documents**.  The Borrower has delivered to the Agents complete and correct copies of each Loan Document and of all Exhibits and Schedules thereto.

    **B. Representations and Warranties**.  Except to the extent otherwise set forth herein or in the schedules hereto, each of the representations and warranties of any Loan Party made in any other Loan Document, except to the extent qualified in the schedules to such Loan Documents, was true and correct in all material respects as of the Effective Date (or as of any earlier date to which such representation and warranty specifically relates).

    ·  **C. Governmental Authorizations**.    All Governmental Authorizations and all other authorizations, approvals and consents of any other Person required by the Loan Documents or to consummate the Transactions have been obtained and are in full force and effect.

    **D. Conditions and Consummation**.  On the Effective Date, (i) all of the conditions to the effectiveness of the Transactions set forth in the Loan Documents have been duly satisfied or, with the consent of the Requisite Lenders, waived, and (ii) each of the Transactions has been consummated in all material respects in accordance with the Loan Documents and all Applicable Laws.

**SECTION 5.**
**AFFIRMATIVE COVENANTS**

    The Borrower covenants and agrees that, until payment in full of all of the Loans and other Obligations, the Borrower shall and shall cause each of its Subsidiaries to:

**5.1    Visits and Inspections**.

    Permit representatives of the Administrative Agent, (a) if no Default or Event of Default exists, twice annually but only during normal business hours and upon twenty (20) days prior notice to the Borrower or (b) if a Default or Event of Default exists, from time to time as often as may be requested, but only during normal business hours and upon reasonable prior notice to the Borrower, to visit and inspect the properties of the Borrower, conduct appraisals of the Borrower's properties, inspect, audit and make extracts from the Borrower's books and records, and discuss with its officers, its employees and its Independent Accountants, the Borrower's business, financial condition, business prospects and results of operations. The Administrative Agent shall also be entitled to contact any Governmental Authority with respect to the Project and the status of the Entitlements with reasonable advance notice to the Borrower. The Borrower shall be entitled to participate with Administrative Agent in any meeting with Governmental Authorities or the Independent Accountants concerning the Project. Representatives of the Borrower (including the Borrower's Independent Accountants) shall be authorized to accompany the Administrative Agent (or representative thereof) on any visit or inspection of the Real Property Collateral, but such authorization shall in no manner be deemed to be a requirement or condition of the Administrative Agent's visits or inspections, and to the extent any of the Borrower's representatives accompany the Administrative Agent on any visit or audit, such Persons shall in no manner hinder or

54

**FIRST LIEN CREDIT AGREEMENT**

delay the audits or inspections of the Administrative Agent.  Representatives of each Lender shall be authorized to accompany the Administrative Agent on each such visit and inspection and to participate with the Administrative Agent therein, but at their own expense, unless a Default or Event of Default exists.  Neither the Administrative Agent nor any Lender shall have any duty to make any such inspection and shall not incur any liability by reason of its failure to conduct or delay in conducting any such inspection.

**5.2**   **Notices**.

Notify the Administrative Agent and Lenders in writing, promptly after the Borrower's obtaining knowledge of the following:

(i)   the institution of, or written threat of, any action, suit, proceeding, governmental or quasi-governmental investigation or arbitration against or affecting the Borrower or its Subsidiaries and not previously disclosed, which action, suit, proceeding, governmental investigation or arbitration (a) exposes, or in the case of multiple actions, suits, proceedings, governmental investigations or arbitrations arising out of the same general allegations or circumstances expose, such Persons, in the Borrower's reasonable judgment, to liability in an amount aggregating $5,000,000 or more and is or are not covered by insurance, or (b) seeks injunctive or other relief which, if obtained, could reasonably be expected to have a Material Adverse Effect, providing such other information as may be reasonably available to enable Administrative Agent and its counsel to evaluate such matters.  The Borrower, upon request of the Administrative Agent, shall promptly give written notice of the status of any action, suit, proceeding, governmental investigation or arbitration.

