# Exhibit 2
# (Part 3 of 3)

similar businesses. Each such policy of casualty insurance covering damage to or loss of property shall name the Collateral Agent for the benefit of the Lenders as additional insured thereunder for all losses, subject to application of proceeds as required by subsection 2.5C, regarding real or personal property in which the Lenders have a security interest, and all such policies of insurance shall provide for at least thirty (30) days' prior written notice to the Collateral Agent of any Modification or cancellation of such policy (ten (10) days' prior written notice in the case of nonpayment or nonrenewal).

**5.7    Lender Meeting.**

The Borrower will, upon the request of the Administrative Agent, participate in a meeting of the Administrative Agent and the Lenders at least once during each Fiscal Year (and will participate in such other meetings at such other times as the Borrower and the Administrative Agent may agree) to be held telephonically or, at Borrower's election, at the Borrower's corporate offices (or such other location as may be agreed to by the Borrower and the Administrative Agent) at such time as may be agreed to by the Borrower and the Administrative Agent.

**5.8    Compliance with Laws, etc.**

The Borrower shall, and shall cause each of its Subsidiaries to, comply with the requirements of all Applicable Laws, noncompliance with which, individually or in the aggregate with other non-compliances, could reasonably be expected to cause a Material Adverse Effect.

**5.9    Environmental Disclosure and Inspection.**

**A.** The Borrower shall, and shall cause each of its Subsidiaries to, exercise all due diligence in order to comply and cause (i) all tenants or subtenants under any leases or occupancy agreements affecting the Real Property Assets, (ii) all contractors, engineers, architects and similar vendors and contractors, and (iii) all other Persons on or occupying the Real Property Assets, to comply with all Environmental Laws, except for any such noncompliance which could not reasonably be expected to cause a Material Adverse Effect.

**B.** The Borrower agrees that the Administrative Agent may, from time to time, retain, at the Borrower' expense, an independent professional consultant reasonably acceptable to the Borrower to review any report relating to Hazardous Materials prepared by or for the Borrower and to conduct their own investigation (the scope of which investigation shall be reasonable based upon the circumstances) of any Real Property Asset currently owned, leased, operated or used by the Borrower or any of its Subsidiaries, if (x) a Default or an Event of Default shall have occurred and be continuing, or (y) the Administrative Agent reasonably believes (1) that an occurrence relating to such Real Property Asset is likely to give rise to an Environmental Liability or (2) that a violation of an Environmental Law on or around such Real Property Asset has occurred or is likely to occur, which could, in either such case, reasonably be expected to result in a Material Adverse Effect. The Borrower shall use its reasonable efforts to obtain for the Administrative Agent and its agents, employees, consultants and contractors the right, upon reasonable notice to the Borrower, to enter into or on to the Real Property Assets currently owned, leased, operated or used by the Borrower or any of its Subsidiaries to perform such tests on such property as are reasonably necessary to conduct such a review and/or investigation. Any such investigation of any Real Property Asset shall be conducted, unless otherwise agreed to by the Borrower and the Administrative Agent, during normal business hours and, shall be conducted so as not to unreasonably interfere with the ongoing operations at any such Real Property Asset or to cause any damage or loss to any property at such Real Property Asset. The Borrower and the Administrative Agent hereby acknowledge and agree that any report of any investigation conducted at the request of the Administrative Agent pursuant to this subsection 5.9B will be obtained and shall be used by the

61

Administrative Agent and the Lenders for the purposes of the Lenders' internal credit decisions, to monitor and police the Loans and to protect the Lenders' security interests, if any, created by the Loan Documents, and the Administrative Agent and the Lenders hereby acknowledge and agree any such report will be kept confidential by them to the extent permitted by law except as provided in the following sentence. The Administrative Agent agrees to deliver a copy of any such report to the Borrower with the understanding that the Borrower acknowledge and agree that (i) they will indemnify and hold harmless the Administrative Agent and each Lender from any costs, losses or liabilities relating to the Borrower's use of or reliance on such report, (ii) neither Agent nor any Lender makes any representation or warranty with respect to such report, and (iii) by delivering such report to the Borrower, neither the Administrative Agent nor any Lender is requiring or recommending the implementation of any suggestions or recommendations contained in such report.

C. The Borrower shall promptly notify the Administrative Agent of (i) any proposed acquisition of stock, assets, or property by the Borrower or any of its Subsidiaries that could reasonably be expected to expose the Borrower or any of its Subsidiaries to, or result in, Environmental Liability that could reasonably be expected to have a Material Adverse Effect and (ii) any proposed action to be taken by the Borrower or any of its Subsidiaries to commence manufacturing, industrial or other similar operations that could reasonably be expected to subject the Borrower or any of its Subsidiaries to additional Environmental Laws, that are materially different from the Environmental Laws applicable to the operations of the Borrower and its Subsidiaries as of the Effective Date.

D. The Borrower shall, at their own expense, provide copies of such documents or information as the Administrative Agent may reasonably request in relation to any matters disclosed pursuant to this Section 5.9.

## 5.10 The Borrower's Remedial Action Regarding Hazardous Materials.

The Borrower shall promptly take, and shall cause each of its Subsidiaries promptly to take, any and all necessary remedial action in connection with the presence, handling, storage, use, disposal, transportation or Release or threatened Release of any Hazardous Materials on, under or affecting any Real Property Asset in order to comply in all material respects with all applicable Environmental Laws and Governmental Authorizations. In the event the Borrower or any of its Subsidiaries undertakes any Cleanup action with respect to the presence, Release or threatened Release of any Hazardous Materials on or affecting any Real Property Asset, the Borrower or such Subsidiary shall conduct and complete such Cleanup action in material compliance with all applicable Environmental Laws, and in accordance with the policies, orders and directives of all federal, state and local governmental authorities except when, and only to the extent that, the Borrower's or such Subsidiary's liability for such presence, handling, storage, use, disposal, transportation or Release or threatened Release of any Hazardous Materials is being Properly Contested.

## 5.11 Unrestricted Subsidiaries; Additional Collateral; Future Subsidiaries

A. Unrestricted Subsidiaries. In the event that Borrower forms an Unrestricted Subsidiary after the Effective Date or if any Person becomes an Unrestricted Subsidiary of the Borrower after the Effective Date, the Borrower will promptly notify the Administrative Agent of that fact prior to the Unrestricted Subsidiary being formed (or, if applicable, being acquired). Any Unrestricted Subsidiaries shall not be guarantors of the Loans; provided, however, that if any Residential Units are transferred to an Unrestricted Subsidiary pursuant to the terms of this Agreement, concurrently with such transfer (or prior to such transfer) the Borrower shall pledge (if they are the direct owner of Capital Stock of such Unrestricted Subsidiary) or shall cause its applicable Subsidiaries to pledge all of the Capital Stock of all Unrestricted Subsidiaries to the Collateral Agent pursuant to a Pledge Agreement, and the Borrower shall

62

take all such further action and execute all such further documents and instruments as may be required or advisable to grant and perfect in favor of the Collateral Agent, for the benefit of the Lenders, a First Priority security interest in the Capital Stock of each Unrestricted Subsidiary. The Borrower agrees, and shall cause each of its Unrestricted Subsidiaries, to ensure that all transactions undertaken by such Unrestricted Subsidiaries will be based on good faith business reasons. The Borrower covenants and agrees that the net proceeds from the sale of any Capital Stock of any Unrestricted Subsidiary pledged to the Collateral Agent as required under this Section 5.11A will be distributed to the holders of the Capital Stock of such Unrestricted Subsidiaries promptly upon receipt. Concurrently with any sale of the Capital Stock of a Subsidiary (Unrestricted or Restricted) pledged to the Collateral Agent, the Collateral Agent shall release its security interest in such Capital Stock, provided that Timothy L. Blixseth, Borrower, the managing member or the board of directors of such Subsidiary shall have submitted to Collateral Agent not less than five (5) Business Days (or such shorter period as is acceptable to the Collateral Agent) prior to the date of such proposed release (which must be on a Business Day) a request, in a form reasonably acceptable to Collateral Agent in its good faith discretion, for a release of such security interest which request shall include a certification that the sale of the Capital Stock will be for fair market value and that the proceeds shall be distributed to the holder(s) of the Capital Stock of such Subsidiary.

