# Exhibit 3
# (Part 1 of 6)

**CREDIT AGREEMENT**

**DATED AS OF MAY 19, 2006**

**Among**

**TAMARACK RESORT LLC**
as the Borrower,

**THE LENDERS LISTED HEREIN,**
as the Lenders,

**CREDIT SUISSE, CAYMAN ISLANDS BRANCH**
as Administrative Agent and Collateral Agent,

**CREDIT SUISSE SECURITIES (USA) LLC,**
as Paying Agent, Fronting Bank, Sole Lead Arranger and Sole Bookrunner,

**and**

**SG AMERICAS SECURITIES, LLC,**
as Co-Arranger and Syndication Agent

**$250,000,000 SENIOR CREDIT FACILITY**

## TABLE OF CONTENTS

**Page**

Section 1. DEFINITIONS ................................................................................................................. 1

    1.1      Certain Defined Terms ................................................................................................ 1
    1.2      Defined Terms; Accounting Terms; Utilization of GAAP for Purposes of
           Calculations Under Agreement ............................................................................... 29

Section 2. AMOUNTS AND TERMS OF COMMITMENTS AND LOANS ............................... 30

    2.1      Tranche A Credit-Linked Deposit Accounts ........................................................... 30
    2.2      Commitments; Loans ............................................................................................... 34
    2.3      Disbursement Procedures for Tranche B Loans ...................................................... 36
    2.4      Disbursement Procedures for Tranche A Loans ...................................................... 37
    2.5      Letters of Credit ....................................................................................................... 38
    2.6      Interest on the Loans ............................................................................................... 41
    2.7      Fees .......................................................................................................................... 45
    2.8      Repayments and Prepayments; General Provisions Regarding Payments .............. 45
    2.9      Use of Proceeds ....................................................................................................... 50
    2.10    Special Provisions Governing Eurodollar Rate Loans ........................................... 51
    2.11    Increased Costs; Taxes ............................................................................................ 53
    2.12    Mitigation Obligations; Replacement of Lenders ................................................... 55
    2.13    Releases of Collateral .............................................................................................. 56
    2.14    Break Funding Payments ......................................................................................... 57

Section 3. CONDITIONS TO EFFECTIVENESS .......................................................................... 58

    3.1      Conditions to Effectiveness on the Effective Date .................................................. 58
    3.2      Conditions to Each Credit Event ............................................................................. 63
    3.3      Conditions to Disbursements from the Development Reserve Account and the
           Company's Operating Account ................................................................................ 64

Section 4. REPRESENTATIONS AND WARRANTIES ................................................................ 67

    4.1      Organization and Qualification. .............................................................................. 67
    4.2      Power and Authority ................................................................................................ 67
    4.3      Legally Enforceable Agreement .............................................................................. 67
    4.4      No Conflict .............................................................................................................. 67
    4.5      Capital Structure ...................................................................................................... 68
    4.6      Special Purpose Entity ............................................................................................. 68
    4.7      Corporate Names ..................................................................................................... 68
    4.8      Business Locations; Agent for Process .................................................................... 68
    4.9      Title to Properties .................................................................................................... 68
    4.10    Priority of Liens; UCC-1 Financing Statements .................................................... 69
    4.11    No Subordination .................................................................................................... 69
    4.12    Permits; Franchises .................................................................................................. 69
    4.13    Indebtedness ............................................................................................................ 69
    4.14    Financial Condition; Projections ............................................................................ 69

i

4.15    Disclosure................................................................................................70
4.16    Solvent Financial Condition..................................................................70
4.17    Surety Obligations.................................................................................70
4.18    Taxes.......................................................................................................71
4.19    Brokers....................................................................................................71
4.20    Intellectual Property..............................................................................71
4.21    Governmental Authorization..................................................................71
4.22    Compliance with Laws...........................................................................71
4.23    Ground Leases........................................................................................72
4.24    Litigation................................................................................................73
4.25    No Defaults.............................................................................................73
4.26    Leases.....................................................................................................73
4.27    Employee Benefit Plans.........................................................................73
4.28    Labor Relations......................................................................................74
4.29    Not a Regulated Entity..........................................................................74
4.30    Margin Stock..........................................................................................74
4.31    No Material Adverse Change.................................................................74
4.32    Environmental Matters..........................................................................74
4.33    Material Contracts.................................................................................75
4.34    Utilities...................................................................................................76
4.35    Licenses..................................................................................................76
4.36    Entitlements...........................................................................................76
4.37    Loan Documents.....................................................................................77
4.38    Insurance Coverage...............................................................................77
4.39    Master Declarations..............................................................................77

Section 5. AFFIRMATIVE COVENANTS................................................................78

5.1     Visits and Inspections............................................................................78
5.2     Notices....................................................................................................78
5.3     Financial Statements and Other Reports..............................................80
5.4     Corporate Existence..............................................................................84
5.5     Payment of Taxes and Claims; Tax Consolidation...............................85
5.6     Maintenance of Properties; Insurance..................................................85
5.7     Lender Meeting......................................................................................85
5.8     Compliance with Laws, etc....................................................................86
5.9     Environmental Disclosure and Inspection............................................86
5.10    The Borrower's Remedial Action Regarding Hazardous Materials.....87
5.11    Subsidiaries...........................................................................................87
5.12    Interest Rate Protection........................................................................88
5.13    Further Assurances................................................................................88
5.14    Title........................................................................................................88
5.15    Estoppels................................................................................................89
5.16    SPE Covenants.......................................................................................89
5.17    Maintenance of Entitlements................................................................90
5.18    Asset Sales.............................................................................................90
5.19    Control....................................................................................................90
5.20    Credit Rating.........................................................................................90
5.21    Accounts.................................................................................................90
5.22    Intentionally Deleted.............................................................................91
5.23    Maintenance of Ground Leases.............................................................91

CREDIT AGREEMENT
NY\1130626.12  mk - tamarack credit agreement

5.24   Material Contracts; Sale Leasebacks...................................................................................91
5.25   Use of Insurance Proceeds Upon the Occurrence of a Recovery Event.............................93

Section 6. NEGATIVE COVENANTS.........................................................................................................95

6.1    Indebtedness.........................................................................................................................95
6.2    Liens and Related Matters....................................................................................................96
6.3    Investments...........................................................................................................................97
6.4    Contingent Obligations........................................................................................................97
6.5    Restricted Payments.............................................................................................................97
6.6    Financial Covenants.............................................................................................................98
6.7    Restriction on Fundamental Changes...................................................................................99
6.8    Asset Sales............................................................................................................................99
6.9    Transactions with Shareholders and Affiliates..................................................................100
6.10   Conduct of Business...........................................................................................................101
6.11   Amendments or Waivers of Certain Agreements...............................................................101
6.12   Fiscal Year..........................................................................................................................101
6.13   Limitation on Standing Inventory......................................................................................101
6.14   The Meadows Project..........................................................................................................102

Section 7. EVENTS OF DEFAULT............................................................................................................102

7.1    Payment of Obligations......................................................................................................102
7.2    Misrepresentations..............................................................................................................102
7.3    Breach of Certain Covenants..............................................................................................102
7.4    Breach of Other Covenants.................................................................................................102
7.5    Default Under Loan Documents.........................................................................................103
7.6    Other Defaults.....................................................................................................................103
7.7    Material Adverse Effect......................................................................................................103
7.8    Solvency..............................................................................................................................103
7.9    Insolvency Proceedings......................................................................................................103
7.10   Business Disruption; Condemnation..................................................................................104
7.11   ERISA.................................................................................................................................104
7.12   Challenge to Loan Documents...........................................................................................104
7.13   Judgment.............................................................................................................................104
7.14   Change in Control...............................................................................................................104
7.15   Criminal Forfeiture.............................................................................................................104

Section 8. AGENTS....................................................................................................................................105

