# Exhibit 3
# (Part 3 of 6)

| DATE | AMORTIZATION SCHEDULE |
|------|----------------------|
| June 30, 2006<br>September 30, 2006<br>December 31, 2006 | .25%<br>.25%<br>.25% |
| March 31, 2007<br>June 30, 2007<br>September 30, 2007<br>December 31, 2007 | .25%<br>.25%<br>.25%<br>.25% |
| March 31, 2008<br>June 30, 2008<br>September 30, 2008<br>December 31, 2008 | .25%<br>.25%<br>.25%<br>.25% |
| March 31, 2009<br>June 30, 2009<br>September 30, 2009<br>December 31, 2009 | .25%<br>.25%<br>.25%<br>.25% |
| March 31, 2010<br>June 30, 2010<br>September 30, 2010<br>December 31, 2010 | .25%<br>.25%<br>.25%<br>.25% |
| March 30, 2011 | .25% |
| Maturity Date | Remaining Principal (after giving effect to any voluntary or mandatory prepayments in accordance with Section 2.8C) |

If any of the dates above are not a Business Day, then the applicable installment shall be made on the preceding Business Day. Any voluntary or mandatory prepayments of the Loans in accordance with Section 2.8B shall be applied to the next succeeding scheduled installment of principal of the Tranche B Loans set forth above, with any remaining prepayment amount applied to the next following scheduled installment or installments until the full amount of the prepayment has been applied. The final installment on the Maturity Date specified above for the repayment by the Borrower of the Loans shall be in an amount sufficient to repay all amounts owing by the Borrower under this Agreement with respect to the Loans.

**B.    Prepayments.**

        (i)        Voluntary Prepayments.

        The Borrower may at any time and from time to time prepay, without premium or penalty, the Loans on any Business Day in whole or in part in an aggregate minimum amount of $1,000,000 and integral multiples of $500,000 in excess of that amount or such lesser amount as is then outstanding; provided, however, that in the event the Borrower elects to prepay a Eurodollar Rate Loan other than on the expiration of the Interest Period applicable thereto, the Borrower shall, at the time of such prepayment, also pay any amounts payable under Section 2.10D hereof. The Borrower shall notify the Administrative Agent, in writing or by telephone, promptly confirmed in writing to the Administrative Agent, no later than 11:00 a.m. (New York time) at least one (1) Business Day prior to such prepaying. The Administrative Agent will promptly notify each Lender upon receipt of such notice from the

NY\1130626.12 mk - tamarack credit agreement

**CREDIT AGREEMENT**

Borrower. Any notice of prepayment shall be irrevocable and having been given as aforesaid, the Loans shall become due and payable on the prepayment date specified in such notice and in the aggregate principal amount specified therein, provided, however that the Borrower may revoke any such notice of prepayment if conditioned upon a refinancing as described in Section 2.8D below. Any voluntary prepayments pursuant to this Section 2.8B(i) shall be applied as specified in Section 2.8C.

    (ii)    Mandatory Prepayments.

    The Tranche B Loans shall be prepaid in the manner provided in Section 2.8C upon the occurrence of the following circumstances:

    (a)  Prepayments Due to Issuance of Debt. Concurrently with and as a condition to the closing of any transaction pursuant to which Borrower or any of its Subsidiaries issue debt Securities or incur additional borrowed Indebtedness (other than Indebtedness permitted under Section 6.1), the Borrower shall prepay the Loans in an amount equal to the sum of (i) the principal amount of such debt Securities or borrowed Indebtedness paid or payable to the Borrower or its Subsidiaries; less (ii) Permitted Transaction Costs. Such prepayment shall not be deemed to waive any violation of Section 6.1 hereof.

    (b)  Prepayments Due to Issuance of Equity Securities. Concurrently with and as a condition to the closing of any transaction pursuant to which the Borrower or any of its Subsidiaries receive any Equity Proceeds (other than Equity Proceeds received by (i) the Borrower from Investments made by the existing holders of the Capital Stock in the Borrower as of Effective Date, (ii) the Borrower's wholly-owned Subsidiaries from Investments made by the Borrower or another of its Subsidiaries in such Subsidiaries and permitted under Section 6.3 or (iii) Equity Proceeds received as a result of a Permitted Equity Issuance, provided that such Equity Proceeds are designated by the Borrower in writing to be used for the purposes pursuant to which Restricted Payments are permitted under Section 6.5(iii)), the Borrower shall prepay the Loans in an aggregate amount equal to 50% of such Equity Proceeds.

    (c)  Prepayments Due to Insurance and Condemnation Proceeds. Except as provided in Section 5.25 hereof, no later than the fifth (5th) Business Day following the date of receipt by the Borrower or any of its Subsidiaries of any cash payments which exceed $250,000 (i) under any insurance policy as a result of any damage to or loss of (a "**Casualty**") all or any portion of the Collateral (the "**Insurance Proceeds**"), or (ii) resulting from the taking of assets by the power of eminent domain, condemnation or otherwise (net of actual and documented reasonable costs incurred by the Borrower or any of its Subsidiaries in connection with adjustment and settlement thereof, "**Condemnation Proceeds**") (any such event resulting in the recovery of Insurance Proceeds or Condemnation Proceeds, a "**Recovery Event**"), the Borrower shall prepay the Loans in an amount equal to the Insurance Proceeds or Condemnation Proceeds, as the case may be, received, unless, in each case, the Borrower shall have delivered a Reinvestment Notice. Concurrently with any prepayment of Loans pursuant to this Section 2.8B(ii)(c), the Borrower shall deliver to the Administrative Agent an Officer's Certificate demonstrating in reasonable detail the derivation of the Insurance Proceeds or Condemnation Proceeds, as the case may be, of the correlative Recovery Event.

    (d)  Prepayments from Excess Cash Flow. In the event that there shall be Excess Cash Flow with respect to any Fiscal Quarter, the Borrower shall, no later than the date upon which the Borrower is required to deliver financial statements under Section 5.3(ii) and (iii) with respect to such Fiscal Quarter, prepay the Loans in an aggregate amount equal to 100% of such

Excess Cash Flow and, from and after the last day of the Fiscal Quarter during which the Trigger Date Events have occurred and continue, 50% of such Excess Cash Flow.

(e)     Prepayments Due to Asset Sales.  Concurrently with the consummation of any Asset Sale (except with respect to Permitted Collateral Asset Sales to the extent the proceeds thereof constitute Excess Cash Flow), the Borrower shall prepay the Loans in an amount equal to the sum of (i) the proceeds of such Asset Sale; less (ii) Permitted Transaction Costs.  Such prepayment shall not be deemed to waive any violation of Section 6.8 hereof.

(iii)     No Waiver.  Nothing contained in Section 2.8B(ii) shall be deemed to permit the Borrower to consummate any Asset Sale unless otherwise permitted under this Agreement.

