# Exhibit 3
# (Part 5 of 6)

by the Borrower or any of its Subsidiaries to commence manufacturing, industrial or other similar operations that could reasonably be expected to subject the Borrower or any of its Subsidiaries to additional Environmental Laws, that are materially different from the Environmental Laws applicable to the operations of the Borrower and its Subsidiaries as of the Effective Date.

    **D.**    The Borrower shall, at its own expense, provide copies of such documents or information as the Administrative Agent may reasonably request in relation to any matters disclosed pursuant to this Section 5.9.

## 5.10   The Borrower's Remedial Action Regarding Hazardous Materials.

The Borrower shall promptly take, and shall cause each of its Subsidiaries promptly to take, any and all necessary remedial action in connection with the presence, handling, storage, use, disposal, transportation or Release or threatened Release of any Hazardous Materials on, under or affecting any Real Property Asset in order to comply in all material respects with all applicable Environmental Laws and Governmental Authorizations. In the event the Borrower or any of its Subsidiaries undertakes any Cleanup action with respect to the presence, Release or threatened Release of any Hazardous Materials on or affecting any Real Property Asset, the Borrower or such Subsidiaries shall conduct and complete such Cleanup action in material compliance with all applicable Environmental Laws, and in accordance with the policies, orders and directives of all federal, state and local governmental authorities except when, and only to the extent that, the Borrower's or such Subsidiary's liability for such presence, handling, storage, use, disposal, transportation or Release or threatened Release of any Hazardous Materials is being Properly Contested.

## 5.11   Subsidiaries.

As of the Effective Date, the Borrower has the Subsidiaries set forth on Schedule 5.11 hereto and will not form (or permit to be formed) any new Subsidiaries or the Meadows Subsidiary after the Effective Date without first receiving the prior written consent of the Administrative Agent, which consent may not be unreasonably withheld, provided that the Administrative Agent may condition such consent upon, among other things, (i) such new Subsidiaries executing a guaranty (in form and substance satisfactory to the Administrative Agent) of the Borrower's Obligations, (ii) the Borrower executing a pledge of the Capital Stock of such Subsidiaries and the Meadows Subsidiary, and (iii) such further action and such further documents and instruments as may be required to grant and perfect in favor of the Collateral Agent, for the benefit of the Secured Parties, a First Priority security interest in all of the: (a) personal property assets of such Subsidiaries; (b) real property assets owned by such Subsidiaries; and (c) leasehold interests owned by such Subsidiaries. With respect to any Subsidiary or the Meadows Subsidiary approved by the Administrative Agent, the Borrower shall deliver to the Administrative Agent, together with such Loan Documents, in the case of each such Subsidiary that is required to be a party to any Loan Document: (i) (a) certified copies of such Subsidiary's and the Meadows Subsidiary's Organizational Certificate together, if applicable, with a good standing certificate from the Secretary of State of the jurisdiction of its incorporation, formation or organization, as applicable, each to be dated a recent date prior to their delivery to the Administrative Agent, (b) a copy of such Subsidiary's and the Meadows Subsidiary's Organizational Documents, certified by its secretary or an assistant corporate secretary (or Person holding an equivalent title or having equivalent duties and responsibilities) as of a recent date prior to their delivery to the Administrative Agent, (c) a certificate executed by the secretary or an assistant secretary of such Subsidiary as to (x) the incumbency and signatures of the officers of such Subsidiary executing such guaranty, the Collateral Documents and the other Loan Documents to which such Subsidiary is a party and (y) the fact that the attached Organizational Authorizations of such Subsidiary authorizing the execution, delivery and performance of such guaranty, such Collateral Documents and such other Loan Documents are in full force and effect and have not been Modified or

rescinded, and (ii) a favorable opinion of counsel to such Subsidiary that is reasonably satisfactory to the Collateral Agent and its counsel, as to (a) the due organization and good standing of such Subsidiary, (b) the due authorization, execution and delivery by such Subsidiary of such guaranty, the Collateral Documents and any other Loan Documents to which it is a party and (c) the enforceability of such guaranty and such Collateral Documents against such Subsidiary, (d) the validity and perfection of the security interests granted by such Subsidiary (and by the parent of such Subsidiaries in respect of the Capital Stock of such Subsidiary) in favor of the Collateral Agent pursuant to the Collateral Documents, and (e) such other matters as any Agent may reasonably request, all of the foregoing to be reasonably satisfactory in form and substance to the Administrative Agent, the Collateral Agent and their counsel. In addition, the Borrower shall promptly deliver a supplement to Schedule 4.1 to the Administrative Agent if any Subsidiary is created or acquired.

**5.12    Interest Rate Protection.**

At all times, commencing one hundred-eighty (180) days after the Effective Date, the Borrower (through itself or one of the Subsidiaries) shall maintain in effect one or more interest rate Hedge Agreements (which, to the extent secured by the Collateral, shall be with the Syndication Agent, the Administrative Agent or the Lenders, or any of their respective Affiliates) in form and substance reasonably satisfactory to the Administrative Agent with respect to an aggregate principal amount equal to at least 50% of the aggregate outstanding principal amount of the Loans. Such Hedge Agreements shall be maintained for two (2) years after the Effective Date in a form and with a counterparty acceptable to the Administrative Agent in its reasonable discretion. To the extent such Hedge Agreements are maintained with the Administrative Agent, the Syndication Agent, a Lender, or any of their respective Affiliates, such Hedge Agreements shall be secured pari-passu with the Collateral.

**5.13    Further Assurances.**

At any time or from time to time upon the request of the Administrative Agent or the Collateral Agent, the Borrower will, at its expense, and will cause each of its Subsidiaries, at the Borrower's expense, to promptly execute, acknowledge and deliver such further documents and do such other acts and things as the Administrative Agent or the Collateral Agent may reasonably request only to the extent such acts or things are consistent with the express intent and purpose of the Loan Documents. In furtherance and not in limitation of the foregoing, the Borrower shall take, and cause each of its Subsidiaries to take, such actions as the Administrative Agent or the Collateral Agent may reasonably request from time to time (including, without limitation, the execution and delivery of guaranties, security agreements, pledge agreements, mortgages, deeds of trust, landlord's consents and estoppels, stock powers, financing statements and other documents, the filing or recording of any of the foregoing, title insurance with respect to any of the foregoing that relates to an interest in real property, and the delivery of stock certificates and other collateral with respect to which perfection is obtained by possession) to ensure that the Obligations are guaranteed by the Subsidiaries and are secured by substantially all of the assets (other than those assets specifically excluded by the terms of the Loan Documents) of the Borrower and its Subsidiaries.

**5.14    Title.**

The Borrower shall and shall cause its Subsidiaries to warrant and defend (a) its title to the Real Property Collateral and every part thereof, subject only to Liens permitted hereunder (including Permitted Encumbrances) and (b) the validity and priority of the Liens of the applicable Collateral Documents, subject only to Liens permitted hereunder (including Permitted Encumbrances), in each case against the claims of all Persons whomsoever. Without limiting the foregoing, the Borrower covenants and agrees that the Administrative Agent shall at all times have a First Priority Lien on the Real Property Collateral.

