# Exhibit 4

EXECUTION VERSION

**FIRST LIEN CREDIT AGREEMENT**

**DATED AS OF JUNE 8, 2006**

**Among**

**GINN-LA CS BORROWER, LLC**

**and**

**GINN-LA CONDUIT LENDER, INC.**
**collectively, as the Borrower,**

**THE LENDERS LISTED HEREIN,**
**as the Lenders,**

**CREDIT SUISSE, CAYMAN ISLANDS BRANCH**
**as Administrative Agent and Collateral Agent**

**and**

**CREDIT SUISSE SECURITIES (USA) LLC,**
**as Paying Agent, Fronting Bank, Sole Lead Arranger and Sole Bookrunner,**

**$525,000,000 SENIOR FIRST LIEN CREDIT FACILITY**

# TABLE OF CONTENTS

**Page**

Section 1. DEFINITIONS ........................................................................................................... 7

    1.1     Certain Defined Terms........................................................................................ 7
    1.2     Defined Terms; Accounting Terms; Utilization of GAAP for Purposes of
            Calculations Under Agreement........................................................................ 36

Section 2. AMOUNTS AND TERMS OF COMMITMENTS AND LOANS ........................... 37

    2.1     Tranche A Credit-Linked Deposit Accounts .................................................. 37
    2.2     Commitments; Loans....................................................................................... 41
    2.3     Disbursement Procedures for Tranche B Loans ............................................. 42
    2.4     Disbursement Procedures for Tranche A Loans ............................................. 43
    2.5     Letters of Credit .............................................................................................. 44
    2.6     Interest on the Loans....................................................................................... 47
    2.7     Fees ................................................................................................................. 51
    2.8     Repayments and Prepayments; General Provisions Regarding Payments...... 52
    2.9     Use of Proceeds .............................................................................................. 58
    2.10   Special Provisions Governing Eurodollar Rate Loans.................................... 58
    2.11   Increased Costs; Taxes.................................................................................... 60
    2.12   Mitigation Obligations; Replacement of Lenders .......................................... 63
    2.13   Releases of Collateral ..................................................................................... 63
    2.14   Break Funding Payments ................................................................................ 65

Section 3. CONDITIONS TO EFFECTIVENESS ................................................................. 65

    3.1     Conditions to Effectiveness on the Effective Date ........................................ 65
    3.2     Conditions to Each Credit Event..................................................................... 71
    3.3     Conditions to Disbursements from the Company's Operating Account.......... 72

Section 4. REPRESENTATIONS AND WARRANTIES ...................................................... 72

    4.1     Organization and Qualification....................................................................... 73
    4.2     Power and Authority ....................................................................................... 73
    4.3     Legally Enforceable Agreement ..................................................................... 73
    4.4     No Conflict ...................................................................................................... 73
    4.5     Capital Structure ............................................................................................. 74
    4.6     Special Purpose Entity .................................................................................... 74
    4.7     Corporate Names ............................................................................................. 74
    4.8     Business Locations; Agent for Process............................................................ 74
    4.9     Title to Properties............................................................................................ 74
    4.10   Priority of Liens; UCC-1 Financing Statements ............................................ 75
    4.11   No Subordination ............................................................................................ 75
    4.12   Permits; Franchises ......................................................................................... 75
    4.13   Indebtedness.................................................................................................... 75
    4.14   Financial Condition; Pro Forma Balance Sheet; Projections.......................... 75
    4.15   Disclosure ....................................................................................................... 76

**CREDIT AGREEMENT**

4.16    Solvent Financial Condition .................................................................... 76
4.17    Surety Obligations .................................................................................. 76
4.18    Taxes ..................................................................................................... 77
4.19    Brokers .................................................................................................. 77
4.20    Intellectual Property .............................................................................. 77
4.21    Governmental Authorization ................................................................. 77
4.22    Compliance with Laws .......................................................................... 78
4.23    Ground Leases ....................................................................................... 78
4.24    Litigation ............................................................................................... 79
4.25    No Defaults ............................................................................................ 79
4.26    Leases .................................................................................................... 79
4.27    Employee Benefit Plans ......................................................................... 79
4.28    Labor Relations ..................................................................................... 80
4.29    Not a Regulated Entity .......................................................................... 80
4.30    Margin Stock.......................................................................................... 80
4.31    No Material Adverse Change.................................................................. 80
4.32    Environmental Matters .......................................................................... 80
4.33    Material Contracts.................................................................................. 82
4.34    Utilities .................................................................................................. 82
4.35    Licenses ................................................................................................. 82
4.36    Entitlements ........................................................................................... 83
4.37    Loan Documents .................................................................................... 83
4.38    Insurance Coverage................................................................................ 84
4.39    Master Declarations ............................................................................... 84

Section 5. AFFIRMATIVE COVENANTS..................................................................... 84

5.1     Visits and Inspections ............................................................................ 84
5.2     Notices .................................................................................................. 85
5.3     Financial Statements and Other Reports................................................. 86
5.4     Corporate Existence ............................................................................... 91
5.5     Payment of Taxes and Claims; Tax Consolidation ................................. 91
5.6     Maintenance of Properties; Insurance..................................................... 91
5.7     Lender Meeting ...................................................................................... 91
5.8     Compliance with Laws and Equator Principles ...................................... 92
5.9     Environmental Disclosure and Inspection .............................................. 92
5.10    The Borrower's Remedial Action Regarding Hazardous Materials ......... 93
5.11    Subsidiaries ........................................................................................... 94
5.12    Interest Rate Protection .......................................................................... 94
5.13    Further Assurances ................................................................................ 95
5.14    Title ....................................................................................................... 95
5.15    Estoppels ............................................................................................... 95
5.16    SPE Covenants....................................................................................... 95
5.17    Maintenance of Entitlements .................................................................. 97
5.18    Asset Sales............................................................................................. 97
5.19    Control ................................................................................................... 97
5.20    Credit Rating.......................................................................................... 97
5.21    Accounts ................................................................................................ 97
5.22    Bahamas Intercompany Indebtedness ..................................................... 98
5.23    Maintenance of Ground Leases .............................................................. 98
5.24    Material Contracts.................................................................................. 98

Section 6. NEGATIVE COVENANTS ............................................................................................. 99

6.1     Indebtedness .......................................................................................................... 99
6.2     Liens and Related Matters .................................................................................... 100
6.3     Investments ........................................................................................................... 101
6.4     Contingent Obligations ......................................................................................... 102
6.5     Restricted Payments .............................................................................................. 102
6.6     Financial Covenants .............................................................................................. 102
6.7     Restriction on Fundamental Changes .................................................................... 104
6.8     Asset Sales ............................................................................................................. 104
6.9     Transactions with Shareholders and Affiliates ..................................................... 105
6.10    Conduct of Business .............................................................................................. 106
6.11    Amendments or Waivers of Certain Agreements. ................................................. 106
6.12    Fiscal Year ............................................................................................................. 106

Section 7. EVENTS OF DEFAULT ............................................................................................ 106

7.1     Payment of Obligations ......................................................................................... 106
7.2     Misrepresentations ................................................................................................. 106
7.3     Breach of Certain Covenants ................................................................................. 106
7.4     Breach of Other Covenants .................................................................................... 107
7.5     Default Under Loan Documents ............................................................................ 107
7.6     Second Lien Credit Agreement; Other Defaults .................................................... 107
7.7     Material Adverse Effect ......................................................................................... 107
7.8     Solvency ................................................................................................................. 107
7.9     Insolvency Proceedings ......................................................................................... 107
7.10    Business Disruption; Condemnation ...................................................................... 108
7.11    ERISA .................................................................................................................... 108
7.12    Challenge to Loan Documents ............................................................................... 108
7.13    Judgment ................................................................................................................ 108
7.14    Change in Control .................................................................................................. 108
7.15    Criminal Forfeiture ................................................................................................ 109

Section 8. AGENTS .................................................................................................................... 109

8.1     Appointment .......................................................................................................... 109
8.2     Rights as a Lender .................................................................................................. 110
8.3     Exculpatory Provisions .......................................................................................... 110
8.4     Reliance by the Agents .......................................................................................... 111
8.5     Delegation of Duties .............................................................................................. 111
8.6     Resignation of Administrative Agent and/or Collateral Agent .............................. 111
8.7     Collateral Documents; Successor Collateral Agent ............................................... 112
8.8     Non-Reliance on Agents and Other Lenders ......................................................... 112
8.9     Withholding Taxes ................................................................................................. 113

Section 9. MISCELLANEOUS ................................................................................................... 113

9.1     Assignments and Participations in Loans .............................................................. 113
9.2     Expenses; Indemnity; Damage Waiver .................................................................. 116
9.3     Right of Set-Off ..................................................................................................... 117
9.4     Sharing of Payments by Lenders ........................................................................... 117

**CREDIT AGREEMENT**

9.5     Amendments and Waivers ............................................................................ 118
9.6     Independence of Covenants ......................................................................... 119
9.7     Notices ....................................................................................................... 119
9.8     Survival of Representations, Warranties and Agreements............................ 121
9.9     Failure or Indulgence Not Waiver; Remedies Cumulative ........................... 121
9.10    Marshalling; Payments Set Aside ............................................................... 122
9.11    Severability ................................................................................................ 122
9.12    Obligations Several; Independent Nature of the Lenders' Rights ................. 122
9.13    Maximum Amount ...................................................................................... 122
9.14    Headings .................................................................................................... 123
9.15    Applicable Law ........................................................................................... 123
9.16    Successors and Assigns .............................................................................. 123
9.17    Consent to Jurisdiction and Service of Process ........................................... 123
9.18    Waiver of Jury Trial.................................................................................... 124
9.19    Confidentiality ........................................................................................... 124
9.20    Limitation of Liability ................................................................................ 125
9.21    Counterparts; Integration; Effectiveness; Electronic Execution .................... 125
9.22    USA Patriot Act Notification ...................................................................... 126

NY\1139561.13

**CREDIT AGREEMENT**

EXECUTION VERSION

## SCHEDULES

Schedule 1.1(a) ............. Borrower Competitors
Schedule 1.1(b) ............. List of Existing Indebtedness (to be extinguished)
Schedule 1.1(c) ............. Existing Equipment Financing
Schedule 1.1(d) ............. Master Plans
Schedule 3.1E ............... Consents and Estoppels Required as of the Closing Date
Schedule 3.1G ............... Real Property Collateral
Schedule 3.1P ............... Capital Structure and Ownership of Borrower
Schedule 4.1 ................. Organization and Qualification
Schedule 4.5 ................. Borrower's Subsidiaries
Schedule 4.7 ................. Corporate Names
Schedule 4.8 ................. Business Locations
Schedule 4.9C ............... Taxes Related to Project
Schedule 4.17 ............... Surety Obligations
Schedule 4.18 ............... Borrower's FEIN
Schedule 4.20 ............... Intellectual Property
Schedule 4.24 ............... Litigation
Schedule 4.26 ............... Leases
Schedule 4.27 ............... Employee Benefit Plan
Schedule 4.28 ............... Labor Relations
Schedule 4.32 ............... Environmental Matters
Schedule 4.33 ............... Material Contracts
Schedule 4.36 ............... List of Current and Pending Entitlements
Schedule 4.38 ............... Insurance Coverage
Schedule 4.39 ............... Master and Supplemental Declarations
Schedule 6.1 ................. List of Permitted Existing Indebtedness

## EXHIBITS

Exhibit I ........................Form of Project Projections
Exhibit II......................Form of Collateral Assignment of Mortgage and Note
Exhibit III.....................Form of Administrative Questionnaire
Exhibit IV ....................Form of Assignment Agreement
Exhibit V......................Form of Compliance Certificate
Exhibit VI ....................Form of Recognition, Collateral Assignment and Estoppel Agreement
Exhibit VII ...................Form of Affiliate Operating Agreement Subordination
Exhibit VIII..................Form of Notes
Exhibit IX ....................Form of Disbursement Authorization
Exhibit X......................Form of Notice of Conversion/Continuation
Exhibit XI  ...................Form of Pledge Agreement
Exhibit XI-A ................Form of Pledge Agreement and Limited Recourse Guaranty
Exhibit XII ...................Form of Security Agreement
Exhibit XIII..................Description of Project
Exhibit XIV.................Form of Request for Loan
Exhibit XV...................Form of Mortgage
Exhibit XVI.................Form of Solvency Certificate
Exhibit XVII  ...............Form of Request for Release
Exhibit XVIII...............Form of Qualified Sales Agreement
Exhibit XIX.................Intentionally Deleted
Exhibit XX...................Form of Collateral Assignment of Declarant's Rights
Exhibit XXI.................Form of Control Agreement
Exhibit XXII  ..............Form of Subsidiary Guaranty
Exhibit XXIII...............Form of Intercreditor Agreement
Exhibit XXIV...............Location of Hammock Beach River Club 50 Acre and 1100 Acre Required Release Tracts
Exhibit XXV ................Form of Reservation Agreement

**CREDIT AGREEMENT**

EXECUTION VERSION

## CREDIT AGREEMENT

This **FIRST LIEN CREDIT AGREEMENT** (this "**Agreement**") is dated as of June 8, 2006 and entered into by and among **GINN-LA CONDUIT LENDER, INC.**, a Delaware corporation, and **GINN-LA CS BORROWER, LLC**, a Delaware limited liability company (collectively, the "**Borrower**"), **THE BANKS, FINANCIAL INSTITUTIONS AND OTHER ENTITIES LISTED ON THE SIGNATURE PAGES HEREOF** (each individually, together with its successors and assigns referred to herein as a  "**Lender**" and collectively, together with their successors and assigns, as the "**Lenders**"), **CREDIT SUISSE, CAYMAN ISLANDS BRANCH** ("**Credit Suisse**"), as administrative agent for the Lenders (in such capacity, together with its successors and assigns, the "**Administrative Agent**") and as collateral agent (in such capacity, together with its successors and assigns, the "**Collateral Agent**"), **CREDIT SUISSE SECURITIES (USA) LLC**, as lead arranger for the Lenders (in such capacity, together with its successors and assigns, the "**Arranger**") as paying agent (in such capacity, together with its successors and assigns, the "**Paying Agent**"), as fronting bank (in such capacity, together with its successors and assigns, the "**Fronting Bank**"), and as sole bookrunner (in such capacity, together with its successors and assigns, the "**Bookrunner**"; together with the Administrative Agent, the Arranger, the Collateral Agent and the Paying Agent, the "**Agents**") for the Lenders.

## R E C I T A L S

A.      **WHEREAS**, the Borrower desires that the Lenders extend certain senior term loans (Tranche B) to the Borrower hereunder, the proceeds of which, together with the proceeds of the loans under the Second Lien Credit Agreement will be used: (i) to repay the Existing Indebtedness of the Borrower and its Subsidiaries, (ii) to make certain distributions to the holders of the Capital Stock of the Borrower, and (iii) to pay the Transaction Costs.

B.      **WHEREAS,** the Borrower desires that the Lenders extend certain senior "synthetic revolving" loans (Tranche A) to the Borrower hereunder, the proceeds of which may be used to finance a portion of the development, construction and other costs associated with each Project and to fund general company and working capital needs of the Borrower and its Subsidiaries; and

C.      **WHEREAS,** the Agents and the Lenders party hereto desire to enter into this Agreement to provide for such loans to the Borrower subject to the terms and conditions contained herein.

**NOW, THEREFORE,** in consideration of the premises and the agreements, provisions and covenants herein contained, and for ten dollars and other good and valuable consideration, the receipt and legal sufficiency of which is hereby acknowledged, the parties hereto agree to enter into this Credit Agreement as follows:

## SECTION 1.
## DEFINITIONS

### 1.1    Certain Defined Terms.

The following terms used in this Agreement shall have the following meanings:

"**Account Holder**" means a financial institution reasonably acceptable to Administrative Agent at which certain Deposit Accounts and/or securities accounts will be maintained, it being understood and agreed that Colonial Bank and First Caribbean Bank are acceptable to Administrative Agent.

"**Administrative Agent**" has the meaning assigned to that term in the preamble to this Agreement.

"**Administrative Questionnaire**" means an Administrative Questionnaire in substantially the form of Exhibit III annexed hereto or in such other form as may be approved by the Administrative Agent.

"**Affected Lender**" has the meaning assigned to that term in Section 2.10C.

"**Affected Loans**" has the meaning assigned to that term in Section 2.10C.

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"**Affiliate Operating Agreement**" means any agreement between Borrower, any Subsidiaries of Borrower and any Affiliate thereof, which provides for the construction, operation and/or management of or provision of development consultant services to all or any portion of each Project.

"**Affiliate Operating Agreement Subordination**" means an agreement, substantially in the form of Exhibit VII, pursuant to which an Affiliate party to any Affiliate Operating Agreement agrees to certain subordinations and other provisions reasonably satisfactory to the Administrative Agent for the benefit of the Lenders.

"**Agents**" means, collectively, the Administrative Agent, Collateral Agent, the Arranger and the Bookrunner.

"**Agreement**" has the meaning assigned to that term in the introductory paragraph as it may be amended, restated, amended and restated, supplemented or otherwise Modified from time to time.

"**Applicable Base Rate Margin**" means with respect to Loans that are Base Rate Loans, (i) for Tranche B Loans and Tranche A Loans held by Tranche A Lenders, the applicable rate margin set forth on Appendix A attached hereto, and (ii) for Tranche A Loans held by the Fronting Bank, the applicable rate margin is 0.0%.

"**Applicable Eurodollar Rate Margin**" means with respect to Loans that are Eurodollar Rate Loans, (i) for Tranche B Loans and Tranche A Loans held by Tranche A Lenders, the applicable rate margin set forth on Appendix A attached hereto, and (ii) for Tranche A Loans held by the Fronting Bank, the applicable rate margin is 0.0%.

"**Applicable Laws**" means, collectively, all statutes, laws, rules, regulations, ordinances, decisions, writs, judgments, decrees, and injunctions of any Governmental Authority affecting the Borrower, any of its Subsidiaries, the Guarantors, each Project or any Collateral, or any of the other assets of the Borrower and its Subsidiaries, whether now or hereafter enacted and in force, and all Governmental Authorizations relating thereto, and all covenants, conditions, and restrictions contained in any instruments, either of record or known to the Borrower or any of its Subsidiaries, at any time in force affecting any Real Property Asset or any part thereof, including any such covenants, conditions and restrictions which may (a) require improvements, repairs or alterations in or to such Real Property Asset or any part thereof or (b) limit the use and enjoyment of such Real Property Asset as used or intended to be used by the Borrower and its Subsidiaries.

**CREDIT AGREEMENT**

"**Applicable Percentage**" means, (a) with respect to any Tranche A Lender for purposes of Section 2 or the calculation of the Tranche A LC Exposure or the Tranche A Exposure, or in respect of any indemnity claim arising out of an action or omission of the Fronting Bank under this Agreement, the percentage of the Tranche A Funding Amounts represented by such Tranche A Lender's Tranche A Funding Amount, and (b) with respect to any Lender in respect of any indemnity claim arising out of an action or omission of the Paying Agent under this Agreement, the percentage of the total of the Tranche A Funding Amounts and the aggregate principal amount of the Tranche B Loans represented by the respective aggregate amounts thereof held by such Lender.  If the Tranche A Funding Amounts have been reduced to zero, the Applicable Percentages shall be determined based upon the Tranche A Funding Amounts most recently in effect, giving effect to any assignments.  If the Tranche B Loans have been paid in full, the Applicable Percentages shall be determined based upon the principal amounts of the Tranche B Loans outstanding immediately before their payment in full, giving effect to any assignments.

"**Appraised Value**" means the "Total Net Value" (as defined in the Initial Appraisal) of the Real Property Collateral as determined by the Appraiser in the most recent and available Qualified Appraisal Update.  As of the Effective Date, the Appraised Value of the Real Property Collateral based on the Initial Appraisal is $1,500,000,000.

"**Appraiser**" means, collectively, Cushman & Wakefield of Florida, Inc. and Cushman & Wakefield of Georgia, Inc., or such other independent appraisal firm selected by the Administrative Agent.

"**Approved Fund**" means any Fund or similar investment vehicle that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Asset Sale**" means the sale, lease, sale and leaseback, assignment, conveyance, transfer or other voluntary disposition (other than Operating Leases entered into in the Ordinary Course of Business) by the Borrower or any of its Subsidiaries to any Person (other than the Loan Parties) of any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including, without limitation, any Capital Stock of the Borrower or the Borrower's Subsidiaries.

"**Assignment Agreement**" means an assignment and assumption agreement in substantially the form of Exhibit IV annexed hereto or in such other form as may be approved by the Administrative Agent.

"**Bahamas Borrower**" means Ginn-LA Conduit Lender, Inc. a Delaware corporation.

"**Bahamas Intercompany Indebtedness**" means Indebtedness pursuant to which Bahamas Owner is liable to Bahamas Borrower in a maximum amount from time to time of up to $276,750,000 to fund (1) Project Expenses associated with the construction and development of the Residential Lots located at the Project commonly known as Grand Bahamas (West End) and (2) other Project Expenses incurred by the Borrower or its Subsidiaries from time to time; provided that, (a) no Default or Event of Default has occurred and is continuing as of the time of the incurrence thereof or would result therefrom and (b) all such intercompany Indebtedness between the Bahamas Borrower and the Bahamas Owner shall be evidenced by a promissory note and secured by a mortgage, each of which shall have been pledged to the Collateral Agent pursuant to the Collateral Assignment of Mortgage and Note and such other documentation as Administrative Agent may reasonably require.

9

**CREDIT AGREEMENT**

"**Bahamas Owner**" means Ginn-LA West End, Limited, an international business company formed under the laws of the Bahamas, which entity owns the Project commonly known as Grand Bahama (West End).

"**Bahamas Project Expenses**" means, for any period and without duplication, the costs and expenses incurred by the Bahamas Owner in connection with the development of the Grand Bahamas (West End) Project (including, without limitation, the development and subdivision of any Residential Lots, Infrastructure and any vertical improvements and bonding therefor) as contemplated in the Project Projections including, without limitation, general and administrative expenses, allocated overhead, marketing expenses, architectural, engineering and legal fees, developer and contractor fees, land development costs, construction costs, costs of acquiring additional Real Property Collateral in accordance with the Project Projections, and carrying costs (consisting of taxes, insurance costs, capital expenditures, and property owners association subsidies and reserve funding), excluding, however, for purposes of the definition of Net Cash from Project Sales, all costs and expenses associated with the operations of the Golf Courses, Membership Clubs and related amenities which are included in the calculation of Net Cash from Operations.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"**Base Rate**" means, at any time, the higher of (a) the Prime Rate or (b) the rate which is 0.5% in excess of the Federal Funds Effective Rate.

"**Base Rate Borrowing**" means a Borrowing of Base Rate Loans.

"**Base Rate Loans**" means Loans bearing interest at rates determined by reference to the Base Rate as provided in Section 2.6A.

"**Borrower**" has the meaning assigned to that term in the introductory paragraph.

"**Borrower Competitor**" means a Person primarily in the business of acquiring and developing land for sale as single family homes and condominiums, including, without limitation, those Persons identified by the Borrower on Schedule 1.1(a).

"**Borrower's Knowledge**" shall mean the actual knowledge, after reasonable inquiry, of the Responsible Officers of the Borrower.

"**Borrower Pension Plan**" means any pension plan, as defined in Section 3(2) of ERISA, other than a Pension Plan or Multiemployer Plan, which is intended to be qualified under Section 401(a) of the Internal Revenue Code and which is, or was within the past six years, maintained or contributed to by Borrower or its Subsidiaries.

"**Borrowing**" means (a) all Base Rate Loans of the same Class made, converted or continued on the same date or (b) all Eurodollar Rate Loans of the same Class that have the same Interest Period.

"**Bulk Asset Sale**" means an aggregate value of an Asset Sale or a series of related Asset Sales equal to or greater than $20,000,000.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close; provided that with respect to matters relating to Eurodollar Rate Loans, the term "**Business Day**" shall mean a day other than a Saturday,

**CREDIT AGREEMENT**

EXECUTION VERSION

Sunday or other day on which commercial banks in New York City or London, England, are authorized or required by law to close.

"**Calculation Date**" means the last day of the relevant Fiscal Quarter.

"**Capital Lease**" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, common stock, preferred stock, partnership interests (general and limited) and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"**Cash**" means all monetary items treated as cash in accordance with GAAP, consistently applied.

"**Cash Collateral**" means the Cash and/or Cash Equivalents held in the Company's Operating Account.

"**Cash EBITDA**" means the sum during any period, without duplication, of (i) Net Cash from Project Sales, plus (ii) Net Cash from Operations, plus (iii) any interest earned on Cash held by the Borrower or any of its Subsidiaries and invested in Cash Equivalents (including interest earned on funds held in the Company's Operating Account).

"**Cash Equivalents**" means (a) marketable securities issued or directly and unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition thereof; (b) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof maturing within one year from the date of acquisition thereof and, at the time of acquisition, having the highest rating obtainable from either S&P or Moody's; (c) commercial paper maturing no more than one year from the date of creation thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's; (d) certificates of deposit or bankers' acceptances maturing within one year from the date of acquisition thereof and, at the time of acquisition, having a rating of at least A-1 from S&P or at least P-1 from Moody's, issued by any Lender or any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia having unimpaired capital and surplus of not less than $500,000,000 (each Lender and each such commercial bank being herein called a "**Cash Equivalent Bank**"); (e) money market funds administered by the Account Holder with a rating of at least AAA from S&P, and (f) Eurodollar time deposits having a maturity of less than one year purchased directly from any Cash Equivalent Bank (provided such deposit is with such bank or any other Cash Equivalent Bank).

"**Cash From Project Sales**" means, with respect to Borrower and its Subsidiaries, for any period and without duplication, the sum of (a) Cash Proceeds (other than Condemnation Proceeds) received during such period attributable to real estate transactions, which occurred during or prior to such period as either (i) a sale of real property, including sales of Residential Lots or (ii) the granting of an option for the purchase of real property (all amounts described in (i) and (ii) above included only if the Cash received with respect to such transaction is nonrefundable); (b) principal and interest collected in Cash on receivables arising from real estate transactions; and (c) Cash previously received in connection with a transaction described in (a)(i) and (ii) above which was previously refundable, but became nonrefundable during the current period; less (d) Permitted Transaction Costs properly allocable to such transactions.

For purposes of the foregoing, the sale of the Capital Stock of any Subsidiary (to the extent permitted by this Agreement) that owns any Real Property Collateral shall be treated as a sale of such Real Property Collateral.

"**Cash Proceeds**" means, with respect to any Asset Sale, Cash payments (including any Cash received by way of deferred payment pursuant to, or monetization of, a note receivable or otherwise, but only as and when so received) received from such Asset Sale.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"**Change of Control**" means any breach of the covenant contained in Section 5.19.

"**Cleanup**" means all actions required to:  (a) cleanup, remove, treat or remediate Hazardous Materials in the indoor or outdoor environment; (b) prevent the Release of Hazardous Materials so that they do not migrate, endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; or (c) perform pre-remedial studies and investigations and post-remedial monitoring and care.

"**Collateral**" means all of the properties and assets in which Liens are purported to be granted by the Collateral Documents.

"**Collateral Agent**" means Credit Suisse, in its capacity as collateral agent hereunder and under the Collateral Documents, and any successor in such capacity.

"**Collateral Assignment of Declarant's Rights**" means the Collateral Assignment of Declarant's Rights executed and delivered by the declarant under the Master Declarations in favor of the Collateral Agent for the benefit of the Agents and the Lenders substantially in the form of Exhibit XX annexed hereto.

"**Collateral Assignment of Mortgage and Note**" means (i) a collateral assignment of the intercompany note evidencing the Bahamas Intercompany Indebtedness and the mortgage encumbering the Project commonly known as Grand Bahama (West End) granted by Bahamas Owner in favor of Bahamas Borrower as security for the Bahamas Intercompany Indebtedness (ii) a collateral assignment of the purchase money promissory note and mortgage in connection with the Tesoro Golf Sale-Leaseback transaction, and (iii) such other collateral assignments of notes and mortgages delivered by any Loan Party pursuant to this Agreement or any of the other Loan Documents from time to time in order to grant, protect or perfect liens on any assets of such Loan Party as security for all or any of the Obligations, in each case, in substantially the form of Exhibit II annexed hereto as amended, amended and restated, supplemented and Modified from time to time.

"**Collateral Documents**" means the Security Agreement, the Mortgage, the Collateral Assignment of Mortgage and Note, the Recognition, Collateral Assignment and Estoppel Agreements, the Affiliate Operating Agreement Subordination, the Collateral Assignment of Declarant's Rights, the Subsidiary Guaranties, the Pledge Agreements and any other documents, instruments or agreements delivered by any Loan Party or any Shareholder Pledgor pursuant to this Agreement or any of the other Loan Documents from time to time in order to grant, protect or perfect liens on any assets of such Loan Party or any Shareholder Pledgor as security for all or any of the Obligations.

**CREDIT AGREEMENT**

"**Commercial Parcel**" means a parcel contemplated to be developed for commercial (i.e., retail, office or similar) purposes at the Project commonly known as Hammock Beach River Club, which lots are described as Parcel 1A and Parcel 1B in the Unit Development Agreement, executed as of January 17, 2006 for such Project.

"**Commitments**" means the commitments of the Lenders to make Loans as set forth in Section 2.2 of this Agreement.

"**Company's Operating Account**" means one or more Deposit Accounts or securities accounts to be established by the Borrower and its Subsidiaries pursuant to and in accordance with Section 5.21, which shall at all times be subject to a Control Agreement in favor of the Administrative Agent.

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit V annexed hereto delivered to the Administrative Agent by the Borrower pursuant to Sections 5.3(iv), 5.3(xi), and 5.3(xvii).

"**Condemnation Proceeds**" has the meaning assigned to that term in Section 2.8B(ii)(c).

"**Condo Parcel**" means one or more parcels designated for development as approximately 100 condominium units at the Project commonly known as Tesoro, 300 condominium units at the Project commonly known as Laurelmor and 4396 condominium units at the Project commonly known as Grand Bahama (West End).

"**Contingent Obligation**" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person (a) with respect to any Indebtedness, lease, dividend or other obligation of another if the primary purpose or intent thereof by the Person incurring the Contingent Obligation is to provide assurance to the obligee of such obligation of another that such obligation of another will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such obligation will be protected (in whole or in part) against loss in respect thereof, (b) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings, or (c) under Hedge Agreements. Contingent Obligations shall include, without limitation, (i) the direct or indirect guaranty, endorsement (other than for collection or deposit in the Ordinary Course of Business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of another, (ii) the obligation to make take-or-pay or similar payments if required regardless of non-performance by any other party or parties to an agreement, and (iii) any liability of such Person for the obligation of another through any agreement (contingent or otherwise) (A) to purchase, repurchase or otherwise acquire such obligation or any security therefor, or to provide funds for the payment or discharge of such obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (B) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (A) or (B) of this sentence, the primary purpose or intent thereof is as described in the preceding sentence. The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if less, the amount to which such Contingent Obligation is specifically limited, less the portion of any such obligation that has been discharged or performed as of the date of determination.

"**Contractor**" means any contractor providing materials or services under a Material Contract.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**Controlled**" have meanings correlative thereto.

**CREDIT AGREEMENT**

"**Control Agreement**" means an account control agreement substantially in the form of Exhibit XXI or otherwise in form and substance acceptable to the Administrative Agent.

"**Credit Suisse**" means Credit Suisse, Cayman Islands Branch, or one or more of its other branches and any Affiliate thereof.

"**Debt Service**" means, for any period, all payments of interest and all scheduled payments of principal made during such period for all Indebtedness of the Borrower and its Subsidiaries (including, without limitation, the Indebtedness evidenced by the Loan Documents), but excluding all mandatory prepayments under Section 2.8(B)(ii).

"**Default**" means a condition or event that, after notice or after any applicable grace period has lapsed, or both, would constitute an Event of Default.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**Developer**" means Ginn Development Company, LLC or such other Affiliate of the Borrower providing development consultant services pursuant to a Development Agreement or similar agreement.

"**Disbursement Authorization**" means a notice in the form of Exhibit IX annexed hereto delivered by the Borrower to the Administrative Agent pursuant to Section 2.3 with respect to a proposed borrowing.

"**Disbursement Date**" means any Business Day specified by the Borrower as a date on which the Borrower delivers a Disbursement Authorization.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Effective Date**" means such date on or prior to June 8, 2006, on which the conditions to effectiveness set forth in Section 3.1 are satisfied.

"**Eligible Assignee**" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, (d) a commercial bank organized under the laws of the United States, or any State thereof, and having a combined capital and surplus of at least $250,000,000; (e) a savings and loan association or savings bank organized under the laws of the United States, or any State thereof, and having a combined capital and surplus of at least $250,000,000; (f) a commercial bank organized under the laws of any other country that is a member of the OECD or has concluded special lending arrangements with the International Monetary Fund associated with its General Arrangements to Borrow or a political subdivision of any such country, and having a combined capital and surplus of at least $250,000,000, so long as such bank is acting through a branch or agency located in the United States; (g) a finance company, insurance company or other financial institution or fund (whether a corporation, partnership, trust or other entity) that is engaged in making, purchasing or otherwise holding commercial loans in the ordinary course of its business and having a combined capital and surplus of at least $250,000,000 or an Approved Fund thereof and (h) any other Person (other than a natural person) approved by the Administrative Agent (such approval not to be unreasonably withheld or delayed) and so long as no Default or Event of Default has occurred and is continuing, approved by the Borrower (such approval not to be unreasonably withheld or delayed); provided that notwithstanding the foregoing, "**Eligible Assignee**" shall not include the Borrower or any of its Subsidiaries or, so long as no Event of Default has occurred and is continuing, any Borrower Competitor, other than any such Person that is a Lender as of the Effective Date.

14

"**Entitlement Documents**" has the meaning assigned to that term in Section 4.36.

"**Entitlements**" shall mean those certain Governmental Authorizations which were required to be obtained and maintained (as applicable), or may be required to be obtained and maintained in the future, in order to allow the completion of the development work for each Project and the sale of the Residential Lots (including, without limitation, the Real Property Collateral) and portions of each Project as legal lots, all as contemplated by the Master Plans and the Project Projections, and including, without limitation, all Governmental Authorizations necessary to permit the legal subdivision and sale of the Residential Lots (to the extent the same are to be legally subdivided to achieve the Project Projections) and the development of the Infrastructure, the Golf Courses and the Membership Clubs as well as applicable earthwork, grading, infrastructure, improvements, equipment, drainage, storm water and sewer systems, roadways and other work, labor or materials required to be furnished or actions to be taken by or in connection with amending, modifying, maintaining and perpetuating all of the foregoing, and the documents, agreements and instruments relating thereto.  The Entitlements currently in effect with respect to the Real Property Collateral are listed on Schedule 4.36 attached hereto.  The Entitlements expected to be obtained by the Borrower in the future with respect to the Real Property Collateral are listed on Schedule 4.36 attached hereto under the heading "Pending Entitlements".

"**Environmental Claim**" means any claim, action, investigation or written notice by any Person alleging potential liability (including, without limitation, potential liability for investigatory costs, Cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, or penalties) arising out of, based on or resulting from (a) the presence, or Release of any Hazardous Materials at any location, whether or not owned, leased or operated by the Borrower or any of its Subsidiaries, or (b) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

"**Environmental Impact Assessment**" means, collectively (i) that certain "West End Project Environmental Impact Assessment" dated as of December 2004, including the Supplement thereto dated as of April 2005 and the Supplement Addendum thereto dated as of March 2006 (ii) that certain letter from Steven J. Peene, Applied Technology & Management, Inc., to John S. Davies, Ginn Development Company, dated as of June 5, 2006 regarding "West End Project, Grand Bahama Island, Equator Principles Compliance" (the "Equator Principles Review Report"), and (iii) any future Environmental Impact Assessments or Equator Principles Review Reports prepared pursuant to the terms of this Agreement.

"**Environmental Laws**" means all federal, state, local and foreign laws and regulations relating to pollution or protection of human health or the environment, including, without limitation, laws relating to Releases or threatened Releases of Hazardous Materials or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, Release, disposal, transport or handling of Hazardous Materials, laws and regulations with regard to record keeping, notification, disclosure and reporting requirements respecting Hazardous Materials, laws relating to the management or use of natural resources and the Equator Principles.

"**Environmental Liabilities**"  means all liabilities, obligations, responsibilities, obligations to conduct Cleanup, and all Environmental Claims pending or threatened against any Loan Party or its Subsidiaries or against any Person whose liability for any Environmental Claim any Loan Party or its Subsidiaries may have retained or assumed either contractually or by operation of law, arising from (a) environmental, health or safety conditions, (b) the presence, Release or threatened Release of Hazardous Materials at any location, whether or not owned, leased or operated by the Borrower or its Subsidiaries, or (c) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

**CREDIT AGREEMENT**

"**Environmental Management Plan**" means that certain Environmental Management Plan included as part of the Environmental Impact Assessment along with any additional Mitigation Measures identified in the Environmental Impact Assessment.

"**Equator Principles**" means those certain principles and standards (including the preamble, materials incorporated by reference and exhibits thereto) voluntarily adopted by certain banks and other financial institutions, all as set forth more fully at www.equator-principles.com/principles.shtml, as the same exist on the date of this Agreement, including without limitation, the following World Bank and International Finance Corporation ("IFC") guidelines, policies and handbooks:  Tourism and Hospitality Development Guideline (World Bank Pollution Prevention and Abatement Handbook, Sept. 2001), General Environmental Guidelines (World Bank Pollution Prevention and Abatement Handbook, July 1998), IFC Life and Fire Safety Guidelines (Dec. 2002), IFC Occupational Health and Safety Guidelines (June 2003), IFC Pesticide Handling and Application Guidelines (July 1, 1998) and IFC Hazardous Materials Management Guidelines (Dec. 2001), to the extent properly determined to be applicable to the Project commonly known as Grand Bahama (West End) by an Environmental Impact Assessment.

"**Equity Proceeds**" means the sum of (i) Cash Proceeds from the issuance of any Capital Stock or other equity Securities of the Borrower or any Subsidiaries of the Borrower; less (ii) underwriting discounts and commissions and other Permitted Transaction Costs.  For the avoidance of doubt, Equity Proceeds do not include Investments or Intercompany Subordinated Debt made by the existing holders of Capital Stock in Borrower or its Subsidiaries as of the Effective Date in exchange for which additional Capital Stock is not issued to the Person making such Investment provided, however that such Equity Proceeds or proceeds of Intercompany Subordinated Debt are used for (A) Project Expenses and Bahamas Project Expenses in a manner consistent with the Project Projections, (B) for purposes of purchasing additional Real Property Collateral to the extent designated in an Officer's Certificate by a Responsible Officer of the Borrower to be used for such purpose, which purchase shall occur prior to one calendar year following the date of such Investment and which Real Property Collateral will be pledged as collateral to secure the Borrrower's and its Subsidiaries' Obligations hereunder as required by Section 5.13 hereof or (C) to make a voluntary prepayment in accordance with Section 2.8B(i) hereof.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor statute.

"**ERISA Affiliate**" means (a) any corporation which is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which the Borrower is a member; (b) any trade or business (whether or not incorporated) which is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which the Borrower is a member; and (c) solely for purposes of obligations under Section 412 of the Internal Revenue Code or under the applicable sections set forth in Section 414(t)(2) of the Internal Revenue Code, any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which the Borrower, any corporation described in clause (a) above or any trade or business described in clause (b) above is a member.

"**ERISA Event**" means (a) a "reportable event" within the meaning of Section 4043(c) of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (b) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(d) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 412(m) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (c) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a

notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA; (d) the withdrawal by the Borrower or any ERISA Affiliate from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting, in either case, in liability pursuant to Section 4063 or 4064 of ERISA, respectively; (e) the institution by the PBGC of proceedings to terminate any Pension Plan pursuant to Section 4042 of ERISA; (f) the imposition of liability on the Borrower or any ERISA Affiliate pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (g) the withdrawal by the Borrower or any ERISA Affiliate in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan resulting in withdrawal liability pursuant to Section 4201 of ERISA, or the receipt by the Borrower or any ERISA Affiliate of written notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4042 of ERISA or under Section 4041A of ERISA if such termination would result in liability to the Borrower or any ERISA Affiliate; (h) the disqualification by the Internal Revenue Service of any Pension Plan or Borrower Pension Plan under Section 401(a) of the Internal Revenue Code, or the determination by the Internal Revenue Service that any trust forming part of any Pension Plan or Borrower Plan fails to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (i) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

"**Eurocurrency Reserve Requirements**" means, for each Interest Period for each Eurodollar Rate Loan, the highest reserve percentage applicable to each Lender making such Eurodollar Rate Loan during such Interest Period under regulations issued from time to time by the Board of Governors of the Federal Reserve System or any successor for determining the maximum reserve requirement (including, without limitation, any emergency, supplemental or other marginal reserve requirement), with respect to liabilities or assets consisting of or including Eurocurrency liabilities having a term equal to such Interest Period.

"**Eurodollar Base Rate**" means the rate per annum (determined by the Administrative Agent or the Paying Agent, as applicable) at approximately 11:00 A.M. (London time) on the date which is two (2) Business Days prior to the beginning of the relevant Interest Period (as specified in the applicable Disbursement Authorization or Notice of Conversion/Continuation) by reference to the British Bankers' Association Interest Settlement Rates for deposits in Dollars (as set forth by any service selected by the Administrative Agent or the Paying Agent which has been nominated by the British Bankers' Association as an authorized information vendor for the purpose of displaying such rates) for a period equal to such Interest Period; provided that to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "Eurodollar Base Rate" shall be the interest rate per annum determined by the Administrative Agent or the Paying Agent, as applicable, to be the average of the rates per annum at which deposits in Dollars are offered for such relevant Interest Period to major banks in the London interbank market in London, England by the Reference Lenders at approximately 11:00 A.M. (London time) on the date which is two (2) Business Days prior to the beginning of such Interest Period. If any of the Reference Lenders shall be unable or shall otherwise fail to supply such rates to the Administrative Agent or Paying Agent upon its request, the rate of interest shall be determined on the basis of the quotations of the remaining Reference Lenders.

"**Eurodollar Borrowing**" means a Borrowing of Eurodollar Rate Loans.

"**Eurodollar Rate Loans**" means Loans bearing interest at rates determined by reference to the Reserve Adjusted Eurodollar Rate as provided in Section 2.6A.

"**Event of Default**" means each of the events set forth in Section 7.

**CREDIT AGREEMENT**

"**Excess Cash Flow**" means, for any period, (a) the amount of Cash EBITDA for such period, less (b) Debt Service for such period.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Taxes**" means, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any Obligation of the Borrower, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the United States or the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lender Office is located, (b) any branch profits taxes imposed by the United States of America or any comparable taxes imposed by any other jurisdiction described in clause (a) hereof and (c) in the case of any non-U.S. Administrative Agent, non-U.S. Paying Agent or any Foreign Lender, any withholding tax that is imposed on amounts payable to such Person at the time such Person becomes a party hereto (or designates a new Lender Office) or is attributable to such Person's failure (other than as a result of a Change in Law) to comply with Section 2.11E(v), except to the extent that such Person (or its assignor, if any) was entitled, at the time of designation of a new Lender Office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.11E(i).

"**Existing Indebtedness**" means the Indebtedness of the Borrower and Subsidiary Guarantors listed on Schedule 1.1(b) attached hereto, which Indebtedness will be paid in full and extinguished on the Effective Date.

"**Federal Funds Effective Rate**" means, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by the Administrative Agent.

"**First Lien Debt LTV Ratio**" has the meaning assigned to that term in Section 6.6B.

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that such Lien is the most senior Lien (other than Liens listed in subclauses (a), (g), and (l) of the definition of Permitted Encumbrances and Permitted Equipment Financing) to which such Collateral is subject.

"**Fiscal Quarter**" means a fiscal quarter of a Fiscal Year.

"**Fiscal Year**" means the fiscal year of the Borrower and its Subsidiaries ending on December 31 of each calendar year.

"**Flood Hazard Property**" means a Real Property Collateral located in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"**FLSA**" means the Fair Labor Standards Act of 1938.

18

**CREDIT AGREEMENT**

"**Foreign Lender**" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is a resident for tax purposes. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"**Fronting Bank**" means Credit Suisse in its capacities as the Lender of Tranche A Loans and the issuer of Letters of Credit hereunder, and its successors in such capacities.

"**Fund**" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans or similar extensions of credit in the ordinary course of its business.

"**Funded Tranche A Loan**" has the meaning set forth in Section 2.1C(iv).

"**Funding and Payment Office**" means the office of the Administrative Agent located at 11 Madison Avenue, New York, NY 10010 (or such office of the Administrative Agent or any successor Administrative Agent specified by the Administrative Agent or such successor Administrative Agent in a written notice to the Loan Parties and the Lenders).

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.2, generally accepted accounting principles, as in effect in the United States of America and on the date of determination; provided, that such definition of GAAP shall not include the application of FASB Interpretation No. 46 or similar pronouncements.

"**Golf Courses**" means the golf courses depicted on Exhibit XIII hereof, each of which has been or is to be developed as part of each Project.

"**Governmental Authority**" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Governmental Authorization**" means any permit, approval, license, zoning and other resolution, certificate of occupancy, authorization, plan, directive, consent order, consent decree or similar authorizations of or from any Governmental Authority.

"**Ground Lease**" means, collectively, (i) that certain Lease Agreement between Ginn Tesoro Golf Ltd., LLLP, a Georgia limited liability limited partnership, as Lessor, and The Tesoro Club, LLC, a Georgia limited liability company, as Lessee, dated December 31, 2005 and (ii) that certain Lease Agreement between the City of Port St. Lucie, Florida, a Florida municipal corporation, as Lessor, and Ginn-LA St. Lucie, Ltd., LLLP, a Georgia limited liability partnership, as Lessee, dated February 3, 2003, in each case, together with all present and future amendments, extensions, renewals, supplements and replacements thereto.

"**Hazardous Materials**" means any chemical, material or substance, the generation, use, storage, transportation or disposal of which, or the exposure to which, is prohibited, limited or regulated by any Governmental Authority or which may or could pose a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any Real Property Asset or to the indoor or outdoor environment.

**CREDIT AGREEMENT**

"**Hedge Agreements**" means all interest rate swaps, caps or collar agreements or similar arrangements entered into by the Borrower or any of its Subsidiaries providing for protection against fluctuations in interest rates or currency exchange rates or the exchange of nominal interest obligations, either generally or under specific contingencies.

"**Indebtedness**" means, as applied to any Person, without duplication, (a) all indebtedness for borrowed money, (b) that portion of obligations with respect to Capital Leases that is properly classified as a liability on a balance sheet in conformity with GAAP, (c) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money (other than current accounts payable incurred in the Ordinary Course of Business and accrued expenses incurred in the Ordinary Course of Business), (d) any obligation owed for all or any part of the deferred purchase price of property or services (excluding any current trade payables incurred in the Ordinary Course of Business, but including earn-outs with respect to any acquisition), (e) all obligations evidenced by notes, bonds (other than payment, performance, surety and indemnity bonds in favor of Governmental Authorities incurred in connection with the development of the Project), debentures or other similar instruments, (f) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to any property or assets acquired by such Person (even though the rights and remedies of the seller or the lender under such agreement in the event of default are limited to repossession or sale of such property or assets), (g) all obligations, contingent or otherwise, as an account party under any letter of credit or under acceptance, letter of credit or similar facilities to the extent not reflected as trade liabilities on the balance sheet of such Person in accordance with GAAP, (h) all obligations, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock, (i) all obligations under Hedge Agreements (excluding, however present payments of interest thereunder) with the Administrative Agent, a Lender or any of their respective Affiliates, including, as of any date of determination, the net amounts, if any, required to be paid by such Person as a result of the termination of such Hedge Agreements and unpaid as of such date, (j) all Contingent Obligations in respect of obligations of the kind referred to in clauses (a) through (i) above or in respect of the payment of dividends on the Capital Stock of any other Person, and (k) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; provided that if such Person has not assumed such secured indebtedness that is nonrecourse to its credit, then the amount of indebtedness of such Person pursuant to this clause (k) shall be equal to the lesser of the amount of the secured indebtedness or the fair market value of the assets of such Person which secure such indebtedness.

"**Indemnified Taxes**" means Taxes other than Excluded Taxes and Other Taxes.

"**Indemnitee**" has the meaning assigned to that term in Section 9.2B.

"**Infrastructure**" means all necessary water systems, sewer systems and treatment plants, roads and other similar utilities necessary for the development of each Project in accordance with the Project Projections.

"**Initial Appraisal**" means (i) with respect to Tesoro, the "Appraisal of Real Property" dated as of _____, 2006, and prepared by the Appraiser for the Administrative Agent, (ii) with respect to Quail West, the "Appraisal of Real Property" dated as of _____, 2006, and prepared by the Appraiser for the Administrative Agent, (iii) with respect to Grand Bahama (West End), the "Appraisal of Real Property" dated as of _____, 2006, and prepared by the Appraiser for the Administrative Agent, (iv) with respect to Laurelmor, the "Appraisal of Real Property" dated as of _____, 2006, and prepared by the Appraiser for the Administrative Agent and (v) with respect to Hammock Beach

River Club, the "Appraisal of Real Property" dated as of _____, 2006, and prepared by the Appraiser for the Administrative Agent.

"**Insolvency Proceeding**" means (A) any case, action or proceeding before any court or other Governmental Authority relating to bankruptcy, reorganization, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors, or (B) any general assignment for the benefit of creditors, composition, marshalling of assets for creditors or other, similar arrangement in respect of its creditors generally or any substantial portion of its creditors; in each case (A) and (B) undertaken under U.S. Federal, State or foreign law, including the Bankruptcy Code.

"**Insurance Proceeds**" has the meaning assigned to that term in Section 2.8B(ii)(c).

"**Intellectual Property**" has the meaning assigned to that term in the Security Agreement.

"**Intercompany Subordinated Debt**" means Indebtedness, which is evidenced by promissory notes in favor of the Permitted Holders or the holders of the Capital Stock of the Borrower, the Borrower's Subsidiaries or the Bahamas Owner, as the case may be, as of the Effective Date, which notes shall be unsecured and subordinated in right of payment (including, without limitation, a restriction preventing any payments thereunder upon the occurrence and during the continuance of an Event of Default) to the payment in full of the Obligations pursuant to the terms of the applicable promissory notes or an intercompany subordination agreement that in any such case, are reasonably satisfactory to the Administrative Agent, provided that no Event of Default has occurred and is continuing as of the time of the incurrence thereof or would result therefrom.

"**Intercreditor Agreement**" means that certain Intercreditor Agreement dated as of the date hereof, substantially in the form of Exhibit XXIII attached hereto, entered into by and between the Collateral Agent and Administrative Agent and Credit Suisse, as Collateral Agent and Administrative Agent under and as defined in the Second Lien Credit Agreement.

"**Interest Payment Date**" means:

> (a)     with respect to any Base Rate Loan, the last Business Day in each of March, June, September and December of each year, commencing on September 29, 2006 and upon each prepayment of Tranche B Loans; and

> (b)     with respect to any Eurodollar Rate Loan, the last day of each Interest Period applicable to such Loan; provided that in the case of each Interest Period of longer than three months, "Interest Payment Date" shall also include the date that is three months after the commencement of such Interest Period.

"**Interest Period**" has the meaning assigned to that term in Section 2.6B.

"**Interest Rate Determination Date**" means each date for calculating the Reserve Adjusted Eurodollar Rate, for purposes of determining the interest rate in respect of an Interest Period. The Interest Rate Determination Date for purposes of calculating the Reserve Adjusted Eurodollar Rate shall be the date two (2) Business Days prior to the first day of the related Interest Period.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter and any successor statute.

**CREDIT AGREEMENT**

"**Investment**" means (a) any direct or indirect purchase or other acquisition by the Borrower or any of its Subsidiaries of, or of a beneficial interest in, Capital Stock or other Securities of any other Person, or (b) any direct or indirect loan, advance (other than advances to employees for moving, education, computer, entertainment and travel expenses, drawing accounts and similar expenditures in the Ordinary Course of Business) or capital contribution by the Borrower or any of its Subsidiaries to any other Person, including all indebtedness and accounts receivable acquired from that other Person that are not current assets or did not arise from sales to that other Person in the Ordinary Course of Business.  The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"**LC Disbursement**" means a payment made by the Fronting Bank pursuant to a Letter of Credit.

"**Lender**" and "**Lenders**" means the Persons identified as "Lenders" and listed on the signature pages of this Agreement, together with their successors and permitted assigns pursuant to Section 9.1; provided that the term "Lenders", when used in the context of a particular Loan Commitment shall mean the Lenders having that Loan Commitment.

"**Lender Office**" means, as to any Lender, the office or offices of such Lender specified in the Administrative Questionnaire completed by such Lender and delivered to the Administrative Agent, and the office or offices of such Lender that the Administrative Agent notifies the Borrower promptly but no later than two days after the Effective Date, or such other office or offices as such Lender may from time to time designate to the Borrower and the Administrative Agent.

"**Letter of Credit**" has the meaning set forth in Section 2.5.

"**Lien**" means any lien, mortgage, pledge, assignment, security interest, fixed or floating charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give any security interest) and any option, trust or deposit or other preferential arrangement having the practical effect of any of the foregoing.

"**Loan Commitment**" means the commitment of a Lender to make a Loan to the Borrower pursuant to Section 2.2 (including the commitment of any Eligible Assignee to participate with respect to a Loan as part of the primary syndication).

"**Loan Documents**" means this Agreement, the Notes and the Collateral Documents or other documents evidencing or securing Obligations.

"**Loan Exposure**" means, with respect to any Lender, as of any date of determination the outstanding principal amount of the Loan of that Lender.

"**Loan Party**" or "**Loan Parties**" means the Borrower and any of its Subsidiaries who executes any of the Loan Documents.

"**Loans**" mean the loans outstanding or made by the Lenders pursuant to Section 2.2.

"**Margin Stock**" has the meaning assigned to that term in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**Master Declarations**" has the meaning assigned to that term in Section 4.39 as they may be further amended, supplemented, amended and restated or otherwise Modified from time to time.

"**Master Plans**" means the documentation described on Schedule 1.1(d), as amended, restated, amended and restated, supplemented or Modified from time to time.

"**Material Adverse Effect**" means (a) a material adverse effect upon the business, operations, properties, assets or condition (financial or otherwise) of the Borrower, its Subsidiaries and Bahamas Owner, taken as a whole, (b) the material impairment of the ability of the Loan Parties, taken as a whole, to perform the Obligations (regardless of whether or not such Material Adverse Effect can be or has been cured at any time or whether Borrower has knowledge of such Material Adverse Effect), (c) a material adverse effect upon the legality, validity, binding effect or enforceability against a Loan Party or the Shareholder Pledgor of the First Lien Credit Agreement, the Second Lien Credit Agreement, any Collateral Document, or any other material Loan Document or Second Lien Loan Document to which it is a party, (d) a material adverse effect upon the rights, remedies and benefits, available to, or conferred upon, the Agents or any Lender under any Loan Document, taken as a whole, (e) a material adverse effect upon the value of the then remaining Real Property Collateral, taken as a whole or (f) a material adverse effect upon the Entitlements and the intended development of the Real Property Collateral as contemplated by the Project Projections, taken as a whole.

"**Material Contracts**" has the meaning assigned to that term in Section 4.33A.

"**Maturity Date**" means June 8, 2011 as to both the Tranche A Loans and the Tranche B Loans.

"**Maximum Amount**" has the meaning assigned to that term in Section 9.13A.

"**Maximum Net Indebtedness**" has the meaning assigned to that term in Section 6.6C.

"**Membership Clubs**" mean the clubhouses and resort club amenities contemplated to be developed at each Project as set forth in the Project Projections.

"**Modifications**" shall mean any amendments, supplements, modifications, renewals, replacements, consolidations, severances, substitutions and extensions of any document or instrument from time to time; "**Modify**", "**Modified**," or related words shall have meanings correlative thereto.

"**Moody's**" means Moody's Investors Service, Inc.

"**Mortgage**" means the first lien mortgages, security agreement, assignment of leases and rents, and fixture filings, substantially in the form of Exhibit XV annexed hereto, executed and delivered by any Loan Party on or after the Effective Date, with such changes thereto as may be recommended by the Collateral Agent's local counsel based on local laws or customary local mortgage or deed of trust practices, as such security instrument may be amended, restated, amended and restated, supplemented, or otherwise Modified from time to time. "**Mortgages**" means all such instruments collectively.

"**Mortgagee Policies**" has the meaning assigned to that term in Section 3.1G(ii).

"**Multiemployer Plan**" means a "multiemployer plan", as defined in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate is contributing or to which the Borrower or any ERISA Affiliate had an obligation to contribute within the last six years.

"**Net Cash from Project Sales**" means, for any period, (i) Cash From Project Sales realized during such period, less (ii) Project Expenses incurred in such period.

**CREDIT AGREEMENT**

"**Net Cash from Operations**" means, for any period, (i) the (A) gross operating revenues (not including, for the avoidance of doubt, any amounts taken into account in determining Cash From Project Sales) actually received by the Borrower and its Subsidiaries during such period with respect to the Golf Courses, the Membership Clubs, any improvements hereafter constructed by the Borrower or any of its Subsidiaries as a part of each Project; (B) any royalty payments under contracts with third party or Affiliate contractors (including, without limitation, any royalties received under the Borrower's and the Subsidiaries' "featured builder" program), and any related amenities; (C) Cash Proceeds received from the sale of golf and general and social club memberships relating to each Project (provided, however that such Cash Proceeds received from any such sale shall only be included in Net Cash from Operations to the extent such Cash Proceeds have not been previously accounted for in connection with the initial sale of the applicable golf, general and/or social club membership); and (D) Cash received as a result of payments of principal, interest and other payments (including, without limitation, all mandatory prepayments) made to Bahamas Borrower by Bahamas Owner under the Bahamas Intercompany Indebtedness, less (ii) all cash amounts of any kind whatsoever paid during such period by the Borrower and its Subsidiaries (including both operating expenses and capital expenditures) but excluding any cash amounts paid from any reserves previously set aside by the Borrower and its Subsidiaries (not including, however, Project Expenses or amounts deducted from Cash EBITDA for purposes of determining Excess Cash Flow.

"**Non-Consenting Lender**" has the meaning assigned to that term in Section 9.5B.

"**Notes**" means (a) the promissory notes of the Borrower issued pursuant to Section 2.3C on the Effective Date and (b) any promissory notes issued by the Borrower in connection with assignments of the Loans of any Lender, in each case substantially in the form of Exhibit VIII annexed hereto, as they may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"**Notice of Conversion/Continuation**" means a notice substantially in the form of Exhibit X annexed hereto delivered by the Borrower to the Administrative Agent pursuant to Section 2.6D with respect to a proposed conversion or continuation of the applicable basis for determining the interest rate with respect to the Loans specified therein.

"**Obligations**" means all obligations of every nature of each Loan Party from time to time owed to the Agents, the Lenders or any of them or their respective Affiliates under the Loan Documents, or, if approved by the Administrative Agent or otherwise required hereunder, Hedge Agreements, whether for principal, interest or payments for early termination of Hedge Agreements, fees, expenses, indemnification or otherwise.

"**OECD**" means the Organization for Economic Co-Operation and Development.

"**Officer's Certificate**" means, with respect to any Person, a certificate executed on behalf of such Person (a) if such Person is a partnership or limited liability company, by its chairman of the Board (if an officer) or chief executive officer or by the chief financial officer of its general partner or managing member or other Person authorized to do so by its Organizational Documents, (b) if such Person is a corporation, on behalf of such corporation by its chairman of the board (if an officer) or chief executive officer or its chief financial officer or vice president, and (c) if such person is one of the Borrower or a Subsidiaries of the Borrower, a Responsible Officer.

"**Operating Lease**" means, as applied to any Person, any lease (including, without limitation, leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) that is not a Capital Lease other than any such lease under which that Person is the lessor.

**CREDIT AGREEMENT**

"**Ordinary Course of Business**" means, with respect to the Borrower and its Subsidiaries, the ordinary course of their business, as related to developing each Project in accordance with the Project Projections, marketing or selling Residential Lots, Condo Parcels and Commercial Parcels and the business of owning and operating the Golf Courses, the Membership Clubs and any other improvements developed as part of each Project, and in each case, as undertaken by the Borrower and its Subsidiaries in good faith and not for purposes of evading any covenant or restriction in any Loan Document.

"**Organizational Authorizations**" means, with respect to any Person, resolutions of its Board of Directors, general partners or members of such Person, and such other Persons, groups or committees (including, without limitation, managers and managing committees), if any, required by the Organizational Certificate or Organizational Documents of such Person to authorize or approve the taking of any action or the entering into of any transaction.

"**Organizational Certificate**" means, with respect to any Person, the certificate or articles of incorporation, partnership or limited liability company or any other similar or equivalent organizational, charter or constitutional certificate or document filed with the applicable Governmental Authority in the jurisdiction of its incorporation, organization or formation, which, if such Person is a partnership or limited liability company, shall include such certificates, articles or other certificates or documents in respect of each partner or member of such Person.

"**Organizational Documents**" means, with respect to any Person, the by-laws, partnership agreement, limited liability company agreement, operating agreement, management agreement or other similar or equivalent organizational, charter or constitutional agreement or arrangement, which, if such Person is a partnership or limited liability company, shall include such by-laws, agreements or arrangements  in respect of each partner or member of such Person.

"**OSHA**" means the Occupational Safety and Hazard Act of 1970.

"**Other Taxes**" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"**Paying Agent**" means Credit Suisse, in its capacity as paying agent for the Lenders hereto.

"**Participant**" has the meaning assigned to that term in Section 9.1D.

"**PBGC**" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA (or any successor thereto).

"**PCBs**" has the meaning assigned to that term in Section 4.32(vi).

"**Pending Entitlements**" has the meaning assigned to that term in Section 4.36.

"**Pension Plan**" means any employee pension benefit plan, as defined in Section 3(2) of ERISA, other than a Multiemployer Plan, which is subject to Title IV of ERISA and is, or was within the past six years, maintained or contributed to by the Borrower or any ERISA Affiliate.

"**Permitted Affiliate Sale**" means a transaction for fair market value of one or more Residential Lots by the Borrower or its Subsidiaries to an Affiliate if the sale to such Affiliate results from an oversubscription at the launch for sales of such Residential Lots at the applicable Project pursuant to (i)

**CREDIT AGREEMENT**

Reservation Agreements prior to Borrower or its Subsidiaries' receipt of HUD or plat approvals necessary to otherwise close such sales to third party buyers, provided, however, that the cumulative, aggregate value of all such sales of such Residential Lots to Affiliates shall not exceed $45,000,000 or (ii) Qualified Sales Agreements prior to Borrower or its Subsidiaries' receipt of HUD or plat approvals necessary to otherwise close such sales to third party buyers.

"**Permitted Collateral Asset Sale**" means any transaction (or series of transactions) constituting an arm's length sale for fair market value of (i) one or more platted and legally subdivided Residential Lots to a third party buyer or (ii) one or more Residential Lots pursuant to a Permitted Affiliate Sale, or (iii) Condo Parcels and Commercial Parcels designated for development as condominium units, and commercial buildings, respectively, to an Affiliate of the Borrower or third party buyer, in each case, for no less than the applicable Release Price and pursuant to a Qualified Sales Agreement.

"**Permitted Encumbrances**" means the following types of Liens:

(a)     Liens for taxes, assessments or governmental charges or claims the payment of which is not, at the time, required by Section 5.5 or otherwise delinquent;

(b)     statutory Liens of landlords, statutory Liens of carriers, warehousemen, mechanics, vendors and materialmen and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or by ERISA) incurred in the Ordinary Course of Business for sums not yet delinquent or being Properly Contested;

(c)     Liens incurred or deposits made in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other types of social security, or to secure the performance of tenders, statutory obligations, surety and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive, in each case, of obligations for the payment of borrowed money or other Indebtedness);

(d)     any attachment or judgment Lien with respect to a money judgment, writ, warrant of attachment or similar process not constituting an Event of Default, so long as such Lien could not reasonably be expected to have a Material Adverse Effect;

(e)     leases, subleases, licenses and sublicenses granted to others (in the Ordinary Course of Business) not interfering with the ordinary conduct of the business or operations of the Borrower or any of its Subsidiaries;

(f)     any (i) interest or title of a lessor or sublessor under any Capital Lease permitted by Section 6.1(iv) or any Operating Lease not prohibited by this Agreement, (ii) restriction or encumbrance that the interest or title of such lessor or sublessor may be subject to, or (iii) subordination of the interest of the lessee or sublessee under such lease to any restriction or encumbrance referred to in the preceding clause (ii);

(g)     zoning, building codes and other Governmental Authorizations regulating the use, development and/or occupancy of any Real Property Asset or activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such Real Property Asset so long as such zoning, building codes and

other Governmental Authorizations could not reasonably be expected to have a Material Adverse Effect;

(h)     Liens securing Indebtedness permitted pursuant to clauses (iii), (iv), (viii) and (ix) of Section 6.1;

(i)     bankers liens and rights of setoff with respect to customary depository arrangements entered into in the Ordinary Course of Business;

(k)     with respect to the Real Property Collateral only, the Permitted Title Exceptions; and

(l)     any existing or future condominium declarations (and Modifications thereof) recorded against a portion of the Real Property Collateral by the Borrower in the Ordinary Course of Business and in furtherance of the development of each Project in accordance with the Project Projections.

"**Permitted Equipment Financing**" means, collectively, (i) the existing financing listed on Schedule 1.1(c) hereto secured solely by furnishings, fixtures and equipment, (ii) financing obtained in the Ordinary Course of Business which is secured solely by furnishings, fixtures and equipment acquired using the proceeds of such financing and (iii) Indebtedness under Capital Leases capitalized on the consolidated balance sheet of the Borrower, in the aggregate amount not to exceed $7,500,000.

"**Permitted Existing Indebtedness**" means the Indebtedness of the Borrower or Subsidiary Guarantors existing as of the Effective Date as further described on Schedule 6.1 attached hereto.

"**Permitted Holder**" means ERG Enterprises, LP, Lubert-Adler Real Estate Fund III, L.P., Lubert-Adler Real Estate Parallel Fund III, L.P., Lubert-Adler Capital Real Estate Fund III, L.P., Lubert-Adler Real Estate Fund IV, L.P., Lubert-Adler Real Estate Parallel Fund IV, L.P. and Lubert-Adler Capital Real Estate Fund IV, L.P.

"**Permitted Title Exceptions**" means the title exceptions reflected in the Mortgagee Policies and, after the Effective Date any title exceptions arising from the recordation of Specified Encumbrances to which Collateral Agent agrees to subordinate the Lien of the Mortgage pursuant to Section 2.13B.

"**Permitted Transaction Costs**" means bona fide, reasonable, direct costs actually incurred by Borrower or its Subsidiaries in connection with an Asset Sale, the issuance of debt Securities (or incurrence of borrowed Indebtedness), or the issuance of equity, including, without limitation, (a) transfer, sales, use and other taxes payable in connection with such Asset Sale, (b) payment of the outstanding principal amount of, premium or penalty, if any, and interest on any permitted Indebtedness (other than the Loans) that is secured by a Lien on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such transaction, (c) brokers' or advisors' commissions, (d) fees and expenses of counsel and other advisors and other customary and reasonable closing costs in connection with such transaction, and (e) any underwriting discounts, commitments, arrangements or similar fees.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, limited partnership, Governmental Authority or other entity.

"**Pledge Agreement**" means the Pledge Agreements and Pledge and Limited Recourse Guaranty Agreements executed and delivered by the Borrower and the Shareholder Pledgors, in each case, in favor

**CREDIT AGREEMENT**

of the Collateral Agent for the benefit of the Agents and the Lenders substantially in the form of Exhibit XI and Exhibit XI-A, respectively, annexed hereto, with such changes thereto as may be reasonably recommended by the Collateral Agent's local counsel based on local laws or customary practice, as may be amended, restated, amended and restated, supplemented or otherwise Modified from time to time in accordance with the terms thereof and hereof.

"**Prime Rate**" means the rate of interest per annum announced from time to time by Credit Suisse as its prime commercial lending rate in effect at its principal office in New York City.  The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer.  Credit Suisse or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Prime Rate.

"**Principal Borrower**" means Ginn-LA CS Borrower, LLC.

"**Proceedings**" has the meaning assigned to that term in Section 5.3(xiii).

"**Pro Forma Basis**" means, with respect to forward-looking compliance with any test or covenant hereunder, compliance with such covenant or test after giving effect to borrowings and projections, based upon good faith estimates and assumptions believed by the Borrower to be correct and reasonable at the time made, which projections shall give effect to, among other things, any proposed borrowing, acquisition, disposition, budget change, schedule change or other action reasonably anticipated to occur and otherwise in conformity with such procedures as may be agreed upon between the Administrative Agent and the Borrower, all such calculations to be in form and substance reasonably satisfactory to the Administrative Agent.

"**Project**" means, individually and collectively, the developments commonly known as (a) Tesoro located in Port St. Lucie, Florida, (b) Quail West located in Naples, Florida, (c) Grand Bahama (West End) located on Grand Bahama Island, the Bahamas, (d) Laurelmor located in Boone, North Carolina and the surrounding vicinity, and (e) Hammock Beach River Club located in Palm Coast, Florida, in each case, as depicted respectively on the maps attached hereto as Exhibit XIII (it being understood and agreed that such maps include Residential Lots and the Golf Course at the Tesoro Project, which have already been sold and therefore are not a part of the Real Property Collateral), together with any additional Real Property Collateral acquired and incorporated into such Projects.

"**Project Expenses**" means, with respect to Borrower and its Subsidiaries, for any period and without duplication, the costs and expenses incurred by the Borrower and its Subsidiaries in connection with the development of each Project (including, without limitation, the development and subdivision of any Residential Lots, Infrastructure and any vertical improvements and bonding therefor) as contemplated in the Project Projections including, without limitation, general and administrative expenses, allocated overhead, marketing expenses, architectural, engineering and legal fees, developer and contractor fees, land development costs, construction costs, costs of acquiring additional Real Property Collateral in accordance with the Project Projections, and carrying costs (consisting of taxes, insurance costs, capital expenditures, and property owners association subsidies and reserve funding), excluding, however, for purposes of the definition of Net Cash from Project Sales, all costs and expenses associated with the operations of the Golf Courses, Membership Clubs and related amenities which are included in the calculation of Net Cash from Operations.

"**Project Projections**" means the development and construction schedule associated with each Project attached hereto as Exhibit I which estimate the Cash from Project Sales, the cash from project sales to be received by the Bahamas Owner and the expenditures to be incurred in connection with the

development and construction of each Project over the period from 2006 through 2011. Borrower shall have the right to update the Project Projections in accordance with Section 5.3(xi) below.

"**Properly Contested**" means, any claim against a Loan Party or any Indebtedness of a Loan Party (including any Taxes) that is not paid or settled as and when such claim or Indebtedness is due or payable by reason of such Loan Party's bona fide dispute concerning its liability to pay same or concerning the amount thereof provided that: (i) such claim or Indebtedness is being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted; (ii) such Loan Party has established appropriate reserves as shall be required in conformity with GAAP; (iii) the non-payment of such claim or Indebtedness could not reasonably be expected to have a Material Adverse Effect; (iv) no Lien is imposed upon any of such Loan Party's assets with respect to such claim or Indebtedness unless such Lien is at all times junior and subordinate in priority to the Liens in favor of the Collateral Agent (except only with respect to Permitted Encumbrances that have priority as a matter of applicable state law) and enforcement of such Lien is stayed during the period prior to the final resolution or disposition of such dispute; (v) if the claim or Indebtedness results from, or is determined by the entry, rendition or issuance against a Loan Party or any of its assets of a judgment, writ, order or decree, enforcement of such judgment, writ, order or decree is stayed pending a timely appeal or other judicial review; and (vi) if such contest is abandoned, settled or determined adversely (in whole or in part) to such Loan Party, such Loan Party forthwith pays such claim or Indebtedness and all penalties, interest and other amounts due in connection therewith as and when required to be paid.

"**Pro Rata Share**" means with respect to all payments, computations and other matters relating to the Loans of any Lender, the percentage obtained by dividing (i) the Loan Exposure of that Lender by (ii) the aggregate Loan Exposure of all the Lenders; in any such case as the applicable percentage may be adjusted by assignments permitted pursuant to Section 9.1. The initial Pro Rata Share of each Lender is set forth in the Register.

"**PTO**" means the United States Patent and Trademark Office.

"**Qualified Appraisal**" means the Initial Appraisal and any other real estate appraisal conducted in accordance with the Uniform Standards of Professional Appraisal Practice (as promulgated by the Appraisal Standards Board of the Appraisal Foundation) and all requirements of Applicable Law applicable to Administrative Agent undertaken by an Appraiser, and providing an assessment of "Total Net Value" (as defined in the Initial Appraisal) of the remaining Real Property Collateral utilizing substantially similar methodology to that used for the Initial Appraisal, the form and substance of such appraisal to be reviewed and approved by the Administrative Agent in its reasonable judgment.

"**Qualified Appraisal Update**" means a quarterly update of the Initial Appraisal or other Qualified Appraisal prepared by the Appraiser, the form and substance of such update to be reviewed and approved by the Administrative Agent in its reasonable judgment.

"**Qualified Sales Agreement**" means (i) an arm's length definitive and binding purchase agreement between the Borrower or any of its Subsidiaries and a third party pursuant to which such third party agrees to purchase a Residential Lot for fair market value; (ii) a definitive and binding purchase agreement between the Borrower or any of its Subsidiaries and an Affiliate evidencing a Permitted Affiliate Sale; (iii) a definitive and binding purchase agreement between the Borrower or any of its Subsidiaries and an Affiliate or third party for purposes of the sale of a Condo Parcel, the purchase price under which shall be at least equal to the product of (A) the number of condominium units proposed to be developed on such Condo Parcel and (B) the applicable Release Price for such condominium units; or (iv) a definitive and binding purchase agreement between the Borrower or any of its Subsidiaries and an Affiliate or third party for purposes of the sale of a Commercial Parcel, the purchase price under which

**CREDIT AGREEMENT**

shall be at least equal to the Release Price for such Commercial Parcel, in each case, which Qualified Sales Agreement shall be substantially in the applicable form attached hereto as <u>Exhibit XVIII</u> or in a form otherwise approved by Administrative Agent in its reasonable discretion.

"**Rate Increase Maximum Net Indebtedness**" has the meaning assigned to that term in Section 2.6G.

"**Real Property Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by the Borrower, any of the Borrower's Subsidiaries or the Bahamas Owner in any real property.

"**Real Property Collateral**" means the portion of the Collateral comprising a Real Property Asset.

"**Recognition, Collateral Assignment and Estoppel Agreement**" means an agreement, substantially in the form of <u>Exhibit VI</u> attached hereto, pursuant to which a Third Party Operator or the Contractor agrees to recognize certain rights of the Administrative Agent and/or Collateral Agent with regard to each Project and consent to the Lien of the Mortgage, among other things.

"**Recovery Event**" has the meaning assigned to that term in Section 2.8B(ii)(c).

"**Reference Lenders**" means (a) Credit Suisse and (b) another Lender determined by the Administrative Agent with the consent of the Borrower, which consent shall not be unreasonably withheld or delayed.

"**Register**" has the meaning assigned to that term in Section 9.1C.

"**Registered Loan**" has the meaning assigned to that term in Section 9.1C.

"**Reinvestment Notice**" means a written notice executed by a Responsible Officer and delivered to the Administrative Agent within five (5) Business Days after a Recovery Event stating that no Default or Event of Default has occurred and is continuing, that the Borrower intended to utilize the Insurance Proceeds for purposes of restoration and repair of the affected Real Property Collateral, that the Borrower agrees to pursue such repair and restoration in a diligent manner, in compliance with all Applicable Laws and without permitting any Liens to encumber the Real Property Collateral except those permitted by Section 6.2 hereof.

"**Related Parties**" means, with respect to any Person, such Person's Affiliates and the directors, officers, employees, agents, trustees and advisors of such Person and of such Person's Affiliates.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Materials into the indoor or outdoor environment (including, without limitation, the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Materials), or into or out of any property, including the movement of any Hazardous Material through the air, soil, surface water, groundwater or property.

"**Release Price**" means, (i) for each condominium unit located within each Condo Parcel designated to be developed as condominium units, the following amounts:  (A) with respect to the Project commonly known as Tesoro, $150,000 for each such condominium unit and (B) with respect to the Projects commonly known as Laurelmor and Grand Bahama (West End), $100,000 for each such

condominium unit, (ii) for each Commercial Parcel, $2,000,000 with respect to the parcel located in the City of Flagler Beach and $7,000,000 with respect to the parcels described as Parcels 1A and 1B in the Planned Unit Development Agreement executed as of January 17, 2006 for the Project commonly known as Hammock Beach River Club and (ii) with respect to the Tesoro Membership Club, $5,917,832.

"**Release Instruments**" has the meaning assigned to that term in Section 2.13.

"**Released Parcel**" has the meaning assigned to that term in Section 2.13.

"**Request for Loan**" means an executed request for loan substantially in the form of <u>Exhibit XIV</u> hereto with all blanks completed by the Borrower.

"**Required Release**" means (a) a dedication or conveyance of a portion of the Real Property Collateral (other than a Residential Lot) in the Ordinary Course of Business at the direction of a Governmental Authority or public utility or as may be required pursuant to the Master Declarations upon completion and approval by the applicable Governmental Authority of plats legally sufficient to effect such dedication or conveyance with respect to respective portions of the Real Property Collateral to (i) such Governmental Authority (or any designee of such Governmental Authority) or public utility, or (ii) to the Resort Association or equity members thereof under the applicable Master Declaration, in each case for roads, common areas, easements and other shared uses; (b) a conveyance of a portion of the Real Property Collateral consisting of approximately 50 acres of real property located within the Project commonly known as Hammock Beach River Club as shown on <u>Exhibit XXIV</u> hereof pursuant to the Post-Closing Agreement dated _____, provided, however, that the documentation pursuant to which such conveyance is effectuated is reasonably acceptable to the Administrative Agent; (c) conveyance of a portion of the Real Property Collateral to Flagler County, Florida or an agency thereof consisting of approximately 1100 acres of real property located within the Project commonly known as Hammock Beach River Club as shown on <u>Exhibit XXIV</u> for purposes of conservation of wetlands and uplands areas, provided, however, that the documentation pursuant to which such conveyance is effectuated is reasonably acceptable to the Administrative Agent; and (d) conveyance of the Golf Courses and Membership Clubs located at the Projects commonly known as Tesoro and Quail West upon either (1) the applicable Subsidiary's conveyance of all Residential Lots contemplated to be platted and developed therein pursuant to the Project Projections and the Master Plans for each such Project or (2) if the applicable Subsidiary is required to convey to the Resort Association or the members thereof pursuant to the Master Declarations, the satisfaction of the conditions necessary to trigger the requirement for such conveyance or (3) in the case of the Membership Club at Tesoro, the applicable Subsidiary's conveyance to an Affiliate in exchange for a purchase money promissory note and mortgage pursuant to the Tesoro Membership Club Sale Leaseback approved by Administrative Agent in its reasonable discretion and pursuant to which the applicable Release Price is paid or evidenced by such purchase money promissory note and mortgage to Ginn-LA St. Lucie Ltd., LLLP and the documentation pursuant to which such conveyance is effectuated is reasonably acceptable to the Administrative Agent, provided, in each case, that any such dedication or conveyance (individually and/or taken together will all other such dedications and conveyances) (i) has not had and could not reasonably be expected to have a Material Adverse Effect or (ii) has not impaired and could not reasonably be expected to impair the Collateral Agent's First Priority Lien on the remaining Real Property Collateral.

"**Requisite Lenders**" means Lenders having or holding more than 50% of the sum of the aggregate Loan Exposure of all Lenders.

"**Reservation Agreement**" means an arms length agreement with a third party buyer to reserve the right to purchase a Residential Lot for fair market value, which Reservation Agreement shall be

substantially in the form attached hereto as <u>Exhibit XXV</u> or in a form otherwise approved by Administrative Agent in its reasonable discretion.

"**Reserve Adjusted Eurodollar Rate**" means, with respect to each day during each Interest Period pertaining to a Eurodollar Rate Loan, a rate per annum determined for such day in accordance with the following formula; provided, however, that at all times such rate shall be equal to or exceed 1%:

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

"**Residential Lot**" means each of (a) Hammock Beach River Club's 453, (b) Tesoro's 397, (c) Quail West's 290, (d) Grand Bahama's (West End) 1858, and (e) Laurelmor's 1500 residential dwelling lots, as the case may be, approved by the Master Plans for development within the Real Property Collateral, some of which are not yet subdivided or platted and which are expected to comprise a combination of estates and single family home lots.

"**Responsible Officer**" means the chief executive officer, chairman of the board, president/chief operating officer, any vice president, general counsel or chief financial officer of the Borrower or its Subsidiaries, but in any event, with respect to financial matters, the chief financial officer or treasurer of the Borrower or its Subsidiaries.

"**Restricted Payment**" means (a) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock (or of any other Capital Stock) of the Borrower or any of its Subsidiaries now or hereafter outstanding or a payment of principal or interest under Intercompany Subordinated Debt, except a dividend or other distribution by the Subsidiaries of the Borrower to the Borrower and any dividend payable solely in shares of that class of stock to the holders of that class, excluding the initial distribution of proceeds of a portion of the Loan as described in Section 2.9A, (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock (or of any other Capital Stock) of its, the Borrower or any of its Subsidiaries now or hereafter outstanding, (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of stock (or of any other Capital Stock) of its, the Borrower or any of its Subsidiaries now or hereafter outstanding, and (d) payment of principal and interest in respect of the Indebtedness incurred under the Second Lien Credit Agreement and any refinancing thereof. For the avoidance of doubt, payments from one Loan Party to another Loan Party under intercompany indebtedness permitted pursuant to Section 6.1(v) shall not constitute a Restricted Payment.

"**Restricted Payment Amount**" means, on any date of determination, an amount equal to 50% of Excess Cash Flow received by the Borrower or its Subsidiaries during the period commencing on the first day of the first Fiscal Quarter on or after the Trigger Date Events shall have occurred and be continuing and ending on the last day of the Fiscal Quarter immediately prior to such date of determination for which financial statements have been delivered pursuant to Section 5.3(ii) or (iii).

"**S&P**" means Standard & Poor's, a division of the McGraw-Hill Companies, Inc.

"**Second Lien Credit Agreement**" means the Second Lien Credit Agreement dated as of the date hereof among the Borrower, Credit Suisse as administrative agent and collateral agent and Credit Suisse Securities (USA) LLC, as sole lead arranger and sole bookrunner, and the lenders party thereto, as it may be amended, restated, amended and restated, supplemented or otherwise Modified from time to time.

**CREDIT AGREEMENT**

"**Second Lien Loan Documents**" means, collectively, the Second Lien Credit Agreement and the other documents, instruments and agreements entered into or delivered by any Loan Party in connection therewith.

"**Securities**" means any Capital Stock, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, bonds, debentures, notes, or other evidences of Indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Security Agreement** " means each Security Agreement executed and delivered by any Loan Party in favor of the Collateral Agent for the benefit of the Agents and the Lenders substantially in the form of Exhibit XII annexed hereto, with such changes thereto as may be reasonably recommended by the Collateral Agent's local counsel based on local laws or customary practice, as may be amended, restated, amended and restated, supplemented or otherwise Modified from time to time in accordance with the terms thereof and hereof.

"**Shareholder Pledgor**" means, collectively, Lubert-Adler Real Estate Fund III, L.P., Lubert-Adler Real Estate Parallel Fund III, L.P., Lubert-Adler Capital Real Estate Fund III, L.P., Lubert-Adler Real Estate Fund IV, L.P., Lubert-Adler Real Estate Parallel Fund IV, L.P., Lubert-Adler Capital Real Estate Fund IV, L.P., ERG Enterprises, LP, Ginn-LA CS Holding Company, LLC and Ginn-LA West End Ltd., LLLP.

"**Solvency Certificate**" has the meaning assigned to that term in Section 3.1I.

"**Solvent**" means, with respect to any Person, that as of the date of determination both (a) (i) the then fair saleable value of the property of such Person, sold as a going concern, is (A) greater than the total amount of liabilities (including contingent liabilities but excluding amounts payable under intercompany promissory notes) of such Person and (B) not less than the amount that will be required to pay the probable liabilities on such Person's then existing debts as they become absolute and matured considering all financing alternatives and potential asset sales reasonably available to such Person; (ii) such Person's capital is not unreasonably small in relation to its business or any contemplated or undertaken transaction; and (iii) such Person does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due; and (b) such Person is "solvent" within the meaning given that term and similar terms under applicable laws relating to fraudulent transfers and conveyances.  For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"**Specified Encumbrances**" has the meaning assigned to that term in Section 2.13B.

"**Stated Amount**" means, on any date and with respect to any Letter of Credit, the total amount then available to be drawn under such Letter of Credit.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other direct ownership interests in such entity entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the

**CREDIT AGREEMENT**

management and policies of such entity is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, excluding Ginn-LA West End Ltd., LLLP, Ginn-LA International Business Company, Ltd., Ginn-LA West End, Limited and Quail West Foundation, Inc.

"**Subsidiary Guarantor**" means, individually, each Subsidiary of Borrower and all Subsidiaries of Subsidiaries of Borrower, and "Subsidiary Guarantors" means, collectively, all of the foregoing, excluding, however Quail West Foundation, Inc.

"**Subsidiary Guaranties**" means the Subsidiary Guaranties, substantially in the form of <u>Exhibit XXII</u> annexed hereto, executed and delivered by each of the Subsidiary Guarantors on the Effective Date, or executed and delivered by any additional Subsidiary Guarantors from time to time thereafter pursuant to Section 5.11, as such Guaranty may hereafter be amended, restated, supplemented or otherwise Modified from time to time.

"**Supplemental Collateral Agent**" and "**Supplemental Collateral Agents**" shall have the meaning assigned to these terms in Section 8.1B.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Tesoro Golf Lease**" means the Lease Agreement between Ginn Tesoro Golf Ltd., LLLP, as Lessor, and The Tesoro Club, LLC, as Lessee, dated  December 31, 2005 pursuant to which the Golf Course (more particularly described therein) located at the Tesoro Project is leased to The Tesoro Club, LLC.

"**Tesoro Golf Sale Leaseback**" means the sale of the Golf Course located at the Tesoro Project and more particularly described in the Tesoro Golf Lease in exchange for a purchase money promissory note and mortgage in favor of Ginn-LA St. Lucie Ltd., LLLP and the Tesoro Golf Lease, which purchase money promissory note and mortgage are collaterally assigned to Collateral Agent pursuant to a Collateral Assignment of Mortgage and Note.

"**Tesoro Membership Club Sale Leaseback**" means the sale of the Membership Club located at the Tesoro Project to an Affiliate in exchange for a purchase money promissory note and mortgage and lease back of such Membership Club in favor of Ginn-LA St. Lucie Ltd., LLLP, which purchase money promissory note and mortgage are collaterally assigned to Collateral Agent pursuant to a Collateral Assignment of Mortgage and Note.

"**Third Party Operator**" means any third party operator or manager of the Golf Courses, the Membership Clubs or other amenities related to each Project providing operations, management and/or other services with regard to each Project.

"**Third Party Operating Agreement**" means any management, operating or other similar agreement between Borrower or any of its Subsidiaries and any Third Party Operator, which agreement shall be in form and substance reasonably satisfactory to the Administrative Agent.

"**Title Company**" means, collectively, one or more title insurance companies reasonably satisfactory to the Administrative Agent.

"**Total Debt LTV Ratio**" has the meaning assigned to that term in Section 6.6A.

**CREDIT AGREEMENT**

"**Tranche A Availability Period**" means the period from and including the Business Day next succeeding the Effective Date to but excluding the earlier of the Tranche A Maturity Date and the date of termination of the Tranche A Funding Amounts.

"**Tranche A Credit-Linked Deposit**" means, with respect to each Tranche A Lender at any time, amounts actually on deposit in the Tranche A Credit-Linked Deposit Account to the credit of such Lender's Tranche A Credit-Linked Sub-Account at such time.

"**Tranche A Credit-Linked Deposit Account**" means the "Tranche A Lenders (Ginn) Credit-Linked Deposit Account" established by the Paying Agent at Credit Suisse pursuant to Section 2.1A.

"**Tranche A Credit-Linked Sub-Account**" has the meaning set forth in Section 2.1A.

"**Tranche A Exposure**" means, with respect to any Tranche A Lender at any time, the sum of its Applicable Percentage of the outstanding principal amount of the Tranche A Loans and its Tranche A LC Exposure at such time.

"**Tranche A Funding Amount**" means, with respect to each Tranche A Lender, the amount that such Tranche A Lender is required hereby to maintain as its Tranche A Credit-Linked Deposit, as such amount may be reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.1.  The initial amount of each Tranche A Lender's Tranche A Funding Amount is set forth in an Assignment and Agreement pursuant to which such Lender shall have assumed its Tranche A Funding Amount, as applicable.  The aggregate amount of the Tranche A Lenders' Tranche A Funding Amounts is $165,000,000.

"**Tranche A LC Exposure**" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time plus (b) the aggregate amount of all LC Disbursements that have not yet been reimbursed by or on behalf of the Borrower at such time.  The Tranche A LC Exposure of any Tranche A Lender at any time shall be its Applicable Percentage of the total Tranche A LC Exposure at such time.

"**Tranche A Lender**" means a Lender with a Tranche A Funding Amount or, if the Tranche A Funding Amounts have terminated or expired, a Lender with Tranche A Exposure.

"**Tranche A Loan Borrowing Conditions**" means (i) no Default or Event of Default shall have occurred and be continuing and (ii) Borrower has provided evidence satisfactory to Administrative Agent of compliance with the financial covenants set forth in Section 6.6 on a Pro Forma Basis for the Fiscal Quarter immediately succeeding the applicable Request for Loan.

"**Tranche A Loans**" means the loans made pursuant to Section 2.2B.

"**Tranche A Maturity Date**" means the fifth anniversary of the Effective Date.

"**Tranche B Loans**" means the Loans made pursuant to Section 2.2A.

"**Tranche B Loan Commitment**" means, with respect to each Tranche B Loan Lender, the commitment, if any, of such Lender to make one or more Tranche B Loans hereunder on the Effective Date, expressed as an amount representing the maximum aggregate principal amount of the Tranche B Loans to be made by such Lender hereunder, as such commitment may be reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.1.  The initial amount of each Tranche B Loan Lender's Tranche B Loan Commitment is set forth in an Assignment and Agreement

pursuant to which such Lender shall have assumed its Tranche B Loan Commitment.  The aggregate amount of the Tranche B Loan Lenders' Tranche B Loan Commitments is $360,000,000.

"**Tranche B Loan Lender**" means a Lender with a Tranche B Loan Commitment or an outstanding Tranche B Loan.

"**Tranche B Maturity Date**" means the fifth anniversary of the Effective Date.

"**Transaction Costs**" means the fees, costs and expenses payable by the Borrower and its Subsidiaries in connection with the Transactions and set forth in the schedule delivered by the Borrower pursuant to Section 3.1J, including, without limitation, amounts payable to the Agents and the Lenders.

"**Transactions**" means, collectively, (a) the consummation of the transactions contemplated under this Agreement and the Second Lien Credit Agreement, (b) the repayment in full of the obligations owing to the lenders under the Existing Indebtedness, and (c) the termination of the Existing Indebtedness and all Liens associated therewith.

"**Trigger Date Events**" means that (i) the Borrower has provided evidence of compliance with the financial covenants set forth in Section 6.6 on a Pro Forma Basis; (ii) the aggregate outstanding principal amount of the Tranche B Loan on such date shall be less than fifty percent (50%) of the aggregate outstanding principal amount of the Tranche B Loan on the Effective Date; (iii) the outstanding principal amount of the Tranche A Loan is equal to zero; and (iv) no Default or Event of Default has occurred and is continuing.

"**UCC**" means the Uniform Commercial Code (or any successor statute) as adopted and in force in the State of New York or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code (or any successor statute) of such state.

## 1.2    Defined Terms; Accounting Terms; Utilization of GAAP for Purposes of Calculations Under Agreement.

**A.**    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented or otherwise Modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Sections, Exhibits and Schedules shall be construed to refer to Sections of, and Exhibits and Schedules to, this Agreement (unless expressly referring to another agreement) and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all Documents, General Intangibles, Goods, Intellectual Property, Investment Related Property, Letter of Credit Rights, Money, Receivables, Receivable Records, Commercial Tort Claims, Material Contracts, and proceeds therefrom (for purposes of this Section, as each such term is defined in the Security Agreement).

**CREDIT AGREEMENT**

**B.**     Except as otherwise expressly provided in this Agreement, (a) all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP; and (b) financial statements and other information required to be delivered by the Borrower to the Lenders pursuant to clauses (iii) and (xvii) of Section 5.3 shall be prepared as required pursuant to Section 5.3. Calculations in connection with the definitions, covenants and other provisions of this Agreement shall utilize accounting principles and policies in conformity with those used to prepare the financial statements of the Borrower referred to in Section 4.14A; provided that should such accounting principles and policies change, the Borrower, the Administrative Agent, and the Lenders shall negotiate in good faith to amend the financial definitions and related covenants in conformity therewith.

# SECTION 2.
## AMOUNTS AND TERMS OF COMMITMENTS AND LOANS

## 2.1     Tranche A Credit-Linked Deposit Accounts.

**A.     Establishment of Tranche A Credit-Linked Deposit Account and Tranche A Credit-Linked Sub-Accounts**.  On or prior to the Effective Date, the Paying Agent shall establish a Tranche A Credit-Linked Deposit Account at Credit Suisse with the title "Tranche A Lenders (Ginn) Credit-Linked Deposit Account".  The Paying Agent shall maintain records enabling it to determine at any time the amount of the interest of each Tranche A Lender in the Tranche A Credit-Linked Deposit Account (the interest of each Tranche A Lender in the Tranche A Credit-Linked Deposit Account, as evidenced by such records, being referred to as such Lender's "**Tranche A Credit-Linked Sub-Account**").  The Paying Agent shall establish such additional Tranche A Credit-Linked Sub-Accounts for assignee Lenders as shall be required pursuant to Section 9.1B(i)(d).  No Person (other than the Paying Agent) shall have the right to make any withdrawal from the Tranche A Credit-Linked Deposit Account or to exercise any other right or power with respect thereto.  Without limiting the generality of the foregoing, each party hereto acknowledges and agrees that the Tranche A Credit-Linked Deposits are and (subject to the last paragraph of Section 7) will at all times be solely the property of the Tranche A Lenders, that the Tranche A Credit-Linked Deposits shall be used solely in accordance with this Agreement and that no amount on deposit at any time in the Tranche A Credit-Linked Deposit Account shall be the property of any of the Loan Parties, constitute collateral for any Obligations of the Loan Parties under the Loan Documents or otherwise be available in any manner to satisfy any Obligations of any of the Loan Parties under the Loan Documents.  Each Tranche A Lender agrees that its right, title and interest in and to the Tranche A Credit-Linked Deposit Account shall be limited to the right to require amounts in its Tranche A Credit-Linked Sub-Account to be applied as provided in Section 2.1C below and that it will have no right to require the return of its Tranche A Credit-Linked Deposit other than as expressly provided in such Section 2.1C (each Tranche A Lender hereby acknowledging that its Tranche A Credit-Linked Deposit constitutes payment for its participations in Tranche A Loans made or to be made hereunder and that the Fronting Bank will be making Tranche A Loans and issuing, amending, renewing and extending Letters of Credit in reliance on the availability of such Lender's Tranche A Credit-Linked Deposit to discharge such Lender's obligations in accordance with Sections 2.1I and 2.5F).  The funding of the Tranche A Credit-Linked Deposits and the agreements with respect thereto set forth in this Agreement constitute arrangements solely among the Paying Agent, the Fronting Bank and the Tranche A Lenders with respect to the funding and reimbursement obligations of the Tranche A Lenders under this Agreement, and do not constitute loans, extensions of credit or other financial accommodations to any Loan Party.  No Loan Party shall have any responsibility or liability to the Tranche A Lenders, the Paying Agent or any other Person in respect of the establishment, maintenance, administration or misappropriation of the Tranche A Credit-Linked Deposit Account (or any Tranche A Credit-Linked Sub-Account) or with respect to the investment of amounts held therein, including pursuant to Section 2.1D below.

**CREDIT AGREEMENT**

**B.      Deposits in Tranche A Credit-Linked Deposit Account**.  The following amounts will be deposited in the Tranche A Credit-Linked Deposit Account at the following times:

(i)      On the Effective Date, each Tranche A Lender shall deposit in the Tranche A Credit-Linked Deposit Account an amount in Dollars equal to such Lender's Tranche A Funding Amount.  Thereafter, the Tranche A Credit-Linked Deposits shall be available, on the terms and subject to the conditions set forth herein, for application pursuant to Sections 2.1I and 2.5F to pay such Lender's Applicable Percentage of (i) the principal of Tranche A Loans that are not paid when due (at stated maturity, by acceleration or otherwise), and (ii) LC Disbursements that are not reimbursed by the Borrower as and when due.

(ii)      On any date prior to the Tranche A Maturity Date on which the Paying Agent or the Fronting Bank receives any reimbursement payment from the Borrower in respect of an LC Disbursement, or any payment of principal of Tranche A Loans, with respect to which amounts were withdrawn from the Tranche A Credit-Linked Deposit Account to reimburse or pay the Fronting Bank, subject to clause (iii) below, the Paying Agent shall deposit in the Tranche A Credit-Linked Deposit Account, and credit to the Tranche A Credit-Linked Sub-Accounts of the Tranche A Lenders, the portion of such reimbursement or other payment to be deposited therein, in accordance with Sections 2.1I and 2.5F.

(iii)      If at any time when any amount is required to be deposited in the Tranche A Credit-Linked Deposit Account under clause (ii) above the sum of such amount and the aggregate amount of the Tranche A Credit-Linked Deposits at such time would exceed the higher of the total aggregate Tranche A Funding Amounts and the Tranche A Exposure, then such excess shall not be deposited in the Tranche A Credit-Linked Deposit Account and the Paying Agent shall instead pay to each Tranche A Lender its Applicable Percentage of such excess.

(iv)      Concurrently with the effectiveness of any assignment by any Tranche A Lender of all or any portion of its Tranche A Funding Amount, the Paying Agent shall transfer into the Tranche A Credit-Linked Sub-Account of the assignee the corresponding portion of the amount on deposit in the assignor's Tranche A Credit-Linked Sub-Account in accordance with Section 9.1(B)(i)(d).

**C.      Withdrawals From and Closing of Tranche A Credit-Linked Deposit Account**.  Each Tranche A Lender irrevocably and unconditionally agrees that its deposit in the Tranche A Credit-Linked Deposit Account shall be withdrawn and distributed (or transferred, in the case of clause (v) below) as follows:

(i)      In the event the Borrower fails to reimburse the Fronting Bank pursuant to Section 2.5F, the Paying Agent shall withdraw from the Tranche A Credit-Linked Deposit Account the amount of such unreimbursed LC Disbursement (and debit the Tranche A Credit-Linked Deposit Sub-Account of each Tranche A Lender in the amount of such Tranche A Lender's Applicable Percentage of such unreimbursed Disbursement) and make such amount available to the Fronting Bank in accordance with Section 2.5F and each of the Tranche A Funding Amount and the Tranche A LC Exposure shall be reduced by such amount.

(ii)      In the event the Borrower fails to pay when due (at stated maturity, by acceleration or otherwise) any principal of any Tranche A Loan, the Paying Agent shall withdraw from the Tranche A Credit-Linked Deposit Account (and debit each Lender's Tranche A Credit-Linked Deposit Sub-Account in the amount of) such Lender's Applicable Percentage of the

**CREDIT AGREEMENT**

amount of such principal not paid when due and the Tranche A Funding Amount shall be reduced by such amount.

(iii)     At any time and from time to time, if the Fronting Bank, in its sole discretion, directs the Paying Agent to withdraw an amount from the Tranche A Credit-Linked Deposit Account sufficient to repay all outstanding Tranche A Loans or any portion thereof, the Paying Agent shall withdraw from the Tranche A Credit-Linked Deposit Account (and debit each Lender's Tranche A Credit-Linked Deposit Sub-Account in the amount of) such Lender's Applicable Percentage of such amount so directed and the Tranche A Funding Amount shall be reduced by such amount.  Additionally, the Fronting Bank, in its sole discretion, may direct the Paying Agent to fund a Tranche A Loan directly with amounts on deposit in the Tranche A Credit-Linked Deposit Account (and such Tranche A Loan shall immediately become a Funded Tranche A Loan as set forth in clause (iv)).

(iv)     Upon the withdrawal of any amounts on deposit in the Tranche A Credit-Linked Deposit Account pursuant to clause (C)(i), (ii) or (iii), each Tranche A Lender shall be deemed to have made a loan (relative to each Tranche A Lender, its "**Funded Tranche A Loan**") to the Borrower in an amount equal to such Tranche A Lender's Applicable Percentage of the amount withdrawn from the Tranche A Credit-Linked Deposit Account.  The Borrower may elect to have Funded Tranche A Loans accrue as Eurodollar Rate Loans or Base Rate Loans as further set forth in Section 2.6D.  The Borrower may repay Funded Tranche A Loans by making deposits into the Tranche A Credit-Linked Deposit Account, which, so long as no Event of Default has occurred and is continuing, will not cause a reduction in the Tranche A Funding Amount.

(v)     Concurrently with the effectiveness of any assignment by any Tranche A Lender of all or any portion of its Tranche A Funding Amount, the corresponding portion of the assignor's Tranche A Credit-Linked Sub-Account shall be transferred from the assignor's Tranche A Credit-Linked Sub-Account to the assignee's Tranche A Credit-Linked Sub-Account in accordance with Section 9.1B and, if required by Section 9.1B, the Paying Agent shall close such assignor's Tranche A Credit-Linked Sub-Account.

(vi)     Upon the reduction of each of the Tranche A Funding Amount and the Tranche A LC Exposure to zero, the Paying Agent shall withdraw from the Tranche A Credit-Linked Deposit Account and pay to each Tranche A Lender the entire remaining amount of such Lender's Tranche A Credit-Linked Deposit, and shall close the Tranche A Credit-Linked Deposit Account.

Each Tranche A Lender irrevocably and unconditionally agrees that its Tranche A Credit-Linked Deposit may be applied or withdrawn from time to time as set forth in this Section 2.1C.

**D.**     **Deposit Earnings**.  Each of the Paying Agent, the Fronting Bank and each Tranche A Lender hereby acknowledges and agrees that (i) each Tranche A Lender is funding its Tranche A Credit-Linked Deposit to the Paying Agent for application in the manner contemplated by Sections 2.1I and 2.5F, (ii) the Paying Agent has agreed to invest the Tranche A Credit-Linked Deposits in such investments as may be determined from time to time by the Paying Agent in its discretion and (iii) the Paying Agent shall pay to the Tranche A Lenders a return on such Tranche A Credit Linked Deposit (except during periods when such Tranche A Credit-Linked Deposits are used to cover unreimbursed LC Disbursements or Tranche A Loans that have not been repaid when due (at stated maturity, by acceleration or otherwise)) equal at any time to (x) the Eurodollar Base Rate for a three-month interest period (provided, however that the initial Interest Period shall be the period commencing on the Effective Date and ending on September 29, 2006) minus (y) 10 basis points.  Such interest will be paid to the

**CREDIT AGREEMENT**

Tranche A Lenders by the Paying Agent in arrears on each day on the last day of the interest period applicable to such Tranche A Credit Linked Deposit (which corresponds to the date on which fees are due and payable to the Tranche A Lenders under Section 2.7).  Any amounts earned and received with respect to Tranche A Credit-Linked Deposits during any applicable Interest Period in excess of the Eurodollar Base Rate for the Interest Period in effect shall be for the account of the Paying Agent.  No Person other than the Paying Agent shall have any obligation under or in respect of this clause.  Notwithstanding anything to the contrary in this Agreement, the Borrower shall not be liable for any losses due to (i) the misappropriation of any Tranche A Credit-Linked Deposit or return thereon or (ii) the failure of the Paying Agent to pay a return to any Tranche A Lender (it being understood and agreed for greater certainty that this clause shall not limit any obligation of the Borrower hereunder to pay any fees pursuant to Section 2.7, repay any Tranche A Loan or Funded Tranche A Loan).  Neither the Paying Agent, the Fronting Bank nor any other Person guarantees any rate of return on the investment of any Tranche A Credit-Linked Deposit held in the Tranche A Credit-Linked Deposit Account.

      **E.**    **Sufficiency of Deposits to Provide for Tranche A Exposure**.  Notwithstanding any other provision of this Agreement, no Tranche A Loan shall be made, and no Letter of Credit shall be issued or any Stated Amount of any Letter of Credit increased, if after giving effect thereto the aggregate amount of the Tranche A Exposures would exceed the aggregate amount of the Tranche A Credit-Linked Deposits as a result of application of Tranche A Credit-Linked Deposits pursuant to paragraph 2.1(C)(i) or (ii) above.

      **F.**    **Satisfaction of Lender Funding Obligations**.  The Borrower and the Fronting Bank acknowledge and agree that, notwithstanding any other provision contained herein (but without limiting the obligations of any Tranche A Lender under Section 9.2C), (i) deposit by each Tranche A Lender in the Tranche A Credit-Linked Deposit Account on the Effective Date of funds equal to its Tranche A Funding Amount will fully discharge the obligation of such Lender to fund Loans by such Lender pursuant to Section 2.2B and to reimburse such Lender's Applicable Percentage of LC Disbursements that are not reimbursed by the Borrower pursuant to Section 2.5F, and that no other or further payments shall be required to be made by any Tranche A Lender in respect of any such funding or reimbursement obligations, and (ii) the failure of any Tranche A Lender to deposit such funds into the Tranche A Credit-Linked Deposit Account shall not release the Fronting Bank from its obligation to fund the full amount of the Tranche A Loan pursuant to the other terms of this Agreement.

      **G.**    **Security**.  Each Tranche A Lender hereby grants to the Fronting Bank a first priority security interest in such Tranche A Lender's Tranche A Credit-Linked Deposit to secure the obligations of such Tranche A Lender under Sections 2.1I and 2.5F.

      **H.**    **Fronting Bank Insecure**.  If the Fronting Bank is enjoined from taking any action referred to in Section 2.1C, or if the Fronting Bank reasonably determines that, by operation of law, it may reasonably be precluded from taking any such action, or if any Tranche A Lender challenges in any legal proceeding any of its respective acknowledgements, agreements or characterizations set forth in Section 2.1A, then, in any such case (and so long as such event or condition shall be continuing), and notwithstanding anything contained herein to the contrary, the Fronting Bank shall have the right to reduce the amount of any Tranche A Loan or issuance, renewal or extension of any Letter of  Credit by the prorata portion of such Tranche A Loan or issuance, renewal or extension of any Letter of Credit represented by the Applicable Percentage of the challenging Tranche A Lender or the Tranche A Lender affected by operation of law and also in such event the Borrower shall have the right to reduce the Tranche A Funding Amounts by the same amount for so long as such condition is in effect].  If any Loan Party challenges in any legal proceeding any of its respective acknowledgements, agreements or characterizations set forth in Section 2.1A, then, in any such case (and so long as such event or condition

**CREDIT AGREEMENT**

shall be continuing), and notwithstanding anything contained herein to the contrary, the Fronting Bank shall not be required to make any Tranche A Loan or to issue, renew or extend any Letter of Credit.

**I.**      **Reimbursement of Fronting Bank**.  If the Borrower fails to pay when due (at stated maturity, by acceleration or otherwise) any principal of any Tranche A Loan, the Fronting Bank shall direct the Paying Agent to withdraw from the Tranche A Credit-Linked Deposit Account (and debit each Tranche A Lender's Tranche A Credit-Linked Sub-Account in the amount of) such Lender's Applicable Percentage of the amount of such principal not paid when due.  Promptly following receipt by the Paying Agent of any payment from the Borrower of principal of Tranche A Loans, the Paying Agent shall distribute such payment to the Fronting Bank or, to the extent that amounts have been withdrawn from the Tranche A Credit-Linked Deposit Account to make any payment pursuant to this paragraph to the Fronting Bank, then such payment shall be deposited in the Tranche A Credit-Linked Deposit Account (and credited to each Tranche A Lender's Tranche A Credit-Linked Sub-Account in the amount of such Lender's Applicable Percentage of such deposit).  Any payment made with amounts withdrawn from the Tranche A Credit-Linked Deposit Account to pay the Fronting Bank for any defaulted principal payment shall constitute the funding by the respective Tranche A Lender of its participation in the related Tranche A Loan and shall not constitute a new Loan or relieve the Borrower of its obligation to pay such principal.

**2.2**      **Commitments; Loans**.

**A.**      **Tranche B Loans**.  Subject to the terms and conditions of this Agreement, each of the Tranche B Lenders agrees to make on the Effective Date a Loan in the amount equal to its Tranche B Loan Commitment.  The Borrower may make one borrowing under the Tranche B Loan Commitment.  As described below, the Tranche B Loans will be disbursed to the Borrower on the Effective Date for the payment of the Existing Indebtedness, Transaction Costs, to make certain distributions to holders of the Capital Stock of the Borrower as provided in Section 2.9A, with the remainder to be deposited into the Company's Operating Account for the purposes contemplated herein.  Each Tranche B Loan Commitment shall terminate immediately and without further action after giving effect to the making of the Tranche B Loans.  The proceeds of the Tranche B Loans shall be used for the purposes identified in Section 2.9A.  Tranche B Loans, once repaid or prepaid, may not be reborrowed.

**B.**      **Tranche A Loans**.

(i)      Subject to the terms and conditions of this Agreement, the Fronting Bank shall, from time to time during the Tranche A Availability Period upon receipt of a Request for Loan from the Borrower, make one or more Tranche A Loans to the Borrower in an aggregate principal amount that will not result in the total Tranche A Exposures exceeding the lesser of the aggregate balance of the Tranche A Credit-Linked Deposit Account (excluding any portion of the Tranche A  Credit-Linked Deposit Account attributable to interest) or the total Tranche A Funding Amounts, provided that the Tranche A Loan Borrowing Conditions have been satisfied.  Within the foregoing limits and subject to satisfaction of the Tranche A Loan Borrowing Conditions and the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow Tranche A Loans in accordance with the procedures set forth herein.

(ii)      By the making of a Tranche A Loan, and without any further action on the part of the Fronting Bank or the Lenders, the Fronting Bank hereby grants to each Tranche A Lender, and each Tranche A Lender hereby acquires from the Fronting Bank, a participation in such Loan equal to such Lender's Applicable Percentage of the principal amount thereof. Each Tranche A Lender acknowledges and agrees that its obligation to acquire participations pursuant to this Section in respect of Tranche A Loans is absolute and unconditional and shall not be

affected by any circumstance whatsoever, including the occurrence and continuance of a Default or, subject to Section 2.1F, reduction or termination of the Tranche A Funding Amounts.

(iii)     In consideration and in furtherance of the foregoing, each Tranche A Lender hereby absolutely and unconditionally authorizes and directs the Paying Agent to withdraw from the Tranche A Credit-Linked Deposit Account (and debit such Lender's Tranche A Credit-Linked Sub-Account in the amount of) such Lender's Applicable Percentage of the principal amount of each Tranche A Loan not paid when due (whether at stated maturity, acceleration or otherwise), or of any payment of principal of any Tranche A Loan required to be refunded to the Borrower for any reason (it being understood and agreed that each Tranche A Lender's obligations in respect of participations in Tranche A Loans shall be payable solely from, and limited to, such Lender's Tranche A Credit-Linked Deposit).

## 2.3    Disbursement Procedures for Tranche B Loans.

**A.    Disbursement Authorization**.  For the Tranche B Loans, the Borrower shall deliver to the Administrative Agent a Disbursement Authorization no later than 11:00 a.m. (New York time), at least one (1) Business Day in advance of the Effective Date. In lieu of delivering the above-described Disbursement Authorization, the Borrower may give the Administrative Agent telephonic notice by the required time of any proposed borrowing under this Section 2.3A; provided that such notice shall be promptly confirmed in writing by delivery of a Disbursement Authorization to the Administrative Agent on or before the Effective Date.  Upon Administrative Agent's receipt of the Disbursement Authorization, Administrative Agent will be fully authorized to fund the Tranche B Loans.

The Borrower shall notify the Administrative Agent prior to the funding of any Loans in the event that any of the matters to which the Borrower is required to certify in the applicable Disbursement Authorization are no longer true and correct as of the Effective Date or the requested Disbursement Date, and the acceptance by the Borrower of the proceeds of any Loans shall constitute a re-certification by the Borrower, as of the Effective Date or the requested Disbursement Date, as to the matters to which the Borrower is required to certify in the applicable Disbursement Authorization.

**B.    Disbursement Procedures for Tranche B Loans**.  The Tranche B Loans shall be made by the Lenders in the amounts of their respective Tranche B Loan Commitments, it being understood that no Lender shall be responsible for any default by any other Lender in that other Lender's obligation to make a Loan requested hereunder nor shall the Commitment of any Lender to make the particular type of Loan requested be increased or decreased as a result of a default by any other Lender in that other Lender's obligation to make a Loan requested hereunder.

Each Lender shall make the amount of its Loan available to the Administrative Agent not later than 2:00 pm (New York time) on the Effective Date in same day funds at the Funding and Payment Office.  Unless the Administrative Agent shall have received written notice to the contrary prior to the Effective Date, the Administrative Agent may assume that each Lender will fund its respective Loan Commitment and may, in reliance upon such assumption, distribute to the Borrower the amount of each such Loan Commitment.  In such event, if any Lender does not in fact fund its respective Loan Commitment, then such Lender and the Borrower severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed by the Administrative Agent to the Borrower, with interest thereon as computed in accordance with this Agreement, for each day from and including the date such amount is distributed to the Borrower to the date of payment to the Administrative Agent.

Upon satisfaction or waiver of the conditions precedent specified in Section 3.1, the Administrative Agent shall make the proceeds of the Tranche B Loans available to the Borrower on the

Effective Date by causing an amount of same day funds equal to the proceeds of all such Tranche B Loans received by the Administrative Agent from the Lenders to be credited pursuant to the terms of the Disbursement Request for payment of the Existing Indebtedness, Transaction Costs and making of certain distributions to the holders of the Capital Stock of the Borrower with the remainder to be deposited into the Company's Operating Account.

C.      **Tranche B Notes**.  The Borrower shall execute and deliver on the Effective Date to each Lender requesting the same (or to the Administrative Agent for that Lender) a Note substantially in the form of <u>Exhibit VIII</u> annexed hereto to evidence that Lender's Loan.  Any Lender not receiving a Note may request at any time that the Borrower issue it such Note on the terms set forth herein, and the Borrower agree to issue such Note promptly upon the request of a Lender.  The Notes and the Obligations evidenced thereby shall be governed by, subject to and benefit from all of the terms and conditions of this Agreement and the other Loan Documents and shall be secured by the Collateral, provided however, however, that the Register shall be determinative as to the identity of the Lenders hereunder.

## 2.4      **Disbursement Procedures for Tranche A Loans**.

A.      **Minimum Amounts**.  Each Borrowing shall be in an aggregate amount of at least $1,000,000 and any integral or multiple of $500,000 in excess of that; provided that a Base Rate Borrowing may be in an aggregate amount that is equal to the entire unused balance of the Tranche A Funding Amount.

B.      **Limitations on Interest Periods**.  The initial Interest Period for any Tranche A Loan that is a Eurodollar Rate Loan shall commence on the date of such Borrowing and expire on the date on which such Interest Period would expire pursuant to Section 2.6B.  Each successive Interest Period shall commence on the date on which the next preceding Interest Period expires.  Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request (or to elect to convert to or continue as a Eurodollar Borrowing) any Tranche A Borrowing if the Interest Period requested therefor would end after the Tranche A Maturity Date.

C.      **Requests for Borrowings**.  To request a Borrowing, the Borrower shall notify the Fronting Bank (with a copy to the Administrative Agent) of such request by telephone in the case of a Tranche A Eurodollar Borrowing or a Tranche A Base Rate Borrowing, not later than 11:00 a.m. (New York time), at least one (1) Business Day in advance of a Base Rate Borrowing and at least three (3) Business Days in advance of a Eurodollar Borrowing.  Each such telephonic request for a Tranche A Loan shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Paying Agent of a Request for Loan signed by the Borrower.   In connection with the Borrower's obligation under Section 2.5F to reimburse the Fronting Bank for each LC Disbursement on the date thereof, the Borrower shall be deemed to have furnished a timely, duly completed Request for Loan for a Tranche A Base Rate Borrowing to be made on such date, in an amount equal to the amount of such LC Disbursement, the proceeds of which shall be applied directly to such obligation.  Each telephonic request for a Tranche A Loan and written Request for Loan shall specify the following information and otherwise comply with Section 3.2:

(i)      the aggregate amount of the requested Borrowing;

(ii)      the date of such Borrowing, which shall be a Business Day;

(iii)      whether such Borrowing is to be an Base Rate Borrowing or a Eurodollar Borrowing;

(iv)     in the case of a Eurodollar Borrowing, the Interest Period therefor, which shall be a period contemplated by the definition of the term "Interest Period" and permitted under this Agreement;

(v)     the location and number of the Borrower's account to which funds are to be disbursed, which shall comply with the requirements of this Agreement and be subject to a Control Agreement in favor of the Collateral Agent; and

(vi)     evidence of Borrower's satisfaction with the Tranche A Loan Borrowing Conditions.

**D.     Failure to Elect**. If no election as to the type of a Borrowing is specified, then the requested Borrowing shall be a Base Rate Borrowing. If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Interest Period shall be one month.

**E.     Disbursement Procedures for Tranche A Loans**.  The Fronting Bank shall make each Tranche A Loan to be made by it hereunder on the date requested in the applicable Request for Loan by wire transfer of immediately available funds by 12:00 noon, New York City time, to the account of the Borrower, as designated in the Request for Loan.

## 2.5     Letters of Credit

**A.     General**.  Subject to the terms and conditions set forth herein, in addition to the Loans provided for in Section 2.2, the Borrower may request the Fronting Bank to issue, and the Fronting Bank shall issue, at any time and from time to time during the period commencing on the Effective Date and ending on the date that is 30 days prior to the Tranche A Maturity Date, one or more standby letters of credit (each, a "**Letter of Credit**") in such form as is acceptable to the Fronting Bank in its reasonable determination (including, without limitation, "auto-renewal" letters of credit); provided that the Fronting Bank shall not be under any obligation to issue any Letter of Credit if the issuance of such Letter of Credit would violate one or more policies of the Fronting Bank generally applicable to the issuance of letters of credit.  All Letters of Credit issued hereunder by the Fronting Bank shall be issued for the account of the Borrower as the named account party thereon.  Letters of Credit issued hereunder shall constitute utilization of the Tranche A Funding Amounts.

**B.     Notice of Issuance, Amendment, Renewal or Extension**.  To request the issuance of a Letter of Credit (or the amendment, renewal (other than "auto-renewal" letters of credit) or extension of an outstanding Letter of Credit), the Borrower shall hand deliver or telecopy (or transmit by electronic communication, if arrangements for doing so have been approved by the Fronting Bank) to the Fronting Bank and with a copy to the Administrative Agent (other than the Letters of Credit requested prior to the date hereof, not later than 11:00 a.m. on the fourth Business Day preceding the requested date of issuance, amendment, renewal or extension) a notice requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended, renewed or extended, and specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day), the date on which such Letter of Credit is to expire (which shall comply with Section 2.5D below), the amount of such Letter of Credit, the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit.  If requested by the Fronting Bank, the Borrower also shall submit a letter of credit application on the Fronting Bank's standard form in connection with any request for a Letter of Credit.  In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by the Borrower to, or entered into by the Borrower with, the Fronting Bank relating to any Letter of Credit, the

44

**CREDIT AGREEMENT**

terms and conditions of this Agreement shall control.  The Fronting Bank shall promptly notify the Administrative Agent of any Letters of Credit issued, amended, renewed or extended by it hereunder and shall deliver a report (in form and substance reasonably acceptable to the Administrative Agent) on the last Business Day of each month after the Effective Date detailing its letter of credit activity under this Agreement; provided that if the last Business Day of such month coincides with the end of a Fiscal Quarter, such report shall be delivered five Business Days prior to the last day of such Fiscal Quarter, and the Fronting Bank shall promptly provide an update report to the Paying Agent of any letter of credit activity under this Agreement during such five Business Day period.

C.      **Limitations on Amounts**.  A Letter of Credit shall be issued, amended, renewed or extended only if (and upon issuance, amendment, renewal or extension of each Letter of Credit the Borrower shall be deemed to represent and warrant that), after giving effect to such issuance, amendment, renewal or extension the total Tranche A LC Exposure shall not exceed $40,000,000.

D.      **Expiration Date**.  Each Letter of Credit shall expire (or provide that the Fronting Bank shall have the option to refuse to renew such Letter of Credit) at or prior to the close of business on the earlier of (i) the date twelve months (or such longer period as the Fronting Bank may agree) after the date of the issuance of such Letter of Credit (or, in the case of any renewal or extension thereof, which renewal or extension may be automatic, twelve months (or such longer period as the Fronting Bank may agree) after the then-current expiration date of such Letter of Credit, so long as such renewal or extension occurs within three months of such then-current expiration date), and (ii) the date that is five Business Days prior to the Tranche A Maturity Date.

E.      **Participations**.  By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof) by the Fronting Bank, and without any further action on the part of the Fronting Bank or the Lenders, the Fronting Bank hereby grants to each Tranche A Lender, and each Tranche A Lender hereby acquires from the Fronting Bank, a participation in such Letter of Credit equal to such Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit.  Each Tranche A Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default or, subject to Section 2.1F, reduction or termination of the Tranche A Funding Amounts.

In consideration and in furtherance of the foregoing, each Tranche A Lender hereby absolutely and unconditionally authorizes and directs the Paying Agent to withdraw from the Tranche A Credit-Linked Deposit Account (and debit such Lender's Tranche A Credit-Linked Sub-Account in the amount of) such Lender's Applicable Percentage of each LC Disbursement made by the Fronting Bank and not reimbursed by the Borrower on the date due as provided in subjection F below, or of any reimbursement payment required to be refunded to the Borrower for any reason (it being understood and agreed that each Tranche A Lender's obligations in respect of participations in Letters of Credit shall be payable solely from, and limited to, such Lender's Tranche A Credit-Linked Deposit).

F.      **Reimbursement**.  If the Fronting Bank shall make any LC Disbursement in respect of a Letter of Credit, the Borrower shall reimburse the Fronting Bank in respect of such LC Disbursement by paying to the Paying Agent an amount equal to such LC Disbursement on the date of such disbursement.

If the Borrower fails to make such payment when due and the Borrower is not entitled to make a Borrowing in the amount of such payment, the Paying Agent shall notify the Administrative Agent who will notify each Tranche A Lender of the applicable LC Disbursement, the payment then due from the Borrower in respect thereof and such Lender's Applicable Percentage thereof, and the Paying Agent shall

withdraw from the Tranche A Credit-Linked Deposit Account (and debit such Lender's Tranche A Credit-Linked Sub-Account in the amount of) such Lender's Applicable Percentage of such LC Disbursement and promptly apply such amount to make payment to the Fronting Bank.  Promptly following receipt by the Paying Agent of any payment from the Borrower pursuant to this Section 2.5F, the Paying Agent shall distribute such payment to the Fronting Bank or, to the extent that amounts have been withdrawn (and credited to each Tranche A Lender's Tranche A Credit-Linked Sub-Account in the amount of such Lender's Applicable Percentage of such deposit) from the Tranche A Credit-Linked Deposit Account to make any payment pursuant to this paragraph to reimburse the Fronting Bank, then such payment shall be deposited in the Tranche A Credit-Linked Deposit Account.  Any payment made with amounts withdrawn from the Tranche A Credit-Linked Deposit Account to reimburse the Fronting Bank for any LC Disbursement constitute the funding by the respective Tranche A Lender of its participation in the related Letter of Credit and shall not constitute a Loan or relieve the Borrower of its obligation to reimburse such LC Disbursement.

If any unreimbursed LC Disbursement resulting in a withdrawal from the Tranche A Credit-Linked Deposit Account as provided in the preceding paragraph shall be subsequently reimbursed other than on the last day of an Interest Period for Tranche A Credit-Linked Deposits, the Paying Agent shall invest the amount so reimbursed in overnight or short-term cash equivalent investments until the end of the Interest Period at the time in effect for Tranche A Credit-Linked Deposits and the Borrower shall pay to the Paying Agent, upon the Paying Agent's request therefor, the amount, if any, by which the interest accrued on a like amount of the Tranche A Credit-Linked Deposits at the Eurodollar Base Rate for such Interest Period shall exceed the interest earned through the investment of the amount so reimbursed for the period from the date of such reimbursement through the end of such Interest Period, as determined by the Paying Agent (such determination to be conclusive absent manifest error) and set forth in the request for payment delivered to the Borrower.  In the event the Borrower shall fail to pay any amount due under this paragraph, the interest payable by the Paying Agent to the Tranche A Lenders on their Tranche A Credit-Linked Deposits under Section 2.1D shall be correspondingly reduced and the Tranche A Lenders shall without further act succeed, ratably in accordance with their Applicable Percentages, to the rights of the Paying Agent with respect to such amount.

**G.**    **Obligations Absolute**.  The Borrower's obligation to reimburse LC Disbursements as provided in Section 2.5F above shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by the Fronting Bank under a Letter of Credit against presentation of a draft or other document that does not comply strictly with the terms of such Letter of Credit, and (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of the Borrower's obligations hereunder.

Neither the Paying Agent, the Tranche A Lenders nor the Fronting Bank, nor any of their Related Parties, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit by the Fronting Bank or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Fronting Bank; provided that the foregoing shall not be construed to excuse the Fronting Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law)

**CREDIT AGREEMENT**

suffered by the Borrower that are caused by the Fronting Bank's gross negligence or willful misconduct when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  The parties hereto expressly agree that:

(i)      the Fronting Bank may accept documents that appear on their face to be in substantial compliance with the terms of a Letter of Credit without responsibility for further investigation, regardless of any notice or information to the contrary, and may make payment upon presentation of documents that appear on their face to be in substantial compliance with the terms of such Letter of Credit;

(ii)     the Fronting Bank shall have the right, in its sole discretion, to decline to accept such documents and to make such payment if such documents are not in strict compliance with the terms of such Letter of Credit; and

(iii)    this sentence shall establish the standard of care to be exercised by the Fronting Bank when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof (and the parties hereto hereby waive, to the extent permitted by applicable law, any standard of care inconsistent with the foregoing).

**H.     Disbursement Procedures**.  The Fronting Bank shall, within a reasonable time following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit.  The Fronting Bank shall promptly after such examination notify the Paying Agent and the Borrower by telephone (confirmed by telecopy) of such demand for payment and whether the Fronting Bank has made or will make an LC Disbursement thereunder; provided that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the Fronting Bank and the Tranche A Lenders with respect to any such LC Disbursement.

**I.      Interim Interest**.  If the Fronting Bank shall make any LC Disbursement, then, unless the Borrower shall reimburse (including through a Borrowing of Tranche A Loans) such LC Disbursement in full on the date such LC Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Borrower reimburses such LC Disbursement, as provided in Section 2.6A and Section 2.6E. Interest accrued pursuant to this paragraph shall be for the account of the Fronting Bank, except that interest accrued on and after the date of payment from the Tranche A Credit-Linked Deposit of any Tranche A Lender to reimburse the Fronting Bank shall be for the account of such Tranche A Lender to the extent of such payment.

**2.6     <u>Interest on the Loans</u>**.

**A.     Rate of Interest**.  Subject to the provisions of Sections 2.10 and 2.11, each Loan shall bear interest on the unpaid principal amount thereof from the date made to maturity (whether by acceleration or otherwise) at a rate determined by reference to the Base Rate or the Reserve Adjusted Eurodollar Rate, as the case may be.  The Tranche B Loans shall be made as Base Rate Loans as of the Effective Date  (it being understood that Tranche B Loans may be converted to Eurodollar Rate Loans after the Effective Date in accordance with Section 2.6D). If on any day any Loan is outstanding with respect to which notice has not been delivered to the Administrative Agent in accordance with the terms of this Agreement specifying the applicable basis for determining the rate of interest, then for that day that Loan shall bear interest determined by reference to the Base Rate.  Subject to the provisions of Sections 2.10 and 2.11 and in addition to the fees payable under Section 2.7 hereof, the Loans shall bear interest through maturity as follows:

**CREDIT AGREEMENT**

(i)      if a Base Rate Loan, then at the Base Rate <u>plus</u> the Applicable Base Rate Margin; or

(ii)     if a Eurodollar Rate Loan, then at the Reserve Adjusted Eurodollar Rate for the relevant Interest Period <u>plus</u> the Applicable Eurodollar Rate Margin.

**B.**      **Interest Periods**.  In connection with each Eurodollar Rate Loan, the Borrower may, pursuant to the applicable Notice of Conversion/Continuation select an interest period (each an "**Interest Period**") to be applicable to such Loan, which Interest Period shall be, at the Borrower's option, either a one (1), two (2), three (3) or six (6) month period; provided that:

(i)      the initial Interest Period for any Eurodollar Rate Loan shall commence on the date specified in the applicable Notice of Conversion/Continuation, in the case of a Loan converted to a Eurodollar Rate Loan;

(ii)     in the case of immediately successive Interest Periods applicable to a Eurodollar Rate Loan continued as such pursuant to a Notice of Conversion/Continuation, each successive Interest Period shall commence on the day on which the next preceding Interest Period expires;

(iii)    if an Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; provided that, if any Interest Period would otherwise expire on a day that is not a Business Day but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day;

(iv)    any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (v) of this Section 2.6B, end on the last Business Day of a calendar month;

(v)     no Interest Period with respect to any portion of the Loans shall extend beyond the Maturity Date for such Loans;

(vi)    the Borrower may not select an Interest Period of longer than one (1) month prior to the end of the period commencing on and including the Effective Date and ending on the earlier of (a) the date on which the Administrative Agent notifies the Borrower that it has concluded its primary syndication of the Loans and the Commitments, and (b) the date which is six (6) months following the Effective Date;

(vii)   there shall be no more than ten (10) Interest Periods outstanding at any time;

(viii)  with respect to a conversion, in the event the Borrower fail to specify an Interest Period for any Eurodollar Rate Loan in the applicable Notice of Conversion/Continuation, the Borrower shall be deemed to have selected an Interest Period of one (1) month; and

(ix)    with respect to a continuation, in the event the Borrower fail to specify an Interest Period for any Eurodollar Rate Loan in the applicable Notice of Conversion/Continuation, the Eurodollar Rate Loan shall automatically be converted to a Base Rate Loan.

**CREDIT AGREEMENT**

C.    **Interest Payments**.  Subject to the provisions of Section 2.6E below, (i) interest on each Eurodollar Loan shall be payable in arrears on each Interest Payment Date applicable to that Loan and (ii) interest on each Base Rate Loan shall be payable in arrears on the Interest Payment Date, and (iii) except with respect to Tranche A Loans that are Base Rate Loans, which is payable pursuant to (ii) above, interest on any Loan shall be payable upon any prepayment of that Loan (to the extent accrued on the amount being prepaid) and at maturity (including final maturity, by acceleration or otherwise).  In each case, with respect to interest payable under this Section 2.6, with respect to Tranche A Loans, such interest shall be payable to the Paying Agent for the account of the Tranche A Lenders, except if the Fronting Bank shall make Tranche A Loans or LC Disbursements that are not reimbursed from the Tranche A Credit-Linked Deposits or by the Borrower, then from and after the date of the making of such Tranche A Loan or LC Disbursement, such interest shall accrue for the account of the Fronting Bank.

D.    **Conversion or Continuation**.  Subject to the provisions of Section 2.10, the Borrower shall have the option:  (i) to convert at any time all or any part of its outstanding Loans equal to $1,000,000 and integral multiples of $500,000 in excess of that amount from Loans bearing interest at a rate determined by reference to one basis to Loans bearing interest at a rate determined by reference to an alternative basis; provided, however, that a Eurodollar Rate Loan may only be converted into a Base Rate Loan on the expiration date of an Interest Period applicable thereto; or (ii) upon the expiration of any Interest Period applicable to a Eurodollar Rate Loan, to continue all or any portion of such Loan equal to $1,000,000 and integral multiples of $500,000 in excess of that amount as a Eurodollar Rate Loan.

The Borrower shall deliver a Notice of Conversion/Continuation to the Administrative Agent no later than 11:00 a.m. (New York time) at least one (1) Business Day in advance of the proposed conversion date (in the case of a conversion to a Base Rate Loan), and at least three (3) Business Days in advance of the proposed conversion/continuation date (in the case of a conversion to, or a continuation of, a Eurodollar Rate Loan).  A Notice of Conversion/Continuation shall specify (i) the proposed conversion/continuation date (which shall be a Business Day), (ii) the amount and type of the Loan to be converted/continued, (iii) the nature of the proposed conversion/continuation, (iv) in the case of a conversion to, or a continuation of, a Eurodollar Rate Loan, the requested Interest Period, and (v) in the case of a conversion to, or a continuation of, a Eurodollar Rate Loan, that no Default or Event of Default has occurred and is continuing.   In lieu of delivering the above-described Notice of Conversion/Continuation, the Borrower may give the Administrative Agent irrevocable telephonic notice by the required time of any proposed conversion/continuation under this Section 2.6D; provided that such notice shall be promptly confirmed in writing by delivery of a Notice of Conversion/Continuation to the Administrative Agent on or before the proposed conversion/continuation date.

Neither the Administrative Agent nor any Lender shall incur any liability to the Borrower in acting upon any telephonic notice referred to above that the Administrative Agent believes in good faith to have been given by a duly authorized officer or other Person authorized to act on behalf of the Borrower or for otherwise acting in good faith under this Section 2.6D, and upon conversion or continuation of the applicable basis for determining the interest rate with respect to any Loans in accordance with this Agreement pursuant to any such telephonic notice, the Borrower shall have effected a conversion or continuation, as the case may be, hereunder.

Except as otherwise provided in Sections 2.10B, 2.10C and 2.10G, a Notice of Conversion/Continuation for conversion to, or continuation of, any Eurodollar Rate Loan (or telephonic notice in lieu thereof) shall be irrevocable, and the Borrower shall be bound to effect a conversion or continuation in accordance therewith.

E.    **Post-Default Interest**.  Upon the occurrence and during the continuation of any Event of Default, if requested by the Requisite Lenders, the outstanding principal amount of all Loans and, to the

extent permitted by applicable law, any interest payments thereon not paid when due and any fees and other amounts then due and payable hereunder, shall thereafter bear interest (including post-petition interest in any proceeding under the Bankruptcy Code, or other applicable bankruptcy or insolvency laws) payable upon demand at a rate that is 2% per annum in excess of the interest rate otherwise payable under this Agreement with respect to the applicable Loans (or, in the case of any such fees and other amounts, at a rate which is 2% per annum in excess of the interest rate otherwise payable under this Agreement for Loans bearing interest at a rate determined by reference to the Base Rate); provided that, in the case of Eurodollar Rate Loans, upon the expiration of the Interest Period in effect at the time any such increase in interest rate is effective such Eurodollar Rate Loans shall thereupon become Base Rate Loans and shall thereafter bear interest payable upon demand at a rate equal to 2% per annum in excess of the interest rates otherwise payable under this Agreement for Base Rate Loans.  Payment or acceptance of the increased rates of interest provided for in this Section 2.6E is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Lender.

  **F.**  **Computation of Interest**.  Interest on Loans shall be computed on the basis of a 360-day year (a 365 or 366-day year, as applicable, in the case of Base Rate Loans based on the Prime Rate) and for the actual number of days elapsed in the period during which it accrues.  In computing interest on any Loan, the date of the making of such Loan or the first day of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted from a Eurodollar Rate Loan, the date of conversion of such Eurodollar Rate Loan to such Base Rate Loan, as the case may be, shall be included, and the date of payment of such Loan or the expiration date of an Interest Period applicable to such Loan or, with respect to a Base Rate Loan being converted to a Eurodollar Rate Loan, the date of conversion of such Base Rate Loan to such Eurodollar Rate Loan, as the case may be, shall be excluded; provided that if a Loan is repaid on the same day on which it is made, one day's interest shall be paid on that Loan.

  **G.**  **Rate Increase Maximum Net Indebtedness.**

   In the event that, as of any Calculation Date, the aggregate consolidated amount of Indebtedness (excluding Intercompany Subordinated Debt and the Bahamas Intercompany Indebtedness) of the Borrower, its Subsidiaries and the Bahamas Owner as of the Calculation Date less the aggregate amount of Cash Collateral and Cash and Cash Equivalents held by the Borrower, its Subsidiaries and the Bahamas Owner (the "Rate Increase Maximum Net Indebtedness") shall exceed the following amounts (shown in thousands):

| Fiscal Quarter ending | Rate Increase Maximum Net Indebtedness |
|---|---|
| After the Effective Date and on or prior to June 30, 2006 | $650,000 |
| September 30, 2006 | $650,000 |
| December 31, 2006 | $500,000 |
| March 31, 2007 | $400,000 |
| June 30, 2007 | $350,000 |
| September 30, 2007 | $350,000 |
| December 31, 2007 | $300,000 |
| March 31, 2008 | $300,000 |
| June 30, 2008 | $300,000 |
| September 30, 2008 | $300,000 |
| December 31, 2008 | $300,000 |
| Thereafter | N/A |

         **CREDIT AGREEMENT**

but such amount is less than the Maximum Net Indebtedness, the Applicable Base Rate Margin, in the case of Base Rate Loans and the Applicable Eurodollar Rate Margin, in the case of Eurodollar Rate Loans, shall increase by 0.25%, provided, however that the maximum cumulative amount of all such increases shall be 0.50% such that the maximum Applicable Base Rate Margin shall in no event exceed 2.50% and the maximum Applicable Eurodollar Rate Margin shall in no event exceed 3.50%.  Such increased rate of interest shall apply from and including the Calculation Date on which it is determined that the preceding sentence shall apply to but excluding the Calculation Date on which it is determined that the next succeeding sentence shall apply and on such a subsequent Calculation Date, such increased rate of interest shall be reduced as set forth in the next succeeding sentence. If, as of any subsequent Calculation Date, the aggregate consolidated amount of Indebtedness (excluding Intercompany Subordinated Debt and the Bahamas Intercompany Indebtedness) of the Borrower, its Subsidiaries and the Bahamas Owner less the aggregate amount of Cash Collateral and Cash and Cash Equivalents held by the Borrower, its Subsidiaries and the Bahamas Owner is less than the Rate Increase Maximum Net Indebtedness specified for the applicable period in the table above, the Applicable Base Rate Margin, in the case of Base Rate Loans and the Applicable Eurodollar Rate Margin, in the case of Eurodollar Rate Loans, shall decrease to such applicable rates as set forth on Annex A attached hereto.  Notwithstanding anything to the contrary contained in this Agreement, in no event shall this Section 2.6G apply from and after January 1, 2009.

**2.7**   **Fees**.  The Borrower agrees to pay the following fees:

    **A.**   **Tranche A Credit-Linked Deposits**.  The Borrower agrees to pay to the Paying Agent on behalf of the Tranche A Lenders on a quarterly basis on the last Business Day of each Fiscal Quarter ending in March, June, September and December of each Fiscal Year (provided, however that the initial Interest Period shall be the period commencing on the Effective Date and ending on September 29, 2006) for the account of each Tranche A Lender a fee, accruing (subject to Section 2.6E) at the rate of 3.00% on the positive difference between (i) the daily amount of the Tranche A Credit-Linked Deposit of such Tranche A Lender based upon such Tranche A Lender's Tranche A Funding Amount and (ii) the principal amount of the Tranche A Loans outstanding during such period and held by Tranche A Lenders and not by the Fronting Bank in its capacity as such plus the principal amount of LC Disbursements reimbursed to the Fronting Bank from the Tranche A Credit-Linked Deposits during the period from and including the Effective Date to but excluding the date on which each of the Tranche A Funding Amounts of all of the Tranche A Lenders and the Tranche A LC Exposure have been reduced to zero.  In addition, the Borrower agrees to pay to the Paying Agent for the account of each Tranche A Lender an additional amount, accruing at the rate of 0.10% per annum, on the positive difference between (i) the daily amount of the Tranche A Credit-Linked Deposit of such Tranche A Lender based upon such Tranche A Lender's Tranche A Funding Amount and (ii) the principal amount of the Tranche A Loans outstanding during such period and held by Tranche A Lenders and not by the Fronting Bank in its capacity as such plus the principal amount of LC Disbursements reimbursed to the Fronting Bank from the Tranche A Credit-Linked Deposits during the period from and including the Effective Date hereof to but excluding the date on which each of the Tranche A Funding Amounts of all of the Tranche A Lenders and the Tranche A LC Exposure have been reduced to zero.  Fees and other amounts under this paragraph accrued to but excluding the Interest Payment Date shall be payable on such Interest Payment Date, and on the date on which each of the Tranche A Funding Amounts of all of the Tranche A Lenders and the Tranche A LC Exposure have been reduced to zero.  All fees payable under this paragraph shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The foregoing commitment fees shall be payable in arrears on the last Business Day in each of March, June, September and December of each year, commencing on June 30, 2006.

**CREDIT AGREEMENT**

**B.     Other Fees**.  The Borrower agrees to pay to the Administrative Agent, the Collateral Agent and the Paying Agent, for their own respective accounts, fees payable in the amounts and at the times separately agreed upon in writing between the Borrower and each of the Administrative Agent, the Collateral Agent and the Paying Agent.

**C.     General**.  All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the Paying Agent (or to the Fronting Bank, in the case of fees payable to it) for distribution, in the case of fees payable under Section 2.7A, to the Lenders entitled thereto.  Fees paid shall not be refundable under any circumstances.

## 2.8     Repayments and Prepayments; General Provisions Regarding Payments; Call Protection.

**A.**     Scheduled Payments of Loans.

The Borrower shall make principal payments on the Tranche B Loans in installments in amounts equal to a percentage of the Tranche B Loans funded on the Effective Date as set forth below and on the dates set forth below:

| DATE | AMORTIZATION SCHEDULE |
|------|----------------------|
| September 30, 2006<br>December 31, 2006 | .25%<br>.25% |
| March 31, 2007<br>June 30, 2007<br>September 30, 2007<br>December 31, 2007 | .25%<br>.25%<br>.25%<br>.25% |
| March 31, 2008<br>June 30, 2008<br>September 30, 2008<br>December 31, 2008 | .25%<br>.25%<br>.25%<br>.25% |
| March 31, 2009<br>June 30, 2009<br>September 30, 2009<br>December 31, 2009 | .25%<br>.25%<br>.25%<br>.25% |
| March 31, 2010<br>June 30, 2010<br>September 30, 2010<br>December 31, 2010 | .25%<br>.25%<br>.25%<br>.25% |
| March 30, 2011 | .25% |
| Maturity Date | Remaining Principal (after giving effect to any voluntary or mandatory prepayments in accordance with Section 2.8C) |

If any of the dates above are not a Business Day, then the applicable installment shall be made on the preceding Business Day. Any voluntary or mandatory prepayments of the Loans in accordance with Section 2.8B shall be applied to the next succeeding scheduled installment of

**CREDIT AGREEMENT**

principal of the Tranche B Loans set forth above, with any remaining prepayment amount applied to the next following scheduled installment or installments until the full amount of the prepayment has been applied. The final installment on the Maturity Date specified above for the repayment by the Borrower of the Loans shall be in an amount sufficient to repay all amounts owing by the Borrower under this Agreement with respect to the Loans.

**B.     Prepayments**.

(i)     Voluntary Prepayments.

(a)     The Borrower may at any time and from time to time prepay, without premium or penalty, the Loans on any Business Day in whole or in part in an aggregate minimum amount of $1,000,000 and integral multiples of $500,000 in excess of that amount or such lesser amount as is then outstanding; provided, however, that in the event the Borrower elects to prepay a Eurodollar Rate Loan other than on the expiration of the Interest Period applicable thereto, the Borrower shall, at the time of such prepayment, also pay any amounts payable under Section 2.10D hereof.  The Borrower shall notify the Administrative Agent, in writing or by telephone, promptly confirmed in writing to the Administrative Agent, no later than 11:00 a.m. (New York time) at least one (1) Business Day prior to such prepaying.  The Administrative Agent will promptly notify each Lender upon receipt of such notice from the Borrower.  Any notice of prepayment shall be irrevocable and having been given as aforesaid, the Loans shall become due and payable on the prepayment date specified in such notice and in the aggregate principal amount specified therein, provided, however that the Borrower may revoke any such notice of prepayment if conditioned upon a refinancing as described in Section 2.8D below.  Any voluntary prepayments pursuant to this Section 2.8B(i) shall be applied as specified in Section 2.8C, provided, however that in connection with any voluntary prepayments by the Borrower pursuant to this Section 2.8B(i), such voluntary prepayments shall be applied first to Base Rate Loans to the full extent thereof before application to Eurodollar Rate Loans, in each case, in a manner that minimizes the amount of any payments required to be made by the Borrower pursuant to Section 2.10.

(b)     <u>Call Protection</u>. In the event that the Tranche B Loans are repaid or prepaid pursuant to Sections 2.8B(i) or 2.8B(ii) hereof, on or prior to June 30, 2007, the Borrowers shall pay to the Lenders a prepayment premium in the amount of 1.0% of the principal amount repaid or prepaid.  For the avoidance of doubt, such prepayment premium shall not be payable in connection with the repayment or Tranche A Loans.

(ii)     Mandatory Prepayments.

The Tranche B Loans shall be prepaid in the manner provided in Section 2.8C upon the occurrence of the following circumstances:

(a)     <u>Prepayments Due to Issuance of Debt</u>.  Concurrently with and as a condition to the closing of any transaction pursuant to which Borrower or any of its Subsidiaries issue debt Securities or incur additional borrowed Indebtedness (other than Indebtedness permitted under Section 6.1 for which no prepayment shall be required), the Borrower shall prepay the Loans in an amount equal to the sum of (i) the principal amount of such debt Securities or borrowed Indebtedness paid or payable to the Borrower or its Subsidiaries; less (ii) Permitted Transaction Costs.  Such prepayment shall not be deemed to waive any violation of Section 6.1 hereof.

**CREDIT AGREEMENT**

(b)     <u>Prepayments Due to Issuance of Equity Securities or Intercompany Subordinated Debt</u>.  Concurrently with and as a condition to the closing of any transaction pursuant to which the Borrower or any of its Subsidiaries receive any Equity Proceeds or proceeds of Intercompany Subordinated Debt, the Borrower shall prepay the Loans in an aggregate amount equal to 50% of such Equity Proceeds, provided, however that any Equity Proceeds or proceeds of Intercompany Subordinated Debt received by (i) the Borrower from Investments made, from time to time, by the existing holders of the Capital Stock in the Borrower as of the Effective Date or (ii) the Borrower's wholly-owned Subsidiaries from Investments made by the Borrower or another of its Subsidiaries in such Subsidiaries and permitted under Section 6.3, in each case, may be retained by the Borrower or such Subsidiary, provided, however that such Equity Proceeds or proceeds from Intercompany Subordinated Debt are used for (A) Project Expenses or Bahamas Project Expenses in a manner consistent with the Project Projections, (B) for purposes of purchasing additional Real Property Collateral to the extent designated in an Officer's Certificate by a Responsible Officer of the Borrower to be used for such purpose, which purchase shall occur prior to one calendar year following the date of such Investment and which Real Property Collateral will be pledged as collateral to secure the Borrower's and its Subsidiaries' Obligations hereunder as required by Section 5.13 hereof, or (C) for purposes of making voluntary prepayments in accordance with Section 2.8B(i) hereof.

(c)     <u>Prepayments Due to Insurance and Condemnation Proceeds</u>.  No later than the fifth (5th) Business Day following the date of receipt by the Borrower or any of its Subsidiaries of any cash payments which exceed $5,000,000 (i) under any insurance policy as a result of any damage to or loss of (a "**Casualty**") all or any portion of the Collateral (the "**Insurance Proceeds**"), or (ii) resulting from the taking of assets by the power of eminent domain, condemnation or otherwise (net of actual and documented reasonable costs incurred by the Borrower or any of its Subsidiaries in connection with adjustment and settlement thereof, "**Condemnation Proceeds**") (any such event resulting in the recovery of Insurance Proceeds or Condemnation Proceeds, a "**Recovery Event**"), the Borrower shall prepay the Loans in an amount equal to the Insurance Proceeds or Condemnation Proceeds, as the case may be, received, unless, in each case, the Borrower shall have delivered a Reinvestment Notice.  Concurrently with any prepayment of Loans pursuant to this Section 2.8B(ii)(c), the Borrower shall deliver to the Administrative Agent an Officer's Certificate demonstrating in reasonable detail the derivation of the Insurance Proceeds or Condemnation Proceeds, as the case may be, of the correlative Recovery Event.

(d)     <u>Prepayments from Excess Cash Flow</u>.  In the event that there shall be Excess Cash Flow with respect to any Fiscal Quarter, the Borrower shall, no later than the date upon which the Borrower is required to deliver financial statements under Section 5.3(ii) and (iii) with respect to such Fiscal Quarter, prepay the Loans in an aggregate amount equal to 100% of such Excess Cash Flow provided that, at the point at which such prepayment of Excess Cash Flow results in the occurrence of the Trigger Date Events on such date, such prepayment obligations shall be reduced to 50% of such Excess Cash Flow.

(e)     <u>Prepayments Due to Asset Sales</u>.  Concurrently with the consummation of any Asset Sale (except with respect to Permitted Collateral Asset Sales or Required Releases to the extent the proceeds thereof constitute Excess Cash Flow), the Borrower shall prepay the Loans in an amount equal to the sum of (i) the proceeds of such Asset Sale; less (ii) Permitted Transaction Costs.  Such prepayment shall not be deemed to waive any violation of Section 6.8 hereof.

Any Lender may elect, by notice in writing to the Administrative Agent or by telephone (confirmed by facsimile) at least seven (7) Business Days prior to the applicable prepayment date,

to decline such Lender's portion of such mandatory prepayment. Failure of any Lender to provide such notice to decline shall be deemed an election by such Lender to accept its portion of such mandatory prepayment. In the event one or more Lenders elect to decline to accept such mandatory prepayment, the aggregate amount of the mandatory prepayment that would have been applied to prepay the Loans but was so declined shall be re-offered to those Lenders under this Agreement who initially accepted (or were deemed to have accepted) such mandatory prepayment (such re-offer to be made to each such Lender based on the percentage which such Lender's Loans represents of the aggregate Loans of all such Lenders who have initially accepted such prepayment). In the event of such a re-offer, the relevant Lenders may elect, by notice in writing to the Administrative Agent or by telephone (confirmed by facsimile) within two (2) Business Days of receiving notification of such re-offer, to decline all of the amount of such prepayment that is re-offered to them, in which case the aggregate amount of the mandatory prepayment that would have been applied to prepay such Loans pursuant to such re-offer but was so declined shall be retained by the Borrowers to be used for any other purpose not prohibited by this Agreement (including without limitation distributions or repayment of Intercompany Subordinated Debt to the Permitted Holders if permitted or voluntary prepayments pursuant to Section 2.8B(i)).

In connection with any mandatory prepayments by the Borrower of the Tranche B Loans pursuant to Section 2.8B(ii) such prepayments shall be applied on a pro rata basis to the then outstanding Tranche B Loans being prepaid irrespective of whether such outstanding Tranche B Loans are Base Rate Loans or Eurodollar Rate Loans; provided that if no Lenders exercise the right to waive a given mandatory prepayment of the Term Loans pursuant to Section 2.8B(ii) then, with respect to such mandatory prepayment, the amount of such mandatory prepayment shall be applied first to Tranche B Loans that are Base Rate Loans to the full extent thereof before application to Tranche B Loans that are Eurodollar Rate Loans in a manner that minimizes the amount of any payments required to be made by the Borrower pursuant to Section 2.10.

(iii)     No Waiver. Nothing contained in Section 2.8B(ii) shall be deemed to permit the Borrower to consummate any Asset Sale unless otherwise permitted under this Agreement.

**C.     Application of Prepayments**.

Each payment received by Collateral Agent or Administrative Agent from the Borrower with respect to the Loans shall be applied in the following order: First, any prepayment premiums; second, to the payment of any late charges due and payable hereunder; third, to the repayment of any amounts advanced by Collateral Agent in accordance with the Mortgages or any of the Collateral Documents for insurance premiums, taxes, assessments or for preservation or protection of the Collateral and to the payment of all costs and expenses incurred by Collateral Agent in connection with the collection of the Loans (including all reasonable attorneys' fees payable hereunder); fourth, to the payment of accrued and unpaid interest; fifth, to fund any reserves or escrows required by Collateral Agent in accordance with the terms of the Mortgages or any of the Collateral Documents; sixth, to payment of any Eurodollar breakage costs incurred by Lenders on account of such payment; seventh, to reduction of the outstanding principal balance of the Tranche A Loans; and eighth, to the reduction of the outstanding principal balance of the Tranche B Loans (provided that any outstanding principal balance under the Tranche A Loans has been paid in full). All such funds shall be deposited into the Company's Operating Account to be used for the purposes provided by this Agreement. Notwithstanding the foregoing, (A) if an Event of Default has occurred and is continuing, Collateral Agent may apply any payments received in such order or proportion as Collateral Agent, in Collateral Agent's sole discretion, may determine, and (B) as among the Lenders, such payments shall be applied in accordance with Section 2.8D(iii) below.

**D.      General Provisions Regarding Payments**.

(i)      <u>Manner and Time of Payment</u>.  All payments by the Borrower of principal, interest, fees and other Obligations hereunder and under the Notes shall be made in same day funds and without defense, setoff or counterclaim, free of any restriction or condition, and delivered to the Administrative Agent or the Paying Agent, as the case may be, not later than 2:00 pm (New York time) on the date due at the Funding and Payment Office for the account of the Lenders; funds received by the Administrative Agent or the Paying Agent, as the case may be, after that time on such due date shall, at the Administrative Agent's or Paying Agent's sole discretion, be deemed to have been paid by the Borrower on the next succeeding Business Day. The Borrower hereby authorizes the Administrative Agent to charge its account with the Administrative Agent in order to cause timely payment to be made to the Administrative Agent or the Paying Agent, as the case may be, of all principal, interest, fees and expenses due hereunder (subject to sufficient funds being available in its accounts for such purpose). Unless the Administrative Agent or the Paying Agent, as the case may be, shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent or the Paying Agent, as the case may be, for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent or the Paying Agent, as the case may be, may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent or the Paying Agent, as the case may be, forthwith on demand the amount so distributed to such Lender, with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent or the Paying Agent, as the case may be, at the greater of the Base Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(ii)      <u>Application of Payments to Principal, Interest, Prepayment Premiums and Breakage Costs</u>.  Except as provided in Section 2.6C, all payments in respect of the principal amount of any Loan shall include payment of accrued interest, prepayment premiums and Eurodollar breakage costs, if any, on the principal amount being repaid or prepaid, and all such payments (and in any event any payments made in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest, prepayment premiums and Eurodollar breakage costs, if any, before application to principal.

(iii)      <u>Apportionment of Payments</u>.  The aggregate principal, prepayment fees and interest payments shall be apportioned among all outstanding Loans to which such payments relate, in each case proportionately to the Lenders' respective Pro Rata Shares.  The Administrative Agent shall promptly distribute to each Lender, at its applicable Lender Office, its Pro Rata Share of all such payments received by the Administrative Agent and the commitment fees of such Lender when received by the Administrative Agent pursuant to Section 2.7. Notwithstanding the foregoing provisions of this Section 2.8D(iii) if, pursuant to the provisions of Section 2.10C, any Notice of Conversion/Continuation is withdrawn as to any Affected Lender or if any Affected Lender makes Base Rate Loans in lieu of its Pro Rata Share of any Eurodollar Rate Loans, the Administrative Agent shall give effect thereto in apportioning payments received thereafter.

(iv)      <u>Payments on Business Days</u>.  Except if expressly provided otherwise, whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time

56

**CREDIT AGREEMENT**

shall be included in the computation of the payment of interest hereunder or of the commitment fees hereunder, as the case may be.

(v)     Notation of Payment.  Each Lender agrees that before disposing of any Note held by it, or any part thereof (other than by granting participations therein), that Lender will make a notation thereon of all Loans evidenced by that Note and all principal payments previously made thereon and of the date to which interest thereon has been paid; provided that the failure to make (or any error in the making of) a notation of any Loan made under such Note shall not limit or otherwise affect such disposition or the obligations of the Borrower hereunder or under such Note with respect to any Loan or any payments of principal or interest on such Note.  In the event of Borrower's satisfaction and repayment in full of the Obligations hereunder, each Lender shall surrender to Borrower any and all Notes held by it.

(vi)     Revocation of Prepayment Notices.  Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment under Section 2.8(B) if such prepayment would have resulted from a refinancing of the Loans, which refinancing shall not be consummated or shall otherwise be delayed.

## E.     Application of Proceeds of Collateral.

(i)     Application of Proceeds of Collateral.  Except as provided in Section 2.8B(ii) with respect to prepayments, all proceeds received by the Collateral Agent after an Event of Default or as a result of exercising remedies under the Loan Documents, in respect of any sale of, collection from, or other realization upon all or any part of the Collateral under any Collateral Document may, in the discretion of the Collateral Agent, be held by the Collateral Agent as Collateral for, and/or (then or at any time thereafter) applied in full or in part by the Administrative Agent against, the applicable Secured Obligations (as defined in such Collateral Document) in the following order of priority:

(a)     to the payment of all costs and expenses of such sale, collection or other realization, including, without limitation, reasonable compensation to the Agents and their agents and counsel, and all other reasonable expenses, liabilities and advances made or incurred by the Agents in connection therewith, and all amounts for which such Agents are entitled to indemnification under such Collateral Document and all advances made by the Collateral Agent thereunder for the account of the applicable Loan Party (excluding principal and interest in respect to any Loans of such Loan Party), and to the payment of all reasonable costs and expenses paid or incurred by the Collateral Agent in connection with the exercise of any right or remedy under such Collateral Document, all in accordance with the terms of this Agreement and such Collateral Document;

(b)     thereafter, to the extent of any excess proceeds, to the payment of all other Secured Obligations (as defined in the Security Agreement), including any Secured Obligations related to Hedge Agreements; and

(c)     thereafter, to the extent of any excess proceeds, to the payment to or upon the order of such Loan Party or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

**2.9**     **Use of Proceeds**.

    **A.**     **Tranche B Loans**.  The proceeds of the Tranche B Loans made to the Borrower shall be applied, together with the proceeds of the loans made pursuant to the Second Lien Credit Agreement, (i) to repay the Existing Indebtedness of the Borrower, its Subsidiaries and Bahamas Owner, (ii) to make certain distributions to the holders of Capital Stock in the Borrower in the amount of the $333,125,000, and (iii) to pay the Transaction Costs.

    **B.**     **Tranche A Loans**.  The proceeds of the Tranche A Loans made to the Borrower shall be applied to fund Project Expenses and Bahamas Project Expenses and for general company and working capital needs of the Borrower, its Subsidiaries and Bahamas Owner in a manner consistent with the Project Projections.

    **C.**     **Compliance With Laws**.  The Borrower undertakes that no portion of the proceeds of any Loans or other extensions of credit under this Agreement shall be used by any Loan Party in any manner which would be illegal under, or which would cause the invalidity or unenforceability (in each case in whole or in part) of any Loan Document under, any applicable law.

    **D.**     **Margin Regulations**.  Without limiting the generality of Section 2.9A and B, no portion of the proceeds of any borrowing under this Agreement shall be used by the Borrower or any of its Subsidiaries in any manner that might cause the borrowing or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation of such Board or to violate the Exchange Act, in each case as in effect on the date or dates of such borrowing and such use of proceeds.

**2.10**     **Special Provisions Governing Eurodollar Rate Loans**.

    Notwithstanding any other provision of this Agreement to the contrary, the following provisions shall govern with respect to Eurodollar Rate Loans as to the matters covered:

    **A.**     **Determination of Applicable Interest Rate**.  As soon as practicable after 11:00 A.M. (New York time) on each Interest Rate Determination Date, the Administrative Agent shall determine (which determination shall, absent manifest error, be final, conclusive and binding upon all parties) the interest rate that shall apply to the Eurodollar Rate Loans for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to the Borrower and each Lender.

    **B.**     **Inability to Determine Applicable Interest Rate**.  In the event that the Administrative Agent shall have reasonably determined (which determination shall be final and conclusive and binding upon all parties hereto), on any Interest Rate Determination Date with respect to any Eurodollar Rate Loans, that by reason of circumstances arising after the date of this Agreement affecting the London interbank market, adequate and fair means do not exist for ascertaining the interest rate applicable to such Loans on the basis provided for in the definition of Reserve Adjusted Eurodollar Rate, the Administrative Agent shall, on such date, give notice (by telecopy or by telephone confirmed in writing) to the Borrower and each Lender of such determination, whereupon (i) no Loans may be made or continued as, or converted to, Eurodollar Rate Loans, until such time as the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist (such notification not to be unreasonably withheld or delayed) and (ii) any Disbursement Authorization or Notice of Conversion/Continuation given by the Borrower with respect to the Loans in respect of which such determination was made shall be deemed to be rescinded by the Borrower; provided, however that, at the option of the Borrower, any such Disbursement Authorization may be re-submitted to the Administrative

58

**CREDIT AGREEMENT**

Agent indicating that the Borrower is electing a Base Rate Loan, which Loan shall be funded no later than one (1) Business Day after the date of such Base Rate Loan Disbursement Authorization.

**C.      Illegality or Impracticability of Eurodollar Rate Loans**.  In the event that on any date any Lender shall have reasonably determined (which determination shall be final and conclusive and binding upon all parties hereto but shall be made only after consultation with the Borrower and the Administrative Agent) that the making, maintaining or continuation of its Eurodollar Rate Loans (i) has become unlawful as a result of compliance by such Lender in good faith with any law, treaty, governmental rule, regulation, guideline or order (or would conflict with any such treaty, governmental rule, regulation, guideline or order not having the force of law even though the failure to comply therewith would not be unlawful) or (ii) has become impracticable, or would cause such Lender material hardship, as a result of contingencies occurring after the date of this Agreement which materially and adversely affect the London interbank market, then, and in any such event, such Lender shall be an "**Affected Lender**" and it shall on that day give notice (by telecopy or by telephone confirmed in writing) to the Borrower and the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each other Lender).  Thereafter (a) the obligation of the Affected Lender to make Loans as, or to convert Loans to, Eurodollar Rate Loans, shall be suspended until such notice shall be withdrawn by the Affected Lender, (b) to the extent such determination by the Affected Lender relates to a Eurodollar Rate Loan then being requested by the Borrower pursuant to the Disbursement Authorization or a Notice of Conversion/Continuation, the Affected Lender shall make such Loan as (or convert such Loan to, as the case may be) a Base Rate Loan, (c) the Affected Lender's obligation to maintain its outstanding Eurodollar Rate Loans, as the case may be (the "**Affected Loans**"), shall be terminated at the earlier to occur of the expiration of the Interest Period then in effect with respect to the Affected Loans or when required by law, and (d) the Affected Loans shall automatically convert into Base Rate Loans on the date of such termination.  Notwithstanding the foregoing, to the extent a determination by an Affected Lender as described above relates to a Eurodollar Rate Loan then being requested by the Borrower pursuant to a Notice of Conversion/Continuation, the Borrower shall have the option, subject to the provisions of Section 2.10D, to rescind such Disbursement Authorization or Notice of Conversion/Continuation as to all Lenders by giving notice (by telecopy or by telephone confirmed in writing) to the Administrative Agent of such rescission on the date on which the Affected Lender gives notice of its determination as described above (which notice of rescission the Administrative Agent shall promptly transmit to each other Lender).  Except as provided in the immediately preceding sentence, nothing in this Section 2.10C shall affect the obligation of any Lender other than an Affected Lender to make or maintain Loans as, or to convert Loans to, Eurodollar Rate Loans in accordance with the terms of this Agreement.

**D.      Compensation For Breakage or Non-Commencement of Interest Periods**.  The Borrower shall compensate the Administrative Agent, upon written request by that Lender (which request shall set forth the basis for requesting such amounts), for all reasonable losses, expenses and liabilities (including, without limitation, any interest paid by that Lender to the lenders of funds borrowed by it to make or carry its Eurodollar Rate Loans and any actual loss, expense or liability sustained by that Lender in connection with the liquidation or re-employment of such funds) which that Lender may sustain: (i) if for any reason (other than a default by that Lender) a borrowing of any Eurodollar Rate Loan does not occur on a date specified therefor in a Disbursement Authorization or a telephonic request for borrowing, or a conversion to or continuation of any Eurodollar Rate Loan does not occur on a date specified therefor in a Notice of Conversion/Continuation or a telephonic request for conversion or continuation, (ii) if any prepayment (including any prepayment pursuant to Section 2.8B or assignment pursuant to Section 2.12) or conversion of any of its Eurodollar Rate Loans occurs on a date that is not the last day of an Interest Period applicable to that Loan (including, without limitation, as a result of the Transactions), (iii) if any prepayment of any of its Eurodollar Rate Loans is not made on any date specified in a notice of

**CREDIT AGREEMENT**

prepayment given by the Borrower, or (iv) as a consequence of any other default by the Borrower in the repayment of its Eurodollar Rate Loans when required by the terms of this Agreement.

**E.    Booking of Eurodollar Rate Loans**.   Any Lender may make, carry or transfer Eurodollar Rate Loans at, to, or for the account of any of its branch offices or the office of an Affiliate of that Lender.

**F.    Assumptions Concerning Funding of Eurodollar Rate Loans**.   Calculation of all amounts payable to a Lender under this Section 2.10 and under Section 2.11A shall be made as though that Lender had actually funded each of its relevant Eurodollar Rate Loans through the purchase of a Eurodollar deposit bearing interest at the rate obtained pursuant to the definition of Reserve Adjusted Eurodollar Rate in an amount equal to the amount of such Eurodollar Rate Loan and having a maturity comparable to the relevant Interest Period and, through the transfer of such Eurodollar deposit from an offshore office of that Lender to a domestic office of that Lender in the United States of America; provided, however, that each Lender may fund each of its Eurodollar Rate Loans in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable under this Section 2.10 and under Section 2.11A.

**G.    Eurodollar Rate Loans After Default**.   After the occurrence of and during the continuation of a Default or Event of Default, (i) the Borrower may not elect to have a Loan be made or maintained as, or converted to, a Eurodollar Rate Loan after the expiration of any Interest Period then in effect for that Loan and (ii) subject to the provisions of Section 2.10D, any Disbursement Authorization or Notice of Conversion/Continuation given by the Borrower with respect to a requested borrowing or conversion/continuation that has not yet occurred shall be deemed to be rescinded by the Borrower.

## 2.11    Increased Costs; Taxes.

**A.    Increased Costs Generally**.   If any Change in Law shall:  (i) impose, Modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any reserve requirement reflected in the Reserve Adjusted Eurodollar Rate); or (ii) impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Rate Loans hereunder made by such Lender; and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Rate Loan (or of maintaining its obligations to make any such Loan) or to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount), then upon request of such Lender, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender on an after-tax basis for such additional costs incurred or reduction suffered.

**B.    Capital Requirements**.   If any Lender determines that any Change in Law affecting such Lender or the applicable Lender Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company on an after-tax basis for any such reduction suffered.

NY\1139561.13

**C.**     **Certificates for Reimbursement**.  A certificate of a Lender setting forth in reasonable detail the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in  Section 2.11A or 2.11B and delivered to the Borrower shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

**D.**     **Delay in Requests**.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than six months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

**E.**     **Taxes**.

(i)     <u>Payments Free of Taxes</u>.  Any and all payments by or on account of any obligation of the Borrower hereunder or any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, provided that if the Borrower shall be required by applicable law to deduct or withhold any Indemnified Taxes or Other Taxes from such payments (other than backup withholding or similar Taxes resulting from Lender's failure to comply with Section 2.11(E)(v)) below, then (a) the sum payable shall be increased as necessary so that after making all required deductions or withholding (including deductions or withholding applicable to additional sums payable under this Section) the Agent or Lender receives an amount equal to the sum it would have received had no such deductions or withholding been made, (b) the Borrower shall make such deductions or withholding and (c) the Borrower shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law.

(ii)     <u>Payment of Other Taxes by the Borrower</u>.  Without limiting the provisions of paragraph (i) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(iii)     <u>Indemnification by the Borrower</u>.  The Borrower shall indemnify the Agents and each Lender within twenty (20) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.11E) paid by such Agent or such Lender and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate stating the amount of such payment or liability and setting forth in reasonable detail the calculation thereof delivered to the Borrower by an Agent or a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(iv)     <u>Evidence of Payments</u>.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

**CREDIT AGREEMENT**

(v)     <u>Status of Lenders</u>.   Any Lender, if requested by the Borrower or the Administrative Agent, shall deliver documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to withholding, backup withholding or information reporting requirements or to qualify any such Lender for any exemption from or reduction in the rate of any withholding, backup withholding, Indemnified Taxes or Other Tax.   Without limiting the generality of the foregoing, in the event that the Borrower is a resident for tax purposes in the United States of America, (a) each Lender that is not a Foreign Lender shall deliver to the Borrower and the Administrative Agent duly completed copies of Internal Revenue Service Form W-9 or other documents to establish such Lender's exempt status in order to prevent the application of the U.S. backup withholding tax and (b) each Foreign Lender shall deliver to the Borrower and the Administrative Agent, on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement, whichever of the following is applicable:  (i) duly completed copies of Internal Revenue Service Form W-8BEN, claiming eligibility for benefits of an income tax treaty to which the United States of America is a party, (ii) duly completed copies of Internal Revenue Service Form W-8ECI, (iii) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Internal Revenue Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Internal Revenue Code, (B) a "10 percent shareholder" of the Borrower within the meaning of section 881(c)(3)(B) of the Internal Revenue Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Internal Revenue Code and (y) duly completed copies of  Internal Revenue Service Form W-8BEN, together with (iv) duly completed copies of Internal Revenue Service form W-8IMY, if required.  In addition, each Foreign Lender shall deliver any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax and reasonably requested by the Borrower or the Administrative Agent duly completed together with such supplementary documentation as may be prescribed by applicable law and reasonably requested by the Borrower or the Administrative Agent to permit the Borrower to determine the withholding or deduction required to be made.  Each Foreign Lender shall also deliver such forms promptly upon the obsolescence, expiration or invalidity of any form previously delivered by such Foreign Lender, and from time to time thereafter upon the request of the Borrower or the Administrative Agent.  Each Foreign Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide, or no longer qualified for any benefit pursuant to, any previously delivered certificate to the Borrower (or any other form of certification adopted by a taxing authority for such purpose).  A Foreign Lender shall not be required to deliver any form or statement pursuant to this Section 2.11E(v) that such Foreign Lender is not legally able to deliver.  If , after reasonable request delivered by Borrower to Lender, such Lender shall refuse or fail to timely deliver the documentation required under this Section or by applicable law (excluding forms or statements a Lender is not legally able to deliver), then Borrower shall not be obligated to increase or "gross-up" any payments due hereunder to account for such required deductions or withholdings.  Thus, for the avoidance of doubt, if a U.S. lender is obligated to certify its U.S. taxpayer identification number but fails to do so, Borrower may reduce any payments due by the amount of backup withhold tax required by applicable law.

(vi)     <u>Treatment of Certain Refunds</u>.   If the Administrative Agent or a Lender determines, in its reasonable discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to such Section 2.11, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under such Section 2.11 with respect to the Taxes or Other Taxes giving

**CREDIT AGREEMENT**

rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrower, upon the request of such Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such Agent or such Lender in the event such Agent or such Lender is required to repay such refund to such Governmental Authority.  This paragraph shall not be construed to require any Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or any other Person.

## 2.12    Mitigation Obligations; Replacement of Lenders.

A.    **Designation of a Different Lender Office**.  If any Lender requests compensation under Section 2.11A or 2.11B, or requires the Borrower to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.11E, or any Lender becomes an Affected Lender, then such Lender shall use reasonable efforts to designate a different Lender Office for making, issuing, funding or maintaining its Commitments or Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.11 in the future and, if applicable, cause such Lender to no longer be an Affected Lender and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be materially disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

B.    **Replacement of Lenders**.  If any Lender requests compensation under Section 2.11A or 2.11B, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.11E, or if any Lender defaults in its obligation to fund Loans hereunder, or if any Lender has determined that it is unable to make, maintain or continue its Eurodollar Rate Loans in accordance with Section 2.10C hereof, then the Borrower may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 9.1), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if a Lender accepts such assignment), provided that (i) the Borrower shall have paid to the Administrative Agent the assignment fee specified in Section 9.1B(i)(c), (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 2.10D) from such Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), (iii) such Eligible Assignee is able to make, maintain or continue, as applicable, Eurodollar Rate Loans, (iv) in the case of any such assignment resulting from a claim for compensation under Section 2.11A or 2.11B or payments required to be made pursuant to Section 2.11E, such assignment will result in a reduction in such compensation or payments thereafter, and (v) such assignment does not conflict with applicable law.  A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

## 2.13    Releases of Collateral.

A.    **Releases in Connection with Permitted Collateral Asset Sales and Required Releases**.  In connection with any Permitted Collateral Asset Sale or Required Release, the Collateral

Agent or its duly authorized attorney-in-fact shall release the applicable portion of the Real Property Collateral from the Lien of the Mortgage or the Collateral Assignment of Note and Mortgage, as the case may be, (such portion of the Real Property Collateral, a "**Released Parcel**"); provided that (a) in the case of the sale of any Condominium Parcel or Commercial Parcel only, the applicable Release Price is paid to the Borrower or the applicable Subsidiary by the Affiliate or third party purchaser under any Qualified Sales Agreement, (b) in the case of the Tesoro Membership Club Sale Leaseback only, the applicable Release Price is paid to Ginn-LA St. Lucie Ltd., LLLP and the Administrative Agent has reviewed and approved (in its reasonable discretion) the purchase money promissory note and mortgage to be executed in connection therewith and the Borrower has executed and delivered or has caused Ginn-LA St. Lucie Ltd., LLLP to execute and deliver a Collateral Assignment of Mortgage and Note and a Mortgage encumbering the leasehold interest held by Ginn-LA St. Lucie Ltd., LLLP in the Membership Club located at the Tesoro Project, and (c) all of the applicable conditions set forth in Section 6.8 have been satisfied, and (c) the Borrower shall have submitted to Collateral Agent (i) a request for release in the form of Exhibit XVII attached hereto (the "**Request for Release**"), (ii) one or more reconveyances or releases for each Released Parcel for execution by the Collateral Agent, and (iii) all and all other documentation as Collateral Agent may reasonably require in connection with such Release (collectively, the "**Release Instruments**") in a form appropriate for recordation in the applicable county and otherwise satisfactory to the Collateral Agent in its good faith discretion for each Released Parcel (for execution by Collateral Agent) together with an Officer's Certificate certifying that (i) the Release Instruments are in compliance with all Applicable Laws and Governmental Authorizations, (ii) the release to be effected will not violate the terms of this Agreement or the other Loan Documents, and (iii) the release to be effected will not impair or otherwise adversely affect the Liens (other than the Lien that is actually being released) and other rights of the Collateral Agent under the Loan Documents not being released.  Collateral Agent shall have the right to establish an escrow arrangement and appoint an escrow agent responsible for the administration therefor, through which Release Instruments may be placed into escrow by the Collateral Agent prior to the occurrence of a Permitted Collateral Asset Sale or Required Release for release by the escrow agent upon escrow agent's confirmation of certain agreed upon conditions.  Borrower shall reasonably cooperate with any such arrangement.  If the requirements of this Section 2.13 and Section 6.8 are otherwise satisfied, the Collateral Agent shall execute (and cause to be notarized) each of the Release Instruments accompanying a Request for Release within five (5) Business Days of receipt of such Request for Release and accompanying Release Instruments.

B.     **Consents and Subordinations in connection with Specified Encumbrances**.  Upon ten (10) Business Days prior written notice from the Borrower, the Collateral Agent shall sign and consent to and/or subordinate the First Priority Lien of the Mortgages to any easements, covenants, conditions, master declarations, rights-of-way, restrictions and plats entered into or effected in the Ordinary Course of Business of the Borrower in connection with the development of each Project which are not inconsistent with the current Project Projections (the "**Specified Encumbrances**"); provided that (i) any such signature of the Collateral Agent is expressly made with no implied duty or obligation (other than as otherwise specifically provided in this Agreement) on the part of the Collateral Agent to review such Specified Encumbrance and is only made for the purpose of consenting to and/or subordinating the First Priority Lien of the Mortgage to such Specified Encumbrance, (ii) no Default or Event of Default has occurred and is continuing, and (iii) the Collateral Agent shall, as a condition to such consent and/or subordination, be satisfied in its reasonable discretion that such consent and/or subordination could not reasonably be expected to (a) have the effect of reducing the number of permitted Residential Lots (unless consistent with the Project Projections) or (b) have a Material Adverse Effect or impair Collateral Agent's Lien on the remaining Real Property Collateral.  The Borrower shall pay all reasonable out-of-pocket costs and expenses of the Collateral Agent and the Title Company in connection with any such consent and/or subordination.

64

**2.14**     **Break Funding Payments**.

In the event of the reduction of any Tranche A Credit-Linked Deposit other than on the last day of an Interest Period, the Borrower shall compensate the Paying Agent for the loss, cost and expense attributable to such event; provided, however, Borrower shall not be required to compensate the Paying Agent if such event is not the result of Borrower's Default or Borrower's failure to pay any amounts due in connection with any Tranche A Loans or Letters of Credit.  Such loss, cost or expense may, at the option of the Paying Agent, be deemed to include an amount determined by the Paying Agent to be the excess, if any, of (i) the amount of interest which would have accrued on such Tranche A Credit-Linked Deposit had such event not occurred, at the Eurodollar Base Rate that would have been applicable to such Tranche A Credit-Linked Deposit, for the period from the date of such event to the last day of the then current Interest Period therefor, over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which the Paying Agent would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the Eurodollar market.  A certificate of the Paying Agent setting forth any amount or amounts that the Paying Agent is entitled to receive pursuant to this Section 2.14 shall be delivered to the Borrower and shall be conclusive absent manifest error.  In the event the Borrower shall fail to pay any amount due to the Paying Agent under this Section 2.14, the interest payable by the Paying Agent to the Tranche A Lenders on their Tranche A Credit-Linked Deposits under Section 2.1D shall be correspondingly reduced and the Tranche A Lenders shall without further act succeed, ratably in accordance with their Applicable Percentages, to the rights of the Paying Agent hereunder with respect to such amount.

**SECTION 3.**
**CONDITIONS TO EFFECTIVENESS**

**3.1**     **Conditions to Effectiveness on the Effective Date**.

The effectiveness of this Agreement, and the obligation of each Lender to make the initial extension of credit requested to be made by it is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Effective Date, of the following conditions precedent:

**A.**     **Organizational Documents**.  On or before the Effective Date, the Borrower shall deliver or cause to be delivered to the Administrative Agent for the Lenders the following with respect to itself and its Subsidiaries, each, unless otherwise noted, dated the Effective Date:

(i)     a certified copy of the Organizational Documents of the Borrower and each of its Subsidiaries certified as of the Effective Date by a Responsible Officer of the Borrower, dated a recent date prior to the Effective Date;

(ii)     certified copies of the Organizational Certificate of the Borrower and each of its Subsidiaries, together with a good standing certificate from the applicable Governmental Authority of their jurisdictions of incorporation, organization or formation, each state or jurisdiction in which any of their Real Property Assets are located, and each other state or jurisdiction in which they are qualified as a foreign corporation or other entity to do business, each dated a recent date prior to the Effective Date;

(iii)     copies of the Organizational Authorizations of the Borrower and each of its Subsidiaries approving and authorizing the execution, delivery and performance of the Loan Documents to which each Borrower and Subsidiary is party or by which it or its assets may be bound that are to be delivered on the Effective Date, certified as of the Effective Date by a

65

Responsible Officer of such Borrower or Subsidiary as being in full force and effect without Modification;

(iv)    incumbency certificates of the officers of the Borrower and its Subsidiaries executing this Agreement and the other Loan Documents to which it is a party as of the Effective Date;

(v)    executed originals of this Agreement and the other Loan Documents to which the Borrower and its Subsidiaries is a party that are to be delivered on the Effective Date;

(vi)    certified copies of each of the other Loan Documents to which the Borrower or its Subsidiaries is a party that are to be delivered on the Effective Date; and

(vii)    such other documents as the Administrative Agent may reasonably request.

**B.**    **Intentionally Deleted**.

**C.**    **Consummation of Transactions**.

(i)    (a) each of the Loan Documents shall be in form and substance reasonably satisfactory to the Administrative Agent and each such Loan Document shall have been duly executed and delivered by each party thereto and shall be in full force and effect; and (b) all other conditions set forth in the Loan Documents shall have been satisfied or the fulfillment of any such conditions shall have been waived with the written consent of the Administrative Agent;

(ii)    $150,000,000 shall have been borrowed by the Borrower pursuant to the Second Lien Credit Agreement;

(iii)    simultaneously with funding of the Loans, the obligations of the lenders under the Existing Indebtedness shall have been repaid in full, all commitments thereunder shall have been permanently terminated and all Liens granted thereunder shall have been permanently terminated and released, and the Administrative Agent shall have received evidence thereof to its reasonable satisfaction;

(iv)    simultaneously with funding of the Loans, each of the other Transactions shall have been effected and consummated to the reasonable satisfaction of the Administrative Agent; and

(v)    after giving effect to the Transactions and the other transactions contemplated hereby, the Borrower and its Subsidiaries shall have no outstanding Indebtedness or preferred stock other than (a) the Loans under this Agreement and the loans under the Second Lien Credit Agreement, and (b) the Indebtedness permitted under Section 6.1.

**D.**    **Lender Signatures.**    The following Persons shall have executed and delivered this Agreement:

(i)    the Lenders; and

(ii)    the Agents.

E.     **Necessary Consents**.  The Borrower shall have obtained all approvals and consents of Governmental Authorities and other Persons necessary or advisable in connection with the Transactions and the continued operation of the business conducted by the Borrower and its Subsidiaries, all applicable appeal periods shall have expired and each of the foregoing shall be in full force and effect and in form and substance reasonably satisfactory to the Administrative Agent.  Such approvals and consents shall be satisfactory to Administrative Agent in its sole and absolute discretion and shall include, without limitation:

(i)     executed consents from any Person required in connection with the Collateral Documents;

(ii)     executed consents from any Person required in connection with the Security Agreement;

(iii)     executed consents and estoppels as set forth on <u>Schedule 3.1E</u> annexed hereto; and

(iv)     executed consents from any Person required in connection with any Indebtedness permitted under Section 6.1 and not extinguished in full on the Effective Date.

F.     **Perfection of Security Interests**.  The Borrower shall have taken or caused to be taken such actions in such a manner directed by the Collateral Agent to create a valid and perfected First Priority security interest in the Collateral of each Loan Party in which a security interest can be granted and perfected under the UCC or other Applicable Law to the extent required by the Collateral Documents. Such actions shall include:  (i) the delivery to the Collateral Agent of (a) the results of a recent search, by a Person satisfactory to the Collateral Agent, of all effective UCC financing statements and fixture filings and all judgment and tax lien filings which may have been made with respect to any personal or mixed property of any Loan Party, together with copies of all such filings disclosed by such search and (b) UCC financing statements the recordation of which has been authorized by the applicable Loan Parties as to all such Collateral granted by such Loan Parties for all jurisdictions as may be necessary or desirable to perfect Collateral Agent's security interest in such Collateral; and (ii) the delivery to the Collateral Agent of evidence reasonably satisfactory to the Collateral Agent that all other filings (including UCC termination statements and releases and filings with the PTO and the United States Copyright Office with respect to Intellectual Property of the Loan Parties), recordings and other actions the Collateral Agent deems necessary or advisable to establish, preserve and perfect the First Priority liens granted to the Collateral Agent in Collateral constituting personal (both tangible and intangible) and mixed property shall have been made.

G.     **Real Property**.  The Administrative Agent shall have received on or prior to the Effective Date from the Borrower and each applicable Loan Party:

(i)     <u>Mortgages</u>.     Fully executed and notarized Mortgages, together with any Modifications thereto deemed necessary by the Collateral Agent in connection with the execution and delivery of this Agreement, the other Loan Documents and the transactions contemplated hereby and thereby, in proper form for recording in the real property records of the appropriate county or counties in the state where the applicable Real Property Collateral is located, encumbering the Real Property Collateral listed on <u>Schedule 3.1.G</u>, in each case in form and substance satisfactory to the Collateral Agent;

     (ii)   <u>Title Insurance</u>.  ALTA extended coverage mortgagee title insurance policies satisfactory to Collateral Agent (the "**Mortgagee Policies**") issued by the Title Company with respect to the Mortgages listed on <u>Schedule 3.1G</u>, in amounts not less than the respective amounts designated on such Schedule with respect to any particular portion of Real Property Collateral, insuring fee simple title to or a leasehold interest in each such portion of Real Property Collateral vested in such Loan Party and insuring the Collateral Agent that the applicable Mortgages create valid and enforceable First Priority mortgage Liens on the respective Mortgaged Properties encumbered thereby, subject only to the Permitted Encumbrances, which Mortgagee Policies (1) shall include all endorsements requested by Collateral Agent, including, if available, an endorsement for mechanics' liens (or a deletion of the standard pre-printed mechanics' lien exception) and (2) shall provide for affirmative insurance and such reinsurance as the Collateral Agent may reasonably request and is available in the applicable jurisdiction, all of the foregoing in form and substance reasonably satisfactory to the Collateral Agent; and evidence satisfactory to the Collateral Agent that such Loan Party has (i) delivered to the Title Company all certificates and affidavits required by the Title Company in connection with the issuance of the  Mortgagee Policies and (ii) paid to the Title Company or to the appropriate Governmental Authorities all expenses and premiums of the Title Company and all other sums required in connection with the issuance of the Mortgagee Policies and all recording and stamp taxes (including mortgage recording and intangible taxes) payable in connection with recording the Mortgages in the real property records in the appropriate county or counties;

     (iii)   <u>Title Reports</u>.  With respect to each portion of the Real Property Collateral, a title report issued by the Title Company with respect thereto, dated a date, and in form and substance, satisfactory to the Collateral Agent and may include Permitted Encumbrances;

     (iv)   <u>Surveys; Plat Maps</u>.  An ALTA/ACSM survey or other form of survey reasonably acceptable to the Administrative Agent and/or plat maps with respect to the Property dated a date, and prepared and certified by a Person and in form and substance, reasonably satisfactory to the Collateral Agent;

     (v)   <u>Appraisal</u>.  One original of the Appraisal, in form and substance satisfactory to the Collateral Agent;

     (vi)   <u>Entitlement Documents</u>.  Administrative Agent shall have received true, correct and complete copies of all Entitlement Documents;

     (vii)   <u>Engineering Reports</u>.  Administrative Agent shall have received engineering and soils reports with respect to each Project in form and substance satisfactory to the Administrative Agent;

     (viii)   <u>Copies of Documents Relating to Title Exceptions</u>.  Copies of all recorded documents listed as exceptions to title or otherwise referred to in the Mortgagee Policies or in the title reports delivered pursuant to clause (iii) above; and

     (ix)   <u>Matters Relating to Flood Hazard Properties</u>.  (a) Evidence, which may be in the form of a letter from an insurance broker as to whether (1) any portion of the Real Property Collateral is a Flood Hazard Property and (2) the community in which any such Flood Hazard Property is located is participating in the National Flood Insurance Program, (b) if there are any such Flood Hazard Properties, such Loan Party's written acknowledgment of receipt of written notification from the Collateral Agent (1) as to the existence of each such Flood Hazard Property

68

and (2) as to whether the community in which each such Flood Hazard Property is located is participating in the National Flood Insurance Program, and (c) in the event any such Flood Hazard Property is located in a community that participates in the National Flood Insurance Program, evidence that the Borrower has obtained flood insurance in respect of such Flood Hazard Property to the extent required under the applicable regulations of the Board of Governors of the Federal Reserve System.

(x)    <u>Construction Drawings and Budgets</u>.  Administrative Agent shall have received constructions drawings and plans acceptable to it and shall have approved an initial budget and project schedule.

**H.    Copies of Documents for Lenders**.  If requested by any Lender or any potential Eligible Assignee in writing (with such request addressed to the Administrative Agent) prior to the Effective Date, Administrative Agent shall provide a copy of any survey or plat maps, the Initial Appraisal, the title report or any other due diligence document reasonably requested by such Lender or potential Eligible Assignee.

**I.    Financial Condition and Solvency Certificate**.  The Borrower shall have delivered to the Administrative Agent a certificate from the chief financial officer of the Borrower, substantially in the form of <u>Exhibit XVI</u> attached hereto (the "**Solvency Certificate**").

**J.    Transaction Costs, Fees and Expenses**.  On or prior to the Effective Date, the Borrower shall have paid (i) to the Administrative Agent any and all fees and reasonable expenses of the Agents that are then due and owing or accrued and not yet paid under or in connection with this Agreement or any of the documents, instrument or agreements executed in connection herewith and (ii) to the appropriate Persons any and all outstanding reasonable fees and expenses (including legal advisors) incurred by the Agents through the Effective Date in connection with the negotiation, drafting and execution of the Loan Documents.  On or prior to the Effective Date, the Borrower shall have delivered to the Administrative Agent a schedule, in a form satisfactory to the Administrative Agent, setting forth the Borrower's estimate of the Transaction Costs (other than fees payable to any of the Agents).

**K.    Opinions of Loan Parties' Counsel**.  The Administrative Agent and its counsel shall have received the written opinions of Morris Manning and Martin, L.L.P. (counsel to the Borrower), Baker & Hostetler LLP (New York and Florida), Parker Poe Adams & Bernstein (North Carolina) and Dupuch & Turnquest & Co. (Bahamian), counsel for the Loan Parties and the Shareholder Pledgors (a) in form and substance reasonably satisfactory to the Administrative Agent and its counsel, (b) dated as of the Effective Date, (c) addressed to each of the Agents and the Lenders, and (d) setting forth the matters reasonably requested by the Administrative Agent.

**L.    Financial Information**.  On or before the Effective Date, the Administrative Agent shall have received from the Borrower (i) such budgets and other cash flow and financial information and projections described in Section 5.3 as the Administrative Agent may reasonably request, and (ii) the Project Projections, all in form and substance reasonably satisfactory to the Administrative Agent.

**M.    Evidence of Insurance**.  The Administrative Agent shall have received copies of certificates of insurance with respect to each of the insurance policies required pursuant to Section 5.6, and the Administrative Agent shall be reasonably satisfied with the nature and scope of these insurance policies.

**N.    Environmental**.  The Administrative Agent shall have received one or more environmental assessment reports, including the Environmental Impact Assessment for the Grand

**CREDIT AGREEMENT**

Bahama (West End) Project, which, in their totality, provide a detailed environmental assessment of the entire Project, in form and substance and from an independent environmental assessment firm satisfactory to the Administrative Agent, and the Administrative Agent shall be reasonably satisfied as to the amount and nature of any environmental and employee health and safety exposures to which the Borrower and its Subsidiaries may be subject after giving effect to the Transactions, and with the plans of the Borrower or such Subsidiaries with respect thereto.

**O.     No Material Adverse Effect**.  Since December 31, 2005, there shall not have occurred any event, change or condition that has had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

**P.     Corporate and Capital Structure, Ownership, Management, Etc**.

(i)     <u>Corporate Structure</u>.  The corporate organizational structure of Borrower and its Subsidiaries as of the Effective Date shall be as set forth on <u>Schedule 3.1P</u>.

(ii)     <u>Capital Structure and Ownership</u>.  The capital structure and ownership of the Borrower and as of the Effective Date shall be as set forth on <u>Schedule 3.1P</u>.

**Q.     Representations and Warranties; Performance of Agreements**.  The Borrower shall have delivered to the Administrative Agent an Officer's Certificate, in form and substance satisfactory to the Administrative Agent, to the effect that the representations and warranties in Section 4 are true and correct in all material respects on and as of the Effective Date and both before and after giving effect to the Transactions, to the same extent as though made on and as of that date and that the Borrower has performed in all material respects all agreements and satisfied all conditions which this Agreement provides shall be performed or satisfied by it on or before the Effective Date.

**R.     No Litigation**.  There shall be no litigation or governmental, administrative or judicial actions or proceedings, actual or threatened, to the Borrower's Knowledge, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect or that could reasonably be expected to restrain, prevent or impose burdensome conditions on any of the Transactions.

**S.     Completion of Proceedings**.  All partnership, corporate, limited liability company and other proceedings taken or to be taken in connection with the Transactions and all documents incidental thereto not previously found acceptable by the Administrative Agent and its counsel shall be satisfactory in form and substance to the Administrative Agent and such counsel, and the Administrative Agent and such counsel shall have received all such counterpart originals or certified copies of such documents as the Administrative Agent may reasonably request.  Each Lender, by delivering its signature page to this Agreement, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by any Agent, Requisite Lenders or Lenders, as applicable, on or prior to the Effective Date.

**T.     Money Laundering**.  The Administrative Agent shall have received, sufficiently in advance of the Effective Date, all documentation and other information required by bank regulatory authorities from the Loan Parties under applicable "know your customer" and anti-money laundering rules and regulations, including the U.S.A. Patriot Act.

**U.     Rating Agencies**.  The Borrower shall have obtained a public credit rating by S&P and by Moody's with respect to the Loans prior to the Effective Date.

**CREDIT AGREEMENT**

**V.     Disbursement Authorization**.  The Administrative Agent shall have received before the Effective Date, in accordance with the provisions of Section 2.2B, an originally executed Disbursement Authorization, signed by the chief executive officer or the chief financial officer of the Borrower or by any executive officer of the Borrower designated by any of the above-described officers on behalf of the Borrower in a writing delivered to the Administrative Agent.

**W.     Searches**.  The Administrative Agent shall have received judgment and lien searches satisfactory to it with respect to the Borrower and its Subsidiaries, the Subsidiary Guarantors and any Shareholder Pledgor in all jurisdictions as Administrative Agent may require.

**X.     As of the Effective Date**:

(i)     The representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects on and as of the Effective Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date;

(ii)     No event shall have occurred and be continuing or would result from the consummation of the borrowing contemplated by such Disbursement Authorization that would constitute a Default or Event of Default, or could reasonably be expected to have a Material Adverse Effect; and

(iii)     No order, judgment or decree of any Governmental Authority shall purport to enjoin or restrain any Lender from making the Loans to be made by it on the Effective Date.

**3.2     Conditions to Each Credit Event**.  The obligation of each Lender to make any Loan after the Effective Date is additionally subject to the satisfaction of the following conditions:

(ii)     The representations and warranties contained herein and in the other Loan Documents shall be true and correct in all material respects on and as of the date of such Loan to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date;

(iii)     At the time of and immediately after giving effect to such Loan no Default or Event of Default shall have occurred and be continuing;

(iv)     The total Tranche A Exposures shall not exceed the total Tranche A Funding Amounts; and

(v)     For each borrowing of a Loan, Borrower shall have delivered a completed and signed Request for Loan and for each issuance of a Letter of Credit, Borrower shall have provided the information required by Section 2.5B.

Each borrowing and each issuance, amendment, renewal or extension of a Letter of Credit shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in this Section 3.2.

**CREDIT AGREEMENT**

**3.3**     **Conditions to Disbursements from the Company's Operating Account**.

    **A.**     **General**.  The Borrower has established, and hereafter agrees to continue to maintain the Company's Operating Account.  The Borrower hereby grants a security interest to the Administrative Agent in the Company's Operating Account to secure the Obligations.  Concurrently with the execution of this Agreement, the Borrower has entered into a Control Agreement with respect to the Company's Operating Account with the Collateral Agent and the Account Holder substantially in the form of Exhibit XXI attached hereto.

    **B.**     **Investments, Withdrawals and Deposits**.

        (i)     The Borrower may direct the Account Holder regarding investment of funds contained in the Company's Operating Account in Cash Equivalents (to the extent available in such account), provided, however, that such direction may be required to be accomplished through direction to the Administrative Agent, who will subsequently direct the Account Holder regarding the same.  At any time prior to the occurrence and continuance of an Event of Default, the Borrower shall have the right to withdraw funds from the Company's Operating Account to be used in a manner consistent with the Project Projections or for purposes of purchasing additional Real Property Collateral, which will be pledged as collateral to secure the Borrrower's and its Subsidiaries' Obligations hereunder as required by Section 5.13 hereof.

        (ii)     The Borrower covenants and agrees to deposit all funds received by the Borrower and its Subsidiaries (whether resulting from Asset Sales, rental programs, club, golf club memberships or otherwise) within five (5) Business Days after receipt of such funds into the Company's Operating Account.

    **C.**     **Priority of Distributions**.  In the event that the Lenders elect to exercise their remedies under Section 8, the funds contained in the Company's Operating Account shall be applied (a) first, to the reasonable expenses of the Administrative Agent, (b) second, to the payment of any late charges due and payable hereunder, (c) third, to the repayment of any amounts advanced by Collateral Agent in accordance with the Mortgages or any of the Collateral Documents for insurance premiums, taxes, assessments or for preservation or protection of the Collateral and to the payment of all costs and expenses incurred by Collateral Agent in connection with the collection of the Loans (including all reasonable attorneys' fees payable hereunder), (d) fourth, to the payment of accrued and unpaid interest (e) fifth, to the outstanding principal amount of, and interest on, the Tranche A Loans until the same are paid in full, (f) sixth, to the outstanding principal amount of, and interest on the Tranche B Loans until the same are paid in full, (g) seventh, to the other Obligations until the same are paid in full, and then (h) eighth, after all Obligations of the Borrower under this Agreement and the Loan Documents shall have been paid in full, returned to the Borrower or the other Persons legally entitled thereto.

**SECTION 4.**
**REPRESENTATIONS AND WARRANTIES**

    In order to induce the Lenders to enter into this Agreement and to make the Loans and to induce the other Lenders to purchase participations therein, the Borrower represents and warrants to each Lender, on the date of this Agreement and on the Effective Date, that the following statements are true and correct.

**4.1** **Organization and Qualification.**

The Borrower and the Loan Parties are duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.  The Borrower and the Loan Parties are duly qualified and is authorized to do business and is in good standing as a foreign corporation in each state or jurisdiction listed on Schedule 4.1 hereto and in all other states and jurisdictions in which the failure of the Borrower or the Loan Parties to be so qualified could reasonably be expected to have a Material Adverse Effect.

**4.2** **Power and Authority**.

The Borrower and the other Loan Parties are duly authorized and empowered to enter into, execute, deliver and perform this Agreement and each of the other Loan Documents to which each is a party.  The execution, delivery and performance of this Agreement and each of the other Loan Documents have been duly authorized by all necessary action.

**4.3** **Legally Enforceable Agreement**.

This Agreement is, and each of the other Loan Documents when delivered under this Agreement will be, a legal, valid and binding obligation of the Borrower and its Subsidiaries signatories thereto, enforceable against each of them in accordance with the respective terms of such Loan Documents, except as the enforceability thereof may be limited by bankruptcy, insolvency or other similar laws of general application affecting the enforcement of creditors' rights or general equitable principals, whether applied in law or equity.

**4.4** **No Conflict**.

After giving effect to the Transactions and the execution, delivery and performance by each of the applicable Loan Parties and the Shareholder Pledgors of the Transaction Documents, the issuance, delivery and payment of the Notes and the consummation of the Transactions do not and will not (i) violate any provision of any law or any governmental rule or regulation applicable to any Loan Party or the Shareholder Pledgors, or violate or contravene the organizational certificate or any other organizational documents of any Loan Party or any order, judgment or decree of any court or other Governmental Authority binding on any Loan Party or the Shareholder Pledgors, (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any indenture, agreement, contract or instrument to which any Loan Party or any Shareholder Pledgor is a party or by which any of them or any of their property may be bound, except to the extent such conflict, breach or default could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (iii) result in or require the creation or imposition of any Lien upon any of the properties or assets of any Loan Party or any Shareholder Pledgor (other than any Liens created under any of the Loan Documents in favor of the Collateral Agent and the Liens securing the obligations under the Second Lien Credit Agreement), (iv) require any approval of stockholders, partners or members or any approval or consent of any Person under any organizational certificate or other indenture, agreement, contract or instrument to which any Loan Party or any Shareholder Pledgor is a party or by which any of them or any of their property may be bound, except for such approvals or consents obtained on or before the Effective Date, or (v) give rise to any preemptive rights, rights of first refusal or other similar rights on behalf of any Person under any Applicable Law or any provision of the organizational documents of any Loan Party or any Material Contract to which any Loan Party or any Shareholder Pledgor is a party or by which any Loan Party or any Shareholder Pledgor is bound.

**CREDIT AGREEMENT**

**4.5**     **Capital Structure**.

        As of the Effective Date, the Borrower has no Subsidiaries other than those listed on Schedule 4.5 hereto.  Borrower has not made, or obligated itself to make, any Restricted Payment except as expressly permitted by this Agreement.  The Borrower has not issued any options to purchase, or any rights or warrants to subscribe for, or any commitments or agreements to issue or sell, or any of its Capital Stock or obligations convertible into, or any powers of attorney relating to, shares of the Capital Stock of the Borrower.   There are no outstanding agreements or instruments binding upon the holders of the Borrower's Capital Stock relating to the ownership of its Capital Stock.  No Lender is an Affiliate of the Borrower.

**4.6**     **Special Purpose Entity**.

        The Borrower is in compliance with the special purpose entity requirements of Section 5.16.

**4.7**     **Corporate Names**.

        During the 5-year period preceding the date of this Agreement and as of the Effective Date, neither the Borrower nor any Subsidiary has been known as or used any corporate, fictitious or trade names except those listed on Schedule 4.7 hereto.  Except as set forth on Schedule 4.7, neither the Borrower nor any Subsidiary has been the surviving corporation of a merger or consolidation or acquired all or substantially all of the assets of any Person.

**4.8**     **Business Locations; Agent for Process**.

        As of the date hereof, the chief executive office and other places of business of the Borrower and each Subsidiary are as listed on Schedule 4.8 hereto.  During the 5-year period preceding the date of this Agreement, neither the Borrower nor any Subsidiary has had an office, place of business or agent for service of process other than as listed on Schedule 4.8.  Except as shown on Schedule 4.8 on the date hereof, no inventory of the Borrower or any Subsidiary is stored with a bailee, warehouseman or similar Person, nor is any inventory consigned to any Person.

**4.9**     **Title to Properties**.

        **A.**     The Borrower has good and marketable title to and fee simple ownership of or valid and subsisting leasehold interests in all of its Real Property Assets (including, without limitation, the Real Property Collateral), and good title to all of the personal property relating to each Project or used in connection with the ownership, maintenance, development or marketing of each Project other than personal property owned by Borrower's Affiliates involved in the development, marketing or operation of each Project (except to the extent disposed of in the Ordinary Course of Business in compliance with this Agreement), including all property reflected in the financial statements referred to in Section 4.14 or delivered pursuant to Section 5.3, in each case free and clear of all Liens except for Liens permitted by this Agreement.  The Borrower has paid or discharged, and has caused each Subsidiary to pay and discharge, all lawful claims which, if unpaid, could reasonably be expected to become a Lien against any properties of the Borrower that is not permitted by this Agreement, except to the extent such claim is being Properly Contested.   The Liens granted to the Collateral Agent pursuant to the Collateral Documents are First Priority Liens, subject only to those Liens which are expressly permitted by the terms of this Agreement.

        **B.**     There are no exceptions or adverse matters affecting the Real Property Collateral that would be disclosed by a survey of the Real Property Collateral except for those matters that would not,

individually or in the aggregate, have a Material Adverse Effect. A true, accurate and complete depiction of each Project is set forth on the maps attached hereto as <u>Exhibit XIII</u>, which maps identify the portions of each Project comprising the Real Property Collateral as of the Effective Date.

C.      None of the Borrower nor any of its Subsidiaries has received any notice of any special assessment or proceeding affecting each Project, change in the tax rate or the assessed valuation of Project or any other changes affecting the taxes, assessments or other charges with respect to each Project which could reasonably be expected to have a Material Adverse Effect. There are no special assessment districts, or plans for the same, or for any other scheme that would involve the imposition of taxes other than those disclosed on <u>Schedule 4.9C</u> relating to each Project. There are no zoning or other land-use regulation proceedings or change or proposed change in any applicable laws, regulations or the Entitlements which could reasonably be expected to have a Material Adverse Effect.

## 4.10     <u>Priority of Liens; UCC-1 Financing Statements</u>.

As of the Effective Date, the security interests and Liens granted to Lender pursuant to the Collateral Documents in the Collateral (i) will constitute perfected security interests under the UCC, and (ii) will be superior and prior to the rights of all Persons now existing or hereafter arising, except for Permitted Encumbrances.

## 4.11     <u>No Subordination</u>.

There is no agreement, indenture, contract or instrument to which the Borrower or any of its Subsidiaries is subject or by which the Borrower or its Subsidiaries may be bound that requires the subordination in right of payment of any of Borrower's obligations under this Agreement to any other obligations of Borrower.

## 4.12     <u>Permits; Franchises</u>.

Except as set forth on <u>Schedule 4.36</u> with respect to Pending Entitlements, the Borrower possesses all permits, memberships, franchises and licenses required and all trademark rights, trade names, trade name rights, patents, patent rights and fictitious name rights necessary to enable Borrower to continue with the development of each Project (i) as contemplated by the Master Plan, (ii) in compliance with Applicable Laws in all material respects, and (iii) as and when necessary to achieve the Project Projections.

## 4.13     <u>Indebtedness</u>.

The Borrower and its Subsidiaries have no Indebtedness outstanding except for Indebtedness permitted pursuant to Section 6.1.

## 4.14     <u>Financial Condition; Pro Forma Balance Sheet; Projections</u>.

A.      **Financial Statements**. The Borrower has heretofore delivered to the Lenders, at the Lenders' request, (i) either annual audited or accountant reviewed balance sheets and related statements of income, stockholders' equity and cash flows of the Borrower and its Subsidiaries for the year ending December 31, 2005, except with respect to the balance sheets and related statements of operations for Ginn-LA West End Ltd., LLLP, Ginn-LA St. Lucie Ltd., LLLP and Ginn-LA Quail West Ltd., LLLP, which were internally prepared and (ii) unaudited balance sheets and related statements of operations, stockholders' equity and cash flows of Borrower's Subsidiaries for the Fiscal Quarter ending March 31, 2006 (excluding percentage of completion calculations), together with all supporting documentation for

**CREDIT AGREEMENT**

the foregoing reasonably requested by the Administrative Agent, which financial statements shall not be materially inconsistent with the financial statements or forecasts previously provided to the Administrative Agent.

**B.    Contingent Obligations**.   Neither the Borrower nor any of its Subsidiaries have any Contingent Obligation, contingent liability or liability for Taxes, long-term lease or unusual forward or long-term commitment that is not reflected in the financial statements referred to in the preceding clauses of this Section, the most recent financial statements delivered pursuant to Section 5.3 or the notes thereto and which in any such case is material in relation to the business, operations, properties, assets, condition (financial or otherwise) or prospects of the Borrower and its Subsidiaries taken as a whole.

**C.    Project Projections**.   On and as of the Effective Date, Project Projections of the Borrower, its Subsidiaries and the Bahamas Owner for the period from the Effective Date through the Fiscal Year ending December 31, 2011 previously delivered to the Lenders are based on good faith estimates and assumptions made by the management of the Borrower at the time the Project Projections were prepared.

## 4.15    Disclosure.

The representations and warranties of the Borrower and its Subsidiaries contained in the Transaction Documents and the information contained in the other documents, certificates and written statements furnished to any of the Agents or the Lenders by or on behalf of the Borrower or any of its Subsidiaries for use in connection with the transactions contemplated by this Agreement or any other Transaction Document, when taken together, do not contain any untrue statement of a material fact or omit to state a material fact (known to the Borrower or the applicable Subsidiaries, in the case of any document not furnished by it) necessary in order to make the statements contained herein or therein taken as a whole not misleading in any material respect in light of the circumstances in which the same were made.  Notwithstanding the foregoing, any projections and financial information prepared on a Pro Forma Basis and contained in such materials are based upon good faith estimates and assumptions believed by the Borrower to be reasonable at the time made, it being recognized by the Agents and the Lenders that such projections as to future events will not be viewed as facts and that actual results during the period or periods covered by any such projections may differ from the projected results and that the differences may be material.  There is no fact known to the Borrower that has had, or could reasonably be expected to result in, a Material Adverse Effect and that has not been disclosed herein or in such other documents, certificates and statements furnished to the Lenders for use in connection with the transactions contemplated hereby.

## 4.16    Solvent Financial Condition.

The Borrower and each of its Subsidiaries is now Solvent and, after giving effect to the Loans to be made hereunder and the consummation of the Transactions, the Borrower and each of its Subsidiaries will be Solvent.

## 4.17    Surety Obligations.

Except as set forth on Schedule 4.17 hereto, on the date hereof, the Borrower and its Subsidiaries are not obligated as surety or indemnitor under any surety or similar bond or other contract issued or entered into any agreement to assure payment, performance or completion of performance of any undertaking or obligation of any Person.

**CREDIT AGREEMENT**

**4.18**    **Taxes**.

The FEIN of the Borrower is as shown on <u>Schedule 4.18</u> hereto.  The Borrower and each of its Subsidiaries has filed all federal, state and other material Tax returns and other reports it is required by law to file and has paid, or made provision for the payment of, all Taxes imposed upon it and each of its Subsidiaries or its properties as and when such Taxes are due and payable, except to the extent being Properly Contested.  The provision for Taxes on the books of the Borrower and each of its Subsidiaries are adequate for all years not closed by applicable statutes, and for its current Fiscal Year.  The Borrower is not aware of any proposed material Tax assessment against any Loan Party.  For United States federal income tax purposes, Principal Borrower has been, and is, treated as a partnership or a "disregarded entity," and Bahamas Borrower has been, and is, treated as a corporation.  Bahamas Borrower is not engaged in any active conduct of trade or business and has no substantial assets other than those arising out of the Bahamas Intercompany Indebtedness, and its assets are substantially offset by its obligation to the Lenders under the Loan Documents.

**4.19**    **Brokers**.

Except as otherwise disclosed in writing to the Agents, there are no claims against the Borrower or its Subsidiaries or amounts owing or to be owed by the Borrower or its Subsidiaries for brokerage commissions, finder's fees or investment banking fees in connection with the Transactions, and the Borrower hereby indemnifies the Agents and the Lenders against, and agrees that it will hold the Agents and the Lenders harmless from, any claim, demand or liability for any such commission or broker's or finder's fees alleged to have been incurred in connection herewith or therewith and any expenses (including reasonable fees, expenses and disbursements of counsel) arising in connection with any such claim, demand or liability.

**4.20**    **Intellectual Property**.

The Borrower and each of its Subsidiaries owns or has the lawful right to use all Intellectual Property necessary for the present and planned future conduct of its business without, to Borrower's Knowledge, any conflict with the rights of others in any material respect; there is no objection to, or pending (or, to the Borrower's Knowledge, threatened) claim with respect to, the Borrower's or any of its Subsidiaries' right to use any such Intellectual Property and the Borrower is not aware of any grounds for challenge or objection thereto; and, except as may be disclosed on <u>Schedule 4.20</u> hereto, as of the Effective Date none of the Borrower nor any of its Subsidiaries pay any royalty or other compensation to any Person for the right to use any Intellectual Property (other than with respect to off-the-shelf or prepackaged software).  All such patents, trademarks, service marks, tradenames, copyrights, licenses and other similar rights are listed on <u>Schedule 4.20</u> hereto, to the extent they are registered under any Applicable Law, application for registration have been made under any Applicable Law or are otherwise material to the Borrower' business.

**4.21**    **Governmental Authorization**.

Except with respect to the Pending Entitlements set forth on <u>Schedule 4.36</u>, the Borrower and each of its Subsidiaries has, and is in good standing with respect to, all Governmental Authorizations necessary to continue to conduct its business as heretofore or proposed to be conducted by it and to own or lease and operate its properties as now owned or leased by it, except where the failure to have such Governmental Authorization could not reasonably be expected to have a Material Adverse Effect.

**4.22    Compliance with Laws**.

The Borrower, each of its Subsidiaries, each Project (including Borrower's development activities thereon), and the Master Plans are in compliance in all material respects with, the provisions of all Applicable Laws, and there have been no citations, notices or orders of noncompliance issued to the Borrower or any of the Subsidiaries under any such law, rule or regulation which could reasonably be expected to have a Material Adverse Effect.   The Borrower and its Subsidiaries are in material compliance with all Environmental Laws applicable to it and properties owned by it.

**4.23    Ground Leases**.

With respect to each Ground Lease:

**A.**    Each Ground Lease is in full force and effect and has not been Modified, amended, supplemented or extended in any manner whatsoever, (ii) there are no defaults under any Ground Lease by the Borrower or landlord thereunder, and no event has occurred which but for the passage of time, or notice, or both would constitute a default under such Ground Lease, (iii) all rents, additional rents and other sums due and payable under each Ground Lease have been paid in full, and (iv) neither Borrower nor the landlord under each Ground Lease has commenced any action or given or received any notice for the purpose of terminating such Ground Lease.

**B.**    The Tesoro Golf Lease or a memorandum thereof (including any material amendment) has been duly recorded, the Tesoro Golf Lease permits the interest of the lessee thereunder to be encumbered by the Mortgage, and there has not been any change in the terms of the Tesoro Golf Lease (as it may have been amended) since the recordation of the Tesoro Golf Lease or the most recent memorandum or amendment thereof;

**C.**    Except the Permitted Encumbrances, the Borrower's interest in the Tesoro Golf Lease is not subject to any Liens superior to, or of equal priority with, the applicable Mortgage;

**D.**    The Borrower's interest in the Ground Lease is mortgageable to the Collateral Agent and the Borrower is permitted to grant the Mortgage encumbering the Borrower's leasehold estate under the Ground Lease and further in the event of foreclosure of the Collateral Agent's security interest granted pursuant to the Mortgage, Collateral Agent shall have the right to further assign its interest under the Tesoro Golf Lease without the need to obtain the consent of the lessor thereunder;

**E.**    The Tesoro Golf Lease requires the lessor thereunder to give notice of any default by the Borrower to Collateral Agent and the Tesoro Golf Lease further provides that notice of termination given under the Tesoro Golf Lease is not effective against the Collateral Agent unless a copy of the notice has been delivered to Lender in the manner described in the Tesoro Golf Lease;

**F.**    Collateral Agent is permitted a reasonable opportunity (including, where necessary, sufficient time to gain possession of the interest of the Borrower under the Tesoro Golf Lease) to cure any default under the Tesoro Golf Lease, which is curable after the receipt of notice of any default before the lessor thereunder may terminate the Tesoro Golf Lease; and

**G.**    The Tesoro Golf Lease requires the lessor to enter into a new lease upon termination of the Tesoro Golf Lease for any reason.

**4.24**    **Litigation**.

Except as set forth on Schedule 4.24 hereto, there are no actions, suits, proceedings or investigations pending or, to the Borrower's Knowledge, threatened on the date hereof against or affecting the Borrower or any of its Subsidiaries, or the business, operations, properties, prospects, profits or condition of the Borrower or any of its Subsidiaries, (i) which relate to any of the Loan Documents or any of the transactions contemplated thereby or (ii) which could reasonably be expected to have a Material Adverse Effect.  To the Borrower's Knowledge, neither the Borrower nor any of its Subsidiaries is in material default on the date hereof with respect to any order, writ, injunction, judgment, decree or rule of any court, Governmental Authority or arbitration board or tribunal.

**4.25**    **No Defaults**.

No event has occurred and no condition exists which would, upon or after the execution and delivery of this Agreement or the Borrower's performance hereunder, constitute a Default or an Event of Default.  Neither the Borrower nor any of its Subsidiaries is in default, and no event has occurred and no condition exists which constitutes or which with the passage of time or the giving of notice or both would constitute a default, under any Material Contract or in the payment of any Indebtedness of the Borrower or a Subsidiaries to any Person, except for any event (or series of events) which would not be reasonably expected to result in a Material Adverse Effect.

**4.26**    **Leases**.

Schedule 4.26 hereto is a complete listing of each Capitalized Lease and Operating Lease of the Borrower and its Subsidiaries on the date hereof that constitutes a Material Contract.  The Borrower and each of its Subsidiaries is in compliance, in all material respects, with all of the terms of each of its respective Capitalized Lease and Operating Leases and there is no basis upon which the lessors under any such leases could terminate same prior to the scheduled maturity or stated termination date thereof or declare the Borrower or any of its Subsidiaries in default thereunder.

**4.27**    **Employee Benefit Plans**.

**A.**    Except as disclosed on Schedule 4.27 hereto, neither the Borrower nor any of its ERISA Affiliates maintains, contributes or participates in or may incur any liability under any Pension Plan as of the date hereof.  The Borrower and each ERISA Affiliate are in compliance in all material respects with all applicable provisions and requirements of ERISA and the Internal Revenue Code with respect to each Pension Plan and Borrower Pension Plan, and have performed all their obligations under each Pension Plan and Borrower Pension Plan, except those where failure to perform such obligations could not reasonably be expected to result in material liability to the Borrower.  With respect to each Pension Plan and Borrower Pension Plan, no material liability to the PBGC (other than required premium payments), the Internal Revenue Service, any such Pension Plan or Borrower Pension Plan or any trust established under Title IV of ERISA has been, or is expected by the Borrower or any ERISA Affiliate to be, incurred by the Borrower or any ERISA Affiliate.

**B.**    No ERISA Event has occurred or could reasonably be expected to occur which has resulted or is reasonably likely to result in any material liability to the Borrower.  No fact or situation that could reasonably be expected to have a Material Adverse Effect exists with respect to any Pension Plan or Borrower Pension Plan.

**C.**    Except as could not reasonably be expected to result in material liability to the Borrower, no Borrower nor any of its Subsidiaries maintains or contributes to any employee welfare benefit plan (as

defined in Section 3(1) of ERISA) that provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employees of the Borrower or any of its Subsidiaries other than as required under Section 4980B of the Internal Revenue Code or Part 6 of Subtitle B of Title I of ERISA.

   **D.**      Except as could not reasonably be expected to result in material liability to the Borrower, no Pension Plan has any "unfunded benefit liability" as defined in Section 4001(a)(18) of ERISA (but excluding from the definition of "current value" of "assets" of such Pension Plan, accrued but unpaid contributions).

   **E.**      Except as could not reasonably be expected to result in material liability to the Borrower, the Borrower and each ERISA Affiliate has complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and is not in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan.  Neither the Borrower nor any of its ERISA Affiliates has incurred or could reasonably be expected to incur any withdrawal liability in connection with a Multiemployer Plan.

## 4.28   <u>Labor Relations</u>.

   Except as described on <u>Schedule 4.28</u> hereto, neither the Borrower nor any of its Subsidiaries is a party to any collective bargaining agreement on the date hereof.  On the date hereof, there are no material grievances, disputes or controversies with any union or any other organization of the Borrower and its Subsidiaries.

## 4.29   <u>Not a Regulated Entity</u>.

   No Loan Party is (i) an "investment company" or a "person directly or indirectly controlled by or acting on behalf of an investment company" within the meaning of the Investment Company Act of 1940; (ii) a "holding company," or a "subsidiary company" of a "holding company," or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company," within the meaning of the Public Utility Holding Company Act of 1935; or (iii) subject to regulation under the Federal Power Act, the Interstate Commerce Act, any public utilities code or any other Applicable Law regarding its authority to incur Indebtedness.

## 4.30   <u>Margin Stock</u>.

   Neither the Borrower nor any of its Subsidiaries is engaged, principally or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.

## 4.31   <u>No Material Adverse Change</u>.

   Since December 31, 2005, no event or change has occurred that has caused or evidences or could reasonably be expected to cause, either individually or in the aggregate, a Material Adverse Effect.

## 4.32   <u>Environmental Matters</u>.

   Except as disclosed on <u>Schedule 4.32</u> hereto:

   (i)      The Borrower and each of its Subsidiaries (including, without limitation, all operations and conditions at or in the Real Property Assets) are in compliance with all applicable Environmental Laws (which compliance includes, but is not limited to, the possession by the

Borrower and each of its Subsidiaries of all permits and other Governmental Authorizations required under applicable Environmental Laws, and compliance with the terms and conditions thereof), except where failure to be in compliance could not reasonably be expected to have a Material Adverse Effect.  Neither the Borrower nor any of its Subsidiaries has received any written communication, whether from a Governmental Authority, citizens group, employee or otherwise, alleging that the Borrower, or any of its Subsidiaries, or any tenant or occupant of each Project is not in such compliance, and to the Borrower's Knowledge there are no past or present actions, activities, circumstances, conditions, events or incidents that could reasonably be expected to prevent or interfere with such compliance in the future, except where failure to be in compliance in the future could not reasonably be expected to have a Material Adverse Effect.

(ii)    There is no Environmental Claim pending or, to the Borrower's Knowledge, threatened against the Borrower or any of its Subsidiaries or, to the Borrower's Knowledge, against any Person whose liability for any Environmental Claim the Borrower or any of its Subsidiaries has retained or assumed either contractually or by operation of law, in each such case which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(iii)    There are no past or present actions, activities, circumstances, conditions, events or incidents, including, without limitation, the Release or presence of any Hazardous Material, which could reasonably be expected to form the basis of any Environmental Claim against the Borrower or any of its Subsidiaries, or to the Borrower's Knowledge, against any Person whose liability for any Environmental Claim the Borrower or any of its Subsidiaries has retained or assumed either contractually or by operation of law, in each such case which could reasonably be expected to have a Material Adverse Effect.

(iv)    The Borrower and its Subsidiaries have not, and to the Borrower's Knowledge, no other Person has placed, stored, deposited, discharged, buried, dumped or disposed of Hazardous Materials on, beneath or adjacent to any property currently or formerly owned, operated or leased by the Borrower or any of its Subsidiaries, in each case, which, individually or in the aggregate, which could reasonably be expected to have a Material Adverse Effect.

(v)    No Lien in favor of any Person relating to or in connection with any Environmental Claim has been filed or has been attached to any Real Property Asset.

(vi)    Without in any way limiting the generality of the foregoing, except as disclosed in the environmental reports provided to the Administrative Agent prior to the Effective Date and as would not have a Material Adverse Effect, none of the Real Property Assets contain any: underground storage tanks; asbestos; polychlorinated biphenyls ("**PCBs**"); underground injection wells; radioactive materials; or septic tanks or waste disposal pits in which process wastewater or any Hazardous Materials have been discharged or disposed.

(vii)    The Grand Bahama (West End) Project is (and at all relevant times has been) in compliance in all material respects with the Environmental Management Plan.

(viii)    To the Borrower's Knowledge, all factual information provided by the Borrower to the consultant responsible for preparing the Environmental Impact Assessment is true and correct in all material respects.

### 4.33    Material Contracts.

**A.**    There are no contracts, agreements, commitments or documents affecting any portion of the Collateral which have an aggregate value greater than (or contemplate the payment of sums which exceed) $10,000,000, excluding any Qualified Sales Agreements for the purchase of any Residential Lots, except as set forth on Schedule 4.33 (as may be updated from time to time, the "**Material Contracts**").

**B.**    The Borrower has heretofore furnished to the Administrative Agent a true, correct and complete copy of each document described on Schedule 4.33 (as may be updated from time to time) annexed hereto and made a part hereof, and all Modifications thereto.  The Material Contracts have not been amended, modified, supplemented or clarified except as set forth on Schedule 4.33 (as may be updated from time to time).

**C.**    Each Material Contract is in full force and effect and constitutes a legal, valid and binding obligation of the applicable Borrower or its Subsidiaries, as the case may be, and, to the Borrower's Knowledge, each other party thereto.

**D.**    Neither Borrower nor any of its Subsidiaries is in material default or breach (with or without the giving of notice or the passage of time) under any such Material Contract.  Except as set forth on Schedule 4.33 (as may be updated from time to time), the Borrower has no knowledge that any other party is in material default or breach of any such Material Contract, or the existence of any conditions which, with the giving of notice or the passage of time, or both, could constitute such a material default or breach.  None of the rights and privileges under the Material Contracts inuring to any Borrower or any of its Subsidiaries has lapsed, which could reasonably be expected to have a Material Adverse Effect or jeopardize the Borrower's ability to develop each Project or sell portions of each Project as contemplated by the Project Projections, and no Governmental Authority nor any other party has any right as of the Effective Date to terminate any of the Material Contracts.

**E.**    As of the Effective Date, the applicable Borrower and its Subsidiaries have paid all fees, made all dedications, posted all bonds and other security, completed all improvements and otherwise performed, in all material respects, all obligations required to be performed by the applicable Borrower and its Subsidiaries prior to the Effective Date under the Material Contracts in accordance therewith.

**F.**    Except as set forth on Schedule 4.33, all of the Material Contracts to which a Loan Party is a party are assignable to the Lenders by their terms (or any successor-in-interest to the applicable Loan Party) as contemplated by the Security Agreement.

### 4.34    Utilities.

Except with respect to Pending Entitlements as disclosed on Schedule 4.36, Borrower is not aware of any facts or circumstances which could reasonably be expected to materially adversely affect Borrower's ability to obtain all water, sewer, gas, electric, telephone and drainage facilities and all other utilities required by law or for the use, development and operation of each Project as and when necessary to permit Borrower to achieve the Project Projections.

### 4.35    Licenses.

Except with respect to Pending Entitlements as set forth on Schedule 4.36, the Borrower has obtained (or caused to be obtained) all material licenses, permits, approvals, easements and rights of way (and all such items are currently in full force and effect) required from any governmental or regulatory authority having jurisdiction over each Project, or from private parties, necessary for the intended use,

**CREDIT AGREEMENT**

development and operation of each Project (i) as contemplated by the Master Plan, (ii) in compliance with Applicable Laws in all material respects, (iii) as and when necessary to achieve the Project Projections by their respective deadlines, and (iv) to ensure free and unimpeded vehicular and pedestrian ingress to and egress from each Project as necessary for the then current stage of the development of each Project. Borrower expects to be able to obtain all licenses, permits, approvals, easements and rights of way as and when necessary to develop each Project as contemplated by the Project Projections and is not aware of any moratoria, potential actions, challenges, proceedings by any third party or Governmental Authority which could reasonably be expected to have a Material Adverse Effect on Borrower's ability to obtain all such licenses, permits, approvals, easements and rights of way.

## 4.36    **Entitlements**.

A.    Except with respect to the Pending Entitlements set forth on Schedule 4.36, each Project is currently entitled and permitted for the uses contemplated by the Project Projections, including the development of the Membership Clubs, Infrastructure and Golf Courses and the development and sale of the Residential Lots.

B.    Except with respect to the Pending Entitlements listed on Schedule 4.36, all of the Entitlements identified on Schedule 4.36 have been obtained and are in full force and effect. The Entitlements and the Pending Entitlements, once obtained, permit the development and subdivision of the Residential Lots, Condo Parcels and Commercial Parcels at the Projects as contemplated by the Project Projections. All the Entitlements currently in effect are vested in the Borrower, and the consummation of this transaction shall not affect the same. There is no uncured material default or breach of any Entitlement. The Borrower is not aware of any defects or potential actions, challenges, proceedings by any third party or Governmental Authority which could reasonably be expected to have a Material Adverse Effect on any Entitlement. The Borrower has not received notice of any changes to any of the Entitlements which could reasonably be expected to have a Material Adverse Effect or jeopardize the Borrower's ability to development each Project or sell the remaining Residential Lots as contemplated by the Project Projections. All of the material documents relating to the Entitlements are identified on Schedule 4.36 annexed hereto and made a part hereof (collectively, the "**Entitlement Documents**"), and there are no other material documents relating to the Entitlements needed to develop each Project in accordance with the Project Projections other than those set forth on Schedule 4.36 under the heading "Pending Entitlements" (the "**Pending Entitlements**"). Borrower agrees to pursue, or cause to be pursued, the Pending Entitlements with all due diligence in the Ordinary Course of Business in order to ensure that the Projects (including, without, limitation, the Infrastructure) are developed and subdivided for sale in accordance with the Project Projections.

## 4.37    **Loan Documents**.

A.    **Delivery of Loan Documents**. The Borrower has delivered to the Agents complete and correct copies of each Loan Document and of all exhibits and schedules thereto.

B.    **Representations and Warranties**. Except to the extent otherwise set forth herein or in the schedules hereto, each of the representations and warranties of any Loan Party, and any Shareholder Pledgor made in any other Loan Document, except to the extent qualified in the schedules to such Loan Documents, was true and correct in all material respects as of the Effective Date (or as of any earlier date to which such representation and warranty specifically relates).

C.    **Governmental Authorizations**. All Governmental Authorizations and all other authorizations, approvals and consents of any other Person required by the Loan Documents or to consummate the Transactions have been obtained and are in full force and effect.

**CREDIT AGREEMENT**

**D.    Conditions and Consummation**.  On the Effective Date, (i) all of the conditions to the effectiveness of the Transactions set forth in the Loan Documents have been duly satisfied or, with the consent of the Requisite Lenders, waived, and (ii) each of the Transactions has been consummated in all material respects in accordance with the Loan Documents and all Applicable Laws.

## 4.38    Insurance Coverage.

Schedule 4.38 sets forth a true and complete list of all property, casualty, public liability, business interruption, workmen's compensation and other insurance policies currently carried by any of Borrower and its Subsidiaries.  Such policies are in full force and effect, constitute all insurance required to be maintained under, and comply with all requirements of, Section 5.6 hereof and all premiums have been paid with respect thereto through the date hereof to the extent due and payable.

## 4.39    Master Declarations.

Schedule 4.39 sets forth a true and complete list of all master and supplemental declarations affecting each Project (the "**Master Declarations**").  The Master Declarations are in full force and effect. There is no uncured material default or breach of any Master Declaration.  The Borrower is not aware of any defects or potential actions, challenges, proceedings by any third party or Governmental Authority which could reasonably be expected to have a material adverse effect on any Master Declaration.  The Master Declarations provide sufficient easements, covenants and restrictions to permit the shared use of each Project as contemplated by the Master Plans and the Project Projections.

**SECTION 5.**
**AFFIRMATIVE COVENANTS**

The Borrower covenants and agrees that, until payment in full of all of the Loans and other Obligations, the Borrower shall and shall cause each of its Subsidiaries to:

## 5.1    Visits and Inspections.

Permit representatives of the Administrative Agent from time to time, as often as may be reasonably requested, but only during normal business hours and (except when a Default or Event of Default exists) upon reasonable prior written notice to the Borrower, to visit and inspect the properties of the Borrower, conduct appraisals of the Borrower's properties, inspect, audit and make extracts from the Borrower's books and records, and discuss with its officers, its employees and its independent accountants, the Borrower's business, financial condition, business prospects and results of operations. The Administrative Agent shall also be entitled to contact any Governmental Authority with respect to each Project and the status of the Entitlements with reasonable advance notice to the Borrower.  The Borrower shall be entitled to participate with the Administrative Agent in any meeting with Governmental Authorities or Borrower's independent accountants concerning each Project.  Representatives of the Borrower (including the Borrower's accountants) shall be authorized to accompany the Administrative Agent (or representative thereof) on any visit or inspection of the Real Property Collateral, but such authorization shall in no manner be deemed to be a requirement or condition of the Administrative Agent's visits or inspections, and to the extent any of the Borrower's representatives accompany the Administrative Agent on any visit or audit, such Persons shall in no manner hinder or delay the audits or inspections of the Administrative Agent.  Representatives of each Lender shall be authorized to accompany the Administrative Agent on each such visit and inspection and to participate with the Administrative Agent therein, but at their own expense, unless a Default or Event of Default exists. Neither the Administrative Agent nor any Lender shall have any duty to make any such inspection and shall not incur any liability by reason of its failure to conduct or delay in conducting any such inspection.

84

**5.2** __Notices__.

Notify the Administrative Agent and Lenders in writing, promptly after the Borrower's obtaining knowledge or receiving copies of the following:

(i)  the institution of, or written threat of, any action, suit, proceeding, governmental or quasi-governmental investigation or arbitration against or affecting the Borrower or its Subsidiaries and not previously disclosed, which action, suit, proceeding, governmental investigation or arbitration (a) exposes, or in the case of multiple actions, suits, proceedings, governmental investigations or arbitrations arising out of the same general allegations or circumstances expose, such Persons, in the Borrower's reasonable judgment, to liability in an amount aggregating $5,000,000 or more and is or are not covered by insurance, or (b) seeks injunctive or other relief which, if obtained, could reasonably be expected to have a Material Adverse Effect, providing such other information as may be reasonably available to enable Administrative Agent and its counsel to evaluate such matters.  The Borrower, upon request of the Administrative Agent, shall promptly give written notice of the status of any action, suit, proceeding, governmental investigation or arbitration.

(ii)  any labor dispute to which any of the Borrower or its Subsidiaries may become a party, any strikes or walkouts relating to any of its property or facilities, and the expiration of any labor contract to which it is a party or by which it is bound, in each case, which could reasonably be expected to have a Material Adverse Effect;

(iii)  any default by any of the Borrower or its Subsidiaries under, or termination of, any Material Contract or any note, indenture, loan agreement, mortgage, lease, deed, guaranty or other similar agreement relating to any Indebtedness of such Person exceeding $5,000,000;

(iv)  termination, suspension or revocation of any Entitlements (or any threat of same) which could reasonably be expected to have a Material Adverse Effect;

(v)  the existence of any (a) Default, (b) Event of Default or (c) event or change that has caused or could be reasonably be expected to cause a Material Adverse Effect;

(vi)  the occurrence of or forthcoming occurrence of any ERISA Event or the receipt by the Borrower or any ERISA Affiliate of notice from a Multiemployer Plan sponsor concerning an ERISA Event;

(vii)  any judgment against any of the Borrower or its Subsidiaries in an amount exceeding $5,000,000;

(viii)  any violation or asserted violation by any of the Borrower or its Subsidiaries of any Applicable Law (including ERISA, OSHA, FLSA, or any Environmental Laws), the adverse resolution of which could reasonably be expected to have a Material Adverse Effect or result in liability of the Borrower or Subsidiaries in an amount in excess of $5,000,000;

(ix)  any Release on any property owned or occupied by any of the Borrower or its Subsidiaries if such Release could reasonably be expected to require remedial action to correct the presence of Hazardous Materials in, around, or under the Real Property Collateral;

**CREDIT AGREEMENT**

(x)     the discharge of the Borrower's independent accountants or any withdrawal or resignation by such independent accountants from their acting in such capacity;

(xi)     the opening of any new office or place of business of Borrower or its Subsidiaries;

(xii)     copies of all environmental audits and reports, whether prepared by personnel of the Borrower or any of its Subsidiaries or by independent consultants, with respect to environmental matters affecting any property owned or operated by the Borrower or its Subsidiaries or which relate to any Environmental Liabilities of the Borrower or its Subsidiaries, to the extent reflecting any matters which, in any such case, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(xiii)     copies of any Tax assessments other than annual ad valorem property tax assessments; and

(xiv)     such other information and data with respect to the Borrower or any of its Subsidiaries as from time to time may be reasonably requested by the Administrative Agent or any Lender.

**5.3     Financial Statements and Other Reports**.

The Borrower will maintain, and cause each of its Subsidiaries to maintain, proper books and records including a system of accounting established and administered in accordance with sound business practices to permit preparation of financial statements in conformity with GAAP.  The Borrower will deliver to the Administrative Agent for distribution to each Lender:

(i)     Monthly Financials:  within thirty (30) days after the end of each calendar month end (other than the last calendar month of any Fiscal Year) commencing with the calendar month ending June 30, 2006, a progress report highlighting progress made in accordance with the Project Projections including revenue and expenditures;

(ii)     Quarterly Financials:  as soon as available and in any event within forty-five (45) days after the end of each Fiscal Quarter (other than the fourth Fiscal Quarter of any Fiscal Year) commencing with the Fiscal Quarter ending June 30, 2006, (a) the consolidated balance sheet of Principal Borrower, Bahamas Borrower and Ginn-LA West End, Ltd., LLLP, as at the end of such Fiscal Quarter and the related consolidated statement of operations and consolidated statement of cash flows for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, setting forth, in the case of the statement of operations only, in comparative form the corresponding figures for the corresponding periods of the previous fiscal year (if applicable) on a GAAP accrual basis, excluding Percentage of Completion calculations and a project status report prepared on a cash flow basis along with the corresponding figures from the consolidated plan and financial forecast for the current Fiscal Year delivered pursuant to Section 5.3(xvii) in reasonable detail (as identified in the Project Projection categories) and certified by the chief financial officer of the Borrower that they fairly present, in all material respects, the financial condition as at the dates indicated and the results of operations and cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments; and (b) a narrative report describing the operations of Principal Borrower and its Subsidiaries, Bahamas Borrower and its Subsidiaries and Ginn-LA West End, Ltd., LLLP and its Subsidiaries, if any, in each case, taken as a whole, in the form prepared for

**CREDIT AGREEMENT**

presentation to senior management for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter;

(iii)    Year-End Financials:  as soon as available and in any event within one hundred five (105) days after the end of each Fiscal Year, (a) the consolidated balance sheets of the Principal Borrower, the Bahamas Borrower and Ginn-LA West End, Ltd., LLLP, as of the end of such Fiscal Year and the related consolidated statement of operations and consolidated statement of cash flows for such Fiscal Year, setting forth, in the case of the statement of operations only, in comparative form the corresponding figures for the previous fiscal year (as applicable) and the corresponding figures from the consolidated plan and financial forecast delivered pursuant to Section 5.1(xvii) for the Fiscal Year covered by such financial statements, all prepared in accordance with GAAP and a project status report prepared on a cash flow basis along with the corresponding figures from the consolidated plan for the Fiscal Year both in reasonable detail (with respect to cash flow, as identified in the Project Projections) and certified by the chief financial officer of the Borrower that they fairly present, in all material respects, the financial condition of the entities covered thereby as at the dates indicated and the results of their operations and their cash flows for the periods indicated; (b) a narrative report describing the operations of the Principal Borrower and its Subsidiaries, the Bahamas Borrower and Ginn-LA West End, Ltd., LLLP and its Subsidiaries, in each case, taken as a whole, in the form prepared for presentation to senior management for such Fiscal Year; and (c) in the case of such consolidated financial statements of Principal Borrower, Bahamas Borrower and Ginn-LA West End, Ltd., LLLP, respectively, a report thereon of independent certified public accountants selected by the Borrower and reasonably satisfactory to the Administrative Agent, which report shall be unqualified as to going concern and scope of audit and contains no other material qualification or exception, and shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of Principal Borrower, Bahamas Borrower and Ginn-LA West End, Ltd., LLLP, respectively, as of the dates indicated and the results of their operations and their cash flows for the periods indicated in conformity with GAAP applied on a basis consistent with prior years (except as otherwise disclosed in such financial statements) and that the audit by such accountants in connection with such consolidated financial statements has been made in accordance with generally accepted auditing standards;

(iv)    Officer's Certificates; Compliance Certificates:  together with each delivery of financial statements of the Borrower and its Subsidiaries pursuant to subdivisions (ii) and (iii) above, (a) an Officer's Certificate of the Borrower stating that the signer has reviewed the terms of Sections 4, 5, 6 and 7 of this Agreement and has made, or caused to be made under his or her supervision, a review in reasonable detail of the transactions and condition of the Borrower and its Subsidiaries during the accounting period covered by such financial statements and that such review has not disclosed the existence during or at the end of such accounting period, and that the signer did not have knowledge of the existence as at the date of such Officer's Certificate, of any condition or event that constitutes a Default or Event of Default under Sections 4, 5, 6 or 7 of this Agreement, or, if any such condition or event existed or exists, specifying the nature and period of existence thereof and what action the Borrower has taken, is taking and proposes to take with respect thereto; and (b) a Compliance Certificate demonstrating compliance during and at the end of the applicable accounting periods with the restrictions contained in Section 6.6.

(v)    Reconciliation Statements:  if, as a result of any change in accounting principles and policies from those used in the preparation of the audited financial statements referred to in Section 4.14, the consolidated financial statements delivered pursuant to subdivisions (i), (ii), (iii) or (xvii) of this Section 5.3 will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in

**CREDIT AGREEMENT**

accounting principles and policies been made, then together with each delivery of financial statements pursuant to subdivision (i), (ii), (iii) or (xvii) of this Section 5.3 following such change, a written statement of the chief accounting officer or chief financial officer of the Borrower setting forth the differences which would have resulted if such financial statements had been prepared without giving effect to such change, if reasonably requested by the Administrative Agent;

(vi)    <u>Accountants' Certification</u>:  together with each delivery of annual consolidated financial statements pursuant to subdivision (iii) above, a written statement by the independent certified public accountants giving the report thereon (a) stating that their audit has included a reading of the terms of Sections 5 and 6 of this Agreement as they relate to the covenants set forth in Section 6.6 and accounting matters, and (b) stating whether, in connection with their audit examination, any condition or event, insofar as such condition or event relates to the covenants set forth in Section 6.6 or accounting matters, that constitutes an Default or Event of Default has come to their attention and, if such a condition or event has come to their attention, specifying the nature and period of existence thereof; provided that such accountants shall not be liable by reason of any failure to obtain knowledge of any such Default or Event of Default that would not be disclosed in the course of their audit examination and provided further that if, in accordance with standard practice of Borrower's independent certified public accountants, the foregoing statement is not available, Borrower shall deliver to Administrative Agent a statement which conforms to this requirement only to the extent available under such practice;

(vii)    <u>Accountants' Reports</u>:  promptly upon receipt thereof (unless restricted by applicable professional standards), copies of all reports submitted to the Borrower by a reputable independent certified public accountants in connection with each annual, interim or special audit of the financial statements of the Principal Borrower and its Subsidiaries, Bahamas Borrower and Ginn-LA West End, Ltd., LLLP and its Subsidiaries made by such accountants, including, without limitation, any comment letter submitted by such accountants to management specifically relating to the annual audits of Borrower;

(viii)    <u>Future Approvals</u>:  promptly upon receipt thereof and upon request of Administrative Agent, copies of any written Entitlements, approvals or consents obtained by the Borrower or any of its Subsidiaries after the Effective Date in connection with the development of each Project;

(ix)    <u>Casualty</u>:  promptly upon the occurrence of any casualty involving any Real Property Asset of the Borrower or any of its Subsidiaries involving a loss that could reasonably be expected to exceed $2,000,000, written notice with sufficient detail describing the casualty and the extent to which any losses resulting from such casualty will be covered by insurance;

(x)    <u>Appraisal Updates</u>:  together with each delivery of financial statements pursuant to subdivisions (ii) and (iii) above, a Qualified Appraisal Update that provides an Appraised Value of the remaining portion of the Real Property Collateral  effective as of the last day of the preceding Fiscal Quarter;

(xi)    <u>Budget and Schedule Updates</u>:  together with each delivery of financial statements pursuant to subdivisions (ii) and (iii) above, (A) an update to the Project Projections and their consolidation showing costs incurred and actually paid with regard to line items shown in the Project Projections and a reasonably detailed summary of what progress has been made in accordance with the line items set forth in the consolidated Project Projections and significant line items in the Project Projections for each Project, effective as of the last day of the preceding

**CREDIT AGREEMENT**

Fiscal Quarter, provided that in the event of any material amendment, modification or adjustment to the Project Projections on a global basis or any material amendment, modification or adjustment to any material line item in the consolidated Project Projections, the Borrower shall deliver, together with such update, a Compliance Certificate prepared on a Pro Forma Basis for the applicable Fiscal Year and an explanation of assumptions on which such forecasts are based, and any such material amendment modification or adjustment shall be subject to the approval of the Administrative Agent not to be unreasonably withheld or delayed and (B) a report from The Sullivan Company describing the progress of the Project commonly known as Grand Bahama (West End) as compared with the Project Projections for such Project and the milestones contemplated under the Master Plan applicable to such Project.  It is hereby understood and agreed that the addition to the Project Projections of the purchase of any additional Real Property Collateral shall be deemed a material modification for any Project.

(xii)   Events of Default, etc.:  promptly upon any Responsible Officer of the Borrower obtaining knowledge (a) of any condition or event that constitutes a Default or an Event of Default (it being understood and agreed that the Borrower shall deliver the Officer's Certificate required hereunder within 5 days after the date on which, to Borrower's Knowledge, such condition or event has occurred), (b) that any Person has given any written notice to the Borrower or any of its Subsidiaries or taken any other action that could reasonably be expected to have an adverse effect on the Borrower or any of its Subsidiaries with respect to a claimed default or event or condition of the type referred to in Section 7.6, or (c) of the occurrence of any event or change that has caused or evidences or could be reasonably expected to cause, either in any case or in the aggregate, a Material Adverse Effect, an Officer's Certificate specifying the nature and period of existence of such condition, event or change, or specifying the written notice given or action taken by any such Person and the nature of such claimed Default, Event of Default, default, event or condition, and what action the Borrower (or applicable Subsidiaries) have taken, is taking and proposes to take with respect thereto;

(xiii)   Litigation or Other Proceedings:  (a) promptly upon any Responsible Officer of the Borrower obtaining knowledge of (X) the institution of, or written threat of, any action, suit, proceeding (whether administrative, judicial or otherwise), Environmental Claim, governmental investigation or arbitration against or affecting the Borrower or any of its Subsidiaries or any property of the Borrower or any of its Subsidiaries (collectively, "**Proceedings**") not previously disclosed in writing by the Borrower to the Lenders or (Y) any material development in any Proceeding that, in any case:

(a)   could reasonably be expected to have a Material Adverse Effect; or

(b)   seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated hereby;

(xiv)   written notice thereof together with such other information as may be reasonably available to the Borrower and as the Borrower and their counsel shall reasonably determine would not jeopardize the attorney-client privilege with respect to such Proceeding, to enable the Lenders and their counsel to evaluate such matters; and (b) within forty-five (45) days after the end of each Fiscal Quarter of the Borrower, a schedule of all Proceedings involving an alleged liability of, or claims against or affecting, the Borrower or any of its Subsidiaries equal to or greater than $5,000,000 and promptly after request by the Administrative Agent such other information as may be reasonably requested by the Administrative Agent to enable the Administrative Agent and its counsel to evaluate any of such Proceedings; provided, however, that the Borrower and their counsel may withhold information if in their reasonable

89

determination, disclosure of such information would jeopardize the attorney-client privilege with respect to such Proceeding;

(xv)   ERISA Events:  promptly upon the Borrower becoming aware of the occurrence of any ERISA Event that could reasonably be expected to have a Material Adverse Effect, a written notice specifying the nature thereof, what action the Borrower or any ERISA Affiliate has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto;

(xvi)   ERISA Notices:  with reasonable promptness, copies of (a) all written notices received by the Borrower or any ERISA Affiliate from a Multiemployer Plan sponsor concerning an ERISA Event; and (b) such other documents or governmental reports or filings relating to any Pension Plan or Borrower Pension Plan as the Administrative Agent shall reasonably request;

(xvii)   Financial Plans:  as soon as is practicable and in any event no later than ninety (90) days after the end of each Fiscal Year, a monthly consolidated plan and financial forecast for the next succeeding Fiscal Year, including without limitation (a) forecasted consolidated statement of cash flows of the Borrower and its Subsidiaries for such Fiscal Year in a form reasonably acceptable to the Administrative Agent, together with a Compliance Certificate prepared on a Pro Forma Basis for such Fiscal Year and an explanation of the assumptions on which such forecasts are based and (b) such other information and projections as the Administrative Agent may reasonably request;

(xviii)   Press Releases:  promptly upon their becoming available, copies of all press releases and other statements made available generally to the public concerning material developments at each Project or in the business of the Borrower or its Subsidiaries;

(xix)   Insurance:  as soon as is practicable and in any event by the last day of each Fiscal Year, an insurance certificate in form and substance satisfactory to the Administrative Agent outlining all material insurance coverage maintained as of the date of such certificate by the Borrower and its Subsidiaries accompanied by a certificate from a Responsible Officer that the coverage described on such certificate is planned to be maintained by the Borrower and its Subsidiaries in the immediately succeeding Fiscal Year;

(xx)   Environmental Audits and Reports:  promptly following receipt thereof, copies of all environmental audits and reports, whether prepared by personnel of the Borrower or any of its Subsidiaries or by independent consultants, with respect to environmental matters at any Real Property Asset presently owned or operated by the Borrower or its Subsidiaries or which relate to any Environmental Liabilities of the Borrower or its Subsidiaries, to the extent reflecting any matters which, in any such case, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(xxi)   Material Contracts:  promptly after (a) any Material Contract is terminated or expires or is renewed or is, amended or otherwise Modified in any manner, or (b) any notice or other communication is delivered by any party to any Material Contract pursuant thereto or in respect thereof relating to (x) any financial matter or other matter having adverse financial consequences to the Borrower or its Subsidiaries in excess of $5,000,000 or (y) any other non-financial matter which could reasonably be expected to have a Material Adverse Effect, notice and a copy thereof and, in the case of any such renewal, amendment, other Modification or new Material Contract, a description in reasonable detail of the material terms thereof; and

90

**CREDIT AGREEMENT**

(xxii)   Other Information:  with reasonable promptness, such other information and data with respect to the Borrower or any of the Borrower's Subsidiaries as from time to time may be reasonably requested by the Administrative Agent or any Lenders, and such other documentation, information and certifications described in Section 3.1T as from time to time requested by the Administrative Agent or any Lender.

## 5.4     Corporate Existence.

The Borrower will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect its organizational existence and all rights and franchises material to the business of the Borrower and its Subsidiaries (on a consolidated basis) or the Loan Parties, taken as a whole.

## 5.5     Payment of Taxes and Claims; Tax Consolidation.

The Borrower will, and will cause each of its Subsidiaries to, pay all taxes, assessments and other governmental charges imposed upon it and each of its Subsidiaries or any of its properties or assets before any material penalty accrues thereon, and all claims (including, without limitation, claims for labor, services, materials and supplies) for sums that have become due and payable which, if unpaid, might become a Lien (other than a Permitted Encumbrance) upon any of its properties or assets; provided that no such tax, charge or claim need be paid if being Properly Contested.  For United States federal income tax purposes, Principal Borrower will at all times be treated as a partnership or a "disregarded entity," and Bahamas Borrower will at all times be treated as a corporation.  Bahamas Borrower will not be engaged in any active conduct of trade or business and will have no substantial assets other than those arising out of the Bahamas Intercompany Indebtedness, and its assets will at all times be substantially offset by its obligation to the Lenders under the Loan Documents.

## 5.6     Maintenance of Properties; Insurance.

The Borrower will, and will cause each of its Subsidiaries to, maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear excepted, all material properties used in the business of the Borrower and its Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof as necessary (i) for the development of each Project as contemplated by the Master Plan, (ii) to ensure each Project is in compliance with Applicable Laws in all material respects, and  (iii) as and when necessary to achieve the Project Projections by their respective deadlines.  The Borrower will maintain or cause to be maintained, with financially sound and reputable insurers, insurance with respect to its properties and business and the properties and businesses of its Subsidiaries against loss or damage of the kinds and with respect to liability customarily carried or maintained under similar circumstances by corporations of established reputation engaged in similar businesses.  Each such policy of casualty insurance covering damage to or loss of property shall name the Collateral Agent for the benefit of the Lenders as additional insured and as the loss payee thereunder for all losses, subject to application of proceeds as required by Section 2.8B(ii)(c), and all such policies of insurance shall provide for at least thirty (30) days' prior written notice to the Collateral Agent of any Modification or cancellation of such policy (ten (10) days' prior written notice in the case of nonpayment or nonrenewal).

## 5.7     Lender Meeting.

The Borrower will, upon the request of the Administrative Agent, participate in a meeting of the Administrative Agent and the Lenders at least once during each Fiscal Year (and will participate in such other meetings at such other times as the Borrower and the Administrative Agent may agree) to be held telephonically or, at Borrower's election, at the Borrower's corporate offices (or such other location as

**CREDIT AGREEMENT**

may be agreed to by the Borrower and the Administrative Agent) at such time as may be agreed to by the Borrower and the Administrative Agent.

### 5.8     Compliance with Laws and Equator Principles.

**A.**     The Borrower shall, and shall cause each of its Subsidiaries to, comply with the requirements of all Applicable Laws, noncompliance with which, individually or in the aggregate with other non-compliances, could reasonably be expected to cause a Material Adverse Effect.

**B.**     The Grand Bahamas (West End) Project shall comply, in all material respects, with the Environmental Management Plan.

**C.**     In the event and to the extent that the Equator Principles applicable to the Grand Bahama (West End) Project materially change after the date of this Agreement, upon the Administrative Agent's written notice to the Borrower of such changes, the Borrower agrees to use commercially reasonable efforts to cause such Project to comply in a commercially reasonable time frame with any such material changes to the Equator Principles; provided however, that in the event the Borrower cannot comply with the changes to the Equator Principles without expending greater than commercially reasonable efforts, then the Borrower need not attempt to comply with such changes to the Equator Principles, except that in such event the Borrower shall in its reasonable discretion mitigate or cause to be mitigated any such noncompliance with such changes.  Nothing in this Section 5.8 shall require any modification to the Environmental Management Plan for the construction of the Grand Bahama (West End) Project.

**D.**     Except where accompanied by material compliance with all applicable Environmental Laws, neither the Borrower nor any Subsidiary shall take any action, enter into any transaction, agreement or proposal or otherwise cause or permit any third person to take any action, that could reasonably be expected to result in a change in the categorization (as determined by a qualified independent consultant reasonably acceptable to the Borrower and the Administrative Agent) of the Grand Bahama (West End) Project from a Category "B" project under the Equator Principles to a "Category A" project thereunder.

### 5.9     Environmental Disclosure and Inspection.

**A.**     The Borrower shall, and shall cause each of its Subsidiaries to, exercise all due diligence in order to comply and cause (i) all tenants or subtenants under any leases or occupancy agreements affecting the Real Property Assets, (ii) all contractors, engineers, architects and similar vendors and contractors, and (iii) all other Persons on or occupying the Real Property Assets, to comply with all Environmental Laws, except for any such noncompliance which could not reasonably be expected to cause a Material Adverse Effect.

**B.**     The Borrower agrees that the Administrative Agent may, from time to time, retain, at the Borrower's expense, an independent professional consultant reasonably acceptable to the Borrower to review any report relating to Hazardous Materials or Borrower's or its Subsidiaries' compliance with Environmental Laws prepared by or for the Borrower and to conduct their own investigation (the scope of which investigation shall be reasonable based upon the circumstances) of any Real Property Asset currently owned, leased, operated or used by the Borrower or any of its Subsidiaries, if (x) a Default or an Event of Default shall have occurred and be continuing, or (y) the Administrative Agent reasonably believes (1) that an occurrence relating to such Real Property Asset is likely to give rise to an Environmental Liability, (2) that a violation of an Environmental Law on or around such Real Property Asset has occurred or is likely to occur or Effect or (3) that a material violation of the Equator Principles or the Environmental Management Plan has occurred or is likely to occur, which could, in each case, reasonably be expected to result in a Material Adverse Effect.  The Borrower shall use its reasonable

efforts to obtain for the Administrative Agent and its agents, employees, consultants and contractors the right, upon reasonable notice to the Borrower, to enter into or on to the Real Property Assets currently owned, leased, operated or used by the Borrower or any of its Subsidiaries to perform such tests on such property as are reasonably necessary to conduct such a review and/or investigation.   Any such investigation of any Real Property Asset shall be conducted, unless otherwise agreed to by the Borrower and the Administrative Agent, during normal business hours and, shall be conducted so as not to unreasonably interfere with the ongoing operations at any such Real Property Asset or to cause any damage or loss to any property at such Real Property Asset.  The Borrower and the Administrative Agent hereby acknowledge and agree that any report of any investigation conducted at the request of the Administrative Agent pursuant to this Section 5.9B will be obtained and shall be used by the Administrative Agent and the Lenders for the purposes of the Lenders' internal credit decisions, to monitor and police the Loans and to protect the Lenders' security interests, if any, created by the Loan Documents, and the Administrative Agent and the Lenders hereby acknowledge and agree any such report will be kept confidential by them to the extent permitted by law except as provided in the following sentence.  The Administrative Agent agrees to deliver a copy of any such report to the Borrower with the understanding that the Borrower acknowledge and agree that (i) they will indemnify and hold harmless the Administrative Agent and each Lender from any costs, losses or liabilities relating to the Borrower's use of or reliance on such report, (ii) neither Agent nor any Lender makes any representation or warranty with respect to such report, and (iii) by delivering such report to the Borrower, neither the Administrative Agent nor any Lender is requiring or recommending the implementation of any suggestions or recommendations contained in such report.

     **C.**     The Borrower shall promptly notify the Administrative Agent of (i) any proposed acquisition of stock, assets, or property by the Borrower or any of its Subsidiaries that could reasonably be expected to expose the Borrower or any of its Subsidiaries to, or result in, Environmental Liability that could reasonably be expected to have a Material Adverse Effect and (ii) any proposed action to be taken by the Borrower or any of its Subsidiaries to commence manufacturing, industrial or other similar operations that could reasonably be expected to subject the Borrower or any of its Subsidiaries to additional Environmental Laws, that are materially different from the Environmental Laws applicable to the operations of the Borrower and its Subsidiaries as of the Effective Date.

     **D.**     The Borrower shall, at their own expense, provide copies of such documents or information as the Administrative Agent may reasonably request in relation to any matters disclosed pursuant to this Section 5.9.

## 5.10    <u>The Borrower's Remedial Action Regarding Hazardous Materials</u>.

     The Borrower shall promptly take, and shall cause each of its Subsidiaries promptly to take, any and all necessary remedial action in connection with the presence, handling, storage, use, disposal, transportation or Release or threatened Release of any Hazardous Materials on, under or affecting any Real Property Asset in order to comply in all material respects with all applicable Environmental Laws and Governmental Authorizations.  In the event the Borrower or any of its Subsidiaries undertakes any Cleanup action with respect to the presence, Release or threatened Release of any Hazardous Materials on or affecting any Real Property Asset, the Borrower or such Subsidiaries shall conduct and complete such Cleanup action in material compliance with all applicable Environmental Laws, and in accordance with the policies, orders and directives of all federal, state and local governmental authorities except when, and only to the extent that, the Borrower's or such Subsidiary's liability for such presence, handling, storage, use, disposal, transportation or Release or threatened Release of any Hazardous Materials is being Properly Contested.

                                        **CREDIT AGREEMENT**

**5.11    Subsidiaries**.

As of the Effective Date, the Subsidiaries of the Borrower are as set forth on Schedule 4.5. The Borrower will not form (or permit to be formed) any new Subsidiaries after the Effective Date without first receiving the prior written consent of the Administrative Agent, which consent the Administrative Agent may condition upon, among other things, (i) such new Subsidiaries executing a guaranty (in form and substance satisfactory to the Administrative Agent) of the Borrower's Obligations, (ii) the Borrower executing a pledge of the Capital Stock of such Subsidiaries, and (iii) such further action and such further documents and instruments as may be required to grant and perfect in favor of the Collateral Agent, for the benefit of the Lenders, a First Priority security interest in all of the: (a) personal property assets of such Subsidiaries; (b) real property assets owned by such Subsidiaries; and (c) leasehold interests owned by such Subsidiaries.   With respect to any Subsidiary approved by the Administrative Agent, the Borrower shall deliver to the Administrative Agent, together with such Loan Documents, in the case of each such Subsidiary that is required to be a party to any Loan Document:  (i) (a) certified copies of such Subsidiary's Organizational Certificate together, if applicable, with a good standing certificate from the Secretary of State of the jurisdiction of its incorporation, formation or organization, as applicable, each to be dated a recent date prior to their delivery to the Administrative Agent, (b) a copy of such Subsidiary's Organizational Documents, certified by its secretary or an assistant corporate secretary (or Person holding an equivalent title or having equivalent duties and responsibilities) as of a recent date prior to their delivery to the Administrative Agent, (c) a certificate executed by the secretary or an assistant secretary of such Subsidiary as to (x) the incumbency and signatures of the officers of such Subsidiary executing such guaranty, the Collateral Documents and the other Loan Documents to which such Subsidiary is a party and (y) the fact that the attached Organizational Authorizations of such Subsidiary authorizing the execution, delivery and performance of such guaranty, such Collateral Documents and such other Loan Documents are in full force and effect and have not been Modified or rescinded, and (ii) a favorable opinion of counsel to such Subsidiary, that is reasonably satisfactory to the Collateral Agent and its counsel, as to (a) the due organization and good standing of such Subsidiary, (b) the due authorization, execution and delivery by such Subsidiary of such guaranty, the Collateral Documents and any other Loan Documents to which it is a party and (c) the enforceability of such guaranty and such Collateral Documents against such Subsidiary, (d) the validity and perfection of the security interests granted by such Subsidiary (and by the parent of such Subsidiaries in respect of the Capital Stock of such Subsidiary) in favor of the Collateral Agent pursuant to the Collateral Documents, and (e) such other matters as any Agent may reasonably request, all of the foregoing to be reasonably satisfactory in form and substance to the Administrative Agent, the Collateral Agent and their counsel.   In addition, the Borrower shall promptly deliver a supplement to Schedule 4.1 to the Administrative Agent if any Subsidiary is created or acquired, if applicable.

**5.12    Interest Rate Protection**.

At all times, commencing one hundred-eighty (180) days after the Effective Date, the Borrower (through itself or one of the Subsidiaries) shall maintain in effect one or more interest rate Hedge Agreements (which, to the extent secured by the Collateral, shall be with the Administrative Agent or the Lenders, or any of their respective Affiliates) in form and substance reasonably satisfactory to the Administrative Agent with respect to an aggregate principal amount equal to at least 50% of the aggregate outstanding principal amount of the Tranche B Loan and the loans under the Second Lien Credit Agreement.  Such Hedge Agreements shall be maintained for two (2) years after the Effective Date in a form and with a counterparty acceptable to the Administrative Agent in its reasonable discretion.

94

**CREDIT AGREEMENT**

**5.13**    **Further Assurances**.

At any time or from time to time upon the request of the Administrative Agent or the Collateral Agent, the Borrower will, at its expense, and will cause each of its Subsidiaries, at the Borrower's expense, to promptly execute, acknowledge and deliver such further documents and do such other acts and things as the Administrative Agent or the Collateral Agent may reasonably request only to the extent such acts or things are consistent with the express intent and purpose of the Loan Documents.   In furtherance and not in limitation of the foregoing, the Borrower shall take, and cause each of its Subsidiaries to take, such actions as the Administrative Agent or the Collateral Agent may reasonably request from time to time (including, without limitation, the execution and delivery of guaranties, security agreements, pledge agreements, mortgages, deeds of trust, landlord's consents and estoppels, stock powers, financing statements and other documents, the filing or recording of any of the foregoing, title insurance with respect to any of the foregoing that relates to an interest in real property, and the delivery of stock certificates and other collateral with respect to which perfection is obtained by possession) to ensure that the Obligations are guaranteed by the Subsidiaries and are secured by substantially all of the assets (other than those assets specifically excluded by the terms of the Loan Documents) of the Borrower and its Subsidiaries.

**5.14**    **Title**.

The Borrower shall warrant and defend (a) its title to the Real Property Collateral and every part thereof, subject only to Liens permitted hereunder (including Permitted Encumbrances) and (b) the validity and priority of the Liens of the applicable Collateral Documents, subject only to Liens permitted hereunder (including Permitted Encumbrances), in each case against the claims of all Persons whomsoever.  Without limiting the foregoing, the Borrower covenants and agrees that the Administrative Agent shall at all times have a First Priority Lien on the Real Property Collateral.  The Borrower shall reimburse the Administrative Agent for any losses, costs, damages or expenses (including reasonable attorneys' fees and court costs) incurred by the Administrative Agent if an interest in the Real Property Collateral, other than as permitted hereunder, is claimed by another Person.

**5.15**    **Estoppels**.

The Borrower will at any time and from time to time, within ten (10) days after written demand by Administrative Agent, deliver to Administrative Agent a certificate duly executed, and in form satisfactory to Administrative Agent, stating and acknowledging the then outstanding principal balance of the Loans and the fact that, to Borrower's Knowledge, there are no defenses, offsets or counterclaims (or, if such should not be the fact, then the facts and circumstances relating to such defenses, offsets or counterclaims) and such other information as may reasonably be requested by Administrative Agent.

**5.16**    **SPE Covenants**.

The Borrower and its Subsidiaries:

(a)    except with regard to Bahamas Borrower, do not own and will not own any asset or property other than their respective interests in each Project and additional Real Property Collateral permitted to be purchased as provided in Section 2.8B(ii)(b), and together with incidental personal property reasonably necessary for the ownership or operation of each Project;

(b)    except with regard to Bahamas Borrower, will not engage in any business other than the ownership, management and operation of each Project, and incidental personal property

**CREDIT AGREEMENT**

reasonably necessary thereto and will conduct and operate its business in all material respects as presently conducted and operated;

(c)     Bahamas Borrower will not engage in any business other than holding and enforcing the note and mortgage evidencing the Bahamas Intercompany Indebtedness and receiving payments thereunder;

(d)     except to the extent permitted by this Agreement, has not made and will not make loans to any Person or hold evidence of Indebtedness issued by any other Person or entity;

(e)     except to the extent permitted by this Agreement, shall not acquire obligations or securities of its Affiliates or any constituent party of Borrower or its Subsidiaries;

(f)     is and will remain solvent and will pay its debts and liabilities from its assets as the same shall become due;

(g)     has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, and will not materially amend, Modify or otherwise change its Organizational Documents in any manner which could reasonably be expected to be adverse to the interests of the Lenders, and in connection with any non-material amendment of any such Organizational Documents, shall forward a copy of such amendment to the Administrative Agent promptly after the execution or filing thereof,

(h)     will maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliates and any constituent party and will file its own tax returns except to the extent that (A) a consolidated tax return is permitted by Applicable Law or (B) a tax return is not required by Applicable Law;

(i)     will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any other Borrower and any Affiliate of any Borrower), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, and shall not identify itself or any of its Affiliates as a division or part of the other;

(j)     will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(k)     will not, and will not permit any constituent party to, seek the dissolution, winding up, liquidation, consolidation or merger in whole or in part, of such entity;

(l)     will not commingle its funds and other assets with those of any Affiliate or constituent party, or any Affiliate of any constituent party, or any other Person;

(m)     has and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or constituent party, or any Affiliate of any constituent party, or any other Person; and

(n)     do not and will not hold itself out to be responsible for the debts or obligations of any other Person (except for the Loans and Permitted Indebtedness).

**CREDIT AGREEMENT**

**5.17**     **Maintenance of Entitlements**.

The Borrower shall warrant and defend, and otherwise maintain, all of the Entitlements obtained in connection with each Project as necessary (i) for the development of each Project as intended and as contemplated by the Master Plan, (ii) to ensure each Project is in compliance with Applicable Laws, and (iii) to enable Borrower to achieve the Project Projections.  To the extent any Entitlements require any obligations or conditions to be fulfilled by the Borrower or any of its Subsidiaries, the Borrower will perform (or caused to be performed) such obligations or conditions.  To the extent the Borrower must obtain certain Pending Entitlements to develop each Project in accordance with the Project Projections and the Master Plans, the Borrower shall diligently pursue the issuance of such Pending Entitlements in the Ordinary Course of Business and as needed to achieve the Project Projections.

**5.18**     **Asset Sales.**

The Borrower covenants and agrees that the Real Property Collateral shall only be sold as Residential Lots, Condo Parcels or Commercial Parcels pursuant to a Permitted Collateral Asset Sale and upon payment to the Borrower of the applicable Release Price with respect to sales of Condo Parcels and Commercial Parcels.  Except for the Condo Parcels and Commercial Parcels, no Real Property Collateral will be sold in bulk that has not been previously subdivided into individual Residential Lots as contemplated by the Master Plan.

**5.19**     **Control**.

The Permitted Holder shall at all times directly or indirectly Control the Borrower and own, directly or indirectly, 66 2/3% of the beneficial interests in the Borrower; subject only to the death or legal incapacity of the Permitted Holder.  ERG Enterprises, LP shall at all times retain direct or indirect management and operational control of the Borrower.

**5.20**     **Credit Rating**.

The Borrower shall use commercially reasonable efforts to maintain at all times public credit ratings by Moody's and S&P with respect to the Loans.

**5.21**     **Accounts**.

The Borrower covenants and agrees that all Cash From Project Sales and Equity Proceeds received by Borrower or its Subsidiaries not applied immediately to prepay the Loans as required by Section 2.8B(ii)(d) shall be deposited into and maintained in the Company's Operating Account as provided in Section 3.3 hereof.  Subject to the right of Borrower and its Subsidiaries to make Restricted Payments as provided in Section 6.5, all withdrawals from the Company's Operating Account shall be used in a manner consistent with the Project Projections.

Any "securities accounts" and "deposit accounts" (as such terms are defined in the UCC) of the Borrower and its Subsidiaries established after the Effective Date shall be subject to effective Control Agreements in favor of the Collateral Agent in form and substance reasonably satisfactory to the Collateral Agent.

**5.22**   **Bahamas Intercompany Indebtedness**.

Bahamas Borrower shall, at all times, strictly enforce the terms and provisions of the note evidencing the Bahamas Intercompany Indebtedness and the mortgage securing the same and the obligations of Bahamas Owner thereunder.

**5.23**   **Maintenance of Ground Leases**.

With respect to each Ground Lease,

**A.**   Borrower shall (i) pay all rents, additional rents and other sums required to be paid by the Borrower, as tenant under and pursuant to the provisions of each Ground Lease, (ii) diligently perform and observe all of the terms, covenants and conditions of each Ground Lease on the part of the Borrower, as tenant thereunder, and (iii) promptly notify the Collateral Agent of the giving of any notice by lessor under the applicable Ground Lease to the Borrower of any default by the Borrower, as tenant thereunder, and deliver to Lender a true copy of each such notice within five (5) Business Days of receipt. The Borrower shall not, without the prior consent of the Collateral Agent surrender the leasehold estate created by the applicable Ground Lease or terminate or cancel any Ground Lease or materially Modify any Ground Lease, either orally or in writing.

**B.**   If the Borrower shall default in the performance or observance of any term, covenant or condition of any Ground Lease on the part of Borrower, as tenant thereunder, and shall fail to cure the same prior to the expiration of any applicable cure period provided thereunder, the Collateral Agent shall have the right, to the extent the Collateral Agent has received notice of, or has otherwise become aware of any such default, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all of the terms, covenants and conditions of such Ground Lease on the part of the Borrower to be performed or observed on behalf of the Borrower, to the end that the rights of the Borrower in, to and under such Ground Lease shall be kept unimpaired and free from default.  If the landlord under the applicable Ground Lease shall deliver to the Collateral Agent a copy of any notice of default under such Ground Lease, such notice shall constitute full protection to the Collateral Agent for any action taken or omitted to be taken by the Collateral Agent, in good faith, in reliance thereon.  The Borrower shall exercise each individual option, if any, to extend or renew the term of each Ground Lease prior to or within the period in which any such option may be exercised, and the Borrower hereby expressly authorizes and appoints the Collateral Agent its attorney-in-fact to exercise any such option in the name of and upon behalf of the Borrower, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest.

**5.24**   **Material Contracts**.

**A.**   Neither Borrower nor any of its Subsidiaries shall enter into a Third Party Operating Agreement or an Affiliate Operating Agreement without prior written consent of the Administrative Agent, such consent not to be unreasonably withheld and without providing the Administrative Agent with a Recognition, Collateral Assignment and Estoppel Agreement or an Affiliate Operating Agreement Subordination (which shall be provided for all Affiliate Operating Agreements even if such Affiliate Operating Agreement does not constitute a Material Contract), as the case may be, in form and substance reasonably satisfactory to the Administrative Agent. Neither Borrower nor any of its Subsidiaries shall terminate or materially Modify any such approved Third Party Operating Agreement that is a Material Contract or Affiliate Operating Agreement without the prior written consent of the Administrative Agent, such consent not to be unreasonably withheld.

**CREDIT AGREEMENT**

**B.**     Neither Borrower nor any of its Subsidiaries shall transfer the responsibility for the oversight of the construction of each Project from the Developer to any other person or entity without the prior written consent of Administrative Agent, which consent shall not be unreasonably withheld and without providing the Administrative Agent with a Recognition, Collateral Assignment and Estoppel Agreement in form and substance reasonably satisfactory to the Administrative Agent.

**C.**     Neither Borrower nor any of its Subsidiaries shall enter into any development agreement or any other agreement with any party other than Developer the purpose of which is to obtain the property development services, similar to those provided by the Developer without the prior written consent of the Administrative Agent, such consent not to be unreasonably withheld and without providing the Administrative Agent with a Recognition, Collateral Assignment and Estoppel Agreement or an Affiliate Operating Agreement Subordination, as the case may be, in form and substance reasonably satisfactory to the Administrative Agent.

**D.**     Neither Borrower nor any of its Subsidiaries shall enter into any new Material Contract, the value of (or the costs required to be paid under) which exceeds $10,000,000 other than Qualified Sales Agreements without the prior approval of Administrative Agent, such approval not to be unreasonably withheld.

**E.**     Neither Borrower nor any of its Subsidiaries shall enter into any material shared use agreement or master declaration with respect to any portion of the Real Property Collateral, without the prior approval of Administrative Agent, except as permitted in Section 2.13B.

## SECTION 6.
## NEGATIVE COVENANTS

The Borrower covenants and agrees that, until payment in full of all of the Loans and other Obligations, the Borrower shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 6.

## 6.1     **Indebtedness**.

The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness or preferred stock, except that the Borrower and its Subsidiaries may create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to Indebtedness or preferred stock, as follows:

(i)     Each of the Loan Parties may become and remain liable with respect to its respective Obligations in accordance with the terms of this Agreement and the Loan Documents;

(ii)     The Borrower and its Subsidiaries may become and remain liable with respect to trade payables incurred in the Ordinary Course of Business of the Borrower or its Subsidiaries;

(iii)     The Borrower and its Subsidiaries may become and remain liable with respect to obligations owed under the Second Lien Credit Agreement in an aggregate principal amount not to exceed $150,000,000 less the amount of any permanent repayments or prepayments thereof (other than repayments or prepayments in connection with a refinancing thereof permitted hereunder);

**CREDIT AGREEMENT**

(iv)     The Borrower and its Subsidiaries may become and remain liable with respect to Permitted Equipment Financing;

(v)     Each of the Loan Parties and Bahamas Owner may become and remain liable with respect to Indebtedness to any other Loan Party and Bahamas Owner; provided that, in each case, (a) no Event of Default has occurred and is continuing as the time of the incurrence thereof or would result therefrom, (b) all such intercompany Indebtedness shall be evidenced by promissory notes (which promissory note may be a grid note under which such Loan Parties may direct Administrative Agent to make entries to reflect additional sums advanced) which shall have been pledged to the Collateral Agent pursuant to the Collateral Documents, (c) all such intercompany Indebtedness owed by the Borrower to any of its Subsidiaries or by the Borrower or any of its Subsidiaries to Bahamas Owner shall be unsecured and subordinated in right of payment to the payment in full of the Obligations pursuant to the terms of the applicable promissory notes or an intercompany subordination agreement that in any such case, are reasonably satisfactory to the Administrative Agent, and (d) any payment by any Subsidiaries of the Borrower under any Guaranty or any payment by the Borrower of the Obligations shall result in a pro tanto reduction of the amount of any intercompany Indebtedness owed by the Borrower or by such Subsidiaries to the Borrower or to any of its Subsidiaries for whose benefit such payment is made;

(vi)     The Borrower and its Subsidiaries may become and remain liable with respect to Indebtedness under appeal bonds required by Governmental Authorities in connection with the development of each Project incurred in the Ordinary Course of Business.

(vii)     Intentionally deleted;

(viii)     The Borrower and its Subsidiaries may become and remain liable with respect to Indebtedness under any Hedge Agreements;

(ix)     The Borrower and its Subsidiaries may remain liable with respect to the Permitted Existing Indebtedness; and

(x)     The Borrower and its Subsidiaries may become liable with respect to Intercompany Subordinated Debt, provided that no Event of Default shall have occurred and be continuing at the time of the incurrence thereof or would result therefrom.

## 6.2   Liens and Related Matters.

**A.     Prohibition on Liens.**   The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable) of the Borrower or any of its Subsidiaries (or a Lien on the Capital Stock of Borrower or its Subsidiaries), whether now owned or hereafter acquired, or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect, any financing statement, or other similar notice of any Lien with respect to any such property, asset, income or profits under the Uniform Commercial Code of any state or under any similar recording or notice statute, except (solely with respect to the Borrower and its Subsidiaries),

(i)     any Permitted Encumbrances; provided, however, that (i) with respect to the Real Property Collateral no Permitted Encumbrances except the Permitted Title Exceptions shall be

**CREDIT AGREEMENT**

senior or prior to the First Priority liens under the Mortgages (which Permitted Title Exceptions include, without limitation, a Lien securing certain of the Permitted Existing Indebtedness); and (ii) no such Permitted Encumbrances shall result in a Lien on the Capital Stock of the Borrower or its Subsidiaries;

(ii)     Liens in favor of the Collateral Agent granted pursuant to the Collateral Documents or granted in favor of any Agent or Lender pursuant to the terms of this Agreement; and

(iii)    Liens on the Collateral securing obligations under the Second Lien Credit Agreement and the other Second Lien Loan Documents.

**B.     No Further Negative Pledges**.  Except with respect to specific property encumbered to secure payment of particular Indebtedness permitted by this Agreement or to be sold pursuant to an Asset Sale otherwise permitted by this Agreement, neither the Borrower nor any of its Subsidiaries shall enter into any agreement (other than the Loan Documents and the Second Lien Loan Documents) prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired.

**C.     No Restrictions on Distributions, etc**.  Except as otherwise provided in the Loan Documents or the Second Lien Loan Documents, the Borrower will not, and will not permit any of its Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance, limitation or restriction of any kind on the ability of any Subsidiaries of the Borrower to (i) pay dividends or make any other distributions on any of such Subsidiary's Capital Stock owned by the Borrower or any other Subsidiaries of the Borrower, (ii) repay or prepay any Indebtedness owed by such Subsidiary to the Borrower or any other Subsidiary of the Borrower, (iii) make loans or advances to the Borrower or any other Subsidiary of the Borrower, or (iv) transfer any of its property or assets to the Borrower or any other Subsidiary of the Borrower.

## 6.3     <u>Investments</u>.

The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, make or own any Investments, except the Borrower and its Subsidiaries may:

(i)      enter into Intercompany Subordinated Debt, provided no Event of Default shall have occurred and be continuing at the time of the incurrence thereof or shall result therefrom;

(ii)     enter into the Investments evidencing the purchase money promissory note and mortgage in connection with the Tesoro Membership Club Sale Leaseback and the Tesoro Golf Sale Leaseback, provided, however that such purchase money promissory note and mortgages are collateral assigned to Collateral Agent pursuant to a Collateral Assignment of Mortgage and Note;

(iii)    enter into Investments evidencing Indebtedness permitted under Section 6.1(v) hereof;

(iv)     make Investments in Cash Equivalents;

(v)      make Investments for purposes of purchasing additional Real Property Collateral, which will be pledged as collateral to secure the Borrrower's and its Subsidiaries' Obligations hereunder as required by Section 5.13 hereof;

**CREDIT AGREEMENT**

(vi)     make Investments in its Subsidiaries; and

(vii)     make the loans contemplated by the Bahamas Intercompany Indebtedness.

**6.4     Contingent Obligations.**

The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, create or become or remain liable with respect to any Contingent Obligation, except:

(i)     The Borrower and its Subsidiaries may become and remain liable with respect to Contingent Obligations in respect of customary indemnification and purchase price adjustment obligations of any such Person incurred in connection with Asset Sales permitted by this Agreement;

(ii)     The Borrower and its Subsidiaries may become and remain liable with respect to Contingent Obligations under Qualified Sales Agreements or other agreements with Governmental Authorities to complete Infrastructure, Golf Courses, Membership Clubs and other amenities at the Projects.

(iii)     The Borrower and its Subsidiaries may become and remain liable with respect to Contingent Obligations in respect of any of the Indebtedness that, if outstanding, would be permitted under Section 6.1.

**6.5     Restricted Payments.**

The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, declare, order, pay, make or set apart any sum for any Restricted Payment; provided that so long as no Event of Default has occurred and is continuing or would result therefrom, the Borrower and its Subsidiaries may make Restricted Payments (i) subject to the terms of the Intercreditor Agreement, that are required payments of interest in respect of the Indebtedness incurred under the Second Lien Credit Agreement and (ii) to the holders of the Capital Stock of the Borrower in an aggregate amount not to exceed the Restricted Payment Amount, provided that no Restricted Payment shall be permitted pursuant to this Section 6.5 unless the Trigger Date Events shall have occurred and be continuing.

**6.6     Financial Covenants.**

**A.     Total Debt LTV Ratio.**   The ratio (the "**Total Debt LTV Ratio**") of (i) the aggregate consolidated amount of Indebtedness (excluding Intercompany Subordinated Debt and the Bahamas Intercompany Indebtedness) of the Borrower, its Subsidiaries and the Bahamas Owner as of the Calculation Date, to (ii) the Appraised Value of the then remaining Real Property Collateral <u>shall not exceed</u> the following ratios:

| Fiscal Quarter ending | Total Debt LTV Ratio |
|---|---|
| After the Effective Date and on or prior to September 30, 2006 | 50% |
| December 31, 2006 | 40% |
| March 31, 2007 and June 30, 2007 | 35% |
| September 30, 2007 and December 31, 2007 | 30% |
| Thereafter | 25% |

**CREDIT AGREEMENT**

**B.     First Lien Debt LTV Ratio.**  The ratio (the "**First Lien Debt LTV Ratio**") of (i) the principal amount of the Obligations as of the Calculation Date, to (ii) the Appraised Value of the then remaining Real Property Collateral as of the Calculation Date shall not exceed the following ratios:

| Fiscal Quarter ending | First Lien Debt LTV Ratio |
|---|---|
| After the Effective Date and on or prior to September 30, 2006 | 40% |
| December 31, 2006 | 30% |
| March 31, 2007 and June 30, 2007 | 25% |
| September 30, 2007 and December 31, 2007 | 20% |
| Thereafter | 15% |

**C.     Maximum** Net Indebtedness**.**  The aggregate consolidated amount of Indebtedness (excluding Intercompany Subordinated Debt and the Bahamas Intercompany Indebtedness) of the Borrower, its Subsidiaries and the Bahamas Owner as of the Calculation Date less the aggregate amount of Cash Collateral and Cash and Cash Equivalents held by the Borrower, its Subsidiaries and the Bahamas Owner (the "**Maximum Net Indebtedness**") shall not exceed the following amounts (shown in thousands):

| Fiscal Quarter ending | Maximum Net Indebtedness |
|---|---|
| After the Effective Date and on or prior to June 30, 2006 | $650,000 |
| September 30, 2006 | $650,000 |
| December 31, 2006 | $650,000 |
| March 31, 2007 | $650,000 |
| June 30, 2007 | $500,000 |
| September 30, 2007 | $500,000 |
| December 31, 2007 | $500,000 |
| March 31, 2008 | $400,000 |
| June 30, 2008 | $400,000 |
| September 30, 2008 | $400,000 |
| December 31, 2008 | $400,000 |
| March 31, 2009 | $250,000 |
| June 30, 2009 | $250,000 |
| September 30, 2009 | $250,000 |
| December 31, 2009 | $250,000 |
| March 31, 2010 | $100,000 |
| June 30, 2010 | $100,000 |
| September 30, 2010 | $100,000 |
| Thereafter | $100,000 |

**D.     Liquidity Test.**  At all times (A) the sum of (i) Cash Collateral, all Cash and Cash Equivalents held by Borrower, its Subsidiaries and the Bahamas Owner, plus (ii) the amount of Tranche A Loans available to be made to the Borrower in accordance with this Agreement shall be greater than (B) $25,000,000.

103

**E.      Compliance with Financial Covenants**.  In the event Borrower fails to comply with the covenants set forth in this Section 6.6 hereof, the Shareholder Pledgors shall have the right, from time to time, but in no event more frequently than once per Fiscal Year, to ensure Borrower's compliance with such covenants by making an Investment in Borrower or by making a loan through Intercompany Subordinated Debt.

## 6.7    Restriction on Fundamental Changes.

Neither the Borrower nor any of its Subsidiaries shall, without the prior written consent of the Requisite Lenders in their sole and absolute discretion, directly or indirectly, enter into any merger, consolidation, reorganization or recapitalization, liquidate, wind up or dissolve, or cause or consent to either the Borrower or any Subsidiaries to enter into any merger, consolidation, reorganization or recapitalization, liquidate, wind up or dissolve.

## 6.8    Asset Sales.

Without the prior written consent of the Requisite Lenders, the Borrower shall not, and shall not permit any of its Subsidiaries to engage in any Asset Sales, except as follows:

(i)      With respect to Real Property Collateral, a Permitted Collateral Asset Sale or Required Release, provided that each of the following conditions has been satisfied:

(a)      no Event of Default shall have occurred and be continuing (other than an Event of Default that will be cured through the consummation of the proposed Asset Sale);

(b)      not less than fifteen (15) days prior written notice of the closing of such sale has been provided to the Collateral Agent with a true, correct and complete copy of the relevant Qualified Sales Agreement;

(c)      such Asset Sale is consummated in accordance with the terms of a Qualified Sales Agreement, as applicable;

(d)      if such Asset Sale is for a Condo Parcel or Commercial Parcel, the Release Price is paid to the Borrower;

(e)      any and all mandatory prepayments of the Loan required to be made through the date of the proposed Asset Sale have been made, and all mandatory prepayments resulting from such Asset Sale will be made in accordance with Section 2.8B(ii)(e);

(f)      the Real Property Collateral subject to such Asset Sale or Required Release, and the remaining Real Property Collateral after giving effect to such Asset Sale or Required Release shall constitute a legal subdivision in accordance with all Applicable Laws and Governmental Authorizations;

(g)      the Borrower shall pay all reasonable out-of-pocket costs and expenses incurred by the Collateral Agent and all reasonable fees and expenses paid to third party consultants (including reasonable attorneys' fees and expenses) by the Collateral Agent in connection with such release; and

**CREDIT AGREEMENT**

(h)      in connection with the occurrence of an Asset Sale the consummation of which will result in a Bulk Asset Sale, Collateral Agent shall have received such title endorsements, date downs or other evidence reasonably satisfactory to Collateral Agent that (i) the priority of the liens evidenced by the Mortgages with respect to the remaining Real Property Collateral after giving effect to such Asset Sale shall be maintained following such Asset Sale, and (ii) the remaining Real Property Collateral is not subject to any Liens other than Permitted Encumbrances and Liens permitted by Section 6.2.

(ii)      With respect to the Capital Stock of the Borrower (or any Subsidiaries of the Borrower), the sale of such Capital Stock provided that each of the following conditions has been satisfied:

(a)      no Default or Event of Default shall have occurred and be continuing (other than a Default or Event of Default that will be cured through the consummation of the proposed Asset Sale);

(b)      the mandatory prepayment required under Section 2.8B(ii)(b), if any, shall have been made concurrently with the consummation of the proposed Asset Sale; and

(c)      no Change of Control will result from the proposed Asset Sale.

Notwithstanding the foregoing, this Section 6.8(ii) shall not apply to sales of Capital Stock in exchange for Intercompany Subordinated Debt or Investments made in the Borrower or any Subsidiaries of the Borrower by holders of the Capital Stock therein as of the Effective Date.

**6.9      <u>Transactions with Shareholders and Affiliates</u>**.

The Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service or the payment of any management fees, consulting fees or the making of other disbursements) with any holder of 5% or more of any class of equity Securities of the Borrower or a Subsidiary or with any Affiliate of the Borrower or of any such Subsidiary or holder, on terms that are less favorable to the Borrower or that Subsidiaries, as the case may be, than those that might be obtained at the time from Persons who are not such a holder or Affiliate; provided that the foregoing restriction shall not apply to:

(i)      the Transactions;

(ii)      the amounts expressly contemplated by the Project Projections to be paid to Affiliates of the Borrower;

(iii)      the Tesoro Golf Lease and Tesoro Membership Club Sale Leaseback in accordance with Section 2.13; and

(iv)      sales of Condo Parcels or Commercial Parcels designated to be developed as condominium units or for commercial purposes to an Affiliate pursuant to a Permitted Collateral Asset Sale.

**6.10** **Conduct of Business**.

The Borrower shall not, and shall not permit any of its Subsidiaries to, engage in any business other than (i) the businesses engaged in by the Borrower and its Subsidiaries on the Effective Date and (ii) such other lines of business as may be reasonably related thereto, in each case, which shall be related to the Project.

**6.11** **Amendments or Waivers of Certain Agreements.**

None of the Borrower nor its Subsidiaries shall terminate or agree to any amendment, restatement, supplement or other Modification to, or waive any of its rights under, any Organizational Certificates or Organizational Documents of the Borrower and its Subsidiaries, if such termination, amendment, restatement, supplement, Modification or waiver would be materially adverse to the Lenders.

**6.12** **Fiscal Year**.

Neither the Borrower nor any of its Subsidiaries shall change its Fiscal Year-end from December 31.

## SECTION 7.
## EVENTS OF DEFAULT

If any of the following conditions or events ("**Events of Default**") shall occur:

**7.1** **Payment of Obligations**.

The Borrower shall fail to pay any of the Obligations on the due date thereof (whether due at stated maturity, on demand, upon acceleration or otherwise), provided that with respect to regularly scheduled interest payments required pursuant to Section 2.6C or fees required pursuant to Section 2.7, the Borrower is required to make such payments within five (5) days after the date on which such payments are due; or

**7.2** **Misrepresentations**.

Any representation, warranty or other written statement to any Agent or any Lender by or on behalf of any Loan Party, or any Shareholder Pledgor whether made in or furnished in compliance with or in reference to any of the Loan Documents, proves to have been false or misleading in any material respect when made or furnished; or

**7.3** **Breach of Certain Covenants**.

The Borrower shall fail or neglect to perform, keep or observe (i) any covenant contained in Sections 5.1, 5.3(i), (ii), (iii) and (xii), 5.4, 5.16, 5.18, 5.19, 5.21, 5.23B and Section 6 (except to the extent such failure or neglect is being cured pursuant to Section 6.6E) hereof on the date that the Borrower is required to perform, keep or observe such covenant, provided, however that with respect to any failure to perform, keep or observe any covenant contained in Sections 5.3(i) or 5.3(ii) hereof, on the date that is ten (10) days after the date that the Borrower is required to perform, keep or observe such covenant; or

106

**7.4**     **Breach of Other Covenants**.

The Borrower shall fail or neglect to perform, keep or observe any other covenant contained in this Agreement not otherwise addressed in this Section 7 and the breach of such other covenant is not cured to the Administrative Agent's satisfaction within thirty (30) days after the sooner to occur of any Responsible Officer's receipt of notice of such breach from the Administrative Agent or the date on which such failure or neglect first becomes known to any Responsible Officer; or

**7.5**     **Default Under Loan Documents**.

Except as otherwise provided in this Section 7, the Borrower or any other Loan Party or any Shareholder Pledgor shall default in the due and punctual observance or performance of any liability or obligation to be observed or performed by it under any of the Loan Documents and such default or breach is not cured to the Administrative Agent's satisfaction within thirty (30) days after the sooner to occur of any Responsible Officer's receipt of notice of such default or breach from the Administrative Agent or the date on which such default or breach first becomes known to any Responsible Officer; or

**7.6**     **Second Lien Credit Agreement; Other Defaults**.

There shall occur an event of default under (i) any of the Permitted Existing Indebtedness, or (ii) there shall occur an Event of Default under the Second Lien Credit Agreement or any of the Second Lien Loan Documents, or (iii) there shall occur any default or event of default on the part of the Borrower or any Subsidiary beyond any applicable cure or grace period under any agreement, document or instrument to which the Borrower or any Subsidiary is a party or by which the Borrower or any Subsidiary or any of their respective properties is bound, creating or relating to any Indebtedness (other than the Obligations) in excess of $2,000,000 if, in each case, the payment or maturity of such Indebtedness may be accelerated in consequence of such event of default or demand for payment of such Indebtedness may be made; or

**7.7**     **Material Adverse Effect**.

There shall occur any event or condition that has resulted in a Material Adverse Effect; or

**7.8**     **Solvency**.

Any Loan Party shall cease to be Solvent; or

**7.9**     **Insolvency Proceedings**.

Any Insolvency Proceeding shall be commenced by any Loan Party or any Shareholder Pledgor; an Insolvency Proceeding is commenced against any Loan Party and any of the following events occur: such Loan Party or any Shareholder Pledgor consents to the institution of the Insolvency Proceeding against it, the petition commencing the Insolvency Proceeding is not timely controverted by such Loan Party or any Shareholder Pledgor, as the case may be, the petition commencing the Insolvency Proceeding is not dismissed within thirty (30) days after the date of the filing thereof (provided that, in any event, during the pendency of any such period, Lenders shall be relieved from their obligation to make Loans or otherwise extend credit to or for the benefit of the Borrower hereunder), an interim trustee is appointed to take possession all or a substantial portion of the properties of such Loan Party or any Shareholder Pledgor or to operate all or any substantial portion of the business of such Loan Party or any Shareholder Pledgor, as the case may be, or an order for relief shall have been issued or entered in

connection with such Insolvency Proceeding; or any Loan Party or any Shareholder Pledgor shall make an offer of settlement extension or composition to its unsecured creditors generally; or

**7.10**   **Business Disruption; Condemnation**.

There shall occur a cessation of a substantial part of the business of any Loan Party for a period which may be reasonably expected to have a Material Adverse Effect; or any Loan Party shall suffer the loss or revocation of any license, permit or Approval now held or hereafter acquired by such Loan Party which is material to the operations of such Loan Party or necessary to the continued or lawful operation of its business or the development of each Project as contemplated by the Master Plans, the Project Projections, and this Agreement and it is reasonably expected that such license, permit, or Approval will not be re-issued or reinstated with sufficient time to avoid a Material Adverse Effect; or any Loan Party shall be enjoined, restrained or in any way prevented by court, governmental or administrative order from conducting all or any material part of its business affairs and such injunction or restraint is not dismissed or stayed within sixty (60) days; or any material lease or agreement pursuant to which any Loan Party leases or occupies any premises on which any Collateral is located shall be canceled or terminated prior to the expiration of its stated term and such cancellation or termination has a Material Adverse Effect; or the Appraised Value of the applicable Project shall be materially impaired through condemnation such that it results in a Material Adverse Effect; or

**7.11**   **ERISA**.

An ERISA Event shall occur which could reasonably be expected to result in a Material Adverse Effect or which the Administrative Agent, in its reasonable discretion, shall determine constitutes grounds for the termination by the PBGC of any Pension Plan or for the appointment by the appropriate United States district court of a trustee for any Pension Plan; or if any Pension Plan shall be terminated or any such trustee shall be requested or appointed; or if the Borrower or any Subsidiaries is in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan resulting from the Borrower's or such Subsidiary's complete or partial withdrawal from such Pension Plan; or

**7.12**   **Challenge to Loan Documents**.

Any Loan Party, any Shareholder Pledgor, or any of its Affiliates shall challenge or contest in any action, suit or proceeding the validity or enforceability of any of the Loan Documents, the legality or enforceability of any of the Obligations or the perfection or priority of any Lien granted to the Collateral Agent, or any of the Loan Documents ceases to be in full force or effect for any reason other than a full or partial waiver or release by the applicable Agent and Lenders in accordance with the terms thereof; or

**7.13**   **Judgment**.

One or more judgments or orders for the payment of money in an amount that exceeds, individually or in the aggregate, $5,000,000 shall be entered against the Borrower or any other Loan Party and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of thirty (30) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

**7.14**   **Change in Control**.

If any Change of Control shall occur.

**CREDIT AGREEMENT**

**7.15**    **Criminal Forfeiture**.

Any Loan Party shall be convicted under any criminal law that could lead to a forfeiture of any property of such Loan Party.

**THEN** subject to the terms of the Intercreditor Agreement, (i) upon the occurrence of any Event of Default described in Section 7.9, each of (a) the unpaid principal amount of and accrued interest on the Loans, and (b) all other Obligations shall automatically become immediately due and payable, without presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by the Company, and the obligation of each Lender to make any Loan shall thereupon terminate, and (ii) upon the occurrence and during the continuation of any other Event of Default, the Administrative Agent shall, upon the written request of the Requisite Lenders, by written notice to the Company, declare all or any portion of the amounts described in clauses (a) and (b) above to be, and the same shall forthwith become, immediately due and payable, and the obligation of each Lender to make any Loan shall thereupon terminate. Upon the occurrence of any Event of Default, Administrative Agent may (and shall as directed by the Requisite Lenders) (A) exercise, on behalf of the Lenders, any and all rights and remedies under any guaranties including the Subsidiary Guaranties (to the extent applicable), the Collateral Documents, and any other collateral documents entered into with respect to the Loans; and/or (B) exercise any and all rights, powers and remedies available to Administrative Agent or Lenders at law, in equity or otherwise, including, without limitation, under the other Loan Documents, all of which rights, powers and remedies are cumulative and not exclusive.

**SECTION 8.**
**AGENTS**

**8.1**    **Appointment**.

**A.**    **Appointment Authority**.  Each of the Lenders hereby irrevocably appoints Credit Suisse as the Administrative Agent and the Collateral Agent hereunder and under the other Loan Documents and authorizes Credit Suisse, in such capacities, to take such actions on its behalf and to exercise such powers as are delegated to Credit Suisse, in such capacities by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  Each Agent agrees to act upon the express conditions contained in this Agreement and the other Loan Documents, as applicable.  In performing its functions and duties under this Agreement, each Agent shall act solely as an agent of the Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for the Borrower or any of its Subsidiaries.  The provisions of this Section 8 are solely for the benefit of the Agents, the Lenders and the Borrower shall not have rights as third party beneficiaries of any of such provisions.

**B.**    **Appointment of Supplemental Collateral Agents**.  It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction.  It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent or the Collateral Agent deems that by reason of any present or future law of any jurisdiction the Administrative Agent or the Collateral Agent may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, it may be necessary that the Administrative Agent or the Collateral Agent appoint an additional individual or institution as a separate trustee, co-trustee, collateral agent or collateral co-agent (any such additional individual or institution being referred to herein

109

individually as a "**Supplemental Collateral Agent**" and collectively as "**Supplemental Collateral Agents**").

In the event that the Administrative Agent or the Collateral Agent appoints a Supplemental Collateral Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent or the Collateral Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Collateral Agent to the extent, and only to the extent, necessary to enable such Supplemental Collateral Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Collateral Agent shall run to and be enforceable by either the Administrative Agent or the Collateral Agent or such Supplemental Collateral Agent, and (ii) the provisions of this Section 8 and of Section 9.2 that refer to the Administrative Agent or the Collateral Agent shall inure to the benefit of such Supplemental Collateral Agent and all references therein to the Administrative Agent or the Collateral Agent shall be deemed to be references to the Administrative Agent or the Collateral Agent and/or such Supplemental Collateral Agent, as the context may require.

Should any instrument in writing from the Borrower or any other Loan Party or any Shareholder Pledgor be required by any Supplemental Collateral Agent so appointed by the Administrative Agent or the Collateral Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrower shall, or shall cause such Loan Party or any Shareholder Pledgor to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Administrative Agent or the Collateral Agent.  In case any Supplemental Collateral Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Collateral Agent, to the extent permitted by law, shall vest in and be exercised by the Administrative Agent or the Collateral Agent until the appointment of a new Supplemental Collateral Agent.

## 8.2     **Rights as a Lender**.

The Persons serving as the Agents hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Persons serving as the Agents hereunder in their individual capacity.  Such Persons and their Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiaries or other Affiliate thereof as if such Persons were not Agents hereunder and without any duty to account therefor to the Lenders.

## 8.3     **Exculpatory Provisions**.

The Agents shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, the Agents (i) shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred and is continuing, (ii)  shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Agents are required to exercise as directed in writing by the Requisite Lenders (or such other number or percentage of the relevant Lenders as shall be necessary under the circumstances as provided in Section 9.5), provided that no Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to

**CREDIT AGREEMENT**

any Loan Document or applicable law, and (iii) shall not, except as expressly set forth herein and in the other Loan Documents have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of their Affiliates that is communicated to or obtained by the Person serving as an Agent or any of its Affiliates in any capacity. No Agent shall be liable to the Lenders for any action taken or not taken by it with the consent or at the request of the Requisite Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.5) or in the absence of its own gross negligence or willful misconduct. No Agent shall be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to such Agent by the Borrower or a Lender. The Agents shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement or any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Section 3 or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agents.

**8.4     Reliance by the Agents**.

The Agents shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, posting or other distribution) believed by it in good faith to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Agents also may rely upon any statement made to it orally or by telephone and believed by it in good faith to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of such Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Agents may presume that such condition is satisfactory to such Lender unless the Agents shall have received notice to the contrary from such Lender prior to the making of such Loan. The Agents may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**8.5     Delegation of Duties**.

Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by such Agent. The Agents and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of Section 8.3 shall apply to any such sub-agent and to the Related Parties of such Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as such Agent.

**8.6     Resignation of Administrative Agent and/or Collateral Agent**.

The Administrative Agent and/or Collateral Agent may at any time give notice of its resignation to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Requisite Lenders shall have the right, with the written consent of the Borrower if no Default or Event of Default shall have occurred and be continuing (such consent not to be unreasonably withheld or delayed), to appoint a successor Administrative Agent and/or Collateral Agent, as applicable, which shall be a bank with an office in New York, or an Affiliate of any such bank with an office in New York. If no such

**CREDIT AGREEMENT**

successor shall have been so appointed by the Requisite Lenders and shall have accepted such appointment within 10 days after the retiring Administrative Agent and/or Collateral Agent as the case may be, gives notice of its resignation, then the retiring Administrative Agent may, with the written consent of the Borrower if no Default or Event of Default shall have occurred and be continuing (such consent not to be unreasonably withheld or delayed), on behalf of the Lenders, appoint a successor Administrative Agent and/or Collateral Agent, as applicable, meeting the qualifications set forth above, provided that if the Administrative Agent and/or Collateral Agent, as applicable, shall notify the Borrower and the Lenders that no such successor is willing to accept such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent and/or Collateral Agent, as applicable, shall be discharged from its duties and obligations hereunder and under the other Loan Documents and (2) all payments, communications and determinations provided to be made by, to or through the Administrative Agent and/or Collateral Agent, as applicable, shall instead be made by or to each Lender directly, until such time as the Requisite Lenders appoint a successor Administrative Agent and/or Collateral Agent, as applicable, as provided for above in this paragraph. Upon the acceptance of a successor's appointment as Administrative Agent and/or Collateral Agent, as applicable hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent and/or Collateral Agent, as applicable, and the retiring Administrative Agent and/or Collateral Agent, as applicable shall be discharged from all of its duties and obligations hereunder or under the Loan Documents.  The fees payable by the Borrower to a successor Administrative Agent and/or Collateral Agent, as applicable, shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring Administrative Agent's and/or Collateral Agent's resignation hereunder and under the other Loan Documents, the provisions of this Section 8 and Section 9.2 shall continue in effect for the benefit of such retiring Administrative Agent and/or Collateral Agent, as applicable, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent and/or Collateral Agent, as applicable was acting in such capacity.

## 8.7    <u>Collateral Documents; Successor Collateral Agent</u>.

Each Lender hereby further authorizes the Collateral Agent to enter into each Collateral Document as secured party on behalf of and for the benefit of the Lenders and the other beneficiaries named therein and agrees to be bound by the terms of each Collateral Document; provided that, except as otherwise provided in this Agreement, the Collateral Agent shall not enter into or consent to any amendment, Modification, termination or waiver of any provision contained in any Collateral Document without the prior consent of the Requisite Lenders (or, if required pursuant to Section 9.5, all the Lenders); provided further, however, that, without further written consent or authorization from any Lender, the Collateral Agent may execute any documents or instruments necessary to effect the release of any asset constituting Collateral from the Lien of the applicable Collateral Document in the event that such asset is sold or otherwise disposed of in a transaction effected in accordance with Section 6.9 or to the extent otherwise required by any Collateral Document.  Anything contained in any of the Loan Documents to the contrary notwithstanding, each Lender agrees that no Lender shall have any right individually to realize upon any of the Collateral under any Collateral Document, it being understood and agreed that all rights and remedies under the Collateral Documents may be exercised solely by the Collateral Agent for the benefit of the Lenders and the other beneficiaries named therein in accordance with the terms thereof.

## 8.8    <u>Non-Reliance on Agents and Other Lenders</u>.

Each Lender acknowledges that it has, independently and without reliance upon any Agent or any other Lender or any of their Related Parties and based on such documents and information as it has

NY\1139561.13

deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

### 8.9    Withholding Taxes.

To the extent required by any Applicable Laws, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax. If the Internal Revenue Service or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold tax from accounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstances which rendered the exemption from or reduction of withholding tax ineffective or for any other reason, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including any penalties or interest and together with any and all expenses incurred.

## SECTION 9.
## MISCELLANEOUS

### 9.1    Assignments and Participations in Loans.

**A.    Successors and Assigns Generally**. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and the Administrative Agent and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of Section 9.1B, (ii) by way of participation in accordance with the provisions of Section 9.1D or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 9.1F (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 9.1D and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

**B.    Assignments by Lenders**.

(i)    Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it); provided that

(a)    except in the case of an assignment of entire remaining amount of the assigning Lender's Loans or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, the aggregate amount of the Loans subject to each such assignment (determined as of the date the Assignment Agreement with respect to such assignment is delivered to the Administrative Agent and taking into account the amount of Lender's Loans held by Affiliates of such Lender or Approved Fund when determining the

113

aggregate amount thereof) shall not be less than $1,000,000 or an integral multiple of $500,000 in excess thereof, unless the Administrative Agent otherwise consents;

(b)        each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans assigned;

(c)        subject to Section 9.1B(ii), the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment Agreement via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent), and the Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent and an Administrative Questionnaire and if required, applicable tax forms; and .

(d)        in connection with each assignment of Tranche A Funding Amounts, the Tranche A Credit-Linked Deposit of the assignor Lender shall not be released, but shall instead be purchased by the relevant assignee and continue to be held for application (to the extent not already applied) in accordance with Section 2 to satisfy such assignee's obligations in respect of Tranche A Loans.  Each Tranche A Lender agrees that immediately prior to each assignment by a Tranche A Lender (i) the Paying Agent shall establish a new Tranche A Credit-Linked Sub-Account in the name of the assignee, (ii) unless otherwise consented to by the Paying Agent, a corresponding portion of the Tranche A Credit-Linked Deposit credited to the Tranche A Credit-Linked Sub-Account of the assignor Lender shall be purchased by the assignee and shall be transferred from the assignor's Tranche A Credit-Linked Sub-Account to the assignee's Tranche A Credit-Linked Sub-Account and (iii) if after giving effect to such assignment the Tranche A Funding Amount of the assignor Lender shall be zero, the Paying Agent shall close the Tranche A Credit-Linked Sub-Account of such assignor Lender.

(ii)        Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 9.1C, from and after the effective date specified in each Assignment Agreement, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment Agreement, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment Agreement, be released from its obligations under this Agreement (and, in the case of an Assignment Agreement covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 2.11 with respect to facts and circumstances occurring prior to the effective date of such assignment.  An Eligible Assignee shall not be entitled to receive any greater payment under Section 2.11 that the assigning Lender would have been entitled to receive with respect to the Loan or portion of the Loan assigned to such Eligible Assignee, unless the grant to such Eligible Assignee is made with the Borrower' prior written consent.  Except in the case of an assignment to a Lender, an Affiliate of a Lender, or an Approved Fund with respect to a Lender, any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 9.1D.

C.        **The Register**.  The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at one of its offices in New York a copy of each Assignment Agreement delivered to it and a register for the recordation of the names and addresses of the Lenders and principal

**CREDIT AGREEMENT**

amounts of the Loans (each, a "**Registered Loan**") owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower at any reasonable time and from time to time upon reasonable prior notice.

     **D.**     **Participations**.  Any Lender may at any time, without the consent of, or notice to, the Borrower or the **Administrative** Agent, sell participations to any Person (other than a natural person or the Borrower or any of the Affiliates or Subsidiaries of the Borrower) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of the Loans owing to it); provided that

     (i)     such Lender's obligations under this Agreement shall remain unchanged,

     (ii)     such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and

     (iii)     the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

     Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, Modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, Modification or waiver with respect to any action (i) effecting the extension of the final maturity of the Loan allocated to such participation, (ii) effecting a reduction of the principal amount of or affecting the rate of interest payable on any Loan or any fee allocated to such participation, or (iii) releasing all or substantially all of the Collateral other than in connection with payment of the Loans in full.  Subject to Section 9.1E, the Borrower agree that each Participant shall be entitled to the benefits of Section 2.11 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 9.1B; provided that such Participant agrees to be subject to Section 2.12 as though it were a Lender.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.3 as though it were a Lender, provided such Participant agrees to be subject to Section 9.4 as though it were a Lender.

     **E.**     **Limitations Upon Participant Rights**.  A Participant shall not be entitled to receive any greater payment under Section 2.11 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower' prior written consent.  Without limiting the generality of the foregoing, a Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 2.11E unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 2.11E(v) as though it were a Lender.

     **F.**     **Certain Pledges**.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.  Notwithstanding anything to the contrary contained herein, any Lender that is a Fund may create a security interest in all or any portion of the

**CREDIT AGREEMENT**

Loans owing to it and the Notes, if any, held by it to the trustee for holders of obligations owed, or Securities issued, by such Fund as security for such obligations or Securities; provided that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 9.1, (i) no such pledge shall release the pledging Lender from any of its obligations under this Agreement and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under this Agreement and the Notes even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

## 9.2    Expenses; Indemnity; Damage Waiver.

**A.    Costs and Expenses**.  In addition to the reimbursement of costs and expenses the Borrower has heretofore agreed to in writing to pay to the Administrative Agent, the Borrower shall pay: (i) all reasonable, actual out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable fees, charges and disbursements of counsel for the Administrative Agent and Collateral Agent (and fees and time charges for attorneys who may be employees of the Administrative Agent and Collateral Agent), in connection the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, Modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated); (ii) all out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent or any Lender, including the reasonable fees, charges and disbursements of any counsel for the Administrative Agent or any Lender (and fees and time charges for attorneys who may be employees of the Administrative Agent, the Collateral Agent or any Lender), in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents, including its rights under this Section 9.2A, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans, and (iii) all reasonable, actual out-of-pocket expenses incurred by the Administrative Agent and its Affiliates, including the reasonable fees, charges and disbursements of counsel for the Administrative Agent and Collateral Agent (and fees and time charges for attorneys who may be employees of the Administrative Agent and Collateral Agent), in connection with each Permitted Collateral Asset Sale and loan disbursement requested pursuant to Section 3.3.

**B.    Indemnification by the Borrower**.  The Borrower shall indemnify each Agent (and any sub-Agent thereof), each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee (and fees and time charges for attorneys who may be employees of any Agent or any Lender), incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use of the proceeds therefrom, (iii)  any actual or alleged presence or release of Hazardous Materials on or from any property, or any Environmental Claim related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto, provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of any Indemnitee.

**CREDIT AGREEMENT**

C.      **Reimbursement by the Lenders**.  To the extent that the Borrower fails to pay any amount required under Section 9.2A or 9.2B to be paid by it to any Agent (or any sub-Agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Agent (or any such sub-Agent) or such Related Party, as the case may be, such Lender's Pro Rata Share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Agent (or any such sub-Agent) in its capacity as such, or against any Related Party of any of the foregoing acting for such Agent (or any such sub-Agent) in connection with such capacity.  The obligations of the Lenders under this Section 9.2C are subject to the provisions of Section 9.12.

D.      **Waiver of Consequential Damages, Etc**.  To the fullest extent permitted by Applicable Law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan  or the use of the proceeds thereof.  No Indemnitee referred to in Section 9.2B above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, unless such damages are directly caused solely by the gross negligence or willful misconduct of such Indemnitee as determined by a court of competent jurisdiction by final and nonappealable judgment.

E.      **Payments**.  All amounts due under this Section 9.2 shall be payable promptly after demand therefor.

## 9.3      Right of Set-Off.

Without limitation of any other rights of the Agents or Lenders, if an Event of Default shall have occurred and be continuing, subject to the Administrative Agent's consent, each Agent, Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Agent, Lender, or any such Affiliate to or for the credit or the account of the Borrower against any and all of the Obligations of the Borrower now or hereafter existing under this Agreement or any other Loan Document to such Agent or Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such Obligations of the Borrower may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Agent, Lender and their respective Affiliates under this Section 9.3 are in addition to other rights and remedies (including other rights of setoff) which such Agent, Lender or their respective Affiliates may have and are subject to the terms of the Intercreditor Agreement.  Each Agent and Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application.

## 9.4      Sharing of Payments by Lenders.

If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other obligations hereunder resulting in such Lender's receiving payment of a proportion of the aggregate amount of its Loans and

**CREDIT AGREEMENT**

accrued interest thereon or other such obligations greater than its Pro Rata Share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for Cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, to the end that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiaries thereof (as to which the provisions of this paragraph shall apply).  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

## 9.5    Amendments and Waivers.

**A.    Amendment and Waivers**.  No amendment, Modification, termination or waiver of any provision of this Agreement or of the Notes, or consent to any departure by the Borrower or any other Loan Party therefrom, shall in any event be effective without the written concurrence of the Requisite Lenders; provided that any such amendment, Modification, termination, waiver or consent which:  (a) reduces or forgives the principal amount of any of the Loans; (b) increases or reduces the percentage specified in the definition of the "Requisite Lenders" (it being understood that, with the consent of the Requisite Lenders, additional extensions of credit pursuant to this Agreement may be included in the definition of the "Requisite Lenders" on substantially the same basis as the Loans are included on the Effective Date); (c) changes in any manner any provision of this Agreement which, by its terms, expressly requires the approval or concurrence of all the Lenders; (d) postpones the scheduled final maturity date of any of the Loans; (e) postpones the date or reduces the amount of any scheduled payment (but not prepayment) of principal of any of the Loans; (f) postpones the date on which any interest, any fees or any amounts due under Section 2.8B(ii) are payable; (g) decreases the interest rate borne by any of the Loans (other than any waiver of any increase in the interest rate applicable to any of the Loans pursuant to Section 2.3E) or the amount of any fees payable hereunder or any amounts payable under Section 2.8B(ii); (h) increases the Commitment of any Lender or the maximum duration of Interest Periods permitted hereunder; (i) releases all or substantially all of the Collateral or any of the Subsidiary Guaranties (except to the extent otherwise required to be released under the terms of the Loan Documents); and (j) changes in any manner the provisions contained in Section 7.1 or this Section 9.5; shall be effective only if evidenced by a writing signed by or on behalf of all the Lenders to whom Obligations are owed being directly affected by such amendment, Modification, termination, waiver or consent (the consent of the Requisite Lenders not being required for any such change); provided, further that any amendment, Modification, termination, waiver or consent which amends or modifies the definition of "Approved Fund," "Eligible Assignee," or "Fund," shall be effective only if evidenced by a written concurrence of the Requisite Lenders and the Administrative Agent.  In addition, (i) any amendment, Modification, termination or waiver of any of the provisions contained in Section 3.2 for periods following the Effective Date shall be effective only if evidenced by a writing signed by or on behalf of the Administrative Agent and the Requisite Lenders, (ii) no amendment, Modification, termination or waiver of any provision of any Note shall be effective without the written concurrence of the Lender which is the holder of that Note, and (iii) no amendment, Modification, termination or waiver of any provision of Section 8 or of any other provision of this Agreement which, by its terms, expressly

118

requires the approval or concurrence of the Administrative Agent shall be effective without the written concurrence of the Administrative Agent. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances. Any amendment, Modification, termination, waiver or consent effected in accordance with this Section 9.5 shall be binding upon each Lender at the time a party to this Agreement, each future Lender and, if signed by the Borrower, on the Borrower.

      **B.**    **Non-Consenting Lenders**. Each Lender grants (x) to the Administrative Agent the right to purchase all (but not less than all) of such Lender's Commitments and Loans owing to it and the Notes held by it and all of its rights and obligations hereunder and under the other Loan Documents, and (y) to the Borrower the right to cause an assignment of all (but not less than all) of such Lender's Loans owing to it, its participations in the Notes held by it and all of its rights and obligations hereunder and under the other Loan Documents to Eligible Assignees, which right may be exercised by the Administrative Agent or the Borrower, as the case may be, if such Lender (a "**Non-Consenting Lender**") refuses to execute any amendment, waiver or consent which requires the written consent of Lenders other than Requisite Lenders and to which the Requisite Lenders, the Administrative Agent and the Borrower has otherwise agreed; provided that such Non-Consenting Lender shall receive, in connection with such assignments, payment equal to the aggregate amount of outstanding Loans owed to such Lender (together with all accrued and unpaid interest, fees and other amounts (other than indemnities) owed to such Lender plus an amount equal to the prepayment premium, if any, that would be payable in respect of the Loans of such Lender upon prepayment thereof pursuant to subsection 2.8B(i)(b)). Each Lender agrees that if the Administrative Agent or the Borrower, as the case may be, exercises their option hereunder, it shall promptly execute and deliver all agreements and documentation necessary to effectuate such assignment as set forth in Section 9.1. The Borrower shall be entitled (but not obligated) to execute and deliver such agreement and documentation on behalf of such Non-Consenting Lender and any such agreement and/or documentation so executed by the Borrower shall be effective for purposes of documenting an assignment pursuant to Section 9.1.

## 9.6    <u>Independence of Covenants</u>.

      All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another such covenant shall not avoid the occurrence of a Default or Event of Default if such action is taken or condition exists.

## 9.7    <u>Notices</u>.

      **A.**    **Notices Generally**. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in Section 9.7B below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows:

      If to Borrower:              Ginn Clubs & Resorts
                                     1 Hammock Beach Parkway
                                     Palm Coast, FL  32127
                                     Attention:  Bobby Masters
                                     Fax:      (386) 246-5785


                                     Ginn Club & Resorts

119

**CREDIT AGREEMENT**

215 Celebration Place, Suite 200
Celebration, FL  34747
Attention:  John Klumph
Fax:       (321) 939-4721


Lubert-Adler Partners, L.P.
The Cira Centre
2929 Arch Street
Philadelphia, PA  19104-2868
Attention:  Dean S. Adler
Fax:        (215) 972-2248 (personal fax)


with copies to:                       Morris, Manning & Martin
                                      1600 Atlanta Financial Center
                                      3343 Peachtree Road, NE
                                      Atlanta, GA  30326
                                      Attention:  Sonny Morris
                                      Phone:      (404) 504-7726


Lubert-Adler Partners, L.P.
535 Madison Avenue
5th floor
New York, NY  10022
Attention:  Robert (Bob) Rosenberg
Phone:      (212) 644-0657


Lubert-Adler Partners, L.P.
The Cira Centre
2929 Arch Street
Philadelphia, PA  19104-2868
Attention:  Stuart A. Margulies
Fax:        (215) 609-3457


If to the Administrative Agent,
or the Collateral Agent, to Credit Suisse:


Eleven Madison Avenue
New York, New York 10010
Attention:  Agency Group - Thomas Lynch
Telephone No.:  212-325-9205
Telecopier No.:  212-743-1865

**CREDIT AGREEMENT**

with copies to:
Latham & Watkins LLP
633 West Fifth Street
Suite 4000
Los Angeles, California 90071
Attention: Paul Fuhrman
Telecopier: (213) 891-8763

If to a Lender, to it at its address (or telecopier number) set forth in its Administrative Questionnaire. Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices delivered through electronic communications to the extent provided in Section 9.7B below, shall be effective as provided in said Section 9.7B.

**B.     Electronic Communications**.   Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Section 2.2, if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Section by electronic communication. The Administrative Agent or the Borrower may, in their discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications. Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgment), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

**C.     Change of Address, Etc**.  Any party hereto may change its address or telecopier number for notices and other communications hereunder by notice to the other parties hereto.

## 9.8     Survival of Representations, Warranties and Agreements.

All representations, warranties and agreements made herein shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.

Notwithstanding anything in this Agreement or implied by law to the contrary, the agreements of the Borrower set forth in Sections 2.10D, 2.11, 2.14, 9.2, and 9.18 and the agreements of the Lenders set forth in Sections 8.2, 8.3, 8.4, 9.2C, 9.3, 9.4, 9.18, 9.19 and 9.20 shall survive the payment of the Loans and the reimbursement of any amounts drawn or paid thereunder, and the termination of this Agreement.

## 9.9     Failure or Indulgence Not Waiver; Remedies Cumulative.

No failure or delay on the part of any Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Loan Document shall impair such power, right or privilege or be

construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.  All rights and remedies existing under this Agreement and the other Loan Documents are cumulative to, and not exclusive of, any rights or remedies otherwise available.

**9.10**     **Marshalling; Payments Set Aside**.

Neither any Agent nor any Lender shall be under any obligation to marshal any assets in favor of the Borrower or any other party or against or in payment of any or all of the Obligations.  To the extent that the Borrower makes a payment or payments to the Administrative Agent or the Lenders (or to the Administrative Agent or Collateral Agent for the benefit of the Lenders), or any Agent or the Lenders enforce any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**9.11**     **Severability**.

In case any provision in or obligation under this Agreement or the Notes shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**9.12**     **Obligations Several; Independent Nature of the Lenders' Rights**.

The obligations of the Lenders hereunder are several and no Lender shall be responsible for the obligations or Commitments of any other Lender hereunder.  Nothing contained herein or in any other Loan Document, and no action taken by the Lenders pursuant hereto or thereto, shall be deemed to constitute the Lenders as a partnership, an association, a joint venture or any other kind of entity.  The amounts payable at any time hereunder to each Lender shall be a separate and independent debt, and each Lender shall be entitled to protect and enforce its rights arising out of this Agreement and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

**9.13**     **Maximum Amount**.

**A.**     It is the intention of the Borrower and the Lenders to conform strictly to the usury and similar laws relating to interest from time to time in force, and all agreements between the Loan Parties and their respective Subsidiaries and the Lenders, whether now existing or hereafter arising and whether oral or written, are hereby expressly limited so that in no contingency or event whatsoever, whether by acceleration of maturity hereof or otherwise, shall the amount paid or agreed to be paid in the aggregate to the Lenders as interest (whether or not designated as interest, and including any amount otherwise designated but deemed to constitute interest by a court of competent jurisdiction) hereunder or under the other Loan Documents or in any other agreement given to secure the Indebtedness or obligations of the Borrower to the Lenders, or in any other document evidencing, securing or pertaining to the Indebtedness evidenced hereby, exceed the maximum amount permissible under applicable usury or such other laws (the "**Maximum Amount**").  If under any circumstances whatsoever fulfillment of any provision hereof, or any of the other Loan Documents, at the time performance of such provision shall be due, shall involve exceeding the Maximum Amount, then, ipso facto, the obligation to be fulfilled shall be reduced to the

CREDIT AGREEMENT

Maximum Amount.  For the purposes of calculating the actual amount of interest paid and/or payable hereunder in respect of laws pertaining to usury or such other laws, all sums paid or agreed to be paid to the holder hereof for the use, forbearance or detention of the Indebtedness of the Borrower evidenced hereby, outstanding from time to time shall, to the extent permitted by Applicable Law, be amortized, pro-rated, allocated and spread from the date of disbursement of the proceeds of the Notes until payment in full of all of such Indebtedness, so that the actual rate of interest on account of such Indebtedness is uniform through the term hereof.  The terms and provisions of this Section shall control and supersede every other provision of all agreements between the Borrower or any endorser of the Notes and the Lenders.

**B.**     If under any circumstances any Lender shall ever receive an amount which would exceed the Maximum Amount, such amount shall be deemed a payment in reduction of the principal amount of the Loans and shall be treated as a voluntary prepayment under Section 2.8B(i) and shall be so applied in accordance with Section 2.8 hereof or if such excessive interest exceeds the unpaid balance of the Loans and any other Indebtedness of the Borrower in favor of such Lender, the excess shall be deemed to have been a payment made by mistake and shall be refunded to the Borrower.

## 9.14   Headings.

Section and Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

## 9.15   Applicable Law.

**THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES.**

## 9.16   Successors and Assigns.

This Agreement shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of the Lenders (it being understood that the Lenders' rights of assignment are subject to Section 9.1).  Neither the Borrower' rights or obligations hereunder nor any interest therein may be assigned or delegated by the Borrower without the prior written consent of all Lenders.

## 9.17   Consent to Jurisdiction and Service of Process.

**A.     SUBMISSION TO JURISDICTION.   EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK CITY AND OF THE UNITED STATES DISTRICT COURT SITTING IN NEW YORK CITY, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.   EACH OF THE PARTIES HERETO AGREES THAT A FINAL**

**CREDIT AGREEMENT**

JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT OR IN ANY OTHER LOAN DOCUMENT SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST THE BORROWER OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

B.    WAIVER OF VENUE. EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN   SECTION 9.17A.   EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

C.    **Service of Process**.  Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 9.7.  Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable law.

## 9.18    Waiver of Jury Trial.

EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

## 9.19    Confidentiality.

Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to it, its Affiliates' and their respective partners, directors, officers, employees, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential as provided herein), (b) to the extent requested by any regulatory authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by Applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject

to an agreement containing provisions substantially the same as those of this Section 9.19, to (i) any assignee or pledgee of or Participant in, or any prospective assignee or pledgee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower (such consent not to be unreasonably withheld or delayed) or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to the Administrative Agent or any Lender on a nonconfidential basis from a source other than the Borrower or any of its Subsidiaries or Affiliates.

For purposes of this Section 9.19, "**Information**" means all written information received from the Borrower or any of its Subsidiaries or Affiliates relating to the Borrower or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower, which to the extent received on or after the date hereof, is identified as confidential by the Borrower.  Any Person required to maintain the confidentiality of Information as provided in this Section 9.19 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

## 9.20    Limitation of Liability.

The Loans and Obligations hereunder shall be recourse to the Borrower at all times.   The Shareholder Pledgors have assumed certain limited recourse obligations to Lender pursuant to the Pledge Agreements, but otherwise none of the Shareholders Pledgors or any of their constituent entities shall have any liability whatsoever with respect to the Loans or Obligations.  Notwithstanding anything to the contrary herein or in any other Loan Document, none of the direct or indirect partners, members, shareholders, officers, employees, controlling persons or affiliates of the Shareholder Pledgors shall have any liability for the Loans or the Obligations or any other obligation or liability hereunder, whether based in law, in equity or otherwise.  It is further hereby understood and agreed that notwithstanding anything to the contrary contained within the Pledge Agreements with regard to the definitions of "Distributions" as defined therein, such definition shall not include, and is not intended to include, the distributions permitted to be made from the proceeds of the Loans on the Effective Date pursuant to Section 2.9 hereof.

## 9.21    Counterparts; Integration; Effectiveness; Electronic Execution.

**A.    Counterparts; Integration; Effectiveness.**    This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto required pursuant to Section 3, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

**B.    Electronic Execution of Assignments.**    The words "execution," "signed," "signature," and words of like import in any Assignment Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or

125

**CREDIT AGREEMENT**

EXECUTION VERSION

enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**9.22    USA Patriot Act Notification**.  The following notification is provided to the Borrower pursuant to Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318, as amended:

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT.

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each Person or entity that opens an account, including any deposit account, treasury management account, loan, other extension of credit, or other financial services product.

What this means for the Borrower:  When the Borrower opens an account, if the Borrower is an individual, the Administrative Agent and the Lenders will ask for the Borrower's name, residential address, tax identification number, date of birth, and other information that will allow the Administrative Agent and the Lenders to identify the Borrower, and, if the Borrower is not an individual, the Administrative Agent and the Lenders will ask for the Borrower's name, tax identification number, business address, and other information that will allow the Administrative Agent and the Lenders to identify the Borrower.  The Administrative Agent and the Lenders may also ask, if the Borrower is an individual, to see the Borrower's driver's license or other identifying documents, and, if the Borrower is not an individual, to see the Borrower's legal organizational documents or other identifying documents.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**CREDIT AGREEMENT**

**GINN-LA CS BORROWER, LLC**,
a Delaware limited liability company

By: _____
Name: Robert F. Masters
Title:  Manager

**GINN-LA CONDUIT LENDER, INC.,**
a Delaware corporation

By: _Robert Masters_
Name: Robert F. Masters
Title:  President

First Lien Credit Agreement

**AGENTS AND LENDERS:**

**CREDIT SUISSE, CAYMAN ISLANDS BRANCH**
individually as a Lender and as the Administrative Agent and Collateral Agent

By:_____
    Name:    BILL O'DALY
    Title:    DIRECTOR

By:_____
    Name:    KIANA JOHAN
    Title:    ASSOCIATE

**CREDIT SUISSE SECURITIES (USA) LLC,**
as the Sole Lead Arranger and Sole Bookrunner

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

First Lien Credit Agreement

**AGENTS AND LENDERS:**

**CREDIT SUISSE, CAYMAN ISLANDS BRANCH**
individually as a Lender and as the Administrative Agent and Collateral Agent

By:_____
    Name:
    Title:

By:_____
    Name:
    Title:

**CREDIT SUISSE SECURITIES (USA) LLC,**
as the Sole Lead Arranger and Sole Bookrunner

By:_____
    Name: J. Tracy Mehr
    Title: Managing Director

By:_____
    Name: MICHAEL SPELLER
    Title: DIRECTOR

First Lien Credit Agreement

EXECUTION VERSION

## APPENDIX A

## APPLICABLE MARGINS

| EURODOLLAR RATE MARGIN | BASE RATE MARGIN |
|------------------------|------------------|
| 300 bps | 200 bps |

**CREDIT AGREEMENT**