Robert C. Huntley, ISB # 894
815 Washington Street, P.O. Box 2188
Boise, ID 83701
Phone: (208) 388-1230
(Fax): (208) 388-0234
rhuntley@huntleylaw.com

Michael J. Flynn, MA Bar # 172780
P.O. Box 690
Rancho Santa Fe, CA 92067
Tel. (858) 775-7624
Fax: (858) 759 0711
mike@mjfesq.com

James C. Sabalos, Tex. Bar No. 17499100
3900Essex Lane, Suite 730
Houston, Texas 77027
Tel: (949) 355-6084
jimsabalos@hotmail.com

John Flood, Texas Bar No.07155910
802 N. Carancahua, Ste 900
Corpus Christi, TX 78470
Tel: (361) 654-8877
Fax: (361) 654-8879
John@floodandflood.com

Philip H. Stillman, CA #152861
508 Meadowmist Court, Ste B
Olivenhain, CA 92024
Tel. (888) 235-4279
Fax. (888) 235-4279
pstillman@stillmanassociates.com

Chris Flood, Texas Bar # 07155700
914 Preston, Suite 800
Houston, Texas 77002
Tel: (713) 223-8877
Fax: (713) 223-8879
chris@floodandflood.com

Christopher J. Conant CO 40269
Conant Law LLC
950 Seventeenth St. Ste. 1700
Denver, CO 80202
Tel: (303) 298-1800
Fax: (303) 298-1804
cconant@conantlawyers.com

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| L.J. GIBSON, BEAU BLIXSETH, et al., | |
| Plaintiffs, | Case No. 1:10-cv-00001-EJL-REB |
| v. | |
| CREDIT SUISSE AG, a Swiss corporation; et al., | Plaintiffs' Opposition to Defendant Cushman & Wakefield Motion to Dismiss (Document 48) |
| Defendants. | |

This brief is written in response to the Motion to Dismiss (Document 48 filed on behalf of the Cushman & Wakefield Defendant, hereinafter "Cushman."

In conservation of the Court's time, we advise that the RICO section of this brief and the RICO section of the Opposition to the Credit Suisse motion are identical.

Brief in Opposition to Cushman & Wakefield's Motion to Dismiss
**Table of Contents**

Page No.

1.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   A.  Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   B.  The Direct Injury to Plaintiffs Caused by Defendants' RICO Conduct . . . . . . . . 5

2.  PLAINTIFFS' RICO ACT CAUSE OF ACTION IS PROPERLY PLED AND
   THEREFORE WITHSTANDS A MOTION TO DISMISS . . . . . . . . . . . . . . . . . . . . 7

   A.  Plaintiffs Have Concisely Pled A "RICO Enterprise" . . . . . . . . . . . . . . . . . 8

   B.  The Pattern of Racketeering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

   C.  The Defendants Have Participated in the Conduct of the Affairs of the
      Enterprise Through the Pattern of Racketeering . . . . . . . . . . . . . . . . . . . . . 11

   D.  The RICO Scheme has Caused Injury to Plaintiffs' "Business or Property . . . . 12

        (a)  Plaintiffs Have adequately Alleged an Injury to Property . . . . . . . . . . 12

     (2)  Proximate Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        (a)  Plaintiffs Have Established a Sufficiently Direct Relationship
           Between the Conduct Alleged and the Harm Suffered . . . . . . . . . . . . . 18

           (i)  The Facts Conclusively Establish Proximate Cause . . . . . . . . . 19

           (ii)  The *Anza* "Remoteness" Test is Also Satisfied . . . . . . . . . . . . 22

        (b)  Contrary to Defendants' Arguments, the Scheme is not Only
           Plausible but Highly Profitable . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

   E.  Plaintiffs Have also Stated a Claim for Conspiracy to Violate the RICO Act . . 27

3.  PLAINTIFFS HAVE ADEQUATELY PLED ALL ELEMENTS OF FRAUD . . . . . . 28

   A.  Conspiracy Allegations Make Cw Jointly and Severally Liable for Cs' Fraud . 29

   B.  Plaintiffs have Sufficiently Pled Fraud Committed by CW . . . . . . . . . . . . . . 31

   C.  Plaintiffs have Sufficiently Pled Third Party Fraud . . . . . . . . . . . . . . . . . . . 36

D.   Whether the Appraisals are Fraudulent is a Question of Fact that cannot
be Disposed of on a Motion to Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

E.   False or Misleading Statements of Value in Real Estate Appraisals are
Actionable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

F.   Plaintiffs have Pled Reasonable Reliance; Whether their Reliance on the
Appraisals was Reasonable is a Question of Fact that Cannot be Disposed
of on a Motion to Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

G.   Defendants Ignore the Fraudulent Scheme Alleged by Plaintiffs in the SAC
as they Must . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

4.   NEGLIGENT MISREPRESENTATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

5.   TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS . . . . . . 48

6.   NEGLIGENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

A.   CW Attacks Plaintiffs' Negligence Claim Merely on the Basis that No. Duty
Existed Between it and Plaintiffs; A Duty Does in Fact Exist . . . . . . . . . . . . . 49

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

1.     **INTRODUCTION**

A.     **Overview.**

As clearly alleged in the Second Amended Complaint ("SAC"), which allegations must

be taken as true for the purposes of this Defendants' Motions, Credit Suisse was the mastermind

of a scheme which has been characterized in the SAC Second Amended Complaint as the "Loan

to Own" Scheme.  With the knowing assistance of real estate giant Cushman & Wakefield,

Credit Suisse intentionally evaded federal and state laws and standards designed to prevent the

Loan to Own Scheme.  The purpose was to saddle real estate developments with huge debts

through fraudulent "appraisals" which could generate huge upfront fees for Credit Suisse, while

condemning high end real estate projects to failure for the ultimate purpose of ensuring Credit

Suisse with a second round of profits as it restructured the resorts for resale.

For evidence of Credit Suisse's *mens rea*, this Court need look no further than the Credit

Suisse/Cayman Islands "Branch," which was a post office box in the Cayman Islands through

which artifice Credit Suisse made its "Loan to Own" loans.  By using its so-called "Cayman

Islands Branch," which did no business other than these real estate loans based on appraisals that

violated FIRREA,[1] Credit Suisse could intentionally make loans that Congress had otherwise

prohibited.  Other than to make these unlawful loans, there was no purpose for the Cayman

Islands branch of Credit Suisse – it took no deposits, had no local office, had no tellers, branch

---

[1] In the wake of the savings and loan crisis of the 1980s, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") to respond to the adverse effects "faulty and fraudulent" appraisals had on the financial integrity of lending institutions. More specifically, inflated appraisals created savings and loan failures when property values did not cover defaulted loans. H. Rep. No. 101-54(I), at 311 (1989), reprinted in 1989 U.S.C.C.A.N. 86. *Bolden v. KB Homes*, 618 F. Supp. 2d 1196, 1202 (C.D.Cal. 2008).

officers or even an automatic teller machine.

Cushman & Wakefield ignored the federal appraisal standards – adopted in each of the states germane to this Complaint – that it was required to use in appraising real estate developments, and traded its obligation to comply with national appraisal standards to expand its share of the appraisal market by appraising high-end master planned communities. For the Loan to Own Scheme, the timing was fortuitous. Credit Suisse enlisted Cushman & Wakefield's willing participation in the Loan to Own Scheme, without which agreement, the Loan to Own Scheme would never have succeeded. Without the unique appraisal methodology crafted by Credit Suisse and supported by Cushman & Wakefield, called "Total Net Value," the loan to value ratios would never have permitted the size of the loans, and therefore the gratuitous origination that those loans generated for Credit Suisse. As alleged in the Complaint, the net result of the scheme was neither implausible nor even unlikely.

Credit Suisse earned huge up front origination and management fees for the loans while they were performing. Then, when the loans failed as planned, Credit Suisse would use bankruptcy court and/or receivership proceedings to begin the second phase of its scheme. Through bankruptcies, it could either take over total control of the properties and sell the developments free and clear of the obligations to develop costly and economically unproductive amenities such as golf courses, or it could put its own proxy in place to accomplish the same goal. This Court need not rely on the allegations of the Complaint; after evidentiary hearings and testimony, the Bankruptcy Court for the District of Montana excoriated Credit Suisse in the Order cited and quoted in the Complaint. The Order of the Bankruptcy Court (USDC MT, Case No. 08-61570-11; Adv. No. 09-00014, May 2009, Exhibit A hereto) ruled that Credit Suisse had

Plaintiffs' Brief in Opposition to Defendant Credit Suisse's Motion to Dismiss - 3

violated federal law, including FIRREA, which standards and guidelines, were adopted in each

state germane to the complaint. That Order establishes the *bona fides* of Plaintiffs' claims.

Although Credit Suisse and Cushman & Wakefield were the beneficiaries of the scheme,

the homeowners in the developments targeted by Credit Suisse were the direct victims. Contrary

to Credit Suisse's mischaracterization in its Memorandum, the damages suffered by the

homeowners were not only the loss of unrealized property values (damages that the Defendants

contend are too speculative to quantify), but rather the complete elimination of all of the features

of the development which that were promised to the homeowners,[2] including vested property and

---

[2]    Credit Suisse contends that "perceived but unrealized diminutions in market value have consistently been deemed insufficient to satisfy the injury in fact standing," Memorandum, p.5. Yet, Credit Suisse was unable to cite to any published decision in support of this "consistent" rule. In fact, the Supreme Court has recognized that unrealized diminution in property values can confer standing. *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 182-83 (2000) (a reduction in home values, among various other injuries, conferred standing to sue a polluter for violating the Clean Water Act). The Ninth Circuit has held that an unrealized diminution in the value of a house caused by a change in that house's surrounding environment may generally comprise an "injury in fact" for constitutional standing purposes. *See, e.g., Tyler v. Cuomo*, 236 F.3d 1124, 1132 (9th Cir. 2000).

Credit Suisse's unpublished slip opinions such as *Tingley v. Beazer Homes Corp.*, No. 07-176, 2008 U.S. Dist. LEXIS 34303 (W.D.N.C. Apr. 25, 2008) (claim that qualifying low income buyers for home loans caused defaults in excess of the state average and diminished neighborhood property values did not confer standing) – bear no factual resemblance to Plaintiffs' claims. Instructive is Defendants' citation of *Kaing v. Pulte Homes, Inc.*, 2010 WL 625365 (N.D.Cal. Feb. 18, 2010) without explanation in n. 5, which is apparently meant to support Credit Suisse's allegedly "consistent" rule. In *Kaing*, the claimed injury was the general decrease in the value of the market value of the neighborhood due to Pulte Homes' lowering of sales prices and its foreclosures on homes it sold. Citing *Green v. Beazer Mortgage Corp.*, No. 07-1098, 2007 U.S. Dist. LEXIS 66887, *7 (D.S.C. Sept. 10, 2007), the court stated that "Plaintiff does not . . . suggest that she or any of her other similarly 'injured' neighbors have realized this decrease in value (e.g., as a result of sale of the home)." Thus, even examining whether unrealized diminution in market value can be a cognizable damage, all that a plaintiff need show at most is that a plaintiff or member of the class realized such a loss. It is a far cry from the blanket rejection Credit Suisse predictably posits. This Court need not decide that issue in connection with Credit Suisse's motion since the Plaintiffs clearly allege other

contractual rights running with the Plaintiffs' land and paid for by Plaintiffs.

**B.     The Direct Injury to Plaintiffs Caused By Defendants' RICO Conduct**

Plaintiffs (and Class Members) do not seek recovery for rights somehow derived from developers.  In the Second Amended Complaint ("SAC"), Plaintiffs seek recovery and damages for injury to their separately owned vested property rights running with land which have been destroyed by the Defendants' illegal and intentional misconduct.  For example, each of the named Plaintiffs suffered loss of use of property and individualized rights including club memberships they owned and paid for.  Plaintiffs allege that they purchased homes and properties at each of the resorts directly from their original developer or from authorized persons with authority from each developer at each resort to communicate and offer promises, amenities, rights and enforceable expectations from the developer which became vested upon purchase of their property and homes. SAC ¶ 26.  Plaintiffs allege, *inter alia*, that the scheme to defraud included depriving Plaintiffs and Class Members of these rights, agreements, amenities and privileges.  The Defendants' scheme including the use of sham developers (a/k/a nominees) to avoid compliance with Defendants' duties as the successor developer, and that as the "*de facto* developer*,*" (See SAC ¶ 76), the Defendants "cleansed" each resort of the Plaintiffs economic and property rights to maximize their economic interests.  SAC ¶¶ 32 (b), (c), (f), (g), (h) & (i)).  They did so as part of their scheme, despite representing that their appraisal methodology "...would not interfere with or place at risk the rights and expectations of the homeowners and landowners...."  SAC ¶ 52.  Defendants knew that the Plaintiffs would be ***directly impacted*** by such appraisal advice and intended justifiable reliance thereon.  SAC ¶ 55.

