# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| L.J. GIBSON, BEAU BLIXSETH; AMY KOENIG, DEAN FRESONKE, VERN JENNINGS, TERRI FROEHLICH, MONIQUE LEFLEUR, and GRIFFEN DEVELOPMENT, LLC, each individually, and on behalf of PROPOSED Plaintiff CLASS Members of Tamarack Resort, Yellowstone Club, Lake Las Vegas and Ginn Sur Mer,<br><br>     Plaintiffs,<br><br>     vs.<br><br>CREDIT SUISSE AG, a Swiss corporation; CREDIT SUISSE SECURITIES (USA), LLC, a Delaware limited liability company, CREDIT SUISSE FIRST BOSTON, a Delaware limited liability corporation; CREDIT SUISSE CAYMAN ISLAND BRANCH, an entity of unknown type; CUSHMAN & WAKEFIELD, INC., a Delaware corporation and DOES 1 through 100 inclusive,<br><br>     Defendants. | Case No.: CV 10-1-EJL-REB<br><br>**REPORT AND RECOMMENDATION RE:**<br><br>**CUSHMAN & WAKEFIELD'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**<br><br>    **(Docket No. 48)**<br><br>**CREDIT SUISSE'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**<br><br>    **(Docket No. 51)**<br><br>**ORDER RE:**<br><br>**PLAINTIFFS' MOTION FOR LEAVE TO FILE OPPOSITION**<br><br>    **(Docket No. 98)**<br><br>**PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE**<br><br>    **(Docket No. 101)** |

Currently pending before the Court are the following matters:  (1) Defendant Cushman

and Wakefield, Inc.'s ("Cushman & Wakefield") Motion to Dismiss Plaintiffs' Second Amended

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 1**

Complaint (Docket No. 48); (2) Defendants Credit Suisse AG, Credit Suisse Securities (USA), LLC, Credit Suisse First Boston, and Credit Suisse Cayman Island Branch's (collectively "Credit Suisse") Motion to Dismiss the Second Amended Complaint (Docket No. 51); (3) Plaintiffs' Motion for Leave to File Opposition to "Bankruptcy" Argument (Docket No. 98); and (4) Plaintiffs' Request for Judicial Notice of Montana Bankruptcy Court Decision (Docket No. 101). Having carefully reviewed the record, participated in oral argument, and otherwise being fully advised, the Court enters the following (1) Report and Recommendation as to Docket Nos. 48 and 51 and (2) Order as to Docket Nos. 98 and 101.

## REPORT

### I.    Background[1]

Plaintiffs purchased real property and homes in resort land developments known as Lake Las Vegas, Tamarack, Ginn Sur Mer, and Yellowstone Club.  This case has many moving parts, evidenced by Plaintiffs' 115-page Second Amended Complaint; however, the general backdrop of Plaintiffs' claims relates to the manner in which Credit Suisse, with Cushman & Wakefield's assistance, arranged financing for the above-referenced developments.

Specifically, Plaintiffs allege that Credit Suisse was the mastermind behind its "Loan to Own" scheme - made possible by Cushman & Wakefield's creative, yet unlawful, Total Net Value ("TNV") appraisal methodology - to (1) induce developers of first class/exclusive master-planned developments to borrow huge sums of money by means of non-recourse loans from Credit Suisse and (2) persuade these developers to take out their equity in these developments,

---

[1]  For the purposes of Defendants' Motions to Dismiss only, this "Background" section reflects the Court's acceptance as true, the allegations raised in Plaintiffs' Second Amended Complaint.  *See infra* at pp. 3-6.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 2**

capitalizing on future growth projections.  Recognizing that these developments would, in turn, be burdened with excessive and unsustainable debt, Plaintiffs contend that Credit Suisse not only expected, but intended for the loans to fail, leaving each of the developments incomplete and undercapitalized.  According to Plaintiffs, this deliberate strategy generated tens of millions of dollars in upfront "loan fees" for Credit Suisse, while conveniently positioning Credit Suisse to take over the developments as a result of the subsequent, but nonetheless anticipated, bankruptcy and/or receivership proceedings - the apparent genesis of Plaintiffs' "Loan to Own" phraseology.

As property owners within these allegedly doomed-from-the-beginning developments, Plaintiffs accuse Defendants of engaging in predatory lending practices, asserting eight causes of action against both Credit Suisse and Cushman & Wakefield: (1) Racketeer Influenced and Corrupt Organizations Act ("RICO") violations; (2) fraud; (3) negligent misrepresentation; (4) breach of fiduciary duty; (5) tortious interference with contractual relations; (6) unjust enrichment; (7) negligence; and (8) common law conspiracy.  Credit Suisse and Cushman & Wakefield now move to dismiss each of Plaintiffs' claims.  Although submitting separate motions, both Credit Suisse and Cushman & Wakefield argue that Plaintiffs lack Article III standing and, regardless, Plaintiffs' Complaint should be dismissed for failure to state a claim.

## II.     Discussion

### A.     Motions to Dismiss: The Standard

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  While a complaint attacked by a Rule 12 motion to dismiss "does not

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 3**

need detailed factual allegations," it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id*. at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id*. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*. at 557.

In a more recent case, the Supreme Court identified two "working principles" that underlie *Twombly*. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Id*. "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 1950. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.* "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

Providing too much in the complaint may also be fatal to a plaintiff. Dismissal may be appropriate when the plaintiff has included sufficient allegations disclosing some absolute defense or bar to recovery. *See Weisbuch v. County of L.A.*, 119 F.3d 778, 783, n. 1 (9th Cir.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 4**

1997) (stating that "[i]f the pleadings establish facts compelling a decision one way, that is as good as if depositions and other . . . evidence on summary judgment establishes the identical facts").

Nonetheless, a dismissal without leave to amend is improper unless it is beyond doubt that the complaint "could not be saved by any amendment." *See Harris v. Amgen, Inc.*, 573 F.3d 728, 737 (9th Cir. 2009) (issued two months after *Iqbal*).[2]  The Ninth Circuit has held that "in dismissals for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Serv., Inc.,* 911 F.2d 242, 247 (9th Cir. 1990).  The issue is not whether plaintiff will prevail but whether he "is entitled to offer evidence to support the claims." *See Diaz v. Int'l Longshore and Warehouse Union, Local 13*, 474 F.3d 1202, 1205 (9th Cir. 2007) (citations omitted).

Under Rule 12(b)(6), the Court may consider matters that are subject to judicial notice. *See Mullis v. United States Bank*, 828 F.2d 1385, 1388 (9th Cir. 1987).  The Court may take judicial notice "of the records of state agencies and other undisputed matters of public record"

---

[2]  The Court has some concern about the continued vitality of the liberal amendment policy adopted in *Harris v. Amgen*, based as it is on language in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), suggesting that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim."  Given *Twombly* and *Iqbal*'s rejection of the liberal pleading standards adopted by *Conley,* a question arises whether the liberal amendment policy of *Harris v Amgen* still exists. Nevertheless, the Circuit has continued to apply the liberal amendment policy even after dismissing claims for violating *Iqbal* and *Twombly*.  *See Market Trading, Inc. v. AT&T Mobility, LLC*, 2010 WL 2836092 (9th Cir. July 20, 2010) (not for publication).  Accordingly, the Court will continue to employ the liberal amendment policy.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 5**

without transforming the motions to dismiss into motions for summary judgment.  *See Disabled Rights Action Comm. v. Las Vegas Events, Inc.,* 375 F.3d 861, 866 (9th Cir. 2004).  The Court may also examine documents referred to in the complaint, although not attached thereto, without transforming the motion to dismiss into a motion for summary judgment.  *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

      B.    <u>Plaintiffs' Article III Standing</u>

Article III standing pertains to a federal court's subject-matter jurisdiction, and it is properly raised in a motion to dismiss under Rule 12(b)(1).  *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  A plaintiff has the burden of establishing the three elements of Article III standing: (1) it has "suffered an injury in fact - an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) the injury is fairly traceable to the challenged conduct; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and footnote omitted).

Together, Defendants argue that Plaintiffs have suffered neither a concrete and particularized injury in fact, nor established the requisite causal connection between Defendants' alleged conduct and Plaintiffs' assumed injury.  *See* Cushman & Wakefield's Mem. in Supp. of Mot. to Dismiss, pp. 8-13 (Docket No. 48, Att. 1); Credit Suisse's Mem. in Supp. of Mot. to Dismiss, pp. 4-6 (Docket No. 51, Att. 1).  On the first point, Defendants assume that Plaintiffs' damages are represented only by depressed property values, reflected in the difference between Plaintiffs' properties' purchase price and their subsequent resale value/worth.  *See, e.g.*, Cushman & Wakefield's Mem. in Supp. of Mot. to Dismiss, p. 8 (Docket No. 48, Att. 1)

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 6**

("Courts routinely have held that generalized allegations of property value decreases do not meet the 'actual injury' requirement . . . because (1) no harm is realized *unless* and *until* plaintiff sells or attempts to sell, and (2) future economic changes may negate any current fluctuations in value.") (italics in original); Credit Suisse's Mem. in Supp. of Mot. to Dismiss, p. 5 (Docket No. 51, Att. 1) ("The Complaint lacks any direct allegations of property sales for less than the purchase price, and contains no specific allegations of any actual, pecuniary harm.  Perceived but unrealized diminutions in market value have consistently been deemed insufficient to satisfy the injury in fact element of standing.").

The Court generally agrees that such presumptive "diminution in value" injuries are likely too generic and unknown to confer standing.  *But see Allendale Neighborhood Ass'n v. Austin Transp. Study Policy Advisory Comm.*, 840 F.2d 258, 262-63 (5th Cir. 1988) (accepting depressed property value as sufficient injury for purposes of constitutional standing, stating "such a loss remains in one sense unrealized until the property is sold.  Nevertheless, a market devaluation has present adverse consequences short of realization through sale.  The knowledge that sale of the property may bring in fewer proceeds will influence and restrict the willingness to sell.  Further, a market devaluation will lessen the property owner's eligibility for loans secured by the property.").  Even so, the Court is not convinced that Plaintiffs' damages are accurately categorized *only* as diminution in value-type injuries.

Plaintiffs certainly claim losses of unrealized property values.  *See* Pls.' Opp. to Credit Suisse's Mot. to Dismiss, p. 4 (Docket No. 91).  Without more, such unadorned allegations may very well compromise Plaintiffs' ability to pursue their claims.  *See* Credit Suisse's Mem. in Supp. of Mot. to Dismiss, pp. 5-6 (Docket No. 51, Att. 1) (citing cases holding that decline in property values due to alleged predatory lending practices is insufficient to confer standing); *see*

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 7**

*also* Cushman & Wakefield's Mem. in Supp. of Mot. to Dismiss, pp. 8-13 (Docket No. 48, Att. 1) (same); *but compare Allendale*, *supra* at p. 7.  But Plaintiffs go further, adding context and more specificity to this overarching damages theme, pointing out: "[T]he damages suffered by the homeowners were not only the loss of unrealized property values . . ., but rather the complete elimination of all of the features of the development that were promised to the homeowners, including vested property and contractual rights running with the Plaintiffs' land and paid for by the Plaintiffs." *See* Pls.' Opp. to Credit Suisse's Mot. to Dismiss, pp. 4-5 (Docket No. 91).

In other words, as alleged in their Complaint, Plaintiffs' damages do not necessarily align with the economy's whim.  Instead, according to Plaintiffs, it was the deliberate, unorthodox manner in which Defendants created, marketed, implemented, managed, and controlled massive loan amounts that ultimately prevented developers (at four different resorts) from constructing and/or maintaining promised amenities.  For example, Plaintiffs alleged:

- Defendants knew and understood that Plaintiffs and Class Members required assurances from Defendants that the promised and bargained for infrastructure, amenities, golf courses, ski runs and ski lifts, restaurants, shops, clubs, hotels, swimming pools and theme parks, trails and other amenities running with the land would be protected and prosper but would result in expanded use and development for each resort; and, that the rights, privileges and amenities promised and provided by the developers would always exist, without interference . . . .

- Upon soliciting and gaining the trust and control of the developers, Plaintiffs and Class Members, the Defendants, knowing that their representations, promises, assurances and agreements, were materially false and misleading, intentionally and systematically set about to destroy the rights, agreements, amenities, guarantees, expectations and economic opportunities of the Plaintiffs and Class Members with respect to their properties.

