Robert C. Huntley, ISB # 894
815 Washington Street, P.O. Box 2188
Boise, ID 83701
Phone: (208) 388-1230
(Fax): (208) 388-0234
rhuntley@huntleylaw.com

Michael J. Flynn, MA Bar # 172780
P.O. Box 690
Rancho Santa Fe, CA 92067
Tel. (858) 775-7624
Fax: (858) 759 0711
mike@mjfesq.com

James C. Sabalos, Tex. Bar No. 17499100
3900 Essex Lane, Ste. 730
Houston, Texas 77027
Tel: (949) 355-6084
jimsabalos@hotmail.com

John Flood, Texas Bar No.07155910
802 N. Carancahua, Ste. 900
Corpus Christi, TX 78470
Tel: (361) 654-8877
Fax: (361) 654-8879
John@floodandflood.com

Philip H. Stillman, CA #152861
508 Meadowmist Court, Ste. B
Olivenhain, CA 92024
Tel. (888) 235-4279
Fax. (888) 235-4279
pstillman@stillmanassociates.com

Chris Flood, Texas Bar # 07155700
914 Preston, Ste. 800
Houston, Texas 77002
Tel: (713) 223-8877
Fax: (713) 223-8879
chris@floodandflood.com

Christopher J. Conant CO 40269
Conant Law LLC
950 Seventeenth St. Ste. 1700
Denver, CO 80202
Tel: (303) 298-1800
Fax: (303) 298-1804
cconant@conantlawyers.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| L.J. GIBSON, et al.,<br><br>Plaintiffs,<br>v.<br><br>CREDIT SUISSE AG, a Swiss corporation, et al.,<br><br>Defendants. | Case No. 1:10-cv-00001-EJL-REB<br><br>**Affidavit of Robert C. Huntley in Support of EMERGENCY Authorization for Issuance of Subpoena for Deposition of Key Witness in Houston, Texas** |

STATE OF IDAHO   )
                 )ss.
County of Ada    )

ROBERT C. HUNTLEY, being first duly sworn, deposes and says:

1. I am an attorney for the Plaintiffs in this matter and make this affidavit of my own personal knowledge in support of an **emergency** motion for issuance of two out-of-state subpoena *duces tecum*, one to take the deposition to preserve the testimony of Michael L. Miller,

Affidavit of Robert C. Huntley - 1

a key "whistleblower-type" witness; and a second subpoena of the Defendant Cushman & Wakefield to produce all computers used by Michael L. Miller and all documents and electronic data involving Cushman & Wakefield employees relative to utilization of Total Net Value and Total Need Proceeds appraisals for loans by banking institutions in connection with approximately twenty-two (22) resort developments in the United States and the Bahamas during the period 2004 to date, all based upon the following facts.

2. During the period between March 7 and March 14, 2011, Plaintiffs' counsel became aware of a former employee of Defendant Cushman & Wakefield who was willing to come forward with testimony which incriminates both Cushman & Wakefield and Credit Suisse of knowingly and intentionally developing and utilizing the misleading, and likely illegal, Total Net Value (TNV) and Total Net Proceeds (TNP) appraisal methodologies for the loans to be made to approximately twenty-two (22) developments in the United States (including Lake Las Vegas, Yellowstone Club, Tamarack, and Ginn Sur Mer, located in the Bahamas).

3. The former employee of C&W is Mr. Michael L. Miller whose was employed by C&W for the seventeen (17) years between 1993 and 2010 and who was and is of the opinion that the appraisal methodologies were unique, unaccepted in the industry, and were violative of both FIRREA and USPAP.

4. Because of the important and critical nature of his testimony to the causes of action of the members of the Plaintiff Class, your Affiant flew to Denver, Colorado on Saturday, March 19, 2011, and along with class counsel, Christopher Conant, took an affidavit of Mr. Miller, who had flown into Denver for that purpose from vacation in Durango. Mr. Miller dictated his affidavit, sitting beside attorney Chris Conant, who transcribed his testimony into his laptop as both men viewed the monitor and edited his testimony. The procedure occupied

Affidavit of Robert C. Huntley - 2

approximately four hours. A copy of the transcribed testimony is attached hereto as Appendix A along with the Professional Profile of Mr. Miller.

