# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| L.J. GIBSON, BEAU BLIXSETH; AMY KOENIG, DEAN FRESONKE, VERN JENNINGS, TERRI FROEHLICH, MONIQUE LEFLEUR, and GRIFFEN DEVELOPMENT, LLC, each individually, and on behalf of PROPOSED Plaintiff CLASS Members of Tamarack Resort, Yellowstone Club, Lake Las Vegas and Ginn Sur Mer, <br><br> Plaintiffs, <br><br> vs. <br><br> CREDIT SUISSE AG, a Swiss corporation; CREDIT SUISSE SECURITIES (USA), LLC, a Delaware limited liability company, CREDIT SUISSE FIRST BOSTON, a Delaware limited liability corporation; CREDIT SUISSE CAYMAN ISLAND BRANCH, an entity of unknown type; CUSHMAN & WAKEFIELD, INC., a Delaware corporation and DOES 1 through 100 inclusive, <br><br> Defendants. | Case No.: 1:10 CV 001-EJL-REB <br><br> **ORDER ON REPORT AND RECOMMENDATION RE:** <br><br> **CUSHMAN & WAKEFIELD'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT** <br><br> **(Docket No. 48)** <br><br> **CREDIT SUISSE'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT** <br><br> **(Docket No. 51)** |

On February 17, 2011, United States Magistrate Judge Ronald E. Bush issued a

Report and Recommendation ("Report"), recommending that Defendants' Motions to

Dismiss be granted in part and denied in part.[1] Any party may challenge a magistrate

judge's proposed recommendation by filing written objections within ten days after being

served with a copy of the Report and Recommendation. 28 U.S.C. § 636(b)(1)(C). The

---

[1] The Report and Recommendation also contained an Order ruling on Plaintiffs' Motion for Leave to File Opposition and Request for Judicial Notice. (Dkt. Nos. 98, 101.)

**ORDER ON REPORT AND RECOMMENDATION - 1**

district court must then "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.* The district court may accept, reject, or modify in whole or in part, the findings and recommendations made by the magistrate judge. *Id.*; *see also* Fed. R. Civ. P. 72(b).

Plaintiffs filed objections challenging the Report's recommendation that their RICO Claim should be dismissed. (Dkt. No. 108). Defendants, Credit Suisse and Cushman & Wakefield, each also filed objections generally disputing the Report's conclusions regarding Plaintiffs' Article III standing, proximate cause, and the viability of Plaintiffs' claims for breach of fiduciary duty, negligence, and conspiracy.[2] (Dkt. Nos. 109, 110.) The parties have filed their responsive briefs and the matter is now ripe for the Court's review. (Dkt. Nos. 113-116.) Having considered the parties' contentions and conducted a de novo review of the record, the Court finds as follows.

## Discussion

## I.     Plaintiffs' Objections: RICO Claim

In his Report, Magistrate Judge Bush provides a comprehensive discussion of the requirements of the RICO Claim; in particular, its causation and standing requirements. The parties do not disagree with the Report's recitation of the law. *See e.g.* (Dkt. No. 108, p. 5) ("The Report and Recommendation thoroughly and accurately analyzes the relevant

---

[2] As used in this Order, "Credit Suisse" refers collectively to the Defendants: Credit Suisse AG, Credit Suisse Securities (USA), LLC, Credit Suisse First Boston, and Credit Suisse Cayman Island Branch. Defendant Cushman & Wakefield, Inc. is referred to as "Cushman & Wakefield."

Supreme Court precedent."); *see also* (Dkt. Nos. 113, 114.) Plaintiffs' objections take issue with the Report's "application" of the precedent. (Dkt. No. 108, p. 5.) The sum and substance of the Plaintiffs' objections center on the Report's conclusion that their Second Amended Complaint ("SAC") fails to plead facts satisfying the causation requirement for their RICO Claim. Defendants have responded to Plaintiffs' objections arguing the Report properly analyzed the RICO Claim and its recommendation to dismiss the claim is correct. (Dkt. Nos. 113, 114.)

> As to the RICO Claim, the Report concludes:
>
> [T]he cause of Plaintiffs' asserted harm is a set of action (the developers' failure to build out the bargained-for amenities at these resorts) that are too removed from the alleged RICO violation (targeting predatory, non-recourse loan scheme to high-end real estate developments by means of mail and wire fraud) to establish the sort of proximate cause needed to state a RICO claim.

(Dkt. No. 106, pp. 21-22.) Further, the Report determined the "asserted RICO violations vis á vis Plaintiffs' claimed injuries are...too attenuated" in that the Plaintiffs' injuries were caused by the developers inability to satisfy their obligations, not by the Defendants' "Loan to Own Scheme." (Dkt. No. 106, pp. 25-26.) Plaintiffs' object to this conclusion arguing it strains the case law by suggesting that "RICO proximate cause exists only for the most directly injured victim of a RICO enterprise." (Dkt. No. 108, p. 5.) Instead, Plaintiffs urge this Court to find RICO proximate cause to exist "so long as there is 'some direct relation between the injury asserted and the injurious conduct alleged.'" (Dkt. No. 108, p. 6) (quoting *Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)).

**ORDER ON REPORT AND RECOMMENDATION - 3**

The Court declines Plaintiffs' invitation and, instead, agrees with the Magistrate Judge's conclusion that the Plaintiffs' alleged injuries are too far removed from the alleged RICO violations to establish proximate cause as required by the case law. The triad of United States Supreme Court cases setting forth the causation requirement for a RICO Claim demand that both "but for" and proximate cause exist. *See Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258, 268 (1992); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 453 (2006); and *Hemi Group, LLC v. City of New York, New York*, 130 S.Ct. 983 (2010). As laid out in the Report, these cases require a sufficiently direct relationship between the fraud alleged and the harm incurred. (Dkt. No. 106, pp. 20-21) (discussing *Hemi*, 130 S.Ct. at 991, recognizing the focus is on "the relationship between the conduct and the harm."). Plaintiffs here have not satisfied this proximate cause requirement.

