# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| L.J. GIBSON, BEAU BLIXSETH, AMY KOENIG, VERN JENNINGS, MARK MUSHKIN, MONIQUE LEFLEUR, and GRIFFEN DEVELOPMENT, LLC, JUDY LAND, and CHARLES DOMINGUEZ, each individually, and on behalf of others similarly situated both<br><br>      Plaintiffs,<br><br>     vs.<br><br>CREDIT SUISSE AG, a Swiss corporation; CREDIT SUISSE SECURITIES (USA), LLC, a Delaware limited liability company, CREDIT SUISSE FIRST BOSTON, a Delaware limited liability corporation; CREDIT SUISSE CAYMAN ISLAND BRANCH, an entity of unknown type; CUSHMAN & WAKEFIELD, INC., a Delaware corporation and DOES 1 through 100 inclusive,<br><br>     Defendants. | Case No.: CV 10-1-EJL-REB<br><br>**MEMORANDUM DECISION AND ORDER RE:**<br><br>PLAINTIFFS' MOTION FOR LEAVE TO AMEND THIRD CAUSE OF ACTION<br>(Docket No. 130)<br><br>**REPORT AND RECOMMENDATION RE:**<br><br>CREDIT SUISSE DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED COMPLAINT<br>(Docket No. 134)<br><br>DEFENDANT CUSHMAN & WAKEFIELD, INC.'S MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT<br>(Docket No. 136)<br><br>MOTION TO INTERVENE<br>(Docket No. 159) |

Currently pending before the Court are the following matters: (1) Plaintiffs' Motion for Leave to Amend Third Cause of Action (Docket No. 130); (2) Defendants Credit Suisse AG, Credit Suisse Securities (USA), LLC, Credit Suisse First Boston, and Credit Suisse Cayman Island Branch's (collectively "Credit Suisse") Motion to Dismiss the Third Amended Complaint

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 1**

(Docket No. 134), (3) Defendant Cushman & Wakefield, Inc.'s ("Cushman & Wakefield")

Motion to Dismiss Plaintiffs' Third Amended Complaint (Docket No. 136), and (4) Motion to

Intervene as Plaintiffs and to File Complaint in Intervention (Docket No. 159).  Having carefully

reviewed the record, heard oral argument, and otherwise being fully advised, the Court issues the

following (1) Memorandum Decision and Order as to Docket No. 130, and (2) Report and

Recommendation as to Docket Nos. 134, 136, and 159:

## I.  <u>SUMMARY OF DECISION</u>

U.S. District Judge Edward J. Lodge, the presiding judge in this case, had previously

entered an order referring to the undersigned the responsibility to consider and recommend to

Judge Lodge a decision upon any dispositive pretrial motions in this case.  Consistent with that

responsibility,  this document contains the Court's second ruling upon Motions to Dismiss filed

by the Defendants Credit Suisse and Cushman & Wakefield.

The decision deals primarily with legal challenges made by Defendants against the

Plaintiffs' Third Amended Complaint.  Previously, this Court ruled upon legal challenges made

to Plaintiffs' Second Amended Complaint.  As with the prior decision, the Court here is making

a "Report and Recommendation" to Judge Lodge as to how this judge would decide the issues

raised by the Motions to Dismiss.  After this Court issued its prior "Report and

Recommendation," the matter went to Judge Lodge who considered objections raised by the

parties to that Report, and who then issued his own, controlling, decision upon the earlier

motions.

The Plaintiffs then filed their Third Amended Complaint, which was followed by

Defendants filing their second, now pending, Motions to Dismiss.  The Plaintiffs also filed a

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 2**

Motion for Leave to Amend Third Cause of Action, by which they ask the Court to allow them to revive a claim for breach of fiduciary duty against Defendant Cushman & Wakefield which had previously been dismissed, with prejudice.  Generally, once a claim has been dismissed with prejudice, it cannot be raised again.  Cushman & Wakefield opposes that Motion.

This decision also addresses a Motion to Intervene, filed on behalf of Timothy L. Blixseth and Alfredo Miguel.  Blixseth identifies himself as the developer of the Yellowstone Club in Montana, and Miguel identifies himself as one of the developers of the Tamarack Resort in Idaho.  Timothy Blixseth and Alfredo Miguel ask to be permitted to join this lawsuit, to prosecute their own claims against Defendants Credit Suisse and Cushman & Wakefield. Defendants oppose that Motion.

Accordingly, this decision (1) rules upon Plaintiffs' Motion for Leave to Amend Third Cause of Action to re-assert the previously-dismissed breach of fiduciary duty claim against Defendant Cushman & Wakefield, (2) recommends to Judge Lodge a decision upon the issues raised by Defendants' Motions to Dismiss, and (3) recommends to Judge Lodge a decision upon the Motion to Intervene filed by Timothy Blixseth and Alfredo Miguel.

The rulings and recommended decisions are summarized here:

1.      Plaintiffs' Motion for Leave to Amend Third Cause of Action is *granted*. Plaintiffs are permitted to amend their pleading to assert a breach of fiduciary duty claim against Cushman & Wakefield.

2.      The Court recommends to Judge Lodge that Defendants' Motions to Dismiss be *granted, in part, and denied, in part.*  Plaintiffs' Third Amended Complaint alleges the following claims against Defendants Credit Suisse and Cushman & Wakefield: (1) fraud; (2) negligent

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 3**

misrepresentation; (3) breach of fiduciary duty; (4) tortious interference with contractual relations; (5) negligence; and (6) Consumer Protection Act violations.  The Third Amended Complaint also alleges an unjust enrichment claim for relief against Credit Suisse only.  Both Credit Suisse and Cushman & Wakefield move to dismiss Plaintiffs' claims; further, Cushman & Wakefield contends that Plaintiffs' class action allegations also should be dismissed.  As to each such claim, the Court recommends:

- Plaintiffs' fraud and negligent misrepresentation claims against Credit Suisse and Cushman & Wakefield should be dismissed, with prejudice, to the extent the claim is alleged on behalf of a united class; and, individually, as to those Plaintiffs who have not adequately pled reliance in the Third Amended Complaint (those are Vern Jennings, Mark Mushkin, Monique LaFleur, Griffen Development, LLC, Judy Land, and Charles Dominguez).  However, Plaintiffs' fraud and negligent misrepresentation claims against Credit Suisse and Cushman & Wakefield should *not* be dismissed as to those individual Plaintiffs who have made plausible claims of reliance in asserting the fraud and negligence misrepresentation claims (those are L.J. Gibson, Beau Blixseth, and Amy Koenig).

- Plaintiffs' breach of fiduciary duty claims against Credit Suisse and Cushman & Wakefield should not be dismissed.

- Plaintiffs' tortious interference with contractual relations claims against Credit Suisse and Cushman & Wakefield should not be dismissed.

- Plaintiffs' unjust enrichment claim against Credit Suisse should be dismissed with prejudice.

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 4**

- Plaintiffs' negligence claims against Credit Suisse and Cushman & Wakefield should not be dismissed.

- Plaintiffs' Consumer Protection Act violation claims against Credit Suisse and Cushman & Wakefield should be dismissed with prejudice.

- Plaintiffs' class allegations should not be dismissed.

3.     Finally, it is recommended that the Motion to Intervene filed by Timothy Blixeth and Alfredo Miguel should be *denied*.

As to the recommendations made about the issues raised in Defendants' Motions to Dismiss and Proposed Intervenors' Motion to Intervene, the Local Civil Rules allow the parties to file "objections" to the Report and Recommendation to Judge Lodge.  If such objections are made, and after Judge Lodge rules upon such objections (or if no objections are made), any claims that are not dismissed will proceed and the case will go forward in the ordinary course. Nothing in the Court's ruling or recommendations is a decision upon the ultimate merits of any claims that remain and are allowed to go forward.  The Plaintiffs will still have the burden to prove such claims, and the Defendants will still have the opportunity to defend against those claims.

## II.  BACKGROUND

**A.     General Factual Background**

Plaintiffs purchased real property and homes in resort-style developments known as Lake Las Vegas, Tamarack, Ginn Sur Mer, and Yellowstone Club.  This case has many moving parts, evidenced by Plaintiffs' 89-page Third Amended Complaint ("TAC"); however, the general

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 5**

backdrop of Plaintiffs' claims relates to the manner in which Credit Suisse, with appraisals prepared by Cushman & Wakefield, marketed and implemented financing for each of the above-referenced developments.

Specifically, Plaintiffs allege that Credit Suisse masterminded a scheme – made possible by Cushman & Wakefield's creative, yet allegedly unlawful, Total Net Value ("TNV") appraisal methodology – to (1) induce the developers of these exclusive master-planned communities ("MPCs") to borrow huge sums of money through non-recourse loans from Credit Suisse, and (2) persuade these same developers to take out their equity in these developments, capitalizing on misleading future growth projections.

According to Plaintiffs, this deliberate strategy (which Plaintiffs refer to as the "Loan to Own" scheme) not only generated tens of millions of dollars in upfront "loan fees" for Credit Suisse, it also provided Credit Suisse with unfettered access to each MPC's confidential, proprietary, and key business information which, in turn, allowed Credit Suisse to assume lender advisory and "co-developer" roles within the MPCs.  Once inside the door, Plaintiffs claim that Credit Suisse was then able to direct the development of, and influence capital decisions for, the MPCs until the expected financial collapse of the developments under the weight of unsustainable debt.

Having "syndicated" its creditor status in the meantime and, thus, allegedly transacting away the inevitable financial consequences of default, Plaintiffs further contend that Credit Suisse intentionally positioned itself to take over the MPCs as a result of the subsequent, but nonetheless anticipated, bankruptcy and/or receivership proceedings – the apparent genesis of Plaintiffs' "Loan to Own" phraseology.

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 6**

**B.      Procedural Background**

As property owners within these allegedly doomed MPCs, Plaintiffs accuse Defendants of engaging in predatory lending practices.  They originally asserted eight causes of action against both Credit Suisse and Cushman & Wakefield in their January 28, 2010 Second Amended Complaint ("SAC"): (1) Racketeer Influenced and Corrupt Organizations Act ("RICO") violations; (2) fraud; (3) negligent misrepresentation; (4) breach of fiduciary duty; (5) tortious interference with contractual relations; (6) unjust enrichment; (7) negligence; and (8) common law conspiracy.  *See* SAC (Docket No. 18).  Credit Suisse and Cushman & Wakefield moved to dismiss each of these claims through their respective March 29, 2010 Motions to Dismiss, arguing that Plaintiffs lacked Article III standing and, regardless, Plaintiffs' SAC failed to state cognizable claims.  *See* Credit Suisse's and Cushman & Wakefield's Mots. to Dismiss (Docket Nos. 48 & 51).

On February 17, 2011, the undersigned issued a Report and Recommendation, recommending that Credit Suisse's and Cushman & Wakefield's Motions to Dismiss be resolved as follows:

| CLAIM | CREDIT SUISSE | CUSHMAN & WAKEFIELD |
|---|---|---|
| •      RICO | Dismissed | Dismissed |
| •      Fraud | Dismissed Without Prejudice | Dismissed Without Prejudice |
| •      Negligent Misrepresentation | Dismissed Without Prejudice | Dismissed Without Prejudice |
| •      Breach of Fiduciary Duty | Not Dismissed | Dismissed With Prejudice |
| •      Tortious Interference with Contractual Relations | Not Dismissed | Dismissed Without Prejudice |
| •      Unjust Enrichment | Dismissed Without Prejudice | Dismissed With Prejudice |
| •      Negligence | Not Dismissed | Not Dismissed |
| •      Common Law Conspiracy | Not Dismissed | Not Dismissed |

*See* 2/17/11 R&R, pp. 50-52 (Docket No. 106).

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 7**

On March 31, 2011, after objections by the parties, U.S. District Judge Edward J. Lodge adopted in part, and rejected in part, the Report and Recommendation as follows:

| CLAIM | CREDIT SUISSE | CUSHMAN & WAKEFIELD |
|---|---|---|
| • RICO | Dismissed | Dismissed |
| • Fraud | Dismissed, Without Prejudice | Dismissed, Without Prejudice |
| • Negligent Misrepresentation | Dismissed, Without Prejudice | Dismissed, Without Prejudice |
| • Breach of Fiduciary Duty | Not Dismissed | Dismissed, With Prejudice |
| • Tortious Interference with Contractual Relations | Not Dismissed | Dismissed, Without Prejudice |
| • Unjust Enrichment | Dismissed, Without Prejudice | Dismissed, With Prejudice |
| • Negligence | Dismissed, Without Prejudice | Dismissed, Without Prejudice |
| • Common Law Conspiracy | Not Dismissed | Dismissed, Without Prejudice |

*See* 3/31/11 Order, pp. 28-29 (Docket No. 126).

Essentially, the Report and Recommendation was not adopted as to the Motions to Dismiss the negligence claim and Cushman & Wakefield's Motion to Dismiss the common law conspiracy claim. The Report and Recommendation was adopted in all other respects. *See id.* at p. 28, n.15. Concerning those claims dismissed without prejudice, Judge Lodge allowed Plaintiffs the opportunity to amend their complaint; furthermore, Judge Lodge permitted Defendants to file a second round of motions to dismiss. *See id.* at pp. 29-30.

On April 21, 2011, a different set of Plaintiffs[1] filed their TAC, asserting the following causes of action against both Credit Suisse and Cushman & Wakefield: (1) fraud; (2) negligent misrepresentation; (3) breach of fiduciary duty;[2] (4) tortious interference with contractual

---

[1] Plaintiffs' TAC removes two of the original Plaintiffs (Fresonke and Froelich), while adding three new ones (Mushkin, Land, and Dominguez). *Compare* SAC (Docket No. 18) *with* TAC (Docket No. 129).

[2] Although their breach of fiduciary duty claim against Cushman & Wakefield was previously dismissed with prejudice (*see* 2/17/11 R&R, p. 44, n.30 (Docket No. 106); 3/31/11

relations; (5) negligence; and (6) Consumer Protection Act violations.  *See* TAC (Docket Nos. 129).  Plaintiffs' TAC also contains an unjust enrichment cause of action against Credit Suisse only.  *See id.* Credit Suisse and Cushman & Wakefield now move to dismiss each claim identified within Plaintiffs' TAC, arguing again that Plaintiffs' causes of action fail as a matter of law.  *See* Credit Suisse's and Cushman & Wakefield's Mots. to Dismiss (Docket Nos. 134 & 136).  Cushman & Wakefield's Motion to Dismiss also tests Plaintiffs' class allegations.  These two Motions to Dismiss are now before this Court for the undersigned's consideration.

