# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| L.J. GIBSON, BEAU BLIXSETH, AMY KOENIG, VERN JENNINGS, MARK MUSHKIN, MONIQUE LAFLEUR, and GRIFFEN DEVELOPMENT, LLC, JUDY LAND, and CHARLES DOMINGUEZ, each individually, and on behalf of others similarly situated<br><br>Plaintiffs,<br><br>vs.<br><br>CREDIT SUISSE AG, a Swiss corporation; CREDIT SUISSE SECURITIES (USA), LLC, a Delaware limited liability company, CREDIT SUISSE FIRST BOSTON, a Delaware limited liability corporation; CREDIT SUISSE CAYMAN ISLAND BRANCH, an entity of unknown type; CUSHMAN & WAKEFIELD, INC., a Delaware corporation and DOES 1 through 100 inclusive,<br><br>Defendants. | Case No.: CV 10-1-EJL-REB<br><br>**REPORT AND RECOMMENDATION RE:**<br><br>**PLAINTIFFS' MOTION TO CERTIFY CLASS (Docket No. 286)**<br><br>**CUSHMAN & WAKEFIELD'S MOTION TO EXCLUDE THE EXPERT REPORT AND RELATED TESTIMONY OF RANDALL BELL (Docket No. 319)** |

Now pending before the Court are the following motions: (1) Plaintiffs' Motion to Certify Class (Docket No. 286), and (2) Defendant Cushman and Wakefield, Inc.'s Motion to Exclude the Expert Report and Related Testimony of Randall Bell (Docket No. 319). Having carefully reviewed the record, participated in oral argument, and otherwise being fully advised, the undersigned enters the following Report and Recommendation:

## I. BACKGROUND

Plaintiffs purchased real property and homes in high-end, resort-style developments known as Lake Las Vegas, Tamarack, Ginn Sur Mer, and Yellowstone Club. This case has

**REPORT AND RECOMMENDATION - 1**

many moving parts; however, the general backdrop of Plaintiffs' claims relates to the manner in which Credit Suisse AG, Credit Suisse Securities (USA), LLC, Credit Suisse First Boston, and Credit Suisse Cayman Island Branch (collectively "Credit Suisse"), with appraisals prepared by Cushman & Wakefield, Inc. ("Cushman & Wakefield), marketed and implemented financing for each of the above-referenced developments.

Specifically, Plaintiffs allege that Credit Suisse masterminded a scheme – made possible by Cushman & Wakefield's creative, yet allegedly unlawful, Total Net Value ("TNV") appraisal methodology – to (1) induce the developers of these exclusive master-planned communities ("MPCs") to borrow huge sums of money through non-recourse loans from Credit Suisse, and (2) persuade these same developers to take out their equity in these developments, capitalizing on misleading future growth projections.

According to Plaintiffs, this deliberate strategy (which Plaintiffs refer to as the "Loan to Own" scheme) not only generated tens of millions of dollars in upfront "loan fees" for Credit Suisse, it also provided Credit Suisse with unfettered access to each MPC's confidential, proprietary, and key business information which, in turn, allowed Credit Suisse to assume lender advisory and "co-developer" roles within the MPCs.  Once inside the door, Plaintiffs claim that Credit Suisse was then able to direct to the development of, and influence capital decisions for, the MPCs until the expected financial collapse of the developments under the weight of unsustainable debt.

Having "syndicated" its creditor status in the meantime and, thus, allegedly transacting away the inevitable financial consequences of default, Plaintiffs further contend that Credit Suisse intentionally positioned itself to take over the MPCs as a result of the subsequent, but

**REPORT AND RECOMMENDATION - 2**

nonetheless anticipated, bankruptcy and/or receivership proceedings – the apparent genesis of Plaintiffs' "Loan to Own" phraseology.

As property owners within these allegedly doomed-from-the-beginning MPCs, Plaintiffs claim that it was the deliberate, unorthodox manner in which Defendants created, marketed, implemented, managed, and controlled massive loan amounts that ultimately prevented the developers (at each of the four MPCs) from constructing and/or maintaining promised common area amenities that, naturally, make up the resorts themselves.  To this end, Plaintiffs accuse Defendants of engaging in predatory lending practices and, pursuant to FRCP 23, move "to certify for class action treatment the claims for tortious interference with Plaintiffs' existing vested property and contractual rights, involving amenities and facilities, and for negligent harm to the same, as set forth in the Third Amended Complaint."[1]  *See* Mem. in Supp. of Class Cert., p. 1 (Docket No. 286, Att. 1).

## II.  REPORT

A court's decision to certify a class is discretionary, with FRCP 23 guiding the court's exercise of that discretion.  *See Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009).  A plaintiff bears the burden of demonstrating each of the four requirements of FRCP 23(a) and at least one of the three requirements of FRCP 23(b).  *See Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 724 (9th Cir. 2007).

FRCP 23(a) requires a plaintiff to demonstrate (1) that the proposed class is sufficiently numerous, (2) that it presents common issues of fact or law, (3) that it will be led by one or more

---

[1]  Based on U.S. District Judge Edward J. Lodge's prior ruling, the only claims available for class certification are Plaintiffs' claims for tortious interference with contract and negligence. *See* 3/30/12 Order, p. 23 (Docket No. 210); *see also* Mem. in Supp. of Class Cert., p. 2 n.3 (Docket No. 286, Att. 1).

**REPORT AND RECOMMENDATION - 3**

class representatives with claims typical of the class, and (4) that the class representatives will adequately represent the class.  *See Gen. Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147, 161 (1982); *see also* Fed. R. Civ. P. 23(a)(1)-(4).  If a plaintiff satisfies the FRCP 23(a) requirements, he must also show that the proposed class action meets one of the three requirements of FRCP 23(b).  *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).  Here, Plaintiffs invoke only FRCP 23(b)(3) which requires them to show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

FRCP 23 is not a "mere pleading standard"; instead, it places an evidentiary burden on a plaintiff who hopes to represent a class.  *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc.").  To satisfy that burden, the court must conduct a "rigorous analysis" that may involve the merits of plaintiff's underlying claims.  *See id.* at 2551-52 ("Frequently, that 'rigorous analysis' will entail some overlap with the merits of plaintiff's underlying claim.  That cannot be helped.  '[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'") (quoting *Falcon*, 457 U.S. at 160)  Any overlap, however, must be no more extensive than necessary to ensure that the plaintiff has satisfied FRCP 23's prerequisites.  *See Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013) ("Merits questions

**REPORT AND RECOMMENDATION - 4**

may be considered to the extent – but only to the extent – that they are relevant to determining whether the [FRCP 23] prerequisites for class certification are satisfied.").

While Plaintiffs originally sought to certify one class of post-2004 homebuyers at the four MPCs (*see* Pls.' Third Am. Compl., ¶ 47 (Docket No. 129)), they now request certification of four separate subclasses (one for each MPC) of all "persons or entities" who acquired, for consideration, any "interest, entitlement, or privilege for the access, utilization or benefit of any facility . . .[,] club membership or recognized amenity" in one of the MPCs and whose "facility, club membership or amenity became impaired, reduced, discontinued or deleteriously impacted." *See* Mem. in Supp. of Class Cert., pp. 7-8 (Docket No. 286, Att. 1).  Plaintiffs contend that this defined "Class" (comprised of the four subclasses) satisfies the requirements of FRCP 23.  *See id.* at p. 8.  Cushman & Wakefield and Credit Suisse disagree, arguing that Plaintiffs' failure to satisfy (1) FRCP 23(a)'s requirements of commonality, typicality, and adequacy of representation,[2] as well as (2) FRCP 23(b)'s predominance and superiority requirements, renders certification improper.  *See* Cushman & Wakefield's Opp. to Class Cert., p. 8 (Docket No. 318); Credit Suisse's Opp. to Class Cert., p. 3 (Docket No. 320).

