## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| L.J. GIBSON, BEAU BLIXSETH, AMY KOENIG, VERN JENNINGS, MARK MUSHKIN, MONIQUE LEFLEUR, and GRIFFEN DEVELOPMENT, LLC, JUDY LAND, and CHARLES DOMINGUEZ, each individually, and on behalf of others similarly situated<br><br>　　　　Plaintiffs,<br><br>　　vs.<br><br>CREDIT SUISSE AG, a Swiss corporation; CREDIT SUISSE SECURITIES (USA), LLC, a Delaware limited liability company, CREDIT SUISSE FIRST BOSTON, a Delaware limited liability corporation; CREDIT SUISSE CAYMAN ISLAND BRANCH, an entity of unknown type; CUSHMAN & WAKEFIELD, INC., a Delaware corporation and DOES 1 through 100 inclusive,<br><br>　　　　Defendants. | Case No.: CV 10-1-EJL-REB<br><br>**REPORT AND RECOMMENDATION RE:**<br><br>**PLAINTIFFS' RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT**<br>**(Docket No. 421)**<br><br>**PLAINTIFFS' MOTION FOR LEAVE TO FILE FOURTH AMENDED COMPLAINT ADDING 60 PLAINTIFF PARTIES**<br>**(Docket No. 451)**<br><br>**MEMORANDUM DECISION AND ORDER RE:**<br><br>**DEFENDANT CUSHMAN & WAKEFIELD'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DOUGLAS W. HANEY AND D. MICHAEL MASON**<br>**(Docket No. 434)** |

Now pending before the Court are (1) Plaintiffs' Renewed Motion for Partial Summary Judgment (Docket No. 421); (2) Plaintiffs' Motion for Leave to File Fourth Amended Complaint Adding 60 Plaintiff Parties (Docket No. 451); and (3) Defendant Cushman & Wakefield, Inc.'s ("Cushman & Wakefield") Motion to Exclude the Expert Testimony of Douglas W. Haney and D. Michael Mason (Docket No. 434). Having heard the oral argument of the parties, carefully considered the record, and otherwise being fully advised, the undersigned issues the following Report and Recommendation and Memorandum Decision and Order:

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 1**

# I.  GENERAL BACKGROUND

Plaintiffs purchased real property and homes in resort-style developments known as Lake Las Vegas, Tamarack, Ginn Sur Mer, and Yellowstone Club.  This case has many moving parts, as reflected by the breadth of the docket; however, the general backdrop of Plaintiffs' claims relates to the manner in which Defendant Credit Suisse,[1] with appraisals prepared by Defendant Cushman & Wakefield, marketed and implemented financing for each of the above-referenced developments.

More specifically, Plaintiffs allege that Credit Suisse was the mastermind behind a "Loan to Own" scheme – made possible by Cushman & Wakefield's creative, yet allegedly unlawful (more on that later), Total Net Value ("TNV") appraisal methodology – to (1) induce the developers of certain first-class and exclusive master-planned communities ("MPCs") to borrow huge sums of money through non-recourse loans from Credit Suisse, and (2) persuade these same developers to take out their equity in these developments, all the while capitalizing on misleading future growth projections.

Credit Suisse recognized that these MPCs would, in turn, be burdened with excessive and unsustainable debt, Plaintiffs contend, and Credit Suisse not only expected, but intended for the loans to fail, leaving each of the developments incomplete and undercapitalized.  According to Plaintiffs, this deliberate strategy generated tens of millions of dollars in upfront "loan fees" for Credit Suisse, while also providing Credit Suisse with unfettered access to each MPC's confidential, proprietary, and key business information – allowing Credit Suisse to assume

---

[1]  Unless otherwise indicated, the term "Credit Suisse" is used to collectively describe Defendants Credit Suisse AG, Credit Suisse Securities (USA), LLC, Credit Suisse First Boston, and Credit Suisse Cayman Island Branch.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 2**

lender advisory and "co-developer" roles with the MPCs as it directed their development, and to influence the MPCs' capital decisions until their inevitable financial collapse.

In the meantime, having "syndicated" its creditor status and, thus, transacting away the allegedly preordained financial consequences of default, Plaintiffs further submit that Credit Suisse intentionally positioned itself to take over the MPCs as a result of the subsequent, but nonetheless anticipated, bankruptcy and/or receivership proceedings – the apparent genesis of Plaintiff' "Loan to Own" characterization.

## II.  RELEVANT PROCEDURAL BACKGROUND

There has never been a question as to the gravamen of Plaintiffs' case, as previously described by this Court:

> [T]he Loan to Own scheme, premised upon misleading appraisals, initially justified massive loans, but, later, so burdened the developer's borrowers, that the resorts' occupants were left with unfinished amenities once those developers defaulted on their loans – allegedly, all by design.  According to Plaintiffs, Credit Suisse's and Cushman & Wakefield's participation in the Loan to Own scheme violated customary real estate valuation practices to Plaintiffs' ultimate detriment . . . .

2/17/11 Rpt. & Recomm., p. 49 (Docket No. 106).  This theory, and Plaintiffs' related sharp critique of Cushman & Wakefield's appraisals, is confirmed by a sampling of the allegations within Plaintiffs' Third Amended Complaint, where, for example, Plaintiffs state in relevant part:

> ¶6.  Unbeknownst to the MPCs, however, each Cushman & Wakefield appraisal (used as an illicit inducement toward a ruinous Credit Suisse loan) was thoroughly and materially false and deceptive because it massively inflated the resorts' calculated net worth of operations, and their corresponding ability to incur and adequately service loan debt without destroying their viability:
>
> > (i)  Specifically, the Cushman & Wakefield appraisals employed an inappropriate – and expressly illegal – appraisal methodology termed "Total Net Value"," which presented MPCs with purported operational values and projected revenues for their enterprises that

had not been discounted in such a way (e.g., back to present day value) so as to provide accurate and reliable bases for configuring reasonable debt load capacity; in point of fact, the TNV appraisal methodology was so inherently misleading to sales and loan transactions that it failed to conform to applicable United States appraisal and lending standards, as mandated by the Financial Institutions Reform, Recovery and Enforcement Act of 1989, 12 U.S.C. § 3331, et seq. ("FIRREA"), and the Uniform Standards of Professional Appraisal Practice ("USPAP") adopted by each applicable state.

(ii)     Credit Suisse and Cushman & Wakefield deployed their seductive TNV appraisals with full and explicit knowledge of their illegality; indeed, Credit Suisse was so acutely aware of the appraisals' prohibition under United States law that it created and attempted to use a sham overseas "subsidiary" entity – denominated "Credit Suisse Cayman Island Branch" – to try and funnel any loan transactions with MPCs through this offshore operation to avoid the purview of both FIRREA and USPAP; notably, on information and belief, the Credit Suisse Cayman Island Branch was at all relevant times nothing more than a postal drop, with no actual cognizable banking operations.

