UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

| | |
|---|---|
| L.J. GIBSON, BEAU BLIXSETH; AMY KOENIG, VERN JENNINGS, MARK MUSHKIN, MONIQUE LAFLEUR, GRIFFEN DEVELOPMENT, LLC, JUDY LAND, CHARLES DOMINGUEZ, et al, | NO. 1:10-CV-00001-JLQ |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |
| v. | |
| CREDIT SUISSE AG, a Swiss corporation; CREDIT SUISSE SECURITIES (USA), LLC, a Delaware limited liability company, CREDIT SUISSE FIRST BOSTON LLC, a Delaware limited liability corporation; CREDIT SUISSE AG, CAYMAN ISLAND BRANCH, an entity of unknown type; and CUSHMAN & WAKEFIELD, INC., a Delaware corporation, | |
| Defendants. | |

## I.    Introduction

BEFORE THE COURT are Cushman & Wakefield, Inc.'s ("Cushman & Wakefield") Motion for Summary Judgment (ECF No. 737) and Credit Suisse AG, Credit Suisse Securities (USA), LLC, Credit Suisse First Boston, and Credit Suisse Cayman Island Branch's (collectively, "Credit Suisse") Motion for Summary Judgment (ECF No. 741). Defendants seek summary judgment and dismissal of all of Plaintiffs' claims. Plaintiffs oppose the Motions (ECF No. 769); (ECF No. 770); (ECF No. 771), asserting there are genuine issues of material fact on all claims. Defendants filed Replies (ECF No. 781); (ECF No. 784). Oral argument on these matters was heard in Boise, Idaho, on April 12, 2016. David Lender argued on behalf of Credit Suisse and Barry Sher argued for

Cushman & Wakefield. James Sabalos and Craig Fuller argued on behalf of the Plaintiffs. The court took the Motions under advisement. This Order memorializes the court's rulings on the Motions.

## II.   Factual Background

In summary judgment proceedings, the facts are viewed in a light most favorable to the nonmoving party, in this case Plaintiffs.[1]

### A.   Lake Las Vegas

In August 2004, Credit Suisse retained Charles Reinagel of Cushman & Wakefield of California, Inc., to prepare an "as-is" market value appraisal of the Lake Las Vegas development in connection with a loan it was arranging with the Lake Las Vegas developer. *See* Declaration of Donald L. Morrow in Support of Cushman & Wakefield, Inc.'s Motion for Summary Judgment ("Morrow Dec."), Ex. 51. Reinagel was the Senior Director of Valuation Service for Cushman & Wakefield of California with over 20 years of experience. Morrow Dec. Ex. 62.

The "as-is" appraisal for Lake Las Vegas in 2004 stated the market value of the resort was $570 million. Declaration of Lockie Jo Gibson in Support of Opposition to Defendants' Various Motions for Summary Judgment ("Gibson Dec."), Ex. 14. Credit Suisse determined its clients to whom it would be syndicating the debt would be better served by a cash-flow analysis rather than market value of the Lake Las Vegas resort. *See* Morrow Dec. Ex. 15. Credit Suisse exchanged emails with Reinagel regarding an appropriate definition to use in the Lake Las Vegas appraisal. *See* Morrow Dec. Exs. 52-

---

[1] The court notes the Huntley Plaintiffs' Statement of Disputed Facts fails to cite to the material facts asserted by Defendants which the Huntley Plaintiffs are disputing and fails to cite to Plaintiffs' evidence which allegedly shows a dispute. *See* (ECF No. 770-1); (ECF No. 771-1). While these documents fail to comply with Fed.R.Civ.P. 56(c)(1), the court has considered the Huntley Plaintiffs' Statement of Disputed Facts along with the other submissions from the parties.

55, 63. The ensuing discussion with Reinagel resulted in formulation of "Total Net Value." *See* (ECF No. 737-2 at 3).

Reinegal's Total Net Value appraisal for Lake Las Vegas was issued on October 26, 2004. (ECF No. 41, Ex. A). The appraisal stated its purpose was "to assist in internal decision making purposes regarding potential financing" and was "intended for use only by the client [Credit Suisse]." (ECF No. 49, Ex. A at 2). The appraisal concluded the Total Net Value of Lake Las Vegas was $1.093 billion. (ECF No. 51-4 at 9).

Credit Suisse arranged a first and second lien loan for the Lake Las Vegas developer, memorialized in credit agreements dated November 1, 2004. Declaration of David J. Lender in Support of Defendants Credit Suisse Securities (USA), LLC, Credit Suisse First Boston, and Credit Suisse Cayman Island Branch's Motion for Summary Judgment ("Lender Dec."), Ex. 11, Ex. 12. The combined loan amount was $560 million. *See* Lender Dec. Ex. 11 at 2, Ex. 12 at 2. The loans allowed the stockholders to make a one-time distribution from the loan proceeds. *See* Lender Dec. Ex. 11 at § 2.5, Ex.12 at § 2.5. The developers took a $500 million dividend, a large portion of which went to buy out the Bass brothers' interest. *See* Gibson Dec. Ex. 12, Ex. 13. Repayment of the loan hinged on the sale of lots. Lender Dec. Ex. 21 at 35. None of the Plaintiffs were parties or participated in this loan. *See* Lender Dec. Ex. 11, Ex. 12. Some of the Lake Las Vegas Plaintiffs purchased lots before and some after the Credit Suisse loan to the developer. *See* Lender Ex. 1.

After Lake Las Vegas sales fell short, Credit Suisse and the developers executed an amended loan credit facility on May 4, 2005. *See* Lender Dec. Ex. 44. Credit Suisse subsequently entered twelve more amendments, waivers, and forbearances with the Lake Las Vegas developer. *See* Lender Dec. Exs. 44-56. On July 17, 2008, Lake Las Vegas entered bankruptcy. *See* Lender Dec. Ex. 73. Credit Suisse currently has a non-controlling interest in an entity which indirectly owns a portion of the remaining collateral at Lake Las Vegas. *See* (ECF No. 671-5 at 79-80).

//

**B.    Yellowstone Club**

On August 11, 2005, Dean Paauw of Cushman & Wakefield of Colorado, Inc., issued a Total Net Value appraisal of Yellowstone Club in Montana. (ECF No. 49, Ex. B). Paauw had over 19 years of experience as an appraiser. (ECF No. 737-4 at 2). Credit Suisse sent the Total Net Value appraisal definition to Paauw to use in his appraisal. Morrow Dec. Ex. 64; (ECF No. 737-4 at 2-3). Paauw reviewed the definition and found it acceptable. (ECF No. 737-4 at 2-4). Paauw's Total Net Value appraised valued Yellowstone Club at $1.165 billion. Lender Dec. Ex. 13 at 10.

On September 30, 2005, Credit Suisse and the Yellowstone Club developers closed on a first-lien credit facility loan for $375 million. Lender Dec. Ex. 13. The loan allowed the members of the resort to distribute up to $209 million of the loan proceeds "for purposes unrelated to the Yellowstone Development." Lender Dec. Ex. 13 at 41. Repayment of the loan was to come through sale of lots at Yellowstone Club. *See* Lender Dec. Ex. 22 at 26-27, Ex. 23 at 26-28. The Yellowstone Club entered bankruptcy in 2008. *See In re Yellowstone Mountain Club, LLC*, No. 08-61570-11. Adv. No. 09-00014 (D. Mont.). On July 22, 2016, the Ninth Circuit held, *inter alia*, the conduct of Credit Suisse and the other lenders to the Yellowstone Club was not comparable to the unlawful conduct of Timothy Blixseth, founder of the Yellowstone Club. *See In re Yellowstone Mountain Club, LLC*, No. 14-35395 (9th Cir. July 22, 2016) (unpublished). All of Yellowstone Club was sold to entities wherein Credit Suisse has no ownership interest. *See* (ECF No. 741-2 at 7). None of the Plaintiffs herein were parties to the Yellowstone loan. *See* Lender Dec. Ex. 13.

**C.    Tamarack**

On April 17, 2006, Paauw issued a Total Net Value appraisal for Tamarack, a development north of Boise, Idaho. (ECF No. 49, Ex. C). The Total Net Value appraisal of Tamarack was $824 million. Lender Dec. Ex. 14 at 11. On May 19, 2006, Credit Suisse entered a $250 million senior loan credit facility with the Tamarack developer. *See* Lender Dec. Ex. 14. None of the Plaintiffs were parties to this loan. *See* Lender Dec. Ex.

14. The loan did not allow for the developers to take a dividend. *See* Lender Dec. Ex. 14 at 58-59. The loan was to be repaid through the sale of lots at Tamarack. *See* Lender Dec. Ex. 22 at 26-27, Ex. 23 at 26-28. Credit Suisse entered a first waiver and amendment to the credit agreement on July 9, 2007. *See* Lender Dec. Ex. 57. Credit Suisse entered three additional waivers, amendments, and forbearances. *See* Lender Dec. Exs. 58-60. A group of creditors, which did not include Credit Suisse, forced Tamarack into involuntary bankruptcy on December 11, 2009. *See* Lender Dec. Ex. 77. The bankruptcy was later dismissed on Credit Suisse's motion. *See* Lender Dec. Ex. 78. Credit Suisse foreclosed on the collateral at Tamarack. *See* Lender Dec. Ex. 79. Credit Suisse holds a non-controlling equity interest in the entity which indirectly owns Tamarack. *See* (ECF No. 671-5 at 79-80).

**D.      Ginn sur Mer**

On April 28, 2006, Scott Tonneson of Cushman & Wakefield of Georgia, Inc., issued a Total Net Value appraisal for Ginn sur Mer, a development in the Bahama Islands. (ECF No. 49, Ex. D). Tonneson had over 12 years of experience as an appraiser. (ECF No. 737-5 at 2). Credit Suisse sent Tonneson the Total Net Value appraisal definition to use in the appraisal. (ECF No. 737-5 at 2-3). Tonneson reviewed the definition and found it acceptable. (ECF No. 737-5 at 2-3). The Total Net Value appraisal of Ginn sur Mer was $1.5 billion. Lender Dec. Ex. 15 at 11.

On June 8, 2006, Credit Suisse and the developers at Ginn sur Mer entered senior first and second lien loan credit facilities for $675 million. *See* Lender Dec. Ex. 15, Ex. 16. The loans allowed a distribution from the loan proceeds of $333,125,000 to the stockholders. Lender Dec. Ex. 15 at 60, Ex. 16 at 48. On April 30, 2007, Credit Suisse entered a waiver and amendment to the Ginn sur Mer loan. Lender Dec. Ex. 61. Credit Suisse entered ten more amendments, waivers, and forbearances, with the Ginn sur Mer developers. *See* Lender Dec. Exs. 62-71. On August 14, 2008, Credit Suisse declared default and acceleration against Ginn sur Mer on the first lien loan. *See* Lender Dec. Ex. 80. The same day, the successor administrative and collateral agent declared default and

acceleration on the second lien loan. *See* Lender Dec. Ex. 81. Credit Suisse currently has a non-controlling equity interest in the entity which indirectly owns Ginn sur Mer. *See* (ECF No. 671-5 at 79-80). None of the Plaintiffs were parties to the loans. *See* Lender Dec. Ex. 15, Ex. 16.