(ii)   any labor dispute to which any of the Borrower or its Subsidiaries may become a party, any strikes or walkouts relating to any of its property or facilities, and the expiration of any labor contract to which it is a party or by which it is bound, in each case, which could reasonably be expected to have a Material Adverse Effect;

(iii)   any default by any of the Borrower or its Subsidiaries under, or termination of, any Material Contract or any note, indenture, loan agreement, mortgage, lease, deed, guaranty or other similar agreement relating to any Indebtedness of such Person exceeding $5,000,000;

(iv)   termination, suspension or revocation of any Entitlements (or any threat of same) which could reasonably be expected to have a Material Adverse Effect;

(v)   the existence of any (a) Default, (b) Event of Default or (c) event or change that has caused or could be reasonably expected to cause, either in any case or in the aggregate, a Material Adverse Effect;

(vi)   the occurrence of or forthcoming occurrence of any ERISA Event or the receipt by the Borrower or any ERISA Affiliate of notice from a Multiemployer Plan sponsor concerning an ERISA Event;

(vii)   any judgment against any of the Borrower or its Subsidiaries in an amount exceeding $5,000,000;

(viii)   any violation or asserted violation by any of the Borrower or its Subsidiaries of any Applicable Law (including ERISA, OSHA, FLSA, or any Environmental Laws), the adverse

55

**FIRST LIEN CREDIT AGREEMENT**

resolution of which could reasonably be expected to have a Material Adverse Effect or result in liability of the Borrower or Subsidiary in an amount in excess of $5,000,000;

(ix)     any Release on any property owned or occupied by any of the Borrower or its Subsidiaries if such Release could reasonably be expected to require remedial action to correct the presence of Hazardous Materials in, around, or under the Mortgaged Property;

(x)     the discharge of the Borrower's Independent Accountants or any withdrawal or resignation by such Independent Accountants from their acting in such capacity.  In addition, the Borrower shall give the Administrative Agent at least ten (10) Business Days' prior written notice of the Borrower's opening of any new office or place of business;

(xi)     copies of all environmental audits and reports, whether prepared by personnel of the Borrower or any of its Subsidiaries or by independent consultants, with respect to environmental matters affecting any property owned or operated by the Borrower or its Subsidiaries or which relate to any Environmental Liabilities of the Borrower or its Subsidiaries, to the extent reflecting any matters which, in any such case, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(xii)     copies of any Tax assessments; and

(xiii)     such other information and data with respect to the Borrower or any of its Subsidiaries as from time to time may be reasonably requested by the Administrative Agent or any Lender.

**5.3     Financial Statements and Other Reports.**

The Borrower will maintain, and cause each of its Subsidiaries to maintain, proper books and records including a system of accounting established and administered in accordance with sound business practices to permit preparation of financial statements in conformity with GAAP.  The Borrower will deliver to the Administrative Agent for distribution to each Lender:

(i)     [Intentionally Deleted]

(ii)     Quarterly Financials: as soon as available and in any event within seventy-five (75) days after the end of the first Fiscal Quarter and within sixty (60) days of each Fiscal Quarter thereafter (other than the fourth Fiscal Quarter of any Fiscal Year) commencing with the Fiscal Quarter ending March 31, 2006, (a) the consolidated balance sheet of the Borrower and its Subsidiaries, as at the end of such Fiscal Quarter and the related consolidated statement of income and consolidated statement of cash flows for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth, in the case of the statement of income only, in comparative form (beginning the quarter ending March 31, 2007) the corresponding figures for the corresponding periods of the previous fiscal year and the corresponding figures from the consolidated plan and financial forecast for the current Fiscal Year delivered pursuant to subsection 5.1(xvi), all prepared in accordance with GAAP and in reasonable detail and certified by the chief financial officer of the Borrower that they fairly present, in all material respects, the financial condition as at the dates indicated and the results of operations and cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments; and (b) a narrative report describing the operations of the Borrower and its Subsidiaries, if any, in each case, taken as a whole, in the form prepared for presentation