**B.**  Additional Collateral.  In the event that the Borrower or any Restricted Subsidiary acquires any property (other than property that is acquired using new Permitted Equipment Financing pursuant to Section 6.1A(ii) hereof and remains subject to such Permitted Equipment Financing) after the Effective Date as to which the Collateral Agent, for the benefit of the Lenders, does not have a perfected Lien, the Borrower will promptly (i) notify the Administrative Agent of that fact, (ii) execute and deliver (or cause to be executed and delivered) to the Administrative Agent, such amendments to the Security Agreement and/or each other applicable Collateral Document, and take all such further action and execute all such further documents and instruments as Agents may deem reasonably necessary or advisable to grant and perfect in favor of the Collateral Agent, for the benefit of the Lenders, a First Priority security interest in: (a) any such personal property assets; (b) any such owned Real Property Assets and any development agreement and Entitlements related thereto; and (c) any such leasehold interests, the fair market value of which exceeds, individually or in the aggregate, $1,000,000, as reasonably determined by the Administrative Agent.  The Borrower shall deliver to the Administrative Agent, together with such Loan Documents, a favorable opinion of counsel to the Borrower that is reasonably satisfactory to the Administrative Agent and its counsel, as to (a) the due organization and good standing of such Borrower Entity, (b) the due authorization, execution and delivery by such Borrower Entity of such Collateral Documents to which it is a party, (c) the enforceability of such Collateral Documents against such Borrower Entity, (d) the validity and perfection of the security interests granted by such Borrower Entity in favor of the Collateral Agent pursuant to the Collateral Documents and (e) such other matters as any Agent may reasonably request, all of the foregoing to be reasonably satisfactory in form and substance to the Administrative Agent, the Collateral Agent and their counsel.  If requested by the Collateral Agent, with respect to each Real Property Asset that becomes subject to a Mortgage pursuant to this subsection 5.11B or subsection 5.11C, the Borrower shall provide the Collateral Agent with (i) Mortgagee Policies of the type described in subsection 3.1F(ii) covering such Real Property Collateral in an amount at least equal to the purchase price of such Real Property Collateral (or such other amount as shall be reasonably specified by the Collateral Agent), (ii) environmental reports of the type described in subsection 3.1M with respect to such Real Property Collateral dated a date, and in form and substance reasonably satisfactory to the Collateral Agent, and (iii) any consents or estoppels reasonably deemed necessary or advisable by the Collateral Agent in connection with the Mortgages relating to such Real Property Collateral, in form and substance reasonably satisfactory to the Collateral Agent.

**C.**  Restricted Subsidiaries.  In the event that Borrower forms a Restricted Subsidiary after the Effective Date or if any Person becomes a Restricted Subsidiary of the Borrower after the Effective Date, the Borrower will promptly notify the Administrative Agent of that fact and, cause such Restricted Subsidiary on or prior to the time it becomes a Subsidiary to execute and deliver to the Administrative

63

Agent a Guaranty, a Pledge Agreement and supplement to the Security Agreement in form and substance satisfactory to the Collateral Agent, and to take all such further action and execute all such further documents and instruments as Agents may deem reasonably necessary or advisable to grant and perfect in favor of the Collateral Agent, for the benefit of the Lenders, a First Priority Lien in all of the: (a) personal property assets of such Restricted Subsidiary; (b) Real Property Assets owned by such Restricted Subsidiary; and (c) leasehold interests of such Restricted Subsidiary, the fair market value of which exceeds, individually or in the aggregate, $1,000,000, as reasonably determined by the Administrative Agent.  In addition, the Borrower shall pledge (if they are the direct owner of Capital Stock of such Restricted Subsidiary) or shall cause its applicable Subsidiaries to pledge (if any of such other Subsidiaries is the direct owner of Capital Stock of such Restricted Subsidiary, each such owner, whether the Borrower or any of its other Subsidiaries, the "**Pledging Parent**") all of the Capital Stock of such Pledging Parent's Subsidiary to the Collateral Agent pursuant to the applicable Collateral Documents and to take all such further action and execute all such further documents and instruments as may be required or advisable to grant and perfect in favor of the Collateral Agent, for the benefit of the Lenders, a First Priority security interest in such Capital Stock.  The Borrower shall deliver to the Administrative Agent, together with such Loan Documents, in the case of each such Restricted Subsidiary that is required to be a party to any Loan Document: (i) (a) certified copies of such Restricted Subsidiary's Organizational Certificate together, if applicable, with a good standing certificate from the Secretary of State of the jurisdiction of its incorporation, formation or organization, as applicable, each to be dated a recent date prior to their delivery to the Administrative Agent, (b) a copy of such Restricted Subsidiary's Organizational Documents, certified by its secretary or an assistant corporate secretary (or Person holding an equivalent title or having equivalent duties and responsibilities) as of a recent date prior to their delivery to the Administrative Agent, (c) a certificate executed by the secretary or an assistant secretary (or other duly authorized Person holding an equivalent title or having equivalent duties and responsibilities) of such Restricted Subsidiary as to (x) the incumbency and signatures of the officers of such Restricted Subsidiary executing the Pledge Agreement, Guaranty, supplement to the Security Agreement, the Collateral Documents and the other Loan Documents to which such Restricted Subsidiary is a party and (y) the fact that the attached Organizational Authorizations of such Restricted Subsidiary authorizing the execution, delivery and performance of such Guaranty, Pledge Agreement, Security Agreement supplement, such Collateral Documents and such other Loan Documents are in full force and effect and have not been Modified or rescinded and (ii) if required by the Collateral Agent, a favorable opinion of counsel to such Restricted Subsidiary, that is reasonably satisfactory to the Administrative Agent and its counsel, as to (a) the due organization and good standing of such Restricted Subsidiary, (b) the due authorization, execution and delivery by such Restricted Subsidiary of such Guaranty, Pledge Agreement, Security Agreement supplement, the Collateral Documents and any other Loan Documents to which it is a party and (c) the enforceability of such Guaranty, Pledge Agreement, Security Agreement supplement and such Collateral Documents against such Restricted Subsidiary, (d) the validity and perfection of the security interests granted by such Restricted Subsidiary (and by the Pledging Parent of such Restricted Subsidiary in respect of the Capital Stock of such Restricted Subsidiary) in favor of the Collateral Agent pursuant to the Collateral Documents and (e) such other matters as Agent may reasonably request, all of the foregoing to be reasonably satisfactory in form and substance to the Administrative Agent, the Collateral Agent and their counsel. In addition, the Borrower shall promptly deliver a supplement to Schedule 4.1 to the Administrative Agent if any Subsidiary is created or acquired.

**5.12**    **[Intentionally Deleted]**.

**5.13**    **Further Assurances**.

At any time or from time to time upon the request of the Administrative Agent or the Collateral Agent, the Borrower will, at its expense, and will cause each of its Subsidiaries, at the Borrower's expense, to promptly execute, acknowledge and deliver such further documents and do such other acts

64

**FIRST LIEN CREDIT AGREEMENT**

and things as the Administrative Agent or the Collateral Agent may reasonably request only to the extent such acts or things are consistent with the express intent and purpose of the Loan Documents. In furtherance and not in limitation of the foregoing, the Borrower shall take, and cause each of its Subsidiaries to take, such actions as the Administrative Agent or the Collateral Agent may reasonably request from time to time (including, without limitation, the execution and delivery of guaranties, security agreements, pledge agreements, mortgages, deeds of trust, landlord's consents and estoppels, stock powers, financing statements and other documents, the filing or recording of any of the foregoing, title insurance with respect to any of the foregoing that relates to an interest in real property, and the delivery of stock certificates and other collateral with respect to which perfection is obtained by possession) to ensure that the Obligations are guaranteed by the Subsidiaries and are secured by substantially all of the assets (other than those assets specifically excluded by the terms of the Loan Documents) of the Borrower and its Subsidiaries.

**5.14**    **Title.**

The Borrower shall warrant and defend (a) its title to the Real Property Collateral and every part thereof, subject only to Liens permitted hereunder (including Permitted Encumbrances) and (b) the validity and priority of the Liens of the applicable Collateral Documents, subject only to Liens permitted hereunder (including Permitted Encumbrances), in each case against the claims of all Persons whomsoever. Without limiting the foregoing, the Borrower covenants and agrees that the Administrative Agent shall at all times have a First Priority Lien on the Real Property Collateral. The Borrower shall reimburse the Administrative Agent for any losses, costs, damages or expenses (including reasonable attorneys' fees and court costs) incurred by the Administrative Agent if an interest in the Real Property Collateral, other than as permitted hereunder, is claimed by another Person.