8.1    Appointment........................................................................................................................105
8.2    Rights as a Lender...............................................................................................................106
8.3    Exculpatory Provisions.......................................................................................................106
8.4    Reliance by the Agents........................................................................................................107
8.5    Delegation of Duties...........................................................................................................107
8.6    Resignation of Administrative Agent and/or Collateral Agent..........................................107
8.7    Collateral Documents; Successor Collateral Agent............................................................108
8.8    Non-Reliance on Agents and Other Lenders......................................................................108
8.9    Withholding Taxes..............................................................................................................109

Section 9. MISCELLANEOUS..................................................................................................................109

CREDIT AGREEMENT
NY\1130626.12  mk - tamarack credit agreement

| | | |
|---|---|---|
| 9.1 | Assignments and Participations in Loans | 109 |
| 9.2 | Expenses; Indemnity; Damage Waiver | 112 |
| 9.3 | Right of Set-Off | 113 |
| 9.4 | Sharing of Payments by Lenders | 113 |
| 9.5 | Amendments and Waivers | 114 |
| 9.6 | Independence of Covenants | 115 |
| 9.7 | Notices | 115 |
| 9.8 | Survival of Representations, Warranties and Agreements | 117 |
| 9.9 | Failure or Indulgence Not Waiver; Remedies Cumulative | 117 |
| 9.10 | Marshalling; Payments Set Aside | 117 |
| 9.11 | Severability | 117 |
| 9.12 | Obligations Several; Independent Nature of the Lenders' Rights | 117 |
| 9.13 | Maximum Amount | 117 |
| 9.14 | Headings | 118 |
| 9.15 | Applicable Law | 118 |
| 9.16 | Successors and Assigns | 118 |
| 9.17 | Consent to Jurisdiction and Service of Process | 118 |
| 9.18 | Waiver of Jury Trial | 119 |
| 9.19 | Confidentiality | 120 |
| 9.20 | Limitation of Liability | 120 |
| 9.21 | Counterparts; Integration; Effectiveness; Electronic Execution | 120 |
| 9.22 | USA Patriot Act Notification | 121 |

CREDIT AGREEMENT
NY\1130626.12 mk - tamarack credit agreement

## SCHEDULES

Schedule 1.1(b)............. List of Existing Indebtedness (to be extinguished)
Schedule 1.1(c) ............ Initial Amounts of Tranche B Loan Commitments
Schedule 1.1(d)............. Permitted Equipment Financing
Schedule 1.1 (e)............ List of Contractors
Schedule 2.9 ................. List of Existing Accounts Payable (to be extinguished)
Schedule 3.1D ............... List of Required Consents & Estoppels
Schedule 3.1F ............... Real Property Collateral
Schedule 3.1O .............. Capital Structure and Ownership of Borrower
Schedule 4.1 ................. Organization and Qualification
Schedule 4.5 ................. Capital Stock Options
Schedule 4.7 ................. Corporate Names
Schedule 4.8 ................. Business Locations
Schedule 4.9C............... Taxes Related to Project
Schedule 4.17 ............... Surety Obligations
Schedule 4.18 ............... Borrower's EIN
Schedule 4.20 ............... Intellectual Property
Schedule 4.22 ............... Noncompliance with Applicable Laws
Schedule 4.24 ............... Litigation
Schedule 4.26 ............... Leases
Schedule 4.27 ............... Employee Benefit Plan
Schedule 4.28 ............... Labor Relations
Schedule 4.32 ............... Environmental Matters
Schedule 4.33 ............... Material Contracts
Schedule 4.36 ............... List of Current Entitlements
Schedule 4.38 ............... Insurance Coverage
Schedule 4.39  ............. Master and Supplemental Declarations
Schedule 5.11 ............... Borrower's Subsidiaries
Schedule 6.1 ................. List of Permitted Existing Indebtedness
Schedule 6.9 ................. Permitted Member Sales

v

## EXHIBITS

Exhibit I ........................ Approved Project Budget
Exhibit I-A.................... Project Projections
Exhibit II ...................... Administrative Questionnaire
Exhibit II-A .................. Form of Assignment Agreement
Exhibit III ..................... Form of Compliance Certificate
Exhibit IV ..................... Form of Recognition and Estoppel Agreement
Exhibit V ...................... Form of Notes
Exhibit VI ..................... Form of Disbursement Authorization
Exhibit VII.................... Form of Notice of Conversion/Continuation
Exhibit VIII ................ Form of Pledge Agreement
Exhibit IX ..................... Form of Security Agreement
Exhibit X ...................... Description of Project
Exhibit XI ..................... Form of Request for Loan
Exhibit XII.................... Form of Mortgage
Exhibit XIII .................. Form of Solvency Certificate
Exhibit XIV ................ Form of Request for Release
Exhibit XV .................. Form of Retail/Commercial Lease
Exhibit XVI ................. Cash Flow Income Statements
Exhibit XVII................. Form of Collateral Assignment of Declarant's Rights
Exhibit XVIII .............. Form of Control Agreement
Exhibit XIX ................ Form of Non-Recourse Guaranty
Exhibit XX .................. Intentionally Deleted
Exhibit XXI ................. Form of Subsidiary Guaranty
Exhibit XXII................. Form of Reconciliation Report
Exhibit XXIII .............. Form of Environmental Indemnity
Exhibit XXIV .............. Borrower's 2006 Fiscal Year
Exhibit XXV................. Description of Real Property Collateral Subject to State of Idaho Ground Lease

CREDIT AGREEMENT
NY\1130626.12 mk - tamarack credit agreement

## CREDIT AGREEMENT

This **CREDIT AGREEMENT** (this "**Agreement**") is dated as of May 19, 2006 and entered into by and among **TAMARACK RESORT LLC**, a Delaware limited liability company (the "**Borrower**"), **THE BANKS, FINANCIAL INSTITUTIONS AND OTHER ENTITIES LISTED ON THE SIGNATURE PAGES HEREOF** (together with their respective successors and permitted assigns, each individually referred to herein as a   "**Lender**" and collectively as the "**Lenders**"), **CREDIT SUISSE, CAYMAN ISLANDS BRANCH** ("**Credit Suisse**"), as administrative agent for the Lenders (in such capacity, together with its successors and assigns, the "**Administrative Agent**") and as collateral agent (in such capacity, together with its successors and assigns, the "**Collateral Agent**"), **CREDIT SUISSE SECURITIES (USA) LLC**, as lead arranger for the Lenders (in such capacity, together with its successors and assigns, the "**Arranger**") as paying agent (in such capacity, together with its successors and assigns, the "**Paying Agent**"), as fronting bank (in such capacity, together with its successors and assigns, the "**Fronting Bank**"), and as sole bookrunner (in such capacity, together with its successors and assigns, the "**Bookrunner**"; together with the Administrative Agent, the Arranger, the Collateral Agent and the Paying Agent the "**Agents**") for the Lenders and **SG AMERICAS SECURITIES, LLC** as co-arranger and syndication agent (in such capacities, the "**Syndication Agent**") for the Lenders.

## R E C I T A L S

**A.**     **WHEREAS**, the Borrower desires that the Lenders extend certain senior term loans (Tranche B) to the Borrower hereunder, the proceeds of which, will be used: (i) to repay the Existing Indebtedness of the Borrower, (ii) to fund the Development Reserve Account with a portion of the funds necessary to finance the development and construction of the Project in accordance with the Approved Project Budget, (iii) to fund the Company's Operating Account with $5,000,000 in Cash and a designated portion of the funds necessary to finance the development and construction of the Project through September 30, 2006 in accordance with the Approved Project Budget (iv) to repay certain accounts payable listed on Schedule 2.9 attached hereto, and (v) to pay the Transaction Costs.