**C.     Application of Prepayments**.

Each payment received by Collateral Agent or Administrative Agent from the Borrower with respect to the Tranche B Loans shall be applied in the following order:  First, any prepayment premiums, if any, due and payable hereunder; second, to the payment of any late charges due and payable hereunder; third, to the repayment of any amounts advanced by Collateral Agent in accordance with the Mortgages or any of the Collateral Documents for insurance premiums, taxes, assessments or for preservation or protection of the Collateral and to the payment of all costs and expenses incurred by Collateral Agent in connection with the collection of the Loans (including all attorneys' fees payable hereunder); fourth, to the payment of accrued and unpaid interest; fifth, to fund any reserves or escrows required by Collateral Agent in accordance with the terms of the Mortgages or any of the Collateral Documents; sixth, to payment of any LIBOR breakage costs incurred by Lenders on account of such payment; seventh, to reduction of the outstanding principal balance of the Tranche B Loans; eighth, to the reduction of the outstanding principal balance of the Tranche A Loans (provided that the Tranche B Loans have been paid in full).  In the event that there is no outstanding principal balance under the Tranche A Loans (and the Tranche B Loans have been repaid in full), then any amount that would otherwise constitute a mandatory prepayment under this Section 2.8B(ii) shall reduce the Tranche A Funding Amounts by such amount. Notwithstanding anything to the contrary contained herein, upon the occurrence and during the continuance of the Trigger Date Events, Borrower shall have the right to elect, by providing to Administrative Agent written notification of such election two (2) Business Days prior to the making of such election, to voluntarily prepay outstanding amounts under Tranche A Loans prior to the payment in full of the Tranche B Loans, without reducing the Tranche A Funding Amounts as more specifically set forth in Section 2.2B above and in the manner required under Section 2.8D.  All such funds shall be deposited into the Company's Operating Account to be used for the purposes provided by this Agreement.  Notwithstanding the foregoing, (A) if an Event of Default has occurred and is continuing, Collateral Agent shall apply any payments received in such order or proportion as Collateral Agent, in Collateral Agent's sole discretion, may determine (subject to the provisions of Section 2.8E regarding application of proceeds of Collateral after an Event of Default), and (B) as among the Lenders, such payments shall be applied in accordance with Section 2.8D(iii) below.

**D.     General Provisions Regarding Payments**.

(i)     Manner and Time of Payment.  All payments by the Borrower of principal, interest, fees and other Obligations hereunder and under the Notes shall be made in same day funds and without defense, setoff or counterclaim, free of any restriction or condition, and delivered to the Administrative Agent or the Paying Agent, as the case may be, not later than 1:00 pm (New York time) on the date due at the Funding and Payment Office for the account of the Lenders; funds received by the Administrative Agent or Paying Agent, as the case may be, after that time on such due date shall, at the Administrative Agent's or Paying Agent's sole discretion,

48

as the case may be, be deemed to have been paid by the Borrower on the next succeeding Business Day. The Borrower hereby authorizes the Administrative Agent to charge its account with the Administrative Agent in order to cause timely payment to be made to the Administrative Agent or the Paying Agent, as the case may be, of all principal, interest, fees and expenses due hereunder (subject to sufficient funds being available in its accounts for such purpose). Unless the Administrative Agent or the Paying Agent, as the case may be, shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent or the Paying Agent, as the case may be, for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent or the Paying Agent, as the case may be, may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent or the Paying Agent, as the case may be, forthwith on demand the amount so distributed to such Lender, with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent or the Paying Agent, as the case may be, at the greater of the Base Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(ii)    <u>Application of Payments to Principal, Interest and Prepayment Fees</u>.  Except as provided in Section 2.6C, all payments in respect of the principal amount of any Loan shall include payment of accrued interest and prepayment fees, if any, on the principal amount being repaid or prepaid, and all such payments (and in any event any payments made in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest and prepayment fees, if any, before application to principal.

(iii)    <u>Apportionment of Payments</u>.  The aggregate principal, prepayment fees and interest payments shall be apportioned among all outstanding Loans to which such payments relate, in each case proportionately to the Lenders' respective Pro Rata Shares. The Administrative Agent shall promptly distribute to each Lender, at its applicable Lender Office, its Pro Rata Share of all such payments received by the Administrative Agent and the commitment fees of such Lender when received by the Administrative Agent pursuant to Section 2.7. Notwithstanding the foregoing provisions of this Section 2.8D(iii) if, pursuant to the provisions of Section 2.10C, any Notice of Conversion/Continuation is withdrawn as to any Affected Lender or if any Affected Lender makes Base Rate Loans in lieu of its Pro Rata Share of any Eurodollar Rate Loans, the Administrative Agent shall give effect thereto in apportioning payments received thereafter.

(iv)    <u>Payments on Business Days</u>.  Except if expressly provided otherwise, whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder or of the commitment fees hereunder, as the case may be.

(v)    <u>Notation of Payment</u>.  Each Lender agrees that before disposing of any Note held by it, or any part thereof (other than by granting participations therein), that Lender will make a notation thereon of all Loans evidenced by that Note and all principal payments previously made thereon and of the date to which interest thereon has been paid; <u>provided that</u> the failure to make (or any error in the making of) a notation of any Loan made under such Note shall not limit or otherwise affect such disposition or the obligations of the Borrower hereunder or under such Note with respect to any Loan or any payments of principal or interest on such Note.

49

In the event of Borrower's satisfaction and repayment in full of the Obligations hereunder, each Lender shall surrender to Borrower any and all Notes held by it.

(vi) <u>Revocation of Prepayment Notices</u>. Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment under Section 2.8(B) if such prepayment would have resulted from a refinancing of the Loans, which refinancing shall not be consummated or shall otherwise be delayed.

**E.** **Application of Proceeds of Collateral**. Except as provided in Section 2.8B(ii) with respect to prepayments, all proceeds received by the Collateral Agent after an Event of Default or as a result of exercising remedies under the Loan Documents, in respect of any sale of, collection from, or other realization upon all or any part of the Collateral under any Collateral Document may, in the discretion of the Collateral Agent, be held by the Collateral Agent as Collateral for, and/or (then or at any time thereafter) applied in full or in part by the Administrative Agent against, the applicable Secured Obligations (as defined in such Collateral Document) in the following order of priority:

(i) to the payment of all costs and expenses of such sale, collection or other realization, including, without limitation, reasonable compensation to the Agents and their agents and counsel, and all other reasonable expenses, liabilities and advances made or incurred by the Agents in connection therewith, and all amounts for which such Agents are entitled to indemnification under such Collateral Document and all advances made by the Collateral Agent thereunder for the account of the applicable Loan Party (excluding principal and interest in respect to any Loans of such Loan Party), and to the payment of all reasonable costs and expenses paid or incurred by the Collateral Agent in connection with the exercise of any right or remedy under such Collateral Document, all in accordance with the terms of this Agreement and such Collateral Document;

(ii) thereafter, to the extent of any excess proceeds, to the payment of all other Secured Obligations (as defined in the Security Agreement) on a pari passu basis (including any Secured Obligations related to Secured Hedge Agreements), it being understood and agreed in all respects that except as provided in Section 2.8 E (i) above, to the extent of any such excess proceeds, (a) payments of costs, expenses and indemnified obligations under such Hedge Agreements shall be made pari passu and ratably with payments of costs, expenses and indemnified obligations under the Loans, (b) regularly scheduled payments under such Hedge Agreements shall be made pari passu and ratably with interest payments on the Loans, and (c) termination payments under such Hedge Agreements shall be made pari passu and ratably with principal payments on the Loans; and

(iii) thereafter, to the extent of any excess proceeds, to the payment to or upon the order of such Loan Party or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

## 2.9 Use of Proceeds.

**A.** **Tranche B Loans**. The proceeds of the Tranche B Loans made to the Borrower shall be applied, (i) to repay the Existing Indebtedness of the Borrower, (ii) to fund the Company's Operating Account with $5,000,000 in Cash and the funds necessary to finance the development and construction of the Project through September 30, 2006 in accordance with the Approved Project Budget, (iii) to fund the Development Reserve Account with a portion of the funds necessary to finance the development and construction of the Project in accordance with the Approved Project Budget, (iv) to repay certain accounts payable listed on <u>Schedule 2.9</u> attached hereto, and (v) to pay the Transaction Costs.