The Borrower shall reimburse the Administrative Agent for any losses, costs, damages or expenses (including reasonable attorneys' fees and court costs) incurred by the Administrative Agent if an interest in the Real Property Collateral, other than as permitted hereunder, is claimed by another Person.

## 5.15   Estoppels.

The Borrower will at any time and from time to time, within ten (10) days after written demand by Administrative Agent, deliver to Administrative Agent a certificate duly executed, and in form satisfactory to Administrative Agent, stating and acknowledging the then outstanding principal balance of the Loans and the fact that, to Borrower's knowledge, there are no defenses, offsets or counterclaims (or, if such should not be the fact, then the facts and circumstances relating to such defenses, offsets or counterclaims) and such other information as may reasonably be requested by Administrative Agent.

## 5.16   SPE Covenants.

The Borrower and its Subsidiaries:

(a)      Do not own and will not own any asset or property other than the property commonly known as "Parks Ranch", real property purchased in accordance with Section 3.3G hereof, the Capital Stock of the Meadows Subsidiary and their respective interests in the Project, and together with incidental personal property reasonably necessary for the ownership or operation of the Project;

(b)      will not engage in any business other than the ownership, management and operation of the Project, and incidental personal property reasonably necessary thereto and will conduct and operate its business in all material respects as presently conducted and operated;

(c)      except to the extent permitted by this Agreement, has not made and will not make loans to any Person or hold evidence of Indebtedness issued by any other Person or entity, except with respect to a loan in the amount of $650,000 made by the Borrower to Borg Family Partners;

(d)      except to the extent permitted by this Agreement, shall not acquire obligations or securities of its Affiliates or any constituent party of Borrower or its Subsidiaries;

(e)      is and will remain solvent and will pay its debts and liabilities from its assets as the same shall become due;

(f)      has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, and will not materially amend, Modify or otherwise change its articles of organization or operating agreement or other organizational documents in any manner which could reasonably be expected to be adverse to the interests of the Lenders, and in connection with any non-material amendment of any such articles of organization or operating agreement or other organizational documents, shall forward a copy of such amendment to the Administrative Agent promptly after the execution or filing thereof,

(g)      will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any other Loan Party and any Affiliate of any Loan Party), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, and shall not identify itself or any of its Affiliates as a division or part of the other;

89

(h)    will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(i)    will not, and will not permit any constituent party to, seek the dissolution, winding up, liquidation, consolidation or merger in whole or in part, of such entity; and

(j)    does not and will not hold itself out to be responsible for the debts or obligations of any other Person (except for the Loans and Permitted Existing Indebtedness).

**5.17    Maintenance of Entitlements**.

The Borrower shall warrant and defend, and otherwise maintain, all of the Entitlements obtained in connection with the Project as necessary (i) for the development of the Project as intended and as contemplated by the Master Plan, (ii) to ensure the Project is in compliance with Applicable Laws, and (iii) to enable Borrower to achieve the Project Projections.  To the extent any Entitlements require any obligations or conditions to be fulfilled by the Borrower or any of its Subsidiaries, the Borrower will perform (or caused to be performed) such obligations or conditions, including, without limitation, any obligations or conditions necessary to be fulfilled in connection with the completion of the North Lake Recreational Sewer and Water District's Phase 2 Parallel Treatment Plant Expansion Project (required to be built to serve the portions of the Project that remain unplatted as of the Effective Date).  In the event that the Borrower or the Administrative Agent becomes aware of a breach of any requirement, condition, restriction or obligation under any of the Entitlement Documents, the Borrower hereby grants to the Administrative Agent the right (but in no event shall Administrative Agent have the obligation) to cure, at the Borrower's sole cost and expense, any such breach, after prior written notice to the Borrower of such intention to cure same.

**5.18    Asset Sales.**

The Borrower covenants and agrees that the Real Property Collateral shall only be sold as commercial units, Unimproved Lots or Residential Units pursuant to a Permitted Collateral Asset Sale. No Real Property Collateral will be sold in bulk that has not been previously subdivided into individual Residential Units or Unimproved Lots as contemplated by the Master Plan.  No Real Property Collateral will be sold pursuant to any discount that does not reflect fair market value other than the Permitted Member Sales.  In no event shall the amount or discount points available pursuant to the Permitted Member Sales be increased in any manner.

**5.19    Control**.

The Permitted Holder shall at all times directly or indirectly Control the Borrower and own, directly or indirectly, 51% of the aggregate voting interests in the Borrower; subject only to the death or legal incapacity of the Permitted Holder.

**5.20    Credit Rating**.

The Borrower shall use its commercially reasonable efforts to cause an updated credit rating by S&P and by Moody's to be received with respect to the Loans at least once during each Fiscal Year.

**5.21    Accounts**.

The Borrower covenants and agrees that all Cash From Project Sales and progress payments under Residential Unit Construction Contracts received by Borrower not applied immediately to prepay

90

the Loans as required by Section 2.4B(ii)(d) and all Equity Proceeds received as a result of a Permitted Equity Issuance shall be deposited into and maintained in the Company's Operating Account as provided in Section 3.3 hereof. Except with respect to withdrawals permitted under Section 3.3G hereof, all withdrawals from the Company's Operating Account shall be used substantially in accordance with the Draw Package submitted for the applicable Fiscal Quarter during which Borrower is withdrawing such funds and approved by Administrative Agent with regard to funds disbursed to the Company's Operating Account pursuant to such Draw Package. All other funds in the Company's Operating Account shall be used substantially in accordance with the Approved Project Budget. The Borrower shall establish the Development Reserve Account prior to entering into this Agreement. All disbursements from the Development Reserve Account shall be made in accordance with the provisions of Section 3.3 hereof.

Any "securities accounts" and "deposit accounts" (as such terms are defined in the UCC) of the Borrower and its Subsidiaries established after the Effective Date shall be subject to effective Control Agreements in favor of the Collateral Agent in form and substance reasonably satisfactory to the Collateral Agent.

**5.22**   **Intentionally Deleted**.

**5.23**   **Maintenance of Ground Leases**.

With respect to each Ground Lease,

**A.**   Borrower shall (i) pay all rents, additional rents and other sums required to be paid by the Borrower, as tenant under and pursuant to the provisions of each Ground Lease, (ii) diligently perform and observe all of the terms, covenants and conditions of each Ground Lease on the part of the Borrower, as tenant thereunder, and (iii) promptly notify the Collateral Agent of the giving of any notice by lessor under the applicable Ground Lease to the Borrower of any default by the Borrower, as tenant thereunder, and deliver to Lender a true copy of each such notice within five (5) Business Days of receipt. The Borrower shall not, without the prior consent of the Collateral Agent surrender the leasehold estate created by the applicable Ground Lease or terminate or cancel any Ground Lease or Modify, change, supplement, alter or amend any Ground Lease, either orally or in writing.