---

cognizable damages in addition to diminution in property values.

Plaintiffs' Brief in Opposition to Defendant Credit Suisse's Motion to Dismiss - 5

Plaintiffs allege in some detail the loss of their property rights which ran with their land and their vested contractual rights through the RICO activity of Defendants. Indeed, Defendants promised that the homeowners would benefit from their advice and could place specific trust and confidence in Defendants to protect their rights and interests. SAC ¶ 77.

The SAC alleges that Credit Suisse promised both developers *and homeowners* that they would not only benefit from their advice and appraisal expertise, but that such advice and appraisal analysis would be in conformity with federal banking law and federal and state appraisal laws, standards and guidelines. SAC ¶¶ 78, 79. Plaintiffs went even further in their SAC in specifying the vested property and contractual rights the Defendants wrongfully and illegally took from them on a resort- by- resort basis.

At *Lake Las Vegas*, the Defendants lost their rights and use of the Falls and Reflection Bay Golf Courses, man-made lakes, pro-golf shops, bars, restaurants, owner discounts at each of the shops, shuttle service and shops. SAC ¶ 92. Class members invested between $25,000 to $150,000 each in either the Yacht and Beach Club and/or the South Shore Golf Club which were property rights directly owned by Class Members and lost by them (converted) through sham proceedings (SAC ¶ 93) in which the Bankruptcy Judge in Nevada referred to the sham nominee for Credit Suisse [the "Atalon Group"] as a "*puppet*" for it. SAC ¶¶ 137, 105, 106, 129. The direct injury and damages to Class Members at *Tamarack, Yellowstone, and Ginn sur Mer* are nearly identical in nature. SAC ¶¶ 142, 143, 157, 158, 159, 160.

At each of the four resorts much of the promised build-out of amenities has not occurred. Credit Suisse, the *de facto* or co-developer has refused and continues to refuse to provide to Plaintiffs their contractually owned property rights. SAC ¶¶ 174, 176 180, 184, 187, 188, 230.

Finally, the fact that the injury suffered by Plaintiffs is their direct injury and not derivative of the developers is no better demonstrated by the common sense notion that the developers are not in a position to bring their own claims against the Defendants to seek redress for the Class Members. The developers cannot be expected to sue Credit Suisse because the developers would be inviting Credit Suisse to assert its own counter-claims against the developers as a result of the default under the loans. The suit would automatically convert the developer's non-recourse loans into recourse loans. Additionally, Credit Suisse has eliminated the original developers through various receiverships, bankruptcies and other means, and as a result Credit Suisse has continued its plan and scheme and has stepped into the shoes of the original developers with the direct obligations to fulfill and not interfere with the property and contractual rights owned by Class Members. Yet, with the developers now out of the picture, and the persons or entities in control in the bankruptcy having been characterized by the bankruptcy Judge as "puppets" for Credit Suisse (SAC ¶ 137), Credit Suisse officers and directors cannot be expected to conduct an independent internal investigation and then sue themselves for destroying the property and contractual rights of Plaintiffs and Class Members. Plaintiffs have properly alleged Ginn to now be a "puppet," just like the Atalon Group at Lake Las Vegas, for Defendant Credit Suisse. SAC ¶¶ 173,174. Thus, as set forth below, contrary to the Defendants' arguments, Plaintiffs have the most direct standing to adjudicate the damages caused by Defendants' criminal RICO activity.

2.   **PLAINTIFFS' RICO ACT CAUSE OF ACTION IS PROPERLY PLED AND THEREFORE WITHSTANDS A MOTION TO DISMISS**

Plaintiffs' first cause of action pleads a claim arising under "RICO." To state a claim

Plaintiffs' Brief in Opposition to Defendant Credit Suisse's Motion to Dismiss - 7

pursuant to the RICO Act, §1962(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's 'business or property.'" *Living Designs, Inc. v. E.I. Dupont de Nemours and Co.*, 431 F.3d 353, 365 (9th Cir. 2005). Plaintiff must show that he "has been injured in his business or property by the conduct constituting the violation." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985).  There are thus three key elements to a civil RICO claim – an "enterprise" that is conducted through "a pattern of racketeering" that causes injury to the plaintiff's business or property.  Plaintiffs have sufficiently pled each of the requisite elements.

A.   **Plaintiffs Have Concisely Pled A "RICO Enterprise."**

The RICO statute does not specifically define the outer boundaries of the "enterprise" concept but states that the term "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4); *Boyle v. United States*, 129 S. Ct. 2237 (2009).  What constitutes an enterprise is obviously broad, encompassing "any . . . group of individuals associated in fact." *Id.*  The term "any" ensures that the definition has a wide reach, *see, e.g., Ali v. Federal Bureau of Prisons*, 552 U.S. 214 (2008), and the very concept of an "association in fact" is expansive. Emphasizing the breadth of the definition of "enterprise," the Court held that the RICO statute provides that its terms are to be "liberally construed to effectuate its remedial purposes." *Boyle, supra*, at 1276.

The first legally cognizable "enterprise" is "Credit Suisse/Cayman Islands." SAC ¶ 205. The Cayman Islands branch was a separate legal entity *purportedly* created by Credit Suisse and

Plaintiffs' Brief in Opposition to Defendant Credit Suisse's Motion to Dismiss - 8

Cushman & Wakefield through which to conduct the Defendants' racketeering.  SAC, ¶¶ 60-64, 200.

Alternatively, to the extent that the Credit Suisse Cayman Islands Branch is determined after discovery *not* to be a legal entity, Plaintiffs also allege that the "enterprise" consists of an association in fact among the Defendants that is called the "Credit Suisse Cayman Island Branch."  SAC, ¶ ¶ 205-207.   An "association in fact" merely comprises "persons associated together for a common purpose of engaging in a course of conduct."  *United States v. Turkette*, 452 U.S. 576, 583, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981).[3]

## B.   The Pattern of Racketeering

"Racketeering activity" under RICO is defined as any act "chargeable" or "indictable" under a number of enumerated federal offenses ("predicate" offenses), including mail fraud and wire fraud, which are contended by the Plaintiffs in this case. See 18 U.S.C. § 1961(1).  To prove a pattern of racketeering, a plaintiff must establish at least two predicate offenses. *Clark v. Time Warner Cable*, 523 F.3d at 1110-16 (9th Cir. 2008). At least two of the predicate offenses must have occurred within ten years. *H.J. Inc., v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 229, (1989).[4]   Predicate acts are related if they "have the same or similar purposes, results,

---

[3]  Section 1962(d) applies to intra-corporate, as well as inter-corporate conspiracies; thus, it is possible for a corporation to engage in a RICO conspiracy with its own officers and representatives. *Webster v. Omnitrition Int'l*, 79 F.3d 776, 787 (9th Cir.1996).

[4]  Credit Suisse falsely contends that the Plaintiffs have not pled the instances of wire fraud with specificity.  First, Plaintiffs plead at least three specific acts of wire fraud and mail fraud by person, place, date and content, at ¶ 217(d) ("September 30, 2005"), ¶ 217(c) ("December 2004") and SAC ¶ 225 ("December 16, 2004"). That is all the specificity that should be required under Fed.R.Civ. P. 9(b) without further discovery.  Second, the Rule 9(b) pleading standard does not require a plaintiff to identify every false statement made by each and every defendant. *Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007).   Third, a settled exception to the particularity requirement of Rule 9(b) exists when the relevant facts "lie exclusively within the knowledge and control of the opposing party." *United States ex rel.*

participants, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240.

Plaintiffs specifically allege at least ten specific predicate acts carried out by the enterprise using the mails and wires. SAC, ¶ 217. Plaintiffs allege that Defendants committed, among others, the predicate offenses defined in 18 U.S.C. §§ 1341 and 1343. Wire fraud has only three elements: "(1) a scheme to defraud; (2) use of the wires in furtherance of the scheme; and (3) a specific intent to deceive or defraud." *United States v. Shipsey*, 363 F.3d 962, 971 (9th Cir. 2004).[5] In light of Fed.R.Civ. P. 8, Plaintiffs have alleged the scheme to defraud in great, if not intricate, detail. SAC, ¶¶ 37-92.

Simply put, the scheme to defraud is the sale of inflated loans on high end real estate developments by means of fraudulent and inflated appraisals that violated FIRREA and USPAP, through which fraudulent appraisals the Defendants were able to collect enormous up-front fees while saddling the developments with debt that would enable the Credit Suisse Defendants to obtain the developments at a steep discount through foreclosure, bankruptcy or receivership, free of the contractual obligations to develop the infrastructure for the resorts for which the homeowners had contracted.

Plaintiffs have also alleged the specific use of the wires and mails in furtherance of the

---

*Wilkins v. State of Ohio,* 885 F. Supp. 1055, 1061 (S.D. Ohio 1995). A court should hesitate to dismiss an action when the facts underlying the claim are within the defendant's control, especially when no discovery has been conducted. *Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 680 (6th Cir. 1988). In any event, leave to amend should be granted to the extent that any portion lacks sufficient specificity.

[5] Because the mail fraud statute is identical but for the use of the mails, Plaintiffs will refer to them interchangeably.

Plaintiffs' Brief in Opposition to Defendant Credit Suisse's Motion to Dismiss - 10

scheme, including in at least three instances, the date place and content of the use.  SAC ¶¶ 217,

225; *see also Semegen v. Weidner*, 780 F.2d 727, 734-35 (9th Cir. 1985) (allegations of place,

time and content sufficient).   Finally, Plaintiffs have alleged Defendants' specific intent to

defraud Plaintiffs by foisting illegal and improper loans upon the homeowners by virtue of

Cushman's illegal appraisals to interfere with their contractual relations and deprive the

homeowners of valuable and important amenities.[6]

### C.    The Defendants Have Participated in the Conduct Of the Affairs Of the Enterprise Through The Pattern Of Racketeering.

To "participate, directly or indirectly, in the conduct of such enterprise's affairs, one must

have some part in directing those affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993).

Moreover, "liability depends on showing that the defendants conducted or participated in the

conduct of the 'enterprise's affairs, 'not just their own affairs.'"  *Id.*  The SAC specifically alleges

that the enterprise was conducted by both Credit Suisse and Cushman, both of which had a major

role in directing those affairs.

For example, Credit Suisse funded the illegal loans through the Cayman Islands Branch,

whose only purpose was the evasion of FIRREA.  SAC ¶ 214.  Plaintiffs also allege that

Cushman participated in the pattern of racketeering by presenting alleged "appraisals" that

---

[6]    Defendants contend that Plaintiffs must plead and prove that they relied on the fraudulent acts.  Not so.  In *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 128 S. Ct. 2131, 2142, 170 L. Ed. 2d 1012 (2008), the Supreme Court explicitly held that using the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud, and hence a predicate act of racketeering under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.S. § 1961 *et seq.*, even if no one relied on any misrepresentation.  One can conduct the affairs of a qualifying enterprise through a pattern of such acts without anyone relying on a fraudulent misrepresentation. *Id.*

grossly inflated the values of the targeted high-end communities in order to facilitate the loans

through the enterprise by Credit Suisse.  SAC ¶¶¶ 39, 42, 47, 49, 51, 52, 56, 57, 58, 60, 61, 62,

65, 67, 68, 69, 70, 79,  80, 85, 86, 88, 89, 104, 105, 129, 148, 156, 164, 172, 175, 180, 188, 192,

193, 197, 198, 199 ,203, 206, 217(f) & (h), 231, 232, 233, 234, 239. Those allegations, standing

alone, satisfy the element of "conducting" the enterprise through a pattern of racketeering.  There

is no *bona fide* dispute that the SAC pleads the conduct of the enterprise by both sets of

defendants, through the pattern of racketeering.

### D.      The RICO Scheme Has Caused Injury To Plaintiffs' "Business or Property."

A civil RICO "plaintiff only has standing if, and can only recover to the extent that, he

has been injured in his business or property by the conduct constituting the violation." *Sedima*,

473 U.S. at 496; *see* 18 U.S.C. § 1964(c).  *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969,

975 (9th Cir. 2008).  Once a plaintiff has satisfactorily alleged an injury to his business or

property, the plaintiff must allege that the injury was proximately caused "by the conduct

constituting the violation." *Id.*  The SAC adequately pleads both injury to property and a direct

relationship between that injury and the RICO scheme.[7]

#### (a)     Plaintiffs Have Adequately Alleged An Injury To Property.

To determine whether a plaintiff has sufficiently alleged that he has been "injured in his

business or property," the Ninth Circuit requires that a plaintiff asserting injury to property allege

"concrete financial loss." *Chaset v. Fleer/Skybox Int'l*, 300 F.3d 1083, 1086-1087 (9th Cir. 2002)

(plaintiffs must show proof of concrete financial loss and injury to property interest).  Concrete

loss requires only that "[t]he plaintiff [ ] prove some damage, but 'proving the fact of damage ...

is satisfied by ... proof of some damage flowing from the unlawful conspiracy; inquiry beyond

---

7  Defendants raise a "red-herring" in their discussion of so-called "constitutional standing."  By
definition, if Plaintiffs establish standing under RICO, "constitutional standing" exists.

this minimum point goes only to the amount and not the fact of damage.'" See *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 811 (9th Cir. 1976).