- Each of the representations, promises, assurances and agreements by Credit Suisse . . . was made in furtherance of Defendants' secret plan to

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 8**

generate unreasonably large and excessive commissions, to eventually foreclose and take over the developments directly and/or indirectly, to constructively interfere with and destroy valuable rights and amenities owed by the developers to the homeowners including Plaintiffs and members of Plaintiff Class in order to generate upstream to Defendants . . . , and eventually, acquire ownership and control of the projects.

• As a direct and proximate result of the Defendants' aforesaid plan and scheme, the developers, Plaintiffs and Class Members, and each of them, were caused economic damages of hundreds of thousands of dollars or more, by the destruction or elimination of their rights, benefits, privileges, amenities and reasonable use of their respective lands and properties, the extreme diminution in value of their lands, and the destruction of other economic interests of thousands of people who relied upon existing promises, understandings and contracts in each development with their developer. Defendants' plan and scheme is continuing to the present time.

*See* Pls.' Second Am. Compl., ¶¶ 78, 82-84 (Docket No. 18). These alleged damages are identifiable, realized, and plausibly separate from any fluctuations in the market for high-end resort developments, specifically, or the overall economy, generally. Although convenient to do so, based upon the record now before it (and the standard that must be applied at this stage of the litigation), the Court will not categorize Plaintiffs' claimed damages as reflective only of a sour economy and, thus, subject to the litany of cases warranting dismissal under those circumstances. *But see infra* at pp. 21-26. Simply put, the damages identified thus far are distinct and, as alleged, occurred independent of a volatile economy for Article III standing purposes.

Moreover, a causal connection exists between Plaintiffs' claimed injury and Defendants' alleged conduct. That is, Plaintiffs lay out what they believe to be Credit Suisse's scheme to starve the at-issue resorts of the money needed to build out the amenities that, naturally, make up the resorts themselves - all the while collecting from developers and homeowners tens of millions of dollars in "loan fees" and, later, increasing Credit Suisse's likelihood of acquiring the

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 9**

resorts' land and improvements through foreclosure and/or bankruptcy.  From Plaintiffs'

perspective, the fate of these developments was tethered to the money improperly loaned by

Credit Suisse and, in every situation, the developments failed according to Credit Suisse's plan.

Viewed in this light, the demise of these developments and, likewise, Plaintiffs' injuries, were

the consequences of Credit Suisse's calculated Loan to Own scheme.[3]  Plaintiffs therefore have

standing to assert claims against Credit Suisse.

     Cushman & Wakefield's involvement in Credit Suisse's alleged Loan to Own scheme is

more removed, to be sure; but not to the extent Cushman & Wakefield argues.  *See* Cushman &

Wakefield's Mem. in Supp. of Mot. to Dismiss, pp. 10 & 12 (Docket No. 48, Att. 1) ("The

_____

[3]  In characterizing Plaintiffs' allegations as a "suicidal business strategy . . . for lenders
to ultimately take possession of the resort properties, worth a fraction of the loan amounts, in
what Credit Suisse supposedly knew would be a severely depressed real estate market," Credit
Suisse argues that "this Court is not required to suspend its common sense in considering and
evaluating Plaintiffs' absurd claims."  *See* Credit Suisse's Mem. in Supp. of Mot. to Dismiss, p.
2 (Docket No. 51, Att. 1).  Implicit in such an argument, and even more expressly argued
elsewhere by Credit Suisse, is the claim that Plaintiffs' theory is so strained as to fail the sort of
"facial plausibility" standard described by the Supreme Court in the *Twombly* decision.
However, Credit Suisse ignores those allegations detailing its subsequent syndication of the
loans to non-bank institutions in order to shift any economic risk to others, after having already
accepted its commissions, yet still being positioned to take over the resorts in the event of default
and foreclosure.  Accepting these allegations as true, Plaintiffs' Loan to Own scheme allegations
are not as inconceivable as Credit Suisse posits, especially when also considering the historical
backdrop described elsewhere in the record, including Judge Kirscher's decisions in the Montana
bankruptcy case (*see* Docket Nos. 91, Att. 1 & 101).  The Court is also not inclined to insert a
distant historical tableau of what might have been a lender's so-called "common sense" into the
more recent history of investment banking and credit markets, which some would argue is a
history marked much more by hubris, risk, huge profit, and huge loss, than by conservative
financial practices.  Whatever the particular financial intricacies and underlying motivations may
have been for the process by which the nature of residential and commercial real estate lending
changed so dramatically in the last decades, the result was a banking and credit marketplace
much different than it once was.  Accordingly, for purposes of considering the facial plausibility
of Plaintiffs' claims, the Court will not accept an argument that what once might have seemed
unthinkable, is therefore implausible today.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 10**

notion that the appraisals prepared by C&W's subsidiaries are the *cause* of plaintiffs' alleged

economic harm cannot withstand scrutiny.  There is no causal link between C&W's subsidiaries'

preparation of appraisals of the Resorts and the alleged diminution in the value of plaintiffs'

homes and lots. . . . .  Plaintiffs' claim that the TNV appraisals caused the decline in their

property values (rather than all of these other actors and events) is nothing short of rank

speculation that destroys standing.") (italics in original).

According to Plaintiffs, Credit Suisse's Loan to Own scheme was only possible by

manipulating the value of each development using the TNV appraisal methodology - something

Cushman & Wakefield was able to accomplish in its capacity as an international real estate

services firm.  So, while it is true that an additional stratum of conduct separates Cushman &

Wakefield from Plaintiffs and their properties, it does not operate to shield Cushman &

Wakefield when recognizing - through the allegations within Plaintiffs' Second Amended

Complaint - that it was the actual interface between *both* Credit Suisse and Cushman &

Wakefield that made Credit Suisse's Loan to Own scheme possible.  Arguably, then, without

Cushman & Wakefield's appraisals, there is no Loan to Own scheme from which Plaintiffs could

premise their claims.  As a result, Plaintiffs have standing to assert claims against Cushman &

Wakefield as well.

Having decided Plaintiffs' standing to assert their claims against both Credit Suisse and

Cushman & Wakefield, the Court turns to Defendants' alternate arguments, attacking the

viability of each of Plaintiffs' substantive claims:  (1) RICO violations; (2) fraud; (3) negligent

misrepresentation; (4) breach of fiduciary duty; (5) tortious interference with contractual

relations; (6) unjust enrichment; (7) negligence; and (8) common law conspiracy.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 11**

C.      First Cause of Action:  Defendants' Alleged RICO Violations

Within their Second Amended Complaint's First Cause of Action, Plaintiffs devote

nearly 30 pages to the approximately 100 paragraphs/subparagraphs concerning Defendants'

alleged RICO violations.  *See* Pls.' Second Am. Compl., ¶¶ 190-265 (Docket No. 18).  "A

private civil action may be brought by a plaintiff under the provisions of [RICO], alleging a

violation of Title 18 U.S.C. § 1962(a), (b), (c) or (d)."  *See* Ninth Circuit Jury Instructions -

Civil, *Introductory Comment to Civil RICO* (2006).  Here, Plaintiffs allege that Defendants

violated RICO - in particular, 18 U.S.C. §§ 1962(c) and (d).[4]

18 U.S.C. § 1962(c) makes it unlawful for "any person employed by or associated with

[an] enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such

enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  *See*

U.S.C. § 1962(c).[5]  To state a civil claim for a RICO violation under 18 U.S.C. § 1962(c), a

plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering

activity."  *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 196 (1985).  "To have standing

---

[4]  Although Plaintiffs' Second Amended Complaint merely cites to 18 U.S.C. § 1962(a) in a number of paragraphs (*see* Pls.' Second Am. Compl., ¶¶ 1, 186, 218, & 259 (Docket No. 18)) and 18 U.S.C. § 1962(b) in only one paragraph (*see id*. at ¶ 260), Plaintiffs focused their briefing and oral argument exclusively on 18 U.S.C. §§ 1962(c) and (d) - even after Defendants incorporated dismissal arguments as to 18 U.S.C. §§ 1962(a) and (b).  Given Plaintiffs' failure to submit a focused reply to Defendants' arguments in these respects, to the extent even alleged, Plaintiffs' allegations premised upon 18 U.S.C. §§ 1962(a) and (b) should be dismissed here.

[5]  Relatedly, 18 U.S.C. § 1962(d) prohibits anyone from conspiring to violate the provisions of 18 U.S.C. § 1962(c).  To state a claim under 18 U.S.C. § 1962(d), a plaintiff "must allege either an agreement that is a substantive violation of RICO or that the defendants agreed to commit, or participated in, a violation of two predicate [racketeering activity] offenses."  *See Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000).  A plaintiff "cannot claim that a conspiracy to violate RICO existed if they do not adequately plead a substantive violation of RICO.  *Id*.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 12**

under civil RICO, [a plaintiff] is required to show that the racketeering activity was both a but-for cause and a proximate cause of his injury." *See Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 2010 WL 5300803 (9th Cir. Dec. 28, 2010) (citing *Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)).[6]  For RICO purposes, proximate causation requires "some direct relation between the injury asserted and the injurious conduct alleged." *See Holmes*, 503 U.S. at 268; *see also Bridge v. Phoenix Bond Indem. Co.*, 553 U.S. 639, 655 (2008) (explaining that finding of proximate causation for RICO claims requires that "particular emphasis" be placed on "demand" for direct relation between asserted injury and alleged RICO violation) (citing *Holmes*, 503 U.S. at 268); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries.").

In addition to arguing that Plaintiffs fail to properly plead the substantive elements of their RICO claim (*see infra* at pp. 27-37), Defendants preliminarily target Plaintiffs' standing to even support the claim (separate from, and in addition to, Plaintiffs' Article III standing (*see supra* at pp. 6-11)).  *See* Cushman & Wakefield's Mem. in Supp. of Mot. to Dismiss, pp. 24-26 (Docket No. 48, Att. 1) ("Plaintiffs do not plead proximate causation . . . . .  [T]he necessary direct causal relationship between C&W's appraisals and the diminution in value of plaintiffs' resort properties is entirely lacking . . . . .  The lack of proximate causation is fatal to all of plaintiffs' RICO claims."); Credit Suisse's Mem. in Supp. of Mot. to Dismiss, pp. 7-11 (Docket

---

[6]  RICO standing is a more rigorous matter than standing under Article III.  *See, e.g.*, *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975, n. 7 (9th Cir. 2008) (finding proximate causation necessary for civil RICO standing not met, even though "less rigorous" Article III causation threshold satisfied); *see also Lerner v. Fleet Bank*, 318 F.3d 113, 122, n. 8 (2d Cir. 2003) (holding that plaintiffs' allegations failed to meet RICO proximate causation requirements but satisfied "the lesser burden for constitutional standing").

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 13**

No. 51, Att. 1) ("Credit Suisse's alleged misconduct was not the proximate cause of Plaintiffs' alleged harm.").  In response to both arguments,[7] Plaintiffs counter that this case "presents a straightforward and uncomplicated link between the predicate acts of mail and wire fraud and the harm suffered by the Plaintiffs - the loss of all promised common area amenities."  *See* Pls.' Opp. to Cushman & Wakefield's Mot. to dismiss, pp. 18-19 (Docket No. 92).

### 1. *RICO, Proximate Cause, and Standing*

To the parties' credit, there is no dispute that three decisions from the U.S. Supreme Court speak to civil RICO's causation requirements and control here: (1) *Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258 (1992); (2) *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (2006) ; and (3) *Hemi Group, LLC v. City of New York, New York*, 130 S. Ct. 983 (2010).