5. Mr. Miller did not sign the affidavit at that time because he was concerned that his doing so might result in subjecting himself to retaliation or litigation against him by C&W. Therefore, he is unwilling to sign his affidavit, but will respond to a subpoena for a deposition.

6. Plaintiffs are requesting that this Court authorize that an exception be made to the current "stay against discovery" and authorize that the United States District Court for the Southern District of Texas, Houston Division to issue a subpoena *duces tecum* for the attendance of Mr. Miller at a deposition on Thursday, March 31, 2011 at 10:00 a.m. in the Offices of Flood and Flood, 914 Preston, Suite 800, Houston, Texas 77002.

7. Further, in order that evidence may be preserved, Plaintiffs are requesting a second subpoena *duces tecum* be issued for service upon Cushman & Wakefield in its Houston, Texas offices for the production of the laptops and computers utilized by Mr. Miller in connection with the matters herein above set forth, with the *duces tecum* to further include all records in hard copy or electronic to which Mr. Miller was an author, recipient, or copy addressee. Your Affiant asserts that it is these subpoenas are necessary to preserve critical data and critical information of utmost importance to the fair prosecution of this litigation.

8. I certify that I initiated a meet and confer conference with the defense attorneys by (a) serving this affidavit (paragraph 8 is hereby updated) together with a proposed motion and brief, on local counsel at 3:30 p.m. MDT Wednesday, March 23, 2011, and (b) followed the electronic notice with an in-person telephone call at about 3:45 advising counsel of the email and they each acknowledged having received same. Plaintiffs had requested a response by 3:00 p.m. on Thursday, March 24th. At 2:50 p.m. Mr. Boardman as counsel for C&W, requested a time

Affidavit of Robert C. Huntley - 3

extension until 10:00 a.m. today, Friday, March 25, which extension Plaintiffs granted to both Defendants. At 9:02 a.m. March 25, Mr. Boardman advised the undersigned via voicemail that:

(1) Defendants are not going to agree to issuance of subpoenas;

(2) C&W has internal preservation and litigation holds in place and there is no need for the Court to enter an order at this time; and

(3) C&W does not see the need for deposition of Miller.

Credit Suisse has advised that it joins C&W in the above position.

Further sayeth affiant naught.

DATED this 25th day of March, 2011.

_____
Robert C. Huntley

On this 25th day of March, 2011, before me, the undersigned, a Notary Public in and for said State, personally appeared Robert C. Huntley, known or identified to me to be the person whose name is subscribed to the within instrument, and acknowledged to me that he executed the same.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this certificate first above written.

[SEAL]

_____
NOTARY PUBLIC for the State of Idaho;
Residing at: Meridian, Idaho
My commission expires: 3/19/14

Affidavit of Robert C. Huntley - 4

Robert C. Huntley, ISB # 894
815 Washington Street, P.O. Box 2188
Boise, ID 83701
Phone: (208) 388-1230
(Fax): (208) 388-0234
rhuntley@huntley.com

Michael J. Flynn, MA Bar # 172780
P.O. Box 690
Rancho Santa Fe, CA 92067
Tel. (858) 775-7624
Fax: (858) 759 0711
mike@mjfesq.com

James C. Sabalos, Tex. Bar No. 17499100
3900Essex Lane, Suite 730
Houston, Texas 77027
Tel: (949) 355-6084
jimsabalos@hotmail.com

John Flood, Texas Bar No.07155910
802 N. Carancahua, Ste 900
Corpus Christi, TX 78470
Tel: (361) 654-8877
Fax: (361) 654-8879
John@floodandflood.com

Philip H. Stillman, CA #152861
508 Meadowmist Court, Ste B
Olivenhain, CA 92024
Tel. (888) 235-4279
Fax. (888) 235-4279
pstillman@stillmanassociates.com

Chris Flood, Texas Bar # 07155700
914 Preston, Suite 800
Houston, Texas 77002
Tel: (713) 223-8877
Fax: (713) 223-8879
chris@floodandflood.com

Christopher J. Conant CO 40269
Conant Law LLC
950 Seventeenth St. Ste. 1700
Denver, CO 80202
Tel: (303) 298-1800
Fax: (303) 298-1804
cconant@conantlawyers.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| L.J. GIBSON, et al.,<br><br>     Plaintiffs,<br>v.<br><br>CREDIT SUISSE AG, a Swiss corporation, et al.,<br><br>     Defendants. | Case No. 1:10-cv-00001-EJL-REB<br><br>**Declaration of Michael L. Miller, MAI** |

STATE OF COLORADO   )
                   )ss.
County of Denver   )

MICHAEL L. MILLER, MAI, being first duly sworn, deposes and says:

1. I have personal knowledge of the facts stated herein.

2. I am currently the Senior Managing Director of Grubb & Ellis Landauer Valuation Advisory Services, LLC and am currently officed in Houston, Texas.