The SAC alleges the Defendants "targeted and aggressively marketed its unlawful scheme to high-end real estate developers by means of mail and wire fraud, along with intentional, material misrepresentations and/or omissions." (Dkt. No. 18, ¶ 191.) It goes on to claim the Defendants would artificially inflate the value of a resort project in order to sell it to the developers, collect huge up-front fees, and eventually saddle the resorts with large debts which forced eventual foreclosure of the resorts at a cost significantly below market value. (Dkt. No. 18, ¶ 192.) The Plaintiffs are current or former owners of real property at and/or interests in the listed resorts. The SAC alleges they were promised the resorts would be completed with high-quality amenities which were never provided.

**ORDER ON REPORT AND RECOMMENDATION - 4**

(Dkt. No. 18, ¶ 202.) Plaintiffs' injuries, as alleged in the SAC, were caused by the inability of the developers to complete the resorts and/or provide the promised amenities which has resulted in the demise of the resort properties and collapse in the resorts' value. (Dkt. No. 18, ¶ 202.) For the reasons articulated in the Report, this Court agrees that the Plaintiffs have failed to show proximate cause sufficient to support their RICO Claim.

In their objections, Plaintiffs maintain proximate cause has been shown in this case because the Defendants' loan scheme was fraudulent from the moment the unsustainable loans were originated. Plaintiffs rely heavily upon the opinions issued by Judge Kirscher to support their position.[3] (Dkt. No. 108, pp. 3, 7.) The Adversary Bankruptcy Proceeding before Judge Kirscher involved loans offered by Credit Suisse to finance the development of the Yellowstone Club, one of the four developments listed in this action.[4] (Dkt. No. 91, Ex. 1, p. 4, n. 3.) In his Orders, Judge Kirscher opined about other failed entities who had received loans from Credit Suisse, including Tamarack Resort, Promontory, Lake Las Vegas, Turtle Bay, and Ginn Sur Mer, stating: "If the foregoing developments were anything like this case, they were doomed to failure once they received their loans from Credit Suisse." (Dkt. No. 91, Ex. 1, p. 16.) The Plaintiffs' reliance on this language does not save their RICO Claim.

---

[3] On May 12, 2009 and August 16, 201, the Honorable Ralph B. Kirscher, United States Bankruptcy Judge, District of Montana, issued decisions in the case of *In re Yellowstone Mountain Club, LLC*. (Dkt. No. 91, Ex. 1), (Dkt. No. 101, Att. 1.)

[4] Cushman & Wakefield argues it was not named as a party in the Montana Bankruptcy action. (Dkt. No. 114, pp. 2, 6.) Though true, Judge Kirscher's opinion discusses Cushman & Wakefield's appraisals of the Yellowstone Club. (Dkt. No. 91, Ex. 1, p. 4, n. 3.)

Regardless of whether or not the developments were "doomed to failure" in the context of a bankruptcy proceeding, as Judge Kirscher was faced with, the claim at issue here is for RICO violations stemming from the Defendants' alleged predatory loan scheme. For the reasons stated in the Report, this Court concludes the Plaintiffs have not shown a sufficiently direct relationship between the fraud alleged and their damages to sustain their RICO Claim. As such, the Court will adopt the Report and grant the Motion dismissing the Plaintiffs' RICO Claim.

## II.     Defendants' Objections: Standing

Both Defendants have lodged objections to the Report's determination that Plaintiffs have established Article III standing. (Dkt. Nos. 109, 110.) Plaintiffs have responded to the objections arguing the Report properly decided the standing issue. (Dkt. Nos. 115, 116.) Article III of the Constitution gives federal courts jurisdiction over "cases and controversies." U.S. Const. Art. III, § 2, cl. 2; *see also Warth v. Seldin*, 422 U.S. 490, 498 (1975) ("In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."). To have standing, a plaintiff has the burden of demonstrating: (1) he has suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) the existence of a causal connection between the injury and the conduct complained of-that is, the injury is "fairly traceable" to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) it is "likely," as opposed to merely

"speculative," that the injury will be redressed by a favorable judicial decision. *Lujan v.*
*Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992) (footnote, citations, and quotation
marks omitted). Both of the Defendants' objections are substantially similar in that they
argue the Plaintiffs have failed to show either an injury in fact or causation. (Dkt. No.
109, pp. 4-7), (Dkt. No. 110, pp. 5-13.)

   A.   **Injury In Fact**

   To satisfy the "injury in fact" requirement, "[t]he plaintiff must show that he has
sustained or is immediately in danger of sustaining some direct injury as a result of the
[defendant's] conduct and the injury or threat of injury must be both real and immediate,
not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983)
(citations omitted); *Lujan*, 504 U.S. at 560 ("[By injury in fact we mean] an invasion of a
legally protected interest which is (a) concrete and particularized, ... and (b) actual or
imminent, not 'conjectural' or 'hypothetical'.").

   Generally, as noted in the Report, losses in value to property are too conjectural
and unascertainable to satisfy the injury in fact requirement. (Dkt. No. 106, p. 7.) The
value and cause of such claimed losses simply cannot be determined unless and until the
property is sold. *See Dodaro v. Standard Pacific Corp.*, 2010 WL 1330889, at *4-5, (C.D.
Cal. April 1, 2010) (citing cases involving homeowners suing for loss in potential market
value of their homes due to excessive foreclosures on other houses in their
neighborhoods). Such alleged injuries have been found to be "conjectural and speculative,
not actual or imminent" where they "fluctuate with changes in the economy." *Id.* at *7.
The Report found, however, that the Plaintiffs' damages are not only diminution in value-

type injuries but also included "the complete elimination of all of the features of the development that were promised to the homeowners, including vested property and contractual rights running with the Plaintiffs' land and paid for by the Plaintiffs." (Dkt. No. 106, p. 8.) Such damages, the Report concludes, are "identifiable, realized, and plausibly separate from any fluctuations in the market for high-end resort developments, specifically, or the overall economy, generally." (Dkt. No. 106, p. 9.)