In addition to Plaintiffs' Motion for Leave to Amend Third Cause of Action and Credit Suisse's and Cushman & Wakefield's respective Motions to Dismiss, this Court also considers Intervenors Timothy L. Blixseth's ("Blixseth")[3] and Alfredo Miguel's ("Miguel") (collectively "Proposed Intervenors") Motion to Intervene as Plaintiffs and to File Complaint in Intervention.  *See* Mot. to Intervene (Docket No. 159).  In support of their Motion to Intervene, Proposed Intervenors claim an interest in the underlying transaction that is the subject of the TAC and argue, relatedly, that common questions of law and fact exist between themselves and the current Plaintiffs.  *See id.* at pp. 1-2.  Both Credit Suisse and Cushman & Wakefield oppose these efforts.  *See* Credit Suisse's and Cushman & Wakefield's Opp'ns to Mot. to Intervene (Docket Nos. 161 & 162).[4]

---

Order, p. 28 (Docket No. 126)), Plaintiffs seek to revive that claim through their Motion for Leave to Amend Third Cause of Action.  *See* Mot. to Am. (Docket No. 130).  This Motion is also now before this Court for the undersigned's consideration.

[3] Proposed Intervenor Timothy L. Blixseth and Plaintiff Beau Blixseth are separate and distinct "parties" to this action.

[4] Following the completion of briefing on the Motion to Intervene, Plaintiffs expressly joined in the relief sought therein.  *See* Joinder (Docket No. 167).  Credit Suisse and Cushman & Wakefield also oppose Plaintiffs' joinder in these respects.  *See* Credit Suisse's and Cushman & Wakefield's Opp'ns (Docket Nos. 134 & 136).

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 9**

### III.  DISCUSSION/REPORT

**A.      Plaintiffs' Motion for Leave to Amend Third Cause of Action (Docket No. 130)**

Originally, Plaintiffs asserted a breach of fiduciary duty claim against Cushman &

Wakefield; however, Plaintiffs did not respond to Cushman & Wakefield's first Motion to

Dismiss on this issue, nor object to the claim's dismissal as to Cushman & Wakefield during oral

argument on the initial go-round of dismissal hearings.  *See* 2/17/11 R&R, p. 44, n. 30 (Docket

No. 106).  With this in mind, the undersigned recommended that Plaintiffs' breach of fiduciary

duty claim against Cushman & Wakefield be dismissed with prejudice.  *See id*. at p. 51.

Plaintiffs did not object and, on March 31, 2011, Judge Lodge officially dismissed Plaintiffs'

breach of fiduciary duty claim against Cushman & Wakefield with prejudice.  *See* 3/31/11 Order,

pp. 28 (Docket No. 126).

Since then, however, Plaintiffs claim that new information in the form of an insider

account – namely, from Mr. Michael Miller –  reveals a conspiracy between Credit Suisse and

Cushman & Wakefield to support a breach of fiduciary duty claim against not only Credit

Suisse, but also Cushman & Wakefield.  *See* Mem. in Supp. of Mot. to Am., p. 2 (Docket No.

130, Att. 1) ("Very clearly, unknown to Plaintiffs until this past March of 2011, were the details

of Cushman & Wakefield's knowing and intentional participation . . . with Credit Suisse to plan,

agree to implement, and implement the appraisal and lending scheme perpetrated against the

Plaintiffs and others.").  Citing to FRCP 15(d), Plaintiffs argue that this newly discovered

information warrants an amendment of their third cause of action to add a breach of fiduciary

duty claim against Cushman & Wakefield directly.  *See id*. at p. 1 ("This brief is filed pursuant to

FRCP 15(d) which permits amendments and supplemental pleadings based upon transactions

which have occurred since the filing of the original document.").

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 10**

FRCP 15(d) is not a good fit for the amendment sought within Plaintiffs' Motion to

Amend.  As Cushman & Wakefield points out, FRCP 15(d) is inapplicable when considering

that the allegations presented within Plaintiffs' proposed breach of fiduciary duty claim do not

represent *new* facts, but, instead, *newly-discovered* facts that "concern alleged conduct that

occurred *prior to* 2010."  *See* Cushman & Wakefield Opp. to Mot. to Am., p. 6 (Docket No. 144)

(emphasis in original).  Plaintiffs concede as much when, in response to Cushman & Wakefield's

arguments opposing Plaintiffs' amendments, Plaintiffs abandon any reliance upon FRCP 15(d) in

favor of FRCP 54(b).  *See* Reply in Supp. of Mot. to Am., p. 1 (Docket No. 154).

Nonetheless, the Court concludes that, at this juncture of the lawsuit, Plaintiffs should not

be forever precluded from asserting a breach of fiduciary duty claim without first seeking

reconsideration of Judge Lodge's March 31, 2011 Order dismissing that claim.  *See* Cushman &

Wakefield Opp. to Mot. to Am., pp. 3-5 (Docket No. 144).  Cushman & Wakefield's arguments

rely primarily upon the "with prejudice" prong of the breach of fiduciary duty claim's dismissal.

The dismissal with prejudice, however, was not the measure of the substantive merits of the

claim;[5] rather, the claim was dismissed (with prejudice) by acquiescence, based upon the then-

existing record.[6]  On the current record, the Court is persuaded that it is more sensible to

---

[5]  Such facts distinguish this action from those cases relied upon by Cushman &
Wakefield on the issue.  *See* Cushman & Wakefield Opp. to Mot. to Am., pp. 4-5 (Docket No.
144).  Had this Court previously dismissed Plaintiffs' breach of fiduciary duty claim against
Cushman & Wakefield based upon Plaintiffs' *legal* inability to pursue such a claim, these cases
would be problematic for Plaintiffs.  However, that did not happen here.

[6]  In other words, by consenting upfront to the dismissal of their breach of fiduciary duty
claim against Cushman & Wakefield, there was no disagreement between Plaintiffs' position and
the Court's ruling from which any substantive reconsideration could be based upon.  This is not
to say that Plaintiffs could not have moved for reconsideration, but only that Plaintiffs were not
required to move for reconsideration given the procedural backdrop surrounding their breach of
fiduciary duty claim's prior dismissal.

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 11**

consider Plaintiffs' Motion for Leave to Amend Third Cause of Action in the same context as if
Plaintiffs had never asserted the claim to begin with, or that it had been dismissed without
prejudice.  Considered in that context, the Court's previous dismissal with prejudice, coupled
with Plaintiffs' failure to first seek reconsideration, are not fatal to their attempt to later assert a
breach of fiduciary duty claim against Cushman & Wakefield via amendment alone.

In reaching this ruling, the Court emphasizes that this action remains in an early
procedural stage.  Cushman & Wakefield has strenuously challenged the Plaintiffs' claims in two
comprehensive motions to dismiss.  However, no case management order has been entered, no
discovery has taken place, and no amendment deadline has been set.  Further, this ruling does
not measure the actual merits of Plaintiffs' breach of fiduciary duty claim against Cushman &
Wakefield (although sufficiently pled, a substantive challenge to its merits may still be raised by
Defendants at a later date) and the ruling is within the Court's inherent power to revise a prior
ruling when justice so requires at any time before final judgment has been entered in the case.

*See U.S. v. Asarco Inc.*, 471 F. Supp. 2d 1063, 1067 (D. Idaho 2005).  Pursuant to FRCP 54(b):

> [A]ny order or other decision, however designated, that adjudicates fewer than all the
> parties does not end the action as to any of the claims or parties and may be revised
> at any time before the entry of a judgment adjudicating all the claims and all the
> parties' rights and liabilities.

Fed. R. Civ. P. 54(b).  Consistent with this Rule,[7] the Court will revise its previous decision and
will permit Plaintiffs the opportunity to allege facts supporting a breach of fiduciary duty claim
against Cushman & Wakefield.

---

[7] During oral argument, Cushman & Wakefield's counsel objected to Plaintiffs
newfound reliance upon FRCP 54(b) because the Rule was not cited as legal support within
Plaintiffs' moving paperwork.  This is true; however, the Court is not particularly troubled by the
shift in Plaintiffs' arguments in this respect when recognizing the Court's power to invoke FRCP
54(b) on its own, independent of any party's request that it do so.  *See, e.g.*, *Asarco*, 471 F. Supp.
2d at 1067 (identifying district court's "Sua Sponte Modification of the Court's Prior Order").

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 12**

In summary, Plaintiffs' breach of fiduciary duty cause of action against Cushman &

Wakefield was not initially dismissed following an in-depth consideration of the claim's merits.

Moreover, at this procedural stage of the lawsuit, an amendment will not unfairly prejudice

Cushman & Wakefield's preparation and related defense.  Finally, Plaintiffs' counsel represent

as officers of the court that Mr. Miller has insider knowledge of Cushman & Wakefield's alleged

coordination with Credit Suisse that presents a new, different, factual backdrop to Plaintiffs'

current breach of fiduciary duty claim against Cushman & Wakefield.  These reasons combine to

warrant the sought-after amendment under FRCP 54(b).[8]  Therefore, it is hereby ordered that

Plaintiffs' Motion for Leave to Amend Third Cause of Action (Docket No. 130) is granted.[9]

**B.    Credit Suisse's and Cushman & Wakefield's Motions to Dismiss Plaintiffs' Third
       Amended Complaint (Docket Nos. 134 & 136)**

        1.    The Legal Measuring Stick for a Motion to Dismiss

        FRCP 8(a)(2) requires "a short and plain statement of the claim showing that the pleader

is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the

grounds upon which it rests."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  While

---

[8] Cushman & Wakefield alternately argues that, even if an amendment is procedurally
proper, leave to amend would be futile.  *See* Cushman & Wakefield Opp. to Mot. to Am., pp. 7-9
(Docket No. 144).  These arguments will be considered in the context of Cushman &
Wakefield's Motion to Dismiss, discussed later in the Report and Recommendation portion of
this document.  *See infra* at pp. 28-32.

[9] Because the undersigned's handling of Plaintiffs' Motion for Leave to Amend Third
Cause of Action is not dispositive of Plaintiffs' proposed breach of fiduciary duty claim against
Cushman & Wakefield, it is resolved via the Memorandum Decision and Order portion of this
document.  See 28 U.S.C. § 636(b)(1)(A); *but see Lewis v. Beaufort Court*, 2010 WL 5672334,
*4 n.4 (D.S.C. 2010) ("Motions to amend and to remand are clearly nondispositive matters
subject to an Order by a Magistrate Judge, however since these issues are so wrapped up with
dispositive matters in this instance, a Report and Recommendation is made as to all issues.").

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 13**

a complaint attacked by a Rule 12 motion to dismiss "does not need detailed factual allegations," it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555. To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id*. at 570. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. at 556. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id*. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*. at 557.

In a subsequent case, the Supreme Court identified two "working principles" that underlie *Twombly*. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Id*. "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id*. at 1950. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id*. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*.

Providing too much in the complaint may also be fatal to a plaintiff. Dismissal may be appropriate when the plaintiff has included sufficient allegations disclosing some absolute defense or bar to recovery. *See Weisbuch v. County of L.A.*, 119 F.3d 778, 783, n.1 (9th Cir.1997

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 14**

(stating that "[i]f the pleadings establish facts compelling a decision one way, that is as good as if depositions and other . . . evidence on summary judgment establishes the identical facts.").

Nonetheless, a dismissal without leave to amend is improper unless it is beyond doubt that the complaint "could not be saved by any amendment." *Krainski v. Nevada ex rel. Bd. of Regents*, 616 F.3d 963, 972 (9th Cir. 2010) (issued after *Iqbal*).[10]   The Ninth Circuit has held that "in dismissals for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook v. Perkiss and Liehe, Inc. v. Northern California Collection Serv., Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).   The issue is not whether plaintiff will prevail but whether he "is entitled to offer evidence to support the claims."  *See Diaz v. Int'l Longshore and Warehouse Union, Local 13*, 474 F.3d 1202, 1205 (9th Cir. 2007) (citations omitted).

Under FRCP 12(b)(6), the Court may consider matters that are subject to judicial notice. *See Mullis v. United States Bank*, 828 F.2d 1385, 1388 (9th Cir. 1987).  The Court may take judicial notice "of the records of state agencies and other undisputed matters of public record" without transforming the motions to dismiss into motions for summary judgment.  *See Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 866 (9th Cir. 2004).  The Court

---

[10]   The Court has some concern about the continued vitality of the liberal amendment policy based as it is on language in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), suggesting that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim . . . ."  Given *Twombly* and *Iqbal's* rejection of the liberal pleading standards adopted by *Conley*, a question arises whether the liberal amendment policy still exists.  Nevertheless, the Circuit has continued to apply the liberal amendment policy even after dismissing claims for violating *Iqbal* and *Twombly*.  Accordingly, the Court will continue to employ the liberal amendment policy.  *See, e.g.*, *Tolman v. American Red Cross*, 2011 WL 6333700, *2, n.1 (D. Idaho 2011).

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 15**

may also examine documents referred to in the complaint, although not attached thereto, without transforming the motion to dismiss into a motion for summary judgment.  *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

 2. <u>First Cause of Action: Fraud Against All Defendants</u>

 "A claim of fraud requires the plaintiff to establish nine elements with particularity: (1) a statement or a representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) justifiable reliance; and (9) resultant injury."  *Mannos v. Moss*, 155 P.3d 1166, 1170 (Idaho 2007).[11]

 a. *Credit Suisse's Alleged Fraud*

 The SAC's fraud claim against Credit Suisse was dismissed due to the absence of allegations speaking to Plaintiffs' reliance (or even ability to rely) upon Credit Suisse's alleged misrepresentation(s).  *See, e.g.*, 2/17/11 R&R, pp. 39-40 (Docket No. 106) (". . . Plaintiffs' alleged reliance on any representations from Credit Suisse and/or Cushman & Wakefield would seem to be compromised if a certain number of Plaintiffs purchased their properties before either Credit Suisse or Cushman & Wakefield was even involved in the conduct Plaintiffs now complain about . . . .  If, in fact, there are Plaintiffs who bought into any of the four resorts prior to Credit Suisse's (and, hence, Cushman & Wakefield's) participation in those projects, rhetorically speaking, how could those Plaintiffs have relied upon *any* (mis)representations from those parties?") (emphasis in original).  Through its latest Motion to Dismiss, Credit Suisse

---

 [11]  For the purposes of resolving Defendants' Motions to Dismiss only, the parties appear to agree that these elements are, more-or-less, consistent with respect to the different state (and international) laws that may apply – Montana, Idaho, Nevada, and the Bahamas.

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 16**

argues that Plaintiffs' TAC does not cure this deficiency and, even if it did, there are no false representations attributable to Credit Suisse that set in motion a fraud claim.  *See* Credit Suisse Mot. to Dismiss, pp. 3-7 (Docket No. 135).  Inherent within these challenges, Credit Suisse additionally maintains that Plaintiffs' TAC fails to plead fraud with the requisite level of particularity.  *See id.* at pp. 8-14.