## A.      FRCP 23(a)(2): Commonality

A class has sufficient commonality if "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Although FRCP 23(a)(2)'s commonality requirement is "less rigorous" than the companion requirements of FRCP 23(b)(3) (*see Hanlon v. Chrysler Corp.*,

---

[2]  Defendants do not contest that the proposed Class is sufficiently numerous.  Therefore, the undersigned's analysis will focus on the commonality, typicality, and adequacy of representation elements of FRCP 23(a)(2)-(4), as well as the predominance and superiority elements of FRCP 23(b)(3).

**REPORT AND RECOMMENDATION - 5**

150 F.3d 1011, 1019 (9th Cir. 1998)), it does not merely mean *any* question underlying all class members' claims.  *See Wal-Mart*, 131 S. Ct. at 2551 ("Any competently crafted class complaint literally raises common 'questions.') (quoting Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U.L.Rev. 97, 131-32 (2009)).  Instead, "'[w]hat matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.'"  *Id.* (quoting Nagareda, *supra*, at 132) (emphasis in original).  Still, "'[t]he test or standard for meeting the [FRCP] 23(a)(2) prerequisite [of commonality] is qualitative rather than quantitative; that is, there need be only a single issue common to all members of the class.'"  *Lewis v. First Am. Title Ins. Co.*, 265 F.R.D. 536, 555 (D. Idaho 2010) (quoting *Newberg on Class Actions* § 3:10).  Thus, FRCP 23(a)(2)'s commonality requirement requires that all class members' claims "depend upon a common contention," and that the common contention be "capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Wal-Mart*, 131 S. Ct. at 2551.

Here, Plaintiffs' Third Amended Complaint alleges that, relative to each MPC, class members were promised a specified set of amenities, but that Defendants' Loan to Own Scheme ultimately contributed to these MPCs' ruin and, as a result, led to the diminishment, retrenchment, and wholesale elimination of the contracted-for amenities.  In other words, whether the MPCs were deprived of the promised amenities and whether such deprivations were a function of the alleged Loan to Own scheme represent a set of common questions whose answers are "apt to drive" a classwide resolution of Plaintiffs' claims.  Whatever dissimilarities

**REPORT AND RECOMMENDATION - 6**

may exist between the class members (and there are several, as pointed out by Cushman &

Wakefield (*see* Cushman & Wakefield's Opp. to Class Cert., pp. 18-19 (Docket No. 318), that

are of notable concern (*see infra*)), they do not operate to foreclose the existence of a nonetheless

common contention, the answer to which may resolve integral components of Plaintiffs' tortious

interference with contract and negligence claims.  *See Meyer v. Portfolio Recovery Assocs., LLC*,

707 F.3d 1036, 1041 (9th Cir. 2012) ("The existence of shared legal issues with divergent factual

predicates is sufficient, as is a common core of salient facts coupled with disparate legal

remedies within the class.") (citing *Hanlon*, 150 F.3d at 1019); *Ginsburg v. Comcast Cable

Commc'ns Mgmt. LLC*, 2013 WL 1661483, *5 (W.D. Wash. 2013) ("Where a plaintiff identifies

at least one common question, differences between class members' claims are not relevant to the

commonality inquiry."); *but see Wal-Mart*, 131 S. Ct. at 2551 ("'Dissimilarities within the

proposed class are what have the potential to impede the generation of common answers.'")

(quoting Nagareda, *supra*, at 132).

Therefore, these considerations establish commonality under the permissive standard of

FRCP 23(a)(2).  *See Hanlon*, 150 F.3d at 1019 ("[FRCP] 23(a)(2) has been construed

permissively.").

## B.    FRCP 23(a)(3): Typicality

To demonstrate typicality, Plaintiffs must show that "the claims or defenses of the

representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).

As the United States Supreme Court explained:

> The commonality and typicality requirements of [FRCP] 23(a) tend to merge.  Both
> serve as guideposts for determining whether under the particular circumstances
> maintenance of a class action is economical and whether the named plaintiff's claim

**REPORT AND RECOMMENDATION - 7**

> and the class claims are so interrelated that the interests of the class members will be
> fairly and adequately protected.

*Falcon*, 457 U.S. at 157, n.13.  "'Typicality refers to the nature of the claim or defense of the

class representative[s], and not to the specific facts from which it arose or the relief sought.'"

*Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (quoting *Weinberger v.*

*Thornton*, 114 F.R.D. 599, 603 (S.D. Cal. 1986).  "The test of typicality 'is whether other

members have the same or similar injury, whether the action is based on conduct which is not

unique to the named plaintiffs, and whether other class members have been injured by the same

course of conduct.'" *Id*. (quoting *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D. Cal. 1985)).  In

short, although they need not be substantially identical, representative claims are typical if they

are "reasonably co-extensive with those of absent class members." *Hanlon*, 150 F.3d at 1020.

Here, Plaintiffs argue that, as class representatives, their claims rely upon an "identical

fact pattern," alongside the "exact same legal theories" as those advanced by members of the

Class. *See* Mem. in Supp. of Class Cert., p. 12 (Docket No. 286, Att. 1).  In particular, Plaintiffs

assert that (1) their tortious interference with contract and negligence claims are both premised

upon a single course of conduct: Defendants' alleged Loan to Own scheme; and that (2)

Plaintiffs and Class members have suffered the same injury: loss of promised amenities

associated with property ownership at their respective MPC.  *See id*.  In response, Defendants do

not challenge the overall similarities between Plaintiffs' claims and those of the rest of the Class;

rather, on the issue of typicality, Defendants imply that Plaintiffs are subject to unique defenses

that threaten to become the focus of the litigation.  *See* Credit Suisse's Opp. to Class Cert., p. 12

(Docket No. 320) (citing *Hanon*, 976 F.2d at 508).

**REPORT AND RECOMMENDATION - 8**

As to Defendants' retort, it is true that courts have held that class certification is inappropriate if "'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'" *Hanon*, 976 F.2d at 508 (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2nd Cir. 1990)).  However, to the extent Defendants offer such a reason as a stand-alone basis for rejecting Plaintiffs' class certification efforts (on typicality grounds), it is overstated.  *But see infra*.

Of the named Plaintiffs – L.J. Gibson, Beau Blixseth, Mark Mushkin, Amy Koenig, Judy Land, Monique LaFleur, Griffen Development, Charles Dominguez, and Vern Jennings – Credit Suisse points only to Messrs. Blixseth and Mushkin as being exposed to unique defenses not shared by other members in the Class – Mr. Blixseth's standing to bring his claim; and Mr. Mushkin's prior knowledge/assumption of the risk, along with potential res judicata defenses. *See* Credit Suisse's Opp. to Class Cert., pp. 12-17 (Docket No. 320).[3]  There is no question that such defenses may not exist as to other Class members' claims and, therefore, are naturally unique to both Mr. Blixseth and Mr. Mushkin.  Still, the question is not whether defenses specific to the representative parties exist at all in the abstract (surely many class certification proceedings yield a litany of defenses particular to represented parties if examined long and hard

---

[3]  Defendants highlight the prospect that other defenses – for example, comparative fault and the economic loss rule – may exist to underscore the individual nature of class members' claims over whatever common issues of law or fact that might remain (*see supra*). *See, e.g.*, Cushman & Wakefield's Opp. to Class Cert., pp. 2, 12-13 (Docket No. 318).  While such arguments may obliquely speak to the issue of typicality (and, even, commonality), they are raised and addressed relative to FRCP 23(b)(3)'s predominance requirements.  *See infra*. Therefore, the undersigned's consideration of these arguments later within this Report and Recommendation do no drive the conclusions reached vis à vis FRCP 23(a)(3)'s typicality requirement, and vice versa.