¶13.     And as contemplated by Credit Suisse, the bank has resultantly achieved total control and/or ownership of Tamarack, Lake Las Vegas, Ginn Sur Mer, and Yellowstone after their falls – at hugely discounted prices – by directly or indirectly receiving such rights through various bankruptcies, receiverships, and by using sham debtors in possession to avoid its responsibility as the actual developer in control of these MPCs. Credit Suisse approached each MPC requesting that it be allowed to re-appraise each resort to more accurately reflect its true value for which it could base a loan to each of them. As more fully described below and as to each MPC, the appraisals were in violation of FIRREA and USPAP and were part of a scheme to use a methodology that violated state and federal laws, appraisal guidelines, and approved standards. All of the appraisals for which the loans were based were grossly inflated and designed to take over each resort as part of a pre-planned scheme.

¶21.     As part of its scheme, Credit Suisse knew and planned in early 2004, that once it made its loans based on inflated appraisals that violated USPAP and FIRREA, that it was critical to announce directly to existing property owners and prospective property owners that it had made loans to each of the MPCs because the use of the name and bank, Credit Suisse, as lender and lending advisor, would entice existing property owners to build-out their properties and for others to purchase properties in each MPC. . . . .

¶55.  Credit Suisse, in anticipation of the economic slowdown, did not want to be the sole developer for the MPCs as it would have to fund and maintain all of the obligations to the Plaintiffs and property owners once all the developers failed or were foreclosed upon as a result of the inflated Credit Suisse loan. Knowing that its loans were based on grossly inflated appraisals that violated USPAP and FIRREA, Credit Suisse knew that the resorts would ultimately fail.  Yet, this was part of the plan. . . . .

¶77.  Cushman & Wakefield knew or should have known that the Credit Suisse loans for which it was preparing these TNV and Total Net Proceeds [("TNP")] appraisals would encumber not only the developers' interest in the MPCs, but also the bundle of rights that each prospective and existing homeowner had in each MPC's amenities . . . .  And because the values concluded to in the . . . appraisals were inflated far above what would have been concluded to in a legitimate "as-is" market value, FIRREA and USPAP compliant appraisal, Cushman & Wakefield knew or should have known that the amount of the Credit Suisse loans for which these . . . appraisals were being prepared, would be far in excess of what would be allowed under prudent lending practices.

¶78.  By appraising the value of Plaintiffs' bundle of rights in the MPCs, Cushman & Wakefield owed a duty to Plaintiffs to appraise the MPCs according to FIRREA and USPAP and not to appraise the MPCs according to the TNV and TNP methodology which was in derogation of all accepted appraisal standards and which resulted in a grossly inflated appraisal value.

¶79.  The appraisals were inflated and violated USPAP and FIRREA in the following ways:

a.  Based on the information contained within the appraisals, the appraisal transmittal letters between Credit Suisse and Cushman & Wakefield, and the Credit Agreements between the MPCs and Credit Suisse, Cushman & Wakefield, Credit Suisse and the appraisals themselves were all subject to the requirements of FIRREA and USPAP.  In fact, the Lake Las Vegas, Yellowstone Club, Tamarack and Ginn Sur Mer appraisals stated that they complied with USPAP when in fact they did not.  The Ginn Sur Mer appraisal even stated that it complied with FIRREA when in fact it did not.

b.  In part, the statutes and regulations of which Defendants and the appraisals were subject to, include without limitation, the following: MT-ADC § 24.207.402; MCA § 37-54-303; MCA § 37-54-201;

IDAPA §§ 24.18.01.004, 24.18.01.700; I.C. § 54-4106; NAC § 645C.400; N.R.S. § 645C.140; N.R.S. § 645C.280; N.R.S. § 645C.170; 12 U.S.C. § 331; 12 U.S.C. § 3339; 12 C.F.R. § 323.4; 12 C.F.R. § 34.44; 12 C.F.R. § 564.4; 12 C.F.R. § 225.64; 12 C.F.R. § 564.4.

    c.    In relevant part, and without limitation, the appraisals prepared by Cushman & Wakefield for Credit Suisse for the MPCs violated USPAP and FIRREA by concluding to the unheard of TNV or TNP valuation premise which failed to properly discount to present value and over a period of time the projected revenues to be generated from each MPC, and which therefore resulted in a much higher value conclusion than would have occurred under a legitimate "as-is" market value conclusion.

¶98.    With its Loan to Own strategy and prey identified, Credit Suisse confronted the single most difficult obstacle to its otherwise assuredly profitable enterprise – the fact that applicable United States regulations and standards prohibited the very type of unlawful appraisal methodologies that Credit Suisse required for the highly leveraged loan product. To the contrary, the provisions of FIRREA and USPAP mandated that before they could originate their contemplated loans, Credit Suisse's American-based banking facilities must create and supply accurate and appropriately informative business/real estate appraisals of the MPCs and their included collateral in compliance with the appraisal standards of USPAP and FIRREA. Such appraisals were intended to, and would in fact, educate the MPCs about the relative size of financial risks entailed in any Credit Suisse loan.

¶99.    Cognizant that USPAP and FIRREA-compliant appraisals would be certain to alert the MPCs of the massive and destructive over-leveraging that Credit Suisse planned to offer – and the near inevitability of debilitating debt service, default, and failure – Credit Suisse invented an insidious yet ingenious avenue for their evasion. It first determined to utilize (and possibly create for such sole purpose) an offshore bank "branch" in the Cayman Islands for the putative origination of any Loan to Own products. In this manner, Credit Suisse sought to structure the transactions so that United States statutes and regulations purportedly did not apply, and the protections that those statutes offered to the MPCs (and to any ultimate holders of the risk of default on their debt . . .) could be circumvented.

¶101.    Having thus attempted to achieve shadow immunity from United States financial laws with its Cayman Island branch, Credit Suisse sought to involve a collusive partner in its Loan to Own plot – indeed, a co-conspirator without

which the entire scheme would have been impossible. Specifically, Credit Suisse knew well that: (1) its ability to seduce MPCs into borrowing oppressive, commercially unreasonably loan amounts hinged almost exclusively on an apparent business appraisal which could justify them, and; (2) an accurate and appropriately informative appraisal would spell almost certain rejection of any excessive loan offered. Consequently, Credit Suisse required a purportedly independent appraisal house which could be depended on to supply each Loan to Own victim with a tailored appraisal of its business that would make even a fatally burdensome loan amount appear easily manageable and low-risk. Moreover, the appraisal house in question would need to produce such misleading numbers with full knowledge that it violated governing United States laws and standards.

¶102. Although Credit Suisse purported to employ its Cayman Islands branch to fund these loans in an artifice to evade United States laws, its domestic banking entities were the ones responsible for ordering the TNV and TNP appraisals and marketing, negotiating, and originating the loans. . . . .

¶104. Together, Defendants Credit Suisse and Cushman & Wakefield devised the TNV appraisal method that would serve as their primary tool of deception in the solicitation and sale of the Loan to Own loans. This appraisal form was directly intended by Defendants to unrealistically inflate and overvalue the apparent worth of MPCs, making them seem comfortably able to assume the excessive amounts of debt load which would otherwise look ill-advised or even crippling. TNV appraisals accomplished this dissimulation predominantly by failing to apply standardized discounting methods which were critically and concretely required by all applicable United States financial/real estate standards and regulations, inclusive of FIRREA and USPAP. In so doing, TNV directly violated these governing laws and regulations in a material manner which was well known to both Credit Suisse and Cushman & Wakefield, and rendered the methodology inappropriate and deceptive for purposes of communicating about the loans which Defendants intended to sell to all the subject MPCs.