**E.     Resort Loans and Amenities**

Prior to issuing loans at any of the four resorts, Credit Suisse received financial projections from the developers, all of which projected sufficient cash flow to service the loans. *See* Lender Dec. Ex. 17 at 13-17, 20, 28, and 31 (Lake Las Vegas), Ex. 19 at 4, 11-13, 27-28, and 31-32 (Ginn sur Mer), Ex. 25 at 10, 21-22 (Tamarack), and Ex. 26 at 7, 20-24, and 27-28 (Yellowstone Club). Credit Suisse did its own analysis of the projected cash flow and concluded the developers would be able to repay the loans. *See* Lender Dec. Ex. 27, Ex. 28 at 22-23, Ex. 29 at 34-35, Ex. 8 at 4, 7-8, 11, 17, and 20. After funding the loans to each of the four resorts' developers, Credit Suisse sold interests in the loans to non-bank investors. Lender Dec. Exs. 30-33. Credit Suisse retained and later purchased interests in the loans for itself. Lender Dec. Exs. 30-33.

Plaintiffs assert most of the amenities at Lake Las Vegas closed down as a result of the bankruptcy and only some have returned. *See* Gibson Dec. at ¶¶ 63-65. Golf memberships were rejected. *See* Lender Dec. Ex. 94. Plaintiffs assert other memberships have been rejected and no new replacement memberships offered. *See* Gibson Dec. at ¶¶ 63-64.

No amenities at Yellowstone Club were ever closed during the bankruptcy and the Yellowstone Club amenities have been improved and continue to exist today. *See* Lender Dec. Ex. 96 at 4-19, 21-22, 25-38, and 41-47. After the bankruptcy, the Yellowstone Club assumed club member agreements for the members who paid for those memberships. *See* Lender Dec. Ex. 84 at 34-35, Ex. 96 at 41, 42-48, 51-52, Ex. 97.

No amenities were ever built at Ginn sur Mer with the exception of a substantially completed but non-operating golf course. Lender Dec. Ex. 97 at 4 and 7.

//

**F.    Plaintiffs' Properties**

Plaintiff Vern Jennings purchased property at Lake Las Vegas in 2002. (ECF No. 644 at ¶86). Plaintiff Mark Mushkin purchased property at Lake Las Vegas prior to the 2004 Credit Suisse loan and also purchased property adjacent to one of the golf courses at Lake Las Vegas after the Credit Suisse loan was announced. (ECF No. 644 at ¶87).

Plaintiff Amy Koenig purchased property at Tamarack in January 2004 and May 2004. (ECF No. 644 at ¶85). Plaintiff Judy Land purchased five properties at Tamarack between 2004 and October 25, 2005. (ECF No. 644 at ¶90).

Plaintiff Monique Lafleur purchased two properties at Tamarack in December 2004. (ECF No. 644 at ¶88). Lafleur, along with her brother, formed Griffen Development LLC to purchase additional properties at Tamarack in 2005 and 2006. (ECF No. 644 at ¶¶88-89).

Plaintiff L.J. Gibson purchased a lot at Tamarack on September 9, 2005. (ECF No. 644 at ¶83). She purchased two lots at Lake Las Vegas in May 2005 and early 2006. (ECF No. 644 at ¶83). Gibson also purchased property at Ginn sur Mer on January 1, 2007. (ECF No. 644 at ¶83). Gibson is the wife of James Sabalos, one of Plaintiffs' attorneys.

Plaintiff Charles Dominguez purchased land at Tamarack in November 2006. (ECF No. 644 at ¶91). Plaintiff Beau Blixseth purchased property at Yellowstone Club in 2008. (ECF No. 644 at ¶84).

The 60 Second-Tier Plaintiffs purchased properties at each of the four Master Planned Communities. *See* (ECF No. 644 at ¶92). The pending Motions apply to all Plaintiffs. The Plaintiffs have been placed into tiers for trial convenience only. *See, e.g.*, (ECF No. 583). All Plaintiffs are included in Defendants' Motions for Summary Judgment.

//

//

//

ORDER - 7

# III.    Legal Analysis

## A.    Summary Judgment Standard

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the court. *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th Cir. 1994).  The moving party is entitled to summary judgment when, viewing the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, there are no genuine issues of material fact in dispute. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  While the moving party does not have to disprove matters on which the opponent will bear the burden of proof at trial, they nonetheless bear the burden of producing evidence that negates an essential element of the opposing party's claim and the ultimate burden of persuading the court no genuine issue of material fact exists. *Nissan Fire & Marine Ins. Co. v. Fritz Companies*, 210 F.3d 1099, 1102 (9th Cir. 2000).  When the nonmoving party has the burden of proof at trial, the moving party need only point out there is an absence of evidence to support the nonmoving party's case. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

Once the moving party has carried its burden, the opponent must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, the opposing party must come forward with specific facts showing there is a genuine issue for trial. (*Id.*).

Although a summary judgment motion is to be granted with caution, it is not a disfavored remedy: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)(citations and quotations omitted).

//

//

ORDER - 8

**B.      Cushman & Wakefield's "Wrong Party" Defense**

Cushman & Wakefield argues all claims against it should be dismissed because its subsidiaries issued the appraisals for the Credit Suisse loans and Cushman & Wakefield did not have any involvement in the creation of Total Net Value. (ECF No. 737-1 at 5-7).

"It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *U.S. v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation marks and citations omitted). Plaintiffs do not dispute this authority. Instead, Plaintiffs argue Cushman & Wakefield waived an improper party defense through its conduct in the six years of litigating this matter. (ECF No. 771 at 8).

In its Motion to Dismiss the Second Amended Complaint filed on March 29, 2010, Cushman & Wakefield asserted Plaintiffs failed to sue the correct entity because the appraisals were prepared by its subsidiaries. *See* (ECF No. 48-1 at 31-32). Because the court did not dismiss all claims against Cushman & Wakefield, and Cushman & Wakefield did not object, appeal, or move to reconsider the Order on the Motion to Dismiss, Plaintiffs argue the defense is waived. (ECF No. 771 at 11). However, neither Magistrate Judge Bush or District Judge Lodge addressed the "wrong party" argument in the Report and Recommendation or Order on the Report. *See* (ECF No. 106); (ECF No. 126). Further, even if the court previously rejected the argument in a Motion to Dismiss, a party may re-raise similar arguments in a Motion for Summary Judgment because the two types of motions are distinct in posture. *See Language Line Services, Inc. v. Language Services Associates, Inc.*, 944 F. Supp. 2d 775, 780 (N.D. Cal. 2013).

Additionally, Plaintiffs mischaracterize the "wrong party" defense. A defendant is required to "affirmatively state any avoidance or affirmative defense" including those in the enumerated list contained within the rule. *See* Fed.R.Civ.P. 8(c)(1). Mandatory joinder is governed by Fed.R.Civ.P. 19 and failure to join a necessary party may be raised in a motion to dismiss. *See* Fed.R.Civ.P. 12(b)(7).

Contrary to Plaintiffs' assertion, Cushman & Wakefield has not argued Plaintiffs failed to join a necessary party, but instead argued the appraisals were performed by legally distinct subsidiaries, making Cushman & Wakefield "the wrong party" named in this lawsuit as it did none of the alleged wrongful acts. *See* (ECF No. 737-1 at 15). In essence, Cushman & Wakefield is arguing Plaintiffs fail to state a claim for relief against it.

Some defenses are waived if a party fails to raise it in its answer or in a motion to dismiss. *See* Fed.R.Civ.P. 12(h)(1). Other defenses, including failure to state a claim upon which relief can be granted and failure to join a necessary party may be raised at any time up to and including at trial. Fed.R.Civ.P. 12(h)(2)(C). As stated above, Cushman & Wakefield raised the "wrong party" defense in the Motion to Dismiss the Second Amended Complaint. *See* (ECF No. 48-1 at 31-32). Additionally, Cushman & Wakefield's Answer to the Fifth Amended Complaint asserts failure to state a claim as a defense. *See* (ECF No. 652 at 6). The Answer does not contain a defense specifically stating Cushman & Wakefield is the "wrong party" because subsidiaries performed the appraisals, however the twelfth affirmative defense asserts Cushman & Wakefield's "acts and conduct were privileged, justified, and/or excused" because "subsidiaries and/or affiliates performed appraisals pursuant to certain contracts and agreements that set forth the terms and conditions under which the appraisals were to be performed." (ECF No. 652 at 10). For all of the above reasons, Cushman & Wakefield has not waived its "wrong party" defense.

Plaintiffs seek leave to name the three Cushman & Wakefield subsidiaries as parties to this case in the event the court finds Cushman & Wakefield did not waive its "wrong party" defense. (ECF No. 771 at 9). While Cushman & Wakefield brought the existence and names of the subsidiaries to Plaintiffs' attention in March 2010, Plaintiffs did not file a motion to amend and add those subsidiaries as parties at any time prior to the instant Motions for Summary Judgment. Because more than 21 days have passed since filing of the Fifth Amended Complaint, Plaintiffs must obtain leave of the court to

add parties. *See* Fed.R.Civ.P. 15(a). Plaintiffs' "request" contained within its response to the summary judgment motions does not constitute a motion for leave to amend. Additionally, Plaintiffs failed to explain why amendment should be granted so late in these proceedings or why they did not move to add the subsidiaries during the prolonged procedural history of this matter. *See Forman v. Davis*, 371 U.S. 178, 182 (1962) (grounds for denying leave to amend includes undue delay and futility of amendment).

Adding the three Cushman & Wakefield subsidiaries would extend alleged liability to the entities who actually conducted the appraisals. To resolve Defendants' Motions for Summary Judgment, the court must determine, *inter alia*, whether FIRREA and USPAP provide a basis for Plaintiffs' claims, and whether there is a genuine issue of fact as to the appraisals causing Plaintiffs' losses. Based on the court's rulings on those issues, adding the subsidiaries is both untimely and futile. The request to add the three Cushman & Wakefield subsidiaries is Denied.

Plaintiffs assert Cushman & Wakefield is a proper party to this action based on its alleged involvement independent of the subsidiaries in the creation and use of Total Net Value. (ECF No. 771 at 9). Because there are allegations directly involving Cushman & Wakefield, the "wrong party" defense does not necessitate Cushman & Wakefield's outright dismissal from this matter.

**C.   Defendants' Lack of Causation Argument**

Defendants argue Plaintiffs cannot establish the Cushman & Wakefield appraisals or Credit Suisse loans caused Plaintiffs' alleged damages. *See* (ECF No. 741-1 at 13-18); (ECF No. 737-1 at 21-24). Defendants contend the nationwide market recession caused the failure of the loans and resorts. (ECF No. 741-1 at 14); (ECF No. 737-1 at 19-20). They assert Plaintiffs cannot prove the loans, rather than the recession, caused the Plaintiffs' loss in value of their lots and that Credit Suisse is legally responsible therefor by reason of its loans to the developers.

Plaintiffs contend causation is an inherently factual issue and there is a genuine issue of fact as to what caused Plaintiffs' damages. (ECF No. 771 at 15); (ECF No. 769 at

11). Plaintiffs assert the Defendants' conduct was a substantial factor in causing Plaintiffs' losses. (ECF No. 769 at 15); (ECF No. 771 at 12).