56

to senior management for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter;

(iii)    Year-End Financials:  as soon as available and in any event within one hundred eighty (180) days after the end of the Fiscal Year ending December 31, 2005, and within one hundred twenty (120) days after the end of each Fiscal Year thereafter, (a) the consolidated balance sheets of the Borrower and its Subsidiaries, as at the end of such Fiscal Year and the related consolidated statement of income and consolidated statement of cash flows for such Fiscal Year, setting forth, in the case of the statement of income only, in comparative form the corresponding figures for the previous fiscal year and the corresponding figures from the consolidated plan and financial forecast delivered pursuant to subsection 5.1(xvi) for the Fiscal Year covered by such financial statements, all prepared in accordance with GAAP and in reasonable detail and certified by the chief financial officer of the Borrower that they fairly present, in all material respects, the financial condition of the entities covered thereby as at the dates indicated and the results of their operations and their cash flows for the periods indicated; (b) a narrative report describing the operations of the Borrower and its Subsidiaries, in each case, taken as a whole, in the form prepared for presentation to senior management for such Fiscal Year; and (c) in the case of such consolidated financial statements of the Borrower and its Subsidiaries, a report thereon of Borrower's Independent Accountants, which report shall be unqualified as to going concern and scope of audit and contains no other material qualification or exception, and shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of the Borrower and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except as otherwise disclosed in such financial statements) and that the audit by such Independent Accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards;

(iv)    Officer's Certificates; Compliance Certificates:  together with each delivery of financial statements of the Borrower and its Subsidiaries pursuant to subdivisions (ii) and (iii) above, (a) an Officer's Certificate of the Borrower stating that the signer has reviewed the terms of this Agreement and has made, or caused to be made under his or her supervision, a review in reasonable detail of the transactions and condition of the Borrower and its Subsidiaries during the accounting period covered by such financial statements and that such review has not disclosed the existence during or at the end of such accounting period, and that the signer did not have knowledge of the existence as at the date of such Officer's Certificate, of any condition or event that constitutes a Default or Event of Default, or, if any such condition or event existed or exists, specifying the nature and period of existence thereof and what action the Borrower has taken, is taking and proposes to take with respect thereto; and (b) a Compliance Certificate demonstrating, in reasonable detail, compliance during and at the end of the applicable accounting periods with the restrictions contained in Section 6.6.

(v)    Reconciliation Statements:  if, as a result of any change in accounting principles and policies from those used in the preparation of the audited financial statements referred to in Section 4.13, the consolidated financial statements delivered pursuant to subdivisions (ii), (iii) or (xvi) of this Section 5.3 will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then together with each delivery of financial statements pursuant to subdivision (ii), (iii) or (xvi) of this Section 5.3 following such change, a written statement of the chief accounting officer or chief financial officer of the Borrower setting

57

forth the differences which would have resulted if such financial statements had been prepared without giving effect to such change, if reasonably requested by the Administrative Agent;

(vi)   <u>Accountants' Certification</u>:  together with each delivery of consolidated financial statements of the Borrower and its Subsidiaries pursuant to subdivision (iii) above, a written statement by the Independent Accountants giving the report thereon (a) stating that their audit has included a reading of the terms of this Agreement and the other Loan Documents as they relate to the covenants set forth in Section 6.6 and accounting matters, and (b) stating whether, in connection with their audit examination, any condition or event, insofar as such condition or event relates to the covenants set forth in Section 6.6 or accounting matters, that constitutes an Default or Event of Default has come to their attention and, if such a condition or event has come to their attention, specifying the nature and period of existence thereof; <u>provided</u> that such accountants shall not be liable by reason of any failure to obtain knowledge of any such Default or Event of Default that would not be disclosed in the course of their audit examination and <u>provided further</u> that if, in accordance with standard practice of Borrower's Independent Accountants, the foregoing statement is not available, Borrower shall deliver to Administrative Agent a statement which conforms to this requirement only to the extent available under such practice;