**5.15**    **Estoppels.**

The Borrower will at any time and from time to time, within ten (10) days after written demand by Administrative Agent, deliver to Administrative Agent a certificate duly executed, and in form satisfactory to Administrative Agent, stating and acknowledging the then outstanding principal balance of the Loans and the fact that, to Borrower's knowledge, there are no defenses, offsets or counterclaims (or, if such should not be the fact, then the facts and circumstances relating to such defenses, offsets or counterclaims) and such other information as may reasonably be requested by Administrative Agent.

**5.16**    **Scope of Operations.**

Each Loan Party (other than Unrestricted Subsidiaries):

(i)    [intentionally deleted];

(ii)    Except to the extent permitted by this Agreement, has not made and will not make loans to any Person or hold evidence of Indebtedness issued by any other Person or entity;

(iii)    Except to the extent permitted by this Agreement, shall not acquire obligations or securities of its Affiliates or any constituent party of Borrower or its Subsidiary;

(iv)    Are and will remain solvent and will pay its debts and liabilities from its assets as the same shall become due;

(v)    Has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, and will not materially amend, Modify or

65

otherwise change its articles of organization or operating agreement or other organizational documents in any manner which could reasonably be expected to be adverse to the interests of the Lenders, and in connection with any non-material amendment of any such articles of organization or operating agreement or other organizational documents, shall forward a copy of such amendment to the Administrative Agent promptly after the execution or filing thereof;

(vi)     Will maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliates and any constituent party and will file its own tax returns except to the extent that (A) a consolidated tax return is permitted by Applicable Law or (B) a tax return is not required by Applicable Law;

(vii)     Will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any other Borrower Entity and any Affiliate of any Borrower Entity), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, and shall not identify itself or any of its Affiliates as a division or part of the other;

(viii)     Will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(ix)     Will not, and will not permit and the Borrower or any Restricted Subsidiary that holds any Collateral to seek the dissolution, winding up, liquidation, consolidation or merger in whole or in party, of such entity unless;

(x)     Will not commingle its funds and other assets with those of any Affiliate or constituent party, or any Affiliate of any constituent party, or any other Person;

(xi)     Has and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or constituent party, or any Affiliate of any constituent party, or any other Person; and

(xii)     Does not and will not hold itself out to be responsible for the debts or obligations of any other Person (except for the Loans).

## 5.17   Maintenance of Entitlements.

The Borrower shall warrant and defend, and otherwise maintain, all of the Entitlements obtained by any Borrower Entity in connection with the Project as necessary (i) for the development of the Project as intended and as contemplated by the Master Plan, (ii) to ensure the Project is in compliance with Applicable Laws, and  (iii) to enable Borrower to achieve the Effective Date Projections.  To the extent any Entitlements require any obligations or conditions to be fulfilled by the Borrower or any of its Subsidiaries, the Borrower will perform (or caused to be performed) such obligations or conditions.

## 5.18   Asset Sales.

The Borrower covenants and agrees that the Real Property Collateral shall only be sold as Residential Units pursuant to a Permitted Collateral Asset Sale.  No Real Property Collateral will be sold in bulk that has not been previously subdivided into individual Residential Units as contemplated by the Master Plan.

66

**FIRST LIEN CREDIT AGREEMENT**

**5.19    Control**.

The Permitted Holder shall at all times directly or indirectly Control the Borrower and own, directly or indirectly, fifty-one percent (51%) of the beneficial interests in the Borrower; subject only to the death or legal incapacity of the Permitted Holder.

**5.20    Credit Rating**.

The Borrower shall use its commercially reasonable efforts to cause a credit rating by S&P and by Moody's to be received with respect to the Loans prior to the Effective Date of this Credit Agreement.

**5.21    Operating Account**.

The Borrower covenants and agrees that all Cash From Land Sales and Cash from operations not applied to prepay the Loans as required by subsection 2.5B(ii)(d) and not used for Land Expenses in accordance with the Financial Plan shall be deposited into and maintained in the Operating Account. The Borrower shall establish the Operating Account prior to entering into this Agreement. The Borrower shall have the right to use the Cash in the Operating Account for costs and expenses (including, without limitation, Land Expenses) incurred in the Ordinary Course of Business of the Borrower relating to the development of the Yellowstone Development or as otherwise expressly permitted under this Agreement. The Borrower shall grant the Administrative Agent (on behalf of the Lenders) a continuing First Priority Lien on the Operating Account pursuant to the Security Agreement and a Control Agreement. Any other "securities accounts" and "deposit accounts" (as such terms are defined in the UCC) of the Borrower and its Restricted Subsidiaries in place on or after the Effective Date shall be subject to effective Control Agreements in favor of the Collateral Agent in form and substance reasonably satisfactory to the Collateral Agent.

**SECTION 6.**
**NEGATIVE COVENANTS**

The Borrower covenants and agrees that, until payment in full of all of the Loans and other Obligations, the Borrower shall perform, and shall cause each of its Restricted Subsidiaries to perform, all covenants in this Section 6.

**6.1    Indebtedness**.

A.  The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness or preferred stock, except that the Borrower and its Restricted Subsidiaries may create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to Indebtedness or preferred stock, as follows:

(i)    Each of the Loan Parties may become and remain liable with respect to its respective Obligations in accordance with the terms of this Agreement and the Loan Documents;

(ii)    The Borrower and its Restricted Subsidiaries may incur (a) new Permitted Equipment Financing and new Indebtedness under Capital Leases (capitalized on the consolidated balance sheet of the Borrower), incurred in the Ordinary Course of Business of the Borrower in the aggregate amount of Thirty Million ($30,000,000), plus (b) each of the applicable Loan Parties may remain liable for the Existing Equipment Financing or any Refinancing or reallocation of the Existing Equipment Financing; provided, however, that any

67

**FIRST LIEN CREDIT AGREEMENT**

such Refinancing or reallocation must not do any of the following, as determined in good faith by the Administrative Agent:  (i) increase the aggregate principal amount of such Indebtedness beyond the balance of the Existing Equipment Financing as of the Effective Date; (ii) result in any Indebtedness that does not qualify as Permitted Equipment Financing or Capital Leases, (iii) increase the amount or type of recourse liability to the Borrower or any of its Restricted Subsidiaries; or (iv) otherwise contain terms not reflective of an arm's length, market transaction;

(iii)    The Borrower and its Restricted Subsidiaries may become and remain liable with respect to trade payables incurred in the Ordinary Course of Business of the Borrower or its Restricted Subsidiaries;

(iv)    Each of the Borrower and any Restricted Subsidiary may become and remain liable with respect to Indebtedness to any other Borrower or Restricted Subsidiary; provided that, in each case, (a) no Default or Event of Default has occurred and is continuing as the time of the incurrence thereof or would result therefrom, (b) all such intercompany Indebtedness shall be evidenced by promissory notes which shall have been pledged to the Collateral Agent pursuant to the Collateral Documents, (c) all such intercompany Indebtedness owed by the Borrower to any of its Restricted Subsidiaries shall be unsecured and subordinated in right of payment to the payment in full of the Obligations pursuant to the terms of the applicable promissory notes or an intercompany subordination agreement that in any such case, are reasonably satisfactory to the Administrative Agent, and (d) any payment by any Restricted Subsidiary of the Borrower under any guaranty or any payment by the Borrower of the Obligations shall result in a pro tanto reduction of the amount of any intercompany Indebtedness owed by the Borrower or by such Restricted Subsidiary to the Borrower or to any of its Restricted Subsidiaries for whose benefit such payment is made;

(v)    The Borrower and its Restricted Subsidiaries may become and remain liable with respect to Indebtedness under performance, surety, appeal or indemnity bonds required by Governmental Authorities in connections with the development of the Project, in each case incurred in the Ordinary Course Of Business;

(vi)    The Borrower and its Restricted Subsidiaries may become and remain liable with respect to Indebtedness under the Hedge Agreements;

(vii)    The Borrower may incur Permitted Construction Financing;

(viii)    The Borrower may remain liable with respect to the Other Permitted Existing Indebtedness; and

(ix)    The Borrower and its Subsidiaries may incur liability for the Existing Membership Deposits and any future membership deposits received.