**B.**     **WHEREAS**, the Borrower desires that the Lenders extend certain senior "synthetic revolving" loans (Tranche A) to the Borrower hereunder, the proceeds of which, may be used to finance a portion of the development, construction and other costs associated with the Project and to fund general company and working capital needs of the Borrower; and

**C.**     **WHEREAS**, the Agents, the Syndication Agent and the Lenders party hereto desire to enter into this Agreement to provide for such loans to the Borrower subject to the terms and conditions contained herein.

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, and for ten dollars and other good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, the parties hereto agree to enter into this Credit Agreement as follows:

## SECTION 1.
## DEFINITIONS

### 1.1     Certain Defined Terms.

The following terms used in this Agreement shall have the following meanings:

CREDIT AGREEMENT

"**Account Holder**" means Sterling Savings Bank or such other financial institution reasonably acceptable to the Administrative Agent.

"**Administrative Agent**" has the meaning assigned to that term in the preamble to this Agreement.

"**Administrative Questionnaire**" means an Administrative Questionnaire in substantially the form of Exhibit II annexed hereto or in such other form as may be approved by the Administrative Agent.

"**Affected Lender**" has the meaning assigned to that term in Section 2.10C.

"**Affected Loans**" has the meaning assigned to that term in Section 2.10C.

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Affiliate Operating Agreement**" means any agreement between Borrower, any Subsidiaries of Borrower and any Affiliate thereof, which provided for the operation and/or management of or provision of development consultant services to all or any portion of the Project.

"**Affiliate Operating Agreement Subordination**" means an agreement pursuant to which an Affiliate party to any Affiliate Operating Agreement agrees to certain subordinations and other provisions satisfactory to the Administrative Agent for the benefit of the Secured Parties.

"**Agents**" means, collectively, the Administrative Agent, Collateral Agent, the Arranger and the Bookrunner.

"**Agreement**" means this Credit Agreement dated as of May 19, 2006 as it may be amended, restated, amended and restated, supplemented or otherwise Modified from time to time.

"**Applicable Base Rate Margin**" means with respect to Loans that are Base Rate Loans, (i) for Tranche B Loans and Tranche A Loans held by Tranche A Lenders, the applicable rate margin set forth on Appendix A attached hereto, and (ii) for Tranche A Loans held by the Fronting Bank, the applicable rate margin is 0.0%.

"**Applicable Eurodollar Rate Margin**" means with respect to Loans that are Eurodollar Rate Loans, (i) for Tranche B Loans and Tranche A Loans held by Tranche A Lenders, the applicable rate margin set forth on Appendix A attached hereto, and (ii) for Tranche A Loans held by the Fronting Bank, the applicable rate margin is 0.0%.

"**Applicable Laws**" means, collectively, all statutes, laws, rules, regulations, ordinances, decisions, writs, judgments, decrees, and injunctions of any Governmental Authority affecting the Borrower, any of its Subsidiaries, the Non-Recourse Guarantors, the Project or any Collateral, or any of the other assets of the Borrower and its Subsidiaries, whether now or hereafter enacted and in force, and all Governmental Authorizations relating thereto, and all covenants, conditions, and restrictions contained in any instruments, either of record or known to the Borrower or any of its Subsidiaries, at any time in force affecting any Real Property Asset or any part thereof, including any such covenants, conditions and restrictions which may (a) require improvements, repairs or alterations in or to such Real Property Asset or any part thereof or (b) limit the use and enjoyment of such Real Property Asset as used or intended to be used by the Borrower and its Subsidiaries.

NY\1130626.12 mk - tamarack credit agreement

CREDIT AGREEMENT

"**Applicable Percentage**" means, (a) with respect to any Tranche A Lender for purposes of Section 2 or the calculation of the Tranche A LC Exposure or the Tranche A Exposure, or in respect of any indemnity claim arising out of an action or omission of the Fronting Bank under this Agreement, the percentage of the Tranche A Funding Amounts represented by such Tranche A Lender's Tranche A Funding Amount, and (b) with respect to any Lender in respect of any indemnity claim arising out of an action or omission of the Paying Agent under this Agreement, the percentage of the total of the Tranche A Funding Amounts and the aggregate principal amount of the Tranche B Loans) represented by the respective aggregate amounts thereof held by such Lender. If the Tranche A Funding Amounts have been reduced to zero, the Applicable Percentages shall be determined based upon the Tranche A Funding Amounts most recently in effect, giving effect to any assignments. If the Tranche B Loans have been paid in full, the Applicable Percentages shall be determined based upon the principal amounts of the Tranche B Loans outstanding immediately before their payment in full, giving effect to any assignments.

"**Appraised Value**" means the "Total Net Value" (as defined in the Initial Appraisal) of the Real Property Collateral as determined by the Appraiser in the most recent and available Qualified Appraisal Update. As of the Effective Date, the Appraised Value of the Real Property Collateral based on the Initial Appraisal is $824,000,000.

"**Appraiser**" means Cushman & Wakefield of Colorado, Inc., or such other independent appraisal firm selected by the Administrative Agent.

"**Approved Fund**" means any Fund or similar investment vehicle that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Approved Project Budget**" means that certain budget attached hereto as Exhibit 1 which describes the costs and expenditures the Borrower and its Subsidiaries project to incur during the course of development of the Project as described in the Project Projections, which budget may be updated from time to time in accordance with Section 5.3(xi) below.

"**Asset Sale**" means the sale, lease, sale and leaseback, assignment, conveyance, transfer or other voluntary disposition (other than operating leases entered into in the Ordinary Course of Business) by the Borrower or any of its Subsidiaries to any Person (other than the Loan Parties) of any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including, without limitation, any Capital Stock of the Borrower or the Borrower's Subsidiaries.

"**Assignment Agreement**" means an assignment and assumption agreement in substantially the form of Exhibit II-A annexed hereto or in such other form as may be approved by the Administrative Agent.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"**Base Rate**" means, at any time, (A) with respect to Tranche A Loans held by Tranche A Lenders, the higher of (i) the Prime Rate or (ii) the rate which is 0.5% in excess of the Federal Funds Effective Rate and (B) with respect to Tranche A Loans held by the Fronting Bank, the higher of (i) the Prime Rate minus 1.0% or (ii) the rate which is 0.5% in excess of the Federal Funds Effective Rate minus 1.0%.

"**Base Rate Borrowing**" means a Borrowing of Base Rate Loans.

3

"**Base Rate Loans**" means Loans bearing interest at rates determined by reference to the Base Rate as provided in Section 2.6A.

"**Bayview Contracts**" means, collectively, that certain (i) Tamarack Condominium Pad Purchase Agreement dated as of August 9, 2005 by and between Tamarack Resort LLC, as seller, and Bayview Financial, L.P., as buyer, and (ii) Option Agreement dated as of February 24, 2006 by and between Tamarack Resort LLC, as optionor, and Bayview Financial, L.P., as optionee, in each case, as amended, amended and restated, supplemented and otherwise Modified from time to time.

"**Bayview Parcels**" means (i) Block 7 of Phase 2.2 of the Tamarack Resort Planned Unit Development (commonly known as the Whitewater Parcel), (ii) a portion of Block 19, Lot 9 and a portion of the remainder of Block 19 of Phase 1 Village of the Tamarack Planned Unit Development consisting of the pads for Buildings B24, B26, and B27 of the Tamarack Master Plan (commonly known as the Belvedere Ridge Parcel), and (iii) a portion of Block 19 of Phase 1 Village of the Tamarack Planned Unit Development consisting of the pads for Buildings B21 and B22 of the Tamarack Resort Master Plan (commonly known as the B21/B22 Parcel).

"**Borrower Pension Plan**" means any pension plan, as defined in Section 3(2) of ERISA, other than a Pension Plan or Multiemployer Plan, which is intended to be qualified under Section 401(a) of the Internal Revenue Code and which is, or was within the past six years, maintained or contributed to by Borrower or its Subsidiaries.