**CREDIT AGREEMENT**

**B.     Tranche A Loans.** The proceeds of the Tranche A Loans made to the Borrower shall be applied to fund the development and construction of the Project and for general company and working capital needs of the Borrower in accordance with the Approved Project Budget.

**C.     Compliance With Laws.** The Borrower undertakes that no portion of the proceeds of any Loans or other extensions of credit under this Agreement shall be used by any Loan Party in any manner which would be illegal under, or which would cause the invalidity or unenforceability (in each case in whole or in part) of any Loan Document under, any applicable law.

**D.     Margin Regulations.** Without limiting the generality of Section 2.9A and B, no portion of the proceeds of any borrowing under this Agreement shall be used by the Borrower or any of its Subsidiaries in any manner that might cause the borrowing or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation of such Board or to violate the Exchange Act, in each case as in effect on the date or dates of such borrowing and such use of proceeds.

**2.10    Special Provisions Governing Eurodollar Rate Loans.**

Notwithstanding any other provision of this Agreement to the contrary, the following provisions shall govern with respect to Eurodollar Rate Loans as to the matters covered:

**A.     Determination of Applicable Interest Rate.** As soon as practicable after 11:00 A.M. (New York time) on each Interest Rate Determination Date, the Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Eurodollar Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to the Borrower and each Lender.

**B.     Inability to Determine Applicable Interest Rate.** In the event that the Administrative Agent shall have reasonably determined (which determination shall be final and conclusive and binding upon all parties hereto), on any Interest Rate Determination Date with respect to any Eurodollar Rate Loans, that by reason of circumstances arising after the date of this Agreement affecting the London interbank market, adequate and fair means do not exist for ascertaining the interest rate applicable to such Loans on the basis provided for in the definition of Reserve Adjusted Eurodollar Rate, the Administrative Agent shall, on such date, give notice (by telecopy or by telephone confirmed in writing) to the Borrower and each Lender of such determination, whereupon (i) no Loans may be made or continued as, or converted to, Eurodollar Rate Loans, until such time as the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist (such notification not to be unreasonably withheld or delayed) and (ii) any Disbursement Authorization or Notice of Conversion/Continuation given by the Borrower with respect to the Loans in respect of which such determination was made shall be deemed to be rescinded by the Borrower; provided, however that, at the option of the Borrower, any such Disbursement Authorization may be re-submitted to the Administrative Agent indicating that the Borrower is electing a Base Rate Loan, which Loan shall be funded no later than one (1) Business Day after the date of such Base Rate Loan Disbursement Authorization.

**C.     Illegality or Impracticability of Eurodollar Rate Loans.** In the event that on any date any Lender shall have reasonably determined (which determination shall be final and conclusive and binding upon all parties hereto but shall be made only after consultation with the Borrower and the Administrative Agent) that the making, maintaining or continuation of its Eurodollar Rate Loans (i) has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental

**CREDIT AGREEMENT**

rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful) or (ii) has become impracticable, or would cause such Lender material hardship, as a result of contingencies occurring after the date of this Agreement which materially and adversely affect the London interbank market, then, and in any such event, such Lender shall be an "**Affected Lender**" and it shall on that day give notice (by telecopy or by telephone confirmed in writing) to the Borrower and the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each other Lender). Thereafter (a) the obligation of the Affected Lender to make Loans as, or to convert Loans to, Eurodollar Rate Loans, shall be suspended until such notice shall be withdrawn by the Affected Lender, (b) to the extent such determination by the Affected Lender relates to a Eurodollar Rate Loan then being requested by the Borrower pursuant to the Disbursement Authorization or a Notice of Conversion/Continuation, the Affected Lender shall make such Loan as (or convert such Loan to, as the case may be) a Base Rate Loan, (c) the Affected Lender's obligation to maintain its outstanding Eurodollar Rate Loans, as the case may be (the "**Affected Loans**"), shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (d) the Affected Loans shall automatically convert into Base Rate Loans on the date of such termination. Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to a Eurodollar Rate Loan then being requested by the Borrower pursuant to a Notice of Conversion/Continuation, the Borrower shall have the option, subject to the provisions of Section 2.10D, to rescind such Disbursement Authorization or Notice of Conversion/Continuation as to all Lenders by giving notice (by telecopy or by telephone confirmed in writing) to the Administrative Agent of such rescission on the date on which the Affected Lender gives notice of its determination as described above (which notice of rescission the Administrative Agent shall promptly transmit to each other Lender). Except as provided in the immediately preceding sentence, nothing in this Section 2.10C shall affect the obligation of any Lender other than an Affected Lender to make or maintain Loans as, or to convert Loans to, Eurodollar Rate Loans in accordance with the terms of this Agreement.

     **D.**    **Compensation For Breakage or Non-Commencement of Interest Periods**. The Borrower shall compensate the Administrative Agent, upon written request by that Lender (which request shall set forth the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including, without limitation, any interest paid by that Lender to the lenders of funds borrowed by it to make or carry its Eurodollar Rate Loans and any actual loss, expense or liability sustained by that Lender in connection with the liquidation or re-employment of such funds) which that Lender may sustain: (i) if for any reason (other than a default by that Lender) a borrowing of any Eurodollar Rate Loan does not occur on a date specified therefor in a Disbursement Authorization or a telephonic request for borrowing, or a conversion to or continuation of any Eurodollar Rate Loan does not occur on a date specified therefor in a Notice of Conversion/Continuation or a telephonic request for conversion or continuation, (ii) if any prepayment (including any prepayment pursuant to Section 2.8B or assignment pursuant to Section 2.10) or conversion of any of its Eurodollar Rate Loans occurs on a date that is not the last day of an Interest Period applicable to that Loan (including, without limitation, as a result of the Transactions), (iii) if any prepayment of any of its Eurodollar Rate Loans is not made on any date specified in a notice of prepayment given by the Borrower, or (iv) as a consequence of any other default by the Borrower in the repayment of its Eurodollar Rate Loans when required by the terms of this Agreement.

     **E.**    **Booking of Eurodollar Rate Loans**. Any Lender may make, carry or transfer Eurodollar Rate Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of that Lender.

     **F.**    **Assumptions Concerning Funding of Eurodollar Rate Loans**. Calculation of all amounts payable to a Lender under this Section 2.10 and under Section 2.11A shall be made as though that Lender had actually funded each of its relevant Eurodollar Rate Loans through the purchase of a

Eurodollar deposit bearing interest at the rate obtained pursuant to the definition of Reserve Adjusted Eurodollar Rate in an amount equal to the amount of such Eurodollar Rate Loan and having a maturity comparable to the relevant Interest Period and, through the transfer of such Eurodollar deposit from an offshore office of that Lender to a domestic office of that Lender in the United States of America; provided, however, that each Lender may fund each of its Eurodollar Rate Loans in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable under this Section 2.10 and under Section 2.11A.