**B.**   If the Borrower shall default in the performance or observance of any term, covenant or condition of any Ground Lease on the part of Borrower, as tenant thereunder, and shall fail to cure the same prior to the expiration of any applicable cure period provided thereunder, the Collateral Agent shall have the right, to the extent the Collateral Agent has received notice of, or has otherwise become aware of any such default, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all of the terms, covenants and conditions of such Ground Lease on the part of the Borrower to be performed or observed on behalf of the Borrower, to the end that the rights of the Borrower in, to and under such Ground Lease shall be kept unimpaired and free from default. If the landlord under the applicable Ground Lease shall deliver to the Collateral Agent a copy of any notice of default under such Ground Lease, such notice shall constitute full protection to the Collateral Agent for any action taken or omitted to be taken by the Collateral Agent, in good faith, in reliance thereon. The Borrower shall exercise each individual option, if any, to extend or renew the term of each Ground Lease prior to or within the period in which any such option may be exercised, and the Borrower hereby expressly authorizes and appoints the Collateral Agent its attorney-in-fact to exercise any such option in the name of and upon behalf of the Borrower, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest.

**5.24**   **Material Contracts; Sale Leasebacks**.

**CREDIT AGREEMENT**

**A.**     Neither Borrower nor any of its Subsidiaries shall enter into a Third Party Operating Agreement or an Affiliate Operating Agreement without prior written consent of the Administrative Agent, such consent not to be unreasonably withheld and without providing the Administrative Agent with a Recognition and Estoppel Agreement or an Affiliate Operating Agreement Subordination, as the case may be, in form and substance reasonably satisfactory to the Administrative Agent. Neither Borrower nor any of its Subsidiaries shall terminate or materially amend, supplement or Modify any such approved Third Party Operating Agreement or Affiliate Operating Agreement without the prior written consent of the Administrative Agent.

**B.**     Neither Borrower nor any of its Subsidiaries shall transfer the responsibility for the oversight of the construction of the applicable portion of the Project pursuant to a Material Contract from the Contractor responsible for such portion to any other person or entity without the prior written consent of Administrative Agent, which consent shall not be unreasonably withheld and without providing the Administrative Agent with a Recognition and Estoppel Agreement in form and substance reasonably satisfactory to the Administrative Agent.

**C.**     Neither Borrower nor any of its Subsidiaries shall enter into a new franchise or license agreement with a franchisor for any Hotel without the prior written consent of the Administrative Agent Neither Borrower nor any of its Subsidiaries shall terminate or materially amend, supplement or Modify any such approved franchise agreement without the prior written consent of the Administrative Agent, which consent shall not be unreasonably withheld.

**D.**     Neither Borrower nor any of its Subsidiaries shall enter into any development agreement or any other agreement the purpose of which is to obtain the property development services, similar to those provided by the Borrower of any third party developer without the prior written consent of the Administrative Agent, such consent not to be unreasonably withheld and without providing the Administrative Agent with a Recognition and Estoppel Agreement or an Affiliate Operating Agreement Subordination, as the case may be, in form and substance reasonably satisfactory to the Administrative Agent.

**E.**     Neither Borrower nor any of its Subsidiaries shall enter into any new Material Contract other than Qualified Sales Agreements, without the prior approval of Administrative Agent, which approval shall not be unreasonably withheld, provided, however that the Borrower shall have the right to enter into leases with third parties for retail and commercial purposes in substantially the form attached hereto as Exhibit XV without the prior approval of the Administrative Agent.

**F.**     Neither Borrower nor any of its Subsidiaries shall enter into any material shared use agreement with respect to the Bayview Parcels or any other portion of the Real Property Collateral, without the prior approval of Administrative Agent.

**G.**     Neither Borrower nor any of its Subsidiaries shall enter into any sale leaseback transaction, which affects any portion of the Project. Notwithstanding the foregoing, it is hereby understood and agreed that the Borrower has subjected the Golf Course to a sale leaseback transaction and is contemplating subjecting the Ski Hill and convention center (commonly known as Arling Center) portions of the Real Property Collateral to a sale-leaseback transaction. In connection with any such transaction, the Administrative Agent will have the right to approve any Third Party Operator or any Affiliate operators and/or owners (such approval not to be unreasonably withheld or delayed with respect to a Third Party Operator of similar stature and repute to the operator or owner currently in place, if any) and all documentation executed in connection with such sale-leaseback transaction, including, without limitation, all conveyance documentation, leases, Third Party Operating Agreements and Affiliate Operating Agreement. Any lease entered in connection with such a sale leaseback transaction shall

contain customary leasehold mortgagee protections, require that any fee lender recognize the tenant's rights under such lease, and provide that the tenant owns all improvements to the property demised thereunder until expiration or the term or termination of such lease. In connection with each such Affiliate Operating Agreement and Third Party Operating Agreement, Borrower shall provide to the Administrative Agent such Affiliate Operating Agreement Subordinations and/or Recognition and Estoppel Agreements in form and substance reasonably satisfactory to the Administrative Agent. Further, the Borrower will grant the Administrative Agent a perfected First Priority Lien in all of Borrower's right, title and interest in and to all Third Party Operating Agreements, Affiliate Operating Agreements and other contracts in connection with the operation of the Ski Hill and convention center, a perfected First Priority Lien on and a Mortgage on all of Borrower's right, title and interest in and to all real property, improvements and all personal and intangible property, in each case, utilized in connection with the Ski Hill and convention center, a First Priority pledge of the Borrower's equity interest in any joint venture or Affiliate serving as the lessor under such sale leaseback transaction, in all cases, to the extent not already provided for in the Collateral Documents executed as of the Effective Date in the Administrative Agent's sole discretion.  The Borrower further agrees to execute, deliver and pursue any additional documentation reasonably requested by the Administrative Agent in connection with such sale leaseback transaction. The Administrative Agent agrees to reasonably cooperate with the Borrower to ensure that the foregoing security interests and Liens are consistent with Borrower's desire to maintain the treatment of the above-described sale leaseback transaction as a bona-fide sale leaseback for state and federal tax purposes.

## 5.25   Use of Insurance Proceeds Upon the Occurrence of a Recovery Event.

**A.**     In the event of a Casualty resulting in damage or destruction, the cost of which to repair is less than $5,000,000, the Borrower shall have the right to settle any and all insurance claims in connection therewith and utilize the Insurance Proceeds received for repair and restoration of the affected Real Property Collateral. Upon the occurrence of such a Casualty, the Borrower shall have the right to collect and receive the Insurance Proceeds in connection therewith so long as (i) no Event of Default has occurred and is continuing, (ii) the Administrative Agent determines in its reasonable discretion that the repair and restoration can be completed prior to one year before the Maturity Date, (iii) the Administrative Agent determines in its reasonable discretion that the Insurance Proceeds are sufficient to allow the Borrower to complete the repair and restoration (or the Borrower has provided evidence of its ability to fund the Restoration Cost Amount not covered by the Insurance Proceeds), and (iv) the Administrative Agent is satisfied, in its reasonable discretion, that any operating deficits incurred as a result of the Casualty will be covered by the Insurance Proceeds, the Borrower's business interruption insurance or by other funds of the Borrower. If the Borrower is permitted to utilize the Insurance Proceeds for repair and restoration as set forth in this Section 5.25A, the Borrower shall deliver to the Administrative Agent a Reinvestment Notice. If the conditions set forth in this Section 5.25A are not satisfied, then the Administrative Agent shall use the Insurance Proceeds to prepay the Loan in accordance with Section 2.8B(ii) hereof.