"Without a harm to a specific business or property interest -- a categorical inquiry typically determined by reference to state law -- there is no injury to business or property within the meaning of RICO." *Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (*en banc*). The "property interest," injury which is cognizable under RICO as a "concrete financial loss" is determined by whether state law recognizes the property interest in question. *Diaz, supra* at 900.

"In the ordinary context of a commercial transaction, a consumer who has been overcharged can claim an injury to her property, based on a wrongful deprivation of her money." *Canyon County*, 519 F.3d at 976, citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 342 (1979). As the Supreme Court reasoned in *Reiter*, "[i]n its dictionary definitions and in common usage 'property' comprehends anything of material value owned or possessed. Money, of course, is a form of property." *Id.* at 338. Thus, the Court concluded that "where petitioner alleges a wrongful deprivation of her money because the price of the hearing aid she bought was artificially inflated . . ., she has alleged an injury in her 'property' . . . ." *Id.* at 342.

The *Diaz* Court held that the "injury to business or property" requirement of RICO was satisfied by the allegation that the plaintiffs were injured by the intentional interference with contractual and prospective business relations, a property interest under California law. The "legal entitlement to business relations unhampered by schemes prohibited by the RICO predicate statutes ... is a property interest sufficient to provide standing under RICO." *Id.*; *see e.g., Avalos v. Baca*, 596 F.3d 583, 593 (9th Cir. 2010) (following *Diaz* and holding that a chose in action is a "property right" that can support RICO); *see also Living Designs, Inc. v. E.I.*

*Dupont de Nemours & Co.*, 431 F.3d 353, 364 (9th Cir. 2005) (plaintiff's claim alleging diminished litigation settlement due to the defendant's fraud alleged injury to a property interest). The SAC fully satisfies the "concrete financial injury" component of the final element of RICO.

The SAC alleges in detail that, using falsely and illegally inflated appraisals, the Defendants saddled the four named developments in which the Plaintiffs were homeowners with huge debt that would not have been possible but for their falsely inflated appraisals that evaded both FIRREA and USPAP as adopted by each of the states. The SAC further alleges that the Defendants knew, (and the Montana Bankruptcy Court Found) that Credit Suisse intended that the developments fail in order to obtain those high end developments at a substantial discount. The SAC alleges that the Defendants, by means of their "Loan to Own" scheme that evaded FIRREA, intended to and did evade the contractual obligations to the homeowners to develop amenities for the development, such as restaurants, golf courses, ski resorts and pools. Credit Suisse, knowing of those obligations, intentionally interfered with the development of the promised amenities by virtue of its total control and domination of the developer as the lender and lending advisor. Thus, under *Diaz*, Plaintiffs have alleged a property interest in the development of the amenities and the injury to that property interest flowing from the RICO scheme itself – the interference with the development of those amenities. Accordingly, the Class Members have suffered a concrete financial loss flowing from the failure to develop the bargained-for amenities and have satisfied the "injury to business or property" prong of the test.

### (2)    Proximate Cause.

After showing that the Plaintiff has sufficiently alleged an "injury to business or property," a plaintiff must next show that the injury was proximately caused by the RICO

scheme. *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258, 268 (1992) (plaintiff is required to show that a RICO predicate offense "not only was a 'but for' cause of his injury, but was the proximate cause as well."). "Proximate cause" only requires "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* However, "the term 'proximate cause' does not easily lend itself to definition." *McBride v. CSX Transp., Inc.*, 598 F.3d 388 (7th Cir. 2010). Indeed, with respect to the concept of proximate cause, one noted commentator has stated:

> There is perhaps nothing in the entire field of law which has called forth more disagreement, or upon which the opinions are in such a welter of confusion. Nor, despite the manifold attempts which have been made to clarify the subject, is there yet any general agreement to the best approach.

W. Page Keeton, et al., *Prosser & Keeton on the Law of Torts* § 41 at 263 (5th Ed. 1984). *See Hemi Group, LLC v. City of New York*, 130 S. Ct. 983, 989 (2010) (stating that "[p]roximate cause for RICO purposes . . . should be evaluated in light of its common-law foundations" and "requires some direct relation between the injury asserted and the injurious conduct alleged"). Under the "common-law foundations" of proximate cause, the *Hemi* court merely applied the standard requirement that there be some direct relation between the injury and the conduct. Thus, there is liability for both "all 'direct' (or 'directly traceable') consequences and those indirect consequences that are foreseeable." *Prosser and Keeton* § 42, at 273; *see also id.*, § 43, at 294, and n. 17. The concepts of direct relationship and foreseeability are not mutually exclusive. They are "two of the many shapes proximate cause took at common law."[8] *Hemi,* 139 S.Ct at 14.

---

[8] Here, for example, the plaintiffs are within the class that FIRREA sought to protect and the harm suffered was precisely the type of harm that FIRREA sought to prevent. Thus, although "foreseeability" alone is not the benchmark of RICO proximate cause, it is clear that under the common law formulation of proximate cause endorsed in *Hemi*, the Plaintiffs have

Plaintiffs' Brief in Opposition to Defendant Credit Suisse's Motion to Dismiss - 15

The Supreme Court has addressed civil RICO's causation requirements in three key cases, *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258 (1992), *Anza v. Ideal Steel Supply Co.*, 547 U.S. 451, 453 (2006) and the Supreme Court's recent decision, *Hemi Group v. City of New York*, 130 S. Ct. 983 (2010).

*Holmes*t focused on § 1964(c)'s requirement that the claimed injury be "by reason of a defendant's RICO violation." See 18 U.S.C. § 1964(c). In that case, after losses due to a stock manipulation scheme caused two broker-dealers to fail, the Securities Investor Protection Corporation ("SIPC") had to pay over $13 million in claims to customers of the broker-dealers after the broker-dealers were unable to meet their obligations to its customers. SIPC sued defendants pursuant to RICO, claiming that because of the fraudulent stock manipulation scheme, SIPC had to pay customers of the failed broker-dealers. Significantly, SIPC was not bringing action on behalf of customers of the broker-dealers who lost money in the scheme.

Rejecting SIPC's claim as lacking proximate cause, the Court held that a plaintiff must be able to show that the violation was not only the "but-for" cause of the injury, but also the proximate cause, which "demand[s] for some direct relation between the injury asserted and injurious conduct alleged." *Id.* at 268. The *Holmes* Court noted the following three policy reasons for requiring proximate causation in the RICO context: (1) the factual difficulty of measuring indirect damages and distinguishing among distinct independent causal factors; (2) the complexity of apportioning damages among plaintiffs "to obviate the risk of multiple recoveries;" and (3) the fact that "the need to grapple with these problems is simply unjustified

---

established proximate cause. *See Abrahams v. Young & Rubicam, Inc.*, 79 F.3d 234, 237 (2nd Cir. 1996).

by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law." *Id.* at 269. The alleged harm was SIPC's payment of claims to customers of the failed broker-dealers. The RICO conduct, however, was the stock manipulation scheme. Thus, any harm befalling the customers was caused by the failure of the broker-dealers, not the loss of money from the stock manipulation scheme. The Court then held that the injury in *Holmes* was too remote to allow recovery because it was contingent upon the harm to another. *Id.* at 271-74.

In *Anza, supra,* the Court found no proximate cause where, although the plaintiff's injury was not derivative as it was in *Holmes,* it was nevertheless too remote to allow recovery. In *Anza,* a merchant sued its competitor under RICO alleging that it was injured because the competitor failed to charge sales tax and submitted fraudulent tax returns and, thus, was able to undercut plaintiff's price. *Id.* at 453-56. In finding that the plaintiff had inadequately alleged proximate causation, the Court explained that "[t]he cause of [the plaintiff's] asserted harms ... is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State)." *Id.* at 458. The alleged RICO violation directly caused the State to be defrauded of taxes, not the plaintiff to lose money to its competitor. *Id.*

The Supreme Court's most recent pronouncement on proximate cause in the civil RICO context is found in *Hemi,* 130 S. Ct. 983. *Hemi* involved a city tax on those who possess cigarettes. *Id.* at 986. In-state sellers were required to collect the tax from purchasers and pay it to the city but out-of-state sellers were not. *Id.* at 987. Instead, the city was responsible for recovering the tax directly from the purchasers. *Id.* New York statute required out-of-state sellers to register and file a report with the state listing the name and address of the in-state

purchasers. *Id.* The city would use the report to track down cigarette buyers who had not paid their possession taxes.

The defendant in *Hemi* was an out-of-state cigarette seller who sold cigarettes to purchasers online but did not file the required reports with the state. *Id.* The city filed suit against the defendant, alleging that its failure to file the reports constituted the RICO predicate offense of mail fraud. *Id.* It asserted its injury was "lost tax revenues." *Id.* at 987-88. The Supreme Court determined that the city could not establish the causation required under RICO because it could not establish it had suffered the injury "by reason of" the alleged fraud as required by § 1964(c) *Id.* at 988.

"The conduct directly responsible for the City's harm was the customers' failure to pay their taxes. And the conduct constituting the alleged fraud was [the defendant's] failure to file. . . reports." *Id.* at 990. Accordingly, "the conduct directly causing the harm was distinct from the conduct giving rise to the fraud." *Id.* Instead, a plaintiff must show that the fraudulent conduct led directly to the plaintiff's injuries. *Id.* at 992. Because the city's injuries "were not caused directly by the alleged fraud," the injuries were not caused "by reason of" the fraud. Thus, the RICO claim failed. *Id.* at 994. Such a circumstance does not exist in the instant case.

**(a)   Plaintiffs Have Established A Sufficiently Direct Relationship Between The Conduct Alleged and The Harm Suffered.**

Unlike the *Holmes, Anza* and *Hemi* cases and their predecessors and progeny, the case at bar presents a straightforward and uncomplicated link between the predicate acts of mail and wire fraud and the harm suffered by the Plaintiffs – the loss of all promised common area

Plaintiffs' Brief in Opposition to Defendant Credit Suisse's Motion to Dismiss - 18

amenities.[9]

        (i)        **<u>The Facts Conclusively Establishing Proximate Cause.</u>**

The purpose of FIRREA "is to provide that Federal financial and public policy interests in real estate related transactions will be protected by requiring that real estate appraisals utilized in connection with federally related transactions be performed in writing, in accordance with uniform standards, by individuals whose competency has been demonstrated and whose professional conduct will be subject to effective supervision." 12 U.S.C. § 3331. To further this purpose, Congress, through FIRREA, directed the states adopt USPAP as the minimum standards of appraisal practice within their jurisdictions and "delegated responsibility for certification and licensing of appraisers to the states in accordance with other specified requirements." *Bolden v. KB Home*, 618 F.Supp.2d 1196, 1202-1203 (C.D. Cal. 2008); *see* 12 U.S.C. § 3345. USPAP was thus enacted to protect the public from misleading appraisals. See *Hice v. Lott*, 223 P.3d 139, 144 (Colo. App. 2009) (quoting from the 2008-2009 edition of USPAP).

To comply with FIRREA, the States implicated in this case thus far have all adopted USPAP as the minimum standards for appraisal practice within their jurisdictions. Plaintiffs allege that the appraisals are fraudulent and intentionally misleading because they use the TNV

---

[9]  Plaintiffs will simply note at this stage of the pleadings that although the Defendants contend that loss of equity is not a damage until the home is sold or lost through foreclosure, it is not difficult to understand that when a high-end master-planned community is shuttered because of the illegal loans burdening the common areas, there are very real damages to the existing homeowners, whether or not the homes are sold or foreclosed upon. However, that issue only goes to the amount of, and not the fact of, damages and is not something that this Court must address at this time.

Plaintiffs' Opposition to Defendant Cushman & Wakefield's Motion To Dismiss - 19

appraisal methodology and therefore violated not only FIRREA, but also USPAP as adopted by Idaho, Nevada, Montana and Florida. See SAC ¶¶ 34, 40, 58, 60, 65, 66, 70, 79, 86, 103, 156, 162, 164, 172, 200, 250; *see also* Vernon Martin, III, *Appraisal Fraud and How it Works*, 108 Banking L.J. 144, 153 (March-April 1991) ("The OTS and the OCC have now issued regulations requiring a uniform definition of market value based on cash equivalency and reasonable expectations of buyer and seller behavior. Previously, appraisers could have used definitions of market value based on favorable or unusual financing terms, which would have had the effect of inflating the appraised value. Regulations now require that 'the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.'" [quoting from 12 C.F.R. § 564.2(f)]).