### a. Holmes v. Securities Investor Prot. Corp.

In *Holmes*, the plaintiff, Securities Investor Protection Corporation ("SIPC"), brought suit against several defendants under RICO.  *Holmes*, 503 U.S. at 262.  SIPC alleged that these defendants conspired in a stock-manipulation scheme that disabled two securities broker-dealers from meeting their financial obligations to customers/investors.  *Id*. at 261.  As an insurance provider to bankrupt broker-dealers that could no longer pay their customers (including the two at issue in *Holmes*), SIPC's statutory duty to advance funds to reimburse the broker-dealers'

---

[7] Plaintiffs' discussion of its RICO claim in response to Cushman & Wakefield's and Credits Suisse's respective Motions to Dismiss is identical.  *See, e.g.*, Pls.' Opp. to Cushman & Wakefield's Mot. to Dismiss, p. I (Docket No. 92) ("In conservation of the Court's time, we advise that the RICO section of this brief and the RICO section of the Opposition to the Credit Suisse motion are identical."); Pls.' Opp. to Credit Suisse's Mot. to Dismiss, p. I (Docket No. 91) ("In conservation of the Court's time, we advise that the RICO section of this brief and the RICO section of the Opposition to the Cushman & Wakefield motion are identical.").  Therefore, as to RICO, the Court's reference to Plaintiffs' opposition to one Defendant's Motion to Dismiss applies equally to both Defendants' Motions to Dismiss.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 14**

customers was triggered. *Id*. As subrogee to these investors, SIPC sued to recover nearly $13 million in funds used to compensate the affected parties. *Id*. at 262-63.

After five years of litigation over other issues, the U.S. District Court for the Central District of California entered summary judgment for the defendants on the RICO claims, ruling, in part, that SIPC had not satisfied the proximate cause requirement under RICO. *Id*. at 263-64. On appeal, the Ninth Circuit reversed and remanded, holding the district court's finding of no proximate cause to be in error. *Id*. at 264. The U.S. Supreme Court granted the defendants' petition for certiorari on the issue of whether SIPC had a right to sue under RICO. *Id*. at 264-65.

The Supreme Court reversed, concluding that RICO required not only "but for" causation, but also proximate causation and that proximate cause demands "some direct relation between the injury asserted and the injurious conduct alleged." *Id*. at 268. The Court then held that SIPC could not sue defendants under RICO for losses it suffered as a result of defendants' stock-manipulation scheme because SIPC's harm was merely derivative of an injury to the two broker-dealers. *Id*. at 271-74 ("We hold not that RICO cannot serve to right the conspirators' wrongs, but merely that the nonpurchasing customers, or SIPC in their stead, are not the proper plaintiffs.").[8] "[A] plaintiff who complain[s] of harm flowing merely from the misfortunes

---

[8] On this point, Justice Souter further opined:

> Allowing suits by those injured only indirectly would open the door to "massive and complex damages litigation[, which would] not only burde[n] the courts, but [would] also undermin[e] the effectiveness of treble-damages suits."

*Holmes*, 503 U.S. at 274 (quoting *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 545 (1983)); *see also Oscar v. University Students Co-Operative Ass'n*, 965 F.2d 783, 786 (9th Cir. 1992) ("RICO was intended to combat organized crime, not to provide a federal cause of action and treble damages to every tort plaintiff."); *but cf. H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989) (rejecting "invitation to invent a rule that RICO's pattern of racketeering concept requires an allegation and proof of an organized crime nexus.").

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 15**

visited upon a third person by the defendant's acts," the Court reasoned, "generally . . . stand[s] at too remote a distance to recover."  *Id*. at 268-69.  While the defendants' acts caused the broker-dealers' bankruptcy, only the bankruptcy caused the losses suffered by the customers and, hence, by SIPC.  *Id*. at 271. ("[T]he conspirators have allegedly injured these customers only insofar as the stock manipulation first injured the broker-dealers and left them without the wherewithal to pay customers' claims.").

> The Court offered three administrative justifications for this "directness" requirement:

>> First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors.  Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries. And, finally, the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

*Id*. at 269-70 (citations omitted).  Therefore, according to the Court, the defendants' acts may have been a "but for" cause of SIPC's loss, but they were not a proximate cause because there was no direct relationship between the defendants' alleged conduct and SIPC's asserted injury. *Id*. at 271; *see also id*. at 274 ("In sum, subrogation to the rights of the manipulation conspiracy's secondary victims does, and should, run afoul of proximate-causation standards . . . .").

> b.   *Anza v. Ideal Steel Supply Corp.*

In *Anza*, Ideal Steel Supply Corporation ("Ideal") asserted RICO claims against its principal competitor, National Steel Supply Inc., and its owners, Joseph and Vincent Anza (collectively "National"), alleging that National was engaged in an unlawful racketeering scheme

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 16**

aimed at gaining sales and market share at Ideal's expense.  *Anza*, 547 U.S. at 453-54.
According to Ideal, National adopted a practice of failing to charge the requisite New York sales
tax to cash-paying customers, even when conducting transactions that were not exempt from
sales tax under state law.  *Id*. at 454.  Ideal claimed that this practice not only was concealed
from the New York State Department of Taxation and Finance using fraudulent tax returns, but
allowed National to reduce its prices without affecting its profit margin, thus depriving Ideal of
sales it otherwise would have made.  *Id*.

The United States District Court for the Southern District of New York dismissed Ideal's
complaint, finding that, as to a RICO claim predicated on mail and/or wire fraud, a plaintiff must
have relied on the defendant's misrepresentations; Ideal did not allege that it relied on National's
false tax returns.  *Id*. at 455.  The district court concluded that Ideal could not go forward with its
RICO claims.  On appeal, the Second Circuit vacated the district court's judgement, holding that,
where a complaint alleges a pattern of racketeering activity "that was intended to and did give
the defendant a competitive advantage over the plaintiff, the complaint adequately pleads
proximate cause, and the plaintiff has standing to pursue a civil RICO claim."  *Id*. (citations
omitted).  The U.S. Supreme Court granted National's petition for certiorari.  *Id*. at 456.

Applying the principles outlined in *Holmes*, the Supreme Court reversed, concluding that
Ideal could not maintain its RICO claim because the direct victim of National's alleged RICO
violation was the State of New York, not Ideal - "it was the State that was being defrauded and
the State that lost tax revenue as a result."  *Id*. at 458 ("The proper referent of the proximate-
cause analysis is an alleged practice of conducting national's business through a pattern of
defrauding the State. . . . .  The cause of Ideal's asserted harms, however, is a set of actions

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 17**

(offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State).").   In support of this conclusion, like *Holmes*, the Court considered the directness requirement's underlying premises.  *Id.* (citing *Holmes*, 503 U.S. at 269-70).

First, "[o]ne motivating principle is the difficulty that can arise when a court attempts to ascertain the damages caused by some remote action."  *Id*. at 458.  The Court noted that defrauding the tax authority did not require National to lower prices, since lower prices may have resulted from, for example, a decision that "additional sales would justify a smaller profit margin."  *Id*.  Additionally, "Ideal's lost sales could have resulted from factors other than petitioner's alleged acts of fraud.  Businesses lose and gain customers for many reasons, and it would require a complex assessment to establish what portion of Ideal's lost sales were the product of National's decreased prices."  *Id*. at 459.

Second, "[t]he speculative nature of the proceedings that would follow if Ideal were permitted to maintain its claim" illustrate "why Ideal's alleged injury was not the direct result of a RICO violation."  *Id*.  A court would have to determine the portion of Ideal's damages resulting from the RICO violation by evaluating the relative causal role of National's fraud in dropping its prices, and the relative causal role of those lowered prices in diminishing Ideal's sales - requiring a complex apportionment of fault among various causes.  *Id*. at 460 ("The element of proximate causation recognized in *Holmes* is meant to prevent these types of intricate, uncertain inquiries from overrunning RICO litigation.").

Third, "[t]he requirement of direct causal connection is especially warranted where the immediate victims of an alleged RICO violation can be expected to vindicate the laws by pursuing their own claims."  *Id*. at 460.  The Court noted that the direct victim, the state tax

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 18**

authority, could be expected to pursue National for its tax violations.  *Id.* ("The adjudication of the State's claims, moreover, would be relatively straightforward; while it may be difficult to determine facts such as the number of sales Ideal lost due to National's tax practices, it is considerably easier to make the initial calculation of how much tax revenue the Anzas withheld from the State.  There is no need to broaden the universe of actionable harms to permit RICO suits by parties who have been injured only indirectly.").

In the Court's words: "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."  *Id.* at 461.  As to Ideal's claim, that answer was no.[9]

### c.     *Hemi Group, LLC v. City of New York, New York*

In *Hemi Group*, the City of New York (the "City) brought a civil RICO claim against Hemi Group, a New Mexico company that sells cigarettes online to New York State residents.  *Hemi Group*, 130 S. Ct. at 987.  As an out-of-state vendor, Hemi Group was obligated under the Jenkins Act to file a report with state tobacco tax administrators listing the name, address, and quantity of cigarettes purchased by state residents.  *Id*.  In theory, such information provided the City with the ability to track down and recover its portion of the state's cigarette excise tax revenue.  *Id*.  Hemi Group, however, failed to submit the requisite reports.  *Id*.  According to the City, Hemi Group's mail and wire fraud in failing to submit buyer information contributed to hundreds of millions of dollars in lost revenue.  *Id*.

---

[9] Another factor discussed in *Holmes* was the risk of multiple recoveries.  *Holmes*, 503 U.S. at 269.  *Anza* makes clear, however, this is not a necessary condition for concluding that proximate cause is lacking.  *See Anza*, 547 U.S. at 459 (acknowledging that there was no appreciable risk of duplicative recoveries).

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 19**

The U.S. District Court for the Southern District of New York dismissed the City's RICO claim, finding that the City could not establish that Hemi Group formed an "enterprise" as is required to establish RICO liability. *Id*. at 988. On appeal, the Second Circuit vacated the district court's judgment, holding that (1) Hemi Group operated as an "enterprise" and that the enterprise committed the predicate RICO acts of mail and wire fraud, based on the failure to file the Jenkins Act material with New York State; (2) the City's asserted injury, lost tax revenue, was "business or property" under RICO; and (3) the City's asserted injury came about "by reason of" the predicate mail and wire frauds. *Id*. According to the Second Circuit, the City had stated a viable RICO claim. *Id*. The U.S. Supreme Court granted Hemi Group's petition for certiorari.

The Supreme Court reversed, reiterating its position (outlined in *Holmes*) that "'[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step.'" *Id*. at 989 (quoting *Holmes*, 503 U.S. at 271-72). Confirming this "general tendency['s]" application to proximate cause inquiries under RICO, the Court noted that the conduct directly responsible for the alleged harm was the customers' failure to pay taxes (not Hemi Group's allegedly fraudulent conduct in failing to file Jenkins Act reports), commenting:

> Here, the City's theory rests not just on separate *actions*, but separate actions carried out by separate *parties*.
>
> The city's theory thus requires that we extend RICO liability to situations where the defendant's fraud on the third party (the State) has made it easier for a *fourth* party (the taxpayer) to cause harm to the plaintiff (the City). Indeed, the fourth-party taxpayers here only caused harm to the City in the first place if they decided not to pay taxes they were legally obligated to pay. Put simply, Hemi's obligation was to file the Jenkins Act reports with the State, not the City, and the City's harm was directly caused by the customers, not Hemi. We have never before stretched the causal chain of a RICO violation so far, and we decline to do so today.

*Id*. at 990 (italics in original). In so finding, the plurality opinion rejected any suggestion that RICO's proximate cause requirement turn on the common law's application of foreseeability,

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 20**

rather than on the existence of a sufficiently "direct relationship" between the fraud and the harm.  *Id*. at 991 ("The concepts of direct relationship and foreseeability are of course two of the 'many shapes [proximate cause] took at common law.'  Our precedents make clear that in the RICO context, the focus is on the directness of the relationship between the conduct and the harm.  Indeed, *Anza* and *Holmes* never even mention the concept of foreseeability." (citations omitted)).[10]

### 2.    *Plaintiffs' Standing to Assert Second Amended Complaint's RICO Violation Claims*

Under *Holmes*, *Anza*, and *Hemi Group*, the Court must determine whether Plaintiffs meet the proximate cause requirement by examining whether Defendants' alleged RICO violation led directly to Plaintiffs' injuries.  The basis of the RICO violation, according to Plaintiffs, is Credit Suisse's systematic Loan to Own scheme, facilitated by Cushman & Wakefield's fraudulent and intentionally misleading appraisals.  The alleged "'harm' suffered by . . . Plaintiffs is . . . the interference with the homeowners' property rights to the contractually promised amenities . . . ." *See* Pls.' Opp. to Credit Suisse's Mot. to Dismiss, pp. 21-22 (Docket No. 91).  Here, just as in *Holmes*, *Anza*, and *Hemi Group*, the cause of Plaintiffs' asserted harm is a set of actions (the developers' failure to build out the bargained-for amenities at these resorts) that are too removed from the alleged RICO violation (targeting predatory, non-recourse loan scheme to high-end real

---

[10]   However, Justice Ginsburg, who supplied the vote necessary to support the plurality's decision to dismiss the City's claims, declined to "subscrib[e] to the broader range of the Court's proximate cause analysis . . . ."  *Hemi Group*, 130 S. Ct. at 994-95 (concurring in part and concurring in judgment).  What Justice Ginsburg meant is unclear; yet it is clear that, despite the above-referenced comment, she declined to endorse the dissent's argument that foreseeability should be the focus of RICO's proximate cause inquiry.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 21**

estate developments by means of mail and wire fraud) to establish the sort of proximate cause needed to state a RICO claim.