Declaration of Michael L. Miller - 1

**APPENDIX A**

3. I have been involved in the appraisal and consultation of real estate and going concerns for more than twenty-five years. My professional profile is attached hereto as Appendix A.

4. I was employed by Cushman & Wakefield (C&W), of Arizona and Texas for the seventeen years between 1993 and 2010. At the time I left Cushman & Wakefield I was a Senior Director. While employed by Cushman & Wakefield I was directly involved in an appraisal made upon the Lake Las Vegas development involved in these proceedings in the year circa 2003.

5. I am one of the leading master planned community appraisers in the United States.

6. I have appraised a significant number of large master-planned communities in the Western and Southern United States. Virtually all appraisals I have prepared for these master-planned communities have been FIRREA and USPAP compliant.

7. I appraised Lake Las Vegas in circa 2003 under the traditional as-is market value methodology in order to be FIRREA compliant.

8. In 2004 I received a phone call from a Cushman employee named Charles Reinagel who approached me about doing a new appraisal for Lake Las Vegas that Credit Suisse was seeking.

9. I thought I was qualified to do the appraisal because of my extensive history and knowledge of the property. However, Mr. Reinegal told me that he was working with Credit Suisse on a new valuation methodology and that as a result, Credit Suisse did not want any prior documentation from my prior appraisals. Credit Suisse did not want to review any appraisals, analysis, financial analysis, or market data. I attempted to send the analysis and part of my prior appraisals to Mr. Reinegal but was informed by him through numerous emails, with executive management copied on these emails, that I was not to provide any information for the new appraisals that Credit Suisse was seeking. In fact, I sent an email to Reinegal with my working

Declaration of Michael L. Miller - 2

papers from my recent appraisal for Lake Las Vegas and he replied by telling me specifically that he was refusing to open my working papers. This occurred in 2004 when Cushman got the assignment from Credit Suisse to do the appraisal for Lake Las Vegas. I was totally perplexed that Reinegal refused my working papers because my working papers from my prior work on Lake Las Vegas were in the Cushman database that was available to other Cushman appraisers.

10. I inquired as to the premise that the appraisal was being prepared and was told by Mr. Reinegal that the appraisals were being prepared under a new valuation premise that Credit Suisse was working on.

11. Subsequently the new Reinegal appraisal was completed and Credit Suisse then started ordering new appraisals from Cushman for new master-planned communities throughout the United States.

12. The appraisers who were introduced to the new valuation premise that was being used a template for these new appraisals questioned the authenticity of this new "valuation premise." Therefore, myself Dean Pauuw and John Busi discussed with Reinegal the premise and the ability for us to perform these types of appraisals. These conversations occurred over the telephone and in emails. I estimate that between 2004 and 2007 we had numerous emails on the subject of the legitimacy and authenticity of the new " valuation premise."

13. These discussions and emails involved us discussing how this new valuation premise was not based on published dictionary terms or commonly used appraisal methodologies compliant with USPAP. Mr. Busi instructed us to do these appraisals notwithstanding that the appraisals were not a market value appraisal. Based upon the Busi instructions, the appraisers were notified that the values recited were much higher than what market value would allow. This new valuation premise was referred to as Total Net Value and later Total Net Proceeds, and later found to not accuretaly reflect the what the conclusion was.

14. The definition of this new valuation premise was Total Net Value but changed to Total Net Proceeds in 2006. The reason is because Brian Curry was brought on at Cushman and

Declaration of Michael L. Miller - 3

he discussed the need for an internal definition change to better qualify what the conclusion was. The change was made because the appraisers believed that the word "value" did not accurately represent the new valuation premise. Specifically, the word "value" did not accurately reflect the conclusion because the premise was we were just adding the total net revenue from all operations of the communities and this was not actually "value."