Credit Suisse maintains Plaintiffs' only alleged injury is the "unrealized loss of market value" of their properties due to the developers failure to construct or maintain the resorts' amenities. (Dkt. No. 109, p. 4.) Credit Suisse objects to the Reports reliance on Plaintiffs' claims that they seek damages other than loss of property values, arguing such claims are vague and ambiguous and fail to allege a "concrete injury" not tied to their "core claim" of unrealized loss in property values. (Dkt. No. 109, p. 5.) Cushman & Wakefield agree that the Plaintiffs have not shown an injury in fact. (Dkt. No. 110, p. 6.) In response, Plaintiffs maintain the Report "accurately explained that Plaintiffs' claims for loss of market value are distinct from the damages" alleged as to the vested property and contractual rights made to the homeowners. (Dkt. No. 116, p. 2.)

In addressing the injury in fact element, the Report generally agrees with the Defendants' arguments that "'diminution in value' injuries are likely too generic and unknown to confer standing." (Dkt. No. 106, p. 7.) The Report goes on to state the Plaintiffs' alleged damages, however, are not limited to diminution in value-type injuries

but include damages resulting from the loss of "vested property and contractual rights" running with and paid for by the Plaintiffs. (Dkt. No. 106, p. 8) *quoting* (Dkt. No. 91, pp. 4-5.) Such losses, the Report notes allegedly occurred as a result of the Defendants' actions which "ultimately prevented developers...from constructing and/or maintaining promised amenities." (Dkt. No. 106, p. 8) *quoting* (Dkt. No. 18, ¶¶ 78, 82-84.) The losses of the promised amenities, the Report concludes, are "identifiable, realized, and plausibly separate from any fluctuations in the market for high-end resort developments, specifically, or the overall economy generally" and "the damages identified thus far are distinct and, as alleged, occurred independent of a volatile economy for Article III standing purposes." (Dkt. No. 106, p. 9.)

This Court agrees with the Report's analysis and finding that Plaintiffs have alleged an injury in fact that is distinct from mere diminution in property value. The allegations in the SAC include damages resulting from broken promises to the homeowners which includes vested property and contractual rights. (Dkt. No. 18, ¶¶ 78, 82-84.)[5] As such, the Court adopts the Report's recommendation in this regard.

### B.     Causation

The causation element of standing requires the Plaintiffs to show an injury that is "fairly traceable to the challenged action of the defendant, and not the result of the

---

[5] For example, Paragraph 84 of the SAC alleges the scheme, as set forth therein, caused Plaintiffs economic damages by destroying or eliminating their "rights, benefits, privileges, amenities and reasonable use of their respective lands and properties" as well as the "extreme diminution of the value of their lands...." (Dkt. No. 18, pp. 33-34, ¶ 84.)

independent action of some third party not before the court." *Lujan*, 504 U.S. at 560. "The line of causation between the [alleged] illegal conduct and injury" must not be "too attenuated." *Allen v. Wright*, 468 U.S. 737, 752 (1984).

Credit Suisse asserts the alleged damages here require speculation and conjecture in order to "determine which of the multiple potential causes brought about Plaintiffs' alleged injury." (Dkt. No. 109, p. 4.) Credit Suisse takes issue with the Report's conclusion that the Plaintiffs' damages are not "reflective only of a sour economy," and argue the Report's analysis of the lack of causation on the RICO Claim is inconsistent with the Article III standing discussion. (Dkt. No. 109, p. 6) *quoting* (Dkt. No. 106, p. 9.) Instead, Credit Suisse maintains the Report's conclusion that Plaintiffs' failed to demonstrate causation in their RICO Claim should similarly be applied to their other claims. (Dkt. No. 109, pp. 6-7.)

Cushman & Wakefield's objection to the Report's analysis of Article III standing focuses on the causation requirement arguing there is no causal connection between the Plaintiffs' alleged damages and the appraisals of the resort projects done by Cushman & Wakefield. (Dkt. No. 110, pp. 6-9.) Cushman & Wakefield states they provided Credit Suisse with appraisals of the entire resort projects where Plaintiffs' properties are located in connection with Credit Suisse's loans issued to the master developers of those resorts. (Dkt. No. 110, p. 1, 3), *see also* (Dkt. No. 18, ¶¶ 57.) Cushman & Wakefield maintains they did not appraise Plaintiffs' individual properties nor do Plaintiffs allege to have spoken with nor relied upon their appraisals. (Dkt. No. 110, p. 1.) As such, Cushman &

Wakefield argues, Plaintiffs' damages are too speculative and attenuated to establish

standing as there is no nexus between its conduct and Plaintiffs' claimed damages. (Dkt.

No. 110, pp. 1-2, 4.) The thrust of Cushman & Wakefield's argument is that 1) their

involvement in the alleged scheme here is simply too remote to have caused the damages

alleged by Plaintiffs and 2) there are too many "outside forces" and "intermediate actors"

which could have caused the alleged damages. (Dkt. No. 110, pp. 6-8.)

The Report concludes the causation element is met here based on the Plaintiffs'

alleged "Loan to Own" scheme to "starve the at-issued resorts of the money needed to

build out the amenities that, naturally, make up the resorts themselves - all the while

collecting from developers and homeowners tens of millions of dollars in 'loan fees' and,

later, increasing Credit Suisse's likelihood of acquiring the resorts' land and

improvements through foreclosure and/or bankruptcy." (Dkt. No. 106, pp. 9-10.) The

Defendants challenge the Report's acceptance of the Plaintiffs' purported "Loan to Own"

scheme calling it "nonsensical" as it makes no sense for them to desire to acquire the

depressed properties and the scheme is based on their alleged loaning of too much money

to developers. *See e.g.* (Dkt. No. 109, p. 2) ("they blame Credit Suisse for loaning *too

much* money to the developers") (emphasis in original); (Dkt. No. 110, pp. 3, 8, n. 4.).

The Report countered this argument noting what was once considered "implausible" in

the real estate lending market is no longer true in today's markets and economy. (Dkt. No.

106, p. 10, n. 3.)