Attacking the fraud claim's most preliminary elements, Credit Suisse argues strenuously that "[t]here was nothing false or misleading in statements – whether published in a developer's press release or passed along by developers – that a loan had been made."  *See id.* at p. 8; *see also id.* at 7 & 9 ("Plaintiffs can do no better in alleging representations by Credit Suisse to the Plaintiffs than to point to a single press release . . . in which the *Tamarack developer* announced that he had received a loan from Credit Suisse. . . . . [T]he press release did nothing more than announce the fact – admittedly true – that Credit Suisse made a loan to a developer.") (emphasis in original).[12]  On its face, this argument carries some legal sway: it is undisputed that Credit

---

[12]  Credit Suisse continues to argue that there are no allegations of (mis)representations directly between Credit Suisse and Plaintiffs.  *See, e.g.*, Credit Suisse Mot. to Dismiss, p. 7 (Docket No. 135) (". . . Plaintiffs . . . fall[ ] back on supposed representations by Credit Suisse to *the developers*, Credit Suisse's borrowers.") (emphasis in original); *see id.* at p. 9 ("Nowhere do Plaintiffs allege that Credit Suisse marketed the loans to Plaintiffs, that Credit Suisse informed the Plaintiffs of the appraisals or its contents, or that Credit Suisse made any statements whatsoever to the Plaintiffs.  None of the Plaintiffs allege to have ever spoken to Credit Suisse or learned anything about the loan from Credit Suisse.  Instead, to the extent Plaintiffs claim to have even known about the loan, the source was always someone *other than Credit Suisse* ") (emphasis in original).  However, "[t]he fact that Credit Suisse may have made its alleged misrepresentations to developers instead of the homeowner Plaintiffs is not, by itself, fatal to Plaintiffs' fraud claim."  *See* 2/17/11 R&R, p. 38 (Docket No. 106) (citing *Adams v. U.S.*, 622 F. Supp. 2d 996, 1004 (D. Idaho 2009) ("Liability for misrepresentation may be based on [defendant's] statements to others that were intended by [defendant] to reach the . . . plaintiffs.")).  Plaintiffs contend that any alleged misrepresentations were made with the expectation that individuals would buy into the MPC projects.  *See, e.g.*, 2/17/11 R&R, p. 39 (Docket No. 106); *see also* 5/11/10 MDO, p. 9 (Docket No. 73); TAC, ¶ 21 (Docket No. 131)

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 17**

Suisse, in fact, issued loans to the developers of the at-issue MPCs.  If those loans were tied to conventional appraisal methods, Credit Suisse's argument in this respect might very well apply to preclude Plaintiffs' fraud claim.  However, Plaintiffs allege just the opposite.  Plaintiffs contend that Cushman & Wakefield's underlying appraisals were purposely deceptive in the calculation of the MPCs' net worth, such that the Credit Suisse loans represented a fundamentally and intentionally skewed perception of the MPCs' value over time.  *See, e.g.*, TAC, ¶¶ 6, 13, 21, 55, 57, 77, & 154 (Docket No. 131).  The Court agrees that an allegation simply that Credit Suisse made a loan to an MPC is not a false statement capable of anchoring a fraud claim.  But that is not the whole of Plaintiffs' contentions; rather, Plaintiffs allege the loans were intentionally premised upon misleading appraisals, were presented without fair explanation of their unusual nature, and, therefore, were intrinsically false and misleading.  Accordingly, Plaintiffs have alleged that Credit Suisse made purposeful misrepresentations of fact, and the unusual nature of the loans are the hub of Plaintiffs' allegations.  Viewed in this light, Plaintiffs' fraud claim against Credit Suisse should not be dismissed at this threshold stage upon this element.

However, Plaintiffs' alleged reliance upon these loans is another matter.  Indeed, Credit Suisse points out that "nearly all of the named Plaintiffs purchased their properties well *before*

---

("Credit Suisse knew . . . that it was critical to announce directly to existing property owners and prospective property owners that it had made loans to each of the MPCs . . . ."); *id*. at ¶ 154 ("Credit Suisse made material false representations that it knew would be communicated to and relied upon by Plaintiffs to their detriment . . . .  When Credit Suisse made these public statements and its private statements to developers . . ., it intended for those statements to reach the Plaintiff class . . . ."); *id*. at ¶ 162  ("Defendants prepared these documents and made these representations . . . with specific knowledge and intent that said documents would be distributed to developers and would foreseeably affect the latter's home buyers . . . .").  Therefore, Plaintiffs' fraud claim against Credit Suisse should not be dismissed due to a lack of representations made directly from Credit Suisse to Plaintiffs.

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 18**

Credit Suisse even issued its loan, making any reliance on Credit Suisse's alleged statements to the developers impossible." *See* Credit Suisse Mot. to Dismiss, p. 4 (Docket No. 135) (emphasis in original); *see also id.* at p. 6 (after discussing timing of various MPC loans vis à vis certain named Plaintiffs' purchases, stating:  "[a]ccordingly, seven of the nine named Plaintiffs admittedly purchased properties before Credit Suisse's loans.").  Plaintiffs do not dispute this point, but argue that Plaintiffs' reliance upon Credit Suisse's alleged fraudulent non-disclosure and/or partial disclosure (1) can be implied, and (2) regardless, exists in the context of certain Plaintiffs' actions taking place *after* they purchased property within the MPCs.  *See* Pls.' Opp. to Credit Suisse Mot. to Dismiss, pp. 6-8 (Docket No. 152).

First, Plaintiffs' reliance in a fraud count cannot be implied, particularly in the present procedural posture of this case where the importance of the reliance element is paramount and obvious to all.  The roadmap for the nature of the needed amendment on reliance allegations could not have been more clear from the prior motion practice and rulings in this case.  Even so, Plaintiffs offer no plausible reasons for finding reliance-by-implication (beyond generically stating its availability "under certain circumstances" (*see id.* at p. 6) not present here), and such an argument has no starting place given Plaintiffs' prior admission in oral argument that *actual* reliance must be specifically alleged:

> [T]o be candid with the Court, my gut reaction when I observed this problem is I think we need to amend and add more specificity under 9(b) on the common law fraud and we would request leave to amend on the common law.  The Court asked what allegations we have in our Complaint specific to when . . . homeowners purchased their properties and was it after the loans . . . .  I think frankly, Your Honor, if we are given leave to amend, that certainly those would require amendment as to specificity because they've alleged just generally as to reliance.

*See* 7/22/10 Tr. at 66:2-5; 90:2-16.  Stating now that reliance is implied, without more, is insufficient.  If such reliance existed, Plaintiffs should be able to particularly identify the

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 19**

circumstances and fact of such reliance, independent of oblique inferences.  Simply put, absent

authentic, plausible, reliance, there is no fraud – regardless of how nefarious the alleged

misrepresentations may be characterized.

Second, although claiming that "the TAC specifically pleads . . . plausible reliance by

Plaintiffs and Plaintiff Class Members" (*see* Pls.' Opp. to Credit Suisse Mot. to Dismiss, p. 7

(Docket No. 152)), Plaintiffs cite only Plaintiff Gibson's and Plaintiff LaFleur's Tamarack

transactions and how, although purchasing their properties *before* Credit Suisse's June 1, 2006

loan, they nonetheless relied upon the loan with respect to *later* investment decisions:

> [L]ead Plaintiff, L.J. Gibson alleges: On September 9, 2005, Gibson purchased her
> Tamarack ski-in-ski-out lot for nearly $840,000 including a club membership with
> a minimal value of $30,000.  In or around May of 2006, Gibson learned from real
> estate agents at Tamarack that a major bank was proposing a long-term loan for
> Tamarack that would help promote further construction and development at the
> MPC.  Instead of selling her lot which would have returned her investment and
> provide a profit of $400,000, Gibson instead kept her lot and developed it after a
> June 1, 2006 press release that the international bank, Credit Suisse, had provided a
> $250,000 loan. . . . .
>
> Monique LaFleur was invited to see Tamarack resort in the Winter of 2003 . . . .  As
> the resort began to further develop, she purchased two Estate home sites in
> approximately December 2004 . . . . .  When Credit Suisse announced its credit
> facilities at Tamarack through press releases, LaFleur further invested based, in part,
> on such loan.[13]  In 2006, LaFleur purchased a Tamarack Townhome as a home base
> for future building projects at Tamarack, and she formed Griffen Development LLC
> [Griffen] with Thomas LaFleur, her brother. . . . .  Griffen purchased additional resort
> homesites during 2005 and 2006. . . . .[14]

---

[13]  The TAC does not adequately explain what is meant by "further invested" and "based,
in part, on such loan."

[14]  It is not clear how, if formed in 2006, Griffen could have purchased Tamarack
homesites in 2005 (and potentially in 2006, depending on Griffen's formation compared to the
2006 purchase date), as alleged in paragraph 31 of the TAC.

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 20**

*See id.* (quoting TAC, ¶¶ 26 & 31 (Docket No. 131)); *see also id.* at p. 9.[15]  This is the extent of

Plaintiffs' response.  Even accepting these particular allegations as true, they paint a very sparse

picture of specific Plaintiffs at specific MPCs.  Plaintiffs' collective reliance upon Credit

Suisse's loans remains much too spare – especially when considering that this action is brought

by Plaintiffs individually, and also "on behalf of all others similarly situated."  *See* TAC, p. 2

(Docket No. 131); *see also id.* at ¶ 47 ("Plaintiffs bring this action individually and on behalf of

the following class of similarly situated persons and entities (the "Class"), of which they are

members . . . ."); *id.* at ¶ 152 ("[D]efendants are liable to Plaintiffs and the Class for damages

arising from their common law fraud . . . .").

When examining each Plaintiff and their related "investments" at the various MPCs,

there is no unified, consistent allegation of reliance.  Yes, as to particular Plaintiffs at particular

MPCs, reliance appears to be alleged in the TAC; however, elsewhere in the TAC, there either is

no reliance or, at best, reliance only *possibly* exists.  For instance:

- Plaintiff Jennings purchased property at Lake Las Vegas in 2002, before the Credit Suisse loan.  *See id.* at ¶ 29.  The TAC does not allege that Jennings ever relied upon Credit Suisse's loan or the underlying Cushman & Wakefield appraisal in making any investment decisions.

- Plaintiff Mushkin purchased property at Lake Las Vegas before Credit Suisse's 2004 loan.  *See id.* at ¶ 30.  After learning of the loan, Mushkin claims to have "invested well over a million dollars of his funds in raw property that was adjacent to one of the well established and famous Lake Las Vegas Golf Clubs, Reflection Bay.  *See id.*  The TAC does not adequately specify whether this investment relates to his pre-loan purchase or, even, took place within the Lake Las Vegas resort complex or, simply, adjacent to a golf club within the MPC.[16]

---

[15]  Although not referenced in Plaintiffs' briefing, Plaintiff Koenig also alleges that she built a home in reliance upon Credit Suisse's financing.  *See* TAC, ¶ 28 (Docket No. 131).

[16]  It is difficult for the Court to draw a reasonable inference from this paragraph that Mushkin invested in the Lake Las Vegas resort.  Plaintiffs are clearly aware that specific

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 21**

- It is not clear whether Plaintiff Griffen's and/or Plaintiff LaFleur's referenced 2006 Tamarack purchases took place before or after Credit Suisse's loan.  *See id*. at ¶ 31.

- Plaintiff Land purchased a cottage, a parcel of land, two townhomes, and a condo at Tamarack in 2004 and 2005, before the Credit Suisse loan.  *See id*. at ¶ 33.  The TAC does not allege that Land ever relied upon Credit Suisse's loan or the underlying Cushman & Wakefield appraisal in making any investment decisions.

- Plaintiff Dominguez claims to have purchased land in Tamarack after the Credit Suisse loan, however does not allege that he relied upon Credit Suisse's loan or the underlying Cushman & Wakefield appraisal in making the purchase.  *See id*. at ¶ 34.

*See also* Credit Suisse Mot. to Dismiss, pp. 4-6 (Docket No. 135); *see also, e.g.*, 1/12/12 Tr. at 97:24-98:2 (Docket No. 194) (as to consumer protection act claim, Plaintiffs' counsel stating: "There are a lot of allegations involving misrepresentations, omissions that will be applicable to *certain* class members, class representatives *if* they did receive those, *if* they did rely on those.") (emphasis added).[17]  These shortcomings call into question Plaintiffs' alleged reliance, regardless of whether Plaintiffs contend it is expressed or inferred.

   While the theory supporting Defendants' alleged fraud may be well known in another forum (e.g., U.S. Bankruptcy Judge Ralph Kirscher's bankruptcy court opinions to date (*see*

---

allegations of reliance are needed.  This paragraph is at best oblique about the property's connection to the Lake Las Vegas MPC, and if the referenced property is, in fact, outside the boundaries as would seem to be the case, it has no merit for Plaintiffs in their attempt to stake out the reliance element.

   [17]  Where the TAC contains a complete absence of particularized reliance allegations as to certain Plaintiffs, its later, purportedly unequivocal statement that "Plaintiffs in fact did rely to their detriment on the value conclusions in the TNV and TNP appraisals as a result of Credit Suisse's marketing campaigns associated with their loans" (*see* TAC, ¶ 153 (Docket No. 131); *see also e.g.*, *id*. at ¶¶ 87 & 182) is necessarily compromised.

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 22**

Docket Nos. 91, Att. 1 & 101)), the Court must consider Plaintiffs' obligation in this case to "state with particularity the circumstances constituting fraud," including the specific details of any alleged misrepresentation(s) and, likewise, Plaintiffs' justifiable reliance. *See* Fed. R. Civ. P. 9(b). Even in the TAC, most of Plaintiffs' alleged instances of reliance could not even be characterized as a "near miss," when what is needed are allegations of matter-of-fact, particularized, reliance upon Credit Suisse's alleged misrepresentations.[18] Hence, the undersigned cannot find in the TAC the necessary allegations of reliance for each Plaintiff, nor can the Court conclude that the potential for a fraud claim applicable to but a limited number of Plaintiffs somehow resuscitates a fraud claim for all other Plaintiffs. *But see* Credit Suisse Reply, p. 4, n.6 (Docket No. 156) (discussing dismissal of some Plaintiffs, but not all Plaintiffs).[19] The law – and fairness to Defendants – requires more for Plaintiffs' currently-styled (and, thus far, briefed) fraud claim against Credit Suisse to continue.

As a result, it is recommended that Plaintiffs' common law fraud claim against Credit Suisse be dismissed with prejudice to the extent the claim is alleged on behalf of a united class

---

[18] Plaintiffs claim to have identified the dates and locations of the fraudulent conduct to the best of their abilities and that they cannot do more without discovery. *See* Pls.' Opp. to Credit Suisse, Mot. to Dismiss, p. 8, n.13 (Docket No. 152). This argument is a non-starter. The fact and particulars of a Plaintiff's own reliance are something that Defendants might understandably be seeking to discover from the Plaintiff, but not the other way around. *Cf.* Credit Suisse Reply, p. 6 (Docket No. 156) ("[I]f any representations had actually been made to Plaintiffs, they would not need discovery to allege what they were, who made them, who heard them, and when they were made.").

[19] Plaintiffs' fraud claim is not broken down by individual Plaintiffs, but is asserted as an all-encompassing class-wide claim. The prospect of dismissed individual claims and the corresponding effect on the entire purported class's ability to pursue that claim, has not been addressed by the parties' arguments to date. Therefore, this Report and Recommendation does not venture down that road.