**REPORT AND RECOMMENDATION - 9**

enough via class certification fact discovery); instead, the appropriate inquiry toward addressing the typicality prerequisite is whether a "major focus" of the litigation will be on those defenses. *See Hanon*, 976 F.2d at 509.  Regardless of the above-stated defenses' merits, the undersigned is not convinced that their resolution through the course of this action will significantly prejudice other Class members' claims moving forward when understanding that, despite such defenses, (1) Plaintiffs consistently allege to have been adversely affected by the same conduct as the putative class, (2) Plaintiffs assert injuries in the same general manner as would all other class members (*but see infra*), and (3) the legal standards applicable to Plaintiffs' tortious interference with contract and negligence claims are not materially different across the jurisdictions applicable for each MPC.

With all this in mind, and recognizing that the representative parties comprise persons from each MPC, the representative claims are sufficiently typical to pass muster under FRCP 23(a)(3).

**C.      FRCP 23(a)(4):  Adequacy of Representation**

"Requiring the claims of the class representatives to be adequately representative of the class as a whole ensures that the interest of absent class members are adequately protected." *Walters v. Reno*, 145 F.3d 1032, 1046 (9th Cir. 1998).  Under FRCP 23(a)(4), Plaintiffs must establish that they "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  To satisfy constitutional due process concerns, absent class members must be afforded adequate representation before entry of a judgment which binds them.  *See Lewis*, 265 F.R.D. at 557 (citing *Hanlon*, 150 F.3d at 1020).  Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class

**REPORT AND RECOMMENDATION - 10**

members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously on

behalf of the class?  *See id.* (citing *Hanlon*, 150 F.3d at 1020).

Responding to Plaintiffs' blanket and conclusory assertions that they "possess no

interests antagonistic to those of any class member" and that they "have a basic understanding of

the case and their roles in its prosecution, specifically including the responsibility to vigorously

prosecute the litigation" (*see* Mem. in Supp. of Class Cert., pp. 12-13 (Docket No. 186, Att. 1)),

Defendants counter that, in fact, each Plaintiff is not an adequate representative of the Class,

owing to their own conflicts of interest, contributory responsibility, and/or contradictory

testimony inconsistent with the pleadings.  *See, e.g.*, Credit Suisse's Opp. to Class Cert., pp. 12-

17 (Docket No. 320).  Each of the Defendants' criticisms in these respects is addressed below.

•     L.J. Gibson: Credit Suisse points out that, because Ms. Gibson is married to and

purchased properties with James Sabalos (one of the attorneys originally involved in initiating

this action), she has "financial motivations not shared by other class members" – a conflict of

interest preventing her from adequately representing the Tamarack, Lake Las Vegas, and Ginn

Sur Mer subclasses.  *See id.* at pp. 12-13.  But Mr. Sabalos is not seeking to serve as Class

counsel.  *See* 12/5/12 Notice of Change of Status of James C. Sabalos (Docket No. 307).[4]  Even

so, Credit Suisse argues that Gibson may still be "more concerned about her husband's

attorneys' fees rather than the best interests of the class."  *See* Credit Suisse's Opp. to Class

Cert., p. 13, n.7 (Docket No. 320).  However, such a possibility, without more, does not rise to

---

[4]  In the event this Court certifies the case, Mr. Sabalos "will remain active in the case on
a more limited basis, that is, he will represent Plaintiff Amy Koenig and Plaintiff L.J. Gibson in
their separate claims which are not certified for pursuit on a class action basis.  *See* 12/5/12
Notice of Change of Status of James C. Sabalos, p. 2 (Docket No. 307).

**REPORT AND RECOMMENDATION - 11**

the level of a conflict of interest between Ms. Gibson and other Class members and, thus, it

cannot be said that she will not fairly and adequately protect the interests of the Class.[5]

      •      <u>Beau Blixseth</u>: Credit Suisse contends that Mr. Blixseth, the sole representative of

the Yellowstone Club subclass, cannot adequately represent the interests of the Class in large

part due to his relationship with Tim Blixseth:

> Beau Blixseth cannot adequately represent the class because he is the son of the
> Yellowstone [Club] developer, Tim Blixseth, who was also the co-owner of the
> property-owning LLCs; Tim's failure to make the payments on the underlying
> mortgages, as agreed with Beau, led to the foreclosure on and loss of the two
> properties.   Tim also financed Beau's earlier purchase, by Beau's Red Rock
> Development LLC, of a building lot at Yellowstone [Club], and later forgave the
> $1.5 million debt.  Beau almost certainly would refuse to assign any blame to his
> father – the principal of the developer that built the amenities – for homeowners'
> amenity-related losses.

*See id*. at p. 14 (internal citations omitted).  Such arguments constitute legitimate reasons for

precluding Mr. Blixseth from representing the Class.

      First, had *Tim* Blixseth sought to represent the Class as the Yellowstone Club subclass's

representative, there would unquestionably be a problematic conflict of interest preventing him

from doing so.  While Mr. Blixseth is not his father, the connection between the two is

undeniable – enough to preemptively taint Mr. Blixseth and prevent him from representing the

interests of the Class, when considering Mr. Blixseth's understandable reluctance to consider the

possibility that the Class members' recoverable damages, if any, were caused by "on the ground"

entities more closely involved with the Yellowstone Club MPC, rather than Defendants.  *See,*

---

    [5]  Moreover, the undersigned considers that, despite Ms. Gibson being the only Ginn Sur
Mer representative, the mere prospect that she would put her interests in *other* resorts ahead of
Gin Sur Mer's (*see* Credit Suisse's Opp. to Class Cert., p. 13, n.7 (Docket No. 320) is too remote
to warrant a finding that a conflict of interest exists that prevents her from adequately
representing the interests of the Class.

**REPORT AND RECOMMENDATION - 12**

*e.g.*, Blixseth Dep., attached as Ex. 30 to Guy Decl., at 257:19-23 (Docket No. 320, Att. 8) ("I would agree that what started the foreclosure process was the lack of payment of the interest. But I still go back to what I said earlier, which is, I believe that this happened because of the Credit Suisse loan.").

Second, as Credit Suisse also makes known, Mr. Blixseth "worked for and owned an interest in the developer and, therefore, arguably contributed to the harm allegedly suffered by the Class." *See* Credit Suisse's Opp. to Class Cert., p. 14 (Docket No. 320).[6]  To the extent this argument differs from the one raised immediately above,  it still gives rise to the same reason for concluding that Mr. Blixseth cannot adequately represent the Yellowstone subclass.  Simply put, Mr. Blixseth is too directly connected to the development, ownership, and management of the Yellowstone Club MPC to maintain (or be perceived to maintain) an objective frame of mind concerning all of the factors that may have contributed to that subclass's damages.  Lacking objectivity, Mr. Blixseth's ability to adequately represent the Yellowstone Club subclass is compromised.