¶106. Yet, despite their patent understanding of the illegality and fundamentally misleading nature of TNV, both Defendants agreed and proceeded to utilize that appraisal methodology in furtherance of their Loan to Own enterprise. As time would demonstrate, the deceptive artifice worked to perfection, causing the downfall of every MPC to receive it, directly engendering the derogation of the [Plaintiffs'] rights and interests.

Pls.' TAC, ¶¶ 6, 13, 21, 55, 77-79, 98-99, 101-102, 104, 106 (Docket No. 131).


**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 7**

Consistent with these same allegations, Plaintiffs now move for partial summary judgment, zeroing in on Cushman & Wakefield's appraisals:

> Partial summary judgment is proper in this case because there are no genuine issues of material fact and because Plaintiffs are entitled to judgment as a matter of law. Specifically, the appraisals issued by Cushman & Wakefield were required, by federal law, federal regulation, state law, state regulation, and, by agreement, to be market value appraisals performed in accordance with USPAP. The appraisals that were issued employed a novel methodology dreamed-up jointly by Credit Suisse and Cushman & Wakefield. That method was deceptive because it purported to report a value without actually reporting value. Finally, without the appraisals, Credit Suisse could not have accomplished its goal of entering into the credit agreements with the four Master Planned Communities (MPCs)

Pls.' MPSJ., pp. 1-2 (Docket No. 140).[2] Plaintiffs posit that, "without the appraisals, Credit Suisse could not have accomplished its goal of entering into the credit agreements with the four MPCs." *Id.* at p. 2. In turn, Plaintiffs ask this Court to make nine distinct (but related, in part) rulings (the "Requested Rulings") as a matter of law:

> **Ruling No. 1:** Each of the loan transactions at issue was a real estate-related financial transaction which (A) a federal financial institutions regulatory agency regulated; and (B) required the services of an appraiser.

> **Ruling No. 2:** Each initial appraisal, and subsequent appraisal, performed by Cushman & Wakefield for Credit Suisse was required to be a "market value" appraisal (as defined by 12 C.F.R. §§ 225.62(a) and (g)) prepared in accordance with the Uniform Standards of Professional Appraisal Practice ("USPAP").

---

[2] Plaintiffs originally moved for partial summary judgment on May 13, 2011. *See* Pls.' MPSJ (Docket No. 140). On November 30, 2011, U.S. District Judge Edward J. Lodge "mooted" that motion, "without prejudice with leave to Plaintiffs to later renew the arguments raised therein once Defendants' [then-pending] motions to dismiss are resolved and, if applicable, Defendants have answered Plaintiffs' applicable Complaint." 11/30/11 MDO, p. 5 (Docket No. 180); *see also* Pls.' Mot. for Suspension of Further Proceedings on Pls.' MPSJ (Docket No. 216) (requesting leave to suspend Motion for Partial Summary Judgment until renewal and after Court order on class certification); 5/18/12 Order (granting Plaintiffs' unopposed motion to suspend). Defendants' motions to dismiss are now resolved (along with Plaintiffs' intervening motion to certify class) and, on October 7, 2013, Plaintiff filed the at-issue Renewed Motion for Partial Summary Judgment, relying largely upon the briefing originally submitted in support of their original Motion for Partial Summary Judgment. *See* Pls.' Renewed MPSJ (Docket No. 421).

**Ruling No. 3:** Each initial appraisal, and subsequent appraisal, was not an "appraisal" under 12 C.F.R. § 225.62(a) and did not comply with USPAP.

**Ruling No. 4:** The "Total Net Value" (or Total Net Proceeds) methodology did not set forth a "market value" under 12 C.F.R. §§ 225.62(a) and (g), and did not comply with USPAP.

**Ruling No. 5:** The initial Yellowstone Club appraisal, and any subsequent appraisal, performed by Cushman & Wakefield for Credit Suisse was required to be prepared in accordance with the Uniform Standards of Professional Appraisal Practice ("USPAP") the Standards of Professional Practice and the Code of Ethics of the Appraisal Institute because Cushman & Wakefield and Credit Suisse agreed that each appraisal would be prepared in accordance with USPAP, the Standards of Professional Practice and the Code of Ethics of the Appraisal Institute.

**Ruling No. 6:** Each initial appraisal, and subsequent appraisal, performed by Cushman & Wakefield for Credit Suisse was required to be compliant with USPAP because the relevant State licensing boards' rules and regulations required the appraisers to issue appraisals that complied with USPAP.

**Ruling No. 7:** Credit Suisse and Cushman & Wakefield jointly designed, developed, implemented, and utilized the Total Net Value (or Total Net Proceeds) methodology.

**Ruling No. 8:** Each appraisal that employed the Total Net Value (or Total Net Proceeds) methodology was deceptive because it simultaneously (1) reported a value; and (2) failed to report a value.

**Ruling No. 9:** Cushman & Wakefield substantially assisted Credit Suisse in accomplishing Credit Suisse's goal of entering the credit agreements with the borrowers at each of the four MPCs.

*Id.* at pp. 2-3; *see also* Mem. in Supp. of Pls.' MPSJ, pp. 8-10 (Docket No. 140, Att. 1).

Defendants oppose Plaintiffs' efforts to secure the Requested Rulings and, hence, the entirety of Plaintiffs' Renewed Motion for Partial Summary Judgment – arguing that the loans to the four MPCs were not subject to FIRREA and, therefore, could not have violated FIRREA or USPAP. *See* Credit Suisse Opp. to Renewed MPSJ, pp. 6-17 (Docket No. 432); Cushman & Wakefield Opp. to Renewed MPSJ, pp. 10-18 (Docket No. 433). In doing so, Defendants also

challenge Plaintiffs' use of two appraiser expert opinions/declarations (from Douglas Haney and Michael Mason) concerning the legal legitimacy of the appraisals preceding the four loans, with Cushman & Wakefield separately moving to exclude their respective testimonies. *See* Cushman & Wakefield Mot. to Exclude (Docket No. 434).

Independent of their Renewed Motion for Partial Summary Judgment, Plaintiffs also move for leave to file a Fourth Amended Complaint to tweak a corporate designation, add 60 plaintiff parties to the action, and adjust the amount of claimed damages accordingly. *See* Pls.' Mot. for Leave to File FAC, pp. 1-2 (Docket No. 451) ("The Fourth Amended Complaint differs from the Third Amended Complaint in only the following respects: (1) The addition of 60 new parties plaintiff, and the addition of the "LLC" designation to the titles of two of the Credit Suisse Defendants; and (2) Amendment of the claim for damages to the sum of "approximately $67 Million" for the total 69 Plaintiffs."). Defendants oppose the amendments, generally arguing that the proposed amended complaint not only is devoid of factual allegations relating to any of the new plaintiffs (what they bought, when they bought, what they relied on, whether they lost or made money, whether they sold or still hold their properties, etc.), and that such an amendment will significantly multiply the nature of the proceedings and delay a case already more than four years old. *See* Cushman &Wakefield Opp. to Mot. for Leave to File FAC, pp. 5-12 (Docket No. 458); Credit Suisse Joinder (Docket No. 459).