Causation is comprised of two components– actual cause and proximate cause (legal cause). *See Newberry v. Martens*, 127 P.3d 187, 191 (Idaho 2005); *Gentry v. Douglas Hereford Ranch, Inc.*, 962 P.2d 1205, 132-33 (Mont. 1998); *Goodrich & Pennington Mortg. Fund, Inc. v. J.R. Woolard, Inc.*, 101 P.3d 792, 797 (Nev. 2004); (ECF No. 741-7 at 3-4).[2] Proximate cause is usually a question of fact and requires a direct and continuous sequence from the defendant's actions leading to the plaintiff's injury without any intervening cause. *See, e.g.*, *McDonald v. Florida Dept. of Transp.*, 655 So.2d 1164, 1168 (Fla. Dist. Ct. App. 1995). Showing a certain act is possibly the cause of injury is insufficient under Florida law because the claimant must meet the "more likely than not standard of causation." *Murphy v. Sarasota Ostrich Farm/Ranch, Inc.*, 875 So.2d 767, 769 (Fla. Dist. Ct. App. 2004).

Cushman & Wakefield argues there is no evidence its appraisals caused injury to Plaintiffs because: (1) Plaintiffs are not competent to testify as to whether the appraisals caused their damages; (2) the developers at each of the four resorts testified the real estate crash and resulting recession, not the appraisals or Credit Suisse loans, caused the failure of the resort; and (3) Plaintiffs' expert, Randall Schneider does not provide any opinion of causation. (ECF No. 737-1 at 23).

Plaintiffs' counsel asserted his clients would not opine as to causation. *See* Morrow Dec. Ex. 140. The developers from three of the resorts testified in depositions they fully expected to repay the loans and blamed the failure of the resorts on failing to sell lots as projected. *See* Morrow Dec. Ex. 21 at 15-16, Ex. 22 at 10-13, Ex. 23 at 8-9, 10-12. The Lake Las Vegas developer explicitly disclaimed the possibility of the Credit Suisse loan

---

[2] Although Ginn sur Mur is located in the Bahamas, Cushman & Wakefield and Plaintiffs cited Florida law in relation to the claims at that resort, while Credit Suisse relied upon Bahamian law. Because the parties presented no argument as to which law should apply, the court cites to both herein.

ORDER - 12

contributing to the resort's failure. *See* Morrow Dec. Ex. 22 at 24-25. The developers at Tamarack and Ginn sur Mer did not specifically address whether they believed the Credit Suisse loans had any role in their resort's failure. *See* Morrow Dec. Ex. 21, Ex. 23. Timothy Blixseth agreed the Yellowstone Club was solvent and fully intended to repay the loan when taken, but only went so far as to say the market recession was "a factor" contributing to the Yellowstone Club's insolvency. Morrow Dec. Ex. 25 at 16-17, 20-21.

Schneider's expert reports attempted to "estimat[e] any potential value loss [to Plaintiffs' properties] from the closure of amenities" at Tamarack and Lake Las Vegas. *See* (ECF No. 672-3 at 54); (ECF No. 672-7 at 55). In his deposition, Schneider admitted he did not examine any properties at Yellowstone Club or Ginn sur Mer. Morrow Dec. Ex. 26 at 13. Schneider also conceded he did not attempt to determine whether the loss of amenities at Lake Las Vegas or Tamarack were related to the Credit Suisse loan. Morrow Dec. Ex. 26 at 5. Plaintiffs did not dispute Cushman & Wakefield's arguments regarding Schneider or the Plaintiffs' inability to opine as to causation.

The only expert testimony on the record actually opining to causation are the reports of Credit Suisse's retained expert, Dr. Walter Torous who opined the collapsing housing market, and not the Credit Suisse loans, caused the resorts to default and enter bankruptcy. *See* (ECF No. 671-5). Credit Suisse also argues its own discounted cash flow analysis using the financial projections provided by the developers showing the loans could be serviced is further proof the market collapse caused the failure of the loans. Lender Dec. Ex. 8 at 4, 7-8, 11, 17, 20; Ex. 27; Ex. 28; Ex. 29.

Plaintiffs assert the evidence establishes five bases for causation: (1) a majority of the loan proceeds at Ginn sur Mer and at Lake Las Vegas were distributed "as apparent kickbacks" to the developers and were not used to progress the master planned communities; (2) an email from a member of Ginn sur Mer's executive management sent the day the loan was funded stating he expected the loan to fail and the resort to become property of the lender; (3) at Tamarack, Credit Suisse "immediately began interfering with the ability of Tamarack to sell lots and assumed de facto control of the financial

affairs at Tamarack;" (4) removing the discounted cash flow analysis from the projections of the developers and Cushman & Wakefield appraisals increased the loan funds available and "thus leveraged debt attached to the MPCs making the subject properties more susceptible to normal market fluctuations;" and (5) the Lake Las Vegas developer's financial projections were allegedly controlled by Credit Suisse. (ECF No. 769 at 13); (ECF No. 771 at 16-17). Plaintiffs also assert the timing of the loans to Tamarack and Lake Las Vegas and "the relatively immediate" defaults thereafter infer the appraisals and loans were a substantial factor causing the failure of the resorts and Plaintiffs' damages. (ECF No. 769 at 13).

At Ginn sur Mer, $333,125,000 of the loan was distributed to the developers as a dividend distribution. Lender Dec. Ex. 15 at 60, Ex. 16 at 48. The developers at Lake Las Vegas received $500 million of the loan as equity recapitalization. *See* Gibson Dec. Ex. 12, Ex. 13. Defendants assert this was proper and recapitalization is commonplace. (ECF No. 781 at 15-16). Plaintiffs failed to provide any other evidence to show the dividend distribution raises a reasonable inference of impropriety or infers the loans caused the resorts' failure. The fact recapitalization occurred on two of the loans does not raise a reasonable inference that the recapitalization caused Plaintiffs' alleged damages.

Plaintiffs rely on the email from the Ginn sur Mer developer which states: "The Credit Suisse deal has closed. Wires on the way. Sonny, please prepare the deed-in-lieu." Gibson Dec. Ex. 38. It was sent the day the loan was funded. (*Id.*). While a literal reading of the text supports Plaintiffs' interpretation, the author of the email testified his intent was "an attempt at dark humor" but he fully believed the resort would repay the loan. *See* (ECF No. 784-13). It is unreasonable based on the email to infer the developer expected the Ginn sur Mer loan to fail, especially in light of his uncontradicted testimony providing the context of the email.

Plaintiffs assert Credit Suisse interfered with sales and took "de facto control" of financial affairs at Tamarack. (ECF No. 769 at 13). According to one of the salespersons at Tamarack, within six months of the loan closing, Credit Suisse started requiring its

approval for all sales prices. *See* Gibson Dec. Ex. 24 at 17-18. The salesperson made this statement based on hearsay from his supervisor. *See* Gibson Dec. Ex. 24 at 14-15.

The slowdown of sales corresponded directly with the nationwide market collapse. *See* Gibson Dec. Ex. 24 at 14-15; (ECF No. 671-5 at 36-37). The loan agreement prohibited any discounted sale "that does not reflect fair market value." Lender Dec. Ex. 14 at 98. The evidence presented by Plaintiffs provides at most, the possibility Credit Suisse inhibited sales at Tamarack, but requires undue speculation to conclude it caused the failure of the loan at Tamarack, or at any other resort where this practice was not alleged to have occurred. *See Cafasso, U.S. ex. rel. v. General Dynamics C4 Systems, Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) (holding evidence which "establishes only that this set of event could conceivably have occurred ... does not give rise to a reasonable inference that it did occur" because to find in favor of such evidence requires "undue speculation"). The admissible evidence shows Credit Suisse approved prices only **after** the developers defaulted on the loan. *See* (ECF No. 784-12 at 3); Lender Dec. Ex. 59 § 10. Additionally, Plaintiffs failed to rebut the expert opinion of Dr. Torous who opined the loan to the Tamarack resort failed because the market for vacation homes collapsed. *See* (ECF No. 671-5 at 68-69, 75-76).

Plaintiffs' fourth assertion regarding the removal of discounted cash flow in the developers' projections and the Cushman & Wakefield appraisals is unsupported by any citation to evidence. *See* (ECF No. 771 at 17). Defendants do not dispute the lack of discounting in the projections and appraisals. (ECF No. 741-2 at 4-5). However, Plaintiffs cite no evidence or explain how the lack of discounted cash flow made the loans more susceptible to market fluctuations. On the other hand, Dr. Torous examined the financial documents of the resorts and opined the market collapse led to the loss of sales and failure of the resorts. *See* (ECF No. 671-5 at 74). Additionally, the court cannot find the market collapse in 2007 constitutes "normal market fluctuations."

Plaintiffs' next argument is the Lake Las Vegas developer's projections were controlled by Credit Suisse. Plaintiffs cite to various exhibits, however, all of those

exhibits relate to Credit Suisse's internal discussion concerning the Cushman & Wakefield appraisal, with no mention of projections from the Lake Las Vegas developers, nor were the emails sent to the developers. *See* Gibson Dec. Exs. 42a-42g. These emails do not provide evidence to reasonably infer anything regarding the financial projections, especially in light of the direct evidence showing Credit Suisse had no involvement in the creation of the developer's projections. *See* (ECF No. 784-11 at 3-4).

Plaintiffs lastly argue the timing of the loans' closing and subsequent default prove causation. As Defendants point out, timing alone does not establish causation. *See Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1343 (11th Cir. 2010) ("[P]roving a *temporal* relationship ... does not establish a *causal* relationship") (emphasis and brackets in original) (citation omitted); *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1389 (5th Cir. 1996) ("an inference of causation based merely on the chronology of events is not a reasonable one for the jury to make."). While the defaults may have occurred, in some cases, within months after the loans closed, this alone is insufficient to raise an issue of fact as to causation. The timing is further strained because the market collapse began during the same time frame as the defaults occurred. *See* (ECF No. 671-5 at 36-37).

In connection with this argument, Plaintiffs assert causation is shown because the loan recapitalization to the Lake Las Vegas and Ginn sur Mer developers left less equity and operating capital in the resorts than existed previously. *See* (ECF No. 769 at 15). Plaintiffs cite no evidence nor argue how this fact proves the loans caused the failure of the resorts. Any loan would result in less equity, but yet not all loans fail. Plaintiffs do not establish how recapitalization and less equity caused the failure of the resorts.

Causation is an element to each of Plaintiffs' claims. As detailed above, Plaintiffs failed to produce evidence raising a genuine issue of fact to show the Credit Suisse loans caused the failure of the resorts. Plaintiffs' failure on this issue requires dismissal of all claims. Accordingly, Defendants are entitled to summary judgment *en toto* on the basis of causation.

//

**D.     Negligence**

      **1.     FIRREA, USPAP, and "Industry Standards"**

Defendants assert neither FIRREA nor USPAP imposed a duty of care towards Plaintiffs. Cushman & Wakefield contends USPAP only imposed duties as to its client, Credit Suisse. (ECF No. 737-1 at 29). Credit Suisse contends USPAP did not apply to it because it was not an appraiser. (ECF No. 741-1 at 20). Defendants assert FIRREA did not apply to the loans at issue because they were not federally regulated transactions. (ECF No. 741-1 at 19-20).

Plaintiffs respond by asserting Credit Suisse had a "duty to utilize appraisals which comport with the Standards of the Industry, which standards are articulated under USPAP, which are applicable in every state." (ECF No. 770 at 13). Plaintiffs further assert USPAP supports "the public purpose articulated when FIRREA was adopted, not only to regulate the banks, but to reaffirm that the public had an interest in appraisals which meet Industry Standards established over the course of seventy years." (ECF No. 770 at 13).