(vii)   <u>Accountants' Reports</u>:  promptly upon receipt thereof (unless restricted by applicable professional standards), copies of all reports submitted to the Borrower by Independent Accountants in connection with each annual, interim or special audit of the financial statements of the Borrower and its Subsidiaries made by such Independent Accountants, including, without limitation, any comment letter submitted by such Independent Accountants to management in connection with their annual audit;

(viii)   <u>Casualty</u>:  promptly upon the occurrence of any casualty involving any Real Property Asset of the Borrower or any of its Subsidiaries involving a loss that could reasonably be expected to exceed $5,000,000, written notice with sufficient detail describing the casualty and the extent to which any losses resulting from such casualty will be covered by insurance;

(ix)   <u>Appraisal Updates</u>:  together with each delivery of financial statements of the Borrower and its Subsidiaries pursuant to subdivisions (ii) and (iii) above, a Qualified Appraisal Update that provides an Appraised Value of the remaining portion of the Real Property Collateral (other than Land Under Contract) effective as of the last day of the preceding Fiscal Quarter;

(x)   <u>Events of Default, etc.</u>:  promptly upon any Responsible Officer of the Borrower obtaining knowledge (a) of any condition or event that constitutes a Default or an Event of Default, (b) that any Person has given any written notice to the Borrower or any of its Subsidiaries or taken any other action that could reasonably be expected to have an adverse effect on the Borrower or any of its Subsidiaries with respect to a claimed default or event or condition of the type referred to in Section 7.6, or (c) of the occurrence of any event or change that has caused or evidences or could be reasonably expected to cause, either in any case or in the aggregate, a Material Adverse Effect, an Officer's Certificate specifying the nature and period of existence of such condition, event or change, or specifying the written notice given or action taken by any such Person and the nature of such claimed Default, Event of Default, default, event or condition, and what action the Borrower (or applicable Subsidiaries) have taken, is taking and proposes to take with respect thereto;

(xi)   <u>Litigation or Other Proceedings</u>:  (a) promptly upon any Responsible Officer of the Borrower obtaining knowledge of (X) the institution of, or written threat of, any action, suit,

proceeding (whether administrative, judicial or otherwise), Environmental Claim, governmental investigation or arbitration against or affecting the Borrower or any of its Subsidiaries or any property of the Borrower or any of its Subsidiaries (collectively, "**Proceedings**") not previously disclosed in writing by the Borrower to the Lenders or (Y) any material development in any Proceeding that, in any case:

       (a)      could reasonably be expected to have a Material Adverse Effect; or

       (b)      seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby;

written notice thereof together with such other information as may be reasonably available to the Borrower and as the Borrower and their counsel shall reasonably determine would not jeopardize the attorney-client privilege with respect to such Proceeding, to enable the Lenders and their counsel to evaluate such matters; and (b) within forty-five (45) days after the end of each Fiscal Quarter of the Borrower, a schedule of all Proceedings involving an alleged liability of, or claims against or affecting, the Borrower or any of its Subsidiaries equal to or greater than $5,000,000 and promptly after request by the Administrative Agent such other information as may be reasonably requested by the Administrative Agent to enable the Administrative Agent and its counsel to evaluate any of such Proceedings; provided, however, that the Borrower and their counsel may withhold information if in their reasonable determination, disclosure of such information would jeopardize the attorney-client privilege with respect to such Proceeding;

       (xii)     <u>ERISA Events</u>:  promptly upon the Borrower becoming aware of the occurrence of any ERISA Event that could reasonably be expected to have a Material Adverse Effect, a written notice specifying the nature thereof, what action the Borrower or any ERISA Affiliate has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto;