## 6.2    Liens and Related Matters.

A. Prohibition on Liens. The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of the Borrower or any of its Restricted Subsidiaries (or a Lien on the Capital Stock of Borrower or its Restricted Subsidiaries), whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement, or other similar notice of any Lien with respect to any such property, asset, income or profits under the

FIRST LIEN CREDIT AGREEMENT

Uniform Commercial Code of any state or under any similar recording or notice statute, except (solely with respect to the Borrower and its Restricted Subsidiaries),

        (i)    any Permitted Encumbrances; provided, however, that (i) with respect to the Real Property Collateral no Permitted Encumbrances except the Permitted Title Exceptions shall be senior or prior to the First Priority liens under the Mortgages; and (ii) no such Permitted Encumbrances shall result in a Lien on the Capital Stock of the Borrower or its Restricted Subsidiaries; and

        (ii)    Liens in favor of the Collateral Agent granted pursuant to the Collateral Documents or granted in favor of any Agent or Lender pursuant to the terms of this Agreement.

**B. No Further Negative Pledges**. Except with respect to specific property encumbered to secure payment of particular Indebtedness permitted by this Agreement or to be sold pursuant to an Asset Sale otherwise permitted by this Agreement, neither the Borrower nor any of its Restricted Subsidiaries shall enter into any agreement (other than the Loan Documents) prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired.

**C. No Restrictions on Distributions, etc.** Except as otherwise provided in the Loan Documents, the Borrower will not, and will not permit any of its Restricted Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance, limitation or restriction of any kind on the ability of any Restricted Subsidiary of the Borrower to (i) pay dividends or make any other distributions on any of such Restricted Subsidiary's Capital Stock owned by the Borrower or any other Subsidiary of the Borrower, (ii) repay or prepay any Indebtedness owed by such Restricted Subsidiary or any other Subsidiary of the Borrower, (iii) make loans or advances to the Borrower or any other Restricted Subsidiary, or (iv) transfer any of its property or assets to the Borrower or any other Restricted Subsidiary.

## 6.3    <u>Investments.</u>

The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, make or own any Investments, except (i) the Borrower and its Restricted Subsidiaries may make Investments in Cash Equivalents and (ii) the Borrower may form and invest the remaining portion of the Permitted Investment Amount during the Term of the Loan in Unrestricted Subsidiaries.

## 6.4    <u>Contingent Obligations</u>.

The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, create or become or remain liable with respect to any Contingent Obligation, except:

        (i)    The Borrower and its Restricted Subsidiaries may become and remain liable with respect to Contingent Obligations in respect of customary indemnification and purchase price adjustment obligations of any such Person incurred in connection with Asset Sales permitted by this Agreement; and

        (ii)    The Borrower and its Restricted Subsidiaries may become and remain liable with respect to Contingent Obligations in respect of any of the Indebtedness, that if outstanding, would be permitted under Section 6.1.

**6.5**     **Restricted Payments**.

The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, declare, order, pay, make or set apart any sum for any Restricted Payment; provided that so long as no Default or Event of Default has occurred and is continuing or would result therefrom, the Borrower and its Restricted Subsidiaries may:

(i)     Make Restricted Payments to the holders of the Capital Stock of the Borrower in an aggregate amount not to exceed the Restricted Payment Amount (less any portion of the Restricted Payment Amount used for Investments permitted under Section 6.3(ii)); provided, that no Restricted Payment shall be permitted pursuant to this clause (i) unless the First Lien Debt LTV Ratio for the most recent Fiscal Quarter prior to the date of such Restricted Payment for which financial statements have been delivered as required by subsection 5.3(ii) and (iii) shall be less than thirty percent (30%);

(ii)     Make Restricted Payments to the holders of the Capital Stock of the Borrower for the purposes of permitting such holders to pay all federal, state and local income tax obligations with respect to income allocated to them from the Borrower and its Subsidiaries; provided the amount of such Restricted Payments made in any Fiscal Year shall not exceed the combined actual amount of such federal, state and local income tax obligations of such holders resulting from income allocated to them from the Borrower; and

(iii)     Make distributions or loans to the holders of the Capital Stock of the Borrower aggregating no more $209,000,000 of the aggregate proceeds of the Loans, which amount may be distributed in one or more payments prior to the Maturity Date.

**6.6**     **Financial Covenants**.

**A. First Lien Debt LTV Ratio.**  The ratio of (i) the principal amount of the Obligations as of the Calculation Date, to (ii) the Appraised Value of the then remaining Real Property Collateral as of the Calculation Date shall not exceed forty-five percent (45%) (the "**First Lien Debt LTV Ratio**").

**B. Interest Coverage Ratio.**  The ratio of (i) EBITDA for the four-Fiscal Quarter period ending on the Calculation Date, to (ii) Consolidated Interest Expense for such four–Fiscal Quarter period shall not be less than 2.00 to 1.00 (the "**Interest Coverage Ratio**").

**6.7**     **Restriction on Fundamental Changes**.

Neither the Borrower nor any of its Restricted Subsidiaries shall, without the prior written consent of the Requisite Lenders in their sole and absolute discretion, directly or indirectly, enter into any merger, consolidation, reorganization or recapitalization, liquidate, wind up or dissolve, or cause or consent to either the Borrower or any Restricted Subsidiary to enter into any merger, consolidation, reorganization or recapitalization, liquidate, wind up or dissolve.

**6.8**     **Asset Sales**.

Without the prior written consent of the Requisite Lenders, the Borrower shall not, and shall not permit any of its Restricted Subsidiaries to engage in any Asset Sales, except as follows:

(i)     With respect to Real Property Collateral, a Permitted Collateral Asset Sale, provided that each of the following conditions has been satisfied:

70

FIRST LIEN CREDIT AGREEMENT

(a)    no Default or Event of Default shall have occurred and be continuing (other than a Default or Event of Default that will be cured through the consummation of the proposed Asset Sale);

(b)    such Asset Sale is consummated in accordance with the terms of a Qualified Sales Agreement;

(c)    any and all mandatory prepayments of the Loans required to be made through the date of the proposed Asset Sale have been made, and all mandatory prepayments resulting from such Asset Sale will be made in accordance with subsection 2.5B(ii)(d);

(d)    the Real Property Collateral subject to such Asset Sale, and the remaining Real Property Collateral after giving effect to such Asset Sale shall constitute a legal subdivision in accordance with all Applicable Laws and Governmental Authorizations; and

(e)    If required by the Collateral Agent, the Collateral Agent shall have received such title endorsements, date downs or other evidence reasonably satisfactory to Collateral Agent that (i) the priority of the liens evidenced by the Mortgages with respect to the remaining Real Property Collateral after giving effect to such Asset Sale shall be maintained following such Asset Sale, and (ii) the remaining Real Property Collateral is not subject to any Liens other than Permitted Encumbrances and Liens permitted by Section 6.2.

(ii)    With respect to Real Property Collateral, a Permitted Collateral Release provided that each of the following conditions has been satisfied:

(a)    no Default or Event of Default shall have occurred and be continuing (other than a Default or Event of Default that will be cured through the consummation of the proposed Asset Sale);

(b)    any and all mandatory prepayments of the Loans required to be made through the date of the proposed Asset Sale have been made, and all mandatory prepayments resulting from such Asset Sale will be made in accordance with subsection 2.5B(ii)(d);

(c)    the Real Property Collateral subject to such Asset Sale, and the remaining Real Property Collateral after giving effect to such Asset Sale shall constitute a legal subdivision in accordance with all Applicable Laws and Governmental Authorizations; and

(d)    If required by the Collateral Agent, the Collateral Agent shall have received such title endorsements, date downs or other evidence reasonably satisfactory to Collateral Agent that (i) the priority of the liens evidenced by the Mortgages with respect to the remaining Real Property Collateral after giving effect to such Asset Sale shall be maintained following such Asset Sale, and (ii) the remaining Real Property Collateral is not subject to any Liens other than Permitted Encumbrances and Liens permitted by Section 6.2.

**FIRST LIEN CREDIT AGREEMENT**

(iii)     With respect to Real Property Collateral, a Special Permitted Release to a Restricted Subsidiary, provided that each of the following conditions has been satisfied:

(a)     no Default or Event of Default shall have occurred and be continuing (other than a Default or Event of Default that will be cured through the consummation of the proposed Asset Sale);

(b)     the Real Property Collateral subject to such Asset Sale, and the remaining Real Property Collateral after giving effect to such Asset Sale shall constitute a legal subdivision in accordance with all Applicable Laws and Governmental Authorizations; and

(c)     If required by the Collateral Agent, the Collateral Agent shall have received such title endorsements, date downs or other evidence reasonably satisfactory to Collateral Agent that (i) the priority of the liens evidenced by the Mortgages with respect to the remaining Real Property Collateral after giving effect to such Asset Sale shall be maintained following such Asset Sale, and (ii) the remaining Real Property Collateral is not subject to any Liens other than Permitted Encumbrances and Liens permitted by Section 6.2.