"**Borrower**" means Tamarack Resort LLC.

"**Borrower's Knowledge**" shall mean the actual knowledge, after reasonable inquiry, of the Responsible Officers of the Borrower.

"**Borrowing**" means (a) all Base Rate Loans of the same class made, converted or continued on the same date or (b) all Eurodollar Rate Loans of the same Class that have the same Interest Period.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close; provided that with respect to matters relating to Eurodollar Rate Loans, the term "**Business Day**" shall mean a day other than a Saturday, Sunday or other day on which commercial banks in New York City or London, England, are authorized or required by law to close.

"**Calculation Date**" means the last day of the relevant Fiscal Quarter.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, common stock, preferred stock, partnership interests (general and limited) and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**Cash**" means all monetary items treated as cash in accordance with GAAP, consistently applied.

4

"**Cash Collateral**" means the Cash and/or Cash Equivalents held in the Company's Operating Account and the Development Reserve Account, provided however that Cash Collateral shall not include the Equity Proceeds of any Permitted Equity Issuance if such Equity Proceeds are designated by the Borrower in writing to be used for the purposes for which Restricted Payments are permitted under Section 6.5(iii).

"**Cash EBITDA**" means the sum during any period, without duplication, of (i) Net Cash from Project Sales, plus (ii) Net Cash from Operations, plus (iii) any interest earned on Cash held by the Borrower or any of its Subsidiaries and invested in Cash Equivalents (including interest earned on funds held in the Development Reserve Account and the Company's Operating Account).

"**Cash Equivalents**" means (a) marketable securities issued or directly and unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof; (b) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having the highest rating obtainable from either S&P or Moody's; (c) commercial paper maturing no more than one year from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's; (d) certificates of deposit or bankers' acceptances maturing within one year from the date of acquisition thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, issued by any Lender or any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia having unimpaired capital and surplus of not less than $500,000,000 (each Lender and each such commercial bank being herein called a "**Cash Equivalent Bank**"); (e) money market funds administered by the Account Holder with a rating of at least AAA from S&P, and (f) Eurodollar time deposits having a maturity of less than one year purchased directly from any Cash Equivalent Bank (provided such deposit is with such bank or any other Cash Equivalent Bank).

"**Cash From Project Sales**" means, with respect to Borrower and its Subsidiaries, for any period and without duplication, (a) Cash Proceeds received during such period attributable to real estate transactions which occurred during or prior to such period as either (i) a sale of real property, (ii) an option for the purchase of real property, or (iii) a transfer of real property (i.e., title has been transferred) that would be recognized as a sale of real property for GAAP purposes if a sufficient Cash payment had been received on account of such transfer (all amounts described in (i) through (iii) above included only if the Cash received with respect such transaction is nonrefundable); (b) principal and interest collected in Cash on receivables arising from real estate transactions; (c) Cash previously received in connection with a transaction described in (a)(i) through (iii) above which was previously refundable, but became nonrefundable during the current period; and (d) Cash proceeds received from sales of golf, ski and club memberships relating to the Project less (e) Permitted Transaction Costs properly allocable to such transactions.  For purposes of the foregoing, the sale of the Capital Stock of any Subsidiaries (to the extent permitted by this Agreement) that own any Real Property Collateral shall be treated as a sale of such Real Property Collateral reduced by commissions and closing costs properly allocable to such transactions.

"**Cash Proceeds**" means, with respect to any Asset Sale, Cash payments (including any Cash received by way of deferred payment pursuant to, or monetization of, a note receivable or otherwise, but only as and when so received) received from such Asset Sale.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any

5

**CREDIT AGREEMENT**

Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"**Change of Control**" means any breach of the covenant contained in Section 5.19.

"**Cleanup**" means all actions required to:  (a) cleanup, remove, treat or remediate Hazardous Materials in the indoor or outdoor environment; (b) prevent the Release of Hazardous Materials so that they do not migrate, endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; or (c) perform pre-remedial studies and investigations and post-remedial monitoring and care.

"**Collateral**" means all of the properties and assets in which Liens are purported to be granted by the Collateral Documents.

"**Collateral Agent**" means Credit Suisse, in its capacity as collateral agent hereunder and under the Collateral Documents, and any successor in such capacity.

"**Collateral Assignment of Declarant's Rights**" means the Collateral Assignment of Declarant's Rights executed and delivered by the declarant under the Master Declarations in favor of the Collateral Agent for the benefit of the Agents and the Secured Parties substantially in the form of Exhibit XVII annexed hereto.

"**Collateral Documents**" means the Security Agreement, the Mortgage, the Recognition and Estoppel Agreements, the Collateral Assignment of Declarant's Rights, the Guaranties, the Pledge Agreement, the Non-Recourse Guaranty, the Environmental Indemnity and any other documents, instruments or agreements delivered by any Loan Party or the Non-Recourse Guarantor pursuant to this Agreement or any of the other Loan Documents from time to time in order to grant, protect or perfect liens on any assets of such Loan Party or the Non-Recourse Guarantor as security for all or any of the Obligations.

"**Commitments**" means the commitments of the Lenders to make Loans as set forth in Section 2.2 of this Agreement.

"**Company's Operating Account**" means a Deposit Account or securities account to be established by the Borrower pursuant to and in accordance with Section 3.3A, which shall at all times be subject to a Control Agreement in favor of the Collateral Agent.

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit III annexed hereto delivered to the Administrative Agent by the Borrower pursuant to Sections 3.3C(i), 5.3(iv), 5.3(xi), and 5.3(xvii).

"**Condemnation Proceeds**" has the meaning assigned to that term in Section 2.8B(ii)(c).

"**Consolidated Capital Expenditures**" means, for any period, the aggregate of all expenditures (whether paid in Cash or other consideration or accrued as a liability, but without duplication), by the Borrower and its Subsidiaries during that period for construction costs as contemplated by the Approved Project Budget and Project Projections, land development costs and purchases of property, plant or equipment, and any comparable items reflected in the consolidated statement of cash flows of the Borrower and its Subsidiaries.

6

"**Consolidated Interest Expense**" means, for any period (as determined for the Borrower and its Subsidiaries on a consolidated basis) total interest expense (including that portion attributable to capital leases in accordance with GAAP) payable in Cash in such period with respect to Indebtedness, including, without limitation, all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Hedge Agreements (excluding, however, (a) any amounts referred to in Section 2.7 payable to Agents or the Lenders on or before the Effective Date, (b) any amortized Transaction Costs and (c) any amounts paid by a Loan Party to another Loan Party with respect to intercompany Indebtedness permitted under Section 6.1).

"**Consultant**" means a construction consultant satisfactory to Administrative Agent in its sole discretion retained by Borrower on behalf of Administrative Agent (with Administrative Agent having the right to replace any consultant retained by Borrower if in Administrative Agent's reasonable discretion, such consultant's performance is unsatisfactory and any such replacement consultant to be reasonably satisfactory to Borrower) to perform periodic inspections of the construction progress at the Project and to whom Borrower will deliver quarterly construction progress reports as required by Section 5.3(ii) of this Agreement.

"**Contingent Obligation**" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person (a) with respect to any Indebtedness, lease, dividend or other obligation of another if the primary purpose or intent thereof by the Person incurring the Contingent Obligation is to provide assurance to the obligee of such obligation of another that such obligation of another will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such obligation will be protected (in whole or in part) against loss in respect thereof, (b) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings, or (c) under Hedge Agreements. Contingent Obligations shall include, without limitation, (i) the direct or indirect guaranty, endorsement (other than for collection or deposit in the Ordinary Course of Business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another, (ii) the obligation to make take-or-pay or similar payments if required regardless of non-performance by any other party or parties to an agreement, and (iii) any liability of such Person for the obligation of another through any agreement (contingent or otherwise) (A) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (B) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (A) or (B) of this sentence, the primary purpose or intent thereof is as described in the preceding sentence. The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if less, the amount to which such Contingent Obligation is specifically limited.