     **G.**    **Eurodollar Rate Loans After Default**.  After the occurrence of and during the continuation of a Default or Event of Default, (i) the Borrower may not elect to have a Loan be made or maintained as, or converted to, a Eurodollar Rate Loan after the expiration of any Interest Period then in effect for that Loan and (ii) subject to the provisions of Section 2.10D, any Disbursement Authorization or Notice of Conversion/Continuation given by the Borrower with respect to a requested borrowing or conversion/continuation that has not yet occurred shall be deemed to be rescinded by the Borrower.

## 2.11   Increased Costs; Taxes.

     **A.**    **Increased Costs Generally**.  If any Change in Law shall: (i) impose, Modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any reserve requirement reflected in the Reserve Adjusted Eurodollar Rate); or (ii) impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Loans hereunder made by such Lender; and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Rate Loan (or of maintaining its obligations to make any such Loan) or to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount), then upon request of such Lender, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender on an after-tax basis for such additional costs incurred or reduction suffered.

     **B.**    **Capital Requirements**.  If any Lender determines that any Change in Law affecting such Lender or the applicable Lender Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company on an after-tax basis for any such reduction suffered.

     **C.**    **Certificates for Reimbursement**.  A certificate of a Lender setting forth in reasonable detail the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in Section 2.11A or 2.11B and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

     **D.**    **Delay in Requests**.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or

**CREDIT AGREEMENT**

reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

**E.    Taxes.**

(i)      Payments Free of Taxes.  Subject to Section 2.11(E)(v) below, any and all payments by or on account of any obligation of the Borrower hereunder or any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, provided that if the Borrower shall be required by applicable law to deduct or withhold any Indemnified Taxes or Other Taxes from such payments, then (a) the sum payable shall be increased as necessary so that after making all required deductions or withholding (including deductions or withholding applicable to additional sums payable under this Section) the Agent or Lender receives an amount equal to the sum it would have received had no such deductions or withholding been made, (b) the Borrower shall make such deductions or withholding and (c) the Borrower shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law.

(ii)     Payment of Other Taxes by the Borrower.  Without limiting the provisions of paragraph (i) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(iii)    Indemnification by the Borrower.  The Borrower shall indemnify the Agents and each Lender within twenty (20) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.11E) paid by such Agent or such Lender and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate stating the amount of such payment or liability and setting forth in reasonable detail the calculation thereof delivered to the Borrower by an Agent or a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(iv)     Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(v)      Status of Lenders.  Any Lender, if requested by the Borrower or the Administrative Agent, shall deliver documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to withholding, backup withholding or information reporting requirements or to qualify any such Lender for any exemption from or reduction in the rate of any withholding, backup withholding, Indemnified Taxes or Other Tax.  Without limiting the generality of the foregoing, in the event that the Borrower is a resident for tax purposes in the United States of America, each Foreign Lender shall deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower

54

**CREDIT AGREEMENT**

or the Administrative Agent), whichever of the following is applicable: (i) duly completed copies of Internal Revenue Service Form W-8BEN, claiming eligibility for benefits of an income tax treaty to which the United States of America is a party, (ii) duly completed copies of Internal Revenue Service Form W-8ECI, (iii) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Internal Revenue Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Internal Revenue Code, (B) a "10 percent shareholder" of the Borrower within the meaning of section 881(c)(3)(B) of the Internal Revenue Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Internal Revenue Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN, together with (iv) duly completed copies of Internal Revenue Service form W-8IMY, if required. In addition, each Foreign Lender shall deliver any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax and reasonably requested by the Borrower or the Administrative Agent duly completed together with such supplementary documentation as may be prescribed by applicable law and reasonably requested by the Borrower or the Administrative Agent to permit the Borrower to determine the withholding or deduction required to be made. Each Foreign Lender shall deliver any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax and reasonably requested by the Borrower or the Administrative Agent duly completed together with such supplementary documentation as may be prescribed by applicable law and reasonably requested by the Borrower or the Administrative Agent to permit the Borrower to determine the withholding or deduction required to be made. Each Foreign Lender shall also deliver such forms promptly upon the obsolescence, expiration or invalidity of any form previously delivered by such Foreign Lender. Each Foreign Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide, or no longer qualified for any benefit pursuant to, any previously delivered certificate to the Borrower (or any other form of certification adopted by a taxing authority for such purpose). A Foreign Lender shall not be required to deliver any form or statement pursuant to this Section 2.11E(v) that such Foreign Lender is not legally able to deliver.

(vi)     Treatment of Certain Refunds. If the Administrative Agent or a Lender determines, in its reasonable discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to such Section 2.11, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under such Section 2.11 with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrower, upon the request of such Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Agent or such Lender in the event such Agent or such Lender is required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require any Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.

### 2.12   Mitigation Obligations; Replacement of Lenders.

**A.     Designation of a Different Lender Office.** If any Lender requests compensation under Section 2.11A or 2.11B, or requires the Borrower to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.11E, or any Lender becomes

CREDIT AGREEMENT

an Affected Lender, then such Lender shall use reasonable efforts to designate a different Lender Office for making, issuing, funding or maintaining its Commitments or Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.11 in the future and, if applicable, cause such Lender to no longer be an Affected Lender and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be materially disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

    **B.**      *Replacement of Lenders*. If any Lender requests compensation under Section 2.11A or 2.11B, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.11E, or if any Lender defaults in its obligation to fund Loans hereunder, or if any Lender has determined that it is unable to make, maintain or continue its Eurodollar Rate Loans in accordance with Section 2.10C hereof, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 9.1), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment), provided that (i) the Borrower shall have paid to the Administrative Agent the assignment fee specified in Section 9.1B(i)(c), (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 2.10D) from such Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), (iii) such Eligible Assignee is able to make, maintain or continue, as applicable, Eurodollar Rate Loans, (iv) in the case of any such assignment resulting from a claim for compensation under Section 2.11A or 2.11B or payments required to be made pursuant to Section 2.11E, such assignment will result in a reduction in such compensation or payments thereafter, and (v) such assignment does not conflict with applicable law. A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

## 2.13     Releases of Collateral.

    **A.**      **Releases in Connection with Permitted Collateral Asset Sales and Required Dedications.**    In connection with any Permitted Collateral Asset Sale or Required Dedication, the Collateral Agent or its duly authorized attorney-in-fact shall release the applicable portion of the Real Property Collateral from the Lien of the Mortgage (such portion of the Real Property Collateral, a "**Released Parcel**"); provided that all of the applicable conditions set forth in Section 6.8 have been satisfied and the Borrower shall have submitted to Collateral Agent (i) a request for release in the form of Exhibit XIV attached hereto (the "**Request for Release**"), (ii) one or more reconveyances or releases for each Released Parcel for execution by the Collateral Agent, (iii), in connection with a Request for Release with respect to an Unimproved Lot to be developed as a residential unit (it being understood and agreed that this provision shall only apply to Unimproved Lots if the buyer of any such Unimproved Lot enters into a Residential Unit Construction Contract with the Borrower or any Subsidiary), a collateral assignment in form and substance reasonably satisfactory to the Administrative Agent of the Residential Unit Construction Contract executed in connection with the construction of improvements upon such unimproved lot, and (iv) all other documentation as Collateral Agent may reasonably require in connection with such Release (collectively, the "**Release Instruments**") in a form appropriate for recordation in the applicable county and otherwise satisfactory to the Collateral Agent in its good faith discretion for each Released Parcel (for execution by Collateral Agent) together with an Officer's