**B.**     In the event of a Casualty resulting in damage or destruction, the cost of which to repair exceeds $5,000,000, the Administrative Agent may either (i) jointly with the Borrower settle and adjust any claim and agree with the insurance company or companies on the amount to be paid as a result of the Casualty, or (ii) allow the Borrower to agree with the insurance company or companies on the amount to be paid as a result of the Casualty; provided, that if at the time of the settlement of such claim an Event of Default has occurred and is continuing, then the Administrative Agent shall settle and adjust such claim without the consent of the Borrower. In any such case the Administrative Agent shall and is hereby authorized to collect any such Insurance Proceeds. The reasonable out-of-pocket expenses incurred by the Administrative Agent in the adjustment and collection of such Insurance Proceeds shall become part of the Obligations and shall be reimbursed by the Borrower to the Administrative Agent upon demand therefore. In the event of a Casualty resulting in damage or destruction, for which the cost of repair and

restoration of the affected portion of the Real Property Collateral net of any actual and documented reasonable costs actually incurred by the Borrower or any of its Subsidiaries in connection with adjustment and settlement thereof (the "**Restoration Cost Amount**") exceeds $5,000,000, the Borrower shall deposit the Restoration Cost Amount, within one (1) Business Day after its receipt thereof, into the Development Reserve Account. The Administrative Agent shall disburse the Restoration Cost Amount from the Development Reserve Account for purposes of restoring and repairing the affected Real Property Collateral in accordance with the terms and provisions of this Section 5.25 so long as (i) no Event of Default has occurred and is continuing, (ii) the Administrative Agent determines in its reasonable discretion that the repair and restoration can be completed prior to one year before the Maturity Date, (iii) the Administrative Agent determines in its reasonable discretion that the Insurance Proceeds are sufficient to allow the Borrower to complete the repair and restoration (or the Borrower has provided evidence of its ability to fund the Restoration Cost Amount not covered by the Insurance Proceeds), and (iv) the Administrative Agent is satisfied, in its reasonable discretion, that any operating deficits incurred as a result of the Casualty will be covered by the Insurance Proceeds, the Borrower's business interruption insurance or by other funds of the Borrower. If the conditions set forth in this Section 5.25B are not satisfied, then the Administrative Agent shall use the Insurance Proceeds to prepay the Loan in accordance with Section 2.8B(ii) hereof.

      **C.**    From time to time, provided that the conditions set forth in Section 5.25B are satisfied, but in no event more frequently than once monthly, the Administrative Agent shall disburse portions of the Restoration Cost Amount to, or as directed by, the Borrower upon receipt of (1) evidence satisfactory to it (which evidence may include inspection(s) of the work performed) that the restoration and repair covered by the disbursement has been completed in accordance with plans and specifications approved by the Administrative Agent and in accordance with all Applicable Laws, (2) evidence reasonably satisfactory to it of the remaining estimated cost of completion of the restoration and repair, (3) funds, or, at the Administrative Agent's option, assurances reasonably satisfactory to Agent that such funds are available and sufficient in addition to the Insurance Proceeds to complete the proposed restoration and repair, and (4) such architect's certificates, waivers of lien, contractor's sworn statements, title insurance endorsements, bonds and other evidences of cost, payment and performance of the foregoing repair and restoration as the Administrative Agent may reasonably require and approve. The Administrative Agent may, in any event, require that all plans and specifications for such restoration, repair, replacement and rebuilding be submitted to and reasonably approved by the Administrative Agent prior to commencement of work. The Administrative Agent may request that the Consultant inspect such work and review the Borrower's request for payments and the Borrower shall, on demand by the Administrative Agent, reimburse the Administrative Agent for the reasonable fees and disbursements of the Consultant in connection therewith. No payment made prior to the final completion of the restoration and repair shall exceed ninety percent (90%) of the hard construction costs value of the work performed from time to time (except for restoration work on a trade by trade basis or on an hourly basis for professional services in which event, payment may be made in full upon the completion of such work). If, at any time during the course of the restoration and repair, the Administrative Agent determines in its reasonable discretion, that the Restoration Cost Amount is not sufficient to complete the restoration and repair in accordance with the approved plans and specifications and in compliance with Applicable Laws, then the Borrower shall promptly deposit or cause to be deposited any deficiency into the Development Reserve Account. No further disbursements will be made by the Administrative Agent until such deficient amount has been deposited. Any surplus which may remain out of Insurance Proceeds held by Administrative Agent after payment of such costs of restoration, repair, replacement or rebuilding shall be paid to Borrower so long as no Event of Default has occurred and is continuing.

      **D.**    In the event that Insurance Proceeds shall be made available to Borrower for the restoration and repair of all or any portion of the Real Property Collateral affected by a Casualty in accordance with the terms and provisions of this Section 5.25, the Borrower covenants and agrees to

restore and repair or cause the same to be restored and repaired to be of at least comparable value as prior to such damage, all to be effected in accordance with Applicable Laws and the plans and specifications approved in advance by the Administrative Agent, such approval not to be unreasonably withheld. Borrower covenants and agrees to commence such restoration and repair as soon as reasonably practicable after the occurrence of any Casualty and the receipt of the Insurance Proceeds therefor and shall diligently pursue the same to satisfactory completion in accordance with the plans and specifications approved by the Administrative Agent and all Applicable Laws. To the extent that any Subsidiary has constructed or is constructing improvements on any land owned by a Borrower, Borrower covenants and agrees that it shall cause such Subsidiary to use any proceeds of insurance as a result of a Casualty affecting all or a portion of such improvements to restore and repair or cause the same to be restored and repaired to be of at least comparable value as prior to such damage, all to be effected in accordance with Applicable Laws and the plans and specifications under which such improvements were being constructed. The Borrower covenants and agrees to cause such Subsidiary to commence such restoration and repair as soon as reasonably practicable after the occurrence of any Casualty and the receipt of the insurance proceeds therefor and shall cause such Subsidiary to diligently pursue the same to satisfactory completion in accordance with such plans and specifications and all Applicable Laws.

> **E.**     Notwithstanding anything to the contrary contained in this Section 5.25, with respect to the portion of the Real Property Collateral subject to the Ground Lease with the State of Idaho as more particularly described on Exhibit XXV hereto, the requirements with regard to the use of Insurance Proceeds or Condemnation Proceeds contained herein shall be subject to the terms and provisions of the Ground Lease with the State of Idaho (for so long as such Ground Lease is in full force and effect) with regard to use of Insurance Proceeds upon the occurrence of a Recovery Event.

## SECTION 6.
## NEGATIVE COVENANTS

The Borrower covenants and agrees that, until payment in full of all of the Loans and other Obligations, the Borrower shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 6.