In this regard, Plaintiffs' common law and federal fraud causes of actions do not depend on violations of FIRREA alone but also on the allegations that the Defendants' scheme was illegal under state law. These federal and state laws were designed to protect against the very harms that Plaintiffs now suffer. The requirements of FIRREA cannot be waived. They protect not only the lending institutions which rely on appraisals in their loan underwriting process, but also preserve public trust and confidence in appraisal practice and protect the end-user of the real-estate that is encumbered by FIRREA and USPAP protected loans. *See* USPAP Preamble.[10] Credit Suisse's abject failure to abide by those rules is also fully documented in the Montana

---

[10] Although not in the SAC, Mr. Haney in his Affidavit has set forth numerous particulars of how appraisals governed by FIRREA and USPAP protect the homebuyer in a development. Those facts from the Haney Affidavit can be pled in an amended complaint if the Court deems it necessary.

Plaintiffs' Opposition to Defendant Cushman & Wakefield's Motion To Dismiss - 20

Bankruptcy Court Order, Appendix A hereto.[11]

After an evidentiary hearing on a motion to subordinate Credit Suisse's loan in *In re*

*Yellowstone Mountain Club*, the U.S. Bankruptcy Court for the District of Montana stated:

> Credit Suisse and the development owners would benefit, while their
> developments – and especially the creditors of their developments – bore all the
> risk of loss. This newly developed syndicated loan product enriched Credit
> Suisse . . . but it left the developments too thinly capitalized to survive.
> Numerous entities that received Credit Suisse's syndicated loan product have
> failed financially, including Tamarack Resort, Promontory, Lake Las Vegas,
> Turtle Bay and Ginn. . . . they were doomed to failure once they received their
> loans from Credit Suisse. . . The Court highly doubts that Credit Suisse could
> have successfully syndicated the Yellowstone Club loan if the loan to value ratio
> was 90 percent. Thus, Credit Suisse instead commissioned Cushman &
> Wakefield to employ its newly devised valuation methodology. . . .

If there were any further doubt about using these fee-driven predatory loans to damage the

homeowners or that there were some other proximate cause for the damages to the Plaintiffs, the

Montana Bankruptcy Court put that to rest:

> The only plausible explanation for Credit Suisse's actions is that it was simply
> driven by the fees it was extracting from the loans it was selling, and letting the
> chips fall where they may. Unfortunately for Credit Suisse, those chips fell in this
> Court with respect to the Yellowstone Club loan. The **naked greed** in this case
> combined with Credit Suisse's complete disregard for the Debtors or any other
> person or entity who was subordinated to Credit Suisse's first lien position,
> **shocks the conscience of this Court**. While Credit Suisse's new loan product
> resulted in enormous fees to Credit Suisse in 2005, it resulted in financial ruin for
> several residential resort communities. Credit Suisse lined its pockets on the backs
> of the unsecured creditors [including the homeowners]. *Id.* (Emphasis supplied.)

The "harm" suffered by the Plaintiffs is, at a minimum, the interference with the

---

[11] The Bankruptcy Court stated: "The Total Net Value methodology was first developed when Credit Suisse was selling its syndicated loan product to Lake Las Vegas. Credit Suisse's Total Net Value methodology does not comply with the Financial Institutions Recovery Reform Act of 1989 ("FIRREA"), but that was not important to Credit Suisse because Credit Suisse was seeking to sell its syndicated loans "to non bank institutions." This Court should note that shortly after this Order was issued, Credit Suisse entered into a settlement.

homeowners' property rights to the contractually promised amenities, that the Credit Suisse Defendants intended to and did interfere with by means of their "Loan to Own" scheme.

Accordingly, Plaintiffs have sufficiently alleged proximate causation because Defendants' arrangement to inflate appraisals was a direct cause of their injuries and a "substantial factor in the sequence of responsible causation." *Johnson v. KB Homes*, 2010 U.S. Dist. LEXIS 30686 (D.Ariz. March 30, 2010) (scheme to inflate appraisals to justify under-secured loans adequately pled proximate cause under *Hemi*), citing *Oki Semiconductor Co. v. Wells Fargo Bank*, 298 F.3d 768, 773 (9th Cir. 2002).

   **(ii)**  **The Anza "Remoteness" Test Is Also Satisfied.**

In *Anza*, the Court looked at three non-exclusive factors to determine whether an injury was "too remote" to establish proximate causation: (1) whether there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general; (2) whether it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct; and (3) whether the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries. *Anza*, 547 U.S. at 458-59. *See also, Canyon County*, 519 F.3d at 974. The allegations set forth in the Complaint satisfies the requirements of these factors.

First, there are no more direct victims of the wrongful conduct who could act as private attorneys general. The wrongful conduct alleged is the homeowners' loss of their use and enjoyment of their vested property and contract rights as a result of Defendants' intentionally and predatorily crushing the developments with debt beyond any legitimate loan to value ratio, causing direct injury to the homeowners. In addition, and as a result of the failure to build out

the bargained-for amenities, the developments are virtually unmarketable and the homeowners cannot sell their properties. Plaintiffs do not complain of a passed-on harm; the homeowners are the only victims of the scheme, since it is the homeowners' bargained-for amenities that were so saddled with debt from Defendants' scheme that the developments and the amenities were eliminated. Plaintiffs' inability to obtain the built-out amenities is not derived from some third party's direct injury. *See, e.g., Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1170 (9th Cir. 2002). Thus, to vindicate the rights of the homeowners, there are no more direct victims of the scheme. Moreover, as discussed in the Introduction section, the Plaintiffs are the only parties who have standing and incentive to sue the Defendants' for their RICO violations. The developers have no standing and no incentive to sue the Defendants for the harms suffered by Plaintiffs.

Secondly, this case poses no problems with ascertaining the amount of Plaintiffs' damages attributable to the Defendants' conduct. It is as simple as using expert appraisers and economists to testify on the value of the Plaintiffs' property had the amenities been built-out as contractually obligated as compared to the value of the Plaintiffs' property without such amenities. Expert testimony on property values by appraisers and economists is a routine part of virtually any damages claims involving real estate. Further, "it is important to distinguish between uncertainty in the fact of damage and in the amount of damage." *Mendoza*, 301 F.3d at 1171 (citing *Knutson*, 548 F.2d at 811 ("Different standards govern proof of the fact and proof of the amount of damages."). At the motion to dismiss stage, Plaintiffs must only prove the fact of some damage, but "proving the fact of damage . . . is satisfied by . . . proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage.'" *Knutson*, 548 F.2d at 811. There is a distinction between

Plaintiffs' Opposition to Defendant Cushman & Wakefield's Motion To Dismiss - 23

uncertainty in the *fact* of damage and in the *amount* of damage. *See Knutson*, 548 F.2d at 811. Such uncertainty at the motion to dismiss stage need not foreclose Plaintiffs' attempt to ascertain proximate cause and the amount of damage attributable to the alleged RICO violation as opposed to intervening factors. *See Mendoza*, 301 F.3d at 1171 (questions requiring expert economic testimony should be left for a later stage of the proceedings).

*Anza*'s treatment of this factor is instructive. There, the injury that the plaintiff alleged was its own loss of sales resulting from the defendant's decreased prices for cash-paying customers. The defendant allegedly lowered prices because it did not pay state taxes. However, the defendant "could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud," such as receiving a cash inflow from some other source or because additional sales from lower prices would justify a smaller profit margin. "Its lowering of prices in no sense required it to defraud the state tax authority." *Id.* at 459. Likewise, "the fact that a company commits tax fraud does not mean the company will lower its prices; the additional cash could go anywhere from asset acquisition to research and development to dividend payouts." Thus, it would only be speculation to link the alleged conduct (tax fraud on the state) with the alleged harm (lower prices).

Here, of course, there is no such complicated and multistep determination. Defendants crushed the developments with their predatory loans,[12] and intentionally prevented the contractual build-out of amenities that gave their properties significant value. The conduct

---

[12]    Unlike a traditional loan, a predatory loan is usually intended to fail. *Willingham v. Novastar Mortgage, Inc.*, 2006 U.S. Dist. LEXIS 97149 (W.D.Tenn. Feb. 7, 2006). The lender is usually unconcerned with a borrower's ability to repay, and the final loan is usually packed with excessive fees and charges and may include charges for nonexistent or unnecessary services. *Id.* The interest rate is usually exorbitant and accompanied by stiff prepayment penalties. *Id.*

Plaintiffs' Opposition to Defendant Cushman & Wakefield's Motion To Dismiss - 24

(predatory lending based on fraudulent appraisals) led directly and without detour, to the harm (loss of contractually promised amenities).

Thirdly, courts examine whether there is a significant risk of multiple recovery. Importantly, "[t]his factor does not bar suit for 'different classes of plaintiffs, each of which suffered a different concrete injury, proximately caused by the violation.'" *Mendoza*, 301 F.3d at 1172.[13] However, there is no risk of multiple recoveries in this case, because this is not a suit for derivative or passed-on harm.  The homeowner-Plaintiffs are the only ones injured by the scheme and thus the only persons who could recover for the claims set forth in the RICO claim.

It is a fundamental premise of American jurisprudence that determination of "proximate cause" is generally is an issue for the jury. *Commodities Reserve Co. v. St. Paul Fire & Marine Ins. Co.*, 879 F.2d 640, 644 (9th Cir. 1989).  "Determination of proximate cause . . . is thus a matter of applying common sense and reasonable judgment as to the source of the losses alleged." *Commodities Reserve Co. v. St. Paul Fire & Marine Ins. Co.*, 879 F.2d 640, 643 (9th Cir.1989) citing *Blaine Richards & Co. v. Marine Indemnity Ins.* Co., 635 F.2d 1051, 1054-55

---

[13]   Credit Suisse contends that the developers are in a better position to bring suit. However, the Plaintiffs are seeking damages *for their direct injury*.  The developers cannot vindicate rights to homeowner amenities since the developers, even when they lost the development to Credit Suisse's predation, only have a claim for lost economic opportunities from the build-out and sale of the development.  Furthermore, part of the scheme to defraud was the inevitable bankruptcies where the developers have no incentive whatsoever to bring suit to vindicate homeowner rights in a development in which the developers no longer have any stake – even if they could have standing to do so. As successor developers, Credit Suisse is the true owner and developer now destroying the homeowner rights and breaching the homeowners' contract rights.  Therefore, one or more developers might have claims against the Defendants that are totally separate and independent from Plaintiffs' claims without running afoul of this factor.  Finally, the developers cannot be expected to bring their own suits against CS because they would inevitably face counter-claims by CS arising from the defaults under the loan.  In this sense, the developers would be buying themselves a lawsuit and therefore have no incentive to bring such claims.

Plaintiffs' Opposition to Defendant Cushman & Wakefield's Motion To Dismiss - 25

(2nd Cir. 1980) (discussing proximate cause in the context of shipping damage).

Unlike the facts presented in *Holmes, Anza, Hemi* and *Canyon County*, the damages presented in this action are neither, speculative, remote or derivative. Instead, the facts as pled are virtually on all fours with *Johnson v. KB Homes* or at least jury issues exist regarding proximate cause. The Motion to Dismiss should be denied as to the RICO claim.[14]

### (b)   Contrary To Defendants' Arguments, The Scheme Is Not Only Plausible But Highly Profitable.

The Defendants contend that dismissal on causation is proper because Plaintiffs' allegations are facially implausible, and thus fail to state a claim under Fed.R.Civ. P. 8(a)(2), because it would be a ludicrous lending policy to write under-secured loans. *See Ashcroft v. Lqbal*, __ U.S. __, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).   Not only did at least one court, after hearing testimony from representatives of the Defendants believe otherwise, but an arrangement that results in such under-secured loans is not only plausible, but logical and highly profitable if the loans can be syndicated (that is; funded with other investors' money) and insured with Credit Default Swaps, also sold or brokered by Credit Suisse.

In fact, the complaint alleging virtually the identical scheme was upheld against this precise argument in *Johnson v. KB Homes* on March 30, 2010, where the Court found that a scheme to use inflated appraisals to support under-secured loans that caused the Plaintiffs to pay more for their homes stated a claim under RICO.   Accordingly, Defendants' claim that the

---

[14]   The Defendants repeatedly and falsely characterize the Plaintiffs' damages as merely due to the "recession." What Defendants are in essence contending is that not all of Plaintiffs' damages flow from the scheme to defraud. However, "it is important to distinguish between uncertainty in the fact of damage and in the amount of damage." *Mendoza*, 301 F.3d at 1171. "Different standards govern proof of the fact and proof of the amount of damages." *Id.*

Plaintiffs' Opposition to Defendant Cushman & Wakefield's Motion To Dismiss - 26

Plaintiffs' complaint is implausible and cannot be amended to correct any defects is simply false. Finally, as this Court can judicially notice from the recent criminal investigations into Goldman Sachs, it is not uncommon for big Wall Street firms to bet against their own loans because they have figured out that by taking short positions in their own loans through Credit Default Swaps and by selling derivatives in these loans, these firms can and do profit when their loans fail.