The rationales for the proximate cause requirement described in *Homes* and *Anza* also suggest that Plaintiffs' alleged harm fails RICO's proximate cause test.

First, notwithstanding Plaintiffs' argument that "[t]he conduct (predatory lending based on fraudulent appraisals) led directly and without detour, to the harm (loss of contractually promised amenities)" (*see id*. at p. 25), the undersigned finds it more difficult to appropriately assess causation.  There are numerous other factors that could have led to the resorts' absence of built-out amenities here: an ornery luxury real estate market; a depressed economy; free-falling credit markets; or, even, the developers' own professional ineptitude or decision to use the Credit Suisse loan proceeds for anything other than the complete build-out of the developments' amenities.[11]

Second, assuming an appropriate assessment of factual causation *could* be made out, this Court is not convinced that a straight-forward and accurate apportionment protocol could be applied to account for the respective recoveries of all parties affected by Defendants' alleged conduct - keeping in mind that each would then be entitled to seek the full treble damages allowed under RICO.  Again, despite Plaintiffs' arguments that "the homeowners are the only

---

[11]  On this point, Justice Souter, in *Holmes*, reasoned:

> If the nonpurchasing customers were allowed to sue, the district court would first need to determine the extent to which their inability to collect from the broker-dealers was the result of the alleged conspiracy to manipulate, as opposed to, say, the broker-dealers' poor business practices or their failures to anticipate developments in the financial markets.

*See Holmes*, 503 U.S. at 272-73.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 22**

victims of the scheme" and that "[t]he homeowner-Plaintiffs are the only ones injured by the scheme" (*see id*. at pp. 23 & 25), there are a multitude of other parties (if the causal chain is pliant enough) that arguably have been injured, including, potentially, developers, contractors, subcontractors, note holders, bond holders, and other investors.  Indeed, within the Bankruptcy Order appended to Plaintiffs' opposition to Defendants' Motions to Dismiss, U.S. Bankruptcy Judge Ralph Kirscher commented on those entities affected by Credit Suisse's Loan to Own scheme, finding that:

> Credit Suisse and the development owners would benefit, while their developments - *and especially the creditors of their developments* - bore all the risk of loss. . . . .  While Credit Suisse's new loan product resulted in enormous fees to Credit Suisse in 2005, it resulted in financial ruin for several resort communities.  Credit Suisse lined its pockets *on the backs of the unsecured creditors*.

*See* 5/12/09 Partial and Interim Order, attached as Ex. A to Pls.' Opp. to Credit Suisse's Mot. to Dismiss, pp. 16 & 19 (Docket No. 91, Att. 1) (italics added).[12]  The point here isn't that Plaintiffs weren't arguably negatively impacted but for Defendants' alleged conduct; rather, the point - highlighted by both *Holmes* and *Anza* - is that other parties may have been impacted too, such that a system for categorizing and quantifying those other claims would involve inexact, speculative, time consuming, and, perhaps, impossible calculations beyond, simply, using expert appraisers and economists to testify on the value of the Plaintiffs' property with and without the

---

[12]  These findings were also referenced within Plaintiffs' briefing.  *See* Pls.' Opp. to Credit Suisse's Mot. to Dismiss, p. 21 (Docket No. 91).  However, Plaintiffs' briefing incorporates a bracketed entry to include the Plaintiff homeowners' interests, in addition to the developments' unsecured creditors.  *See id*. ("Credit Suisse lined its pockets on the backs of the unsecured creditors [including the homeowners].").  Judge Kirscher did not include the substantive bracketed language: "[including the homeowners]," the significance of which is not dispositive in any one respect, but important only to highlight, once more, that Plaintiffs are not the only individuals potentially damaged by Defendants' alleged actions.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 23**

"contractually obligated" amenities, as Plaintiffs suggest is the case (*see* Pls.' Opp. to Credit Suisse's Mot. to Dismiss, p. 23 (Docket No. 91)).

Third, if the allegations in Plaintiffs' Second Amended Complaint are true, the more direct victims of Defendants' alleged infringement actions, the developers, could pursue their own claims.  As alleged in Plaintiffs' Second Amended Complaint, it was Defendants' conduct, allegedly intended to ensnare the developers, that set in motion the Loan to Own scheme that prevented the resorts' amenities from being completed and, eventually, crushed the developments:

> Credit Suisse . . . [was] paid on a contingent fee basis: [it] only earned loan fees if [it] sold loans.  Thus, as part of its scheme, Credit Suisse advised and encouraged developers of the named residential resorts to take unnecessarily risky and excessive loans which required them to burden their developments with excessive debt because, the higher the amount, the larger and more excessive the loan fee which could be exacted by Credit Suisse. . . . .

> The loan fee structure led to one of the most egregious aspects of Credit Suisse's FIRREA-violating, loan-product scheme.  In its role as lending advisor, Credit Suisse induced, encouraged, advised and recommended that the developers remove and take the proceeds of the loan out of the project development accounts, without placing commercially reasonable lending controls on the loans.  In violation of the standards of normal and usual commercial lending and appraisal practices, Defendant Credit Suisse failed to specify how developers used the proceeds of the loan; and instead recommended, advised, encouraged and authorized developers to use the proceeds for any purpose, including purposes totally unrelated to the subject development . . . .

> Credit Suisse "marketed" its new loan product to developers by characterizing a substantial portion of each amount of loan proceeds as a "distribution," which would cause the owner's equity account to be reflected as a negative balance.  This caused the owner's equity to be reflected on the developers' audited financial statements as a "qualification."  Credit Suisse knew that this practice was highly likely, if not certain, to substantially diminish the value and credit worthiness of such developers' financial statements, balance sheets, and credit reputation and status in the financial community.  Notwithstanding this

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 24**

knowledge, Credit Suisse as lender and lending advisor solicited, encouraged and persuaded the developers to engage in this practice . . . .

Credit Suisse knew at the time that the lending advice and authorizations were given that its scheme and tactics would cause the developers and the Resorts financial ruin, resulting in the ultimate take-over by Credit Suisse, directly, or indirectly through constructive control and/or collusion with third parties.

. . . .   The most critical component of [Credit Suisse's] aggressive solicitation scheme involved a uniform pattern of representations and conduct designed to have the developers as their "clients" **"ENGAGE"** Credit Suisse as lending fiduciaries; and then induce the resort developer/clients to trust the Credit Suisse executives as lending advisors/fiduciaries, so that *Credit Suisse could obtain the developers' private, confidential and proprietary financial information in order to sell the syndication which produced the loan proceeds*. **Without such trust and confidence, the syndication process could NOT proceed; and the Credit Suisse executives driving the "GRAVY TRAIN" scheme knew it; so they devised their scheme to secure developer trust and confidence, with full knowledge of the contractual commitments to the Plaintiff Class, to enable Credit Suisse to obtain the required financial information; and then to sell the syndicated notes and obtain subscriptions BEFORE it loaned the money to the developers.**

*See* Pls.' Second Am. Compl., ¶¶ 51-54 (italics, bold, and capitalization in original).  The fact that the developers either have not brought or have no incentive to bring claims against Defendants (*see* Pls.' Opp. to Credit Suisse's Mot. to Dismiss, p. 23 (Docket No. 91)), even if true, misses the point when recognizing the purpose of such a query is to justify the "remoteness" of the alleged RICO violations to a litigant's claimed injuries.  Here, there are other impacted parties who, theoretically, can be counted on to bring suit - the developers.[13]

With all this in mind, in the context of RICO, Defendants' Loan to Own Scheme *directly* harmed the resorts' developers who defaulted on the loans, whereas it was the inability of the

---

[13]  Relatedly, "a suit by an indirectly injured victim could be an attempt to circumvent the relative priority its claim would have in the directly injured victim's liquidation proceedings." *See Holmes*, 503 U.S. at 274 (citing *Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago*, 877 F.2d 1333, 1336 (7th Cir. 1989)).  Although raised in Credit Suisse's briefing, Plaintiffs do not appear to address this concern.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 25**

injured developers to pay the debt service and complete the promised amenities that *directly* caused Plaintiffs' injuries.  The asserted RICO violations vis à vis Plaintiffs' claimed injuries are therefore too attenuated.  *Cf. Holmes*, 503 U.S. at 271 ("The broker-dealers simply cannot pay their bills, and only that intervening insolvency connects the conspirators' acts to the losses suffered by the nonpurchasing customers and general creditors.").  Unable to show a direct relationship between their injuries and Defendants' conduct, Plaintiffs cannot demonstrate sufficient proximate causation to state a RICO claim.[14]  As a consequence, it is recommended that Plaintiffs' 18 U.S.C. §§ 1962(c) and (d) claims be dismissed.

---

[14]  Citing to *Johnson v. KB Homes*, 720 F. Supp. 2d 1109 (D. Ariz. 2010), Plaintiffs argue that they "have sufficiently alleged proximate causation because Defendants' arrangement to inflate appraisals was a direct cause of their injuries and a 'substantial factor in the sequence of responsible causation.'"  *See* Pls.' Opp. to Credit Suisse's Mot. to Dismiss, pp. 22 & 26 (Docket No. 91).  As Credit Suisse points out, however, *KB Homes* is distinguishable for at least two reasons.  *See* Credit Suisse's Reply in Supp. of Mot. to Dismiss, pp. 5-6 (Docket No. 94).  First, in *KB Homes*, the U.S. District Court for the District of Arizona not only did not issue any ruling on RICO's proximate cause requirement, it acknowledged *Hemi Group's* holding that intentional conduct was insufficient to establish proximate causation where a plaintiff was injured only indirectly.  *See KB Homes*, 720 F. Supp. 2d at 1118.  Second, as to those parties not dismissed from the action, the allegedly inflated appraisals in *KB Homes* related to appraisals of the plaintiffs' own homes.  *See id.* at 1114 ("[P]laintiffs claim that the appraised values of their homes were inflated to meet or exceed the contract prices. . . . . [P]laintiffs assert that they overpaid for their homes and that they would not have completed their purchases at the contract prices had proper appraisals been prepared.").

Additionally, Plaintiffs argue that proximate cause is an issue for the jury, not to be decided on a motion to dismiss.  *See* Pls.' Opp. to Credit Suisse's Mot. to Dismiss, pp. 25-26 (Docket No. 91) ("It is a fundamental premise of American jurisprudence that determination of 'proximate cause' is generally an issue for the jury.").  At least as to RICO, *Anza* and *Hemi Group* - two recent U.S. Supreme Court decisions - do not agree.  *See supra* at pp. 16-21; *see also, generally*, *Hemi Group*, 130 S. Ct. At 991 ("But the City cannot escape the proximate cause requirement merely by alleging that the fraudulent scheme embraced all those indirectly harmed by the alleged conduct.  Otherwise, our RICO proximate cause precedent would become a mere pleading rule.").

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 26**

### 3. *Other RICO Elements*

In addition to challenging Plaintiffs' standing to bring their RICO claim, Defendants also argue that Plaintiffs failed to adequately state a RICO claim.[15]  Both Credit Suisse and Cushman & Wakefield argue that Plaintiffs have not adequately pled the predicate acts of fraud.  *See* Credit Suisse's Mot. to Dismiss, pp. 11-12 (Docket No. 51, Att. 1); Cushman & Wakefield's Mot. to Dismiss, pp. 14-21 (Docket No. 48, Att. 1).  Credit Suisse further asserts that Plaintiffs failed to plead a RICO enterprise (*see* Credit Suisse's Mot. to Dismiss, pp. 13-14 (Docket No. 51, Att. 1)) while Cushman & Wakefield contends that Plaintiffs (1) failed to plead that it participated in a RICO enterprise and (2) failed to adequately allege a RICO conspiracy involving Cushman & Wakefield (*see* Cushman & Wakefield's Mot. to Dismiss, pp. 28-30 (Docket No. 48, Att. 1)).