15. The impetus for this change was based on the perception within Cushman that the word "value" was misleading for the reasons discussed above.

16. Between 2005 and 2006 I had discussions with Dean Pauuw and Charles Reinegal and a new appraiser was added to the team, Chris Donaldson, about the appraisals being made under the Total Net Value and Total Net Proceeds methodology and the significant numbers being concluded in those reports. On several occasions, Dean Paauw specifically called me to discuss his concerns and the significant liability associated with those appraisals. He discussed the option of leaving Cushman as a result of his concern of continuing to prepare these types of appraisals because of the significant values above "as-is" market value being represented. There were many discussions between myself and Dean Paauw and Charles Reinegal, Chris Donaldson and John Busi that Total Net Value methodology was not a commonly accepted premise which might result in liability. The appraisers knew that the appraisals were not FIRREA compliant because they did not require a "as-is" market value. Further, because all the reports were required to be USPAP compliant, in one conference call with this group Mr. Busi instructed the group that Cushman wanted us to continue to write the appraisal reports under the Total Net Proceeds valuation premise. Myself, Mr. Pauuw, Donaldson and Curry expressed concerns during this conference call that the appraisal reports under the Total Net Value or Total Net Proceeds methodology may not be compliant with USPAP, but Mr. Busi stated that he was wanted the appraisers to conduct the additional assignments under the premise.

17. Because the valuation amounts being put on these new appraisal reports were significantly higher than market value, Dean Pauuw, myself and other appraisers were seriously

Declaration of Michael L. Miller - 4

concerned as to our liability and the compliance approval required under FIRREA and USPAP. So concerned about this new methodology was Dean Pauuw, that at one point he made the comment to me "...not in jail yet and still continuing to write these appraisals...." We were concerned about doing these appraisals because we had never done anything like this. At specific points in time, we did not know what upper level management at Credit Suisse were doing with these appraisals; and we could not believe that Credit Suisse would be lending money above the true market value of these properties. In our minds based on discussions among us, why would Credit Suisse lend more money then what market value would allow because if Credit Suisse had to foreclose on its security, it could only sell the property for its value, and not the higher dollar figure it would lend out under a higher appraisal conclusion.

18. In 2005 or 2006 on my initiative due to my concerns, I flew to Los Angeles, California (I remember it being at the "Die-Hard" building) to meet with Credit Suisse executives to better understand why they wanted this new valuation premise. I met with Eric Rielly, Jeremy Rogers, Grant Little, and Arik Prawer (I only met with briefly with Prawer) and discussed the significant number of appraisals we were doing under the new methodology for Credit Suisse and significant value conclusions on those appraisals and what the liability was for the appraisals and the chance that whatever Credit Suisse was doing with the appraisals could or would have on the appraisers. I was assured by the Credit Suisse team that the appraisals were not being used to mislead or over-leverage the assets and therefore this new valuation process that was being extended to new projects (the projects in existence at that time included 12-15+- developments, including Tamarack, Yellowstone, Ginn Sur Mer, and Lake Las Vegas) would not have an unusual adverse effect on the build out of those communities. They explained to me that they were structuring a type of bond platform that once the initial loan proceeds were given to the developer, the developer was then making repayments similar to a bond schedule, the bond payment amounts were structured to be less than what the expected proceeds from the developments' operations at any one time and therefore there was a level of coverage that caused

Declaration of Michael L. Miller - 5

a degree of security of repayment and that they were moving forward on additional projects under the same schedule.

19. Despite these assurances by Credit Suisse, I remained troubled because of the significant valuations in these appraisals and had continued conversations with the other Cushman appraisers on whether we wanted to continue with this work for Credit Suisse.

20. Email traffic relating our concerns about the valuation methodology was sent among the appraisers and executive management on numerous occasions beginning in 2003 to 2007.

21. I was asked by executives at Barclays to discuss this new appraisal methodology and was curious how we and Credit Suisse could come up with these high appraisal values. Barclays was concerned that it was missing out on a potential market and new product.