This Court agrees with the Magistrate Judge that what may have been

**ORDER ON REPORT AND RECOMMENDATION - 11**

"unthinkable" in the real estate market at one time, is no longer necessarily "implausible" today given the realities of the financial, banking, credit, and real estate markets in the last few years. In light of the recent economic history, this Court will not discount Plaintiffs' "Loan to Own" theory as alleged simply because it may not appear to make sense in hindsight. The Court also agrees with the Report's conclusion that the Plaintiffs have satisfied the causal connection requirement as to Credit Suisse by alleging it employed a loan scheme which caused them damages as the "fate of these developments was tethered to the money improperly loaned by Credit Suisse and, in every situation, the developments failed according to Credit Suisse's plan." (Dkt. No. 106, p. 10.)[6]

As to the causal connection linking Cushman & Wakefield, this Court finds Plaintiffs have satisfied the causal connection requirement. Cushman & Wakefield find error in the Report's failure to consider a multitude of intermediate actors/steps which, it argues, make the Plaintiffs' asserted injury too far removed from their action. (Dkt. No. 110, p. 8.)[7] The Report, however, points to Plaintiffs' argument that the "Loan to Own" scheme was "only possible by manipulating the value of each development using the

---

[6] In making the above determinations, the Court does not find the Plaintiffs have or can prove either of these Defendants caused their alleged damages. The Court only finds for purposes of these Motions that Plaintiffs have met the Article III standing requirements.

[7] Plaintiffs counter arguing the "intermediate" steps are "manufactured" by Cushman & Wakefield to distance themselves from the harm here. (Dkt. No. 115, p. 3.) Instead, Plaintiffs argue Cushman & Wakefield "knowingly over-appraised the value of each plaintiff's lot so that Credit Suisse could originate predatory loans that doomed the plaintiff's properties and interests in the resorts from the moment of origination. No intermediate steps are involved...." (Dkt. No. 115, p. 3.)

TNV[8] appraisal methodology - something Cushman & Wakefield was able to accomplish

in its capacity as an international real estate services firm" and that "it was the actual

interface between *both* Credit Suisse and Cushman & Wakefield that made Credit

Suisse's Loan to Own scheme possible." (Dkt. No. 106, p. 11.) Taking the Plaintiffs'

allegations as true, the Court agrees that, as alleged, the "interface" between Credit Suisse

and Cushman & Wakefield made the scheme possible.[9] Thus, the fact that Cushman &

Wakefield's participation was early in the steps down the road leading to the resorts'

demise by allegedly manipulating the appraisals, it is not absolved from liability simply

because there may have been steps taken further down the road. The alleged scheme is

premised on the idea that the early actions of the Defendants were responsible for setting

the plan into motion that would allegedly result in the failures of the resorts and thereby

cause Plaintiffs' injuries.

 The Defendants also object to the Report's conclusions with regard to causation

arguing the recommendations for Article III standing and RICO's proximate causation are

inconsistent. (Dkt. No. 109, pp. 6-7), (Dkt. No. 110, pp. 12-13.) In particular, Cushman &

Wakefield again points to the "myriad of potential actors and intermediate decisions that

led to [P]laintiffs' alleged injury" on the RICO Claim also apply to Article III standing.

(Dkt. No. 110, p. 12.) Plaintiffs respond arguing the Report's conclusions are not

---

[8] "TNV" refers to Total Net Value appraisal methodology Plaintiffs allege Cushman & Wakefield used in the Loan to Own scheme. (Dkt. No. 106, p. 2.)

[9] Again, in making the above determinations, the Court does not find the Plaintiffs have or can prove either of these Defendants caused their alleged damages. The Court only finds for purposes of these Motions that Plaintiffs have met the Article III standing requirements.

**ORDER ON REPORT AND RECOMMENDATION - 13**

inconsistent given the differing analysis employed to determine standing for Article III and RICO. (Dkt. No. 115, p. 3), (Dkt. No. 116, p. 4.)

The Report considered this issue, noting the statutory standing under RICO "is a more rigorous matter than standing under Article III," requiring "some direct relation between the injury asserted and the injurious conduct alleged." (Dkt. No. 106, p. 13, n. 6.)[10] This Court agrees with the Report that the differing standards applied to Article III standing and RICO account for the seemingly diverging results. As to Article III standing, the Report found the SAC made sufficient allegations of the purported "Loan to Own" scheme connecting the Defendants' conduct to the Plaintiffs' damages. (Dkt. No. 106, pp. 6-11.) Plaintiffs' RICO Claim, however, attempted to demonstrate a link between the predicate acts of mail and wire fraud and the harm they allegedly suffered. The Report determined Plaintiffs had failed to demonstrate the Defendants' actions in the alleged Loan to Own scheme directly caused harm that directly caused Plaintiffs' injuries as required by RICO. (Dkt. No. 106, pp. 25-26.) In reaching this conclusion, the Report discussed three underlying rationales for RICO's proximate cause requirement. (Dkt. No. 106, pp. 22-26.) As articulated in the Report and adopted by this Court above, the Plaintiffs failed to demonstrate the requisite direct relation between the injury and violating conduct alleged to support their RICO Claim. (Dkt. No. 106, pp. 14-26.) The Court finds this conclusion is not inconsistent with the Report's determination on the

---

[10] Cushman & Wakefield recognizes the distinction between the Article III standing and RICO standards. (Dkt. No. 110, p. 12, n. 6.)

**ORDER ON REPORT AND RECOMMENDATION - 14**

Article III standing requirements given RICO standard's more stringent proximate cause requirements. *See Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975, n. 7 (9th Cir. 2008); *Lerner v. Fleet Bank*, 318 F.3d 113, 122, n. 8 (2nd Cir. 2003). Accordingly, the Court will adopt the Report's recommendations as to Article III standing.