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 23**

and, individually, as to those Plaintiffs who have not adequately pled reliance in the TAC.[20]

However, because the TAC appears to speak to particular Plaintiffs' reliance in ways that may

preserve their individual fraud claims at given MPCs, it would seem logical to, at the very least,

permit the progression of those discrete claims at this time[21] – to this extent only, then, it is

recommended that Credit Suisse's Motion to Dismiss be denied.

> b.    *Cushman & Wakefield's Alleged Fraud*

Like Credit Suisse, Cushman & Wakefield also takes issue with Plaintiffs' fraud claim,

similarly arguing that it never interacted with or had any communications with Plaintiff and,

separately, that Plaintiffs did not allege reliance upon its appraisals. *See* Cushman & Wakefield

Mot. to Dismiss, pp. 6-11 (Docket No. 139). As with the previous Report and Recommendation,

given the interrelationship between Cushman & Wakefield's appraisals with Credit Suisse's

loans, the Court's consideration of Credit Suisse's arguments in these related respects likewise

applies to Cushman & Wakefield.

The Court also will consider two additional challenges made by Cushman & Wakefield

to Plaintiffs' fraud claim: (1) that Cushman & Wakefield made no false statements of fact

because (a) its appraisals are opinions, not statements of fact, (b) its appraisals are not false, and

---

[20]  Plaintiffs who have not adequately pled reliance in the TAC are: (1) Jennings (Lake Las Vegas), (2) Mushkin (Lake Las Vegas), (3) LaFleur (Tamarack), (4) Griffen (Tamarack), (5) Land (Tamarack), and (6) Dominguez (Tamarack).

[21]  Plaintiffs who have adequately pled reliance in the TAC are: (1) Gibson (Tamarack, Lake Las Vegas, and Ginn Sur Mer), (2) Blixseth (Yellowstone Club), and (3) Koenig (Tamarack). In reaching that conclusion, the Court also believes that the plausibility standard of *Twombly* and *Iqbal* as to the claim's viability is nearly stretched to its limit. These claims, even with their reliance element hanging by a thread after a motion to dismiss, will no doubt be tested in some future dispositive motion.

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 24**

(c) FIREA and USPAP are not applicable; and (2) Plaintiffs' own allegations cut against any suggestion that Cushman & Wakefield intended to defraud anyone.  *See* Cushman & Wakefield Mot. to Dismiss, pp. 11-18 (Docket No. 139).  Having considered the written and oral argument upon these challenges, the Court concludes that they are not persuasive at the motion to dismiss stage of the litigation.

First, the present record does not establish as a matter of law that Cushman & Wakefield made no false statements.  It is true that appraisals generally represent opinions; however, inaccurate or misleading opinions of appraisal value made with an intent to deceive can still be actionable, as Plaintiffs allege here.  *See* Pls.' Opp. to Cushman & Wakefield Mot. to Dismiss, p. 8 (Docket No. 153) (citing *Jordan v. Hunter*, 124 Idaho 899, 907 (Idaho Ct. App. 1993)); *see also, e.g.*, 26 Williston on Contracts § 69:8 (4th ed.); *U.S. v. Hill*, 643 F.3d 807, 863 (11th Cir. 2011); *Croye v. GreenPoint Mortg. Funding, Inc.*, 740 F. Supp. 2d 788, 795 (S.D. W.Va. 2010).  Moreover, for the purposes of its latest Motion to Dismiss, the undersigned has already rejected Cushman & Wakefield's argument that its appraisals are accurate given what they claim to represent.  *See* 2/17/11 R&R, pp. 41-42 (Docket No. 106) ("Such an argument assumes . . . that a reader negotiating the appraisals' provisions understands (or *should* have understood) the quoted language to mean what Cushman & Wakefield and/or Credit Suisse understood it to mean. . . . . Although one could interpret the appraisals' language through the lenses of Cushman & Wakefield's arguments, the Court must consider the limited record before it on the standards applicable to a motion to dismiss, and accept Plaintiffs' allegations as true.  Finally, the application of (let alone violation by virtue of)  FIREA and USPAP to Cushman & Wakefield's appraisals is plainly a disputed matter between Plaintiffs and Cushman & Wakefield.  *Compare*

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 25**

Cushman & Wakefield Mot. to Dismiss, pp. 14-17 (Docket No. 139) *with* Pls.' Opp. to Cushman & Wakefield Mot. to Dismiss, pp. 13-15 (Docket No. 153).  Even if Cushman & Wakefield's position may eventually carry the day, the fact that questions remain as to either authority's applicability here is not fatal to a claim alleging the existence of misrepresentations.  Instead, if necessary, they may be presented in the context of a summary judgment motion, after consideration of any remaining, applicable issues following the resolution of Defendants' Motions to Dismiss.

Second, Plaintiffs' TAC allegations do not discount the possibility of Cushman & Wakefield's purported intent to defraud, as Cushman and Wakefield contends. The TAC does allege that certain "appraisers did not know what upper level management at Credit Suisse was doing with these Total Net Value and Total Net Proceeds appraisals that they were ordering" (*see* TAC, ¶ 671 (Docket No. 131)), thus asserting that some part of the company's employees did not know of the allegedly fraudulent conduct and motives of another part of the company. However,  that allegation does not equate to an admission of some sort that *all* of Cushman & Wakefield was unaware of Credit Suisse's alleged Loan to Own scheme.  The allegation, on its face, is to the contrary, and paints a decidedly different picture.

Even though these two arguments are unavailing for Cushman & Wakefield, the undersigned nonetheless recommends dismissal of Plaintiffs' fraud claim against Cushman and Wakefield consistent with its recommendation relative to Plaintiffs' fraud claim against Credit Suisse.[22]  Hence, dismissal of the claim with prejudice to the extent it is alleged on behalf of a

---

[22]   The Court recognizes that Cushman & Wakefield contends that reliance is even more thinly alleged against it than Credit Suisse.  However, the nature of Plaintiffs' fraud allegations regarding the making, collaboration, and implementation of the TNV appraisals in conjunction with the loans marketed and made to the MPC developers is sufficiently broad to bring Cushman

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 26**

united class and, individually, as to those Plaintiffs who have not adequately pled reliance in the TAC; and permitting the claim as to those Plaintiffs who have properly pled reliance. *See supra* at pp. 16-24.

3.     Second Cause of Action: Negligent Misrepresentation Against All Defendants

The elements of a negligent misrepresentation claim closely resemble those of a fraud claim. Relying on their arguments in favor of dismissing Plaintiffs' fraud claim, Credit Suisse and Cushman & Wakefield also move to dismiss Plaintiffs' negligent misrepresentation claim. *See* Credit Suisse Mot. to Dismiss, p. 15 (Docket No. 135) ("Thus, Plaintiffs' negligent misrepresentation claim fails for the same reasons as their fraud count."); Cushman & Wakefield Mot. to Dismiss, pp. 5-18 (Docket No. 139) (attacking Plaintiffs' fraud and negligent misrepresentation claims using identical arguments); *see also* Pls.' Opp. to Credit Suisse Mot. to Dismiss, p. 9 (Docket No. 152) & Pls.' Opp. to Cushman & Wakefield Mot. to Dismiss, p. 8 (Docket No. 153) ("Much of the material supplied above relative to fraud is equally instructive relative to the Second Cause of Action for Negligent Misrepresentation, and will not be repeated here.").

Given the admitted similarities between fraud and negligent misrepresentation claims, and the corresponding arguments made as to each such claim,[23] the Court recommends that, like

---

& Wakefield within their reach. Hence, a particularized allegation of reliance upon the fact of the loans, which were alleged to be intertwined with the appraisals, is sufficient at this stage, albeit, as with Credit Suisse, only as to those particular Plaintiffs who made such allegations.

[23]  Plaintiffs argue that the Restatement (Second) of Torts § 552 outlines the claim for negligent misrepresentation by a professional. *See* Pls.' Opp. to Credit Suisse Mot. to Dismiss, pp. 9-10 (Docket No. 152) & Pls.' Opp. to Cushman & Wakefield Mot. to Dismiss, pp. 8-9 (Docket No. 153). In doing so, however, Plaintiffs concede that, as with their fraud claim, their negligent misrepresentation claim also requires reliance. *See id.* ("Section 552 does not require

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 27**

Plaintiffs' fraud claim, Plaintiffs' negligent misrepresentation claim be dismissed with prejudice to the extent the claim is alleged on behalf of a united class and, individually, as to those Plaintiffs who have not adequately pled reliance in the TAC (Jennings, Mushkin, LaFleur, Griffen, Land, and Dominguez).  However, Plaintiffs' negligent misrepresentation claim should not be dismissed as to those Plaintiffs who have alleged reliance in the TAC (Gibson, Blixseth, and Koenig).[24]

4.    Third Cause of Action: Breach of Fiduciary Duty Against All Defendants

To establish a claim for breach of fiduciary duty in the relevant jurisdictions, a plaintiff must establish that defendants owed plaintiff a fiduciary duty and that the fiduciary duty was breached.  *See Buschi v. Sage Health Care, PLLC*, 203 P.3d 694, 699 (Idaho 2009) (citation and marks omitted); *see also Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865, 880-81 (9th Cir. 2007) (applying Nevada law).[25]  Previously, the Court denied Credit Suisse's Motion to Dismiss as to Plaintiffs' breach of fiduciary duty claim.  *See* 2/17/11 R&R, pp. 43-46 & 51 (Docket No. 106); 3/31/11 Order, pp. 15-17 & 29 (Docket No. 126).  However, based upon Plaintiffs' latest round of briefing specific to *other* claims asserted in the TAC, Credit Suisse argues that "the

_____

privity between the Plaintiff and defendant or that the defendant knew of the identify of the Plaintiff who relied on the appraisal.  All that is required is that Plaintiffs are within the limited group of persons that Credit Suisse or Cushman knew or foresaw would rely on the appraisals to their detriment.").  Plaintiffs have not adequately pled uniform reliance in support of either their fraud or misrepresentation claims.

[24]  Notably, "Plaintiffs agree with Defendants that no cause of action . . . for negligent misrepresentation exists in Idaho."  *See* Pls.' Opp. to Credit Suisse Mot. to Dismiss, p. 9, n.14 (Docket No. 152) & Pls.' Opp. to Cushman & Wakefield Mot. to Dismiss, p. 9, n.11 (Docket No. 153).  Therefore, such a claim alleged to be drawn from Idaho law is *not* present within the TAC.

[25]  The parties do not contend the presence of any important distinction in these basic elements across the applicable jurisdictions.

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 28**

basis for a supposed fiduciary duty owed to Plaintiffs no longer exists" and, thus, Plaintiffs'

breach of fiduciary duty claim against it should now be dismissed.  *See* Credit Suisse Reply, p.

15 (Docket No. 156).  Moreover, having already granted Plaintiffs' Motion to Amend, the

undersigned also takes up Cushman & Wakefield's substantive arguments against the

availability of a breach of fiduciary duty claim against it as well.

> a.    *Credit Suisse's Alleged Breach of Fiduciary Duty*

Looking to the allegations within the SAC, the undersigned determined that Plaintiffs had

alleged a direct relationship of sorts between Credit Suisse and Plaintiffs, justifying the basis for

a breach of fiduciary duty claim.  *See* 2/17/11 R&R, pp. 44-45 (Docket No. 106) (recounting

particular allegations within SAC and stating: "While these allegations may be thin proof at

present of a legitimate, legally-cognizable fiduciary relationship between Plaintiffs and Credit

Suisse, it is of little consequence at this time when Plaintiffs' allegations must be accepted as

true.  This standard compels a finding that Plaintiffs have alleged a fiduciary relationship

between themselves and Credit Suisse.").  Judge Lodge upheld the recommendation and denied

Credit Suisse's Motion to Dismiss in this respect.  *See* 3/31/11 Order, p. 17 (Docket No. 126)

("The Court has reviewed the SAC and, in particular Paragraphs 74-82 and agrees with the

Report that although the Plaintiffs' Fiduciary Duty Claim barely survives, the SAC's allegations

are sufficient to survive the inquiry demanded by *Twombly* and *Iqbal*.  Plaintiffs have alleged

representations were made to them by Credit Suisse such that, if true, a fiduciary duty could be

found").

Credit Suisse now argues that Plaintiffs' recent "fraud by non-disclosure" arguments

(presented in response to Credit Suisse's second Motion to Dismiss) somehow nullifies the

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 29**

previous basis for permitting Plaintiffs' breach of fiduciary duty claim. *See* Credit Suisse Reply, p. 15 (Docket No. 156) ("With the Plaintiffs having abandoned the slender allegation that the Court found might possibly support a fiduciary duty, it is appropriate for the Court to re-address the claim."). The Court disagrees – at least for now.

Plaintiffs' allegations of fraudulent non-disclosure do not foreclose their ability to also pursue a breach of fiduciary duty claim against Credit Suisse. This is particularly true where the original justification for allowing Plaintiffs' breach of fiduciary duty claim to proceed against Credit Suisse – identified within particular allegations of the SAC – remains within the TAC. For example, as in the SAC, the TAC appears to argue in favor of a fiduciary relationship directly between Plaintiffs and Credit Suisse by alleging:

- Credit Suisse served as "Administrator" for the loans, thereby acquiring for itself all of the powers and controls over the lending facilities and decision making for the MPCs, Plaintiffs and members of the Plaintiff Class.

- The aforesaid false promises, representations, and material omissions of Credit Suisse to the MPCs and in turn intended to be communicated to and relied upon by Plaintiffs were made for the purpose of "engaging" the MPCs, and persuading Plaintiffs that their investments in the MPCs would be safe and protected by Credit Suisse.

- By thrusting itself into the financial underpinnings of each resort with its fraudulent scheme, and implementing said controls, Credit Suisse effectively entered into a co-developer and successor developer relationship with Plaintiffs, thereby promising to protect the interests, rights and reasonable expectations of each land owner, home buyer and homeowner at each MPC.

- At all times relevant, Credit Suisse and Cushman & Wakefield knew and understood that land owners and homeowners within the MPCs, were to benefit from Defendants' appraisal methodology and unique management, implementation and control of each of the loans for each MPC; and Credit Suisse agreed and understood and accepted the same not merely as a lender but as a lending advisor to Plaintiffs, having unique and special expertise in creating, marketing and selling syndicated real estate loans, outside normal banking channels.

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 30**

• Defendants knew and understood that Plaintiffs required assurances from Credit Suisse that the promised and bargained for infrastructure, club memberships, amenities, golf courses, ski runs and ski lifts, restaurants, shops, clubs, hotels, swimming pools and theme parks, tails and other amenities running with the land would be protected and prosper, and, that the rights, privileges and amenities promised and provided by the MPCs would always exist, without interference by Credit Suisse or its representatives, agents, contractors, partners, joint venture partners or assignees, affiliated entities or others.

• Defendants, their agents and employees, acting in the course and scope of their employment, instituted a relationship of trust and confidence with the developers of Plaintiffs' and the Class's MPCs, especially in matters related to the latter's loan or debt transactions.  Defendants, by virtue of this same conduct, also acquired intimate knowledge of the legal duties and obligations flowing from MPC developers to Plaintiffs and the Class. . . . . Simultaneously, Defendants knew, or had reason to know, that because of their actions denoted in the preceding allegation, the developers, Plaintiffs and the Class had placed a special trust in them to counsel or inform them of material matters affecting the developments; and, additionally, to exercise any control relating to said developments with honesty, reasonable care, loyalty and good faith.  As such, Defendants owed Plaintiffs and the Class fiduciary duties of candor, reasonable care, loyalty and good faith and fair dealing.