•    <u>Mark Mushkin</u>: In addition to suggesting the existence of certain defenses applicable to Mr. Mushkin (a representative of the Lake Las Vegas subclass) (*see supra*), Credit Suisse argues that he is not an adequate Class representative because "he considers himself

---

[6]  The authority for such a proposition – a response to an interrogatory and a deposition excerpt – does not actually state what Credit Suisse suggests it does.  For example, Mr. Blixseth's referenced response to Interrogatory No. 15 indicates only that he has not interviewed or had any communications with any members of the putative class.  *See* Blixseth Resp. to Interrog. No. 15, attached as Ex. 2 to Guy Decl. (Docket No. 320, Att. 2).  Similarly, the referenced deposition excerpt speaks only to (1) the purchase/investment of an entity that purchased residential real property at Yellowstone Club, and (2) the investments into those properties.  *See* Blixseth Dep., attached as Ex. 30 to Guy Decl., at 77:17-24 (Docket No. 320, Att. 8).  Regardless, Plaintiffs do not dispute Mr. Blixseth's involvement in these respects and, accordingly, the undersigned will consider it here for these purposes.

**REPORT AND RECOMMENDATION - 13**

superior in knowledge and experience to them." *See id*. at p. 14.  Mr. Mushkin's professional

backdrop, institutional knowledge, and experiences at Lake Las Vegas is without question, but

they do not combine to reflect an inability to sufficiently represent the Class members' interests

(and Credit Suisse supplies no authority suggesting otherwise).[7]

> •   <u>Amy Koenig</u>: Focusing on Ms. Koenig's (1) "work[ ] as the Vice President of

Marketing at Tamarack," (2) ownership of shares in the Tamarack resort, (3) access to

confidential information, and (4) role in creating "fact sheets for salespeople to using in selling

Tamarack properties and review[ing] press releases announcing Tamarack amenities," Credit

Suisse paints Ms. Koenig (a representative for the Tamarack subclass) as an "insider" who

cannot adequately represent the Class.  *See id*. at p. 15.  For reasons similar to those impacting

Mr. Blixseth's ability to represent the Yellowstone Club subclass, the undersigned agrees that

Ms. Koenig is not an adequate representative for the Tamarack subclass.

The mere fact that Ms. Koenig is a Tamarack insider is not enough to prevent her from

serving as a Class representative.  *See, e.g.*, *Newberg on Class Actions* § 22:40 ("Defendants in

securities class actions have often asserted that a plaintiff who was an insider or tippee at the

time of the alleged violation cannot adequately represent the interests of other purchasers or

sellers.  Most courts have rejected this argument, holding that insider status does not in itself

---

[7]  Despite this recommendation concerning Mr. Mushkin's ability to represent the Lake Las Vegas subclass, the undersigned notes that the record concerning his property purchases is conflicting or, at the very least, confusing – perhaps owing to the type of documentation surrounding such purchases and the unknown representations contained therein.  Therefore, it is possible that a more stout argument may eventually develop to challenge Mr. Mushkin's status as a representative. *See infra*.  Until then, however, based on what is now in the record, Mr. Mushkin is a suitable, albeit far from perfect, representative.  If necessary, his status in this respect may be revisited if the future course of the case should call for such.

**REPORT AND RECOMMENDATION - 14**

create a conflict of interest.").  However, here, her professional responsibilities naturally would have fostered personal and professional relationships with Tamarack's development team (Tamarack's developer and former owner, Jean-Pierre Boespflug, actually walked Ms. Koenig down the aisle at her wedding), such that a risk exists that either of their potential liabilities may be disregarded in favor of focusing solely upon Defendants' alleged conduct.  *See, e.g.*, Reply in Supp. of Class Cert., p. 3 (Docket No. 332) ("The development of the amenities was an integral part of the "resort lifestyle *being sold and advertised by the developers*.") (emphasis added). The potential for such self-interested "tunnel vision" does not represent the best interests of the Tamarack subclass.  Therefore, Ms. Koenig is not an adequate representative.

• Judy Land: Like Ms. Koenig, Credit Suisse tabs Ms. Land (a representative for the Tamarack subclass) as an insider, having worked in sales for the Tamarack resort's developer and made representations to prospective buyers.  *See* Credit Suisse's Opp. to Class Cert., pp. 15-16 (Docket No. 320).  For the same reasons expressed as to Ms. Koenig, Ms. Land's own involvement in property sales contributing to the claims involved in this action (and, hence, her own potential liability), renders her an inadequate representative for the Tamarack subclass.

• Monique LaFleur and Griffen Development, LLC: Credit Suisse argues that, because Ms. LaFleur (a representative for the Tamarack subclass) purchased (though limited liability entities rather than in her individual capacity) Tamarack properties as an investment, she and her development company (and now owner of several of Ms. LaFleur's Tamarack purchased properties), Griffen Development, LLC (another representative for the Tamarack subclass), are neither typical of, nor can they adequately represent, the "amenity-seeking homebuyer characterized in the Complaint."  *See* Credit Suisse's Opp. to Class Cert., p. 16 (Docket No.

**REPORT AND RECOMMENDATION - 15**

320).  From the undersigned's perspective, any distinctions between these different purchasers

(investors vs. actual homebuyers) are inconsequential on the issue of Ms. LaFleur's and/or

Griffen Development, LLC's ability to adequately represent the Class – both purchasers in the

context of this case are similarly injured when promised amenities are not made available.

Also, the fact that Ms. LaFleur may have testified during her deposition that she believed

the money loaned to the Tamarack MPC developer could have been used to develop and

maintain these amenities (*see id*.) is likewise unavailing.  This is true because, consistent with

the Third Amended Complaint, she is of the further belief that it was Credit Suisse's assumption

of  successor developer/lending advisor roles within Tamarack, coupled with its knowledge of

Tamarack's financial underpinnings and subsequent control over Tamarack's decision-making,

that actually contributed to the failure to develop and maintain the resort's many amenities – not

the fact of the loan itself.  *Compare* LaFleur Dep., attached as Ex. 28 to Guy Decl., at 216:2-17

(Docket No. 320, Att. 7) ("I believe that Credit Suisse mandated how the money was spent and

where the money was to – where it was to go and at what rate that money was spent and how that

money was to be utilized, and that it went beyond the scope of what Tamarack Resort, LLC was

doing prior to Credit Suisse coming aboard as what I call a pseudo-partner. . . . .  I base that on

facts that are items that are in this Third Amended Complaint to this proceeding that we're here;

I base that on knowledge of how the management within Tamarack, LLC changed after the

Credit Suisse loan came on board; I base that on the fact that it wasn't status quo once the Credit

Suisse loan was brought aboard.  There were other individuals, we'll say, driving the effort.")

*with* TAC ¶¶ 174, 176, 181-82, & 184 (Docket No. 131).  Thus, Ms. LaFleur's and Griffen

Development, LLC's interests adequately align with those of other Class members.

**REPORT AND RECOMMENDATION - 16**

• __Charles Dominguez and Vern Jennings__:   Credit Suisse asserts that both Charles

Dominguez (a representative for the Tamarack subclass) and Vern Jennings (a representative for

the Lake Las Vegas subclass) cannot adequately serve as class representatives because, like Ms.