### III. <u>STANDARDS OF REVIEW</u>

**A.    Motion for Summary Judgment**

A principal purpose of summary judgment is to "isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a

disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the nonmoving party to produce evidence sufficient to support a jury verdict in its own favor. *See Anderson*, 477 U.S. at 256-57. The "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *S. Cal. Gas Go.*, 336 F.3d at 889. Thus, the nonmoving party must go beyond the pleadings and show "by [its] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 324. The Court must draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and the weight to be accorded particular evidence, and must view the facts in the light most favorable to the nonmoving party. *See Kaelin v. Globe Communications Corp.*, 162 F.3d 1036, 1039 (9th Cir. 1998).

The party bearing the burden of proof at trial "must establish beyond controversy every essential element of its . . . claim." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th

Cir. 2003) (adopting decision of district court "as our own"). A moving party "may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact." Fed. R. Civ. P. 56(c)(1)(B) (advisory committee note).

## B.    Motion to Amend

Federal Rule of Civil Procedure 15(a) provides that, once a responsive pleading has been served, a party may amend its pleading "only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The Ninth Circuit Court recognizes that "the underlying purpose of Rule 15 [is] to facilitate [a] decision on the merits, rather than on the pleadings or technicalities," and, therefore, "Rule 15's policy of favoring amendments to pleadings should be applied with extreme liberality." *Chudacoff v. University Med. Cent. of Southern Nev.*, 649 F.3d 1143, 1152 (9th Cir. 2011) (quoting *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981)).

The decision whether to grant or deny a motion to amend pursuant to Rule 15(a) rests in the sole discretion of the trial court. The four factors that are commonly used to determine the propriety of a motion for leave to amend are: (1) undue delay, bad faith or dilatory motive on the part of the movant; (2) repeated failure to cure deficiencies by amendments previously allowed; (3) undue prejudice to the opposing party by virtue of allowance of the amendment; and (4) futility of amendment. *See C.F. ex. Rel. Farnan v. Capistrano Unified School Dist.*, 654 F.3d 975, 985 n.5 (9th Cir. 2011) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

However, "[t]hese factors . . . are not of equal weight in that delay, by itself, is insufficient to justify denial of leave to amend." *Webb*, 655 F.2d at 979 ("The mere fact that an amendment is offered late in the case is . . . not enough to bar it."); *Bowles v. Beade*, 198 F.3d

752, 758 (9th Cir. 1999). "Only where prejudice is shown or the movant acts in bad faith are courts protecting the judicial system or other litigants when they deny leave to amend a pleading." *Webb*, 655 F.2d at 980 (citation omitted). The Ninth Circuit has held that although all these factors are relevant to consider when ruling on a motion for leave to amend, the "crucial factor is the resulting prejudice to the opposing party." *Howey v. United States*, 481 F.2d 1187, 1189 (9th cir. 1973). Indeed, prejudice is the touchstone of the inquiry under Rule 15(a). *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). Ultimately, "[u]nless undue prejudice to the opposing party will result, a trial judge should ordinarily permit a party to amend its complaint." *Howey*, 481 F.2d at 1190.

## IV. <u>REPORT/DISCUSSION</u>

**A.     Plaintiffs' Renewed Motion for Partial Summary Judgment (Docket No. 421)**

Plaintiffs' Renewed Motion for Summary Judgment attacks the appraisals issued for each of the four MPCs – namely, that they were misleading and illegal because they only estimated the net case flow each MPC would generate over its lifetime (the allegedly suspect TNV appraisal methodology), without discounting those revenues to present value and, therefore, without opining as to the MPCs' actual market value. As a result, Plaintiffs claim that the appraisals violated FIRREA and USPAP; indeed, Plaintiffs' Requested Rulings largely depend upon a finding that the MPCs' appraisals should have complied with FIRREA and USPAP.

1.     <u>FIRREA and USPAP: What Are They?</u>

Following the Savings and Loan financial failures and the resulting crises of the 1980s, Congress passed FIRREA, responding to the adverse effects of "faulty and fraudulent" appraisals upon the financial integrity of lending institutions – that is, the financial consequences of inflated

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 13**

appraisals in the large number of Savings and Loan failures when property values did not cover

defaulted loans. *See Bolden v. KB Home*, 618 F. Supp. 2d 1196, 1202 (C.D. Cal. 2008) (citing

H. Rep. No. 101-54(I), at 311 (1989)). Therefore, Congress designed FIRREA:

> to provide that Federal financial and public policy interests in real estate related transactions will be protected by requiring that real estate appraisals utilized in connection with federally related transactions are performed in writing, in accordance with uniform standards, by individuals whose competency has been demonstrated and whose professional conduct will be subject to effective supervision.

*Bolden*, 618 F. Supp. 2d at 1202 (quoting 12 U.S.C. § 3331).

> Relevant here, FIRREA's enforcement provision provides:

> [I]t shall be a violation . . . for a financial institution to seek, obtain, or give money or any other thing of value in exchange for the performance of an appraisal by a person who the institution knows is not a State certified or licensed appraiser in connection with a federally related transaction.

12 U.S.C. § 3349(a). FIRREA goes on to define "financial institution" and "federally related

transaction" (as well as terms within those definitions) as follows:

- *Financial Institution*: "[A]n insured depository institution . . . or an insured credit union . . . ." 12 U.S.C. § 3350(7).

  - *Insured Depository Institution*: "[A]ny bank or savings association the deposits of which are insured by the [Federal Deposit Insurance] Corporation . . . ." 12 U.S.C. 1813(c)(2).

- *Federally Related Transaction*: "[A]ny real estate-related financial transaction which (A) a federal financial institutions regulatory agency or the Resolution Trust Corporation engages in, contracts for, or regulates; and (B) requires the services of an appraiser." 12 U.S.C. § 3350(4).

  - *Real Estate-Related Financial Transaction*: "[A]ny transaction involving (A) the sale, lease, purchase, investment in or exchange of real property, including interests in property, or the financing thereof; (B) the refinancing of real property or interest in real property; and (C) the use of real property or interests in property as security for a

loan or investment, including mortgage-backed securities." 12
U.S.C. § 3350(5).

- *Federal Financial Institutions Regulatory Agencies*: "[T]he Board of
Governors of the Federal Reserve System, the Federal Deposit
Insurance Corporation, the Office of the Comptroller of the Currency,
the Office of Thrift Supervision, and the National Credit Union
Administration." 12 U.S.C. § 3350(6).

Unwrapping these definitions reveals that FIRREA applies to (by attempting to assert

greater regulatory control over) federally insured deposits and federally insured/regulated

depository institutions. *See, e.g.*, FIRREA, Pub.L. No. 101-73, §§ 101(9 & 10), 103 Stat. 183

(1989) (discussing FIRREA's purpose as, in part, "strengthen[ing] the enforcement powers of

Federal regulators of *depository institutions*" and "strengthen[ing] the civil sanctions of criminal

penalties for defrauding or otherwise damaging *depository institutions* and their depositors")

(emphasis added); H. Rep. No. 101-222, at 393 (1989) (FIRREA designed to "curtail

investments and other activities of savings associations that pose unacceptable risks to the

*Federal deposit insurance funds*") (emphasis added); *Bolden*, 618 F. Supp. 2d at 1204 ("The

legislative history [of FIRREA] further indicates an interest in addressing fraudulent appraisals

by *federal financial institutions*.") (emphasis added); S. Rep. 101-19, pp. 35-36 (1989) ("Many

loans and other transactions entered into by *federally insured financial institutions* are

collateralized by real estate. While repayment ability forms the primary determinant of

creditworthiness, the value of collateral and reasonable ratio of loan to collateral value provide

important protections against loss. Thus, the quality of real estate appraisals can significantly

affect the soundness of *insured institutions* and, ultimately, the *Federal deposit insurance*

*system*.") (emphasis added); *Wertz v. Washington Mut. Bank*, 2008 WL 1882843, *1 (E.D. Cal.