FIRREA was enacted in 1989 following the national banking and savings and loan crises. *See Sharpe v. F.D.I.C.*, 126 F.3d 1147, 1154 (9th Cir. 1997). Congress was attempting to remedy "faulty and fraudulent" appraisals which created loan failures when the collateral value did not cover defaulted loans. *Bolden v. KB Home*, 618 F. Supp. 2d 1196, 1202 (C.D. Cal. 2008). The purpose of FIRREA is to protect federal financial and public policy interests in real estate transactions "by requiring that real estate appraisals utilized in connection with federally related transactions are performed in writing, in accordance with uniform standards, by individuals whose competency has been demonstrated and whose professional conduct will be subject to effective supervision." 12 U.S.C. § 3331. If applicable, FIRREA requires appraisals to opine to "market value." *See* 12 C.F.R. § 225.62(a) and (g).

Judge Lodge previously found in order for FIRREA to apply in this matter, the Credit Suisse loans must 1) involve "financial institutions" and 2) have been made in

connection with a "federally related transaction." *See* (ECF No. 524 at 9); *see also* (ECF No. 510 at 13-18). A "financial institution" is "an insured depository institution ... or an insured credit union." 12 U.S.C. § 3350(7); *see* 12 U.S.C. § 1813(c)(2) (defining "insured depository institution" as "any bank or savings association the deposits of which are insured by the [Federal Deposit Insurance] Corporation").

A "federally related transaction" means:

> any real estate-related financial transaction which (A) a federal financial institutions regulatory agency or the Resolution Trust Corporation engages in, contracts for, or regulates; and (B) requires the services of an appraiser." 12 U.S.C. § 3350(4). "Real estate-related financial transaction" is further defined as "any transaction involving (A) the sale, lease, purchase, investment in or exchange of real property, including interests in property, or the financing thereof; (B) the refinancing of real property or interest in real property; and (C) the use of real property or interests in property as security for a loan or investment, including mortgage-backed securities.

12 U.S.C. § 3350(5).

Defendants admit the Cushman & Wakefield Total Net Value appraisals did not opine to market value. *See* (ECF No. 741-2 at 5). Defendants assert FIRREA does not apply to the loans because Credit Suisse did not accept FDIC-insured deposits. *See* (ECF No. 432-10 at 2). Defendants additionally assert the loans were not "federally related transactions" because the lender, Credit Suisse Cayman Islands Branch, is not regulated by any of the federal agencies named in the FIRREA statute.

The Yellowstone Club loan was signed solely by Credit Suisse Cayman Islands Branch. Lender Dec. Ex. 13 at 102. Credit Suisse Cayman Islands Branch signed the Tamarack loan and Ginn sur Mer loan as lender and agent. *See* Lender Dec. Ex. 14 at 131, Ex. 15 at 132, and Ex. 16 at 120. However, Credit Suisse First Boston signed the loans as agent and "individually as a Lender" on behalf of Credit Suisse Cayman Islands Branch for the Lake Las Vegas loans. *See* Lender Dec. Ex. 11 at 110; Ex. 12 at 109. While Credit Suisse First Boston (currently known as "Credit Suisse AG") maintains a branch in New York for state regulatory purposes, it does not accept deposits from United States citizens which are covered by FDIC deposit insurance. *See* (ECF No. 432-10 at 2).

ORDER - 18

Plaintiffs do not dispute Defendants' factual evidence, but instead argue FIRREA was enacted "not only to regulate the banks, but to reaffirm that the public had an interest in appraisals which met industry standards established over the course of at least seventy years." *See* (ECF No. 769 at 23). Plaintiffs did not cite any authority nor develop their apparent argument that the scope of FIRREA is broader than the statutory text states. The court finds Plaintiffs' argument unavailing in light of the clear statutory scope.

USPAP are the "generally accepted standards for professional appraisal practice in the United States." *Bolden*, 618 F. Supp. 2d at 1202 (internal citation omitted). All licensed and certified real property appraisers are required to comply with USPAP. (ECF No. 671-2 at 6). Defendants' expert admits the Cushman & Wakefield Total Net Value appraisals were required to comply with USPAP. *See* (ECF No. 671-2 at 7).

In her opinion, Defendants' expert believes Total Net Value appraisals did not violate USPAP. *See* (ECF No. 671-2). Plaintiffs' expert found 10 violations of USPAP. *See* (ECF No. 142 at 16, 19, 22, 25, 26, 27, and 36).

Notwithstanding these findings by Plaintiffs' expert, Cushman & Wakefield asserts it only owed duties to its client, Credit Suisse, and USPAP imposed no duties towards Plaintiffs. *See* (ECF No. 737-1 at 28-30). Idaho holds an appraiser may owe a duty of care to third-parties "based on the nature of the contractual undertaking when it is foreseeable that others may rely on performance of the contract." *Cumis Ins. Society, Inc. v. Massey*, 318 P.3d 932, 938 (Idaho 2014). There, the court held an appraiser owed a duty of care to parties other than the client identified in the appraisal because the appraisal contained certifications: (1) allowing the client to distribute the appraisal to the borrower or another lender, and (2) permitting the borrower to rely on the appraisal "as part of any mortgage finance transaction that involves any one or more [of the lender and/or other lenders to whom the appraisal is distributed to]." (*Id.*). The court declined to find USPAP categorically imposed a duty of care to third parties. (*Id.* at 938-39). Here, the appraisals specifically stated they were for use by the client for internal financing decisions and were not to be relied upon by any third party other than investors in the

loan at Tamarack. *See* (ECF No. 49, Ex. A at 19, Ex. B at 2, 9; Ex. C at 2, 27; Ex. D at 3, 17).

Florida cases hold a lender does not owe duties to a borrower on the basis of appraisals the lender obtained for its own benefit. *See McElrath v. ABN AMRO Mortg. Group, Inc.*, No. 11-62216-CIV, 2012 WL 463893 at **2-3 (S.D. Fla. February 13, 2012); *D.H.G. Properties, LLC v. Ginn Companies, LLC*, No. 3:09-CV-735-J-34JRK, 2010 WL 5584464 at **8-9 (M.D. Fla. September 28, 2010). Nevada permits a claim of negligence against an appraiser brought by the lender who hired the appraiser. *See Goodrich & Pennington Mortgage Fund, Inc. v. J.R. Woolard, Inc.*, 101 P.3d 792 (Nev. 2004).

Montana requires "[a] licensed or certified real estate appraiser shall comply with generally accepted standards of appraisal practice, evidenced by the uniform standards of professional appraisal practice promulgated by the appraisal standards board of the appraisal foundation." Mont. Code Ann. § 37-54-403(1). The statute applies "regardless of whether the appraisal is a federally related transaction or is capable of being performed by an unlicensed person under 37-54-201(3)." (*Id.*). The statute does not expressly grant a cause of action to enforce violations or provide the scope of an appraiser's duty under the statute. There are no cases interpreting the statute.

Plaintiffs did not point to any authority which would impose a duty on Defendants in favor of Plaintiffs. *See* (ECF No. 770 at 13-18); (ECF No. 769 at 23-24). The alleged violations of USPAP do not entitle Plaintiffs to any relief if Defendants owed no duty to them in regard to the appraisals. *See Knapton ex rel. E.K. v. Monk*, 347 P.3d 1257, 1259-60 (Mont. 2015); *Baccus v. Ameripride Services, Inc.*, 179 P.3d 309, 312 (Idaho 2008); *Williams v. Davis*, 974 So.2d 1052, 1056 n.2 (Fla. 2007); *Scialabba v. Brandise Const. Co., Inc.*, 921 P.2d 928, 968 (Nev. 1996). Credit Suisse did not finance any of Plaintiff's purchase of lots at any of the four resorts. Plaintiffs have not presented any authority or argument showing Defendants owed a duty **to Plaintiffs** to use reasonable care in

ORDER - 20

conducting the appraisals. For these reasons, the court finds neither FIRREA nor USPAP imposed a duty of care on Defendants in favor of Plaintiffs.

### 2. Plaintiffs' "Co-Developer" Claim

Plaintiffs argue Credit Suisse owed co-developer and agency duties because it allegedly "exercised excessive control over the construction of the MPCs." (ECF No. 769 at 17); (ECF No. 770 at 6). Plaintiffs rely on a 1968 California state case wherein the Supreme Court of California imposed a duty of reasonable care on a financial institution for defects in the construction of homes. *See Connor v. Great Western Sav. & Loan Ass'n*, 69 Cal. 2d 850 (Cal. 1968).

In *Connor*, the bank provided construction loans to a housing developer, but also "warehoused" the land by taking title and also retained a right of first refusal for construction loans to all home buyers who sought mortgages through other banks. *See* (*id*. at 858-59). The bank also was given the right to make construction loans on the homes. *See* (*id*. at 858). The bank retained a geologist to determine whether there was adequate water supply in the area. (*Id*.). During the loan transaction with the developers, the bank was listed as buyer of the land and took title, giving the developer a one year option to repurchase the land. *See* (*id*. at 859). The bank also set the selling prices for the lots. (*Id*. at 860). Bank inspectors visited the property every week to verify how the loan funds were being spent. (*Id*. at 862).

The home designs had a major construction defect with the foundation which the inexperienced developer did not correct and the bank did not investigate despite frequently requiring the construction plans to be submitted to it. *See* (*id*. at 856-57, 860-61). The bank "departed from its normal procedure" in failing to examine the foundation plans for the houses. (*Id*. at 860). The bank was in privity with the home buyers because it lent money to the home buyers to purchase their homes. (*Id*. at 865).

The home buyers brought suit against the developers and the bank, seeking to hold the bank liable either because it was an alleged joint venturer with the developer, and because the bank owed an independent duty to the home buyers regarding the

construction of the homes. (*Id*. at 857). The home buyers' injury was a loss of property value due to the structural defects. (*Id*. at 871). The case was dismissed in the lower court. (*Id*. at 856). On appeal, the California Supreme Court gave "plaintiffs' evidence all the value to which it is legally entitled," recognized "every legitimate reference that may be drawn from that evidence," and disregarded "conflicting evidence." (*Id*. at 857).

The California Supreme Court first found the bank "became much more than a lender content to lend money at interest on the security of real property" because it was "an active participant in a home construction enterprise" and "had the right to exercise extensive control of the enterprise." (*Id*. at 864). The court noted the bank had a duty of care owed to its shareholders "to exercise its power of control over the enterprise to prevent the construction of defective homes." (*Id*. at 865). Viewing the evidence in favor of the home buyers, the court stated the bank "knew or should have known that the developers were inexperienced, undercapitalized, and operating on a dangerously thin capitalization" which made the risk of damage from "attempts to cut corners in construction" reasonably foreseeable. (*Id*.).

The *Connor* court used a six-factor test in determining whether the bank owed a duty of care to the home buyers it was not privity with: (1) the extent the transaction was intended to affect the plaintiffs; (2) forseeability of harm to plaintiffs; (3) degree of certainty the plaintiffs suffered injury; (4) the closeness of connection between the defendant's conduct and plaintiffs' injury; (5) the moral blame attached the defendant's conduct; and (6) the public policy of preventing future harm. (*Id*.). After evaluating the factors, the California Supreme Court held the bank owed a duty of care to the home buyers, rejected the developers' negligence as a superseding cause, and remanded for further proceedings. (*Id*. at 866-70).

After the *Connor* decision, California enacted a statute generally disclaiming a lender's liability for structural defects in homes "unless such loss or damage is a result of an act of the lender outside the scope of the activities of a lender of money or unless the lender has been a party to misrepresentations to homeowners with respect to such real or

personal property." Cal. Civ. Code § 3434. *Connor* has not been overruled, but has been limited by the statute.