       (xiii)     <u>ERISA Notices</u>:  with reasonable promptness, copies of (a) all written notices received by the Borrower or any ERISA Affiliate from a Multiemployer Plan sponsor concerning an ERISA Event; and (b) such other documents or governmental reports or filings relating to any Pension Plan or Borrower Pension Plan as the Administrative Agent shall reasonably request;

       (xiv)     <u>Financial Plans</u>:  as soon as is practicable and in any event no later than one hundred twenty (120) days after the end of each Fiscal Year, a Financial Plan in a form similar to the Financial Plan attached as Exhibit I, together with an Officer's Certificate which demonstrates that the Borrower will be in compliance with the financial covenants set forth in Section 6.6 hereof on a pro forma basis for remaining Term of the Loan based on the projections and assumptions set forth in such updated Financial Plan.

       (xv)     <u>Insurance</u>:  as soon as is practicable and in any event by the last day of each Fiscal Year, an insurance certificate in form and substance satisfactory to the Administrative Agent outlining all material insurance coverage maintained as of the date of such certificate by the Borrower and its Subsidiaries accompanied by a certificate from a Responsible Officer that the coverage described on such certificate is planned to be maintained by the Borrower and its Subsidiaries in the immediately succeeding Fiscal Year;

       (xvi)     <u>Environmental Audits and Reports</u>:  promptly following receipt thereof, copies of all environmental audits and reports, whether prepared by personnel of the Borrower or any of its

Subsidiaries or by independent consultants, with respect to environmental matters at any Real Property Asset presently owned or operated by the Borrower or its Subsidiaries or which relate to any Environmental Liabilities of the Borrower or its Subsidiaries, to the extent reflecting any matters which, in any such case, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(xvii)   <u>Material Contracts</u>:  promptly after (a) any Material Contract is terminated or expires or is renewed or is, amended or otherwise Modified in any manner, or (b) any notice or other communication is delivered by any party to any Material Contract pursuant thereto or in respect thereof relating to (x) any financial matter or other matter having adverse financial consequences to the Borrower or its Subsidiaries in excess of $5,000,000 or (y) any other non-financial matter which could reasonably be expected to have a Material Adverse Effect, notice and a copy thereof and, in the case of any such renewal, amendment, other Modification or new Material Contract, a description in reasonable detail of the material terms thereof; and

(xviii)   <u>Other Information</u>:  with reasonable promptness, such other information and data with respect to the Borrower or any of the Borrower's Subsidiaries as from time to time may be reasonably requested by the Administrative Agent or any Lenders, and such other documentation, information and certifications described in subsection 3.1T as from time to time requested by the Administrative Agent or any Lender.

**5.4   <u>Company Existence</u>.**

The Borrower will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect its organizational existence and all rights and franchises material to the business of the Borrower and its Subsidiaries (on a consolidated basis) or the Loan Parties, taken as a whole.

**5.5   <u>Payment of Taxes and Claims; Tax Consolidation</u>.**

The Borrower will, and will cause each of its Subsidiaries to, pay all taxes, assessments and other governmental charges imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any material penalty accrues thereon, and all claims (including, without limitation, claims for labor, services, materials and supplies) for sums that have become due and payable which, if unpaid, might become a Lien (other than a Permitted Encumbrance) upon any of its properties or assets; <u>provided</u> that no such tax, charge or claim need be paid if being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and if such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made therefore.

**5.6   <u>Maintenance of Properties; Insurance</u>.**

The Borrower will, and will cause each of its Subsidiaries to, maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all material properties used in the business of the Borrower and its Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof as necessary (i) for the development of the Project as contemplated by the Master Plan, (ii) to ensure the Project is in compliance with Applicable Laws in all material respects, and  (iii) as and when necessary to achieve the Effective Date Projections by their respective deadlines.  The Borrower will maintain or cause to be maintained, with financially sound and reputable insurers, insurance with respect to its properties and business and the properties and businesses of its Subsidiaries against loss or damage of the kinds and with respect to liability customarily carried or maintained under similar circumstances by corporations of established reputation engaged in