(iv)     With respect to Real Property Collateral, Borrower shall have the right to transfer one or more legally platted and subdivided Residential Units to an Unrestricted Subsidiary, provided that each of the following conditions has been satisfied:

(a)     the Release Amount for each such Residential Unit has been paid to the Administrative Agent (or deposited into the Release Payment Account);

(b)     no Default or Event of Default shall have occurred and be continuing (other than a Default or Event of Default that will be cured through the consummation of the proposed Asset Sale);

(c)     the Real Property Collateral subject to such Asset Sale, and the remaining Real Property Collateral after giving effect to such Asset Sale shall constitute a legal subdivision in accordance with all Applicable Laws and Governmental Authorizations;

(d)     if required by the Collateral Agent, the Collateral Agent shall have received such title endorsements, date downs or other evidence reasonably satisfactory to Collateral Agent that (i) the priority of the liens evidenced by the Mortgages with respect to the remaining Real Property Collateral after giving effect to such Asset Sale shall be maintained following such Asset Sale, and (ii) the remaining Real Property Collateral is not subject to any Liens other than Permitted Encumbrances and Liens permitted by Section 6.2; and

(e)     the Administrative Agent shall have received an Officer's Certificate which demonstrates that the Borrower will be in compliance with the financial covenants set forth in Section 6.6 on a pro forma basis giving effect to the proposed transfer of the Residential Units to an Unrestricted Subsidiary.

(v)     With respect to the Capital Stock of any Subsidiary of the Borrower, the sale of such Capital Stock provided that each of the following conditions has been satisfied:

FIRST LIEN CREDIT AGREEMENT

(a)     no Default or Event of Default shall have occurred and be continuing (other than a Default or Event of Default that will be cured through the consummation of the proposed Asset Sale);

(b)     no Change of Control will result from the proposed sale;

(c)     if the Subsidiary to be sold is a Restricted Subsidiary that holds any of the Real Property Collateral, the Borrower has complied with applicable provisions of subsections 6.8(i) above; and

(d)     if the Subsidiary to be sold is an Unrestricted Subsidiary (the Capital Stock of which has been pledged to the Collateral Agent pursuant to Section 5.11), then concurrently with the sale the proceeds of the sale will be distributed to the holders of the Capital Stock of such Unrestricted Subsidiary.

**6.9     Transactions with Shareholders and Affiliates.**

The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service or the payment of any management fees, consulting fees or the making of other disbursements) with any holder of 5% or more of any class of equity Securities of the Borrower or a Restricted Subsidiary or with any Affiliate of the Borrower or of any such Restricted Subsidiary or holder, on terms that are less favorable to the Borrower or that Restricted Subsidiary, as the case may be, than those that might be obtained at the time from Persons who are not such a holder or Affiliate; provided that the foregoing restriction shall not apply to (i) the Transactions, (ii) the amounts expressly contemplated under the Financial Plan to be paid to Affiliates of the Borrower, and (iii) contracts and agreements with Borrower and its Restricted Subsidiaries, owners, manager, or affiliates in force as of the Effective Date of this Agreement.

**6.10     Conduct of Business.**

The Borrower shall not, and shall not permit any of its Restricted Subsidiaries to, engage in any business other than (i) the businesses engaged in by the Borrower and its Restricted Subsidiaries on the Effective Date and (ii) such other lines of business as may be reasonably related thereto.

**6.11     Amendments or Waivers of Certain Agreements.**

None of the Borrower nor its Restricted Subsidiaries shall terminate or agree to any amendment, restatement, supplement or other Modification to, or waive any of its rights under, any Organizational Certificates or Organizational Documents of the Borrower and its Restricted Subsidiaries, if such termination, amendment, restatement, supplement, Modification or waiver would be materially adverse to the Lenders.

**6.12     Fiscal Year.**

Neither the Borrower nor any of its Restricted Subsidiaries shall change its Fiscal Year-end from December 31 (provided, however, that any Subsidiary acquired by the Borrower after the Effective Date is not required to have a Fiscal Year ending December 31).

73

## SECTION 7.
## EVENTS OF DEFAULT

IF any of the following conditions or events ("**Events of Default**") shall occur:

### 7.1    Payment of Obligations.

The Borrower shall fail to pay any of the Obligations on the due date thereof (whether due at stated maturity, on demand, upon acceleration or otherwise), provided, that with respect to regularly scheduled interest payments required pursuant to subsection 2.2C or fees required pursuant to Section 2.4, the Borrower is required to make such payments within three (3) days after the date on which such payments are due; or

### 7.2    Misrepresentations.

Any representation, warranty or other written statement to any Agent or any Lender by or on behalf of any Loan Party, whether made in or furnished in compliance with or in reference to any of the Loan Documents, proves to have been false or misleading in any material respect when made or furnished; or

### 7.3    Breach of Certain Covenants.

The Borrower shall fail or neglect to perform, keep or observe any covenant contained in Sections 5.1, 5.3(ii), 5.3(iii), 5.3(x), 5.4, 5.16, 5.19, 5.21 and Section 6 hereof on the date that the Borrower is required to perform, keep or observe such covenant; or

### 7.4    Breach of Other Covenants.

The Borrower shall fail or neglect to perform, keep or observe any other covenant contained in this Agreement not otherwise addressed in this Section 7 and the breach of such other covenant is not cured to the Administrative Agent's satisfaction within thirty (30) days after the sooner to occur of any Responsible Officer's receipt of notice of such breach from the Administrative Agent or the date on which such failure or neglect first becomes known to any Responsible Officer; provided, however, that such notice and opportunity to cure shall not apply in the case of any failure to perform, keep or observe any covenant which is not capable of being cured at all or within such 30-day period or which is a willful and knowing breach by the Borrower; or

### 7.5    Default Under Loan Documents.

Except as otherwise provided in this Section 7, the Borrower or any other Loan Party shall default in the due and punctual observance or performance of any liability or obligation to be observed or performed by it under any of the Loan Documents and such default or breach is not cured to the Administrative Agent's satisfaction within thirty (30) days after the sooner to occur of any Responsible Officer's receipt of notice of such default or breach from the Administrative Agent or the date on which such default or breach first becomes known to any Responsible Officer; provided, however, that such notice and opportunity to cure shall not apply in the case of any default or breach which is not capable of being cured at all or within such 30-day period or which is a willful and knowing breach by the Borrower; or

74

**7.6**     **Material Adverse Effect.**

There shall occur any event or condition that has a Material Adverse Effect; or

**7.7**     **Solvency.**

Any Loan Party shall cease to be Solvent; or

**7.8**     **Insolvency Proceedings.**

Any Insolvency Proceeding shall be commenced by any Loan Party; an Insolvency Proceeding is commenced against any Loan Party and any of the following events occur: such Loan Party consents to the institution of the Insolvency Proceeding against it, the petition commencing the Insolvency Proceeding is not timely controverted by such Loan Party, the petition commencing the Insolvency Proceeding is not dismissed within ninety (90) days after the date of the filing thereof (provided that, in any event, during the pendency of any such period, Lenders shall be relieved from their obligation to make Loans or otherwise extend credit to or for the benefit of the Borrower hereunder), an interim trustee is appointed to take possession all or a substantial portion of the properties of such Loan Party or to operate all or any substantial portion of the business of such Loan Party or an order for relief shall have been issued or entered in connection with such Insolvency Proceeding; or any Loan Party shall make an offer of settlement extension or composition to its unsecured creditors generally; or

**7.9**     **Business Disruption; Condemnation.**

There shall occur a cessation of a substantial part of the business of any Loan Party for a period which may be reasonably expected to have a Material Adverse Effect; or any Loan Party shall suffer the loss or revocation of any license, permit or Approval now held or hereafter acquired by such Loan Party which is material to the operations of such Loan Party or necessary to the continued or lawful operation of its business or the development of the Project as contemplated by the Master Plan and this Agreement; or any Loan Party shall be enjoined, restrained or in any way prevented by court, governmental or administrative order from conducting all or any material part of its business affairs; or any material lease or agreement pursuant to which any Loan Party leases or occupies any premises on which any Collateral is located shall be canceled or terminated prior to the expiration of its stated term and such cancellation or termination has a Material Adverse Effect; or any material part of the Collateral shall be taken through condemnation or the Appraised Value of such property shall be materially impaired through condemnation; or