"**Contractor**" means each of the general contractors and construction managers listed on Schedule 1.1(e) hereto, or such other general contractor or construction manager engaged by the Borrower or any of its Subsidiaries in accordance with the terms of this Agreement, to construct all or a portion of the improvements and amenities located at the Project.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

"**Control Agreement**" means an account control agreement substantially in the form of Exhibit XVIII or otherwise in form and substance acceptable to the Administrative Agent.

7

"**Credit Suisse**" means Credit Suisse, Cayman Islands Branch, or one or more of its other branches and any Affiliate thereof.

"**Crest Fractional Units**" means the portion of the Real Property Collateral comprising a 40-unit fractional condominium project located in the upper portion of the Whitewater Development in the Project. The Crest Fractional project is located on the parcel bordered by Whitewater Drive, Crest Court, Lot 39, and a ski run, as more particularly described on Exhibit X attached hereto.

"**Debt Service**" means, for any period, all payments of interest and all scheduled mandatory and voluntary prepayments of principal made during such period for all Indebtedness of the Borrower and its Subsidiaries (including, without limitation, the Indebtedness evidenced by the Loan Documents).

"**Default**" means a condition or event that, after notice or after any applicable grace period has lapsed, or both, would constitute an Event of Default.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Designated Speculative Housing Units**" means up to sixty-four (64) Residential Units comprising only the Crest Fractional Units and the Members Lodge Extension Units.

"**Development Reserve Account**" means the account established pursuant to Section 3.3A.

"**Disbursement Authorization**" means a notice in the form of Exhibit VI annexed hereto delivered by the Borrower to the Administrative Agent pursuant to Section 2.3 with respect to a proposed borrowing.

"**Disbursement Date**" means any Business Day specified by the Borrower as a date on which the Borrower delivers a Disbursement Authorization.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Draw Package**" has the meaning assigned to that term in Section 3.3C(i).

"**Effective Date**" means such date on or prior to May 19, 2006, on which the conditions to effectiveness set forth in Section 3.1 are satisfied.

"**Eligible Assignee**" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, (d) a commercial bank organized under the laws of the United States, or any State thereof, and having a combined capital and surplus of at least $250,000,000; (e) a savings and loan association or savings bank organized under the laws of the United States, or any State thereof, and having a combined capital and surplus of at least $250,000,000; (f) a commercial bank organized under the laws of any other country that is a member of the OECD or has concluded special lending arrangements with the International Monetary Fund associated with its General Arrangements to Borrow or a political subdivision of any such country, and having a combined capital and surplus of at least $250,000,000, so long as such bank is acting through a branch or agency located in the United States; (g) a finance company, insurance company or other financial institution or fund (whether a corporation, partnership, trust or other entity) that is engaged in making, purchasing or otherwise holding commercial loans in the ordinary course of its business and having a combined capital and surplus of at least $250,000,000 or an Approved Fund thereof and (h) any other Person (other than a natural person) approved by the Administrative Agent (such

8

approval not to be unreasonably withheld or delayed) and so long as no Default or Event of Default has occurred and is continuing, approved by the Borrower (such approval not to be unreasonably withheld or delayed); provided that notwithstanding the foregoing, "**Eligible Assignee**" shall not include the Borrower or any of its Subsidiaries.

"**Entitlement Documents**" has the meaning assigned to that term in Section 4.36.

"**Entitlements**" shall mean those certain Governmental Authorizations which were required to be obtained and maintained (as applicable), or may be required to be obtained and maintained in the future, in order to allow the completion of the development work for the Project and the sale of the Residential Units and Unimproved Lots (including, without limitation, the Real Property Collateral) and portions of the Project as legal lots, all as contemplated by the Master Plans and the Project Projections, and including, without limitation, all Governmental Authorizations necessary to permit the legal subdivision and sale of the Residential Units and Unimproved Lots (to the extent the same are to be legally subdivided to achieve the Project Projections) and the development of the Residential Units, the Hotels, the Golf Course and the Ski Hill as well as applicable earthwork, grading, infrastructure, improvements, equipment, drainage, storm water and sewer systems, roadways and other work, labor or materials required to be furnished or actions to be taken by or in connection with amending, modifying, maintaining and perpetuating all of the foregoing, and the documents, agreements and instruments relating thereto. The Entitlements currently in effect with respect to the Real Property Collateral are listed on Schedule 4.36 attached hereto.

"**Environmental Claim**" means any claim, action, investigation or written notice by any Person alleging potential liability (including, without limitation, potential liability for investigatory costs, Cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, or penalties) arising out of, based on or resulting from (a) the presence, or Release of any Hazardous Materials at any location, whether or not owned, leased or operated by the Borrower or any of its Subsidiaries, or (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

"**Environmental Indemnity**" means the Environmental Indemnity executed and delivered by the Non-Recourse Guarantor as of the Effective Date substantially in the form attached hereto as Exhibit XXIII hereto, as amended, amended and restated, supplemented or otherwise Modified from time to time.

"**Environmental Laws**" means all federal, state, local and foreign laws and regulations relating to pollution or protection of human health or the environment, including, without limitation, laws relating to Releases or threatened Releases of Hazardous Materials or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, Release, disposal, transport or handling of Hazardous Materials, laws and regulations with regard to record keeping, notification, disclosure and reporting requirements respecting Hazardous Materials and laws relating to the management or use of natural resources.

"**Environmental Liabilities**"   means all liabilities, obligations, responsibilities, obligations to conduct Cleanup, and all Environmental Claims pending or threatened against any Loan Party or its Subsidiaries or against any Person whose liability for any Environmental Claim any Loan Party or its Subsidiaries may have retained or assumed either contractually or by operation of law, arising from (a) environmental, health or safety conditions, (b) the presence, Release or threatened Release of Hazardous Materials at any location, whether or not owned, leased or operated by the Borrower or its Subsidiaries, or (c) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

9

CREDIT AGREEMENT

"**Equity Proceeds**" means the sum of (i) Cash Proceeds from the issuance of any Capital Stock or other equity Securities of the Borrower or any Subsidiaries of the Borrower; less (ii) underwriting discounts and commissions and other Permitted Transaction Costs.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute.

"**ERISA Affiliate**" means (a) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which the Borrower is a member; (b) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which the Borrower is a member; and (c) solely for purposes of obligations under Section 412 of the Internal Revenue Code or under the applicable sections set forth in Section 414(t)(2) of the Internal Revenue Code, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which the Borrower, any corporation described in clause (a) above or any trade or business described in clause (b) above is a member.

"**ERISA Event**" means (a) a "reportable event" within the meaning of Section 4043(c) of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (b) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(d) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 412(m) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (c) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (d) the withdrawal by the Borrower or any ERISA Affiliate from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting, in either case, in liability pursuant to Section 4063 or 4064 of ERISA, respectively; (e) the institution by the PBGC of proceedings to terminate any Pension Plan pursuant to Section 4042 of ERISA; (f) the imposition of liability on the Borrower or any ERISA Affiliate pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (g) the withdrawal by the Borrower or any ERISA Affiliate in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan resulting in withdrawal liability pursuant to Section 4201 of ERISA, or the receipt by the Borrower or any ERISA Affiliate of written notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4042 of ERISA or under Section 4041A of ERISA if such termination would result in liability to the Borrower or any ERISA Affiliate; (h) the disqualification by the Internal Revenue Service of any Pension Plan or Borrower Pension Plan under Section 401(a) of the Internal Revenue Code, or the determination by the Internal Revenue Service that any trust forming part of any Pension Plan or Borrower Plan fails to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (i) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

"**Eurocurrency Reserve Requirements**" means, for each Interest Period for each Eurodollar Rate Loan, the highest reserve percentage applicable to any Lender during such Interest Period under regulations issued from time to time by the Board of Governors of the Federal Reserve System or any successor for determining the maximum reserve requirement (including, without limitation, any emergency, supplemental or other marginal reserve requirement), with respect to liabilities or assets consisting of or including Eurocurrency liabilities having a term equal to such Interest Period.