Certificate certifying that (i) the Release Instruments are in compliance with all Applicable Laws and Governmental Authorizations, (ii) the release to be effected will not violate the terms of this Agreement or the other Loan Documents, and (iii) the release to be effected will not impair or otherwise adversely affect the Liens (other than the Lien that is actually being released) and other rights of the Collateral Agent under the Loan Documents not being released. Collateral Agent shall have the right to establish an escrow arrangement and appoint an escrow agent responsible for the administration therefor, through which Release Instruments may be placed into escrow by the Collateral Agent prior to the occurrence of a Permitted Collateral Asset Sale or Required Dedication for release by the escrow agent upon escrow agent's confirmation of certain agreed upon conditions. Borrower shall reasonably cooperate with any such arrangement. If the requirements of this Section 2.13 and Section 6.8 are otherwise satisfied, the Collateral Agent shall execute (and cause to be notarized) each of the Release Instruments accompanying a Request for Release within five (5) Business Days of receipt of such Request for Release and accompanying Release Instruments.

B.      **Consents and Subordinations in connection with Specified Encumbrances**. Upon ten (10) Business Days prior written notice from the Borrower, the Collateral Agent shall sign and consent to and/or subordinate the First Priority Lien of the Mortgages to any easements, covenants, conditions, master declarations, rights-of-way, and restrictions entered into or effected in the Ordinary Course of Business of the Borrower in connection with the development of the Project which are not inconsistent with the current Project Projections (the "**Specified Encumbrances**"); provided that (i) any such signature of the Collateral Agent is expressly made with no implied duty or obligation on the part of the Collateral Agent to review such Specified Encumbrance and is only made for the purpose of consenting to and/or subordinating the First Priority Lien of the Mortgage to such Specified Encumbrance, (ii) no Default or Event of Default has occurred and is continuing, and (iii) the Collateral Agent shall, as a condition to such consent and/or subordination, be satisfied in its reasonable discretion that such consent and/or subordination could not reasonably be expected to (a) have the effect of reducing the number of permitted Residential Units or (b) have a Material Adverse Effect or impair Collateral Agent's Lien on the remaining Real Property Collateral. The Borrower shall pay all reasonable out-of-pocket costs and expenses of the Collateral Agent and the Title Company in connection with any such consent and/or subordination.

## 2.14    **Break Funding Payments**.

In the event of the reduction of any Tranche A Credit-Linked Deposit other than on the last day of an Interest Period, the Borrower shall compensate the Paying Agent for the loss, cost and expense attributable to such event; provided, however, Borrower shall not be required to compensate the Paying Agent if such event is not the result of Borrower's Default or Borrower's failure to pay any amounts due in connection with any Tranche A Loans or Letters of Credit. Such loss, cost or expense may, at the option of the Paying Agent, be deemed to include an amount determined by the Paying Agent to be the excess, if any, of (i) the amount of interest which would have accrued on such Tranche A Credit-Linked Deposit had such event not occurred, at the Eurodollar Base Rate that would have been applicable to such Tranche A Credit-Linked Deposit, for the period from the date of such event to the last day of the then current Interest Period therefor, over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which the Paying Agent would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the Eurodollar market. A certificate of the Paying Agent setting forth any amount or amounts that the Paying Agent is entitled to receive pursuant to this Section 2.14 shall be delivered to the Borrower and shall be conclusive absent manifest error. In the event the Borrower shall fail to pay any amount due to the Paying Agent under this Section 2.14, the interest payable by the Paying Agent to the Tranche A Lenders on their Tranche A Credit-Linked Deposits under Section 2.1D shall be correspondingly reduced

and the Tranche A Lenders shall without further act succeed, ratably in accordance with their Applicable Percentages, to the rights of the Paying Agent hereunder with respect to such amount.

## SECTION 3.
## CONDITIONS TO EFFECTIVENESS

### 3.1  ˈConditions to Effectiveness on the Effective Date.

The effectiveness of this Agreement, and the obligation of each Lender to make the initial extension of credit requested to be made by it is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Effective Date, of the following conditions precedent:

**A.    Organizational Documents.**  On or before the Effective Date, the Borrower shall deliver or cause to be delivered to the Administrative Agent for the Lenders the following, each, unless otherwise noted, dated the Effective Date:

(i)    a certified copy of the Organizational Documents of the Borrower and each of its Subsidiaries certified as of the Effective Date by a Responsible Officer of the Borrower, dated a recent date prior to the Effective Date;

(ii)    certified copies of the Organizational Certificates of the Borrower and each of its Subsidiaries, together with a good standing certificate from the applicable Governmental Authority of its jurisdiction of incorporation, organization or formation, each state or jurisdiction in which any of its Real Property Assets are located, and each other state or jurisdiction in which it is qualified as a foreign corporation or other entity to do business, each dated a recent date prior to the Effective Date;

(iii)    copies of the Organizational Authorizations of each Subsidiary approving and authorizing the execution, delivery and performance of the Subsidiary Guaranty by each such Subsidiary and the other Loan Documents to which such Subsidiary is party or by which it or its assets may be bound that are to be delivered on the Effective Date, certified as of the Effective Date by a Responsible Officer of such Subsidiary as being in full force and effect without Modification;

(iv)    incumbency certificates of the officers of the Borrower and its Subsidiaries executing this Agreement and the other Loan Documents to which it is a party as of the Effective Date;

(v)    executed originals of this Agreement and the other Loan Documents to which the Borrower and its Subsidiaries is a party that are to be delivered on the Effective Date; and

(vi)    such other documents as the Administrative Agent may reasonably request.

**B.    Consummation of Transactions.**

(i)    (a) each of the Loan Documents shall be in form and substance reasonably satisfactory to the Administrative Agent and each such Loan Document shall have been duly executed and delivered by each party thereto and shall be in full force and effect; and (b) all other conditions set forth in the Loan Documents shall have been satisfied or the fulfillment of any such conditions shall have been waived with the written consent of the Administrative Agent;

(ii)        simultaneously with funding of the Loans, the obligations of the lenders under the Existing Indebtedness shall have been repaid in full, all commitments thereunder shall have been permanently terminated and all Liens granted thereunder shall have been permanently terminated and released, and the Administrative Agent shall have received evidence thereof to its reasonable satisfaction;

(iii)        simultaneously with funding of the Loans, each of the other Transactions to be consummated on the Effective Date shall have been effected and consummated to the reasonable satisfaction of the Administrative Agent; and

(iv)        after giving effect to the Transactions, the Borrower and its Subsidiaries shall have no outstanding Indebtedness or preferred stock other than (a) the Loans under this Agreement, (b) the Indebtedness permitted under Section 6.1 and (c) the preferred stock listed as "P" shares under the Operating Agreement of the Borrower.

**C.        Lender Signatures.**   The following Persons shall have executed and delivered this Agreement:

(i)        the Lenders;

(ii)        the Agents; and

(iii)        the Syndication Agent.