### 6.1    Indebtedness.

The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness or preferred stock, except that the Borrower and its Subsidiaries may create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to Indebtedness or preferred stock, as follows:

> (i)     Each of the Loan Parties may become and remain liable with respect to its respective Obligations in accordance with the terms of this Agreement and the Loan Documents;

> (ii)     The Borrower may become and remain liable with respect to Permitted Equipment Financing;

> (iii)     The Borrower and its Subsidiaries may become and remain liable with respect to trade payables incurred in the Ordinary Course of Business of the Borrower or its Subsidiaries;

> (iv)     Each of the Loan Parties may become and remain liable with respect to Indebtedness to any other Loan Party; provided that, in each case, (a) no Default or Event of

95

Default has occurred and is continuing as the time of the incurrence thereof or would result therefrom, (b) all such intercompany Indebtedness shall be evidenced by promissory notes which shall have been pledged to the Collateral Agent pursuant to the Collateral Documents, (c) all such intercompany Indebtedness owed by the Borrower to any of its Subsidiaries shall be unsecured and subordinated in right of payment to the payment in full of the Obligations pursuant to the terms of the applicable promissory notes or an intercompany subordination agreement that in any such case, are reasonably satisfactory to the Administrative Agent, and (d) any payment by any Subsidiaries of the Borrower under any Guaranty or any payment by the Borrower of the Obligations shall result in a pro tanto reduction of the amount of any intercompany Indebtedness owed by the Borrower or by such Subsidiaries to the Borrower or to any of its Subsidiaries for whose benefit such payment is made;

(v)     The Borrower and its Subsidiaries may become and remain liable with respect to Indebtedness under performance, surety, appeal or indemnity bonds required by Governmental Authorities in connection with the development of the Project, in each case incurred in the Ordinary Course Of Business;

(vi)     The Borrower and its Subsidiaries may become and remain liable with respect to Indebtedness under any Hedge Agreements entered into in compliance with Section 5.12 of this Agreement;

(vii)     The Borrower may remain liable with respect to the Permitted Existing Indebtedness; and

(viii)     The Borrower may remain liable with respect to preferred stock issued as of the Effective Date as "P" shares under the Operating Agreement of the Borrower and any preferred stock issued in a Permitted Equity Issuance.

## 6.2    Liens and Related Matters.

**A.     Prohibition on Liens.**   The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of the Borrower or any of its Subsidiaries (or a Lien on the Capital Stock of Borrower or its Subsidiaries to the extent held by the Shareholder Pledgors), whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement, or other similar notice of any Lien with respect to any such property, asset, income or profits under the Uniform Commercial Code of any state or under any similar recording or notice statute, except (solely with respect to the Borrower and its Subsidiaries):

(i)     any Permitted Encumbrances; provided, however, that (i) with respect to the Real Property Collateral no Permitted Encumbrances except the Permitted Title Exceptions shall be senior or prior to the First Priority liens under the Mortgages (which Permitted Title Exceptions include, without limitation, a Lien securing certain of the Permitted Existing Indebtedness); and (ii) no such Permitted Encumbrances shall result in a Lien on the Capital Stock of the Borrower or its Subsidiaries; and

(ii)     Liens in favor of the Collateral Agent granted pursuant to the Collateral Documents to secure the Obligations or granted in favor of any Agent or Lender pursuant to the terms of this Agreement.

96

**B.    No Further Negative Pledges.**  Except with respect to specific property encumbered to secure payment of particular Indebtedness permitted by this Agreement or to be sold pursuant to an Asset Sale otherwise permitted by this Agreement, neither the Borrower nor any of its Subsidiaries shall enter into any agreement (other than the Loan Documents) prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired.

**C.    No Restrictions on Distributions, etc.**  Except as otherwise provided in the Loan Documents, the Borrower will not, and will not permit any of its Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance, limitation or restriction of any kind on the ability of any Subsidiaries of the Borrower to (i) pay dividends or make any other distributions on any of such Subsidiary's Capital Stock owned by the Borrower or any other Subsidiaries of the Borrower, (ii) repay or prepay any Indebtedness owed by such Subsidiary to the Borrower or any other Subsidiary of the Borrower, (iii) make loans or advances to the Borrower or any other Subsidiary of the Borrower, or (iv) transfer any of its property or assets to the Borrower or any other Subsidiary of the Borrower.

**6.3    Investments.**

The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, make or own any Investments, except

(i)    the Borrower and its Subsidiaries may make Investments in Cash Equivalents; and

(ii)    the Borrower may make an Investment in the amount of $2,500,000 in the Meadows Subsidiary and may own the Capital Stock in the Meadows Subsidiary.

**6.4    Contingent Obligations.**

The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, create or become or remain liable with respect to any Contingent Obligation, except:

(i)    The Borrower and its Subsidiaries may become and remain liable with respect to Contingent Obligations in respect of customary indemnification and purchase price adjustment obligations of any such Person incurred in connection with Asset Sales permitted by this Agreement;

(ii)    The Borrower and its Subsidiaries may become and remain liable with respect to Contingent Obligations in respect of any of the Indebtedness that, if outstanding, would be permitted under Section 6.1;

(iii)    The Borrower may remain liable under the LID Bond Repayment Guarantee Agreement, dated as of June 25, 2003 in respect of the LID Bonds issued pursuant to Ordinance No. 2003-3 of the North Lake Recreational Sewer and Water District, Valley County, Idaho dated May 10, 2003; and

(iv)    The Borrower may become and remain liable with respect to bonding, surety and letter of credit obligations as are required by the State of Idaho, Valley County or other applicable Governmental Authority as a condition to compliance with the Entitlements.

**6.5    Restricted Payments.**

97

The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, declare, order, pay, make or set apart any sum for any Restricted Payment; provided that so long as no Default or Event of Default has occurred and is continuing or would result therefrom, the Borrower and its Subsidiaries may

(i)     so long as the Borrower and its Subsidiaries are treated as a partnership or a disregarded entity for federal and state income tax purposes, make Restricted Payments to the holders of the Capital Stock of the Borrower for the purposes of permitting such holders to pay federal and state income tax obligations with respect to income allocated to them from the Borrower and its Subsidiaries; provided that the amount of such Restricted Payments made with respect to any Fiscal Year shall not exceed an amount equal to (A) the net taxable income of the Borrower and its Subsidiaries for any Fiscal Year (computed as if they were filing a separate consolidated or combined tax return that only include the Borrower and its Subsidiaries for such Fiscal Year) multiplied by (b) the lesser of (i) forty percent (40%) and (ii) the highest combined marginal federal and state tax rate for any individual or entity, as the case may be, resident in Delaware;

(ii)    make Restricted Payments to the holders of the Capital Stock of the Borrower in an aggregate amount not to exceed the Restricted Payment Amount, provided that no Restricted Payment shall be permitted pursuant to this clause (ii) unless the Trigger Date Events shall have previously occurred and be continuing, and provided further that any portion of the Restricted Payment Amount that has been utilized for the purposes permitted in the last sentence of Section 6.13 shall be subtracted from the amount of the Restricted Payments permitted to be made under this Section 6.5(ii); and

(iii)   make Restricted Payments to the holders of the Capital Stock of the Borrower in an aggregate amount not to exceed the amount of the Equity Proceeds realized from a Permitted Equity Issuance, provided, however that such Equity Proceeds shall only be used for the types of Restricted Payments described in clauses (b) and (c) of the definition of "Restricted Payment" and provided further that such Equity Proceeds shall not be used to redeem, retire, make a sinking fund or similar payment with respect to, purchase or otherwise acquire for value, or directly or indirectly repurchase the Capital Stock of Jean-Pierre Boespflug if, immediately following such action, the aggregate percentage of Capital Stock in the Borrower held by Jean-Pierre Boespflug, would be less than 40%.