### E.      **Plaintiffs Have Also Stated A Claim For Conspiracy To Violate RICO.**

Plaintiffs also plead a claim pursuant to § 1962(d) of RICO. "[S]ection 1962(d) makes it unlawful to conspire to conduct or participate in the conduct of an enterprise's affairs, where its affairs are conducted through a pattern of racketeering activity." *U.S. v. Tille*, 729 F.2d 615, 619 (9th Cir. 1984). To state a claim under § 1962(d), a plaintiff need only supply "[p]roof of an agreement the objective of which is a substantive violation of RICO (such as conducting the affairs of an enterprise through a pattern of racketeering)." "The illegal agreement need not be express as long as its existence can be inferred from the words, actions, or interdependence of activities and persons involved." *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 775 (9th Cir. 2002); *Id.*  However, when proof of such an agreement is lacking, "the evidence must establish the defendant's participation or agreement to participate in two predicate offenses." *Tille*, at 619; *see, e.g., Howard v. America Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000) ("If a substantive violation is properly pleaded, a conspiracy claim may survive a factfinder's conclusion that there is not sufficient evidence to prove the violation.").

There is ample "proof of an agreement the objective of which is a substantive violation of RICO (such as conducting the affairs of an enterprise through a pattern of racketeering)." First, the Montana Bankruptcy Court's Order specifically found, after an evidentiary hearing, that

"Credit Suisse instead commissioned Cushman & Wakefield to employ its newly devised valuation methodology" to foist its predatory loans on the four high-end developments. That finding alone should be more than sufficient to uphold the RICO conspiracy claim in the face of Defendants' Rule 12(b)(6) motion. It is difficult to characterize "commission[ing]" Cushman's appraisals that violated FIRREA and supported the Defendants' fraudulent scheme as anything other than an express agreement to conduct the affairs of the enterprise by means of the pattern of racketeering discussed above.

Read in the light most favorable to the Plaintiffs, as this Court must at this stage of the pleadings, the Defendants' motion to dismiss the RICO claim must be denied.

## 3.   PLAINTIFFS HAVE ADEQUATELY PLED ALL ELEMENTS OF FRAUD

Cushman ("CW") contends that the SAC fails to adequately describe its fraudulent conduct or how it was involved in the conspiracy, pursuant to Rule 9(b). To the contrary, the SAC makes it clear what CW's role was in the fraudulent enterprise. CW's role was to create inflated appraisals which violated USPAP and skirted FIRREA, all for the purpose of facilitating CS in perpetrating its larger "Loan to Own" scheme against the resorts and the Plaintiffs.

"Rule 9(b) must be read in conjunction with Federal Rule of Civil Procedure 8(a), which demands only 'a short and plain statement of the claim,' and with the Federal Rules' policy in favor of flexibility and simplicity in pleading." *Superior Bank, F.S.B. v. Tandem National Mortgage, Inc.*, 197 F.Supp.2d 298, 314 (D. Md. 2000) ("an examination of the entire [complaint] is necessary" to determine if pleading requirements of Rule 9(b) are satisfied). Toward this policy, Rule 9(b) "only requires the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Walling v. Beverly Enterprises*, 476 F.2d 393, 397 (9th Cir. 1973); *Neubronner v. Milken*, 6 F.3d 666, 671-672 (9th Cir. 1993); *Semegen v. Weidner*, 780 F.2d 727, 734-35 (9th Cir.1985). While

allegations of time, place and identity of the actors involved in the fraudulent conduct are sufficient, they are not necessary to satisfy Rule 9(b)'s particularity requirements. See *Semegen*, 780 F.2d at 735; *Bosse v. Crowell Collier and Macmillan*, 565 F.2d 602, 611 (9th Cir. 1977); *Superior Bank, F.S.B.*, 197 F.Supp.2d at 314.

Moreover, where, as here, the details of the time and place of the fraudulent conduct perpetrated by the Defendants are primarily within their knowledge and are readily obtainable by them, the pleading requirements of Rule 9(b) are substantially relaxed so that all that is required of Plaintiffs at this stage is that "they plead their theory of fraud," and identify the facts upon which their theory is based. *Neubronner*, 6 F.3d at 972; *In re GlenFed, Inc. Securities Litigation*, 11 F.3d 843, 848 (9th Cir. 1993); *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987) (rev'd on other grounds); *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989); *U.S. ex rel. Mason v. State Farm Mut. Auto. Ins. Co.*, No. CV07-297-S-EJL, 2008 WL 2857372 at * 13 (July 23, 2008) (Lodge, J.).

Therefore, "[t]he central question which arises when a complaint is attacked under 9(b) is how much detail is necessary to give adequate notice to the opposing party in order to enable that party to prepare adverse pleadings." *Superior Bank, F.S.B.*, 197 F.Supp.2d at 314 (quoting *PPM Am., Inc. v. Marriott Corp.*, 820 F.Supp. 970, 973 (D. Md. 1993); *Neubronner*, 6 F.3d at 671-672. Defendants most certainly have a sufficient basis from the SAC to prepare "an adequate answer from the allegations," which is all that Rule 9(b) requires. In fact, CW does not actually complain that it must guess what fraudulent conduct it is being accused of. Finally, if this Court were to determine that Plaintiffs' claims are not pled with sufficient specificity, Plaintiffs respectfully request leave to amend in lieu of dismissal. *See Aardema Group, LLC v. Northwest Dairy Ass'n*, Case # 09-0045, 2009 WL 1748082 at *3, n.3 D. Idaho, Jun. 17, 2009 (Bush, M.J.).

A.    **CONSPIRACY ALLEGATIONS MAKE CW JOINTLY AND SEVERALLY LIABLE FOR CS' FRAUD.**

Although "civil conspiracy" is not an independent cause of action, it serves to impose

Plaintiffs' Opposition to Defendant Cushman & Wakefield's Motion To Dismiss - 29

joint and several liability on all co-conspirators for damages based on the underlying wrong. *Hilton Hotels v. Butch Lewis Productions*, 862 P.2d 1207, 1210 (Nev.1993); *Mannos v. Moss*, 155 P.3d 1166, 1173 - 1174 (Idaho 2007). For a defendant to be liable based on a conspiracy with another party, a plaintiff must allege the following: "(a) a conspiracy between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to [the] plaintiff as a result of the acts performed pursuant to the conspiracy." *Olson v. Johnson*, 961 So.2d 356, 359 (Fla. App. 2nd Dist. 2007) (internal quotations omitted); *Schumacker v. Meridian Oil Co.*, 956 P.2d 1370, 1373 (Mont. 1998); *McPheters v. Maile*, 64 P.3d 317, 321 (Idaho Ct. App. 2003) (requiring only "an agreement between two or more to accomplish an unlawful objective or to accomplish a lawful objective in an unlawful manner."); *Hilton Hotels*, 862 P.2d at 1210 (same).

Contrary to CW's assertion, the strict pleading requirements of Rule 9(b) are not necessarily required with respect to pleading a conspiracy between multiple defendants so long as the plaintiff, at a minimum, identifies the role of each defendant in the alleged fraudulent scheme. *Silver Valley Partners, LLC v. De Motte*, Case No. 06-429, 2007 WL 2802315 at * 4 (D. Idaho, Sept. 24, 2007) (Lodge, J.) (In the context of a fraud suit involving multiple defendants, a plaintiff must, at a minimum, identify the role of each defendant in the alleged fraudulent scheme); *Deutsch v. Flannery*, 823 F.2d 1361, 1365-1366 (9th Cir. 1987) (when pleading a conspiracy in connection with a fraudulent scheme, the critical inquiry is whether "[t]he defendants have enough information to frame a responsive pleading.").

Plaintiffs have sufficiently pled the existence of a conspiracy between CS and CW to attach liability to each for the intentional wrongs of the other. The allegations clearly put CW on notice that its role in the fraudulent scheme was to prepare intentionally inflated appraisals that knowingly violated both state and federal law. SAC ¶¶ 57, 58, 66, 69, 85, 88, 140.

In particular, Plaintiffs have alleged an agreement between CS and CW to accomplish the

otherwise lawful objective of closing loans secured by the resorts' real property and Plaintiffs' rights therein, but that this lawful objective was accomplished through the unlawful means of skirting and violating FIRREA, and blatantly violating USPAP through CW's involvement in the preparation of inflated and misleading appraisals which utilized the Total Net Value methodology. SAC ¶¶ 43, 53, 60, 61, 62, 67 69, 79, 88. The SAC alleges that CW knowingly collaborated with CS by preparing unlawful appraisals. SAC ¶ 88. The alleged overt acts were the consistent pattern of CS and CW producing appraisals that were inflated and violated FIRREA and USPAP. SAC ¶¶ 39, 40, 41-53, 56, 57, 61, 62, 65, 67, 69, 79, 140. The SAC alleges in each cause of action that the acts of CW and CS caused Plaintiffs' damages. *Id.*

Because the SAC sufficiently alleges (1) the agreement to conspire, (2) acts by CW in furtherance of the objects of the conspiracy and (3) damages, CW is jointly and severally liable along with CS on each cause of action.

**B.**   **Plaintiffs have Sufficiently Pled Fraud Committed by CW**

In Idaho, Nevada, Montana and Florida, the elements for pleading actual fraud are essentially the same. They are: (1) a representation; (2) the falsity of that representation; (3) the materiality of the representation; (4) the speaker's knowledge of the representation's falsity or ignorance of its truth; (5) the speaker's intent that the representation should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of the representation's falsity; (7) the hearer's reliance upon the truth of the representation; (8) the hearer's right to rely upon the representation; and (9) the hearer's consequent and proximate injury or damages caused by their reliance on the representation. *Town of Geraldine v. Montana Mun. Ins. Authority*, 198 P.3d 796, 801 (Mont. 2008); Mont. Code Ann. 28-2-405; *Glaze v. Deffenbaugh*, 172 P.3d 1104, 1108 (Idaho 2007); *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1386 (Nev. 1998); *Ward v. Atlantic Sec. Bank*, 777 So.2d 1144, 1146 (Fla. App. 3rd Dist. 2001).

Nor must the misrepresentation be made directly to the plaintiff. "A defendant cannot

escape liability if he or she makes a representation to one person while intending or having reason to expect that it will be repeated to and acted upon by the plaintiff (or someone in the class of persons of which plaintiff is a member." *Shapiro v. Sutherland*, 64 Cal.App.4th 1534, 1548 (1998): Restatement (Second) of Torts § 533;[15] *Adams v. U.S.*, 622 F.Supp.2d 996, 1004 (D. Idaho 2009) (adopting § 533); *Advance-Rumely Thresher Co. v. Jacobs*, 4 P.2d 657, 660 (Idaho 1931) ("recovery can be had for representations made to another with the intent or knowledge that they should or would be repeated to complainant"); *Epperson v. Roloff*, 719 P.2d 799, 803 (Nev. 1986) (adopting §533); *Madden v. Cowen & Co.*, 576 F.3d 957 (9th Cir. 2009).

While the allegations in the SAC contain all nine elements required to establish fraud, where, as here, the level of engineering and sophistication employed by the Defendants, who are well-versed in the ways of Wall Street, has evolved to new heights but resulted in catastrophic economic lows, it is important to keep in mind what the Idaho Supreme Court once said about fraud:

> To say that *all* fraudulent misrepresentation must fit within [the] nine-element formulation misconstrues the very nature of fraud. 'Fraud vitiates everything it touches. It is difficult to define; there is no absolute rule as to what facts constituted [sic] fraud; and the law does not provide one 'lest knavish ingenuity may avoid it.' *Massey-Ferguson, Inc. v. Bent Equipment Company*, 283 F.2d 12, 15 (5th Cir. 1960). '[T]he law does not define fraud; it needs no definition; it is as old as falsehood and as versable as human ingenuity. *Id. Tusch Enterprises v. Coffin*, 740 P.2d 1022, 1027 (Idaho 1987).

CW and CS's sophisticated schemes resulted in the destruction of lifetime investments -- including the property and contract rights -- of nearly every single owner of property at Tamarack, Idaho (CS shut down the resort), at Lake Las Vegas (as a resort, it is shut down),

---

[15] "Comment d to section 533 makes it clear the rule of section 533 applies where the maker of the misrepresentation has information that gives him special reason to expect that the information will be communicated to others and will influence their conduct. Comment g goes on to explain that it is not necessary that the maker of the misrepresentation have the particular person in mind. It is enough that it is intended to be repeated to a particular class of persons." *Shapiro*, 64 Cal.App.4th at 1548.