### a. *Predicate Acts of Fraud*

"'Racketeering activity' is any act indictable under several provisions of Title 18 of the United States Code, and includes the predicate acts of mail fraud, wire fraud and obstruction of justice." *Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004).  Here, Plaintiffs allege that, "[b]y means of mail and wire fraud, and money laundering, the Defendants violated and conspired to violate [RICO]."  *See* Pls.' Second Am. Compl., ¶ 1 (Docket No. 18).[16]

---

[15]  On March 10, 2010, U.S. District Judge Edward J. Lodge referred all matters to the undersigned.  *See* 3/10/10 CMO (Docket No. 35).  Because Defendants' Motions to Dismiss are dispositive in nature, the Court issues this Report and Recommendation, recognizing it is just that - a recommendation that may or may not be accepted.  Therefore, while recommending that Plaintiffs do not have standing to bring their RICO claims, Defendants' alternate arguments will also be considered here.

[16]  Although listed twice within its first paragraph, no other references to money laundering are made in the remaining 312 paragraphs of Plaintiffs' Second Amended Complaint.  Additionally, money laundering, specifically, was not addressed during oral argument.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 27**

Wire or mail fraud consists of the following elements: (1) formation of a scheme or artifice to defraud; (2) use of the United States mails or wires, or causing such a use, in furtherance of the scheme; and (3) specific intent to deceive or defraud. *See Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400 (9th Cir. 1986). Rule 9(b) provides that, "[i]n alleging fraud . . ., a party must state with particularity the circumstances constituting fraud," while "[m]alice, intent, knowledge, and other conditions of a person's mind may be averred generally." *See* Fed. R. Civ. P. 9(b).[17] Consequently, "[t]he only aspects of wire [or mail] fraud that require particularized allegations are the factual circumstances of the fraud itself." *Odom v. Microsoft Corp.*, 486 F.3d 541, 554 (9th Cir. 2007). Defendants argue that Plaintiffs fail to meet these standards. *See* Credit Suisse's Mot. to Dismiss, p. 11 (Docket No. 51, Att. 1) ("In their Complaint, Plaintiffs have not even attempted to meet these [particularity] requirements."); Cushman & Wakefield's Mot. to Dismiss, p. 17 (Docket No. 48, Att. 1) ("The Complaint does not satisfy the heightened pleading standards as to C&W.").

The basis for Plaintiffs' underlying fraud claim is clear. Using misleading appraisals, Defendants deliberately engaged in a plan to financially hamstring resort developers/borrowers to the point that the resorts at issue would never be completed; all the while collecting immense commissions/fees and positioning itself to later take over the vulnerable resorts. Enough is

---

[17]   The particularity requirements of Rule 9(b) apply "to RICO predicate acts based on fraud." *Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1362 (10th Cir. 1989) (highlighting every circuits' application of particularity requirement to RICO predicate acts based on fraud); *see also Tate v. PG & E Corp.*, 94 Fed. Appx. 529, 531 (9th Cir. 2004) ("The district court properly dismissed the RICO claim on the pleadings because the predicate acts of mail fraud and wire fraud were not properly pled under the heightened pleading standards applicable to fraud claims. Rule 9(b)'s requirements apply to RICO actions alleging a predicate act of fraud.").

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 28**

contained within Plaintiffs' Second Amended Complaint to afford Defendants the requisite notice, allowing the parties to fully identify the boundaries and probe the depths of the alleged Loan to Own scheme during discovery.  *See* Wright & Miller Federal Practice and Procedure: Civil 3d § 1298 (2009) ("Perhaps the most basic consideration for a federal court in making a judgment as to the sufficiency of a pleading for purposes of Rule 9(b) - a consideration that is reflected in many of the decided cases - is the determination of how much detail is necessary to give adequate notice to an adverse party and enable that party to prepare a responsive pleading.").  For example, Plaintiffs' allegations include the following:

- • During 2004 and continuing to at least 2008, principals, employees or agents of the Credit Suisse Loan to Own scheme repeatedly used the mails and wires to solicit potential borrowers and "ENGAGE" them as clients for each of the four land development resorts listed herein; and after gaining their trust and confidence through misrepresentations and fraud, then transmitted loan forms by both wire and mail in furtherance of the scheme to defraud.

- • Between 2004 through 2008, on dates presently unknown to Plaintiff class, Credit Suisse, with the consent of the other Defendants, sent, through the mails, false and misleading marketing materials, and "Confidential Information Memoranda" for the Loan to Own scheme representing itself to be "Credit Suisse First Boston" in order to sell the loans, and then switching to "Credit Suisse Cayman Island Branch" at the time of execution of the loan documents . . . .[18]

- • In December 2004, Credit Suisse used the wires to solicit Yellowstone Mountain Club, LLC for the Loan to Own scheme.

---

[18]  According to Plaintiffs, in order to circumvent the standards and requirements adopted under the United States Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), "Credit Suisse created a 'separate' banking entity in the Cayman Islands, known as the 'Credit Suisse Cayman Island Branch,' through which its Loan to Own programs and appraisals were funneled.  Defendant created this corporate banking and lending shell for the express purpose of evading the strict state and federal appraisal and other requirements implemented pursuant to FIRREA."  *See* Pls.' Second Am. Compl., ¶ 60 (Docket No. 18).

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 29**

- On September 30, 2005, Credit Suisse transmitted loan forms by wire in furtherance of the scheme to defraud.

- At various times between 2004 and 2008, Credit Suisse and its agents and employees transferred funds from Credit Suisse bank accounts both within and outside the United States to developers to fund the Loan to Own scheme and similarly used the wires to transmit fees to Credit Suisse-controlled accounts.

- At dates and times presently unknown to Plaintiffs, Credit Suisse Defendants [and] Cushman & Wakefield discussed with the Plaintiff Class and with each other, both in person and over the telephone, the status of the Loan to Own scheme and, on information and belief, approved various of the fraudulent acts herein described.[19]

- At dates and times presently unknown to Plaintiffs, Defendants corresponded by mail with the various banks concerning the transfer of funds for the enterprise at issue here.

- At times presently unknown to the Plaintiffs, Cushman & Wakefield used both the mails and the wires to transmit fraudulent and unlawful "Total Net Value" appraisals to the developments and to the Credit Suisse Defendants.

- The Credit Suisse Defendants helped fund the Loan to Own Enterprise with the proceeds of its illegal scheme to assist agencies of the Iranian government to circumvent USA economic sanctions in violation of 18 U.S.C. § 1957(a).

- The racketeering activities also included using the Cayman Islands "connections" to aid and facilitate clients in evading U.S. income taxes.

See Pls.' Second Am. Compl., ¶¶ 217(a)-(j) (Docket No. 18); see also id. at ¶ 225 ("On or about

December 16, 2004, a senior Credit Suisse executive, Jeff Barcy, . . . made a 'cold call' on the

Yellowstone Club Resort ('YC') and Tim Blixseth pursuant to its highly refined 'pre-planned'

_____

[19]  Plaintiffs' theory behind Defendants' fraud occupies 56 paragraphs of Plaintiffs' Second Amended Complaint, with the headings: (1) "Credit Suisse's 'Loan to Own' Scheme"; and (2) "The Defendants' Scheme to Defraud."  See Pls.' Second Am. Compl., ¶¶ 37-92 (Docket No. 18).

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 30**

solicitation protocols to have the Resorts, including the YC, 'ENGAGE' Credit Suisse as *the*

'SOLE-LEAD/ARRANGER' - the Credit Suisse term for 'Lending Advisor/Fiduciary' - for each

Resort.") (italics, underlining, and capitalization in original).

While the general nature of Defendants' alleged theories of fraud may be known to all

(particularly when considering the perspective of things as revealed through Judge Kirscher's

bankruptcy court opinions), the Court must also consider Plaintiffs' obligation to "state with

particularity the circumstances constituting fraud." *See supra* at p. 28 (citing Fed. R. Civ. P.

9(b)). "[T]he reference to 'circumstances' in [FRCP 9(b)] is to matters such as the time, place,

and contents of the false representations or omissions, as well as the identity of the person

making the misrepresentation or failing to make a complete disclosure and what that defendant

obtained thereby." *See* Wright & Miller Federal Practice and Procedure: Civil 3d § 1297 (2009).

Here, notwithstanding allegations pertaining to the allegedly fraudulent Loan to Own

scheme generally, there are no specifics relative to the (mis)representations made to Plaintiffs

themselves - that is, *who* represented *what* to Plaintiffs and *when*?  The fact that allegedly

fraudulent statements eventually made their way to Plaintiffs who then allegedly relied upon

them before purchasing properties in the resorts (*see infra* at pp. 38-39) is not enough.  Rule 9(b)

unequivocally requires more in this respect.  Further, such information is squarely within

Plaintiffs' possession.  *Compare, with New England Data Servs., Inc. v. Becher*, 829 F.2d 286,

290 (1st Cir. 1987) (softening impact of Rule 9(b) in RICO claim when information necessary to

plead mail or wire fraud with required specificity is in exclusive possession of defendants).

These factors combine to reflect a separate recommendation that Plaintiffs' RICO claim

be dismissed against both Defendants for failure to plead the predicate acts of Defendants'

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 31**

alleged fraud with the requisite level of particularity.  *See also infra* at pp. 37-42.[20]  Any such

dismissal should be without prejudice, to allow Plaintiffs the opportunity to amend their Second

Amended Complaint to cure the pleading deficiency.  This recommendation applies in the event

the district court disagrees with the undersigned's previous recommendation, and concludes that

Plaintiffs have sufficiently alleged that the claimed RICO violations proximately caused their

injuries.

b.   *RICO Enterprise*

A RICO enterprise "includes any individual, partnership, corporation, association, or

other legal entity, and any union or group of individuals associated in fact although not a legal

entity."  18 U.S.C. § 1961(4).  The criteria for an associated-in-fact enterprise are "a group of

persons associated together for a common purpose of engaging in a course of conduct,"

---

[20]  Cushman & Wakefield additionally argues that "Plaintiffs' *modus operandi* throughout the Complaint is to plead action on the part of Credit Suisse, and then lump C & W in as an afterthought."  *See* Credit Suisse's Mot. to Dismiss, p. 17 (Docket No. 48, Att. 1).  Cushman & Wakefield correctly notes that, in a case involving multiple defendants, "the complaint should inform each defendant separately of the allegations surrounding [its] participation in the fraud."  *See id.* at p. 19 (quoting *Hutson v. American Home Mortg. Servicing, Inc.*, 2009 WL 3353312, at *9 (N.D. Cal. 2009)).  While not plentiful, Plaintiffs' allegations against Cushman & Wakefield nonetheless paint a picture of a necessary participant in Credit Suisse's Loan to Own Scheme - one that improperly appraised the involved resorts in such a way as to command huge loan amounts which, in turn, set in motion each resort's demise after those loans were defaulted upon.  *See, e.g.*, Pls.' Second Am. Compl., ¶ 105 (Docket No. 18) ("Credit Suisse and Cushman & Wakefield knew in 2004 that they had dishonestly and deliberately overvalued Lake Las Vegas Resort by significant amounts in order to obtain huge multi-million dollar fees that would run through their Cayman Island Branch owned, controlled and operated by Credit Suisse AG.  Additionally, Defendants did so to ensure that the resort would be so substantially leveraged that Defendants could, under their complex, confusing and deceitful lending scheme, gain control and subsequent constructive ownership over the resort not long thereafter.").  Cushman & Wakefield is clearly a more removed player in the Loan to Own scheme hierarchy - however, it is still a player; not an afterthought, as Cushman & Wakefield now seems to assert.  All the more reason, then, why Plaintiffs must satisfy Rule 9(b)'s particularity requirement as to each Defendant.  *See supra* at pp. 31-32.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 32**

"evidence of an ongoing organization, formal or informal," and "evidence that the various

associates function as a continuing unit." *Odom*, 486 F.3d at 552 (quoting *United States v.*

*Turkette*, 452 U.S. 576 (1981)).