22. In retrospect, what Credit Suisse did was turn these developments appraised under the TNV or TNP methodology into bond-type instruments but the cyclical nature of real estate does not allow uniform payments that are normally required on a bonded ("income") investment vehicle, particularly when the investment (i.e., loan) amount is based on a valuation that is well in excess of the market value. The unusual combination of integrating traditional real estate development lending based on an appraisal methodology compliant with FIRREA and USPAP with the syndication/investment banking investment scheme could only have sufficient authenticity if reserve accounts were created to the extent of the excess valuation (i.e., the appraisal amount that exceeded the regular "as-s" market value) in the appraisals. These reserve accounts could have guaranteed payment of the bonds over the life of the loans.

23. In any instance the appraisals prepared for Credit Suisse under any methodology would have to comply with USPAP. Any federally regulated entity is subject to FIRREA. As an appraiser, a FIRREA compliant appraisal depends on the identity of the party requesting the appraisal. If a federally regulated entity requests an appraisal then it has to be FIRREA compliant. If a FIRREA regulated entity orders an appraisal for any purpose to be non-FIRREA

Declaration of Michael L. Miller - 6

compliant would be misleading to the appraiser or potential user of the appraisal.

I declare under penalty of perjury under the laws of the United States that the foregoing are true and correct and based on my personal knowledge.

DATED this 19th day of March, 2011.

_____
Michael L. Miller, MAI

Declaration of Michael L. Miller - 7

# Professional Profile





GRUBB & ELLIS.
Landauer

**Michael L. Miller, MAI**
Senior Managing Director
Grubb & Ellis Landauer Valuation Advisory Services, LLC
Michael.miller@grubb-ellis.com
713-599-5106 direct

## CAREER SUMMARY

Mr. Miller has been involved in the appraisal and consultation of real estate and going concerns for over 25 years. Previously he was Senior Director, with Cushman & Wakefield of Arizona and Texas for 17 years and with CB Commercial Real Estate Group, Inc. (CBRE) as an Assistant Vice President for 10 years.

Clients include financial institutions, insurance companies, law firms, governmental entities, developers, private property owners, and many Fortune 500 companies active in the U.S. and institutional international clients active outside the U.S., specifically in the Caribbean, Central America, Bahamas and Mexico. International assignments include all property types in the 20 largest cities of Mexico, resort developments along the Pacific Ocean side of Costa Rica, largest private land holdings in Belize, and numerous resort master planned communities in the Bahamas and Caribbean.

### RESPONSIBILITIES
- Senior Managing Director, South Central U.S. – Grubb & Ellis Landauer Valuation Advisory Services, LLC.
- Corporate client relationship manager for South Central U.S., including Texas, Louisiana, Arkansas, Oklahoma, New Mexico and Colorado
- Maintain corporate

### SPECIALTIES
- The practice region features litigation, consultation and appraisal experts that cover all aspects of the real estate markets.
- Expert witness testimony
- master planned consultant, providing land use profiles, density studies, marketing comparisons and structures, feasibility analysis, appraisal reports Item 3

### EXPERIENCE
Federal, Bankruptcy, Condemnation, Divorce & District Courts: Texas and Arizona. Mr. Miller has extensive experience testifying in Arbitration hearings relating to real estate partnership conflicts. Expert qualifications include all types of real estate in the U.S. and internationally, including: regional malls, office buildings, subdivisions, master planned communities, business parks, single and multi-tenant retail centers, industrial facilities, independent and assisted living facilities, self storage facilities, marinas, golf courses and right-of-way acquisitions.

Advised the Department of the Interior in Washington, D.C. on one of the largest federal land exchanges ever conducted in the U.S. and have worked with Native American agencies on valuation and development options. Mr. Miller has briefed major banks, investment advisors, private developers, presidents, governors and local development offices on real estate development within their respective countries and/or targeted investment regions.

### EDUCATION

## Professional Profile (continued) 

- Mr. Miller attended University of Texas, Arlington, Texas where he majored in real estate and minored in economics. Mr. Miller has successfully completed numerous real estate related courses and seminars sponsored by the Appraisal Institute, IRWA, accredited universities, and others.

- Published articles on real estate valuation in C&W National Investor Survey (real estate in Mexico) and the Houston Business Journal (real estate oriented to Telecom occupancy).

### PROFESSIONAL AFFILIATIONS

- Texas Certified General Real Estate Appraiser No. TX-1329234-G (certified to 02/29/12)
- MAI-Member of Appraisal Institute; Certificate No. 9664 (certified to 12/31/13)
- Texas Real Estate Sales License (inactive status)