III.     **Defendants' Objections: Fiduciary Duty Claim**

Credit Suisse objects to the Report's denial of its Motion as to the Breach of Fiduciary Duty Claim arguing the allegations in the SAC fail to satisfy the *Twombly* and *Iqbal* standard. (Dkt. No. 109, p. 7.) Because it had no relationship to the Plaintiffs, Credit Suisse argues, there was no fiduciary relationship. Additionally, Credit Suisse disputes any fiduciary relationship arises by virtue of it providing any administrative services on the loans it had issued or the Plaintiffs' "pass-through" theory. (Dkt. No. 109, pp. 9-10.) In arriving at its recommendation, the Report identifies portions of the SAC where Plaintiffs allege a direct relationship with Credit Suisse arising from its role administrator for the loans and making false promises and representations to Plaintiffs. (Dkt. No. 106, pp. 44-45.) The Report is careful to point out the Plaintiffs' allegations are "thin proof" and may not survive a motion for summary judgment. (Dkt. No. 106, pp. 45-46.) This Court has reviewed the briefing and materials herein and concludes the Report addressed this claim consistent with this Court's own view of the record in this case.

"In order to establish a claim for breach of fiduciary duty, a plaintiff must establish that defendants owed plaintiff a fiduciary duty and that the fiduciary duty was breached." *Bushi v. Sage Health Care, PLLC*, 203 P.3d 694, 699 (Idaho 2009) (citation and marks omitted); *see also Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 880-881 (9th

Cir. 2007) (applying Nevada law). Plaintiffs allege Credit Suisse undertook a fiduciary duty to them by 1) its "absolute control and domination over the developers" and 2) representing to Plaintiffs that it would act in their best interests in connection with marketing, managing, and maintaining the resorts and developing amenities at the resorts. (Dkt. No. 91, p. 38.) In support of this argument Plaintiffs cite primarily to Paragraphs 75-82 of their SAC. (Dkt. No. 18.) Plaintiffs contend Credit Suisse "marketed its loans to the developers with the understanding and full knowledge that the projects would, in turn, be marketed to the class members based upon the allegedly fraudulent and illegal appraisals." (Dkt. No. 116, pp. 4-5.) Plaintiffs claim Credit Suisse became their "fiduciary and breached its duties of loyalty and disclosure when it engineered the bogus appraisals and then concealed their true nature from the Plaintiffs." (Dkt. No. 116, p. 5-6.) Plaintiffs go on to characterize Credit Suisse as the "co-developer" and "leading advisor" to the developers who had "control over" and "dominated" the developers. (Dkt. No. 91, p. 39.), (Dkt. No. 116, p. 6.) Furthermore, Plaintiffs allege Credit Suisse became their "agent." (Dkt. No. 116, p. 5) (citing Dkt. No. 18, ¶¶ 74-82.)

Credit Suisse maintains these conclusory allegations fail to satisfy *Twombly* as they do not allege any actual instance of anyone at Credit Suisse making such representations to Plaintiffs. (Dkt. No. 94, p. 14.) Credit Suisse claims the loans were not issued to the Plaintiffs but, instead, to the developers, who are not a party to this action. Moreover, the Credit Agreements between Credit Suisse and the developers, Credit

Suisse argues, contain language expressly disavowing any existence or assumption of a relationship of trust and/or any fiduciary or implied duties. (Dkt. No. 51, Att. 1, p. 22-23.)

The Court has reviewed the SAC and, in particular Paragraphs 74-82 and agrees with the Report that although the Plaintiffs' Fiduciary Duty Claim barely survives, the SAC's allegations are sufficient to survive the inquiry demanded by *Twombly* and *Iqaba*. Plaintiffs have alleged representations were made to them by Credit Suisse such that, if true, a fiduciary duty could be found. (Dkt. No. 18, ¶¶ 74-82, 287.) Whether this claim will survive a later summary judgment inquiry is unclear. At this stage, however, the allegations are sufficient to overcome the Motion to Dismiss. Accordingly, the Court will adopt the Report on this claim and deny the Motion.

## IV. Defendants' Objections: Fraud, Negligence, Tortious Interference, and Conspiracy Claims

### A.    Fraud

Cushman & Wakefield argue the "deception" underlying each of Plaintiffs' claims never occurred and, therefore, its Motion should be granted as to all claims against it. (Dkt. No. 110, p. 13.) The appraisals, Cushman & Wakefield assert, expressly state they do not represent market value of the property and, therefore, did not misrepresent the market value of the resorts as alleged by Plaintiffs. (Dkt. No. 110, p. 13.) This language, it argues, eliminates Plaintiffs ability to satisfy its burden of proving false and misleading statements were made in the appraisals as alleged in the SAC. In addressing this argument, the Report acknowledged the language in the assessments but concludes

because it is "unclear what the developers/homeowners understood these figures to represent" that because Plaintiffs' allegations regarding the appraisals must be taken as true, the Motion should be denied. (Dkt. No. 106, p. 42.) Plaintiffs respond to the objection arguing the Report is correct and should be adopted. (Dkt. No. 115, p. 4.) This Court agrees with the Report that, at least on this Motion where we take the Plaintiffs' allegations as true, the appraisals' language does not absolve Cushman & Wakefield as to Plaintiffs' Fraud Claim.

### B. Negligence

The SAC raises a Negligence Claim against both Defendants. (Dkt. No. 18, p. 112.) The "essential elements" of a negligence claim require a plaintiff to establish: "(1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of duty; (3) a causal connection between the defendant's conduct and the resulting injuries; and (4) actual loss or damage." *Jones v. Starnes*, 245 P.3d 1009, 1012 (Idaho 2011) (quoting *Hansen v. City of Pocatello*, 184 P.3d 206, 208 (Idaho 2008)). Both Defendants here object to the Report's recommendation denying their Motions as to the Negligence Claim. Credit Suisse argues Plaintiffs fail to allege any facts demonstrating a duty of care it owed to them. (Dkt. No. 109, p. 12.) Cushman & Wakefield lodge two objections to the Report arguing it fails to 1) apply Rule 9(b)'s standard and 2) articulate a basis for a duty it owed to Plaintiffs. (Dkt. No. 110, p. 15.)

### (1) Applicability of Rule 9(b)

The Report applied Rule 9(b)'s  heightened pleading standard to the Plaintiffs'

**ORDER ON REPORT AND RECOMMENDATION - 18**

claims for fraud and negligent misrepresentation, but did not apply Rule 9(b) to the Negligence Claim. (Dkt. No. 108, p. 38, n. 26; pp. 43, 49-50.)[11] Cushman & Wakefield object arguing the Report should have applied the same pleading standard to the Negligence Claim. (Dkt. No. 110, p. 15.)