*Compare* TAC, ¶¶ 174, 176, 181-82, & 184 (Docket No. 131) *with* SAC, ¶¶ 75-80 & 287)

(Docket No. 18); *see also* 3/31/11 Order, p. 17 (Docket No. 126).

The point here is not to endorse Plaintiffs' breach of fiduciary duty claim against Credit

Suisse but, rather, to point out that Plaintiffs have stated a plausible claim to this point in the

litigation.  Whether the claim ultimately prevails[26] remains to be seen.  Therefore, it is

---

[26] Of immediate concern to the undersigned is, even when assuming Credit Suisse's inheritance of a co-developer role in the MPCs, rhetorically speaking, what non-contractual duties did it then inherit to support any breach of fiduciary duty claim, separate from any breach of contract claim?  *See* TAC, ¶¶ 123, 135, & 150 (Docket No. 131) ("Inevitably, as the direct and foreseeable result of [a given MPC's] intended financial withering under an impossible *Loan to Own* burden, the MPC materially derogated and violated its core contractual duties to its homeowners . . . ."); *see also id*. at ¶ 193 ("Plaintiffs and the Class had substantively uniform

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 31**

recommended that Credit Suisse's Motion to Dismiss[27] be denied as to Plaintiffs' breach of fiduciary duty claim.

> b.      *Cushman & Wakefield's Alleged Breach of Fiduciary Duty*

Plaintiffs' breach of fiduciary duty claim against Cushman & Wakefield is premised upon Credit Suisse's alleged breaches of its own fiduciary duties to Plaintiffs – that is, by virtue of an alleged conspiracy between the two Defendants, Cushman & Wakefield is also responsible for Credit Suisse's related breaches.  *See* Pls.' Opp. to Cushman & Wakefield Mot. to Dismiss, p. 10 (Docket No. 153).

"In order to allege conspiracy to hold one accountable for the conduct of an alleged co-conspirator, Plaintiffs must allege a combination of two or more persons who, by some concerted action, intended to accomplish some unlawful objective for the purpose of harming another which resulted in damage."  Cushman & Wakefield Mot. to Dismiss, p. 24 (Docket No. 139) (citing *Vieux v. E. Bay Reg'l Park Dist.*, 906 F.2d 1330, 1334 (9th Cir. 1990)).  Cushman & Wakefield argues that there are no allegations supporting a finding of collusion or conspiracy here.  *See* Cushman & Wakefield Opp. to Mot. to Amend, p. 8 (Docket No. 144).  However, after Plaintiffs' amendment, the TAC *does* contain allegations of a civil conspiracy between Cushman & Wakefield and Credit Suisse relative to Credit Suisse's alleged breach of fiduciary duty.

---

contracts with the developers of each MPC, which contracts provided for the construction and maintenance of the rights, amenities and privileges running with the lands alleged hereinabove and which were known to Defendants at all times relevant hereto.").

[27]  Additionally, given the timing of the arguments, Plaintiffs were never able to formally respond to Credit Suisse's recent position as to the viability of Plaintiffs' breach of fiduciary duty claim.  This circumstance provides additional support to the undersigned's recommendation.

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 32**

According to the TAC:

> Defendant, Cushman & Wakefield, entered into an agreement with Credit Suisse to assist Credit Suisse in foisting the *Loan to Own* scheme based on Cushman & Wakefield's unlawful appraisals.   Cushman & Wakefield is therefore a co-conspirator with Credit Suisse in the design, drafting, and launching of the illicit Total Net Value and Total Net Proceeds appraisal methodologies and appraisals is jointly and severally liable to the Plaintiff class under the breach of fiduciary duty claim of the Plaintiffs.

*See* TAC, ¶ 190; *see also id.* at ¶ 101 & p. 82, n.5.[28]  These allegations, construed in Plaintiffs favor, allege a civil conspiracy between Credit Suisse and Cushman & Wakefield, supporting, in turn, a breach of fiduciary duty claim against Cushman & Wakefield.  Whether the claim survives a motion for summary judgment[29] is, again, another matter.  In the meantime, like Plaintiffs' breach of fiduciary duty claim against Credit Suisse, it is recommended that Cushman & Wakefield's Motion to Dismiss be denied as to Plaintiffs' breach of fiduciary duty claim.

5. Fourth Cause of Action: Tortious Interference with Contractual Relations Against All Defendants

"One who intentionally and improperly interferes with the performance of a contract...between another and a third person by inducing or otherwise causing the third person

---

[28]  Although less specific, the SAC also attempted to tether Cushman & Wakefield's alleged breach of fiduciary duty to Credit Suisse's conduct.  *See* SAC, ¶ 309 (Docket No. 18) ("Defendants, and each of them, combined and conspired with each other in furtherance of a conspiracy to defraud plaintiffs and members of the Plaintiff Class by means of racketeering, breach of fiduciary duty, and fraud.").

[29]  Cushman & Wakefield also argues that the TAC itself jeopardizes the viability of any conspiracy between it and Credit Suisse.  *See* Cushman & Wakefield Mot. to Dismiss, pp. 17-18 & 24-25 (Docket No. 139) (citing TAC, ¶¶ 140 & 73 (Docket No. 131)).  These arguments (*see also supra* at pp. 31-32, n.26) may provide fertile ground for a future motion for summary judgment, after the benefit of additional discovery.  Further, to the extent Plaintiffs claim Cushman & Wakefield to be Credit Suisse's agent (*see, e.g.*, TAC, ¶ 183), a civil conspiracy claim may very well be unavailable.  *See, e.g.*, *Taylor v. McNichols*, 243 P.3d 642, 660 (Idaho 2010) ("Furthermore, it is axiomatic that an agent acting within the scope of his representation cannot conspire with his principal . . . .").  At this point, however, they will not be considered against Plaintiffs in light of the balance of the over-arching allegations specific to Plaintiffs' breach of fiduciary duty claim.

not to perform the contract, is subject to liability . . . ."  *Wesco Autobody Supply, Inc. v. Ernest*, 243 P.3d 1069, 1083 (Idaho 2010) (quoting Restatement (Second) of Torts § 766 (1979)). "Tortious interference with contract has four elements: (1) the existence of a contract; (2) knowledge of the contract on the part of the defendant; (3) intentional interference causing a breach of the contract; and (4) injury to the plaintiff resulting from the breach."  *Id.* (citation and quotations omitted).

In light of the TAC's latest allegations, (1) Credit Suisse asks this Court to "re-address" its earlier ruling (*see* Credit Suisse Reply, p. 15, n.17 (Docket No. 156)), and (2) Cushman & Wakefield moves to dismiss Plaintiffs' re-asserted tortious interference with contractual relations claim (previously dismissed, without prejudice) against it (*see* Cushman & Wakefield Mot. to Dismiss, pp. 19-20 (Docket No. 139)).

       a.     *Credit Suisse's Alleged Tortious Interference with Contractual Relations*

Credit Suisse argues that, "[g]iven the TAC, the Court also may want to re-address its ruling retaining the tortious interference with contract claim, since the TAC still fails to identify the contract pursuant to which the Plaintiffs allegedly were promised perpetual operation of golf courses or ski lifts such as might be susceptible of interference.  *See* Credit Suisse Reply, p. 15, n.17 (Docket No. 156).  It is unclear whether this request from Credit Suisse operates as a motion to reconsider or as a new, separate argument in support of its latest Motion to Dismiss (presented for the first time in a footnote on the last page of their reply in support of Motion to Dismiss).  Regardless, in adopting the undersigned's original Report and Recommendation as to Plaintiffs' tortious interference with contractual relations claim, Judge Lodge preemptively addressed Credit Suisse's renewed argument, stating:

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 34**

> As the Report points out, it is the scheme itself that gives rise to Credit Suisse's alleged intent to interfere with Plaintiffs' contractual relations with the developers. The "Loan to Own" scheme, as alleged by Plaintiffs, presumes the developers would default on their loans and their promises to Plaintiffs to furnish and maintain amenities at the resorts thereby allowing Credit Suisse to later acquire the resorts in bankruptcy/receivership proceedings.  Thus, the allegations in the Complaint reflect Plaintiffs' theory that because Credit Suisse's scheme knew of and anticipated the developers' failing to fulfill their promises to Plaintiffs, it had interfered with that relationship to Plaintiffs' detriment.

*See* 3/31/11 Order, p. 27 (Docket No. 126).  Therefore, thus far, Plaintiffs' have at least alleged a tortious interference with contractual relations claim against Credit Suisse.  As a result, it is recommended that Credit Suisse's Motion to Dismiss be denied as to this claim.

        b.    *Cushman & Wakefield's Alleged Tortious Interference with Contractual Relations*

This Court previously found that, "as pleaded, Cushman & Wakefield's involvement in the alleged Loan to Own scheme is too attenuated to presume (as Plaintiffs' [SAC] and briefing requires us to do) Cushman & Wakefield's awareness of and, separately, intent to disrupt the resort developers' obligations to build out certain amenities.  The lack of allegations relating to Cushman & Wakefield's particular understanding of and subjective intent to accomplish the alleged interference warrants the claim's dismissal."  2/17/11 R&R, p. 47 (Docket No. 106); *see also* 3/31/11 Order, pp. 25-27, (Docket No. 126).  Cushman & Wakefield argues that Plaintiffs' TAC "add[s] nothing in response to the Court's concerns to mandate an alternative result," arguing that Plaintiffs do not (1) identify the contractual rights allegedly interfered with, (2) allege that Cushman & Wakefield was aware of such rights, and (3) allege Cushman & Wakefield's intent to interfere with any contractual rights.  *See* Cushman & Wakefield Mot. to Dismiss, pp. 19-20 (Docket No. 139).  The Court disagrees.

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 35**

According to the TAC, the contractual rights allegedly interfered with are Plaintiffs' rights to the resort amenities.  *See supra* at pp. 34-35; *see also* TAC, p. 82 (identifying fourth cause of action as: "Tortious Interference with Plaintiffs' Existing Rights, Amenities, and Privileges at Each Resort Against All Defendants"), *id*. at ¶ 193 (Docket No. 131) ("Plaintiffs and the Class had substantively uniform contracts with the developers of each MPC, which contracts provided for the construction and maintenance of the rights, amenities, and privileges running with the lands . . . and which were known to Defendants at all times relevant hereto."). The TAC further alleges that Cushman & Wakefield was aware of, and interfered with, these rights.  For example:

- Credit Suisse and Cushman & Wakefield also obtained detailed understandings of the contractual and legal obligations that each MPC owed directly to the individuals (and entities) who purchased and owned residential properties within their confines.  As such, both Credit Suisse and Cushman & Wakefield learned and exquisitely appreciated that every MPC homeowner had <u>inescapably</u> determined to buy their residence in reliance on the MPCs' provision of a variety of "luxury resort" services and amenities, including without limitation, club houses, exclusive club memberships, golf courses, ski resort facilities and the like.  The Defendants correspondingly conclusively knew that any interference with, or hindrance of, the MPCs' present or future supply of such aspects of resort life would utterly derogate or destroy the distinct legal rights and benefits which the MPC homeowners had purchased and expected.

- Cushman & Wakefield knew or should have known that the Credit Suisse loans for which it was preparing these TNV and TNP appraisals would encumber not only the developers' interest in the MPCs, but also the bundle of rights that each prospective and existing homeowner had in each MPCs' amenities and entitlements . . . .  Thus, Cushman & Wakefield knew or consciously disregarded the fact that the bundle of rights that each homeowner had in the MPCs would be grossly over-leveraged by Credit Suisse's new loan product.

- Despite Defendants' knowledge of said contractual rights of Plaintiffs and the Class, Defendants intentionally, without justification or privilege, and in pursuit solely of their own material gain, interfered with said contractual rights by committing the unlawful, deceptive, and illegal acts and omissions alleged in the preceding sections.

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 36**

*See* TAC, ¶¶ 8, 77, & 194 (Docket No. 131) (emphasis in original).

Therefore, while the undersigned still has reservations concerning Plaintiffs' ability to ultimately prove their tortious interference with contractual relations claim against Cushman & Wakefield, Plaintiffs have nonetheless stated a plausible claim at this time. Therefore, it is recommended that Cushman & Wakefield's Motion to Dismiss be denied.

      6.    <u>Fifth Cause of Action: Unjust Enrichment Against Credit Suisse</u>

Generally speaking, a claim for unjust enrichment exists when a defendant improperly accepts a benefit (without payment) from a plaintiff. *See* 2/17/11 R&R, p. 48 (Docket No. 106). The undersigned previously recommended that Plaintiffs' unjust enrichment claim against Credit Suisse be dismissed because the benefit Credit Suisse allegedly improperly accepted, was not a benefit conferred by Plaintiffs. *See id.* ("The problem for Plaintiffs, however, is that they were not the ones who conferred the claimed benefit. Plaintiffs cannot seek to recover a benefit for which they were not responsible."). Plaintiffs offered no objection to the claim's dismissal and, on March 31, 2011, Judge Lodge adopted the Report and Recommendation in this respect. *See* 3/31/11 Order, p. 29 (Docket No. 126). Credit Suisse now argues that Plaintiffs' latest unjust enrichment claim against it should be dismissed for the same reason, "since the TAC does not add a single allegation that addresses the pleading deficiencies" already identified by this Court. *See* Credit Suisse Mot. to Dismiss, p. 17 (Docket No. 135). The undersigned agrees.

Within the body of their earlier unjust enrichment claim, Plaintiffs' SAC alleged in relevant part:

> Defendants and each of them wrongfully benefitted from and were enriched by their role in the aforesaid fraudulent loans and financial transactions by receiving compensation, payment or fees for their services in connection therewith, of which

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 37**

the Defendants acted with knowledge and intent to defraud, and thereby to reap rich financial rewards.

Pls.' SAC, ¶ 299 (Docket No. 18).  Even after the Court's criticism of Plaintiffs' original unjust

enrichment claim, Plaintiffs' TAC makes the identical allegation – albeit only against Credit

Suisse this time:

Defendant Credit Suisse wrongfully benefitted from and was enriched by its role in the aforesaid fraudulent loans and financial transactions by receiving compensation, payment or fees for their services in connection therewith, of which [Credit Suisse] acted with knowledge and intent to defraud, and thereby to reap rich financial rewards.

Pls.' TAC, ¶ 201 (Docket No. 131).[30]

For the same reasons expressed in the Report and Recommendation, Plaintiffs' latest

unjust enrichment claim fails to identify benefits flowing from Plaintiffs to Credit Suisse.[31]  As a

result, it is recommended that Plaintiffs' unjust enrichment claim against Credit Suisse be

---

[30]  All other allegations specific to the unjust enrichment claim in Plaintiffs' TAC (*See* Pls.' TAC, ¶¶ 200, 202, & 203 (Docket No. 131) are also materially identical to those alleged in Plaintiffs' SAC (*see* Pls.' SAC, ¶¶ 298, 300, & 301).