LaFleur, they gave testimony that contradicted crucial allegations within the Third Amended

Complaint – in particular, that they "did not believe that Credit Suisse engaged in a loan-to-own

scheme." *See* Credit Suisse's Opp. to Class Cert., pp. 16-17 (Docket No. 320).  It is certainly

possible to construe certain isolated sentences from Messrs. Dominguez's and Jennings's

respective depositions as suggesting their beliefs that Credit Suisse and/or Cushman &

Wakefield are without blame.  *See, e.g.*, Dominguez Dep., attached as Ex. 22 to Guy Decl., at

219:17-23 (Docket No. 320, Att. 6); Jennings Dep., attached as Ex. 23 to Guy Decl., at 20:18-20

(Docket No. 320, Att. 6).  However, in reality, these individuals do not know exactly what

contributed to their applicable MPC having to face foreclosure proceedings, but, at the very

least, suspect Credit Suisse's and Cushman & Wakefield's involvement to some extent.  *See,*

*e.g.*, Dominguez Dep., attached as Ex. 22 to Guy Decl., at 220:19-23, 221:8-10 (Docket No. 320,

Att. 6) ("So to answer your question, I know we're suing because of some wrongdoing on the

finance side.  I don't understand exactly what was done wrong. . . . .  I feel that possibly it was

due partly to [the Cushman & Wakefield appraisals and Credit Suisse's loan].  But I don't know

exactly how much."); Jennings Dep., attached as Ex. 23 to Guy Decl., at 20:22-21:7 (Docket No.

320, Att. 6) (responding "I don't know" to whether he believed that Credit Suisse issued loan

with expectation that developers would default).  Messrs. Dominguez and Jennings could be

more familiar with the instant litigation, to be sure; however, any shortcomings in this respect

should not be understood as an endorsement of Credit Suisse's and Cushman & Wakefield's

defense to Plaintiffs' claims or that their failure to absolutely comprehend the extraordinarily

**REPORT AND RECOMMENDATION - 17**

complex nuances of this case renders them inadequate to represent the interests of the Class.[8,9]

All told, named Plaintiffs Beau Blixseth, Amy Koenig, and Judy Land are not adequate Class representatives.  FRCP 23(a)(4) is not satisfied in these three respects.  Whatever "warts" may exist after examining the other named Plaintiffs' ability to adequately represent the Class, those perceived shortcomings do not mean *ipso facto* that they cannot do so on the pledged claims moving forward.  Therefore, FRCP 23(a)(4) is satisfied as to L.J. Gibson, Mark Mushkin, Monique LaFleur, Griffen Development, LLC, Charles Dominguez, and Vern Jennings; they are adequate representatives of the Class.

## D.   FRCP 23(b)(3): Predominance

FRCP 23(b)(3)'s predominance analysis "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  Though akin to the commonality requirement of FRCP 23(a)(2) (indeed,

---

[8] Credit Suisse's reference to *Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2nd Cir. 1998), is misplaced.  There, the proposed representative "repeatedly changed his position" on an integral aspect of the case.  *Id.*  According to the Second Circuit, such changes in position "would create serious concerns as to his credibility at trial."  *Id.*  These same concerns do not exist here.  Additionally, that Mr. Dominguez's company may have been listed by the Tamarack MPC as a preferred builder (*see* Credit Suisse's Opp. to Class Cert., p. 17 (Docket No. 320)) does not create a conflict of interest preventing him from representing the Class (and, besides mentioning the relationship itself, Credit Suisse offers no related argument detailing how such a conflict arises or its interrelated consequences).  *See supra.*

[9] The undersigned remains troubled by the fact that a Lender Agreement exists amongst the Class representatives prospectively assigning 23% of any award made to the Class to Tim Blixseth.  *See* Credit Suisse's Opp. to Class Cert., p. 17 (Docket No. 320) ("The startling presumptuousness of assigning away rights of potential members of an as-yet-uncertified class, *before* any court has endowed them with any right to do so, surely renders all nine of the named Plaintiffs inadequate as class representatives.").  This issue is starkly problematic for Beau Blixseth, and raises questions as to the representatives' ability to adequately represent the interests of other Class members (or some other prerequisite to class certification).  However, in light of the undersigned's consideration of the predominance criteria of FRCP 23(b)(3), the Court makes no direct ruling on this potential roadblock in this Report and Recommendation.

**REPORT AND RECOMMENDATION - 18**

FRCP 23's commonality and predominance requirements were frequently discussed in tandem within the parties' briefing and during oral argument), FRCP 23(b)(3)'s predominance inquiry already presumes the existence of common issues of fact or law; therefore, "the presence of commonality alone is not sufficient" to satisfy FRCP 23(b)(3).  *Hanlon*, 150 F.3d at 1022; *see also Amchem*, 521 U.S. at 624 (stating that predominance analysis under FRCP 23(b)(3) is "far more demanding" than commonality requirement); *see also Ginsburg*, 2013 WL 1661483 at \*5 (unlike FRCP 23(a)(2)'s commonality requirement, "[i]n determining whether common issues predominate in accordance with [FRCP] 23(b)(3), . . . differences among class members' claims are crucial.").  In contrast to FRCP 23(a)(2), FRCP 23(b)(3) focuses on the relationship between the common and individual issues, requiring that the court find "that the questions common to the class predominate over the questions affecting individual members."  Fed. R. Civ. P. 23, Adv. Comm. Notes (1966 Amendments); *see also Newberg on Class Actions* § 4:49 ("Predominance therefore asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual cases.").

Similar to their arguments in favor of finding commonality under FRCP 23(a)(2), Plaintiffs state that "this litigation contains core common issues, which overwhelmingly predominate all of its aspects," arguing further that:

> [e]very Class member is suing on a single set of facts (per subclass) to support two different causes of action: tortious interference and negligence, as well as proof of causation and damage.  The "common nucleus of facts" deals with Plaintiffs' fundamental contention that Defendants devised and orchestrated a common scheme or course of conduct – the Loan-to-Own scheme – which intentionally or negligently caused the MPCs to diminish or eliminate promised amenities and facilities, thereby damaging each and every MPC property owner in the same exact manner.

Mem. in Supp. of Class Cert., p. 14 (Docket No. 286, Att. 1); *compare with id.* at pp. 10-11 (discussing FRCP 23(a)(2)'s commonality prong).  Relatedly, Plaintiffs go on to declare in no

**REPORT AND RECOMMENDATION - 19**

uncertain terms that:

- "There are no individual issues which bear on Defendants' liability."

- "The only individual issue that may exist is the amount of damages suffered by each Class member."

- "All Class members will rely on the same testimony and documentary evidence to establish the elements of the Loan-to-Own scheme and show that it caused their claimed loss of amenities or facilities."

- "[A]ll C]lass members will rely on the same expert testimony to show the measurable extent to which Defendants' conduct caused the MPCs to fail and thus deprive Plaintiffs of the compensable value of their guaranteed amenities and facilities."

- "[V]irtually all issues with respect to the Class claims are subject to common proof."

- "[T]his case does not involve significant individual issues, as all of the Class members were exposed to the same conduct and claim the same resulting injury."

- "In sum, Defendants' wrongful actions produced indistinguishable claims for all Class members, which are perfectly suited for representative determination. Shared issues and testimony will resolve nearly all questions for this matter for every Class member and with respect to the only aspect of the litigation implicating marginally individualized damage questions."

*Id*. at pp. 15-17. Defendants dispute these contentions as amounting to nothing more than vague abstractions, devoid of any specific evidentiary detail sustaining Plaintiffs' underlying causes of action; namely, the absence of common proof speaking to (1) the actual contracts underlying Plaintiffs' tortious interference with contract claim, and (2) the causal connection between Defendants' conduct and the Class members' injuries supporting Plaintiffs' tortious interference with contract and negligence claims. *See* Cushman & Wakefield's Opp. to Class Cert., p. 0 (Docket No. 318) (citing *Klay v. Humana, inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004) ("Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of

**REPORT AND RECOMMENDATION - 20**

individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under [FRCP] 23(b)(3).")).  The undersigned agrees with Defendants.