2008) ("[Office of Thrift Supervision] also regulates the preparation and use of real estate

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 15**

appraisals by *federally regulated financial institutions* pursuant to [FIRREA].") (emphasis added); *U.S. v. Bank of New York Mellon*, 941 F. Supp. 2d 438, 443 (S.D.N.Y. 2013) ("In passing FIRREA, Congress sought to deter fraudulent conduct that might put *federally insured deposits* at risk.") (emphasis added); *Fidelity Nat. Info. Solutions, Inc. v. Sinclair*, 2004 WL 764834, *1 & *7 (E.D. Pa. 2004) ("[FIRREA] put in place protections to shore up the financial integrity of *federally insured financial institutions*. . . . . The plain language of the statute and the legislative history point to a singular purpose for FIRREA, which is not to regulate the entire real estate appraisal process, but instead to protect *federal financial institutions* from the dangers associated with fraudulent or poorly executed appraisals. Given this focus, it is unreasonable to read FIRREA as making any indication, express or otherwise, that the statute was intended to control real estate transactions beyond those involving *federal financial institutions*.") (emphasis added).

Hence, as to the above-referenced real estate appraisals issued in connection with federally related transactions (defined *supra*), FIRREA authorizes federal financial institutions regulatory agencies (defined *supra*) to "prescribe appropriate standards" for their performance. 12 U.S.C. § 3339. These agencies require, among other things, that such appraisals "[c]onform to generally accepted appraisal standards as evidence by [USPAP]" – the "generally accepted standards for professional appraisal practice in the United States." *Bolden*, 618 F. Supp. 2d at 1202 (quoting 12 C.F.R. §§ 34.44, 225.64, 323.4, 564.4).

Among other things, USPAP requires an appraiser to "identify the type and definition of value" when developing a real property appraisal. USPAP Standards Rule 1-2(c). Importantly, USPAP recognizes the existence of various standards of value, including, but not limited to,

market value; therefore, so long as an appraisal discloses the type and definition of value considered therein (be it market value or some other value), the appraisal is USPAP-compliant in this discrete respect. *See id*; *see also* USPAP Definitions, attached as Exs. 14-17 to Abdollahi Decl. (Docket No. 433, Att. 5) (". . . . In appraisal practice, value must always be qualified – for example, market value, liquidation value, or investment value."); 2012-2013 USPAP FAQ No. 157, attached as Ex. 14 to Abdollahi Decl. (Docket No. 433, Att. 5) ("USPAP does not provide any specific definition of value or endorse any particular source; it merely defines the general components required to establish a market value definition. Sources of value definitions could include, for example, a regulatory agency, a legal jurisdiction, an engagement letter, or a textbook."); 2012-2013 USPAP FAQ No. 159 & 2006 FAQ No. 88, attached as Exs. 14 & 15 to Abdollahi Decl. (Docket No. 433, Att. 5) ("As part of identifying the problem to be solved, the appraiser must identify the type and definition of value, but USPAP does not require the use of any specific type or definition of value. . . . . The source of the definition of value could be as simple as provided in the engagement letter.") In other words, USPAP does not require that an appraisal done in connection with the financing of real property be a market value appraisal. *But compare with* 12 C.F.R. § 225.62(a) & (g) (FIRREA regulation defining appraisal as ". . . setting forth an opinion as to the market value of an adequately described property . . . .").

2.  The Requested Rulings Sought by Plaintiffs' Renewed Motion for Partial
Summary Judgment Cannot Be Made as a Matter of Law

For the most part, Plaintiffs' Requested Rulings require this Court to find as a matter of law that FIRREA applied to the four MPC appraisals. Such a conclusion, however, depends on many things, including a finding that these appraisals involve (a) financial institutions, and that they were made (b) in connection with federally related transactions – as those terms are defined

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 17**

by FIRREA (*see supra*).  However, the record spread out beneath Plaintiffs' Renewed Motion

for Partial Summary Judgment – reflected largely in the parties' respective contentions (outlined

in tabular format below) – reveals questions of fact precluding a finding that Credit Suisse

(including its related entities) is a financial institution and/or that the appraisals involved here

involve federally related transactions.  The pertinent details of the record that lay bare those

questions of fact include:

| PLAINTIFFS | CREDIT SUISSE | CUSHMAN & WAKEFIELD |
|---|---|---|
| "Credit Suisse First Boston (USA), Inc., Credit Suisse (USA), Inc., and Credit Suisse Securities (USA) LLC, were regulated by, among others, the Board of Governors of the Federal Reserve System." Mem. in Supp. of Pls.' MPSJ, p. 7 (Docket No. 140, Att. 1). | "Accordingly, FIRREA by its explicit terms applies only to loans made by insured depository institutions.  None of the Credit Suisse Defendants accept federally-insured deposits; FIRREA was entirely inapplicable to this case and is irrelevant to this case."  Credit Suisse Opp. to Renewed MPSJ, p. 2 (Docket No. 432). | "The loans were arranged by Credit Suisse's Cayman Islands Branch, which is not regulated under FIRREA."  Cushman & Wakefield Opp. to Renewed MPSJ, p. 1 (Docket No. 433). |
| "However, as will be shown, Plaintiffs believe Credit Suisse misled the Court when it stated that no member of any of the 'lending groups' in any of the credit agreements was 'federally-regulated.'" Mem. in Supp. of Pls.' MPSJ, p. 13, n.3 (Docket No. 140, Att. 1). | "***NONE OF THE CREDIT SUISSE ENTITIES INVOLVED IN THE TRANSACTION ARE INSURED DEPOSITORY INSTITUTIONS . . . . .***  None of those [Credit Suisse Defendant] entities are or were insured depository institutions."  Credit Suisse Opp. to Renewed MPSJ, p. 3 (Docket No. 432) (emphasis in original). | "[A]ll of the Credit Agreements were entered into by CS Cayman.  That entity was not (and has never been) regulated by any of the relevant regulatory entities. . . . . Because the loans were arranged and made by an entity not covered by FIRREA, they were not subject to FIRREA's appraisal requirements."  Cushman & Wakefield Opp. to Renewed MPSJ, pp. 11-12 (Docket No. 433). |
| "Therefore, every U.S.-based, and federally-regulated Credit Suisse entity (such as Credit Suisse Securities (USA) LLC, and Credit Suisse First Boston, LLC) were members of the lending groups."  Mem. in Supp. of Pls.' MPSJ, pp. 13-14 (Docket No. 140, Att. 1). | "None of the Credit Suisse Defendants is an insured depository institution; no part of the funds dispensed to any of the four MPCs consisted of insured deposits."  Credit Suisse Opp. to Renewed MPSJ, p. 6 (Docket No. 432). | "The relevant facts are that the loans were arranged and funded by an entity that was outside the scope of FIRREA. . . .  Thus, the loans were not 'federally related transactions.'"  Cushman & Wakefield Opp. to Renewed MPSJ, p. 12 (Docket No. 433). |