Plaintiffs seek to have this court adopt the six-factor test from *Connor* and, analogizing their theory of the case to *Connor*, find Credit Suisse was a "co-developer" and owed agency duties to Plaintiffs. *See* (ECF No. 769 at 17-22); (ECF No. 770 at 5-10). Defendants argue *Connor*, which applied California law in state court, does not impose any duties on it. (ECF No. 784 at 11). Plaintiffs assumed, but made no argument showing how a California case imposes a duty on Defendants for claims arising in Idaho, Montana, Nevada, and the Bahamas. No published Idaho or Montana case has cited to *Connor*. A Nevada statutory provision protecting lenders from defective property claims was enacted in response to *Connor*. *See Central Bank, N.A. v. Baldwin*, 583 P.2d 1087, 1089 (Nev. 1978).

Plaintiffs assert the facts concerning the bank in *Connor* are the same as the facts regarding Credit Suisse. Plaintiffs assert Credit Suisse exerted "extensive control" over the construction of the resorts. (ECF No. 770 at 6). Credit Suisse admits it gained the rights to control sale prices at Tamarack, but assert it happened only after the developers defaulted and was done to protect Credit Suisse's collateral. *See* (ECF No. 784 at 12 n.3). Credit Suisse also argues it did not retain title to any of the resorts when the loans were funded. (ECF No. 784 at 12). Plaintiffs point out the loan required Cushman & Wakefield to perform quarterly appraisals and Credit Suisse retained the right to review those appraisals. (ECF No. 770 at 6). Additionally, Plaintiffs assert the cases are the same because both the bank in *Connor* and Credit Suisse earned substantial fees as a result of the transactions. These facts, taken *en toto*, do not rise to the same level of involvement demonstrated in *Connor* where the bank took title to the land, performed weekly inspections of the construction, and obtained the right to fund loans to the home purchasers. Plaintiffs had no legal relationship with Credit Suisse or Cushman & Wakefield.

Using the language found in *Connor*, Plaintiffs assert Credit Suisse "knew or should have known that the MPC's developers operated on a dangerously thin capitalization" because of the Total Net Value methodology and the "huge fee" Credit Suisse took for each of the loans and also on default. (ECF No. 770 at 7). Plaintiffs do not cite to any evidence or develop this argument, although the evidence is clear Credit Suisse received large amounts in fees for both the loans and re-working of the loans in default and in bankruptcy. *See* Gibson Dec. Ex. 11 at 8-12, 15. The Sabalos Plaintiffs argue the recapitalization funds the developers took from the Lake Las Vegas and Ginn sur Mer loans further evidences the thin capitalization of the resorts. (ECF No. 769 at 18). The submitted evidence does not support Plaintiffs' categorization of Defendants' conduct.

Defendants argue the developers provided financial projections showing their expected cash flow would be sufficient to repay the loans and Credit Suisse's own analyses confirmed the ability to repay the loans. (ECF No. 784 at 12-13); *see* (ECF No. 741-2 at 4). Defendants also contend if lenders owed duties based on receiving fees for arranging loans, then "virtually every commercial lender would be a co-developer." (ECF No. 784 at 13). Plaintiffs present no expert testimony to rebut the financial projections or demonstrate the Credit Suisse loans were unique. The court cannot reasonably infer from this evidence that Credit Suisse's conduct was comparable to the bank in *Connor*.

Lastly, Plaintiffs argue Credit Suisse's conduct is comparable to the bank in *Connor* because Credit Suisse stepped outside the role of a lender by positioning itself to become owner of the resorts, knowing the likelihood of the loans entering default. (ECF No. 770 at 7). Plaintiffs rely on the deposition testimony of the former Lake Las Vegas Chief Financial Officer who stated, when asked who said "loan to own" and when: "It would be too distant to remember specifically, other than somebody from Credit Suisse used that term." Gibson Dec. Ex. 15 at 6. However, the rest of the testimony from the line of questioning provides the context of "loan to own": "Somebody from Credit Suisse used the term to refer to Highland Capital.... Something to the effect that the Highland

Capital motivation – I wouldn't say 'motivation,' maybe, but maybe the term was, they were not afraid to own this project." Gibson Dec. Ex. 15 at 6. The evidence Plaintiffs rely on establishes, at most, Credit Suisse used the term because it was discussing one of the loan investor's willingness to own the resort. It does not show Credit Suisse had a desire to own the project, and such desire cannot be reasonably inferred. Plaintiffs failed to submit evidence showing Credit Suisse wanted to own the resorts.

*Connor*, which applied California law and is only applicable to claims arising in California, imposed no duty on the Defendants herein as a matter of law. None of the states wherein Plaintiffs' claim arose have adopted or even cited *Connor*. There is no basis in law or fact to apply *Connor* to any of the instant claims. Though Plaintiffs frame their arguments in the same terms used in *Connor*, the undisputed evidence shows Credit Suisse's conduct did not rise to the same level as the bank in *Connor* whereby it would be appropriate to impose "co-developer" duties on Defendants in the instant matter.

### 3.  Economic Loss Rule

Defendants additionally seek summary judgment on the negligence claims arising from Lake Las Vegas and Tamarack because the economic loss rule bars those claims in Nevada and Idaho. (ECF No. 741-1 at 21). The economic loss rule in Idaho "prohibits recovery of purely economic losses in a negligence action because there is no duty to prevent economic loss to another." *Blahd v. Richard B. Smith, Inc.*, 108 P.3d 996, 1000 (Idaho 2004). "Economic loss includes costs of repair and replacement of defective property which is the subject of the transaction, as well as commercial loss for inadequate value and consequent loss of profits or use." (*Id.*). "[T]he subject of the transaction" determines whether loss is property damages or economic loss. (*Id.* at 1001). "[T]he *underlying contract* that is the subject of the lawsuit is the subject of the transaction." *Aardema v. U.S. Dairy Systems, Inc.*, 215 P.3d 505, 511 n.2 (Idaho 2009) (emphasis in original).

In Nevada, the economic loss rule "bars unintentional tort actions when the plaintiff seeks to recover purely economic losses." *Terracon Consultants Western, Inc. v.*

*Mandalay Resort Group*, 206 P.3d 81, 86 (Nev. 2009) (internal quotation marks and citation omitted). "[U]nless there is personal injury or property damage, a plaintiff may not recover in negligence for economic losses." (*Id*. at 87).

Plaintiffs assert the economic loss rule does not apply to the Idaho claims because there is no transaction between Defendants and Plaintiffs. (ECF No. 770 at 23). Plaintiffs admit their damages would ordinarily be considered economic losses, but argue the rule's intent is to protect parties to a contract, not present here. (ECF No. 770 at 23). Plaintiffs rely on a California federal case which applied California state law regarding the economic loss rule. *See Monday v. Saxon Mortg. Services, Inc.*, No. CIV 2:10-989 WBS KJM, 2010 WL 10065312 (E.D. Cal. November 29, 2010). Plaintiffs argue the "special relationship" exception from California law should be applied here to prevent the economic loss rule's application because one district court found the economic loss rule "essentially the same in all states." (ECF No. 770 at 24); *FDIC v. LSI Appraisal, LLC*, No. SA CV-11-706 DOC, 2011 U.S. Dist. LEXIS 126980 at *8 (C.D. Cal. November 2, 2011). This does not mean all states employ the same exceptions to the rule, as demonstrated by the differing case law of Idaho and Nevada set forth above.

Plaintiffs do not specifically address the law of Idaho, where the exception to the economic loss rule is limited to a professional performing personal services or where an entity holds itself out to the public as having expertise regarding a specialized function. *See Blahd*, 108 P.3d at 1001. Nevada recognizes exceptions for cases involving construction defects in newly constructed residential properties and for negligent misrepresentation cases. *See Terracon Consultants*, 206 P.3d at 88 n.3. As Plaintiffs point out, the Nevada Supreme Court cited cases from other jurisdictions which allowed exceptions under other circumstances. However, Plaintiffs omit the fact the Nevada Supreme Court declined to follow those cases. *See Terracon Consultants*, 602 P.3d at 89.

Plaintiffs have failed to demonstrate how their negligence claims under Nevada law should be exempted from the economic loss rule. There is no question of material fact which would allow the negligence claims in Nevada to fall under an exception to the

rule. Accordingly, the court finds Plaintiffs' negligence claims at Lake Las Vegas are barred by the economic loss rule.

Plaintiffs' negligence claims under Idaho law are subject to the "subject of the transaction" test. The "underlying contract" for Plaintiffs' tortious interference claims is the purchase agreements. However, Plaintiffs' negligence claims are based on Defendants' actions in performing the appraisals and issuing the loans, not the purchase agreements. It does not appear the economic loss rule precludes the Idaho claims, as it was not designed to address this case where the parties to the suit are not in privity to any contract. While the court declines to grant summary judgment on this basis, Plaintiffs' negligence claims arising under Idaho law fail for other reasons stated elsewhere in this Order.

**E.    Tortious Interference**

In Idaho, the elements for a tortious interference with a contract claim are: (1) the existence of a contract; (2) defendant's knowledge of the contract; (3) intentional interference causing breach of the contract; and (4) injury to the plaintiff resulting from the breach. *BECO Const. Co., Inc. v. J-U-B Engineers, Inc.*, 184 P.3d 844, 848 (Idaho 2008).

In Montana, the plaintiff must show the defendant's acts were: (1) intentional and willful; (2) calculated to cause damage to the plaintiff in their business; (3) done with the unlawful purpose of causing damage or loss, without right or justifiable cause on the part of the defendant; and (4) actual damages and loss resulted. *Emmerson v. Walker*, 236 P.3d 598, 603 (Mont. 2010). Those elements determine "whether a party's actions were 'improper'" in light of: "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of the action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties." (*Id.*).

To prevail on a tortious interference case in Nevada, the plaintiff must prove: "(1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage." *J.J. Industries, LLC v. Bennett*, 71 P.3d 1264, 1267 (Nev. 2003).

In Florida, the elements are: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the interference." *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 724 So.2d 381, 385 (Fla. Dist. Ct. App. 1999).

Under Bahamian law, the plaintiff must show "that a party has induced a second person to commit a breach of contract against a third person, whereby that third person suffers damage." (ECF No. 741-7 at 6). However, the claims fails if "the conduct complained of is justified." (ECF No. 741-7 at 5).

Plaintiffs allege Defendants interfered with their contracts with the resort developers and other sellers "which contracts provided for the construction and maintenance of the rights, amenities and privileges running with the lands." (ECF No. 644 at 121). Defendants argue Plaintiffs' tortious interference claims fail because there was no contractual promise for perpetual amenities or vested rights and any oral representations are not binding because each purchase contract contained an integration clause. (ECF No. 741-1 at 21-24); (ECF No. 737-1 at 24-28); (ECF No. 784 at 15-16). Credit Suisse also asserts it was justified in foreclosing on the collateral for its loan. (ECF No. 741-1 at 23-24). Plaintiffs assert the amenities were part of the developers' contracts with Plaintiffs because the developers allegedly acknowledged this through emails to Credit Suisse and Credit Suisse identified contractual rights in internal memoranda. (ECF No. 769 at 9). Plaintiffs also argue the amenities were part of a "bundle of rights" which was "embedded" in the purchase price of their lots, and without the amenities Plaintiffs'

properties were "virtually worthless." (ECF No. 771 at 21). Because tortious interference with a contract is premised on a breach of contract, the court must determine whether Plaintiffs' various agreements and contracts with the developers and private home sellers were breached by the bankruptcies and closing of amenities.