**7.10**    **ERISA.**

An ERISA Event shall occur which could reasonably be expected to result in a Material Adverse Effect or which the Administrative Agent, in its reasonable discretion, shall determine constitutes grounds for the termination by the PBGC of any Pension Plan or for the appointment by the appropriate United States district court of a trustee for any Pension Plan; or if any Pension Plan shall be terminated or any such trustee shall be requested or appointed; or if the Borrower or any Subsidiary is in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan resulting from the Borrower's or such Subsidiary's complete or partial withdrawal from such Pension Plan; or

**7.11**    **Challenge to Loan Documents.**

Any Loan Party or any of its Affiliates shall challenge or contest in any action, suit or proceeding the validity or enforceability of any of the Loan Documents, the legality or enforceability of any of the

75

**FIRST LIEN CREDIT AGREEMENT**

Obligations or the perfection or priority of any Lien granted to the Collateral Agent, or any of the Loan Documents ceases to be in full force or effect for any reason other than a full or partial waiver or release by the applicable Agent and Lenders in accordance with the terms thereof; or

**7.12    Judgment**.

One or more judgments or orders for the payment of money in an amount that exceeds, individually or in the aggregate, Five Million Dollars ($5,000,000) shall be entered against the Borrower or any other Loan Party and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

**7.13    Change in Control**.

If any Change of Control shall occur.

**7.14    Criminal Forfeiture**.

Any Loan Party shall be convicted under any criminal law that could lead to a forfeiture of any property of such Loan Party.

**THEN** (i) upon the occurrence of any Event of Default described in subsection 7.9, each of (a) the unpaid principal amount of and accrued interest on the Loans, and (b) all other Obligations shall automatically become immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by the Company, and the obligation of each Lender to make any Loan shall thereupon terminate, and (ii) upon the occurrence and during the continuation of any other Event of Default, the Administrative Agent shall, upon the written request of the Requisite Lenders, by written notice to the Company, declare all or any portion of the amounts described in clauses (a) and (b) above to be, and the same shall forthwith become, immediately due and payable, and the obligation of each Lender to make any Loan shall thereupon terminate. Upon the occurrence of any Event of Default, Administrative Agent may (and shall as directed by the Requisite Lenders) (A) exercise, on behalf of the Lenders, any and all rights and remedies under any guaranties, the Collateral Documents, and any other collateral documents entered into with respect to the Loans; and/or (B) exercise any and all rights, powers and remedies available to Administrative Agent or Lenders at law, in equity or otherwise, including, without limitation, under the other Loan Documents, all of which rights, powers and remedies are cumulative and not exclusive.

**SECTION 8.**
**AGENTS**

**8.1    Appointment**.

**A.  Appointment Authority**.  Each of the Lenders hereby irrevocably appoints Credit Suisse as the Administrative Agent and the Collateral Agent hereunder and under the other Loan Documents and authorizes Credit Suisse, in such capacities, to take such actions on its behalf and to exercise such powers as are delegated to Credit Suisse, in such capacities by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  Each Agent agrees to act upon the express conditions contained in this Agreement and the other Loan Documents, as applicable.  In performing its functions and duties under this Agreement, each Agent shall act solely as an agent of the Lenders and

76

does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for the Borrower or any of its Subsidiaries. The provisions of this Section 8 are solely for the benefit of the Agents, the Lenders and the Borrower shall not have rights as third party beneficiaries of any of such provisions.

**B.    Appointment of Supplemental Collateral Agents.**  It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction.  It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent or the Collateral Agent deems that by reason of any present or future law of any jurisdiction the Administrative Agent or the Collateral Agent may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, it may be necessary that the Administrative Agent or the Collateral Agent appoint an additional individual or institution as a separate trustee, co-trustee, collateral agent or collateral co-agent (any such additional individual or institution being referred to herein individually as a "**Supplemental Collateral Agent**" and collectively as "**Supplemental Collateral Agents**").

In the event that the Administrative Agent or the Collateral Agent appoints a Supplemental Collateral Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent or the Collateral Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Collateral Agent to the extent, and only to the extent, necessary to enable such Supplemental Collateral Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Collateral Agent shall run to and be enforceable by either the Administrative Agent or the Collateral Agent or such Supplemental Collateral Agent, and (ii) the provisions of this Section 8 and of subsection 9.2 that refer to the Administrative Agent or the Collateral Agent shall inure to the benefit of such Supplemental Collateral Agent and all references therein to the Administrative Agent or the Collateral Agent shall be deemed to be references to the Administrative Agent or the Collateral Agent and/or such Supplemental Collateral Agent, as the context may require.

Should any instrument in writing from the Borrower or any other Loan Party be required by any Supplemental Collateral Agent so appointed by the Administrative Agent or the Collateral Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrower shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Administrative Agent or the Collateral Agent.  In case any Supplemental Collateral Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Collateral Agent, to the extent permitted by law, shall vest in and be exercised by the Administrative Agent or the Collateral Agent until the appointment of a new Supplemental Collateral Agent.

**8.2    Rights as a Lender.**

The Persons serving as the Agents hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Persons serving as the Agents hereunder in their individual capacity.  Such Persons and their Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other

77

**FIRST LIEN CREDIT AGREEMENT**

advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Persons were not Agents hereunder and without any duty to account therefor to the Lenders.

**8.3      Exculpatory Provisions**.

The Agents shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Agents (i) shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred and is continuing, (ii)  shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agents are required to exercise as directed in writing by the Requisite Lenders (or such other number or percentage of the relevant Lenders as shall be necessary under the circumstances as provided in subsection 9.5), provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law, and (iii)  shall not, except as expressly set forth herein and in the other Loan Documents have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of their Affiliates that is communicated to or obtained by the Person serving as an Agent or any of its Affiliates in any capacity. No Agent shall be liable to the Lenders for any action taken or not taken by it with the consent or at the request of the Requisite Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in subsection 9.5) or in the absence of its own gross negligence or willful misconduct. No Agent shall be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to such Agent by the Borrower or a Lender. The Agents shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement or any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Section 3 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agents.

**8.4      Reliance by the Agents**.

The Agents shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, posting or other distribution) believed by it in good faith to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Agents also may rely upon any statement made to it orally or by telephone and believed by it in good faith to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of such Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Agents may presume that such condition is satisfactory to such Lender unless the Agents shall have received notice to the contrary from such Lender prior to the making of such Loan. The Agents may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

78

**9.2**    **Expenses; Indemnity; Damage Waiver**.

   **A. Costs and Expenses**.   The Borrower shall pay: (i) all reasonable, actual out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable fees, charges and disbursements of counsel for the Administrative Agent and Collateral Agent (and fees and time charges for attorneys who may be employees of the Administrative Agent and Collateral Agent), in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents (provided that such costs and expenses shall not exceed the amount set forth in the Engagement Letter), and any amendments, Modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated); (ii) all out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent or any Lender, including the fees, charges and disbursements of any counsel for the Administrative Agent or any Lender (and fees and time charges for attorneys who may be employees of the Administrative Agent, the Collateral Agent or any Lender), in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents, including its rights under this subsection 9.2A, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans; (iii) all title and survey charges, all fees and expenses of Borrower's counsel, and all of Borrower's closing costs; and (iv) all reasonable, actual out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable fees, charges and disbursements of counsel for the Administrative Agent and Collateral Agent (and fees and time charges for attorneys who may be employees of the Administrative Agent and Collateral Agent), in connection with each Permitted Collateral Asset Sale, Special Permitted Release and Permitted Collateral Release.

   **B. Indemnification by the Borrower**.   The Borrower shall indemnify each Agent (and any sub-Agent thereof), each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee (and fees and time charges for attorneys who may be employees of any Agent or any Lender), incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property, or any Environmental Claim related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of any Indemnitee.

   **C. Reimbursement by the Lenders**.   To the extent that the Borrower fails to pay any amount required under subsection 9.2A or 9.2B to be paid by it to any Agent (or any sub-Agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Agent (or any such sub-Agent) or such Related Party, as the case may be, such Lender's Pro Rata Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Agent (or any such sub-Agent) in its capacity

83

as such, or against any Related Party of any of the foregoing acting for such Agent (or any such sub-Agent) in connection with such capacity. The obligations of the Lenders under this subsection 9.2C are subject to the provisions of subsection 9.12.