"**Eurodollar Base Rate**" means the rate per annum (determined by the Administrative Agent or the Paying Agent, as applicable) at approximately 11:00 A.M. (London time) on the date which is two (2) Business Days prior to the beginning of the relevant Interest Period (as specified in the applicable Disbursement Authorization or Notice of Conversion/Continuation) by reference to the British Bankers' Association Interest Settlement Rates for deposits in Dollars (as set forth by any service selected by the Administrative Agent or the Paying Agent which has been nominated by the British Bankers' Association as an authorized information vendor for the purpose of displaying such rates) for a period equal to such Interest Period; provided that to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "Eurodollar Base Rate" shall be the interest rate per annum determined by the Administrative Agent or the Paying Agent, as applicable, to be the average of the rates per annum at which deposits in Dollars are offered for such relevant Interest Period to major banks in the London interbank market in London, England by the Reference Lenders at approximately 11:00 A.M. (London time) on the date which is two (2) Business Days prior to the beginning of such Interest Period. If any of the Reference Lenders shall be unable or shall otherwise fail to supply such rates to the Administrative Agent or Paying Agent upon its request, the rate of interest shall be determined on the basis of the quotations of the remaining Reference Lenders.

"**Eurodollar Borrowing**" means a Borrowing of Eurodollar Rate Loans.

"**Eurodollar Rate Loans**" means Loans bearing interest at rates determined by reference to the Reserve Adjusted Eurodollar Rate as provided in Section 2.6A.

"**Event of Default**" means each of the events set forth in Section 7.

"**Excess Cash Flow**" means, for any period, (a) the amount of Cash EBITDA for such period, less (b) Debt Service for such period, less (c) amounts reserved for Tax Distributions permitted to be made pursuant to Section 6.5(i) in the Fiscal Year in which the amount is being reserved, less (d) an amount, if any, reasonably necessary to ensure the Borrower maintains a Cash reserve during the course of the succeeding Fiscal Quarter in an amount of no less than $15,000,000 (taking into consideration the amounts remaining in the Company's Operating Account and the Development Reserve Account).

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Taxes**" means, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any Obligation of the Borrower, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the United States or the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lender Office is located, (b) any branch profits taxes imposed by the United States of America or any comparable taxes imposed by any other jurisdiction described in clause (a) hereof and (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 2.12B), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new Lender Office) or is attributable to such Foreign Lender's failure (other than as a result of a Change in Law) to comply with Section 2.11E(v), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Lender Office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.11E(i).

"**Existing Indebtedness**" means the Indebtedness of the Borrower listed on Schedule 1.1(b) attached hereto, which Indebtedness will be paid in full and extinguished on the Effective Date.

11

"**Federal Funds Effective Rate**" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by the Administrative Agent.

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the most senior Lien (other than Liens listed in subclauses (a), (g), and (l) of the definition of Permitted Encumbrances) to which such Collateral is subject.

"**Fiscal Month**" means one of the 13 periods comprising the Fiscal Year of the Borrower.

"**Fiscal Quarter**" means a fiscal quarter based upon a 13 period Fiscal Year of the Borrower.

"**Fiscal Year**" means the fiscal year of the Borrower and its Subsidiaries ending on December 31 of each calendar year. Borrower's 2006 Fiscal Year is more particularly described on <u>Exhibit XXIV</u> hereto.

"**Flood Hazard Property**" means a Real Property Collateral located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"**FLSA**" means the Fair Labor Standards Act of 1938.

"**Foreign Lender**" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is a resident for tax purposes. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"**Fronting Bank**" means Credit Suisse in its capacities as the Lender of Tranche A Loans and the issuer of Letters of Credit hereunder, and its successors in such capacities.

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans or similar extensions of credit in the ordinary course of its business.

"**Funded Tranche A Loan**" has the meaning set forth in Section 2.1C(iv).

"**Funding and Payment Office**" means the office of the Administrative Agent located at 11 Madison Avenue, New York, NY 10010 (or such office of the Administrative Agent or any successor Administrative Agent specified by the Administrative Agent or such successor Administrative Agent in a written notice to the Loan Parties and the Lenders).

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.2, generally accepted accounting principles, as in effect in the United States of America and on the date of determination.

"**Golf Course**" means the 18-hole championship Robert Trent Jones Il-designed golf course as depicted on Exhibit X, which has been developed as part of the Project and is commonly known as Osprey Meadows.

"**Governmental Authority**" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Governmental Authorization**" means any permit, approval, license, zoning and other resolution, certificate of occupancy, authorization, plan, directive, consent order, consent decree or similar authorizations of or from any Governmental Authority.

"**Ground Lease**" means collectively, the (i) Commercial Lease No. M-5042 dated June 11, 2002, by and between the State of Idaho, acting by and through the State Board of Land Commissioners, as lessor, and WestRock Associates, L.L.C., a Delaware limited liability company, as lessee and (ii) Lease dated as of December 31, 2004, by and between West Mountain Golf, LLC, a Delaware limited liability company, as lessor, and Tamarack Resort LLC, as lessee, in each case, as amended, amended and restated, supplemented, extended or otherwise Modified from time to time.

"**Guaranties**" means the Subsidiary Guaranties and the Non-Recourse Guaranty.

"**Hazardous Materials**" means any chemical, material or substance, the generation, use, storage, transportation or disposal of which, or the exposure to which, is prohibited, limited or regulated by any Governmental Authority or which may or could pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any Real Property Asset or to the indoor or outdoor environment.

"**Hedge Agreements**" means all interest rate swaps, caps or collar agreements or similar arrangements entered into by the Borrower or any of its Subsidiaries providing for protection against fluctuations in interest rates or currency exchange rates or the exchange of nominal interest obligations, either generally or under specific contingencies.

"**Hotels**" means any hotel project constructed on the Real Property Collateral and owned by the Borrower or any of its Subsidiaries.

"**Indebtedness**" means, as applied to any Person, without duplication, (a) all indebtedness for borrowed money (including, without limitation, the indebtedness permitted under Section 6.1), (b) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP, (c) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money (other than current accounts payable incurred in the Ordinary Course of Business and accrued expenses incurred in the Ordinary Course of Business), (d) any obligation owed for all or any part of the deferred purchase price of property or services (excluding any current trade payables incurred in the Ordinary Course of Business, but including earn-outs with respect to any acquisition), (e) all obligations evidenced by notes, bonds (other than performance bonds), debentures or other similar instruments, (f) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property or assets acquired by such Person (even though the rights and remedies of the seller or the lender under such agreement in the event of default are limited to repossession or sale of such property or assets), (g) all obligations due and payable under Capital Leases, (h) all obligations, contingent or otherwise, as an account party under any

13

NY\1130626.12 mk - tamarack credit agreement

CREDIT AGREEMENT

letter of credit or under acceptance, letter of credit or similar facilities to the extent not reflected as trade liabilities on the balance sheet of such Person in accordance with GAAP, (i) all obligations, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock, (j) all obligations under Hedge Agreements with the Administrative Agent, the Syndication Agent, a Lender or any of their respective Affiliates, including, as of any date of determination, the net amounts, if any, that would be required to be paid by such Person if such Hedge Agreements were terminated on such date, (k) all Contingent Obligations in respect of obligations of the kind referred to in clauses (a) through (i) above or in respect of the payment of dividends on the Capital Stock of any other Person, and (l) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; provided that if such Person has not assumed such secured indebtedness that is nonrecourse to its credit, then the amount of indebtedness of such Person pursuant to this clause (l) shall be equal to the lesser of the amount of the secured indebtedness or the fair market value of the assets of such Person which secure such indebtedness.