**D.        Necessary Consents.**   The Borrower shall have obtained all approvals and consents of Governmental Authorities and other Persons necessary or advisable in connection with the Transactions and the continued operation of the business conducted by the Borrower and its Subsidiaries, all applicable appeal periods shall have expired and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to the Administrative Agent.  Such approvals and consents shall be satisfactory to Administrative Agent in its sole and absolute discretion and shall include, without limitation:

(i)        executed consents from any Person required in connection with the Collateral Documents;

(ii)        executed consents from any Person required in connection with the Security Agreement;

(iii)        executed consents and estoppels as set forth on Schedule 3.1D annexed hereto; and

(iv)        executed consents from any Person required in connection with any Indebtedness permitted under Section 6.1 and not extinguished in full on the Effective Date.

**E.        Perfection of Security Interests.**   The Borrower shall have taken or caused to be taken such actions in such a manner directed by the Collateral Agent to create a valid and perfected First Priority security interest in the Collateral of each Loan Party in which a security interest can be granted and perfected under the UCC or other Applicable Law to the extent required by the Collateral Documents. Such actions shall include: (i) the delivery to the Collateral Agent of (a) the results of a recent search, by a Person satisfactory to the Collateral Agent, of all effective UCC financing statements and fixture filings

59

and all judgment and tax lien filings which may have been made with respect to any personal or mixed property of any Loan Party, together with copies of all such filings disclosed by such search and (b) UCC financing statements the recordation of which has been authorized by the applicable Loan Parties as to all such Collateral granted by such Loan Parties for all jurisdictions as may be necessary or desirable to perfect Collateral Agent's security interest in such Collateral; and (ii) the delivery to the Collateral Agent of evidence reasonably satisfactory to the Collateral Agent that all other filings (including UCC termination statements and releases and filings with the PTO and the United States Copyright Office with respect to Intellectual Property of the Loan Parties), recordings and other actions the Collateral Agent deems necessary or advisable to establish, preserve and perfect the First Priority liens granted to the Collateral Agent in Collateral constituting personal (both tangible and intangible) and mixed property shall have been made.

      **F.**    **Real Property**. The Administrative Agent shall have received on or prior to the Effective Date from the Borrower and each applicable Loan Party:

      (i)    <u>Mortgages</u>. Fully executed and notarized Mortgages, together with any Modifications thereto deemed necessary by the Collateral Agent in connection with the execution and delivery of this Agreement, the other Loan Documents and the transactions contemplated hereby and thereby, in proper form for recording in the real property records of Valley County and Adams County, State of Idaho, encumbering the Real Property Collateral listed on <u>Schedule 3.1.F</u>, in each case in form and substance satisfactory to the Collateral Agent;

      (ii)    <u>Title Insurance</u>. ALTA extended coverage mortgage title insurance policies satisfactory to Collateral Agent (the "**Mortgagee Policies**") issued by the Title Company with respect to the Mortgages listed on <u>Schedule 3.1F</u>, in amounts not less than the respective amounts designated on such Schedule with respect to any particular portion of Real Property Collateral, insuring fee simple title to or a leasehold interest in each such portion of Real Property Collateral vested in such Loan Party and insuring the Collateral Agent that the applicable Mortgages create valid and enforceable First Priority mortgage Liens on the respective Mortgaged Properties encumbered thereby, subject only to the Permitted Encumbrances, which Mortgagee Policies (1) shall include all endorsements reasonably requested by Collateral Agent, including an endorsement for mechanics' liens (or a deletion of the standard pre-printed mechanics' lien exception) and (2) shall provide for affirmative insurance and such reinsurance as the Collateral Agent may reasonably request, all of the foregoing in form and substance reasonably satisfactory to the Collateral Agent; and evidence satisfactory to the Collateral Agent that such Loan Party has (i) delivered to the Title Company all certificates and affidavits required by the Title Company in connection with the issuance of the Mortgagee Policies and (ii) paid to the Title Company or to the appropriate Governmental Authorities all expenses and premiums of the Title Company and all other sums required in connection with the issuance of the Mortgagee Policies and all recording and stamp taxes (including mortgage recording and intangible taxes) payable in connection with recording the Mortgages in the Valley County and Adams County real property records;

      (iii)    <u>Title Reports</u>. With respect to each portion of the Real Property Collateral, a title report issued by the Title Company with respect thereto, dated a date, and in form and substance, satisfactory to the Collateral Agent and may include Permitted Encumbrances;

      (iv)    <u>Surveys; Plat Maps</u>. An ALTA/ACSM survey, plat maps or other form of survey with respect to the Project dated a date, and prepared and certified by a Person and in form and substance, reasonably satisfactory to the Collateral Agent;

(v)        Appraisal.  One original of the Initial Appraisal, in form and substance satisfactory to the Collateral Agent;

(vi)       Entitlement Documents.  Administrative Agent shall have received true, correct and complete copies of all Entitlement Documents;

(vii)      Engineering Reports.  Administrative Agent shall have received engineering and soils reports with respect to the Project in form and substance satisfactory to the Administrative Agent;

(viii)     Copies of Documents Relating to Title Exceptions.  Copies of all recorded documents listed as exceptions to title or otherwise referred to in the Mortgagee Policies or in the title reports delivered pursuant to clause (iii) above; and

(ix)       Matters Relating to Flood Hazard Properties.  (a) Evidence, which may be in the form of a letter from an insurance broker as to whether (1) any portion of the Real Property Collateral is a Flood Hazard Property and (2) the community in which any such Flood Hazard Property is located is participating in the National Flood Insurance Program, (b) if there are any such Flood Hazard Properties, such Loan Party's written acknowledgment of receipt of written notification from the Collateral Agent (1) as to the existence of each such Flood Hazard Property and (2) as to whether the community in which each such Flood Hazard Property is located is participating in the National Flood Insurance Program, and (c) in the event any such Flood Hazard Property is located in a community that participates in the National Flood Insurance Program, evidence that the Borrower has obtained flood insurance in respect of such Flood Hazard Property to the extent required under the applicable regulations of the Board of Governors of the Federal Reserve System.

(x)        Construction Drawings and Budgets.  Administrative Agent shall have received constructions drawings and plans acceptable to it and shall have approved an initial budget and project schedule.

**G.**      **Copies of Documents for Lenders**.  If requested by any Lender or any potential Eligible Assignee in writing (with such request addressed to the Administrative Agent) prior to the Effective Date, Administrative Agent shall provide a copy of any survey or plat maps, the Initial Appraisal, the title report or any other due diligence document reasonably requested by such Lender or potential Eligible Assignee.

**H.**      **Financial Condition and Solvency Certificate**.  The Borrower shall have delivered to the Administrative Agent a certificate from the chief financial officer of the Borrower, substantially in the form of Exhibit XIII attached hereto (the "**Solvency Certificate**").

**I.**      **Transaction Costs, Fees and Expenses**.  On or prior to the Effective Date, the Borrower shall have paid (i) to the Administrative Agent any and all fees and reasonable expenses of the Agents that are then due and owing or accrued and not yet paid under or in connection with this Agreement or any of the documents, instrument or agreements executed in connection herewith and (ii) to the appropriate Persons any and all outstanding reasonable fees and expenses (including legal advisors) incurred by the Agents through the Effective Date in connection with the negotiation, drafting and execution of the Loan Documents.  On or prior to the Effective Date, the Borrower shall have delivered to the Administrative Agent a schedule, in a form satisfactory to the Administrative Agent, setting forth the Borrower's estimate of the Transaction Costs (other than fees payable to any of the Agents).