## 6.6    **Financial Covenants**.

**A.**     **Total Debt LTV Ratio**. The ratio (the "**Total Debt LTV Ratio**") of (i) the principal amount of all Indebtedness of the Borrower and its Subsidiaries as of the Calculation Date, to (ii) the Appraised Value of the then remaining Real Property Collateral as of the Calculation Date shall not exceed:

| Fiscal Quarter ending | Total Debt LTV Ratio |
|---|---|
| June 30, 2006 through June 30, 2008 | 30% |
| Thereafter | 20% |

**B.**     **Interest Coverage Ratio**. The ratio (the "**Interest Coverage Ratio**") of (i) Cash EBITDA for the four-Fiscal Quarter period ending on the Calculation Date, to (ii) Consolidated Interest Expense for such four–Fiscal Quarter period shall not be less than the following ratios:

98

| Fiscal Quarter ending | Interest Coverage Ratio |
|---|---|
| September 30, 2008 | 1.00 to 1.00 |
| December 31, 2008 | 2.00 to 1.00 |
| Thereafter | 3.00 to 1.00 |

**C.      Liquidity Test**.  At all times (A) the sum of (i) Cash Collateral, plus (ii) the amount of Tranche A Loans available to be made to the Borrower in accordance with this Agreement shall be greater than (B) $25,000,000.

**D.      Limitation on Consolidated Capital Expenditures**.  From and after the Closing Date, during each calendar year ending on the dates set forth below (it being understood and agreed that the initial calendar year period shall commence on the Closing Date and the final calendar year period shall end on the Maturity Date), neither the Borrower nor any of its Subsidiaries shall make any Consolidated Capital Expenditure, or become legally obligated to make any Consolidated Capital Expenditure, except Consolidated Capital Expenditures associated with the Project and in no event in excess of the following amounts:

| Calendar Year ending | Consolidated Capital Expenditure Amount |
|---|---|
| December 31, 2006 | $140,000,000 |
| December 31, 2007 | $120,000,000 |
| December 31, 2008 | $150,000,000 |
| December 31, 2009 | $210,000,000 |
| December, 31 2010 | $250,000,000 |
| Maturity Date | $130,000,000 |

Notwithstanding the foregoing, if the amount of Consolidated Capital Expenditures made by the Borrower or its Subsidiaries during any such period as set forth above is (i) less than the amount set forth above as permissible during any such period, the Borrower and its Subsidiaries shall have the right to utilize any amounts not so expended during the next succeeding period or any period thereafter until the Maturity Date or (ii) more than the amount set forth above as permissible during any such period, the Borrower and its Subsidiaries shall have the right to utilize, during the period in question, up to 50% of the amounts permitted to be expended during the next succeeding period.

**6.7      Restriction on Fundamental Changes**.

Neither the Borrower nor any of its Subsidiaries shall, without the prior written consent of the Requisite Lenders in their sole and absolute discretion, directly or indirectly, enter into any merger, consolidation, reorganization or recapitalization, liquidate, wind up or dissolve, or cause or consent to either the Borrower or any Subsidiaries to enter into any merger, consolidation, reorganization or recapitalization, liquidate, wind up or dissolve.

**6.8      Asset Sales**.

Without the prior written consent of the Requisite Lenders, the Borrower shall not, and shall not permit any of its Subsidiaries to engage in any Asset Sales, except as follows:

(i)      With respect to Real Property Collateral, a Permitted Collateral Asset Sale or Required Dedication, provided that each of the following conditions has been satisfied:

**CREDIT AGREEMENT**

(a)     no Default or Event of Default shall have occurred and be continuing (other than a Default or Event of Default that will be cured through the consummation of the proposed Asset Sale);

(b)     not less than ten (10) days prior written notice of the closing of such sale has been provided to the Collateral Agent with a true, correct and complete copy of the relevant Qualified Sales Agreement;

(c)     such Asset Sale is consummated in accordance with the terms of a Qualified Sales Agreement or the Bayview Contracts, as applicable;

(d)     any and all mandatory prepayments of the Loan required to be made through the date of the proposed Asset Sale have been made, and all mandatory prepayments resulting from such Asset Sale will be made in accordance with Section 2.8B(ii)(e);

(e)     the Real Property Collateral subject to such Asset Sale or Required Dedication, and the remaining Real Property Collateral after giving effect to such Asset Sale or Required Dedication shall constitute a legal subdivision in accordance with all Applicable Laws and Governmental Authorizations;

(f)     the Borrower shall have paid all reasonable out-of-pocket costs and expenses incurred by the Collateral Agent and all reasonable fees and expenses paid to third party consultants (including reasonable attorneys' fees and expenses) by the Collateral Agent in connection with such release; and

(g)     the Collateral Agent shall have received such title endorsements, date downs or other evidence reasonably satisfactory to Collateral Agent that (i) the priority of the liens evidenced by the Mortgages with respect to the remaining Real Property Collateral after giving effect to such Asset Sale or Required Dedication shall be maintained following such Asset Sale or Required Dedication, and (ii) the remaining Real Property Collateral is not subject to any Liens other than Permitted Encumbrances and Liens permitted by Section 6.2.

(ii)     With respect to the Capital Stock of the Borrower (or any Subsidiaries of the Borrower), the sale of such Capital Stock provided that each of the following conditions has been satisfied:

(a)     no Default or Event of Default shall have occurred and be continuing (other than a Default or Event of Default that will be cured through the consummation of the proposed Asset Sale);

(b)     the mandatory prepayment required under Section 2.8B(ii)(b), if any, shall have been made concurrently with the consummation of the proposed Asset Sale; and

(c)     no Change of Control will result from the proposed Asset Sale.

## 6.9     <u>Transactions with Shareholders and Affiliates</u>.

The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service or the payment of any management fees, consulting fees or

the making of other disbursements) with any holder of 5% or more of any class of equity Securities of the Borrower or a Subsidiaries or with any Affiliate of the Borrower or of any such Subsidiaries or holder, on terms that are less favorable to the Borrower or that Subsidiaries, as the case may be, than those that might be obtained at the time from Persons who are not such a holder or Affiliate; provided that the foregoing restriction shall not apply to:

    (i)        the Transactions;

    (ii)       the Permitted Member Sales; and

    (iii)      the amounts expressly contemplated under the Approved Project Budget to be paid to Affiliates of the Borrower.

**6.10**    **Conduct of Business**.

The Borrower shall not, and shall not permit any of its Subsidiaries to, engage in any business other than (i) the businesses engaged in by the Borrower and its Subsidiaries on the Effective Date and (ii) such other lines of business as may be reasonably related thereto.