Ginn sur Mer (a dead end at the West end of Grand Bahama Island) and Yellowstone and is precisely what the Court in Idaho had in mind when it found "Fraud vitiates everything it touches". Here, CW has not merely been put on notice, it knew exactly the evil it would bring upon the lives of the thousands of class members who were in no position to anticipate or foresee the consequences of the fraud.

Plaintiffs have sufficiently pled the elements of fraud against CW. Specifically, the SAC alleges the following elements:

1.  CW Made False Representations or Failed to Disclose Material Facts as follows:

    (a)     The inflated appraisals produced by CW grossly misrepresented the market value of the subject resorts, SAC at ¶¶ 70, 43, 42, 45, 47, 49, 51, 72,73, 74, 67 [Brian J. Curry of Cushman & Wakefield participating in the scheme], ¶ 128 [Cushman & Wakefield with Credit Suisse *sharing* their illegal appraisal with Rhodes Homes to deceive and entrap Rhodes Homes and their homeowners], ¶¶ 148, 155, 156 [Cushman & Wakefield also participated in the Tamarack resort scheme in 2006 prior to the loan "...by telephone, emails, U.S. mails and verbally], ¶¶ 157, 162, 164, 165, 169, 172, 173,174, 175, 179, 180, 181, 185, 197, 198, [the same scheme and "*modus operandi*" was employed by Credit Suisse and Cushman & Wakefield at Yellowstone and Ginn sur Mer].

    (b)     The deliberately inflated appraisals violated promises to Plaintiffs that the appraisals were prepared in accordance with state and federal law. SAC ¶¶ 43, 45, 52, 58, 60, 69, 70, 74, 75, 76, 77, 88, 89, 79 [expressly representing and promising to "the developers *and homeowners*, including Plaintiffs and members of Plaintiff Class, that the initial appraisals of the resorts obtained by Credit Suisse with Cushman ...were based upon state and federal standards in the field, in conformity with banking regulation and required *state*

*and federal appraisal standards…*"].  The SAC further alleges that prior to the finalization of the loan documents at Tamarack Resort in Idaho, Cushman stated and promised in its appraisal report that the appraisal was performed in "compliance" "with FIRREA" which statement was intentionally false and untrue. SAC¶¶ 148, 85, 86.  These false representations were made by Cushman in 2006 by telephone, email, U.S. Mail and verbally. SAC¶ 156.  The same false representations were made by Cushman at Ginn sur Mer to the borrowers at closing in Florida from a Florida mortgage lender; that is: the appraisals would be made in compliance with state and federal law under FIRREA.  SAC ¶¶ 161, 162, 163 & 64.

        (c)     The appraisals for each of the four resorts and jurisdictions of Idaho, Montana, Nevada and Florida were inflated and misleading under and violated state law pursuant to the Uniform Standards and Professional Appraisal Practice (hereinafter "USPAP" ) adopted by each of the states to implement the standards, guidelines and ethics required pursuant to the enactment of FIRREA in 1989.  *See Bolden v. KB Homes*, 618 F. Supp. 2d 1196 (C.D. Cal. 2008); SAC ¶¶ 56, 60, 65, 79, 161, 162,163, 164.

2.    Materiality of the Misrepresentations

        (a)     The validity and accuracy of the appraisals were material to the Plaintiffs' decisions to purchase real estate within the resorts and otherwise make financing decisions with their properties.  SAC ¶¶ 76, 78, 79, 80, 81, 89, 134, 135, 136, 142, 143, 157,158, 159, 160, 168, 171, 172, 174, 176, 178, 180, 184, 187, 197, 198, 230.

3.    Knowledge of Falsity of Representations

        (a)     CW knew that the appraisals were inflated.  SAC ¶¶ 47-78, 82, 83,

84, 85, 86, 87, 88, 89.

      (b)    CW knew that the loan amounts that were originated based on the inflated appraisals were far greater than what would be allowed under normal underwriting and appraisal standards -- the very reason why part of the Defendants' scheme involved originating the loans out of the Cayman Islands -- so CW could skirt FIRREA, as adopted in each state.  SAC¶¶ 40, 45, 47, 49, 55, 56, 58, 59, 60, 61, 62, 63, 64, 65, 79, 80, 83, 88, 119, 121,122.

4.    Intent that the False Statements and Non-Disclosures Would be Acted Upon by the Plaintiffs.

      (a)    CW knew and intended that the misleading appraisals would be acted upon by the Plaintiffs and others beyond Credit Suisse.  SAC ¶¶ 52, 72, 74, 75, 76 (Plaintiffs and Class Members "reasonably relied on and trusted" the representations made by CW), SAC ¶¶ 76, 77.  In fact, the Plaintiffs were the direct targets of CW's misrepresentations because it was the very existence of the Plaintiff class including their *property rights* and *contractual interests* at each resort that supported and under-lied the assumptions that led to the intentionally inflated and unlawful appraisals.  SAC ¶¶ 77, 78.

      (b)    CW's intent that the Plaintiffs and Plaintiff class would rely on the appraisals has been adequately established in the record before this Court, for purposes of Rule 12(b)(6). Memorandum of Decision at 9, Docket No. 73.

5.    Hearer's ignorance of the falsity

      (a)    Neither Plaintiffs (nor the developers) know that the appraisals violated FIRREA and USPAP (which were otherwise designed to protect them).  SAC ¶¶ 86, 70, 43, 42, 45, 47, 49.

6.    Plaintiffs' Reliance

(a)     Plaintiffs have alleged that they reasonably relied on the validity of the appraisals. SAC ¶¶ 48, 49, 51, 52, 53, 55, 74, 75, 76, 80.

7.     Defendants' Representations Directly and Proximate Caused Plaintiffs' Harm.

(a)     Plaintiffs have repeatedly pled that CW's misrepresentations were the direct and proximate cause of their harm. SAC ¶¶ 80-90, 106, 125, 134, 135, 136, 139, 154, 157, 158, 159, 160, 166, 167, 168, 171, 172, 173, 174, 175, 176, 177, 178, 179, 184, 185, 187, 189, 196, 197.

**C.     Plaintiffs Have Sufficiently Pled Third Party Fraud**

To the extent that CW argues that the SAC fails to sufficiently allege that it made direct fraudulent communications to the Plaintiffs, the SAC alleges that CW intended and knew that its inflated appraisals would be communicated to and relied upon by the Plaintiffs. SAC ¶¶ 48, 49, 52, 68, 74, 75, 76, 80, 81-90, 106, 111, 112, 113,  151, 154, 156,164, 166, 167, 168, 171, 172, 173,175, 176,183, 186, 188, 198, 229, 238, 245, 78.  These allegations are sufficient for a third party to state a claim for fraud against the maker of the fraudulent misrepresentations or nondisclosures. *See e.g.*,  *Adams v. U.S.*, 622 F.Supp.2d 996, 1004 (D. Idaho 2009) (adopting § 533); *Advance-Rumely Thresher Co. v. Jacobs*, 4 P.2d 657, 660 (Idaho 1931) ("recovery can be had for representations made to another with the intent or knowledge that they should or would be repeated to complainant").

**D.     Whether the Appraisals are Fraudulent is a Question of Fact that Cannot be Disposed of on a Motion to Dismiss**

CW claims that the SAC should be dismissed because the appraisals cannot be misleading as a matter of law in that "no one can credibly contend that anyone was misled into thinking TNV was the same as market value...." CW Memorandum, pp. 21-22. CW's argument essentially requires all end-users of real estate appraisals to become their own experts in the field of interpreting appraisals so as not to be duped by CW.

Fortunately, the law does not require this. Instead, whether any given real estate appraisal

Plaintiffs' Opposition to Defendant Cushman & Wakefield's Motion To Dismiss - 36

is fraudulent or misleading and in violation of FIRREA and USPAP is a question of fact that requires expert testimony, even when the appraisal uses terms that one of the litigants believes to be "self-evident to any juror". *Hice v. Lott*, 223 P.3d 139, 145-149 (Colo. App. 2009); *Crawford v. Signet Bank*, 179 F.3d 926, 929 (D.C.Cir.1999) (claim of negligent real estate appraisal required expert testimony on the standard of care governing the appraisal profession); *Brown v. Interbay Funding, LLC*, 417 F.Supp.2d 573, 579 (D.Del.2006) (expert testimony was required to state claim for professional negligence against real estate appraiser).

Here, CW asks this Court to believe that it would be "self-evident" to any lay person that its appraisals did not violate USPAP or FIRREA or were not misleading or fraudulent because they defined what TNV was and disclaimed in technical terms that it was something other than "Market Value."  This Court should decline CW's invitation to allow its misleading and fraudulent appraisal methodology to bootstrap CW out of liability, simply because CW had the foresight to disclose, in technical terms that no lay person would understand, that its appraisals were misleading.  It is for the jury to decide with the assistance of expert testimony whether CW's use of TNV was fraudulent and misleading.  *U.S. v. Owens*, 301 F.3d 521, 527-529 (7th Cir. 2002) (expert testimony proper to opine upon whether an appraisal was fraudulent or misleading); *Luessenhop v. U.S.*, No. 02-298, 2006 WL 848118 at * 6 (E.D. Va., March 28, 2006) (expert testimony to determine whether an appraisal complied with USPAP standards).

Moreover, because USPAP and FIRREA are designed to instill public confidence in the reliability of appraisals, homeowners and developers cannot be tasked with understanding the significant differences between a TNV appraisal value (which as alleged has no existence outside of CW and CS (SAC 49, 56 and the Montana Bankruptcy Court's Order) and the accepted "as is" market value.  See 12 U.S.C. § 3331("The purpose of this chapter [Title XI of FIRREA] is to provide that Federal financial and public policy interests in real estate related transactions will be protected by requiring that real estate appraisals utilized in connection with federally related

transactions are performed in writing, in accordance with uniform standards, by individuals whose competency has been demonstrated and whose professional conduct will be subject to effective supervision.") See Preamble to USPAP ("The purpose of the Uniform Standards of Professional Appraisal Practice (USPAP) is to promote and maintain a high level of public trust in appraisal practice by establishing requirements for appraisers. It is essential that appraisers develop and communicate their analyses, opinions and conclusions to intended users of their services in a manner that is meaningful and not misleading.") Any other result would force every homeowner and developer to be their own appraisal expert so that they could evaluate the reliability of any given appraisal, thereby defeating the very purpose of FIRREA and USPAP.

### E.   False or Misleading Statements of Value in Real Estate Appraisals are Actionable

CW claims that its admittedly non-FIRREA compliant appraisal cannot give rise to a claim for fraud or misrepresentation because by their nature, appraisals are merely statements of opinion. CW Brief at p. 31. CW is again wrong in this regard and tellingly, none of the cases cited by CW to support this position deal with appraisals. To the contrary, false or misleading statements contained in real estate appraisals prepared by expert real estate appraisers can and do give rise to fraud and negligent misrepresentation causes of action. See *Olney Sav. & Loan Ass'n v. Trinity Banc Sav. Ass'n*, 885 F.2d 266, 273 (5th Cir. 1989)(false or misleading statements in real estate appraisal are actionable); *James v. Nationsbank Trust Co. (Florida) Nat. Assoc.*, 639 So.2d 1031, 1034 (Fla.App. 1994) (same); *Superior Bank, F.S.B.*, 197 F.Supp.2d at 311-312 (applying Maryland law but also analyzing law in accord from other jurisdictions); *Costa v. Neimon*, 366 N.W.2d 896, 900 (Wis. App. 1985) (discussing appraiser liability to third party).

Instructive is *Guildhall Ins. Co., Ltd. v. Silberman*, 688 F.Supp. 910, 915-916 (S.D.N.Y. 1988), where the court held that: "Fraud requires a misrepresentation of material fact, the mere expression of an opinion about value does not give rise to a cause of action. However, a statement of monetary value can, in certain circumstances, be regarded as a representation of

Plaintiffs' Opposition to Defendant Cushman & Wakefield's Motion To Dismiss - 38

existing fact. Expressions of opinion by an expert can form the basis of a fraud action when the defrauded party reasonably assumed that the defendant's expertise informed his opinion. Where one party has superior knowledge of the facts, his expression of opinion implies that he knows facts support that opinion and that he is unaware of anything to the contrary." *Id*; *see also*, Williston on Contracts § 69:8 (4th ed. 2004) ("a professional appraiser is assumed to have superior knowledge regarding the valuation of property, and may be held liable for an opinion respecting value when the appraisal is intentionally inaccurate and made to induce a buyer or lender to enter into a transaction....") Kemper, *Liability to Third Party for Negligent or Fraudulent Appraisal Value of Real Property*, 44 A.L.R. 6th.