Plaintiffs allege that "Credit Suisse/Cayman Islands" is a legally cognizable "enterprise"

in and of itself, created by Credit Suisse and Cushman & Wakefield through which to conduct

the Loan to Own scheme.  *See* Pls.' Opp. to Credit Suisse's Mot. to Dismiss, pp. 8-9 (Docket No.

91).  Alternatively, even when assuming the "Credit Suisse Cayman Island Branch" is not a

separate, legal entity, Plaintiffs assert that it nonetheless constitutes an association-in-fact among

the Defendants to perform the illegal Loan to Own scheme.  *See id.* at p. 9.  Indeed, within their

Second Amended Complaint, Plaintiffs claim:

> At all material times, the Credit Suisse Defendants and Cushman & Wakefield
> formed an association-in-fact that was an enterprise which engaged in, and whose
> activities affected, interstate commerce. . . . .  The enterprise, which is called the
> Credit Suisse Cayman Island Branch, among other things, engages in the sale and
> solicitation of investments for unregistered and fraudulent investments . . . and
> [has] been and [is] being operated in furtherance of a common purpose beginning
> in or around 2004.

*See* Pls.' Second Am. Compl., ¶¶ 205-206 (Docket No. 18).  Credit Suisse challenges these

allegations in three respects: (1) the alleged enterprise is not distinct from a named Defendant;

(2) there is no agreement between Credit Suisse and Cushman & Wakefield to violate or

conspire to violate RICO; and (3) the alleged "conspiracy conduct" is completely co-extensive

with Defendants' ordinary and legal business.  *See* Credit Suisse's Mot. to Dismiss, pp. 13-14

(Docket No. 51, Att. 1).  The Court disagrees; Plaintiffs have adequately alleged that Defendants

formed a cohesive ongoing unit with specific roles for each entity and a common purpose.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 33**

First, the similarity in the enterprise's name and that of a named Defendant is immaterial when recognizing the overall relationship between the parties making up the enterprise.  The Court will not elevate form over substance to deliver a fatal blow to Plaintiffs' RICO claim as a result of any uncertainty in the proper name of a party and/or an arbitrarily assigned name for an enterprise.  Second, Plaintiffs' Second Amended Complaint adequately alleges an agreement between Credit Suisse and Cushman & Wakefield to participate in the Loan to Own scheme. *See, e.g.*, Pls.' Second Am. Compl., ¶ 47 (Docket No. 18) ("This newly developed syndicated loan scheme was deliberately designed by Credit Suisse with the knowing assistance of Cushman & Wakefield in order to enrich Credit Suisse and its employees, while placing the Resorts in a perfect position to be taken over by Credit Suisse . . . by leaving the developments too thinly capitalized to survive, precisely as Credit Suisse intended, planned and schemed from the beginning of each Resort.").  Third, it would not be proper to define the Loan to Own scheme as, in Credit Suisse's words, "making loans, conducting appraisals in connection with those loans, collecting fees associated with this loan activity, and foreclosing on properties where those loans are in default." *See* Credit Suisse's Mot. to Dismiss, p. 14 (Docket No. 51, Att. 1).  As alleged, they are not one and the same. *See, e.g., supra* at p. 10, n. 3.

Therefore, it is recommended that Plaintiffs' RICO claim not be dismissed as a result of Plaintiffs' enterprise allegations.  This specific recommendation applies only in the event the district court disagrees with the undersigned's previous recommendation, and concludes that Plaintiffs have sufficiently alleged that the claimed RICO violations proximately caused their injuries.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 34**

c.       *Participation in RICO Enterprise*

"One is not liable under [18 U.S.C. § 1962(c)] unless one has participated in the operation or management of the enterprise itself."  *See* Cushman & Wakefield's Mot. to Dismiss, p. 28 (Docket No. 48, Att.1) (citing *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993)). Cushman & Wakefield claims that Plaintiffs' Second Amended Complaint does not include allegations that it sufficiently participated in the operation or management of the alleged Credit Suisse Cayman Island Branch enterprise.  *See* Cushman & Wakefield's Mot. to Dismiss, p. 28 (Docket No. 48, Att. 1).

Plaintiffs counter that Cushman & Wakefield participated in the Credit Suisse Cayman Island Branch enterprise "by presenting alleged 'appraisals' that grossly inflated the values of the targeted high-end communities in order to facilitate the loans through the enterprise by Credit Suisse."  *See* Pls.' Opp. to Cushman & Wakefield's Mot. to Dismiss, pp. 11-12 (Docket No. 91). The Court agrees that the allegations made in Plaintiffs' Second Amended Complaint sufficiently assert that Cushman & Wakefield participated in the alleged enterprise - above and beyond simply performing services for the enterprise.[21]  *See, e.g.*, Pls.' Second Am. Compl., ¶¶ 47 & 57 ("This newly developed syndicated loan scheme was deliberately designed by Credit Suisse with the knowing assistance of Cushman & Wakefield in order to enrich Credit Suisse . . . . The objective of the conspiracy with Cushman & Wakefield was to obtain appraisals of the

_____

[21]   In reaching this conclusion, the Court is not finding that each of the paragraphs Plaintiffs cite in support of their argument reflects Cushman & Wakefield's participation in a RICO enterprise.  To the contrary, many of them do not; in fact, several of the paragraphs do not even reference Cushman & Wakefield.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 35**

targeted developments in amounts high enough to generate excessive loan fees that could be charged by Credit Suisse . . . .").[22]

Therefore, it is recommended that Plaintiffs' RICO claim as to Cushman & Wakefield not be dismissed as a result of Plaintiffs' allegations concerning Cushman & Wakefield's alleged participation in the Credit Suisse Cayman Island Branch enterprise.[23]  This specific recommendation applies only in the event the district court disagrees with the undersigned's previous recommendation, and concludes that Plaintiffs have sufficiently alleged that the claimed RICO violations proximately caused their injuries.

> d.     *RICO Conspiracy*

Without an underlying substantive RICO violation, there can be no claim for RICO conspiracy.  *See supra* at p. 12, n. 5.  Regardless, Cushman & Wakefield additionally argues that "Plaintiffs' complaint does not allege facts to show there was any agreement between co-conspirators to commit predicate acts such as mail fraud, wire fraud or racketeering.  No facts alleged suggest that C&W had any knowledge of an allegedly fraudulent scheme.  *See* Cushman & Wakefield's Mot. to Dismiss, pp. 29-30 (Docket No. 48, Att. 1).  The Court disagrees.

While no-doubt substantively disputed, Plaintiffs' Second Amended Complaint adequately alleges at least *some* agreement between Credit Suisse and Cushman & Wakefield to

---

[22]  The unusual nature of Cushman & Wakefield's TNV appraisals can further be inferred in Plaintiffs' favor to support its participation in a RICO enterprise, recognizing that they appear to have been created to obtain the highest possible dollar value for the uncompleted developments, resting primarily on forecasted, not yet realized, net cash flow streams, but without discounting the net cash flow back to a present value.

[23]  In the event Plaintiffs' RICO claim survives, the Court would expect a motion for summary judgment challenging, among other things, this particular element of Plaintiffs' RICO claim against Cushman & Wakefield.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 36**

engage in the Loan to Own scheme.  *See, e.g.*, Pls.' Second Am. Compl., ¶¶ 47, 57 & 105 ("This newly developed syndicated loan scheme was deliberately designed by Credit Suisse with the knowing assistance of Cushman & Wakefield in order to enrich Credit Suisse . . . .  The objective of the conspiracy with Cushman & Wakefield was to obtain appraisals of the targeted developments in amounts high enough to generate excessive loan fees that could be charged by Credit Suisse . . . .  Credit Suisse and Cushman & Wakefield knew in 2004 that they had dishonestly and deliberately overvalued Lake Las Vegas Resort by significant amounts in order to obtain huge multi-million dollar fees . . . .").  Under the circumstances, these allegations suggest that Cushman & Wakefield engaged in more than, simply, "a lawful service: property appraisals."  *See* Cushman & Wakefield's Mot. to Dismiss, p. 30 (Docket No. 48, Att. 1).

Therefore, it is recommended that Plaintiffs' RICO claim as to Cushman & Wakefield not be dismissed as a result of Plaintiffs' allegations concerning Plaintiffs' RICO conspiracy allegations.[24]  This specific recommendation applies only in the event the district court disagrees with the undersigned's previous recommendation, and concludes that Plaintiffs have sufficiently alleged that the claimed RICO violations proximately caused their injuries.

D.    Second Cause of Action: Fraud

"A claim of fraud requires the plaintiff to establish nine elements with particularity: (1) a statement or a representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) justifiable reliance; and (9) resultant

---

[24]  In the event Plaintiffs' RICO claim survives, the Court would expect a motion for summary judgment challenging, among other things, this particular element of Plaintiffs' RICO claim against Cushman & Wakefield.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 37**

injury.  *Mannos v. Moss*, 155 P.3d 1166, 1170 (Idaho 2007).[25]  Both Credit Suisse and Cushman & Wakefield argue that Plaintiffs' fraud claim should be dismissed.[26]

### 1.    *Credit Suisse's Alleged Fraud*

Credit Suisse legitimately points out the Second Amended Complaint's tendency to blur the distinction between developers and homeowners.  *See* Credit Suisse Mot. to Dismiss, p. 17 (Docket No. 51, Att. 1) ("[T]he [particularity] requirement is of critical importance because of Plaintiffs' repeated blurring of the distinction between the developer/borrowers - with whom Credit Suisse actually had business dealings and other communications - and the Plaintiffs, with whom Credit Suisse had <u>no</u> relationship and to whom Credit Suisse made <u>no</u> representations and had <u>no</u> communications, fraudulent or otherwise.") (underlining in original).  According to Credit Suisse, (1) "if the alleged misrepresentations were not made to *the Plaintiffs*, they will not support Plaintiffs' fraud claim"; and (2) "obviously, [Plaintiffs] could not have relied on representations that they did not receive."  *See id*. at p. 18 (italics in original).

The fact that Credit Suisse may have made its alleged misrepresentations to developers instead of the homeowner Plaintiffs is not, by itself, fatal to Plaintiffs' fraud claim.  "Liability for misrepresentation may be based on [defendant's] statements to others that were intended by [defendant] to reach the . . . plaintiffs."  *See Adams v. U.S.*, 622 F. Supp. 2d 996, 1004 (D. Idaho 2009) (citing *Advance-Rumely Thresher Co. v. Jacobs*, 4 P.2d 657, 660 (Idaho 1931) ("recovery

---

[25]  For the purpose of resolving Defendants' Motions to Dismiss only, the parties appear to agree that these elements are, more-or-less, consistent with respect to the different state (and international) laws that may apply - Montana, Idaho, Nevada, and the Bahamas.

[26]  Again, Credit Suisse and Cushman & Wakefield take issue with Rule 9(b)'s particularity requirement.  The Court refers to and incorporates here its discussion on this issue relative to Plaintiffs' RICO claim.  *See supra* at pp. 27-32.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 38**

can be had for representations made to another with the intent or knowledge that they should or would be repeated to complainant")); *Restatement (Second) of Torts* § 533 (liability for misrepresentation arises if "the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other and that it will influence his conduct in the transaction . . . involved").  The existing record, coupled with the deference lent to Plaintiffs' pleadings at this preliminary juncture, suggest that any alleged misrepresentations (be it Cushman & Wakefield's appraisals themselves or separate, but nonetheless related, communications between Credit Suisse and the developers) were made with the expectation that individuals would buy into the resort projects.  *See e.g.*, 5/11/10 MDO, p. 9 (Docket No. 73) (this Court determining that "the nature of the appraisals was such that they were intended for others - not just Credit Suisse - or at a minimum, issued with an implicit understanding that they would be distributed and utilized in a broader universe."); *see also* Pls.' Second Am. Compl., ¶ 62 (Docket No. 18) ("Defendants knew that its "Total Net Value" appraisal values in violation of FIRREA would filter through to the developers' personal and/or corporate financial statements and loan applications to U.S. Banks, as well as on to the financial statements and loan applications of Plaintiff Class.").  Therefore, Plaintiffs' fraud claims should not be dismissed at this time, based upon a lack of representations made directly from Credit Suisse to Plaintiffs. *But see supra* at p. 31 (discussing need for Plaintiffs to identify nature of (mis)representations: "*who* represented *what* to Plaintiffs and *when*?") (emphasis in original).