"Rule 9(b) requires that, when fraud is alleged, 'a party must state with particularity the circumstances constituting fraud....'" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting Fed. R. Civ. P. 9(b)). "Where fraud is not an essential element of a claim, only those allegations of a complaint which aver fraud are subject to Rule 9(b)'s heightened pleading standard." *Id.* (citation omitted). "To the extent a party does not aver fraud, the party's allegations need only satisfy the requirements of Rule 8(a)(2)." *Id.* "Fraud can be averred by specifically alleging fraud, or by alleging facts that necessarily constitute fraud (even if the word 'fraud' is not used)." *Id.*[12]

_____

[11] In its alternative recommendation for dismissing the RICO Claim, the Report applied Rule 9(b) to the predicate acts of wire and mail fraud as alleged in the SAC and found it failed to satisfy the particularity requirement of Rule 9(b). (Dkt. No. 108, pp. 27-32) ("there are no specifics relative to the (mis)representations made to Plaintiffs themselves....") The Report then referenced and incorporated its discussion of Rule 9(b)'s particularity requirement in its analysis of the Fraud and Negligent Misrepresentation Claims as to both Defendants. (Dkt. No. 108, p. 38, n. 26.) There is no similar reference to Rule 9(b) in the Report as to the Negligence Claim. (Dkt. No. 108, pp. 49-50.)

[12] The Ninth Circuit in *Kearns* went on to define the perimeter of Rule 9(b) stating:

> Rule 9(b) demands that the circumstances constituting the alleged fraud be specific enough to give defendants notice of the particular misconduct ... so that they can defend against the charge and not just deny that they have done anything wrong. Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged. A party alleging fraud must "set forth more than the neutral facts necessary to identify the transaction.

Cushman & Wakefield argues Rule 9(b) applies to the Plaintiffs' Negligence Claim here because it "sounds in fraud," pointing out that the SAC "makes no new allegations and simply incorporates by reference the prior allegations...all of which allege fraudulent conduct...." (Dkt. No. 110, p. 15.) In response, Plaintiffs state only that the SAC gives "very comprehensive knowledge of the nature of the claim" and that "most of the specifics are in the exclusive domain of the Defendants and Plaintiffs cannot be expected to have all of the specifics until they have" pursued further discovery. (Dkt. No. 115, p. 5.)

In support of their objection, Cushman & Wakefield cite to *United Guaranty Mortgage Indemnity Co. v. Countrywide Financial Corp.*, a mortgage insurance case, where the plaintiff insurer asserted contract, tort, and statutory claims against the defendant mortgage companies which included claims of fraudulent inducement, negligent misrepresentation, and negligence. *United Guaranty Mortgage Indemnity Co. v. Countrywide Financial Corp.*, 660 F.Supp.2d 1163, 1170 (C.D. Cal. 2009). There, the court applied Rule 9(b)'s heightened standard to one of the defendants because, under California law, "negligent misrepresentation is a species of actual fraud" and the negligence claim was "grounded in fraud."*Id.* at 1179 (citation omitted). As to the other

---

Rule 9(b) serves three purposes: (1) to provide defendants with adequate notice to allow them to defend the charge and deter plaintiffs from the filing of complaints as a pretext for the discovery of unknown wrongs; (2) to protect those whose reputation would be harmed as a result of being subject to fraud charges; and (3) to prohibit] plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis.

*Kearns*, 567 F.3d at 1124-25 (citations and quotation marks omitted).

defendant against whom negligence was the only tort asserted, the court did not apply Rule 9(b) because the negligence claim did not "sound in fraud." *Id.*

Cushman & Wakefield also cite to *In re Metropolitan Securities Litigation*, which was a securities action where the court applied Rule 9(b) to the Section 11 claim because it "sounded in fraud" by alleging "a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim." *In re Metropolitan Securities Litigation*, 532 F.Supp.2d 1260, 1278 (E.D. Wash. 2007) (citation omitted). There the Court stated "[w]hen the facts underlying a negligence claim are also 'said to be part of a fraud claim,' the negligence claim sounds in fraud." *Id.* (citation omitted).

The Court has reviewed the SAC, the Report, the parties' initial briefing on the Motions, and their briefing on the objections, and finds the objection is well taken and that Rule 9(b)'s heightened pleading standard should be applied to Plaintiffs' Negligence Claim. In Cushman & Wakefield's initial briefing on the Motion to Dismiss and their objections here, it argued that Rule 9(b) applies to all of Plaintiffs' claims because all of the claims "sound in fraud." (Dkt. No. 48, pp. 2, 13-21), (Dkt. No. 93, p. 2), (Dkt. No. 110, p. 15.) The Negligence Claim in particular, Cushman & Wakefield asserts, "sounds in fraud" because the SAC merely "recites and incorporates by reference the previously alleged paragraphs" from the other claims which also "sound in fraud." (Dkt. No. 48, p. 17.)

The Court's own review of the SAC is consistent with Cushman & Wakefield's

position. The allegations in the SAC generally raise claims sounding in fraud. (Dkt. No. 18.) As alleged in the SAC, the Negligence Claim does not provide allegations distinct from the claims that precede it which sound in fraud. (Dkt. No. 18, ¶¶ 302-307.) The Plaintiffs do not dispute that Rule 9(b) applies to their Negligence Claim or that the claim "sounds in fraud" in either their initial briefing on the Motion nor their response to the objections. (Dkt. Nos. 92, 115.) Instead, Plaintiffs argue that the source of the negligence duty as to the Defendants arises both by way of statute and because the Plaintiffs were foreseeable victims. (Dkt. No. 115, pp. 5-6.)[13] In reviewing the SAC itself, however, one cannot ascertain that these are the sources giving rise to the Defendants' duties for purposes of the Negligence Claim. (Dkt. No. 18, ¶¶ 302-307.) In particular, there is no mention of the purported statutory basis for the duty in the SAC. (Dkt. No. 18.) Arguably, the SAC makes several allegations that Plaintiffs were foreseeable victims of the Defendants' conduct. (Dkt. No. 18, ¶¶ 46, 275, 306.) Because these allegations "sound in fraud," however, they are subject to Rule 9(b)'s heightened pleading standard which the Negligence Claim, as alleged in the SAC, does not satisfy here. Therefore, the Court finds the allegations in the SAC as to the Negligence Claim are too conclusory to provide the Defendants notice of the alleged sources of the negligence based duties Plaintiffs' have raised in their briefing and they do not satisfy Rule 9(b)'s particularity requirement. As such, the Court will grant the Motion and dismiss without prejudice the Negligence Claim

_____

[13] A more complete discussion of the alleged sources of negligence duties is contained in the next section of this Order.

as to both Defendants. Plaintiffs will be afforded leave to amend their Negligence Claim to provide additional specificity as discussed in the Report in relation to the other claims.