[31]  In an apparent response to this critique, Plaintiffs argue that Credit Suisse "t[ook] . . . all of the money of the  investor property owners that was placed in an escrow trust for the building of the infrastructure and golf courses at Ginn sur Mer (actual total about $175 million)" and that "Credit Suisse has been in control as the actual developer of Ginn sur Mer since 2008, receiving the massive benefits from Gibson and the Plaintiffs at that MPC while all their rights were being deprived, frustrated and destroyed by Defendants with Plaintiffs' funds."  *See* Pls.' Opp. to Credit Suisse Mot. to Dismiss, pp. 11-12 (Docket No. 152).  However, in addition to neglecting all the MPCs besides Ginn sur Mer, as Credit Suisse notes, these arguments overstate the actual allegations contained within the body of the TAC.  *See* Credit Suisse Reply, p. 8 (Docket No. 156) ("the actual language cited by Plaintiffs alleges that Credit Suisse supposedly controlled the developer to the extent that the only construction at Ginn was 'the completion of the infrastructure and golf course *which was paid for by Plaintiffs and investors from an escrow account and not by Credit Suisse*.'") (citing Pls.' TAC, ¶ 18 (Docket No. 131)) (emphasis in original).  Moreover – and most importantly – these arguments (even if true) are not reflected within the allegations underscoring Plaintiffs' actual unjust enrichment claim.

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 38**

dismissed with prejudice.[32]

7.    Sixth Cause of Action: Negligence and Gross Negligence Against All Defendants

The undisputed "essential elements" of a negligence claim require a plaintiff to establish:

"(1) a duty, recognized by law, requiring the defendant to conform to a certain standard of

conduct; (2) a breach of duty; (3) a causal connection between the defendant's conduct and the

resulting injuries; and (4) actual damage." *Jones v. Starnes*, 245 P.3d 1009, 1012 (Idaho 2011)

(quoting *Hansen v. City of Pocatello*, 184 P.3d 206, 208 (Idaho 2008)).  Applying FRCP 9(b)'s

particularity requirement to Plaintiffs' negligence claims, Judge Lodge rejected the

recommendation that Defendants' original Motions to Dismiss be denied as to Plaintiffs'

negligence claims sounding in fraudulent conduct, finding:

> [T]he allegations in the SAC as to the negligence claim are too conclusory to provide
> the Defendants notice of the alleged sources of the negligence-based duties Plaintiffs
> have raised in their briefing and they do not satisfy Rule 9(b)'s particularity
> requirement.

3/31/11 Order, p. 22 (Docket No. 126).  As such, Judge Lodged dismissed Plaintiffs' negligence

claims against Defendants, without prejudice.  *See id.* at pp. 22-23.

Plaintiffs' TAC attempts to more specifically outline the basis for their negligence claim

against both Credit Suisse and Cushman & Wakefield; even so, Defendants move to dismiss the

claim.  Targeting the TAC's revised allegations, Credit Suisse argues that Plaintiffs' negligence

claim is now a statute-based negligence claim and, with that understanding, Plaintiffs fail to

properly plead the requirements for negligence *per se*.  *See* Credit Suisse Mot. to Dismiss, pp.

19-23 (Docket No. 135).  Relatedly, Cushman & Wakefield argues that it owed no duty to

---

[32]  In light of the substantive deficiencies in Plaintiffs' unjust enrichment claim, the Court
need not take up Credit Suisse's alternate statute of limitations arguments (*see* Credit Suisse
Mot. to Dismiss, pp. 18-19 (Docket No. 135); Pls.' Opp. to Credit Suisse Mot. to Dismiss, pp.
13-14 (Docket No. 152); and Credit Suisse Reply, p. 9 n.9 (Docket No. 156)).

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 39**

Plaintiffs, thus eviscerating Plaintiffs' negligence claim.  *See* Cushman & Wakefield Mot. to

Dismiss, pp. 20-22 (Docket No. 139).

    As has always been the case, the gravamen of Plaintiffs' negligence claim remains clear –

at least to the undersigned:

> [T]he Loan to Own scheme, premised upon misleading appraisals, initially justified
> massive loans, but, later, so burdened the developer's borrowers, that the resorts'
> occupants were left with unfinished amenities once those developers defaulted on
> their loans – allegedly, all by design.  According to Plaintiffs, Credit Suisse's and
> Cushman & Wakefield's participation in the Loan to Own scheme violated
> customary real estate valuation practices to Plaintiffs' ultimate detriment, thus
> representing the duty, breach, . . . causation[, and damages] elements of a negligence
> claim.

2/17/11 R&R, p. 49 (Docket No. 106).  This becomes more apparent when examining the revised

allegations within the TAC, where Plaintiffs state in part:

> 6.    Unbeknownst to the MPCs, however, each CW appraisal (used as an illicit
> inducement toward a ruinous Credit Suisse loan) was thoroughly and
> materially false and deceptive because it massively inflated the resorts'
> calculated net worth of operations, and their corresponding ability to incur
> and adequately service loan debt without destroying their viability:
>
> (I)    Specifically, the CW appraisals employed an inappropriate – and
> expressly illegal – appraisal methodology termed "Total Net Value,"
> which presented MPCs with purported operational values and
> projected revenues for their enterprises that had not been discounted
> in such a way (e.g., back to present day value) so as to provide
> accurate and reliable bases for configuring reasonable debt load
> capacity; in point of fact, the "Total Net Value" appraisal
> methodology was so inherently misleading to sales and loan
> transactions that it failed to conform to applicable United States
> appraisal and lending standards, as mandated by the Financial
> Institutions Reform, Recovery and Enforcement Act of 1989, 12
> U.S.C. § 3331, et seq. ("FIRREA"), and the Uniform Standards of
> Professional Appraisal Practice ("USPAP") adopted by each
> applicable state.
>
> (ii)   Credit Suisse and CW deployed their seductive "Total Net Value"
> appraisals with full and explicit knowledge of their illegality; indeed,

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 40**

Credit Suisse was so acutely aware of the appraisals' prohibition under United States law that it created and attempted to use a sham overseas "subsidiary" entity – denominated "Credit Suisse Cayman Island Branch" – to try and funnel any loan transactions with MPCs through this offshore operation to avoid the purview of both FIRREA and USPAP; notably, on information and belief, the Credit Suisse Cayman Island Branch was at all relevant times nothing more than a postal drop, with no actual cognizable banking operations.

78.    By appraising the value of Plaintiffs' bundle of rights in the MPCs, Cushman & Wakefield owed a duty to Plaintiffs to appraise the MPCs according to FIRREA and USPAP and not to appraise the MPCs according to the TNV and TNP methodology which was in derogation of all accepted appraisal standards and which resulted in a grossly inflated appraisal value.

79.    The appraisals were inflated and violated USPAP and FIRREA in the following ways:

a.    Based on the information contained within the appraisals, the appraisal transmittal letters between Credit Suisse and Cushman & Wakefield, and the Credit Agreements between the MPCs and Credit Suisse, Cushman & Wakefield, Credit Suisse and the appraisals themselves were all subject to the requirements of FIRREA and USPAP.  In fact, the Lake Las Vegas, Yellowstone Club, Tamarack and Ginn Sur Merr appraisals stated that they complied with USPAP when in fact they did not.  The Ginn Sur Mer appraisal even stated that it complied with FIRREA when in fact it did not.

b.    In part, the statutes and regulations of which Defendants and the appraisals were subject to, include without limitation, the following: MT-ADC § 24.207.402; MCA § 37-54-303; MCA § 37-54-201; IDAPA §§ 24.18.01.004, 24.18.01.700; I.C. § 54-4106; NAC § 645C.400; N.R.S. § 645C.140; N.R.S. § 645C.280; N.R.S. § 645C.170; 12 U.S.C. § 3331; 12 U.S.C. § 3339; 12 C.F.R. § 323.4; 12 C.F.R. § 34.44; 12 C.F.R. § 564.4; 12 C.F.R. § 225.64; 12 C.F.R. § 564.4.

c.    In relevant part, and without limitation, the appraisals prepared by Cushman & Wakefield for Credit Suisse for the MPCs violated USPAP and FIRREA by concluding to the unheard of TNV or TNP valuation premise which failed to properly discount to present value and over a period of time the projected revenues to be generated from each MPC, and which therefore resulted in a much higher value conclusion than would have occurred under a legitimate "as-is" market value conclusion.

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 41**

98.    With its Loan to Own strategy and prey identified, Credit Suisse confronted the single most difficult obstacle to its otherwise assuredly profitable enterprise – the fact that applicable United States regulations and standards prohibited the very type of unlawful appraisal methodologies that Credit Suisse required for the highly leveraged loan product.  To the contrary, the provisions of FIRREA and USPAP mandated that before they could originate their contemplated loans, Credit Suisse's American-based banking facilities must create and supply accurate and appropriately informative business/real estate appraisals of the MPCs and their included collateral in compliance with the appraisal standards of USPAP and FIRREA.  Such appraisals were intended to, and would in fact, educate the MPCs about the relative size of financial risks entailed in any Credit Suisse loan.

99.    Cognizant that USPAP and FIRREA compliant appraisals would be certain to alert the MPCs of the massive and destructive over-leveraging that Credit Suisse planned to offer – and the near inevitability of debilitating debt service, default and failure – Credit Suisse invented an insidious yet ingenious avenue for their evasion.  It first determined to utilize (and possibly create for such sole purpose) an offshore bank "branch" in the Cayman Islands for the putative origination of any *Loan to Own* products.  In this manner, Credit Suisse sought to structure the transactions so that United States statutes and regulations purportedly did not apply, and the protections that those statutes offered to the MPCs (and to any ultimate holders of the risk of default on their debt . . .) could be circumvented.

102.    Although Credit Suisse purported to employ its Cayman Islands branch to fund these loans in an artifice to evade United States laws, its domestic banking entities were the ones responsible for ordering the TNV and TNP appraisals and marketing, negotiating and originating the loans . . . .

104.    Together, Defendants Credit Suisse and Cushman & Wakefield devised the TNV appraisal method that would serve as their primary tool of deception in the solicitation and sale of the *Loan to Own* loans.  This appraisal form was directly intended by Defendants to unrealistically inflate and overvalue the apparent worth of MPCs, making them seem comfortably able to assume the excessive amounts of debt load which would otherwise look ill-advised or even crippling.    TNV appraisals accomplished this dissimulation predominantly by failing to apply standardized discounting methods which were critically and concretely required by all applicable United States financial/real estate standards and regulations, inclusive of FIRREA and USPAP.  In so doing, TNV directly violated these governing laws and regulations in a material manner which was well known to both Credit Suisse and Cushman & Wakefield, and rendered the methodology inappropriate and

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 42**

> deceptive for purposes of communicating about the loans which Defendants
> intended to sell to all the subject MPCs.

TAC, ¶¶ 6, 78-79, 98-99, 102, & 104 (Docket No. 131).

It can be argued that these allegations remain unacceptably generalized and conclusory (as reflected by the unfocused, regurgitated laundry list of alleged statutory duties at paragraph 79(b) that may or may not apply to this action and, if so, how they were never fulfilled). However, they nonetheless succeed in discussing the statutory bases for Defendants' alleged duties and, in doing so, define the "alleged sources of negligence-based duties" that previously troubled Judge Lodge in his March 31, 2011 Order.

This is not to say that these allegations are substantively persuasive. Indeed, both Credit Suisse and Cushman & Wakefield offer cogent reasons why, even when considering the TAC's allegations, Plaintiffs' negligence claims may not ultimately prevail (*see* Credit Suisse Mot. to Dismiss, pp. 20-23 (Docket No. 135); Cushman & Wakefield Mot. to Dismiss, pp. 20-22 (Docket No. 139)) and, therefore, should be dismissed. Still, in the Court's mind, these arguments are more appropriately addressed on motions for summary judgment, not motions to dismiss. Suffice it to say that, at this time, the Court is satisfied that the TAC's allegations extend just beyond the threshold of *stating* a negligence claim and, while likely to be challenged on summary judgment, state a plausible claim, and should not be dismissed before the allegations are even tested further. Therefore, it is recommended that Credit Suisse's and Cushman & Wakefield's Motions to Dismiss be denied as to Plaintiffs' negligence claim.

    8.    <u>Seventh Cause of Action: Consumer Protection Act Violations Against All Defendants</u>

With their final cause of action, Plaintiffs allege that Defendants violated Idaho's and Nevada's consumer protection statutes in a "deceptive, misleading, and unfair/unconscionable

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 43**

course of conduct, *inter alia*: their contraventions of FIRREA and USPAP; their deceptive and misleading engagement in their *Loan to Own* scheme; and their failures to disclose material information necessary to render their commercial conduct and representations . . . accurate and not misleading."  TAC at ¶ 211 (Docket No. 131).[33]  Defendants raise similar arguments in opposition to such a claim – namely, that (1) Plaintiffs fail to assert violations of the Idaho Consumer Protection Act ("ICPA") and Nevada Deceptive Trade Practices Act ("NDTPA") with any specificity; (2) Plaintiffs' lack standing; (3) Plaintiffs have not suffered an ascertainable loss caused by Defendants' conduct; and (4) Plaintiffs could not have relied upon Defendants' conduct – however interpreted – leading up to/causing any alleged loss.  *See* Credit Suisse Mot. to Dismiss, pp. 23-26 (Docket No. 135); Cushman & Wakefield Mot. to Dismiss, pp. 22-23 (Docket No. 135).

> a.    *Alleging Consumer Protection Act Claims with Specificity*

Plaintiffs' consumer protection act claim is asserted generally, with no reference to the particular statutes Defendants allegedly violated.  *See* TAC at ¶ 210 (Docket No. 131). According to Defendants, such allegations are inadequate to state a claim.  *See* Credit Suisse Mot. to Dismiss, p. 24 (Docket No. 135) (citing *McCurdy v. Wells Fargo Bank, N.A.*, 2010 WL 4102943, *3 (D. Nev. 2010) ("This claim fails because it does not allow the Court to draw a reasonable inference of Wells Fargo's liability.  There are several ways in which a person could engage in a deceptive trade practice under those statutes.  However, Plaintiffs do not clarify

---

[33]  Although Plaintiffs' TAC originally asserted claims based upon the Montana Unfair Trade Practices and Consumer Protection Act, their briefing disavows such a claim, stating that its inclusion within their seventh cause of action was "inadvertent."  *See* Pls.' Opp. to Credit Suisse Mot. to Dismiss, p. 18, n.19 (Docket No. 152); Pls.' Opp. to Cushman & Wakefield Mot. to Dismiss, p. 16, n.14 (Docket No. 153).