     1.    <u>Variations in the Contracts Defeat a Classwide Tortious Interference with Contract Claim</u>

The parties do not dispute that, regardless of the jurisdictional law applied, the elements of a tortious interference with contract claim are (1) the existence of a contract; (2) knowledge of the contract on the part of the defendant; (3) intentional interference causing breach of the contract; and (4) injury to the plaintiff resulting from the breach.  *See* Mem. in Supp. of Class Cert., pp. 5-6 (Docket No. 286, Att. 1).  Throughout this action, Plaintiffs have repeatedly touted the similarity in contracts from one Class member to the next:

- "Plaintiffs and the Class had substantially uniform contracts with the developers of each MPC, which contracts provided for the construction and maintenance of the rights, amenities and privileges running with the lands alleged hereinabove and which were known to Defendants at all times relative hereto."  Pls.' Third Am. Compl., 193 (Docket No. 129) (made in conjunction with Plaintiffs' tortious interference with contract claim);

- "In conjunction with their purchase or acquisition of property in one of the four MPCs, the Plaintiffs and all Putative Class members entered into contractual agreements pursuant to which the MPCs' developer promised to provide, maintain and/or develop certain amenities and facilities . . . .  Although the specific amenities and features provided by each MPC differed in form, the contractual promises to provide each and every property owner with a specified set of amenities were substantially identical."  Mem. in Supp. of Class Cert., p. 1 (Docket No. 286, Att. 1); and

- "[T]he contracts between all MPCs and their homeowners uniformly required the MPCs to provide certain amenities."  *Id*. at p. 10.

Except, as Cushman & Wakefield argues, discovery to date reveals that these representations are not altogether true.  To the contrary, the produced "contract" documents for each MPC (discussed below) are, in fact, materially *not* substantially uniform between Class members,

**REPORT AND RECOMMENDATION - 21**

according to Cushman & Wakefield.  *See* Cushman & Wakefield Opp. to Class Cert., pp. 8-9

(Docket No. 318) (citing *Jordan v. Paul Fin., LLC*, 2009 WL 192888, *6 (N.D. Cal. 2009) ("The

Court finds plaintiff's characterization of putative class members' loan documents as uniform

does not accord with the evidence cited by defendants.")).  As a result, Defendants claim that the

differing, individual contractual interests between Class members (between and among

subclasses) cut against a finding that common issues predominate.

   For instance, at the Lake Las Vegas MPC, Plaintiffs' four purchase contracts were with

four different seller, and only one of which was the developer.  *See* Cushman & Wakefield Opp.

to Class Cert., p. 10 (Docket No. 318); *see also* Exs. 1 & 3 to Abdollahi Decl. (Docket No. 318,

Att. 2).  Moreover, these contracts cannot be read to be uniform when understanding that:

- The Jennings' February 15, 2002 Purchase and Sale Agreement with the *developer* incorporated a "Disclosure Statement" that disclaimed any promises with respect to amenities other than constructing those specifically identified.[10]  *See* Ex. 3 to Abdollahi Decl. (Docket No. 318, Att. 2) (citing Ex. 26 to Abdollahi Decl. (Docket No. 318, Att. 7)); *see also* Ex. 27 to Abdollahi Decl. (Docket No. 318, Att. 7) ("WE ARE NOT CONTRACTUALLY OBLIGATED TO YOU TO PROVIDE THE PROPOSED FACILITIES. THERE IS NO ASSURANCE THAT ANY OR ALL OF THE PROPOSED FACILITIES WILL BE DEVELOPED.") (capitalization in original);

- The Gibsons' November 19, 2002 Residential Purchase Agreement with a *builder* did not discuss amenities at all.  *See* Ex. 3 to Abdollahi Decl. (Docket No. 318, Att. 2) (citing Ex. 14 to Abdollahi Decl. (Docket No. 318, Att. 4)). The Gibsons' June 26, 2004 and July 24, 2005 Purchase Agreements with other *builders* incorporated particular disclaimers regarding resort improvements.  *See* Ex. 3 to Abdollahi Decl. (Docket No. 318, Att. 2) (citing Ex. 15 to Abdollahi Decl. (Docket No. 318, Att. 4)); and

- Mr. Mushkin had *no* contracts because each of his property purchases (between 2004 and 2009) were by "grant bargain" or "sale deeds" in lieu of

---

   [10]  Mr. Jennings confirmed at his deposition that the specifically-identified amenities were completed at the time he purchased his property.  *See* Jennings Dep., attached as Ex. 5 to Abdollahi Decl., at 162:20-164:17 (Docket No. 318, Att. 2).

**REPORT AND RECOMMENDATION - 22**

foreclosure, or inheritance from a trust. *See* Pls.' 1/25/13 Notice, p. 3
(Docket No. 334); *see also* Pls.' Resp. to Defs.' Mot. to Enforce Ct. Order,
pp. 13-14 (Docket No. 356).

At the Tamarack MPC, Plaintiffs' property purchases were likewise not all from the

developer and, therefore, included different "Guaranteed Amenities," if any at all. *See* Exs. 1 &

2 to Abdollahi Decl. (Docket No. 318, Att. 2) (citing Exs. 16-22 to Abdollahi Decl. (Docket No.

318, Atts. 4 & 5)). Additionally, Plaintiff Judy Land testified that, while working for/at

Tamarack as its resale broker, she *resold* approximately 80 properties (necessarily, then, between

parties other than the developer), the terms and conditions of which are currently unknown but,

as Defendants imply, far from uniform. *See* Land Dep., attached as Ex. 11 to Abdollahi Decl., at

22:16-23:13, 25:13-17 (Docket No. 318, Att. 3).

At the Yellowstone Club MPC, each of Plaintiffs' three property purchases involved

Plaintiff Beau Blixseth, but under different circumstances – only Red Rock Development LLC's

July 13, 2006 property purchase involved the developer, while Mr. Blixseth's (jointly with his

father, Tim Blixseth) two property purchases on June 30, 2008 involved resellers. *See* Ex. 1 to

Abdollahi Decl. (Docket No. 318, Att. 2). As stated above, such contracts necessarily differed

from one another. Still, to the extent Plaintiffs base their claim for guaranteed amenities at the

Yellowstone Club on a membership agreement rather than purchase contracts between buyer and

seller (*see* Mem. in Supp. of Class Cert., p. 3 (Docket No. 286, Att. 1)), that agreement arguably

disclaimed any perpetual or vested rights in amenities regardless. *See* Ex. 4 to Huntley Aff.

(Docket No. 286, Att. 4).

Finally, at the Ginn Sur Mer MPC, only Plaintiff L.J. Gibson's and attorney James

Sabalos's October 2, 2006 "Contract for Lot Purchase" has been submitted thus far. *See* Ex. 3 to

**REPORT AND RECOMMENDATION - 23**

Huntley Aff. (Docket No. 286, Att. 3).  Notably, the "property report" dealing with the
subdivision encompassing the lot purchase, warns that "**NO ASSURANCES HAVE BEEN
POSTED TO GUARANTEE THE PROMISED RECREATIONAL FACILITIES AND
THERE IS NO GUARANTEE THAT THE RECREATIONAL FACILITIES WILL BE
COMPLETED AS PROPOSED.**"  *See* Ex. 32 to Abdollahi Decl. (Docket No. 318, Att. 9)
(emphasis in original).  Because no other Ginn Sur Mer-related purchase contracts are in the
record, it is unknown whether Ms. Gibson's and Mr. Sabalos's purchase contract is uniform
among the Ginn Sur Mer subclass.