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 18**

| | | |
|---|---|---|
| "In its filings with the Securities & Exchange Commission, Credit Suisse represented that Credit Suisse Securities (USA) LLC, and Credit Suisse First Boston, LLC were 'subject to significant bank regulatory restrictions [. . .] imposed pursuant to [. . .] regulations and interpretations of [The Board of Governors of the Federal Reserve System],' the Gramm-Leach-Bliley Act of 1999 (GLBA) and 'related Board [The Board of Governors of the Federal Reserve System] regulations.'" Mem. in Supp. of Pls.' MPSJ, p. 14 (Docket No. 140, Att. 1). | "The Credit Suisse Defendants do not accept insured deposits and they are not 'insured depository institutions' subject to the restrictions and enforcement mechanisms of Title XI of FIRREA. Thus, the loans at issue were not subject to FIRREA and thus cannot have violated FIRREA." Credit Suisse Opp. to Renewed MPSJ, p. 8 (Docket No. 432). | "Moreover, Plaintiffs have not shown that Credit Suisse First Boston (USA), Inc. or Credit Suisse Securities (USA), LLC (the other identified affiliate) was subject to regulation by any of the relevant agencies for purposes of the loan transactions." Cushman & Wakefield Opp. to Renewed MPSJ, pp. 12-13 (Docket No. 433). |
| "In addition to explicitly including federally-regulated Credit Suisse entities as Lenders, the credit agreements also defined Lenders to include federally-regulated and insured U.S. banks." Mem. in Supp. of Pls.' MPSJ, p. 14 (Docket No. 140, Att. 1). | "The transactions at issue in this case did not imperil federal deposit insurance funds. Neither FIRREA nor the FRB's implementing regulations apply to Credit Suisse or to the MPC loans." Credit Suisse Opp. to Renewed MPSJ, p. 10 (Docket No. 432). | "FIRREA does not apply to the loan transactions for an additional (and independent) reason - none of the relevant Credit Suisse entities was a depository institution that accepts federally insured deposits. . . . . Here, CS Cayman, the signatory to the loan transactions, did not accept federally insured deposits when the loans were made, and as such was outside the realm of FIRREA. Nor did any of the Credit Suisse entities that received the appraisals – Credit Suisse First Boston, Credit Suisse First Boston LLC, or Credit Suisse Securities (USA) LLC – accept federally insured deposits from 2004-2006. As such, FIRREA is irrelevant to these entities and to the loan transactions." Cushman & Wakefield Opp. to Renewed MPSJ, p. 13, n.12 (Docket No. 433). |

| | | |
|---|---|---|
| "Therefore, there is no genuine issue of material fact as to whether the lending group in each transaction included federally-regulated institutions, and Plaintiffs respectfully request that Ruling No. 1 be granted." Mem. in Supp. of Pls.' MPSJ, p. 14 (Docket No. 140, Att. 1). | "Plaintiffs never assert that Credit Suisse was an insured depository institution and, likewise, never present a legal argument as to why the regulations they cite apply to Credit Suisse." Credit Suisse Opp. to Renewed MPSJ, p. 12 (Docket No. 432). | "Moreover, Plaintiffs' presumption that Credit Suisse First Boston or Credit Suisse Securities (USA), LLC is 'federally regulated' for purposes of FIRREA is incorrect, or at least disputed. Credit Suisse First Boston is the former name of Credit Suisse, AG. Credit Suisse AG is (and was) a Swiss banking corporation regulated by the Swiss Financial Market Supervisory Authority. Credit Suisse Securities (USA) LLC (formerly known as Credit Suisse First Boston, LLC) is not a bank at all, but a Delaware limited liability company. Neither entity receives federally insured funds. Nor was either entity subject to regulation for purposes of FIRREA. Cushman & Wakefield Opp. to Renewed MPSJ, pp. 14-15 (Docket No. 433). |
| "The appraisals themselves were issued to the federally-regulated entities, Credit Suisse First Boston and Credit Suisse Securities (USA) LLC, for the stated function of 'potential financing.'" Mem. in Supp. of Pls.' MPSJ, pp. 14-15 (Docket No. 140, Att. 1). | "Plaintiffs have not pled and cannot plead a federal financial or public policy interest in a loan made by a lending group, none of which are federally-regulated or insured by federal deposit insurance funds, to a resort real estate developer, allegedly with adverse consequences for owners of multi-million dollar resort homes." Credit Suisse Mot. to Dismiss Pls.' TAC, p. 22 (Docket No. 135). | |
| "The effect of that duplicitous act [involving Credit Suisse's Cayman Islands branch] does not change the fact that the appraisals were provided to federally-regulated and insured entities for the purpose of financing. The inquiry ends there." Mem. in Supp. of Pls.' MPSJ, p. 15 (Docket No. 140, Att. 1). | | |

| | | |
|---|---|---|
| "Issuing a non-FIRREA, non-USPAP compliant appraisal to a federally-regulated and insured lending institution 'for purposes of financing' is a violation of FIRREA, USPAP, and the state laws and regulations that implemented USPAP and their regulation of appraisers." Mem. in Supp. of Pls.' MPSJ, p. 15 (Docket No. 140, Att. 1). | | |
| "Rulings 1 and 2 should be made because there is no genuine issue of material fact as to whether the transactions at issue were real estate-related financial transactions in excess of $1,000,000 involving lenders regulated by the Board of the Federal Reserve." Mem. in Supp. of Pls.' MPSJ, p. 17 (Docket No. 140, Att. 1). | | |

The parties' arguments and counter-arguments on the fundamental issue concerning the extent (if any) of federal regulation surrounding the MPCs' financing are like "ships passing in the night." It may be that the involved parties and the transactions themselves ultimately implicate FIRREA; however, the current record does not make such a finding indisputably clear to warrant this Court saying so as a matter of law. Without an affirmative finding that FIRREA applied to the four MPC appraisals, Requested Ruling No. 1 is impossible. It is therefore recommended that Plaintiffs' Renewed Motion for Partial Summary Judgment be denied in this respect.[3]

---

[3] Plaintiffs' alternate argument that a "federally regulated" or "insured U.S. bank" could later be assigned allocations of interest in the MPCs' loans is similarly lacking. *See* Mem. in Supp. of Pls.' MPSJ, p. 14 (Docket No. 140, Att. 1). Not only is the factual strength of such a statement in question, given the affirmative denials of such made by Credit Suisse and Cushman & Wakefield, but Plaintiffs cite no law supporting the notion that FIRREA applies to *every* syndicated loan from the outset if a bank insured in connection with other, clearly applicable

Likewise, in the context of this case, any requirement that the at-issue appraisals discuss market values presupposes FIRREA's underlying application – said another way, without FIRREA, there is no requirement that appraisers use a market value methodology. Because it cannot be said on this record that FIRREA applies, and because USPAP allows an appraiser to opine to other definitions of value, Requested Ruling No. 2 cannot be made. It is therefore recommended that Plaintiffs' Renewed Motion for Partial Summary Judgment be denied in this respect.