The express terms of the Plaintiffs' purchase agreements with the developers are either silent or expressly disclaim any right to amenities. Jennings' purchase agreement with the Lake Las Vegas developer promised construction of a private road system within the resort, water, sewer, electric, telephone and gas service lines, underground cable television lines, the Beach Club facilities, and the SouthShore beach access improvements. Morrow Dec. Ex. 79 at ¶ 3. A property report provided to Jennings prior to completing his purchase explicitly disclaimed any contractual obligation to provide the proposed facilities. Morrow Dec. Ex. 33 at 8. The facilities mentioned in the purchase agreement with the developer were all completed at the time Jennings purchased his Lake Las Vegas property. *See* Morrow Dec. Ex. 5 at 6-9.

Gibson's three properties at Lake Las Vegas were all purchased from private home builders and not the Lake Las Vegas developer. Morrow Dec. Ex. 81, Ex. 82, and Ex. 84. One purchase agreement made no mention of any amenities. *See* Morrow Dec. Ex. 81. The other two purchase agreements contained identical language disclaiming any obligation to construct developments or improvements. Morrow Dec. Ex. 82 at 7, Ex. 84 at 7. Mushkin did not have purchase contracts, and none of his property deeds made promises regarding facilities or amenities. *See* Morrow Dec. ¶ 155 and Exs. 86, 88, 90, 92, 94, 96, 98, 100, 102, 105, and 108.

Blixseth admits his purchase contracts with private sellers at the Montana Yellowstone Club did not contain any guarantees of the developer maintaining amenities. *See* Morrow Dec. Ex. 41 at 3. The Membership Plan at Yellowstone Club disclaimed any vested rights to use the facilities. Morrow Dec. Ex. 34 at 3-4.

Gibson's purchase contract with the developer for the lot at Ginn sur Mer called for the construction of infrastructure "necessary to permit the development and use of the Lot

for residential purposes, consisting of, without limitation, access roads, electricity, water and sewage facilities and telephone lines and facilities." Morrow Dec. Ex. 139 at 6. Those facilities were built. *See* Morrow Dec. Ex. 24 at 3-5. Gibson's purchase contract left development and maintenance of amenities in the developer's discretion and did not make any assurance of perpetual existence. *See* Morrow Dec. Ex. 139 at 7 and 10.

Despite Plaintiffs' argument, the purchase agreements do not present a question of material fact as to interpretation. The purchase agreements are unambiguous and made no promises for any amenities and disclaimed oral representations. Even if there was a question as to what constitutes an amenity, there was no contractual promise for perpetual amenities for which Plaintiffs could claim a breach of contract by Defendants when those amenities closed. None of the Defendants were parties to any agreement with any of the Plaintiffs. Accordingly, there is no contractual promise in favor of perpetual amenities or Defendants' interference therewith. Plaintiffs' tortious interference claims fail.

Plaintiffs' "bundle of rights" theory similarly fails. The purchase prices for properties at the resorts would certainty seem to be valued in part based on the amenities. However, even assuming Plaintiffs' properties were "virtually worthless" without the amenities, there was no contractual promise the amenities would continue to exist. At the time the Credit Suisse loan was made, amenities at Lake Las Vegas, Yellowstone Club, and Tamarack were already built. It would not be a breach of contract if the amenities closed at any time after the sale to a Plaintiff because there was no contractual promise the amenities would continue to exist. The risk of amenities closing was one Plaintiffs assumed in purchasing their lots under the contractual terms provided.

No amenities were built at the time of Plaintiffs' purchase at Ginn sur Mer, and no amenities were ever completed there. While the purchase prices might have been based in part on proposed future amenities, the purchase agreements disclaimed completion of any amenities. *See* Morrow Dec. Ex. 139 at 7, 10. In an attempt to overcome these facts, Plaintiffs rely on a memorandum dated April 19, 2007, and addressed to Credit Suisse wherein the Ginn sur Mer developers acknowledged "[i]n order for the Borrower to

satisfy its obligations to its existing and future lot buyers, as well as its obligations to its Lenders, it is essential for the Borrower to complete the infrastructure and amenities" at Ginn sur Mer. Gibson Dec. Ex. 40 at 3. The memorandum further describes the infrastructure and amenities as "access roads, spine roads, canals, golf courses, marinas and other amenities." (*Id*. at 4). The golf course was deemed "the most essential amenity for future lot sales." (*Id*. at 5). To the developers, "the greatest significance" of completing the infrastructure and amenities was "maintain[ing] the confidence of its existing lot owners and its future lot buyers as well as the lenders providing lot loan financing to such owners and buyers." (*Id*. at 4). Maintaining the confidence of lot owners was considered "crucial to preserving and enhancing the value of the lenders' collateral." (*Id*.). These facts, accepted as true for the purposes of this Motion, show the importance of the amenities, but fail to give rise to a reasonable inference that the amenities were contractually required in light of the clear contrary language of the purchase agreements.

Gibson's declaration also states individual salespersons gave her assurances of the "bundle of rights" related to the amenities when negotiating the sale of properties to her at Lake Las Vegas. *See* Gibson Dec. ¶¶15-20, 26-27. These alleged statements are undermined by terms in Gibson's purchase agreement which states "NO VERBAL AGREEMENTS: This Purchase Agreement constitutes the entire agreement between the parties and no verbal statements made by any person are a part hereof unless reduced to writing and signed by the parties." Gibson Dec. Ex. 8 at 4. Plaintiffs argue, however, that all terms in the contract, including the disclaimer of oral promises, are null and void, citing two Florida cases. *See D&M Jupiter, Inc. v. Friedopfer*, 853 So.2d 485, 489 (Fla. Dist. Ct. App. 2003); *Mejia v. Durich*, 781 So.2d 1175, 1178 (Fla. Dist. Ct. App. 2001). Under those cases, a merger or integration clause does not prevent a buyer from relying on oral representations which fraudulently induced the buyer to enter a contract. *See* (*id*.). However, Plaintiffs do not allege claims of fraudulent inducement to purchase their lots based on those oral representations. Plaintiffs' fraud claims, discussed *infra*, are premised

on Defendants' alleged failure to disclose material facts concerning the loans. Because there are no alleged claims of fraud stemming from oral representations made by salespersons, these cases are immaterial to Plaintiffs' tortious interference claims.

All purchase agreements, deeds, and contracts disclaimed the perpetual existence of amenities. Ginn sur Mer was the only resort where no amenities existed at the time Plaintiffs purchased lots therein. The oral representations made to Gibson were not integrated into the contract and there is no claim alleged whereby the written agreement of the Plaintiffs and sellers should be discarded. For these additional reasons, summary judgment on the tortious interference claims is appropriate.

## F.     Fraud and Negligent Misrepresentation

Fraud and negligent misrepresentation claims are brought only by Gibson, Koenig, and Blixseth. *See* (ECF No. 644 at 124). The court previously dismissed with prejudice any negligent misrepresentation claims brought under Idaho law because Idaho does not recognize negligent misrepresentation as a cause of action. *See* (ECF No. 126 at 28).

In Nevada, the elements of fraud are: (1) a false representation made by the defendant; (2) the defendant's knowledge or belief that the representation is false; (3) the defendant's intent to induce the plaintiff to act or refrain from acting in reliance on the misrepresentation; (4) the plaintiff's justifiable reliance on the misrepresentation; and (5) damage to the plaintiff as a result of such reliance. *Bulbman, Inc. v. Nevada Bell*. 825 P.2d 588, 592 (Nev. 1992).

In Idaho, fraud requires showing: "(1) a statement or representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) justifiable reliance; and (9) resultant injury." *Partout v. Harper*, 183 P.3d 771, 776 (Idaho 2008).

In Montana, the elements are: "(1) a representation; (2) falsity of the representation; (3) materiality of the representation; (4) speaker's knowledge of the falsity of the representation or ignorance of its truth; (5) speaker's intent that it be relied

upon; (6) the hearer's ignorance; (7) the hearer's reliance on the representation; (8) the hearer's right to rely on the representation; and (9) the hearer's consequent and proximate injury caused by the reliance on the representation." *McCulley v. U.S. Bank of Montana*, 347 P.3d 247, 256 (Mont. 2015).

In Florida, the elements for fraud are: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Johnson v. Davis*, 480 So.2d 625, 627 (Fla. 1985). Contrary to Cushman & Wakefield's assertion, justifiable reliance is not an element of fraud under Florida law, but it is an element for negligent misrepresentation claims. *Specialty Marine & Industrial Supplies, Inc. v. Venus*, 66 So.3d 306, 310 (Fla. Dist. Ct. App. 2011).

Fraudulent misrepresentation under Bahamian law requires a showing of the following elements: (1) the defendant made a false representation to the plaintiff; (2) the defendant knew the representation was false or was reckless as to whether it was true or false; (3) the defendant intends the plaintiff to act in reliance on the representation; and (4) the plaintiff acts in reliance on the representation and suffers loss as a consequence of the reliance. (ECF No. 741-7 at 8).

Negligent misrepresentation has similar elements to fraud, except "[r]ather than requiring an intent to misrepresent, it requires a showing of a failure to use reasonable care or competence in obtaining or communicating the information." *Barrett v. Holland & Hart*, 845 P.2d 714, 717 (Mont. 1992); *see Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1387 (Nev. 1998). Under Bahamian law, negligent misrepresentation "is a type of innocent misrepresentation which does not require dishonesty in order to be proved." (ECF No. 741-7 at 9). Negligent misrepresentation is established when "notwithstanding that the misrepresentation was made with the honest belief in its truth, such a belief was as a result of a lack of care, skill or competence on the part of the party making the statement." (ECF No. 741-7 at 9).

ORDER - 33

Defendants assert summary judgment on the fraud and negligent misrepresentation claims is appropriate because there is no evidence Defendants knowingly made a misrepresentation of material fact to Plaintiffs. *See* (ECF No. 741-1 at 25-28); (ECF No. 737-1 at 34-38). Defendants argue there is no evidence they told Plaintiffs the loans "would be" beneficial and the developers "would be" able to pay back the debt as those statements were allegedly made to the developers, not the Plaintiffs. *See* (ECF No. 741-1 at 25). Defendants argue that even if such statements had been made they were not fraudulent because they would have related to future events and are opinions and predictions. *See Maroun v. Wyreless Systems, Inc.*, 114 P.3d 974, 985 (Idaho 2005), *abrogated on other grounds by Wandering Trails, LLC v. Big Bite Excavation, Inc.*, 329 P.3d 368 (Idaho 2014); *Davis v. Church of Jesus Christ of Latter Day Saints*, 852 P.2d 640, 644 (Mont. 1993), *overruled on other grounds by Gliko v. Permann*, 130 P.3d 155 (Mont. 2006); *Bulbman, Inc.*, 825 P.2d at 592; ECF No. 741-7 at ¶¶ 20-21. Plaintiffs did not respond to this argument or present contrary authority. *See* (ECF No. 769 at 26-29).

Defendants next argue there is no evidence they knew representations, if any, were false based on the developers all believing they could repay the loans. (ECF No. 741-1 at 25). Plaintiffs assert Defendants ignore the fact the developers at Lake Las Vegas were found to be co-conspirators with Credit Suisse "on these same facts." (ECF No. 769 at 28). Plaintiffs appear to be referring to the *Claymore Holdings* case in Texas, wherein the trial court found the existence of a conspiracy between the developers, Credit Suisse, and CBRE to defraud Claymore, a purchaser of a portion of Credit Suisse's refinanced loan to the Lake Las Vegas developer. *See* (ECF No. 731-4 at 30, 38-39). Claymore was not a lot purchaser. *See* (*id.*). This court has already differentiated the findings in the Texas matter and the allegations in the instant matter. *See* (ECF No. 807).