      **D. Waiver of Consequential Damages, Etc**. To the fullest extent permitted by Applicable Law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No Indemnitee referred to in subsection 9.2B above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, unless such damages are directly caused solely by the gross negligence or willful misconduct of such Indemnitee as determined by a court of competent jurisdiction by final and nonappealable judgment.

      **E. Payments**. All amounts due under this subsection 9.2 shall be payable promptly after demand therefor.

## 9.3    <u>Right of Set-Off</u>.

      Without limitation of any other rights of the Agents or Lenders, if an Event of Default shall have occurred and be continuing, subject to the Administrative Agent's consent, each Agent, Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Agent, Lender, or any such Affiliate to or for the credit or the account of the Borrower against any and all of the Obligations of the Borrower now or hereafter existing under this Agreement or any other Loan Document to such Agent or Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such Obligations of the Borrower may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. Each Agent and Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application; <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

## 9.4    <u>Sharing of Payments by Lenders</u>.

      If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other obligations hereunder resulting in such Lender's receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other such obligations greater than its Pro Rata Share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for Cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, to the end that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; <u>provided</u> that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement

84

or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary thereof (as to which the provisions of this paragraph shall apply). The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

**9.5**     **Amendments and Waivers**.

      **A. Amendment and Waivers.** No amendment, Modification, termination or waiver of any provision of this Agreement or of the Notes, or consent to any departure by the Borrower or any other Loan Party therefrom, shall in any event be effective without the written concurrence of the Requisite Lenders; provided that any such amendment, Modification, termination, waiver or consent which: (a) reduces or forgives the principal amount of any of the Loans; (b) reduces the percentage specified in the definition of the "Requisite Lenders" (it being understood that, with the consent of the Requisite Lenders, additional extensions of credit pursuant to this Agreement may be included in the definition of the "Requisite Lenders" on substantially the same basis as the Loans are included on the Effective Date); (c) changes in any manner any provision of this Agreement which, by its terms, expressly requires the approval or concurrence of all the Lenders; (d) postpones the scheduled final maturity date of any of the Loans; (e) postpones the date or reduces the amount of any scheduled payment (but not prepayment) of principal of any of the Loans; (f) postpones the date on which any interest, any fees or any amounts due under subsection 2.5B(ii) are payable; (g) decreases the interest rate borne by any of the Loans (other than any waiver of any increase in the interest rate applicable to any of the Loans pursuant to subsection 2.2E) or the amount of any fees payable hereunder or any amounts payable under subsection 2.5B(ii); (h) increases the Loan Commitment of any Lender or the maximum duration of Interest Periods permitted hereunder; (i) releases all or substantially all of the Collateral or any Guarantor (except to the extent otherwise required to be released under the terms of the Loan Documents); and (j) changes in any manner the provisions contained in subsection 7.1 or this subsection 9.5; shall be effective only if evidenced by a writing signed by or on behalf of all the Lenders to whom Obligations are owed being directly affected by such amendment, Modification, termination, waiver or consent (the consent of the Requisite Lenders not being required for any such change); provided, further that any amendment, Modification, termination, waiver or consent which amends or modifies the definition of "Approved Fund," "Eligible Assignee," or "Fund," shall be effective only if evidenced by a written concurrence of the Requisite Lenders and the Administrative Agent. In addition, (i) any amendment, Modification, termination or waiver of any of the provisions contained in subsection 3.2 for periods following the Effective Date shall be effective only if evidenced by a writing signed by or on behalf of the Administrative Agent and the Requisite Lenders, (ii) no amendment, Modification, termination or waiver of any provision of any Note shall be effective without the written concurrence of the Lender which is the holder of that Note, and (iii) no amendment, Modification, termination or waiver of any provision of Section 8 or of any other provision of this Agreement which, by its terms, expressly requires the approval or concurrence of the Administrative Agent shall be effective without the written concurrence of the Administrative Agent. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances. Any amendment, Modification, termination, waiver or consent effected in accordance with this subsection 9.5 shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by the Borrower, on the Borrower.

      **B. Non-Consenting Lenders.** Each Lender grants (x) to the Administrative Agent the right to purchase all (but not less than all) of such Lender's Loan Commitments and Loans owing to it and the Notes held by it and all of its rights and obligations hereunder and under the other Loan Documents, and

(y) to the Borrower the right to cause an assignment of all (but not less than all) of such Lender's Loans owing to it, its participations in the Notes held by it and all of its rights and obligations hereunder and under the other Loan Documents to Eligible Assignees, which right may be exercised by the Administrative Agent or the Borrower, as the case may be, if such Lender (a "**Non-Consenting Lender**") refuses to execute any amendment, waiver or consent which requires the written consent of Lenders other than Requisite Lenders and to which the Requisite Lenders, the Administrative Agent and the Borrower has otherwise agreed; provided that such Non-Consenting Lender shall receive, in connection with such assignments, payment equal to the aggregate amount of outstanding Loans owed to such Lender (together with all accrued and unpaid interest, fees and other amounts (other than indemnities) owed to such Lender). Each Lender agrees that if the Administrative Agent or the Borrower, as the case may be, exercises their option hereunder, it shall promptly execute and deliver all agreements and documentation necessary to effectuate such assignment as set forth in subsection 9.1. The Borrower shall be entitled (but not obligated) to execute and deliver such agreement and documentation on behalf of such Non-Consenting Lender and any such agreement and/or documentation so executed by the Borrower shall be effective for purposes of documenting an assignment pursuant to subsection 9.1.

**9.6     Independence of Covenants.**

All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another such covenant shall not avoid the occurrence of a Default or Event of Default if such action is taken or condition exists.

**9.7     Notices.**

**A. Notices Generally.**   Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection 9.7B below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows:

|  |  |
|---|---|
| If to Borrower: | Yellowstone Development, LLC |
|  | Yellowstone Mountain Club, LLC |
|  | Big Sky Ridge, LLC |
|  | P.O. Box 161097 |
|  | Big Sky, MT 59716 |
|  | Attention: Timothy L. Blixseth |
|  | Facsimile: (406) 995-7313 |
|  |  |
|  | P.O. Box 161097 |
|  | Big Sky, MT 59716 |
|  | Attention: Christopher B. Campbell |
|  | Vice President of Finance |
|  | Facsimile: (406) 995-7313 |
|  |  |
| with copies to: | Michael W. Doyle/P. Scott McCleery |
|  | Doyle, Gartland, Nelson, McCleery & Wade, P.C. |
|  | 44 Club Road, Suite 200 |
|  | Eugene, OR 97401 |
|  | Attention: Michael W. Doyle |
|  | Facsimile: (541) 344-0209 |

86

**FIRST LIEN CREDIT AGREEMENT**

If to the Administrative Agent,
or the Collateral Agent, to Credit Suisse:

> Eleven Madison Avenue
> New York, New York 10010
> Attention: Thomas Lynch
> Telephone No.: 212-325-9205
> Facsimile: 212-325-8304

Or to the Operating Account Bank:

> American Bank
> 1632 W. Main
> Bozeman, MT 59715
> Attention: Leon Royer
> Telephone No.: 406-522-3529
> Facsimile: 406-585-7574/406-586-4362

If to a Lender, to it at its address (or telecopier number) set forth in its Administrative Questionnaire. Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices delivered through electronic communications to the extent provided in subsection 9.7B below, shall be effective as provided in said subsection 9.7B.

**B. Electronic Communications.** Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Sections 2 and 5.2, if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such subsection by electronic communication. The Administrative Agent or the Borrower may, in their discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, _provided_ that approval of such procedures may be limited to particular notices or communications. Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), _provided_ that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or other communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

**C. Change of Address, Etc.** Any party hereto may change its address or telecopier number for notices and other communications hereunder by notice to the other parties hereto.

87

FIRST LIEN CREDIT AGREEMENT

**9.8    Survival of Representations, Warranties and Agreements.**

All representations, warranties and agreements made herein shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.

Notwithstanding anything in this Agreement or implied by law to the contrary, the agreements of the Borrower set forth in subsections 2.7D, 2.8, 9.2, and 9.18 and the agreements of the Lenders set forth in subsections 8.2, 8.3, 8.4, 9.2C, 9.3, 9.4 and 9.19 shall survive the payment of the Loans and the reimbursement of any amounts drawn or paid thereunder, and the termination of this Agreement.