"**Indemnified Taxes**" means Taxes other than Excluded Taxes and Other Taxes.

"**Indemnitee**" has the meaning assigned to that term in Section 9.2B.

"**Initial Appraisal**" means that certain "Appraisal of Real Property" dated as of March 31, 2006, and prepared by the Appraiser for the Administrative Agent.

"**Insolvency Proceeding**" means (A) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors, or (B) any general assignment for the benefit of creditors, composition, marshalling of assets for creditors or other, similar arrangement in respect of its creditors generally or any substantial portion of its creditors; in each case (A) and (B) undertaken under U.S. Federal, State or foreign law, including the Bankruptcy Code.

"**Insurance Proceeds**" has the meaning assigned to that term in Section 2.8B(ii)(c).

"**Intellectual Property**" has the meaning assigned to that term in the Security Agreement.

"**Interest Coverage Ratio**" has the meaning assigned to that term in Section 6.6B.

"**Interest Payment Date**" means:

> (a)     with respect to any Base Rate Loan, the last Business Day in each of March, June, September and December of each year, commencing on June 30, 2006 and upon each prepayment of the Tranche B Loans; and

> (b)     with respect to any Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan; provided that in the case of each Interest Period of longer than three months, "Interest Payment Date" shall also include the date that is three months after the commencement of such Interest Period.

"**Interest Period**" has the meaning assigned to that term in Section 2.6B.

"**Interest Rate Determination Date**" means each date for calculating the Reserve Adjusted Eurodollar Rate, for purposes of determining the interest rate in respect of an Interest Period. The Interest

14

Rate Determination Date for purposes of calculating the Reserve Adjusted Eurodollar Rate shall be the second Business Day prior to the first day of the related Interest Period.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter and any successor statute.

"**Investment**" means (a) any direct or indirect purchase or other acquisition by the Borrower or any of its Subsidiaries of, or of a beneficial interest in, Capital Stock or other Securities of any other Person, or (b) any direct or indirect loan, advance (other than advances to employees for moving, education, computer, entertainment and travel expenses, drawing accounts and similar expenditures in the Ordinary Course of Business) or capital contribution by the Borrower or any of its Subsidiaries to any other Person, including all indebtedness and accounts receivable acquired from that other Person that are not current assets or did not arise from sales to that other Person in the Ordinary Course of Business. The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"**LC Disbursement**" means a payment made by the Fronting Bank pursuant to a Letter of Credit.

"**Lender**" and "**Lenders**" means the Persons identified as "Lenders" and listed on the signature pages of this Agreement, together with their successors and permitted assigns pursuant to Section 9.1; provided that the term "Lenders", when used in the context of a particular Loan Commitment shall mean the Lenders having that Loan Commitment.

"**Lender Office**" means, as to any Lender, the office or offices of such Lender specified in the Administrative Questionnaire completed by such Lender and delivered to the Administrative Agent, and the office or offices of such Lender that the Administrative Agent notifies the Borrower promptly but no later than two days after the Effective Date, or such other office or offices as such Lender may from time to time designate to the Borrower and the Administrative Agent.

"**Letter of Credit**" has the meaning set forth in Section 2.5.

"**LID Bonds**" means the bonds issued pursuant to Ordinance No. 2003-3 of the North Lake Recreational Sewer and Water District, Valley County, Idaho dated May 10, 2003 as amended by Ordinance No. 03-05 of the North Lake Recreational Sewer and Water District, Valley County, Idaho dated October 11, 2003 and as further amended by Ordinance No. 2006-1 of the North Lake Recreational Sewer and Water District, Valley County, Idaho, dated March 11, 2006, as well as any bonds issued pursuant to the North Lake Recreational Sewer and Water District LID Nos. 2004-1; 2004-2 and 2005-1.

"**Lien**" means any lien, mortgage, pledge, assignment, security interest, fixed or floating charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give any security interest) and any option, trust or deposit or other preferential arrangement having the practical effect of any of the foregoing.

"**Loan Commitment**" means the commitment of a Lender to make a Loan to the Borrower pursuant to Section 2.2 (including the commitment of any Eligible Assignee to participate with respect to a Loan as part of the primary syndication).

"**Loan Documents**" means this Agreement, the Notes and the Collateral Documents or other documents evidencing or securing Obligations executed on or prior to the Effective Date or at any time thereafter.

"**Loan Exposure**" means, with respect to any Lender, as of any date of determination the outstanding principal amount of the Loan of that Lender.

"**Loan Party**" or "**Loan Parties**" means the Borrower and any of its Subsidiaries who executes any of the Loan Documents.

"**Loans**" mean the loans outstanding or made by the Lenders pursuant to Section 2.2.

"**Margin Stock**" has the meaning assigned to that term in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**Master Declarations**" has the meaning assigned to that term in Section 4.39 as they may be further amended, supplemented, amended and restated or otherwise Modified from time to time.

"**Master Plans**" means the approvals of Valley County, Idaho, being Conditional Use Permit No. 02-04 WestRock - Private Property and No. 02-05 WestRock - State Lease Property for PUD 98-1 WestRock Resort, a Planned Unit Development dated and recorded June 11, 2002, as amended, restated, amended and restated, supplemented or modified from time to time, PUD approval 98-1 and as modified June 3, 2002, Preliminary Plat Approval granted June 3, 2002, and Final Plat Approvals recorded in Books of Plats in the Office of the Recorder of Valley County, Idaho, as follows:  Book 9 at page 66, Book 9 at page 67, Book 9 at page 840, Book 10 at page 2, Book 10 at page 5, Book 10 at page 25, Book 10 at page 26 and Book 10 at page 39, and the approvals of Adams County, Idaho, approvals of Adams County, Idaho, being Conditional Use Permit issued March 17, 2003, on conditions set forth in letter dated March 17, 2003, to Steven Milleman from Michael Fisk, Clerk of the Adams County Board of Commissioners enclosing Conditional Use Permit, and State of Idaho Commercial Lease No. M-5042.

"**Material Adverse Effect**" means (a) a material adverse effect upon the business, operations, properties, assets or condition (financial or otherwise) of the Borrower and its Subsidiaries, taken as a whole, (b) the material impairment of the ability of the Loan Parties to perform the Obligations (regardless of whether or not such Material Adverse Effect can be or has been cured at any time or whether Borrower has knowledge of such Material Adverse Effect), (c) a material adverse effect upon the legality, validity, binding effect or enforceability against a Loan Party or the Non-Recourse Guarantor of a Loan Document to which it is a party, (d) a material adverse effect upon the rights, remedies and benefits, available to, or conferred upon, the Agents or any Lender under any Loan Document, (e) a material adverse effect upon the value of the then remaining Real Property Collateral, or (f) a material adverse effect upon the Entitlements and the intended development of the Real Property Collateral as contemplated by the Project Projections.

"**Material Contracts**" has the meaning assigned to that term in Section 4.33A.

"**Maturity Date**" means the Tranche A Maturity Date or the Tranche B Maturity Date, as the case may be.

"**Maximum Amount**" has the meaning assigned to that term in Section 9.13A.

"**Meadows Project**" means the real property to be purchased by Meadows Subsidiary, as buyer pursuant to six Real Estate Purchase and Sale Agreement & Receipt for Earnest Money contracts, further identified as ID#64747017-A through F, with Timberline Development LLC, as seller, and utilized for purposes of employee housing.

16

"**Meadows Subsidiary**" means Tamarack Community Housing LLC, a subsidiary of the Borrower that will own the Meadows Project.

"**Members' Lodge Extension Units**" means the 24-unit condominium project located adjacent to the existing Members' Lodge in the Project on the pad known as Building ID B-25, as more particularly described on the map attached hereto as Exhibit X.