61

**J.**    **Opinions of Loan Parties' Counsel.**  The Administrative Agent and its counsel shall have received the written opinions of Farella Braun + Martel LLP, Akin Gump Strauss Hauer & Feld LLP (New York) and Millemann Pittenger McMahan & Pemberton, LLP (Idaho), counsel for the Loan Parties and the Non-Recourse Guarantor (a) in form and substance reasonably satisfactory to the Administrative Agent and its counsel, (b) dated as of the Effective Date, (c) addressed to each of the Agents and the Lenders, and (d) setting forth the matters reasonably requested by the Administrative Agent.

**K.**    **Financial Information.**  On or before the Effective Date, the Administrative Agent shall have received from the Borrower (i) such budgets and other cash flow and financial information and projections described in Section 5.3 as the Administrative Agent may reasonably request, and (ii) the Approved Project Budget and Project Projections, all in form and substance reasonably satisfactory to the Administrative Agent.

**L.**    **Evidence of Insurance.**  The Administrative Agent shall have received copies of certificates of insurance with respect to each of the insurance policies required pursuant to Section 5.6, and the Administrative Agent shall be reasonably satisfied with the nature and scope of these insurance policies.

**M.**    **Environmental.**    The Administrative Agent shall have received one or more environmental assessment reports which, in their totality, provide a Phase I environmental assessment of the entire Project, in form and substance and from an independent environmental assessment firm satisfactory to the Administrative Agent, and the Administrative Agent shall be reasonably satisfied as to the amount and nature of any environmental and employee health and safety exposures to which the Borrower and its Subsidiaries may be subject after giving effect to the Transactions, and with the plans of the Borrower or such Subsidiaries with respect thereto.

**N.**    **No Material Adverse Effect.**  Since December 31, 2005, there shall not have occurred any event, change or condition that has had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

**O.**    **Corporate and Capital Structure, Ownership, Management, Etc.**

    (i)    Corporate Structure.  The corporate organizational structure of Borrower and its Subsidiaries as of the Effective Date shall be as set forth on Schedule 3.1O.

    (ii)    Capital Structure and Ownership.  The capital structure and ownership of the Borrower and as of the Effective Date shall be as set forth on Schedule 3.1O.

**P.**    **Representations and Warranties; Performance of Agreements.**  The Borrower shall have delivered to the Administrative Agent an Officer's Certificate, in form and substance satisfactory to the Administrative Agent, to the effect that the representations and warranties in Section 4 are true and correct in all material respects on and as of the Effective Date, both before and after giving effect to the Transactions, to the same extent as though made on and as of that date, and that the Borrower has performed in all material respects all agreements and satisfied all conditions which this Agreement provides shall be performed or satisfied by it on or before the Effective Date.

**Q.**    **No Litigation.**  There shall be no litigation or governmental, administrative or judicial actions or proceedings, actual or threatened, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or that could reasonably be expected to restrain, prevent or impose burdensome conditions on any of the Transactions.

**R.**     **Completion of Proceedings**. All partnership, corporate, limited liability company and other proceedings taken or to be taken in connection with the Transactions and all documents incidental thereto not previously found acceptable by the Administrative Agent and its counsel shall be satisfactory in form and substance to the Administrative Agent and such counsel, and the Administrative Agent and such counsel shall have received all such counterpart originals or certified copies of such documents as the Administrative Agent may reasonably request. Each Lender, by delivering its signature page to this Agreement, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by any Agent, Requisite Lenders or Lenders, as applicable, on or prior to the Effective Date.

**S.**     **Money Laundering**. The Administrative Agent shall have received, sufficiently in advance of the Effective Date, all documentation and other information required by bank regulatory authorities from the Loan Parties under applicable "know your customer" and anti-money laundering rules and regulations, including the U.S.A. Patriot Act.

**T.**     **Rating Agencies**. The Borrower shall have obtained a credit rating by S&P and by Moody's with respect to the Loans prior to the Effective Date.

**U.**     **Disbursement Authorization**. The Administrative Agent shall have received before the Effective Date, in accordance with the provisions of Section 2.2B, an originally executed Disbursement Authorization, signed by the chief executive officer or the chief financial officer of the Borrower or by any executive officer of the Borrower designated by any of the above-described officers on behalf of the Borrower in a writing delivered to the Administrative Agent.

**V.**     **Searches**. The Administrative Agent shall have received judgment and lien searches satisfactory to it with respect to the Borrower and its Subsidiaries, the Subsidiary Guarantors, and the Non-Recourse Guarantor in all jurisdictions as Administrative Agent may require.

**W.**     **As of the Effective Date**:

(i)     The representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects on and as of the Effective Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date;

(ii)     No event shall have occurred and be continuing or would result from the consummation of the borrowing contemplated by such Disbursement Authorization that would constitute a Default or Event of Default, or could reasonably be expected to have a Material Adverse Effect; and

(iii)     No order, judgment or decree of any Governmental Authority shall purport to enjoin or restrain any Lender from making the Loans to be made by it on the Effective Date.

**3.2     Conditions to Each Credit Event**. The obligation of each Lender to make any Loan after the Effective Date is additionally subject to the satisfaction of the following conditions:

(ii)     The representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects on and as of the date of such Loan to the same extent as though made on and as of that date, except to the extent such representations

63

and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date;

(iii)      At the time of and immediately after giving effect to such Loan no Default or Event of Default shall have occurred and be continuing;

(iv)      The total Tranche A Exposures shall not exceed the total Tranche A Funding Amounts; and

(v)      For each borrowing of a Loan, Borrower shall have delivered a completed and signed Request for Loan and for each issuance of a Letter of Credit, Borrower shall have provided the information required by Section 2.5B.

Each borrowing and each issuance, amendment, renewal or extension of a Letter of Credit shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in this Section 3.2.

**3.3**    <u>Conditions to Disbursements from the Development Reserve Account and the Company's Operating Account</u>.

**A.**    **General**.  The Borrower has established, and hereafter agrees to continue to maintain, the Development Reserve Account and the Company's Operating Account.  The Borrower hereby grants a security interest to the Administrative Agent in the Development Reserve Account and the Company's Operating Account to secure the Obligations.  Concurrently with the execution of this Agreement, the Borrower has entered into Control Agreements with respect to the Development Reserve Account and the Company's Operating Account with the Collateral Agent and the Account Holder substantially in the form of <u>Exhibit XVIII</u> attached hereto.

**B.**    **Investments, Withdrawals and Deposits**.

(i)      The Borrower may direct the Account Holder regarding investment of funds contained in the Development Reserve Account and the Company's Operating Account in Cash Equivalents (to the extent available in such account), <u>provided</u>, however, that such direction may be required to be accomplished through direction to the Administrative Agent, who will subsequently direct the Account Holder regarding the same.  The Borrower shall not have any right to withdraw funds from the Development Reserve Account (or any of the income upon investment thereof), except in compliance with Section 3.3C and Section 5.25 hereof.  At any time prior to the occurrence and continuance of an Event of Default, the Borrower shall have the right to withdraw funds from the Company's Operating Account to be used substantially in accordance with the Draw Package approved and funded by Administrative Agent during the previous Fiscal Quarter (or such other time, as applicable).