**6.11**    **Amendments or Waivers of Certain Agreements**.

None of the Borrower nor its Subsidiaries shall terminate or agree to any amendment, restatement, supplement or other Modification to, or waive any of its rights under, any Organizational Certificates or Organizational Documents of the Borrower and its Subsidiaries, if such termination, amendment, restatement, supplement, Modification or waiver would be materially adverse to the Lenders.

**6.12**    **Fiscal Year**.

Neither the Borrower nor any of its Subsidiaries shall change its Fiscal Year-end from December 31.

**6.13**    **Limitation on Standing Inventory**.

So long as the Borrower owns (whether in whole or part) at least thirty-two (32) of the Designated Speculative Housing Units, neither the Borrower nor any Subsidiaries shall own, at any given time, more than an aggregate of 84 Residential Units that are under construction or completely constructed and not Pre-Sold. From and after the date the Borrower no longer owns (whether in whole or part) at least thirty-two (32) of the Designated Speculative Housing Units, neither the Borrower nor any Subsidiaries shall own, at any given time, more than an aggregate of 70 Residential Units that are under construction or completely constructed and not Pre-Sold. In addition to the foregoing limitation, at all times no less than seventy percent (70%) of all Residential Units that are under construction or completely constructed must be Pre-Sold (excluding, for purposes of this sentence, the Designated Speculative Housing Units). For purposes of the Village Plaza Project only, all of the Residential Units contained in the Village Plaza Project that are subject to a Qualified Sales Agreement shall be deemed Pre-Sold for purposes of this Section 6.13 *so long as* the mean (i.e., the weighted average) and the median of the non-refundable deposits made pursuant to such Qualified Sales Agreements is equal to or greater than ten percent (10%) of the aggregate applicable purchase price under such Qualified Sales Agreements. Notwithstanding anything to the contrary contained in this Section 6.13, so long as the Trigger Date Events shall have occurred and be continuing, the Restricted Payment Amount or any portion thereof may be used for purposes of constructing Residential Units that are not Pre-Sold and to the extent such Residential Units are funded solely from funds that would otherwise be available to the

101

Borrower under Section 6.5(ii) as the Restricted Payment Amount the limitations contained within this Section 6.13 shall not apply to such Residential Units.

## 6.14    The Meadows Project.

In connection with the acquisition of the Meadows Project, the Meadows Subsidiary shall not become or remain liable with respect to any Indebtedness other than non-recourse Indebtedness for purposes of financing the acquisition of the Meadows Project. The Meadows Subsidiary shall not own any asset or property other than the Meadows Project and shall not engage in any business other than the ownership, management and operation of the Meadows Project.

## SECTION 7.
## EVENTS OF DEFAULT

If any of the following conditions or events ("**Events of Default**") shall occur:

## 7.1    Payment of Obligations.

The Borrower shall fail to pay any of the Obligations on the due date thereof (whether due at stated maturity, on demand, upon acceleration or otherwise), provided that with respect to regularly scheduled interest payments required pursuant to Section 2.6C or fees required pursuant to Section 2.7, the Borrower is required to make such payments within three (3) days after the date on which such payments are due; or

## 7.2    Misrepresentations.

Any representation, warranty or other written statement to any Agent or any Lender by or on behalf of any Loan Party, or the Non-Recourse Guarantor whether made in or furnished in compliance with or in reference to any of the Loan Documents, proves to have been false or misleading in any material respect when made or furnished; or

## 7.3    Breach of Certain Covenants.

The Borrower shall fail or neglect to perform, keep or observe (i) any covenant contained in Sections 5.1, 5.3(i), (ii), (iii) and (xii), 5.4, 5.16, 5.18, 5.19, 5.21, 5.23 and Section 6 hereof on the date that the Borrower is required to perform, keep or observe such covenant, and, (x) in the case of a breach of covenants contained in Sections 5.3(i), (ii) and (iii), the breach of such covenant is not cured to the satisfaction of the Administrative Agent within fifteen (15) days after the earlier to occur of the date on which any Responsible Officer's receives notice of such breach from the Administrative Agent or the date on which such Responsible Officer becomes aware of such breach and (y) in the case of a breach of covenants contained in Sections 5.23(A)(i) and (ii), the lessor under the applicable Ground Lease shall have declared Borrower to be in default under such Ground Lease; provided, however that such opportunity to cure shall not apply in the case of any failure to perform, keep or observe any covenant which is not capable of being cured at all or within such 15-day period, which is a willful or knowing breach by the Borrower or which involves a repeated breach of such covenant.

## 7.4    Breach of Other Covenants.

The Borrower shall fail or neglect to perform, keep or observe any other covenant contained in this Agreement not otherwise addressed in this Section 7 and the breach of such other covenant is not cured to the Administrative Agent's satisfaction within thirty (30) days after the sooner to occur of any

102

Responsible Officer's receipt of notice of such breach from the Administrative Agent or the date on which such failure or neglect first becomes known to any Responsible Officer; provided, however, that such notice and opportunity to cure shall not apply in the case of any failure to perform, keep or observe any covenant which is not capable of being cured at all or within such 30-day period or which is a willful and knowing breach by the Borrower; or

**7.5     Default Under Loan Documents**.

Except as otherwise provided in this Section 7, the Borrower or any other Loan Party or the Non-Recourse Guarantor shall default in the due and punctual observance or performance of any liability or obligation to be observed or performed by it under any of the Loan Documents and such default or breach is not cured to the Administrative Agent's satisfaction within thirty (30) days after the sooner to occur of any Responsible Officer's receipt of notice of such default or breach from the Administrative Agent or the date on which such default or breach first becomes known to any Responsible Officer; provided, however, that such notice and opportunity to cure shall not apply in the case of any default or breach which is not capable of being cured at all or within such 30-day period or which is a willful and knowing breach by the Borrower; or

**7.6     Other Defaults**.

There shall occur an event of default under (i) any of the Permitted Indebtedness or (ii) there shall occur any default or event of default on the part of the Borrower or any Subsidiary beyond any applicable cure or grace period under any agreement, document or instrument to which the Borrower or any Subsidiary is a party or by which the Borrower or any Subsidiary or any of their respective properties is bound, creating or relating to any Indebtedness (other than the Obligations) in excess of $1,000,000 if, in each case, the payment or maturity of such Indebtedness may be accelerated in consequence of such event of default or demand for payment of such Indebtedness may be made; or

**7.7     Material Adverse Effect**.

There shall occur any event or condition that has a Material Adverse Effect; or

**7.8     Solvency**.

Any Loan Party shall cease to be Solvent; or

**7.9     Insolvency Proceedings**.

Any Insolvency Proceeding shall be commenced by any Loan Party or the Non-Recourse Guarantor; an Insolvency Proceeding is commenced against any Loan Party and any of the following events occur: such Loan Party or the Non-Recourse Guarantor consents to the institution of the Insolvency Proceeding against it, the petition commencing the Insolvency Proceeding is not timely controverted by such Loan Party or the Non-Recourse Guarantor, as the case may be, the petition commencing the Insolvency Proceeding is not dismissed within thirty (30) days after the date of the filing thereof (provided that, in any event, during the pendency of any such period, Lenders shall be relieved from their obligation to make Loans or otherwise extend credit to or for the benefit of the Borrower hereunder), an interim trustee is appointed to take possession all or a substantial portion of the properties of such Loan Party or the Non-Recourse Guarantor or to operate all or any substantial portion of the business of such Loan Party or the Non-Recourse Guarantor, as the case may be, or an order for relief shall have been issued or entered in connection with such Insolvency Proceeding; or any Loan Party or

the Non-Recourse Guarantor shall make an offer of settlement extension or composition to its unsecured creditors generally; or