**F.**     **Plaintiffs Have Pled Reasonable Reliance; Whether their Reliance on the Appraisals was Reasonable is a Question of Fact that Cannot be Disposed of on a Motion to Dismiss**

CW argues that Plaintiffs' claim for fraud and negligent misrepresentation fails because Plaintiffs have not alleged reliance. This is simply not true. Plaintiffs have alleged that their reliance on the appraisals at each resort was reasonable because Defendant CS specifically represented to Plaintiffs and developers that in connection with the CW appraisals and CS taking control of each resort and the property and contract rights of the Plaintiffs as co-developer, that Plaintiffs' property and contracts in the resorts would be protected. SAC ¶¶ 76-79 ("Defendants knew and understood that Plaintiffs and Class Members required assurances from Defendants that the promised and bargained for…amenities, ski runs, golf courses…running with the land…would be protected and prosper…and would always exist…without interference… [by Defendants]".)

Despite the allegations within the SAC, CW alleges that any reliance by the Plaintiffs would have been unreasonable because of the "explicit language limiting who may rely on them." CW Brief at 32. CW cites to no reported opinion within the Ninth Circuit to support this position. Instead, to support its argument, CW relies on one case from Alabama, one case from

Plaintiffs' Opposition to Defendant Cushman & Wakefield's Motion To Dismiss - 39

Georgia, and one unreported federal case from California which involve reliance by third parties on financial statements that were not distributed to a wide universe of recipients.[16]

Unfortunately for Defendants, the weight of authority holds that the question of reasonable reliance is always a question of fact, and therefore cannot be disposed of on a motion to dismiss. *Cechovic v. Hardin & Associates, Inc.*, 902 P.2d 520, 526 (Mont. 1995) (reliance is a question of fact); *King v. Lang*, 42 P.3d 698, 704 (Idaho 2002) ("the issue of justifiable reliance is generally a question of fact"); *S & S Air Conditioning Co. v. Freire*, 555 So.2d 387, 388 n. 2 (Fla. App. 3rd Dist. 1989) ("Whether there was reliance on the misrepresentations is a question of fact."); 37 Am. Jur. 2d Fraud and Deceit § 247 ("For purposes of supporting a fraud claim, the question of justifiable reliance is one of fact and requires an inquiry into the relationship between the parties."); *see also Hoffman v. Stamper*, 867 A.2d 276, 296 (Md. 2005) (claim of homeowners based on fraudulent appraisal survived even though there was no evidence that the plaintiffs actually reviewed the appraisals before purchasing their homes, it was enough that the plaintiffs indirectly relied on the fraudulent appraisals as a result of the fraudulent appraisals infecting the entirety of their transactions in a way that removed any meaningful choice they may have had to rescind their purchase contracts); *see also . Sage v. Blagg Appraisal Company, LTD.*, 209 P.3d 169, 174-175 (analyzing issue presented by limiting language in appraisals with respect to appraiser duty and user reliance and quoting from Fannie Mae regulations holding that, "The appraisers certification [ ] clarifies that the appraiser is accountable for the quality of his or her work to those who often rely on it as part of a mortgage finance transaction. The appraiser's

---

[16] CW also provides a *cf* citation to *Cooper v. Brakora & Assoc.*, 838 So. 2d 679 (Fla. Dist. Ct. App. 2003) but that case addresses the question of whether an appraiser's duty under § 552 of the Restatement (Second) of Torts runs to a homeowner when the appraisal is prepared for the lending bank. *Cooper* does not address whether limiting language in an appraisal as a matter of law defeats a third party's reasonable reliance claim. Moreover, the *Cooper* decision is not in accord with most jurisdictions' (including Florida) application of §552 of the Restatement (Second) of Torts to the duty of real estate appraisers to third parties.

Plaintiffs' Opposition to Defendant Cushman & Wakefield's Motion To Dismiss - 40

accountability for the quality of his or her appraisal should not be limited to the lender/client and/or intended user identified in the appraisal report." [emphasis added]); *In re Colonial Ltd. Partnership Litigation*, 854 F.Supp. 64, 92 (D. Conn. 1994) (finding that limiting language in private placement memoranda and real estate appraisals were not a bar to the plaintiff's reasonable reliance on such documents where the plaintiffs alleged that the defendant appraisers knew that the plaintiffs would rely on those documents and where plaintiffs alleged that they relied on those documents as evidence of the legitimacy of the investment, not necessarily the forward looking statements therein); See also *Phillips v. Better Homes Depot, Inc.*, No. 02-cv-1168, 2003 WL 25867736 at *26 (E.D.N.Y., Nov. 12, 2003) ("To the extent that an appraiser is a part of a common scheme to defraud someone, knowingly produces a false appraisal with the intent of inducing reliance on it, and injures someone through reasonable reliance on that appraisal, that appraiser may be found liable for fraud.").

Finally, as alleged, and as supported by the documents which this Court may consider (Memorandum Decision, Docket No. 73 at p. 9), Plaintiffs' reliance on the appraisals was reasonable because CS specifically showed the appraisals to the Plaintiffs as part of CS's sales pitch to the Plaintiffs to induce them to purchase real estate within the resorts. Moreover, while CW may have provided the limiting language in the appraisals, CW knew and intended for CS to put the appraisals into public arenas to be considered by the Plaintiff Class and securities investors.

Indeed, this issue of reasonable reliance has largely been resolved in Plaintiffs' favor by this Court in its Order of May 11, 2010 (Doc. No. 73, page 9) where this Court ruled as follows:

> These apparent realities...suggest to the Court that the nature of the appraisals was such that they were intended for others-not just Credit Suisse-or at a minimum, issued with an implicit understanding that they would be distributed and utilized in a broader universe.

Thus, based on the allegations in the SAC and in factual matters already opined upon by

the Court, and because all factual inferences must be drawn in favor of the Plaintiffs for purposes of CW's Motion to Dismiss, it must be presumed that CW intended for and knew that others would rely upon its appraisals and therefore it must be estopped from relying on the limiting language in the appraisals to prevail on its Motion to Dismiss, at least at this preliminary stage.

### G. Defendants Ignore the Fraudulent Scheme Alleged by Plaintiffs in the SAC, As They Must

As alleged in the SAC, CS's fraudulent scheme involved its use of a sham "Cayman Islands" branch of Credit Suisse to originate its avaricious loans that were obtained only through appraisals that were intentionally inflated and violated FIRREA and USPAP as adopted by the relevant states. SAC ¶¶ 40, 43, 45, 58, 59, 60, 61, 62, 65, 66. The "Cayman Islands" branch of Credit Suisse was merely an empty vehicle employed by the domestic branches of Credit Suisse to knowingly skirt FIRREA compliance. SAC ¶¶40, 43, 45, 56, 58, 59, 60, 61, 62, 65, 66. Indeed, as alleged in the SAC, representatives of CS that worked with the developers in originating and administering the loans were all employees of Credit Suisse who worked in the Los Angeles and New York offices of Credit Suisse and held themselves out as employees of such domestic entities. SAC at ¶¶ 225, 237, 238. Up until the point of closing on the loan documents, CS represented prominently the name "Credit Suisse First Boston" or "Credit Suisse Securities (USA) LLC" in its correspondence to the developers (SAC ¶ 241(a); see also letterhead on September 8, 2004 LLV Engagement Letter; May 6, 2005 Yellowstone Club Engagement Letter; March 30, 2006 Ginn Sur Mer Engagement Letter; March 8, 2006 Tamarack Engagement Letter [Example for all resorts contained in Document 51-17, Exhibit 6 thereto), but then at the time of closing, CS pulled a bait and switch on the developers by having the "Credit Suisse Cayman Islands Branch" be the originating lender. SAC at ¶ 241(a). As alleged in the SAC, the purpose of this bait and switch was to facilitate CS knowingly skirt FIRREA compliance to originate enormous real estate loans that were based on intentionally inflated and misleading appraisals; appraisals that would support loans far excess of what would otherwise be

Plaintiffs' Opposition to Defendant Cushman & Wakefield's Motion To Dismiss - 42

permitted if FIRREA and USPAP compliant appraisals were used.  SAC ¶¶ 40, 43, 44, 45, 51, 52, 53, 54, 56, 58, 59, 60, 61, 62, 65, 66.

As further alleged in the SAC, CS employed CW as its willing agent in this fraudulent scheme to prepare intentionally misleading appraisals by use of the TNV valuation methodology, which failed entirely to comply with FIRREA and USPAP.  SAC ¶¶ 40, 41, 42, 56, 58, 59, 60, 62, 63, 65, 66, 69, 70, 71, 74, 75, 79, 86, 88, 89.  CS needed CW's participation to further this fraudulent scheme for the purpose of giving the developers and Plaintiffs the impression of credibility to the otherwise grossly inflated the appraisals.  SAC ¶¶ 47, 56, 57, 66, 67, 68.  The SAC further alleges that CW knowingly participated with CS in violating both federal and state appraisal regulations because CW was engaged by the domestic CS entities that were subject to FIRREA compliance and would eventually lend to domestic borrowers, securing those loans with domestic real estate assets, yet CW knew that the loans would be funded by the "Cayman Islands" branch of the domestic CS entities, all for the purpose of skirting federal law.  SAC ¶¶ 40, 43, 44, 45, 48, 49, 50, 53, 56, 58, 59, 60, 61, 62, 65.

In addition, and as alleged in the SAC, it was only through the artifice of the Cayman Islands branch acting as the agent of the domestic CS entities that CS could perpetrate its fraudulent scheme against the Plaintiffs in violation FIRREA.  SAC ¶¶ 40, 41, 42, 43, 47, 48, 49, 50, 51, 52, 54, 55, 56, 57, 58, 59, 60, 61, 62, 65, 66, 67, 68, 70, 71, 74, 75, 76, 77, 85, 86, 88, 128.  The fraudulent scheme directed against the Plaintiffs was to burden their property rights with far more debt than could be sustained by the loans for the purpose of earning CS huge origination fees on the front-end of their loans, and then later give CS ownership of the resorts at a steep discount and without the burden of the promises and real estate covenants the developers made to the Plaintiffs, all of which would then reap CS yet another windfall.  SAC ¶¶ 44, 45, 47, 48, 49, 51, 52, 79, 80, 86, 87, 88.  In short, the domestic entities of CS and CW conspired to violate federal law (FIRREA) and state law (USPAP) in Idaho, Montana, Nevada, and Florida,

which laws were expressly enacted to protect Plaintiffs, the states, and the nation from the very RICO perpetrated "Wall Street" driven greed which directly and proximately caused the damage complained about in the SAC.

To the extent that CW argues that FIRREA is not implicated in this case because the Cayman Islands branch of Credit Suisse is purportedly not a federally regulated financial institution, such position merely proves its culpability in the "bait and switch" scheme that the believes shields them from compliance with FIRREA (and USPAP, which adopts FIRREA). SAC ¶¶ 56, 59, 60, 61, 62, 65.

The purpose of FIRREA "is to provide that Federal financial and public policy interests in real estate related transactions will be protected by requiring that real estate appraisals utilized in connection with federally related transactions are performed in writing, in accordance with uniform standards, by individuals whose competency has been demonstrated and whose professional conduct will be subject to effective supervision." 12 U.S.C. § 3331. To further this purpose, Congress through FIRREA directed the states to adopt USPAP as the minimum standards of appraisal practice within their jurisdictions and "delegated responsibility for certification and licensing of appraisers to the states in accordance with other specified requirements". *Bolden v. KB Home*, 618 F.Supp.2d 1196, 1202-1203 (C.D. Cal. 2008); *see* 12 U.S.C. § 3345. See *Hice v. Lott*, 223 P.3d 139, 144 (Colo. App. 2009). To comply with Congress' mandate in FIRREA, the States implicated in this case thus far (Idaho, Montana, Nevada and Florida) have all adopted USPAP as the minimum standards for appraisal practice within their jurisdictions. See Mont. Code Ann. §§ 37-54-303, 37-54-201; Mont. Admin. R. 24.207.402; Idaho Code Ann. § 54-4106; Idaho Admin. Code 24.18.01.004, 24.18.01.700; Nev. Rev. Stat. §§ 645C.140, 645C.280, 645C.170; Nev. Admin. Code § 645C.400; Fla. Stat. Ann. §§ 475.615(2),(5), 475.617, 475.628; Fla. Admin. Code 61J1-9.001.

Plaintiffs allege in the SAC that the appraisals are fraudulent and intentionally misleading

Plaintiffs' Opposition to Defendant Cushman & Wakefield's Motion To Dismiss - 44

because they use the TNV appraisal methodology and therefore violated not only FIRREA, but also USPAP as adopted by Idaho, Nevada, Montana and Florida.  See SAC ¶¶ 34, 40, 58, 60, 65, 66, 70, 79, 86, 103, 156, 162, 164, 172, 200, 250.  In this regard, Plaintiffs' allegations in the SAC do not solely rely on the CS's FIRREA violations in connection with the appraisal aspect of the scheme alleged in the SAC.