However, whether Plaintiffs relied on these alleged misrepresentations is a concern.  As the Court discussed during the hearing, Plaintiffs' alleged reliance on any representations from Credit Suisse and/or Cushman & Wakefield would seem to be compromised if a certain number

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 39**

of Plaintiffs purchased their properties before either Credit Suisse or Cushman & Wakefield was

even involved in the conduct Plaintiffs now complain about:

> What I'm after, is there anything that specifies that [Plaintiffs] purchased after
> Credit Suisse got involved?  Because it strikes me that that's a significant fact
> because I'm having trouble tracking your reliance argument if these folks were
> in the – had bought into the development before Credit Suisse got involved.

*See* 7/22/10 Tr. at 64:22-65:2 (Docket No. 99).  Although cursorily alleged throughout,

Plaintiffs' Second Amended Complaint does not detail this important timing component.  *See,*

*e.g.*, Pls.' Second Am. Compl., ¶ 276 (Docket No. 18) ("Plaintiffs and Class Members received

the appraisals and other written and oral presentations from Defendants before entering into the

financial transactions with Defendants.").  If, in fact, there are Plaintiffs who bought into any of

the four resorts prior to Credit Suisse's (and, hence, Cushman & Wakefield's) participation in

those projects, rhetorically speaking, how could those Plaintiffs have relied upon *any*

(mis)representations from those parties?  Plaintiffs' counsel admits as much:

> [T]o be candid with the Court, my gut reaction when I observed this problem is
> I think we need to amend and add more specificity under 9(b) on the common law
> fraud and we would request leave to amend on the common law.  The Court asked
> what allegations we have in our Complaint specific to when and what
> homeowners – I'm sorry, when homeowners purchased their properties and was
> it after the loans . . . .  I think frankly, Your Honor, if we are given leave to
> amend, that certainly those would require amendment as to specificity because
> they've alleged just generally as to reliance.

*See id*. at 66:2-5; 90:2-16.  Plaintiffs' reliance on the representations at issue in this case is

necessarily jeopardized.

As a result, it is recommended that Plaintiffs' common law fraud claim additionally be

dismissed, without prejudice, to allow Plaintiffs the opportunity to include the temporal

specificity needed to even preliminarily *assume* each Plaintiffs' reliance.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 40**

### 2.    *Cushman & Wakefield's Alleged Fraud*

Like Credit Suisse, Cushman & Wakefield also takes issue with Plaintiffs' fraud claim, similarly arguing that it made no representations to Plaintiffs; that it did not intend for Plaintiffs to rely upon the appraisals; and that Plaintiffs did not allege reliance upon its appraisals. *See* Cushman & Wakefield's Mot. to Dismiss, pp. 17-21; 32-33 (Docket No. 48, Att. 1).  At this time, the Court's consideration of Credit Suisse's arguments in these respects likewise applies to Cushman & Wakefield.  *See supra* at pp. 38-40.

But Cushman & Wakefield lobs an additional argument against Plaintiffs' fraud claim. Responding to Plaintiffs' position that the appraisals "grossly misrepresented the market value of the subject resorts" (*see* Pls.' Opp. to Cushman & Wakefield's Mot. to Dismiss, p. 33 (Docket No. 92)), Cushman & Wakefield notes that "[t]he appraisals on their face plainly state they are *not* concluding to market value: *"This is not the Market Value* of the property as the standard valuation deductions for the time value of money and profit are not reflected."  *See* Cushman & Wakefield's Reply in Supp. of Mot. to Dismiss, p. 15 (Docket No. 93) (italics in original).[27]

---

[27]  During this point in the hearing, for completeness' sake, the undersigned also quoted the appraisals' preceding paragraph:

> Okay.  And the paragraph before that reads, "For purposes of this report, total net value is defined as the sum of the market value of the bulk lots of the entire planned community as if all the bulk lots were complete in terms of backbone and infrastructure and available for sale to merchant builders as of the date of the appraisal.  Total net value is the total of the merchant builders' sales revenues and includes an allowance for all lot or individual planning parcel participation or premiums as applicable and reflects deductions for infrastructure development, carrying costs and selling costs that does not reflect the deduction for developers' profit or the time value of money."

*See* 7/22/10 Tr. at 41:12-23 (Docket No. 99)

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 41**

According to Cushman & Wakefield, "[i]f the appraisals explicitly state that they are not concluding to market value, then how could they 'grossly inflate' market value?" *See id*.

Without so holding here, Cushman & Wakefield may technically be correct in arguing that the appraisals' language insulates it from any claim that the appraisals somehow represent bogus market values. Such an argument assumes, however, that a reader negotiating the appraisals' provisions understands (or *should have* understood) the quoted language to mean what Cushman & Wakefield and/or Credit Suisse understood it to mean. At the moment, it is unclear what the developers/homeowners understood these figures to represent- assuming they even read them in the first place. Did the referenced appraisal amounts reflect cash flow analyses?; total net values?; total net proceeds?; or something else? Separately, whatever it is, what is the difference between that and market value? Although it is indeed possible to view the appraisals' language through the lenses of Cushman & Wakefield's arguments, the Court must consider the limited record before it, and accept Plaintiffs' allegations as true (*see supra* at pp. 3-6). Doing so, prevents a conclusion at this time that the appraisals do not constitute misrepresentations of any sort as a matter of law. Therefore, the Court recommends that Cushman & Wakefield's Motion to Dismiss be denied in this limited, separate respect. *But see supra* at pp. 39-40 (recommending that Plaintiffs' common law fraud claim be dismissed nonetheless, without prejudice, to allow Plaintiffs opportunity to include level of temporal specificity needed to even preliminarily *assume* each Plaintiffs' reliance).

E.   Third Cause of Action: Negligent Misrepresentation

The elements of a negligent misrepresentation claim closely resemble those of a fraud claim. Relying on their arguments in favor of dismissing Plaintiffs' fraud claim, Credit Suisse

and Cushman & Wakefield also move to dismiss Plaintiff's negligent misrepresentation claim. *See* Credit Suisse Mot. to Dismiss, pp. 20-21 (Docket No. 51, Att. 1) ("For the same reasons discussed above in connection with the fraud claim, the negligent misrepresentation claim should be dismissed because plaintiffs have failed to adequately plead a misrepresentation, reliance, thereon, or any of the other elements with the requisite specificity."); Cushman & Wakefield's Mot. To Dismiss, p. 31 (Docket No. 48, Att. 1) ("Plaintiffs fail to allege key elements of both causes of action, no matter what law is applied, and particularly fail to allege that there was any misrepresentation or reliance.").

Given the similarities between fraud and negligent misrepresentation claims, and the corresponding arguments made as to each such claim, the Court recommends that, like Plaintiffs' fraud claim, Plaintiffs' negligent misrepresentation claim be dismissed, without prejudice, to allow Plaintiffs the opportunity to amend and include the level of specificity needed with respect to the alleged misrepresentations. *See supra* at pp. 37-42.[28]

F.      Fourth Cause of Action: Breach of Fiduciary Duty

To establish a claim for breach of fiduciary duty in the relevant jurisdictions, a plaintiff must establish that defendants owed plaintiff a fiduciary duty and that the fiduciary duty was breached. *See Bushi v. Sage Health Care, PLLC*, 203 P.3d 694, 699 (Idaho 2009).[29]   Here, Credit Suisse argues not only that it owed no fiduciary duty to either the developers or Plaintiffs,

---

[28]   Plaintiffs acknowledge that Idaho does not recognize a claim for negligent misrepresentation.  *See, e.g.*, Pls.' Opp. to Credit Suisse's Mot. to Dismiss, p. 36, n. 17 (Docket No. 91).  Therefore, such a claim alleged to be drawn from Idaho law is dismissed without leave to amend.

[29]   The parties do not highlight any important distinction in these basic elements across the applicable jurisdictions.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 43**

but that, even if it did, it never breached any such fiduciary duty.  *See* Credit Suisse's Mot. to Dismiss, pp. 21-26 (Docket No. 51, Att. 1).[30]

Pointing to a lack of any direct relationship between it and Plaintiffs, Credit Suisse argues that Plaintiffs' attempt to claim a derivative fiduciary duty via the developers is without merit because (1) the law does not recognize such pass-through fiduciary relationships and, regardless, (2) its relationship with the developers was that of a lender/borrower, incapable of developing into a fiduciary relationship.  *See id.* at pp. 21-25.   Except, instead of arguing in favor of a fiduciary relationship exclusively dependent on the developers, Plaintiffs also appear to argue in favor of such a relationship directly between them and Credit Suisse, alleging:

- Credit Suisse served as "Administrator" for the loans, thereby acquiring for itself all of the powers and controls over the lending facilities and decision making for the developers and resorts, Plaintiffs and members of the Plaintiff Class.

- The aforesaid false promises and representations made by Defendants to the developers of the subject resort land developments and to Plaintiff and members of the Plaintiff Class were made for the purpose of "ENGAGING" the developers, and persuading Plaintiffs and members of the Plaintiff Class that their investments in the project would be safe and protected by Credit Suisse.

- By thrusting itself into the financial underpinnings of each resort with its fraudulent scheme, and implementing said controls, Credit Suisse effectively entered into a co-developer and successor developer relationship with the Plaintiff Class, thereby promising to protect the interests, rights and reasonable expectations of each land owner, home buyer and homeowner at each resort.

- At all times relevant to this Complaint, Defendants knew, understood and agreed that the land owners, homeowners, as well as the developers, were

---

[30]  Plaintiffs originally asserted a breach of fiduciary duty claim against Cushman & Wakefield, however neither responded to Cushman & Wakefield's Motion to Dismiss on this issue, nor objected to the claim's dismissal as to Cushman & Wakefield during oral argument. *See* 7/22/10 Tr. at 90:17-91:9 (Docket No. 99).

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 44**

> to benefit from Defendants' appraisal methodology and unique management, implementation and control of each of the loans for each resort; and Defendants agreed and understood and accepted the same not merely as lenders but as lending advisors to Plaintiffs and the Class Members, having unique and special expertise in creating, marketing and selling syndicated real estate loans, outside normal banking channels.

> • Defendants knew and understood that Plaintiffs and Class Members required assurances from Defendants that the promised and bargained for infrastructure, amenities, golf courses, ski runs and ski lifts, restaurants, shops, clubs, hotels, swimming pools and theme parks, trails and other amenities running with the land would be protected and prosper but would result in expanded use and development for each resort; and, that the rights, privileges and amenities promised and provided by the developers would always exist, without interference by Credit Suisse or its representatives, agents, contractors, partners, joint venture partners or assignees, affiliated entities or others.

> • Defendants, their agents and employees, acting in the course and scope of their employment, instituted a relationship of trust and confidence with Plaintiffs. Defendants knew or had reason to know that the borrowers and Plaintiff Class had placed a special trust in them to counsel or inform them of material matters affecting the developments.

*See* Pls.' Second Am. Compl., ¶¶ 75-80, 287 (Docket No. 18). While these allegations may be thin proof at present of a legitimate, legally-cognizable fiduciary relationship between Plaintiffs and Credit Suisse, it is of little consequence at this time when Plaintiffs' allegations must be accepted as true. This standard compels a finding that Plaintiffs have alleged a fiduciary relationship between themselves and Credit Suisse.[31] The fiduciary relationship having been alleged, Plaintiffs proceed to allege a breach of the relationship's accompanying duties. *See id.*

---

[31] Additionally, even though an arms-length lender-borrower relationship is typically not fiduciary in nature, "exceptional circumstances" may exist to establish a fiduciary relationship in any event. *See, e.g.*, *Madrid v. Roth*, 10 P.3d 751, 754 (Idaho Ct. App. 2000) ("[F]iduciary duties may arise between lenders and borrowers in limited circumstances where there is 'an agreement creating a duty, or if the lender exercises complete control over the disbursement of funds.'" (quoting *Wooden v. First Security Bank of Idaho, N.A.*, 822 P.2d 995, 997 (Idaho 1991)). Whether these circumstances exist here is unclear from the record provided thus far.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 45**

at ¶ 289 ("Defendants breached their fiduciary duties with respect to each resort by making oral and written statements which were known by Credit Suisse to be false at the time they were made, and while knowing that each resort's developer would never have undertaken any lending relationship with the Defendants had they truthfully represented the aforementioned facts and intentions of Defendants.").[32]  Therefore, it is recommended that Credit Suisse's Motion to Dismiss be denied as to Plaintiffs' breach of fiduciary duty claim; whether the alleged fiduciary relationship and corresponding breach survive an anticipated motion for summary judgment remains to be seen.