### (2) Existence of a Duty

The Defendants also object to the Report's conclusion that the SAC alleged facts which, if true, could be found to give rise to a duty.(Dkt. No. 106, p. 49), (Dkt. Nos. 109, 110.) The duty, the Report determined, arises as to both Defendants' from the alleged "violations of customary real estate valuation practices" which, the SAC alleges, resulted in Plaintiffs' injuries. (Dkt. No. 106, p. 49.) The Report further points out that the SAC alleges negligence-based duties against Credit Suisse from its mismanagement of the loaned finances and the resorts themselves in its capacity as a "co-developer." (Dkt. No. 106, p. 49, n. 35.) Both Defendants object to the Report's conclusion that the SAC alleged facts upon which a duty could be found. Plaintiffs counters arguing duties were owed by both Defendants arising from 1) statutory duties under the United States Professional Appraisal Standards (USPAP) and 2) under the common law because Plaintiffs were foreseeable victims to their conduct. (Dkt. No. 115, p. 5), (Dkt. No. 116, p. 8.)

As to Cushman & Wakefield in particular, Plaintiffs argue its inflated appraisals violated customary real estate valuation practices in violation of the USPAP making Plaintiffs foreseeable victims of the resulting excessive loan amounts encumbering Plaintiffs' property and contract rights. (Dkt. No. 115, p. 6.) Cushman & Wakefield's objection contends there are no allegations that Plaintiffs had any relationship to it or ever read or relied upon any of its appraisals. (Dkt. No. 110, p. 16.) Cushman & Wakefield

point out, they never prepared any appraisals of Plaintiffs' homes nor any appraisals in connection with Plaintiffs' loans and, therefore, did not violate any "customary real estate valuation practices." Moreover, Cushman & Wakefield argue its appraisals were not subject to FIRREA. (Dkt. No. 110, pp. 17-18.) Plaintiffs counter disputing whether the Report relied on FIRREA and its application to the loans at issue in this case. (Dkt. No. 115, pp. 6-7.)

As to Credit Suisse, Plaintiffs assert it substantially participated in formulating the TNV appraisal methodology which caused the inflated/misleading appraisals which allowed it to loan more money excessively encumbering Plaintiffs' property and contract rights in the resorts and, from which, Plaintiffs were foreseeable victims when the resorts failed. (Dkt. No. 116, p. 8.) Plaintiffs argue Credit Suisse's role also went "into the realm of active management of the finances and development of the resorts" whereby Credit Suisse assumed an ordinary duty of care to Plaintiffs whose property and contract rights were dependent upon such management. (Dkt. No. 116, p. 8.) Credit Suisse maintains the SAC's legal conclusions do not give rise to a duty as it did not prepare any appraisals for which "customary real estate valuation practices" would apply and the appraisals that were done were not of Plaintiffs' individual properties. Furthermore, Credit Suisse disputes whether the USPAP applies to it as it is not an appraiser subject to the USPAP and Plaintiffs are not within the class of individuals protected by the USPAP because the appraisals at issue here were not done for Plaintiffs. (Dkt. No. 109, p. 12.)

**ORDER ON REPORT AND RECOMMENDATION - 24**

Because the Court has determined above that the SAC has not adequately plead the Negligence Claim, the Court finds it unnecessary to rule on these objections as to the question of whether the Defendants owed a duty; particularly because Plaintiffs have been granted leave to amend their Negligence Claim.

### C. Tortious Interference

"One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability...." *Wesco Autobody Supply, Inc. v. Ernest*, 243 .3d 1069, 1083 (Idaho 2010) (quoting Restatement (Second) of Torts § 766 (1979)). "Tortious interference with contract has four elements: (1) the existence of a contract; (2) knowledge of the contract on the part of the defendant; (3) intentional interference causing a breach of the contract; and (4) injury to the plaintiff resulting from the breach." *Id.* (citation and quotations omitted.)

Credit Suisse argues its Motion should be granted as to the Tortious Interference Claim because the claim is "implausible on its face and fails to plead the necessary elements."[14] (Dkt. No. 109, p. 13.) Its objection argues there are no allegations of "believable" facts to support a claim that Credit Suisse intentionally interfered with Plaintiffs' contractual relations with developers. In particular, Credit Suisse points out the lack of any facts identifying any contracts that it interfered with, any documents or

---

[14] The Report recommends granting Cushman & Wakefield's Motion to Dismiss as to this claim. (Dkt. No. 106, pp. 47-48.)

statement by any developer regarding the promised amenities, or any facts that Credit Suisse was aware of any such promises or obligation made by any of the developers to Plaintiffs. (Dkt. No. 109, p. 13.) Credit Suisse also revives its argument that the alleged scheme defies common sense that it lended the developers too much money with the intent of later taking over the ruined properties. (Dkt. No. 109, p. 14.) The causation element, Credit Suisse argues, has also not been plead as there are many reasons for why the developers failed to install or maintain the resorts' amenities such that it cannot be said that its actions caused Plaintiffs' alleged injuries. (Dkt. No. 109, p. 15.)

Responding to this objection, Plaintiffs argue the SAC's allegations are adequate in that it pleads 1) contracts existed between Plaintiffs and developers, 2) Credit Suisse knew of the contracts' requirements upon the developers to the Plaintiffs, 3) Credit Suisse intended to and did disrupt the contractual obligations, and 4) the disruption caused Plaintiffs damages. (Dkt. No. 116, pp. 9-10.)