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 44**

which provision the defendants have violated on the face of the Complaint.  As a result, the

Court must dismiss the claim."); *Taylor v. McNichols*, 243 P.3d 642, 662 (Idaho 2010)

("Respondents further point out that the ICPA only permits recovery for certain specific

prohibited actions that are deemed to be unfair or deceptive.  Reed's complaints fail to allege

which specific prohibited unfair or deceptive practice they are meant to have engaged in.  Even

assuming all facts pled by Reed to be true, he has failed to state a claim for which relief may be

granted under the ICPA)); Cushman & Wakefield Mot. to Dismiss, p. 23 (Docket No. 139)

(addressing NDTPA claim).

 In response, Plaintiffs argue that *federal* cases, interpreting *federal* rules, endorse the

manner in which they have pled their consumer protection act claims in the TAC.  *See* Pls.' Opp.

to Credit Suisse Mot. to Dismiss, pp. 17-18 (Docket No. 152); Pls.' Opp. to Credit Suisse Mot. to

Dismiss, pp. 15-16 (Docket No. 153).  The undersigned agrees with Defendants.

First, as a matter of sensible consistency, where Plaintiffs' fraud claims must be pled with

a certain level of specificity and particularity, so too must Plaintiffs' consumer protection act

claim.  As it now stands, the allegations fall short of actually informing Defendants of (1) what

was specifically required of them by way of particular mandates of the applicable consumer

protection act laws, and (2) how their respective conduct specifically ran afoul of those same

mandates.  Second, while Plaintiffs overstate that Credit Suisse "largely cites state-law cases" in

support of its argument, they fail to address the *federal* authority actually referenced in support

of Credit Suisse's position.  Moreover, the case law Plaintiffs go on to rely upon is from other

jurisdictions – North Carolina, Illinois, New York, the Seventh Circuit, and Pennsylvania – not

dealing with either the ICPA or the NDTPA.  Third, given that the ICPA and NDTPA apply

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 45**

more seamlessly (but not necessarily limited) to situations involving goods and services, the need for more specificity is understandably apparent when dealing with different factual scenarios – like those alleged in Plaintiffs' TAC.  *See, e.g.*, Credit Suisse Reply, p. 12, n.15 (Docket No. 156).

Together, these reasons combine to require more specificity in this case.  Thus far, Plaintiffs' TAC does not adequately allege a plausible consumer protection act claim against Credit Suisse and Cushman & Wakefield.  Defendants' Motions to Dismiss should therefore be granted in this respect.

> b.    *Standing to Bring Consumer Protection Act Claims*

There is no question that *some* relationship between Plaintiffs and Defendants is necessary in order for Plaintiffs to have standing under either the ICPA or the NDTPA – the extent of that relationship, however, is at issue here.  Defendants argue that there is simply no recognized relationship between the parties and, thus, no standing (*see* Credit Suisse Mot. to Dismiss, pp. 24-25 (Docket no. 135); Cushman & Wakefield Mot. to Dismiss, p. 23 (Docket No. 139)); on the other hand, Plaintiffs argue that they, as the alleged victim of consumer fraud, are situated within the "nexus" relationship between injured and offending parties that establish their own standing to bring a consumer protection act claim.  *See* Pls.' Opp. to Credit Suisse Mot. to Dismiss, pp. 18-21 (Docket No. 152); Pls.' Opp. to Cushman & Wakefield Mot. to Dismiss, pp. 16-18 (Docket No. 153).

In Idaho, "to have standing under the [ICPA] . . . the aggrieved party must have been in a contractual relationship with the party alleged to have acted unfairly or deceptively."  *Taylor*, 243 P.3d 642, 662.  Without addressing *Taylor*, Plaintiffs argue that they are third-party

beneficiaries to the agreements between Defendants and the MPCs.  *See* Pls.' Opp. to Credit Suisse Mot. to Dismiss, p. 20 (Docket No. 152); Pls.' Opp. to Cushman & Wakefield Mot. to Dismiss, p. 18 (Docket No. 1153).  However, as Credit Suisse and Cushman & Wakefield point out, Plaintiffs point to no Idaho authority extending the ICPA's contractual relationship requirement to third party beneficiaries and, even if such authority did exist, Plaintiffs have not adequately pled the elements of third-party-beneficiary status beyond several gratuitous references within the TAC.  *See* Credit Suisse Reply, p. 13 (Docket No. 156); Cushman & Wakefield Reply, pp. 12-13 (Docket No. 155).  For these reasons, the TAC does not allege the necessary contractual relationship to confer standing upon Plaintiffs to bring a claim under the ICPA.

The offered cases interpreting Nevada's standing requirements under the NDTPA, while less clear, nonetheless convince this Court that an underlying contract's incidental impact on a remote third-person is likewise not enough to establish that third-person's standing.  *See, e.g.*, *William Lyon Homes, Inc. v. Partington*, 2010 WL 1292296, *2 (D. Nev. 2010) (dismissing NDTPA claim, holding that "[t]he Court is not persuaded that Plaintiff has the right to insert itself into a transaction between Defendants and the homeowners for purposes of consumer fraud or that Plaintiffs are victims within the meaning of N.R.S. § 41.600."); *Windisch v. Hometown Health Plan, Inc.*, 2010 WL 786518, *1, 6, & 7 (D. Nev. 2010) (allowing claim for consumer fraud where (1) plaintiff contracted with defendants, (2) defendants provided services to putative class, (3) misrepresentations were made to plaintiff medical provider's own enrollees, and (4) direct misrepresentations were made to plaintiff and putative class); *Southern Serv. Corp. v. Excel Bldg. Servs., Inc.*, 617 F. Supp. 2d 1097, 1099 (D. Nev. 2007) (acknowledging that

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 47**

NDTPA does not define "victim of consumer fraud," while holding that business competitors harmed by deceptive trade practices are victims of consumer fraud).

Plaintiffs' TAC does not allege the necessary relationship between themselves and Defendants to establish Plaintiffs' standing to assert claims under either the ICPA and the NDTPA.  As a result, Defendants' Motions to Dismiss should be granted in this respect.

c.      *Plaintiffs' Ascertainable Loss*

Pointing again to the timing of the appraisals and loans in relation to Plaintiffs' purchases in the MPCs, Defendants argue that Plaintiffs do not plead the requisite ascertainable losses at the hands of Defendants' alleged conduct.  *See* Credit Suisse Mot. to Dismiss, p. 25 (Docket No. 135); Cushman & Wakefield Mot. to Dismiss, p. 23 (Docket No. 139).  Yet, given that the element of reliance is less significant as to a consumer protection act claim than as to a fraud claim (*see infra* at p. 49), the Court rejects Defendants' arguments in these respects, finding that the timing of any alleged misrepresentations giving rise to a consumer protection act claim is inconsequential to Plaintiffs' ability to claim subsequent damages relating thereto.

Regarding damages, Plaintiffs allege that, by virtue of Defendants' allegedly deceitful conduct, certain amenities at certain MPCs were never built; without these amenities, Plaintiffs claim to have suffered losses regardless of when they purchased into the MPCs  – in short, the absence of expected amenities represents the resulting ascertainable losses.  *See* Pls.' Opp. to Cushman & Wakefield's Mot. to Dismiss, pp. 18-19 (Docket No. 153).  Plaintiffs' counsel compared the circumstance to cellular phone services in oral argument:

> None of those kinds of claims require reliance.  They don't require any temporal occurrence that is – that is simultaneous with the transaction, in fact.  And consumer protection claims of this type are legion.

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 48**

There are thousands of cases that have been filed with regard to cell phone service, for example, that are not based on the transaction, the day I go in and I order my phone and I get my service, but in fact what happens after that. Does the cell phone service company fail to provide a network? Do they inflict additional fees undisclosed on my bill? Do they . . . give me a faulty device at some point? These are all nexuses of harm that occur after the point of sale transaction and about which I may not have based my decision to purchase, but which in a Consumer Protection Act [context] harm me because they deprive me of the interest which was inherent in what I bought.

*See* 1/12/12 Tr. at 99:4-19 (Docket No. 194).

Because Plaintiffs have alleged ascertainable losses attributable to Defendants' alleged conduct, their consumer protection act claim should not be dismissed on this basis.

> d.    *Reliance and Consumer Protection Act Claims*

To the extent either Credit Suisse or Cushman & Wakefield oppose Plaintiffs' consumer protection act claims due to a lack of reliance (*see* Credit Suisse Mot. to Dismiss, p. 26 (Docket No. 135); Cushman & Wakefield Mot. to Dismiss, p. 22 (Docket No. 139)), those arguments are misplaced. *See In re Beach*, 447 B.R. 313, 319, n.4 (Bkrtcy. D. Idaho 2011) ("Notably, neither reliance by an injured party nor the offending party's intention to deceive must be demonstrated in a successful ICPA claim."); *Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 658 (D. Nev. 2009) (limiting need for reliance to cases alleging affirmative misrepresentations as basis for NDTPA claim). Therefore, Plaintiffs' consumer protection act claim should not be dismissed on this basis.

> 9.    Viability of Plaintiffs' Class Action Complaint

Cushman & Wakefield lastly attacks Plaintiffs' class allegations, arguing that the class claims should be dismissed in light of the individual questions and circumstances that predominate Plaintiffs' collective claims. *See* Cushman & Wakefield Mot. to Dismiss, pp. 26-28

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 49**

(Docket No. 139).  Cushman & Wakefield's arguments in these respects have the undersigned's attention in that this Court has already questioned Plaintiffs' ability to allege reliance in support of their fraud and negligent misrepresentation claims.  Even so, dismissal of Plaintiffs' class claims (in whatever form they may take following the Court's complete consideration of the pending Motions to Dismiss) at this point in the litigation is premature.

The present question before the Court is not whether the class should be certified, but whether the class allegations in the TAC should be stricken.  In this respect, Cushman & Wakefield does not contest that Plaintiffs have alleged the prerequisites of FRCP 23(a); instead, it argues that, from the face of the TAC (and particularly with respect to those claims where reliance is an issue), individual questions inherently predominate Plaintiffs' claims such that Plaintiffs are unable to allege a class pursuant to FRCP 23(b)(3).  However, adopting Cushman & Wakefield's arguments requires a settled understanding of the actual scope of Plaintiffs' claims.  Plaintiffs' fraud and negligent misrepresentation claims may be dismissed in part; however, even if they are not, Plaintiffs' counsel indicated during oral argument that certain claims may be certified class-wide, while others may not.  *See* 1/12/12 Tr. at 107:8-10 (Docket No. 194) ("We may not try to certify fraud.  Fraud is quintessentially a claim that is difficult to certify.").  Add to this the fact that no discovery has taken place thus far on the merits of any one claim and it becomes clear that taking up Cushman & Wakefield's arguments and striking Plaintiffs' class allegations is inappropriate at this time.  Indeed, Cushman & Wakefield's cited authority suggest as much.  *See, e.g.*, *Bessette v. Avco Fin. Servs., Inc.*, 279 B.R. 442, 451 (D.R.I. 2002) ("Although defendant may ultimately be proven correct, at the initial stages of litigation, prior to discovery, defendant cannot prevail because it has a hunch or even a reasonable basis to

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 50**

believe that plaintiff will fail to meet Rule 23's requirements for class action."); *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1309 (11th Cir. 2008) ("However, precedent also counsels that the parties' pleadings alone are often not sufficient to establish whether class certification is proper, and the district court will need to go beyond the pleadings and permit some discovery and/or evidentiary hearing to determine whether a class may be certified."); *Picus v. Wal-Mart Stores, Inc.*, 256 F.R.D. 651, 655 (D. Nev. 2009) ("Indeed, 'dismissal of class allegations at the pleading stage should be done rarely and . . . the better course is to deny such a motion because the shape and form of a class action evolves only through the process of discovery.'") (quoting *In re Wal-Mart Stores, Inc. Wage & Hour Litig.*, 505 F. Supp. 2d 609, 615 (N.D. Cal. 2007));

For the foregoing reasons, it is recommended that Plaintiffs' class allegations not be dismissed at this time.  If procedurally proper following resolution of the Motions to Dismiss, discovery should be allowed on class certification issues at which point the Court will consider any motion to certify a class and any related objections thereto.

### C.    Motion to Intervene (Docket Nos. 159)[34]

Proposed Intervenors Timothy L. Blixseth and Alfredo Miguel seek to intervene pursuant to FRCP 24(a)(2) and (b)(1), espousing the underlying similarities between their claims and Plaintiffs' claims, while arguing that "Credit Suisse, through its loans to the Yellowstone Club and Tamarack, and Cushman & Wakefield, through its inflated appraisals of the resorts, created

---

[34] "Because there is a conflict with regard to whether the denial of a motion to intervene is or is not a dispositive motion, the Court has opted to issue its decision as a report and recommendation, rather than as a final order."  *Mid-Continent Cas. Co. v. Old Dominion Ins. Co.*, 2011 WL 5510802, n.1 (MD. Fla. 2011) (citing/comparing conflicting cases); *compare also Lewis v. First Am. Title Ins. Co.*, 2010 WL 3735712 (D. Idaho 2010) *with Scenic Valley View, L.L.C. v. Ridgeway Holdings, LLC*, 2010 WL 2103974 (D. Idaho 2010).

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 51**

a parade of horribles for Proposed Intervenors and the existing Plaintiff.  The damages suffered by Proposed Intervenors and the Plaintiffs all stem from substantially the same facts involving Credit Suisse's loans to the Yellowstone Club, Tamarack, Lake Las Vegas, and Ginn Sur Merr." Mot. to Intervene, p. 1 (Docket No. 159, Att. 1).  Credit Suisse and Cushman & Wakefield oppose these intervention efforts as separate and unrelated to the action now positioned before this Court.  *See, e.g.*, Credit Suisse Opp. to Mot. to Intervene, p. 5 (Docket no. 161) ("[T]he Complaint in Intervention is plainly a separate action based, in part, on different facts, and is not a true attempt to intervene into the underlying class action."); Cushman & Wakefield Opp. to Mot. to Intervene, p. 15 ("These are all 'new and unrelated' allegations and claims, and thus render intervention as of right under Rule 24(a) impermissible.").

 1. <u>Intervention as of Right</u>

 FRCP 24 allows an applicant to intervene either as of right or permissibly.  An applicant may intervene as of right if the applicant meets four requirements: (1) "the applicant must timely move to intervene"; (2) "the applicant must have a significantly protectable interest related to the property . . . that is the subject of the action"; (3) the applicant must prove that "the disposition of the action may impair or impede" the applicant's ability to protect that interest; and (4) "the applicant's interest must not be adequately represented by existing parties."  *Arakaki v. Cayetano*, 324 F.3d 1078, 1083 (9th Cir. 2003); *see also* Fed. R. Civ. P. 24(a)(2).  In general, courts construe FRCP 24(a) liberally in favor of intervention.  *See Southwest Center for Biological Diversity v. Berg*, 268 F.3d 810, 818 (9th Cir. 2001).  Moreover, the Court's evaluation is "guided primarily by practical considerations," not technical distinctions.  *Id*. Nonetheless, the "[f]ailure to satisfy any one of the requirements is fatal to the application." *Perry v. Prop. 8 Official Proponents*, 587 F.3d 947, 950 (9th Cir. 2009).