The point here is not to address the substantive merits of the Class members' tortious
interference with contract claim – that is immaterial at this point in the litigation and not the
subject of this Report and Recommendation.  Rather, regardless of the claim's viability, the
undersigned agrees that the above-referenced differences in just a sample of the named
Plaintiffs' underlying contracts making up the backbone of such a class-wide claim underscores
the existence of individualized issues, central to the question of liability, that cannot be resolved
using common proof.[11]  Plaintiffs' arguments to the contrary are unconvincing when looking at
the contracts themselves.  *See, e.g.*, *Martinez v. Welk Group, Inc.*, 2012 WL 2888536, *4 (S.D.
Cal. 2012) (finding no predominance, in part, because "[s]ome . . . owners have no contract . . .
because they purchased their points on the resale market" and "[t]hose who do have contracts . . .

---

[11]  These differences not only relate to whether, and to what extent, certain amenities
were contractually promised between seller and buyer (and whether such amenities were
completed), but also the market conditions in effect at the time of the various property purchases.
For example, the economic backdrop and motivation for purchasing property in 2002 before the
housing market collapse were markedly different than, say, 2008 and 2009 when Messrs.
Mushkin and Blixseth purchased their properties at the Lake Las Vegas and Yellowstone Club
MPCs, fully aware of the market situation, yet speculating on its rebound.

**REPORT AND RECOMMENDATION - 24**

do not all have the same contract . . . ."); *CLN Props., Inc. v. Republic Servs., Inc.*, 2010 WL 5146734, *3 (D. Ariz. 2010) (predominance not met when "the facts presented by the parties make clear that members of the class held a wide variety of contracts with Defendant, and some had no written contracts at all.").

Because an examination of the named Plaintiffs' contracts making up their tortious interference with contract claim does not adequately paint a consistent picture of the other property purchasers' contractual relationships at play at the various MPCs over time, the legal and factual questions common to the Class, significant as they may be (*see supra*), do not predominate over questions affecting only individual Class members' contract-based claims. Plaintiffs' repeated focus on the alleged illegality of Cushman & Wakefield's appraisals, part and parcel with Credit Suisse's alleged Loan to Own scheme, while no-doubt important to their case, does not override the individual contractual issues that present themselves here when litigating a class-wide tortious interference with contract claim. Predominance is therefore lacking and, as a result, Class certification should be denied on this basis.

2.   <u>Individual Issues Concerning Causation Defeat Class-Wide Tortious Interference with Contract and Negligence Claims</u>

The parties also do not dispute that, as with claims for tortious interference with contract, negligence claims require a causal connection between the defendant's conduct and the plaintiff's resulting injuries.  *See* Mem. in Supp. of Class Cert., p. 6 (Docket No. 286, Att. 1). Plaintiffs clearly understand this, acknowledging that "[a] major element of [their] claims is causation based on [Cushman & Wakefield's] illegal appraisals."  Reply in Supp. of Class Cert., p. 5 (Docket No. 331).  But Cushman & Wakefield argues that any proximate causation analysis cannot be applied to the Class as a whole using common proof given the presence of

**REPORT AND RECOMMENDATION - 25**

individualized factual issues particular to each Class member.  *See* Cushman & Wakefield's

Opp. to Class Cert., p. 13 (Docket No. 318) (citing *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294,

302 (5th Cir. 2003) ("[W]here fact of damage cannot be established for every class member

through proof common to the class, the need to establish [ ] liability for individual class members

defeats Rule 23(b)(3) predominance.")).  According to Cushman & Wakefield, these individual

issues defeat class-wide tortious interference with contract and negligence claims.

Plaintiffs take a broad approach toward addressing Cushman & Wakefield's concerns

over causation, proclaiming in sweeping terms that the violative appraisals proximately caused

the MPCs' bankruptcies which, in turn, caused a decrease in each MPC's value.  *See* Reply in

Supp. of Class Cert., p. 6 (Docket No. 331) (citing Bell Rpt., ¶ 124 (Docket No. 287, Att. 1)).

While possibly helpful from a quantum of damages perspective, Plaintiffs' argument needs more

unpacking when it comes to establishing the Class members' precedent, underlying fact of

injury.  Contrary to Plaintiffs apparent position on this point, "each class member's individual

action would [*not*] rely on the same documents, depositions, discovery responses, and expert

opinions to establish the elements of the claims."  *Id.* at p. 8.

Recognizing that the Class is a diverse group, Cushman & Wakefield calls attention to

the fact that the purported Class members purchased properties in different MPCs, at different

times, in different market conditions, with different amenities, for different reasons, from

different sellers, and with different contracts.  *See* Cushman & Wakefield Opp. to Class Cert., p.

14 (Docket No. 318) (citing Buchalter Rpt. at ¶¶ 71-78 (Docket No. 318, Att. 11).  While some

may have purchased and resold their properties at a loss, others have not – some have resold at a

profit, while still others have held on to their properties with no intention of selling.  *See id*.

**REPORT AND RECOMMENDATION - 26**

According to Defendants, these realities emphasize the individual differences between Class members when looking to common proof of causation and, hence, predominance.

For example, at the Lake Las Vegas MPC, Cushman & Wakefield points to evidence that (1) of the over 4,000 property ownership transactions between January 1993 and October 2012, less than half still maintain their properties and thus have an ongoing interest in amenities; (2) of those that no longer own property, 465 sold or transferred their interests *before* the Credit Suisse loan; and (3) 42% of owners who purchased property and sold *after* the Credit Suisse loan realized a net profit gain or broke even.  *See id*. at pp. 14-15 (citing Buchalter Rpt. at ¶¶ 44-50 (Docket No. 318, Att. 11)).  Yet, under Plaintiffs' proposed Class definition, former property owners would be grouped together with current owners, all supposedly having suffered the same type of injuries owing to Defendants' conduct.  Such differences between Class members (at just one MPC even) reveal that an assessment of Defendant's conduct's impact upon the Class as a whole is only possible through individualized analysis, thus undermining a finding of predominance.

In addition, the responses to questionnaires that Plaintiffs' counsel sent to potential Class members about the cause of homeowner losses further indicate widely divergent ideas of impact and causation.  Even though some responding homeowners blamed Defendants for their losses, others suggested Defendants caused no harm at all:

- "My house has increased in value.  I am very happy here.  No one ever misled me.  I think all have been very fair.  They all told me the truth.  Please forward this to the court!

- P.S.  I also invested $1.6 MM in Restaurant in Village.  Lost it all due to Developer."

**REPORT AND RECOMMENDATION - 27**

- "Credit Suisse happened I believe after my unit was foreclosed."

- "Was sold the dream that it would be a community, which never happened. Poor leadership was definitely the reason Lake Las Vegas got slaughtered."

Exs. 18-21 to Guy Decl. (Docket No. 320, Att. 5).  Such examples are not offered to somehow prove that the Class suffered no damage as a result of Defendant's conduct, but, rather, that such damages, if any, involve individualized factual issues pertaining to their specific cause.  *See, e.g.*, Cushman & Wakefield's Opp. to Class Cert., p. 14 (Docket No. 318) ("Thus whether, and to what extent, Defendants' alleged conduct actually caused injury to Plaintiffs would vary per individual.  This is distinct from the question of "amount" of damages – the question of impact; the "fact of damages," is more fundamental to the class certification issue, particularly where, as here, it is apparent that many purported class members were not impacted at all.") (citing *Gonzalez v. Comcast Corp.*, 2012 WL 10621, *18 (E.D. Cal. 2012) ("While determining that the *amount* of damages does not defeat the predominance inquiry, a proposed class action requiring the court to determine individualized *fact* of damages does not meet the predominance standards of Rule 23(b)(3).") (emphasis in original)); *see also Martinez v. Welk Group, Inc.*, 2012 WL 2888536, *5 (S.D. Cal. 2012) (finding negligence claim unsuitable for class treatment because it depends "upon the peculiar circumstances and experiences of each class member."); *Tourgeman v. Collins Fin. Servs.*, 2011 WL 5025152, *15 (S.D. Cal. 2011) ("[B]ecause causation must be adjudicated on a class member-by-class member basis, this individual issue threatens to swamp the common ones.").