The record is certain that (1) Cushman & Wakefield's appraisals did not meet the definition of "appraisal" under 12 C.F.R. § 225.62(a), and (2) the TNV/TNP methodology did not set forth "market value" under 12 C.F.R. §§ 225.62(a) and (b). The Plaintiffs would say that a ruling from the Court stating as much is, in part, what Requested Ruling Nos. 3 and 4 seek. However, a "ruling" as to those factual details – without FIRREA's statutory vestments – is of no consequence otherwise and becomes simply an abstraction, especially when considering that appraisals need not opine exclusively on market value under USPAP. So, even though Cushman & Wakefield's appraisals do not align with FIRREA's requirements, it cannot be said that they are inconsistent with USPAP as a matter of law, which is what the undersigned perceives is the thrust of Requested Ruling Nos. 3 and 4. It is therefore recommended that Plaintiffs' Renewed Motion for Partial Summary Judgment be denied in this respect.[4]

_____

transactions, might, at some indeterminate future time, purchase an interest in the paper of a loan transaction not subject to FIRREA when it was made. *Cf.* 12 C.F.R. § 2265.65(b)(2)(ii) ("A regulated institution also may accept an appraisal that was prepared by an appraiser engaged directly by another financial services institution, if . . . [t]he regulated institution determines that the appraisal conforms to the requirements of this subpart and is otherwise acceptable.").

[4] Similarly, through Requested Ruling No. 8, Plaintiffs ask the Court to conclude that the TNV/TNP methodology was deceptive. To the extent this request is grounded upon either FIRREA or USPAP, it is rejected for the reasons already discussed; to the extent this request is

Requested Ruling Nos. 5 and 6 also address the need for the Cushman & Wakefield appraisals to comply with USPAP generally. Neither Credit Suisse nor Cushman & Wakefield dispute this notion. *See* Credit Suisse Opp. to Renewed MPSJ, p. 17-18 (Docket No. 432); Cushman & Wakefield Opp. to Renewed MPSJ, p. 19 (Docket No. 433). Still, both argue against the entry of any related ruling without Plaintiff identifying how any such ruling is dispositive or relevant to any of their causes of action. *See id.* The undersigned agrees that, while there does not appear to be any dispute concerning the applicability of USPAP to Cushman & Wakefield's appraisals, such an affirmative finding is advisory in nature without a context to other aspects of the case as it continues to evolve. There is no purpose, or appropriate basis, to issue what is essentially only an advisory ruling, without either a procedural frame for such a ruling (a claim for a declaratory judgment, for example) or some further tie to an ultimate claim for relief. It is therefore recommended that Plaintiffs' Renewed Motion for Partial Summary Judgment be denied in this respect.

Finally, Requested Ruling No. 7 addresses the TNV's development and the use by and between Credit Suisse and Cushman & Wakefield; and Requested Ruling No. 9 addresses the extent of Cushman & Wakefield's assistance in syndicating the loans. To begin, not only are such rulings fact-driven, but, additionally, Plaintiffs offer very little by way of evidence to support these rather nuanced findings – above and beyond, that is, the undisputed fact that Credit Suisse syndicated loans to the four MPCs and that Cushman & Wakefield performed initial appraisals with respect thereto. *See* Credit Suisse Opp. to Renewed MPSJ, pp. 5-6 (Docket No.

based on something other than FIRREA or USPAP, it involves disputed issues of fact that preclude a finding as a matter of law. It is therefore recommended that Plaintiffs' Renewed Motion for Partial Summary Judgment be denied in this respect.

432).  The current record will not support a ruling of the nature sought in Requested Ruling Nos.

7 and 9.  It is therefore recommended that Plaintiffs' Renewed Motion for Partial Summary

Judgment be denied in this respect.[5]

**B.  Plaintiffs' Motion for Leave to File Fourth Amended Complaint (Docket No. 451)**

In accord with this Court's November 19, 2013 Case Management Order outlining a

January 31, 2014 deadline to join parties, Plaintiffs' Motion for Leave to File Fourth Amended

Complaint operates as an attempt to add 60 new parties[6] to the queue of Plaintiffs, along with a

corresponding increase in alleged damages.  *See* Pls.' Mot. for Leave to File FAC, pp. 1-2

(Docket No. 451).[7]  Whether to allow the requested amendment/joinder is within this Court's

discretion.  *See supra*.

Plaintiffs' most recent amendment efforts do not contain any obvious indicia of undue

delay, bad faith, or dilatory motive.  Rather, Plaintiffs seek their amendment consistent with the

Court's mandated deadline for doing so (there also has been a related filing, apparently to

---

[5]  Cushman & Wakefield argues that the affidavits of Douglas Haney (Docket Nos. 59 & 68, Att. 1) and the expert declaration of D. Michael Mason (Docket No. 142), offered by Plaintiffs in connection with their Renewed Motion for Partial Summary Judgment should be rejected as improper.  *See* Cushman & Wakefield Mot. to Exclude (Docket No. 434).  While certain of Cushman & Wakefield's arguments in these respects have the undersigned's attention (particularly as to opinions relating to ultimate issues of law), this Recommendation that Plaintiffs' Renewed Motion for Summary Judgment be denied and that the related Requested Rulings not be entered was made independent of the viability of Plaintiffs' experts' opinions. Therefore, Cushman & Wakefield's Motion to Exclude is denied as moot, without prejudice to later renew, if necessary, at a later date.

[6]  Or a number closer to 89, if one follows the position of Cushman & Wakefield that the married couples count as two Plaintiffs, not one.  *See* Cushman & Wakefield Opp. to Mot. for Leave to File FAC, p. 3, n. 1 (Docket No. 458).  Plaintiffs do not seem to disagree.  *See* Pls.' Reply in Supp. of Mot. for Leave to File FAC, p. 2 (Docket No. 469).

[7]  Plaintiffs also look to add an "LLC" designation to the titles of two of the Credit Suisse Defendants.  *See* Pls.' Mot. for Leave to File FAC, p. 1 (Docket No. 451).  Credit Suisse does not seem to object to this discrete request.

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 24**

preserve those same "new" individuals' claims, of a separate action in this Court (the "*Barker*" action), which occurred after the denial of class certification). Further, the current proposed amendment is more-or-less unrelated to Plaintiffs' extensively-litigated, previous attempts at amendment (since polished down by Defendants' multiple motions to dismiss). Still, the exponential increase in the number of Plaintiffs will inescapably substantially increase the manageability issues of an already unwieldy and aging case. Such factors loom large when considering Plaintiffs' Motion for Leave to File Fourth Amended Complaint.