Plaintiffs further assert Defendants knew of the inability of the Lake Las Vegas developer to repay loans based on the developer admitting "[T]he goal was to get a loan sufficient to recapitalize the company and allow the project to go forward." Gibson Dec. Ex. 15 at 12. Even if this testimony could reasonably infer, as Plaintiffs assert, one

motivation for obtaining the loan was recapitalization, Plaintiffs fail to demonstrate how the desire for recapitalization made statements regarding the ability to repay the loans false. Desiring to recapitalize does not support a conclusion that the loan would fail. Plaintiffs do not point to any evidence which establishes the resorts were "doomed to failure" and could not repay the loans under any circumstances simply because the developer at one resort obtained the loan in order to recapitalize.

Defendants argue Plaintiffs' allegations of a "loan to own scheme" and Credit Suisse allegedly betting against the loans is unsupported by evidence. (ECF No. 741-1 at 27). Credit Suisse asserts it "invested in the Loans and lost millions as a result." (ECF No. 741-1 at 27). Plaintiffs do not address these arguments in their Response. *See* (ECF No. 769 at 26-29).

Defendants assert they had no duty to disclose material facts which Plaintiffs allege were concealed "in connection with the described financial transactions" because there was no fiduciary or other special relationship giving rise to such legal obligation towards Plaintiffs. *See Dow Chemical Co. v. Mahlum*, 970 P.2d 98, 110 (Nev. 1998), *disagreed with on other grounds by GES, Inc. v. Corbitt*, 21 P.3d 11 (Nev. 2001); (ECF No. 741-7 at ¶¶ 23, 26); (ECF No. 741-1 at 26). Defendants had no contractual relationship with Plaintiffs, and the credit agreements between Credit Suisse and the developers disclaimed bestowing any legal or equitable right on third parties. *See* Lender Dec. Exs. 11-16 at § 9.1(A).

Plaintiffs argue Credit Suisse "exercised control sufficient to become a co-developer" at all resorts except Yellowstone Club, as addressed above. *See supra* § D(2). Plaintiffs assert when this occurred, Credit Suisse "assumed the fiduciary and special relationship duties that the LLV, Ginn, and Tamarack developers owed" to Plaintiffs, "including the obligation to disclose material facts." (ECF No. 769 at 27). As previously addressed, Plaintiffs' reliance on the 50 year old *Connor* California state case to impose co-developer duties on Credit Suisse is unpersuasive and based on clear factual differences and roles of the *Connor* lender were not present herein. *See supra* § D(2).

Even if there were some duty to disclose imposed on Defendants, Plaintiffs do not specify what material facts were allegedly concealed. It appears Plaintiffs are asserting Defendants concealed facts regarding the difference between the Total Net Value and market value, the amount of the loans taken as recapitalization, and the lack of a specific requirement for the resorts to use loan proceeds to further development of the amenities. The developers acknowledged they understood undiscounted cash flows and were aware the Total Net Value appraisals did not discount cash flow to present value. *See* (ECF No. 741-2 at 5). The appraisals explicitly disclaim being compliant with FIRREA or state they do not purport to opine to market value. *See* (ECF No. 49, Ex. A at 2; Ex. B at 3; Ex. C at 3; Ex. D at 4). The appraisals for Tamarack, Lake Las Vegas, and Ginn sur Mer state the as-is market value would be lower than Total Net Value. Lender Dec. Ex. 37 at 4; Ex. 39 at 4; Ex. 40 at 5.

Even assuming the appraisals contained violations of USPAP, the dispositive issue is whether Defendants had a duty to disclose USPAP violations in the appraisals to Plaintiffs with whom they had no contractual relationship. The court has already rejected Plaintiffs' "co-developer" theory based on *Connor*, and Plaintiffs have presented no other authority to impose such a duty on Defendants. Based on the lack of evidence showing a misrepresentation of fact occurred or Defendants had a duty to disclose additional facts to Plaintiffs, summary judgment on the fraud and negligent misrepresentation claims is appropriate.

### G.   Conspiracy

Plaintiffs present two differing arguments as to the extent of an alleged conspiracy. The Huntley Plaintiffs assert there was a conspiracy between Credit Suisse and Cushman & Wakefield to inflate appraisals and issue loans which would bring in massive profits while bankrupting the resorts. (ECF No. 770 at 1, 21-22). The Sabalos Plaintiffs assert the developers were part of the alleged conspiracy. (ECF No. 769 at 2-3). The Fifth Amended Complaint does not allege the developers were part of a conspiracy, although it

does allege an agreement between the Defendants "and with third parties or persons not herein named." (ECF No. 644 at ¶ 241).

Conspiracy is not a separate tort and there can be no conspiracy to commit negligence. *See Daou v. Abelson*, No. 2:11-CV-01385-PMP-GWF, 2014 WL 939086, at *6 (D. Nev. Mar. 9, 2014); *Wesco Autobody Supply, Inc. v. Ernest*, 243 P.3d 1069, 1086-87 (Idaho 2010); (ECF No. 741-7 at ¶¶ 15, 19). Because the court has granted summary judgment to Defendants on the intentional tort claims, the conspiracy claim fails as well.

The Sabalos Plaintiffs additionally argue the existence of a conspiracy was found by Judge Tillery in the Texas *Claymore* case. (ECF No. 769 at 15). However, Judge Tillery made no conspiracy finding in relation to the 2004 Lake Las Vegas loan, or in relation to Total Net Value. Instead, he found Credit Suisse, CBRE, and the Lake Las Vegas developers conspired to fraudulently obtain Claymore's syndication participation in the assignment by Credit Suisse to Claymore of the refinancing of the original loan in 2007. *See* (ECF No. 716-4 at ¶¶ 63-69). This argument fails to establish any facts in relation to the 2004 Credit Suisse loan to the developer or the Total Net Value appraisals.

**H.    Standing and Judicial Estoppel**

Defendants additionally assert specific Plaintiffs lack standing and should be judicially estopped from proceeding on their claims. *See* (ECF No. 737-1 at 31-35); (ECF No. 741-1 at 29-31). While certain Plaintiffs lack standing the court declines to grant summary judgment on the basis of judicial estoppel, as discussed below.

**1.    Blixseth**

Defendants assert Blixseth's claims should be dismissed because he did not purchase property in his personal capacity. (ECF No. 737-1 at 32). Plaintiffs assert Blixseth has standing because the limited liability companies have "gone out of existence for the purpose of this litigation." (ECF No. 770 at 23).

Blixseth purchased units in Yellowstone limited liability companies which owned lots at the resort. (ECF No. 770-5 at 2). He asserts purchasing units in the limited liability companies was the only option available to him. (ECF No. 770-5 at 2). Blixseth

purchased the units along with his father, using $502,000 of his own money with another $502,000 due one year later. (ECF No. 770-5 at 2). When Blixseth failed to pay the additional $502,000, the limited liability companies which owned lots at Yellowstone Club reverted to the prior owners and the lots were thereafter foreclosed upon by American Bank. Morrow Dec. Ex. 12 at 29; (ECF No. 770-5 at 2). An entity owned by Blixseth paid $162,535, the amount of unpaid interest owed, to settle all claims with American Bank. (ECF No. 770-5 at 2). Blixseth asserts he is suing in his personal ownership loss of the limited liability companies and is not asserting injury on behalf of the limited liability companies which he no longer owns. (ECF No. 770-5 at 3).

An individual member of a limited liability company lacks standing to pursue individual claims against third parties when those injuries are derivative of the limited liability company's injuries. *See Woods View II, LLC v. Kitsap County*, 484 Fed.Appx. 160, 161 (9th Cir. 2012) (unpublished). To have standing to pursue individual claims, an individual must be injured "directly and independently" of the company. (*Id.*) (Citing *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1057 (9th Cir. 2012)). The Fifth Amended Complaint does not contain specific allegations concerning the limited liability companies, but Blixseth's alleged injury occurred "when the subject MPC was forced by Defendants - through their control, interference and deceptive behavior - to retrench, discontinue and otherwise fail to provide the rights, privileges, benefits and amenities to which Plaintiff Blixseth was entitled." *See* (ECF No. 644 at 55-56). Those injuries are the same and derivative of the alleged harm to the limited liability companies. As such, Blixseth lacks standing to pursue claims against Defendants.

### 2.    Mushkin

Mushkin owned several properties, but only three at Lake Las Vegas are at issue in this suit. *See* (ECF No. 769 at 30). Mushkin bought the 41 Avenida Fiori lot on May 7, 2004, for $720,000.00. Morrow Dec. Ex. 88. He sold the lot on February 28, 2006, for $899,000.00. Morrow Dec. Ex. 89. Mushkin bought 29 Montelago Blvd., Unit 101 on July 23, 2009, for $148,050.00. Morrow Dec. Ex. 98. He sold the lot on May 21, 2013,

for $195,000.00. Morrow Dec. Ex. 99. Mushkin concedes he lacks standing regarding the third lot (6 Via Ravello) because it is owned by a limited liability company. (ECF No. 769 at 31).

Mushkin states he is seeking recovery for loss of a $125,000.00 club membership and $30,000.00 transfer fees at 41 Avenida Fiori. (ECF No. 769 at 31); Sabalos Dec. Ex. 49. Mushkin asserts he is seeking damages for his "capital investment losses" at 29 Montelago Blvd., Unit 101. (ECF No. 769 at 31). Mushkin asserts he spent $90,000.00 to repair and improve the property and seeks reimbursement in full. Sabalos Dec. Ex. 49. He also asserts Credit Suisse took a Founders Club Membership purchased in 1991 for $50,000.00. Sabalos Dec. Ex. 49.

It appears Mushkin is asserting club membership damages apart from the two properties at issue. The Founders Club Membership was purchased over two decades before Mushkin purchased the 41 Avenida Fiori lot. Additionally, he sold these lots, so it would appear the memberships ran separate and apart from the property.

Regarding his "capital investment" losses, Mushkin sold the Montelago condo at a profit, though the profit was less than the amount allegedly used for repair and improvements. It does not seem he would reasonably expect to gain back the exact same amount invested in the sale. Additionally, as Defendants point out, the purchase of the unit came after the bankruptcy, straining the connection between his alleged loss and actions of the Defendants. The court finds it likely Mushkin lacks injury, though it is unnecessary to resolve this issue in light of the court's ruling on the merits of Mushkin's claims.

### 3.    Dominguez and Land

Defendants assert Dominguez and Land should each be barred from bringing claims because they failed to include their claims in this case in the course of their individual bankruptcies. (ECF No. 741-1 at 30); (ECF No. 737-1 at 33-35). As part of bankruptcy proceedings, debtors must disclose all assets, including contingent and unliquidated claims. *See* 11 U.S.C. § 521(a); *Hamilton v. State Farm Fire & Cas. Co.*,

270 F.3d 778, 785 (9th Cir. 2001). "If a plaintiff-debtor omits a pending (or soon-to-be-filed) lawsuit form the bankruptcy schedules and obtains a discharge (or plan confirmation), judicial estoppel bars the action." *Ah Quin v. County of Kauai Dept. of Transp.*, 733 F.3d 267, 271 (9th Cir. 2013). Where a debtor fails to disclose claims in bankruptcy due to "inadvertence" or "mistake," and moves to reopen their bankruptcy to disclose the litigation, judicial estoppel is inapplicable. *See* (*id.* at 276-77). It is within the court's discretion to decide whether to apply judicial estoppel. (*Id.* at 270).