**9.9    Failure or Indulgence Not Waiver; Remedies Cumulative.**

No failure or delay on the part of any Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Loan Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege. All rights and remedies existing under this Agreement and the other Loan Documents are cumulative to, and not exclusive of, any rights or remedies otherwise available.

**9.10    Marshalling; Payments Set Aside.**

Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of the Borrower or any other party or against or in payment of any or all of the Obligations. To the extent that the Borrower makes a payment or payments to the Administrative Agent or the Lenders (or to the Administrative Agent or Collateral Agent for the benefit of the Lenders), or any Agent or the Lenders enforce any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**9.11    Severability.**

In case any provision in or obligation under this Agreement or the Notes shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**9.12    Obligations Several; Independent Nature of the Lenders' Rights.**

The obligations of the Lenders hereunder are several and no Lender shall be responsible for the obligations or Loan Commitments of any other Lender hereunder. Nothing contained herein or in any other Loan Document, and no action taken by the Lenders pursuant hereto or thereto, shall be deemed to constitute the Lenders as a partnership, an association, a joint venture or any other kind of entity. The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out of this Agreement and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

**9.13**   **Maximum Amount**.

A.   It is the intention of the Borrower and the Lenders to conform strictly to the usury and similar laws relating to interest from time to time in force, and all agreements between the Loan Parties and their respective Subsidiaries and the Lenders, whether now existing or hereafter arising and whether oral or written, are hereby expressly limited so that in no contingency or event whatsoever, whether by acceleration of maturity hereof or otherwise, shall the amount paid or agreed to be paid in the aggregate to the Lenders as interest (whether or not designated as interest, and including any amount otherwise designated but deemed to constitute interest by a court of competent jurisdiction) hereunder or under the other Loan Documents or in any other agreement given to secure the Indebtedness or obligations of the Borrower to the Lenders, or in any other document evidencing, securing or pertaining to the Indebtedness evidenced hereby, exceed the maximum amount permissible under applicable usury or such other laws (the "**Maximum Amount**").  If under any circumstances whatsoever fulfillment of any provision hereof, or any of the other Loan Documents, at the time performance of such provision shall be due, shall involve exceeding the Maximum Amount, then, ipso facto, the obligation to be fulfilled shall be reduced to the Maximum Amount.  For the purposes of calculating the actual amount of interest paid and/or payable hereunder in respect of laws pertaining to usury or such other laws, all sums paid or agreed to be paid to the holder hereof for the use, forbearance or detention of the Indebtedness of the Borrower evidenced hereby, outstanding from time to time shall, to the extent permitted by Applicable Law, be amortized, pro-rated, allocated and spread from the date of disbursement of the proceeds of the Notes until payment in full of all of such Indebtedness, so that the actual rate of interest on account of such Indebtedness is uniform through the term hereof.  The terms and provisions of this subsection shall control and supersede every other provision of all agreements between the Borrower or any endorser of the Notes and the Lenders.

B.   If under any circumstances any Lender shall ever receive an amount which would exceed the Maximum Amount, such amount shall be deemed a payment in reduction of the principal amount of the Loans and shall be treated as a voluntary prepayment under subsection 2.3B(i) and shall be so applied in accordance with subsection 2.3 hereof or if such excessive interest exceeds the unpaid balance of the Loans and any other Indebtedness of the Borrower in favor of such Lender, the excess shall be deemed to have been a payment made by mistake and shall be refunded to the Borrower.

**9.14**   **Headings**.

Section and subsection headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

**9.15**   **Applicable Law**.

**THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK AND, TO THE EXTENT REQUIRED BY MONTANA STATE LAW, THE LAWS OF THE STATE OF MONTANA.**

**9.16**   **Successors and Assigns**.

This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of the Lenders (it being understood that the Lenders' rights of assignment are subject to subsection 9.1).  Neither the

89

**FIRST LIEN CREDIT AGREEMENT**

Borrower' rights or obligations hereunder nor any interest therein may be assigned or delegated by the Borrower without the prior written consent of all Lenders.

9.17    <u>Consent to Jurisdiction and Service of Process</u>.

A. SUBMISSION TO JURISDICTION.    EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY AND OF THE UNITED STATES DISTRICT COURT SITTING IN NEW YORK CITY, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.    EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST A BORROWER OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

B. WAIVER OF VENUE. EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN SUBSECTION 9.17A.    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

C. SERVICE OF PROCESS. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SUBSECTION 9.7. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

9.18    <u>Waiver of Jury Trial</u>.

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS

**FIRST LIEN CREDIT AGREEMENT**

REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**9.19    Confidentiality.**

Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to it, its Affiliates' and their respective partners, directors, officers, employees, trustees, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential as provided herein), (b) to the extent requested by any regulatory authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by Applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this subsection 9.19, to (i) any assignee or pledgee of or Participant in, or any prospective assignee or pledgee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower (such consent not to be unreasonably withheld or delayed) or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this subsection or (y) becomes available to the Administrative Agent or any Lender on a nonconfidential basis from a source other than the Borrower or any of its Subsidiaries or Affiliates.

For purposes of this subsection 9.19, "**Information**" means all written information received from the Borrower or any of its Subsidiaries or Affiliates relating to the Borrower or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower, which to the extent received on or after the date hereof, is identified as confidential by the Borrower. Any Person required to maintain the confidentiality of Information as provided in this subsection 9.19 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

**9.20    No Recourse to Partners.**  Notwithstanding anything in any of the Loan Documents to the contrary, no partner or member or managing member in the Borrower shall be personally liable for the payment of the Obligations; provided, however, nothing contained herein shall release, diminish or impair the obligations of the Borrower to pay in full when due all Obligations in accordance with the provisions of the Loan Documents.

**9.21    Counterparts; Integration; Effectiveness; Electronic Execution.**

**A.    Counterparts; Integration; Effectiveness.**  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Agreement

91

**FIRST LIEN CREDIT AGREEMENT**

shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto required pursuant to Section 3, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

**B. Electronic Execution of Assignments**. The words "execution," "signed," "signature," and words of like import in any Assignment Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**9.22   USA Patriot Act Notification**. The following notification is provided to the Borrower pursuant to Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318:

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT.

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each Person or entity that opens an account, including any deposit account, treasury management account, loan, other extension of credit, or other financial services product.

What this means for the Borrower:   When the Borrower opens an account, if the Borrower is an individual, the Administrative Agent and the Lenders will ask for the Borrower's name, residential address, tax identification number, date of birth, and other information that will allow the Administrative Agent and the Lenders to identify the Borrower, and, if the Borrower is not an individual, the Administrative Agent and the Lenders will ask for the Borrower's name, tax identification number, business address, and other information that will allow the Administrative Agent and the Lenders to identify the Borrower. The Administrative Agent and the Lenders may also ask, if the Borrower is an individual, to see the Borrower's driver's license or other identifying documents, and, if the Borrower is not an individual, to see the Borrower's legal organizational documents or other identifying documents.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

92

**FIRST LIEN CREDIT AGREEMENT**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

THE BORROWER:

YELLOWSTONE MOUNTAIN CLUB, LLC,
a Montana limited liability company
by its Manager, BLIXSETH GROUP, INC.

By: _____
Name:     Timothy L. Blixseth
Title:     President

YELLOWSTONE DEVELOPMENT, LLC,
a Montana limited liability company
by its Manager, BLIXSETH GROUP, INC.

By: _____
Name:     Timothy L. Blixseth
Title:     President

BIG SKY RIDGE, LLC,
a Montana limited liability company

By: _____
Name:     Timothy L. Blixseth
Title:     Manager

*(Signature Page to Credit Agreement)*

**AGENTS AND LENDERS:**

**CREDIT SUISSE, CAYMAN ISLANDS BRANCH**
individually as a Lender and as the Administrative Agent, Collateral Agent, Paying Agent, Sole Lead Arranger and Sole Bookrunner

By: _____

Name:

Title:    BILL O'DALY
          DIRECTOR

By: _____

Name:

Title:    RIANKA MOHAN
          ASSOCIATE

*(Signature Page to Credit Agreement)*

## APPENDIX A

## APPLICABLE MARGINS

| ADJUSTED LIBOR | ABR LOANS |
|---|---|
| 237.5 | 137.5 |