"**Modifications**" shall mean any amendments, supplements, modifications, renewals, replacements, consolidations, severances, substitutions and extensions of any document or instrument from time to time; "**Modify**", "**Modified**," or related words shall have meanings correlative thereto.

"**Moody's**" means Moody's Investors Service, Inc.

"**Mortgage**" means a first lien mortgage, security agreement, assignment of leases and rents, and fixture filing, substantially in the form of Exhibit XII annexed hereto, executed and delivered by any Loan Party on or after the Effective Date, with such changes thereto as may be recommended by the Collateral Agent's local counsel based on local laws or customary local mortgage or deed of trust practices, as such security instrument may be amended, restated, amended and restated, supplemented, or otherwise Modified from time to time. "**Mortgages**" means all such instruments collectively.

"**Mortgagee Policies**" has the meaning assigned to that term in Section 3.1G(ii).

"**Multiemployer Plan**" means a "multiemployer plan", as defined in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate is contributing or to which the Borrower or any ERISA Affiliate had an obligation to contribute within the last six years.

"**Net Cash from Project Sales**" means, for any period, (i) Cash From Project Sales realized during such period, less (ii) Project Expenses incurred in such period. The parties acknowledge that Net Cash from Project Sales may be a negative dollar amount for purposes of calculating the financial covenants set forth in Section 6.6 only.

"**Net Cash from Operations**" means, for any period, (i) the gross operating revenues (not including, for the avoidance of doubt, any amounts taken into account in determining Cash From Project Sales) actually received by the Borrower and its Subsidiaries during such period with respect to the Hotel, the Golf Course, the Ski Hill, any improvements hereafter constructed by the Borrower or any of its Subsidiaries as a part of the Project, and any related amenities and any progress payments received under Residential Unit Construction Contracts, less (ii) all cash amounts of any kind whatsoever paid during such period by the Borrower and its Subsidiaries (including both operating expenses and capital expenditures) other than out of reserves previously set aside by the Borrower and its Subsidiaries (not including, however, Project Expenses or amounts deducted from Cash EBITDA for purposes of determining Excess Cash Flow), less (iii) reasonable reserves set aside during such period for furniture, fixtures and equipment, other capital expenditures (not including, however, Project Expenses) and operating expenses. The parties acknowledge that Net Cash From Operations may be a negative dollar amount for purposes of calculating the financial covenants set forth in Section 6.6 only.

"**Non-Consenting Lender**" has the meaning assigned to that term in Section 9.5B.

"**Non-Recourse Guarantor**" means collectively, Jean-Pierre Boespflug and Alfredo Miguel Afif.

17

**CREDIT AGREEMENT**

"**Non-Recourse Guaranty**" means the Non-Recourse Guaranty executed and delivered by the Non-Recourse Guarantor on the Effective Date substantially in the form attached as Exhibit XIX hereto, as amended, restated, amended and restated, supplemented or otherwise Modified from time to time.

"**Notes**" means (a) the promissory notes of the Borrower issued pursuant to Section 2.3C on the Effective Date and (b) any promissory notes issued by the Borrower in connection with assignments of the Loans of any Lender, in each case substantially in the form of Exhibit V annexed hereto, as they may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"**Notice of Conversion/Continuation**" means a notice substantially in the form of Exhibit VII annexed hereto delivered by the Borrower to the Administrative Agent pursuant to Section 2.6D with respect to a proposed conversion or continuation of the applicable basis for determining the interest rate with respect to the Loans specified therein.

"**Obligations**" means all obligations, liabilities and indebtedness of every nature of each Loan Party now or from time to time hereafter owed to any Agent, the Lenders, the Syndication Agent (with respect to Secured Hedge Agreements), or any of them or their respective Affiliates, whether direct or indirect, absolute or contingent, which may arise out of or in connection with the Loan Documents or Secured Hedge Agreements, whether for principal, interest or scheduled payments or payments for early termination of Secured Hedge Agreements, fees, expenses, indemnification or otherwise.

"**OECD**" means the Organization for Economic Co-Operation and Development.

"**Officer's Certificate**" means, with respect to any Person, a certificate executed on behalf of such Person (a) if such Person is a partnership or limited liability company, by its chairman of the Board (if an officer) or chief executive officer or by the chief financial officer of its general partner or managing member or other Person authorized to do so by its Organizational Documents, (b) if such Person is a corporation, on behalf of such corporation by its chairman of the board (if an officer) or chief executive officer or its chief financial officer or vice president, and (c) if such person is one of the Borrower or a Subsidiaries of the Borrower, a Responsible Officer.

"**Operating Lease**" means, as applied to any Person, any lease (including, without limitation, leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) that is not a Capital Lease other than any such lease under which that Person is the lessor.

"**Ordinary Course of Business**" means, with respect to the Borrower and its Subsidiaries, the ordinary course of their business, as related to developing the Project in accordance with the Project Projections, marketing, selling or leasing commercial units, Unimproved Lots and Residential Units, time shares, and parcels and other portions of or interests in the Project, and the business of owning, marketing, selling, leasing or operating any commercial units included in the Project, and the business of owning, marketing, leasing or operating any Hotel, the Golf Course, the Ski Hill and any other improvements developed as part of the Project, and in each case, as undertaken by the Borrower and its Subsidiaries in good faith and not for purposes of evading any covenant or restriction in any Loan Document.

"**Organizational Authorizations**" means, with respect to any Person, resolutions of its Board of Directors, general partners or members of such Person, and such other Persons, groups or committees (including, without limitation, managers and managing committees), if any, required by the Organizational Certificate or Organizational Documents of such Person to authorize or approve the taking of any action or the entering into of any transaction.

"**Organizational Certificate**" means, with respect to any Person, the certificate or articles of incorporation, partnership or limited liability company or any other similar or equivalent organizational, charter or constitutional certificate or document filed with the applicable Governmental Authority in the jurisdiction of its incorporation, organization or formation, which, if such Person is a partnership or limited liability company, shall include such certificates, articles or other certificates or documents in respect of each partner or member of such Person.

"**Organizational Documents**" means, with respect to any Person, the by-laws, partnership agreement, limited liability company agreement, operating agreement, management agreement or other similar or equivalent organizational, charter or constitutional agreement or arrangement, which, if such Person is a partnership or limited liability company, shall include such by-laws, agreements or arrangements in respect of each partner or member of such Person.

"**OSHA**" means the Occupational Safety and Hazard Act of 1970.

"**Other Taxes**" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"**Paying Agent**" means Credit Suisse, in its capacity as paying agent for the Lenders hereto.

"**Participant**" has the meaning assigned to that term in Section 9.1D.

"**PBGC**" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA (or any successor thereto).

"**PCBs**" has the meaning assigned to that term in Section 4.32(vi).

"**Pension Plan**" means any employee pension benefit plan, as defined in Section 3(2) of ERISA, other than a Multiemployer Plan, which is subject to Title IV of ERISA and is, or was within the past six years, maintained or contributed to by the Borrower or any ERISA Affiliate.

"**Permitted Collateral Asset Sale**" means any transaction (or series of transactions) constituting an arms length sale for fair market value of one or more platted and legally subdivided Residential Units or Unimproved Lots to a third party buyer in the Ordinary Course of Business pursuant to a Qualified Sales Agreement or the Bayview Contracts.

"**Permitted Encumbrances**" means the following types of Liens:

> (a)     Liens for taxes, assessments or governmental charges or claims the payment of which is not, at the time, required by Section 5.5 or otherwise delinquent, including, without limitation, the LID Bonds;

> (b)     statutory Liens of landlords, statutory Liens of carriers, warehousemen, mechanics, vendors and materialmen and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or by ERISA) incurred in the Ordinary Course of Business for sums not yet delinquent or being Properly Contested;