(ii)     The Borrower covenants and agrees to deposit all funds received by the Borrower and its Subsidiaries (whether resulting from Asset Sales, Residential Unit Construction Contracts, a Permitted Equity Issuance, rental programs, club, golf or ski club memberships or otherwise) within five (5) Business Days after receipt of such funds into the Company's Operating Account.

**C.**    **Conditions to Disbursements**.  The Borrower shall have the right to make withdrawals from the Development Reserve Account (i) on a quarterly basis commencing on September 30, 2006, to

CREDIT AGREEMENT

pay for Project Expenses contemplated by the Approved Project Budget and (ii) at any other time, but in no event more frequently than once per calendar month, upon the occurrence of unanticipated events or expenses in connection with the Project, in each case, subject to satisfaction of the following conditions prior to the date of each such proposed withdrawal (it being understood and agreed that with respect to a withdrawal request made other than quarterly upon the occurrence of anticipated events or expenses, the Administrative Agent agrees to use commercially reasonable efforts to expedite the review and approval of all items delivered in connection with such withdrawal request):

(i)     Not later than forty-five (45) days prior to the Requested Funding Date (as defined in the Disbursement Request), the Borrower shall submit and Administrative Agent shall have approved (a) a fully completed Disbursement Request (with all necessary attachments and updated schedules, as appropriate) signed by a Responsible Officer of the Borrower; (b) a fully completed reconciliation report substantially in the form attached as Exhibit XXII hereto (a "**Reconciliation Report**") setting forth an analysis of Cash From Project Sales received and Project Expenses incurred during the immediately preceding quarter (i.e., if a Reconciliation Report is submitted with a Draw Package on August 15, 2006, such Reconciliation Report shall cover the Fiscal Quarter ending June 30, 2006) as compared with the Disbursement Request submitted for such quarter (with all necessary attachments, as appropriate to demonstrate any material discrepancies contained in any line item or budget category) and signed by a Responsible Officer of the Borrower; (c) an updated projection of the use of Cash on deposit in the Development Reserve Account during the quarter for which the Disbursement Request is being made signed by a Responsible Officer of the Borrower; (d) a Compliance Certificate on a Projected Basis for the next succeeding four quarters signed by a Responsible Officer of the Borrower; (e) a statement from the Borrower certifying that there have not been and are not intended to be any modifications to the Project Projections, that Borrower has no knowledge of any material matter, cause, impediment, issue, controversy or dispute that is reasonably likely to result in changes to the Project Projections and setting forth any anticipated discrepancies from the Approved Project Budget on a Projected Basis for the next four succeeding quarters signed by a Responsible Office of the Borrower; and (f) any supporting materials reasonably requested by Administrative Agent, Collateral Agent or the Consultant in connection with any of the foregoing, and in each of (a) through (f) above, such information shall be provided to the Administrative Agent, Collateral Agent, Account Holder and the Consultant (items (a) – (f), collectively, the "**Draw Package**");

(ii)     On one or more dates which are mutually convenient to the Borrower and the Consultant, but in any event prior to the fifteenth day before the end of each Fiscal Quarter, the Borrower shall cause representatives of the Borrower (and the general contractor, to the extent appropriate) to be available to meet with the Consultant at the site of the Project to review the progress of construction at the site in comparison with the Project Projections and Approved Project Budget and to review the Draw Package submitted in connection with the previously made withdrawal, in an attempt to resolve any discrepancies associated with such Draw Package in preparation for the next withdrawal request.

(iii)     No Default or Event of Default shall have occurred and be continuing;

(iv)     Each of the representations and warranties made by the Borrower in or pursuant to the Loan Documents shall be true and correct in all material respects on and as of the date of such proposed withdrawal as if made on and as of such date (except to the extent such representation or warranty specifically relates to an earlier date in which case such representation or warranty shall be true and correct in all material respects as of such date);

65

(v)     The Administrative Agent and the Collateral Agent shall have received a progress report from the Consultant as described in Section 5.3(ii)(c) for the quarter preceding the Requested Funding Date; and

(vi)     With respect to a requested withdrawal at any time other than a quarterly withdrawal, concurrently with the submissions required by Section 3.2C(i) above, the Borrower shall provide the Administrative Agent with a narrative description of the unanticipated events or expenses causing such requested withdrawal, which explanation shall be reasonably satisfactory to the Administrative Agent.

**D.     Disbursements.** The requested disbursement from the Development Reserve Account shall be made upon satisfaction of the conditions set forth in Section 3.3C above. The requested disbursement shall be made by the Account Holder for the Development Reserve Account (at the direction of the Administrative Agent) and deposited, within one (1) Business Day, into the Company's Operating Account for use by the Borrower for all purposes approved in the Draw Request for the applicable Fiscal Quarter. The Administrative Agent shall have the right to make a partial funding of the amount requested in any Disbursement Request to the extent the Administrative Agent is unable or unwilling to approve the entire amount requested by the Borrower as a result of review of items included in the Draw Package. The Administrative Agent shall further have the right to adjust the amount of any withdrawal to reflect discrepancies raised in the Reconciliation Report, provided, that the Administrative Agent shall not adjust such withdrawal amount to the extent the Borrower demonstrates to the reasonable satisfaction of the Administrative Agent that the Borrower has incurred costs described in the previous Disbursement Request or expects to incur such costs during the time period to which the current Draw Package relates, but has not yet expended funds for such incurred costs as a result of the timing of delivery of construction materials, invoicing or similar circumstances.

**E.     Priority of Distributions.** In the event that the Lenders elect to exercise their remedies under Section 7, the funds contained in the Development Reserve Account and the Company's Operating Account shall be applied (a) first, to the reasonable expenses of the Administrative Agent, (b) second, to the outstanding principal amount of, and interest on, the Tranche B Loans until the same are paid in full, (c) third, to the outstanding principal amount of, and interest on the Tranche A Loans until the same are paid in full, (d) fourth, to the other Obligations until the same are paid in full, (e) fifth, to the reduction of the Tranche A Funding Amounts, and then (f) sixth, after all obligations of the Borrower under this Agreement and the Loan Documents shall have been paid in full, returned to the Borrower or the other Persons legally entitled thereto.

**F.     Voluntary Prepayments.** Provided no Event of Default has occurred and is continuing, notwithstanding anything to the contrary contained in Section 3.3D above, the Borrower shall have the right to direct the Administrative Agent to make one or more voluntary prepayments of the Loans from the funds held in the Development Reserve Account at any time upon at least one (1) business day prior written notice to the Administrative Agent.

**G.     Proceeds of Permitted Equity Issuance.** Notwithstanding anything to the contrary contained in this Agreement and provided that the conditions set forth in Section 3.3C(iii) and (iv) have been satisfied, the Borrower shall have the right to withdraw from the Company's Operating Account the Equity Proceeds received as a result of a Permitted Equity Issuance for purposes of (i) the purchase of additional real property, which real property will be pledged as collateral to secure the Borrrower's and its Subsidiaries' Obligations hereunder as required by Section 5.13 hereof or (ii) the making of the payments set forth in Section 6.5(iii) hereof.

CREDIT AGREEMENT