### 7.10   Business Disruption; Condemnation.

There shall occur a cessation of a substantial part of the business of any Loan Party for a period which may be reasonably expected to have a Material Adverse Effect; or any Loan Party shall suffer the loss or revocation of any license, permit or Approval now held or hereafter acquired by such Loan Party which is material to the operations of such Loan Party or necessary to the continued or lawful operation of its business or the development of the Project as contemplated by the Master Plans, the Project Projections, and this Agreement; or any Loan Party shall be enjoined, restrained or in any way prevented by court, governmental or administrative order from conducting all or any material part of its business affairs; or any material lease or agreement pursuant to which any Loan Party leases or occupies any premises on which any Collateral is located shall be canceled or terminated prior to the expiration of its stated term and such cancellation or termination has a Material Adverse Effect; or any material part of the Collateral shall be taken through condemnation or the Appraised Value of such property shall be materially impaired through condemnation; or

### 7.11   ERISA.

An ERISA Event shall occur which could reasonably be expected to result in a Material Adverse Effect or which the Administrative Agent, in its reasonable discretion, shall determine constitutes grounds for the termination by the PBGC of any Pension Plan or for the appointment by the appropriate United States district court of a trustee for any Pension Plan; or if any Pension Plan shall be terminated or any such trustee shall be requested or appointed; or if the Borrower or any Subsidiaries is in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan resulting from the Borrower's or such Subsidiary's complete or partial withdrawal from such Pension Plan; or

### 7.12   Challenge to Loan Documents.

Any Loan Party, the Non-Recourse Guarantor, or any of its Affiliates shall challenge or contest in any action, suit or proceeding the validity or enforceability of any of the Loan Documents, the legality or enforceability of any of the Obligations or the perfection or priority of any Lien granted to the Collateral Agent, or any of the Loan Documents ceases to be in full force or effect for any reason other than a full or partial waiver or release by the applicable Agent and Lenders in accordance with the terms thereof; or

### 7.13   Judgment.

One or more judgments or orders for the payment of money in an amount that exceeds, individually or in the aggregate, $7,500,000 shall be entered against the Borrower or any other Loan Party and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

### 7.14   Change in Control.

If any Change of Control shall occur.

### 7.15   Criminal Forfeiture.

Any Loan Party shall be convicted under any criminal law that could lead to a forfeiture of any property of such Loan Party.

**THEN** (i) upon the occurrence of any Event of Default described in Section 7.9, each of (a) the unpaid principal amount of and accrued interest on the Loans, and (b) all other Obligations shall automatically become immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by the Company, and the obligation of each Lender to make any Loan shall thereupon terminate, and (ii) upon the occurrence and during the continuation of any other Event of Default, the Administrative Agent shall, upon the written request of the Requisite Lenders, by written notice to the Company, declare all or any portion of the amounts described in clauses (a) and (b) above to be, and the same shall forthwith become, immediately due and payable, and the obligation of each Lender to make any Loan shall thereupon terminate. Upon the occurrence of any Event of Default, Administrative Agent may (and shall as directed by the Requisite Lenders) (A) exercise, on behalf of the Lenders, any and all rights and remedies under any guaranties including the Guaranties (to the extent applicable), the Collateral Documents, and any other collateral documents entered into with respect to the Loans; and/or (B) exercise any and all rights, powers and remedies available to Administrative Agent or Lenders at law, in equity or otherwise, including, without limitation, under the other Loan Documents, all of which rights, powers and remedies are cumulative and not exclusive.

**SECTION 8.
AGENTS**

**8.1    Appointment.**

**A.    Appointment Authority.** Each of the Lenders hereby irrevocably appoints Credit Suisse as the Administrative Agent and the Collateral Agent hereunder and under the other Loan Documents and authorizes Credit Suisse, in such capacities, to take such actions on its behalf and to exercise such powers as are delegated to Credit Suisse, in such capacities by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. Each Agent agrees to act upon the express conditions contained in this Agreement and the other Loan Documents, as applicable. In performing its functions and duties under this Agreement, each Agent shall act solely as an agent of the Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for the Borrower or any of its Subsidiaries. The provisions of this Section 8 are solely for the benefit of the Secured Parties and the Borrower shall not have rights as third party beneficiaries of any of such provisions.

**B.    Appointment of Supplemental Collateral Agents.** It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction. It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent or the Collateral Agent deems that by reason of any present or future law of any jurisdiction the Administrative Agent or the Collateral Agent may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, it may be necessary that the Administrative Agent or the Collateral Agent appoint an additional individual or institution as a separate trustee, co-trustee, collateral agent or collateral co-agent (any such additional individual or institution being referred to herein individually as a "**Supplemental Collateral Agent**" and collectively as "**Supplemental Collateral Agents**").

105

In the event that the Administrative Agent or the Collateral Agent appoints a Supplemental Collateral Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent or the Collateral Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Collateral Agent to the extent, and only to the extent, necessary to enable such Supplemental Collateral Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Collateral Agent shall run to and be enforceable by either the Administrative Agent or the Collateral Agent or such Supplemental Collateral Agent, and (ii) the provisions of this Section 8 and of Section 9.2 that refer to the Administrative Agent or the Collateral Agent shall inure to the benefit of such Supplemental Collateral Agent and all references therein to the Administrative Agent or the Collateral Agent shall be deemed to be references to the Administrative Agent or the Collateral Agent and/or such Supplemental Collateral Agent, as the context may require.

Should any instrument in writing from the Borrower or any other Loan Party or the Non-Recourse Guarantor be required by any Supplemental Collateral Agent so appointed by the Administrative Agent or the Collateral Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrower shall, or shall cause such Loan Party or the Non-Recourse Guarantor to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Administrative Agent or the Collateral Agent. In case any Supplemental Collateral Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Collateral Agent, to the extent permitted by law, shall vest in and be exercised by the Administrative Agent or the Collateral Agent until the appointment of a new Supplemental Collateral Agent.

## 8.2    Rights as a Lender.

The Persons serving as the Agents hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Persons serving as the Agents hereunder in their individual capacity. Such Persons and their Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiaries or other Affiliate thereof as if such Persons were not Agents hereunder and without any duty to account therefor to the Lenders.

## 8.3    Exculpatory Provisions.

Neither the Agents, the Syndication Agent nor their respective Affiliates shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Agents and the Syndication Agent (i) shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred and is continuing, (ii) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agents or the Syndication Agent are required to exercise as directed in writing by the Requisite Lenders (or such other number or percentage of the relevant Lenders as shall be necessary under the circumstances as provided in Section 9.5), provided that no Agent or Syndication Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent or Syndication Agent to liability or that is contrary to any Loan Document or applicable law, and (iii) shall not, except as expressly set forth herein and in the other Loan Documents have any duty to disclose, and