## 4.    NEGLIGENT MISREPRESENTATION

As with the fraud allegations, Plaintiffs have sufficiently pled causes of action for negligent misrepresentation.[17]   Montana, Florida and Nevada have adopted the Restatement (Second) of Torts § 552 as setting forth the standards for negligent misrepresentation of a professional.  *First Florida Bank, N.A. v. Max Mitchell & Co.* 558 So.2d 9, 15-16 (Fla. 1990); *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1387 (Nev. 1998); *Cechovic v. Hardin & Associates, Inc.*, 902 P.2d 520, 526 (Mont. 1995); *Mattingly v. First Bank of Lincoln*, 947 P.2d 66, 70-71 (Mont. 1997) (§ 552 applies to appraisals).

In relevant part, the Restatement (Second) of Torts § 552 provides as follows:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

---

[17] After a careful review of Idaho law, Plaintiffs agree with Defendants that no cause of action against appraisers for negligent misrepresentation exists in Idaho.  However, Plaintiffs reserve the right to reassert this claim relative to the Tamarack resort should future discovery indicate that another jurisdiction's choice of law should control the Tamarack appraisals.

Plaintiffs' Opposition to Defendant Cushman & Wakefield's Motion To Dismiss - 45

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Rather uniformly, the jurisdictions that have adopted Section 552 have found that a real estate appraiser, who values a particular property for a lender, may be liable to the homeowner for negligently preparing the appraisal, even if the appraiser is not in privity with the homeowner, or even knew of the identity of the homeowner. *Soderberg v. McKinney*, 44 Cal.App.4[th] 1760, 1768-1769 (1996); *West v. Inter-Financial, Inc.*, 139 P.3d 1059, 1065-1066 (Utah Ct. App. 2006) (adopting § 552 to impose duty on real estate appraiser to third parties not in privity and citing cases from other jurisdictions that are in accord); *Costa v. Neimon*, 366 N.W.2d 896, 899 (Wis. Ct. App. 1985) (one of the seminal cases in the nation cited by other jurisdictions to impose real estate appraiser liability on foreseeable third parties);, *Larsen v. United Federal Saving & Loan Assn.*, 300 N.W.2d 281, 287-288 (Iowa 1981); *Fisher v. Comer Plantation, Inc.*, 772 So.2d 455, 462 (Ala. 2000); *Sage v. Blagg Appraisal Company, LTD.*, 209 P.3d 169 (Ariz. Ct. App. 2009) (thorough discussion and analysis of nationwide treatment of § 552 in connection with real estate appraiser duty to third parties, and concluding § 552 imposes duty on real estate appraisers to potential purchasers who are not in privity with the appraiser); *see also* § 552, com. h; *Soderberg v. McKinney*, 44 Cal.App.4[th] 1760, 1768-1769 (1996); *Amwest Sur. Ins. Co. v. Ernst & Young*, 677 So.2d 409, 411-412 (Fla. 5th Dist. Ct. App. 1996).

Plaintiffs have alleged all the necessary elements for finding CW liable to them for negligent misrepresentations based on the inflated appraisals.

1.      Plaintiffs have alleged that CW prepared the appraisals in the course of its business (SAC ¶¶ 38, 42, 47, 52, 53, 56, 68, 70, 74, 75, 76, 77), and that it had a pecuniary interest in the underlying transactions for which the appraisals were prepared SAC ¶¶ 44, 52, 70, 76, 77. Plaintiffs have alleged that the appraisals were false and misleading and inflated the actual values of the properties at each resort. SAC ¶¶ 39, 40, 45, 52, 53, 54, 56, 57, 58, 59, 60,

61. Plaintiffs have alleged that the appraisals were prepared by CW and circulated by CS for the guidance of the Plaintiff class and others (SAC ¶¶ 76, 77, 78, 79, 80, 81, 83, 84, 85, 86). Plaintiffs have alleged that they justifiably relied on the appraisals in making their decisions with respect to their real estate within the resorts; Plaintiffs have alleged that CW failed to use reasonable care and competence when they prepared and communicated the appraisals (SAC ¶ 49).

2.    Plaintiffs have alleged that they suffered loss as parties who were within the limited group of persons for whom CW knew or should have known that the appraisals were intended to benefit, guide and/or impact. SAC ¶¶ 77, 78.

3.    Plaintiffs have alleged that they relied on the appraisals and promises to protect their property rights and contract rights and CS and CW intended to influence both Plaintiffs and developers with the misleading information in the appraisals. SAC ¶¶ 74, 75, 76, 77, 78; *see also* ¶ 79 [Credit Suisse explicitly represented and promised the developers and homeowners, including Plaintiffs...that the initial appraisals of the resorts ... were based on state and federal standards.] They were not. They violated the law. The resorts are destroyed. The property and contract rights of the Plaintiffs were wiped out. In the case of Tamarack, it is and has been shut down, just like Lake Las Vegas and Ginn sur Mer along with similar damage and destruction to the homeowners' property and contract rights at Yellowstone.

For the reasons stated above, Plaintiffs have adequately pled causes of action against CW for negligent misrepresentation. To the extent that CW has attacked Plaintiffs negligent representation claims on the same grounds that it has attacked Plaintiffs' fraud claims, Plaintiffs have addressed those alleged deficiencies above. Finally, as the comments to § 552 make clear, there is no need for privity between CW and the Plaintiffs or even that CW knew of the identity of the individual Plaintiffs who would ultimately rely on the appraisals in making their transactional decisions relative to their real estate within the resorts. All that is required is that

Plaintiffs' Opposition to Defendant Cushman & Wakefield's Motion To Dismiss - 47

Plaintiffs are within the limited group of persons that CW knew or foresaw would rely on the appraisals to their detriment.  See Restatement (Second) Torts § 552, com. h, j.  And as the homeowners and purchasers for whom the resorts existed, the Plaintiffs are most certainly within the limited class of persons for whom CW knew the appraisals would guide and be relied upon.

**5.      TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS**

A claim for tortious interference with contractual relationships in the relevant jurisdictions requires a plaintiff to establish substantially similar elements, which are as follows: (1)a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage. *J.J. Industries, LLC v. Bennett*, 71 P.3d 1264, 1267 (Nev. 2003); *Davis v. Professional Business Services, Inc.*, 712 P.2d 511, 520 (Idaho 1985); *Barlow v. International Harvester Co.*, 522 P.2d 1102, 1114 (Idaho 1974); *St. Johns River Water Management Dist. v. Fernberg Geological Services, Inc.*, 784 So.2d 500, 504-505 (Fla. App. 5th Dist. 2001);.*Maloney v. Home and Investment Center, Inc.*, 994 P.2d 1124, 1132 (Mont. 2000).

The SAC contains sufficient factual allegations to support a cause of action against CW for intentional interference with contractual relations.  Specifically, Plaintiffs have pled:

1.      Contracts existed between Plaintiffs and Developers requiring the Developers to maintain and develop the common areas and amenities for the resorts, including, golf courses, ski facilities, casinos, etc., these contracts took the form of recorded covenants running with the land and other specific representation made by the developers to the Plaintiffs.  SAC ¶¶ 26, 32, 52, 53, 55, 78, 84,  92, 106, 125, 134, 135, 142, 143, 157, 158, 159, 160, 168, 171, 172, 174, 176, 177, 178,180, 184, 187, 239.

2.      CW knew about the existence of the covenants and obligations of the developers to the plaintiffs because it was these very covenants and contractual rights that gave the resorts their unique characteristic.  CW knew of these covenants as they formed a material part of its

analysis in the appraisals.  SAC ¶¶ 52, 55, 78; *see* Appraisals filed with CW Motion to Dismiss.

3.      CW knew or should have known with substantial certainty that the contractual obligations owed by the developers to Plaintiffs would be interfered with through foreclosures, bankruptcies and receiverships because the loans encumbering the resorts were far greater than that which would have been permitted had CW prepared FIRREA and USPAP compliant appraisals for the resorts.  SAC ¶¶ 40, 44, 45, 46, 47, 48, 49, 52, 53, 55, 57, 59, 59, 6074, 75, 76, 77. 106, 125-132 134, 135, 142, 143, 157-160, 168, 171-178, 180, 184, 187, 230.

4.      As anticipated by CW, the resorts have failed and been largely shut down as already discussed herein.

5.      Plaintiffs have suffered significant damage.  SAC ¶¶133, 134, 135, 136, 139 [Destruction of contractual rights of Plaintiffs],140, 141, 142, 143, 148, 151, 154, 155, 156 [CW's telephone and emails], 157, 159, 160, 163, 164 [CS promising CW would provide a compliant FIRREA base appraisal and they produced a non-compliant and illegal appraisal], 165, 166, 168, 169, 170, 171, 172, 173, 174, 175, 177, 178, 179, 180, 182, 186, 189, 239.

6.   **NEGLIGENCE**

   A.   **CW Attacks Plaintiffs' Negligence Claim Merely on the Basis that no Duty Existed Between it and Plaintiffs; A Duty Does in Fact Exist**

CW claims that it cannot be liable in negligence for the harm suffered by Plaintiffs, even though it was CW's inflated appraisals that directly caused such harm.  CW supports this position by arguing that because there was no relationship between it and the Plaintiffs, there can be no duty owed to them.  This is simply incorrect.

CW owed a duty of care to the Plaintiffs for two reasons: (1) CW owed a statutory duty of care toward the Plaintiffs arising from its obligations in Florida, Idaho, Nevada and Montana arising from those States' adoption of USPAP; and (2) CW owed a duty to Plaintiffs because the Plaintiffs were in the foreseeable zone of risk of CW's reckless endeavor.  *Abril v. Department of Corrections*, 884 So.2d 206, 209 (Fla. App. 2nd Dist. 2004) ("When a statute creates a clear duty

Plaintiffs' Opposition to Defendant Cushman & Wakefield's Motion To Dismiss - 49

of care, the violation of that duty can generate[ ] a viable cause of action in tort" [internal quotations omitted]); *McCain v. Florida Power Corp.* 593 So.2d 500, 503 (Fla. 1992) (adopting majority foreseeable zone of risk concept of duty "Where a defendant's conduct creates a foreseeable zone of risk, the law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses."); Mont. Code Ann § 1-1-204(1) (defining negligence as ""a want of attention to the nature or probable consequences of the act or omission that a prudent man would ordinarily give in acting in his own concerns."); *Busta v. Columbus Hosp. Corp.*, 916 P.2d 122, 134 (Mont. 1996) (confirming that the existence of a duty depends entirely on foreseeability "The obligation of defendants turns on whether: the offending conduct foreseeably involved unreasonably great risk of harm to the interests of someone other than the actor.... Duty, in other words, is measured by the scope of the risk which negligent conduct foreseeably entails." [quoting from specified source]); *Nation v. State, Dept. of Correction*, 158 P.3d 953, 966-967 (Idaho 2007) (duty is determined by foreseeability and by statute, also discussing factors to consider when recognizing a previously unrecognized duty); *Williams v. University Medical Center of Southern Nevada*, Case No. 09-CV-00554, 2010 WL 668527 (D. Nev. Feb. 25, 2010) (applying Nevada law and citing to *Ashwood v. Clark County*, 930 P.2d 740, 742-743 (Nev. 1997).

Specifically, USPAP requires all real estate appraisals conducted by state licensed appraisers to not be misleading or inflated. As alleged in the SAC, CW formulated the TNV appraisal methodology, which resulted in a grotesquely inflated and misleading value for the resorts. As a result, CS was able to loan far more money than it otherwise would have been able to under a USPAP compliant loan. CS's excessive loan amounts encumbered Plaintiffs' property and contract rights in the resorts. And predictably, when the inflated loans failed, the natural victims of such failures were the Plaintiffs. Thus, under both statutory and foreseeability concepts of duty, it is clear that CW owed a legal duty to Plaintiffs.

## CONCLUSION

The Motion to Dismiss should be in all respects denied, save and except for the tentative dismissal of the negligence cause of action in Idaho.

Respectfully submitted this 7th day of June, 2010.

/s/  Michael J. Flynn
Michael J. Flynn

/s/  James C. Sabalos
James C. Sabalos

/s/ Chris Flood
Chris Flood

/s/ Christopher  J. Conant
Christopher J. Conant

/s/  Philip H. Stillman
Philip H. Stillman

/s/  John Flood
John Flood

/s/  Robert C. Huntley
Robert C. Huntley

*Attorneys for Plaintiffs and members of proposed Plaintiff Class*

## CERTIFICATE OF SERVICE

I hereby Certify that on the 7th day of June, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF filing system which sent a Notice of Electronic Filing to the following persons:

Randall A. Peterman
David J. Lender
Thomas R. Guy
Richard C. Boardman
Donald L. Morrow
Barry G. Sher

David W. Dummer
Jason I. Lichter
James L. Martin
Rebecca H. Benavides
Panteha Abdollahi

/s/  Robert C. Huntley
Robert C. Huntley