G.      Fifth Cause of Action: Tortious Interference with Contractual Relations

A claim for tortious interference with contractual relations in the relevant jurisdictions generally requires a plaintiff to establish the following elements: (1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage.  *See, e.g.*, Pls.' Opp. to Credit Suisse's Mot. to Dismiss, p. 40 (Docket No. 91).  Both Credit Suisse and Cushman & Wakefield challenge the adequacy of Plaintiffs' tortious interference allegations.

Taking aim at the third element - an intentional act designed to disrupt the underlying contractual relationship - Credit Suisse argues that Plaintiffs' Second Amended Complaint fails

---

[32] In response to Credit Suisse's argument that Plaintiffs' breach of fiduciary duty claim (at least in Nevada and Montana) violate the statute of limitations (*see* Credit Suisse's Mot. to Dismiss, p. 26 (Docket No. 51, Att. 1)), Plaintiffs claim any limitations period is tolled.  *See* Pls.' Opp. to Credit Suisse's Mot. to Dismiss, p. 50 (Docket No. 91) ("Importantly, in Montana and Nevada the statute of limitations for breach of fiduciary duty is tolled based on the 'discovery rule' where, as here, the Plaintiffs could not have learned of CS's breach of its fiduciary duty because of the inherent concealment of such.").  In turn, Credit Suisse argues that "Plaintiffs had all the information they needed to file this action more than three years prior to the date of the Complaint."  *See* Credit Suisse's Reply in Supp. of Mot. to Dismiss, p. 16, n. 7 (Docket No. 94). The factual dispute in this regard cannot be resolved on Credit Suisse's Motion to Dismiss and, therefore, is rejected.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 46**

to allege that "Credit Suisse intended to, or did, induce any breach of contractual obligations owed to Plaintiffs by the developers." *See* Credit Suisse's Mot. to Dismiss, p. 28 (Docket No. 51, Att. 1). The Court disagrees, understanding that Plaintiffs allege that Credit Suisse's alleged illegal Loan to Own scheme anticipated that the developers would default on their loans, leaving each resort undercapitalized and unfinished such that Credit Suisse would then be in a position to swoop in and take over the resorts following bankruptcy/receivership proceedings. *See, e.g.*, Pls.' Second Am. Compl., ¶¶ 47-49 (Docket No. 18). In other words, it is the scheme itself (discussed repeatedly throughout the Second Amended Complaint) that reflects Credit Suisse's alleged intent to interfere with Plaintiffs' contractual relations with the developers.[33] Given this, it is recommended that Credit Suisse's Motion to Dismiss be denied as to Plaintiffs' tortious interference with contractual relations claim.

However, as pleaded, Cushman & Wakefield's involvement in the alleged Loan to Own scheme is too attenuated to presume (as Plaintiffs' Second Amended Complaint and briefing require us to do) Cushman & Wakefield's awareness of and, separately, intent to disrupt the resort developers' obligations to build out certain amenities. The lack of allegations relating to Cushman & Wakefield's particular understanding of and subjective intent to accomplish the alleged interference warrants the claim's dismissal. Therefore, it is recommended that Plaintiffs' tortious interference with contractual relations claim against Cushman & Wakefield be

---

[33] Credit Suisse's reliance on *AMX Intern., Inc. v. Battelle Energy Alliance, LLC*, 2009 WL 5064561 (D. Idaho 2009) is not particularly persuasive. There, the extent of the defendant's intent to interfere with the plaintiff's employment contract is its "repeated[ ], intentional[ ] interfere[nce] with AMX employees." *See id*. at *2. The allegations here are not so stark and thin.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 47**

dismissed, without prejudice; Plaintiffs are permitted to amend and allege other necessary facts

supporting a tortious interference with contractual relations claim against Cushman &

Wakefield.

H.      Sixth Cause of Action: Unjust Enrichment

The parties acknowledge that, generally speaking, a claim for unjust enrichment exists

when a defendant improperly accepts a benefit (without payment) from a plaintiff.  *See* Pls.'

Opp. to Credit Suisse's Mot. to Dismiss, pp. 41-42 (Docket No. 91) (citing *Gibson v. Ada*

*County*, 133 P.3d 1211, 1224 (Idaho 2006)).  Here, Credit Suisse argues that the benefit it

allegedly improperly accepted, was not a benefitted conferred by Plaintiffs.  *See* Credit Suisse's

Mot. to Dismiss, pp. 30-31 (Docket No. 51, Att. 1).[34]  The Court agrees.

Within the body of their unjust enrichment claim, Plaintiffs' Second Amended Complaint

alleges:

> Defendants and each of them wrongfully benefitted from and were enriched by
> their role in the aforesaid fraudulent loans and financial transactions by receiving
> compensation, payment or fees for their services in connection therewith, of
> which the Defendants acted with knowledge and intent to defraud, and thereby to
> reap rich financial rewards.

*See* Pls.' Second, Am. Compl., ¶ 299 (Docket No. 18).  This same "benefit" is identified in

Plaintiffs' briefing.  *See* Pls.' Opp. to Credit Suisse's Mot. to Dismiss, p. 42 (Docket No. 91)

("CS obtained enormous fees through its fraudulent appraisal scheme.").  The problem for

Plaintiffs, however, is that they were not the ones who conferred the claimed benefit.  Plaintiffs

cannot seek to the recover a benefit for which they were not responsible.  As a result, it is

---

[34]  Plaintiffs originally asserted an unjust enrichment claim against Cushman &
Wakefield, however neither responded to Cushman & Wakefield's Motion to Dismiss on this
issue, nor objected to the claim's dismissal as to Cushman & Wakefield during oral argument.
*See* 7/22/10 Tr. at 90:17-91:9 (Docket No. 99).

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 48**

recommended that Plaintiffs' unjust enrichment claim against Credit Suisse be dismissed, without prejudice; Plaintiffs are permitted to amend and allege other necessary facts supporting an unjust enrichment claim against Credit Suisse.

I.       Seventh Cause of Action: Negligence

The parties do not dispute the elements of a negligence claim: (1) a duty is owed; (2) that duty is breached; and (3) the breach of that duty proximately caused injury. *See, e.g.*, Credit Suisse's Mot. to Dismiss, p. 33 (Docket No. 51, Att. 1). Together, Credit Suisse and Cushman & Wakefield argue that they owed no duty to Plaintiffs, thus eviscerating Plaintiffs' negligence claim. *See id.*; *see also* Cushman & Wakefield's Mot. to Dismiss, pp. 36-37 (Docket No. 28, Att. 1). The Court disagrees.

The gravamen of Plaintiffs' negligence claim is that the Loan to Own scheme, premised upon misleading appraisals, initially justified massive loans, but, later, so burdened the developer's borrowers, that the resorts' occupants were left with unfinished amenities once those developers defaulted on their loans - allegedly, all by design. According to Plaintiffs, Credit Suisse's and Cushman & Wakefield's participation in the Loan to Own scheme violated customary real estate valuation practices[35] to Plaintiffs' ultimate detriment, thus representing the duty, breach, and causation elements of a negligence claim. The Court is satisfied, at this time, that such allegations represent a claim that, while likely to be further tested on summary judgment, should not be dismissed before the allegations are even tested further. Therefore, it is

---

[35]  It should also be noted that Plaintiffs' negligence-related allegations against Credit Suisse also involve the latter's alleged (mis)management of (1) the loaned finances and (2) of the resorts themselves in its capacity as a co-developer. *See, e.g.*, Pls.' Opp. to Credit Suisse's Mot. to Dismiss, p. 45 (Docket No. 91).

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 49**

recommended that Credit Suisse's and Cushman & Wakefield's Motions to Dismiss be denied as to Plaintiffs' negligence claim.[36]

       J.      <u>Eighth Cause of Action: Conspiracy</u>

Plaintiffs' conspiracy claim is not a stand-alone claim - it is necessarily anchored to their existing tort claims against Defendants.  Because it is recommended that certain tort claims not be dismissed at this time, Plaintiffs' conspiracy claim is not outright improper.  Still, a civil conspiracy exists only if there is an agreement between two or more parties to accomplish an unlawful objective (or to accomplish a lawful objective in an unlawful manner).  *See, e.g.*, Pls.' Opp. to Credit Suisse's Mot. to Dismiss, p. 48 (Docket No. 91).  For reasons similar to those offered with respect to Plaintiffs' RICO conspiracy claim (*see supra* at pp. 36-37), it is recommended that Credit Suisse's and Cushman & Wakefield's Motions to Dismiss be denied as to Plaintiffs' conspiracy claim.

## **RECOMMENDATION**

Based upon the foregoing, it is HEREBY RECOMMENDED that:

•    **Cushman & Wakefield's Motion to Dismiss (Docket No. 48) be GRANTED in part and DENIED in part, as follows:**

1.    Plaintiffs' RICO claims - 18 U.S.C. §§ 1962(a-d) claims be dismissed;

2.    Plaintiffs' common law fraud claim be dismissed, without prejudice, to allow

---

[36]  The Court also does not find that the economic loss rule prevents Plaintiffs' negligence claim right now.  Notwithstanding issues surrounding the nature of damages sought (mere economic losses versus damage to property) at least in Idaho, there are two exceptions to the economic loss rule: (1) in cases involving a "special relationship" between the parties; and (2) where "unique circumstances" require a different allocation of risk.  *See Blahd v. Richard B. Smith, Inc.*, 108 P.3d 996 (Idaho 2005).  The record is simply too underdeveloped to decide whether the economic loss rule bars Plaintiffs' tort claims here.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 50**

Plaintiffs the opportunity to include the level of specificity needed;

      3.     Plaintiffs' negligent misrepresentation claim be dismissed, without prejudice, to allow Plaintiffs the opportunity to include the level of specificity needed.  However, to the extent Idaho law applies, those claims are dismissed with prejudice;

      4.     Plaintiffs' breach of fiduciary duty claim be dismissed with prejudice;

      5.     Plaintiffs' tortious interference with contractual relations claim be dismissed, without prejudice; Plaintiffs are permitted to amend and allege other necessary facts supporting a tortious interference with contractual relations claim against Cushman & Wakefield;

      6.     Plaintiffs' unjust enrichment claim be dismissed with prejudice;

      7.     Plaintiffs' negligence claim not be dismissed; and

      8.     Plaintiffs' conspiracy claim not be dismissed.

•     **Credit Suisse's Motion to Dismiss (Docket No. 51) be GRANTED in part and DENIED in part, as follows:**

      1.     Plaintiffs' RICO claims - 18 U.S.C. §§ 1962(a-d) claims be dismissed;

      2.     Plaintiffs' common law fraud claim be dismissed, without prejudice, to allow Plaintiffs the opportunity to include the level of specificity needed;

      3.     Plaintiffs' negligent misrepresentation claim be dismissed, without prejudice, to allow Plaintiffs the opportunity to include the level of specificity needed.  However, to the extent Idaho law applies, those claims are dismissed with prejudice.

      4.     Plaintiffs' breach of fiduciary duty claim not be dismissed;

      5.     Plaintiffs' tortious interference with contractual relations claim not be dismissed;

      6.     Plaintiffs' unjust enrichment claim against Credit Suisse be dismissed, without

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 51**

prejudice; Plaintiffs are permitted to amend and allege other necessary facts supporting an unjust enrichment claim against Credit Suisse.

      7.      Plaintiffs' negligence claim not be dismissed; and

      8.      Plaintiffs' conspiracy claim not be dismissed.

## **ORDER**

As to the related housekeeping matters, Plaintiffs' Motion for Leave to File Opposition to "Bankruptcy" Argument (Docket No. 98) is GRANTED; and, to the extent necessary, Plaintiffs' Request for Judicial Notice of Montana Bankruptcy Court Decision (Docket No. 101) is also GRANTED.



DATED:  **February 17, 2011**

_____
Honorable Ronald E. Bush
U. S. Magistrate Judge

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 52**