As the Report points out, it is the scheme itself that gives rise to Credit Suisse's alleged intent to interfere with Plaintiffs' contractual relations with the developers. (Dkt. No. 106, p. 47.) The "Loan to Own" scheme, as alleged by Plaintiffs, presumes the developers would default on their loans and their promises to Plaintiffs to furnish and maintain amenities at the resorts thereby allowing Credit Suisse to later acquire the resorts in bankruptcy/receivership proceedings. Thus, the allegations in the Complaint reflect Plaintiffs' theory that because Credit Suisse's scheme knew of and anticipated the

developers' failing to fulfill their promises to Plaintiffs, it had interfered with that relationship to Plaintiffs' detriment. Therefore, the Court will adopt the recommendations of the Magistrate Judge and deny the Motion on this claim.

### D.    Conspiracy

Defendants both object to the Report's recommendation that the Conspiracy Claim survives, arguing the claim cannot stand on its own without another existing tort claim nor can it be based on a claim for negligence. (Dkt. No. 109, pp. 15-16), (Dkt. No. 110, p. 18.) Plaintiffs concede that civil conspiracy is not an independent tort, but counter that the Report properly concludes the allegations in the SAC are adequate to support a claim that an agreement between Credit Suisse and Cushman & Wakefield existed and that claims other than their negligence claim exist. (Dkt. No. 115, p. 7), (Dkt. No. 116, p. 10.)

As to Cushman & Wakefield, although Plaintiffs will be granted leave to amend their complaint, particularly as to the common law Fraud Claim, because civil conspiracy is not independent tort and no other non-negligence claims survived, the Plaintiffs' claim for Civil Conspiracy must also be dismissed without prejudice at this time. Plaintiffs will, however, be afforded leave to include this claim in their amended complaint. As to Credit Suisse, other non-negligence claims survived upon which Plaintiffs can attach their Civil Conspiracy Claim. Further, this Court agrees that the SAC has alleged facts which, if true, may evidence some kind of agreement between the Defendants. Therefore, the Court will adopt the Report as to the Civil Conspiracy Claim against Credit Suisse.

## ORDER

Having conducted a *de novo* review of the Report and Recommendation, this

Court finds that Magistrate Judge Bush's Report and Recommendation is well founded in

law and consistent with this Court's own view of the evidence in the record. Acting on

the recommendation of Magistrate Judge Bush, and this Court being fully advised in the

premises, **IT IS HEREBY ORDERED** that the Report and Recommendation entered on

February 17, 2011, (Dkt. No. 106), should be, and is hereby, **INCORPORATED** by

reference and **ADOPTED IN PART AND REJECTED IN PART** as detailed herein.

**THEREFORE, IT IS HEREBY ORDERED** as follows:

1) Defendant Cushman & Wakefield's Motion to Dismiss (Dkt. No. 48) is
   **GRANTED IN PART AND DENIED IN PART**[15] as follows:

   a) Plaintiffs' First Cause of Action: RICO is **DISMISSED**;

   b) Plaintiffs' Second Cause of Action: Fraud is **DISMISSED
      WITHOUT PREJUDICE**;

   c) Plaintiffs' Third Cause of Action: Negligent Misrepresentation is
      **DISMISSED WITHOUT PREJUDICE**, except to the extent Idaho
      law applies, those claims are dismissed with prejudice;

   d) Plaintiffs' Fourth Cause of Action: Breach of Fiduciary Duty is
      **DISMISSED WITH PREJUDICE**;

   e) Plaintiffs' Fifth Cause of Action: Tortious Interference is
      **DISMISSED WITHOUT PREJUDICE**;

---

[15] The Report is not adopted as to the Motions to Dismiss the Negligence Claim and
Cushman & Wakefield's Motion to Dismiss on the Civil Conspiracy Claim. The Report is
adopted in all other respects.

**ORDER ON REPORT AND RECOMMENDATION - 28**

f) Plaintiffs' Sixth Cause of Action: Unjust Enrichment is **DISMISSED WITH PREJUDICE**;

   g) Plaintiffs' Seventh Cause of Action: Negligence is **DISMISSED WITHOUT PREJUDICE**;

   h) Plaintiffs' Eighth Cause of Action: Conspiracy is **DISMISSED WITHOUT PREJUDICE**.

2) Defendant Credit Suisse's Motion to Dismiss (Docket No. 51) is **GRANTED IN PART AND DENIED IN PART** as follows:

   a) Plaintiffs' First Cause of Action: RICO is **DISMISSED**;

   b) Plaintiffs' Second Cause of Action: Fraud is **DISMISSED WITHOUT PREJUDICE**;

   c) Plaintiffs' Third Cause of Action: Negligent Misrepresentation is **DISMISSED WITHOUT PREJUDICE**, except to the extent Idaho law applies, those claims are dismissed with prejudice;

   d) Plaintiffs' Fourth Cause of Action: Breach of Fiduciary Duty is **NOT DISMISSED**;

   e) Plaintiffs' Fifth Cause of Action: Tortious Interference is **NOT DISMISSED**;

   f) Plaintiffs' Sixth Cause of Action: Unjust Enrichment is **DISMISSED WITHOUT PREJUDICE**;

   g) Plaintiffs' Seventh Cause of Action: Negligence is **DISMISSED WITHOUT PREJUDICE**;

   h) Plaintiffs' Eighth Cause of Action: Conspiracy is **NOT DISMISSED**.

3) As to those claims which are dismissed without prejudice, the Court will afford the Plaintiffs' an opportunity to amend their complaint as directed in the Report and Recommendation. Plaintiffs shall file such amended complaint, if any, no later **than April 21, 2011**.

**ORDER ON REPORT AND RECOMMENDATION - 29**

4)    Defendants may file any Motions to Dismiss no later than **May 5, 2011**.
      Responsive briefing shall be filed in accordance with the applicable rules.

DATED:  March 31, 2011



**Honorable Edward J. Lodge**
**U. S. District Judge**