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 52**

Comparing and contrasting Plaintiffs' existing action with Proposed Intervenors' arguments in favor of intervention highlights the Proposed Intervenors' inability to satisfy these pertinent requirements.  Most notably, after oral argument, it became clear that Proposed Intervenors' issue with Defendants does not relate to the way the loans themselves were engineered on the front end (as Plaintiffs' currently argue), but rather in the personal fall-out resulting therefrom:

THE COURT:     Well, what is [Mr. Blixseth's] individual interest?  What's he seeking to recover in his individual interest?  Is he – is he seeking to recover as some – well, I'm not going to surmise.

MR. GRANT:     He's seeking to recover damages as a result of Credit Suisse's actions of trying to set aside his marital settlement agreement, for instance.  Credit Suisse turning around and going after him on a non-recourse loan to have him personally liable for, in excess of 200 million dollars on the non-recourse loan.

As far as the actions going against him personally, there was a judgment that's now on appeal for 40 million dollars as a result of this.  So his damages all stem from the actions of Credit Suisse and what they've done with regard to the loans and how they've breached the agreements with him and come after him.

THE COURT:     Mm-hmm.   Tell me if you would, where any of those particular claims and what he's seeking damages for are similar to what the plaintiffs are seeking here.

MR. GRANT:     His damages I think are similar –

THE COURT:     Now where – where are the claims similar?

MR. GRANT:     Where are the claims similar?

THE COURT:     He's arguing that somehow they screwed up his marriage dissolution agreement.  I haven't seen anything in this third amended complaint that says these plaintiffs are complaining that Credit Suisse or Cushman & Wakefield screwed up their marriage dissolution agreement.

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 53**

MR. GRANT:          Judge, that was a part of the pattern of both breach of fiduciary duty for all that was perpetrated on Mr. Blixseth and the conspiracy that was involved in trying to use him as the source of the funds for their loan and for their fraudulent loan.

But for any of the actions of Credit Suisse and Cushman & Wakefield the loan wouldn't have been entered into. There wouldn't have been any of the consequential damages that flowed from it. That goes as far as Mr. Blixseth.

As far as Mr. Miguel, his damages stem from the same operative facts that the homeowners are, in that he was also a homeowner. He entered into these agreements based on the inflated appraisals, based on the misrepresentations from Credit Suisse, based on his reliance. And as a result, ended up with a personal guarantee that they then sought to recover from him, even though that they were responsible for the downfall of the club.

THE COURT:          Well, that didn't have anything to do with being a landowner or homeowner. That was the personal guaranty on the loan from Credit Suisse to Tamarack. Right?

MR. GRANT:          Yes, Your Honor.

THE COURT:          Yeah.

MR. GRANT:          But as I say, he is a homeowner as well, but his damages stem from the fact of the process that went from start to finish, and then the collection efforts that were used by the bank to gain control.

In Mr. Miguel's instance they were using him on a personal guaranty for the loan that they had given and that they were responsible for it being in default on as we set out in the petition. That's where his damages stem from. The homeowners' damages stem from the same fact that they came in, took over the loan and then failed to build out any of the amenities.

***

THE COURT:          But explain to me how anything of the claims that you would seek to assert in this case for Mr. Blixseth and Mr. Miguel,

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 54**

<table>
<tr><td></td><td>that come after – that relate to any facts after the Credit Suisse loans were made, and even going as far as to when any default occurred and Credit Suisse then acted on any of its rights upon default, how anything after that point in time has anything at all to do with the plaintiffs in this case? You say it's the same common facts but it seems to me it's more that maybe there are some common facts that might be at issue, but there's an awful lot that aren't.</td></tr>
</table>

MR. GRANT:    Well, for instance, in the – starting with Tamarack. In the Tamarack case after Credit Suisse came in, acted as the co-developer and began instructing Tamarack on how to develop the club, what they could, what they couldn't do, and then ultimately foreclosing on the loans that they wee responsible for going into default, as a consequence of that the homeowners were damaged because the resort was not built out. Their contractual rights were denied by Credit Suisse.

Mr. Miguel was denied by that same fact and was damaged in the same fact because they came after him individually on a guarantee on the loan that they themselves were responsible for putting in default. So in that sense they are separate claims that they have –

THE COURT:    What does that have to do with – yeah. What does that have to do with Ms. Koenig – Ms. Koenig, for instance? Are you familiar with that – who that is?

MR. GRANT:    No, I'm not, Your Honor.

THE COURT:    She's one of the plaintiffs in the case that I'm sitting on here.

MR. GRANT:    That I'm not familiar with, Your Honor.

THE COURT:    Okay.

MR. GRANT:    I'm only familiar with the intervention.

*See* 1/12/12 Tr. at 132:13-134:25, 157:19-159:6 (Docket No. 194) *see also id*. at 159:7-21.

Even though there is *some* possible common cross-section of facts between Plaintiffs and

Proposed Intervenors, given the distinct angles of the two camps' claims and accompanying

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 55**

timing of those claims, it cannot be said that there is a significantly protectable interest that is possibly impaired in the event intervention is not allowed.  If, and to the extent Proposed Intervenors are also homeowners/members of the Plaintiff Class (*see id* at 157:1-5), their interests are adequately represented; however, where their individual claims depart from those common to the rest, their separate status as intervenors in this action cannot stand.  For these reasons, intervention as a matter of right is not proper.[35]  It is therefore recommended that Proposed Intervenors' Motion to Intervene be denied in this respect.

 2. <u>Permissive Intervention</u>

 An applicant who seeks permissive intervention under FRCP 24(b)(1)(B) must prove that it meets three threshold requirements: (1) it shares a common question of law or fact with the main action; (2) its motion is timely; and (3) the court has an independent basis for jurisdiction over the applicant's claims.  *See Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir. 1998). Courts must also consider "whether intervention will unduly delay the main action or will unfairly prejudice the existing parties."  *Id.*; *see also* Fed. R. Civ. P. 24(b)(3).  Even if an applicant has proven independent jurisdiction and therefore meets the requirements for permissive intervention, a court has discretion to deny permissive intervention.  *See id.*

 Alongside the shortcomings in seeking intervention as of right, the interests between Plaintiffs and Proposed Intervenors cannot be massaged enough to conclude that common questions of law and/or fact exist between the two that warrant permissive intervention. Additionally, the undersigned is concerned about the seeming conflict of interest between

---

[35]  In reaching this conclusion, the Court need not address whether Proposed Intervenors' Motion to Intervene was timely.

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 56**

Proposed Intervenors – the principal developer of the Yellowstone Club and one of the principal developers of Tamarack (*see* Mot. to Intervene, p. 1 (Docket No. 159, Att. 1)) – and Plaintiffs. This concern was emphasized when, during oral argument, the Court and one of Plaintiffs' counsel (who, while representing Timothy Blixseth in other matters elsewhere, is also representing Plaintiffs here) had the following exchange:

THE COURT:      Well, let's – let's be clear, Mr. Flynn, that this illusion that you're talking about, whatever it may be, if there is such a thing, isn't part of what's coloring my questions today. My questions are drawn from a very basic observation from my perspective of, if these loans were made to developers [on the collateral of the developments] and the monies were not used for purposes of developing the projects, then it – it would seem, on its face, that the homeowners would have some complaint to raise with the developers who received the money. So that's – that's where I'm struggling here when – with Mr. Blixseth wanting to get involved, and Mr. Miguel, frankly.

MR. FLYNN:      I understand, Your Honor. And on the surface it appears to be a valid problem. But in the reality of the evidence it is not because what happened is, that they told Mr. Blixseth, and you asked Mr. Grant the question on damages on this point, they asked Mr. Blixseth and Mr. Blixseth consulted with them as his fiduciary what he could do with these loan proceeds. They, in fact, agreed that he could take 209 million dollars out of the loan proceeds and use it for whatever purpose he wanted.

THE COURT:      Or he could have not done so and used it on the club. Isn't that the converse of that statement?

MR. FLYNN:      Yes, Your Honor. And in fact –

THE COURT:      And if that were the case then don't – don't the homeowners – aren't they going to say well no, you should be spending that here?

MR. FLYNN:      And in fact, he spent 140 million of the 209 million on the – of the 375 million on the club. The 209 million though was

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 57**

|  | used to create Yellowstone Club World, purchase properties all over the world, to expand the trademark, to expand the asset so that Europeans and Asians would now become owners at Yellowstone Club.  So it was all part and parcel of a business expansion.  So – |
|---|---|
| THE COURT: | So, and I had inquired of you at the prior hearing, so – and I want to be sure of this, you had – are you still representing Mr. Tim Blixseth in any capacity? |
| MR. FLYNN: | I do, Your Honor – |
| THE COURT: | Okay. |
| MR. FLYNN: | – but there are numerous lawyers in this case that do not represent Mr. Blixseth. |
| THE COURT: | All right.  Go ahead. |
| MR. FLYNN: | So, with regard to the – and there's – what Your Honor is really raising there is full disclosure to all of the class representatives and ultimately to all of the class members.  And there hasn't – |
| THE COURT: | And you're telling me there's no conflict.  It's not an issue of disclosure and consent, you're saying there's no conflict. |
| MR. FLYNN: | I'm saying, Your Honor, that at best there's a – there's a superficial appearance of a conflict which is waivable, and that – that issue of the conflicts being waivable has been extensively discussed.  And if there is any conflict by the class representatives will waive it because, in fact, Mr. Blixseth is in their camp. . . . . |

See 1/12/12 Tr. at 137:8-139:14 (Docket No. 194); *see also* 2/17/11 R&R, p. 22 (Docket No.

106) ("There are numerous other factors that could have led to the resorts' absence of built-out

amenities here . . . [including] . . . the developers' own professional ineptitude or decision to use

the Credit Suisse loan proceeds for anything other than the complete build-out of the

developments' amenities."); *id*. at 25-26 (discussing RICO claim, stating: ". . . it was the

inability of the injured developers to pay the debt service and complete the promised amenities

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 58**

that *directly* caused Plaintiffs' injuries.") (emphasis in original).[36]

Add to this concern, the fact that this action is already extraordinarily complex – even at this procedurally early stage – and that certain causes of action (asserted in Proposed Intervenors' proposed Complaint in Intervention) are being pursued and/or have already been dismissed with prejudice (saying nothing of what Judge Lodge may order by way of the recommended dismissal of claims here).

Like intervention as of right, these concerns auger strongly against Proposed Intervenors' request for permissive intervention.  It is therefore recommended that Proposed Intervenors' Motion to Intervene be denied in this respect.

## IV.  ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that Plaintiffs' Motion for Leave to Amend Third Cause of Action (Docket No. 130) is GRANTED.

---

[36]   In this regard, the "Assignment of Claims" ("Assignment") (attached as Ex. A to Pls.' Joinder in Mot. to Intervene (Docket No. 167, Att. 1)) contributes to the Court's concern over the the requested intervention, and highlights even more starkly the potential conflict and its impediment to the fact-finding process.  Specifically, even though no class has even been certified, the Assignment purports to (1) entitle Timothy Blixseth to 25% of any judgment the class recovers, while (2) insulating Blixseth and Miguel (the same developers who received enormous Credit Suisse loans) from future claims by the class members – all in exchange for Blixseth "funding" the litigation.  The Court is concerned that such an agreement threatens the integrity of the fact-finding process of the existing lawsuit.  That is (independent of any issues surrounding the attempt to bind a currently-uncertified class), upon intervention and by virtue of the Assignment, Proposed Intervenors arguably are not just prosecuting their own claims but are also contingent investors in the litigation by virtue of the upfront bankrolling of the lawsuit and their self-interested protection against any claims that might be made against them by the class members.  Such an agreement seems overreaching on its face, even without a specific evaluation of the value of the consideration Blixseth and Miguel stand to gain in exchange for whatever the actual value might be of Blixeth "funding" the litigation.  The Court struggles to understand how there can be any informed waiver (even assuming that such a wiaver can properly be sought on the facts) to the conflict of interest by class members who are not yet even identified and notified, much less informed.  These factors do not weigh in favor of intervention; actually, just the opposite.

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 59**

## V.  **RECOMMENDATION**

For the foregoing reasons, IT IS HEREBY RECOMMENDED that:

**A.     Credit Suisse's Motion to Dismiss the Third Amended Complaint (Docket No. 134) be GRANTED in part and DENIED in part as follows:**

1.      Plaintiffs' fraud claim be dismissed with prejudice to the extent the claim is alleged on behalf of a united class and, individually, as to those Plaintiffs who have not adequately pled reliance in the TAC (Jennings, Mushkin, LaFleur, Griffen, Land, and Dominguez); and Plaintiffs' fraud claim not be dismissed as to those Plaintiffs who properly allege reliance (Gibson, Blixseth, and Koenig).

2.      Plaintiffs' negligent misrepresentation claim be dismissed with prejudice to the extent the claim is alleged on behalf of a united class and, individually, as to those Plaintiffs who have not adequately pled reliance in the TAC (Jennings, Mushkin, LaFleur, Griffen, Land, and Dominguez); and Plaintiffs' negligent misrepresentation claim not be dismissed as to those Plaintiffs who properly allege reliance (Gibson, Blixseth, and Koenig).

3.      Plaintiffs' breach of fiduciary duty claim not be dismissed;

4.      Plaintiffs' tortious interference with contractual relations claim not be dismissed;

5.      Plaintiffs' unjust enrichment claim be dismissed with prejudice;

6.      Plaintiffs' negligence claim not be dismissed; and

7.      Plaintiffs' Consumer Protection Act claim be dismissed with prejudice.

**B.     Cushman & Wakefield's Motion to Dismiss Plaintiffs' Third Amended Complaint (Docket No. 136) be GRANTED in part and DENIED in part as follows:**

1.      Plaintiffs' fraud claim be dismissed with prejudice to the extent the claim is alleged on behalf of a united class and, individually, as to those Plaintiffs who have not

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 60**

adequately pled reliance in the TAC (Jennings, Mushkin, LaFleur, Griffen, Land, and Dominguez); and Plaintiffs' fraud claim not be dismissed as to those Plaintiffs who properly allege reliance (Gibson, Blixseth, and Koenig).

 2. Plaintiffs' negligent misrepresentation claim be dismissed with prejudice to the extent the claim is alleged on behalf of a united class and, individually, as to those Plaintiffs who have not adequately pled reliance in the TAC (Jennings, Mushkin, LaFleur, Griffen, Land, and Dominguez); and Plaintiffs' negligent misrepresentation claim not be dismissed as to those Plaintiffs who properly allege reliance (Gibson, Blixseth, and Koenig).

 3. Plaintiffs' breach of fiduciary duty claim not be dismissed;

 4. Plaintiffs' tortious interference with contractual relations claim not be dismissed;

 5. Plaintiffs' negligence claim not be dismissed;

 6. Plaintiffs' Consumer Protection Act claim be dismiss with prejudice; and

 7. Plaintiffs' Class Allegations not be dismissed.

 **C.** **Proposed Intervenors' Motion to Intervene as Plaintiffs and to File Complaint in Intervention (Docket No. 159) be DENIED.**



DATED:  **February 17, 2012**

Honorable Ronald E. Bush
U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER/REPORT AND RECOMMENDATION - 61**