As with the contractual issues discussed above, the fact that Plaintiffs may be able to present common proof relating to Cushman & Wakefield's appraisals in conjunction with Credit

**REPORT AND RECOMMENDATION - 28**

Suisse's alleged Loan to Own scheme is not enough to establish predominance when realizing that the more individualized, fact-specific determinations of causation (and, perhaps, any related affirmative defenses) speaking to the alleged Class-wide injuries overwhelm such common denominators.  *See Newberg on Class Actions* § 4:50 ("Common questions do not predominate if a great deal of individualized proof would need to be introduced or a number of individualized legal points would need to be established after common questions were resolved.  Nor do common questions predominate if, as a practical matter, the resolution of an overarching common issue breaks down into an unmanageable variety of individual legal and factual issues.") (internal quotations/citations omitted).  That mass appraisal techniques may possibly be used to measure damage amounts puts the cart before the horse in presuming not only Class-wide harm, but also harm proximately caused by Defendants' actions.[12]  Because causation is an integral element of Plaintiffs' tortious interference with contract and negligence claims, any shortcomings in establishing causation through the use of common proof is an impediment to class certification.  Predominance is therefore lacking and, as a result, Class certification should be denied on this separate basis.

**D.**     **FRCP 23(b)(3): Superiority**

In addition to the predominance requirement, FRCP 23(b)(3) provides a non-exhaustive list of matters relevant to the Court's determination of whether class treatment is superior to

---

[12]  Plaintiffs' expert, Randall Bell, attempts to apply mass appraisal techniques to measure any diminution in value suffered by a particular MPC.  *See* Bell Rpt. (Docket No. 287, Att. 1).  Cushman & Wakefield seeks to exclude Mr. Bell's expert report as both incomplete and unhelpful toward addressing the issue of causation and injury via Class-wide proof.  *See* Cushman & Wakefield's Opp. to Class Cert., pp. 17-18 (Docket No. 318); *see also* Cushman & Wakefield's Mot. to Exclude (Docket No. 319).  The undersigned's analysis of FRCP 23(b)(3)'s predominance requirement exists independent of such arguments.  Therefore, it is recommended that Cushman & Wakefield's Motion to Exclude be denied as moot.  The undersigned makes a recommendation in this respect given the interplay with Plaintiffs' Motion to Certify Class.

**REPORT AND RECOMMENDATION - 29**

other methods of adjudication: (1) the class members' interests in individually controlling the

prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning

the controversy already begun by or against class members; (3) the desirability or undesirability

of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties

in managing a class action.  *See* Fed. R. Civ. P. 23(b)(3)(A-D).  The superiority requirement tests

whether "classwide litigation of common issues will reduce litigation costs and promote greater

efficiency."  *Valentino v. Carter-Wallace, inc.*, 97 F.3d 1277, 1234 (9th Cir. 1996).  "If each class

member has to litigate numerous and substantial separate issues to establish his or her right to

recovery individually, a class action is not superior."  *Zinser v. Accufix Research Inst., Inc.*, 253

F.3d 1180, 1192 (9th Cir. 2001).  The undersigned finds that a class resolution is ultimately not

superior to other methods for adjudicating the instant controversy.

The United States Supreme Court has explained that the main purpose of FRCP 23(b)(3)

class action is to vindicate "the rights of groups of people who individually would be without

effective strength to bring their opponents into court at all," such as those whose individual

recoveries would be too small to warrant an individual suit.  *Amchem*, 521 U.S. at 617 (quoting

*Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997) ("A class action solves this

[small recovery] problem by aggregating the relatively paltry potential recoveries into something

worth someone's (usually an attorney's) labor.")).  Here, by Plaintiffs' own admission, they are

seeking $8 billion in actual damages for the approximately 3,000 Class members – on average,

approximately $2,666,666 per Class member.  *See* TAC ¶¶ 48 & 172 (Docket No. 131).  If there

are such potentially sizeable damages involved for Class members individually, there are

**REPORT AND RECOMMENDATION - 30**

incentives for such individuals to separately pursue and control their own claims, if any, against Defendants.[13]  This recommends against certifying the Class.

Furthermore, while Plaintiffs' claims share common threads, the resolution of which could reduce litigation costs and promote greater efficiency (*see supra*), they are nevertheless not without the need for individual causation determinations vital to the progression of the two Class-wide claims (*see supra*).  In other words, because individual issues predominate, Plaintiffs' proposed class cannot be superior to other methods of adjudication absent a practical way for this Court to readily resolve the individual factual issues that bear on causation and damage.  While no single forum (Idaho, Montana, Nevada, or the Bahamas) is obviously best (or worst, as the case may be) equipped to address these significant concerns, their management is made unsurmountably difficult by the complexity and multiplicity of the issues regardless.  This also recommends against certifying the Class.

Based on all of the foregoing, the undersigned finds that Plaintiffs' putative class does not withstand a rigorous FRCP 23 review.[14]  Accordingly, the undersigned recommends the

---

[13]  The Court is not aware of any other litigation raising the claims at issue here which have been commenced elsewhere on behalf of Class members.  Both Plaintiffs and Credit Suisse attempt to construe this fact in their respective favors.  *Compare* Mem. in Supp. of Class Cert., p. 18 (Docket No. 286, Att. 1) *with* Credit Suisse's Opp. to Class Cert., p. 19 (Docket No. 320).  While the existence of other, related actions would no-doubt suggest that a class action is not superior to other adjudicatory methods, the undersigned cannot ignore the possibility that the instant action is driven by only a handful of interested individuals.  With these considerations in mind, this factor is immaterial toward resolving FRCP 23(b)(3)'s superiority inquiry.

[14]  The Court need not take up Defendants' challenge to Plaintiffs' proposed Class definition.  *See* Cushman & Wakefield's Opp. to Class Cert., pp. 19-20 (Docket No. 318); Credit Suisse's Opp. to Class Cert., pp. 3-5 (Docket No. 320).  The definition is either (1) proper, in which case the undersigned's consideration of FRCP 23's requirements still applies to preclude class certification, or (2) improper, providing further support for recommending that class certification be denied.

**REPORT AND RECOMMENDATION - 31**

denial of Plaintiffs' Motion to Certify Class so that any homeowners who actually do blame Credit Suisse and/or Cushman & Wakefield for their claimed injuries can either join in this suit or file individual ones in Montana, Nevada, or the Bahamas.

## III.  <u>RECOMMENDATION</u>

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      Plaintiffs' Motion to Certify Class (Docket No. 286) be DENIED; and

2.      Cushman & Wakefield's Motion to Exclude the Expert Report and Related

Testimony of Randall Bell (Docket No. 319) be DENIED as moot.

Pursuant to District of Idaho Local Civil Rule 72.1(b)(2), a party objecting to a Magistrate Judge's recommended disposition "must serve and file specific, written objections, not to exceed twenty pages . . . within fourteen (14) days . . ., unless the magistrate or district judge sets a different time period."  Additionally, the other party "may serve and file a response, not to exceed ten pages, to another party's objections within fourteen (14) days after being served a copy thereof."

DATED:  **August 16, 2013**

_____
Honorable Ronald E. Bush
U. S. Magistrate Judge

**REPORT AND RECOMMENDATION - 32**