The relevant inquiry is not so much whether the additional parties will have their day in court (given the companion *Barker* action), because all is not lost in the event Plaintiffs' Motion for Leave to File Fourth Amended Complaint is denied. Even so, efficiencies and conservation of resources suggest that it makes little sense to start anew with *Barker* and "re-invent the wheel" relative to these new parties' clearly-interrelated factual and legal claims. Efficiency is the key consideration, but only when any added Plaintiffs will be in the same procedural slot as the existing Plaintiffs, with the latter's same causes of action against Defendants. Plaintiffs' counsel suggested this to be the case during oral argument, commenting:

> We concede that, if the 60 join, all the rulings that this Court has made relative to the nine [existing Plaintiffs] are binding on the 60 and so we don't enhance anybody's burden. The Defendants put in their briefing that, well, that will cause for delay because there will be new motions to dismiss. Well, I certainly think Your Honor can control that one. . . . . So, we have notice pleadings and we have pleadings and we have pled that these 60 people have the same causes of action and the same factual basis as do the original nine. Also, I can represent to the Court that to the best of our knowledge, there's not a single one of them that has any of those claims in the causes of actions that were reserved for [Plaintiffs] L.J. Gibson, and I think Beau Blixseth, and Amy Koenig. They were all the vanilla type as the rest of them.

4/29/14 Hrg. Tr., pp. 79-80 (Docket No. 492). If the opposite was true, what would be the point of allowing the joinder by amendment of so many more parties now?

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 25**

With this premise in mind, it bears emphasis that Plaintiffs' Motion states in no uncertain terms that the proposed Fourth Amended Complaint is but a "duplicate" of their original, pristine Third Amended Complaint, with few exceptions (the simple listing of the 60 new parties, organized by MPC; adding "LLC" to two of the Credit Suisse Defendants; and increasing the damages amount). *See* Prop. FAC (Docket No. 451, Att. 1). A closer view, however, suggests that the proposed Fourth Amended Complaint stakes more ground than it is entitled to occupy. To begin, a comparison of the two (the proposed Fourth Amended Complaint and the Third Amended Complaint) indicates that the proposed Fourth Amended Complaint is not so benignly framed as Plaintiffs suggest. Moreover, there have been significant rulings made upon the claims contained in the Third Amended Complaint since its April 22, 2011 filing. For example, of the seven claims for relief in the Third Amended Complaint, two (fraud and negligent misrepresentation) have been dismissed altogether; three (breach of fiduciary duty, unjust enrichment, and violations of consumer protection statutes) remain only for Plaintiffs Gibson, Blixseth, and Koenig; and just two (tortious interference with contract and negligence) are still available to all the current Plaintiffs. *See* 3/30/12 Order, pp. 22-23 (Docket No. 210).

So, to be clear, granting Plaintiffs' Motion for Leave to File Fourth Amended Complaint would add 60 new Plaintiffs, but limit them to only two claims against Defendants: tortious interference with contract and negligence.[8] Duplication and additional proceedings would result, lengthening any resolution further for the foreseeable future, to be sure. Nonetheless, when considered against what would follow in the *Barker* case if no amendment was permitted, such a resolution still advances the collective ball in a positive, economical, and more manageable way.

---

[8] Not only did Plaintiffs' counsel essentially admit to this during oral argument (*see supra*), but Plaintiffs' proposed Fourth Amended Complaint contains no factual specifics that would revive any of the previously-dismissed claims – even if that was procedurally proper.

At the same time, allowing the requested amendment (at least as to the addition of new parties) might unfairly compromise Defendants' ability to raise underlying jurisdictional challenges to these new parties' *individual* claims, as any new claims are *not* subject to a class-wide handling of the issues because of the Court's denial of class certification.  As of now, such objections can be anticipated, but are impossible to foresee and adjudicate because of the lack of factual particulars in Plaintiffs' proposed Fourth Amended Complaint.  For example, Plaintiffs' proposed Fourth Amended Complaint does not identify where each new Plaintiff resides, to say nothing of the absence of allegations relating to their respective lot purchases at the MPCs.

Taking all of these considerations into account, it is recommended that Plaintiffs' Motion for Leave to File Fourth Amended Complaint be denied, without prejudice, with the directive that (1) Plaintiffs may renew their Motion for Leave to File Fourth Amended Complaint within 14 days of District Judge Lodge's Order on this Report and Recommendation (or such other date certain as determined by District Judge Lodge), should they chose to do so; (2) Plaintiffs be permitted to conditionally add the proposed additional Plaintiffs; (3) the claims raised on behalf of such proposed additional Plaintiffs be limited to tortious interference with contract and negligence; and (4) Plaintiffs be required to include in any amended pleading those allegations necessary to establish this Court's jurisdiction over the new parties and their individual claims.[9]

After the filing of a new motion to amend containing a more finely-tuned, but still only proposed amended complaint, the Defendants will then be free to object to the granting of such a motion on futility grounds.  They cannot, however, re-argue the points raised in either opposing Plaintiffs' original Motion for Leave to File Fourth Amended Complaint *or* matters previously

---

[9]  As previously-discussed, Plaintiffs should also be permitted to add the "LLC" designation to the titles of two of the Credit Suisse Defendants.

argued in their motions to dismiss. From there, the Court will consider and decide whether to allow (and if allowed, the final form of) a Fourth Amended Complaint. The case will then proceed toward trial with the parties and claims that are put at issue. An updated scheduling order to include a trial setting will follow.

## V. RECOMMENDATION/ORDER

1.      Based on the foregoing, IT IS HEREBY RECOMMENDED that:

A.      Plaintiffs' Renewed Motion for Partial Summary Judgment (Docket No. 421) be DENIED.

B.      Plaintiffs' Motion for Leave to File Fourth Amended Complaint Adding 60 Plaintiff Parties (Docket No. 451) be DENIED, without prejudice, with the following understanding moving forward:

i.      That Plaintiffs be permitted to renew their Motion for Leave to File Fourth Amended Complaint within 14 days of U.S. District Judge Edward J. Lodge's Order on this Report and Recommendation (or such other date certain as determined by Judge Lodge), should they chose to do so;

ii.      That Plaintiffs be permitted to conditionally add the proposed additional Plaintiffs and the "LLC" designation to the titles of two of the Credit Suisse Defendants;

iii.      That the causes of action raised on behalf of such proposed additional Plaintiffs within any amended complaint be limited to two claims: tortious interference with contract and negligence;

iv.      That Plaintiffs include in any amended complaint those allegations necessary to establish this Court's jurisdiction over the new parties and their individual claims;

**REPORT AND RECOMMENDATION/MEMORANDUM DECISION AND ORDER - 28**

v.      That Defendants are permitted to oppose any renewed Motion for Leave to File Fourth Amended Complaint, consistent with the Rules of Civil Procedure and this District's Local Civil Rules; and

vi.      That any opposition from Defendants to a renewed Motion for Leave to File Fourth Amended Complaint *not* include arguments previously raised in either opposing Plaintiffs' original Motion for Leave to File Fourth Amended Complaint (beyond any jurisdictional arguments) or moving to dismiss.

Pursuant to District of Idaho Local Civil Rule 72.1(b)(2), a party objecting to a Magistrate Judge's recommended disposition "must serve and file specific, written objections, not to exceed twenty pages . . . within fourteen (14) days. . ., unless the magistrate or district judge sets a different time period."  Additionally, the other party "may serve and file a response, not to exceed ten pages, to another party's objections within fourteen (14) days after being served with a copy thereof."

2.      Additionally, based on the foregoing, IT IS HEREBY ORDERED that Defendant Cushman & Wakefield's Motion to Exclude the Expert Testimony of Douglas W. Haney and D. Michael Mason (Docket No. 434) is DENIED, without prejudice.

DATED:  **July 31, 2014**

_____
Honorable Ronald E. Bush
U. S. Magistrate Judge