Plaintiffs Dominguez and Land argue Defendants have waived any judicial estoppel argument by failing to raise it in their Answer or at any time during the pendency of this case. *See* (ECF No. 770 at 22). However, "an affirmative defense may be raised for the first time at summary judgment." *Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993). Accordingly, Plaintiffs' waiver argument fails.

Dominguez filed for bankruptcy on May 6, 2010 and received a discharge on September 2, 2010. (ECF No. 770-3 at 1). Land filed for bankruptcy on September 22, 2010, and received a discharge January 2011. (ECF No. 770-4 at 1). Both Dominguez and Land assert they were not aware of this litigation "until a few days before" they were added as a party on April 21, 2011. (ECF No. 770-4 at 1); (ECF No. 770-3 at 1-2). While Dominguez and Land assert they knew nothing of this case until April 2011, they each were provided with a "Survey and Direct Injury Report to Counsel in re: *Gibson et al vs. Credit Suisse and Cushman & Wakefield et al*." *See* Morrow Dec. Ex. 49, Ex. 50. Land faxed her survey and direct injury report back to counsel on July 18, 2010. *See* Morrow Dec. Ex. 50. Dominguez' survey does not contain any date, but he admitted in discovery to seeking to become a class member after receiving the survey. *See* Morrow Dec. Ex. 49 at 3, Ex. 38 at 3.

After Defendants moved for summary judgment raising judicial estoppel, Dominguez and Land applied to reopen their bankruptcies to amend the schedules to include this action claiming they were unaware they had a duty to reopen their bankruptcy to disclose this litigation until counsel informed them of the duty in January

2016. (ECF No. 770-4 at 2-3); (ECF No. 770-3 at 2). Defendants correctly note Land withdrew her bankruptcy court motion, but she has since renewed her motion and successfully reopened her bankruptcy. *See Order Reopening Case*, *In re Land*, No. 10-10-16836-CL7, Dkt. 31 (Bankr. S.D. Cal. March 7, 2016).

There appears to be disputed facts and an insufficient record for the court to make a definitive ruling on judicial estoppel. Based on the court's ruling on issues related to the merits of Plaintiffs' claims, the disputed facts relating to Land and Dominguez's bankruptcies are immaterial.

### 4.    Gibson

Defendants also seek judicial estoppel against Gibson based on allegedly inconsistent positions taken by her in this litigation and by her attorney husband, James Sabalos, in his personal bankruptcy. (ECF No. 737-1 at 34); (ECF No. 741-1 at 30-31). Defendants assert Gibson and Sabalos made the inconsistent statements concerning the ownership of the Tamarack, Ginn sur Mer, and Lake Las Vegas properties in order to gain an unfair advantage. (ECF No. 737-1 at 35). Defendants assert Gibson and Sabalos "are in sufficient privity as husband/wife and attorney/client to warrant judicial estoppel." (ECF No. 737-1 at 35).

In her discovery responses, Gibson asserted each property was purchased "with separate property funds pursuant to a controlling prenuptial agreement." Morrow Dec. Ex. 36 at 3. Although Sabalos signed some documents and contracts relating to the loans to secure the properties, Gibson alleged  it was only because the bank required it and Sabalos had no interest in the properties because of the prenuptial agreement. *See* Morrow Dec. Ex. 8 at 3-6.

Prior to her deposition testimony, Gibson's husband, Sabalos, filed for bankruptcy and in the schedule of assets claimed a fee simple interest in the resort properties. He did not list Gibson as having any interest or as co-debtor to the properties. *See* Morrow Dec. Ex. 76 at 4. Sabalos later filed an amended schedule of assets which named Gibson as a co-debtor but made no amendment to list her as having an interest in the properties. *See*

Morrow Dec. Ex. 77. Sabalos' Plan of Reorganization and Disclosure Statement proposed to surrender the Ginn sur Mer and Tamarack properties in exchange for discharge and the Plan also stated Sabalos had no pending litigation. *See* Morrow Dec. Ex. 78 at 3-5, 6, 9-10. The court approved the plan. *See Order Confirming Debtor's First Modified Plan of Reorganization Dated December 12, 2012*, *In re Sabalos*, No. 12-10129, Dkt. 104 (Bankr. D. Nev. May 14, 2013).

Gibson and Sabalos do not appear to dispute the inconsistent statements, but rather assert judicial estoppel is inapplicable because Gibson should not be estopped based on her husband's statements in bankruptcy. (ECF No. 769 at 30). Gibson and Sabalos also argue Defendants failed to provide any authority where judicial estoppel was applied to a person based on statements made by their spouse. (ECF No. 769 at 30).

The sole case cited by Defendants discussed privity in the context of *res judicata* and did not consider privity in a marital relationship. *See Stratosphere Litigation, L.L.C. v. Grand Casinos, Inc.*, 298 F.3d 1137, 1142-43 n.3 (9th Cir. 2002). Judicial estoppel may be applied against a non-party to the first litigation "if one of the parties to the earlier suit is so closely aligned with the non-party's interests as to be its virtual representative." *Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 996 (9th Cir. 2012) (citation omitted). The purpose of judicial estoppel is to "preclude[] a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton*, 270 F.3d at 782.

The positions taken by Gibson and Sabalos are inconsistent. However, the parties failed to provide authority holding husbands and wives have *per se* privity in the other spouse's individual bankruptcy. The conduct of Sabalos and Gibson is suspect, and would appear to be the type of conduct judicial estoppel seeks to prevent. In any event, the court need not make a finding on the issue of privity between Sabalos and Gibson because of the court's rulings on the merits of Plaintiffs' claims.

//

//

**I.    Defendants' Evidentiary Objections**

Cushman & Wakefield filed a 22 page brief detailing their objections to the declarations Plaintiffs submitted in support of their responses to Defendants' Motions for Summary Judgment. *See* (ECF No. 781-1). Credit Suisse joined the objections. (ECF No. 785). The Objections mostly relate to the lengthy declaration of L. J. Gibson, but also include evidentiary objections to other declarations of individual Plaintiffs. The court has reviewed the declarations and objections, and given the declarations their proper weight, if any, in considering the Motions for Summary Judgment.

**J.    Plaintiffs' Motion for Leave to File Sixth Amended Complaint**

After the hearing on Defendants' Motions for Summary Judgment, Plaintiffs moved for leave to file a **Sixth** Amended Complaint. (ECF No. 805). Plaintiffs state the additional allegations therein are to conform with the evidence already presented. *See* (ECF No. 805-1 at 1). Plaintiffs state those allegations include: adding the developers of the resorts as a co-conspirator with Defendants; the relationship between developers and Plaintiffs being a fiduciary relationship; the developers violating their fiduciary duties; and Defendants' liability for the developers' alleged breaches based on the alleged conspiracy. (ECF No. 805-1 at 2-3). Plaintiffs assert these claims were all presented in the summary judgment proceedings. (ECF No. 805-1 at 3). Although not disclosed in Plaintiff's Motion, the proposed Sixth Amended Complaint also adds four Cushman & Wakefield subsidiary companies as parties. *See* (ECF No. 805-2 at 3).

Plaintiffs appear to be relying on Fed.R.Civ.P. 15(b) which allows, during and after trial, a party to move to amend the pleadings "to conform them to the evidence and to raise an unpleaded issue" when the issue "is tried by the parties' express or implied consent." Fed.R.Civ.P. 15(b)(2). Although the Rule specifically states "during and after trial," the Ninth Circuit broadly interprets this Rule to also apply to summary judgment proceedings. *See Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1154 (9th Cir. 2014). Even if the proposed amendment conforms to the evidence presented at summary judgment, the court must consider the following factors in determining whether to grant

leave to amend: (1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) futility of amendment; and (5) whether the plaintiff has previously amended the complaint. *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004).

The original deadline to amend pleadings and add additional parties was July 31, 2012. *See* (ECF No. 239 at 1). Magistrate Judge Bush extended the deadline to add parties to January 31, 2014. *See* (ECF No. 430 at 1). However, the deadline to amend pleadings was never reset and Plaintiffs never sought to extend that deadline. Once the deadline set forth in the Scheduling Order has passed, the moving party must demonstrate "good cause" to modify the Scheduling Order and allow leave to amend. Fed.R.Civ.P. 16(b)(4); *In re Western States Wholesale Natural Gas Antitrust Litigation*, 715 F.3d 716, 737 (9th Cir. 2013). Good cause exists when the deadline "cannot reasonably be met despite the diligence of the party seeking the extension." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992) (citation omitted). "The focus of the inquiry is upon the moving party's reasons for seeking modification.... If that party was not diligent, the inquiry should end." (*Id.*).

In the Motion for Leave to File Sixth Amended Complaint, Plaintiffs did not address Rule 16 or request the court to amend the Scheduling Order to allow amendment of pleadings. *See* (ECF No. 805). Plaintiffs failed to demonstrate good cause to reopen the time for amendment of pleadings which expired four years ago. The inordinate delay in seeking to add the four Cushman & Wakefield subsidiaries is inexcusable considering their role was made known to Plaintiffs six years ago. *See* (ECF No. 48-1 at 31-32). Despite having knowledge of the facts which were presented in their summary judgment responsive briefs, Plaintiffs did not move to amend pleadings until after the hearing on Defendants' Motions for Summary Judgment. Additionally, this is the **sixth** time Plaintiffs have sought to amend their Complaint. Plaintiffs have had ample opportunity throughout the past six years to make the amendments they now seek.

In addition to the above reasons which themselves are sufficient to deny Plaintiffs' Motion, the court has considered Plaintiffs' arguments, including the additional

allegations, and claimed evidence, and has found Defendants are entitled to summary judgment because there is no genuine issue of material fact. Because the court considered the additional facts and allegations and found they do not create a genuine issue of material fact, any amendment would be futile. *See Gabrielson v. Montgomery Ward & Co.*, 785 F.2d 762, 766 (9th Cir. 1986). For all of the foregoing reasons, Plaintiffs' Motion for Leave to File Sixth Amended Complaint is Denied.

## IV.   Conclusion

For the reasons stated herein, it is the judgment of this court Defendants' Motions for Summary Judgment must be granted. The court has also determined the Plaintiffs' Motion for Leave to File Sixth Amended Complaint is futile and must be denied.

**IT IS HEREBY ORDERED:**

1.   The Motion for Summary Judgment by Defendant Cushman & Wakefield, Inc. (ECF No. 737) and Motion for Summary Judgment by the Credit Suisse Defendants (ECF No. 741) are **GRANTED** as set forth herein.

2.   The Motion for Leave to File Sixth Amended Complaint (ECF No. 805) is **DENIED**.

3.   All other pending Motions are denied as moot.

4.   The Clerk directed to enter Judgment in favor of Defendants dismissing the Fifth Amended Complaint (ECF No. 644) and the claims therein with prejudice.

**IT IS SO ORDERED.** The Clerk is hereby directed to enter this Order, enter Judgment in favor of Defendants as directed herein, furnish copies to counsel, and close this file.

Dated this 27th day of July, 2016.

s/ Justin L. Quackenbush
JUSTIN L. QUACKENBUSH
SENIOR UNITED STATES DISTRICT JUDGE

ORDER - 45